**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RELATIVITY FASHION, LLC, *et al.*, [1] | Case No. 15-11989 (MEW) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF DR. BRIAN G. KUSHNER PURSUANT TO
RULE 1007-2 OF THE LOCAL BANKRUPTCY RULES FOR
THE SOUTHERN DISTRICT OF NEW YORK IN SUPPORT OF
CHAPTER 11 BANKRUPTCY PETITIONS AND FIRST DAY PLEADINGS**

Dr. Brian G. Kushner, being duly sworn, deposes and states:

1.      I am the Chief Restructuring Officer ("**CRO**") of (i) Relativity Fashion, LLC, a New York limited liability company ("**Relativity Fashion**"),[2] its ultimate parent company, Relativity Holdings LLC ("**Relativity Holdco**"), and their 143 affiliates (collectively, the "**Debtors**") that have filed voluntary petitions (the "**Chapter 11 Petitions**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") commencing these chapter 11 cases (the "**Cases**"), and (ii) the various non-Debtor subsidiaries of Relativity Holdco, both direct and indirect (the "**Non-Debtor Subsidiaries**").  The Debtors and the Non-Debtor Subsidiaries are referred to herein collectively as "**Relativity**" or the "**Relativity Group**."

---

[1] The 145 Debtors in these chapter 11 cases are as set forth on page (i).

[2] Additional information regarding Relativity Fashion and the basis for venue in this District is set forth below.

The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Relativity Fashion, LLC (4571); Relativity Holdings LLC (7052); Relativity Media, LLC (0844); Relativity REAL, LLC (1653); RML Distribution Domestic, LLC (6528); RML Distribution International, LLC (6749); RMLDD Financing, LLC (9114); 21 & Over Productions, LLC (7796); 3 Days to Kill Productions, LLC (5747); A Perfect Getaway P.R., LLC (9252); A Perfect Getaway, LLC (3939); Armored Car Productions, LLC (2750); Best of Me Productions, LLC (1490); Black Or White Films, LLC (6718); Blackbird Productions, LLC (8037); Brant Point Productions, LLC (9994); Brick Mansions Acquisitions, LLC (3910); Brilliant Films, LLC (0448); Brothers Productions, LLC (9930); Brothers Servicing, LLC (5849); Catfish Productions, LLC (7728); Cine Productions, LLC (8359); CinePost, LLC (8440); Cisco Beach Media, LLC (8621); Cliff Road Media, LLC (7065); Den of Thieves Films, LLC (3046); Don Jon Acquisitions, LLC (7951); DR Productions, LLC (7803); Einstein Rentals, LLC (5861); English Breakfast Media, LLC (2240); Furnace Films, LLC (3558); Gotti Acquisitions, LLC (6562); Great Point Productions, LLC (5813); Guido Contini Films, LLC (1031); Hooper Farm Music, LLC (3773); Hooper Farm Publishing, LLC (3762); Hummock Pond Properties, LLC (9862); Hunter Killer La Productions, LLC (1939); Hunter Killer Productions, LLC (3130); In The Hat Productions, LLC (3140); J & J Project, LLC (1832); JGAG Acquisitions, LLC (9221); Left Behind Acquisitions, LLC (1367); Long Pond Media, LLC (7197); Madaket Publishing, LLC (9356); Madaket Road Music, LLC (9352); Madvine RM, LLC (0646); Malavita Productions, LLC (8636); MB Productions, LLC (4477); Merchant of Shanghai Productions, LLC (7002); Miacomet Media LLC (7371); Miracle Shot Productions, LLC (0015); Most Wonderful Time Productions, LLC (0426); Movie Productions, LLC (9860); One Life Acquisitions, LLC (9061); Orange Street Media, LLC (3089); Out Of This World Productions, LLC (2322); Paranoia Acquisitions, LLC (8747); Phantom Acquisitions, LLC (6381); Pocomo Productions, LLC (1069); Relative Motion Music, LLC (8016); Relative Velocity Music, LLC (7169); Relativity Development, LLC (5296); Relativity Film Finance II, LLC (9082); Relativity Film Finance III, LLC (8893); Relativity Film Finance, LLC (2127); Relativity Films, LLC (5464); Relativity Foreign, LLC (8993); Relativity India Holdings, LLC (8921); Relativity Jackson, LLC (6116); Relativity Media Distribution, LLC (0264); Relativity Media Films, LLC (1574); Relativity Music Group, LLC (9540); Relativity Production LLC (7891); Relativity Rogue, LLC (3333); Relativity Senator, LLC (9044); Relativity Sky Land Asia Holdings, LLC (9582); Relativity TV, LLC (0227); Reveler Productions, LLC (2191); RML Acquisitions I, LLC (9406); RML Acquisitions II, LLC (9810); RML Acquisitions III, LLC (9116); RML Acquisitions IV, LLC (4997); RML Acquisitions IX, LLC (4410); RML Acquisitions V, LLC (9532); RML Acquisitions VI, LLC (9640); RML Acquisitions VII, LLC (7747); RML Acquisitions VIII, LLC (7459); RML Acquisitions X, LLC (1009); RML Acquisitions XI, LLC (2651); RML Acquisitions XII, LLC (4226); RML Acquisitions XIII, LLC (9614); RML Acquisitions XIV, LLC (1910); RML Acquisitions XV, LLC (5518); RML Bronze Films, LLC (8636); RML Damascus Films, LLC (6024); RML Desert Films, LLC (4564); RML Documentaries, LLC (7991); RML DR Films, LLC (0022); RML Echo Films, LLC (4656); RML Escobar Films LLC (0123); RML Film Development, LLC (3567); RML Films PR, LLC (1662); RML Hector Films, LLC (6054); RML Hillsong Films, LLC (3539); RML IFWT Films, LLC (1255); RML International Assets, LLC (1910); RML Jackson, LLC (1081); RML Kidnap Films, LLC (2708); RML Lazarus Films, LLC (0107); RML Nina Films, LLC (0495); RML November Films, LLC (9701); RML Oculus Films, LLC (2596); RML Our Father Films, LLC (6485); RML Romeo and Juliet Films, LLC (9509); RML Scripture Films, LLC (7845); RML Solace Films, LLC (5125); RML Somnia Films, LLC (7195); RML Timeless Productions, LLC (1996); RML Turkeys Films, LLC (8898); RML Very Good Girls Films, LLC (3685); RML WIB Films, LLC (0102); Rogue Digital, LLC (5578); Rogue Games, LLC (4812); Roguelife LLC (3442); Safe Haven Productions, LLC (6550); Sanctum Films, LLC (7736); Santa Claus Productions, LLC (7398); Smith Point Productions, LLC (9118); Snow White Productions, LLC (3175); Spy Next Door, LLC (3043); Story Development, LLC (0677); Straight Wharf Productions, LLC (5858); Strangers II, LLC (6152); Stretch Armstrong Productions, LLC (0213); Studio Merchandise, LLC (5738); Summer Forever Productions, LLC (9211); The Crow Productions, LLC (6707); Totally Interns, LLC (9980); Tribes of Palos Verdes Production, LLC (6638); Tuckernuck Music, LLC (8713); Tuckernuck Publishing, LLC (3960); Wright Girls Films, LLC (9639); Yuma, Inc. (1669); Zero Point Enterprises, LLC (9558). The location of the Debtors' corporate headquarters is: 9242 Beverly Blvd., Suite 300, Beverly Hills, CA 90210.

-i-

2.      I am authorized to submit this declaration (this "**Declaration**") on behalf of the Debtors.  This Declaration is made pursuant to Rule 1007-2 of the Local Rules (the "**Local Rules**") for the United States Bankruptcy Court for the Southern District of New York (the "**Court**") in support of the Chapter 11 Petitions and each of the motions and applications for relief filed concurrently therewith (collectively, the "**First Day Pleadings**").  I have reviewed the First Day Pleadings or have otherwise had their contents explained to me and believe that approval of the relief requested therein is necessary to (i) minimize the adverse effects and disruption the filing of the Chapter 11 Petitions may have on the Debtors' business operations, (ii) permit an effective transition into chapter 11, and (iii) preserve and maximize the value of the Debtors' estates with the overall goal of achieving a successful reorganization.

3.      Except as otherwise indicated herein, I have personal knowledge of the matters and issues set forth herein or have gained knowledge of such matters from my review of the relevant documents, or from information provided to me or verified by the Debtors' management, other employees, and/or professional advisors.  If called upon to testify, I would testify competently to the facts set forth herein.

4.      I began serving as CRO of the Relativity Group upon the filing of the Chapter 11 Petition of Relativity Fashion, and immediately prior to that, served as the Chief Consultant ("**CC**") to the Relativity Group beginning on June 15, 2015.  In my capacity as CC to and CRO of Relativity, I have become familiar with the Debtors' businesses, operations and financial affairs.  As part of my duties as CRO, I will be overseeing and advising the Debtors on their day-to-day operations, bankruptcy compliance, budgets, cash flows, financial analysis, asset dispositions, and overall restructuring and reorganization efforts.

5.     In addition to being the CRO of Relativity, I am a senior managing director of FTI

Consulting, Inc., an international financial advisory firm ("**FTI**"), and my business address is FTI's

Dallas offices located at 2001 Ross Avenue, Suite 400, Dallas, Texas 75201.  Over the past 20 years,

I have served as Chairman, Director, Chief Executive Officer ("**CEO**")/Interim CEO, CRO and/or

CC for over a dozen public and private media, telecom, and technology companies.

6.     On July 30, 2015 (the "**Petition Date**") each of the above-captioned 145 Debtors filed

a Chapter 11 Petition.  It is anticipated that the Debtors will continue to manage their affairs and

operate their businesses as debtors and debtors-in-possession pursuant and subject to the

requirements of sections 1107(a) and 1108 of the Bankruptcy Code.

7.     Section I of this Declaration provides an overview of the Debtors' businesses and

operations, the Debtors' capital structure, and the events leading to the filing of the Chapter 11

Petitions.  Section II of this Declaration describes the First Day Pleadings and sets forth the relevant

facts in support of such pleadings.  Finally, Section III sets forth the information required under Rule

1007-2 of the Local Rules.

## I.
## The Debtors' Businesses

8.     Relativity is a privately-held entertainment company with an integrated and

diversified global media platform that provides, among other things, film and television financing,

production and distribution.  Relativity was founded in 2004 by Ryan Kavanaugh as a film slate co-

financier partnering with major studios such as Sony and Universal.  In 2010, Relativity acquired the

marketing and distribution operations of Overture Films, and began to transform itself into a full-

service movie studio.  Since its inception, Relativity has produced, distributed or structured

financing for over 200 feature films, including pictures such as THE FIGHTER, LIMITLESS, SAFE

HAVEN and ACT OF VALOR.  Relativity has further expanded into other forms of content production

and distribution, including branding services, sports management, digital media, music publishing, fashion brand management and consultation, and education. Each of these businesses units is further described below.

9.      Relativity is headquartered at 9242 Beverly Boulevard, Suite 300, Beverly Hills, California 90210, and operates out of multiple other locations in Los Angeles and New York. Relativity leases (and thus does not own) all of the premises out of which it operates under leases and office license agreements. Each lease or license is in the name of one of the following three Debtors: (i) Relativity Media, LLC ("**RML**"), (ii) Relativity REAL, LLC (d/b/a Relativity Television) ("**RTV**"), and (iii) Long Pond Media, LLC. A description of the premises and the relevant agreements is contained in Schedule 7. In addition, in connection with the Debtors' film and television productions, the Debtors own small parcels of real property used for short-term production sites.

10.      As of the Petition Date, the Debtors have approximately 89 full and part-time employees and 54 independent contractors, with almost all of them employed by (i) RML; (ii) Relativity Fashion; or (iii) RTV. RML provides many of the employees to the various business units described below, including the film, branding, digital media, and music groups.

11.      In addition, in connection with the Debtors' film and television productions, there are approximately 760 temporary production personnel (the "**Temporary Production Personnel**") that provide cast and crew services, as well as other production supports, to certain of the Debtors. The aggregate number of Temporary Production Personnel used by the Debtors fluctuates daily based on the schedule and production demands of the specific films or television productions. These Debtors include, without limitation, (i) RML Distribution Domestic, LLC ("**RMLDD**"); (ii) RML Film

Development, LLC; (iii) Relativity Development, LLC; (iv) Relativity Films, LLC; (v) RTV; and (vi) many of the single picture special purpose vehicles ("**SPVs**").

12.     The Temporary Production Personnel are employed and supplied by professional employer organizations ("**PEOs**"), which are payroll processing services and/or staffing agencies (the "**Production Staffing Agencies**").  Currently, the following Production Staffing Agencies are providing support to the Debtors' various productions: Cast & Crew Production Services, LLC; EASE Worldwide Services, LP; CAPS, LLC; Features Processing CA, Inc.; Media Services, LLC; and Sargent Disc Limited.

13.     For the twelve months ending December 31, 2014, Relativity generated approximately $501,074,000 in revenues on a consolidated basis.  As of December 31, 2014, Relativity had assets with a book value of approximately $559,973,000 and liabilities of $1,178,810,000 on a consolidated basis.[3]

## A.     Relativity Group's Corporate Structure

14.     The Relativity Group operates its businesses through separate, but affiliated companies that are generally organized by business lines or units.  Relativity Holdco is the ultimate parent company in the Relativity Group.  Relativity Holdco owns 100% of the equity of RML.

15.     RML is the Relativity Group's main operating company, and is the direct or indirect owner of each of the other companies in the Relativity Group.  A list of all of the Debtors, organized alphabetically and by business unit, is attached hereto as Exhibit A.

---

[3] The amounts are presented on a consolidated basis for the Relativity entities listed on Exhibit B hereto, which includes the Debtors and the Non-Debtor Subsidiaries in the Relativity Group.  Unless otherwise indicated, the financial information contained in this Declaration is unaudited and may be subject to change.

16.     The following chart summarizes Relativity's current corporate structure by business unit rather than legal entity.  More detailed charts of the Relativity Group's corporate structure by legal entity are attached hereto as Exhibit B.



17.    Relativity Holdco's five classes of equity are held by approximately 55 holders.    The following is a general description of the five equity classes:

(i)    <u>Class A Units</u>:  Relativity Holdco currently has 120.75 million Class A Units outstanding.  The Class A Units have voting rights on a 1 vote per unit basis. These units are not subject to any mandatory dividends.  One holder of the Class A Units has a put right, and certain other rights, in the event an IPO or other specified liquidity event does not occur prior to November 26, 2018.

(ii)    <u>Class B Units</u>:  Relativity Holdco currently has 59.95 million Class B Units outstanding.  The Class B Units do not have any voting rights, and are held by members of Relativity's management team, either directly or indirectly through a holding company, as well as by members of the Board of Managers and certain consultants to Relativity.  The Class B Units are profits interests and only have value to the extent Relativity Holdco's valuation per unit exceeds the applicable threshold amount.

(iii)    <u>Class C Preferred Equity</u>:  Relativity Holdco currently has 3.4704 Class C Units outstanding.  The Class C Units do not have any voting rights, and are held by Dune Capital Partners IV LLC ("**Dune Capital**").  The Class C Units accrue dividends at 12.5% paid in kind ("**PIK**"), must be exchanged by Dune Capital into Class E Units or debt no later than December 31, 2015 and are otherwise non-convertible.[4]

(iv)    <u>Class D Units</u>:  Relativity Holdco currently has 1.36 million Class D Units outstanding.  The Class D Units do not have any voting rights, and are held by Tom Forman.  The Class D Units permit Mr. Forman to cause Relativity Holdco, under certain circumstances, to repurchase all or any portion of the Class D Units held by Mr. Forman in approximately 3.5 years for either $6.25 per Class D Unit in a lump sum or $12.50 per Class D Unit paid over time (at Relativity Holdco's election).

(v)    <u>Class E Units</u>:  Relativity Holdco currently has 11.7 million Class E Units outstanding.  The Class E Units have voting rights on a 2 vote per unit basis and accrue dividends at 12.5% PIK.  The Class E Units are convertible into Class A Units at the option of the holders thereof and, in certain circumstances, on a mandatory basis.

---

[4] Historically, the Debtors have treated the Class C Preferred Equity as debt for both financial reporting and income tax purposes, and there is a contractual obligation to a holder of the Class C Preferred Equity to continue treating the units as indebtedness for income tax purposes.  The cumulative preference per Class C Unit through May 30, 2015 is $871,301.83 and the total Class C Unit preference is $8,251,576.87.  The Debtors will be evaluating the proper characterization of the Class C Preferred Equity as equity versus debt in light of the Debtors' chapter 11 cases.

**B.**    **The Debtors' Management and Board of Managers**

18.    The following is an overview of Relativity's key officers and management as of the

Petition Date, each of whom serve in the indicated capacities:

| Name | Position |
|---|---|
| Ryan Kavanaugh | Chief Executive Officer, RML |
| Tucker Tooley | President. RML |
| Carol Genis | Managing Director, RML |
| Happy Walters | Co-President, RML/Chief Executive Officer, Relativity Sports, LLC |
| Andrew Matthews | Chief Financial Officer & Co-Chief Operating Officer, RML |
| Greg Shamo | Co-Chief Operating Officer, RML |
| Ramon Wilson | General Manager, RML |
| David Shane | Chief Communications Officer, Executive Vice President, RML |
| Robbie Brenner | Co-President, Production, RML |
| Matt Alvarez | Co-President, Production/President, Multicultural Division, RML |
| Kyle Davies | President, Worldwide Distribution, Relativity EuropaCorp Distribution, LLC |
| Ken Halsband | President, Physical and Post Production, RML |
| Rachel Cadden | Executive Vice President, Marketing, Relativity EuropaCorp Distribution, LLC |
| Tom Forman | Chief Executive Officer, RTV |
| Andrew Marcus | Chief Operating Officer, RTV |
| Camela Galano | President, Relativity International |
| Bob Bowen | President, Relativity Music |
| Rosalind Lawton | Executive Vice-President, Business and Legal Affairs |
| Tommy Gargotta | President, Theatrical Marketing, Relativity EuropaCorp Distribution, LLC |
| Matt Brodlie | Executive Vice President, Acquisitions, RML |
| Brian G. Kushner | Chief Restructuring Officer |
| Luke Schaeffer | Deputy Chief Restructuring Officer |

19.    Each of the Debtors, other than Relativity Holdco, has a sole member that is the direct

parent of such Debtor, including RML, whose sole member is Relativity Holdco.  Relativity Holdco,

as the ultimate parent, is the only Debtor with a Board of Managers which, as of the Petition Date,

was constituted of the following individuals:

| Name | Board Tenure and Experience |
|---|---|
| Ryan Kavanaugh<br>*Chairman*<br>*Founder and CEO, RML* | Since May 30, 2012.  Mr. Kavanaugh is the Founder and Chief Executive Officer of RML. |

-8-

| Name | Board Tenure and Experience |
|------|------------------------------|
| Tucker Tooley<br>*President, RML* | Since May 30, 2012.  Mr. Tooley is the President of RML |
| Ron Burkle<br>*The Yucaipa Companies, LLC* | Since May 30, 2012.  Mr. Burkle is the co-founder and managing partner of The Yucaipa Companies, LLC. |
| Mark Canton<br>*Producer* | Since December 21, 2012.  Mr. Canton has over 20 years of experience in the entertainment industry. |
| Gurpreet Chandhoke<br>*VII Peaks Capital* | Since May 11, 2015.  Mr. Chandhoke is the Managing Partner and Chief Investment Officer for VII Peaks Capital. |
| Shep Gordon<br>*Music Producer and Talent Manager* | Since August 27, 2013.  Mr. Gordon is a talent manager, film agent and movie producer. |
| Carey Metz<br>*Whiteside Energy, LP* | Since May 26, 2015.  Mr. Metz is the Chief Investment Officer and Managing Partner and Founder of Whiteside Energy, LP. |
| Hugo Shong<br>*IDG Capital Partners, IDG-Accel China Growth Fund and IDG-Accel Capital Fund* | Since May 29, 2013.  Mr. Shong is the founding General Partner of IDG Capital Partners, IDG-Accel China Growth Fund and IDG-Accel Capital Fund.  Mr. Shong is also a partner with Relativity in Sky Land Entertainment. |
| Jim Wiatt | Since May 30, 2012.  Mr. Wiatt is a strategic advisor to AOL. |

## C.      The Debtors' Operations

20.      The Relativity Group's operations are conducted through various subsidiaries and affiliates that are grouped by business units.  Many, but not all, of the subsidiaries and affiliates are Debtors in these Cases.  The Debtors' key business units include (i) film production and distribution; (ii) television production and distribution; (iii) music; (iv) digital; (v) branding; and (vi) fashion. The following are descriptions of each of these business units and the Debtors within them.  This Declaration begins with one of the smaller business units, fashion, as Relativity Fashion  was the first to file its Chapter 11 Petition and is thus the lead captioned Debtor in these Cases.

### (i)      Relativity Fashion

21.      Relativity Fashion (also known by its d/b/a, M3/Relativity), is a New York limited liability company that was organized on October 22, 2013.  It is the lead captioned Debtor in these Cases.  It is a consultancy service company that represents fashion designers and provides services to

other clients in connection with building and launching their brands and expanding them into various forms of media through involvement with other Relativity entities (for example, into television through a partnership with RTV). It is the primary entity in the Debtors' fashion business unit. As of immediately prior to the Petition Date, it had approximately ten employees, with nine working in its offices at 315 Park Avenue South, New York, New York 10010. Certain other Debtors continue to have personnel in the New York office.

22.     With its principal place of business in New York City and being organized and thus domiciled in the State of New York, Relativity Fashion's Chapter 11 Petition was filed in this Court just prior to the filing of the Chapter 11 Petitions of the other Debtors. The other Debtors also filed their Chapter 11 Petitions in this Court because they are affiliates of Relativity Fashion, which by then had its Case already pending in this Court. Accordingly, I have been informed by legal counsel that all of the Debtors were entitled to file their Chapter 11 Petitions in this District and in this Court. The Debtors have requested joint administration of their Cases.

23.     RML provides certain administrative and support services to Relativity Fashion under a Services Agreement, dated as of September 16, 2013. Specifically, RML provides Relativity Fashion with office space, logistics, human resources, payroll, accounting, accounts receivable and payable, legal, and IT services. Relativity Fashion pays a fee to RML for such services. One of the Debtors' primary secured financing facilities (the Cortland TLA/TLB Financing Agreement (defined below)) provides that any Relativity subsidiary that was not in existence on May 30, 2012 is to become obligated under the financing agreement. Relativity Fashion was formed after that date.

24.     RML owns 70% of Relativity Fashion, with the remaining 30% owned by three of the consultants in Relativity Fashion's business. I am informed by legal counsel that the class of units held by RML provide it with virtually all of the material voting rights, while the units held by the

three individuals provide voting rights that are limited to decisions regarding insider transactions between Relativity Fashion and the other entities in the Relativity Group. I understand that the units held by the individuals are largely for the purpose of providing a financial participation in the performance of the company as opposed to controlling the company. RML thus has full control over Relativity Fashion. Relativity Fashion owns 100% of its subsidiary, M3 Fashion Acceleration GP, LLC, which is not a Debtor in these Cases.

25.    Relativity Fashion's assets include contractual rights under license agreements and contracts with fashion talent and designers. For the twelve months ending December 31, 2014, Relativity Fashion generated approximately $572,000 in revenues.

**(ii)    Relativity Film**

26.    The Relativity film business provides a full-service studio with development, production, financing and distribution capabilities (the "**Film Business**"). Since its inception, the Film Business has distributed, produced or arranged financing for over 200 films that have earned over $23 billion in worldwide box office receipts, with 78 films generating more than $100 million in worldwide box office receipts, 49 films opening at number one at the domestic box office, and 73 films earning Oscar nominations with 11 wins.

27.    The Film Business consists of (i) an acquisition division that purchases film rights (the "**Acquisition Division**"); (ii) a single picture division that oversees production of Relativity's films and a group of single picture SPVs that each hold the rights to and produce a particular Relativity film (collectively, the "**Single Picture Division**"); and (iii) a marketing and distribution division that arranges the domestic and international distribution of Relativity's films (the "**Marketing and Distribution Division**"). In addition, Relativity EuropaCorp Distribution, LLC ("**RED**") provides distribution and marketing services to the Debtors. RED is a Non-Debtor Subsidiary and is described more fully below.

-11-

28.     The assets of the Film Business include the master of each of the Debtors' films, the

trademarks and copyrights associated with the films, and the right to distribute the films.  For the

twelve months ending December 31, 2014, the Relativity Film Business generated approximately

$346.3 million in revenues.

29.     The Debtors in the Relativity Film Business are:

**Acquisition Division**

| | | | |
|---|---|---|---|
| RML Acquisitions I, LLC | RML Acquisitions II, LLC | RML Acquisitions III, LLC | RML Acquisitions IV, LLC |
| RML Acquisitions V, LLC | RML Acquisitions VI, LLC | RML Acquisitions VII, LLC | RML Acquisitions VIII, LLC |
| RML Acquisitions IX, LLC | RML Acquisitions X, LLC | RML Acquisitions XI, LLC | RML Acquisitions XII, LLC |
| RML Acquisitions XIII, LLC | RML Acquisitions XIV, LLC | RML Acquisitions XV, LLC | |

**Single Picture Division**

| | | | |
|---|---|---|---|
| 21 & Over Productions, LLC | 3 Days to Kill Productions, LLC | A Perfect Getaway, LLC | A Perfect Getaway P.R., LLC |
| Armored Car Productions, LLC | Best of Me Productions, LLC | Black Or White Films, LLC | Blackbird Productions, LLC |
| Brick Mansions Acquisitions, LLC | Brilliant Films, LLC | Brothers Servicing, LLC | Brothers Productions, LLC |
| Catfish Productions, LLC | CinePost, LLC | Cine Productions, LLC | Den of Thieves Films, LLC |
| Don Jon Acquisitions, LLC | DR Productions, LLC | Furnace Films, LLC | Gotti Acquisitions, LLC |
| Guido Contini Films, LLC | Hunter Killer Productions, LLC | Hunter Killer La Productions, LLC | In The Hat Productions, LLC |
| JGAG Acquisitions, LLC | J&J Project, LLC | Left Behind Acquisitions, LLC | Malavita Productions, LLC |
| Merchant of Shanghai Productions, LLC | MB Productions, LLC | Miracle Shot Productions, LLC | Most Wonderful Time Productions, LLC |

| | | | |
|---|---|---|---|
| Movie Productions, LLC | One Life Acquisitions, LLC | Out Of This World Productions, LLC | Paranoia Acquisitions, LLC |
| Phantom Acquisitions, LLC | Relativity Films, LLC | Relativity Development, LLC | Relativity Film Finance, LLC |
| Relativity Film Finance II, LLC | Relativity Film Finance III, LLC | Relativity Media Distribution, LLC | Relativity Media Films, LLC |
| Reveler Productions, LLC | RML Bronze Films, LLC | RML Damascus Films, LLC | RML Desert Films, LLC |
| RML Documentaries, LLC | RML DR Films, LLC | RML Echo Films, LLC | RML Escobar Films LLC |
| RML Film Development, LLC | RML Hector Films, LLC | RML Hillsong Films, LLC | RML IFWT Films, LLC |
| RML Kidnap Films, LLC | RML Lazarus Films, LLC | RML Nina Films, LLC | RML November Films, LLC |
| RML Oculus Films, LLC | RML Our Father Films, LLC | RML Romeo and Juliet Films, LLC | RML Scripture Films, LLC |
| RML Solace Films, LLC | RML Somnia Films, LLC | RML Timeless Productions, LLC | RML Turkeys Films, LLC |
| RML Very Good Girls Films, LLC | RML WIB Films, LLC | Safe Haven Productions, LLC | Sanctum Films, LLC |
| Santa Claus Productions, LLC | Snow White Productions, LLC | Spy Next Door, LLC | Story Development, LLC |
| Strangers II, LLC | Stretch Armstrong Productions, LLC | Studio Merchandise, LLC | Summer Forever Productions, LLC |
| The Crow Productions, LLC | Totally Interns, LLC | Tribes of Palos Verdes Production, LLC | Wright Girls Films, LLC |
| Yuma, Inc. | | | |

**Marketing and Distribution Division**

| Relativity Foreign, LLC | Relativity India Holdings, LLC | Relativity Production LLC | Relativity Senator, LLC |
|---|---|---|---|
| Relativity Sky Land Asia Holdings, LLC | RMLDD Financing, LLC | RML Distribution Domestic, LLC | RML Distribution International, LLC |
| RML Films PR, LLC | RML International Assets, LLC | | |

     **(iii)**     **Relativity Television**

30.     The Relativity television business (the "**TV Business**") started as a television production company in 2008 and now includes over 29 series in production and more than 46 contracted pilots and presentations, including eight upcoming scripted shows.  Examples of these series include: *Catfish: The TV Show* (MTV), *The Great Food Truck Race* (Food Network), *Kim of Queens* (Lifetime Network), *Young & Hungry* (ABC Family), as well as the upcoming *Limitless* on CBS.

31.     The Debtors in the TV Business have contractual rights with each of the networks for the production of various shows and series.  Certain Debtors in the TV Business also own real property associated with the production of such shows and series.  As of immediately prior to the Petition Date, the TV Business had approximately 24 full- and part-time employees, and continues to have approximately 510 Temporary Production Personnel.  For the twelve months ending December 31, 2014, the Relativity TV Business generated approximately $96.6 million in revenues.

32.     All of the entities in the TV Business are Debtors.  RTV and Relativity REAL LLC are the two lead companies in the Relativity TV Business, with the following entities their subsidiaries:

| Brant Point Productions, LLC | Cisco Beach Media, LLC | Cliff Road Media, LLC | Einstein Rentals, LLC |
|---|---|---|---|

| | | | |
|---|---|---|---|
| English Breakfast Media, LLC | Great Point Productions, LLC | Hooper Farm Music, LLC | Hooper Farm Publishing, LLC |
| Hummock Pond Properties, LLC | Long Pond Media, LLC | Madaket Publishing, LLC (f/k/a Broad Street Publishing, LLC) | Madaket Road Music, LLC (f/k/a Broad Street Music, LLC) |
| Miacomet Media LLC | Orange Street Media, LLC | Pocomo Productions, LLC | Smith Point Productions, LLC |
| Straight Wharf Productions, LLC | Tuckernuck Music, LLC | Tuckernuck Publishing, LLC | Zero Point Enterprises, LLC |

### (iv)    Relativity Music

33.    The Relativity music business (the "**Music Business**") was founded in 2009 to provide in-house music supervision and soundtrack services for films produced and/or financed by Relativity and for other film studios, and to release the soundtracks internationally.

34.    Accordingly, the entities in the Music Business have distribution rights with respect to the soundtracks produced by the Music Business, as well as the copyrights associated thereto.  For the twelve months ending December 31, 2014, the Relativity Music Business generated approximately $1.5 million in revenues.

35.    The Debtors in the Music Business are:

| | | |
|---|---|---|
| Relativity Music Group, LLC | Relative Motion Music, LLC | Relative Velocity Music, LLC |

36.    Select Music LLC, which is also part of Relativity's Music Business, is not a Debtor in these Cases.  Select Music LLC is owned 45% by RML, with the remaining 55% being owned by various unrelated investors.

### (v)    Relativity Digital

37.    Relativity's digital business unit (the "**Digital Business**") develops, produces and distributes original content and other promotional material for digital distribution.  The Digital Business' in-house production and graphics team produces, directs, and edits television-quality

programming and creates high-end special effects.  The Digital Business also develops branded entertainment campaigns that connect brand partners with other Relativity businesses, such as the Fashion Business, Music Business and TV Business.

38.    The entities in the Digital Business own and manage websites and website content, and their assets include the intellectual property related to digital shorts and the equipment necessary to produce such content.  For the twelve months ending December 31, 2014, the Relativity Digital Business generated approximately $242,000 in revenues.

39.    The Debtors in the Relativity Digital Business are:

| Relativity Jackson, LLC | Relativity Rogue, LLC | RML Jackson, LLC | Rogue Digital, LLC |
|---|---|---|---|
| Rogue Games, LLC | Roguelife LLC d/b/a Relativity Digital | | |

**(vi)    Relativity Branding**

40.    Madvine RM, LLC ("**Madvine**") is Relativity's branded entertainment and consumer products company.  Madvine creates and offers full product and brand integration for companies, major brands, and other strategic partners outside of the Relativity Group.  Madvine works with both established and emerging brand partners.  Its work for established brands is paid for in cash, and its work for emerging brands is compensated through equity participations in the brandholder.

41.    Madvine's assets include contractual rights under license agreements with various product brands.  For the twelve months ending December 31, 2014, Madvine generated approximately $2.2 million in revenues.

**D.    Non-Debtor Subsidiaries**

42.    As noted above, not all of entities in the Relativity Group filed Chapter 11 Petitions and thus are Non-Debtor Subsidiaries in these Cases.  The decisions regarding which entities would file and which ones would not were based upon a variety of factors including, without limitation,

-16-

whether the entities are (i) wholly-owned or otherwise controlled by RML, either directly or indirectly; (ii) obligors on the financing facilities of RML and/or the other Debtors; and (iii) whether there were other debt or special reasons that would require the protections of the automatic stay and the chapter 11 process.  As a general rule, entities in which RML holds only a partial or non-controlling interest, that were not obligors on the Relativity Group credit facilities, and/or that had had debt loads that were manageable by the specific entities on a standalone basis, remained Non-Debtor Subsidiaries.  There are approximately 50 Non-Debtor Subsidiaries.  The following are general descriptions of the Non-Debtor Subsidiaries and their business units.

### (i)      Joint Ventures

43.      Certain entities that are in the Film Business, the Digital Business and the Music Business are only partially owned by RML.  They are all Non-Debtor Subsidiaries and are thus not in bankruptcy.  This includes RED, which is a domestic distribution and marketing joint venture formed by RML and an unrelated company named EuropaCorp Films USA, Inc. ("**EuropaCorp.**") RED was created to support each party's domestic distribution for their respective film slates, and it provides marketing and distribution services to both entities.  RED has approximately 56 employees.

44.      In addition, RML is a minority owner of several other joint ventures that fall outside the business units described above.  None of these joint ventures are Debtors in these Cases.

### (ii)     Relativity Sports

45.      None of the Relativity Group subsidiaries involved in the sports business (the "**Relativity Sports Group**") are in bankruptcy and are, therefore, Non-Debtor Subsidiaries in these Cases.  These entities include Relativity Sports Management, LLC ("**Sports Management**"), Relativity Sports, LLC ("**Sports LLC**"), Relativity Sports Enterprises, LLC ("**Sports Enterprises**"), and together with Sports LLC, "**Sports Holdings**"), and their subsidiaries.

-17-

46.     On July 28, 2015, YC Athletic Holdings, LLC exercised warrants to purchase 50% of the equity in Sports Management, and RML thus owns 50% of Sports Management.  Sports Management, in turn, owns 59.71% of Sports LLC, with the remaining 40.29% of Sports LLC owned by certain individuals and other entities.  Sports LLC owns each of Sports Enterprises and Relativity NEXT, LLC, with Sports Enterprises owning each of the other Relativity Sports Group entities.

47.     The Relativity Sports Group represents and manages over 300 professional athletes in Major League Baseball, the National Basketball Association and the National Football League. Relativity Sports Group currently has 77 employees, including over 20 agents and representatives across the country, and provides career management for multiple players.

48.     RML provides certain overhead and support services to Sports Holdings under a Services Agreement, dated as of August 14, 2012, as modified by a letter agreement dated as of July 31, 2014.   Specifically, RML provides Sports Holdings with office space, logistics, human resources, payroll, accounting, accounts receivable and payable, legal, and IT services.  Sports Holdings pays a fee to RML for such services.

**(iii)     Relativity Education**

49.     None of the Relativity Group subsidiaries involved in its education division are in bankruptcy and are, therefore, Non-Debtor Subsidiaries in these Cases.  These entities include Relativity Education, LLC ("**Relativity Education**") and its direct and indirect subsidiaries (collectively, "**Relativity University**").  Relativity Education is 36% owned by RML, with the remaining 64% owned by a number of entities outside of the Relativity Group.

50.     Relativity University is a for-profit accredited branch campus of Hussian School of Art.  It offers an array of film, media, performing arts, and graphic arts Bachelor of Fine Arts programs.  The programs include curricula developed in collaboration with industry insiders, with

classes taught by working professionals operating from an active Hollywood production studio. Relativity owns a minority stake in the Relativity University subsidiaries.

51.    RML provides human resource services to Relativity Education under a Services Agreement, dated March 26, 2013, and can from time to time provide other services.  Relativity Education pays a fee to RML for such services.

**E.    Prepetition Indebtedness and Capital Structure**

52.    The following is a summary of the Debtors' pre-petition secured indebtedness (all terms as defined below), with further description of each debt and the terms thereof provided below:

| Debt | Amount Outstanding |
|------|--------------------|
| Cortland TLA/TLB Facility | $361,611,038 plus accrued interest |
| Manchester Credit Facility | $137,078,557 plus accrued interest |
| P&A Facility | $116,292,818 plus accrued interest |
| Production Loans | $37,810,909 plus accrued interest |
| Ultimates Facility | $27,789,945 plus accrued interest |

**(i)    RML Level Debt**

**(a)    Cortland Term Loan A/Term Loan B Financing Facility**

53.    On May 30, 2012, RML and certain of its subsidiaries (the "**Cortland Borrowers**") entered into a Financing Agreement with a variety of lenders that are parties to the agreement (the "**Cortland Lenders**"), Cortland Capital Market Services LLC ("**Cortland**"), as collateral and administrative agent, and CB Agency Services, LLC ("**CBA**"), as origination agent (collectively with all the related loan and other documents identified therein, the "**Cortland TLA/TLB Financing Agreement**").

54.     The financing extended under the Cortland TLA/TLB Financing Agreement was divided into two tranches:  (i) a tranche A term loan in the aggregate principal amount of $125,000,000 (the "**Cortland Term Loan A**"); and (ii) a tranche B term loan in the aggregate initial principal amount of $125,000,000 (the "**Cortland Term Loan B**", and together with the Cortland Term A Loan, the "**Cortland TLA/TLB Facility**").  Prior to an Event of Default, the Cortland Term Loan A bore interest at 10% per annum, payable quarterly in cash, while the Cortland Term Loan B bore PIK interest at 15% per annum.  Following an Event of Default, the Cortland Term Loan A bears interest at 12% per annum, payable quarterly in cash, while the Cortland Term Loan B bears PIK interest at 17% per annum.  The Cortland TLA/TLB Facility is secured by substantially all of the assets of the Cortland Borrowers.   Under the Cortland TLA/TLB Financing Agreement, Relativity Holdco (together with the Cortland Borrowers, the "**Cortland Obligors**") guaranteed the obligations of the Cortland Borrowers under the Cortland TLA/TLB Financing Agreement, and has pledged 100% of its equity interest in RML.

55.     Under the Cortland TLA/TLB Financing Agreement, prior to the occurrence of an Event of Default, payments of principal are distributed ratably to all of the Cortland Lenders.  After the occurrence and during the continuance of an Event of Default, Cortland may (and at the direction of certain of the Cortland Lenders shall) apply the proceeds of the collateral in an order that repays interest and principal on the Cortland Term Loan A in full before repaying any of the interest or principal on the Cortland Term Loan B.

56.     The Cortland TLA/TLB Facility matured on June 1, 2015 (the "**Cortland Maturity Date**").  As of the Petition Date, approximately $145,834,693 was outstanding under the Cortland Term Loan A and approximately $215,776,345 was outstanding under the Cortland Term Loan B, for a total of approximately $361,611,038 plus accrued interest outstanding under the Cortland

TLA/TLB Facility. As more fully described in the section below regarding the events that have led to the filing of the Chapter 11 Petitions, the lenders in the Cortland Term Loan A (the "**Term Loan A Lenders**") have traded their debt and it is currently held by lenders in the Cortland Term Loan B (the "**Term Loan B Lenders**").

<p style="text-align:center;">(b)    <em><strong>Manchester Credit Facility</strong></em></p>

57.    On May 30, 2012, RML and each of the other Cortland Borrowers (the "**Manchester Borrowers**") entered into an additional credit facility with Manchester Securities Corporation (the "**Manchester**") under the Second Amended and Restated Credit Agreement, as amended by Amendment No. 1 thereto, dated September 30, 2014 (collectively with all the related loan and other documents identified therein, the "**Manchester Credit Facility**"). As of the Petition Date, approximately $137,078,557 plus accrued interest was outstanding under the Manchester Credit Facility.

58.    The obligations under the Manchester Credit Facility bear PIK interest at 7.5% per annum, and mature on May 30, 2016. The Manchester Credit Facility is subordinated to the Cortland TLA/TLB Facility and is secured by substantially all of the assets of the Manchester Borrowers (as the same collateral securing the repayment of the Cortland TLA/TLB Facility). Relativity Holdco (together with the Manchester Borrowers, the "**Manchester Obligors**") guaranteed the obligations of the Manchester Borrowers under the Manchester Credit Facility.

**(ii)    Debt at the Subsidiary Level**

59.    As part of the Film Business, many of the Debtors enter into various agreements to finance the production and distribution of films. Films that are in pre-production are not financed, and the cost of that is largely paid with operating cash flow. Once in production, the films generally go through three distinct stages of secured financing that correspond to the phase of production, completion or distribution that the film is in at the time. The three stages are: production loans,

prints and advertising ("**P&A**") financing and ultimates financing, all as described below.  After

entering the secured financing process, and at the completion of each phase of the film's evolution,

the film collateral moves from the prior financing facility to the next.

(a)    *Production Loans*

60.    Relativity finances the production of its films through a combination of equity (i.e.,

RML contributing funds to the production entity as equity) and individual production loans (the

"**Production Loans**") that are secured by the respective films and their related assets, including, tax

credits and/or rebates, international sales estimates and international receivables.  The Production

Loans are non-recourse to RML.

61.    As of the Petition Date, the following are the only two outstanding Production Loans:

(i)    On August 5, 2014, Armored Car Productions, LLC (a Debtor), as borrower
("**ACP**"), entered into an Amended and Restated Loan and Security
Agreement with OneWest Bank N.A., as agent, and Surefire Entertainment
Capital, LLC, as lender (the "**A&R Armored Car LSA**"), for loans up to
$24,090,353 (inclusive of fees and the Interest and Fee Reserve (as defined in
the A&R Armored Car LSA)) for the purpose of acquiring, producing,
completing and delivering a motion picture not yet released, and the payment
of related financing costs (the "**Armored Car Loan**").[5]  A portion of the
Armored Car Loan was syndicated to City National Bank.  The Armored Car
Loan matures on May 31, 2016, bears interest at a rate of the Prime Rate plus
3.875% or LIBOR plus 5.875%, and is secured by all of the assets of ACP,
excluding the Excluded Collateral (as defined in the A&R Armored Car LSA.
As of the Petition Date, approximately $21,576,218 plus accrued interest was
outstanding under the Armored Car Loan.

(ii)    On September 5, 2014, DR Productions, LLC (a Debtor), as borrower
("**DRP**"), entered into a Loan and Security Agreement with OneWest Bank
N.A., as agent and lender (the "**DR LSA**"), for loans up to $14,688,456
(inclusive of fees and the Interest and Fee Reserve (as defined in the DR
LSA)) for the purpose of acquiring, producing, completing and delivering a
motion picture not yet released, and the payment of related financing costs
(the "**DR Loan**").  The DR Loan matures on July 29, 2016, bears interest at a
rate of the Prime Rate plus 1.00% or LIBOR plus 3.00%, and is secured by

---

[5] The A&R Armored Car LSA amends and restates in its entirety that certain Loan and Security Agreement, dated as of
July 9, 2014, by and among the Borrower, the Agent and OneWest Bank N.A.

all of the assets of DRP, excluding the Excluded Collateral (as defined in the DR LSA. As of the Petition Date, approximately $12,272,477 plus accrued interest was outstanding under the DR Loan.

62.    In addition, in connection with the production of the films 3:10 TO YUMA and THE FORBIDDEN KINGDOM, Debtors Yuma, Inc. and J & J Project, LLC (the "**Vine/Verite Borrowers**") entered into certain loan and security agreements with Verite Capital Onshore Loan Fund LLC, which were subsequently transferred Vine Film Finance Fund II LP (collectively, the "**Vine/Verite Loans**"). Each of the Vine/Verite Loans bear interest at LIBOR plus 5.00%, are collateralized by the assets of the respective films, and are otherwise non-recourse to the Vine/Verite Borrowers. The Vine/Verite Loans have matured and are in default. As of the Petition Date, $3,962,215 was outstanding under the Vine/Verite Loans.

### (b)    *The P&A Facility*

63.    The Debtors also finance their P&A budgets. P&A comes into play as film production finishes and the film moves into post-production. During this phase, editing occurs, special effects and music are added, trailers are created, the release of the film is advertised, and then it moves on to distribution.

64.    On June 30, 2014, certain of RML's subsidiaries (the "**P&A Borrowers**"),[6] together with RMLDD and RMLDD Financing, LLC ("**RMLDD Financing**"), as accommodation pledgors, entered into their current P&A financing facility, the Second Amended and Restated Funding Agreement with Macquarie US Trading LLC LLC ("**Macquarie**"), as Agent for the Lenders, Macquarie Bank Limited, as Post-Release Lender, and RKA Film Financing, LLC, as Pre-Release Lender and Pre-Release Lender Agent (as all such terms are defined therein) (collectively, the "**P&A**

---

[6] The P&A Borrowers are (1) 3 Days to Kill Productions, LLC; (2) Best of Me Productions, LLC; (3) Blackbird Productions, LLC; (4) Brick Mansions Acquisitions, LLC; (5) Furnace Films, LLC; (6) RML Echo Films, LLC; (7) RML Oculus Films, LLC; (8) RML November Films, LLC; and (9) RML Somnia Films, LLC, all of which are Debtors.

Lenders")[7], as amended by the First Amendment, dated August 26, 2014 (collectively with all the related loan and other documents identified therein, the "**P&A Funding Agreement**").  The loans under the P&A Funding Agreement are divided into two types:  (i) specific loans each made in connection with an individual film prior to its theatrical release that bear interest at 5.5% per annum for the first 12 months and 11.5% thereafter (the "**Pre-Release P&A Loans**"); and (ii) specific loans each made in connection with an individual film in the calendar week following the theatrical release of a film that bear interest at 6.9% per annum for the first 12 months and 9.9% per annum thereafter (the "**Post-Release P&A Loans**," and together with the Pre-Release P&A Loans, the "**P&A Facility**").  In addition, each loan under the P&A Facility is subject to an original issue discount of 6.5% for the Pre-Release P&A Loans and 3% for Post-Release P&A Loans.

65.     Each Pre-Release P&A Loan matures the earlier of December 31, 2015 or 18 months after its respective funding date.  Each Post-Release P&A Loan matures 18 months after its respective funding date.  The P&A Facility is secured by the assets of the film-specific entities, including the domestic distribution agreements for the films financed under the P&A Facility, the intellectual property, picture rights, and the receipts from such films.  The P&A Facility is non-recourse to RML.  RMLDD and RMLDD Financing guaranteed the obligations of the P&A Borrowers under the P&A Facility.

66.     As of the Petition Date, approximately $83,868,538 plus accrued interest was outstanding under the Pre-Release P&A Loans and $32,424,280 plus accrued interest was outstanding under the Post-Release P&A Loans.

---

[7] Claren Road Credit Master Fund Ltd., an original lender under the P&A Funding Agreement, is no longer a party thereto.

(c)    *Ultimates Loan*

67.    Following a film's theatrical release, the value of the future cash flows for the film in all media (*e.g.*, theatrical, DVD, digital and television), referred to as the "**Ultimates**", serves as collateral for a loan facility to fund a studio's operations.  The amount available under an Ultimates loan facility is determined by the "borrowing base," which is a formula-based calculation based on the portion of an Ultimate's cash flow that has not yet been collected (called the "to come" portion). Here, Relativity's Ultimates value is calculated by Relativity itself or the producer and distributor of the film or a major studio (if other than Relativity), and is then reviewed and validated by a third-party valuation firm on behalf of the Ultimates lenders.

68.    On September 25, 2012, RMLDD Financing, which is one of the Debtors, entered into a Credit, Security, Guaranty and Pledge Agreement with OneWest Bank N.A., as Administrative Agent, Issuing Bank, Joint Lead Arranger and Joint Bookrunner (as such terms are defined therein) ("**OneWest**"), as amended from time to time, by those certain and various amendments thereto, including and through Amendment No. 17, dated April 29, 2015 (collectively with all the related loan and other documents identified therein, the "**Ultimates Credit Agreement**").  Following the closing date of September 25, 2012, the Ultimates facility was syndicated to Barclays Bank PLC, City National Bank, Comerica Bank, First Republic Bank, Bank Hapoalim B.M. and Wilshire Bank (collectively, with OneWest, the "**Ultimates Lenders**").

69.    The Ultimates Credit Agreement provides RMLDD Financing with a senior secured revolving credit facility for up to $202.5 million (the "**Ultimates Facility**").  The obligations under the Ultimates Facility incur interest at LIBOR plus 3.75% with a LIBOR floor of 0.50% or the Alternate Base Rate (as defined in the Ultimates Credit Agreement) plus 2.75%, as well as commitment, unused and collateral and administrative fees, which are calculated and payable

quarterly. The obligations of RMLDD Financing under the Ultimates Facility are guaranteed by certain of the Debtors (the "**Ultimates Guarantors**").[8]

70.     The Ultimates Facility matured on May 30, 2015, and is secured by the right, title, and interest in all personal property, and tangible and intangible property of debtor RMLDD Financing and the Ultimates Guarantors. This covers all property wherever located, currently owned presently or later created or acquired, and should include but not be limited to, all goods, accounts, instruments, inter-company obligations, contract rights, partnership and joint venture interests, documents, chattel paper, general intangibles, goodwill, equipment, machinery, inventory, investment property, copyrights, trademarks, trade names, and insurance policies.

71.     On July 17, 2015, OneWest swept the balances contained in (a) a bank account at OneWest that serves as the operating account for RMLDD Financing, which maintained a balance of approximately $1,700, and (b) a bank account at OneWest in RMLDD Financing's name that is used to pay participations and residuals to the producers, performers, writers and other individuals or entities entitled to compensation for the exhibition of the content developed, produced, and/or distributed by the Debtors and the Non-Debtor Subsidiaries (all as further explained in Part II below), which maintained a balance of approximately $17.9 million. The sweeps completely depleted the balances of those accounts and, on information and belief, the funds were applied to the outstanding balance of the Ultimates Facility. As a result, as of the Petition Date, approximately $27,789,945 plus accrued interest was outstanding under the Ultimates facility.

---

[8] The Ultimates Guarantors are RML Distribution Domestic, LLC, RML Distribution International, LLC, RML Acquisition I, LLC, RML Acquisition II, LLC, RML Acquisition III, LLC, RML Acquisition IV, LLC, RML Acquisition V, LLC, RML Acquisition VI, LLC, RML Acquisition IX, LLC, RML Acquisition XI, LLC, Movie Productions, LLC, Safe Haven Productions, LLC, 21 And Over Productions, LLC, Snow White Productions, LLC, Malavita Productions, LLC, Don Jon Acquisitions, LLC, Paranoia Acquisitions, LLC, RML Turkeys Films, LLC, Furnace Films, LLC, 3 Days to Kill Productions, LLC, RML Oculus Films, LLC, Brick Mansions Acquisitions, LLC, RML November Films, LLC, RML Echo Films, LLC, RML Hector Films, LLC, Best of Me Productions, LLC, RML Solace Films, LLC, Blackbird Productions, LLC, RML Lazarus Films, LLC, RML WIB Films, LLC and Black Or White Films, LLC, all of which are Debtors in these Cases.

(iii)    **Intercreditor Agreements**

72.    The relationship among the Debtor's lenders are governed by the following intercreditor and subordination agreements:

(i)    Pursuant to the Amended and Restated Subordination Agreement, dated as of December 21, 2012, between Manchester and Manchester Library Company LLC ("**Manchester Library**"), Relativity Holdco, RML, each of the Cortland Borrowers, Cortland, CBA (as agent for a now fully repaid P&A facility), and Macquarie, the security interests and payment rights of the Manchester Credit Facility are subordinated to the Cortland TLA/TLB Facility and the P&A Facility.

(ii)    Pursuant to the Third Amended and Restated Intercreditor and Subordination Agreement, dated as of June 30, 2014, between Macquarie and Cortland, the security interests and certain payment rights of the Cortland TLA/TLB Facility are subordinated to the P&A Facility.

(iii)    Pursuant to the Subordination and Intercreditor Agreement, dated as of September 25, 2012, among OneWest, Cortland, Manchester and Manchester Library, the security interests and certain payment rights of the Cortland TLA/TLB Facility and the Manchester Credit Facility are subordinated to the Ultimates Facility.

73.    In addition, various films are subject to individual-film intercreditor agreements among agents or lenders for some or all of the Cortland TLA/TLB Facility, the Manchester Credit Facility, the Ultimates Facility, the P&A Facility and the production loan for such films, among other parties.

(iv)    **Unsecured Trade Debt**

74.    The Debtors' unsecured trade creditors include vendors providing services to the Relativity Group for print and advertising services, production-related services and products, and other services necessary to run a business on a day to day basis. According to the Debtors' books and records, as of the Petition Date, there is approximately $89.9 million in unsecured trade vendor debt.

(v)     **Unsecured RED Loan**

75.     Pursuant to a series of agreements, RML and EuropaCorp. formed RED as a joint venture to support each joint venture partner's domestic distribution and marketing needs.  As part of the formation of RED, RED made an unsecured loan to RML (the "**RED Loan**"), which RML repays through amortization payments equal to 50% of the quarterly overhead of RED.  If RML Fails to make the amortization payments, it becomes obligated to make capital contributions in an amount equal to the corresponding amortization payment.  However, as the sole holder of Class B membership interests in RED, RML is also the sole beneficiary of the amounts repaid with respect to the loan and has the unilateral right to forgive the balance of the loan at any time.  As of the Petition Date, $70,550,262 was outstanding under the RED Loan.

**F.     Events Leading to Debtors' Chapter 11 Filing**

76.     Prior to the Cortland Maturity Date, Relativity sought to raise additional funds for its operations and to service existing debt.  These efforts resulted in the issuance of 5,000,000 Class E Units in Relativity Holdco, in exchange for $62,500,000 gross cash proceeds, to entities affiliated with an individual investor and VII Peaks on or about May 11, 2015.  Simultaneously with the issuance of such equity interests, and at various times subsequent thereto, holders of the aggregate amount of 96.5296 Class C Units exchanged such Class C Units for an aggregate of 6,695,648 Class E Units pursuant to exchange agreements entered into concurrent with the Class E Unit issuance on May 11, 2015.

77.     On the Cortland Maturity Date, over $320 million in debt became due and payable.  Notwithstanding the previous equity issuances, Relativity was unable to make payment on the Cortland TLA/TLB Facility.  Accordingly, on June 1, 2015, Relativity entered into a Forbearance Agreement with a majority of Term Loan A Lenders and a majority of Term Loan B Lenders (the "**TLA/TLB Forbearance Agreement**").  On the same day, Relativity executed a Forbearance

Agreement with the Ultimates Lenders under the Ultimates Facility (the "**Ultimates Forbearance Agreement**"), and thereafter, on June 5, 2015, the Debtors entered into a Forbearance Agreement with the P&A Lenders under the P&A Facility (the "**P&A Forbearance Agreement**," and collectively with the TLA/TLB Forbearance Agreement and the Ultimates Forbearance Agreement, the "**Forbearance Agreements**").  On June 25, 2015, the Forbearance Agreements expired in accordance with their terms.

78.    In early July 2015, Catalyst Capital Group, a Toronto-based hedge fund ("**Catalyst**") purchased the outstanding Cortland Term Loan A debt, and became the sole lender under the Cortland Term Loan A.  Anchorage Capital Master Offshore, Ltd. and Luxor Capital LLC, as lenders under the Cortland Term Loan B (the "**Purchasing TLB Lenders**"), promptly provided notice of their intent to exercise their right under Section 10.17 of the Cortland TLA/TLB Financing Agreement to purchase the outstanding debt under the Cortland Term Loan A.  On July 9, 2015, the Purchasing TLB Lenders, along with Catalyst (also a lender under the Cortland Term Loan B) purchased all of the Cortland Term Loan A debt.

79.    On July 16, 2015, the Cortland Borrowers and the Cortland Lenders entered into Amendment No. 1 to the Cortland TLA/TLB Financing Agreement, pursuant to which certain of the Cortland Lenders funded $15 million of additional Term Loans (as defined therein), denominated as "**Term A-1 Loans**," of which $7.5 million was funded on July 16, 2015, and $7.5 million was funded on July 20, 2015, all with a maturity date of July 27, 2015.  Interest on the Term A-1 Loans is payable in cash at a rate of 15% per annum.  On July 27, 2015, the Term A-1 Loans matured.

80.    The Debtors experienced severe liquidity constraints and increasing limitations imposed by the Forbearance Agreements and the new debt issuances.  With over $350 million in outstanding matured secured debt and unable to finalize any further financing, the Debtors

-29-

determined it was in their best interests to file for bankruptcy protection.  A more detailed description of the events leading to the chapter 11 Cases is found in the *Declaration of Timothy R. Coleman in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing and (B) Use Cash Collateral; (II) Granting the Prepetition Lenders Adequate Protection; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief*, filed concurrently herewith (the "**Coleman Declaration**").

## II.
## First Day Pleadings

81.      Contemporaneously herewith, the Debtors have filed a number of First Day Pleadings.  I believe that, among other things, the relief requested in the First Day Pleadings is necessary to enable the Debtors to operate with minimal disruption during the pendency of these Cases and to maintain value as a going concern, as well as support the efficient and economical administration of these Cases.  A description of the relief requested and the facts supporting each of the First Day Pleadings is set forth below.

**A.      Administrative Motions**

**(i)      Debtors' Motion for an Order Authorizing the Joint Administration of Their Related Chapter 11 Cases (the "Joint Administration Motion")**

82.      As stated above, there are 145 Relativity entities that filed Chapter 11 Petitions on the Petition Date, many of which are part of the same business groups under RML and/or are otherwise related.  The Debtors estimate that, among the 145 Debtor entities, there are more than 1,000 creditors and other parties-in-interest in these Cases, whose interests may not be limited to interests in any one particular Debtor.  Many of the motions, hearings, and orders that will be filed in the chapter 11 Cases will almost certainly affect most, if not all, of the Debtors.  I believe that the separate administration of the Debtors' cases will result in substantial duplication of pleadings and

prosecution of matters, which translates into significant cost, inefficiency and, potentially, confusion among parties-in-interest.

83.     Accordingly, in the Joint Administration Motion, the Debtors request entry of an order authorizing the joint administration of their chapter 11 Cases for procedural purposes only. Specifically, the Debtors request that the Court maintain one file and one docket for all of the chapter 11 Cases under the case number and name of Relativity Fashion, such that the chapter 11 Cases be administered under one consolidated caption and that an entry be made on the docket of each of the Debtors' chapter 11 Cases, other than Relativity Fashion, to indicate the joint administration of the chapter 11 Cases thereunder.  The Debtors also seek authority to file the monthly operating reports required by the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees, issued by the Office of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") on a consolidated basis.

84.     Given the foregoing, I believe that an order directing joint administration of the chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections, and will allow the U.S. Trustee and all parties in interest to monitor the chapter 11 cases with greater ease and efficiency, which will inure to the benefit of all interested parties, and will not harm the substantive rights of any party-in-interest.

**(ii)     Debtors' Motion for the Entry of an Order (I) Authorizing the Debtors to (A) Prepare a List of Creditors in Lieu of Submitting a Formatted Mailing Matrix, (B) File a Consolidated List of the Debtors' 50 Largest Unsecured Creditors, and (C) Mail Initial Notices, and (II) Approving the Form and Manner of Notifying Creditors of the Commencement of the Debtors' Chapter 11 Cases  (the "<u>Creditor Matrix Motion</u>")**

85.     As described below, the Debtors are not in a position to file their Schedules and Statements as (defined below) on the Petition Date and, I have been informed by legal counsel, without further relief, they would be required to each file a list of creditors and their addresses.

86.     In the Creditor Matrix Motion, the Debtors seek entry of an order (a) authorizing the Debtors to prepare a consolidated list of creditors in lieu of submitting any required mailing matrix, (b) authorizing the Debtors to file a consolidated list of the Debtors' 50 largest unsecured creditors (the "**Top 50 Creditors List**"), (c) authorizing the Debtors to mail initial notices through their proposed claims and noticing agent, Donlin Recano & Company, Inc. ("**Donlin Recano**" or the "**Claims and Noticing Agent**"), (d) waiving the requirement that each Debtor file a list of creditors on the Petition Date, and (e) approving the form and manner of notifying creditors of commencement of the Debtors' chapter 11 cases (the "**Notice of Commencement**").

87.     The Debtors have worked with the Claims and Noticing Agent to prepare a single, consolidated list of the Debtors' creditors in electronic format, which the Debtors are prepared to make available in electronic form to any party-in-interest who requests it.  I believe that preparing a consolidated list of creditors in lieu of individual creditor matrices will permit the Claims and Noticing Agent to promptly provide notice to all applicable parties, maximize efficiency and accuracy, and reduce costs.  In addition, converting the Debtors' computerized information to a format compatible with the matrix requirements would be a burdensome task and would greatly increase the risk and recurrence of error with respect to information already intact on computer systems maintained by the Debtors or their agents.

88.     The Debtors also propose that the Claims and Noticing Agent undertake all mailings directed by the Court, the U.S. Trustee, or as required by the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").  I believe that using the Claims and Noticing Agent for this purpose will maximize efficiency in administering the chapter 11 cases and will ease administrative burdens that otherwise fall upon the Court and the U.S. Trustee.

89.     Finally, because many of the Debtors have many creditors in common and, in many cases, operate as an integrated business enterprise, the Debtors request authority to file a single, consolidated list of their 50 largest general unsecured creditors instead of compiling separate top 20 creditor lists for each individual Debtor.  I believe that preparing separate lists would consume an excessive amount of the Debtors' time and resources.

**(iii)    Debtors' Application for an Order Appointing Donlin Recano &
Company, Inc. as Claims and Noticing Agent for the Debtors
Pursuant to 28 U.S.C. § 156(C), 11 U.S.C. § 105(A) and Local
Rule 5075-1 (the "<u>Claims and Noticing Agent Retention Application</u>")**

90.     In the Claims and Noticing Agent Retention Application, the Debtors seek entry of an order engaging and appointing Donlin Recano as the Debtors' Claims and Noticing Agent in connection with, among other things, the distribution of notices and the administration, maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases.

91.     Prior to the Petition Date, counsel for the Debtors solicited and reviewed engagement proposals from five court-approved claims and noticing agents.  Thereafter, counsel for the Debtors requested that three of the claims and noticing agents provide their best and most competitive bids in a multi-round process.  The proposals were then compared and Donlin Recano's bid was selected as the most competitive.

92.     The Debtors believe that, based on all engagement proposals obtained and reviewed, that Donlin Recano's rates are competitive and reasonable given Donlin Recano's quality of services and expertise.  I have also been informed that Donlin Recano is equipped to handle the volume of mailings and claims involved in these chapter 11 Cases, and that Donlin Recano has acted as the claims and noticing agent in numerous cases of comparable size, including cases in this Court.  I have further been informed that Donlin Recano is not materially connected with any of the Debtors, their creditors, other parties in interest, the United States Trustee, or any person employed by the

Office of the United States Trustee, and that to the best of Donlin Recano's knowledge, after due inquiry, Donlin Recano does not, by reason of any direct or indirect relationship to, connection with, or interest in any of the Debtors, hold or represent any interest materially adverse to any of the Debtors, their estates, or any class of creditors or equity interest holders with respect to the matter upon which it is to be engaged.

93.    Accordingly, I believe that the employment of Donlin Recano as Claims and Noticing Agent is necessary, appropriate, and in the best interests of the Debtors' estates.

**(iv)    Debtors' Motion for an Order Authorizing the Establishment of Certain Notice, Case Management and Administrative Procedures (the "<u>Case Management Motion</u>")**

94.    In the Case Management Motion, the Debtors seek to establish certain notice, case management and administrative procedures in these chapter 11 cases (the "**Case Management Procedures**").  Specifically, the Case Management Motion, among other things, seeks entry of an order that the Debtors believe would (a) establish streamlined and less onerous requirements for filing and serving notices, motions, applications, declarations, objections, responses, memoranda, briefs, supporting documents and other documents filed in these chapter 11 Cases (collectively, the "**Court Papers**"); (b) delineate less burdensome standards for notices of hearings and agenda letters; (c) fix periodic omnibus hearing dates and articulate mandatory and uniform guidelines for the scheduling of hearings and objection deadlines; and (d) limit matters that are required to be heard by the Court.

95.    Given the size and scope of these cases (as described above), I believe that the Case Management Procedures will facilitate service of Court Papers that will be less burdensome and costly than serving such pleadings on every potentially interested party, which, in turn, will maximize the efficiency and orderly administration of these chapter 11 cases, while at the same time

ensuring that appropriate notice is provided, particularly to parties who have expressed an interest in these Cases and those directly affected by a request for relief.

   **(v)    Debtors' Motion for an Order Extending the Time to File
   (I)(A) Schedules of Assets and Liabilities, (B) Schedules of Current
   Income and Expenditures, (C) Schedules of Executory Contracts and
   Unexpired Leases and (D) Statements of Financial Affairs and (II) Reports
   of Financial Information (the "Schedules and Statements Motion")**

96.    In the Schedules and Statements Motion, the Debtors seek entry of an order extending the deadline to file their (i)(a) schedules of assets and liabilities, (b) schedules of current income and expenditures, (c) schedules of executory contracts and unexpired leases, and (d) statements of financial affairs, as required by section 521 of the Bankruptcy Code and Rules 1007(b)(1) and 1007(c) of the Bankruptcy Rules (the "**Schedules and Statements**"), to that date which is 45 days after the Petition Date; and (ii)(a) reports of financial information with respect to entities in which the Debtors' estates hold a controlling or substantial interest (the "**2015.3 Reports**") or (b) alternatively, a motion seeking a modification of the requirements to file the 2015.3 Reports, to that date which is 30 days after the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code (the "**341 Meeting**"), without prejudice to the Debtors' ability to request additional time should it become necessary.

97.    The nature and scope of the Debtors' operations require them to maintain voluminous records and intricate accounting systems.  I believe that an extension of the deadline for filing the Debtors' Schedules and Statements is warranted in light of the complexity and diversity of the Debtors' businesses, the limited staff available to perform the required internal review of their financial records and affairs, the numerous critical operational matters that their accounting and legal personnel must address in the early days of these chapter 11 Cases, the pressure incident to the commencement of these chapter 11 Cases and the fact that various prepetition invoices may not have yet been received or entered into their accounting systems.  I believe that focusing the attention of

the Debtors' key accounting and legal personnel on critical operational and chapter 11 compliance issues during the early days of these chapter 11 Cases will help the Debtors make a smoother transition into chapter 11 and, therefore, ultimately will maximize the value of their estates for the benefit of creditors and all parties-in-interest.

98.    Many of the Debtors hold a substantial or controlling interest in other entities within the Relativity Group, including complex and sizeable businesses. I believe that an extension of the time for filing the 2015.3 Reports is warranted given the size, complexity and geographic reach of the Debtors' businesses, along with the substantial burdens that will be imposed on the Debtors if they must comply with Bankruptcy Rule 2015.3 without sufficient time to gather the requisite information, and/or seek a modification of the requirements, prior to a 341 Meeting. I also believe that extending the deadline for the initial 2015.3 Reports will enable the Debtors to work with their financial advisors and the U.S. Trustee to determine the appropriate nature and scope of the 2015.3 Reports and any proposed modifications to the reporting requirements established by Bankruptcy Rule 2015.3.

**B.    Operational Motions Requesting Immediate Relief**

> **(i)    Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing, but not Directing, the Debtors to Continue Prepetition Insurance Coverage and Pay Prepetition Obligations Relating Thereto and (B) Authorizing, but not Directing, all Financial Institutions to Honor all Related Payment Requests (the "Insurance Motion")**

99.    In the Insurance Motion, the Debtors seek authority to continue to administer their prepetition insurance coverage and to pay prepetition obligations, including those under their premium financing agreements, and to authorize financial institutions to receive, process, honor and pay all related checks and electronic payment requests, but solely to the extent the Debtors have sufficient funds standing to their credit with such financial institutions.

100.    In connection with the operation of their businesses, the Debtors maintain workers' compensation programs and various liability, property, and other insurance programs (collectively, the "**Insurance Programs**") through several different insurance carriers.  As of the Petition Date, the Debtors owe aggregate premiums of $12,694 to two Insurance Carriers for policy renewals that occurred on July 28, 2015.

101.    Most of the Debtors' Insurance Programs require annual premium payments to be made at the beginning of the applicable policy period.  Because it is not always economically advantageous for the Debtors to pay premiums on a lump-sum basis, the Debtors finance certain of their premiums, including, without limitation, the premium payments pertaining to the Insurance Program covering directors and officers, employment practices, fiduciary duties, and criminal activity.  The Debtors finance such premiums pursuant to two separate commercial premium financing agreements entered into with Bank Direct Capital Finance (collectively, the "**Premium Financing Agreements**").

102.    Under Premium Financing Agreements, the Debtors finance premium payments owed on account of the Insurance Programs totaling approximately $1.1 million.  The financed premium payments were paid by Bank Direct Capital Finance to the Debtors' respective insurance carriers at the beginning of the applicable policy period.  In exchange, the Debtors repay Bank Direct Capital Finance monthly installments under each of the Premium Financing Arrangements.  As part of the Premium Financing Agreements, the Debtors granted Bank Direct Capital Finance a security interest in, among other things, any and all unearned premiums or dividends which may become payable for any reason under the Liability and Property Insurance Programs financed.

103.    I have been informed by counsel that, under state law, the Debtors are required to maintain a workers' compensation program.  Further, counsel has informed me that operating

businesses in chapter 11 without liability or property coverage may be a violation of bankruptcy law as well as a breach of certain contracts. Without insurance, I believe the Debtors would be at risk for significant losses if accidents, casualties, natural disaster or other unforeseen events were to occur. Further, if the Debtors were not permitted to continue the insurance policies, the Debtors would be forced to replace the necessary coverage, which could likely only be obtained at higher than current prices.

104.    Accordingly, I believe that maintaining the existing Insurance Programs is in the best interests of the estate and its creditors

**(ii)    Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing, but not Directing, the Debtors to Pay Certain Prepetition Claims of Critical Vendors, (B) Approving Related Procedures and (C) Authorizing, but not Directing, all Financial Institutions to Honor all Related Payment Requests (the "Critical Vendor Motion")**

105.    In the Critical Vendor Motion, the Debtors seek authority to pay the prepetition obligations owed to certain vendors, suppliers, service providers, and other similar entities that are essential to maintaining the going concern value of the Debtors' enterprise (the "**Critical Vendors**").

106.    In the ordinary course of business, the Debtors do business with many of these vendors pursuant to short term, or "spot," purchase orders without a long-term agreement. As is typical in distressed situations, vendors have been increasingly unwilling to extend trade credit to the Debtors. In the months immediately preceding the Petition Date, a number of the Debtors' film production and distribution suppliers have contacted management and demanded changes in payment and credit terms or full payment of past due balances. Some of these film production and distribution suppliers have already stopped providing goods or services to the Debtors unless the Debtors comply with their restricted terms or pay all past due amounts in full. With regard to television production and distribution, the Debtors currently enjoy favorable trade terms with many of the Critical Vendors.

107.    Many of these vendors, which in many cases are small or independent service providers, may be unfamiliar with the chapter 11 process and unwilling to do business on existing terms – even assuming such parties will continue to supply the Debtors.

108.    With the assistance of my staff at FTI, the Debtors have spent significant time reviewing and analyzing their books and records, consulting operations management and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and historical practice to identify certain critical business relationships and/or suppliers of goods and services—the loss of which could materially harm the Debtors' remaining businesses, shrink their market share, reduce their enterprise value, and/or impair going-concern viability of their film and television production businesses.

109.    As a result of significant analysis and review, the Debtors have identified certain categories of Critical Vendors including: corporate technology providers, equipment providers, film element providers, memberships in trade organizations, production staffing agencies, television production service providers, and production location vendors.    These Critical Vendors cannot be timely and/or efficiently replaced given the highly-specialized nature of the services that they provide.

110.    Pursuant to the Critical Vendor Motion, the Debtors therefore request authority to condition payment to a Critical Vendor upon such party's written agreement to continue supplying goods or services to the Debtors in accordance with trade terms at least as favorable to the Debtors as those practices and programs (including credit limits, pricing, timing of payments, availability, and other terms) in place in the 120 days prior to the Petition Date.    If, however, the Debtors are unable to reach such an agreement with a particular Critical Vendor to continue business on

customary trade terms, the Debtors seek authority to pay, in their sole discretion, all or a portion of such Critical Vendor's prepetition obligations.

111.    The Debtors are requesting authority to pay $4.0 million to Critical Vendors on an interim basis and an amount not to exceed $6.4 million prior to the final hearing on the Critical Vendor Motion.  I estimate that the $6.4 million request represents less than ten percent of the total projected unsecured claims that may be asserted against the Debtors during these chapter 11 Cases.

112.    I have been informed by legal counsel that in order to pay the Critical Vendor claims, the Debtors must demonstrate some business justification or necessity in favor of paying these claims at this time.  Based on the analysis conducted by FTI and the Debtors, I believe that the Debtors' inability to maintain relationships with their most critical suppliers and service providers during the pendency of these chapter 11 Cases would irreparably harm the Debtors' businesses, causing catastrophic damage to their going-concern value.  If given the flexibility to pay prepetition claims to certain Critical Vendors in an amount not to exceed $6.4 million, I believe that Debtors can maintain the  going-concern value and ultimately maximize value for the benefit of their creditors.

    **(iii)    Debtors' Motion for Entry of Interim and Final Orders Authorizing, But Not Directing, Debtors to (A) Pay Certain Prepetition Wages and Reimbursable Employee Expenses, (B) Pay and Honor Employee Medical and Other Benefits and (C) Continue Employee Benefits Programs (the "<u>Wage Motion</u>")**

113.    In the Wage Motion, the Debtors seek authority to pay prepetition wages, salaries, commissions and other compensation, including associated taxes, withholdings and other costs, and certain reimbursable pre-petition employee and independent contractor expenses, as well as to continue the Debtors' employee medical, insurance and other benefits programs on a post-petition basis, including the payment and honoring of obligations relating thereto.

114.    As of the Petition Date, the Debtors, collectively, employed approximately 89 people (the "**Employees**").   None of the Employees are unionized.   The Debtors also employ 54

-40-

independent contractors (the "**Independent Contractors**," and together with the Employees, the "**Workforce**").  In order to retain the Workforce, the Debtors pay and incur a number of obligations such as compensation, deductions and payroll taxes, expense reimbursement, and depending on the status of such member of the Workforce, health benefits, workers' compensation benefits, paid leave and time off, life insurance, accidental death and disability benefits, retirement and savings benefits and other benefits that the Debtors have historically provided in the ordinary course of business (collectively, the "**Employee Obligations**").

115.    In the ordinary course of business, the Debtors also contract with the Production Staffing Agencies that provide the Debtors with various essential production-related services including, among others, supplying and paying the Temporary Production Personnel that provide cast and crew services and support on the productions.  In the ordinary course of business, the Debtors pay Temporary Production Personnel (the "**Production Personnel Obligations**") through the Production Staffing Agencies on a bi-weekly basis, in arrears, every other Friday.  As of the Petition Date, approximately 760 Temporary Production Personnel provide services to the Debtors. By the Wage Motion, the Debtors do not seek to pay the Production Personnel Obligations.  Rather, the Debtors seek to pay the Production Personnel Obligations in the Critical Vendor Motion discussed below.

116.    By the Wage Motion, the Debtors seek the authority, but not the direction, to pay certain prepetition Employee Obligations, and to continue to pay such post Employee Obligations in the Debtors business judgement.  The Employee Obligations include; wages, salaries and, with respect to non-exempt Employees, overtime compensation when earned (the "**Compensation**"); expenses incurred by the Workforce and the Temporary Production Personnel in the scope of their

-41-

service and on behalf of the Debtors (collectively, the "**Reimbursable Expenses**"); and employee benefit plans and policies (the "**Employee Benefit Programs**").

117.    The Debtors are seeking the authority, but not the direction, to pay prepetition Compensation to the Workforce, provided that the amount paid to any individual Workforce member for wages, salary or other compensation does not exceed the $12,475 priority cap under section 507(a)(4) of the Bankruptcy Code (the "**Priority Cap**").  The Debtors are further seeking to pay Reimbursable Expenses that were incurred prepetition, but which have not yet been submitted and processed by the Debtors for reimbursement.  For the most part, the Debtors do not believe that they owe outstanding amounts for the prepetition costs of the Employee Benefit Programs.

118.    In my opinion, payment of the outstanding Employee Obligations is essential to the Debtors' reorganization strategy and will result in enhanced creditor recoveries through the preservation of the going-concern value of the Debtors' estates.  Delay or disruption in the satisfaction of these claims could irreparably harm the Debtors' relationships with their Workforce and workplace morale at a time when such morale is most critical.  The amounts requested herein represent amounts necessary for the Workforce to meet their own personal obligations.  If such payments are not made, the Workforce necessary to maintain the Debtors' operations, productions and other operations may seek alternative employment, putting these operations, businesses and productions, and therefore the value of the Debtors, at risk.  The Employees and their knowledge specific to the Debtors' operations, relationships with customers, vendors and third parties are necessary to maximizing the value in connection with any restructuring plans.  The loss of valuable Workforce members at this critical stage would undoubtedly affect the Debtors' ability to focus on stabilizing their business operations.

119.    Accordingly, I believe that the payment of the Employee Obligations, in the amount and manner described herein, represents the Debtors' sound business judgment and is in the best interest of the Debtors' estates and creditors.  In my opinion, prompt payment of the Employee Obligations is critical to prevent the immediate and irreparable harm to Employee morale and the Debtors' ability to continue its operations without interruption.

### (iv)    Debtors' Motion for Entry of Interim and Final Orders Authorizing Payment of Prepetition Residuals and Participations in the Ordinary Course of Business (the "P&R Motion")

120.    In the P&R Motion, the Debtors request authority to make certain residuals and participations payments incurred in the ordinary course of business.  The primary driver of the Debtors' film and television library is the exploitation of the library through a variety of platforms, including television, home video and new media.  The Debtors also generate revenue from the theatrical release of new major motion pictures and the production and licensing of programing for television and digital exploitation ("**New Production**").  New Production is an essential component of the Debtors' business model because New Production refreshes and replenishes the library, expands interest in library product and otherwise preserves the inherent value of the library.

121.    Pursuant to industry-wide collective bargaining agreements ("**Collective Bargaining Agreements**"), the Debtors' film and television programs are produced using writers, directors, performers and other similar persons (collectively, the "**Talent**") who are members of various guilds and unions (collectively, the "**Guilds and Unions**").  Certain of the Debtors, as producers and distributors of film and television programs, are signatories to such Collective Bargaining Agreements.

122.    As part of Talent's gross compensation package, the Collective Bargaining Agreements require the payment of residuals, which is compensation due to the Talent represented by their respective Guilds and Unions, or their members, for the Debtors' reuse of library product.

-43-

For example, following the initial release of most film or television programs contained in the Debtors' library, the Debtors must pay residuals for any subsequent exploitation of the library.

123.    Pursuant to certain of the Collective Bargaining Agreements, certain of the Debtors' are contractually obligated to remit some or all of Talent's residual compensation to a designated employee benefit plan.   Further, as is common in the film industry for certain production studios, pursuant to these Collective Bargaining Agreements, the obligation to remit the residuals to Guilds, in certain instances, is secured through perfected liens on all rights, title, interests and proceeds for each film from which residuals obligation arise.

124.    In addition, the Debtors, and other studios in the United States, offer certain parties bonuses based upon box office performance, deferments based upon gross or net proceeds, or a share – or "participation" – in a film or television program's revenue stream through individual profit participation or license agreements.   The Debtors use participations to attract and retain name brand producers and other Talent.   In these instances, Talent's right to receive participations is generally independent of their right to receive residuals.   Similarly, the Debtors may offer participations in connection with obtaining intellectual property, such as the assignment of rights to a screenplay, an exclusive license to create a film based on a book, or the use of a brand or work of art within a film or television program.   Furthermore, third party distributors of the Debtors' films may be entitled to a percentage of the film's receipts (as well as recoupment of distribution expenses).   Like residuals, the Debtors are contractually required to pay participations.

125.    As of the Petition Date, the Debtors may owe residuals and participations up to an aggregate amount of $28 million.

126.    I have been informed by legal counsel that the payment of prepetition residuals and participations must be based on an articulated and valid business judgment.   I believe that the ability

of the Debtors to preserve and enhance the value of the library is directly tied to the Debtors' ability to maintain a minimum level of New Production.  To this end, I believe it is essential that the Debtors honor the residual and participation obligations because the failure to make such payments would greatly jeopardize the Debtors' ability to continue to develop New Production.  Furthermore, I believe that the failure to honor the residual and participation obligations would negatively impact the Debtors' relationship with its Talent and other key stakeholders, including the Guilds and Unions.

> **(v)**    **Debtors' Motion for Interim and Final Orders Authorizing the Debtors to Honor Prize Obligations under Existing Production Agreements (the "<u>Prize Obligations Motion</u>")**

127.    In the Prize Obligations Motion, the Debtors seek authority to perform and honor their obligations under RTV's agreements to develop and produce television programing (the "**Production Agreements**").  Under the Production Agreements, RTV is obligated to advance certain costs and expenses in connection with producing television programing.  These costs and expenses include prizes that are awarded to participants in the television programs produced by the Debtors (the "**Prize Obligations**").  The participants who receive the Prize Obligations are third party contestants and are not affiliated with the Debtors, or the Debtors' counterparties under the Production Agreements.

128.    The value of the Prize Obligations is approximately $2,500,000.  If the Debtors fail to perform the Prize Obligations it would likely cause the Debtors to default under certain of the Production Agreements, and would result in serious harm to the Debtors' estate.  Additionally, it would harm the participants in the television programs, who are innocent third parties, if the Debtors failed to honor the Prize Obligations.  Moreover, the negative publicity associated with the Debtors' failure to honor the Prize Obligations would diminish the value and appeal of the television programing that the Debtors have developed and sold.

129.    In order to capitalize on the value of the Production Agreements, the Debtors must honor their Prize Obligations.  I understand that the failure to do so would likely constitute a default under the Production Agreements, and would likely subject the Debtors to claims by the counterparties to the Production Agreements and other third parties, including the participants in the television programs produced pursuant to the Production Agreements.  The Debtors' inability to honor their Prize Obligations would irreparably harm the Debtors' relationship the counterparties to the Production Agreements, and thereby irreparably harm the Debtors' businesses, causing catastrophic damage to its going-concern value.

130.    I believe that the Debtors' continued compliance with the Production Agreements is critical to the success of these chapter 11 Cases.  The Debtors' business relies on the Production Agreements, and the ability of the Debtors to receive the value of the Production Agreements is contingent on the Debtors' satisfaction of their Prize Obligations.  The disruption and damage to the Debtors' business that will ensue if the Debtors do not comply with their Prize Obligations far exceed the costs associated with honoring the Prize Obligations.

**(vi)    Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Continued Use of Existing Cash Management System, Bank Accounts and Business Forms, and Payment of Related Prepetition Obligations, (B) Waiving Certain Investment and Deposit Requirements on a Limited Basis, (C) Authorizing Continued Engagement in Intercompany Transactions, and (D) According Administrative Expense Priority Status to All Postpetition Intercompany Claims (the "<u>Cash Management Motion</u>").**

131.    In the Cash Management Motion, the Debtors seek authority to continue to use their existing cash management system (the "**Cash Management System**"), bank accounts ("**Bank Accounts**") and business forms, and to pay related prepetition obligations, as well as the waiver of certain investment and deposit requirements.  In addition, the Debtors seek authority to continue to engage in intercompany transactions in the ordinary course of business, and to grant administrative expense priority status to such postpetition intercompany claims.

132.    In the ordinary course of their businesses, the Debtors have historically used their Cash Management System to fund their operations as well as the operations of certain of their non-Debtor affiliates.  By use of the Cash Management System, the Debtors collect, concentrate and disburse funds generated by their business.  The Cash Management System allows the Debtors to efficiently collect and transfer the cash generated by their business and pay their financial obligations.  Further, the Cash Management System enables the Debtors to facilitate their cash forecasting and reporting, monitor the global collection and disbursement of funds, and maintain control over the administration of the Debtors' Bank Accounts.  In my experience, the Debtors' Cash Management System is similar to the cash management systems used by other major corporate enterprises.

133.    The Cash Management System for the Debtors' film business is centered primarily on bank accounts held by RMLDD Financing.  Under that system, the Debtors collect money from exhibiting film content developed, produced, distributed and/or owned by the Debtors and concentrate the collected cash in a Theatrical Concentration Account and a Primary Concentration Account (collectively, the "**Concentration Accounts**").  The funds in the Concentration Accounts are used first to pay participations and residuals, then to pay down certain credit facilities, then any remainder is deposited in operating accounts.

134.    The Cash Management System for the Debtors' television and general production business is centered primarily on bank accounts held by RML and RTV.  RML and RTV maintain operating accounts (the "**Operating Accounts**") to fund production, payroll, distribution and other aspects of the Debtors' television business.  RTV also maintains dozens of bank accounts used for producing television programs (the "**TV Production Accounts**").  Cash is paid into the TV Production Accounts, generally from the Operating Accounts, on an as needed basis to pay for the

costs and expenses incurred by the TV Production Debtors in producing television content for the Debtors' television business.

135.    The Debtors also maintain several consolidated accounts that cover both the film and television operations of the Debtors' businesses.  These accounts are generally funded from the Operating Accounts and are used to pay the Debtors' employees, as well as the Debtor's marketing and other miscellaneous costs.  This includes the Debtors' Payroll Accounts , the Debtors Marketing Account, and others.

136.    The Debtors also maintain production and collection accounts under the names of certain of the SPVs.  The Debtor SPVs were established to produce a specific film or project as part of the Debtors' overall business.  The Debtor SPVs maintain production accounts to pay the expenses and costs associated with a specific film or project, and collection accounts which pool receipts or other revenues generated by the specific production for the benefit of the lenders affiliated with those productions.

137.    As discussed above, the Cash Management System and applicable procedures employed by the Debtors constitute ordinary, usual, and essential business practices.  In my opinion, the Cash Management System affords the Debtors significant benefits, including, among other things, the ability to (a) control corporate funds centrally, (b) ensure the availability of funds when necessary, and (c) reduce costs and minimize administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information.  Based upon these facts, it would be unduly difficult and expensive for the Debtors to establish a new cash management system, and forcing the Debtors to do so would unnecessarily deprive them of the efficiencies they enjoy under the existing Cash Management System.  The Debtors therefore believe that continuing to use the existing Cash Management System is in the best interests of the estates.

138.    I also believe that allowing the existing Cash Management System to continue will facilitate a smoother transition into chapter 11 and will aid the Debtors' restructuring efforts. Notably, the Cash Management System includes the necessary accounting controls to enable the Debtors, as well as creditors and the Court, if necessary, to trace amounts through the system and ensure that all transactions are adequately documented and readily ascertainable.

139.    Based on these facts, I believe that maintenance of the existing Cash Management System is critical to the Debtors' continuing business operations and is therefore in the best interests of the Debtors' estates and all parties in interest, and request that the Court authorize the Debtors to continue the maintenance of their Cash Management System during these chapter 11 Cases.

**C.    Debtor-in-Possession Financing**

**(i)    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing and (B) Use Cash Collateral; (II) Granting the Prepetition Lenders Adequate Protection; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief (the "DIP Motion").**

140.    The Debtors have obtained postpetition financing ("**DIP Financing**") from certain of the Debtors prepetition secured lenders (the "**DIP Lenders**").    The factual background and circumstances underlying the DIP Motion are provided in the Coleman Declaration.

**D.    Sale-Related Motion**

**(i)    Debtors' Motion to Shorten Time for Notice of the Hearing to Consider the Debtors' Motion for (I) an Order (A) Establishing Bid Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Approving Stalking Horse APA and Bidding Protections, and (C) Granting Certain Related Relief, and (II) an Order (A) Approving the Sale of a Substantial Portion of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Other Interest, (B) Approving the Assumption and Assignment of Certain Executors Contracts and Unexpired Leases Related Thereto, and (C) Granting Certain Related Relief (the "Motion to Shorten Time")**

141.    Concurrently herewith, the Debtors have filed a motion (the "**Sale Motion**") for an order establishing bid procedures for the sale of substantially all of their assets (the "**Bid**

-49-

**Procedures**"), including the approval of the Stalking Horse APA and Bidding Protections (both as defined therein), (the "**Bid Procedures Order**"), and an order approving the sale of a substantial portion of their assets free and clear of liens, claims, encumbrances and other interests, and approving the assumption and assignment of certain executory contracts and unexpired leases (the "**Sale Order**").

142.    The Sale Motion seeks to effectuate a sale of a substantial portion of the Debtors' assets on a going concern basis.  The Debtors believe the proposed bid procedures and sale represent the best strategy to maximize value for the Debtors' various stakeholders.

143.    In addition, the DIP Lenders under the DIP Financing (and the Stalking Horse Bidder, as defined in the Sale Motion) require that the Bid Procedures provide a streamlined and expeditious auction and sale process.  The time periods set forth in the Bid Procedures were negotiated by the Stalking Horse Bidder and the DIP Lenders, and failure to adhere to such time periods could jeopardize the closing of the sale of the Debtors' assets.  It is my opinion that the continued presence of the Stalking Horse Bidder will set a floor for the value of the Debtors' assets and attract other potential buyers to bid for them, thereby maximizing the realizable value of the assets for the benefit of the Debtors, the Debtors' estates, the Debtors' creditors, and all other parties-in-interest.  If the Debtors are not able to adhere to such negotiated time periods, the Debtors are in danger of losing the only parties currently bound to consummate the sale of their assets.

144.    Accordingly, I believe that completing the bid process in an expeditious manner is critical to maintaining and maximizing the value of the Debtors' assets.  As such, and because of the requirements of the Stalking Horse Bidder and the DIP Lenders, the Debtors believe that it is imperative that they undertake the process contemplated by the Bid Procedures with the goal of closing the highest and best sale transaction available to the Debtors' estates, as soon as possible.

Accordingly, in the Motion to Shorten Time, the Debtors seek to shorten the time for notice of the

hearing to consider that portion of the Sale Motion that seeks entry of the Bid Procedures Order.

### III.
### Local Rule 1007 Disclosures

145.    Pursuant to and in accordance with Bankruptcy Rule 1007(d) and Local Rule 1007-2,

the following information is attached hereto and incorporated by reference herein:

146.    <u>Schedule 1.</u>  Pursuant to Local Rule 1007-2(a)(3), Schedule 1 sets forth a list of the

committees formed prior to the filing of the Debtors' chapter 11 petitions.

147.    <u>Schedule 2.</u>  Pursuant to Local Rule 1007-2(a)(4), Schedule 2 sets forth a list of the

names and addresses of the creditors holding the 50 largest unsecured claims against the Debtors (on

a consolidated basis), excluding insiders. This list also includes the amount of each claim, and, if

appropriate, an indication whether such claim is contingent, unliquidated, disputed or partially

secured, subject to the Debtors' rights to dispute the validity of any claims.

148.    <u>Schedule 3.</u>  Pursuant to Local Rule 1007-2(a)(5), Schedule 3 sets forth a list of the

names and addresses of the creditors holding the five largest secured claims against the Debtors (on

a consolidated basis).  This list also includes the amount of each claim, a brief description of the type

of collateral securing the claim, and whether the claim or lien is disputed, subject to the Debtors'

rights to dispute the validity of any claims. The value of the collateral securing these claims remains

undetermined.

149.    <u>Schedule 4.</u>  Pursuant to Local Rule 1007-2(a)(6), Schedule 4 sets forth a summary of

the assets and liabilities of the Debtors on a consolidated basis, as of December 31, 2014, which has

not been audited and is subject to change.

150.    <u>Schedule 5.</u>  Pursuant to Local Rule 1007-2(a)(7), Schedule 5 lists the number and

classes of shares of stock, debentures, and other securities of the Debtors that are held and the

number of holders thereof, as well as a list of those held by each of the debtor's officers and directors and the amounts so held.

151.    <u>Schedule 6.</u>  Pursuant to Local Rule 1007-2(a)(8), Schedule 6 sets forth a list of the Debtors' property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor (other than bank accounts which may be subject to claims or setoff), or agent for any such entity.

152.    <u>Schedule 7.</u>  Pursuant to Local Rule 1007-2(a)(9), Schedule 7 sets forth a list of the premises owned, leased or held under other arrangement from which the Debtors operate their business.

153.    <u>Schedule 8.</u>  Pursuant to Local Rule 1007-2(a)(10), Schedule 8 sets forth a list of the locations of the Debtors' substantial assets and books and records, and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States.

154.    <u>Schedule 9.</u>   Pursuant to Local Rule 1007-2(a)(11), Schedule 9 sets forth a list identifying the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property, where a judgment against the Debtors or a seizure of their property may be imminent.

155.    <u>Schedule 10.</u>  Pursuant to Local Rule 1007-2(a)(12), Schedule 10 sets forth a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors and a brief summary of their relevant responsibilities and experience.

156.    <u>Schedule 11.</u>  Pursuant to Local Rule 1007-2(b)(1)-(2)(A), Schedule 11 sets forth a list identifying the estimated amount of the gross weekly payroll to employees (exclusive of officers and directors) and the estimated amount to be paid to officers, directors, stockholders, and financial

and business consultants retained by the Debtors, for the thirty-day period following the filing of the Debtors' Chapter 11 Petitions.

157.    <u>Schedule 12.</u>  Pursuant to Local Rule 1007-2(b)(3), Schedule 12 sets forth a list of the estimated cash receipts and disbursements, net cash gain or loss, and unpaid obligations and receivables expected to accrue but remaining unpaid (other than professional fees), for the thirty-day period following the filing of the Debtors' Chapter 11 Petitions.

158.    Notwithstanding anything in this Declaration or on any of the exhibits attached hereto to the contrary, nothing contained in this Declaration or on any of the exhibits or schedules attached hereto is intended to be, or should be deemed or construed as, an admission with respect to: (a) the liability for, the amount of, the enforceability of or the validity of any claim; (b) the existence, validity, enforceability or perfection of any lien, mortgage, charge, pledge or other grant of security for any claim; (c) the proper characterization of any transaction or financing as a sale or financing; or (d) any interest, or lack of interest, of the Debtors in property  The Debtors specifically reserve the right to challenge any claim or any transaction or any alleged security for any claim on any and all bases, and to seek turnover of any property to the full extent permitted under the Code.

<div align="center">

**IV.**
**Conclusion**

</div>

159.    To minimize any loss of value to their business, the Debtors' immediate objective is to engage in business as usual following the commencement of these chapter 11 Cases with as little interruption to the Debtors' operations as possible. If this Court grants the relief requested in the First Day Pleadings, I believe the prospect of achieving these objectives—to the maximum benefit of the Debtors' estates, creditors and parties in interest—will be substantially enhanced.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable

inquiry, the foregoing is true and correct.

_/s/ Brian G. Kushner_____
Brian G. Kushner
Chief Restructuring Officer
Relativity Holdings LLC

**Exhibit A**

**Debtor Lists**

## **CORPORATE**

Relativity Holdings LLC
Relativity Media, LLC

## **FASHION DIVISION**

Relativity Fashion, LLC

## **FILM DIVISION**

### **Acquisitions Division**

RML Acquisitions I, LLC
RML Acquisitions II, LLC
RML Acquisitions III, LLC
RML Acquisitions IV, LLC
RML Acquisitions V, LLC
RML Acquisitions VI, LLC
RML Acquisitions VII, LLC
RML Acquisitions VIII, LLC
RML Acquisitions IX, LLC
RML Acquisitions X, LLC
RML Acquisitions XI, LLC
RML Acquisitions XII, LLC
RML Acquisitions XIII, LLC
RML Acquisitions XIV, LLC
RML Acquisitions XV, LLC

### **Single Picture Division**

21 & Over Productions, LLC
3 Days to Kill Productions, LLC
A Perfect Getaway, LLC
A Perfect Getaway P.R., LLC
Armored Car Productions, LLC
Best of Me Productions, LLC
Black Or White Films, LLC
Blackbird Productions, LLC
Brick Mansions Acquisitions, LLC
Brilliant Films, LLC
Brothers Servicing, LLC
Brothers Productions, LLC
Catfish Productions, LLC
CinePost, LLC
Cine Productions, LLC

Den of Thieves Films, LLC
Don Jon Acquisitions, LLC
DR Productions, LLC
Furnace Films, LLC
Gotti Acquisitions, LLC
Guido Contini Films, LLC
Hunter Killer Productions, LLC
Hunter Killer La Productions, LLC
In The Hat Productions, LLC
J & J Project, LLC
JGAG Acquisitions, LLC
Left Behind Acquisitions, LLC
Malavita Productions, LLC
Merchant of Shanghai Productions, LLC
MB Productions, LLC
Miracle Shot Productions, LLC
Most Wonderful Time Productions, LLC
Movie Productions, LLC
One Life Acquisitions, LLC
Out Of This World Productions, LLC
Paranoia Acquisitions, LLC
Phantom Acquisitions, LLC
Relativity Films, LLC
Relativity Development, LLC
Relativity Film Finance, LLC
Relativity Film Finance II, LLC
Relativity Film Finance III, LLC
Relativity Media Distribution, LLC
Relativity Media Films, LLC
Reveler Productions, LLC
RML Bronze Films, LLC
RML Damascus Films, LLC
RML Desert Films, LLC
RML Documentaries, LLC
RML DR Films, LLC
RML Echo Films, LLC
RML Escobar Films LLC
RML Film Development, LLC
RML Hector Films, LLC
RML Hillsong Films, LLC
RML IFWT Films, LLC
RML Kidnap Films, LLC
RML Lazarus Films, LLC
RML Nina Films, LLC
RML November Films, LLC
RML Oculus Films, LLC

RML Our Father Films, LLC
RML Romeo and Juliet Films, LLC
RML Scripture Films, LLC
RML Solace Films, LLC
RML Somnia Films, LLC
RML Timeless Productions, LLC
RML Turkeys Films, LLC
RML Very Good Girls Films, LLC
RML WIB Films, LLC
Safe Haven Productions, LLC
Sanctum Films, LLC
Santa Claus Productions, LLC
Snow White Productions, LLC
Spy Next Door, LLC
Story Development, LLC
Strangers II, LLC
Stretch Armstrong Productions, LLC
Studio Merchandise, LLC
Summer Forever Productions, LLC
The Crow Productions, LLC
Totally Interns, LLC
Tribes of Palos Verdes Production, LLC
Wright Girls Films, LLC
Yuma, Inc.

### **Marketing and Distribution Division**

Relativity Foreign, LLC
Relativity India Holdings, LLC
Relativity Production LLC
Relativity Senator, LLC
Relativity Sky Land Asia Holdings, LLC
RML Distribution Domestic, LLC
RML Distribution International, LLC
RML Films PR, LLC
RML International Assets, LLC
RMLDD Financing, LLC

### **TV DIVISION**

Brant Point Productions, LLC
Cisco Beach Media, LLC
Cliff Road Media, LLC
Einstein Rentals, LLC
English Breakfast Media, LLC
Great Point Productions, LLC

Hooper Farm Music, LLC
Hooper Farm Publishing, LLC
Hummock Pond Properties, LLC
Long Pond Media, LLC
Madaket Publishing, LLC
Madaket Road Music, LLC
Miacomet Media LLC
Orange Street Media, LLC
Pocomo Productions, LLC
Relativity REAL, LLC
Relativity TV, LLC
Smith Point Productions, LLC
Straight Wharf Productions, LLC
Tuckernuck Music, LLC
Tuckernuck Publishing, LLC
Zero Point Enterprises, LLC

## **MUSIC DIVISION**

Relativity Music Group, LLC
Relative Motion Music, LLC
Relative Velocity Music, LLC

## **DIGITAL**

Relativity Jackson, LLC
Relativity Rogue, LLC
RML Jackson, LLC
Rogue Digital, LLC
Rogue Games, LLC
Roguelife LLC

## **BRANDING**

Madvine RM LLC

**Alphabetical List of Debtors**

21 & Over Productions, LLC
3 Days to Kill Productions, LLC
A Perfect Getaway P.R., LLC
A Perfect Getaway, LLC
Armored Car Productions, LLC
Best of Me Productions, LLC
Black Or White Films, LLC
Blackbird Productions, LLC
Brant Point Productions, LLC
Brick Mansions Acquisitions, LLC
Brilliant Films, LLC
Brothers Productions, LLC
Brothers Servicing, LLC
Catfish Productions, LLC
Cine Productions, LLC
CinePost, LLC
Cisco Beach Media, LLC
Cliff Road Media, LLC
Den of Thieves Films, LLC
Don Jon Acquisitions, LLC
DR Productions, LLC
Einstein Rentals, LLC
English Breakfast Media, LLC
Furnace Films, LLC
Gotti Acquisitions, LLC
Great Point Productions, LLC
Guido Contini Films, LLC
Hooper Farm Music, LLC
Hooper Farm Publishing, LLC
Hummock Pond Properties, LLC
Hunter Killer La Productions, LLC
Hunter Killer Productions, LLC
In The Hat Productions, LLC
J & J Project, LLC
JGAG Acquisitions, LLC
Left Behind Acquisitions, LLC
Long Pond Media, LLC
Madaket Publishing, LLC
Madaket Road Music, LLC
Madvine RM, LLC
Malavita Productions, LLC
MB Productions, LLC
Merchant of Shanghai Productions, LLC

Miacomet Media LLC
Miracle Shot Productions, LLC
Most Wonderful Time Productions, LLC
Movie Productions, LLC
One Life Acquisitions, LLC
Orange Street Media, LLC
Out Of This World Productions, LLC
Paranoia Acquisitions, LLC
Phantom Acquisitions, LLC
Pocomo Productions, LLC
Relative Motion Music, LLC
Relative Velocity Music, LLC
Relativity Development, LLC
Relativity Fashion, LLC
Relativity Film Finance II, LLC
Relativity Film Finance III, LLC
Relativity Film Finance, LLC
Relativity Films, LLC
Relativity Foreign, LLC
Relativity Holdings LLC
Relativity India Holdings, LLC
Relativity Jackson, LLC
Relativity Media Distribution, LLC
Relativity Media Films, LLC
Relativity Media, LLC
Relativity Music Group, LLC
Relativity Production LLC
Relativity REAL, LLC
Relativity Rogue, LLC
Relativity Senator, LLC
Relativity Sky Land Asia Holdings, LLC
Relativity TV, LLC
Reveler Productions, LLC
RMLDD Financing, LLC
RML Acquisitions I, LLC
RML Acquisitions II, LLC
RML Acquisitions III, LLC
RML Acquisitions IV, LLC
RML Acquisitions IX, LLC
RML Acquisitions V, LLC
RML Acquisitions VI, LLC
RML Acquisitions VII, LLC
RML Acquisitions VIII, LLC
RML Acquisitions X, LLC
RML Acquisitions XI, LLC

RML Acquisitions XII, LLC
RML Acquisitions XIII, LLC
RML Acquisitions XIV, LLC
RML Acquisitions XV, LLC
RML Bronze Films, LLC
RML Damascus Films, LLC
RML Desert Films, LLC
RML Distribution Domestic, LLC
RML Distribution International, LLC
RML Documentaries, LLC
RML DR Films, LLC
RML Echo Films, LLC
RML Escobar Films LLC
RML Film Development, LLC
RML Films PR, LLC
RML Hector Films, LLC
RML Hillsong Films, LLC
RML IFWT Films, LLC
RML International Assets, LLC
RML Jackson, LLC
RML Kidnap Films, LLC
RML Lazarus Films, LLC
RML Nina Films, LLC
RML November Films, LLC
RML Oculus Films, LLC
RML Our Father Films, LLC
RML Romeo and Juliet Films, LLC
RML Scripture Films, LLC
RML Solace Films, LLC
RML Somnia Films, LLC
RML Timeless Productions, LLC
RML Turkeys Films, LLC
RML Very Good Girls Films, LLC
RML WIB Films, LLC
Rogue Digital, LLC
Rogue Games, LLC
Roguelife LLC
Safe Haven Productions, LLC
Sanctum Films, LLC
Santa Claus Productions, LLC
Smith Point Productions, LLC
Snow White Productions, LLC
Spy Next Door, LLC
Story Development, LLC
Straight Wharf Productions, LLC

Strangers II, LLC
Stretch Armstrong Productions, LLC
Studio Merchandise, LLC
Summer Forever Productions, LLC
The Crow Productions, LLC
Totally Interns, LLC
Tribes of Palos Verdes Production, LLC
Tuckernuck Music, LLC
Tuckernuck Publishing, LLC
Wright Girls Films, LLC
Yuma, Inc.
Zero Point Enterprises, LLC

**Exhibit B**

**Organizational Chart**





Relativity Holdings LLC (DE)
Relativity Media, LLC ("RML") (CA)
Music Division
Digital Division
Distribution and Marketing Division
Various Investors
Virgin Management USA, Inc.
[45.9%]
[52%]
Relativity Music Group, LLC (CA)
Relative Motion Music, LLC (CA)
Relative Velocity Music, LLC (f/k/a RM Velocity Music, LLC) (CA)
[45%]
[55%]
Select Music LLC (NY)
RML Jackson, LLC (CA)
Roguelife LLC d/b/a Relativity Digital (DE)
Rogue Games, LLC (CA)
Relativity Rogue, LLC (CA)
Relativity Jackson, LLC (CA)
Rogue Movie Network, LLC (CA)
Rogue Digital, LLC (CA)
[5%]
[95%]
Realta Entertainment Group, Inc. (DE)
EuropaCorp Films USA, Inc
Sky Land Management
[50%]
[50%]
[10%]
[90%]
Relativity EuropaCorp Distribution, LLC (DE)
Sky Land Entertainment Ltd. (BVI)
[51%]
[49%]
RML DD Licensing I, LLC (DE)
Sky Land (Beijing) Film-Television Culture Development Ltd.
Relativity Sky Land Asia Holdings, LLC (CA)
Relativity India Holdings, LLC (DE)
LMB Holdings Limited
[50%]
[50%]
Relativity B4U Limited (Mauritius)
Relativity Senator, LLC (CA)
RML Distribution International, LLC (CA)
RML Distribution Domestic, LLC (CA)
RMLDD Financing, LLC (CA)
RML Films PR, LLC (Puerto Rico)
Relativity Foreign, LLC (CA)
[2.1%]
Virgin Produced, LLC (DE)
RML International Assets, LLC (CA)
Relativity Production LLC (DE)
Relativity Distribution LLC (DE)
Single Picture Division
Story Development, LLC (CA)
CinePost, LLC (CA)
Relativity Films, LLC (f/k/a Relativity Productions, LLC) (CA)
Relativity Development, LLC (CA)
Relativity Media Films, LLC (f/k/a Relativity Directors, LLC (f/k/a Relativity DGA, LLC)) (CA)
Relativity Film Finance, LLC (DE)
Relativity Film Finance II, LLC (CA)
Relativity Film Finance III, LLC (CA)
Relativity Media Distribution, LLC (CA)
RML Film Development, LLC (CA)
Debtor
Acquisitions
Distribution and Marketing
TV Division
Single Picture Division
Digital Division
Music Division
Subject to Separation Agreement
* In Process of Dissolution

**Single Picture SPVs**

21& Over Productions, LLC (CA)

American Kids, LLC (CA)

Best of Me Productions, LLC (CA)

Brothers Servicing, LLC (CA)

Cine Productions, LLC (LA)

Den of Thieves Films, LLC (CA)

Five Continents Imports, LLC (f/k/a Knockout Films, LLC) (CA)

Guido Contini Films, LLC (CA)

In The Hat Productions, LLC (CA)

JGAG Acquisitions, LLC (CA)

3 Days to Kill Productions, LLC (CA)

Armored Car Productions, LLC f/k/a/ Loomis Fargo Productions, LLC (CA)

Black Or White Films, LLC

Brothers Productions, LLC (CA)

Dark Fields Productions, LLC (CA)

Don Jon Acquisitions, LLC (CA)

The Weinstein Co [50%]

[50%] Habory Pictures, LLC (CA)

J & J Project LA, Inc (CA corp)*

A Perfect Getaway, LLC (CA)

Blackbird Productions, LLC (CA)

Catfish Productions, LLC (CA)

Dear John, LLC (CA)

DR Productions, LLC (CA)

Fighter, LLC (CA)

Furnace Films, LLC (CA)

J & J Project, LLC (f/k/a J&J Profects, LLC (f/k/a Monkey King, LLC)) (CA)

A Perfect Getaway P.R., LLC (CA)

[50%] Atlas Entertainment

[25%] [25%] Current Entertainment

Baker Street Investors, LLC (CA)

Brilliant Films, LLC (CA)*

Brick Mansions Acquisitions, LLC (CA)

Gotti Acquisitions, LLC (f/k/a RML Jobs, LLC) (CA)

Hunter Killer Productions, LLC (CA)

Hunter Killer La Productions, LLC (LA)

**Acquisitions**

1   Articles Indicate J&J LA, Inc. is parent.
*   In Process of Dissolution

RML Acquisitions I, LLC (CA)

RML Acquisitions II, LLC (CA)

RML Acquisitions III, LLC (CA)

RML Acquisitions IV, LLC (CA)

RML Acquisitions IV, LLC (CA)

RML Acquisitions VI, LLC (CA)

RML Acquisitions VII, LLC (CA)

RML Acquisitions VIII, LLC (CA)

RML Acquisitions IX, LLC (CA)

RML Acquisitions X, LLC (CA)

RML Acquisitions XI, LLC (CA)

RML Acquisitions XII, LLC (CA)

RML Acquisitions XIII, LLC (CA)

RML Acquisitions XIV, LLC (CA)

RML Acquisitions XV, LLC (CA)









RMG
Single Picture SPVs
RML Bronze Films, LLC (CA)
RML Documentaries, LLC (CA)
RML DR Films, LLC (CA)
RML Damascus Films, LLC (CA)
RML Desert Films, LLC (CA)
RML Echo Films, LLC (CA)
RML Escobar Films LLC (CA)
RML Hector Films, LLC (CA)
RML Hillsong Films, LLC (CA)
RML IFWT Films, LLC (CA)
RML Kidnap Films, LLC (CA)
RML Lazarus Films, LLC (CA)
RML Nina Films, LLC (CA)
RML November Films, LLC (CA)
RML Oculus Films, LLC (CA)
RML Our Father Films, LLC (CA)
RML Romeo and Juliet Films, LLC (CA)
RML Scripture Films, LLC (CA)
RML Solace Films, LLC (CA)
RML Somnia Films, LLC (CA)
RML Timeless Productions, LLC (CA)
RML Turkeys Films, LLC (f/k/a RML Turkeys Acquisitions, LLC) (CA)
RML Very Good Girls Films, LLC (CA)
RML WIB Films, LLC (CA)
Safe Haven Productions, LLC (CA)
Sanctum Films, LLC (CA)
Santa Claus Productions, LLC (CA)
Season of the Witch Distributions, LLC (CA)
Season of the Witch, LLC (CA)
Season of the Witch Productions, LLC (CA)
Snow White Productions, LLC (CA)
Spy Next Door, LLC (CA)
Strangers II, LLC (CA)
Stretch Armstrong Productions, LLC (CA)
Studio Merchandise, LLC (CA)
Summer Forever Productions, LLC (CA)
The Crow Productions, LLC (CA)
Totally Interns, LLC (CA)
Tribes of Palos Verdes Production, LLC (CA)
War of the Gods, LLC (CA)
War of Gods Distributions, LLC (CA)
War of Gods Productions, LLC (CA)
Warrior Way, LLC (CA)
Wright Girls Films, LLC (CA)
Yuma, Inc. (NM)
Yuma Films, Inc. (CA)

RML
TV Division
Relativity TV, LLC (CA)
Relativity REAL, LLC (CA) d/b/a Relativity Television
Pocomo Productions, LLC (CA)
Smith Point Productions, LLC (CA)
Cisco Beach Media, LLC (CA)
English Breakfast Media, LLC (CA)
Great Point Productions, LLC (CA)
Hooper Farm Publishing, LLC (CA)
Long Pond Media, LLC (CA)
Madaket Road Music, LLC (f/k/a Broad Street Music, LLC) (CA)
Orange Street Media, LLC (CA)
Tuckernuck Music, LLC (CA)
Zero Point Enterprises, LLC (CA)
Brant Point Productions, LLC (CA)
Cliff Road Media, LLC (CA)
Einstein Rentals, LLC (CA)
Hooper Farm Music, LLC (CA)
Hummock Pond Properties, LLC (CA)
Madaket Publishing, LLC (f/k/a Broad Street Publishing, LLC) (CA)
Miacomet Media LLC (CA)
Straight Wharf Productions, LLC (CA)
Tuckernuck Publishing, LLC (CA)

*Relativity Media, LLC's ownership of Relativity Sports Management, LLC is subject to warrants issued to YC Athletic Holdings, LLC, granting the right to purchase 50% of the equity interests in Relativity Sports Management, LLC for a nominal amount.
**The ownership of Relativity Sports, LLC ("RS") indicated above is subject to warrants issued to Roosevelt Barnes, Jr., Yucaipa American Affiliate II, LLC and Colbeck Partners IV, LLC, granting the right to purchase 2.10%, 3.30% and 6.60% respectively, of the equity interest in RS for a nominal amount.
***Ownership interest is evidenced by warrants to purchase amounts as shown
****Such percentage is not on a fully-diluted basis.
*****The ownership of Rogue Sports, LLC indicated above is subject to the terms of the grant agreement in favor of Happy Walters for 15% of the non-voting ownership interests.

**Schedule 1**

**Committees**

      Pursuant to Local Rule 1007-2(a)(3), the Debtors do not believe that any committee has been formed prior to the Petition Date.

**Schedule 2**

**Consolidated List of 50 Largest Unsecured Claims (Excluding Insiders)**

       Pursuant to Local Rule 1007-2(a)(4), the following is a list of creditors holding, as of July 29, 2015, the fifty (50) largest unsecured claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.[1]

| | Name of Creditor | Complete mailing address, and employee, agents, or department familiar with claim[2] | Nature of claims | Indicate if claim if contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 1. | Carat USA | 2700 Pennsylvania Ave, 2nd Floor Santa Monica, CA 90404 Fax: 310-255-1021 | Trade | Disputed | 36,812,731 |
| 2. | Palisades Mediagroup | 1620 26th Street, #200 S Santa Monica, CA 90404 Fax: 310-828-7852 | Trade | | 5,172,626 |
| 3. | Cinram Group, Inc. | 2255 Markham Road Toronto, Ontario Canada M1B2W2 Fax: 416-298-0612 | Loan | | 4,197,187 |
| 4. | Technicolor Digital Cinema | 3401 N. Centre Lake Dr., Suite 500 Ontario, CA 91761 Fax: 909-974-2005 | Trade | | 3,437,150 |
| 5. | Technicolor, Inc. | 6040 West Sunset Boulevard Hollywood, CA 90028 Fax: 909-974-2005 | Loan | | 3,057,047 |
| 6. | Cinedigm Digital Cinema Corp. | 902 Broadway, 9th Floor New York, NY 10010 Fax: 212-598-4898 | Trade | | 1,949,896 |

---

[1] The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. All claims are subject to customary offsets, rebates, discounts, reconciliations, credits, and adjustments, which are not reflected on this Schedule.

[2] Local Rule 1007-2(a)(4) requires that the Debtors provide the telephone number of the creditors included herein. However, in the interest of protecting the privacy of the creditors, the telephone numbers have been omitted. They will be provided to the U.S. Trustee.

| | Name of Creditor | Complete mailing address, and employee, agents, or department familiar with claim[2] | Nature of claims | Indicate if claim if contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 7. | Left Behind Investments, L.L.C. o/b/o Ollawood Prod., LLC | 1 St. Paul Street, Suite 701 St. Catharines, Ontario Canada L2R 7L4 Fax: 905-684-7946 | Trade | | 1,809,434 |
| 8. | American Express | 200 Vesey Street New York, NY 10285-3106 Fax: 212-640-0404 | Business Credit Cards | | 1,518,450 |
| 9. | Say Media, Inc. | 180 Townsend St. 1st Floor San Francisco, CA 94107 Fax: 415-979-1586 | Trade | | 1,487,350 |
| 10. | Kasima LLC | One International Blvd, #902 Mahwah, NJ 07495 Fax: 201-252-4215 | Trade | | 1,049,846 |
| 11. | Deluxe Advertising Services, LLC | 2400 West Empire Ave., Suite 200 Burbank, CA 91504 Fax: 818-260-2125 | Trade | | 861,750 |
| 12. | Allied Integrated Marketing | 55 Cambridge Parkway, Ste. 200 Cambridge, MA 02142 Fax: 617-247-8380 | Trade | | 766,142 |
| 13. | Clarius BIGS | 9100 Wilshire Blvd., Suite 520E Beverly Hills, CA 90212 Fax: 310-360-7033 | Trade | | 648,942 |
| 14. | Google, Inc. | 1600 Amphitheatre Pkwy. Mountain View, CA 94043 Fax: 650-963-3574 | Trade | | 647,874 |
| 15. | Buddha Jones | 910 N. Sycamore Ave. Los Angeles, CA 90038 Fax: 323-850-3321 | Trade | | 607,988 |
| 16. | Huddled Masses, LLC | 79 Madison Ave., 2nd Floor New York, NY 10016 Fax: 206-350-1704 | Trade | | 579,398 |
| 17. | Identical Production Company, LLC | 6213 Charlotte Pike, Ste. 111 Nashville, TN 37209 Fax: 615-633-4773 | Trade | | 550,000 |

| | Name of Creditor | Complete mailing address, and employee, agents, or department familiar with claim[2] | Nature of claims | Indicate if claim if contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 18. | Story Pictures, LLC | 5738 Calpine Dr. Malibu, CA 90265 | Trade | | 500,000 |
| 19. | K&L Gates LLP | 925 Fourth Ave., #2900 Seattle, WA 98104 Fax: 206-623-7022 | Legal Services | | 489,249 |
| 20. | Workshop Creative LLC | 9006 Melrose Ave. West Hollywood, CA 90069 Fax: 818-566-8995 | Trade | | 478,805 |
| 21. | Major League Gaming | 3 Park Ave., Floor 32 New York, NY 10016 | Trade | | 400,000 |
| 22. | MarketCast, LLC | 1801 W. Olympic Blvd. Pasadena, CA 91199 Fax: 323-617-9537 | Trade | | 386,000 |
| 23. | Technicolor Entertainment Services | 3401 N. Centre Lake Dr., Suite 500 Ontario, CA 91761 Fax: 909-974-2005 | Trade | | 342,214 |
| 24. | Panay Films, Inc. | 2029 Century Park East, Ste. 1500 Los Angeles, CA 90067 Fax: 310-785-9035 | Trade | | 331,005 |
| 25. | Ease Services, LP | 8383 Wilshire Blvd., Suite 100 Beverly Hills, CA 90211 Fax: 310-469-7314 | Trade | | 325,959 |
| 26. | Screen Engine, LLC | 10635 Santa Monica Blvd., Suite #125 Los Angeles, CA 90025 Fax: 310-361-8499 | Trade | | 306,155 |
| 27. | Nielsen NRG, Inc. | 6255 Sunset Blvd., 19th Floor Los Angeles, CA 90028 Fax: 201-590-6923 | Trade | | 301,760 |
| 28. | Create Advertising Group | 6022 Washington Blvd. Culver City, CA 90232 Fax: 310-280-2991 | Trade | | 300,091 |
| 29. | Bad Beard Productions | 1890 S Cochran Ave., #6 Los Angeles, CA 90019 | Trade | | 299,907 |

| | Name of Creditor | Complete mailing address, and employee, agents, or department familiar with claim[2] | Nature of claims | Indicate if claim if contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 30. | Holthouse Carlin & Van Trigt LLP | 1801 W. Olympic Blvd., Pasadena, CA 91199 Fax: 626-243-5101 | Accountancy & Tax Services | | 298,517 |
| 31. | EuropaCorp Films USA, Inc. | 137 Rue du Faubourg Saint-Honoré Paris 75008 France Fax: +33-1-53-83-03-04 | Trade | | 297,233 |
| 32. | Christie Digital Systems USA | 10650 Camden Dr. Cypress, CA 90630 Fax: 714-503-3375 | Trade | | 274,930 |
| 33. | Technicolor Creative Services USA Inc. | 3401 N Centre Lake Dr, Suite 500 Ontario, CA 91761 Fax: 909-974-2005 | Trade | | 261,415 |
| 34. | Katz Media Group | 12022 Collection Center Dr. Chicago, IL 60693 Fax: 212-424-6489 | Trade | | 251,667 |
| 35. | Fishbowl, LLC | 751 Fairfax Ave. Los Angeles, CA 90046 Fax: 310-550-8080 | Trade | | 240,575 |
| 36. | IMG Models | 304 Park Ave. South, Penthouse North New York, NY 10010 Fax: 212-253-0395 | Trade | | 240,000 |
| 37. | Atlas Digital LLC | 170 S. Flower Street Burbank, CA 91502 Fax: 323-878-0020 | Trade | | 214,691 |
| 38. | Debmar-Mercury, LLC | 225 Santa Monica Blvd., 8th Floor Santa Monica, CA 90401 Fax: 310-393-6110 | Trade | | 212,500 |
| 39. | mOcean Pictures LLC | 2440 S. Sepulveda Blvd., Suite #150 Los Angeles, CA 90064 Fax: 310-481-0807 | Trade | | 202,663 |
| 40. | Alexander Wang, Inc. | 386 Broadway New York, NY 10013 Fax: 212-532-3110 | Trade | | 200,000 |

| | Name of Creditor | Complete mailing address, and employee, agents, or department familiar with claim[2] | Nature of claims | Indicate if claim if contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 41. | National CineMedia, LLC | 9110 East Nichols Avenue, Suite 200 Centennial, CO 80112 Fax: 303-792-8202 | Trade | | 199,303 |
| 42. | Ignition Creative LLC | 12959 Coral Tree Place Los Angeles, CA 90066 Fax: 310-315-6301 | Trade | | 196,914 |
| 43. | Sony Electronics Inc. | 10202 W. Washington Blvd. Culver City, CA 90232 Fax: 201-930-6065 | Trade | | 193,595 |
| 44. | Eclipse Marketing Services | 490 Headquarters Plaza North Tower, 10th Floor Morristown, NJ 07960 Fax: 973-695-0209 | Trade | | 180,646 |
| 45. | Daniel Segal | 7 Winthrop Street, PO Box 37 Essex, MA 01929-1203 Fax: 978-768-6570<br><br>c/o Lowe Law, PC 11400 Olympic Blvd., Ste. 640 Los Angeles, CA 90025 Fax: 310-477−7672 | Litigation | Disputed | Unknown |
| 46. | Patrick White | 8506 1/2 S San Pedro St. Los Angeles, CA 90003 | Litigation | Disputed | Unknown |
| 47. | Bruce Talamon | 3626 Mount Vernon Drive Los Angeles, CA 90008 | Litigation | Disputed | Unknown |
| 48. | Kenneth Heusey | 190 Smithfield Street Pittsburgh, PA 15222 | Litigation | Disputed | Unknown |
| 49. | Jeff Most; Jeff Most Productions, Inc. | c/o Gersh Derby, LLP 15321 Ventura Boulevard, Suite 515 Encino, California 91436 Fax: 818-981-4618 | Litigation | Disputed | Unknown |
| 50. | Michael Matthew Jarman | 15234 Lakes of Delray Blvd. Delray Beach, FL 33484 | Litigation | Disputed | Unknown |

**Schedule 3**

**Consolidated List of Holders of 5 Largest Secured Claims**

Pursuant to Local Rule 1007-2(a)(5), the following chart lists the creditors holding, as of July 29, 2015, the five largest secured, non-contingent claims against the Debtors, on a consolidated basis, excluding claims of insiders defined in 11 U.S.C. § 101.

| No. | Creditor | Contact, Mailing Address, Telephone Number / Fax Number, Email | Amount of Claim (as of 7/29/15) | Type of Collateral |
|---|---|---|---|---|
| 1 | Cortland Capital Markets Services LLC, as Collateral Agent and Administrative Agent | Cortland Capital Market Services LLC 225 W. Washington Street, Suite 1450 Chicago, Illinois 60606 Attn: Beata Konopko T: 312-564-5080 F: 312-376-0751 | $361,611,038 plus accrued interest | All the property and assets and all interests therein and proceeds thereof now owned or hereafter acquired of RML and certain of its subsidiaries. |
| 2 | Manchester Securities Corp., as Lender | Manchester Securities Corp. 40 West 57th Street New York, NY 10019 Attn: Johannes Weber T: 212-478-2275 F: 212-478-2276 | $137,078,557 plus accrued interest | All the property and assets and all interests therein and proceeds thereof now owned or hereafter acquired of RML and certain of its subsidiaries. |

| No. | Creditor | Contact, Mailing Address, Telephone Number / Fax Number, Email | Amount of Claim (as of 7/29/15) | Type of Collateral |
|---|---|---|---|---|
| 3 | RKA Film Financing, LLC, as Agent | Cortland Capital Market Services LLC 225 W. Washington Street, 21st Floor Chicago, Illinois 60606 F: 312-376-0751 | $83,868,538 plus accrued interest | Domestic Distribution Agreements, IP, Picture Rights, Related Picture Assets, Gross Receipts, Blocked Accounts, related Intercreditor Agreements and Proceeds related to the applicable P&A Picture. |
| 4 | Macquarie US Trading LLC, as Agent | Macquarie US Trading LLC c/o Cortland Capital Market Services LLC 225 W. Washington Street, 21st Floor Chicago, Illinois 60606 Attn: Agency Services – Macquarie F: 312-376-0751 | $32,424,280 plus accrued interest | Domestic Distribution Agreements, IP, Picture Rights, Related Picture Assets, Gross Receipts, Blocked Accounts, related Intercreditor Agreements and Proceeds related to the applicable P&A Picture. |
| 5 | OneWest Bank, FSB, as Administrative Agent | OneWest Bank, FSB 888 E. Walnut Street Pasadena, CA 911101 Attn: Lauren Puliso & Tina Dave T: 866-518-6540 | $27,789,945 plus accrued interest | All personal property, and tangible and intangible property, of RMLDD Financing and the Ultimates Guarantors. |

**Schedule 4**

**RELATIVITY HOLDINGS, LLC[1]**
**Consolidated Balance Sheet (unaudited)**
**as of December 31, 2014**

(dollars in thousands)

| Assets | unaudited |
|---|---|
| Cash | 92,293 |
| Restricted cash | 1,114 |
| Accounts receivable, net | 98,436 |
| Prepaids and other assets | 11,566 |
| Property and equipment, net | 5,629 |
| Film costs, net | 139,585 |
| Goodwill | 34,008 |
| Intangible assets, net | 171,278 |
| Deferred finance costs, net | 6,063 |
| **Total assets** | $      559,973 |

**Liabilities and Members' Deficit**

**Liabilities**

| | |
|---|---|
| Accounts payable and accrued liabilities | 209,601 |
| Accrued participations and residuals | 52,503 |
| Advances and deferred revenue | 54,080 |
| Notes payable | 22,114 |
| Bank debt | 123,767 |
| Production loans | 49,395 |
| Related-party borrowings | 667,350 |
| **Total liabilities** | 1,178,810 |
| **Members' deficit** | (618,837) |
| **Total liabilities and members' deficit** | $      **559,973** |

---

[1] The amounts provided herein are presented on a consolidated basis for all Relativity entities reflected on Exhibit B hereto and not just the Debtors who have filed Chapter 11 Petitions. Unless otherwise indicated, the financial information contained in this Declaration is unaudited and subject to change.

**Schedule 5**

**The Debtors' Securities**

Pursuant to Local Rule 1007-2(a)(7), the Debtors submit that they have not issued securities that are registered with the Securities and Exchange Commission. The securities listed in the chart below were issued by the Debtor pursuant to an exemption from registration under the Securities Act of 1933, as amended.

**Class, Units and Percentages of the Members**
**(as of July 7, 2015)**

| Total Units Issued and Outstanding | Number of Units | Ownership Percentage[1] | Voting Percentage |
|---|---|---|---|
| Class A[2] | 120,750,089 | 66.3134% | 83.7720% |
| Class B[3] | 59,979,890 | 32.9397% | 0.0000% |
| Class C[4] | 3.4704 | 0.0000% | 0.0000% |
| Class D | 1,360,000 | 0.7469% | 0.0000% |
| Class E[2][4] | 11,695,648 | 0.0000% | 16.2280%[5] |

---

[1] Reflects current ownership percentage. Calculations of ownership on a fully diluted as-converted basis on file with Relativity.

[2] Indicates voting class.

[3] There are 17,253,638 Class B Units that are currently vested at $12.50 per Unit.

[4] Indicates Preferred Equity class.

[5] Voting Percentage calculated at two times number of outstanding Class E Units.

-10-

| SHARES HELD BY DEBTORS' OFFICERS AND DIRECTORS[6] | | | |
|---|---|---|---|
| **Name** | **Units and Class** | **Ownership Percentage** | **Voting Percentage** |
| Ryan Kavanaugh | 22,684,800 Class A | 12.4580% | 15.7379% |
| Carey Metz | 2,897,744 Class A | 1.5914% | 2.0103% |
| Ryan Kavanaugh | 15,543,800* Class B | 8.5363% | 0% |
| Tucker Tooley | 3,260,900 Class B | 1.7908% | 0% |
| Angela Courtin | 160,000* Class B | 0.0879% | 0% |
| Tom Forman | 1,360,000* Class B | 0.7469% | 0% |
| Lisa Eisenpresser | 75,000* Class B | 0.0412% | 0% |
| RHL Management LLC** | 4,179,760* Class B | 2.2955% | 0% |
| Mark Canton | 29,630 Class B | 0.0163% | 0% |
| Tom Forman | 1,360,000 Class D | 0.7469% | 0% |

** Includes Class B Units for Carol Genis, Robbie Brenner, William Kyle Davies, Danny Stepper, Greg Shamo and Ramon Wilson

---

[6] Local Rule 1007-2(a)(7) requires that the Debtors list separately those class of shares of stock, debentures, or other securities held by each of the Debtor's officers and directors and the amounts so held. This list includes only those shares of stock held directly by the Debtors' officers and directors. A full list of the Debtors' equity holders can be found in the *List of Equity Security Holders*, filed contemporaneously herewith.

**Schedule 6**

**Debtors' Property Not in the Debtors' Possession**

Local Rule 1007-2(a)(8) requires the Debtors to list property that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

In the ordinary course of business, on any given day, property of the Debtors (including film masters, masters for DVDs, production sets and production equipment, security deposits or other collateral with counterparties to certain commercial relationships) is likely to be in the possession of various third parties, including, shippers, common carriers, materialmen, logistics vendors, tooling vendors, distributors, processors, expeditors, warehousemen, other related service providers, or agents, where the Debtors' ownership is not affected. Because of the constant movement of this property, providing a comprehensive list of the property that is in the possession or custody of such persons and a list of the persons or entities in possession of such property, their addresses and telephone numbers, and the location of any court proceeding affecting the property would be impractical.

# Schedule 7

Pursuant to Local Rule 1007-2(a)(9), the following lists the property of premises owned, leased or held under other arrangement from which the Debtors operate their business.[1]

1.   315 Park Avenue South, New York, NY 10010 pursuant to Agreement of Lease, dated of March 20, 2014 (as amended, supplemented or otherwise modified, renewed, restated or replaced from time to time), between 315 Holdings, LLC and Relativity Media, LLC.

2.   9242 Beverly Blvd., Beverly Hills, CA 90210 pursuant to Lease, dated as of April 25, 2011 (as amended, supplemented or otherwise modified, renewed, restated or replaced from time to time), between Beverly Place, L.P. and Relativity Media, LLC.

3.   335-345 North Maple Drive, Beverly Hills, CA 90210 pursuant to Lease, dated as of May 1, 2012 (as amended, supplemented or otherwise modified, renewed, restated or replaced from time to time), all licenses related thereto, between Maple Plaza, L.P. and Relativity Media, LLC.

4.   Airplane hangar located at 3000 31st Street, North Hangar, North Bay, Santa Monica, CA 90405 pursuant to Gunnell Hangar Agreement, dated as of January 26, 2011 (as amended, supplemented or otherwise modified, renewed, restated or replaced from time to time), between Gunnell Properties and CinePost, LLC.

5.   Hollywood Center Studios, 1040 North Las Palmas Avenue, Los Angeles, CA 90038 pursuant to Office License Agreement, dated as of March 30, 2009 (as amended, supplemented or otherwise modified, renewed, restated or replaced from time to time), between Relativity REAL, LLC and Hollywood Center Studios.

6.   Hollywood Center Studios, 1040 North Las Palmas Avenue, Los Angeles, CA 90038 pursuant to Office License Agreement, dated as of January 29, 2015 (as amended, supplemented or otherwise modified, renewed, restated or replaced from time to time), between Relativity REAL, LLC and Hollywood Center Studios.

7.   Hollywood Center Studios, 1040 North Las Palmas Avenue, Los Angeles, CA 90038 pursuant to Office License Agreement, dated as of April 12, 2010 (as amended, supplemented or otherwise modified, renewed, restated or replaced from time to time), between Relativity REAL, LLC and Hollywood Center Studios.

8.   Hollywood Center Studios, 1040 North Las Palmas Avenue, Los Angeles, CA 90038 pursuant to Office License Agreement, dated as of November 5, 2010 (as amended, supplemented or otherwise modified, renewed, restated or replaced from time to time), between Relativity REAL, LLC and Hollywood Center Studios.

---

[1] The classification of the contractual agreements listed herein as real leases or property held by other arrangements is not binding upon the Debtors.

9.      Hollywood Center Studios, 1040 North Las Palmas Avenue, Los Angeles, CA 90038
        pursuant to Office License Agreement, dated as of March 22, 2010 (as amended,
        supplemented or otherwise modified, renewed, restated or replaced from time to time),
        between Long Pond Media, LLC and Hollywood Center Studios.

10.     1135 North Mansfield Avenue, Los Angeles, CA 90038 pursuant to Lease, dated as of
        August 1, 2011 (as amended, supplemented or otherwise modified, renewed, restated or
        replaced from time to time), between J&R Film Co., Inc. dba Moviola and Relativity REAL,
        LLC.

11.     Certain small parcels of real property used for short-term production sites in Greater Atlanta,
        Georgia.

**Schedule 8**

**Locations of Debtors' Assets, Books, and Records**

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits if the United States.

**Location of Debtors' Substantial Assets**

The Debtors have assets of more than $560,000,000 (unaudited consolidated basis and subject to change), with substantial assets in California, New York and Delaware.

**Books and Records**

The Debtors' books and records are located in Beverly Hills, California.

**Debtors' Assets Outside the United States**

The Debtors, in addition to their non-Debtor affiliates, have significant assets worldwide, including significant assets held outside of the United States through direct and indirect subsidiaries of the Debtors, including:

- Sky Land (Beijing) Film-Television Culture Development Ltd. Joint Venture Interest: Unknown value

- Relativity B4U Limited Joint Venture Interest: Unknown value

**Schedule 9**

**Litigation**

Pursuant to Local Rule 1007-2(a)(11), to the best of the Debtors' knowledge and belief, the following is a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

**Litigations**

| | Plaintiff(s) | Defendant(s) | Jurisdiction | Nature of Proceeding | Status |
|---|---|---|---|---|---|
| 1. | Daniel Segal, an individual | Rogue Pictures, a division of Relativity Media LLC; Universal Pictures Company LLC, a subsidiary of NBC Universal Inc.; Phantom Four Films; David S. Goyer; Michael Bay; Andrew Form; Brad Fuller; Jessika Borsiczky Goyer; William Beasley; and DOES 1-50, inclusively. | District Court for the Central District of California | Copyright infringement and breach of implied in fact contract relating to *The Unborn* | Claim against Rogue Pictures dismissed with prejudice on 8/19/2011; Second amended complaint dismissed 1/24/2012. Appellate court affirmed. Appeals exhausted and *writ of certiorari* denied on October 6, 2014. |
| 2. | Daniel Segal, an individual | Rogue Pictures, a division of Relativity Media, LLC; and DOES 1-50 | Superior Court of the State of California | Breach of implied contract relating to *The Unborn* | Complaint filed January 9, 2012. Stayed pending federal court case. No activity since March 2015. |

| | Plaintiff(s) | Defendant(s) | Jurisdiction | Nature of Proceeding | Status |
|---|---|---|---|---|---|
| 3. | Patrick White | Sony Pictures; Columbia Pictures; Media Rights Capital; Relativity Media; NBC Universal Media; and Universal Pictures | District Court for the Central District of California | Copyright Infringement claim relating to *Salt*, *Charlie St. Cloud*, *Battle: Los Angeles* and *Safe House* | Complaint filed January 7, 2013. |
| 4. | Bruce Talamon | Stacey Mooradian, EVP of Publicity, Relativity Media | Equal Opportunity Commission, Los Angeles District Office | Allegation that decision to deny plaintiff a still photographer position for *Beyond the Lights* was racially discriminatory | Complaint filed February 7, 2014. |
| 5. | Kenneth Heusey | Sony Pictures Entertainment, Inc.; Relativity Media, LLC | District Court for the Central District of California | Copyright claim relating to *Anonymous* | Defendants' motion to dismiss is pending. |
| 6. | Jeff Most and Jeff Most Productions, Inc. | Relativity Media, LLC; Edward R. Pressman Film Corporation; and Sammyjack Productions | Los Angeles Superior Court | Breach of contract and other claims relating to *The Crow* | Complaint filed on July 17, 2013.<br><br>Tolling agreement entered into in April 2014 that dismissed the litigation without prejudice. |
| 7. | Michael Matthew Jarman | Relativity Media, LLC | California | Intellectual property fraud, unethical business practices and | Complaint filed on April 14, 2015. |

| Plaintiff(s) | Defendant(s) | Jurisdiction | Nature of Proceeding | Status |
|---|---|---|---|---|
| | | | intentional infliction of emotional and physical distress relating to VII Peaks transaction. | |

**Guild Arbitrations**

| | Plaintiff(s) | Defendant(s) | Jurisdiction | Nature of Proceeding | Status |
|---|---|---|---|---|---|
| 1. | Writers Guild of America, West, Inc. | Relativity Media, LLC; J&J Project, LLC; J&J Productions, Ltd.; Lions Gate Films, Inc. | Arbitration Tribunal | Unpaid residual compensation in connection with *The Forbidden Kingdom* | Claim settled on March 20, 2015. |
| 2. | WGA | Relativity Films, LLC; Relativity Development, LLC; Spy Next Door, LLC; Relativity Media, LLC; Lions Gate Films, Inc.; Ryan Kavanaugh | Arbitration Tribunal | Unpaid residuals by Lionsgate in connection with *Spy Next Door* | Claim received June 26, 2012. |
| 3. | WGA | Brothers Productions, LLC; Relativity Media, LLC; Metro Goldwyn Mayer Distribution Co.; Lions Gate Films, Inc. | Arbitration Tribunal | Unpaid residuals by Lionsgate in connection with *Brothers* | Claim received December 5, 2012. |

| | Plaintiff(s) | Defendant(s) | Jurisdiction | Nature of Proceeding | Status |
|---|---|---|---|---|---|
| 4. | WGA | Baker Street Investors, LLC | Arbitration Tribunal | Unpaid residuals by Baker Street Investors, LLC in connection with *Bank Job* | Claim received June 1, 2012. |
| 5. | WGA | Furnace Films, LLC; Relativity Films, LLC; Relativity Development, LLC; Relativity Media, LLC; Ryan Kavanaugh | Arbitration Tribunal | Residuals reserves and related financial assurances. | Claim settled on March 14, 2013. |
| 6. | Director's Guild of America | Blackbird Productions, LLC | California | Grievance regarding hiring prohibited production staff prior to hiring a UPM | Claim settled on March 4, 2015 |

**Threatened Claims**

| | Plaintiff(s) | Defendant(s) | Nature of Proceeding | Status |
|---|---|---|---|---|
| 1. | Brett Ratner | Relativity Rogue, LLC | Alleged fees related to the series *Catfish* | Received notice of potential claim from insurance company on June 3, 2013. |
| 2. | Bland-Ricky Roberts | Relativity Media, LLC; Relativity Music Group; and Paul Leonard-Morgan | Alleged unauthorized sampling in *Limitless* song "Hiring Bodyguards" | Settled on October 15, 2013. |
| 4. | Proctor & Gamble | Relativity Media, LLC | Alleged copyright infringement for unauthorized use of "Tampax" in *Movie 43* | Not reported to carrier yet (notice only) |
| 5. | PeopleAreThings (Band) | Relativity Media, LLC | Alleged Copyright Infringement in *Catfish* song "Hitman" | Waiting status update from carrier |
| 6. | Mr. Charlie aka John Doe | Relativity Media, LLC | Alleged Copyright Infringement in *21 & Over* song "Lets Touch" | Demand letter dated March 20, 2013 |
| 7. | Joseph L. | Relativity REAL | Alleged unauthorized Use of Image on *Police Women 7* | Letter received July 18, 2013 |
| 8. | Kimberly Tucker | unclear based on email | Alleged copyright infringement with respect to *Black or White* | Email received on January 30, 2015 |

| | Plaintiff(s) | Defendant(s) | Nature of Proceeding | Status |
|---|---|---|---|---|
| 9. | Howard Rosenberg | Relativity Media, LLC | Alleged copyright infringement for alleged unauthorized use of images of NWA on ArtistDirect website | Received cease and desist letter from Edward C. Greenberg, LLC on February 2, 2015<br><br>Received email from Edward C. Greenberg on February 11, 2015 threatening litigation. |
| 10. | LaTunya Carr | Relativity Media, LLC | Alleged copyright infringement with respect to *The Lazarus Effect* | Email received from Carr on February 19, 2015 |
| 11. | Chris Fillmore | Relativity Media, LLC | Alleged copyright infringement with respect to *The Lazarus Effect* | Email received from Fillmore on March 16, 2015 |
| 12. | DGA | Armored Car Productions, LLC | Alleged failure to pay interest due on late employer contributions Invoice #: 2652747-49 | Notice received February 18, 2015 |
| 13. | DGA | Relativity Media, LLC | Alleged failure to provide a new UPM deal memo on *The Disappointments Room* | Notice received August 22, 2014<br>DGA threatened to file formal grievance on March 25, 2015; potential settlement |
| 14. | Kristian House | Relativity Real, LLC d/b/a Relativity Television | Alleged royalty and credit due on *American Jungle* | Dispute is currently between House and This is Just A Test Productions, Inc. (where she was a partner). |

| | Plaintiff(s) | Defendant(s) | Nature of Proceeding | Status |
|---|---|---|---|---|
| 15. | Butter & Toast | Long Pond Media, LLC | Alleged payment issue related to *American Jungle* | No response to our reply regarding their payment request. |
| 16. | Jerez Coleman | Long Pond Media, LLC | Alleged defamation related to *Catfish The TV Show: Jerez Coleman* (Episode #304) | Threatened action for defamation starting in April 2014 and most recently on February 19, 2015. |
| 17. | Carl Ciarfalio | Relativity Media, LLC; Cast & Crew Payroll, Inc. | Alleged worker's compensation claim | Letter received from Gordon Edelstein Krepack Grant Felton and Goldstein LLP on March 30, 2015 |
| 18. | Jody Williams, a viewer of "8 Minutes" | Nancy Dubuc (A&E Network); Tom Forman (Relativity Media); DominaElle; and other so called "sex workers" | Alleged defamation with respect to *8 Minutes* | Email and letter received from Williams on May 7, 2015 |
| 19. | WGA, Matthew Sand | Relativity Development, LLC | Alleged unpaid writing services compensation and applicable health and pension contributions | Demand for payment received on June 12, 2015. WGA has threatened to proceed to arbitration if payment is not received by June 17, 2015. |
| 20. | Don Campbell | Relativity Media, LLC; Relativity REAL, LLC | Alleged copyright infringement with respect to *American Bible Challenge* | Letter received from Campbell on June 7, 2015. |
| 21. | Viacom International Inc. | Relativity Media | Alleged unpaid advertisements | Letter received on July 29, 2015 |

-22-

**Schedule 10**

**Senior Management**

Pursuant to Local Rule 1007-2(a)(12), the following provides the name of the individuals who comprise the Debtors' existing senior management, a description of their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

| Name and Position | Responsibilities and Experience |
|---|---|
| Ryan Kavanaugh<br><br>*Chief Executive Officer* | Ryan Kavanaugh is the founder and Chief Executive Officer of Relativity. |
| Tucker Tooley<br><br>*President* | Tucker Tooley is the President, overseeing the company's day-to-day operations, business divisions, and personnel. In addition, Mr. Tooley oversees Relativity's film slate, and is responsible for marketing, theatrical distribution and the international business operations of Relativity's network of foreign output partners. Mr. Tooley joined RML in 2007. |
| Happy Walters<br><br>*Co-President*<br><br>*Chief Executive Officer, Relativity Sports* | Happy Walters is the Co-President, serving alongside Tucker Tooley overseeing the company's day-to-day operations, business divisions, and personnel. Mr. Walters also serves as the Chief Executive Officer of Relativity Sports. Mr. Walters joined RML in 2009. |
| Andrew Matthews<br><br>*Chief Financial Officer & Co-Chief Operating Officer* | Andrew Matthews is the Chief Financial Officer and Co-Chief Operating Officer, supervising the overall financial strategy and planning for Relativity. Mr. Matthews joined RML in 2013. |
| Greg Shamo<br><br>*Co-Chief Operating Officer* | Greg Shamo is the Co-Chief Operating Officer, overseeing the company's corporate, business and legal affairs, technology, human resources and operations departments, working alongside Co-Chief Operating Officer Andrew Matthews to manage the company's day-to-day activities. Mr. Shamo joined RML in 2009. |
| Carol Genis<br><br>*Managing Director* | Carol Genis is the Managing Director. She was former outside litigation, and Intellectual Property counsel for RML and joined RML in the fall of 2014 to manage legal, including business affairs and litigation matters for all divisions, management and supervision of outside counsel, management of personnel, operations and to work on strategic planning as well as special situations. |

| Name and Position | Responsibilities and Experience |
|---|---|
| Brian G. Kushner<br><br>*Chief Restructuring Officer* | Brian G. Kushner is a senior managing director of FTI Consulting, Inc. |
| Luke Schaeffer<br><br>*Deputy Chief Restructuring Officer* | Luke Schaeffer is a senior managing director of FTI Consulting, Inc. |

**Schedule 11**

**Payroll**

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors for the 30-day period following the filing of the chapter 11 petitions.

| | |
|---|---|
| **Payments to Employees (Not Including Officers, Directors, and Stockholders)** | $1,750,000[1] |
| **Payments to Officers, Stockholders, and Directors** | $450,000[2] |
| **Payments to Financial and Business Consultants** | $0[3] |

---

[1] In the ordinary course of their business, the Debtors hire independent contracts and utilize Temporary Production Personnel in connection with the production of their films and TV programs. This amount does not include the estimated amount to be paid to the Debtors' independent contractors or Temporary Production Personnel.

[2] The Debtors do not anticipate making any payments to stockholders or directors in the 30-day period following the filing of the Chapter 11 Petitions, except for the payment of ordinary course compensation to the Debtors' officers.

[3] This does not include any payments to the Debtors' attorneys or auditors. Pursuant to the retention applications filed for these professionals, the Debtors will not make any payments in the 30-day period following the filing of the Chapter 11 Petitions. In addition, this does not include the estimated amount to be paid to the Debtors' independent contracts.

-25-

**Schedule 12**

**Cash Receipts and Disbursements,
Net Cash Gain or Loss, Unpaid Obligations and Receivables**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of the chapter 11 petition, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivable expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $16,900,000 |
| **Cash Disbursements** | $21,000,000 |
| **New Cash Loss** | ($14,000,000) |
| **Unpaid Obligations** | $12,000,000 |
| **Uncollected Receivables** | $5,000,000 |