## <u>EXHIBIT B</u>

**DIP Credit Agreement**

**EXECUTION COPY**

**DEBTOR-IN-POSSESSION FINANCING AGREEMENT**

**Dated as of July 30, 2015**

**by and among**

**RELATIVITY MEDIA, LLC AND EACH SUBSIDIARY
THEREOF IDENTIFIED AS
BORROWERS ON THE SIGNATURE PAGES HERETO, each a Debtor and Debtor-in-Possession
under Chapter 11 of the Bankruptcy Code,
as Borrowers,**

**RELATIVITY HOLDINGS LLC, a Debtor and Debtor-in-Possession under Chapter 11 of the
Bankruptcy Code,
as Guarantor,**

**THE LENDERS FROM TIME TO TIME PARTY HERETO,
as Lenders,**

**and**

**CORTLAND CAPITAL MARKET SERVICES LLC,
as Collateral Agent and Administrative Agent**

_____

#4849-2963-6390

## TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS; CERTAIN TERMS ........................................................................... 1
    Section 1.01    Definitions.................................................................................. 1
    Section 1.02    Terms Generally ......................................................................... 23
    Section 1.03    Certain Matters of Construction .................................................. 23
    Section 1.04    Accounting and Other Terms ...................................................... 24
    Section 1.05    Time References .......................................................................... 24

ARTICLE II THE LOANS ............................................................................................................ 24
    Section 2.01    Commitments .............................................................................. 24
    Section 2.02    Making the Loans ....................................................................... 24
    Section 2.03    Repayment of Loans; Evidence of Debt ..................................... 26
    Section 2.04    Interest ........................................................................................ 26
    Section 2.05    Reduction of Commitment; Prepayment of Loans ..................... 27
    Section 2.06    Fees ............................................................................................. 28
    Section 2.07    Use of Proceeds .......................................................................... 28
    Section 2.08    Taxes ........................................................................................... 29
    Section 2.09    Right to Participate in Credit Bid ............................................... 32

ARTICLE III PRIORITY AND LIENS/RANKING/COLLATERAL RELEASE ..................... 32
    Section 3.01    Prepetition TL Obligations ......................................................... 32
    Section 3.02    Acknowledgment of Security Interests ...................................... 32
    Section 3.03    Binding Effect of Documents ..................................................... 32
    Section 3.04    Collateral; Grant of Lien and Security Interest .......................... 33
    Section 3.05    Administrative Priority ............................................................... 33
    Section 3.06    Grants, Rights and Remedies ...................................................... 34
    Section 3.07    No Filing Required ...................................................................... 34
    Section 3.08    Survival ....................................................................................... 34
    Section 3.09    Release ......................................................................................... 35

ARTICLE IV FEES, PAYMENTS AND OTHER COMPENSATION ..................................... 35
    Section 4.01    Audit and Collateral Monitoring Fees ........................................ 35
    Section 4.02    Payments; Computations and Statements .................................... 35
    Section 4.03    Sharing of Payments, Defaulting Lenders, Etc. .......................... 36
    Section 4.04    Apportionment of Payments ....................................................... 37
    Section 4.05    Increased Costs and Reduced Return .......................................... 38
    Section 4.06    Making or Maintaining Loans ..................................................... 39
    Section 4.07    Joint and Several Liability of the Borrowers .............................. 40

ARTICLE V CONDITIONS TO LOANS ..................................................................................... 41
    Section 5.01    Conditions Precedent to Interim Facility Effective Date ............ 41
    Section 5.02    Conditions Precedent to Final Facility Effectiveness ................. 43
    Section 5.03    Conditions Precedent to all Loans .............................................. 43

ARTICLE VI REPRESENTATIONS AND WARRANTIES ...................................................... 45
    Section 6.01    Representations and Warranties .................................................. 45

ARTICLE VII COVENANTS OF THE LOAN PARTIES ........................................................... 51
    Section 7.01    Affirmative Covenants ................................................................ 51

Section 7.02    Negative Covenants ................................................................... 57

ARTICLE VIII 363 SALE COVENANTS .................................................................62
Section 8.01    Sale Process ........................................................................ 62
Section 8.02    Sale and Bidding Procedures........................................................ 62
Section 8.03    Winning Bidder; Sale ............................................................... 62
Section 8.04    Sale Proceeds ...................................................................... 62

ARTICLE IX EVENTS OF DEFAULT ..................................................................63
Section 9.01    Events of Default .................................................................. 63

ARTICLE X AGENTS .................................................................................67
Section 10.01    Appointment ....................................................................... 67
Section 10.02    Nature of Duties .................................................................. 68
Section 10.03    Rights, Exculpation, Etc. ......................................................... 68
Section 10.04    Reliance .......................................................................... 69
Section 10.05    Indemnification ................................................................... 69
Section 10.06    Agents Individually ............................................................... 69
Section 10.07    Successor Agent ................................................................... 70
Section 10.08    Collateral Matters ................................................................ 70
Section 10.09    Agency for Perfection ............................................................. 71
Section 10.10    No Reliance on any Agent's Customer Identification Program ....................... 72
Section 10.11    Liability ......................................................................... 72
Section 10.12    No Third Party Beneficiaries....................................................... 72
Section 10.13    No Fiduciary Relationship.......................................................... 72

ARTICLE XI GUARANTY .............................................................................72
Section 11.01    Guaranty .......................................................................... 72
Section 11.02    Guaranty Absolute ................................................................. 72
Section 11.03    Waiver ............................................................................ 73
Section 11.04    Continuing Guaranty; Assignments .................................................. 74
Section 11.05    Subrogation ....................................................................... 74

ARTICLE XII MISCELLANEOUS .......................................................................74
Section 12.01    Notices, Etc. ..................................................................... 74
Section 12.02    Amendments, Etc. .................................................................. 75
Section 12.03    No Waiver; Remedies, Etc. ......................................................... 76
Section 12.04    Expenses; Taxes; Attorneys' Fees .................................................. 76
Section 12.05    Right of Set-off .................................................................. 77
Section 12.06    Severability ...................................................................... 77
Section 12.07    Assignments and Participations..................................................... 77
Section 12.08    Counterparts ...................................................................... 79
Section 12.09    GOVERNING LAW ..................................................................... 80
Section 12.10    CONSENT TO JURISDICTION; SERVICE OF PROCESS AND
                 VENUE ............................................................................. 80
Section 12.11    WAIVER OF JURY TRIAL, ETC. ........................................................ 80
Section 12.12    Consent by the Agents and Lenders ................................................. 80
Section 12.13    No Party Deemed Drafter ........................................................... 81
Section 12.14    Reinstatement; Certain Payments ................................................... 81
Section 12.15    Indemnification; Limitation of Liability for Certain Damages ...................... 81
Section 12.16    RML as Agent for Borrowers ........................................................ 82
Section 12.17    Records ........................................................................... 82

Section 12.18    Binding Effect ....................................................................................... 82
Section 12.19    Interest .................................................................................................... 83
Section 12.20    Confidentiality ....................................................................................... 84
Section 12.21    Public Disclosure .................................................................................. 84
Section 12.22    Integration .............................................................................................. 85
Section 12.23    USA PATRIOT Act ............................................................................... 85

SCHEDULE AND EXHIBITS

Schedule 1.01(A)      Lenders and Lenders' Commitments
Schedule 6.01(e)      Capitalization; Subsidiaries
Schedule 6.01(f)      Litigation; Commercial Tort Claims
Schedule 6.01(i)      Employee Benefits
Schedule 6.01(j)      Taxes
Schedule 6.01(o)      Real Property
Schedule 6.01(q)      Insurance
Schedule 6.01(s)      Bank Accounts
Schedule 6.01(t)      Intellectual Property
Schedule 6.01(u)      Material Contracts
Schedule 6.01(y)      Name; Jurisdiction of Organization; Organizational ID Number; Chief Place of
                      Business; Chief Executive Office; FEIN
Schedule 7.02(a)      Existing Liens
Schedule 7.02(b)      Existing Indebtedness
Schedule 7.02(d)      Existing Investments
Schedule 7.02(h)      Affiliate Transactions


Exhibit A       Form of Interim Order
Exhibit B       Form of Initial Budget
Exhibit C       Form of Notice of Borrowing
Exhibit D       Form of Assignment and Acceptance

#4849-2963-6390

## DEBTOR-IN-POSSESSION FINANCING AGREEMENT

Debtor-In-Possession Financing Agreement, dated as of July 30, 2015, by and among Relativity Media, LLC, a California limited liability company ("RML"), the subsidiaries of RML identified as Borrowers on the signature pages hereto (together with RML, each a "Borrower" and collectively, the "Borrowers"), Relativity Holdings LLC, a Delaware limited liability company (the "Parent" and together with the Borrowers, each a "Guarantor" and collectively, the "Guarantors"), the lenders from time to time party hereto (each a "Lender" and collectively, the "Lenders") and Cortland Capital Market Services LLC, as collateral agent for the Lenders (in such capacity, together with its successors and assigns, the "Collateral Agent"), and as administrative agent for the Lenders (in such capacity, together with its successors and permitted assigns, the "Administrative Agent").

## RECITALS

On July 30, 2015, (the "Petition Date"), RML and certain of its Subsidiaries and Affiliates (collectively, the "Debtors") commenced voluntary cases (the "Chapter 11 Cases") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and the Debtors have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

The Borrowers have requested and the Lenders have agreed to provide a secured super-priority debtor-in-possession financing agreement to the Borrower, in an aggregate principal amount not to exceed $45,000,000, the proceeds of which will be used to fund working capital and certain permitted administrative expenses of the Debtors during the pendency of the Chapter 11 Cases in accordance with the Budget and the terms of this Agreement.

The Guarantors have agreed to guarantee the obligations of the Borrowers hereunder and the Borrowers and the Guarantors have agreed to secure their respective Obligations by granting to Administrative Agent, for the benefit of Secured Parties, a lien on substantially all of their respective assets, in accordance with the priorities provided in the DIP Order.

In consideration of the premises and the covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS; CERTAIN TERMS

Section 1.01    Definitions.  As used in this Agreement, the following terms shall have the respective meanings indicated below, such meanings to be applicable equally to both the singular and plural forms of such terms:

"363 Sale" means the sale of all or substantially all of the Borrowers' assets pursuant to an asset purchase agreement and/or agency agreement acceptable, in each case, to the Required Lenders and approved by the Bankruptcy Court in the 363 Sale Order pursuant to section 363 of the Bankruptcy Code.

"363 Sale Hearing" means the hearing before the Bankruptcy Court to consider approval of the 363 Sale.

"363 Sale Motion" means a motion in form and substance satisfactory to the Required Lenders seeking the entry of the 363 Sale Order.

"363 Sale Order" means an order of the Bankruptcy Court, in form and substance satisfactory to Required Lenders, approving the 363 Sale and distribution of proceeds to the Administrative Agent.

"Action" has the meaning specified therefor in Section 12.12.

"Additional Amount" has the meaning specified therefor in Section 2.08(a).

"Adjusted Eurodollar Rate" means, for any Interest Rate Determination Date with respect to an Interest Period for a Loan, the rate per annum obtained by dividing (i) the rate per annum equal to the rate determined by Administrative Agent to be the London interbank offered rate administered by the ICE Benchmark Administration (or any other person which takes over the administration of that rate) for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars displayed on the ICE LIBOR USD page of the Bloomberg Screen (or any replacement Bloomberg page which displays that rate) or, if such page or replacement page is not available, the average of quotations for such day on such transactions received by the Administrative Agent from three brokers of recognized standing selected by the Administrative Agent, determined as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, by (ii) an amount equal to (a) one minus (b) the Applicable Reserve Requirement; provided, however, that notwithstanding the foregoing, the Adjusted Eurodollar Rate shall at no time be less than 1.0% per annum.

"Administrative Agent" has the meaning specified therefor in the preamble hereto.

"Administrative Agent Fee Letter" means that certain letter dated on or about the date hereof among the Administrative Agent and the Borrowers, with respect to certain fees to be paid from time to time by Borrowers to Administrative Agent.

"Administrative Agent's Account" means an account at a bank designated by the Administrative Agent from time to time as the account into which the Loan Parties shall make all payments to the Administrative Agent for the benefit of the Agents and the Lenders under this Agreement and the other Loan Documents.

"Administrative Borrower" has the meaning specified therefor in Section 12.16.

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the Equity Interests having ordinary voting power for the election of members of the Board of Directors of such Person or (b) direct or cause the direction of the management and policies of such Person whether by contract or otherwise. Notwithstanding anything herein to the contrary, in no event shall any Agent or any Lender be considered an "Affiliate" of any Loan Party.

"Agent" means the Administrative Agent and the Collateral Agent.

"Agreement" means this Debtor-in-Possession Financing Agreement, including all amendments, modifications and supplements and any exhibits or schedules to any of the foregoing, and shall refer to this Agreement as the same may be in effect at the time such reference becomes operative.

"Anti-Terrorism Laws" means any laws of the United States of America relating to terrorism or money laundering, including, without limitation, (i) the Money Laundering Control Act of 1986 (*i.e.*, 18 U.S.C. §§ 1956 and 1957), (ii) the Bank Secrecy Act, as amended by the USA PATRIOT Act, (iii) the Laws, regulations and Executive Orders administered by OFAC, (iv) the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 and implementing regulations by the United States Department of the Treasury, (v) any Law prohibiting or directed against terrorist activities or the financing of terrorist activities (*e.g.*, 18 U.S.C. §§ 2339A and 2339B), or (vi) any similar Laws enacted in the United States or any other jurisdictions in which the parties to this Agreement operate, as any of the foregoing Laws may from time to time be amended, renewed, extended, or replaced and all other present and future legal requirements of any Governmental Authority governing, addressing, relating to, or attempting to eliminate, terrorist acts and acts of war and any regulations promulgated pursuant thereto.

"Applicable Reserve Requirement" means, at any time, for any Loan, the maximum rate, expressed as a decimal, at which reserves (including any basic marginal, special, supplemental, emergency or other reserves) are required to be maintained with respect thereto against "Eurocurrency liabilities" (as such term is defined in Regulation D) under regulations issued from time to time by the Board or other applicable banking regulator. Without limiting the effect of the foregoing, the Applicable Reserve Requirement shall reflect any other reserves required to be maintained by such member banks with respect to (i) any category of liabilities which includes deposits by reference to which the applicable Adjusted Eurodollar Rate or any other interest rate of a Loan is to be determined, or (ii) any category of extensions of credit or other assets which include Loans. A Loan shall be deemed to constitute Eurocurrency liabilities and as such shall be deemed subject to reserve requirements without benefits of credit for proration, exceptions or offsets that may be available from time to time to the applicable Lender. The rate of interest on Loans shall be adjusted automatically on and as of the effective date of any change in the Applicable Reserve Requirement.

"Approved Completion Guarantor" means each of (i) International Film Guarantors LLC and Film Finances, Inc. and (ii) any other completion guarantor acceptable to the Required Lenders; provided that, in each case, the Required Lenders may from time to time, in their good faith credit judgment, upon thirty (30) days' prior written notice to the Administrative Borrower remove any such Person as an Approved Completion Guarantor and/or establish or reduce exposure limits with respect thereto on a prospective basis with respect to any Picture.

"Approved Domestic Distributor" means (i) RML Distribution Domestic, LLC or another Loan Party acceptable to the Required Lenders, (ii) any other Major Studio reasonably acceptable to the Required Lenders, or (iii) any other Person reasonably acceptable to the Required Lenders, in each case to serve as a theatrical distributor in the domestic territory.

"Assignment and Acceptance" means an assignment and acceptance entered into by an assigning Lender and an assignee, and delivered to the Administrative Agent, in accordance with Section 12.07 hereof and substantially in the form of Exhibit D hereto.

"Authorized Financial Officer" means, with respect to any Person, any of the chief executive officer, chief financial officer and chief operating officer of such Person.

"Authorized Officer" means, with respect to any Person, any of the chief executive officer, chief financial officer, chief operating officer, controller, general counsel, manager and president of such Person or any other officer duly authorized to act on behalf of or represent such Person.

"Avoidance Action Proceeds" has the meaning specified in the Interim Order or Final Order, as applicable.

"Avoidance Actions" has the meaning specified in the Interim Order or Final Order, as applicable.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as applicable to the Chapter 11 Cases, now and hereafter in effect, or any applicable successor statute.

"Bankruptcy Court" has the meaning assigned to such term in the recitals hereto; provided that "Bankruptcy Court" shall also mean any other court having competent jurisdiction over the Chapter 11 Cases.

"Base Rate" means, for any day, a rate per annum equal to the greatest of (i) the Prime Rate in effect on such day, (ii) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (iii) the Adjusted Eurodollar Rate (after giving effect to any Adjusted Eurodollar Rate "floor") that would be payable on such day for a Loan bearing interest at a rate determined by reference to the Adjusted Eurodollar Rate plus (b) 1.0%.  Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective on the effective day of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"Base Rate Loan" means a Loan bearing interest at a rate determined by reference to the Base Rate.

"Bidding Procedures" means the procedures for the 363 Sale which shall be in a form and substance satisfactory to the Required Lenders.

"Bidding Procedures Motion" means a motion in form and substance satisfactory to the Required Lenders seeking the entry of the Bidding Procedures Order.

"Bidding Procedures Order" means an order of the Bankruptcy Court, in a form and substance satisfactory to the Required Lenders (a) approving the Bidding Procedures, (b) approving the form of the asset purchase agreement or the stalking horse purchase agreement and (c) scheduling an auction and the 363 Sale Hearing.

"Blocked Person" has the meaning assigned to such term in Section 6.01(aa)(ii).

"Board" means the Board of Governors of the Federal Reserve System of the United States.

"Board of Directors" means, (a) with respect to any corporation or company, the board of directors of the corporation or company or any committee thereof duly authorized to act on behalf of such board, (b) with respect to a partnership, the board of directors of the general partner of the partnership, (c) with respect to a limited liability company, the managing member or members or any controlling committee or board of directors of such company or the sole member or the managing member thereof, and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"Borrower" has the meaning specified therefor in the preamble hereto.

"Budget" means the Initial Budget, as the same may be further amended, supplemented, restated or otherwise modified from time to time with the written consent of the Required Lenders in their sole discretion.

"Budget Period" means each weekly period set forth in the Budget commencing with the week ending August 7, 2015.

"Business Day" means (i) any day other than a Saturday, Sunday or other day on which commercial banks in New York City or Los Angeles are authorized or required to close and (ii) with respect to all notices, determinations, fundings and payments in connection with the Adjusted Eurodollar Rate or any Loan, the term "Business Day" means any day which is a Business Day described in clause (i) and which is also a day for trading by and between banks in Dollar deposits in the London interbank market.

"Capitalized Lease" means, with respect to any Person, any lease of real or personal property by such Person as lessee which is required under GAAP to be capitalized on the balance sheet of such Person.

"Capitalized Lease Obligations" means, with respect to any Person, obligations of such Person and its Subsidiaries under Capitalized Leases, and, for purposes hereof, the amount of any such obligation shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve-Out" has the meaning specified in the Interim Order or Final Order, as applicable.

"Cash Management Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases, together with all extensions, modifications and amendments that are in form and substance acceptable to the Required Lenders, which, among other matters, authorizes the Borrowers to use their cash management system.

"Change in Law" has the meaning specified therefor in Section 4.05(a).

"Change of Control" means each occurrence of any of the following:

(a)    the Parent shall cease to have beneficial ownership (as defined in Rule 13d-3 under the Exchange Act) of 100% of the aggregate voting or economic power of the Equity Interests of each other Loan Party, free and clear of all Liens (other than (i) Permitted Liens described in paragraph (a) of the definition and (ii) any Lien securing obligations under the Prepetition Manchester Facility Documents or the Prepetition TL Documents); or

(b)    (i) any Loan Party consolidates or amalgamates with or merges into another entity or conveys, transfers or leases all or substantially all of its property and assets to another Person, or (ii) any entity consolidates or amalgamates with or merges into any Loan Party in a transaction pursuant to which the outstanding voting Equity Interests of such Loan Party is reclassified or changed into or exchanged for cash, securities or other property, other than any such transaction described in this clause (ii) in which in the case of any such transaction involving a Loan Party other than the Parent, the Parent has beneficial ownership of 100% of the aggregate voting and economic power of all Equity Interests of the resulting, surviving or transferee entity.

"Chapter 11 Cases" has the meaning assigned to such term in the recitals hereto.

"Chapter 11 Orders" means, collectively, the DIP Order, 363 Sale Order, the Wage Order, the Bidding Procedures Order, Critical Vendor Order and Cash Management Order.

"Claim" has the meaning assigned to such term in Section 101(5) of the Bankruptcy Code.

"Collateral" has the meaning specified therefor in Section 3.04(a).

"Collateral Agent" has the meaning specified therefor in the preamble hereto.

"Commitment" means, with respect to each Lender, the commitment of such Lender to make the Loan to the Borrowers in the amount set forth in Schedule 1.01(A) hereto, as the same may be terminated or reduced from time to time in accordance with the terms of this Agreement.

"Completed" or "Completion" means that, with respect to any Picture, (a) if such Picture was produced by a Loan Party, sufficient elements thereof have been delivered by the applicable Loan Party to, and accepted, deemed accepted and/or exploited by, the applicable Approved Domestic Distributor to permit it to exhibit the Picture in the theatrical or other medium for which the Picture is intended for initial exploitation in the United States of America or elsewhere, or (b) if such Picture was acquired by a Loan Party from a third Person, the entire fixed acquisition price or minimum advance shall have been paid to the extent then due, sufficient elements thereof have been made available to the applicable Loan Party to permit it to exhibit the Picture in the theatrical or other medium for which the Picture is intended for initial exploitation in the United States of America or elsewhere, and there is no condition or event, other than the payment of money not yet due (solely based on economic performance of the Picture), the occurrence of which might result in the applicable Loan Party losing any of its rights in such Picture or otherwise preclude release of such Picture in the intended medium of exploitation.

"Contingent Obligation" means, with respect to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary Loan Party") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary Loan Party, (b) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, (c) any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary Loan Party or otherwise to maintain the net worth or solvency of the primary Loan Party, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary Loan Party to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term "Contingent Obligation" shall not include any product warranties extended in the ordinary course of business.  The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation with respect to which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Critical Vendors" has the meaning specified in the Critical Vendors Motion.

"Critical Vendors Motion" means a motion in form and substance satisfactory to the Required Lenders authorizing payment of prepetition obligations to Critical Vendors and approving related procedures.

"Critical Vendors Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases in form and substance acceptable to the Required Lenders, which, among other matters, authorizes the Borrowers to pay prepetition obligations of Critical Vendors.

"Debtors" has the meaning assigned to the term in the recitals hereto.

"Default" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Defaulting Lender" means any Lender that (i) has failed to fund any portion of the Loans required to be funded by it hereunder within one Business Day of the date required to be funded by it hereunder and has not cured such failure prior to the date of determination, (ii) has otherwise failed to pay over to any Agent or any other Lender any other amount required to be paid by it hereunder within one Business Day of the date when due, unless the subject of a good faith dispute, and has not cured such failure prior to the date of determination, or (iii) has been deemed insolvent or become the subject of an Insolvency Proceeding.

"DIP Account" means the escrow account maintained in the name of the Administrative Agent at a financial institution that is selected by the Required Lenders subject to the prior approval of the Administrative Agent (which approval shall not be unreasonably withheld) pursuant to escrow arrangements on terms and conditions reasonably acceptable to the Required Lenders, the Administrative Agent and the Borrowers.

"DIP Account Withdrawal Amount" has the meaning specified therefor in Section 2.02(c).

"DIP Account Withdrawal Date" has the meaning specified therefor in Section 2.02(c).

"DIP Liens" has the meaning specified therefor in Section 6.01(z)(ii).

"DIP Order" means, collectively, the Interim Order and the Final Order.

"Disposition" means any transaction, or series of related transactions, pursuant to which any Person or any of its Subsidiaries sells, assigns, transfers or otherwise disposes of any property or assets (whether now owned or hereafter acquired) to any other Person, in each case, whether or not the consideration therefor consists of cash, securities or other assets owned by the acquiring Person.

"Disqualified Equity Interests" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interest into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition, (a) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the date which is one year after the Final Maturity Date, (b) is convertible into or exchangeable for (i) debt securities or (ii) any Equity Interests referred to in clause (a) above, in each case at any time prior to the date which is one year after the Final Maturity Date, (c) contains any repurchase obligation that may come into effect either (i) prior to payment in full of all Obligations or (ii) prior to the date that is one year after the Final Maturity Date or (d) provides for scheduled payments or the payment of cash dividends or distributions prior to the date that is one year after the Final Maturity Date.

"Distribution Agreement" means any distribution agreement or license agreement heretofore or hereafter entered into by a Loan Party or Licensing Intermediary (or in either case a sales agent on its behalf), as licensor, with a Distributor, as licensee, with respect to the sale, lease, assignment, distribution, license or other exploitation of one or more Pictures in any medium, as any such agreement may be amended, supplemented or otherwise modified, renewed or replaced from time to time as permitted herein.

"Distributor" means any entity which a Loan Party or Licensing Intermediary (or, in each case, a sales agent on its behalf) engages to sell, lease, assign, distribute, license or otherwise exploit any Picture in any medium.

"Dollar," "Dollars" and the symbol "$" each means lawful money of the United States of America.

"Employee Plan" means an employee benefit plan (other than a Multiemployer Plan) covered by Title IV of ERISA and maintained or that was maintained at any time during the six (6) calendar years preceding the date of any borrowing hereunder) for employees of any Loan Party or any of its ERISA Affiliates.

"Equity Interest" means (a) with respect to any Person that is a corporation or company, any and all shares, options, membership interests, ownership interests, participations or other equivalents (however designated and whether or not voting and whether or not in certificated form) of corporate stock, and (b) with respect to any Person that is not a corporation or company, any and all partnership, options, membership or other equity, profit or ownership interests of such Person.

"Equity Issuance" means either (a) the sale or issuance by any Loan Party or any of its Subsidiaries of any shares of its Equity Interests or (b) the receipt by Parent of any cash capital contributions.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, and regulations thereunder, in each case, as in effect from time to time.  References to sections of ERISA shall be construed also to refer to any successor sections.

"ERISA Affiliate" means, with respect to any Person, any trade or business (whether or not incorporated) which is a member of a group of which such Person is a member and which would be deemed to be a "controlled group" within the meaning of Sections 414(b), (c), (m) and (o) of the Internal Revenue Code.

"Event of Default" means any of the events set forth in Section 9.01, subject to any applicable notice and cure provisions expressly set forth in Section 9.01

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Exclusivity Period" means the Debtors exclusive plan filing and plan solicitation periods under section 1121 of the Bankruptcy Code.

"Exit Fee" means, with respect to any payment or prepayment prior to October 2, 2015 (other than with proceeds of the 363 Sale), a fee in the amount of 5.00% of the principal amount of the Loan prepaid on such date.

"Extraordinary Receipts" means any cash received by the Parent or any of its Subsidiaries not in the ordinary course of business (and not consisting of proceeds described in Section 2.05(c)(i) or

(ii)), including, without limitation, (a) tax refunds, (b) pension plan reversions, (c) proceeds of insurance, (d) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (e) condemnation awards (and payments in lieu thereof), (f) indemnity payments and (g) any purchase price adjustment received in connection with any purchase agreement.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, any current or future regulations or official interpretations thereof, any intergovernmental agreement entered into thereunder, any foreign legislation implemented to give effect to an intergovernmental agreement entered into thereunder or guidance notes or practices adopted pursuant thereto, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any analogous provisions of non-U.S. law.

"Federal" means the federal government of the United States of America and the laws, rules and regulations of same.

"Federal Funds Effective Rate" means for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, (i) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average of quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by the Administrative Agent.

"Final Facility Effective Date" has the meaning specified therefor in Section 5.02.

"Final Maturity Date" means the date which is the earliest of (i) the date that is 30 days after the date of entry of the Interim Order, if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (ii) October 2, 2015, (iii) the earlier of the effective date and the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code), in each case, of (if any) a plan of reorganization or a plan of liquidation, (iv) the consummation of a sale of all or substantially all of the Loan Parties' assets whether pursuant to the 363 Sale or otherwise, (v) the date the Bankruptcy Court orders the conversion of the Chapter 11 Cases of any of the Debtors to a Chapter 7 liquidation and (vi) such earlier date on which all Loans and other Obligations for the payment of money shall become due and payable in accordance with the terms of this Agreement and the other Loan Documents.

"Final Order" means an order (in substantially the form of the Interim Order with only such modifications as are satisfactory in form and substance to the Required Lenders (in its sole discretion) and, to the extent affecting the rights or obligations of the Administrative Agent, the Administrative Agent) of the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code approving this Agreement and the other Loan Documents, including the granting of the super-priority claims and Lien status in accordance with priorities specified in the Interim Order, the waiver of rights under Section 506(c) of the Bankruptcy Code and the payment of all fees constituting Obligations hereunder and modifying the automatic stay to permit the Loan Parties to perform their obligations hereunder and the Lenders and the Administrative Agent to exercise their rights and remedies in accordance with Section 9.01 of this Agreement, authorizing the incurrence by the Loan Parties of permanent post-petition secured and superpriority Indebtedness in accordance with this Agreement and each other Loan Document, as to which no stay has been entered and which has not been reversed, vacated or overturned, and which has not been amended, supplemented or otherwise modified in any

respect adverse to the Lenders without the prior written consent of the Required Lenders and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless the Required Lenders waive such requirement in writing.

"Final Period" means the period commencing on the Final Facility Effective Date and ending on the Final Maturity Date.

"Fiscal Year" means the fiscal year of the Parent and its Subsidiaries ending on December 31st of each year.

"Foreign Lender" means any Lender that is not a United States person, within the meaning of Section 7701(a)(30) of the Internal Revenue Code.

"GAAP" means generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis.

"Governing Documents" means, (a) with respect to any corporation or company, the memorandum, certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. Person); (b) with respect to any limited liability company, the certificate or articles of formation or organization, and the operating agreement (or equivalent or comparable constitutive documents with respect to any non-U.S. Person); (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture agreement, declaration or other applicable agreement or documentation evidencing or otherwise relating to its formation or organization (or equivalent or comparable constitutive documents with respect to any non-U.S. Person); and (d) with respect to any of the entities described above, any other agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization.

"Governmental Authority" means the government of any nation, state, province, city, town, municipality, county, or locality that has jurisdiction over any Loan Party, any Subsidiary of any Loan Party, and includes any department, commission, board, bureau, court, agency, tribunal, administrative hearing body, arbitration panel, or instrumentality or political subdivision thereof or thereto and any department, commission, board, bureau, instrumentality, agency or other entity or officer exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government or any court. The term "Governmental Authority" includes any supra-national bodies such as the European Union or the European Central Bank to the extent such bodies have jurisdiction over any Loan Party.

"Guaranteed Obligations" has the meaning specified therefor in Section 11.01.

"Guarantor" has the meaning specified therefor in the preamble hereto.

"Guaranty" means (a) the guaranty of each Guarantor party hereto contained in Article XI hereof and (b) each other guaranty, in form and substance reasonably acceptable to the Required Lenders, made by any other Guarantor in favor of the Collateral Agent for the benefit of the Agents and the Lenders guaranteeing all or part of the Obligations.

"Hedging Agreement" means any interest rate, foreign currency, commodity or equity swap, collar, cap, floor or forward rate agreement, or other agreement or arrangement designed to protect against fluctuations in interest rates or currency, commodity or equity values (including, without limitation, any option with respect to any of the foregoing and any combination of the foregoing

agreements or arrangements), and any confirmation executed in connection with any such agreement or arrangement.

"Highest Lawful Rate" means, with respect to any Agent or any Lender, the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Obligations under Laws applicable to such Agent or such Lender which are currently in effect or, to the extent allowed by Law, under such applicable Laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable Laws now allow.

"Indebtedness" means, with respect to any Person, without duplication, (a) all indebtedness of such Person for borrowed money; (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables or other accounts payable incurred in the ordinary course of such Person's business and not outstanding for more than 90 days after the date such payable was created); (c) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or upon which interest payments are customarily made; (d) all reimbursement, payment or other obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used and/or acquired by such Person, even though the rights and remedies of the lessor, seller and/or lender thereunder may be limited to repossession or sale of such property; (e) all Capitalized Lease Obligations of such Person; (f) all obligations and liabilities, contingent or otherwise, of such Person, in respect of letters of credit, acceptances and similar facilities; (g) all obligations and liabilities, calculated on a basis satisfactory to the Collateral Agent and in accordance with accepted practice, of such Person under Hedging Agreements; (h) all monetary obligations under any receivables factoring, receivable sales or similar transactions and all monetary obligations under any synthetic lease, tax ownership/operating lease, off-balance sheet financing or similar financing; (i) all Contingent Obligations of such Person in respect of Indebtedness of others referred to in clauses (a) through (h) of this definition; (j) all Disqualified Equity Interests; and (k) all obligations referred to in clauses (a) through (j) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness. The Indebtedness of any Person (i) shall include the Indebtedness of any partnership of or joint venture in which such Person is a general partner or a joint venturer, to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor, and (ii) shall exclude any non-refundable advance made to a Loan Party by a third party Distributor in connection with the production, distribution or sale of any Picture.

"Indemnified Matters" has the meaning specified therefor in Section 12.15(a).

"Indemnitees" has the meaning specified therefor in Section 12.15(a).

"Interest Payment Date" means with respect to any Loan, the last day of each Interest Period applicable to such Loan.

"Interest Period" means an interest period of one month, (i) initially, commencing on the date of borrowing a Loan; and (ii) thereafter, commencing on the day on which the immediately preceding Interest Period expires; provided, (a) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day unless no further Business Day occurs in such month, in which case such Interest Period shall expire on the immediately preceding Business Day; (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at

the end of such Interest Period) shall, subject to clauses (c), of this definition, end on the last Business Day of a calendar month; and (c) no Interest Period with respect to any portion of any Loan shall extend beyond the Final Maturity Date.

"Interest Rate Determination Date" means, with respect to any Interest Period, the date that is two Business Days prior to the first day of such Interest Period.

"Initial Budget" means the 9-week cash flow forecast for the 9-week period beginning on the Petition Date attached hereto as Exhibit B.

"Initial Loan" has the meaning specified therefor in Section 2.01.

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, compromises, arrangements or extensions generally with creditors, or proceedings seeking winding-up, dissolution, administration, reorganization (by way of voluntary arrangement, insolvent scheme of arrangement or otherwise), arrangement, or other similar relief or any proceeding with respect to the appointment of a liquidator, receiver, receiver manager or other Person having similar powers with respect to a stay or compromise of the claims of any creditors.

"Interim Facility Effective Date" means the date, on or before July 31, 2015, on which all of the conditions precedent set forth in Section 5.01 are satisfied or waived, which shall be no later than three Business Days after the date the Interim Order has been entered by the Bankruptcy Court.

"Interim Order" has the meaning assigned to such term in Section 5.01(d).

"Interim Period" means the period commencing on the Interim Facility Effective Date and ending on the earlier to occur of (i) the Final Facility Effective Date and (ii) the Final Maturity Date.

"Internal Revenue Code" means the United States Internal Revenue Code of 1986, as amended (or any successor statute thereto) and the regulations thereunder.

"Investment" means, with respect to any Person, (a) any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances or other extensions of credit (excluding accounts receivable arising in the ordinary course of business), capital contributions or acquisitions of Indebtedness (including, any bonds, notes, debentures or other debt securities), Equity Interests, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), (b) the purchase or ownership of any futures contract or liability for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract or (c) any investment in any other items that are or would be classified as investments on a balance sheet of such Person prepared in accordance with GAAP.  The amount of any Investment shall be (i) the original cost of such Investment plus the cost of all additions thereto (without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment), less (ii) all cash returns, cash dividends and cash distributions received by such Person in respect thereof.

"Laboratory" means (i) Technicolor, Inc., Technicolor Creative Services USA, Inc., Deluxe Laboratories, Inc., and NT Audio and (ii) any other laboratory acceptable to the Required Lenders, in each case, where such laboratory is a party to a Pledgeholder Agreement or a Laboratory Access Letter; provided that none of the foregoing shall include locations outside of the United States, Canada or the United Kingdom without the consent of the Required Lenders.

"Laboratory Access Letter" means a letter agreement among (i) a Laboratory holding any elements (including data backups of work in progress) of any Picture to which any Loan Party has the right of access, (ii) the applicable Loan Party, (iii) if appropriate, the applicable Distributor, and (iv) any other appropriate Person, in a form acceptable to the Administrative Agent, in each case as the same may be amended, supplemented or otherwise modified, renewed or replaced from time to time; provided that any such letter agreement may not be amended in a manner which adversely affects the rights of (or the benefit to) the Agents or any Lender thereunder without the prior written consent of the Required Lenders.

"Laws" means, with respect to any Person, collectively, all national, state, provincial, city, town, municipal, county, local, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities) and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of, any Governmental Authority, in each case that are applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Lease" means any lease of real property to which any Loan Party or any of its Subsidiaries is a party as lessor or lessee.

"Lender" has the meaning specified therefor in the preamble hereto.

"Lending Office" means the branch or branches (or Affiliate or Affiliates of a Lender) from which a Lender's Loans are made or maintained and for the account of which all payments of principal of, and interest on, such Lender's Loans are made, as notified to the Administrative Agent from time to time.

"Licensing Intermediary" means GEM Entertainment Kft. (formerly known as Fintage Magyar Kft.), Freeway Entertainment Kft., Cinephil France S.A.S., Film & TV House Limited, Batrax Entertainment B.V. and any other Person acceptable to the Required Lenders, which in each case will serve as a licensing intermediary for distribution rights in respect of a Picture, provided in each case that the Required Lenders may in good faith using their reasonable credit judgment from time to time by written notice to the Administrative Borrower remove any such Person as a Licensing Intermediary on a prospective basis unless, with respect to any Picture, an agreement with respect to such Picture has been duly executed and delivered by a Loan Party and such Person and has become effective.

"Lien" means any mortgage, deed of trust, pledge, lien (statutory or otherwise), security interest, charge or other encumbrance or security or preferential arrangement of any nature, including, without limitation, any conditional sale or title retention arrangement, any Capitalized Lease and any assignment, deposit arrangement or financing lease intended as, or having the effect of, security.

"Loan" means the term loans made by a Lender to the Borrowers pursuant to Article II hereof.

"Loan Account" means an account maintained hereunder by the Administrative Agent on its books of account at the Payment Office, and with respect to the Borrowers, in which the Borrowers will be charged with all Loans made to, and all other Obligations incurred by, the Borrowers.

"Loan Document" means this Agreement, any Guaranty and any other agreement, instrument, certificate and other document executed and delivered pursuant hereto or thereto or otherwise evidencing or securing any Loan or any other Obligation.

"Loan Party" means any Borrower and any Guarantor.

"Major Studio" means each of the following studios and its primary U.S. distribution subsidiary and "specialty divisions or subsidiaries": (i) Paramount Pictures Corporation, (ii) Twentieth Century Fox Film Corporation, (iii) Sony Pictures Entertainment Inc., (iv) Walt Disney Motion Pictures Group, Inc., (v) Warner Bros. Entertainment Inc., (vi) Universal Pictures, a division of Universal City Studios, LLP, and (vii) Lions Gate Entertainment Inc. (including Summit Entertainment, LLC).

"Material Adverse Effect" means a material adverse effect on any of (a) the operations, assets, liabilities, financial condition or prospects of the Loan Parties taken as a whole, (b) the ability of the Loan Parties taken as a whole to perform any of their obligations under any Loan Document, (c) the legality, validity or enforceability of this Agreement or any other Loan Document, (d) the rights and remedies of any Agent or any Lender under any Loan Document, or (e) the validity, perfection or priority of a Lien in favor of the Collateral Agent for the benefit of the Agents and the Lenders on Collateral.

"Material Contract" means, with respect to any Person that is a party to such contract or agreement, all contracts or agreements material to the business, operations, financial condition or prospects of the Parent and its Subsidiaries taken as a whole.  For the avoidance of doubt, the Loan Documents are not Material Contracts.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which any Loan Party or any of its ERISA Affiliates has contributed to, or has been obligated to contribute, at any time during the preceding six (6) years.

"Net Cash Proceeds" means, (a) with respect to any Disposition by any Person or any of its Subsidiaries, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration, at the time of such payment or disposition) by or on behalf of such Person or such Subsidiary, in connection therewith after deducting therefrom only (i) reasonable expenses related thereto incurred by such Person or such Subsidiary in connection therewith and (ii) transfer taxes paid to any taxing authorities by such Person or such Subsidiary in connection therewith, and (b) with respect to the issuance or incurrence of any Indebtedness by any Person or any of its Subsidiaries, or an Equity Issuance, the aggregate amount of cash received (directly or indirectly) from time to time by or on behalf of such Person or such Subsidiary in connection therewith, after deducting therefrom only (i) reasonable expenses related thereto incurred by such Person or such Subsidiary in connection therewith, and (ii) transfer taxes paid by such Person or such Subsidiary in connection therewith; in each case of clause (a) and (b) to the extent, but only to the extent, that the amounts so deducted are (x) actually paid in cash to a Person that, is not an Affiliate of such Person or any of its Subsidiaries and (y) cash expenses that would not have been incurred but for the occurrence of such transaction.

"Non-Primed Permitted Payments" means payments permitted to be made under the DIP Order solely from collections on the collateral securing the applicable Non-Primed Prepetition Facility and received in the applicable accounts listed on Schedule 6.01(s) hereto, such amounts to be applied in reduction of the principal claim of the lenders under and in accordance with the applicable Non-Primed Prepetition Facility.

"Non-Primed Prepetition Facilities" means the Prepetition P&A Facility, the Prepetition Ultimates Credit Agreement, Prepetition A&R Armored Car LSA, Prepetition Verite LSA and Prepetition DR LSA.

"Non-Wholly Owned Subsidiary" of any Person means any Subsidiary of such Person other than a Wholly Owned Subsidiary.

"Notice of Borrowing" has the meaning specified therefor in Section 2.02(a).

"Obligations" means all present and future indebtedness, obligations, and liabilities of each Loan Party to the Agents, the Lenders and any other Person, in each case arising under or in connection with this Agreement or any other Loan Document, whether or not the right of payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any proceeding referred to in Section 9.01. Without limiting the generality of the foregoing, the Obligations of each Loan Party under the Loan Documents include (a) the obligation (irrespective of whether a claim therefor is allowed in an Insolvency Proceeding) to pay principal, interest, charges, expenses and fees, attorneys' fees, costs and disbursements, indemnities and other amounts payable by such Person under the Loan Documents, and (b) the obligation of such Person to reimburse any amount in respect of any of the foregoing that any Agent or any Lender (in its sole discretion) may elect to pay or advance on behalf of such Person.

"OFAC" means the United States Department of the Treasury's Office of Foreign Assets Control.

"OFAC Sanctions Programs" means the laws, regulations and Executive Orders administered by OFAC, including but not limited to, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as it has been or shall thereafter be renewed, extended, amended, or replaced, and the list of Specially Designated Nationals and Blocked Persons administered by OFAC, as such list may be amended from time to time.

"Official Committee" means the official committee of unsecured creditors (if any) appointed in the Chapter 11 Cases pursuant to Section 1102 of the Bankruptcy Code.

"Other Taxes" has the meaning specified therefor in Section 2.08(b).

"Parent" has the meaning specified therefor in the preamble hereto.

"Participant Register" has the meaning specified therefor in Section 12.07(g).

"Participation" means any amount payable to any third Person that is not an Affiliate of a Loan Party who furnishes rights and/or renders services in connection with any Picture, television program or musical work, whether characterized as a deferment, gross participation, net participation, profit participation, contingent compensation, box office bonus, award or credit bonus or otherwise, which amount is based, dependent, computed, or payable, in whole or in part, on the net or gross receipts, earnings, or proceeds derived from such Picture, television program or musical work or any percentage of the foregoing or is payable at such time as any such receipts, earnings or proceeds equal a specified amount, or any similar type of payment or the economic equivalent thereof.

"Payment Office" means the Administrative Agent's office located at 225 W. Washington Street, 21st Floor, Chicago, IL 60606, or at such other office or offices of the Administrative Agent as may be designated in writing from time to time by the Administrative Agent to the Administrative Borrower.

"Permitted Adequate Protection Payments" means the adequate protection payments to the secured parties under the Prepetition Agreements pursuant to the terms of the DIP Order.

"Permitted Indebtedness" means:

(a)    any Indebtedness owing to any Agent or any Lender under this Agreement and the other Loan Documents;

(b)    any other Indebtedness listed on Schedule 7.02(b) and existing on the Petition Date and any other non-material Indebtedness existing on the Petition Date that does not constitute Indebtedness for borrowed money;

(c)    Indebtedness in respect of netting services, overdraft protection or other like services, so long as such Indebtedness (i) is not for borrowed money, (ii) is incurred in the ordinary course of business and (iii) is not outstanding for more than 5 Business Days;

(d)    Indebtedness incurred in the ordinary course of business to any Person providing property, casualty, liability, or other insurance to the Loan Parties, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the year in which such Indebtedness is incurred and such Indebtedness is outstanding only during such year;

(e)    Indebtedness owed to any Person (including obligations in respect of letters of credit for the benefit of such Person) providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance, pursuant to reimbursement or indemnification obligations to such Person, in each case incurred in the ordinary course of business, provided that upon the incurrence of Indebtedness with respect to reimbursement obligations regarding workers' compensation claims, such obligations are reimbursed not later than 30 days following such incurrence;

(f)    trade payables or account payables existing on the date hereof that are outstanding more than 90 days after the date such payable was created; and

(g)    Indebtedness existing on the date hereof of Non-Wholly Owned Subsidiaries of RML which are not Loan Parties and which are not primarily engaged in the film business or television business; provided none of such Indebtedness creates any obligation or liability of any Loan Party with respect to such Indebtedness.

"Permitted Investments" means (a) marketable direct obligations issued or unconditionally guaranteed by the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case, maturing within six months from the date of acquisition thereof; (b) commercial paper, maturing not more than 270 days after the date of issue rated P-1 by Moody's or A-1 by Standard & Poor's; (c) certificates of deposit maturing not more than 270 days after the date of issue, issued by commercial banking institutions and money market or demand deposit accounts maintained at commercial banking institutions, each of which is a member of the Federal Reserve System and has a combined capital and surplus and undivided profits of not less than $500,000,000; (d) repurchase agreements having maturities of not more than 90 days from the date of acquisition which are entered into with major money center banks included in the commercial banking institutions described in clause (c) above and which are secured by readily marketable direct obligations of the United States Government or any agency thereof; and (e) money market accounts maintained with mutual funds having assets in excess of $2,500,000,000.

"Permitted Liens" means:

(a)        Liens securing the Obligations;

(b)        Liens for taxes, assessments and governmental charges the payment of which is not required under Section 7.01(b);

(c)        Liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's and other similar Liens arising in the ordinary course of business and securing obligations (other than Indebtedness for borrowed money) that are not overdue by more than 30 days or are being contested in good faith and by appropriate proceedings promptly initiated and diligently conducted, and a reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made therefor;

(d)        Liens customarily granted or incurred in the ordinary course of business with regard to goods provided or services rendered by laboratories and production houses and record warehouses; provided such Liens are limited to the goods provided or to the goods relating to which services were rendered;

(e)        customary Liens in favor of Distributors to secure their right to enjoy their licensed rights pursuant to Distribution Agreements entered into in the ordinary course of business or to secure first negotiation and/or last refusal rights and not to secure any Indebtedness for borrowed money;

(f)        Liens described on Schedule 7.02(a) and existing on the Petition Date provided that (i) no such Lien shall at any time be extended to cover any additional property not subject thereto on the Petition Date and (ii) the principal amount of the Indebtedness secured by such Liens shall not be extended, renewed, refunded or refinanced;

(g)        rights of setoff or bankers' liens upon deposits of cash in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such deposit accounts in the ordinary course of business;

(h)        possessory Liens (other than those of laboratories and production houses) that (i) occur in the ordinary course of business, (ii) secure normal trade debt that is not yet due and payable and (iii) do not secure Indebtedness; and

(i)        Liens existing on the date hereof solely on assets of Non-Wholly Owned Subsidiaries of RML which are not Loan Parties and which are not primarily engaged in the film business or television business.

"Person" means an individual, corporation, limited liability company, partnership, association, joint-stock company, trust, unincorporated organization, joint venture or other enterprise or entity or Governmental Authority.

"Physical Materials" means, with respect to any Picture, all tangible personal property relating to such Picture, including, without limitation, all exposed film, developed film, positives, negatives, prints, positive prints, answer prints, magnetic tapes and other digital or electronic storage media, special effects, preparing materials (including interpositives, duplicate negatives, internegatives, color reversals, intermediates, lavenders, fine grain master prints and matrices, and all other forms of pre-print elements), sound tracks, cutouts, trims and any and all other physical properties of every kind and nature relating to such Picture whether in completed form or in some state of completion, and all masters,

duplicates, drafts, versions, variations and copies of each thereof, in all formats whether on film, videotape, disk or otherwise and all music sheets and promotional materials relating to such Picture.

"Petition Date" shall have the meaning assigned to the term in the recitals hereto.

"Picture" means any motion picture, film or video tape, whether recorded on film, videotape, cassette, cartridge, disc or on or by any other means, method, process or device whether now known or hereafter developed, and with respect to which a Loan Party (i) has an ownership interest in the copyright or (ii) has an equity interest or any exploitation rights.  The term "Picture" shall include, without limitation, the scenario, screenplay or script upon which such Picture is based, all of the properties thereof, tangible and intangible, and whether now in existence or hereafter to be made or produced, whether or not in possession of a Loan Party, and all rights therein and thereto, of every kind and character.

"Pledgeholder Agreement" means a laboratory pledgeholder agreement among (i) the applicable Loan Party (or Loan Parties), (ii) the Collateral Agent, (iii) if appropriate, the applicable Distributor, (iv) if appropriate, the applicable Approved Completion Guarantor, (v) the applicable Laboratory and (vi) any other appropriate Persons, in form acceptable to the Administrative, in each case, as the same may be amended, supplemented or otherwise modified from time to time.

"Post-Default Rate" means a rate of interest per annum equal to the rate of interest otherwise in effect from time to time pursuant to the terms of this Agreement plus 3.0%.

"Prepetition A&R Armored Car LSA Agent" means OneWest Bank N.A., as agent for the Prepetition Armored Car LSA Lenders.

"Prepetition A&R Armored Car LSA" means that certain Amended and Restated Loan and Security Agreement dated as of August 5, 2014, among Armored Car Productions, LLC, as borrower, the Prepetition A&R Armored Car LSA Lenders and the Prepetition A&R Armored Car LSA Agent.

"Prepetition A&R Armored Car LSA Lenders" means the lenders party to the Prepetition A&R Armored Car LSA, from time to time.

"Prepetition A&R Armored Car LSA Documents" means the Prepetition A&R Armored Car LSA and all instruments and documents executed at any time in connection therewith.

"Prepetition Agents" means the Prepetition TL Agent, the Prepetition Ultimates Credit Agreement Agent, Prepetition A&R Armored Car LSA Agent and Prepetition DR LSA Agent.

"Prepetition Agreements" means the Prepetition TL Financing Agreement, Prepetition Manchester Facility, the Prepetition Ultimates Credit Agreement, Prepetition P&A Facility, Prepetition A&R Armored Car LSA, Prepetition Verite LSA and Prepetition DR LSA.

"Prepetition DR LSA Agent" means OneWest Bank N.A., as agent for the Prepetition DR LSA Lenders.

"Prepetition DR LSA" means that certain Loan and Security Agreement dated as of September 5, 2014, among DR Productions, LLC, as borrower, the Prepetition DR LSA Lenders and the Prepetition DR LSA Agent.

"Prepetition DR LSA Lenders" means the lenders party to the Prepetition DR LSA, from time to time.

"Prepetition DR LSA Documents" means the Prepetition DR LSA and all instruments and documents executed at any time in connection therewith.

"Prepetition Lenders" means the Prepetition TL Lenders, the Prepetition Manchester Facility Lender, the Prepetition Ultimates Credit Agreement Lenders, Prepetition P&A Facility Lenders, Prepetition A&R Armored Car LSA Lenders, Prepetition Verite LSA Lenders and Prepetition DR LSA Lenders.

"Prepetition Loan Documents" means the Prepetition TL Loan Documents, the Prepetition Manchester Facility Documents, the Prepetition Ultimates Credit Agreement Documents, the Prepetition P&A Facility Documents, Prepetition A&R Armored Car LSA Documents, Prepetition Verite LSA Documents and Prepetition DR LSA Documents.

"Prepetition Manchester Facility" means that certain Second Amended and Restated Credit Agreement dated as of May 30, 2012, by and among RML and certain of its subsidiaries as borrowers, the Parent, as guarantor and the Prepetition Manchester Facility Lender.

"Prepetition Manchester Facility Documents" means the Prepetition Manchester Facility and all instruments and documents executed at any time in connection therewith.

"Prepetition Manchester Facility Lender" means Manchester Securities Corp., as lender under the Prepetition Manchester Facility.

"Prepetition Manchester Obligations" means all indebtedness, obligations and liabilities of the Loan Parties to the Prepetition Manchester Facility Lender incurred prior to the Petition Date arising from or related to the Prepetition Manchester Facility and the other agreements, instruments and other documents related thereto including fees, premiums, expenses, indemnities and reimbursement obligations due thereunder and interest thereon accruing both before and after the Petition Date, whether such indebtedness, obligations or liabilities are direct or indirect, joint or several, absolute or contingent, due or to become due, whether for payment or performance, now existing or hereafter arising.

"Prepetition Obligations" means all indebtedness, obligations and liabilities of the Loan Parties to the Prepetition Agents and the Prepetition Lenders incurred prior to the Petition Date arising from or related to the Prepetition Agreements and the other agreements, instruments and other documents related thereto including fees, premiums, expenses, indemnities and reimbursement obligations due thereunder and interest thereon accruing both before and after the Petition Date, whether such indebtedness, obligations or liabilities are direct or indirect, joint or several, absolute or contingent, due or to become due, whether for payment or performance, now existing or hereafter arising.

"Prepetition P&A Facility" means that certain Second Amended and Restated Funding Agreement dated as of June 30, 2014, by and among certain subsidiaries of RML party thereto as borrowers and accommodation pledgors and the Prepetition P&A Facility Lenders.

"Prepetition P&A Facility Documents" means the Prepetition P&A Facility and all instruments and documents executed at any time in connection therewith.

"Prepetition P&A Facility Lenders" means the lenders party to the Prepetition P&A Facility, from time to time.

"Prepetition Subordination and Intercreditor Agreement" means that certain Subordination and Intercreditor dated as of September 25, 2012 among the Prepetition Ultimates Credit Agreement Agent, the Prepetition TL Agent, the Prepetition Manchester Facility Lender and Manchester Library Company, LLC.

"Prepetition TL Agent" means Cortland Capital Market Services LLC, as administrative agent and collateral agent for the Prepetition TL Lenders.

"Prepetition TL Financing Agreement" means that certain Financing Agreement dated as of May 30, 2012, among the RML and certain of its subsidiaries as borrowers, the Parent, as guarantor, the Prepetition TL Lenders, the Prepetition TL Agent and CB Agency Services, LLC, as origination agent.

"Prepetition TL Lenders" means the lenders party to the Prepetition TL Financing Agreement, from time to time.

"Prepetition TL Loan Documents" means the Prepetition TL Financing Agreement and all instruments and documents executed at any time in connection therewith.

"Prepetition TL Obligations" means all indebtedness, obligations and liabilities of the Loan Parties to the Prepetition TL Agent and the Prepetition TL Lenders incurred prior to the Petition Date arising from or related to the Prepetition TL Financing Agreement and the other agreements, instruments and other documents related thereto including fees, premiums, expenses, indemnities and reimbursement obligations due thereunder and interest thereon accruing both before and after the Petition Date, whether such indebtedness, obligations or liabilities are direct or indirect, joint or several, absolute or contingent, due or to become due, whether for payment or performance, now existing or hereafter arising.

"Prepetition Ultimates Credit Agreement" means that certain Credit, Security, Guaranty and Pledge Agreement dated as of September 25, 2012, by and among RMLDD Financing, LLC, as borrower, the guarantors party thereto, the Prepetition Ultimates Credit Agreement Lenders and the Prepetition Ultimates Credit Agreement Agent.

"Prepetition Ultimates Credit Agreement Agent" means OneWest Bank, N.A., as administrative agent and for the Prepetition Ultimates Credit Agreement Lenders.

"Prepetition Ultimates Credit Agreement Documents" means the Prepetition Ultimates Credit Agreement and all instruments and documents executed at any time in connection therewith.

"Prepetition Ultimates Credit Agreement Lenders" means the lenders party to the Prepetition Ultimates Credit Agreement, from time to time.

"Prepetition Verite LSA" means that certain Loan and Security Agreement dated as among Yuma, Inc. and J & J Project, LLC, as borrowers and the Prepetition Verite Lenders.

"Prepetition Verite LSA Lenders" means the lenders party to the Prepetition Verite LSA from time to time.

"Prepetition Verite LSA Documents" means the Prepetition Verite LSA and all instruments and documents executed at any time in connection therewith.

"Prime Rate" means the rate of interest quoted in the print edition of The Wall Street Journal, Money Rates Section as the Prime Rate (currently defined as the base rate on corporate loans posted by at least 75% of the nation's thirty (30) largest banks), as in effect from time to time.  The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer.  The Administrative Agent or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"Primed Collateral" has the meaning specified in the Interim Order or Final Order, as applicable.

"Pro Rata Share" means, the percentage obtained by dividing (i) the Term Loan Exposure of a Lender, by (ii) the aggregate Term Loan Exposure of all Lenders; provided that, the portion of any Loan held or deemed held by any Defaulting Lender shall be excluded for the purposes of making a determination of Pro Rata Share if and to the extent such term is used to determine any voting rights of the Lenders, except as otherwise expressly provided herein.

"Reference Bank" means JPMorgan Chase Bank, N.A., its successors or any other commercial bank designated by the Administrative Agent to the Administrative Borrower from time to time.

"Reference Rate" means the rate of interest publicly announced by the Reference Bank in New York, New York from time to time as its reference rate, base rate or prime rate.  The reference rate, base rate or prime rate is determined from time to time by the Reference Bank as a means of pricing some loans to its borrowers and neither is tied to any external rate of interest or index nor necessarily reflects the lowest rate of interest actually charged by the Reference Bank to any particular class or category of customers.  Each change in the Reference Rate shall be effective from and including the date such change is publicly announced as being effective.

"Register" has the meaning specified therefor in Section 12.07(d).

"Registered Loans" has the meaning specified therefor in Section 12.07(d).

"Regulation T," "Regulation U" and "Regulation X" mean, respectively, Regulations T, U and X of the Board or any successor, as the same may be amended or supplemented from time to time.

"Related Fund" means, with respect to any Person, an Affiliate of such Person, or a fund or account managed by such Person or an Affiliate of such Person.

"Required Lenders" means, Lenders whose Pro Rata Shares aggregate at least 50.1%.

"Residuals" means, with respect to any Picture, television program or musical work, all amounts required to be paid to third parties pursuant to collective bargaining, union or guild agreements (in all applicable jurisdictions) by reason of, in connection with, as a condition to or arising from the use or exploitation of such Picture, television program or musical work, or any part thereof, or any use or reuse thereof, in any media, including residuals, supplemental market payments, pension, health and welfare payments, and employer share of taxes.

"RML" has the meaning specified therefor in the preamble hereto.

"SEC" means the Securities and Exchange Commission or any other similar or successor agency of the Federal government administering the Securities Act.

"Secured Parties" has the meaning specified therefor in Section 3.04(a).

"Securities Act" means the Securities Act of 1933, as amended, or any similar Federal statute, and the rules and regulations of the SEC thereunder, all as the same shall be in effect from time to time.

"Standard & Poor's" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Subsidiary" means, with respect to any Person at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity (a) the accounts of which would be consolidated with those of such Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP or (b) of which more than 50% of (i) the outstanding Equity Interests having (in the absence of contingencies) ordinary voting power to elect a majority of the Board of Directors of such Person, (ii) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (iii) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or controlled directly or indirectly through one or more intermediaries, by such Person.

"Taxes" has the meaning specified therefor in Section 2.08(a).

"Term Loan Exposure" means, with respect to any Lender, as of any date of determination, the sum of (i) the outstanding principal amount of the Loans of such Lender and (ii) the unfunded portion of such Lender's Commitment.

"Third Party Entitlements" mean, with respect to any Picture, television program or musical work, and without duplication, amounts based, computed or dependent on the proceeds derived from the exploitation of such Picture, television program or musical work that the applicable Loan Party is obligated to pay to any other Person that is not an Affiliate of any Loan Party, including, without limitation, (i) Residuals and Participations to the extent not paid or otherwise assumed by the applicable Distributor and (ii) payments to any producer or licensor required pursuant to any acquisition agreement.

"Transferee" has the meaning specified therefor in Section 2.08(a).

"Ultimates" means, as of any date, the then current historical actuals and future estimates of revenue and expenses, as of the date the ultimates were last updated and as defined by GAAP, that are expected to be recognized by the Loan Parties from the exploitation of a Picture as of such date in all markets, media and territories for a period of time not to exceed ten (10) years following the date of each such Picture's initial U.S. theatrical release. The Administrative Borrower shall prepare and deliver the Ultimates based on the ultimates statements provided pursuant to the Distribution Agreements in a format to be approved by the Required Lenders.

"Uniform Commercial Code" has the meaning specified therefor in Section 1.04(b).

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (PATRIOT) Act of 2001 (Title III of Pub. L. 107-56, Oct. 26, 2001).

"Wage Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases, together with all extensions, modifications and amendments, that are in form and substance acceptable to the Required Lenders, which among other matters, authorizes and directs the Borrowers to pay certain pre-petition wages, benefits and other amounts owing to employees.

"Wholly Owned Subsidiary" means, with respect to any Person at any date, a Subsidiary of such Person of which securities or other ownership interests representing 100% of the Equity Interests (other than (a) directors' qualifying shares and (b) nominal shares issued to foreign nationals to the extent required by applicable Law) are, as of such date, owned, controlled or held by such Person or one or more Wholly Owned Subsidiaries of such Person or by such Person and one or more Wholly Owned Subsidiaries of such Person.

Section 1.02    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any right or interest in or to assets and properties of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

Section 1.03    Certain Matters of Construction.  References in this Agreement to "determination" by any Agent include good faith estimates by such Agent (in the case of quantitative determinations) and good faith beliefs by such Agent (in the case of qualitative determinations). References in this Agreement to "acceptable to" the Administrative Agent, the Collateral Agent or the Agents (or any combination of the foregoing) shall mean that the applicable Agent or Agents has accepted, approved or consented to the applicable matter in writing.  A Default or Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement or, in the case of a Default, is cured within any period of cure expressly provided for in this Agreement; and an Event of Default shall "continue" or be "continuing" until such Event of Default has been cured or waived in writing by the Required Lenders.  Any Lien referred to in this Agreement or any other Loan Document as having been created in favor of any Agent, any agreement entered into by any Agent pursuant to this Agreement or any other Loan Document, any payment made by or to or funds received by any Agent pursuant to or as contemplated by this Agreement or any other Loan Document, or any act taken or omitted to be taken by any Agent, shall, unless otherwise expressly provided, be created, entered into, made or received, or taken or omitted, for the benefit or account of the Agents and the Lenders. Wherever the phrase "to the knowledge of any Loan Party" or words of similar import relating to the knowledge or the awareness of any Loan Party are used in this Agreement or any other Loan Document, such phrase shall mean and refer to (i) the actual knowledge of an Authorized Officer of any Loan Party or (ii) the knowledge that an Authorized Officer would have obtained if such officer had engaged in good faith and diligent performance of such officer's duties, including the making of such reasonably specific inquiries as may be necessary of the employees or agents of such Loan Party and a

good faith attempt to ascertain the existence or accuracy of the matter to which such phrase relates.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or otherwise within the limitations of, another covenant shall not avoid the occurrence of a default if such action is taken or condition exists.  In addition, all representations and warranties hereunder shall be given independent effect so that if a particular representation or warranty proves to be incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached will not affect the incorrectness of a breach of a representation or warranty hereunder.

        Section 1.04        <u>Accounting and Other Terms</u>.

        (a)        Unless otherwise expressly provided herein, each accounting term used herein shall have the meaning given it under GAAP.  Notwithstanding the foregoing, all financial statements delivered hereunder shall be prepared without giving effect to an election under FASB ASC 825 (or any similar accounting principal) permitting a Person to value its financial liabilities at the fair market value thereof.

        (b)        All terms used in this Agreement which are defined in Article 8 or Article 9 of the Uniform Commercial Code as in effect from time to time in the State of New York (the "<u>Uniform Commercial Code</u>") and which are not otherwise defined herein shall have the same meanings herein as set forth therein, <u>provided</u> that terms used herein which are defined in the Uniform Commercial Code as in effect in the State of New York on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as any Agent may otherwise determine.

        Section 1.05        <u>Time References</u>.  Unless otherwise indicated herein, all references to time of day refer to Eastern standard time or Eastern daylight saving time, as in effect in New York City on such day.  For purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; <u>provided</u>, <u>however</u>, that with respect to a computation of fees or interest payable to any Agent or any Lender, such period shall in any event consist of at least one full day.

## ARTICLE II

## THE LOANS

        Section 2.01        <u>Commitments</u>.  Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Lender severally agrees to make Loans to the Borrowers in an aggregate principal amount not to exceed the amount of such Lender's Commitment. During the Interim Period, the Borrowers may make, in a single draw within three Business Days of the Interim Facility Effective Date, the first borrowing under the Commitments, in an amount of up to $20,000,000 (such Loan, the "<u>Initial Loan</u>"), which amount shall be funded into the DIP Account.  During the Final Period, the Borrowers may make, in a single draw within three Business Days of the Final Facility Effective Date, the final borrowing hereunder in an aggregate principal amount not to exceed the remaining amount of the Commitments, which amount shall be funded into the DIP Account.  Any principal amount of a Loan that is repaid or prepaid may not be reborrowed.

        Section 2.02        <u>Making the Loans</u>.  (a)  The Administrative Borrower shall give the Administrative Agent prior written notice in substantially the form of Exhibit C hereto (a "<u>Notice of Borrowing</u>"), not later than 11:00 a.m. (New York City time) one Business Day prior to the date of the proposed Loan (any Notice of Borrowing received after such time shall be deemed received on the

immediately following Business Day); provided, that with respect to the Initial Loan, a Notice of Borrowing may be delivered at such later time as agreed by the Administrative Agent and the Lenders. Such Notice of Borrowing shall specify (i) the principal amount of the proposed Loan, and (ii) the proposed borrowing date.  The Administrative Agent and the Lenders may act without liability upon the basis of written or faxed notice believed by the Administrative Agent in good faith to be from the Administrative Borrower (or from any Authorized Officer thereof designated in writing purportedly from the Administrative Borrower to the Administrative Agent).  The Administrative Agent and each Lender shall be entitled to rely conclusively on any Authorized Officer's authority to request a Loan on behalf of the Administrative Borrower until the Administrative Agent receives written notice to the contrary.  The Administrative Agent and the Lenders shall have no duty to verify the authenticity of the signature appearing on any written Notice of Borrowing.  Each Notice of Borrowing pursuant to this Section 2.02 shall be irrevocable and the Borrowers shall be bound to make a borrowing in accordance therewith.

(b)      Each Lender shall make its Loan available to Administrative Agent not later than 11:00 a.m. (New York City time) on the date of the proposed borrowing, by wire transfer of same day funds in Dollars, to the Administrative Agent's Account.  Upon satisfaction or waiver of the conditions precedent specified herein, Administrative Agent shall make the proceeds of the Loans available to the Borrowers on such day by causing an amount of same day funds in Dollars equal to the proceeds of all such Loans received by Administrative Agent from Lenders to be credited to the DIP Account.

(c)      On each Monday after the Petition Date (or, if such day is not a Business Day, the Business Day immediately following such day), or, solely with regards to the initial withdrawal which may be made on the Friday after the Petition Date provided that no additional withdrawal is permitted on the immediately following Monday (the date of any requested withdrawal, a "DIP Account Withdrawal Date"), the Borrowers may withdraw amounts from the DIP Account so long as, after giving effect to such draw, (i) with respect to the first and second Budget Periods, the amount withdrawn from the DIP Account does not exceed 140% of the amount set forth in the Budget for such Budget Periods in the line item "Total Drawn on DIP Balance", (ii) with respect to the second and third Budget Periods, the amount withdrawn from the DIP Account does not exceed 130% of the amount set forth in the Budget for such Budget Periods in the line item "Total Drawn on DIP Balance", (iii) with respect to the each Budget Period thereafter, the amount withdrawn from the DIP Account does not exceed 120% of the amount set forth in the Budget for such Budget Periods in the line item "Total Drawn on DIP Balance" and (iv) the Borrower has provided the Administrative Agent with a written request for such withdrawal no later than 2:00 p.m. (New York time) one Business Day prior to such DIP Account Withdrawal Date, along with evidence of the calculation of the amount to be withdrawn from the DIP Account on a DIP Account Withdrawal Date (the "DIP Account Withdrawal Amount") in accordance with this Section 2.02(c) (and Administrative Agent shall be entitled to rely conclusively on the Borrowers' written request and evidence of the calculation of the amount to be withdrawn from the DIP Account); provided that (x) on any date on which the Term Loans shall have been accelerated, any amounts remaining in the DIP Account shall be applied to reduce the Loans then outstanding, in accordance with Section 4.04(b), and (y) none of the Borrowers shall have (and each Borrower hereby affirmatively waives) any right to withdraw, claim or assert any property interest in any funds on deposit in the DIP Account if any Default or Event of Default has occurred and is continuing or would result from such draw.  Upon satisfaction or waiver of the conditions precedent specified herein, by 11 a.m. (New York Time) on a DIP Account Withdrawal Date (or such later time as agreed by the Lenders and Administrative Agent), the Administrative Agent shall direct the withdrawal of the DIP Account Withdrawal Amount from the DIP Account.

(d)      The Loans under this Agreement shall be made by the Lenders simultaneously and proportionately to their Pro Rata Shares of the Commitment, it being understood that no Lender shall be responsible for any default by any other Lender in that other Lender's obligations to

make the Loan requested hereunder, nor shall the Commitment of any Lender be increased or decreased as a result of the default by any other Lender in that other Lender's obligation to make the Loan requested hereunder, and each Lender shall be obligated to make the Loan required to be made by it by the terms of this Agreement regardless of the failure by any other Lender.

Section 2.03    Repayment of Loans; Evidence of Debt.  (a)  The outstanding unpaid principal of the Loans shall be due and payable in full on the Final Maturity Date.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrowers to such Lender resulting from the Loan made by such Lender, including the amount of principal and interest payable and paid to such Lender from time to time hereunder.

(c)    The Administrative Agent shall maintain accounts in which it shall record (i) the amount of the Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof. In the event of any conflict between the records of the Administrative Agent and any Lender, the records of the Administrative Agent shall govern and control.

(d)    The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that (i) the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrowers to repay the Loans in accordance with the terms of this Agreement and (ii) in the event of any conflict between the entries made in the accounts maintained pursuant to Section 2.03(b) and the accounts maintained pursuant to Section 2.03(c), the accounts maintained pursuant to Section 2.03(c) shall govern and control.

(e)    Any Lender may request that Loans made by it be evidenced by a promissory note.  In such event, the Borrowers shall execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) in a form furnished by the Collateral Agent.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 12.07) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

Section 2.04    Interest.

(a)    Each Loan shall bear interest on the principal amount thereof from time to time outstanding, from the date of the making of such Loan to the DIP Account until repaid, at a rate per annum equal to the Adjusted Eurodollar Rate plus 9.50%.  Except as otherwise set forth herein, interest on each Loan (i) shall accrue on a daily basis and shall be payable in arrears on each Interest Payment Date with respect to interest accrued on and to each such payment date; (ii) shall accrue on a daily basis and shall be payable in arrears upon any prepayment of that Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid; and (iii) shall accrue on a daily basis and shall be payable in arrears at maturity of the Loans, including the Final Maturity Date.

(b)    To the extent permitted by law and notwithstanding anything to the contrary in this Section, upon the occurrence and during the continuance of an Event of Default, the principal of, and all accrued and unpaid interest on, all Loans, fees, indemnities or any other Obligations of the Loan Parties under this Agreement and the other Loan Documents, shall bear interest, from the date such

Event of Default occurred until the date such Event of Default is cured or waived in writing in accordance herewith, at a rate per annum equal at all times to the Post-Default Rate. Interest that accrues at the Post-Default Rate shall be payable in cash and on demand.

(c)    Promptly on each Interest Rate Determination Date, the Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the Loan for which an interest rate is then being determined and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to the Administrative Borrower and each Lender

(d)    All interest shall be computed on the basis of a year of 360 days for the actual number of days, including the first day but excluding the last day, elapsed. In computing interest on any Loan, the date of the making of such Loan, the first day of an Interest Period applicable to such Loan or the last Interest Payment Date with respect to such Loan, as the case may be, shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan, as the case may be, shall be excluded; provided, if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

Section 2.05    Reduction of Commitment; Prepayment of Loans.

(a)    Reduction of Commitments. Each Lender's Commitment shall terminate immediately and without further action on the earlier to occur of (1) the Final Facility Effective Date after giving effect to the funding (if any) of such Lender's Loan on such date and (2) the Final Maturity Date.

(b)    Optional Prepayment. The Borrowers may, at any time and from time to time, upon at least 3 Business Days' prior written notice to the Administrative Agent, prepay the principal of the Loans in whole but not in part. Each prepayment made pursuant to this clause (b) shall be accompanied by the payment of (i) accrued interest to the date of such payment on the amount prepaid, and (ii) unless such prepayment is made with proceeds from the 363 Sale where the Prepetition TL Lenders are the winning bidders, the Exit Fee.

(c)    Mandatory Prepayment. With respect to each of the following prepayments, the Loan Parties shall use their best efforts to provide the Administrative Agent with at least two Business Days' prior written notice (but such notice shall not alter any of the timing requirements below):

(i)    Immediately upon any Disposition (including the 363 Sale) by any Loan Party or its Subsidiaries, the Borrowers shall prepay the outstanding principal amount of the Loans in accordance with clause (d) below in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with such Disposition. If any Borrower receives Net Cash Proceeds after any Disposition, including, without limitation, deferred payments pursuant to a seller note, the Borrowers shall prepay the outstanding principal amount of the Loans in accordance with clause (d) below in an amount equal to 100% of the Net Cash Proceeds received by such Person. Nothing contained in this Section 2.05(c)(i) shall permit any Loan Party or any of its Subsidiaries to make a Disposition of any property other than in accordance with Section 7.02(c) or to make a Disposition of any property for consideration other than cash.

(ii)    Upon the issuance or incurrence by any Loan Party or any of its Subsidiaries of any Indebtedness (other than Permitted Indebtedness), the Borrowers shall prepay the outstanding amount of the Loans in accordance with clause (d) below in an amount equal to 100% of the

Net Cash Proceeds received by such Person in connection therewith.  The provisions of this subsection (ii) shall not be deemed to be implied consent to any such issuance, incurrence or sale otherwise prohibited by the terms and conditions of this Agreement.

(iii)    Upon the receipt by any Loan Party or any of its Subsidiaries of any Extraordinary Receipts, the Borrowers shall prepay the outstanding principal of the Loans in accordance with clause (d) below in an amount equal to 100% of such Extraordinary Receipts, net of (A) any reasonable expenses incurred in collecting such Extraordinary Receipts and (B) the aggregate amount of Third Party Entitlements that are required to be, and are, paid or reserved for payment (and actually paid within six months of receipt) with such Extraordinary Receipts.

(d)    Application of Payments.  Each prepayment pursuant to Section 2.05(c) above shall be applied, first, to pay the amounts specified in Section 2.05(e) on the principal amount being prepaid and second, to the Loan, until paid in full. Notwithstanding the foregoing, upon the exercise of secured creditor remedies by the Administrative Agent, prepayments required under Section 2.05(c) shall be applied in the manner set forth in Section 4.04(b).

(e)    Interest and Fees.  Any prepayment made pursuant to this Section 2.05 shall be accompanied by (i) accrued interest on the principal amount being prepaid to the date of prepayment, (ii) unless such prepayment is made with proceeds from the 363 Sale where the Prepetition TL Lenders are the winning bidders, the Exit Fee and (iii) if such prepayment would reduce the amount of the outstanding Loans to zero, such prepayment shall be accompanied by the payment of all fees accrued to such date pursuant to Section 2.06.

(f)    Cumulative Prepayments.  Except as otherwise expressly provided in this Section 2.05, payments with respect to any subsection of this Section 2.05 are in addition to payments made or required to be made under any other subsection of this Section 2.05.

Section 2.06    Fees.

(a)    Commitment Fee. The Borrowers shall pay to the Administrative Agent for the account of each Lender, a commitment fee in an aggregate amount equal to 2.00% of the aggregate amount of such Lender's Commitment, payable in cash on the date of the making of the Initial Loan out of the proceeds of such Loan; provided that no commitment fee shall accrue on the Commitment of a Defaulting Lender so long as such Lender shall be a Defaulting Lender.

(b)    Administration Fees.  The Borrowers shall pay to each Agent for its own account the fees set forth in the Administrative Agent Fee Letter.

(c)    Generally.  All fees shall be paid on the dates due, in immediately available funds in Dollars, to the Administrative Agent for distribution, if and as appropriate, among the Lenders.  Once paid, none of the fees shall be refundable under any circumstances.

Section 2.07    Use of Proceeds.  The proceeds of the Loans shall be applied strictly in accordance with the Budget. No part of the proceeds of any Loan will be used, whether directly or indirectly:

(a)    in any manner that causes or would reasonably be expected to cause such Loan or the application of such proceeds to violate the regulations of the Board, including Regulation T, Regulation U and Regulation X, or any other regulation thereof, or to violate the Exchange Act;

(b)    for any purpose that is prohibited under the Bankruptcy Code, the DIP Order or not expressly contemplated in the Budget;

(c)    to finance in any way: (i) any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of any or all of the Administrative Agent, the Lenders, or the Prepetition Term TL Lenders or their respective rights and remedies under this Agreement, the other Loan Documents, the DIP Order or the Prepetition TL Loan Documents, as the case may be, including to commence or prosecute or join in any action against any or all of the Administrative Agent, the Lenders the Prepetition TL Agent or the Prepetition TL Lenders seeking (x) to avoid, subordinate or recharacterize the Obligations or any of the Administrative Agent's, the Lenders', the Prepetition TL Agent's or any Prepetition TL Lenders' Liens, (y) any monetary, injunctive or other affirmative relief against any or all of the Administrative Agent, the Lenders the Prepetition TL Agent or the Prepetition TL Lenders or their Collateral or "Collateral" under (and as defined in) the Prepetition TL Loan Documents) in connection with the Loan Documents or the Prepetition TL Loan Documents or (z) to prevent or restrict the exercise by any or all of the Administrative Agent, the Lenders, the Prepetition TL Agent or the Prepetition TL Lenders of any of their respective rights or remedies under the Loan Documents or the Prepetition TL Loan Documents or (ii) any other action which with the giving of notice or passing of time would result in an Event of Default hereunder. Notwithstanding the foregoing, subject to entry of the Final Order, up to $75,000 in the aggregate proceeds of the Loan, the Collateral, any collateral under the Prepetition Agreements and/or the Carve-Out may be used to pay fees and expenses of the professional retained by the Official Committee that are incurred in connection with investigation of the matters covered by the stipulations contained in Paragraph I of the Interim Order;

(d)    for the payment of fees, expenses, interest, principal or any other amount with respect to any Indebtedness outstanding under the Prepetition Loan Documents (other than Permitted Adequate Protection Payments contemplated hereby) or to make any payment or transfer of value to any holders of any other Indebtedness of RML or any of its Subsidiaries;

(e)    to make any distribution under a plan of reorganization in the Chapter 11 Cases;

(f)    to make any payment, distribution or transfer of any kind to any Debtor or affiliate thereof that is not a Loan Party other than (i) the Investment permitted under Section 7.02(d)(iii) hereof and (ii) payments made with regards to the Picture known as "The Crow" to the extent permitted under Section 7.02(y); or

(g)    to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the Administrative Agent acting at the direction of the Required Lenders.

Nothing herein shall in any way prejudice or prevent the Administrative Agent or the Lenders from objecting, for any reason, to any requests, motions, or applications made in the Bankruptcy Court, including any application of final allowances of compensation for services rendered or reimbursement of expenses incurred under Sections 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest (and each such order shall preserve the Administrative Agent's and the Lenders' right to review and object to any such requests, motions or applications).

Section 2.08    Taxes.  (a)  Except as required by applicable Law, any and all payments or transfers by or on account of any Loan Party hereunder or under any other Loan Document (including any transfer or payment in satisfaction or deemed to be in satisfaction of any amount owing hereunder) shall be made without deduction for any and all present or future taxes, levies, imposts, deductions,

charges or withholdings, and all liabilities with respect thereto, <u>excluding</u> taxes imposed on the net income of any Agent or any Lender ("<u>Excluded Taxes</u>") or any transferee or assignee thereof, including a participation holder (any such entity, a "<u>Transferee</u>")) by the jurisdiction in which such Person is organized or has its principal lending office (all such non-Excluded Taxes, levies, imposts, deductions, charges withholdings and liabilities, collectively or individually, "<u>Taxes</u>").  If any Loan Party shall be required to deduct any Taxes from or in respect of any sum payable hereunder or under any other Loan Document to any Agent or any Lender (or any Transferee), (i) the sum payable shall be increased by the amount (an "<u>Additional Amount</u>") necessary so that after making all required deductions for Taxes (including deductions for Taxes applicable to additional sums payable under this Section 2.08) such Agent or such Lender (or such Transferee) shall receive an amount equal to the sum it would have received had no such deductions been made, (ii) such Loan Party shall make such deductions and (iii) such Loan Party shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Law, <u>provided</u> that no Loan Party will be required to pay the Additional Amount to any Lender to the extent such Taxes would not have arisen but for such Lender's failure to comply with the requirements of Section 2.08(g).

(b)    In addition, each Loan Party agrees to pay to the relevant Governmental Authority in accordance with applicable Law any present or future stamp, court or documentary taxes, intangible, recording, filing, excise or property taxes, or any similar charges or levies that arise from any payment made hereunder or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement or any other Loan Document ("<u>Other Taxes</u>").  Each Loan Party shall deliver to each Agent and each Lender official receipts in respect of any Taxes or Other Taxes payable hereunder promptly after payment of such Taxes or Other Taxes.

(c)    The Loan Parties hereby jointly and severally indemnify and agree to hold each Agent and each Lender harmless from and against Taxes and Other Taxes (including, without limitation, Taxes and Other Taxes imposed on any amounts payable under this Section 2.08) paid by such Person, whether or not such Taxes or Other Taxes were correctly or legally asserted.  Such indemnification shall be paid within 10 days from the date on which any such Person makes written demand therefor specifying in reasonable detail the nature and amount of such Taxes or Other Taxes.

(d)    Any Agent or any Lender (or Transferee) claiming any indemnity payment or additional payment amounts payable pursuant to this Section 2.08 shall use reasonable efforts (consistent with legal and regulatory restrictions) to file any certificate or document reasonably requested in writing by the Administrative Borrower or to change the jurisdiction of its applicable lending office if the making of such a filing or change would avoid the need for or reduce the amount of any such indemnity payment or additional amount that may thereafter accrue, would not require such Agent or such Lender (or Transferee) to disclose any information such Agent or such Lender (or Transferee) deems confidential and would not, in the sole determination of such Agent or such Lender (or Transferee), be otherwise disadvantageous to such Agent or such Lender (or Transferee).

(e)    If any Lender determines, in its sole judgment exercised in good faith, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by any Loan Party or with respect to which any Loan Party has paid additional amounts pursuant to this Section 2.08, it shall pay to the Administrative Borrower any amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Loan Parties under this Section 2.08 with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); <u>provided</u> that the Administrative Borrower, upon the request of such Lender, agrees to repay the amount paid over to the Administrative Borrower (plus any penalties, interest or other

charges imposed by the relevant Governmental Authority) to such Lender in the event such Lender is required to repay such refund to such Governmental Authority. Nothing in this paragraph (e) shall be construed to require any Lender to make available its tax returns (or any other information that it deems confidential) to any Loan Party or any other Person.

(f)     The obligations of the Loan Parties, the Agents and the Lenders under this Section 2.08 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(g)

(i)     Each Foreign Lender shall deliver to the Administrative Borrower and the Administrative Agent two (2) copies of either U.S. Internal Revenue Service Form W-8BEN-E, Form W-8ECI or Form W-8 IMY (with appropriate attachments thereto) claiming complete exemption from, or a reduced rate of, U.S. federal withholding tax on all payments by the Loan Parties under this Agreement and the other Loan Documents. In addition, in the case of a Foreign Lender claiming exemption from U.S. Federal withholding tax under Section 871(h) or 881(c) of the Internal Revenue Code with respect to payments of "portfolio interest", a Form W-8BEN, or any subsequent versions thereof or successors thereto, properly completed and duly executed by such Foreign Lender claiming complete exemption from, or a reduced rate of, U.S. federal withholding tax on all payments by the Loan Parties  under this Agreement and the other Loan Documents. In addition, in the case of a Foreign Lender claiming exemption from U.S. Federal withholding tax under Section 871(h) or 881(c) of the Internal Revenue Code, such Foreign Lender hereby represents to the Administrative Agent and the Borrowers that such Foreign Lender is not a bank for purposes of Section 881(c) of the Internal Revenue Code, is not a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code) of the Parent and is not a controlled foreign corporation related to the Parent (within the meaning of Section 864(d)(4) of the Internal Revenue Code), and such Foreign Lender agrees that it shall promptly notify the Administrative Agent in the event any such representation is no longer accurate. Such forms shall be delivered by each Foreign Lender on or before the date it becomes a party to this Agreement and on or before the date, if any, such Foreign Lender changes its applicable Lending Office by designating a new Lending Office. In addition, if such previously delivered form shall become obsolete or inaccurate (other than due to a change in law) each Foreign Lender shall update such forms promptly. Each Foreign Lender shall promptly notify the Administrative Borrower at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Administrative Borrower (or any other form of certification adopted by the United States taxing authorities for such purpose).

(ii)     Any Lender that is not a Foreign Lender and has not otherwise established to the reasonable satisfaction of the Administrative Borrower and Administrative Agent that it is an exempt recipient (as defined in Section 6049(b)(4) of the Internal Revenue Code) shall at the reasonable request of the Administrative Borrower or the Administrative Agent deliver to the Administrative Borrower and the Administrative Agent two duly executed and properly completed copies of Internal Revenue Service Form W-9.

(iii)     If a payment made to a Lender under this Agreement would be subject to withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA, such Lender shall deliver to the Administrative Borrower and Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Administrative Borrower or Administrative Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Administrative Borrower and Administrative

Agent as may be necessary for the Borrowers, Administrative Borrower and Administrative Agent to comply with their obligations under FATCA and to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(iv)    Notwithstanding clauses (i), (ii) and (iii) of this Section 2.08(g), a Lender shall not be required to deliver any form pursuant to this Section 2.08(g) that such Lender is not legally able to deliver.

Section 2.09    Right to Participate in Credit Bid.  The Administrative Agent (on behalf of the Lenders), the Lenders or any designee thereof (in each case via an acquisition co) shall have the right to credit bid the amount of their respective claims during any sale of all or any portion of any Borrowers' assets, including without limitation, sales occurring pursuant to Section 363 of the Bankruptcy Code or included as part of any plan of reorganization subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

## ARTICLE III

## PRIORITY AND LIENS/RANKING/COLLATERAL RELEASE

Section 3.01    Prepetition TL Obligations.  Each of the Loan Parties hereby acknowledges, confirms and agrees that RML and its Subsidiaries (including the Loan Parties) are indebted to the Prepetition TL Agent and the Prepetition TL Lenders for the Prepetition TL Obligations, as of the Petition Date, in an aggregate amount of not less than $365,880,319.73, in respect of Prepetition TL Obligations under the Prepetition TL Agreement plus fees, costs, expenses, charges and disbursements incurred in connection therewith (including attorneys' fees), indemnities, reimbursement obligations and other charges now or hereafter owed by RML and its Subsidiaries (including the Loan Parties) to the Prepetition TL Agent and the Prepetition TL Lenders pursuant to the terms of the Prepetition TL Agreement, all of which are unconditionally owing by RML and its Subsidiaries (including the Loan Parties) to the Prepetition TL Agent and the Prepetition TL Lenders, without offset, defense or counterclaim of any kind, nature and description whatsoever.

Section 3.02    Acknowledgment of Security Interests.  As of Petition Date, each of the Loan Parties hereby acknowledges, confirms and agrees (and hereby agrees that it will not dispute, challenge or otherwise contest) that (i) the Prepetition TL Agent and the Prepetition TL Lenders have valid, enforceable and perfected first priority and senior liens (subject only to "Permitted Liens" (as defined in the Prepetition TL Loan Documents)) upon and security interests in all of the Collateral (as defined in the Prepetition TL Loan Documents) granted pursuant to the Prepetition TL Loan Documents and the other "Security Documents" (as defined in the Prepetition TL Loan Documents) as in effect on such Petition Date to secure all of the Prepetition TL Obligations and (ii) such Liens are not subject to avoidance, set off, counterclaim, recharacterization, reduction, disallowance, impairment or subordination (whether contractual, equitable or otherwise) or other challenge pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

Section 3.03    Binding Effect of Documents.  Each of the Loan Parties hereby acknowledges, confirms and agrees (and hereby agrees that it will not dispute, challenge or otherwise contest) that (i) each of the Prepetition TL Loan Documents and the other "Security Documents" (as defined in the Prepetition TL Loan Documents) to which it is a party is in full force and effect as of the date hereof, (ii) the agreements and obligations of the Borrowers and each of its Subsidiaries contained in the Prepetition TL Loan Documents and the other "Security Documents" (as defined in the Prepetition TL Loan Documents) constitute the legal, valid and binding obligations of each of RML and its Subsidiaries

enforceable against each of them in accordance with their respective terms and neither RML nor any of its Subsidiaries has any valid defense, offset or counterclaim to the enforcement of such obligations and (iii) the Prepetition TL Agent and the Prepetition TL Lenders are and shall be entitled to all of the rights, remedies and benefits provided for in the Prepetition TL Loan Documents and the other "Security Documents" (as defined in the Prepetition TL Loan Documents), except to the extent clauses (ii) and (iii) above are subject to the automatic stay under the Bankruptcy Code upon commencement of the Chapter 11 Cases.

Section 3.04    Collateral; Grant of Lien and Security Interest.

(a)    Pursuant to the DIP Order and in accordance with the terms thereof, as security for the full and timely payment and performance of all of the Obligations, each of the Loan Parties hereby assigns, pledges and grants to the Collateral Agent, for the benefit of itself and the Lenders (the "Secured Parties"), a security interest in, and Lien on, all of the property, assets or interests in property or assets of such Person, of any kind or nature whatsoever, real or personal, tangible and intangible now existing or hereafter acquired or created, including all property of the "estate" (within the meaning of the Bankruptcy Code) of the Loan Parties, and all accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, general intangibles, payment intangibles, letters of credit, letter-of-credit rights, supporting obligations, machinery and equipment, real property, fixtures, leases, all of the issued and outstanding common and preferred stock of each Subsidiary of the Loan Parties, all of the common and preferred stock of all other Persons that are not Subsidiaries directly owned by the Loan Parties, money, investment property, deposit accounts, all commercial tort claims and other causes of action other than, prior to the Final Facility Effective Date, Avoidance Actions, Avoidance Action Proceeds, all "Cash Collateral" (as defined in the Interim Order), and all cash and non-cash proceeds, rents, products, substitutions, accessions and profits of any of collateral described above (all property of the Loan Parties subject to the security interest referred to in this clause (a) being hereinafter, collectively, referred to as the "Collateral").

(b)    The security interests and Liens in favor of the Collateral Agent in the Collateral shall be effective immediately upon the entry of the Interim Order and subject and subordinate only to the Carve-Out and the obligations under the Non-Primed Prepetition Facilities (but solely to the extent of the Collateral securing such Non-Primed Prepetition Facility). Such Liens and security interests and their priority shall remain in effect until the Commitments shall have been terminated and all Obligations shall have been paid in full.

(c)    Notwithstanding anything herein to the contrary (A) all proceeds received by the Collateral Agent and the Lenders from the Collateral subject to the Liens granted in clause (a) of this Section 3.04 and in each other Loan Document shall be, upon the occurrence and during the continuation of an Event of Default or a default under the DIP Order, subject and subordinate to the prior payment of the Carve-Out and (B) no Person entitled to the Carve-Out shall be entitled to sell or otherwise dispose of any Collateral, and without limiting such Person's right to receive proceeds of a sale up to the amount of the Carve-Out owed to such Person, such Person shall not seek or object to the sale or other disposition of any Collateral.

(d)    Subject only to prior payment of Carve-Out, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of any Lender or any Agent against any Loan Party in respect of any Obligation.

Section 3.05    Administrative Priority. Each Loan Party agrees that its Obligations shall constitute allowed administrative expenses in the Chapter 11 Cases, having priority over all

administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, subject only to prior payment of the Carve-Out and the terms and conditions of the DIP Order.

Section 3.06    <u>Grants, Rights and Remedies</u>.  The Liens and security interests granted pursuant to Section 3.04(a) and the administrative priority granted pursuant to Section 3.05 may be independently granted by the Loan Documents and by other Loan Documents hereafter entered into.  This Agreement, the DIP Order and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Administrative Agent and the Lenders hereunder and thereunder are cumulative.

Section 3.07    <u>No Filing Required</u>.  The Liens and security interests referred to herein shall be deemed valid and perfected by entry of the Interim Order and the Final Order, as the case may be, and entry of the Interim Order shall have occurred on or before the date of any Loan prior to the Final Period and entry of the Final Order shall have occurred on or before the date of any Loan during the Final Period.  No Agent shall be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office, take possession or control of any Collateral, or take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, the Interim Order or the Final Order, as the case may be, or any other Loan Document.

Section 3.08    <u>Survival</u>.

(a)    The Liens, lien priority, administrative priorities and other rights and remedies granted to the Agents and the Lenders pursuant to this Agreement, the DIP Order and the other Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by the Loan Parties (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Chapter 11 Cases, or by any other act or omission whatsoever.  Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(b)    except to the extent of the Carve-Out, no fees, charges, disbursements, costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on parity with any claim of the Agents and the Lenders against the Loan Parties in respect of any Obligation.  For the avoidance of doubt, no fees, costs, expenses, charges and disbursements shall be payable by the Loan Parties to their attorneys, accountants or other professionals or to attorneys, accountants or other professionals of the Official Committee except as provided by the Carve-Out;

(c)    the Liens in favor of the Collateral Agent and the Lenders set forth in Section 3.04 shall constitute valid and perfected first priority Liens and security interests, and shall be prior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever subject and subordinate only to the Carve-Out and the obligations under the Non-Primed Prepetition Facilities (but solely to the extent of the Collateral securing such Non-Primed Prepetition Facility); and

(d)    the Liens in favor of the Collateral Agent and the Lenders set forth herein and in the other Loan Documents shall continue to be valid and perfected without the necessity that the

Administrative Agent file financing statements or mortgages, take possession or control of any Collateral, or otherwise perfect its Lien under applicable non-bankruptcy law.

Section 3.09    Release.  As of the dates of both the Interim Order and the Final Order, the Loan Parties forever and irrevocably release, discharge and acquit, the Prepetition TL Lenders, the Prepetition TL Agent, the Agents and the Lenders, and each of their respective former, current and future officers, employees, directors, agents, representatives, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates and predecessors in interest of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, including without limitation any so-called "lender liability", equitable subordination or recharacterization claims or defenses, which occurred on or prior to the date hereof with respect to or against the Loan Parties in any capacity, the Indebtedness with respect to the Prepetition Agreements, the Prepetition Loan Documents, the Loan Parties' attempts to refinance the Indebtedness with respect to the Prepetition Agreements, the Loans and/or the documents, agreements, and instruments executed in connection with this Agreement, any and all claims and causes of action arising under Title 11 of the Bankruptcy Code, and any and all claims regarding the validity, priority, perfection or avoidability of the liens or secured claims of the Prepetition Lenders.

## ARTICLE IV

## FEES, PAYMENTS AND OTHER COMPENSATION

Section 4.01    Audit and Collateral Monitoring Fees.  The Borrowers acknowledge that pursuant to Section 7.01(e), representatives of the Agents and/or the Required Lenders may visit any or all of the Loan Parties and/or conduct audits, inspections, appraisals, valuations and/or field examinations of any or all of the Loan Parties at any time and from time to time in a manner so as to not unduly disrupt the business of the Loan Parties.  The Borrowers agree to pay (i) the examiner's out-of-pocket costs and reasonable expenses incurred in connection with all such visits, audits, inspections, appraisals, valuations and field examinations and (ii) the cost of all visits, audits, inspections, appraisals, valuations and field examinations conducted by a third party on behalf of the Agents.

Section 4.02    Payments; Computations and Statements.  (a)  The Borrowers will make each payment under this Agreement not later than 12:00 noon (New York City time) on the day when due, in lawful money of the United States of America and in immediately available funds, to the Administrative Agent's Account.  All payments received by the Administrative Agent after 12:00 noon (New York City time) on any Business Day will be credited to the Loan Account on the next succeeding Business Day. All payments shall be made by the Borrowers without set-off, counterclaim, recoupment, deduction or other defense to the Agents and the Lenders.  After receipt, the Administrative Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal ratably to the Lenders in accordance with their Pro Rata Shares and like funds relating to the payment of any other amount payable to any Lender to such Lender, in each case to be applied in accordance with the terms of this Agreement; provided that the Administrative Agent will cause to be distributed all interest and fees received from the Borrowers not less than once each month and in any event promptly after receipt thereof.  The Lenders and the Borrowers hereby authorize the Administrative Agent to, and the Administrative Agent will, from time to time at the direction of the Required Lenders, charge the Loan Account of the Borrowers with any amount due and payable by the Borrowers under any Loan Document.

Each of the Lenders and the Borrowers agrees that the Administrative Agent shall have the right to make such charges whether or not any Default or Event of Default shall have occurred and be continuing.  Any amount charged to the Loan Account of the Borrowers shall be deemed an Obligation hereunder, which shall bear interest at the rate applicable to the Loans.  The Lenders and the Borrowers confirm that any charges which the Administrative Agent may so make to the Loan Account of the Borrowers as herein provided will be made as an accommodation to the Borrowers and solely at the Required Lenders' discretion.  Whenever any payment to be made under any such Loan Document shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall in such case be included in the computation of interest or fees, as the case may be.  All computations of fees shall be made by the Administrative Agent on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) occurring in the period for which such fees are payable.  Each determination by the Administrative Agent of an interest rate or fees hereunder shall be conclusive and binding for all purposes in the absence of manifest error.

(b)    The Administrative Agent shall provide the Administrative Borrower, promptly after the end of each calendar month, a summary statement (in the form from time to time used by the Administrative Agent) of the opening and closing daily balances in the Loan Account of the Borrowers during such month, the amounts and dates of all Loans made to the Borrowers during such month, the amounts and dates of all payments on account of the Loans to the Borrowers during such month and the Loans to which such payments were applied, the amount of interest accrued on the Loans to the Borrowers during such month and the amount and nature of any charges to the Loan Account made during such month on account of fees, commissions, expenses and other Obligations.  All entries on any such statement shall be presumed to be correct and, thirty (30) days after the same is sent to the Administrative Borrower, shall be final and conclusive absent manifest error.

Section 4.03    Sharing of Payments, Defaulting Lenders, Etc.

(a)    The Administrative Agent shall not be obligated to transfer to a Defaulting Lender any payments made by any Borrower to the Administrative Agent for the Defaulting Lender's benefit, and, in the absence of such transfer to the Defaulting Lender, the Administrative Agent shall transfer any such payments to each other non-Defaulting Lender ratably in accordance with their Commitments (but only to the extent that such Defaulting Lender's Loan was funded by the other Lenders).  This Section 4.03(a) shall remain effective with respect to such Lender until (x) the Obligations under this Agreement shall have been declared or shall have become immediately due and payable, (y) the non-Defaulting Lenders, the Administrative Agent, and the Borrowers shall have waived such Defaulting Lender's default in writing, or (z) the Defaulting Lender makes its Pro Rata Share of the applicable defaulted Loan and pays to the Administrative Agent all amounts owing by such Defaulting Lender in respect thereof.  The operation of this Section 4.03(a) shall not be construed to increase or otherwise affect the Commitment of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by the Borrowers of its duties and obligations hereunder to the Administrative Agent or to the Lenders other than such Defaulting Lender.

(b)    If any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of any Obligation in excess of its ratable share of payments on account of similar obligations obtained by all the Lenders, such Lender shall forthwith purchase from the other Lenders such participations in such similar obligations held by them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; provided, however, that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and such Lender shall repay

to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (i) the amount of such Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender of any interest or other amount paid by the purchasing Lender in respect of the total amount so recovered). The Borrowers agree that any Lender so purchasing a participation from another Lender pursuant to this Section 4.03(b) may, to the fullest extent permitted by law, exercise all of its rights (including the Lender's right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of the Borrowers in the amount of such participation.

Section 4.04    Apportionment of Payments. Subject to any written agreement among the Agents and/or the Lenders:

(a)    All payments of principal and interest in respect of outstanding Loans, all payments of fees (other than the fees set forth in Section 2.06 hereof and the audit and collateral monitoring fee provided for in Section 4.01) and all other payments in respect of any other Obligations, shall be allocated by the Administrative Agent among such of the Lenders as are entitled thereto, in proportion to their respective Pro Rata Shares or otherwise as provided herein or, in respect of payments not made on account of Loans, as designated by the Person making payment when the payment is made.

(b)    After the occurrence and during the continuance of an Event of Default the Administrative Agent may, and upon the direction of the Required Lenders shall, apply all proceeds of the Collateral, subject to the provisions of this Agreement, (i) first, ratably to pay the Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due and payable to the Agents until paid in full; (ii) second, ratably to pay the Obligations in respect of any fees and indemnities then due and payable to the Lenders until paid in full; (iii) third, ratably to pay interest then due and payable in respect of the Loan until paid in full; (iv) fourth, ratably to pay principal of the Loan until paid in full; (v) fifth, to the ratable payment of all other Obligations then due and payable until paid in full; and (vii) sixth, to the Prepetition TL Agent for the benefit of the holders of the Prepetition TL Obligations or as otherwise ordered by the Bankruptcy Court.

(c)    In each instance, so long as no Event of Default has occurred and is continuing, Section 4.04(b) shall not be deemed to apply to any payment by the Borrowers specified by the Administrative Borrower to the Administrative Agent to be for the payment of Obligations then due and payable under any provision of this Agreement or the prepayment of all or part of the principal of a Loan in accordance with the terms and conditions of Section 2.05.

(d)    For purposes of Section 4.04(b), (other than clause (v)), "paid in full" means payment in cash of all amounts owing under the Loan Documents according to the terms thereof, including loan fees, service fees, professional fees, interest, default interest, interest on interest, and expense reimbursements; provided, however, that for the purposes of clause (v), "paid in full" means payment in cash of all amounts owing under the Loan Documents according to the terms thereof, including loan fees, service fees, professional fees, interest, default interest, interest on interest, and expense reimbursements.

(e)    In the event of a direct conflict between the priority provisions of this Section 4.04 and other provisions contained in any other Loan Document, it is the intention of the parties hereto that both such priority provisions in such documents shall be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 4.04 shall control and govern.

Section 4.05    Increased Costs and Reduced Return.  (a)  If any Lender or any Agent shall have determined that the adoption or implementation of, or any change in, any Law, rule, treaty or regulation, or any policy, guideline or directive of, or any change in, the interpretation or administration thereof by, any court, central bank or other administrative or Governmental Authority, or compliance by any Lender or any Agent or any Person controlling any such Agent or any such Lender with any directive of, or guideline from, any central bank or other Governmental Authority or the introduction of, or change in, any accounting principles applicable to any Lender or any Agent or any Person controlling any such Agent or any such Lender (in each case, whether or not having the force of law) (each, a "Change in Law"), shall (i) subject such Agent or such Lender or any Person controlling such Agent or such Lender to any tax, duty or other charge with respect to this Agreement or any Loan made by such Agent or such Lender or change the basis of taxation of payments to such Agent or such Lender or any Person controlling such Agent or such Lender of any amounts payable hereunder (except for taxes on the overall net income of such Agent or such Lender or any Person controlling such Agent or such Lender), (ii) impose, modify or deem applicable any reserve, special deposit or similar requirement against any Loan or against assets of or held by, or deposits with or for the account of, or credit extended by, such Agent or such Lender or any Person controlling such Agent or such Lender (other than any such reserve or other requirement with respect to Loans that are reflected in the definition of "Adjusted Eurodollar Rate") or (iii) impose on such Agent or such Lender or any Person controlling such Agent or such Lender or any other condition regarding this Agreement or any Loan, and the result of any event referred to in clause (i), (ii) or (iii) above shall be to increase the cost to such Agent or such Lender of making any Loan, or agreeing to make any Loan, or to reduce any amount received or receivable by such Agent or such Lender hereunder, then, upon demand by such Agent or such Lender, the Borrowers shall pay to such Agent or such Lender such additional amounts as will compensate such Agent or such Lender for such increased costs or reductions in amount.

(b)    If any Agent or any Lender shall have determined that any Change in Law either (i) affects or would affect the amount of capital required or expected to be maintained by such Agent or such Lender or any Person controlling such Agent or such Lender and such Agent or such Lender determines that the amount of such capital is increased as a direct or indirect consequence of any Loans made or maintained, such Agent's or such Lender's or such other controlling Person's other obligations hereunder, or (ii) has or would have the effect of reducing the rate of return on such Agent's or such Lender's such other controlling Person's capital to a level below that which such Agent or such Lender or such controlling Person could have achieved but for such circumstances as a consequence of any Loans made or maintained, or any agreement to make Loans, or such Agent's or such Lender's or such other controlling Person's other obligations hereunder (in each case, taking into consideration, such Agent's or such Lender's or such other controlling Person's policies with respect to capital adequacy), then, upon demand by such Agent or such Lender, the Borrowers shall pay to such Agent or such Lender from time to time such additional amounts as will compensate such Agent or such Lender for such cost of maintaining such increased capital or such reduction in the rate of return on such Agent's or such Lender's or such other controlling Person's capital.

(c)    All amounts payable under this Section 4.05 shall bear interest from the date that is ten (10) days after the date of demand by any Agent or any Lender until payment in full to such Agent or such Lender at the Reference Rate.  A certificate of such Agent or such Lender claiming compensation under this Section 4.05, specifying the event herein above described in reasonable detail and the nature of such event shall be submitted by such Agent or such Lender to the Administrative Borrower, setting forth the additional amount due and an explanation of the calculation thereof, and such Agent's or such Lender's reasons for invoking the provisions of this Section 4.05, and shall be final and conclusive absent manifest error.

(d)    Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section 4.05 shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrowers shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section 4.05 for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Administrative Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)    If any Lender requests compensation under this Section 4.05, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to this Section 4.05, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrowers hereby jointly and severally agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

Section 4.06    Making or Maintaining Loans.

(a)    Inability to Determine Applicable Interest Rate.  In the event that the Administrative Agent shall have determined (which determination shall be final and conclusive and binding upon all parties hereto), on any Interest Rate Determination Date with respect to any Loan, that by reason of circumstances affecting the London interbank market adequate and fair means do not exist for ascertaining the interest rate applicable to such Loans on the basis provided for in the definition of "Adjusted Eurodollar Rate", the Administrative Agent shall on such date give notice (by telefacsimile or by telephone confirmed in writing) to the Administrative Borrower and each Lender of such determination, whereupon Loans shall bear interest at a rate determined by reference to the Base Rate until such time as the Administrative Agent notifies the Administrative Borrower and Lenders that the circumstances giving rise to such notice no longer exist.

(b)    Illegality or Impracticability of Loans.  In the event that on any date (i) any Lender shall have determined (which determination shall be final and conclusive and binding upon all parties hereto) that the making, maintaining, converting to or continuation of its Loans has become unlawful as a result of compliance by such Lender in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental rule, regulation, guideline or order not having the force of law even though the failure to comply therewith would not be unlawful), or (ii) the Administrative Agent is advised by the Requisite Lenders (which determination shall be final and conclusive and binding upon all parties hereto) that the making, maintaining, converting to or continuation of its Loans has become impracticable, as a result of contingencies occurring after the date hereof which materially and adversely affect the London interbank market or the position of the Lenders in that market, then, and in any such event, such Lenders (or in the case of the preceding clause (i), such Lender) shall be an "Affected Lender" and such Affected Lender shall on that day give notice (by e-mail or by telephone confirmed in writing) to the Administrative Borrower and the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each other Lender). If the Administrative Agent receives a notice from (x) any Lender pursuant to clause (i) of the preceding sentence or (y) a notice from the Lenders constituting Requisite Lenders pursuant to clause (ii) of the preceding sentence, then (1) the obligation of the Lenders (or, in the case of any notice pursuant to clause (i) of the preceding sentence, such Lender) to make Loans as shall be suspended until such notice shall be withdrawn by each Affected Lender, (2) to the extent such determination by the Affected Lender relates

to a Loan then being requested by the Borrowers pursuant to a Funding Notice, the Lenders (or in the case of any notice pursuant to clause (i) of the preceding sentence, such Lender) shall make such Loan as (or continue such Loan as or convert such Loan to, as the case may be) a Base Rate Loan, (3) the Lenders' (or in the case of any notice pursuant to clause (i) of the preceding sentence, such Lender's) obligations to maintain their respective outstanding Loans (the "Affected Loans") shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law, and (4) and Affected Loans shall automatically convert into Base Rate Loans on the date of such termination.  Notwithstanding the foregoing, to the extent a determination by an Affected Lender as described above relates to a Loan then being requested by the Administrative Borrower pursuant to a Notice of Borrowing, the Administrative Borrower shall have the option, subject to the provisions of Section 4.06(c), to rescind such Notice of Borrowing as to all Lenders by giving written or telephonic notice (promptly confirmed by delivery of written notice thereof) to Administrative Agent of such rescission on the date on which the Affected Lender gives notice of its determination as described above (which notice of rescission Administrative Agent shall promptly transmit to each other Lender).

(c)    Compensation for Breakage or Non Commencement of Interest Periods. The Borrowers shall compensate each Lender, upon written request by such Lender (which request shall set forth the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including any interest paid or payable by such Lender to Lenders of funds borrowed by it to make or carry its Loans and any loss, expense or liability sustained by such Lender in connection with the liquidation or re-employment of such funds but excluding loss of anticipated profits) which such Lender may sustain: (i) if for any reason (other than a default by such Lender) a borrowing of any Loan does not occur on a date specified therefor in a Notice of Borrowing or a telephonic request for borrowing; (ii) if any prepayment or other principal payment of, or any conversion of, any of its Loans occurs on a date prior to the last day of an Interest Period applicable to that Loan; or (iii) if any prepayment of any of its Loans is not made on any date specified in a notice of prepayment given by the Administrative Borrower. Immediately upon receipt by the Borrowers of a written request by a Lender or Lenders for compensation for breakage, as provided in this Section, the Borrowers shall provide the Administrative Agent with a copy of such notice by facsimile or electronic mail.

(d)    Booking of Loans.  Any Lender may make, carry or transfer Loans at, to, or for the account of any of its branch offices or the office of an Affiliate of such Lender.

(e)    Assumptions Concerning Funding of Loans.  Calculation of all amounts payable to a Lender under this Section 4.06 and Section 4.05 shall be made as though such Lender had actually funded each of its relevant Loans through the purchase of a Eurodollar deposit bearing interest at the rate obtained pursuant to clause (i) of the definition of "Adjusted Eurodollar Rate" in an amount equal to the amount of such Loan and having a maturity comparable to the relevant Interest Period and through the transfer of such Eurodollar deposit from an offshore office of such Lender to a domestic office of such Lender in the United States of America; provided, however, each Lender may fund each of its Loans in any manner it sees fit and the foregoing assumptions shall be utilized only for the purposes of calculating amounts payable under this Section 4.06 and under Section 4.05.

Section 4.07    Joint and Several Liability of the Borrowers.  (a)  Notwithstanding anything in this Agreement or any other Loan Document to the contrary, each of the Borrowers hereby accepts joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Agents and the Lenders under this Agreement and the other Loan Documents, for the mutual benefit, directly and indirectly, of each of the Borrowers and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations.  Each of the Borrowers, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers,

with respect to the payment and performance of all of the Obligations (including, without limitation, any Obligations arising under this Section 4.07), it being the intention of the parties hereto that all of the Obligations shall be the joint and several obligations of each of the Borrowers without preferences or distinction among them.  If and to the extent that any of the Borrowers shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event, the other Borrowers will make such payment with respect to, or perform, such Obligation.  Subject to the terms and conditions hereof, the Obligations of each of the Borrowers under the provisions of this Section 4.07 constitute the absolute and unconditional, full recourse Obligations of each of the Borrowers, enforceable against each such Person to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement, the other Loan Documents or any other circumstances whatsoever.

(b)    The provisions of this Section 4.07 are made for the benefit of the Agents, the Lenders and their successors and permitted assigns, and may be enforced by them from time to time against any or all of the Borrowers as often as occasion therefor may arise and without requirement on the part of the Agents, the Lenders or such successors or assigns first to marshal any of its or their claims or to exercise any of its or their rights against any of the other Borrowers or to exhaust any remedies available to it or them against any of the other Borrowers or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy.  The provisions of this Section 4.07 shall remain in effect until all of the Obligations shall have been paid in full in cash.

(c)    Each of the Borrowers hereby agrees that it will not enforce any of its rights of contribution or subrogation against the other Borrowers with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to the Agents or the Lenders with respect to any of the Obligations or any Collateral, until such time as all of the Obligations have been paid in full in cash.  Any claim which any Borrower may have against any other Borrower with respect to any payments to the Agents or the Lenders hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations.

## ARTICLE V

## CONDITIONS TO LOANS

Section 5.01    Conditions Precedent to Interim Facility Effective Date.  The obligation of each Lender to make its Initial Loan hereunder is subject the satisfaction, or waiver in accordance with Section 12.02, of the following conditions:

(a)    Payment of Fees, Etc.  The Borrowers shall have paid on or before the date of this Agreement (i) all fees, costs, expenses and taxes then payable pursuant to Section 2.06 and Section 12.04 of this Agreement and (ii) all fees, costs, expenses and taxes then payable to the Prepetition TL Agent (including outstanding attorney's fees).

(b)    Delivery of Documents.  The Administrative Agent shall have received on or before the Interim Facility Effective Date the following, each in form and substance reasonably acceptable to the Administrative Agent and, unless indicated otherwise, dated the Interim Facility Effective Date:

(i)    a copy of the resolutions of each Loan Party, certified as of the Interim Facility Effective Date by an Authorized Officer thereof, authorizing (A) the borrowings

hereunder and the transactions contemplated by the Loan Documents to which such Loan Party is party, and (B) the execution, delivery and performance by such Loan Party of each Loan Document to which such Loan Party is or will be a party and the execution and delivery of the other documents to be delivered by such Person in connection herewith and therewith;

(ii)    a certificate of an Authorized Officer of each Loan Party, certifying the names and true signatures of the representatives of such Loan Party authorized to sign each Loan Document to which such Loan Party is or will be a party and the other documents to be executed and delivered by such Loan Party in connection herewith and therewith, together with evidence of the incumbency of such Authorized Officers;

(iii)    a certificate of the appropriate official(s) of the jurisdiction of organization of each Loan Party certifying as of a recent date as to the subsistence in good standing of such Loan Party in such jurisdictions;

(iv)    a true and complete copy of the charter, certificate of formation, certificate of limited partnership or other publicly filed organizational document of each Loan Party certified as of a recent date by an appropriate official of the jurisdiction of organization of such Loan Party which shall set forth the same complete name of such Loan Party as is set forth herein and the organizational number of such Loan Party, if an organizational number is issued in such jurisdiction;

(v)    a copy of the Governing Documents of each Loan Party, together with all amendments thereto, certified as of the Interim Facility Effective Date by an Authorized Officer of such Loan Party; and

(vi)    a certificate of an Authorized Officer of each Loan Party, certifying as to the matters set forth in Section 5.03(a).

(c)    Commencement of Chapter 11 Cases.  The Borrowers shall have commenced the Chapter 11 Cases and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Chapter 11 Cases or shortly thereafter shall have been reviewed in advance by the Agents and the Required Lenders and shall be in form and substance acceptable to the Agents and the Required Lenders in their respective sole discretion.

(d)    Interim Order. The Administrative Agent shall have received a signed copy of an order of the Bankruptcy Court in the form attached hereto as Exhibit A (the "Interim Order"), which shall be certified by the Clerk of the Bankruptcy Court as having been duly entered, and the Interim Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the written consent of the Required Lenders and, if the Interim Order is the subject of a pending appeal in any respect, neither the making of the Loans nor the performance by the Loan Parties of their respective obligations under the Loan Documents shall be the subject of a presently effective stay pending appeal.  The Loan Parties shall be in compliance in all respects with the Interim Order.

(e)    Other Bankruptcy Court Filings. The Bankruptcy Court shall have entered the Cash Management Order and the Wage Order, each on an interim basis. The Bidding Procedures Motion and all related documents shall have been filed.  All orders entered by the Bankruptcy Court including the foregoing and the Interim Order, shall, and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be form and substance satisfactory to the Required Lenders in their sole discretion.

#4849-2963-6390

(f)    No Trustee; Control Over Collateral. (i) No trustee, examiner or receiver shall have been appointed or designated with respect to the Debtors or their business, properties or assets and no motion shall be pending seeking any such relief, and (ii) no motion shall be pending seeking any other relief in the Bankruptcy Court to exercise control over Collateral with an aggregate fair market value in excess of $100,000 with respect to all such motions.

(g)    Prepetition Obligations. The holders of Indebtedness under the Prepetition TL Loan Documents shall have received adequate protection in respect of the Liens securing the Prepetition TL Obligations in the form set forth in the DIP Order.

(h)    Initial Budget; Information. Administrative Agent and the Lenders shall have received the Initial Budget, which shall be in form and substance acceptable to the Required Lenders in their sole discretion, and such other information (financial or otherwise) as the Required Lenders or the Administrative Agent may reasonably request.

(i)    Perfected Liens on Collateral. All Obligations shall be secured by a perfected Lien on the Collateral with the priorities set forth in the Interim Order.

(j)    Chief Restructuring Officer.  Brian G. Kushner shall have been appointed the Chief Restructuring Officer by the Bankruptcy Court with expanded powers to operate or manage the financial affairs, the business and reorganization of the Debtors.

Section 5.02    Conditions Precedent to Final Facility Effectiveness.  The obligation of each Lender to make any Loan during the Final Period shall commence as of the Business Day (the "Final Facility Effective Date") of, and subject to, the satisfaction, or waiver in accordance with Section 12.02, of the following conditions:

(a)    Final Order.

(i)    The Final Order shall have been signed and entered by the Bankruptcy Court prior to the date which is 30 days following the date of the entry of the Interim Order, and the Administrative Agent shall have received a true and complete copy of such order.

(ii)    The Final Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended, appealed or subject to a stay pending appeal without the written consent of the Administrative Agent and the Required Lenders.

(iii)    The Loan Parties shall be in compliance with the Final Order.

Section 5.03    Conditions Precedent to all Loans.  In addition to the conditions set forth in Sections 5.01 and 5.02, as applicable, the obligation of each Lender to make any Loan, shall be subject to the satisfaction, or waiver in accordance with Section 12.02, of the following conditions:

(a)    Representations and Warranties; No Event of Default.  The following statements shall be true and correct: (i) the representations and warranties contained in Article VI and in each other Loan Document, certificate or other writing delivered to any Agent or any Lender by any Loan Party pursuant hereto or thereto are true and correct in all material respects on and as of the date of such Loan as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct on and as of such earlier date) and (ii) no Default or Event of Default shall have occurred and be

- 43 -

continuing or would result from this Agreement or the other Loan Documents becoming effective in accordance with its or their respective terms.

(b)    <u>Legality</u>.  The making of the Loans shall not contravene any Laws applicable to any Agent or any Lender.

(c)    <u>Approvals</u>.  All consents, authorizations and approvals of, and filings and registrations with, and all other actions in respect of, any Governmental Authority or other Person required in connection with the making of the Loans or the conduct of the Loan Parties' business shall have been obtained and shall be in full force and effect.

(d)    <u>Proceedings; Receipt of Documents</u>.  All proceedings in connection with the making of the Loans and the other transactions contemplated by this Agreement and the other Loan Documents, and all documents incidental hereto and thereto, shall be reasonably satisfactory to the Administrative Agent, the Required Lenders and its counsel (provided that the Administrative Agent's consent shall not be unreasonably withheld) and counsel shall have received all such information and such counterpart originals or certified or other copies of such documents as such parties may reasonably request.

(e)    <u>Budget</u>. The Administrative Agent and the Lenders shall have received all periodic updates required under the Budget and any variance reports, each in form and substance satisfactory to the Required Lenders and the Loan Parties shall be in compliance with the Budget.

(f)    <u>No Litigation</u>. Except for claims, actions, suits, investigations, litigation or proceedings stayed by 11 U.S.C. § 362 and set forth on Schedule 6.01(f), there shall not exist any action, suit, investigation, litigation or proceeding or other legal or regulatory developments, pending in any court or before any arbitrator or Governmental Authority that could reasonably be expected to singly or in the aggregate to have a Material Adverse Effect and there shall not exist any action, suit, investigation, litigation or proceeding or other legal or regulatory developments, pending or threatened in any court or before any arbitrator or Governmental Authority that singly or in the aggregate, relates to the Loans or the transactions contemplated by the Loan Documents.

(g)    <u>Notice of Borrowing</u>. The Administrative Agent shall have received a Notice of Borrowing from the Administrative Borrower in the manner and in the timeframe provided in Section 2.02 herein.

(h)    <u>Chapter 11 Orders</u>

(i)    Each Chapter 11 Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the written consent of the Administrative Agent and the Required Lenders.

(ii)    No appeal of any DIP Order shall have been filed or remain pending as of the date of the applicable borrowing.

(iii)    The Loan Parties shall be in compliance with each Chapter 11 Order.

# ARTICLE VI

# REPRESENTATIONS AND WARRANTIES

Section 6.01    Representations and Warranties.  Each Loan Party hereby represents and warrants to the Agents and the Lenders as follows:

(a)    Organization, Good Standing, Etc.  Each Loan Party (i) is a corporation, limited liability company or limited partnership duly incorporated, organized or formed, as the case may be, validly existing and in good standing under the Laws of the state, jurisdiction, province or country of its incorporation, organization or formation, as the case may be, (ii) has all requisite power and authority to conduct its business as now conducted and as presently contemplated and, in the case of the Borrowers, to make the borrowings hereunder, and to execute and deliver each Loan Document to which it is a party, and to consummate the transactions contemplated hereby and thereby, and (iii) is duly qualified to do business and is in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary.

(b)    Authorization, Etc.  Upon entry of the Interim Order or the Final Order, as the case may be, the execution, delivery and performance by each Loan Party of each Loan Document to which it is or will be a party, (i) have been duly authorized by all necessary action, (ii) do not and will not contravene any of its Governing Documents or any applicable Law or any Material Contract binding on or otherwise affecting it or any of its properties, (iii) do not and will not result in or require the creation of any Lien (other than pursuant to any Loan Document) upon or with respect to any of its properties, and (iv) do not and will not result in any default, noncompliance, suspension, revocation, impairment, forfeiture or non-renewal of any permit, license, authorization or approval applicable to its operations or any of its properties.

(c)    Governmental Approvals.  Except for the approval of the Bankruptcy Court, no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required in connection with the due execution, delivery and performance by any Loan Party of any Loan Document to which it is or will be a party.

(d)    Enforceability of Loan Documents.  Upon entry of the Interim Order or the Final Order, as applicable, this Agreement is, and each other Loan Document to which any Loan Party is or will be a party, when delivered hereunder, will be, a legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its terms.

(e)    Capitalization; Subsidiaries.

(i)    On the Interim Facility Effective Date, the authorized Equity Interests of the Parent and the issued and outstanding Equity Interests of the Parent are as set forth on Schedule 6.01(e).  All of the issued and outstanding shares of Equity Interests of the Parent have been validly issued and are fully paid and nonassessable, and the holders thereof are not entitled to any preemptive, first refusal or other similar rights.  Except as described on Schedule 6.01(e), as of the Interim Facility Effective Date, there are no outstanding debt or equity securities of the Parent or any of its Subsidiaries and no outstanding obligations of the Parent or any of its Subsidiaries convertible into or exchangeable for, or warrants, options or other rights for the purchase or acquisition from the Parent, or other obligations of the Parent to issue, directly or indirectly, any shares of Equity Interests of the Parent.

(ii)    Schedule 6.01(e) is a complete and correct description of the name, jurisdiction of incorporation, share capital (authorized, issued and outstanding) and ownership of

the outstanding Equity Interests of such Subsidiaries of the Parent in existence as of the Interim Facility Effective Date.  All of the issued and outstanding shares of Equity Interests of such Subsidiaries have been validly issued and are fully paid and non-assessable, and the holders thereof are not entitled to any preemptive, first refusal or other similar rights.  Except as indicated on Schedule 6.01(e), all such Equity Interests are owned by the Parent or one or more of its Wholly Owned Subsidiaries, free and clear of all Liens other than the Liens granted to the Collateral Agent pursuant to the Loan Documents and Permitted Liens.  There are no outstanding debt or equity securities of the Parent or any of its Subsidiaries and no outstanding obligations of the Parent or any of its Subsidiaries convertible into or exchangeable for, or warrants, options or other rights for the purchase or acquisition from the Parent or any of its Subsidiaries, or other obligations of any Subsidiary to issue, directly or indirectly, any shares of Equity Interests of any Subsidiary of the Parent.

(f)    Litigation; Commercial Tort Claims.  Except as set forth in Schedule 6.01(f), (i) there is no pending or, to the best knowledge of any Loan Party, threatened action, suit or proceeding affecting any Loan Party or any of its properties before any court or other Governmental Authority or any arbitrator that (A) could reasonably be expected to have a Material Adverse Effect and which is not stayed by the bankruptcy proceeding or (B) relates to this Agreement or any other Loan Document and (ii) as of the Interim Facility Effective Date, none of the Loan Parties holds any commercial tort claims in respect of which a claim has been filed in a court of law or a written notice by an attorney has been given to a potential defendant.

(g)    Budget. The Budget was prepared in good faith by the management of the Loan Parties, based on assumptions believed by the management of the Loan Parties to be reasonable at the time made and upon information believed by the management of the Loan Parties to have been accurate in all material respects based upon the information available to the management of the Loan Parties at the time such Budget was furnished.

(h)    Compliance with Law, Rules, Etc.  No Loan Party or any of its Subsidiaries is in violation of (i) any of its Governing Documents, (ii) any Law, or (iii) any material term of any Contractual Obligation (including, without limitation, any Material Contract) other than the Prepetition Loan Agreements, binding on or otherwise affecting it or any of its properties, except where the failure to so comply could not reasonably be expected to have a Material Adverse Effect, and no Default or Event of Default has occurred and is continuing.

(i)    ERISA.  No Loan Party nor any of its ERISA Affiliates contributes to, sponsors, maintains or has an obligation to contribute to or maintain any Multiemployer Plan or any defined benefit plan and has not at any time prior to the date hereof established, sponsored or maintained, been a party to and has not at any time prior to the date hereof contributed or been obligated to contribute to or maintain any Multiemployer Plan or any defined benefit plan.

(j)    Taxes, Etc.  All Federal, state, local and foreign tax returns and other reports required by applicable Law to be filed by any Loan Party have been properly and timely filed, or extensions have been properly and timely obtained, and all taxes, assessments and other governmental charges imposed upon any Loan Party or any property of any Loan Party and which have become due and payable on or prior to the date hereof have been paid in full, except to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof in accordance with GAAP.  No tax return is under audit or examination by any Governmental Authority and no notice of such an audit or examination or any assertion of any claim for taxes has been given or made by any Governmental Authority. Each Loan Party is a partnership or entity disregarded as separate

from its sole owner for U.S. federal income tax purposes and the execution and delivery of this Agreement shall not affect such status.

(k)    Regulations T, U and X.  No Loan Party is or will be engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation T, U or X), and no proceeds of any Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

(l)    Nature of Business.  No Loan Party is engaged in any business other than the media or entertainment business, including motion pictures, video, video games, publishing of any kind (including book, magazine, newspaper and the like), content over telephone or personal electronic devices (whether on satellite, wireless, mobile, terrestrial or cellular platforms), television (whether broadcast, cable, satellite or other means of transmission), radio (terrestrial, satellite or other means of transmission), music, music publishing or distribution, the Internet, live theatrical performance, talent or sports agency or management, merchandising, and the representation of, or the provision of production, consulting, financing, investment or other similar services to, any Person with respect to the foregoing.

(m)    Adverse Agreements, Etc.  No Loan Party or any of its Subsidiaries is a party to any Contractual Obligation or subject to any restriction or limitation in any Governing Document or any judgment, order, regulation, ruling or other requirement of a court or other Governmental Authority, which (either individually or in the aggregate) has, or in the future could reasonably be expected (either individually or in the aggregate) to have, a Material Adverse Effect.

(n)    Permits, Etc.  Each Loan Party has, and is in compliance with, all material permits, licenses, authorizations, approvals, entitlements and accreditations required for such Person lawfully to own, lease, manage or operate, or to acquire, each business currently owned, leased, managed or operated, or to be acquired, by such Person.  To the knowledge of the Loan Parties, no condition exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, would result in the suspension, revocation, impairment, forfeiture or non-renewal of any such material permit, license, authorization, approval, entitlement or accreditation, and to the knowledge of the Loan Parties there is no claim that any thereof is not in full force and effect.

(o)    Properties. (i) Each Loan Party has good and marketable title to, valid leasehold interests in, or valid licenses to use, all property and assets material to its business, free and clear of all Liens, except Permitted Liens.  All such properties and assets are in good working order and condition, ordinary wear and tear excepted.

(ii)    Schedule 6.01(o) sets forth a complete and accurate list, as of the Interim Facility Effective Date, of the location, by state and street address, of all real property owned or leased by each Loan Party and identifies the interest (fee or leasehold) of such Loan Party therein (excluding any temporary, short-term production space).

(p)    Full Disclosure.  Each Loan Party has disclosed to the Agents all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the other reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party to the Agents in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished) to the knowledge of any Loan Party contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which it was made, not misleading; provided that, with respect to projected financial information, each Loan Party represents

only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time prepared.  There is no contingent liability or fact that could reasonably be expected to have a Material Adverse Effect which has not been set forth in a Schedule hereto.

(q)    Insurance.  Each Loan Party keeps its property adequately insured and maintains (i) insurance to such extent and against such risks, including fire, as is customary with companies in the same or similar businesses, (ii) workmen's compensation insurance in the amount required by applicable Law, (iii) public liability insurance, which shall include product liability insurance, in the amount customary with companies in the same or similar business against claims for personal injury or death on properties owned, occupied or controlled by it, (iv) directors and officers liability insurance, and (v) such other insurance as may be required by Law.  Schedule 6.01(q) sets forth a list of all insurance maintained by each Loan Party on the Interim Facility Effective Date.

(r)    Use of Proceeds; Borrowers.  The Borrowers will use the proceeds of Loans and "Cash Collateral" (as defined in the Interim Order) for funding (i) certain administrative fees and expenses of the Chapter 11 Cases permitted under the Chapter 11 Orders and (ii) working capital and general corporate purposes during the pendency of the Chapter 11 Cases, in each case subject to compliance with Section 9.01 and Section 2.07.

(s)    Location of Bank Accounts.  Schedule 6.01(s) sets forth a complete and accurate list as of the Interim Facility Effective Date of all deposit, checking and other bank accounts, all securities and other accounts maintained with any broker dealer and all other similar accounts maintained by each Loan Party, together with a description thereof (i.e., the bank or broker dealer at which such deposit or other account is maintained and the account number and the purpose thereof).

(t)    Intellectual Property.  Except as set forth on Schedule 6.01(t), each Loan Party owns or licenses or otherwise has the right to use all material licenses, permits, patents, patent applications, trademarks, trademark applications, service marks, tradenames, registered copyrights, copyright applications, industrial designs, domain names and other intellectual property rights that are necessary for the operation of its business, without (to the knowledge of the Loan Parties) infringement upon or conflict with the rights of any other Person with respect thereto, except for such infringements and conflicts which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  Set forth on Schedule 6.01(t) is a list as of the Interim Facility Effective Date of all such material licenses, permits, patents, patent applications, trademarks, trademark applications, service marks, tradenames, registered copyrights, copyright applications, industrial designs, domain names and other intellectual property rights of each Loan Party.  To the best knowledge of each Loan Party, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party infringes upon or conflicts with any rights owned by any other Person, and no claim or litigation regarding any of the foregoing is pending or (to the knowledge of the Loan Parties) threatened, except for such infringements and conflicts which could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(u)    Material Contracts.  Set forth on Schedule 6.01(u) is a complete and accurate list as of the Interim Facility Effective Date of all Material Contracts of each Loan Party, showing the parties and subject matter thereof and amendments and modifications thereto.  Each such Material Contract (i) is in full force and effect and is binding upon and enforceable against each Loan Party  that is a party thereto and, to the best knowledge of such Loan Party, all other parties thereto in accordance with its terms, (ii) has not been otherwise amended or modified except as specified on Schedule 6.01(u), and (iii) is not in default due to the action or omission of any Loan Party or, to the knowledge of any Loan Party, any other party thereto.

(v)    Investment Company Act.  None of the Loan Parties is (i) an "investment company" or an "affiliated person" or "promoter" of, or "principal underwriter" of or for, an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended, or (ii) subject to regulation under any Law that limits in any respect its ability to incur Indebtedness or which may otherwise render all or a portion of the Obligations unenforceable.

(w)    Employee and Labor Matters.  There is (i) no unfair labor practice complaint pending or, to the best knowledge of any Loan Party, threatened against any Loan Party  before any Governmental Authority and no grievance or arbitration proceeding pending or threatened against any Loan Party which arises out of or under any collective bargaining agreement, (ii) no strike, labor dispute, slowdown, stoppage or similar action or grievance pending or threatened against any Loan Party or (iii) to the best knowledge of each Loan Party, no union representation question existing with respect to the employees of any Loan Party and no union organizing activity taking place with respect to any of the employees of any Loan Party.  No Loan Party or any of its ERISA Affiliates has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act or similar statute, which remains unpaid or unsatisfied.  The hours worked and payments made to employees of any Loan Party have not been in violation of the Fair Labor Standards Act or any other applicable legal requirements, except to the extent such violations could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  All material payments due from any Loan Party on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of such Loan Party, except where the failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(x)    Interrelated Business.  The Loan Parties make up a related organization of various entities constituting a single economic and business enterprise so that the Loan Parties share an identity of interests such that any benefit received by any one of them benefits the others.  From time to time each Loan Party may render services to or for the benefit of the other Loan Parties, purchase or sell and supply goods to or from or for the benefit of the others, make loans, advances and provide other financial accommodations to or for the benefit of the other Loan Parties (including inter alia, the payment by such Loan Party of creditors of the other Loan Parties and guarantees by such Loan Party of indebtedness of the other Loan Parties and provides administrative, marketing, payroll and management services to or for the benefit of the other Loan Parties ).

(y)    Name; Jurisdiction of Organization; Organizational ID Number; Chief Place of Business; Chief Executive Office; FEIN.  Schedule 6.01(y) sets forth a complete and accurate list as of the date hereof of (i) the exact legal name of each Loan Party, (ii) the jurisdiction of organization, formation or incorporation of each Loan Party, (iii) the organizational identification number, (or indicates that such Loan Party has no organizational identification number), (iv) each place of business of each Loan Party, (v) the chief executive office of each Loan Party, and (vi) the federal employer identification number of each Loan Party.

(z)    Secured, Super-Priority Obligations. On and after the Interim Facility Effective Date:

(i)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for (x) the motions seeking approval of the Loan Documents and the DIP Order and (y) the hearings for the approval of the DIP Order was given in each case. The Borrowers shall give, on a timely basis as specified in the DIP Order, all notices required to be given to all parties specified in the DIP Order.

(ii)    The provisions of this Agreement and the Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be are effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, legal, valid and perfected Liens on and security interests in all right, title and interest in the Collateral (the "DIP Liens"), having the priority provided for herein and in the DIP Order, and enforceable against the Loan Parties.

(iii)    Pursuant to Section 364(c)(1) of the Bankruptcy Code and the DIP Order, all Obligations and all other obligations of the Loan Parties under the Loan Documents at all times shall constitute allowed super-priority administrative expense claims in the Chapter 11 Cases having priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, and shall at all times be senior to the rights of Loan Parties, the estates of Loan Parties, and any successor trustee or estate representative in the Chapter 11 Cases or any subsequent proceeding or case under the Bankruptcy Code, subject only to the Carve-Out.

(iv)    Pursuant to Section 364(c)(2) of the Bankruptcy Code and the DIP Order, all Obligations are secured by a first priority perfected Lien on all tangible and intangible unencumbered assets of the Loan Parties (now existing or hereafter acquired) and, subject to entry of the Final Order, the Avoidance Actions and the Avoidance Action Proceeds.

(v)    Pursuant to Section 364(d)(1) of the Bankruptcy Code and the DIP Order, all Obligations are secured by a senior perfected Lien on the Primed Collateral.

(vi)    Pursuant to Section 364(c)(3) of the Bankruptcy Code and the DIP Order, all Obligations are secured by a junior Lien on all other encumbered assets of the Loan Parties (now existing or hereafter acquired) and all proceeds thereof, including without limitation the Production Collateral, the P&A Collateral and the Ultimates Collateral (as each such term is defined in the DIP Order).

(aa)    Anti-Terrorism Laws.

(i)    General.  None of the Loan Parties nor any Affiliates of any Loan Parties, is in violation of any Anti-Terrorism Law or engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the Anti-Terrorism Laws.

(ii)    None of the Loan Parties, nor any Affiliates of any Loan Parties, or their respective agents acting or benefiting in any capacity in connection with the Loans, letters of credit or other transactions hereunder, is any of the following (each, a "Blocked Person"):

(A)    a Person that is prohibited pursuant to any of the OFAC Sanctions Programs, including a Person named on OFAC's list of Specially Designated Nationals and Blocked Persons;

(B)    a Person that is owned or controlled by, or that owns or controls, or that is acting for or on behalf of, any Person described in subclause (A), above;

(C)    a Person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(D)    a Person that is affiliated or associated with a Person described in subclauses (A) through (C), above.

(iii)    None of the Loan Parties, nor any of their agents acting in any capacity in connection with the Loans or other transactions hereunder (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to any OFAC Sanctions Programs.

(iv)    None of the Loan Parties, nor any of their agents acting in any capacity in connection with the Loans or other transaction hereunder is a "money services business" as defined in 31 C.F.R. § 103.11(uu).

(bb)    Representations and Warranties in Documents; No Default.  All representations and warranties set forth in this Agreement and the other Loan Documents are true and correct in all material respects at the time as of which such representations were made and on the Interim Facility Effective Date.  No Event of Default has occurred and is continuing and no condition exists which constitutes a Default or an Event of Default.

(cc)    Chapter 11 Orders.

(i)    The DIP Order and the transactions contemplated hereby and thereby, are in full force and effect and have not been vacated, reversed, modified, amended or stayed without the prior written consent of Required Lenders.

(ii)    Proper notice for (A) the 363 Sale Motion, 363 Sale Procedures Order and the 363 Sale Order and (B) the hearing for the approval of 363 Sale Procedures Order and the 363 Sale Order will be given.  The Borrowers will give on a timely basis all notices required to be given to all parties specified in the 363 Sale Motion, 363 Sale Procedures Order and 363 Sale Order.

Notwithstanding the foregoing, the Loan Parties representations and warranties in this Article VI with regards to Relativity Sports Management, LLC, Skyland Entertainment Limited and each of their respective Subsidiaries are made for the benefit of the Lenders and Agents solely for the purposes of allocation of risk and not reliance; provided, that any breach of such representation or warranty with respect to such Person shall still constitute an Event of Default under Section 9.01 in accordance with the terms thereof.

# ARTICLE VII

# COVENANTS OF THE LOAN PARTIES

Section 7.01    Affirmative Covenants.  So long as any principal of or interest on any Loan or any other Obligation (whether or not due) shall remain unpaid or any Lender shall have any Commitment hereunder, each Loan Party will, unless the Required Lenders shall otherwise consent in writing:

(a)    Reporting Requirements.  Furnish to the Administrative Agent (whom shall provide a copy to each Lender):

(i)    by 5:00 p.m. (New York time) on each Tuesday after the Petition Date (or, if such day is not a Business Day, the Business Day immediately following such day), the

Administrative Borrower shall deliver to Administrative Agent and Lenders, a report, in form and substance reasonably satisfactory to Required Lenders, setting forth (x) for the immediately preceding week (ending on the Sunday immediately preceding the applicable Tuesday reporting deadline) and for the cumulative period from the Petition Date through the immediately preceding Sunday, the actual and budgeted results for such week and cumulative post-Petition Date time period by line item in the Budget, together with a reasonably detailed written explanation of all material variances, and (y) for the 9-week period beginning on the immediately preceding Monday, the projected weekly results by line item in the Budget, together with a reasonably detailed written explanation of all projected material variances (as compared to the immediately preceding rolling 9-week forecast delivered by the Borrowers);

(ii)    simultaneously with the delivery of the financial information of the Parent required by clause (i) of this Section 7.01(a), a certificate of an Authorized Financial Officer of the Parent stating that such Authorized Financial Officer has reviewed the provisions of this Agreement and the other Loan Documents and has made or caused to be made under his or her supervision a review of the condition and operations of the Parent and its Subsidiaries during the period covered by such financial statements with a view to determining whether the Parent and its Subsidiaries were in compliance with all of the provisions of this Agreement and such Loan Documents at the times such compliance is required hereby and thereby, and that such review has not disclosed, and such Authorized Financial Officer has no knowledge of, the existence during such period of an Event of Default or Default or, if an Event of Default or Default existed, describing the nature and period of existence thereof and the action which the Parent and its Subsidiaries propose to take or have taken with respect thereto;

(iii)    as soon as possible and in any event within 3 Business Days after submission to any Governmental Authority, all documents and information furnished to such Governmental Authority in connection with any investigation of any Loan Party other than routine inquiries by such Governmental Authority;

(iv)    as soon as possible and in any event within 1 Business Day after any Authorized Officer of any Loan Party obtains knowledge of the occurrence of an Event of Default or Default or the occurrence of any event or development that could reasonably be expected to have a Material Adverse Effect, the written statement of an Authorized Officer of the Administrative Borrower setting forth the details of such Event of Default or Default or other event or development having a Material Adverse Effect and the action which the affected Loan Party proposes to take with respect thereto;

(v)    promptly after the commencement thereof but in any event not later than 3 Business Days after service of process with respect thereto on, or the obtaining of knowledge thereof by, any Loan Party, notice of each action, suit or proceeding before any court or other Governmental Authority or other regulatory body or any arbitrator which could reasonably be expected to have a Material Adverse Effect;

(vi)    as soon as possible and in any event within 3 Business Days after receipt thereof, copies of any material notice that any Loan Party receives from any court or other Governmental Authority or other regulatory body or any arbitrator;

(vii)    as soon as possible and in any event within 3 Business Days after execution, receipt or delivery thereof, copies of any material notices that any Loan Party executes or receives in connection with any Material Contract;

(viii)    as soon as possible and in any event within 3 Business Days after execution, receipt or delivery thereof, copies of any material notices that any Loan Party executes or

receives in connection with the sale or other Disposition of the Equity Interests of, or all or any substantial portion of the assets of, any Loan Party;

(ix)    promptly after the sending or filing thereof, copies of all statements, reports and other information any Loan Party sends to any holders of its publicly traded Indebtedness or its securities or files with the SEC or any national (domestic or foreign) securities exchange;

(x)    promptly upon receipt thereof, copies of all financial reports (including, without limitation, management letters), if any, submitted to any Loan Party by its auditors in connection with any annual or interim audit of the financial statements or books thereof;

(xi)    as soon as possible and in any event within 8 weeks after the theatrical debut of any Picture distributed or produced by RML or any of its Subsidiaries, and as soon as received by RML if distributed by an Approved Domestic Distributor other than RML, an Ultimates calculation for such Picture in accordance with GAAP;

(xii)    within five Business Days after the end of each fiscal quarter, copies of any new Material Contract entered into during the preceding fiscal quarter;

(xiii)    furnish to the Administrative Agent promptly after the same is available, copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Borrowers or any other Loan Party with the Bankruptcy Court in the Chapter 11 Cases, or distributed by or on behalf of the Borrowers or any other Loan Party to the Official Committee; and

(xiv)    promptly upon request, such other information concerning the condition or operations, financial or otherwise, of any Loan Party or the Collateral as the Administrative Agent and/or the Required Lenders may from time to time may reasonably request.

(b)    Compliance with Laws, Etc.  Comply, and cause each of its Subsidiaries to comply, with all Laws, judgments and awards (including any settlement of any claim that, if breached, could give rise to any of the foregoing), except for any such non-compliance that could not reasonably be expected to result in a Material Adverse Effect.  Timely pay, to the extent expressly provided for in the Budget, all material obligations arising after the Petition Date promptly and in accordance with their terms and timely pay and discharge promptly all material taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property arising after the Petition Date, as well as all material lawful claims for labor, materials and supplies or otherwise arising after the Petition Date which, if unpaid, would become a Lien or charge upon such properties or any part thereof, before the same shall become in default; provided that the Borrowers and each of its Subsidiaries shall not be required to pay and discharge or to cause to be paid and discharged any such obligation, tax, assessment, charge, levy or claim so long as (i) the validity or amount thereof shall be contested in good faith by appropriate proceedings (if the Borrowers or its Subsidiaries shall have set aside on their books adequate reserves therefor) or (ii) non-payment and discharge thereof is permitted or required under the Bankruptcy Code or order of the Bankruptcy Court.

(c)    Preservation of Existence, Etc.  Maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, (i) its existence, rights and privileges, and (ii) become or remain, and cause each of its Subsidiaries to become or remain, duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary, except (A) in each case to the extent otherwise

provided in Section 7.02(c) and (B) in the case of clause (ii) to the extent that the failure to do so could not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

(d)    <u>Keeping of Records and Books of Account</u>.  Keep, and cause each of its Subsidiaries to keep, adequate records and books of account, with complete entries made to permit the preparation of financial statements in accordance with GAAP.

(e)    <u>Inspection and Audit Rights</u>.

(i)    Permit, and cause each of its Subsidiaries to permit, the agents and representatives of the Administrative Agent and/or the Required Lenders at any time and from time to time upon reasonable notice during normal business hours, at the expense of the Borrowers (subject to the limitation in Section 4.01), to examine and make copies of and abstracts from its records and books of account, to visit and inspect its properties, to verify materials, leases, notes, accounts receivable, deposit accounts and its other assets, to conduct audits, valuations, appraisals or examinations and to discuss its affairs, finances and accounts with any of its directors, officers, managerial employees, independent accountants or any of its other representatives.  In furtherance of the foregoing, each Loan Party hereby authorizes its independent accountants, and the independent accountants of each of its Subsidiaries, to discuss the affairs, finances and accounts of such Person (independently or together with representatives of such Person) with the agents and representatives of the Administrative Agent and/or the Required Lenders in accordance with this Section 7.01(e).

(ii)    Promptly notify the Administrative Agent and the Required Lenders of, and at all times allow the Administrative Agent and one Person appointed by the Required Lenders or their designees access to the results of all material audits conducted by (A) any Loan Party of any third party licensee, partnership, or joint venturer, or (B) any contract counterparty of the Loan Party, in each case to the extent the final results thereof are material, in each case except to the extent any such audit is subject to a written confidentiality agreement with a non-Affiliate that prohibits RML or any of its Subsidiaries from granting such access to the Administrative Agent and one Person appointed by the Required Lenders; <u>provided</u> that, with respect to such confidentiality restrictions affecting RML or any of its Subsidiaries, an Authorized Officer is made available to the Administrative Agent and one Person appointed by the Required Lenders to discuss such confidential information to the extent permitted.  The Loan Parties will exercise their audit rights with respect to any such third party licensees, partnerships and joint ventures in a manner consistent with past practice; <u>provided</u> that, if an Event of Default shall have occurred and be continuing, the Administrative Agent and one Person appointed by the Required Lenders shall have the right, subject to any prohibition expressly set forth in any contract with any Person that is not an Affiliate of any Loan Party, to exercise directly such Loan Party's audit rights under any agreement with respect to any Picture included in the Collateral.

(f)    <u>Maintenance of Properties, Etc.</u>  Maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, all of its properties which are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear excepted, and comply, and cause each of its Subsidiaries to comply, at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder.

(g)    <u>Observance of Agreements</u>.  Duly observe and perform, and cause each of its Subsidiaries to duly observe and perform, all material terms and conditions of all Contractual Obligations to which it is a party and diligently protect and enforce (or cause to be protected and enforced) the material rights of the Loan Parties under all such agreements in a manner consistent with

prudent business judgment and subject to the terms and conditions of such agreements as from time to time in effect.

        (h)    <u>Maintenance of Insurance</u>.

        (i)    Maintain, and cause each of its Subsidiaries to maintain, insurance with responsible and reputable insurance companies (with a Best Rating of at least AX, unless otherwise reasonably approved by the Administrative Agent) or associations (including, without limitation, comprehensive general liability, hazard, rent and business interruption insurance) with respect to its properties (including all real properties leased or owned by it) and business, in such amounts and covering such risks as is required by any Governmental Authority having jurisdiction with respect thereto or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and in any event in amount, adequacy and scope reasonably satisfactory to the Administrative Agent.

        (ii)    Maintain, or cause to be maintained, in effect during the period from the commencement of principal photography of each Picture produced by any Loan Party or from the date of acquisition of each Picture acquired by any Loan Party, through the third anniversary of the date on which such coverage commenced, a so-called "Errors and Omissions" policy or policies covering such Pictures, and cause such "Errors and Omissions" policy or policies to provide coverage to the extent and in such manner as is customary for Pictures of a like type but at a minimum to the extent and in such manner as is required under all applicable Distribution Agreements and other contracts relating thereto. After such three year period, the Loan Parties shall ensure that such Picture is covered by the Loan Parties' general corporate library insurance policy.

        (iii)    Maintain, or cause to be maintained, in effect during the period from the commencement of principal photography of each Picture produced by a Loan Party, or from the date of delivery of each such Picture acquired by a Loan Party (A) until such time as the Collateral Agent shall have been advised of the existence of one negative or master tape in one location and an interpositive, internegative or duplicate master tape in another location of the final version of the Completed Picture (satisfactory evidence thereof to be delivered to the Collateral Agent upon request), insurance on the negatives and sound tracks or master tapes of such Picture in an amount not less than the cost of re-shooting the principal photography of such Picture and otherwise re-creating such Picture and (B) until principal photography of such Picture has been concluded, a cast insurance policy with respect to such Picture, which provides coverage to the extent and in such manner as is customary for Pictures of a like type, but at minimum to the extent and in such manner as is required under all applicable Distribution Agreements and other contracts relating thereto.

        (i)    <u>Obtaining of Permits, Etc.</u>  Obtain, maintain and preserve, and cause each of its Subsidiaries to obtain, maintain and preserve, and take all necessary action to timely renew, all material permits, licenses, authorizations, approvals, entitlements and accreditations which are necessary or useful in the proper conduct of its business.

        (j)    <u>Further Assurances</u>.  Take such action and execute, acknowledge and deliver, and cause each of its Subsidiaries to take such action and execute, acknowledge and deliver, at its sole cost and expense, such ancillary and related agreements, instruments or other documents as the Administrative Agent and/or the Required Lenders may reasonably require from time to time consistent herewith in order (i) to carry out more effectively the purposes of this Agreement and the other Loan Documents, (ii) to subject to valid and perfected Liens any of the Collateral or any other property of any Loan Party and its Subsidiaries with the priority set forth in the DIP Order, (iii) to establish and maintain the validity and effectiveness of any of the Loan Documents and the validity, perfection and priority of

the Liens intended to be created thereby, and (iv) to better assure, convey, grant, assign, transfer and confirm unto each Agent and each Lender the rights now or hereafter intended to be granted to it under this Agreement or any other Loan Document.  In furtherance of the foregoing, to the maximum extent permitted by applicable Law, each Loan Party (A) authorizes each Agent to execute any such agreements, instruments or other documents in such Loan Party's name and to file such agreements, instruments or other documents consistent herewith in any appropriate filing office, in each case if the applicable Loan Party fails to do so within five Business Days of any request therefor (it being understood and agreed that (I) no such request shall be required if any Event of Default has occurred and is continuing, and (II) the applicable Agent shall promptly provide to the Administrative Borrower copies of all agreements, instruments or other documents so executed, but the failure to do so shall not give rise to any offset, setoff, counterclaim or defense with respect to the Obligations or result in any liability of any Agent or Lender to any Loan Party), (B) authorizes each Agent to file any financing statement (or the equivalent thereof in any foreign jurisdiction) required hereunder or under any other Loan Document, and any continuation statement or amendment with respect thereto (or the equivalent thereof in any foreign jurisdiction), in any appropriate filing office without the signature of such Loan Party, and (C) ratifies the filing of any financing statement (or the equivalent thereof in any foreign jurisdiction), and any continuation statement or amendment with respect thereto, filed without the signature of such Loan Party prior to the date hereof.

(k)    <u>Change in Collateral; Collateral Records</u>.  (i)  Advise the Collateral Agent promptly, in sufficient detail, of any material adverse change relating to the type, quantity or quality of the Collateral or the Lien granted thereon and (ii) execute and deliver, and cause each of its Subsidiaries to execute and deliver, to the Collateral Agent for the benefit of the Agents and the Lenders from time to time, solely for the Collateral Agent's convenience in maintaining a record of Collateral, such written statements and schedules as the Administrative Agent may reasonably require, designating, identifying or describing the Collateral.

(l)    <u>Subordination</u>. Cause all Indebtedness and any other obligations now or hereafter owed by it to any of its Affiliates, to be subordinated in right of payment and security to the Indebtedness and other Obligations owing to the Agents and the Lenders in accordance with a subordination agreement in form and substance reasonably acceptable to the Required Lenders.

(m)    <u>Fiscal Year</u>.  Cause the Fiscal Year of the Parent and its Subsidiaries to end on December 31st of each calendar year unless the Required Lenders consent to a change in such Fiscal Year (and appropriate related changes to this Agreement).

(n)    <u>Lender Teleconferences</u>.  Cause the executive management of the Parent and its Subsidiaries (including the Chief Consultant of RML) to participate in a telephonic meeting with the Agents and Lenders to discuss the business, financial and operational condition and results of the Parent and its Subsidiaries when requested by the Required Lenders upon reasonable notice during normal business hours.

(o)    <u>Cash Management</u>. The Borrowers and their Subsidiaries shall maintain cash managements systems reasonably acceptable to the Administrative Agent and in accordance with the applicable Chapter 11 Orders.

(p)    <u>Laboratories; No Removal</u>.

(i)    To the extent any Loan Party has control over, has received delivery of, or has current access rights to, any of the Physical Materials relating to any Picture, deliver or cause to be delivered to a Laboratory or Laboratories all the original negative (or digital original negative,

if applicable, or if no original negative or digital original negative exists, digital files) (the "Original Negative") and preprint materials (until Completion of the Picture), and subsequent to Completion, the Original Negative, master sound elements and digital interpositive with respect to each such Picture sufficient to exploit its rights in all media licensed or otherwise granted to a Loan Party (the "Key Materials") and deliver to the Collateral Agent a fully executed Pledgeholder Agreement with respect to such materials.  To the extent that any Loan Party has only rights of access to such Key Materials and has not created duplicate materials sufficient to exploit its rights and has not stored such duplicate materials at a Laboratory that has delivered a Pledgeholder Agreement to the Collateral Agent, the applicable Loan Party shall deliver to the Collateral Agent a fully executed Laboratory Access Letter covering such materials.  Prior to requesting any such Laboratory to deliver any Key Materials to another Laboratory, such Loan Party shall provide the Collateral Agent with a Pledgeholder Agreement or Laboratory Access Letter, as appropriate, executed by such other Laboratory and all other parties to such Pledgeholder Agreement or Laboratory Access Letter, as the case may be (including, with respect to any such Pledgeholder Agreement, the Collateral Agent).  Each Loan Party hereby agrees not to deliver or remove or cause the delivery or removal of the Key Materials with respect to any Picture owned by any Loan Party, or any Picture in which any Loan Party has an interest and the right to control the delivery or removal of Key Materials, to a location outside the United States of America, Canada or the United Kingdom without the prior written consent of the Required Lenders, except for material created during production occurring outside the United States, Canada or the United Kingdom and for a limited, temporary duration stored locally prior to delivery, provided that before any such material may be located in Canada or the United Kingdom, at the request of the Administrative Agent, appropriate local law security documents in form and substance satisfactory to the Administrative Agent shall be delivered to the Collateral Agent.

(ii)     During production of any Picture produced by any Loan Party, such Loan Party shall promptly deliver (or cause to be delivered) the daily rushes for such Picture to the appropriate Laboratory as soon as reasonably practicable, if applicable (e.g., if dailies are being developed at a Laboratory and are not digital).

(iii)     With respect to all Pictures for which principal photography commences after the date hereof, promptly after Completion, deliver to the Collateral Agent and the Laboratories that are signatories to Pledgeholder Agreements a revised schedule of the Physical Materials therefor on deposit with such Laboratories to the extent applicable.

(q)     Chapter 11 Cases. Comply with each Chapter 11 Order.

Notwithstanding the foregoing, the Loan Parties covenants in this Section 7.01 with regards to Relativity Sports Management, LLC, Skyland Entertainment Limited and each of their respective Subsidiaries are made for the benefit of the Lenders and Agents solely for the purposes of allocation of risk and not reliance; provided, that any breach of such covenant with respect to such Person shall still constitute an Event of Default under Section 9.01 in accordance with the terms thereof.

Section 7.02     Negative Covenants.  So long as any principal of or interest on any Loan or any other Obligation (whether or not due) shall remain unpaid or any Lender shall have any Commitment hereunder, each Loan Party shall not, unless the Required Lenders shall otherwise consent in writing:

(a)     Liens, Etc.  Create, incur, assume or suffer to exist, or permit any of its Subsidiaries to create, incur, assume or suffer to exist, any Lien upon or with respect to any of its properties, whether now owned or hereafter acquired; file or suffer to exist under the Uniform Commercial Code or any Law of any jurisdiction, a financing statement (or the equivalent thereof in any

foreign jurisdiction) that names it or any of its Subsidiaries as debtor; sign or suffer to exist any security agreement authorizing any secured party thereunder to file such financing statement (or the equivalent thereof); sell any of its property or assets subject to an understanding or agreement, contingent or otherwise, to repurchase such property or assets (including sales of accounts receivable) with recourse to it or any of its Subsidiaries or assign or otherwise transfer, or permit any of its Subsidiaries to assign or otherwise transfer, any account or other right to receive income; other than, as to all of the above, Permitted Liens.

(b)    Indebtedness.  Create, incur, assume, guarantee or suffer to exist, or otherwise become or remain liable with respect to, or permit any of its Subsidiaries to create, incur, assume, guarantee or suffer to exist or otherwise become or remain liable with respect to, any Indebtedness other than Permitted Indebtedness.

(c)    Fundamental Changes; Dispositions.  Wind-up, liquidate or dissolve, or merge, consolidate or amalgamate with any Person, or convey, sell, lease or sublease, transfer or otherwise dispose of, whether in one transaction or a series of related transactions, all or any part of its business, property or assets, whether now owned or hereafter acquired (or agree to do any of the foregoing), or purchase or otherwise acquire, whether in one transaction or a series of related transactions, all or substantially all of the assets of any Person (or any division thereof) (or agree to do any of the foregoing), or permit any of its Subsidiaries to do any of the foregoing except as contemplated by the 363 Sale Order.

(d)    Loans, Advances, Investments, Etc.  Make or commit or agree to make any Investment, or permit any of its Subsidiaries to do any of the foregoing, except for: (i) Investments existing on the date hereof, as set forth on Schedule 7.02(d) hereto, but not any increase in the amount thereof as set forth in such Schedule or any other modification of the terms thereof, (ii) Permitted Investments, (iii) Investments in Relativity EuropaCorp Distribution, LLC after the date hereof in an amount not to exceed $1,500,000 and (iv) other Investments approved in writing by the Required Lenders.

(e)    Lease Obligations.  Create, incur or suffer to exist, or permit any of its Subsidiaries to create, incur or suffer to exist, any obligations as lessee for the payment of rent for any real or personal property under leases or agreements to lease, other than leases set forth on Schedule 6.01(o).

(f)    Restricted Payments.  (i) Declare or pay any dividend or other distribution, direct or indirect, on account of any Equity Interests of any Loan Party or any of its Subsidiaries, now or hereafter outstanding, (ii) make any repurchase, redemption, retirement, defeasance, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any Equity Interests of any Loan Party or any direct or indirect parent of any Loan Party, now or hereafter outstanding, (iii) make any payment to retire, or to obtain the surrender of, any outstanding warrants, options or other rights for the purchase or acquisition of shares of any class of Equity Interests of any Loan Party, now or hereafter outstanding, (iv) return any Equity Interests to any shareholders or other equity holders of any Loan Party or any of its Subsidiaries, or make any other distribution of property, assets, shares of Equity Interests, warrants, rights, options, obligations or securities thereto as such or (v) pay any management fees or any other fees or expenses (including the reimbursement thereof by any Loan Party or any of its Subsidiaries) pursuant to any management, consulting or other services agreement to any of the shareholders or other equityholders of any Loan Party or any of its Subsidiaries or other Affiliates, or to any other Subsidiaries or Affiliates of any Loan Party; provided, however, that any Subsidiary of any Loan Party may pay dividends to such Loan Party (other than the Parent);

(g)    <u>Federal Reserve Regulations</u>.  Permit any Loan or the proceeds of any Loan under this Agreement to be used for any purpose that would cause such Loan to be a margin loan under the provisions of Regulation T, U or X of the Board.

(h)    <u>Transactions with Affiliates</u>.  Enter into, renew, extend or be a party to, or permit any of its Subsidiaries to enter into, renew, extend or be a party to, any transaction or series of related transactions (including, without limitation, the purchase, sale, lease, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate, except the transactions described in Schedule 7.02(h).

(i)    <u>Limitations on Dividends and Other Payment Restrictions Affecting Subsidiaries</u>.  Unless the Required Lenders shall otherwise consent, create or otherwise cause, incur, assume, suffer or permit to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of any Loan Party (i) to pay dividends or to make any other distribution on any shares of Equity Interests of such Subsidiary owned by any Loan Party or any of its Subsidiaries, (ii) to pay or prepay or to subordinate any Indebtedness owed to any Loan Party or any of its Subsidiaries, (iii) to make loans or advances to any Loan Party or any of its Subsidiaries or (iv) to transfer any of its property or assets to any Loan Party or any of its Subsidiaries, or permit any of its Subsidiaries to do any of the foregoing; <u>provided</u>, <u>however</u>, that nothing in any of clauses (i) through (iv) of this Section 7.02(i) shall prohibit or restrict compliance with:

(A)    this Agreement and the other Loan Documents;

(B)    any agreements in effect on the date of this Agreement;

(C)    any applicable Law, rule or regulation (including, without limitation, applicable currency control laws and applicable state corporate statutes restricting the payment of dividends in certain circumstances); or

(D)    in the case of clause (iv) above, any agreement setting forth customary restrictions on the subletting, assignment or transfer of any property or asset that is a lease, license, conveyance or contract of similar property or assets, provided that such restriction shall apply solely to the property or asset subject to such lease, license, conveyance or contract.

(j)    <u>Limitation on Issuance of Equity Interests</u>.  Issue or sell or enter into any agreement or arrangement for the issuance and sale of, or permit any of its Subsidiaries to issue or sell or enter into any agreement or arrangement for the issuance and sale of, any shares of its Equity Interests, any securities convertible into or exchangeable for its Equity Interests or any warrants.

(k)    <u>Modifications of Indebtedness, Organizational Documents and Certain Other Agreements; Etc.</u>

(i)    Amend, modify or otherwise change (or permit the amendment, modification or other change in any manner of) any of the provisions of any of its or its Subsidiaries' Indebtedness or of any instrument or agreement (including, without limitation, any purchase agreement, indenture, loan agreement or security agreement) relating to any such Indebtedness unless the Required Lenders shall otherwise approve such amendment, modification or change;

(ii)    make any payment, prepayment, redemption, defeasance, sinking fund payment or repurchase of any Indebtedness or of it or its Subsidiaries other than Permitted Adequate Protection Payments and Non-Primed Permitted Payments;

(iii)    amend, modify or otherwise change its name, jurisdiction of organization, organizational identification number or federal employer identification number; or

(iv)    amend, modify or otherwise change any of its Governing Documents, including, without limitation, by the filing or modification of any certificate of designation, or any agreement or arrangement entered into by it, with respect to any of its Equity Interests (including any shareholders' agreement), or enter into any new agreement with respect to any of its Equity Interests.

(l)    <u>Investment Company Act of 1940</u>.  Engage in any business, enter into any transaction, use any securities or take any other action or permit any of its Subsidiaries to do any of the foregoing, that would cause it or any of its Subsidiaries to become subject to the registration requirements of the Investment Company Act of 1940, as amended, by virtue of being an "investment company" or a company "controlled" by an "investment company" not entitled to an exemption within the meaning of such Act.

(m)    <u>ERISA</u>.  (i) Establish, sponsor, maintain, become party or contribute to or become obligated to sponsor, maintain or contribute to any Multiemployer Plan or any defined benefit plan (or permit any of its ERISA Affiliates to do any of the foregoing) or (ii) adopt or permit any ERISA Affiliate to adopt any employee welfare benefit plan within the meaning of Section 3(1) of ERISA which provides benefits to employees after termination of employment other than as required by Section 601 of ERISA or applicable Law.

(n)    <u>Limited Activities</u>.  Permit the Parent to incur any liabilities for borrowed money (other than liabilities arising under the Loan Documents and the Prepetition TL Documents), own or acquire any assets (other than the Equity Interests of other Loan Parties or any assets incidental thereto) or engage itself in any operations or business (other than actions required for compliance with, or are expressly permitted under, the Loan Documents).

(o)    <u>Certain Agreements</u>.  Agree to any material amendment or other material change to or material waiver of any of its rights under any Material Contract in any manner unless otherwise approved by the Required Lenders.

(p)    <u>Limitations on Negative Pledges</u>.  Enter into, incur or permit to exist, or permit any Subsidiary to enter into, incur or permit to exist, directly or indirectly, any agreement, instrument, deed, lease or other arrangement that prohibits, restricts or imposes any condition upon the ability of any Loan Party or any Subsidiary of any Loan Party to create, incur or permit to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, or that requires the grant of any security for an obligation if security is granted for another obligation, except the following: (i) this Agreement and the other Loan Documents, (ii) restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by Section 7.02(a) of this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (iii) any customary restrictions and conditions contained in agreements relating to the sale or other disposition of assets or of a Subsidiary pending such sale or other disposition; <u>provided</u> that such restrictions and conditions apply only to the assets or Subsidiary to be sold or disposed of and such sale or disposition is permitted hereunder, and (iv) customary provisions in leases restricting the assignment or sublet thereof.

(q)      Anti-Terrorism Laws.  None of the Loan Parties, nor any of their Affiliates or agents shall:

(i)      conduct any business or engage in any transaction or dealing with any Blocked Person, including the making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person,

(ii)      deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the OFAC Sanctions Programs, or

(iii)      engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the OFAC Sanctions Programs, the USA PATRIOT Act or any other Anti-Terrorism Law.

The Borrowers shall deliver to the Lenders any certification or other evidence requested from time to time by any Lender in its sole discretion, confirming compliance with this Section 7.02(p).

(r)      Pictures.  Commence principal photography on any Picture or acquire any Picture, or permit any of its Subsidiaries to do the foregoing.

(s)      Chapter 11 Claims; Adequate Protection. Incur, create, assume, suffer to exist or permit (i) any administrative expense, unsecured claim, or other super-priority claim or Lien that is pari passu with or senior to the claims of the Secured Parties against the Loan Parties hereunder, or apply to the Bankruptcy Court for authority to do so, except for the Carve-Out or (ii) any obligation to make adequate protection payments, or otherwise provide adequate protection, other than Permitted Adequate Protection Payments.

(t)      Chapter 11 Orders. Make or permit to be made any change, amendment or modification, or any application or motion for any change, amendment or modification, to any Chapter 11 Order.

(u)      Chapter 11 Cases. Except as otherwise permitted pursuant to the Chapter 11 Orders, (a) assume any executory contract or unexpired lease not assumed on or before the date hereof or reject any executory contract or unexpired lease not rejected on or before the date hereof, or (b) consent to termination or reduction of the Exclusivity Period or fail to object to any motion seeking to terminate or reduce the Exclusivity Period other than a motion filed by or with the consent of the Required Lenders.

(v)      363 Sale.  Accept any bid or collection of bids in the 363 Sale which would have Net Cash Proceeds less than the amount necessary to pay the Obligations in full on the date such sale is consummated.

(w)      Taxes. Make any tax elections or take or permit any action that would alter a Loan Party's tax characterization or amend any tax returns or settle any audit or other tax claim.

(x)      Additional Liabilities. Incur any liability in excess of the amount for such type of liability provided for in the Budget in any material respect.

(y)      Crow Production Spending.  (i) Incur, spend or become liable for more than $2,000,000 in fees, expenses or other amounts with regards to the Picture known as "The Crow" prior to the beginning of physical production unless the Required Lenders have received an executed

commitment for financing, in form and substance acceptable to the Required Lenders in their sole discretion, providing for third party financing of the production and such obligations, which financing is not contingent upon any additional diligence or other conditions precedent or (ii) begin physical production of the Picture known as "The Crow" or incur any obligations in respect thereof until the Required Lenders have received an executed financing agreement, in form and substance acceptable to the Required Lenders, providing for third party financing of the production and such obligations, which financing is not contingent upon any additional diligence or other conditions precedent.

(z)    Critical Vendors.  Make payments to Critical Vendors during the term of this Agreement that aggregate more than $6,400,000.

(aa)    Professional Fees. Permit to be incurred aggregate "Professional Fees" in excess of 105% of the aggregate "Professional Fees" contained in the Budget.

Notwithstanding the foregoing, the Loan Parties covenants in this Section 7.02 with regards to Relativity Sports Management, LLC, Skyland Entertainment Limited and each of their respective Subsidiaries are made for the benefit of the Lenders and Agents solely for the purposes of allocation of risk and not reliance; provided, that any breach of such covenant with respect to such Person shall still constitute an Event of Default under Section 9.01 in accordance with the terms thereof.

## ARTICLE VIII

## 363 SALE COVENANTS

Section 8.01    Sale Process. The Borrowers shall conduct a process for a 363 Sale.  In connection with the 363 Sale, the Borrowers shall as soon as reasonably practicable, upon any such information becoming available to the Borrowers, provide the Administrative Agent copies of any informational packages provided to potential bidders, and any draft order pertaining to the 363 Sale, all draft agency or sale agreements, the deadlines established as to receipt of bids and, upon request of the Administrative Agent, a status report and updated information relating to such motions and copies of any bids received from any proposed bidder for all or any portion of the Borrowers' assets and any updates, modifications or supplements to such information and materials.

Section 8.02    Sale and Bidding Procedures. (i) On the Petition Date, the Borrowers shall file the 363 Sale Motion seeking approval of the Bidding Procedures Order and the sale of substantially all the assets, which motion shall be in form and substance acceptable to the Required Lenders. (ii) By no later than seven days prior to the hearing to approve the Bidding Procedures Order, the Debtors shall finalize an asset purchase agreement in form and substance acceptable to the Required Lenders. (iii) On or before August 10, 2015 the Bankruptcy Court shall commence or have commenced the hearing to enter the Bidding Procedures Order.

Section 8.03    Winning Bidder; Sale. (i) The Borrowers shall, in the case of a 363 Sale, commenced the auction on or before September 16, 2015. (ii) The Bankruptcy Court shall have commenced the 363 Sale Hearing on or before September 21, 2015.  (iii) The Bankruptcy Court must enter the 363 Sale Order on or before the day after the 363 Sale Hearing and the 363 Sale Order must become a "final" order on or before the 14th day after the 363 Sale Order is entered. (iv) The closing of the 363 Sale shall occur on or before October 2, 2015.

Section 8.04    Sale Proceeds. Upon consummation of the 363 Sale, the lien hereunder and under the Prepetition TL Facility shall attach to the proceeds of such 363 Sale and such proceeds shall be remitted directly by the successful bidder in the following order: first, to permanently and indefeasibly

repay the Obligations; and second, to permanently and indefeasibly repay the Prepetition Term Loan Obligations.

## ARTICLE IX

## EVENTS OF DEFAULT

Section 9.01    Events of Default.  If any of the following Events of Default shall occur and be continuing:

(a)    any Borrower shall fail to pay (a) any principal of any Loan payable under this Agreement when due or (b) any interest on any Loan or any fee, indemnity or other amount payable under this Agreement or any other Loan Document when due and such failure continues for a period of three Business Days, in each case, whether such amount becomes due by scheduled maturity, required prepayment, acceleration, demand or otherwise;

(b)    any representation or warranty made or deemed made by or on behalf of any Loan Party or by any officer of the foregoing under or in connection with any Loan Document or under or in connection with any report, certificate or other document delivered by any Loan Party to any Agent or any Lender pursuant to any Loan Document, which representation or warranty is subject to a materiality or a Material Adverse Effect qualification, shall have been incorrect in any respect when made or deemed made; or any representation or warranty made or deemed made by or on behalf of any Loan Party or by any officer of the foregoing under or in connection with any Loan Document or under or in connection with any report, certificate or other document delivered to any Agent or any Lender by any Loan Party pursuant to any Loan Document, which representation or warranty is not subject to a materiality or a Material Adverse Effect qualification, shall have been incorrect in any material respect when made or deemed made;

(c)    any Loan Party shall fail to perform or comply with any covenant or agreement contained in:

(i)    Section 7.01(a), Section 7.02 or Article VIII; or

(ii)    any Loan Party shall fail to perform or comply with any other term, covenant or agreement contained in any Loan Document to be performed or observed by it and, except as set forth in subsections (a), (b) and (c)(i) this Section 9.01, such failure, if capable of being remedied, such failure shall remain unremedied for 5 Business Days;

(d)    (i) any Subsidiary of RML that is not a Loan Party shall fail to pay any of its Indebtedness in excess of $5,000,000, or any payment of principal, interest or premium thereon, when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Indebtedness, or (ii) any other default under any agreement or instrument relating to any such Indebtedness, or any other event, shall occur and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such default or event is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness; or (iii) any such Indebtedness shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased or an offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case, prior to the stated maturity thereof;

(e)    any Subsidiary of RML that is not a Loan Party (i) shall institute any proceeding or voluntary case seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, liquidation, administration, examination, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, administrator or examiner, trustee, custodian or other similar official for any such Person or for any substantial part of its property, (ii) shall be generally not paying its debts as such debts become due or shall admit in writing its inability to pay its debts generally, (iii) shall make a general assignment for the benefit of creditors, or (iv) shall take any action to authorize or effect any of the actions set forth above in this subsection (e);

(f)    any provision of any Guaranty or any other Loan Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against any Loan Party intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by any Loan Party or any Governmental Authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or any Loan Party shall deny in writing that it has any liability or obligation purported to be created under any Loan Document;

(g)    any Loan Party or any of its Subsidiaries is enjoined, restrained or in any way prevented by the order of any court or any Governmental Authority from conducting all or any material part of its business for more than five (5) days other than pursuant to this Agreement or any court order in connection with the Chapter 11 Cases;

(h)    any material damage to, or loss, theft or destruction of, any Collateral, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than five (5) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of any Loan Party, if any such event or circumstance could reasonably be expected to have a Material Adverse Effect;

(i)    any cessation of a substantial part of the business of any Loan Party or any of its Subsidiaries for a period of longer than five (5) days other than pursuant to this Agreement or any court order in connection with the Chapter 11 Cases;

(j)    the loss, suspension or revocation of, or failure to renew, any license or permit now held or hereafter acquired by any Loan Party or any of its Subsidiaries, if such loss, suspension, revocation or failure to renew could reasonably be expected to have a Material Adverse Effect;

(k)    the indictment, or the threatened indictment, of any Loan Party or any of its Subsidiaries, or the indictment of any Authorized Financial Officer of any of the foregoing, in each case, under any criminal statute, or the commencement, or threatened commencement, of criminal or civil proceedings against any Loan Party or any of its Subsidiaries, and in each case with respect to a Loan Party or a Subsidiary thereof, pursuant to which statute or proceedings the penalties or remedies sought or available include forfeiture to any Governmental Authority of any material portion of the property of such Person;

(l)    any Loan Party or any of its ERISA Affiliates sponsors, maintains, contributes to or is, or becomes, obligated to any Multiemployer Plan or any defined benefit plan;

(m)    a Change of Control shall have occurred;

(n)    a Final Order shall not have been entered by the Bankruptcy Court on or before the date that is 30 days after the entry of the Interim Order, which Final Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect without prior written consent of the Required Lenders;

(o)    any Chapter 11 Cases shall be dismissed (or the Bankruptcy Court shall make a ruling requiring the dismissal of any Chapter 11 Case), suspended or converted to a case under Chapter 7 of the Bankruptcy Code, or any Loan Party shall file any pleading requesting any such relief; or a motion shall be filed by any Loan Party for the approval of, or there shall arise, (i) any other Claim having priority senior to or pari passu with the claims of the Administrative Agent and Lenders under the Loan Documents or any other claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve-Out) or (ii) any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests granted herein, except as expressly provided herein and in the DIP Order;

(p)    any Loan Party files a motion in the Chapter 11 Cases without the express written consent of Required Lenders, to obtain additional financing from a party other than Lenders under Section 364(d) of the Bankruptcy Code or to use cash collateral of a Lender under Section 363(c) of the Bankruptcy Code;

(q)    any Loan Party shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any pre-petition Claim other than (x) as provided for in a "first day orders" and included in the Budget, (y) payments of the Non-Primed Permitted Payments or (z) otherwise consented to by the Required Lenders in writing, (ii) granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess of $100,0000 in the aggregate or to permit other actions that would have a Material Adverse Effect on any Loan Party or their estates, or (iii) approving any settlement or other stipulation not approved in writing by the Required Lenders and not included in the Budget (together with such variances thereto as are permitted pursuant to Section 9.01) with any secured creditor of any Loan Party providing for payments or other transfer of value as adequate protection or otherwise to such secured creditor;

(r)    (A) any Chapter 11 Order shall be amended, supplemented, stayed, reversed, vacated or otherwise modified (or any Loan Party shall apply for authority to do so) without the written consent of the Required Lenders (or any Loan Party shall file, or otherwise support, any pleading seeking such relief described in this subparagraph) or (B) any Chapter 11 Order shall cease to be in full force and effect;

(s)    any of the Loan Parties shall fail to comply with the terms and conditions of any Chapter 11 Order in any material respect;

(t)    the Bankruptcy Court shall enter an order appointing a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, or a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in subclauses (3) and (4) of clause (a) of Section 1106 of the Bankruptcy Code) under clause (b) of Section 1106 of the Bankruptcy Code in the Chapter 11 Cases (or any Loan Party shall file, or otherwise support, any pleading seeking such relief described in this subparagraph);

(u)    entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Debtor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders;

(v)       the Loan Parties or any of their Affiliates shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Loan Parties or any of their Subsidiaries) any other Person's opposition of any motion made in the Bankruptcy Court by the Lenders seeking confirmation of the amount of the Lenders' claim or the validity and enforceability of the Liens in favor of the Administrative Agent;

(w)       (A) the Loan Parties or any of their Affiliates shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Loan Parties or any of their Subsidiaries) any other Person's motion to, disallow in whole or in part the Lenders' claim in respect of the Obligations or to challenge the validity and enforceability of the Liens in favor of the Administrative Agent or contest any material provision of any Loan Document, (B) such Liens and/or super-priority claims shall otherwise cease to be valid, perfected and enforceable in all respects or (C) or any material provision of any Loan Document shall cease to be effective;

(x)       any judgments or settlements which are in the aggregate in excess of $100,000 as to any post-petition obligation shall be rendered against (or in the case of settlements, entered into by) any of the Loan Parties and the enforcement thereof shall not be stayed; or there shall be rendered against (or in the case of settlements, entered into by) any of the Loan Parties a non-monetary judgment or non-monetary settlement with respect to a post-petition event which causes or would reasonably be expected to cause a material adverse change or a material adverse effect on the ability of the Loan Parties to perform their obligations under the Loan Documents or the value of the Collateral;

(y)       (A) the Loan Parties or any of their Affiliates shall file any pleading or proceeding which could reasonably be expected to result in a material impairment of the rights or interests of the Lenders or (B) entry of an order of the Bankruptcy Court with respect to any pleading or proceeding brought by any other Person which results in such a material impairment of the rights or interests of the Lenders;

(z)       any Loan Party shall fail to execute and deliver to the Administrative Agent or Collateral Agent, as applicable, any agreement, financing statement, trademark filing, copyright filing, mortgages, notices of lien or similar instruments or other documents that the Administrative Agent may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the Liens created in favor of the Collateral Agent (for the benefit of the Secured Parties) under the DIP Order;

(aa)       the making of any payment or disbursement that is not expressly set forth in the Budget;

(bb)       the failure to ensure that cumulative "Total Cash Sources" received with respect to each Budget Period (beginning with the second Budget Period) are: (i) at least equal to 70% of the cumulative "Total Cash Sources" projected to be received pursuant to the Budget with respect to the combined first and second Budget Periods after the Petition Date, (ii) at least equal to 75% of the cumulative "Total Cash Sources" projected to be received pursuant to the Budget with respect to the first through third Budget Periods after the Petition Date and (iii) at least equal to 80% of the cumulative "Total Cash Sources" projected to have been received pursuant to the Budget for each Budget Period thereafter;

(cc)       the failure to ensure that cumulative "Operating Cash Uses" (other than with respect to interest and fees to be paid pursuant to this Agreement) disbursed as of any Budget Period

testing date are not greater than: (i) 125% of the corresponding amount projected to have been disbursed pursuant to the Budget for the combined first and second Budget Periods after the Petition Date, (ii) 120% of the corresponding amount projected to have been disbursed pursuant to the Budget for the first through third Budget Periods after the Petition Date, (iii) 115% of the corresponding amount projected to have been disbursed pursuant to the Budget for the first through fourth Budget Periods after the Petition Date and (iv) 110% of the corresponding amount projected to be disbursed pursuant to the Budget for each Budget Period thereafter; or

      (dd)    the Loan Parties shall fail to meet any of the milestones set forth in Article VIII on or prior to the date contained therein unless satisfaction of such milestone is waived by the Administrative Agent (acting at the direction of the Required Lenders) or any Loan Party shall cease to promptly pursue the 363 Sale;

then, and in any such event, the Collateral Agent shall at the request of the Required Lenders, by notice to the Administrative Borrower, (i) terminate or reduce all Commitments, whereupon all Commitments shall immediately be so terminated or reduced, (ii) declare all or any portion of the Loans then outstanding to be due and payable, whereupon all or such portion of the aggregate principal of all Loans, all accrued and unpaid interest thereon, all fees (including the Exit Fee) and all other amounts payable under this Agreement and the other Loan Documents shall become due and payable immediately, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by each Loan Party and (iii) exercise any and all of its other rights and remedies under applicable Law, hereunder and under the other Loan Documents, including applying all amounts in the DIP Account to repayment of the Obligations.  In addition the automatic stay provided in Section 362 of the Bankruptcy Code shall be deemed automatically vacated without further action or order of the Bankruptcy Court and the Administrative Agent and the Lenders shall be entitled to exercise all of their respective rights and remedies under the Loan Documents, including all rights and remedies with respect to the Collateral and the Guarantors. In addition to the remedies set forth above, the Administrative Agent may exercise any other remedies provided for by this Agreement in accordance with the terms hereof and thereof or any other remedies provided by applicable law.

## ARTICLE X

## AGENTS

      Section 10.01    <u>Appointment</u>.  Each Lender (and each subsequent maker of any Loan by its making thereof) hereby irrevocably appoints and authorizes the Administrative Agent and the Collateral Agent to perform the duties of each such Agent as set forth in this Agreement including, where applicable: (i) to receive on behalf of each Lender any payment of principal of or interest on the Loans outstanding hereunder and all other amounts accrued hereunder for the account of the Lenders and paid to such Agent, and to distribute promptly to each Lender its Pro Rata Share of all payments so received; (ii) to distribute to each Lender copies of all material notices and agreements received by such Agent and required to be delivered to each Lender pursuant to the terms of this Agreement, <u>provided</u> that the Agents shall not have any liability to the Lenders for any Agent's failure to distribute any such notices or agreements to the Lenders; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Loans, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; (iv) to execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Agreement or any other Loan Document; (v) to perform, exercise, and enforce any and all other rights and remedies of the Lenders with respect to the Loan Parties, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by such

Agent of the rights and remedies specifically authorized to be exercised by such Agent by the terms of this Agreement or any other Loan Document; (vi) to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Agreement or any other Loan Document; and (vii) subject to Section 10.03 of this Agreement, to take such action as such Agent deems appropriate on its behalf to administer the Loans and the Loan Documents and to exercise such other powers delegated to such Agent by the terms hereof or the other Loan Documents (including, without limitation, the power to give or to refuse to give notices, waivers, consents, approvals and instructions and the power to make or to refuse to make determinations and calculations) together with such powers as are reasonably incidental thereto to carry out the purposes hereof and thereof.  As to any matters not expressly provided for by this Agreement and the other Loan Documents (including, without limitation, enforcement or collection of the Loans), the Agents shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions of the Required Lenders shall be binding upon all Lenders and all makers of Loans.

Section 10.02    <u>Nature of Duties</u>.  The Agents shall have no duties or responsibilities except those expressly set forth in this Agreement or in the other Loan Documents.  The duties of the Agents shall be mechanical and administrative in nature.  The Agents shall not have by reason of this Agreement or any other Loan Document a fiduciary relationship in respect of any Lender.  Nothing in this Agreement or any other Loan Document, express or implied, is intended to or shall be construed to impose upon the Agents any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein or therein.  Each Lender shall make its own independent investigation of the financial condition and affairs of the Loan Parties in connection with the making and the continuance of the Loans hereunder and shall make its own appraisal of the creditworthiness of the Loan Parties and the value of the Collateral, and the Agents shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into their possession before the initial Loan hereunder or at any time or times thereafter, <u>provided</u> that, upon the reasonable request of a Lender, each Agent shall provide to such Lender any documents or reports delivered to such Agent by the Loan Parties pursuant to the terms of this Agreement.  If any Agent seeks the consent or approval of the Required Lenders to the taking or refraining from taking any action hereunder, such Agent shall send notice thereof to each Lender.  Each Agent shall promptly notify each Lender any time that the Required Lenders have instructed such Agent to act or refrain from acting pursuant hereto.

Section 10.03    <u>Rights, Exculpation, Etc.</u>  The Agents and their directors, officers, agents or employees shall not be liable for any action taken or omitted to be taken by them under or in connection with this Agreement or the other Loan Documents, except for their own gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction.  Without limiting the generality of the foregoing, the Agents (i) may treat the payee of any Loan as the owner thereof until the Collateral Agent receives written notice of the assignment or transfer thereof, pursuant to Section 12.07 hereof, signed by such payee and in form satisfactory to the Collateral Agent; (ii) may consult with legal counsel (including, without limitation, counsel to any Agent or counsel to the Loan Parties), independent public accountants, and other experts selected by any of them and shall not be liable for any action taken or omitted to be taken in good faith by any of them in accordance with the advice of such counsel or experts; (iii) make no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, certificates, warranties or representations made in or in connection with this Agreement or the other Loan Documents; (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement or the other Loan Documents on the part of any Person, the existence or possible existence of any Default or Event of Default, or to inspect the Collateral or other property (including, without limitation, the books and records) of any Person; (v) shall not be responsible to any Lender for the due

execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; and (vi) shall not be deemed to have made any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Agents be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.  The Agents shall not be liable for any apportionment or distribution of payments made in good faith pursuant to Section 4.04, and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of any Lender to whom payment was due but not made, shall be to recover from other Lenders any payment in excess of the amount which they are determined to be entitled.  The Agents may at any time request instructions from the Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the other Loan Documents the Agents are permitted or required to take or to grant, and if such instructions are promptly requested, the Agents shall be absolutely entitled to refrain from taking any action or to withhold any approval under any of the Loan Documents until they shall have received such instructions from the Required Lenders.  Without limiting the foregoing, no Lender shall have any right of action whatsoever against any Agent as a result of such Agent acting or refraining from acting under this Agreement or any of the other Loan Documents in accordance with the instructions of the Required Lenders.

Section 10.04    Reliance.  Each Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Agreement or any of the other Loan Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

Section 10.05    Indemnification.  To the extent that any Agent is not reimbursed and indemnified by any Loan Party, and whether or not such Agent has made demand on any Loan Party for the same, the Lenders will, within five days of written demand by such Agent, reimburse and indemnify such Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, client charges and expenses of counsel or any other advisor to such Agent), advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against such Agent in any way relating to or arising out of this Agreement or any of the other Loan Documents or any action taken or omitted by such Agent under this Agreement or any of the other Loan Documents, in proportion to each Lender's Pro Rata Share, including, without limitation, advances and disbursements made pursuant to Section 10.08; provided, however, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements for which there has been a final judicial determination that such liability resulted from such Agent's gross negligence or willful misconduct.  The obligations of the Lenders under this Section 10.05 shall survive the payment in full of the Loans and the termination of this Agreement.

Section 10.06    Agents Individually.  With respect to its Pro Rata Share of the Commitment hereunder and the Loans made by it, each Agent shall have and may exercise the same rights and powers hereunder and is subject to the same obligations and liabilities as and to the extent set forth herein for any other Lender or maker of a Loan.  The terms "Lenders" or "Required Lenders" or any similar terms shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity as a Lender or one of the Required Lenders.  Each Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, trust or other business with any Borrower as if it were not acting as an Agent pursuant hereto without any duty to account to the other Lenders.

Section 10.07    Successor Agent.  (a) Each Agent may resign from the performance of all its functions and duties hereunder and under the other Loan Documents at any time by giving at least thirty (30) Business Days' prior written notice to the Administrative Borrower and each Lender.  The Required Lenders may, upon ten (10) Business Days' notice to the Administrative Agent and/or the Collateral Agent, order the removal of the Administrative Agent and/or the Collateral Agent.  Such resignation or removal shall take effect upon the acceptance by a successor Agent of appointment pursuant to clauses (b) and (c) below or as otherwise provided below; provided, however, any removal or resignation with respect to the Administrative Agent or the Collateral Agent will only be effective on the appointment of a successor to both the Administrative Agent and the Collateral Agent under this Agreement and the other Loan Documents.

(b)    Upon any such notice of resignation or removal, the Required Lenders shall appoint a successor Agent (subject to Section 10.07(a)).  Upon the acceptance of any appointment as Agent hereunder by a successor Agent, such successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations under this Agreement and the other Loan Documents.  After any Agent's resignation hereunder as an Agent, the provisions of this Article X shall inure to its benefit as to any actions taken or omitted to be taken by it while it was an Agent under this Agreement and the other Loan Documents.

(c)    In the case of a resignation, if a successor Agent shall not have been so appointed within said thirty (30) Business Day period, the retiring Agent, with the consent of the other Agents shall then appoint a successor Agent who shall serve as an Agent until such time, if any, as the Required Lenders, with the consent of the other Agent, appoint a successor Agent as provided above.

Section 10.08    Collateral Matters.

(a)    The Lenders hereby irrevocably authorize the Collateral Agent, at its option and in its discretion, to release any Lien granted to or held by the Collateral Agent upon any Collateral upon termination of the Commitment and payment and satisfaction in cash of all Loans and all other Obligations in accordance with the terms hereof; or constituting property being sold or disposed of in the ordinary course of any Loan Party's business or otherwise in compliance with the terms of this Agreement and the other Loan Documents; or constituting property in which the Loan Parties owned no interest at the time the Lien was granted or at any time thereafter; or if approved, authorized or ratified in writing by the Lenders.  Upon request by the Collateral Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this Section 10.08(a).

(b)    Without in any manner limiting the Collateral Agent's authority to act without any specific or further authorization or consent by the Lenders (as set forth in Section 10.08(a)), each Lender agrees to confirm in writing, upon request by the Collateral Agent, the authority to release Collateral conferred upon the Collateral Agent under Section 10.08(a).  Upon receipt by the Collateral Agent of confirmation from the Lenders and/or the Required Lenders, as applicable, of its authority to release any particular item or types of Collateral, and upon prior written request by any Loan Party, the Collateral Agent shall (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary to evidence the release of the Liens granted to the Collateral Agent for the benefit of the Agents and the Lenders upon such Collateral; provided, however, that (i) the Collateral Agent shall not be required to execute any such document on terms which, in the Collateral Agent's opinion, would expose the Collateral Agent to liability or create any obligations or entail any consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner

discharge, affect or impair the Obligations or any Lien upon (or obligations of any Loan Party in respect of) all interests in the Collateral retained by any Loan Party.

(c)    Anything contained in any of the Loan Documents to the contrary notwithstanding, the Loan Parties, each Agent and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral under any Loan Document or to enforce any Guaranty, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Collateral Agent for the benefit of the Lenders in accordance with the terms thereof, (ii) in the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale, the Administrative Agent, the Collateral Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and (iii) the Collateral Agent, as agent for and representative of the Agents and the Lenders (but not any other Agent or any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled (either directly or through one or more acquisition vehicles) for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral to be sold (A) at any public or private sale, (B) at any sale conducted by the Collateral Agent under the provisions of the Uniform Commercial Code (including pursuant to Sections 9-610 or 9-620 of the Uniform Commercial Code), (C) at any sale or foreclosure conducted by the Collateral Agent (whether by judicial action or otherwise) in accordance with applicable Law or (D) any sale conducted pursuant to the provisions of the Bankruptcy Code (including Section 363 of the Bankruptcy Code), to use and apply all or any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Collateral Agent at such sale.

(d)    The Collateral Agent shall have no obligation whatsoever to any Lender to assure that the Collateral exists or is owned by the Loan Parties or is cared for, protected or insured or has been encumbered or that the Lien granted to the Collateral Agent pursuant to this Agreement or any other Loan Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 10.08 or in any other Loan Document, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral as one of the Lenders and that the Collateral Agent shall have no duty or liability whatsoever to any other Lender, except as otherwise provided herein.

Section 10.09    Agency for Perfection.    Each Agent and each Lender hereby appoints each other Agent and each other Lender as agent and bailee for the purpose of perfecting the security interests in and liens upon the Collateral in assets which, in accordance with Article 9 of the Uniform Commercial Code (or any other similar law), can be perfected only by possession or control (or where the security interest of a secured party with possession or control has priority over the security interest of another secured party) and each Agent and each Lender hereby acknowledges that it holds possession of or otherwise controls any such Collateral for the benefit of the Agents and the Lenders as secured party. Should the Administrative Agent or any Lender obtain possession or control of any such Collateral, the Administrative Agent or such Lender shall notify the Collateral Agent thereof, and, promptly upon the Collateral Agent's request therefor shall deliver such Collateral to the Collateral Agent or in accordance with the Collateral Agent's instructions.  In addition, the Collateral Agent shall also have the power and authority hereunder to appoint such other sub-agents as may be necessary or required under applicable state law or otherwise to perform its duties and enforce its rights with respect to the Collateral and under the Loan Documents.  Each Loan Party by its execution and delivery of this Agreement hereby consents to the foregoing.

Section 10.10    No Reliance on any Agent's Customer Identification Program.  Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on any Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other requirements imposed by the USA PATRIOT Act or the regulations issued thereunder, including the regulations set forth in 31 CFR § 103.121, as hereafter amended or replaced ("CIP Regulations"), or any other Anti-Terrorism Laws, including any programs involving any of the following items relating to or in connection with any of the Loan Parties, their Affiliates or their agents, the Loan Documents or the transactions hereunder or contemplated hereby: (1) any identity verification procedures, (2) any recordkeeping, (3) comparisons with government lists, (4) customer notices or (5) other procedures required under the CIP Regulations or other regulations issued under the USA PATRIOT Act.  Each Lender, Affiliate, participant or assignee subject to Section 326 of the USA PATRIOT Act will perform the measures necessary to satisfy its own responsibilities under the CIP Regulations.

Section 10.11    Liability.  Notwithstanding anything to the contrary in this Agreement, no Agent shall be required to take any action at the direction of the Required Lenders in connection with this Agreement or any obligation arising pursuant to this Agreement, if such Agent has not received a satisfactory indemnity or such other security it may require for any cost, loss or liability which it may incur in connection with complying with the instructions of the Required Lenders.  No provision of this Agreement or any direction of the Required Lenders shall require any Agent to do anything which such Agent has reasonable grounds to believe may (i) be illegal or contrary to applicable law or regulation, or (ii) cause any Agent to expend or risk its own funds or otherwise incur any liability, if such Agent has reasonable grounds to believe that it will not receive the repayment of such funds or indemnity for it.

Section 10.12    No Third Party Beneficiaries.  The provisions of this Article are solely for the benefit of the Agents and the Lenders, and no Loan Party shall have rights as a third-party beneficiary of any of such provisions (except to the extent expressly set forth in Section 10.07).

Section 10.13    No Fiduciary Relationship.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Document (or any other similar term) with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

## ARTICLE XI

## GUARANTY

Section 11.01    Guaranty.  Each Guarantor hereby jointly and severally and unconditionally and irrevocably (as primary Loan Parties and not merely as sureties) guarantees the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of all Obligations of the Borrowers now or hereafter existing under any Loan Document, whether for principal, interest (including, without limitation, all interest that accrues after the commencement of any Insolvency Proceeding of any Borrower, whether or not a claim for post-filing interest is allowed in such Insolvency Proceeding) fees, commissions, expense reimbursements, indemnifications or otherwise (such obligations, to the extent not paid by the Borrowers, being the "Guaranteed Obligations"), and agrees to pay any and all expenses (including reasonable counsel fees and expenses) incurred by the Agents and the Lenders in enforcing any rights under the guaranty set forth in this Article XI.

Section 11.02    Guaranty Absolute. Each Guarantor jointly and severally guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents,

regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Agents or the Lenders with respect thereto. Each Guarantor agrees that this Article XI constitutes a guaranty of payment when due and not of collection and waives any right to require that any resort be made by any Agent or any Lender to any Collateral. The obligations of each Guarantor under this Article XI are independent of the Guaranteed Obligations, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce such obligations, irrespective of whether any action is brought against any Loan Party or whether any Loan Party is joined in any such action or actions. The liability of each Guarantor under this Article XI shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now or hereafter have in any way relating to, any or all of the following:

(a)    any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

(b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or otherwise;

(c)    any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations;

(d)    the existence of any claim, set-off, defense or other right that any Guarantor may have at any time against any Person, including, without limitation, any Agent or any Lender;

(e)    any change, restructuring or termination of the corporate, limited liability company or partnership structure or existence of any Loan Party; or

(f)    any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by the Agents or the Lenders that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety.

This Article XI shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by the Agents, the Lenders or any other Person upon the insolvency, bankruptcy or reorganization of any Borrower or otherwise, all as though such payment had not been made.

Section 11.03    Waiver. Each Guarantor hereby waives (i) promptness and diligence, (ii) notice of acceptance and any other notice with respect to any of the Guaranteed Obligations and this Article XI and any requirement that the Agents or the Lenders exhaust any right or take any action against any Loan Party or any other Person or any Collateral, (iii) any right to compel or direct any Agent or any Lender to seek payment or recovery of any amounts owed under this Article XI from any one particular fund or source or to exhaust any right or take any action against any other Loan Party, any other Person or any Collateral, (iv) any requirement that any Agent or any Lender protect, secure, perfect or insure any security interest or Lien on any property subject thereto or exhaust any right to take any action against any Loan Party, any other Person or any Collateral, and (v) any other defense available to any Guarantor. Each Guarantor agrees that the Agents and the Lenders shall have no obligation to marshal any assets in favor of any Guarantor or against, or in payment of, any or all of the Obligations. Each Guarantor

acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated herein and that the waiver set forth in this Section 11.03 is knowingly made in contemplation of such benefits. Each Guarantor hereby waives any right to revoke this Article XI, and acknowledges that this Article XI is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

Section 11.04    Continuing Guaranty; Assignments.  This Article XI is a continuing guaranty and shall (a) remain in full force and effect until the later of the cash payment in full of the Guaranteed Obligations (other than indemnification obligations as to which no claim has been made) and all other amounts payable under this Article XI and the Final Maturity Date, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Agents and the Lenders and their successors, pledgees, transferees and assigns.  Without limiting the generality of the foregoing clause (c), any Lender may pledge, assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including, without limitation, all or any portion of its Commitments and its Loans) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted such Lender herein or otherwise, in each case as provided in Section 12.07.

Section 11.05    Subrogation.  No Guarantor will exercise any rights that it may now or hereafter acquire against any Loan Party or any other guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this Article XI, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Agents and the Lenders against any Loan Party or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from any Loan Party or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations and all other amounts payable under this Article XI shall have been paid in full in cash and the Final Maturity Date shall have occurred.  If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the later of the payment in full in cash of the Guaranteed Obligations and all other amounts payable under this Article XI and the Final Maturity Date, such amount shall be held in trust for the benefit of the Agents and the Lenders and shall forthwith be paid to the Agents and the Lenders to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Article XI whether matured or unmatured, in accordance with the terms of this Agreement, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Article XI thereafter arising.  If (i) any Guarantor shall make payment to the Agents and the Lenders of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this Article XI shall be paid in full in cash and (iii) the Final Maturity Date shall have occurred, the Agents and the Lenders will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment by such Guarantor.

## ARTICLE XII

## MISCELLANEOUS

Section 12.01    Notices, Etc.  All notices and other communications provided for hereunder shall be in writing and shall be mailed (certified mail, postage prepaid and return receipt requested), telecopied or delivered by hand, Federal Express or other reputable overnight courier, at the following address:

(a)    if to any Loan Party:


c/o Relativity Media, LLC
9242 Beverly Blvd., Suite 300
Beverly Hills, California 90210
Attention:  Corporate Legal Department
Fax No.:  310-724-7701
Email:  corporate.legal@relativitymedia.com


(b)    if to the Administrative Agent and/or the          with a copy to (which shall not constitute notice for
Collateral Agent:                                                         purposes of this Agreement):


Cortland Capital Market Services LLC                     Kaye Scholer LLP
225 W. Washington Street, 21st Floor                       Three First National Plaza
Chicago, Illinois 60606                                            70 West Madison Street, Suite 4200
Attention: Aslam Azeem and Legal Department        Chicago, Illinois 60602
Facsimile: 312-376-0751                                          Attn: Daniel J. Hartnett and Seth J. Kleinman
Email: aslam.azeem@cortlandglobal.com and         Facsimile: 312-583-2300
legal@cortlandglobal.com                                         Email: daniel.hartnett@kayescholer.com and
                                                                                  seth.kleinman@kayescholer.com


(d)    if to any Lender, to it at the address set forth in the administrative details delivered by such
Lender or the Assignment and Acceptance executed by such Lender;


or, as to each party, at such other address as shall be designated by such party in a written notice to the
other parties complying as to delivery with the terms of this Section 12.01. All such notices and other
communications shall be effective, (i) if mailed (certified mail, postage prepaid and return receipt
requested), when received or 3 days after deposited in the mails, whichever occurs first, (ii) if telecopied,
when transmitted and confirmation received, or (iii) if delivered by hand, Federal Express or other
reputable overnight courier, upon delivery, except that notices to any Agent pursuant to Article II shall
not be effective until received by such Agent.

 Section 12.02 <u>Amendments, Etc.</u> No amendment or waiver of any provision of this
Agreement or any other Loan Document, and no consent to any departure by any Loan Party therefrom,
shall in any event be effective unless the same shall be in writing and signed by the Required Lenders or
by the Administrative Agent with the consent of the Required Lenders, and then such waiver or consent
shall be effective only in the specific instance and for the specific purpose for which given, <u>provided</u>,
<u>however</u>, that no amendment, waiver or consent shall (i) increase the Commitment of any Lender, reduce
the principal of, or interest on, the Loans payable to any Lender, reduce the amount of any fee payable for
the account of any Lender, or postpone or extend any scheduled date fixed for any payment of principal
of, or interest or fees on, the Loans payable to any Lender, in each case without the written consent of any
Lender affected thereby, (ii) increase the Commitment without the written consent of each Lender, (iii)
change the percentage of the Commitments or of the aggregate unpaid principal amount of the Loans that
is required for the Lenders or any of them to take any action hereunder without the written consent of
each Lender, (iv) amend the definition of "Required Lenders," or "Pro Rata Share" without the written
consent of each Lender, (v) release all or a substantial portion of the Collateral (except as otherwise
provided in this Agreement and the other Loan Documents), subordinate any Lien granted in favor of the
Collateral Agent for the benefit of the Agents and the Lenders, or release any Borrower or any Guarantor
without the written consent of each Lender, or (vii) amend, modify or waive the proviso in Section

4.04(d) or this Section 12.02 of this Agreement without the written consent of each Lender. Notwithstanding the foregoing, no amendment, waiver or consent shall, unless in writing and signed by an Agent, affect the rights or duties of such Agent (but not in its capacity as a Lender) under this Agreement or the other Loan Documents.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent under the Loan Documents and any Loans held by such Person for purposes hereof shall be automatically deemed to be voted pro rata according to the Loans of all other Lenders in the aggregate (other than such Defaulting Lender).

Section 12.03    No Waiver; Remedies, Etc.  No failure on the part of any Agent or any Lender to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right under any Loan Document preclude any other or further exercise thereof or the exercise of any other right.  The rights and remedies of the Agents and the Lenders provided herein and in the other Loan Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law.  The rights of the Agents and the Lenders under any Loan Document against any party thereto are not conditional or contingent on any attempt by the Agents and the Lenders to exercise any of their rights under any other Loan Document against such party or against any other Person.

Section 12.04    Expenses; Taxes; Attorneys' Fees.  The Borrowers will pay on demand, all costs and reasonable expenses incurred by or on behalf of each Agent and Lender, regardless of whether the transactions contemplated hereby are consummated, including, without limitation, reasonable fees, costs, client charges and reasonable expenses of outside counsel for each Agent and of outside counsel for the Lenders, accounting, due diligence, periodic field audits, physical counts, valuations, investigations, searches and filings, monitoring of assets, appraisals of Collateral, the rating of the Loans, title searches and reviewing environmental assessments, miscellaneous disbursements, examination, travel, lodging and meals, arising from or relating to: (a) the negotiation, preparation, execution, delivery, performance and administration of this Agreement and the other Loan Documents (including, without limitation, the review of any of the agreements, instruments and documents referred to in Section 7.01(e)), (b) any requested amendments, waivers or consents to this Agreement or the other Loan Documents whether or not such documents become effective or are given, (c) the preservation and protection of the Agents' or any of the Lenders' rights under this Agreement or the other Loan Documents, (d) the defense of any claim or action asserted or brought against any Agent or any Lender by any Person that arises from or relates to this Agreement, any other Loan Document, the Agents' or the Lenders' claims against any Loan Party, or any and all matters in connection therewith, (e) the commencement or defense of, or intervention in, any court proceeding arising from or related to this Agreement or any other Loan Document, (f) the filing of any petition, complaint, answer, motion or other pleading by any Agent or any Lender, or the taking of any action in respect of the Collateral or other security, in connection with this Agreement or any other Loan Document, (g) the protection, collection, lease, sale, taking possession of or liquidation of, any Collateral or other security in connection with this Agreement or any other Loan Document, (h) any attempt to enforce any Lien or security interest in any Collateral or other security in connection with this Agreement or any other Loan Document, (i) any attempt to collect from any Loan Party, (j) all liabilities and costs arising from or in connection with the past, present or future operations of any Loan Party involving any damage to real or personal property or natural resources or harm or injury alleged to have resulted from any release of hazardous materials on, upon or into such property, or (k) the receipt by any Agent or any Lender of any advice from professionals with respect to any of the foregoing, provided that with respect to the Lenders, excluding clauses (a) and (b).  Without limitation of the foregoing or any other provision of any Loan Document: (x) the Borrowers agree to pay all stamp, document, transfer, recording or filing taxes or fees and similar impositions now or hereafter determined by any Agent or any Lender to be payable in connection with this Agreement or any other Loan Document, and the Borrowers agree to save each Agent and each Lender harmless from and against any

and all present or future claims, liabilities or losses with respect to or resulting from any omission to pay or delay in paying any such taxes, fees or impositions, (y) the Borrowers agree to pay all broker fees that may become due in connection with the transactions contemplated by this Agreement and the other Loan Documents, and (z) if the Borrowers fail to perform any covenant or agreement contained herein or in any other Loan Document, any Agent may itself perform or cause performance of such covenant or agreement, and the expenses of such Agent incurred in connection therewith shall be reimbursed on demand by the Borrowers.  The obligations of the Borrowers under this Section 12.04 shall survive the repayment of the Obligations and discharge of any Liens granted under the Loan Documents.

Section 12.05    Right of Set-off.  Upon the occurrence and during the continuance of any Event of Default, any Agent or any Lender may, and is hereby authorized to, at any time and from time to time, without notice to any Loan Party (any such notice being expressly waived by the Loan Parties) and to the fullest extent permitted by law, set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other Indebtedness at any time owing by such Agent or such Lender to or for the credit or the account of any Loan Party against any and all obligations of the Loan Parties either now or hereafter existing under any Loan Document, irrespective of whether or not such Agent or such Lender shall have made any demand hereunder or thereunder and although such obligations may be contingent or unmatured.  Each Agent and each Lender agrees to notify such Loan Party promptly after any such set-off and application made by such Agent or such Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.  The rights of the Agents and the Lenders under this Section 12.05 are in addition to the other rights and remedies (including other rights of set-off) which the Agents and the Lenders may have under this Agreement or any other Loan Documents of law or otherwise.

Section 12.06    Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 12.07    Assignments and Participations.

(a)    This Agreement and the other Loan Documents shall be binding upon and inure to the benefit of each Loan Party and each Agent and each Lender and their respective successors and permitted assigns; provided, however, that none of the Loan Parties may assign or transfer any of its rights hereunder or under the other Loan Documents without the prior written consent of each Lender and any such assignment without the Lenders' prior written consent shall be null and void.

(b)    Each Lender may assign to one or more other lenders or other entities all or a portion of its rights and obligations under this Agreement with respect to all or a portion of its Commitment and any Loan made by it; provided, however, that (i) such assignment is in an amount which is at least $1,000,000 or a multiple of $500,000 in excess thereof (or the remainder of such Lender's Commitment) (except such minimum amount shall not apply to an assignment by a Lender to (x) a Lender, an Affiliate of such Lender or a Related Fund of such Lender or (y) a group of new Lenders, each of whom is an Affiliate or Related Fund of each other to the extent the aggregate amount to be assigned to all such new Lenders is at least $1,000,000 or a multiple of $500,000 in excess thereof), (ii) the parties to each such assignment shall execute and deliver to the Administrative Agent, for its acceptance, an Assignment and Acceptance, together with any promissory note subject to such assignment and such parties shall deliver to the Administrative Agent, for the benefit of the Administrative Agent, a processing and recordation fee of $3,500 (together with a copy of such Assignment and Acceptance) (except the payment of such fee shall not be required in connection with an assignment by a Lender to a Lender, an Affiliate of such Lender or a Related Fund of such Lender) and

(iii) no assignment shall be made to any Loan Party or any Affiliate of any Loan Party. Upon such execution, delivery and acceptance, from and after the effective date specified in each Assignment and Acceptance and recordation on the Register (A) the assignee thereunder shall become a "Lender" hereunder and, in addition to the rights and obligations hereunder held by it immediately prior to such effective date, have the rights and obligations hereunder that have been assigned to it pursuant to such Assignment and Acceptance and (B) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(c)    By executing and delivering an Assignment and Acceptance, the assigning Lender and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment and Acceptance, the assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or any other Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document furnished pursuant hereto; (ii) the assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or any of its Subsidiaries or the performance or observance by any Loan Party of any of its obligations under this Agreement or any other Loan Document furnished pursuant hereto; (iii) such assignee confirms that it has received a copy of this Agreement and the other Loan Documents, together with such other documents and information it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the assigning Lender, any Agent or any Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents; (v) such assignee appoints and authorizes the Agents to take such action as agents on its behalf and to exercise such powers under this Agreement and the other Loan Documents as are delegated to the Agents by the terms hereof and thereof, together with such powers as are reasonably incidental hereto and thereto; and (vi) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other Loan Documents are required to be performed by it as a Lender.

(d)    The Administrative Agent shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain, or cause to be maintained at the Payment Office, a copy of each Assignment and Acceptance delivered to and acceptable to it and a register (the "Register") for the recordation of the names and addresses of the Lenders and the Commitments of, and the principal amount of the Loans (and stated interest thereon) (the "Registered Loans"). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrowers, the Agents and the Lenders may treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Administrative Borrower at any reasonable time and from time to time upon reasonable prior notice.

(e)    Upon receipt by the Administrative Agent of a completed Assignment and Acceptance, the Administrative Agent shall accept such assignment and record the information contained therein in the Register.

(f)    A Registered Loan (and the registered note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register (and each registered note shall expressly so provide). Any assignment or sale of all or part of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by

registration of such assignment or sale on the Register, together with the surrender of the registered note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such registered note, whereupon, at the request of the designated assignee(s) or transferee(s), one or more new registered notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s). Prior to the registration of assignment or sale of any Registered Loan (and the registered note, if any, evidencing the same), the Agents shall treat the Person in whose name such Registered Loan (and the registered note, if any, evidencing the same) is registered on the Register as the owner thereof for the purpose of receiving all payments thereon, notwithstanding notice to the contrary.

(g)     In the event that any Lender sells participations in a Registered Loan, such Lender shall, acting for this purpose as a non-fiduciary agent on behalf of the Borrowers, maintain, or cause to be maintained, a register, on which it enters the name of all participants in the Registered Loans held by it and the principal amount (and stated interest thereon) of the portion of the Registered Loan that is the subject of the participation (the "Participant Register"). A Registered Loan (and the registered note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide). Any participation of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register. The Participant Register shall be available for inspection by the Administrative Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(h)     Each Lender may sell participations to one or more banks or other entities (other than a natural person, the Parent or any of its Subsidiaries) in or to all or a portion of its rights and obligations under this Agreement and the other Loan Documents (including, without limitation, all or a portion of its Commitments and the Loans made by it); provided that (i) such Lender's obligations under this Agreement (including without limitation, its Commitments hereunder) and the other Loan Documents shall remain unchanged; (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and the Borrowers, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents; and (iii) a participant shall not be entitled to require such Lender to take or omit to take any action hereunder except (A) action directly effecting an extension of the maturity dates or decrease in the principal amount of the Loans, (B) action directly effecting an extension of the due dates or a decrease in the rate of interest payable on the Loans or the fees payable under this Agreement, or (C) actions directly effecting a release of all or a substantial portion of the Collateral or any Loan Party (except as set forth in Section 10.08 of this Agreement or any other Loan Document). The Loan Parties agree that each participant shall be entitled to the benefits of Sections 2.08 and 4.05 of this Agreement with respect to its participation in any portion of the Commitments and the Loans as if it was a Lender.

Section 12.08    Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by telefacsimile or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile or electronic mail also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document *mutatis mutandis*.

Section 12.09    GOVERNING LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, EXCEPT TO THE EXTENT NEW YORK LAW IS SUPERSEDED BY THE BANKRUPTCY CODE.

Section 12.10    CONSENT TO JURISDICTION; SERVICE OF PROCESS AND VENUE.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE BANKRUPTCY COURT.  EACH LOAN PARTY HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF THE BANKRUPTCY COURT AND IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE LOAN PARTIES AT THEIR ADDRESS FOR NOTICES AS SET FORTH IN SECTION 12.01.  THE LOAN PARTIES AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT AND THE LENDERS TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY IN ANY OTHER JURISDICTION.  EACH LOAN PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN SUCH COURT AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  TO THE EXTENT THAT ANY LOAN PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH LOAN PARTY HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

Section 12.11    WAIVER OF JURY TRIAL, ETC.  EACH LOAN PARTY, THE ADMINISTRATIVE AGENT AND EACH LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.  EACH LOAN PARTY CERTIFIES THAT NO OFFICER, REPRESENTATIVE, AGENT OR ATTORNEY OF THE ADMINISTRATIVE AGENT OR ANY LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE ADMINISTRATIVE AGENT OR ANY LENDER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK TO ENFORCE THE FOREGOING WAIVERS.  EACH LOAN PARTY HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE ADMINISTRATIVE AGENT AND THE LENDERS ENTERING INTO THIS AGREEMENT.

Section 12.12    Consent by the Agents and Lenders.  Except as otherwise expressly set forth herein to the contrary or in any other Loan Document, if the consent, approval, satisfaction,

determination, judgment, acceptance or similar action (an "Action") of any Agent or any Lender shall be permitted or required pursuant to any provision hereof or any provision of any other agreement to which any Loan Party is a party and to which any Agent or any Lender has succeeded thereto, such Action shall be required to be in writing and may be withheld or denied by such Agent or such Lender, in its sole discretion, with or without any reason, and without being subject to question or challenge on the grounds that such Action was not taken in good faith.

Section 12.13    No Party Deemed Drafter.  Each of the parties hereto agrees that no party hereto shall be deemed to be the drafter of this Agreement.

Section 12.14    Reinstatement; Certain Payments.  If any claim is ever made upon any Agent or any Lender for repayment or recovery of any amount or amounts received by such Agent or such Lender in payment or on account of any of the Obligations, such Agent or such Lender shall give prompt notice of such claim to the other Agent and each other Lender and the Administrative Borrower, and if such Agent or such Lender repays all or part of such amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such Agent or such Lender or any of its property, or (ii) any good faith settlement or compromise of any such claim effected by such Agent or such Lender with any such claimant, then and in such event each Loan Party agrees that (A) any such judgment, decree, order, settlement or compromise shall be binding upon it notwithstanding the cancellation of any Indebtedness hereunder or under the other Loan Documents or the termination of this Agreement or the other Loan Documents, and (B) it shall be and remain liable to such Agent or such Lender hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by such Agent or such Lender.

Section 12.15    Indemnification; Limitation of Liability for Certain Damages.

(a)    In addition to each Loan Party's other Obligations under this Agreement, each Loan Party agrees to, jointly and severally, defend, protect, indemnify and hold harmless each Agent and each Lender and all of their respective Affiliates, officers, directors, members, managers, employees, attorneys, consultants and agents (collectively called the "Indemnitees") from and against any and all losses, damages, liabilities, obligations, penalties, fees, reasonable costs and expenses (including, without limitation, reasonable attorneys' fees, costs and expenses) incurred by such Indemnitees, whether prior to or from and after the Interim Facility Effective Date, whether direct, indirect or consequential, as a result of or arising from or relating to or in connection with any of the following: (i) the negotiation, preparation, execution or performance or enforcement of this Agreement, any other Loan Document or of any other document executed in connection with the transactions contemplated by this Agreement, (ii) any Agent's or any Lender's furnishing of funds to the Borrowers under this Agreement or the other Loan Documents, including, without limitation, the management of any such Loans, (iii) any matter relating to the financing transactions contemplated by this Agreement or the other Loan Documents or by any document executed in connection with the transactions contemplated by this Agreement or the other Loan Documents, or (iv) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto (collectively, the "Indemnified Matters"); provided, however, that the Loan Parties shall not have any obligation to any Indemnitee under this clause (a) for any Indemnified Matter caused by the gross negligence or willful misconduct of such Indemnitee, as determined by a final judgment of a court of competent jurisdiction.

(b)    The indemnification for all of the foregoing losses, damages, fees, costs and expenses of the Indemnitees set forth in this Section 12.15 are chargeable against the Loan Account. To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section 12.15 may be unenforceable because it is violative of any law or public policy, each Loan Party shall, jointly and

severally, contribute the maximum portion which it is permitted to pay and satisfy under applicable Law, to the payment and satisfaction of all Indemnified Matters incurred by the Indemnitees.

(c)        No Loan Party shall assert, and each Loan Party hereby waives, any claim against the Indemnitees, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and each Loan Party hereby waives, releases and agrees not to sue upon any such claim or seek any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(d)        The indemnities and waivers set forth in this Section 12.15 shall survive the repayment of the Obligations and discharge of any Liens granted under the Loan Documents.

Section 12.16    <u>RML as Agent for Borrowers</u>.  Each Borrower hereby irrevocably appoints RML as the borrowing agent and attorney-in-fact for the Borrowers (the "<u>Administrative Borrower</u>") which appointment shall remain in full force and effect unless and until the Agents shall have received prior written notice signed by all of the Borrowers that such appointment has been revoked and that another Borrower has been appointed Administrative Borrower.  Each Borrower hereby irrevocably appoints and authorizes the Administrative Borrower (i) to provide to the Agents and receive from the Agents all notices with respect to Loans obtained for the benefit of any Borrower and all other notices and instructions under this Agreement and (ii) to take such action as the Administrative Borrower deems appropriate on its behalf to obtain Loans and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement.  It is understood that the handling of the Loan Account and Collateral of the Borrowers in a combined fashion, as more fully set forth herein, is done solely as an accommodation to the Borrowers in order to utilize the collective borrowing powers of the Borrowers in the most efficient and economical manner and at their request, and that neither the Agents nor the Lenders shall incur liability to the Borrowers as a result hereof.  Each of the Borrowers expects to derive benefit, directly or indirectly, from the handling of the Loan Account and the Collateral in a combined fashion since the successful operation of each Borrower is dependent on the continued successful performance of the integrated group.  To induce the Agents and the Lenders to do so, and in consideration thereof, each of the Borrowers hereby jointly and severally agrees to indemnify the Indemnitees and hold the Indemnitees harmless against any and all liability, expense, loss or claim of damage or injury, made against such Indemnitee by any of the Borrowers or by any third party whosoever, arising from or incurred by reason of (a) the handling of the Loan Account and Collateral of the Borrowers as herein provided, or (b) the Agents and the Lenders relying on any instructions of the Administrative Borrower.

Section 12.17    <u>Records</u>.  The unpaid principal of and interest on the Loans, the interest rate or rates applicable to such unpaid principal and interest, the duration of such applicability, the Commitments, and the accrued and unpaid fees payable pursuant to Section 2.06 hereof shall at all times be ascertained from the records of the Agents, which shall be conclusive and binding absent manifest error.

Section 12.18    <u>Binding Effect</u>  This Agreement shall become effective when it shall have been executed by each Loan Party, each Agent and each Lender and when the conditions precedent set forth in Section 5.01 hereof have been satisfied or waived in writing by the Required Lenders, and thereafter shall be binding upon and inure to the benefit of each Loan Party, each Agent and each Lender,

and their respective successors and assigns, except that the Loan Parties shall not have the right to assign their rights hereunder or any interest herein without the prior written consent of each Agent and each Lender, and any assignment by any Lender shall be governed by Section 12.07 hereof.

Section 12.19    Interest.  It is the intention of the parties hereto that each Agent and each Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby or by any other Loan Document would be usurious as to any Agent or any Lender under Laws applicable to it (including the Laws of the United States of America and the State of New York or any other jurisdiction whose Laws may be mandatorily applicable to such Agent or such Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in this Agreement or any other Loan Document or any agreement entered into in connection with or as security for the Obligations, it is agreed as follows:  (i) the aggregate of all consideration which constitutes interest under law applicable to any Agent or any Lender that is contracted for, taken, reserved, charged or received by such Agent or such Lender under this Agreement or any other Loan Document or agreements or otherwise in connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable Law, any excess shall be canceled automatically and if theretofore paid shall be credited by such Agent or such Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Agent or such Lender, as applicable, to the Borrowers); and (ii) in the event that the maturity of the Obligations is accelerated by reason of any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to any Agent or any Lender may never include more than the maximum amount allowed by such applicable Law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically by such Agent or such Lender, as applicable, as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such Agent or such Lender, as applicable, on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Agent or such Lender to the Borrowers).  All sums paid or agreed to be paid to any Agent or any Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to such Agent or such Lender, be amortized, prorated, allocated and spread throughout the full term of the Loans until payment in full so that the rate or amount of interest on account of any Loans hereunder does not exceed the maximum amount allowed by such applicable Law.  If at any time and from time to time (x) the amount of interest payable to any Agent or any Lender on any date shall be computed at the Highest Lawful Rate applicable to such Agent or such Lender pursuant to this Section 12.19 and (y) in respect of any subsequent interest computation period the amount of interest otherwise payable to such Agent or such Lender would be less than the amount of interest payable to such Agent or such Lender computed at the Highest Lawful Rate applicable to such Agent or such Lender, then the amount of interest payable to such Agent or such Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to such Agent or such Lender until the total amount of interest payable to such Agent or such Lender shall equal the total amount of interest which would have been payable to such Agent or such Lender if the total amount of interest had been computed without giving effect to this Section 12.19.

For purposes of this Section 12.19, the term "applicable Law" shall mean that law in effect from time to time and applicable to the loan transaction between the Borrowers, on the one hand, and the Agents and the Lenders, on the other, that lawfully permits the charging and collection of the highest permissible, lawful non-usurious rate of interest on such loan transaction and this Agreement, including Laws of the State of New York and, to the extent controlling, Laws of the United States of America.

The right to accelerate the maturity of the Obligations does not include the right to accelerate any interest that has not accrued as of the date of acceleration.

Section 12.20    Confidentiality.  Each Agent and each Lender agrees (on behalf of itself and each of its affiliates, directors, officers, employees and representatives) to use reasonable precautions to keep confidential, in accordance with its customary procedures for handling confidential information of this nature and in accordance with safe and sound practices of comparable commercial finance companies, any (a) non-public information supplied to it by the Loan Parties pursuant to this Agreement or the other Loan Documents prior to the Interim Facility Effective Date and (b) any non-public information supplied to it by the Loan Parties pursuant to this Agreement or the other Loan Documents on or after the Interim Facility Effective Date that is identified in writing by the Loan Parties as being confidential at the time the same is delivered to such Person (and in any case which at the time is not, and does not thereafter become, publicly available or available to such Person from another source not known to be subject to a confidentiality obligation to such Person not to disclose such information), provided that nothing herein shall limit the disclosure of any such information (i) in response to any order of any court or other Governmental Authority (including by subpoena or similar legal process), to the extent required by any applicable Law or as otherwise requested by any Governmental Authority, (ii) to counsel for any Agent or any Lender (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential in accordance with this Section 12.20), (iii) to examiners, auditors or accountants (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential in accordance with this Section 12.20), (iv) in connection with the exercise or enforcement of any rights or remedies hereunder or any other Loan Document or any action, suit or proceeding relating to this Agreement or any other Loan Document or any transaction or matter related hereto or thereto, (v) if required to do so in connection with any other action, suit or similar proceeding or (vi) to any assignee or participant (or prospective assignee or participant) so long as such assignee or participant (or prospective assignee or participant) first agrees, in writing, to be bound by confidentiality provisions similar in substance to this Section 12.20.  Each Agent and each Lender agrees, prior to any disclosure under clause (i) or (v) above to (A) any Governmental Authority that does not have supervisory, regulatory or other similar authority with respect to such Agent or such Lender and that is seeking such disclosure solely in connection with an investigation, action, suit or other proceeding that does not otherwise involve such Agent or such Lender or (B) any other Person that is not a Governmental Authority, to use reasonable efforts to notify the Administrative Borrower of any request for the disclosure of any such confidential information so as to provide the Administrative Borrower with a reasonable opportunity to obtain a protective order or other comparable relief; provided that no such notification will be required if such Agent or Lender (or their respective counsel) reasonably determines that such notification may be prohibited by applicable Law or court order.

Section 12.21    Public Disclosure.  Each Loan Party agrees that neither it nor any of its Affiliates will now or in the future issue any press release or other public disclosure using the name of an Agent, any Lender or any of their respective Affiliates or referring to this Agreement or any other Loan Document without the prior written consent of such Agent or such Lender, except to the extent that such Loan Party or such Affiliate is required to do so under applicable Law (in which event, such Loan Party or such Affiliate will consult with such Agent or such Lender before issuing such press release or other public disclosure unless it is impractical to do so), the financial arrangements entered into among the parties hereto or in connection with the exercise or enforcement of any rights or remedies hereunder or any other Loan Document or any action, suit or proceeding relating to this Agreement or any other Loan Document or any transaction or matter related hereto or thereto.  Each Agent and Lender agrees that neither it nor any of its Affiliates will now or in the future issue any press release or other public disclosure using the name of any Loan Party or any of their respective Affiliates or referring to this

Agreement or any other Loan Document without the prior written consent of the Administrative Borrower, except to the extent that such Agent or Lender or any of their respective Affiliates is required to do so under applicable Law (in which event, such Agent or Lender or such Affiliate will consult with the Administrative Borrower before issuing such press release or other public disclosure unless it is impractical to do so), the financial arrangements entered into among the parties hereto or in connection with the exercise or enforcement of any rights or remedies hereunder or any other Loan Document or any action, suit or proceeding relating to this Agreement or any other Loan Document or any transaction or matter related hereto or thereto.  Notwithstanding the foregoing, each Loan Party, each Agent and each Lender agrees that such party may advertise the closing of the transactions contemplated by this Agreement.

Section 12.22    <u>Integration</u>.  This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

Section 12.23    <u>USA PATRIOT Act</u>. Each Lender that is subject to the requirements of the USA PATRIOT Act hereby notifies the Borrowers that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the entities composing the Borrowers, which information includes the name and address of each such entity and other information that will allow such Lender to identify the entities composing the Borrowers in accordance with the USA PATRIOT Act.  Each Loan Party agrees to take such action and execute, acknowledge and deliver at its sole cost and expense, such instruments and documents as any Lender may reasonably require from time to time in order to enable such Lender to comply with the USA PATRIOT Act.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

BORROWERS:

| | |
|---|---|
| 3 DAYS TO KILL PRODUCTIONS, LLC | MOST WONDERFUL TIME PRODUCTIONS, LLC |
| 21 & OVER PRODUCTIONS, LLC | MOVIE PRODUCTIONS, LLC |
| A PERFECT GETAWAY PR, LLC | ONE LIFE ACQUISITIONS, LLC |
| A PERFECT GETAWAY, LLC | ORANGE STREET MEDIA, LLC |
| ARMORED CAR PRODUCTIONS, LLC | OUT OF THIS WORLD PRODUCTIONS, LLC |
| BEST OF ME PRODUCTIONS, LLC | PARANOIA ACQUISITIONS, LLC |
| BLACK OR WHITE FILMS, LLC | PHANTOM ACQUISITIONS, LLC |
| BLACKBIRD PRODUCTIONS, LLC | POCOMO PRODUCTIONS, LLC |
| BRANT POINT PRODUCTIONS, LLC | RELATIVE MOTION MUSIC, LLC |
| BRICK MANSIONS ACQUISITIONS, LLC | RELATIVE VELOCITY MUSIC, LLC |
| BRILLIANT FILMS, LLC | RELATIVITY DEVELOPMENT, LLC |
| BROTHERS PRODUCTIONS, LLC | RELATIVITY FASHION, LLC |
| BROTHERS SERVICING, LLC | RELATIVITY FILM FINANCE II, LLC |
| CATFISH PRODUCTIONS, LLC | RELATIVITY FILM FINANCE III, LLC |
| CINE PRODUCTIONS, LLC | RELATIVITY FILM FINANCE, LLC |
| CINEPOST, LLC | RELATIVITY FILMS, LLC |
| CISCO BEACH MEDIA, LLC | RELATIVITY FOREIGN, LLC |
| CLIFF ROAD MEDIA, LLC | RELATIVITY INDIA HOLDINGS, LLC |
| DEN OF THIEVES FILMS, LLC | RELATIVITY JACKSON, LLC |
| DON JON ACQUISITIONS, LLC | RELATIVITY MEDIA, LLC |
| DR PRODUCTIONS, LLC | RELATIVITY MEDIA DISTRIBUTION, LLC |
| EINSTEIN RENTALS, LLC | RELATIVITY MEDIA FILMS, LLC |
| ENGLISH BREAKFAST MEDIA, LLC | RELATIVITY MUSIC GROUP, LLC |
| FURNACE FILMS, LLC | RELATIVITY PRODUCTION LLC |
| GOTTI ACQUISITIONS, LLC | RELATIVITY REAL, LLC |
| GREAT POINT PRODUCTIONS, LLC | RELATIVITY ROGUE, LLC |
| GUIDO CONTINI FILMS, LLC | RELATIVITY SENATOR, LLC |
| HOOPER FARM MUSIC, LLC | RELATIVITY SKY LAND ASIA HOLDINGS, LLC |
| HOOPER FARM PUBLISHING, LLC | RELATIVITY TV, LLC |
| HUMMOCK POND PROPERTIES, LLC | REVELER PRODUCTIONS, LLC |
| HUNTER KILLER LA PRODUCTIONS | RML ACQUISITIONS I, LLC |
| HUNTER KILLER PRODUCTIONS, LLC | RML ACQUISITIONS II, LLC |
| IN THE HAT PRODUCTIONS, LLC | RML ACQUISITIONS III, LLC |
| J & J PROJECT, LLC | RML ACQUISITIONS IV, LLC |
| JGAG ACQUISITIONS, LLC | RML ACQUISITIONS IX, LLC |
| LEFT BEHIND ACQUISITIONS, LLC | RML ACQUISITIONS V, LLC |
| LONG POND MEDIA, LLC | RML ACQUISITIONS VI, LLC |
| MADAKET PUBLISHING, LLC | RML ACQUISITIONS VII, LLC |
| MADAKET ROAD MUSIC, LLC | RML ACQUISITIONS VIII, LLC |
| MADVINE RM, LLC | RML ACQUISITIONS X, LLC |
| MALAVITA PRODUCTIONS, LLC | RML ACQUISITIONS XI, LLC |
| MB PRODUCTIONS, LLC | RML ACQUISITIONS XII, LLC |
| MERCHANT OF SHANGHAI PRODUCTIONS, LLC | RML ACQUISITIONS XIII, LLC |
| MIACOMET MEDIA LLC | RML ACQUISITIONS XIV, LLC |
| MIRACLE SHOT PRODUCTIONS, LLC | RMLDD FINANCING, LLC |
| RML ACQUISITIONS XV, LLC | RML TIMELESS PRODUCTIONS, LLC |
| RML BRONZE FILMS, LLC | RML TURKEYS FILMS, LLC |
| RML DAMASCUS FILMS, LLC | RML VERY GOOD GIRLS FILMS, LLC |

[Signature Page to DIP Financing Agreement]

| | |
|---|---|
| RML DESERT FILMS, LLC | RML WIB FILMS, LLC |
| RML DISTRIBUTION DOMESTIC, LLC | ROGUE DIGITAL, LLC |
| RML DISTRIBUTION INTERNATIONAL, LLC | ROGUE GAMES, LLC |
| RML DOCUMENTARIES, LLC | ROGUELIFE LLC |
| RML DR FILMS, LLC | SAFE HAVEN PRODUCTIONS, LLC |
| RML ECHO FILMS, LLC | SANCTUM FILMS, LLC |
| RML ESCOBAR FILMS, LLC | SANTA CLAUS PRODUCTIONS, LLC |
| RML FILM DEVELOPMENT, LLC | SMITH POINT PRODUCTIONS, LLC |
| RML FILMS PR, LLC | SNOW WHITE PRODUCTIONS, LLC |
| RML HECTOR FILMS, LLC | SPY NEXT DOOR, LLC |
| RML HILLSONG FILMS, LLC | STORY DEVELOPMENT, LLC |
| RML IFWT FILMS, LLC | STRAIGHT WHARF PRODUCTIONS, LLC |
| RML INTERNATIONAL ASSETS, LLC | STRANGERS II, LLC |
| RML JACKSON LLC | STRETCH ARMSTRONG PRODUCTIONS, LLC |
| RML KIDNAP FILMS, LLC | STUDIO MERCHANDISE, LLC |
| RML LAZARUS FILMS, LLC | SUMMER FOREVER PRODUCTIONS, LLC |
| RML NINA FILMS, LLC | THE CROW PRODUCTIONS, LLC |
| RML NOVEMBER FILMS, LLC | TOTALLY INTERNS, LLC |
| RML OCULUS FILMS, LLC | TRIBES OF PALOS VERDES PRODUCTION, LLC |
| RML OUR FATHER FILMS, LLC | TUCKERNUCK MUSIC, LLC |
| RML ROMEO AND JULIET FILMS, LLC | TUCKERNUCK PUBLISHING, LLC |
| RML SCRIPTURE FILMS, LLC | WRIGHT GIRLS FILMS, LLC |
| RML SOLACE FILMS, LLC | YUMA, INC. |
| RML SOMNIA FILMS, LLC | ZERO POINT ENTERPRISES, LLC |

By: _____
Name: Luke S. Schaeffer
Title: Authorized Signatory

[Signature Page to DIP Financing Agreement]

GUARANTOR:

RELATIVITY HOLDINGS LLC

By: _____
      Name: Ryan Kavanaugh
      Title: Authorized Signatory

<u>COLLATERAL AGENT AND ADMINISTRATIVE
AGENT</u>:

CORTLAND CAPITAL MARKET SERVICES LLC

By: _____
        Name:
        Title:

LENDERS:

ANCHORAGE CAPITAL MASTER OFFSHORE, LTD.

By: Anchorage Capital Group, L.L.C., as its investment
manager

By: _____
  Name:
  Title:

[Signature Page to DIP Financing Agreement]

LUXOR CAPITAL, LLC


By: _____
Name:
Title:

[Signature Page to DIP Financing Agreement]

**Schedule 1.01(A)**

Lenders and Lenders' Commitments

| Lender | Commitment | Pro Rata Share |
|---|---|---|
| Anchorage Capital Master Offshore, Ltd. | $22,500,000 | 50% |
| Luxor Capital, LLC | $22,500,000 | 50% |
| **Total:** | **$45,000,000** | **100%** |

**Exhibit A**

Form of Interim Order

[separately provided]

**Exhibit B**

Form of Initial Budget

[separately provided]

**Exhibit C**

Form of Notice of Borrowing

Date: [_____ __], 20[_]

Cortland Capital Market Services LLC
225 W. Washington Street, 21st Floor
Chicago, Illinois 60606

Ladies and Gentlemen:

The undersigned, Relativity Media, LLC, a California limited liability company (the "Administrative Borrower"), refers to the Debtor-In-Possession Financing Agreement, dated as of July 30, 2015 (as amended, supplemented or otherwise modified from time to time, the "Financing Agreement"), by and among Relativity Holdings LLC, a Delaware limited liability company (the "Parent"), Administrative Borrower, the subsidiaries of Administrative Borrower identified as Borrowers on the signature pages thereto (together with Administrative Borrower, each a "Borrower" and collectively, the "Borrowers"), the lenders identified on the signature pages thereto (such lenders, together with their respective successors and assigns, each a "Lender" and collectively, the "Lenders"), and Cortland Capital Market Services LLC, as collateral agent for the Lenders (in such capacity, together with its successors and assigns, the "Collateral Agent"), and as administrative agent for the Lenders (in such capacity, together with its successors and assigns, the "Administrative Agent"), and hereby gives you notice pursuant to Section 2.02 of the Financing Agreement that the undersigned hereby requests a Loan under the Financing Agreement (the "Proposed Loan"), and in that connection sets forth below the information relating to the Proposed Loan as required by Section 2.02 of the Financing Agreement. All capitalized terms used but not defined herein have the same meanings herein as set forth in the Financing Agreement..

(i) The aggregate principal amount of the Proposed Loan is $[_____].

(ii)The borrowing date of the Proposed Loan is [_____ __], 20[_].

The undersigned hereby certifies that (i) the representations and warranties of the Loan Parties contained in Article VI of the Financing Agreement are true and correct in all material respects on and as of the date hereof as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct in all material respects on and as of such earlier date), (ii) no Default or Event of Default has occurred or is continuing or will result from the making of the Proposed Loan, and (iii) the conditions set forth in Section 5.01 and 5.03 of the Financing Agreement will be satisfied as of the date of the Proposed Loan.

Very truly yours,

RELATIVITY MEDIA, LLC,  as
Administrative Borrower

By: _____
   Name:
   Title:

#4849-2963-6390

**Exhibit D**

Form of Assignment and Acceptance

This Assignment and Assumption Agreement (this "Assignment") is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "**Assignor**") and [*Insert name of Assignee*] (the "Assignee").  Capitalized terms used but not defined herein shall have the meanings given to them in the DIP Financing Agreement identified below (as it may be amended, supplemented or otherwise modified from time to time, the "DIP Financing Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee.  The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the DIP Financing Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, (i) all of the Assignor's rights and obligations in its capacity as a Lender under the DIP Financing Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of the Assignor's outstanding rights and obligations under the respective facilities identified below and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the DIP Financing Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by the Assignor to the Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as the "**Assigned Interest**").  Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment, without representation or warranty by the Assignor.

| | | |
|---|---|---|
| 1. | Assignor: | _____ |
| 2. | Assignee: | _____ [and is an Affiliate/Related Fund[1] of [*identify Lender*]] [Assignor is not a Defaulting Lender] Markit Entity Identifier (if any): _____ |
| 3. | Administrative Borrower: | Relativity Media, LLC |
| 4. | Agents: | Cortland Capital Market Services LLC, as the administrative agent and collateral agent under the DIP Financing Agreement |
| 5. | DIP Financing Agreement: | The Debtor-in-Possession Financing Agreement dated as of July [30], 2015 among the Administrative Borrower and certain subsidiaries and affiliates thereto, the Lenders parties thereto and the Agents. |
| 6. | Assigned Interest[s]: | |

---

[1]    Select as applicable

| Aggregate Amount of Commitment/Loans for all Lenders | Amount of Commitment/Loans Assigned | Percentage Assigned of Commitment/Loans |
|---|---|---|
| $_____ | $_____ | _____% |
| $_____ | $_____ | _____% |

Effective Date:  _____, 20__ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

7.     Notice and Wire Instructions:

**[NAME OF ASSIGNOR]**                         **[NAME OF ASSIGNEE]**

Notices:                                                      Notices:

_____                    _____
_____                    _____
_____                    _____
Attention:                                                   Attention:
Telecopier:                                                  Telecopier:

Wire Instructions:                                    Wire Instructions:


The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR
**[NAME OF ASSIGNOR]**

By:_____
Title:

ASSIGNEE
**[NAME OF ASSIGNEE]**

By:_____
Title:

Accepted:

CORTLAND CAPITAL MARKET SERVICES

LLC, as Administrative Agent

By:_____
Title:

#4849-2963-6390

ANNEX 1

STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
AND ASSUMPTION AGREEMENT

1.    <u>Representations and Warranties</u>.

1.1    <u>Assignor</u>.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and (iv) it is not a Defaulting Lender; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with any Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the DIP Financing Agreement or any other instrument or document delivered pursuant thereto, other than this Assignment (herein collectively the "<u>Credit Documents</u>"), or any collateral thereunder, (iii) the financial condition of Borrowers, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by Borrowers, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Credit Document.

1.2    <u>Assignee</u>.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the DIP Financing Agreement, (ii) from and after the Effective Date, it shall be bound by the provisions of the DIP Financing Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iii) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (iv) it has received a copy of the DIP Financing Agreement, and has received or has been accorded the opportunity to receive copies of such documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest, (vi) it has, independently and without reliance upon Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest, and (vii) if it is a Non-US Lender, attached to this Assignment is any documentation required to be delivered by it pursuant to the terms of the DIP Financing Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender.

2.    <u>Payments</u>.  All payments with respect to the Assigned Interests shall be made on the Effective Date as follows:

2.1    From and after the Effective Date, Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date. Notwithstanding the foregoing, Administrative Agent shall make all payments of interest, fees or other amounts paid or payable in kind from and after the Effective Date to the Assignee.

3.    <u>General Provisions</u>. This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment. This Assignment shall be governed by, and construed in accordance with, the internal laws of the State of New York without regard to conflict of laws principles thereof.

[Remainder of page intentionally left blank]

#4849-2963-6390