**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RELATIVITY FASHION, LLC, *et al.*,[1] | Case No. 15-11989 (MEW) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF TIMOTHY R. COLEMAN IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POST-PETITION FINANCING AND (B) USE CASH COLLATERAL; (II) GRANTING THE PREPETITION LENDERS ADEQUATE PROTECTION; (III) SCHEDULING A FINAL HEARING; AND (IV) GRANTING RELATED RELIEF**

I, Timothy R. Coleman, hereby declare, pursuant to 28 U.S.C. §1746, under penalty of perjury:

1.     I am a Senior Managing Director and Head of the Restructuring and Reorganization group at The Blackstone Group, L.P. ("**Blackstone**"), a provider of financial advisory services, with offices at 345 Park **Avenue**, New York, New York 10154.  I am authorized to make this Declaration (the "**Declaration**") on behalf of Blackstone.   I submit this Declaration in support of *Debtors' Motion for Entry of Interim and Final Orders  (i) Authorizing the Debtors to (a) Obtain Post-Petition Financing and (b) Use Cash Collateral; (ii) Granting the Prepetition Lenders Adequate Protection; (iii) Scheduling a Final Hearing; and (iv) Granting Related Relief  (the "**DIP Motion**").*

---

[1] The Debtors in these chapter 11 cases are as set forth on page (i).

The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Relativity Fashion, LLC (4571); Relativity Holdings LLC (7052); Relativity Media, LLC (0844); Relativity REAL, LLC (1653); RML Distribution Domestic, LLC (6528); RML Distribution International, LLC (6749); RMLDD Financing, LLC (9114); 21 & Over Productions, LLC (7796); 3 Days to Kill Productions, LLC (5747); A Perfect Getaway P.R., LLC (9252); A Perfect Getaway, LLC (3939); Armored Car Productions, LLC (2750); Best of Me Productions, LLC (1490); Black Or White Films, LLC (6718); Blackbird Productions, LLC (8037); Brant Point Productions, LLC (9994); Brick Mansions Acquisitions, LLC (3910); Brilliant Films, LLC (0448); Brothers Productions, LLC (9930); Brothers Servicing, LLC (5849); Catfish Productions, LLC (7728); Cine Productions, LLC (8359); CinePost, LLC (8440); Cisco Beach Media, LLC (8621); Cliff Road Media, LLC (7065); Den of Thieves Films, LLC (3046); Don Jon Acquisitions, LLC (7951); DR Productions, LLC (7803); Einstein Rentals, LLC (5861); English Breakfast Media, LLC (2240); Furnace Films, LLC (3558); Gotti Acquisitions, LLC (6562); Great Point Productions, LLC (5813); Guido Contini Films, LLC (1031); Hooper Farm Music, LLC (3773); Hooper Farm Publishing, LLC (3762); Hummock Pond Properties, LLC (9862); Hunter Killer La Productions, LLC (1939); Hunter Killer Productions, LLC (3130); In The Hat Productions, LLC (3140); J & J Project, LLC (1832); JGAG Acquisitions, LLC (9221); Left Behind Acquisitions, LLC (1367); Long Pond Media, LLC (7197); Madaket Publishing, LLC (9356); Madaket Road Music, LLC (9352); Madvine RM, LLC (0646); Malavita Productions, LLC (8636); MB Productions, LLC (4477); Merchant of Shanghai Productions, LLC (7002); Miacomet Media LLC (7371); Miracle Shot Productions, LLC (0015); Most Wonderful Time Productions, LLC (0426); Movie Productions, LLC (9860); One Life Acquisitions, LLC (9061); Orange Street Media, LLC (3089); Out Of This World Productions, LLC (2322); Paranoia Acquisitions, LLC (8747); Phantom Acquisitions, LLC (5503); Pocomo Productions, LLC (1069); Relative Motion Music, LLC (8016); Relative Velocity Music, LLC (7169); Relativity Development, LLC (5296); Relativity Film Finance II, LLC (9082); Relativity Film Finance III, LLC (8893); Relativity Film Finance, LLC (2127); Relativity Films, LLC (5464); Relativity Foreign, LLC (8993); Relativity India Holdings, LLC (8921); Relativity Jackson, LLC (6116); Relativity Media Distribution, LLC (0264); Relativity Media Films, LLC (1574); Relativity Music Group, LLC (9540); Relativity Production LLC (7891); Relativity Rogue, LLC (3333); Relativity Senator, LLC (9044); Relativity Sky Land Asia Holdings, LLC (9582); Relativity TV, LLC (0227); Reveler Productions, LLC (2191); RML Acquisitions I, LLC (9406); RML Acquisitions II, LLC (9810); RML Acquisitions III, LLC (9116); RML Acquisition IV, LLC (4997); RML Acquisitions IX, LLC (4410); RML Acquisitions V, LLC (9532); RML Acquisitions VI, LLC (9640); RML Acquisitions VII, LLC (7747); RML Acquisitions VIII, LLC (7459); RML Acquisitions X, LLC (1009); RML Acquisitions XI, LLC (2651); RML Acquisitions XII, LLC (4226); RML Acquisitions XIII, LLC (9614); RML Acquisitions XIV, LLC (1910); RML Acquisitions XV, LLC (5518); RML Bronze Films, LLC (8636); RML Damascus Films, LLC (6024); RML Desert Films, LLC (4564); RML Documentaries, LLC (7991); RML DR Films, LLC (0022); RML Echo Films, LLC (4656); RML Escobar Films LLC (0123); RML Film Development, LLC (3567); RML Films PR, LLC (1662); RML Hector Films, LLC (6054); RML Hillsong Films, LLC (3539); RML IFWT Films, LLC (1255); RML International Assets, LLC (1910); RML Jackson, LLC (1081); RML Kidnap Films, LLC (2708); RML Lazarus Films, LLC (0107); RML Nina Films, LLC (0495); RML November Films, LLC (9701); RML Oculus Films, LLC (2596); RML Our Father Films, LLC (6485); RML Romeo and Juliet Films, LLC (9509); RML Scripture Films, LLC (7845); RML Solace Films, LLC (5125); RML Somnia Films, LLC (7195); RML Timeless Productions, LLC (1996); RML Turkeys Films, LLC (8898); RML Very Good Girls Films, LLC (3685); RML WIB Films, LLC (0102); Rogue Digital, LLC (5578); Rogue Games, LLC (4812); Roguelife LLC (3442); Safe Haven Productions, LLC (6550); Sanctum Films, LLC (7736); Santa Claus Productions, LLC (7398); Smith Point Productions, LLC (9118); Snow White Productions, LLC (3175); Spy Next Door, LLC (3043); Story Development, LLC (0677); Straight Wharf Productions, LLC (5858); Strangers II, LLC (6152); Stretch Armstrong Productions, LLC (0213); Studio Merchandise, LLC (5738); Summer Forever Productions, LLC (9211); The Crow Productions, LLC (6707); Totally Interns, LLC (9980); Tribes of Palos Verdes Production, LLC (6638); Tuckernuck Music, LLC (8713); Tuckernuck Publishing, LLC (3960); Wright Girls Films, LLC (9639); Yuma, Inc. (1669); Zero Point Enterprises, LLC (9558).  The location of the Debtors' corporate headquarters is: 9242 Beverly Blvd., Suite 300, Beverly Hills, CA 90210.

i

## QUALIFICATIONS

2.      I hold a Bachelor of Arts in Political Science from the University of California at Santa Barbara and a Master of Business Administration from the University of Southern California.  I have been recognized for my work in the turnaround and restructuring industry.  In 2014, I received the Turnaround Leadership Award from the M&A Advisor, and in 2013, I was inducted into the Turnaround Restructuring, and Distressed Investing Industry Hall of Fame by the Turnaround Management Association.  In 2011, I was named Global Investment Banker of the Year by the Turnaround Atlas Awards.  I also participated in the restructurings of C-BASS and Ford Motor Company, both of which were named *Restructuring of the Year* in 2008 and 2009, respectively.

3.      Prior to joining Blackstone in 1992, I served as a Vice President of Citibank, N.A. for twelve years, where I oversaw restructurings, real estate restructurings, and loan syndications.

4.      Since joining Blackstone in 1992, I led, or participated in, a variety of restructuring and reorganization assignments for companies, municipalities, creditor groups, special committees of corporate boards, corporate parents of troubled companies and acquirers of distressed assets.  These matters included engagements by Adelphia, Los Angeles Dodgers, Quad/Graphics (Re: Vertis), AMBAC, Financial Guaranty Insurance Company, Rescap, Asian Art Museum, FLAG Telecom, R.H. Macy & Co., AT&T (AT&T Canada), Alestra, and Excite@Home, Ford Motor Company, Roust Trading (Re: CEDC), State of Kansas, Bear Stearns Asset Management, Guangdong Enterprises, The Weinstein Company, Cable & Wireless Holdings, Nautilus, Travelport, Credit-Based Asset Servicing and Securitization LLC ("C-BASS"), MBIA (Re: BofA and Detroit), Tribune, Williams Communications, Delta Air Lines,

2

Delta (Re: Pinnacle Airlines), Mohegan Sun, Genco Shipping, Xerox Corporation, and XL

Capital, and other confidential assignments.

## BLACKSTONE ENGAGEMENT

5.      In September 2014, the Debtors-in-Possession identified in the caption

(collectively, the "**Debtors**"), retained Blackstone to provide an assessment of their capital

structure and liquidity alternatives.  After several months of work on this engagement, the

Debtors had some success raising capital to fund operations and, consequently, Blackstone's

work on this engagement was temporarily suspended.

6.      In June 2015, Blackstone was asked by the Debtors to actively resume its

engagement as investment banker for the Debtors' company.  The Debtors were facing the

maturity of significant debt obligations and their liquidity situation was rapidly deteriorating.   In

fact, by the time that this engagement resumed, the Debtors' financial situation was distressed.

7.      During both active engagement periods, members of my team and I worked

closely with the Debtors and, among other things, performed diligence on the Debtors' operating

business segments and related business plans.  We negotiated directly with the Debtors' various

creditor contingencies and assessed the Debtors' transaction alternatives and restructuring

options.  My team and I also assisted the Debtors in reviewing the terms, conditions, and the

potential impact of any transaction, restructuring or bankruptcy under consideration by the

Debtors.

8.      I have become familiar with the Debtors' material businesses, operations, assets,

debts, contractual arrangements, financial affairs, and restructuring efforts.  Consequently, I have

personal knowledge of the facts, matters, and issues set forth herein.   I have obtained such

knowledge from my experiences with the Debtors, and a review of the relevant business records

and information provided to me by the Debtors, their management team, employees, and team of advisors.

9.      I am not being compensated directly for this testimony.  However, Blackstone does receive payment as the investment banker retained by the Debtors.  If called upon to testify, I would testify competently to the facts set forth herein.

## THE DEBTORS' LIQUIDITY AND CAPITAL STRUCTURE

10.      The Debtors have a relatively complicated business and organizational structure. The Debtors operate their businesses through several separate, but affiliated companies that are organized by business units.  For the purpose of this summary, Debtor Relativity Holdings LLC ("**Relativity Holdco**") is the ultimate parent of all of the Relativity Debtors.  Relativity Media, LLC ("**RML**") is the Debtors' main operating company and is the direct or indirect owner of the other Debtor affiliates and subsidiaries.

11.      The Debtors' capital structure is complex.  The Debtors financed the various segments of their businesses through multiple financings, fundings, credit agreements, term loans, bank facilities, and intercreditor agreements, which are typical in the film industry.

12.      RML and certain of its subsidiaries (the "**Cortland Borrowers**") entered into a May 30, 2012 Financing Agreement with a number of lenders, (the "**Cortland Lenders**"), Cortland Capital Market Services LLC ("**Cortland**") as collateral and administrative agent, and CB Agency Services, LLC ("**CBA**"), as origination agent (collectively, with all related loan and other documents identified therein, the "**Cortland TLA/TLB Financing Agreement**.")

13.      The outstanding debt under this Agreement, more than $330 million, matured on June 1, 2015.  Although the Debtors' CEO and management team had successfully raised

approximately $62.5 million in preferred equity just prior to June 1, 2015, and were still in

advanced discussions with several investors, the Debtors were unable to refinance or extend this

debt.

14.    The Debtors' inability to satisfy the Cortland obligation on the maturity date

triggered cross-default provisions in two particular agreements governing debt at the Debtors'

subsidiary levels; a P&A Facility, which was used to finance the print and advertising budgets

associated with films produced and distributed by Debtors, and an Ultimates Facility, used to

fund the studio's operations.  The Debtors therefore sought from the lenders forbearance

agreements on these loans so that Debtors' management could continue its quest for additional

debt and equity capital.

15.    The Debtors entered into a series of separate, short-term Forbearance Agreements

between June 1 and June 5.  Specifically, on June 1, 2015, the Debtors and a majority of the

Term Loan A and B lenders entered into a Forbearance Agreement on the Cortland TLA/TLB

Loans (the "**TLA/TLB Forbearance**"). The Debtors also executed a Forbearance Agreement

with its Ultimates Lenders,[1] (the "**Ultimates Forbearance**") on June 1, 2015.  On June 5, 2015,

the Debtors finalized a Forbearance Agreement with its P&A Lenders[2] (the "**P&A**

**Forbearance**") (collectively, the "**Forbearance Agreements**").

---

[1]The Ultimates Facility is collateralized by the value of future cash flows for its films in all media (e.g., theatrical, DVD, digital, and TV).  This financing was secured under a September 25, 2012 Credit, Security, Guaranty and Pledge Agreement with OneWest Bank (and others), which was amended by a series of amendments, including and through Amendment No. 17, dated April 29, 2015.

[2] The Debtors financed the Pre- and Post- Release P&A (print and advertising) budgets for films under a June 30, 2014 P&A Second Amended Funding Agreement ("P&A Facility") with RKA Film Financing, Inc. (as pre-release lender), Macquarie Investments US, Inc. (as post-release lender), and Macquarie US Trading, LLC, as Agent for the Pre-and Post- Release Lenders.  The P&A Facility was amended by the First Amendment, dated August 26, 2014. The Pre-and Post-Release Lenders and Macquarie as Agent, executed the P&A Forbearance Agreement.

16.     To obtain the Ultimates Forbearance, and because the Debtors anticipated that the forbearance period would be short, the Debtors agreed that all cash flow from the film library that secured the Ultimates Facility could be swept by OneWest Bank.  This provision effectively removed a cash flow source of the Debtors and thus further strained the Debtors' already problematic liquidity situation, as over the following two months, approximately $32 million was swept, a significant amount of the Debtors' otherwise available cash.  This liquidity crisis caused the Debtors to largely have to stop paying many vendor bills, to postpone production of certain film projects, and to postpone the release of certain completed films  On July 17, 2015, OneWest Bank additionally swept the balances contained in two of the Debtors' accounts, including an account that was used to pay participations and residuals to the "Guilds" -- producers, performers, writers, and other individuals or entities entitled to compensation for the exhibition of the content developed, produced, and/or distributed by the Debtors and the Non-Debtor Subsidiaries.  That account maintained a balance of approximately $17.9 million; the sweeps completely depleted the balances of those accounts.  OneWest Bank applied the swept funds to the outstanding balance of the Ultimates Facility.

17.     The following table provides a snap-shot of the Debtors' pre-petition secured indebtedness.   These facilities and the related material terms are more fully described in the First Day Declaration:[3]

---

[3] "**First Day Declaration**" means the *Declaration of Dr. Brian G. Kushner Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of Chapter 11 Bankruptcy Petitions and First Day Pleadings*.

| Debt | Amount Outstanding[4] |
|------|------------------------|
| Cortland TLA/TLB Facility | $361,611,038 |
| Manchester Credit Facility | $137,078,557 |
| P&A Facility | $116,292,818 |
| Production Loans | $37,810,909 |
| Ultimates Facility | $27,789,945 |

18.     A key component to the Debtors' ability to meet its financing goals during the Forbearance Period was the execution of an "amend-and-extend" transaction with the existing Cortland TLA and TLB lenders, which the Debtors were tasked with negotiating.  The Debtors believed that if they could extend the capital structure under the Cortland facility for approximately one year, it would provide enough stability to allow the equity investors identified by, and working with, the Debtors' management to finalize their respective and anticipated investments.

19.     Also in June, the Debtors began working with Catalyst Capital Group, a Toronto-based hedge fund ("**Catalyst**") on potential financing.  Catalyst began extensive diligence on the Debtors' businesses while considering the possibility of a significant capital contribution to stabilize the company.  After a full week of intense diligence, which included (among other events) substantial face-to-face meeting time, Catalyst purchased the entire TLA debt (approximately $131 million) at par from the existing TLA lenders.

20.     Separately, the Debtors and Catalyst were negotiating a more comprehensive transaction that intended to provide the Debtors with potentially more than $100 million of

---

[4] All balances exclude accrued interest.

additional working capital, and amend-and-extend the TLA and TLB debt. The Debtors, Catalyst and three of the existing Term Loan B lenders ("**TLB Lenders**") vigorously negotiated this proposed transaction, but were unable to close a deal. Consequently, on July 9, 2015, two of the TLB Lenders, Anchorage Capital Master Offshore, Ltd. ("Anchorage") and Luxor Capital, LLC ("Luxor"), exercised a right under the Cortland TLA/TLB Financing Agreement and purchased almost all of the outstanding Term Loan A debt which was then held by Catalyst.

21.      While these and other negotiations offered significant opportunities for the Debtors to restructure their secured debt obligations on favorable terms, the Debtors' liquidity continued to slide. While the Debtors and their advisors previously focused their efforts on completing an out-of-court transaction with Catalyst, the Anchorage and Luxor buy-out of Catalyst's Term Loan A debt constrained Catalyst's ability to provide a workable and timely solution. Due to the complexity of the Debtors' capital structure, and the limitations imposed on new debt issuances, the Debtors' short term financing options were limited, and they therefore had to turn to the Cortland Lenders for liquidity relief.

22.      On July 16, 2015, the Cortland Borrowers and Lenders Amended the Cortland TLA/TLB Financing Agreement (Amendment No. 1), pursuant to which certain of the Cortland Lenders would provide $15 million of cash (the "**Term A-1 Loans**") to be released incrementally. $7.5 million was issued on July 16, 2015 and $7.5 million was issued on July 20, 2015. In addition, the Debtors and the Lenders agreed on terms for an "amend-and-extend" arrangement, subject to certain conditions, including the Debtors ability to raise $250 million of debt and $175 million of equity capital on or before July 27.

23.      During that narrow, two-week forbearance period, the Debtors began to prepare a contingency plan for a chapter 11 filing if these conditions could not be met.

## DIP FINANCING  AND "STALKING HORSE" NEGOTIATING PROCESS

24.      In light of the Debtors' difficulty in meeting their liquidity needs, their highly-leveraged capital structure and their lack of unencumbered assets, the Debtors determined, after consulting with their advisors, that the most viable source of DIP Financing was the company's existing secured creditors.  The Debtors, Jones Day, and Blackstone thus approached three of the Cortland Lenders to entertain discussions about possible debtor-in-possession financing ("DIP Financing").  Eventually, two of those lenders (the "DIP Lenders") determined that they would be willing to provide DIP Financing to assist the Debtors through an expedited 363 sale process. Their proposal contemplated providing liquidity to allow the Debtors to file these cases, to continue operating the company's businesses, and to have time to engage in a sale of the company's businesses in chapter 11.

25.      Because it appeared that RML would be unable to finalize any further financing by July 27, 2015, the Debtors, in conjunction with their advisors, determined that it was in their best interest to seek chapter 11 bankruptcy protection and to pursue a stalking horse bid proposed by the DIP Lenders.

26.      The Debtors and the DIP Lenders conducted urgent and rigorous negotiations on the DIP Lenders' proposal over the last two and a half weeks prior to the Debtors' bankruptcy filing.  The DIP Lenders engaged in a significant amount of due diligence with the Debtors and their advisors to complete this transaction, which included on-site diligence meetings at the Debtors' facilities, the development of an agreed upon DIP budget and a new comprehensive business plan that supported the DIP Lenders' bid proposal.  The Debtors and the DIP Lenders negotiated and fully executed a number of agreements, including a credit agreement, a binding asset purchase term sheet, and the necessary first day motions.  The Debtors, their advisors, and

the DIP Lenders invested a significant amount of effort and attention to the details in order to prepare for this filing in such a short period of time.

27.     These efforts, and the arms-length negotiations, culminated in the agreed terms set forth in the DIP Loan Documents and the APA Term Sheet.

28.     The DIP Lenders, as the holders of the senior prepetition debt, have substantial interests in the success of the proposed sale and, therefore, are willing to provide the DIP Facility in conjunction with a stalking horse bid on the terms provided here.

### THE DEBTORS' NEED TO OBTAIN DIP FINANCING AND USE OF COLLATERAL CASH

29.     In the months prior to filing these chapter 11 cases, the Debtors' financial position precipitously diminished to a point where they had more than $350 million in maturing secured debt, and very little in operating cash on the Petition Date.   Consequently, the Debtors urgently need the relief requested in the DIP Motion, including access to the post-petition financing described therein (the "**DIP Financing**"), and use of the pre-petition lenders' Cash Collateral in order to continue operations.  The nature of the Debtors' businesses makes a shutdown of any length of time a serious threat to the survival of the enterprise.  Throughout the Debtors' various business units, the most critical assets are the employees and their relationships.  Continuing to make payroll and providing stability to key employees will allow the Debtors to retain critical relationships.  Any cessation of operations will damage valuable relationships with industry talent, vendors and suppliers, and employees who the Debtors need to effectuate a sale of their assets in Chapter 11.

30.     Without immediate access to the DIP Financing, the Debtors will be unable to fund payroll and benefit obligations to employees, resulting in substantial job losses and

departures.  Immediate access to the funds proposed to be advanced under the DIP Financing is

essential to the Debtors' efforts to: (a) continue their ordinary course, day-to-day operations,

including satisfying payroll obligations; (b) meet their ongoing obligations under their major

trade agreements; and (c) market their business for sale as a going concern.  Based on the

Debtors' projected cash flows for the early portion of these chapter 11 cases, the $20 million

portion of the DIP Financing proposed to be made available upon entry of the Interim Order is

necessary and appropriate to provide the Debtors with interim operating liquidity and in order to

avoid immediate and irreparable harm to the Debtors and their estates.

31.    The Debtors have been liquidity constrained for many weeks.  In anticipation of

their immediate need for postpetition financing and the use of Cash Collateral, the Debtors, in

consultation with another advisor, FTI Consulting, Inc. ("FTI"), performed a review and analysis

of their projected cash needs.  Based upon that review and analysis, the Debtors and FTI

prepared a budget outlining the Debtors' postpetition cash needs (the "**DIP Budget**").

32.    In sum, without access to postpetition financing, the Debtors would suffer

substantial and irreparable harm.  By contrast, once the relief sought in the Motion is approved,

the Debtors' ability to continue their operations without disruption will be substantially

enhanced.

## THE DEBTORS WOULD BE UNABLE TO OBTAIN FINANCING ON AN UNSECURED OR JUNIOR SECURED BASIS.

33.    The proposed DIP Financing will be a senior, secured superpriority facility that

will prime the Cortland TLA/TLB Facility and the Manchester Facility (the "**Primed**

**Facilities**").  Given the Debtors' financial condition, the exigency of these chapter 11 filings, the

Debtors' complex capital structure and their lack of unencumbered assets, the Debtors have been

unable to obtain more favorable financing.  Indeed, substantial time and resources were invested

in seeking forbearances and outside capital during the tumultuous forbearance periods in  June

and July.  If the Debtors had not responded to these circumstances, they would have been in

bankruptcy without access to capital, which would have significantly destroyed the value of the

estate.   With the constant changing of key creditor constituencies and near-term forbearance

deadlines, the Debtors needed to concentrate on the most secure, risk-adverse path to reach a DIP

commitment.

34.    I do not believe that they would be able to obtain financing on an unsecured basis

pursuant to sections 364(b) and 503(b)(1) of the Bankruptcy Code, or even a superpriority basis

under section 364(c)(1) of the Bankruptcy Code, on terms more favorable than those of the DIP

Facility.

35.    In the time available, if the Debtors were to solicit offers for financing secured by

liens on their unencumbered assets (which are virtually nonexistent) pursuant to section

364(c)(2) of the Bankruptcy Code, or junior liens on their encumbered assets pursuant to section

364(c)(3) of the Bankruptcy Code, the Debtors believe that such financing would be

unattainable.

**THE TERMS OF THE DIP FACILITY ARE FAIR AND REASONABLE
UNDER THE CIRCUMSTANCES**

36.    The Debtors have concluded that the DIP Lenders' proposal is the best alternative

available for post-petition financing, and further have concluded that the loan cannot be obtained

from another source on more favorable terms in the time frame needed.  Given my experience in

the solicitation and obtainment of financing for companies in bankruptcy, I do not believe that

the Debtors could have obtained such financing on an unsecured basis or on a junior-secured

basis subordinate to the other secured creditors of the Debtors.  Moreover, the various fees and

charges associated with obtaining the DIP Facility are reasonable for a financing needed to fund

a situation of this type.

37.      The DIP Facility provides the Debtors the liquidity they need to operate their

business during these chapter 11 cases, on fair and customary terms, for a situation of this type,

and permits the Debtors to effectively market and sell their assets.

38.      The DIP Facility subjects the security interests and administrative expense claims

granted to the DIP Lenders to the Carve-Out for certain administrative and professional fees,

including (i) fees required to be paid to the Court and to the U.S. Trustee, and (ii) fees and

disbursements incurred by professional persons employed by the Debtors, or any statutory

committee in the Debtors' chapter 11 cases.

39.      After appropriate examination and analysis by the Debtors' management, and their

professionals, including myself, the Debtors have concluded that the DIP Financing provides

sufficient liquidity to allow the Debtors to operate as a going concern during the pendency of

these chapter 11 cases.  Without the financing provided by the DIP Facility, the Debtors will lack

the liquidity necessary to continue operations and would likely be forced into liquidation to the

detriment of both the Debtors' estates and their creditors.  Accordingly, the Debtors believe that

the DIP Financing is necessary to preserve the assets of the Debtors' estates and is in the best

interests of their creditors.

40.      The Debtors further believe that the DIP Financing is the best option available in

this circumstance.  Because of the complex nature of the Debtors' capital structure and the

immediate need for liquidity, the Debtors do not believe they could have obtained postpetition

financing from any other lending source on these or superior terms.

41.    The Debtors engaged in good faith and arms-length negotiations with the

DIP Lenders and believe they have negotiated fair and reasonable terms for the DIP Facility.

42.    These factors, coupled with the Debtors' review of debtor in possession financing

that has been approved in other recent cases, have confirmed that the DIP Facility proposed is

fair and reasonable, and represents the best financing currently available to the Debtors.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  July 30, 2015
New York, New York

/s/ Timothy Coleman
Timothy Coleman
Senior Managing Director
The Blackstone Group, L.P.