Richard L. Wynne
Bennett L. Spiegel, Esq.
Lori Sinanyan, Esq. (*pro hac vice* pending)
**JONES DAY**
222 East 41st Street
New York, NY 10017
Tel:  (212) 326-3939
Fax: (212) 755-7306

- and -

Craig A. Wolfe, Esq.
Malani J. Cademartori, Esq.
Blanka K. Wolfe, Esq.
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
30 Rockefeller Plaza
New York, NY 10112
Tel:  (212) 653-8700
Fax: (212) 653-8701

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RELATIVITY FASHION, LLC, *et al.*,[1] | Case No. 15-11989 (MEW) |
| Debtors. | (Joint Administration Pending) |

**DEBTORS' MOTION FOR (I) AN ORDER (A) ESTABLISHING BID PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) APPROVING STALKING HORSE APA AND BIDDING PROTECTIONS, AND (C) GRANTING CERTAIN RELATED RELIEF AND (II) AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO, AND (C) GRANTING CERTAIN RELATED RELIEF**

---

1.  The Debtors in these chapter 11 cases are as set forth on page (i).

The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Relativity Fashion, LLC (4571); Relativity Holdings LLC (7052); Relativity Media, LLC (0844); Relativity REAL, LLC (1653); RML Distribution Domestic, LLC (6528); RML Distribution International, LLC (6749); RMLDD Financing, LLC (9114); 21 & Over Productions, LLC (7796); 3 Days to Kill Productions, LLC (5747); A Perfect Getaway P.R., LLC (9252); A Perfect Getaway, LLC (3939); Armored Car Productions, LLC (2750); Best of Me Productions, LLC (1490); Black Or White Films, LLC (6718); Blackbird Productions, LLC (8037); Brant Point Productions, LLC (9994); Brick Mansions Acquisitions, LLC (3910); Brilliant Films, LLC (0448); Brothers Productions, LLC (9930); Brothers Servicing, LLC (5849); Catfish Productions, LLC (7728); Cine Productions, LLC (8359); CinePost, LLC (8440); Cisco Beach Media, LLC (8621); Cliff Road Media, LLC (7065); Den of Thieves Films, LLC (3046); Don Jon Acquisitions, LLC (7951); DR Productions, LLC (7803); Einstein Rentals, LLC (5861); English Breakfast Media, LLC (2240); Furnace Films, LLC (3558); Gotti Acquisitions, LLC (6562); Great Point Productions, LLC (5813); Guido Contini Films, LLC (1031); Hooper Farm Music, LLC (3773); Hooper Farm Publishing, LLC (3762); Hummock Pond Properties, LLC (9862); Hunter Killer La Productions, LLC (1939); Hunter Killer Productions, LLC (3130); In The Hat Productions, LLC (3140); J & J Project, LLC (1832); JGAG Acquisitions, LLC (9221); Left Behind Acquisitions, LLC (1367); Long Pond Media, LLC (7197); Madaket Publishing, LLC (9356); Madaket Road Music, LLC (9352); Madvine RM, LLC (0646); Malavita Productions, LLC (8636); MB Productions, LLC (4477); Merchant of Shanghai Productions, LLC (7002); Miacomet Media LLC (7371); Miracle Shot Productions, LLC (0015); Most Wonderful Time Productions, LLC (0426); Movie Productions, LLC (9860); One Life Acquisitions, LLC (9061); Orange Street Media, LLC (3089); Out Of This World Productions, LLC (2322); Paranoia Acquisitions, LLC (8747); Phantom Acquisitions, LLC (6381); Pocomo Productions, LLC (1069); Relative Motion Music, LLC (8016); Relative Velocity Music, LLC (7169); Relativity Development, LLC (5296); Relativity Film Finance II, LLC (9082); Relativity Film Finance III, LLC (8893); Relativity Film Finance, LLC (2127); Relativity Films, LLC (5464); Relativity Foreign, LLC (8993); Relativity India Holdings, LLC (8921); Relativity Jackson, LLC (6116); Relativity Media Distribution, LLC (0264); Relativity Media Films, LLC (1574); Relativity Music Group, LLC (9540); Relativity Production LLC (7891); Relativity Rogue, LLC (3333); Relativity Senator, LLC (9044); Relativity Sky Land Asia Holdings, LLC (9582); Relativity TV, LLC (0227); Reveler Productions, LLC (2191); RML Acquisitions I, LLC (9406); RML Acquisitions II, LLC (9810); RML Acquisitions III, LLC (9116); RML Acquisitions IV, LLC (4997); RML Acquisitions IX, LLC (4410); RML Acquisitions V, LLC (9532); RML Acquisitions VI, LLC (9640); RML Acquisitions VII, LLC (7747); RML Acquisitions VIII, LLC (7459); RML Acquisitions X, LLC (1009); RML Acquisitions XI, LLC (2651); RML Acquisitions XII, LLC (4226); RML Acquisitions XIII, LLC (9614); RML Acquisitions XIV, LLC (1910); RML Acquisitions XV, LLC (5518); RML Bronze Films, LLC (8636); RML Damascus Films, LLC (6024); RML Desert Films, LLC (4564); RML Documentaries, LLC (7991); RML DR Films, LLC (0022); RML Echo Films, LLC (4656); RML Escobar Films LLC (0123); RML Film Development, LLC (3567); RML Films PR, LLC (1662); RML Hector Films, LLC (6054); RML Hillsong Films, LLC (3539); RML IFWT Films, LLC (1255); RML International Assets, LLC (1910); RML Jackson, LLC (1081); RML Kidnap Films, LLC (2708); RML Lazarus Films, LLC (0107); RML Nina Films, LLC (0495); RML November Films, LLC (9701); RML Oculus Films, LLC (2596); RML Our Father Films, LLC (6485); RML Romeo and Juliet Films, LLC (9509); RML Scripture Films, LLC (7845); RML Solace Films, LLC (5125); RML Somnia Films, LLC (7195); RML Timeless Productions, LLC (1996); RML Turkeys Films, LLC (8898); RML Very Good Girls Films, LLC (3685); RML WIB Films, LLC (0102); Rogue Digital, LLC (5578); Rogue Games, LLC (4812); Roguelife LLC (3442); Safe Haven Productions, LLC (6550); Sanctum Films, LLC (7736); Santa Claus Productions, LLC (7398); Smith Point Productions, LLC (9118); Snow White Productions, LLC (3175); Spy Next Door, LLC (3043); Story Development, LLC (0677); Straight Wharf Productions, LLC (5858); Strangers II, LLC (6152); Stretch Armstrong Productions, LLC (0213); Studio Merchandise, LLC (5738); Summer Forever Productions, LLC (9211); The Crow Productions, LLC (6707); Totally Interns, LLC (9980); Tribes of Palos Verdes Production, LLC (6638); Tuckernuck Music, LLC (8713); Tuckernuck Publishing, LLC (3960); Wright Girls Films, LLC (9639); Yuma, Inc. (1669); Zero Point Enterprises, LLC (9558).  The location of the Debtors' corporate headquarters is: 9242 Beverly Blvd., Suite 300, Beverly Hills, CA 90210.

The above-captioned debtors (collectively, the "**Debtors**" or "**Relativity**" or "**Sellers**") move the Court, pursuant to sections 105, 363, 365, 503(b) and 507 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 6004-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York[2] for the entry of an order (the "**Bidding Procedures Order**"), substantially in the form attached hereto as Exhibit A:

(i)  approving the proposed procedures (the "**Bidding Procedures**") to be used in connection with the sale of a substantial portion of the Debtors' assets (the "**Purchased Assets**");

(ii)  authorizing the Debtors to pay the break-up fee and expense reimbursement set forth in and pursuant to the terms of the Stalking Horse APA (the "**Stalking Horse Protection**");

(iii)  setting the dates for the Bid Deadline (as defined below), the auction of the Purchased Assets (the "**Auction**"), the hearing with respect to the approval of the sale (the "**Sale Hearing**") and approval of notices related thereto;

(iv)  establishing notice procedures and approving the form and manner of notice of the sale hearing (the "**Sale Notice**");

(v)  approving and authorizing the stalking-horse asset purchase agreement (the "**Stalking Horse APA**") to be entered into according to agreed-upon terms by the Debtors as sellers and RM Bidder LLC[3] as buyer (the "**Stalking Horse Bidder**" or "**Buyer**")), subject only to higher and better offers submitted in accordance with the Bidding Procedures;

(vi)  authorizing certain procedures related to the Debtors' assumption and assignment of executory contracts and unexpired leases (the "**Assignment Procedures**") to the Stalking Horse Bidder; and

---

[2]  This Motion also references the Guidelines for the Conduct of Asset Sales promulgated by General Order M-383 of the this Court (the "**Sale Guidelines**").

[3]  The Stalking Horse Bidder is an entity formed and owned by certain of the Debtors' prepetition secured lenders.

(vii)    granting related relief.

The Debtors also move the Court, pursuant to Bankruptcy Code sections 105, 363 and 365, Bankruptcy Rules 2002, 6004, and 6006 for the entry of an order (the "**Sale Order**"):

(i)    authorizing the sale of the Purchased Assets (such sale, the "**Sale Transaction**") free and clear of all liens, claims, interests and encumbrances;

(ii)    authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection therewith; and

(iii)    granting related relief.[4]

In support of this Motion, the Debtors incorporate the statements contained in the *Declaration of Brian G. Kushner Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**"), and further respectfully state as follows:

## Jurisdiction

1.    This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

2.    Relativity is a privately-held Hollywood studio with an integrated and diversified global media platform that provides, among other things, film and television production and distribution.  Relativity was founded in 2004 by Ryan Kavanaugh as a film slate co-financier partnering with major studios.  In 2010, Relativity hired the marketing and distribution business that was formerly employed by Overture Films, and began to transform itself into a full-service

---

4  The Debtors will file the proposed Sale Order and the Stalking Horse APA as a supplement to this Motion no later than five days prior to the Bidding Procedures Hearing.

studio. Since then, Relativity has distributed, produced, or arranged financing for over 185 films. THE FIGHTER, LIMITLESS, SAFE HAVEN and ACT OF VALOR are four noteworthy examples. Relativity has further expanded into content production and distribution, including movies, television, branding services, sports management, digital media, music publishing, fashion brand management and consultation, and education.

3.      Relativity is headquartered at 9242 Beverly Boulevard, Suite 300, Beverly Hills, California 90210, and operates out of multiple other locations in Los Angeles and New York. Relativity has approximately 89 employees, including approximately 85 full-time employees and 4 part-time employees along with approximately 54 independent contractors within the Debtors' film, branding, digital media, and music groups.

4.      For the twelve months ending December 31, 2014, Relativity generated approximately $501,074,000 in revenues on a consolidated basis. As of December 31, 2014, Relativity had assets with a book value of approximately $559,973,000 and liabilities of $1,178,810,000 on a consolidated basis.[5]

5.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.

6.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases. No committees have yet been appointed or designated.

---

[5]  The amounts are presented on a consolidated basis for the Relativity entities listed on Exhibit B to the First Day Declaration, including the Debtors and certain non-debtor subsidiaries. Unless otherwise indicated, the financial information contained in this Declaration is unaudited and may be subject to change.

7.      As described in more detail in the First Day Declaration, the Debtors have

commenced these chapter 11 cases to effectuate a sale of a substantial portion of their assets on a

going concern basis to the Stalking Horse Bidder, subject to any higher and better offers received

in connection with a proposed sale process.  The Debtors believe the proposed sale represents the

best available option to maximize value for the Debtors' various stakeholders.

**The Proposed Sale Transaction and Marketing Process**

8.      The   Debtors   have   engaged   various   professional   advisors,   including

The Blackstone Group, L.P. and FTI Consulting, Inc. to, among other things, facilitate the

thorough solicitation and marketing of the Purchased Assets.  The Debtors have agreed upon the

material terms of a Stalking Horse APA with the Stalking Horse Bidder and intend to robustly

seek motivated and financially able bidders for the Purchased Assets prior to the Auction date as

provided in the bidding procedures outlined herein.

**The Need for a Timely Sale Process**

9.      The Debtors believe that the auction process and the time periods set forth in the

Bidding Procedures are reasonable and will provide parties with sufficient time and information

necessary to formulate a bid to purchase the Purchased Assets.  In formulating the procedures

and time periods, the Debtors balanced the need to provide adequate and appropriate notice to

parties in interest and to potential purchasers with the need to quickly and efficiently sell the

Relativity enterprise while it still has realizable value and can be maintained as a going concern.

Furthermore, potential bidders will have access to comprehensive information prepared by the

Debtors and their advisors and a substantial body of data, inclusive of a management

presentation, financial projections and an electronic data room.

10.     Completion of the sale process in a timely manner will also maximize the value of

the Purchased Assets.  The time periods set forth in the Bidding Procedures were negotiated by

the Stalking Horse Bidder, and failure to adhere to such time periods could jeopardize the closing

of the Sale Transaction, which the Debtors believe is the best means of maximizing the value of

their assets and the only means of maintaining Relativity as a going concern, which will enable

the Debtors to retain hundreds of jobs and significantly reduce claims against the estates.  Thus,

the Debtors have determined that pursuing the Sale Transaction in the manner and with the

procedures proposed is in the best interest of the Debtors' estates and will provide all interested

parties with sufficient opportunity to participate.

**Stalking Horse APA and Sale Order**[6]

11.     A term sheet (the "**Stalking Horse Term Sheet**") of the material terms of the to-

be-finalized Stalking Horse APA is attached hereto as <u>Exhibit B</u> and incorporated herein by

reference.  The Debtors will file the executed Stalking Horse APA and corresponding proposed

sale order (the "**Sale Order**") as a supplement to this Motion no later than five days prior to the

Bidding Procedures Hearing.  The proposed Stalking Horse APA will contain the following

material terms:

> **Purchased Assets**:  The Buyer will acquire all of the assets of the Sellers' assets used or held for use in the Sellers' TV, film and distribution businesses (including its interest in the RED and Sky Land ventures) (collectively, the "**Businesses**"), other than the Excluded Assets.
>
> **Assumed Liabilities**:   The liabilities to be assumed by the Buyer are: (i) liabilities related to the Purchased Assets arising on and after the Closing Date, as expressly set forth in the Purchase Agreement; (ii) any cure amounts under assumed contracts; (iii) accounts payable arising from the Business; (iv) transfer taxes; and (v) other specified liabilities to be agreed, including certain permitted senior liens.[7]

---

[6] The following summary is qualified in its entirety by reference to the provisions of  the Stalking Horse Term Sheet.  In the event of any inconsistencies between the provisions of the Stalking Horse APA and the terms set forth herein, the terms of the Stalking Horse APA will govern.  Capitalized terms used in this summary and not otherwise defined herein have the meanings given to them in the Stalking Horse Term Sheet.

[7] The Stalking Horse Asset Purchase Agreement will set forth the Excluded Liabilities.

**Purchase Price**:  The Purchase Price of $250 million for the Purchased Assets is paid as follows:   (i) the discharge in full of all amounts outstanding and obligations under the DIP Loans, including the principal amount of indebtedness and interest accrued as of the Closing Date, plus any penalty or pre-payment fees, owed under the DIP Loans; (ii) the discharge in full of all amounts outstanding and obligations under the Term A Loans, including the principal amount of indebtedness and interest accrued as of the Closing Date, plus any penalty or pre-payment fees, owed under the Term A Loans; (iii) the discharge of a portion of the principal amount of indebtedness and interest accrued as of the Closing Date, plus any penalty or pre-payment fees, owed under the Term B Loans; and (iv) assuming the liabilities of the Sellers set forth below under "Assumed and Excluded Liabilities."

**Termination and Other Deadlines**:  Among other things, the provisions of the Stalking Horse APA allow the Buyer to terminate the Stalking Horse APA if (i) the Debtors shall not have commenced the Auction (if such Auction is necessary) on or before September 17, 2015; (ii) the Sale Order shall not have been entered by the Bankruptcy Court in form and substance satisfactory to the Buyer on or before the day after the Sale Hearing; (iii) the Sale Order shall not have become a "final" order on or before the 15th day after the Sale Hearing; (iv) any secured creditor identified on a specified schedule obtains relief from the automatic stay provided by section 362 of the Bankruptcy Code to foreclose on any of the equity interests held by the Sellers that are Purchased Assets or if any secured creditor takes any adverse action (including, without limitation, the imposition of any non-consensual liens or security interests) with respect to any of the assets of any subsidiary, affiliate or other entity being acquired hereunder; (v) the Sellers consummate a Competing Transaction, or the Bankruptcy Court approves, or authorizes the Sellers or any of their affiliates to enter into, a Competing Transaction (other than a Competing Transaction with the winning bidder(s) at the auction for the Sale of the assets); and (vii) there shall be an Event of Default under the DIP Loan.

Further, and among other things, both the Buyer and/or Sellers can terminate the Stalking Horse APA if:  (i) the Closing has not occurred by October 2, 2015 (the "Outside Date"); (ii) there shall be a breach by the other party of any representation, warranty, covenant or obligation which would result in a failure of one or more of the Conditions Precedent and which breach cannot be cured or has not been cured by the earlier of (A) 20 calendar days after the giving of written notice by the Buyer or the Sellers, as applicable, and (B) the Outside Date; or (iii) the Bankruptcy Court enters an order appointing a trustee, examiner with expanded powers or responsible officer in the Bankruptcy Cases, (iv) the Bankruptcy Cases are converted to a case under chapter 7 of the Bankruptcy Code or (v) the Bankruptcy Cases are dismissed.

**Break-Up Fee, Buyer Expense Reimbursement Amount and Overbid Protection**:  Under the terms of the Stalking Horse APA, the Sellers will pay to the Buyer the Break-Up Fee in the amount of $3.75 million (i.e., 1.5% of the

Purchase Price) and Expense Reimbursement not to exceed $1 million if the Stalking Horse APA is terminated because the Bankruptcy Court has approved, or the Sellers have consummated, a Competing Transaction. In the event: (i) the Sellers voluntarily withdraw this Motion for any reason other than in connection with the Sellers' termination of the Purchase Agreement for an uncured material breach of the Purchase Agreement by the Buyer; or (ii) the Buyer terminates the Purchase Agreement as a result of the material uncured breach of the Purchase Agreement by the Sellers or any of them, then Sellers shall pay to Buyer the Break-Up Fee <u>and</u> the Expense Reimbursement Amount, but only equal to Buyers' reasonable and documented out-of-pocket costs and expenses (including fees and expenses of counsel) incurred after the date hereof by Buyer in connection with the Stalking Horse APA. The Break-Up Fee and the Expense Reimbursement Amount shall have administrative expense priority obligations pursuant to section 364(c)(1) of the Bankruptcy Code with priority over all expenses of the kind specified in section 503(b) and 507(b) of the Bankruptcy Code.

**Releases**: None.

**Sale Free and Clear**: All Purchased Assets will be transferred to the Buyer, pursuant to section 363(f) of the Bankruptcy Code, free and clear of all claims, liens, encumbrances, interests and other restrictions of any kind or nature whatsoever, including, without limitation, any and all prepetition and postpetition adequate protection liens of the Sellers' prepetition lenders, in each case, as set forth in the Sale Order. Any such liens existing at the time of the consummation of the Proposed Transaction will attach to the sale proceeds according to their relative priorities.

**Record Retention**: None.

**No Successor Liability**: The terms of the proposed Sale Order provide that the Stalking Horse Bidder and its affiliates and their respective predecessors, successors, assigns, members, partners, principals, directors, officers, and shareholders (or equivalent) have no obligations with respect to any liabilities of the Debtors other than the Assumed Liabilities assumed under or pursuant to the Stalking Horse APA.

**Extraordinary Provisions Under the Court's Guidelines for the Conduct of Asset Sales**

12.    Pursuant to the Sale Guidelines, the Debtors are required to specify any provisions of the proposed Sale Order that may be considered Extraordinary Provisions under the Sale Guidelines. The Debtors will supplement this Motion with a listing of such provisions, if any, upon the filing of the Stalking Horse APA with the Court.

**The Bidding Procedures**

13.     The Bidding Procedures are designed to maximize value for the Debtors' estates and will enable the Debtors to review, analyze and compare all bids received to determine which bid or collection of bids is in the best interests of the Debtors' estates and creditors.  The Bidding Procedures describe, among other things, the procedures for parties to access due diligence, the manner in which bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of any auction, the selection and approval of any ultimately successful bidders and the deadlines with respect to the foregoing Bidding Procedures.  The Debtors submit that the Bidding Procedures afford the Debtors a sufficient opportunity to pursue a sale process that will maximize the value of their estates.

*__Assignment and Cure Procedures__*

14.     The Debtors propose the following procedures for notifying counterparties to executory contracts and unexpired leases of potential cure amounts in the event the Debtors decide to assume such contracts or leases and assign them to the eventual purchaser:

> **Notice of Assignment and Cure**:  On or before August 21, 2015, the Debtors will file a notice scheduling all of the contracts and leases proposed to be assumed and assigned pursuant to the Stalking Horse APA (the "**Assumed Contracts and Leases**").  On or before August 21, 2015, the Debtors will also serve each of the non-Debtor counterparties to the Assumed Contracts and Leases an individualized notice, the form of which is attached hereto as Exhibit C (the "**Notice of Assignment and Cure**"), by first class mail, that will include (i) the title of the Assumed Contracts and Leases to be assumed, (ii) the name of the counterparty to the Assumed Contracts and Leases, (iii) any applicable cure amounts, (iv) that the assignee is the Stalking Horse Bidder or its designee, or any other Successful Bidder(s), and (v) the deadline by which any such Assumed Contracts and Leases counterparty must object.

> **Assignment and Cure Objection Deadline**:  Any objections to the assumption and/or assignment of any Assumed Contracts and Leases identified on a Notice of Assignment and Cure, including to the cure amount set forth on such notice, must be in writing, filed with the Court, and be actually received by the Notice Parties **no later than fourteen (14) days after such Notice of Assignment and Cure is mailed to the affected party**, as indicated by the date noted on such Notice of

Assignment and Cure (the "**Assignment and Cure Objection Deadline**"), and must set forth a specific default under the Assumed Contracts and Leases and claim a specific monetary amount that differs from the amount, if any, specified by the Debtors in such Notice of Assignment and Cure.

**Resolution of Objections to Assumption and/or Assignment of Assumed Contracts and Leases**:  If no objection is received by the Assignment and Cure Objection Deadline, then the assumption and assignment of the applicable Assumed Contract or Lease is authorized pursuant to section 365 of the Bankruptcy Code and the cure amounts, if any, set forth on the Notice of Assignment and Cure will be binding upon the non-Debtor party to the Assumed Contracts and Leases for all purposes and will constitute a final determination of total cure amounts required to be paid to the Assumed Contracts and Leases counterparty in connection with any potential assignment of such Assumed Contracts and Leases to the Successful Bidder(s).  In addition, each non-Debtor party to such Assumed Contracts and Leases will be forever barred from objecting to the assumption and assignment of such contract or lease or the cure information set forth in the Notice of Assignment and Cure, including, without limitation, the right to assert any additional cure or other amounts with respect to the Assumed Contracts and Leases arising or relating to any period prior to such assumption or assignment.  Furthermore, if no timely objection is received by the Assignment and Cure Objection Deadline, the Stalking Horse Bidder (or Successful Bidder(s), if applicable) will enjoy all of the rights and benefits under all Assumed Contracts and Leases acquired under the Stalking Horse APA (or such other purchase agreement of an alternative Successful Bidder(s), if applicable), without the necessity of obtaining any party's written consent to the Debtors' assumption and assignment of such rights and benefits, and each such party will be deemed to have waived any right to object to, contest, condition or otherwise restrict any such assumption and assignment.

*Sale Notice*

15.    Within four days after entry of the Bidding Procedures Order (the "**Mailing Deadline**"), the Debtors (or their agents) shall:

(a)    serve the Sale Notice, the form of which is attached hereto as <u>Exhibit D</u>, on (a) the Office of the United States Trustee for the Southern District of New York; (b) all applicable state and local taxing authorities; (c) the Internal Revenue Service; (d) the Securities & Exchange Commission; (e) the United States Attorney General/Antitrust Division of Department of Justice; (f) each of the non-Debtor counterparties to the Assumed Contracts and Leases; (g) counsel to the Stalking Horse Bidder; and (h) all entities who are known to possess or assert a claim against the Debtors (collectively, the "**Notice Parties**"); and

(b)    on or about the same date, the Debtors will publish the Sale Notice once in the National Edition of *The Wall Street Journal*.

16.    Within one (1) business day after the conclusion of the Auction, the Debtors will file a notice (i) identifying the Successful Bidder(s) and (ii) providing adequate assurance materials demonstrating the ability of the Successful Bidder(s) to perform under the Assumed Contracts and Leases (the "**Notice Of Successful Bidder**").

17.    The Debtors submit that the proposed Notice of Assignment and Cure, the Sale Notice and the Notice of Successful Bidder, and providing notice of this Motion, the Auction and the Sale Hearing as described herein, complies fully with Bankruptcy Rule 2002 and constitutes good and adequate notice of the Sale Transaction and the proceedings with respect thereto. Therefore, the Debtors respectfully request that this Court approve the form of the Sale Notice and the notice procedures proposed above.

<u>**Legal Basis for Relief Requested**</u>

**The Bidding Procedures Are Fair, Appropriate and Are**
<u>**Designed to Maximize the Value Received for the Purchased Assets**</u>

18.    Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The Debtors submit that the Bidding Procedures are appropriate, consistent with procedures routinely approved by courts in this district, ensure that the bidding process is fair and reasonable and will yield the maximum value for their estates and creditors. The Bidding Procedures proposed herein are designed to maximize the value received for the Purchased Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids. The Bidding Procedures provide potential bidders with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid. Thus, the Debtors and all parties in interest can be assured that the consideration for the Purchased Assets will be fair and reasonable. At the same time, the

Bidding Procedures provide the Debtors with an adequate opportunity to consider all competing offers and to select, in their reasonable business judgment, the highest and best offer for the Purchased Assets. Accordingly, the Debtors submit that the Court should approve the Bidding Procedures.

**The Break-Up Fee and Expense Reimbursement**
**Amount Have Sound Business Purpose and Should Be Approved**

19.  The terms of the Stalking Horse APA provide for the Stalking Horse Protection in an amount not to exceed $4.75 million, which will be paid to the Stalking Horse Bidder upon the entry of an order approving, or the consummation of, an Alternative Transaction. The Debtors believe that the Stalking Horse Protection was necessary for the Stalking Horse Bidder to agree to enter into the Stalking Horse APA. In addition, the Debtors believe that the presence of the Stalking Horse Bidder will set a floor for the value of the Purchased Assets and attract other potential buyers to bid for the Purchased Assets, thereby maximizing the realizable value of the Purchased Assets for the benefit of the Debtors' estates, creditors and other parties-in-interest.

20.  The proposed Stalking Horse Protection is appropriate and should be approved. Courts in this district have recognized that bid protections may be used to protect bidders in connection with a sale of assets pursuant to section 363 of the Bankruptcy Code and that such fees can be "important tools to encourage bidding and to maximize the value of the debtor's assets." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992, *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). Such protections enable a debtor to assure a sale to a contractually-committed bidder at a price the debtor believes is fair and reasonable, while providing the debtor with the opportunity of obtaining even greater benefits for the estate through an auction process. *See In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be

"legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted).

21.    The Stalking Horse Protection is reasonable and appropriate in light of the size and nature of the transaction and the efforts that have been and will be expended by the Stalking Horse Bidder.  Moreover, the Stalking Horse Protection is actually necessary to preserve the value of the estate.  First, the Stalking Horse Protection represents no more than approximately 1.5% of the estimated purchase price for the Debtors' assets plus payment of reasonable expenses capped at $1,000,000.  Additionally, the Stalking Horse Protection was heavily negotiated in good faith and was necessary to secure the Stalking Horse Bidder's commitment to purchase the Debtors' assets.  In sum, the Debtors' ability to offer the Stalking Horse Protection enables them to ensure the sale of the Purchased Assets at a price they believe to be fair while, at the same time, providing them with the potential of even greater benefit to the estates.

22.    This Court has approved protections similar to the proposed Stalking Horse Protection as reasonable and consistent with the type and range of bidding protections typically approved, and also has granted superpriority administrative expense status to breakup fees that become due under the terms of a stalking horse purchase agreement.  *See, e.g., In re D.A.B. Grp., LLC*, Case No. 14-12057 (SCC) (Bankr. S.D.N.Y. Dec. 18, 2014) (approving bidder protections of approximately 3% of the purchase price); *In re Choice Building Supplies of Westchester Co. Inc.*, Case No. 13-23859 (RDD) (Bankr. S.D.N.Y. May 5, 2014) (approving bidder protections of approximately 3.64% of the purchase price); *In re HMX Acquisition Corp.*, Case No. 12-14300 (ALG) (Bankr. S.D.N.Y. Nov. 29, 2012) (approving bidder protections of approximately 3.46% of the purchase price); *In re Bos. Generating, LLC*, Case No. 10-14419 (SCC) (Bankr. S.D.N.Y.

-13-

Oct. 12, 2010) (approving bidder protections totaling approximately 3.18% of the purchase price).

23.     The Stalking Horse Bidder requires the Stalking Horse Bid Protection as a precondition to entering into the Stalking Horse APA, and the Debtors have determined the inclusion of Stalking Horse Bid Protection into the Stalking Horse APA is absolutely necessary to successfully pursue the sale transaction and maximize recoveries for the Debtors' estates. Accordingly, the Debtors submit that the Stalking Horse Protection reflects a sound business purpose, is fair and appropriate under the circumstances, and the Debtors respectfully submit that the Stalking Horse Protection should be approved.

**Approval of the Sale Is Warranted Under Section 363 of the Bankruptcy Code**

24.     Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  A debtor must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business.  *See, e.g., Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *In re Phx. Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that judicial approval of a section 363 sale requires a showing that the proposed sale is fair and equitable, a good business reason exists for completing the sale and the transaction is conducted in good faith).

25.     The Debtors possess ample and sound business reasons for selling the Purchased Assets as set forth herein.  The Debtors capital structure was no longer sustainable and liquidity constraints have limited the Debtors' ability to continue as a going concern.  The proposed sale

provides the Debtors with a mechanism to avoid the further deterioration and ultimate loss of their going concern value.  In addition, the Debtors' marketing efforts and the Bidding Procedures will ensure the consideration the Debtors' receive for the Purchased Assets is fair. For these reasons, the Debtors have determined that a sale, conducted in accordance with the Bidding Procedures, is in the best interests of the Debtors' estates.

26.    The Debtors also meet the additional requirements necessary to approve a sale under section 363 of the Bankruptcy Code.  As stated herein, the Debtors will provide adequate notice of the Sale Transaction to interested parties, and the Debtors submit that the aforementioned notice procedures are reasonable and adequate under the circumstances.  In addition, the Debtors will continue to market the Purchased Assets up until the Bid Deadline in order to maximize the number of participants who may participate as buyer at the Auction. Accordingly, the Debtors are confident that their sale process will maximize the value to be achieved from the Sale Transaction and that the sale price is fair and reasonable.

27.    Finally, the Stalking Horse Bidder has proceeded in good faith.  Both the Debtors and the Stalking Horse Bidder were represented by sophisticated advisors in the arm's-length negotiations of the Stalking Horse APA.  As such, it is a valid exercise of the Debtors' business judgment to seek the relief requested by this Motion.

**The Proposed Sale Transaction Satisfies the**
**Requirements of Bankruptcy Code Section 363(f) for a Sale Free and Clear**

28.    The Debtors request approval to sell the Purchased Assets free and clear of any and all liens, claims, interests and encumbrances (except for Assumed Liabilities) in accordance with section 363(f) of the Bankruptcy Code.  Pursuant to section 363(f), a debtor in possession may sell estate property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

-15-

(a)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(b)     such entity consents;

(c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)     such interest is in bona fide dispute; or

(e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also Contrarian Funds, LLC v. Westpoint Stevens, Inc. (In re Westpoint Stevens, Inc.)*, 333 B.R. 30, 50 (S.D.N.Y. 2005) ("Where … a sale is to be free and clear of existing liens and interests other than those of the estate, one or more of the criteria specified in section 363(f) of the statute must also be met."), *rev'd in part on other grounds* 600 F.3d 231 (2d Cir. 2010).

29.     Section 363(f) is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a); *see Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

30.     The Debtors submit that the sale transaction will satisfy the requirements of section 363(f) of the Bankruptcy Code.  To the extent a party objects to the Sale Transaction on the basis that it holds a lien or encumbrance on the Purchased Assets, the Debtors believe that any such party could be compelled to accept a monetary satisfaction of such Claims or that such lien would be in bona fide dispute.  In addition, the Debtors will provide such party with notice

of, and an opportunity to object to, the Sale Transaction. Absent objection, each such party will be deemed to have consented to the sale of the Purchased Assets.

31.    Accordingly, the Debtors believe that the Sale Transaction (i) will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code and (ii) should be approved free and clear of all liens, claims, interests and encumbrances.

**A Successful Bidder Should Be
Entitled to the Protections of Bankruptcy Code Section 363(m).**

32.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). Although the Bankruptcy Code does not define "good faith," the Second Circuit Court of Appeals has held that the:

> [g]ood faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made. A purchaser's good faith is lost by "fraud, collusion between the purchaser and other bidders or the trustee," or an attempt to take grossly unfair advantage of other bidders.

*In re Gucci*, 126 F.3d 380, 390 (2d. Cir. 1997) (*quoting In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting Bankruptcy Rule 805, the precursor to section 363(m) of the Bankruptcy Code)); *see also Bace v. Babbitt*, Case No. 07 Civ. 2420 (WHP), 2008 WL 800579, at *3 (S.D.N.Y. Mar. 25, 2008) (same) (*quoting Gucci*, 126 F.3d at 390); In re *Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same) (*quoting Tompkins v. Frey (In re Bel Air Assocs., Ltd.*), 706 F.2d 301, 305 (10th Cir. 1983).

-17-

33.     In other words, a party would have to show fraud or collusion between the buyer
and the debtor in possession or trustee or other bidders in order to demonstrate a lack of good
faith.  *See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.),*
111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s
good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders
or the trustee, or an attempt to take grossly unfair advantage of other bidders"); see *also In re
Angelika Films, 57th, Inc.*, 1997 WL 283412, *7 (S.D.N.Y. 1997); *In re Balcalis*, 220 B.R. 525,
537 (Bankr. E.D.N.Y. 1998).   Due to the absence of a bright line test for good faith, the
determination is based on the facts of each case, concentrating on the "integrity of [an actor's]
conduct in the course of the sale proceedings."  *In re Pisces Leasing Corp.,* 66 B.R. 671, 673
(E.D.N.Y. 1986) (*quoting In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1998 (7th Cir. 1978)).

34.     The Debtors submit the Stalking Horse Bidder, or other successful bidder arising
from the Auction, is, or would be, a "good faith purchaser" within the meaning of section 363(m)
of the Bankruptcy Code.  The terms of the Stalking Horse APA, or any marked version thereof,
is, or would be, a good faith agreement on arm's-length terms.  The consideration to be received
by the Debtors pursuant to the Stalking Horse APA is substantial, fair, and reasonable.
Additionally, the parties will enter into the Stalking Horse APA in good faith and after extensive,
arm's-length negotiations, during which both parties will be represented by competent counsel of
similar bargaining positions.

35.     There is no indication of any "fraud, collusion between the purchaser and other
bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar
conduct that would cause or permit the Sale Transaction or Stalking Horse APA to be avoided
under section 363(n) of the Bankruptcy Code.  Finally, the Stalking Horse Bidder's offer was

-18-

evaluated and approved by the board in consultation with the Debtors' professionals. Accordingly, the Debtors believe that the Stalking Horse Bidder (or other successful bidder) and Stalking Horse APA (or other purchase agreement) should be entitled to the full protections of Section 363(m) of the Bankruptcy Code.

**Assumption and Assignment of Executory**
**Contracts and Unexpired Leases Should Be Authorized**

36.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g., Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (noting that section 365 of the Bankruptcy Code "permits the trustee or debtor-in-possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts of the debtor and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject").

37.     The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).  Any more exacting scrutiny would slow the administration of the debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.  *See Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to

-19-

assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for "actual pecuniary loss" relating to such default. 11 U.S.C. 365(b)(1).

38.    Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract.  Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case. Adequate assurance may be provided, among other means, by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that adequate assurance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of success).

39.    The Debtors request approval under Bankruptcy Code section 365 of the Debtors' assumption and assignment of the Assumed Contracts and Leases to the Stalking Horse Bidder or the Successful Bidder(s).  The Debtors further request that the Sale Order provide that the Assumed Contracts and Leases will be transferred to, and remain in full force and effect for the benefit of, the Stalking Horse Bidder or the Successful Bidder(s) notwithstanding any provisions in the Assumed Contracts and Leases, including those described in Bankruptcy Code sections 365(b)(2) and (f)(1) and (f)(3) that prohibit such assignment.

40.    To the extent necessary, the Debtors will present facts at the Sale Hearing to show the financial wherewithal, willingness, and ability of the Stalking Horse Bidder or the Successful

-20-

Bidder(s) to perform under the Assumed Contracts and Leases. The Sale Hearing will afford the Court and other interested parties the opportunity to evaluate the ability of the Stalking Horse Bidder or the Successful Bidder(s) to provide adequate assurance of future performance under the Assumed Contracts and Leases, as required under Bankruptcy Code section 365(b)(1)(C).

41.     Further, as set forth above, the Debtors will give notice to all parties to the Assumed Contracts and Leases. This notice will include the amounts the Debtors believe are necessary to cure any defaults in accordance with section 365(b) of the Bankruptcy Code. Accordingly, the Debtors submit that implementation of the proposed Assignment Procedures is appropriate in these cases.

**Requests for Immediate Relief & Waiver of Stay**

42.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtors request that the Bidding Procedures Order and Sale Order(s) be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

43.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. _See_ Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen (14) day stay period, Collier on Bankruptcy suggests that the fourteen (14) day stay period should be eliminated to allow a sale

-21-

or other transaction to close immediately "where there has been no objection to the procedure."
10 Collier on Bankruptcy, ¶6004.11 (L. King, 16th rev. ed. 2011).  Furthermore, Collier's
provides that if an objection is filed and overruled, and the objecting party informs the court of
its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such
appeal. Id.

44.    Accordingly, the Debtors hereby request that the Court waive the fourteen-day
stay period under Bankruptcy Rules 6004(h) and 6006(d).

**Notice**

45.    Notice of this Motion shall be provided to:  (i) the Office of the United States
Trustee for the Southern District of New York; (ii) the entities listed on the Consolidated List of
Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d);
(iii) counsel to the Stalking Horse Bidder; (iv) counsel to the Debtors' prepetition and
postpetition lenders, and (v) all parties entitled to notice pursuant to Bankruptcy Rule 2002.  The
Debtors have also provided notice in accordance with the Sale Guidelines, to (a) entities known
or reasonably believed to have expressed an interest in acquiring any of the assets offered for
sale via overnight mail and (b) all parties who are known to claim interests in or liens upon the
Purchased Assets via overnight mail.  The Debtors submit that no other or further notice need be
provided.

**No Prior Request**

46.    No prior request for the relief sought in this Motion has been made to this or any
other Court in connection with these chapter 11 cases.

WHEREFORE, the Debtors respectfully request that the Court:  (a) enter the

Bidding Procedures Order in substantially the form attached hereto as Exhibit A; (b) enter a Sale

Order in a form to be submitted prior to the Bidding Procedures Hearing, authorizing the sale of

the Purchased Assets to the Stalking Horse Bidder or another Successful Bidder(s) at the

Auction; and (c) grant such other and further relief to the Debtors as the Court may deem proper.


Dated: July 30, 2015
   New York, New York     **JONES DAY**

            By:  */s/ Richard L. Wynne*     
            Richard L. Wynne, Esq.
            Bennett L. Spiegel, Esq.
            Lori Sinanyan, Esq. (*pro hac vice* pending)
            222 East 41st Street
            New York, NY 10017
            Tel:  (212) 326-3939
            Fax: (212) 755-7306
            E-mail: rlwynne@jonesday.com
              blspiegel@jonesday.com
              lsinanyan@jonesday.com

            -and-

            **SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
            Craig A. Wolfe, Esq.
            Malani J. Cademartori, Esq.
            Blanka K. Wolfe, Esq.
            30 Rockefeller Plaza
            New York, New York 10112
            Tel: (212) 653-8700
            Fax: (212) 653-8701
            E-mail: cwolfe@sheppardmullin.com
              mcademartori@sheppardmullin.com
              bwolfe@sheppardmullin.com

            *Proposed Co-Counsel to the Debtors and Debtors*
            *in Possession*