**GIBSON, DUNN & CRUTCHER LLP**
J. Eric Wise
Shira D. Weiner
200 Park Avenue
New York, New York 10166
Tel:  (212) 351-4000
Fax:  (212) 351-4035

- and -

Samuel A. Newman (admitted *pro hac vice*)
Daniel B. Denny (admitted *pro hac vice*)
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel.  (213) 229-7000
Fax.  (213) 229-7520

ATTORNEYS FOR MACQUARIE INVESTMENTS US INC.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RELATIVITY FASHION, LLC, *et al.* | Case No. 15-11989 (MEW) |
| Debtors. | (Jointly Administered) |

**OMNIBUS OBJECTION AND RESERVATION OF RIGHTS OF MACQUARIE
INVESTMENTS US INC. TO (i) DEBTORS' MOTION FOR (I) AN ORDER (A)
ESTABLISHING BID PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF
THE DEBTORS' ASSETS, (B) APPROVING STALKING HORSE APA AND BIDDING
PROTECTIONS, AND (C) GRANTING CERTAIN RELATED RELIEF AND (II) AN
ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS'
ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER
INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO, AND
(C) GRANTING CERTAIN RELATED RELIEF, (ii) DEBTORS' MOTION FOR ENTRY
OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A)
OBTAIN POST-PETITION FINANCING AND (B) USE CASH COLLATERAL; (II)
GRANTING THE PREPETITION LENDERS ADEQUATE PROTECTION; (III)
SCHEDULING A FINAL HEARING; AND (IV) GRANTING RELATED RELIEF, AND
(iii) DEBTORS' MOTION FOR ENTRY OF AN ORDER
AUTHORIZING THEM TO FILE DIP FEE LETTER UNDER SEAL**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................... 2

BACKGROUND .................................................................................................. 4

ARGUMENT ...................................................................................................... 6

    A.    The Debtors' Proposed Bid Procedures Should Not Be Approved. ...................... 6

        i.    The Sale Timeline and Piecemeal Auction Proposed by the
            Debtors Is Unfair and Unreasonable.......................................................... 7

        ii.    The Stalking Horse APA Fails to Provide an Adequate Benchmark
            For the Sale of the Debtors' Assets and Will Likely Chill the
            Bidding Process. ..................................................................................... 8

        iii.    The Stalking Horse Protections Should Not Be Approved...................... 14

    B.    Additional Provisions in the Bid Procedures Will Thwart a Robust and
        Competitive Bidding Process And Should Not Be Approved. ............................ 15

    C.    The DIP Motion Should Not Be Approved to The Extent the Sale
        Timeline and Terms of the Sale Process are Incorporated Into the DIP
        Loan Agreement................................................................................................ 17

    D.    Deficiencies in the Proposed Sale Order Further Undermine the Adequacy
        of the Stalking Horse APA and Macquarie Reserves Its Rights to Further
        Object to the Sale Order.................................................................................... 18

CONCLUSION.................................................................................................... 20

# TABLE OF AUTHORITIES

<u>**Page**</u>

**Cases**

*AGV Productions, Inc. v. Metro-Goldwyn Mayer, Inc.*,
  115 F. Supp. 2d 378 (S.D.N.Y. 2000) ...................................................................... 12

*Empire State Bldg. Co. v. New York Skyline, Inc. (In re New York Skyline, Inc.)*,
  432 B.R. 66 (Bankr. S.D.N.Y. 2010) ...................................................................... 12

*In re Adelphia Bus. Solutions, Inc.*,
  322 B.R. 51 (Bankr. S.D.N.Y. 2005) ...................................................................... 12

*In re Buffets Holdings, Inc.*,
  387 B.R. 115 (Bankr. D. Del. 2008) ........................................................................ 12

*In re Edwards*,
  228 B.R. 552 (Bankr. E.D. Pa. 1998) ....................................................................... 6

*In re Hawker Beechcraft Inc.*,
  2013 WL 2663193 (Bankr. S.D.N.Y. June 13, 2013) ............................................ 12

*In re Integrated Resources*,
  147 B.R. 650 (Bankr. S.D.N.Y. 1992) .................................................................... 16

*In re Metaldyne Corp.*,
  409 B.R. 661 (Bankr. S.D.N.Y. 2009) .................................................................... 15

*In re Oklahoma Trash Control, Inc.*,
  258 B.R. 461 (Bankr. N.D. Okla. 2001) ................................................................. 12

*In re Plitt Amusement Co. of Washington, Inc.*,
  233 B.R. 837 (Bankr. C.D. Cal. 1999) ................................................................... 13

*In re The Standard Register Co.*,
  No. 15-10541 (BLS) (Bankr. D. Del. Apr. 15, 2015) ............................................ 15

*Moore v. Pollock (In re Pollock)*,
  139 B.R. 938 (B.A.P. 9th Cir. 1992) ...................................................................... 13

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
  478 F.3d 452 (2d Cir. 2007) ................................................................................... 20

*Siddiqui v. Gardner (In re Williamson)*,
  327 B.R. 578 (Bankr. E.D. Va. 2005) ...................................................................... 7

Macquarie Investments US Inc. ("***Macquarie***"), as lender under that certain Second Amended and Restated Funding Agreement, dated as of June 30, 2014 (as amended, the "***Funding Agreement***"), by and through its undersigned counsel, hereby files this omnibus objection and reservation of rights (the "***Objection***") to the (i) *Debtors' Motion For (I) An Order (A) Establishing Bid Procedures For the Sale of Substantially All of the Debtors' Assets, (B) Approving Stalking Horse APA and Bidding Protections, and (C) Granting Certain Related Relief; and (II) An Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Certain Related Relief* [Dkt. No. 25] (the "***Original Bid Procedures Motion***"), as amended by the *Notice of Filing Exhibits to Debtors' Motion For (I) An Order (A) Establishing Bid Procedures For the Sale of Substantially All of the Debtors' Assets, (B) Approving Stalking Horse APA and Bidding Protections, and (C) Granting Certain Related Relief; and (II) An Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Certain Related Relief* [Dkt. No. 122] (the "***Bid Procedures Amendment***", and, together with the Original Bid Procedures Motion, the "***Bid Procedures Motion***")[1], (ii) *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing and (B) Use Cash Collateral; (II) Granting the Prepetition Lenders Adequate Protection; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* [Dkt. No. 23] (the "***DIP***

---

[1]  Capitalized terms not otherwise defined in this Objection shall have the meanings ascribed to them in the Bid Procedures Motion.

*Motion*"), and (iii) *Debtors' Motion for Entry of an Order Authorizing Them to File DIP Fee Letter Under Seal* [Dkt. No. 116] (the "***Seal Motion***").  In support of its Objection, Macquarie states the following:

## PRELIMINARY STATEMENT

1.    On shortened notice,[2] and at the behest of their DIP Lenders, who are also serving as the Stalking Horse Bidder, the Debtors have requested that the Court approve bidding procedures and ultimately the purported sale of "all or substantially all" of their assets.  By the Debtors' own admission, this "streamlined and expeditious auction and sale process" is being forced upon them by the DIP Lenders/Stalking Horse Bidder.  Motion to Shorten ¶¶ 6, 9.  The only parties to benefit from this accelerated timeline are the DIP Lenders/Stalking Horse Bidder, each of whom is attempting to run away with valuable assets of the Debtors' estates – not on a going concern basis, but on a cherry-picked, piecemeal basis.

2.    Despite the Debtors' assertions in Court and in the Bid Procedures Motion (including the Stalking Horse Term Sheet annexed thereto) that they are selling "all or substantially all" of their assets, the Stalking Horse APA, which was entered on the docket after midnight on August 10, 2015, less than five days prior to the hearing on the Bid Procedures Motion, clearly contemplates a sale of less than the entire business of the Debtors.  Given this bait-and-switch and the "limited marketing" of their assets conducted by the Debtors prior to the commencement of these chapter 11 cases, it is not clear at this point what – if anything – has

---

[2]    *See Order* [Dkt. No. 81] *Granting the Debtors' Motion to Shorten Time for Notice of the Hearing to Consider the Debtors' Motion for (I) an Order Establishing Bid Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Approving Stalking Horse APA and Bidding Protections, and (C) Granting Certain Related Relief; and (II) An Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Certain Related Relief* (the "***Motion to Shorten***") [Dkt. No. 26].

been done to ensure that the bid submitted by the Stalking Horse Bidder is the appropriate floor

for an auction process.  In order to ensure that the Debtors will obtain the greatest value for their

assets, the Debtors must conduct a customary bankruptcy auction process over a longer period of

time.  The timeline proposed in the Bid Procedures Motion and required under the DIP Motion

cannot be approved.

3.    Additionally, given the dual identity of the Stalking Horse Bidder and the DIP

Lender, the break-up fee and expense reimbursement are excessive and should not be approved.

The Stalking Horse Bidder is already being compensated for its financing efforts through

payment of fees relating to the DIP Facility.  The Stalking Horse Protections are "double

dipping" at the expense of the estate and should not be permitted.  Further, the Debtors should

not be permitted to file the DIP Fee Letter under seal.  Without understanding the fees, creditors

do not have the opportunity to evaluate their reasonableness.  The limited visibility into the

aggregate fees being paid to the DIP Lenders is a sufficient reason to deny approval of the

Stalking Horse Protections.

4.    Contrary to the Debtors' assertions, the Purchased Assets include P&A Collateral

consisting of, *inter alia*, rights related to certain executory contracts that govern the distribution

of the Post-Release P&A Films as a whole (the "***Domestic Distribution Agreements***").  As a

holder of first-priority liens on such assets (to the extent relating to the Post-Release P&A

Films), Macquarie does not consent to the sale of these assets free and clear of its liens.  In any

event, in addition to the restrictions prescribed by section 363(f) of the Bankruptcy Code, in

accordance with the Intercreditor Agreements, any sale of these assets must include sufficient

cash to satisfy in full *all* of the obligations due and owing to Macquarie as required by the

Intercreditor Agreements.  Specifically, the P&A Intercreditor Agreement provides that any

creditor may bid for and purchase "any Collateral at any private or judicial foreclosure upon such Collateral initiated by a Senior Creditor; provided, that *such bid may not include a 'credit bid' in respect of <u>any</u> Subordinated Obligations <u>unless the proceeds of such bid are otherwise sufficient to cause the Senior Obligations to be Paid in Full</u>.*" (P&A Intercreditor Agreement, Section 5(i)(iii)) (emphasis added).  Moreover, the DIP Facility by its terms and by the terms of the Interim DIP Order (as hereinafter defined) does not prime P&A Collateral and cannot, therefore, be used to credit bid for P&A Collateral.  Additionally, each Domestic Distribution Agreement is an executory contract that must be assumed and assigned in its entirety – the Debtors cannot partially assume and assign the Domestic Distribution Agreements separate from the obligations and benefits related to the licensed distribution of the Post-Release P&A Films.

5.     Furthermore, Macquarie reserves its rights to object to the proposed Sale Order approving the sale of the Purchased Assets to the Stalking Horse Bidder.  As a matter of contract and the Bankruptcy Code, the Debtors may not sell Macquarie's assets free and clear of the Macquarie Interests (as hereinafter defined), they cannot partially assume and assign the Domestic Distribution Agreements to the Buyer, and the transaction contemplated by the Stalking Horse APA amounts to a *sub rosa* plan to the prejudice of the Debtors' creditors and the estates.

## BACKGROUND

6.     On July 30, 2015 (the "***Petition Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***").

7.     Prior to the Petition Date, certain of RML's subsidiaries (together with additional affiliate borrowers, the "***P&A Borrowers***") together with RML Distribution Domestic, LLC ("***RMLDD***") and RMLDD Financing, LLC ("***RMLDD Financing***" and, together with the P&A

4

Borrowers and RMLDD, the "**P&A Obligors**"), as accommodation pledgors, entered into

Relativity's current print and advertising ("**P&A**") financing facility, the Funding Agreement.

The loans under the Funding Agreement are divided into two types: (i) specific loans each made

in connection with an individual film prior to its theatrical release (the "**Pre-Release P&A**

**Loans**"); and (ii) specific loans each made in connection with an individual film in the calendar

week following the theatrical release of a film (the "**Post-Release P&A Loans**," and together

with the Pre-Release P&A Loans, the "**P&A Facility**").

    8.    As of the Petition Date, there are three outstanding Post-Release P&A Loans (the

"**Outstanding Post-Release P&A Loans**"):

| Post-Release P&A Borrower[3] | P&A Picture | Outstanding Balance as of the Petition Date[4] |
|---|---|---|
| RML WIB Films, LLC | "The Woman in Black 2: Angel of Death" | $18,879,520.05 |
| RML Lazarus Films, LLC | "The Lazarus Effect" | $10,421,601.67 |
| Blackbird Productions, LLC | "Beyond the Lights" | $3,123,157.81 |
| *TOTAL*: | | *$32,424,279.53* |

    9.    Pursuant to the Funding Agreement and other Loan Documents (as defined in the

Funding Agreement), Macquarie holds interests in the Debtors' property, including without

limitation perfected first priority security interests, rights of setoff and rights of recoupment (the

"**Macquarie Interests**"). The Macquarie Interests include a security interest in the Debtors'

domestic distribution agreements as each relates to the P&A Picture of each Post-Release P&A

Borrower, which, among others, include (i) that certain License Agreement for Internet

Transmission between Netflix, Inc. and Relativity Media, LLC, dated June 1, 2010 (as amended,

---

[3]   RML WIB Films, LLC, RML Lazarus Films, LLC, Blackbird Productions, LLC, RMLDD and RMLDD Financing (collectively, the "**Post-Release P&A Obligors**") are each Debtors in the above-captioned case.

[4]   Macquarie reserves all rights with respect to accrued interest, legal fees, costs, expenses and other obligations of the P&A Obligors under the Funding Agreement and related loan documents.

the "*Netflix Agreement*), (ii) that certain Home Video Rights Acquisition Agreement, dated

July 1, 2015, between Twentieth Century Fox Home Entertainment LLC and RMLDD (the "*Fox

Agreement*"), and (iii) that certain Digital Video Distribution Agreement between RMLDD and

Apple, Inc. (as amended, the "*iTunes Contract*," and together with the Netflix Contract and the

Fox Contract, the "*Netflix-Fox-iTunes Distribution Agreements*").

10.    Furthermore, the Agent for the P&A Lenders under the Funding Agreement entered

into various intercreditor agreements and side letters with other lenders of the Debtors regarding

each lender's priority in assets securing the obligations of various Relativity-affiliate borrowers.

Pursuant to the Intercreditor Agreements, a lender with a junior lien in the Macquarie Interests

may not credit bid with respect to any of the collateral securing any Outstanding Post-Release

P&A Loan unless the net proceeds of such credit bid are sufficient to repay in full the then

outstanding amount of the obligations owing to Macquarie on account of the Outstanding Post-

Release P&A Loans.

11.    On the Petition Date, the Debtors filed the Original Bid Procedures Motion

purportedly seeking authority to sell substantially all of the Debtors' assets and proposing RM

Bidder LLC, an entity formed and owned by certain of the Debtors' prepetition secured lenders

(not including Macquarie), as the Stalking Horse Bidder.  On August 10, 2015, the Debtors filed

their Bid Procedures Amendment, which significantly revised the Bid Procedures and disclosed

the actual terms of the Stalking Horse APA as described in more detail below.

## ARGUMENT

A.    **The Debtors' Proposed Bid Procedures Should Not Be Approved.**

12.    "The purpose of procedural bidding orders is to facilitate an open and fair public sale

designed to maximize value for the estate."  *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa.

1998); *see also Siddiqui v. Gardner (In re Williamson)*, 327 B.R. 578, 581 (Bankr. E.D. Va.

2005) ("This is accomplished, in part, by assuring that the marketing is full, fair and complete and that all prospective purchasers have a fair opportunity to participate in the process.").

    i.    **The Sale Timeline and Piecemeal Auction Proposed by the Debtors Is Unfair and Unreasonable.**

13. The Debtors filed the Original Bid Procedures Motion seeking entry of an order, among other things, approving the sale of "substantially all of the Debtors' assets" – specifically, the sale of "all of the assets of the Sellers' assets used or held for use in the Sellers' TV, film and distribution businesses (including its interest in the RED and Sky Land ventures)" other than the Excluded Assets. Original Bid Procedures Motion ¶ 11. The Original Bid Procedures Motion contained a high-level "Summary of Acquisition Terms and Conditions" that appeared to establish a floor for the sale of substantially all of the Debtors' assets for the purported purchase price of $250 million. However, the recently filed Stalking Horse APA significantly deviates from what was promised at the first-day hearing and in the Original Bid Procedures Motion. What was originally advertised as a sale of "substantially all of the Debtors' assets" is now a piecemeal and cherry-picked sale of certain of the Debtors' assets.

14. At the first day hearing in this case, when all parties were under the impression that the Stalking Horse APA was a bid for all the assets, the Court expressed its concern that there would not be sufficient time to conduct an auction process designed to maximize value. *See* Hr'g Tr. 38:9-11, July 31, 2015 ("I will not tie my hands with deadlines that will not allow me to have an appropriate sale process."). The Court noted that it "[had] no idea what's been done, whether data rooms have been put together, whether that is a sufficient period. It is awfully short . . . ." Hr'g Tr. 19:24-25, 20:1. We now know the answer to these questions, which is even less comforting: little has been done, and the period is grossly insufficient.

15.   In fact, the Debtors conducted "limited marketing prior to the commencement of these cases" and "the Debtors did not market substantially all of their assets prior to the commencement of these cases other than *de minimis* asset sales."  Declaration of C.J. Brown, ¶ 12, Aug. 10, 2015 [Dkt. No. 130] (hereafter the "***Brown Declaration***").  Moreover, the Debtors had no formal asset purchase agreement when they filed the Original Bid Procedures Motion, and not until August 9, 2015, less than a week before the Bid Procedures hearing, did the Debtors manage to sign and file it with the Court.  Brown Declaration ¶ 11.

16.   The Debtors' assertion that that this compressed time frame was necessary to "quickly and efficiently sell the Relativity enterprise while it still has realizable value and can be maintained as a going concern" has not been supported by any evidence, and the Stalking Horse APA does not contemplate a sale of "the Relativity enterprise."  Original Bid Procedures Motion ¶ 9.  Given the haste with which this purported auction process has been assembled, and now with the recently disclosed Stalking Horse APA, the proposed sale timeline is inadequate and will chill the bidding process to the detriment of all creditors.  The Bid Procedures Motion should therefore not be approved.

ii.     **The Stalking Horse APA Fails to Provide an Adequate Benchmark For the Sale of the Debtors' Assets and Will Likely Chill the Bidding Process.**

17.   The Stalking Horse APA and the Bid Procedures – separately and taken together – are highly confusing, incomplete, replete with inconsistencies, and unlikely to result in the Debtors obtaining the greatest value for their assets.  To the contrary, they are, quite obviously, designed to provide the Stalking Horse Bidder the highest value.

18.   The Stalking Horse APA, which purports to be a sale of "substantially all" of the Debtors' assets, describes the "Purchased Assets" to include "all of the Sellers' business, assets, properties, contractual rights, goodwill, going concern value, rights and claims used or held for

8

use in the Business (other than the Excluded Assets) as of the Closing." Stalking Horse APA,

Section 2.1(b). The revised Bid Procedures, in contrast, call for an auction of all or substantially

all of the Debtors' assets in one or more lots (defined as the "Acquired Assets") irrespective of

the Stalking Horse APA and provides no clear direction for how prospective bidders – or the

Debtors – can evaluate a bid for one or more lots against the Stalking Horse APA.

19.    Additionally, the Debtors' financial advisors have stated that they will provide

"access to a data room of confidential information on the Purchased Assets to all Qualified

Bidders." Brown Declaration ¶ 13. This means the universe of information in the data room

would be incomplete – apparently only information regarding the Purchased Assets, not the

Excluded Assets or possibly other lots of the Acquired Assets, is available for potential bidders.

If this sale process is truly meant to accommodate piecemeal sales, the data room must contain

information with respect to all of the Debtors' assets, including the Excluded Assets.

20.    Accordingly, the Stalking Horse APA, taken together with the Bid Procedures, is

likely to confuse potential bidders and, at the very least, chill the bidding process. Potential

bidders must be provided sufficient time to conduct due diligence with respect to the revised

structure of the sale, and the Debtors must revise the Bid Procedures to clarify how the process

will actually work.

21.    The Stalking Horse APA is also an inadequate benchmark bid because it purports to

purchase assets in a manner that violates the rights of senior lenders in various respects. First,

pursuant to the Intercreditor Agreements, in the event of a sale of any collateral, a junior lender

is permitted to credit bid for senior lender collateral *only if* its bid includes a cash component

sufficient to satisfy *all* outstanding obligations of senior lenders in full. While the Stalking

Horse APA purports to include a cash component for the benefit of Senior Lenders sufficient to

cause the payment in full of the Senior Obligations under the Intercreditor Agreements, upon

further discussions with Debtors' counsel, this provision has been clarified to provide solely for

cash payments to the extent of certain purchased assets but not all collateral being purchased,

particularly the Domestic Distribution Agreements.  Intercreditor agreements are enforceable

subordination agreements pursuant to section 510(a) of the Bankruptcy Code.  Accordingly, to

the extent the Stalking Horse APA intends to include a credit bid for *any* P&A Collateral, *all* of

Macquarie's claims, which are Senior Obligations under the Intercreditor Agreements, must be

paid in full.  In addition, the DIP Facility by its terms, and by the terms of the interim order

approving the DIP Motion (the "***Interim DIP Order***"), does not prime the P&A Collateral.  As

such, the DIP Facility obligations cannot be used to credit bid any P&A Collateral.

22.   Second, the proposed sale order provides that the Debtors should be authorized to

sell the assets free and clear of the P&A Lenders' liens because the Buyer will not be purchasing

any of the P&A Collateral.  *See* Bid Procedures Amendment, Exhibit 1 (the "***Proposed Sale

Order***") ¶ Y.  This statement makes no sense,[5] but reconstructed to its likely meaning it is also

simply untrue.  Macquarie's collateral under the P&A Facility comprises, among other things, to

the extent relating to the Domestic Territory (as defined in the Funding Agreement), all rights,

title and interest in the films "Beyond the Lights", "Lazarus" (aka "The Lazarus Effect") and

"Woman in Black 2: Angel of Death" (collectively, the "***Post-Release P&A Films***").  Pursuant

to the Stalking Horse APA, the Buyer intends to purchase the film "Beyond the Lights" as well

---

[5]   Paragraph 14 of the Proposed Sale Order is equally confusing in that it provides "As of the Closing Date, the
Buyer shall be vested with all right, title, and interest of the Debtors to all assets that are collateral under the
P&A Facility and Production Loans free and clear of any and all Liens and Excluded Liabilities because the
Buyer is not purchasing any assets that are collateral for the P&A Facility and the Production Loans."  The
Buyer cannot be vested with all right, title and interest to the P&A Collateral if it is not purchasing such assets,
and to the extent it is buying such assets, it must pay for the assets and they cannot be sold free and clear of the
P&A Lenders' liens.

as all intellectual property and distribution rights attendant thereto.  Furthermore, the Buyer

intends to purchase "the Netflix receivable which has been represented as collateral for the

Ultimates facility," (Schedule 2.2(d) of the Stalking Horse APA), but the P&A Lenders have a

lien in the Netflix receivable, which is subordinate only to the Ultimates Facility, and a credit bid

for the Netflix receivable requires, under the terms of the Intercreditor Agreements, the payment

first of the Senior Obligations.

23.   Third, the Stalking Horse APA provides that the Debtors intend to assume and

assign to the Buyer the Domestic Distribution Agreements as part of the sale.  These agreements,

which are part of the P&A Collateral, are not severable and must be assumed and assigned in

their entirety or left behind.  Consequently, to the extent the Debtors intend to assume and assign

such Domestic Distribution Agreements to the Buyer as part of the Purchased Assets, (i) the

Purchased Assets must include the whole of the Domestic Distribution Agreements, including

that related to the Post-Release P&A Films representing the near entirety of the value of the Post-

Release P&A Films, and (ii) the Senior Obligations in respect thereof must be paid in full, in

cash, to Macquarie in accordance with the Intercreditor Agreements and the terms of the Stalking

Horse APA.  In addition, the DIP Lenders' loan, which does not prime the P&A Collateral by its

terms and the terms of the Interim DIP Order, cannot be used to credit bid such assets.

24.   A debtor cannot "assume parts of a single, indivisible agreement while rejecting

other parts.  It must assume or reject an[] indivisible agreement *in toto*."  *In re Hawker*

*Beechcraft Inc.*, Case No. 12-11873 (SMB), 2013 WL 2663193, at *3 (Bankr. S.D.N.Y. June 13,

2013) (internal citation omitted); *see also AGV Prods., Inc. v. Metro-Goldwyn Mayer, Inc.*, 115

F. Supp. 2d 378, 390-91 (S.D.N.Y. 2000) (holding that the Bankruptcy Code does not permit a

debtor to assume and assign only a portion of a contract).  It is well-settled that state law governs

the question whether an agreement is divisible or indivisible for the purposes of assumption and

rejection under section 365 of the Bankruptcy Code.  *Hawker Beechcraft*, 2013 WL 2663193 at

*3; *see, e.g.*, *Empire State Bldg. Co. v. New York Skyline, Inc. (In re New York Skyline, Inc.)*, 432

B.R. 66, 77 (Bankr. S.D.N.Y. 2010); *In re Buffets Holdings, Inc.*, 387 B.R. 115, 120 (Bankr. D.

Del. 2008); *In re Adelphia Bus. Solutions, Inc.*, 322 B.R. 51, 55 (Bankr. S.D.N.Y. 2005).

Furthermore, the Debtors have the ultimate burden of persuasion that an executory contract

meets all the requirements for assumption and assignment.  *See In re Oklahoma Trash Control,*

*Inc.*, 258 B.R. 461, 462 (Bankr. N.D. Okla. 2001).

25.    The P&A Collateral includes several Domestic Distribution Agreements relating to

the Post-Release P&A Films, including, *inter alia*, the Netflix-Fox-iTunes Distribution

Agreements,[6] each governed by the law of the state of California.  Under California law, the

question of whether multiple obligations in an agreement are severable is a question of the

parties' intent based upon the substance and language of the agreement at issue. *See Moore v.*

*Pollock (In re Pollock)*, 139 B.R. 938, 940 (B.A.P. 9th Cir. 1992); *In re Plitt Amusement Co. of*

*Washington, Inc.*, 233 B.R. 837, 843 (Bankr. C.D. Cal. 1999).  In determining whether

contractual provisions are severable, courts consider "(1) [w]hether the nature and purpose of the

obligations are different; (2) whether the consideration for the obligations is separate and

distinct; and (3) whether obligations of the parties are interrelated."  *Pollock*, 139 B.R. at 940-41.

26.    The substance and language of the Netflix-Fox-iTunes Distribution Agreements

clearly and unequivocally illustrate that the intent of the parties was to create one non-divisible

agreement covering a portfolio of films rather than a master agreement of several arrangements

---

[6]    As a result of the timing of the filing of these Chapter 11 Cases and the Bid Procedures Motion, Macquarie did
not have sufficient time to review all the Domestic Distribution Agreements.  The discussion contained in this
Objection is based on Macquarie's review of certain agreements and Macquarie reserves its rights to assert
similar arguments with respect to all other relevant agreements, as applicable.

for several films, and the obligations under the Post-Release P&A Films' Domestic Distribution Agreements are not divisible as to individual films thereunder.[7]

27.    In view of the foregoing, the Debtors cannot assume and assign the Domestic Distribution Agreements, which constitutes P&A Collateral to the extent they inseparably relate to the Post-Release P&A Films, without payment in full of the Senior Obligations related thereto. The economic value of the Post-Release P&A Films cannot be separated from the Domestic Distribution Agreements, i.e., the Debtors generate value by licensing the rights – often on an exclusive basis – to distribute and exploit the Post-Release P&A Films across various media and platforms. The Debtors leveraged their library of films to enter into the Domestic Distribution Agreements for the benefit of their portfolio of films. Accordingly, the Buyer must purchase the entirety of the Domestic Distribution Agreements and with it the value of the Domestic Distribution Agreements as they relate to all of the Post-Release P&A Films. The Debtors fail to provide a basis upon which, much less carry their burden of persuasion, for the assumption and assignment of the Domestic Distribution Agreements under the terms of the Stalking Horse APA.

28.    Finally, notwithstanding that the "Excluded Assets" include "Lazarus" or Woman in Black 2," Schedule 5.9 to the Stalking Horse APA, which lists all of the Intellectual Property that is included as "Purchased Intellectual Property," includes copyrights in all of the Post-Release P&A Films. The Intellectual Property relating to the Post-Release P&A Films is P&A Collateral. Accordingly, the Debtors may not sell these assets free and clear of Macquarie's

---

[7]    The Netflix-Fox-iTunes Distribution Agreements contain confidentiality provisions that limit Macquarie's ability to provide a more fulsome explanation of the non-severability of the agreements. To the extent the Court requires additional information with respect to these arguments, Macquarie will seek relief from the Court to file the relevant Netflix-Fox-iTunes Distribution Agreements, or portions thereof, under seal.

liens.  Moreover, given this inconsistency in the Stalking Horse APA, a potential bidder at the

Auction would likely be confused as to what assets they are agreeing to purchase.

  iii.  **The Stalking Horse Protections Should Not Be Approved.**

  29. In view of the limited marketing efforts for the Debtors' assets, it is clear that any

due diligence performed by the Stalking Horse Bidder was done in connection with its providing

financing as DIP Lender, and it is likely already receiving significant fees in connection

therewith.  Given the dual identity of the Stalking Horse Bidder and the DIP Lender, the break-

up fee and expense reimbursement are excessive and should not be approved.  *See In re The*

*Standard Register Co.*, No. 15-10541 (BLS) (Bankr. D. Del. Apr. 15, 2015) (order establishing

sale procedures) (declining to approve break-up fee or full amount of expense reimbursement

where stalking horse bidder was also a DIP lender).  Moreover, on August 7, 2015, the Debtors

filed the Seal Motion seeking authorization to file under seal a "DIP Fee Letter" which

"identifies the fees charged to the Debtors by the DIP Agent in connection with the DIP Credit

Agreement."  Seal Motion ¶ 17.  Absent visibility into the fees charged by the DIP Lender qua

DIP Lender, it is impossible to know whether the Stalking Horse Protections are reasonable.  For

these reasons, Macquarie hereby objects to the Seal Motion.

  30. Bidding protections such as breakup fees and expense reimbursement should be

reflective of the bidder's efforts in connection with the sale.  *See In re Metaldyne Corp.*, 409

B.R. 661, 670 (Bankr. S.D.N.Y. 2009) (bidder protections should only be granted "when a bidder

provides a floor for bidding by expending resources to conduct due diligence and allowing its bid

to be shopped around for a higher offer"); *In re Integrated Resources, Inc.*, 147 B.R. 650, 662

(S.D.N.Y. 1992) (break-up fee should "be reasonably related to the risk, effort, and expenses of

the prospective purchaser" and a "court should consider the prospective buyer's investment of

both time and money when determining whether a break-up fee is reasonable").  The Stalking

Horse Bidder is also a prepetition lender of the Debtors and therefore likely had conducted

significant due diligence in connection with such financing and was readily knowledgeable about

the Debtors' business.  In view of the foregoing, the proposed Stalking Horse Protections are

entirely unwarranted and should not be approved.

B.    **Additional Provisions in the Bid Procedures Will Thwart a Robust and Competitive Bidding Process And Should Not Be Approved.**

31.   The Bid Procedures are clearly not adequately developed for a full and robust

auction.  Set forth below is a summary of Macquarie's additional objections to the proposed Bid

Procedures:

| Bid Procedure | Objection |
|---|---|
| Section II.A. – "Participation Requirements – Interested Parties" | The Bid Procedures do not provide a specific deadline by which the Debtors will determine who is deemed to be a "Potential Bidder."  The Debtors should revise the Bid Procedures to provide such a deadline, and such deadline should provide sufficient time for any Potential Bidder to conduct the necessary due diligence to submit a Qualified Bid. |
| Section III – "Aggregate Bids" | The Bid Procedures are not clear as to what happens if some but not all of the lots are bid for at the Auction but the aggregate purchase price exceeds any Qualified Bid for all of the Purchased Assets.  It is unclear if the Debtors willing to keep some of the Purchased Assets, or how and when any subsequent auctions would be conducted with respect to any assets that are not included in the aggregate bids. |
| Section IV.B. – "Qualified Bid – Bid Requirements" | The Bid Procedures require that any Qualified Bid for all or substantially all of the Purchased Assets contain a cash component of not less than the amount of the Stalking Horse Protection and any amounts required to be paid by the Stalking Horse Bidder to satisfy Senior Obligations (as defined in the Staling Horse APA).  But the aggregate cash component may or may not have bearing on whether a bid is likely to produce in the aggregate with other bids the highest and best value for the estate, and it is not clear whether there are any cash component requirements for piecemeal bids comprised of some lots from the Purchased Assets and other lots not included in the |

| Bid Procedure | Objection |
|---|---|
| | Purchased Assets. |
| Section VI – "Stalking Horse Protection" | The Bid Procedures provide for a break-up fee in the amount of $2.5 million and expense reimbursement in an amount of up to $1 million.  For the reasons discussed in Section A above, these Stalking Horse Protections should not be approved.  To the extent the Court may approve the Stalking Horse Protections (which it should not), any invoices for expense reimbursement should be subject to review and approval by the Committee. |
| Section VII – "Auction" | The Bid Procedures require that any topping bid at the Auction be at least $1 million above the immediately preceding highest or best bid.  This requirement might have been justified in the context of a sale of substantially all of the Debtors' assets, but it does not work in the context of a piecemeal sale.  The incremental bidding requirements must be modified to take into account bidding on lots as opposed to substantially all of the Debtors' assets. |
| Section VIII – "Selection of Successful Bid(s)" | The Bid Procedures provide: "Notwithstanding anything contained herein to the contrary, the Debtors shall not accept any offer or any collection of offers which would have Net Cash Proceeds (as defined in the DIP Credit Agreement) less than the amount necessary to repay the DIP Obligations in full on the date the sale contemplated by such bid is consummated."  If the Purchased Assets include the P&A Facility collateral, this must be modified to make clear that the DIP Obligations cannot be repaid until the Senior Obligations are paid in full in cash. |
| Section VIII – "Selection of Successful Bid(s)" | The Bid Procedures provide that if the Stalking Horse Bidder is in second place following the Auction, it can withdraw its bid and cede its second place finish to the third place finisher.  This concession is unfair to the process and should not be allowed.  Moreover, if the Stalking Horse Bidder is permitted to withdraw its bid, it should not be entitled to receive payment of the Stalking Horse Protections. |
| Section XII – "Free and Clear of Any and All Interests" | The Debtors cannot be permitted to sell any P&A Lenders' collateral free and clear of P&A Lenders' liens without either payment in full of the obligations owing to the P&A Lenders or their consent. |

**C.      The DIP Motion Should Not Be Approved to The Extent the Sale Timeline and
Terms of the Sale Process are Incorporated Into the DIP Loan Agreement.**

32.   Macquarie objects to the DIP Motion to the extent the DIP Facility requires an

expedited sale process that, as described above, fails to provide a fair and robust auction and is

designed to chill bids in favor of the Stalking Horse Bidder's cherry-picked, piecemeal bid for

some of the Debtors' assets.

33.   Article VIII of the DIP Facility requires that the Debtors meet the following

milestones with respect to the Bid Procedures or risk defaulting under the terms of the DIP

Facility:

> (a)  By no later than seven days prior to the hearing to approve the Bid Procedures
> Order, the Debtors shall finalize an asset purchase agreement in form and
> substance acceptable to the Required Lenders;
>
> (b)  On or before August 10, 2015 the Bankruptcy Court shall commence or have
> commenced the hearing to enter the Bid Procedures Order;
>
> (c)  The Debtors shall, in the case of a 363 Sale, commence the auction on or before
> September 16, 2015;
>
> (d)  The Bankruptcy Court must enter a 363 Sale Order on or before September 21,
> 2015, and
>
> (e)  The closing of the 363 Sale shall occur on or before October 2, 2015.

34.   For the reasons stated above, the Debtors' proposed sale timeline cannot be

approved, and the DIP Facility must not be linked through Events of Default or otherwise to this

timeline.  Indeed, the Debtors have already been unable to maintain the aggressive milestones in

the DIP Facility relating to the sale.  The asset purchase agreement was "finalized" just five days

before the hearing to approve the Bid Procedures Order, and the Stalking Horse APA is

unworkable in its current form.  Additionally, the hearing on the Bid Procedures Motion is

scheduled to commence on August 14, 2015.  The Court's hands should not be tied with respect

to the DIP Motion by an unjustifiably aggressive sale timeline, particularly where the Debtors

17

are already in default with respect to certain of the milestones.  To the extent the timeline is
required by the terms of DIP Facility, inappropriately preventing a robust auction process
required by the Bankruptcy Code, the DIP Motion should not be approved.

35.   In addition, Macquarie requests adequate protection of its interests in collateral due
to the imposition of the automatic stay and the Debtors' continued use of such collateral.

D.    **Deficiencies in the Proposed Sale Order Further Undermine the Adequacy of the
Stalking Horse APA and Macquarie Reserves Its Rights to Further Object to the
Sale Order and to Entry of the Final DIP Order.**

36.   The Stalking Horse APA is premised on the entry of the proposed Sale Order if the
Debtors select the Stalking Horse Bidder as the winning bid at the conclusion of the sale process.
The proposed Sale Order should not be approved on the following grounds:

37.   The proposed Sale Order purports to authorize the sale of the Acquired Assets free
and clear of all Liens, but the Purchased Assets under the Stalking Horse APA cannot be sold
free and clear of the Post-Release P&A Lender's senior liens in the P&A Collateral.  Section
363(f) of the Bankruptcy Code does not authorize the sale of any portion of the P&A Collateral
for the following reasons:

a.  Under Section 363(f)(1), applicable nonbankruptcy law does not permit a sale of
the P&A Collateral free and clear of Post-Release P&A Lender's senior liens;

b.  Under Section 363(f)(2), the Post-Release P&A Lender does not consent to the
sale of the P&A Collateral free and clear of its liens;

c.  Under Section 363(f)(3), the price at which the P&A Collateral is being sold is
not greater than the aggregate value all the liens on the P&A Collateral;

d.  Under Section 363(f)(4), the Post-Release P&A Lender's lien in the P&A
Collateral is not in dispute; and

e.  Under Section 363(f)(5), the Post-Release P&A Lender cannot be compelled in a
legal or equitable proceeding to accept a money satisfaction of its senior interest
in the P&A Collateral.

38.   As discussed above, the Stalking Horse APA contemplates the Debtors' assumption and assignment of certain executory contracts, including domestic distribution agreements, that secure the Post-Release P&A Films under the P&A Facility.  The Debtors are not permitted to partially assume and assign these domestic distribution agreements.

39.   Furthermore, the Debtors are prohibited from selling a significant portion of the Debtors' assets if the sale amounts to a *sub rosa* plan of reorganization lacking the requirements and safeguards of a chapter 11 confirmation process.  *See Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007).  Central tenets of the plan confirmation process are the disclosure of "adequate information" in support of the plan and the fair and equitable treatment of creditors.  Here, the Stalking Horse APA fails to adequately identify the Debtors' assets included in the Purchased Assets, thereby making it unclear whether this is a *sub rosa* plan without additional information.  The Stalking Horse APA is further flawed in that it attempts to prejudice the Macquarie Interests by selling the Purchased Assets free and clear of Macquarie's Interests and is premised on an aggressive sale process designed to chill bids.

40.   Macquarie reserves its right to object to entry of the proposed Sale Order and entry of a final order approving the DIP Facility on these and other grounds.


*[Remainder of Page Intentional Left Blank]*

## CONCLUSION

41.   The purpose of a stalking horse bidder and buyer protections is to generate the

highest and best bid for the debtors' assets.  This goal is achieved by creating a fair opportunity

for all interested parties to qualify and submit bids.  The Bid Procedures proposed in the Bid

Procedures Motion and incorporated into the terms of the DIP Loan run counter to this goal and

should not be approved.

WHEREFORE, Macquarie respectfully requests that the Court deny the Bid Procedures

Motion, the DIP Motion and the Seal Motion, and grant such other relief as the Court deems just

and proper.

Dated: August 12, 2015

Respectfully submitted,

/s/   J. Eric Wise
**GIBSON, DUNN & CRUTCHER LLP**
J. Eric Wise
Shira D. Weiner
200 Park Avenue
New York, New York 10166
Tel:  (212) 351-4000
Fax:  (212) 351-4035

- and -

Samuel A. Newman (admitted *pro hac vice*)
Daniel B. Denny (admitted *pro hac vice*)
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel.  (213) 229-7000
Fax.  (213) 229-7520

*ATTORNEYS FOR MACQUARIE INVESTMENTS US INC.*