**Hearing Date and Time: August 14, 2015 at 11:00 a.m. (ET)**
**This filing relates to CM/ECF Docket No. 23**

**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
David S. Heller, Esq.
Christopher J. Clark, Esq.
Keith A. Simon, Esq.
Benjamin A. Naftalis, Esq.
Matthew Salerno, Esq.
Email: David.Heller@lw.com
Email: Christopher.Clark2@lw.com
Email: Keith.Simon@lw.com
Email: Benjamin.Naftalis@lw.com
Email: Matthew.Salerno@lw.com

*Counsel for RKA Film Financing, LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>RELATIVITY FASHION, LLC, *et. al.*<br><br>                    Debtors. | Chapter 11<br>Case No. 15-11989 (MEW)<br><br>(Jointly Administered) |

## OBJECTION OF RKA FILM FINANCING, LLC TO DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POST-PETITION FINANCING AND (B) USE CASH COLLATERAL; (II) GRANTING THE PREPETITION LENDERS ADEQUATE PROTECTION; (III) SCHEDULING A FINAL HEARING; AND (IV) GRANTING RELATED RELIEF

RKA Film Financing, LLC ("**RKA**"), by and through its undersigned counsel, hereby

objects to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors*

*to (A) Obtain Postpetition Financing and (B) Use Cash Collateral; (II) Granting the Prepetition*

*Lenders Adequate Protection; (III) Scheduling a Final Hearing; and (IV) Granting Related*

*Relief*, filed on July 30, 2015 [Docket No. 23] (the "**Motion**").[1]  Pursuant to the Motion, the

Debtors seeks to obtain secured postpetition financing from lenders (or their affiliates) who are

also lenders party to the prepetition Cortland TLA/TLB Facility (such prepetition lenders,

the "**Prepetition Cortland TLA/TLB Lenders**").  In support of this objection, RKA states as

follows:[2]

## PRELIMINARY STATEMENT

### A.    General Background

1.    As discussed more fully in the objection filed by RKA to the Debtors' proposed

bidding procedures filed concurrently herewith,[3] RKA made dedicated pre-release print and

advertising loans (the "**P&A Loans**" and the related loan facility, the "**P&A Facility**") to certain

special purpose entities that own or license a single film and that are wholly-owned subsidiaries

of Relativity Media, LLC (such special purpose entities, the "**P&A Borrowers**").[4]  These P&A

Borrowers borrowed the P&A Loans and granted liens and security interests to secure RKA's

P&A Loans under the P&A Facility (the "**RKA Liens**") in certain specified collateral of the

P&A Borrowers and Other P&A Credit Parties[5] (the "**RKA Collateral**"), which collateral

---

[1]    Capitalized terms used, but not otherwise defined, in this Objection shall have the meaning set forth in the Motion.

[2]    RKA reserves the right to file a supporting declaration or to otherwise present evidence in support of this Objection at the hearing.

[3]    *See Objection of RKA Film Financing to Debtors' Motion for Order Establishing Bidding Procedures for the Sale of Substantially all of the Debtors' Assets and Approving Stalking Horse APA and Bidding Protections*, dated August 12, 2015 (the "**Bidding Procedures Objection**").  In particular, the factual background between RKA and the Debtors is described in paragraphs 9-15 of the Bidding Procedures Objection, which is incorporated herein by reference.

[4]    The Motion identified the original P&A Borrowers, but neglected to list certain of the additional P&A Borrowers that joined the P&A loan agreement and security documents subsequent to the original closing date; the additional P&A Borrowers include the following:  (i) RML Lazarus Films, LLC; (ii) Armored Car Productions, LLC; (iii) RML Somnia Films, LLC; (iv) DR Productions, LLC; and (v) RML Kidnap Films, LLC.  Of these additional P&A Borrowers, only RML Somnia Films, LLC was identified in the Motion.

[5]    The "**Other P&A Credit Parties**" consist of (i) RML Distribution Domestic, LLC, a wholly-owned subsidiary of Relativity Media, LLC and (ii) RMLDD Financing, LLC, a wholly-owned subsidiary of RML Distribution Domestic, LLC.

NY\7219212.7

generally consists of the domestic distribution agreements for the films financed under the P&A Facility, and the intellectual property, picture rights, and receipts related to such films. *See* Motion, ¶ 25. The P&A Borrowers and the Other P&A Credit Parties are debtors-in-possession in these Chapter 11 Cases and, as of August 3, 2015, approximately $85,005,933, plus accrued interest, was outstanding under RKA's P&A Loans.

2.      Pursuant to various prepetition intercreditor agreements, the RKA Liens in the RKA Collateral are (with limited exceptions not relevant here) senior to the liens of other secured creditors with rights against the P&A Borrowers. There is no dispute that pursuant to that certain Third Amended and Restated Intercreditor and Subordination Agreement dated as of June 30, 2014, a copy of which is attached hereto as <u>Exhibit A</u> (the "**Cortland-P&A Intercreditor Agreement**"), the RKA Liens in the RKA Collateral are senior and superior to the prepetition liens held by the Prepetition Cortland TLA/TLB Lenders in the RKA Collateral. The Debtors claim they are not seeking to prime the RKA Liens in the RKA Collateral pursuant to the DIP Facility. *See* Motion, ¶ 51 (defining the "Non-Primed Facilities" to include the P&A Facility).

**B.      Interim DIP Order**

3.      On July 31, 2015, this Court entered its *Interim Order Pursuant to Sections 105, 361, 362, 364, and 507 of the Bankruptcy Code (I) Authorizing Debtors to Obtain Superpriority Secured Debtor-in-Possession Financing, (II) Authorizing Debtors to Use Cash Collateral, (III) Granting Adequate Protection to the Cortland Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 48] (the "**Interim DIP Order**").

4.      At the first day hearing on the Motion, RKA objected to the relief sought in the Motion arguing that the P&A Borrowers should not be parties to, have their assets encumbered by, or otherwise be restricted by the DIP Credit Agreement or related loan documents (and that

NY\7219212.7

no liens or claims should be granted as to the P&A Borrowers) because the P&A Borrowers were not receiving any proceeds of the DIP Facility or otherwise benefiting from such facility.

5.      As a result of RKA's objection, the Debtors and DIP Lenders agreed to reserve the grant of any liens or claims on account of the DIP Facility with respect to the P&A Borrowers until this hearing.  *See* Interim DIP Order, ¶ 8 ("All parties' rights are reserved with respect to the granting of the Junior P&A Lien and the DIP Superpriority Claims against the P&A Borrowers, which issues shall be determined by the Bankruptcy Court at the hearing on August 14, 2015.").

### OBJECTION

6.      RKA hereby objects to the relief sought in the Motion as set forth herein.

**A.      The P&A Borrowers and Other P&A Credit Parties do not benefit from the DIP Facility and should not grant liens or claims in connection therewith**

7.      The DIP Budget is crystal clear—and the Debtors do not dispute—that no proceeds of the DIP Loan can or are to be used for print and advertising expenses of the P&A Borrowers (the line item in the DIP Budget for "Total Print and Advertising Spending" is blank). Because no proceeds of the DIP Facility are being directed to (or for the benefit of) the P&A Borrowers, RKA objects to any of the P&A Borrowers and Other P&A Credit Parties either (a) being parties to the DIP Credit Agreement or any related loan documents or (b) granting any liens or claims (including junior liens or superpriority claims) in connection with the DIP Facility, whether on encumbered or unencumbered assets of the P&A Borrowers or Other P&A Credit Parties.[6]

---

[6]    Should any funds from the DIP Facility be made available to the P&A Borrowers or Other P&A Credit Parties, RKA objects to any attempt to grant liens or claims with priority over the P&A Loans, and RKA reserves all rights under the Cortland-P&A Intercreditor Agreement, other applicable intercreditor agreements, or applicable law.

NY\7219212.7

8.      Unlike in many large corporate capital structures where the entire enterprise is operated as a consolidated whole with a single balance sheet, the Debtors' highly complex capital structure includes special purpose entities, such as the P&A Borrowers, that were expressly and intentionally formed—and which have organizational documents prohibiting them from doing anything other than—the business of motion picture acquisition, production and exploitation of a particular film.  As such, the P&A Borrowers have their own debts and obligations, including the P&A Loans, which are subject to complex intercreditor relationships. In such circumstances, the P&A Borrowers and Other P&A Credit Parties should not become obligors, grant liens or claims, or otherwise agree to be restricted in connection with the DIP Facility absent a legally sufficient showing.

9.      In this case, however, there is no justification since the Debtors are not directing a single dollar from the DIP Facility to the release or for the benefit of the P&A Borrowers' films. The proposed upstream guarantee (and granting of liens) by the P&A Credit Parties in connection with the DIP Facility is not supported by reasonable consideration.  Courts have found prepetition transactions similar to these to be fraudulent transfers since the obligor/grantor did not receive reasonably equivalent value in return.  *See Official Comm. of Unsecured Creditors of Tousa, Inc. v. Citicorp N. Am., Inc. (In re Tousa, Inc.)*, 422 B.R. 783, 866 (Bankr. S.D. Fla. 2009) (avoiding an upstream guarantee because the guarantee was not made for reasonably equivalent value, stating "as a general rule, an insolvent debtor receives less than a reasonably equivalent value where it transfers its property in exchange for consideration which passes to a third party.  In such cases, it ordinarily receives little or no value.") *Aff'd*, 680 F.3d 1298 (11th Cir. 2012); *In re O.P.M. Leasing Services, Inc.*, 40 B.R. 380, 396 (Bankr. S.D.N.Y. 1984), Aff'd 44 B.R. 1023 (S.D.N.Y. 1984) (citing *Rubin v. Manufacturers Hanover Trust Co.*,

661 F.2d 979 (2d Cir. 1981) for the proposition that "in determining what constitutes fair consideration, the Court, must attempt to measure the economic benefit, if any, that accrued to each bankrupt . . . . [and] then determine whether that benefit was disproportionately small when compared to the size of the security that that bankrupt gave and the obligations that it incurred" and noting the Second Circuit's position that "[a]ny significant disparity between the value received [by the debtor] and the obligation assumed . . . . will have significantly harmed the innocent creditors of [the debtor]." ) (internal quotations and citations omitted).

10.     Likewise, courts have found that amorphous, indirect benefits to the transferor's general corporate enterprise do not meet the standard for reasonable equivalent value.  Instead, the benefits must have been received directly by the applicable transferor, and those benefits must be tangible and concrete.  *See Tousa*, 422 B.R. at 867 ("A benefit received by some other entity does not automatically become a benefit received by *the debtor* merely because both entities are engaged in a common business enterprise.") (emphasis added); *see also Silverman v. Paul's Landmark, Inc. (In re Nirvana Rest.)*, 337 B.R. 495, 503-504 (Bankr. S.D.N.Y. 2006) (finding a lack of fair consideration under the New York constructive fraudulent conveyance statute where indirect benefits were largely theoretical, noting "[i]n determining whether prospective benefits constitute 'fair consideration,' the court must determine the likelihood that the debtor will actually realize those benefits.").

11.     Here, the DIP Budget does not provide for any print and advertising funding, which is the funding that the P&A Borrowers and Other P&A Credit Parties critically need, and the Debtors have provided no evidence that the P&A Borrowers are receiving any benefit under the DIP Facility, let alone direct and tangible benefits.  Accordingly, any guarantee or credit support of the DIP Facility from the P&A Borrowers or Other P&A Credit Parties, or lien

granted on any of their respective assets or property, is not supported by adequate consideration and should, therefore, be denied (and certainly not facilitated) by this Court.

12.    As debtors in possession, the P&A Borrowers and Other P&A Credit Parties (and their respective directors, officers and managers) owe fiduciaries duties to the creditors of their particular bankruptcy estate, rather than to the enterprise as a whole.  *See*, *e.g.*, *Commodity Futures Trading Com v. Weintraub*, 471 U.S. 343, 355 (U.S. 1985) ("Indeed, the willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.'"); *Smart World Techs., LLC v. Juno Online Servs. (In re Smart World Techs., LLC)*, 423 F.3d 166, 175 (2d Cir. N.Y. 2005) ("As fiduciary, the debtor bears the burden of 'maximizing the value of the estate'").  Because the P&A Borrowers and Other P&A Credit Parties are special purpose entities and none of the DIP Facility's proceeds are being directed to them or being used for their benefit, their proposed entry into the DIP Facility is inconsistent with their fiduciary duties as there is no material benefit derived by the creditors of their respective bankruptcy estates.

**B.    Avoidance Actions and Avoidance Action Proceeds should not be available to pay adequate protection claims of subordinate prepetition lenders until so determined at the Final Hearing**

13.    The Interim DIP Order expressly states that the DIP Superpriority Claims, the DIP Liens, and the DIP Collateral would not include (or encumber) either the Avoidance Actions or Avoidance Action Proceeds unless approved by the Final Order.  *See* Interim DIP Order, ¶ 8. The Cortland Adequate Protection Liens were subject to the same limitation with respect to the Avoidance Actions and Avoidance Action Proceeds.  *See* Interim DIP Order, ¶ 12(i).  The Interim DIP Order, however, appears to be silent (or at least unclear) on this matter as to the Cortland Administrative Expense Claim in connection with its adequate protection obligations

7

(although the Cortland Administrative Claim is fully subordinate to the DIP Superpriority Claims, which as noted above are not payable from Avoidance Actions or Avoidance Action Proceeds until approved by this Court in the Final Order). *See* Interim DIP Order, ¶ 12(ii).  RKA presumes this omission was inadvertent and that such matters were fully reserved for the Final Hearing.  However, to the extent the Debtors seek to grant adequate protection claims against either the Avoidance Actions or the Avoidance Action Proceeds of the P&A Borrowers or Other P&A Credit Parties at the upcoming second interim hearing, RKA objects to such relief for the reasons as described above.[7]

## C.    RKA reserves all rights in connection with the Cortland-P&A Intercreditor Agreement and other intercreditor agreements

14.    Pursuant to the Cortland-P&A Intercreditor Agreement, the Prepetition Cortland TLA/TLB Lenders agreed that, among other things (a) RKA had the express right to provide debtor in possession financing to the P&A Borrowers and Other P&A Credit Parties (without objection from them), (b) RKA controlled the disposition and sale of the RKA Collateral, without interference from the Prepetition Cortland TLA/TLB Lenders, and (c) the Prepetition Cortland TLA/TLB Lenders may not object to any motion by RKA for relief from the automatic stay to foreclose on its collateral.  *See* Cortland-P&A Intercreditor Agreement, §§ 6, 7 & 10.

15.    The Prepetition Cortland TLA/TLB Lenders (as non-debtor entities) should not (and cannot) end-run around the requirements of the Cortland-P&A Intercreditor Agreement or other applicable intercreditor agreements through the DIP Facility or related orders. Accordingly, to the extent the P&A Borrowers or Other P&A Credit Parties are or become

---

[7]    Under the Interim DIP Order, the adequate protection liens and claims are expressly junior and subordinate to the DIP Superpriority Claims and the DIP Liens.  Because the DIP Superpriority Claims and the DIP Liens did not extend to the Avoidance Actions and Avoidance Action Proceeds, RKA believes the adequate protection liens and claims are subject to the same limitations.

parties to the DIP Loan Agreement or otherwise grant liens or claims in connection therewith, RKA requests that the Interim DIP Order expressly reserve all rights and claims of RKA under the Cortland-P&A Intercreditor Agreement or other applicable intercreditor agreements to the extent of any breach or violation thereof by the Prepetition Cortland TLA/TLB Lenders or their agents.

## **RESERVATION OF RIGHTS**

16.     RKA reserves all of its rights with respect to further hearings on the Motion.

## CONCLUSION

WHEREFORE, RKA respectfully requests that this Court (i) deny approval of the Motion absent the modifications, limitations and clarifications set forth above, and (ii) grant such other and further relief as this Court deems just and proper.

Dated: New York, New York

August 12, 2015

Respectfully Submitted,

LATHAM & WATKINS LLP

/S/ Keith A. Simon
David S. Heller
Christopher J. Clark
Keith A. Simon
Benjamin A. Naftalis
Matthew Salerno
885 Third Avenue
New York, New York 10022
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email: David.Heller@lw.com
Email: Christopher.Clark2@lw.com
Email: Keith.Simon@lw.com
Email: Benjamin.Naftalis@lw.com
Email: Matthew.Salerno@lw.com

Ted A. Dillman (*pro hac vice*)
355 S. Grand Avenue
Los Angeles, California 90071-1560
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
Email: Ted.Dillman@lw.com

*Counsel for RKA Film Financing, LLC*

NY\7219212.7

## EXHIBIT A

**Cortland-P&A Intercreditor Agreement**

**(attached)**

## THIRD AMENDED AND RESTATED
## INTERCREDITOR AND SUBORDINATION AGREEMENT

Third Amended and Restated Intercreditor and Subordination Agreement dated as of June 30, 2014 by and between Macquarie US Trading LLC, in its various capacities as administrative agent for the Senior Lenders (as defined below), collateral agent for certain Senior Lenders and as collateral agent for certain other Senior Lenders (in such capacities, together with any successor agents thereto, individually and collectively, the "Senior Agent"), and Cortland Capital Market Services LLC, a Delaware limited liability company, as administrative agent and collateral agent for the Junior Lenders, as defined below (in such capacity, together with any successor agent, the "Junior Agent").  This Agreement amends and restates in its entirety that certain Second Amended and Restated Intercreditor and Subordination Agreement dated as of January 21, 2014 between the Senior Agent and the Junior Agent.

### RECITALS

This Agreement is being entered into in reference to the following facts:

A.      Certain of the Borrowers (as defined herein) and certain of the Guarantors (as defined herein) entered into, and from time to time hereafter additional Persons may become party to, that certain Second Amended and Restated Funding Agreement, dated as of June 30, 2014 (as amended, restated or otherwise modified from time to time, the "Senior Loan Agreement"), with the Senior Agent and the lenders party thereto (the "Senior Lenders" as hereinafter further defined) pursuant to which the Senior Creditors (as hereinafter defined) have made loans to certain of the Borrowers.

B.      As security for the prompt payment and performance of the Senior Indebtedness (as hereinafter defined), certain of the Borrowers and certain of the Guarantors entered into, and from time to time hereafter additional Persons may become party to, that certain Amended and Restated Security Agreement dated as of January 21, 2014 (as amended, restated or otherwise modified from time to time, the "Senior Security Agreement") among RML Distribution Domestic, LLC, a California limited liability company, certain affiliates thereof and the Senior Agent and certain other security agreements, pledge agreements, collateral assignments and other security documents (collectively, with the Senior Security Agreement, the "Senior Security Documents") pursuant to which certain of the Borrowers and certain of the Guarantors granted a lien on and a security interest in certain of their assets to the Senior Agent.

C.      On or about May 30, 2012, the Borrowers and the Guarantors entered into that certain Financing Agreement dated as of May 30, 2012 (as amended or otherwise modified from time to time, the "Junior Loan Agreement"), with the Junior Agent and the lenders party thereto (the "Junior Lenders" as hereinafter further defined) pursuant to which the Junior Creditors (as hereinafter defined) agreed to make certain term loans to the Borrowers.

D.      On or about May 30, 2012, as security for the prompt payment and performance of the Junior Indebtedness (as hereinafter defined), the Borrowers and the Guarantors entered into certain security agreements, pledge agreements, collateral assignments and other security documents (collectively, as amended or otherwise modified from time to time, the "Junior Security Documents") pursuant to which the Borrowers and the Guarantors granted a lien on and a security interest in all of its assets to the Junior Agent.

E.      The Senior Creditors and the Junior Creditors wish to agree as to their respective liens upon and security interests in the Collateral (as hereinafter defined) and as to certain other rights, priorities, and interests as between and among the Senior Creditors and the Junior Creditors.

**AGREEMENT**

In consideration of the foregoing, the mutual covenants contained herein, and for other good and valuable consideration, the receipt of which the Senior Agent and the Junior Agent hereby acknowledge, the Senior Agent and the Junior Agent hereby agree as follows:

1.    Definitions and Rules of Construction.

(a)    Definitions.   The following terms, as used in this Agreement, shall have the following meanings:

"Agreement" means this Amended and Restated Intercreditor and Subordination Agreement together with any and all amendments, extensions, modifications, riders, addenda, exhibits, and schedules hereto.

"Bankruptcy Case" means any proceeding commenced by or against any Borrower or any Guarantor, under any provision of the Bankruptcy Code or under any other federal or state bankruptcy or insolvency law, including assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with its creditors, or proceedings seeking reorganization, arrangement, or other similar relief, and all converted or succeeding cases in respect thereof.

"Bankruptcy Code" means the United States Bankruptcy Code (11 U.S.C. § 101, et seq.), as amended, and any successor statute.

"Borrowers" means any person that as of the date hereof is, or hereafter becomes, a borrower of any of the Senior Indebtedness or the Junior Indebtedness on or after the date hereof.

"Business Day" means any day that is not a Saturday, Sunday or other day on which national banks are authorized or required to close.

"Collateral" means "Collateral" as defined in the Senior Security Agreement (as in effect on the date hereof), as supplemented from time to time after the date hereof solely to include such rights with respect to additional motion pictures to be released during the 2013, 2014, 2015 or 2016 calendar year, including other related interests in property consistent with the scope of property pledged on the date hereof, in each case, with respect to which loans are advanced under the Senior Loan Agreement; provided for purposes of this Agreement, Excluded Property (as defined in the Senior Security Documents (as in effect on the date hereof) shall not constitute Collateral.

"Documents" means, collectively, the Senior Documents and the Junior Documents.

"Guarantor" and "Guarantors" means any person that becomes a guarantor of the Senior Indebtedness or the Junior Indebtedness on or after the date hereof.

"Junior Agent" has the meaning set forth in the preamble to this Agreement.

"Junior Creditors" means collectively the Junior Agent, the Origination Agent (as defined in the Junior Loan Agreement) and the Junior Lenders.

"Junior Documents" means, collectively, the Junior Loan Agreement, the Junior Security Documents, the Junior Guaranty, the Junior Guaranty Documents and any other document, instrument, mortgage or agreement now existing or in the future entered into evidencing, documenting, securing, or

2

otherwise relating to the Junior Indebtedness or the Collateral, together with any amendments, replacements, substitutions, or restatements thereof.

"Junior Guaranty" means any guaranty or similar agreement of the obligations of the Borrower owing to Junior Creditors under the Junior Loan Agreement entered into by any Guarantor.

"Junior Guaranty Documents" means any security documents pursuant to which a Guarantor grants a lien on and a security interest in all or part of its assets to the Junior Creditors to secure its obligations under a Junior Guaranty or other Junior Indebtedness.

"Junior Indebtedness" means any and all presently existing or hereafter arising indebtedness, claims, debts, liabilities, obligations, interest, fees and expenses of the Obligors owing to the Junior Creditors under the Junior Documents, whether direct or indirect, whether contingent or of any other nature, character, or description including all interest and other amounts accruing after commencement of any Bankruptcy Case, and any interest and other amounts that, but for the provisions of the Bankruptcy Code, would have accrued and become due or otherwise would have been allowed), and any refinancings, renewals, refundings, or extensions of such amounts.

"Junior Lenders" has the meaning set forth in the preamble to this Agreement and shall include all subsequent holders of the Junior Indebtedness.

"Junior Loan Agreement" has the meaning set forth in the Recitals to this Agreement.

"Junior Security Documents" has the meaning set forth in the Recitals to this Agreement.

"Obligors" means collectively each Borrower and each Guarantor.

"Paid in Full" means (other than with respect to unasserted contingent obligations for which no claim has been made), the full payment in cash, in immediately available funds, of all the Senior Indebtedness (whether or not any of the Senior Indebtedness shall have been voided, disallowed or subordinated pursuant to any provision of the Bankruptcy Code, any applicable state fraudulent conveyance law, any other law in connection with a Bankruptcy Case or otherwise) after (i) all principal of the Loans (as defined in the Senior Loan Agreement), interest thereon (including interest accruing subsequent to the filing of any petition initiating any Bankruptcy Case, whether or not a claim for such interest is allowed in any such proceeding) and all other Senior Indebtedness shall have been paid in full, (ii) the Senior Agent shall have received either cash collateral (or a letter of credit issued for the account of the Borrowers and at the Borrowers' expense, in form and substance satisfactory to the Senior Agent, by an issuer acceptable to the Senior Agent and payable to the Senior Agent as beneficiary) in such amounts as the Senior Agent determines are reasonably necessary to secure the Senior Agent and the Senior Lenders from loss, cost, damage or expense, including attorneys fees and expenses in connection with any contingent Senior Indebtedness, including checks or other payments provisionally credited to the Senior Indebtedness and/or as to which the Senior Agent or any Senior Lender has not yet received final payment (the "Paid in Full Date"). If a Bankruptcy Case shall have been commenced on or prior to such Paid in Full Date, then the Senior Indebtedness shall not be deemed to have been Paid in Full. The expressions "prior payment in full", "payment in full", "paid or satisfied in full" and "paid in full" (whether or not such expressions are capitalized) and other similar phrases shall have correlative meanings.

"Secured Creditor" means any of the Senior Creditors or any of the Junior Creditors, or any successor or assignee of any of them, or any future holder of Senior Indebtedness or Junior Indebtedness, respectively.

3

"Secured Creditor Remedies" means any action by a Secured Creditor in furtherance of the sale, foreclosure, realization upon, or the repossession or liquidation of any of the Collateral, including, without limitation:  (i) the exercise of any remedies or rights of a "Secured Creditor" under Article 9 of the UCC, such as, without limitation, the notification of account debtors; (ii) the exercise of any remedies or rights or of any rights or remedies as a mortgagee or beneficiary (or by the trustee on behalf of the beneficiary), including, without limitation, the appointment of a receiver, or the commencement of any foreclosure proceedings or the exercise of any power of sale, including, without limitation, the placing of any advertisement for the sale of any Collateral; (iii) the exercise of any remedies available to a judgment creditor; (iv) the exercise of any rights of forfeiture, recession, or repossession of any assets, or (v) any other remedy available in respect of the Collateral available to such Secured Creditor under any Document to which it is a party or under applicable law, provided that Secured Creditor Remedies shall not include any action taken by a Secured Creditor solely to (A) correct any mistake or ambiguity in any Documents, (B) create, perfect, preserve or protect its Lien on the Collateral so long as such action is not adverse to the priority status of Senior Agent's Liens as contemplated by this Agreement or Senior Agent's right to exercise remedies, or (C) remedy or cure any defect in or lapse of perfection of the lien of a Secured Creditor in the Collateral.

"Secured Creditors' Indebtedness" means, collectively, the Senior Indebtedness and the Junior Indebtedness.

"Senior Agent" has the meaning set forth in the preamble to this Agreement and shall include its successors and assigns.

"Senior Creditors" means collectively the Senior Agent and the Senior Lenders.

"Senior Documents" means, collectively, the Senior Loan Agreement, the Senior Security Documents, any Loan Documents (as defined in the Senior Loan Agreement), the Senior Guaranty, the Senior Guaranty Documents and any other document instrument or agreement now existing or in the future entered into evidencing, documenting, securing or otherwise relating to the Senior Indebtedness or the Collateral, together with, to the extent not prohibited by Section 14 of this Agreement, any amendments, replacements, substitutions, or restatements thereof.

"Senior Guaranty" means any guaranty or similar agreement of the obligations of the Borrowers owing to Senior Creditors under the Senior Loan Agreement entered into by any Guarantor.

"Senior Guaranty Documents" means any security documents pursuant to which a Guarantor grants a lien on and a security interest in all or part of its assets to the Senior Creditors to secure its obligations under a Senior Guaranty or other Senior Indebtedness.

"Senior Indebtedness" means any and all presently existing or hereafter arising indebtedness, claims, debts, liabilities, obligations, interest, expenses and fees (including all fees payable under the Senior Loan Agreement) of the Obligors owing to the Senior Creditors under the Senior Documents, whether direct or indirect, whether contingent (including in respect of the Senior Guaranty) or of any other nature, character, or description (including all interest and other amounts accruing after commencement of any Bankruptcy Case, and all interest and other amounts that, but for the provisions of the Bankruptcy Code, would have accrued and become due or otherwise would have been allowed), and any refinancings, renewals, refundings, or, to the extent permitted in Section 14 hereof, extensions of such amounts, provided, that, for purposes of this Agreement, the term "Senior Indebtedness" shall not include the aggregate principal amount of any loans advanced under the Senior Loan Agreement in excess of the principal amount outstanding in respect of any such loan immediately following the advance of such loan (excluding any accrued or paid-in-kind interest added to the principal balance of any applicable loans,

4

which shall constitute Senior Indebtedness). The foregoing limitation shall not apply to, and the term "Senior Indebtedness" shall include, obligations consisting of interest, fees, costs or expenses, in each case whether or not charged by the Senior Creditors to the loan account of the Borrowers maintained by the Senior Creditors pursuant to the Senior Loan Agreement.

"Senior Lenders" has the meaning set forth in the Recitals to this Agreement and shall include all subsequent holders of the Senior Indebtedness.

"Senior Loan Agreement" has the meaning set forth in the Recitals to this Agreement.

"Senior Security Documents" has the meaning set forth in the Recitals to this Agreement.

"Specified Collateral" has the meaning set forth in Section 12 of this Agreement.

"UCC" means the Uniform Commercial Code as adopted in the State of New York, or in such other jurisdiction as governs the perfection of the liens and security interests in the Collateral for the purposes of the provisions hereof relating to such perfection or effect of perfection.

(b)    UCC Definitions. All other capitalized terms used in this Agreement that are defined in the UCC shall have the meanings given to them in the UCC unless otherwise expressly defined herein.

(c)    Other Definitional Provisions. When used in this Agreement: (i) the words "herein," "hereof," and "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any provision of this Agreement; (ii) the words "include," "includes," and "including" are not limiting; the word "or" has, except where otherwise required by the context, the inclusive meaning represented by the phrase "and/or"; (iii) unless otherwise specified, the words "Section," "Schedule" and "Exhibit" refer to Sections of, and Schedules and Exhibits to, this Agreement unless otherwise specified; and (iv) the singular number includes the plural, and vice versa, whenever the context so requires.

2.    Intentionally Omitted.

3.    Permitted Liens and Relative Priorities. As among the Secured Creditors, and notwithstanding the terms (including the description of Collateral), dating, execution, or delivery of any document, instrument, or agreement; the time, order, method, or manner of granting, or perfection of or failure to perfect any security interest or lien; the time of filing or recording of any financing statements, assignments, deeds of trust, mortgages, or any other documents, instruments, or agreements under the UCC or any other applicable law; and any provision of the UCC or any other applicable law to the contrary, the Secured Creditors agree:

(a)    The Senior Creditors shall have a first priority security interest in and lien upon the Collateral; and

(b)    The Junior Creditors shall have a second priority security interest in and lien upon the Collateral.

For purposes of the foregoing allocation of priorities, any claim of a right to a setoff shall be treated in all respects as a security interest and no claimed right of setoff shall be asserted to defeat or diminish the rights or priorities provided for herein.

5

4.      No Alteration of Priority.  The lien and security interest priorities provided in Section 3 shall not be altered or otherwise affected by any amendment, modification, supplement, extension, renewal, restatement or (to the extent permitted in Section 14 hereof) refinancing of any of the Senior Indebtedness or any Junior Indebtedness nor by any action or inaction which any Secured Creditor may take or fail to take in respect of the Collateral.  The Secured Creditors consent to Obligors' granting to each other Secured Creditor the liens and security interests reflected in Section 3.

5.      Perfection.  Each of the Secured Creditors shall be solely responsible for, and nothing herein shall prohibit any Secured Creditor from, perfecting and maintaining the perfection of its lien or security interest in any of the Collateral in which such party has been granted a lien or security interest. The provisions of this Agreement are intended solely to govern the respective priorities as among the Secured Creditors.  Each Secured Creditor agrees that it will not directly or indirectly take any action to contest or challenge the validity, legality, perfection, priority, availability, or enforceability of the liens of any other Secured Creditor upon the Collateral or seek to have the same avoided, disallowed, set aside, or otherwise invalidated in any judicial proceeding or otherwise.

6.      Exercise of Remedies; Management of Collateral.  Notwithstanding anything to the contrary contained in any of the Documents:

(a)      Until all Senior Indebtedness has been Paid in Full:  (i) the Senior Creditors shall have the exclusive right to manage, perform, and enforce the terms of the Senior Documents with respect to the Collateral and to exercise and enforce all privileges and rights thereunder in its sole discretion, including, without limitation, the exclusive right to enforce or settle insurance claims with respect to Collateral, take or retake control or possession of Collateral and to hold, prepare for sale, process, sell, lease, dispose of, or liquidate Collateral; (ii) the Junior Creditors shall not exercise any Secured Creditor Remedies with respect to Collateral; and (iii) any and all proceeds of Collateral which shall come into the possession, control, or custody of the Junior Creditors will be deemed to have been received for the account of the Senior Creditors and shall be immediately paid over to the Senior Agent.  In connection with the provisions of clause 6(a)(i) above, each Junior Creditor waives any and all rights to affect the method or challenge the appropriateness of any action by the Senior Creditors with respect to the Collateral, and waives any claims or defenses they may have against the Senior Creditors, including any such claims or defenses based on any actions or omissions of any such person in connection with the perfection, maintenance, enforcement, foreclosure, sale, liquidation or release of any lien or security interest therein, or any modification or waiver of any Senior Documents.

(b)      The rights and priorities set forth in this Agreement shall remain binding irrespective of the terms of any plan of reorganization in a Bankruptcy Case or other provisions of the Bankruptcy Code or any similar federal or state statute.

7.      Sale of Collateral.

(a)      Until the Senior Indebtedness has been Paid in Full, as among the Secured Creditors:  (i) only the Senior Creditors shall have the right to restrict or permit, or approve or disapprove, the sale, transfer or other disposition of the Collateral; and (ii) provided that such sale, transfer or other disposition is permitted under the Senior Loan Agreement or the proceeds thereof are applied to the Senior Indebtedness, the Junior Agent will, immediately upon the request of the Senior Agent, release or otherwise terminate its liens and security interests upon the Collateral (subject to the proviso below), to the extent such Collateral is sold or otherwise disposed of by any Obligor with the consent of the Senior Creditors in accordance with the Senior Documents, and the Junior Agent will immediately deliver such release documents as the Senior Creditors may require in connection therewith; provided, however, that if any such sale or disposition results in a surplus after the Senior Indebtedness has been fully Paid in Full,

6

such surplus shall be paid to the Junior Agent, for application in accordance with the terms of the Junior Documents.

(b)    This Section 7 shall not be construed in any way to limit or impair the right of (i) any Secured Creditor to bid for and purchase Collateral at any private or judicial foreclosure upon such Collateral initiated by any other Secured Creditor, provided, that such bid may not include a "credit bid" in respect of any Junior Indebtedness unless the proceeds of such bid are otherwise sufficient to cause the Senior Indebtedness to be Paid in Full, (ii) any Junior Creditor to join (but not control) any foreclosure or other judicial lien enforcement proceeding with respect to such Collateral initiated by the Senior Creditors thereon, so long as it does not delay or interfere with the exercise by the Senior Creditors of their rights and (iii) subject to the terms of this Agreement, the right of the Junior Creditors on any Collateral to receive payments from the proceeds of the collection, sale or other disposition of such Collateral.

8.    Sections 9-611 and 9-613 Notice and Waiver of Marshalling.  Each Secured Creditor hereby acknowledges that this Agreement shall constitute notice of the other Secured Creditors' respective interests in the Collateral as provided by Sections 9-611 and 9-613 of the UCC and each of the Secured Creditors waives any right to compel the other Secured Creditors to marshal any of the Collateral or to seek payment from any particular assets of any Obligor or from any third party.

9.    Insurance or Condemnation.  In the event of the occurrence of a fire or other casualty resulting in damage to all or any portion of any Collateral (collectively, a "Casualty"):

(a)    each Junior Creditor hereby waives any right to object to any adjustment, compromise, or settlement of any claims approved by the Senior Creditors resulting from a Casualty with respect to any Collateral;

(b)    all proceeds received or to be received on account of a Casualty shall be applied in the manner or manners provided for in the Senior Documents; and

(c)    each Junior Creditor agrees to execute and deliver any documents, instruments, agreements or further assurances required to effectuate any of the foregoing.

10.    Bankruptcy Issues.

(a)    Except as provided in this Section 10, this Agreement shall continue in full force and effect after the commencement of a Bankruptcy Case (all references herein to Obligors being deemed to apply to Obligors as debtor-in-possession and to a trustee for Obligors' estate in a Bankruptcy Case), and shall apply with full force and effect with respect to all Collateral acquired by such Obligors, and to all Secured Creditors' Indebtedness incurred by Obligors, subsequent to such commencement.

(b)    If any Obligor shall become subject to a Bankruptcy Case, and if the Senior Creditors shall desire to permit the use of cash collateral or to provide post-petition financing to such Obligor, the Junior Creditors agree as follows:  (i) adequate notice to the Junior Creditors shall be deemed to have been provided for such use of cash collateral or post-petition financing if the Junior Agent receives notice thereof at least three (3) Business Days prior to any hearing on a request to approve such use of cash collateral or post-petition financing; and (ii) no objection will be raised by the Junior Creditors to any such use of cash collateral or such post-petition financing by the Senior Creditors, on the grounds of a failure to provide adequate protection for the Junior Agent's junior liens and security interests in the Collateral, provided that the Junior Agent is granted liens and security interests on the post-petition Collateral to the same extent as the liens that are granted to or for the benefit of the Senior Creditors, junior only to the liens or security interests of the Senior Creditors therein.  No objection will

7

be raised by the Junior Secured Creditors to the Senior Creditors' motion for relief from the automatic stay in any proceeding under the Bankruptcy Code to foreclose on and sell the Collateral.

11.     <u>Notice of Default and Certain Events</u>.  Each Secured Creditor shall send written notice to each other Secured Creditor upon the occurrence of any of the following as applicable:

(a)     the declaration of any default under such Secured Creditor's Documents, or the acceleration of any of such Secured Creditor's Indebtedness; or

(b)     the commencement of any sale or liquidation of, or realization upon, any of the Collateral.

Each such notice shall be sent to each other Secured Creditor contemporaneously with the sending of such notice to Obligors if and when sent under the applicable Documents.  The failure of any Secured Creditor to give such notice shall not affect the relative lien or security interest priorities or the other privileges of such Secured Creditor as provided in this Agreement or give rise to any liability.

12.     <u>Bailment</u>.  With respect to any Collateral in which a security interest may be perfected under the UCC or other relevant law by possession or control or with respect to which the rights or interests granted to the Junior Creditors may be precluded by or inconsistent with the rights or interests granted to the Senior Creditors ("<u>Specified Collateral</u>"), the Senior Agent will possess or control such Specified Collateral as gratuitous bailee or gratuitous agent for perfection for the benefit of Junior Creditors until the Payment in Full in cash of the Senior Indebtedness (so as to satisfy the requirements of Sections 9-106(d)(3), 8-301(a)(2) and 9-313(v) of the UCC), whereupon possession of or the other rights with respect to any such Specified Collateral remaining shall be immediately transferred to the Junior Agent; and immediately upon such transfer of possession or the other rights the Junior Agent shall become the pledgeholder of the Specified Collateral.  In this Section 12, "control" has the meaning assigned to such term in Sections 8-106 and 9-314 of the UCC.  The Junior Agent acknowledges and agrees that:  (a) the Senior Creditors do not make any representation or warranty whatsoever as to the nature, extent, description, validity or priority of any Specified Collateral or the security interests in or liens upon any Specified Collateral; (b) while any Specified Collateral is held by the Senior Agent or any other Senior Creditor, the Senior Creditors shall not have any liability to, and shall be held harmless by, the Junior Creditors, for any losses, damages, claim, or liability of any kind to the extent arising out of the holding of such Specified Collateral, other than losses, damages, claims, or liabilities arising out of the Senior Creditors' gross negligence or willful misconduct; (c) the Senior Agent need not act as a pledgeholder for the Junior Creditors with respect to any Collateral in which a security interest may be perfected by means other than possession; (d) prior to the Payment in Full of the Senior Indebtedness, the Junior Agent shall immediately deliver to the Senior Agent any Specified Collateral that is now in or in the future comes into its possession; and (e) the priority of the Secured Creditors' security interests in and liens upon the Specified Collateral shall be governed by the terms of this Agreement.

13.     <u>Authority of Agents/Trustees</u>.  Each Secured Creditor agrees that any assignment or transfer of an interest in any of the Secured Creditors' Indebtedness shall be made expressly subject to the terms and conditions of this Agreement.

14.     <u>Modification of Documents; Additional Covenants</u>.  The Junior Creditors agree that the Senior Creditors shall have absolute power and discretion, without notice to the Junior Creditors, to deal in any manner with the Senior Indebtedness, including, but not by way of limitation, the power and discretion to do any of the following:  (i) any demand for payment of any Senior Indebtedness may be rescinded in whole or in part, and any Senior Indebtedness may be continued, and the Senior Indebtedness or the liability of Obligors upon or for any part thereof, or any Collateral or guaranty therefor, or right of

offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, modified, accelerated, compromised, waived, surrendered, or released; and (ii) the Senior Documents may be amended, modified, waived, supplemented, refinanced, renewed, refunded, extended or terminated, in whole or in part, as the Senior Creditors may deem advisable from time to time, provided that the Senior Creditors shall not increase the principal amount of any loans advanced in respect of any individual motion picture in excess of the principal amount outstanding immediately following the advance of any such loan (excluding any accrued or paid-in-kind interest added to the principal balance of any applicable loans). The Junior Creditors will remain bound under this Agreement, and the subordination provided for herein shall not be impaired, abridged, released, or otherwise affected notwithstanding any such renewal, extension, modification, acceleration, compromise, amendment, supplement, termination, sale, exchange, waiver, surrender, or release. The Senior Indebtedness shall conclusively be deemed to have been created, contracted, or incurred in reliance upon this Agreement, and all dealings between the Senior Creditors on the one hand, and the Obligors, on the other hand, shall be deemed to have been consummated in reliance upon this Agreement.

15.   _Junior Creditors' Waivers_.  Each Junior Creditor waives:  (a) any and all notice of the creation, modification, renewal, extension, or accrual of any of the Senior Indebtedness and notice of or proof of reliance by Senior Creditors upon this Agreement; (b) agrees not to assert against the Senior Creditors, any rights which a guarantor or surety could exercise, but nothing in this Agreement shall constitute any Junior Creditor as a guarantor or surety; and (c) prior to the time the Senior Indebtedness is Paid in Full, any right of subrogation, contribution, reimbursement, or indemnity which it may have against any Obligor arising directly or indirectly out of this Agreement.

16.   _Binding Effect; Other_.  This Agreement shall be a continuing agreement, shall be binding upon and shall inure to the benefit of the parties hereto from time to time and their respective successors and assigns, shall be irrevocable, and shall remain in full force and effect until the Senior Indebtedness shall have been Paid in Full, but shall continue to be effective, or be reinstated, as the case may be, if any payment, or any part thereof, of any amount paid by or on behalf of any Obligor with regard to any Senior Indebtedness is invalidated, avoided, declared to be fraudulent or preferential, rescinded or must otherwise be restored or returned upon or as a result of any Bankruptcy Case, or for any other reason, all as though such payments had not been made. Any waiver or amendment hereunder must be evidenced by a signed writing of the party to be bound thereby, and shall only be effective in the specific instance. This Agreement shall be governed by and construed in accordance with the laws of the State of New York. The parties agree that any actions arising out of or in connection with this Agreement shall be tried and litigated in the state and federal courts located in the County of New York, in the State of New York. The headings in this Agreement are for convenience of reference only, and shall not alter or otherwise affect the meaning hereof.

17.   _Parties Intended to be Benefited_.  All of the understandings, covenants, and agreements contained herein are solely for the benefit of the Senior Creditors and the Junior Creditors, their respective successors and assigns, and future holders of the Senior Indebtedness and the Junior Indebtedness respectively, and there are no other parties, including any Obligor or any of their creditors, successors, or assigns, which are intended to be benefited, in any way, by this Agreement.

18.   _No Limitation Intended_.  Nothing contained in this Agreement is intended to or shall affect or limit, in any way, the rights that the Senior Creditors and the Junior Creditors have with respect to any third parties. The Senior Creditors and the Junior Creditors hereby specifically reserve all of their respective rights against the Obligors and all other third parties.

19.   _Notice_.  Whenever it is provided herein that any notice, demand, request, consent, approval, declaration, or other communication shall or may be given to or served upon any of the parties

9

hereto, or whenever any of the parties desires to give or serve upon the other communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration, or other communication shall be in writing and shall be delivered either in person or by registered, or certified United States mail, postage prepaid, by facsimile, or by recognized overnight courier service, addressed as follows:

19.1    If to the Senior Creditors, at:

MACQUARIE US TRADING LLC, as
Senior Agent
c/o 225 West Washington Street, Suite 2100
Chicago, IL 60606
Attention: Agency Services – Macquarie
Email: MacquarieUST@cortlandglobal.com

with a copy to:

GIBSON DUNN & CRUTCHER LLP
2029 Century Park E., Suite 4000
Los Angeles, CA  90067
Attn: Cromwell R. Montgomery, Esq.
Fax No.  310-552-7063

If to the Junior Agent, at:

CORTLAND CAPITAL MARKET SERVICES LLC
225 W. Washington Street, Suite 2100
Chicago, Illinois 60606
Attn:  Beata Konopko
Fax No.: 312-376-0751

with a copy to:

KAYE SCHOLER LLP
70 West Madison
Chicago, Illinois 60602
Attn: Daniel J. Hartnett, Esq.
Fax No.: 312-583-2580

If to the Obligors, at:

RELATIVITY MEDIA, LLC
9242 Beverly Blvd., Suite 300
Beverly Hills, California 90210
Attn: Corporate Legal Department
Fax No.: 310-724-7701

with a copy to:

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1600

Los Angeles, California 90067
Attn: Matthew C. Thompson, Esq.
Fax No.: 310-556-5959

or at such other address as may be substituted by notice given as herein provided.  Giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice.  Every notice, demand, request, consent, approval, declaration or other communication hereunder shall be deemed to have been duly given when received.

20.    Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

21.    Complete Agreement.    This Agreement constitutes the complete agreement and understanding of each of the Secured Creditors, and supersedes all prior or contemporaneous oral and written negotiations, agreements and understandings, express or implied, with respect to the subject matter hereof.

22.    No Joint Venture.  Each of the Secured Creditors acknowledges and confirms that this Agreement shall not create a joint venture, agency or fiduciary relationship.

23.    Counterparts.  This Agreement may be executed in any number of counterparts, and by the parties each in separate counterparts, each of which shall be an original, but all of which shall together constitute one and the same Agreement.  Delivery of an executed counterpart of this Agreement by facsimile or electronic mail shall be equally effective as delivery of an original executed counterpart.

24.    Waiver of Jury Trial.  THE SENIOR AGENT AND THE JUNIOR AGENT HEREBY EXPRESSLY WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE SENIOR AGENT AND THE JUNIOR AGENT WITH RESPECT TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED BY THEM IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE.  THE SENIOR AGENT AND THE JUNIOR AGENT HEREBY AGREE AND CONSENT THAT ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT JURY, AND THAT ANY OF THEM MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT TO THE WAIVER OF RIGHT TO TRIAL BY JURY.

25.    Specific Performance.  Each of the parties agrees and acknowledges that in the event of any breach of this Agreement, the non-breaching party would be irrevocably harmed and would not be made whole by monetary damages.  It is accordingly agreed that the parties hereto shall and do hereby waive the defense in any action for specific performance that a remedy at law would be adequate and that the parties hereto, in addition to any other remedy to which they made be entitled at law or in equity, shall be entitled to compel specific performance of this Agreement in any action instituted in the Supreme Court of the State of New York or the United States District Court of the Southern District of New York,

or, in the event such courts shall not have jurisdiction of such action, in any court of the United States or any state thereof having subject matter jurisdiction of such actions.

26.     Legend; Further Assurances.

(a)     The Junior Creditors and each Obligor will cause each Junior Document and any other instrument or agreement hereafter evidencing or guaranteeing any Junior Indebtedness to be indorsed with substantially the following legend:

> "The liens on the Collateral (as defined in the Third Amended and Restated Intercreditor and Subordination Agreement hereinafter referred to) securing the indebtedness evidenced by this instrument is subordinated to the liens on the Collateral (as defined in the Third Amended and Restated Intercreditor and Subordination Agreement hereinafter referred to) securing the Senior Indebtedness (as defined in the Third Amended and Restated Intercreditor and Subordination Agreement hereinafter referred to) pursuant to, and to the extent provided in, the Third Amended and Restated Intercreditor and Subordination Agreement, dated as of June 30, 2014 by and between Macquarie US Trading LLC, as senior agent, and Cortland Capital Market Services, LLC, as junior agent, and acknowledged by Relativity Holdings, LLC, Relativity Media, LLC and their subsidiaries."

(b)     The Junior Creditors and the Obligors will mark their books or accounts or take such other action as shall be effective to give reasonable notice of the effect of this Agreement.  The Junior Creditors will, at Obligors' expense and at any time and from time to time, promptly execute and deliver all further instruments and other documents, and take all further action, that may be necessary or, in the opinion of the Senior Agent, desirable, or that the Senior Agent may reasonably request, in order to protect any right or interest granted or purported to be granted hereby or to enable the Senior Creditors to exercise and enforce their rights and remedies hereunder.

27.     Cash Management.  Each of the Secured Creditors agrees and acknowledges that (i) each Secured Creditor has a lien on certain deposit accounts of the Borrowers and Guarantors party to the Senior Documents(the "RML Distribution  Accounts") and (ii) the Secured Creditors have entered into deposit account control agreements with respect to the RML Distribution Accounts (the "Control Agreements").  Pursuant to the Control Agreements, until all Senior Indebtedness has been Paid in Full, the Senior Agent shall be the "Controlling Agent" and the "Controlling Secured Party", as applicable, under the Control Agreements.  If the Senior Agent exercises a notice of control under a Control Agreement, the Senior Agent hereby agrees that it shall (x) apply all identifiable cash proceeds related to each P&A Picture (as defined in the Senior Documents) to the Senior Indebtedness applicable to such P&A Picture until the Senior Indebtedness has been Paid in Full and (y) transfer all other cash subject to the Control Agreements to the Junior Agent to be applied to the Junior Indebtedness.

[signature page follows]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first herein above set forth.

MACQUARIE US TRADING LLC,
as Senior Agent

By: _____
Name:
Title:
      Robert M. Perdock
      Managing Director

By: _____
Name:
Title:
           Anita Chiu
         Associate Director

CORTLAND CAPITAL MARKET
SERVICES LLC,
as Junior Agent

By: _____
Name: Emily Ergang Pappas
Title: Associate Cansel

Each of the undersigned hereby acknowledges and agrees to the foregoing terms and provisions. By its signature below, each of the undersigned agrees that it will, together with its successors and assigns, be bound by the provisions hereof.

Each of the undersigned agrees that any Secured Creditor holding or controlling Collateral does so as bailee (under the UCC) for each other Secured Creditor which has a lien on such Collateral and is hereby authorized to and may turn over to such other Secured Creditors upon request therefor (and provided there are outstanding obligations owing to such Secured Creditors under their respective Documents) any such Collateral, after all obligations and indebtedness of the undersigned to the bailee Secured Creditors have been fully paid and performed.

Each of undersigned acknowledges and agrees that:  (i) although it may sign this Third Amended and Restated Intercreditor and Subordination Agreement it is not a party hereto and does not and will not receive any right, benefit, priority or interest under or because of the existence of the foregoing Third Amended and Restated Intercreditor and Subordination Agreement, and (ii) it will execute and deliver such additional documents and take such additional action as may be necessary or desirable in the reasonable opinion of any of the Secured Creditors to effectuate the provisions and purposes of the foregoing Third Amended and Restated Intercreditor and Subordination Agreement.

[signature pages follows]

OBLIGORS:
RELATIVITY MEDIA, LLC,
RML ACQUISITIONS I, LLC,
RML ACQUISITIONS II, LLC,
RML ACQUISITIONS III, LLC,
RML ACQUISITIONS IV, LLC,
RML ACQUISITIONS V, LLC,
RML ACQUISITIONS VI, LLC,
RML ACQUISITIONS VII, LLC,
RML ACQUISITIONS VIII, LLC,
RELATIVITY ACQUISITIONS IX, LLC,
RML TURKEYS FILMS, LLC,
PARANOIA ACQUISITIONS, LLC,
ONE LIFE ACQUISITIONS, LLC,
RML JACKSON LLC,
ROGUELIFE LLC,
ROGUE GAMES, LLC,
ROGUE DIGITAL, LLC,
RELATIVITY SKY LAND ASIA
HOLDINGS, LLC,
RML DISTRIBUTION DOMESTIC, LLC,
RML DISTRIBUTION INTERNATIONAL,
LLC,
RML INTERNATIONAL ASSETS, LLC,
RELATIVITY FOREIGN, LLC,
RMLDD FINANCING, LLC,
RML FILMS PR, LLC,
RELATIVITY SENATOR, LLC,
RELATIVITY REAL, LLC,
BRANT POINT PRODUCTIONS, LLC,
CISCO BEACH MEDIA, LLC,
ENGLISH BREAKFAST MEDIA, LLC,
EINSTEIN RENTALS, LLC,
GREAT POINT PRODUCTIONS, LLC,
LONG POND MEDIA, LLC,
MADAKET ROAD MUSIC, LLC,
MADAKET PUBLISHING, LLC,
MIACOMET MEDIA LLC,
ORANGE STREET MEDIA, LLC,
STRAIGHT WHARF PRODUCTIONS, LLC,
TUCKERNUCK MUSIC, LLC,
TUCKERNUCK PUBLISHING, LLC,
RELATIVITY FILMS, LLC,
RELATIVITY DEVELOPMENT, LLC,
CINEPOST, LLC,
STORY DEVELOPMENT, LLC,
RELATIVITY MEDIA FILMS, LLC,
RELATIVITY FILM FINANCE, LLC,
RELATIVITY FILM FINANCE II, LLC,
RELATIVITY FILM FINANCE III, LLC,
RELATIVITY MEDIA DISTRIBUTION, LLC,
RML FILM DEVELOPMENT, LLC,
RELATIVITY MUSIC GROUP, LLC,
RELATIVE MOTION MUSIC, LLC,
RELATIVE VELOCITY MUSIC, LLC,

3 DAYS TO KILL PRODUCTIONS, LLC,
21 & OVER PRODUCTIONS, LLC,
A PERFECT GETAWAY, LLC,
A PERFECT GETAWAY PR, LLC,
ARMORED CAR PRODUCTIONS, LLC,
BEST OF ME PRODUCTIONS, LLC,
BLACKBIRD PRODUCTIONS, LLC,
BRICK MANSIONS ACQUISITIONS, LLC,
BRILLIANT FILMS, LLC,
BROTHERS PRODUCTIONS, LLC,
BROTHERS SERVICING, LLC,
CATFISH PRODUCTIONS, LLC,
CINE PRODUCTIONS, LLC,
DEN OF THIEVES FILMS, LLC,
DON JON ACQUISITIONS, LLC,
FURNACE FILMS, LLC,
GUIDO CONTINI FILMS, LLC,
HUNTER KILLER PRODUCTIONS, LLC,
JGAG ACQUISITIONS, LLC,
LEFT BEHIND ACQUISITIONS, LLC,
MALAVITA PRODUCTIONS, LLC,
MERCHANT OF SHANGHAI PRODUCTIONS, LLC,
MOVIE PRODUCTIONS, LLC,
MOST WONDERFUL TIME PRODUCTIONS, LLC,
PHANTOM ACQUISITIONS, LLC,
POCOMO PRODUCTIONS, LLC,
RELATIVITY TV, LLC,
RML DAMASCUS FILMS, LLC,
RML DESERT FILMS, LLC,
RML DOCUMENTARIES, LLC,
RML DR FILMS, LLC,
RML ECHO FILMS, LLC,
RML ESCOBAR FILMS, LLC,
RML HECTOR FILMS LLC,
GOTTI ACQUISITIONS, LLC,
RML NOVEMBER FILMS LLC,
RML OCULUS FILMS, LLC,
RML ROMEO AND JULIET FILMS, LLC,
RML SOMNIA FILMS, LLC,
RML TIMELESS PRODUCTIONS, LLC,
RML VERY GOOD GIRLS FILMS, LLC,
SAFE HAVEN PRODUCTIONS, LLC,
SANTA CLAUS PRODUCTIONS, LLC,
SANCTUM FILMS, LLC,
SMITH POINT PRODUCTIONS, LLC,
SPY NEXT DOOR, LLC,
SNOW WHITE PRODUCTIONS, LLC,
STRANGERS II, LLC,
STRETCH ARMSTRONG PRODUCTIONS, LLC,
STUDIO MERCHANDISE, LLC,

By: _____
Name: Greg Shamo
Title: Authorized Signatory

SIGNATURE PAGE TO THIRD AMENDED AND RESTATED INTERCREDITOR AND SUBORDINATION AGREEMENT

OBLIGORS (CONTINUED):

THE CROW PRODUCTIONS LLC,
TOTALLY INTERNS, LLC,
WRIGHT GIRLS FILMS, LLC,
ZERO POINT ENTERPRISES, LLC,
RELATIVITY PRODUCTIONS LLC,
RELATIVITY ROGUE, LLC,
RELATIVITY JACKSON, LLC,
RELATIVITY INDIA HOLDINGS, LLC,
DR PRODUCTIONS, LLC,
MIRACLE SHOT PRODUCTIONS, LLC,
TRIBES OF PALOS VERDES PRODUCTION LLC,
OUT OF THIS WORLD PRODUCTIONS LLC

By: _____
Name: Greg Shamo
Title: Authorized Signatory

RELATIVITY HOLDINGS LLC

By: _____

    Name: Ryan Kavanaugh
    Title: Chief Executive Officer