TOGUT, SEGAL & SEGAL LLP  
One Penn Plaza, Suite 3335  
New York, New York 10119  
(212) 594-5000  
Albert Togut  
Frank A. Oswald  
Scott E. Ratner  
Anthony F. Pirraglia  

Hearing Time:  August 14, 2015 at 11:00 a.m. (ET)

*Proposed Counsel to Official Committee of Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT  
SOUTHERN DISTRICT OF NEW YORK  
-----------------------------------------------------------------X  
In re:                                                                          :    Chapter 11  
                                                                                    :  
RELATIVITY FASHION, LLC, *et al.*,[1]          :    Case No. 15-11989 (MEW)  
                                                                                    :  
                                        Debtors.                 :    (Jointly Administered)  
                                                                                    :  
-----------------------------------------------------------------X  

**PRELIMINARY OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' MOTION FOR (I) AN ORDER (A) ESTABLISHING BID PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) APPROVING THE STALKING HORSE APA AND BIDDING PROTECTIONS, AND (C) GRANTING CERTAIN RELATED RELIEF AND (II) AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO, AND (C) GRANTING CERTAIN RELATED RELIEF**

TO THE HONORABLE MICHAEL E. WILES,  
UNITED STATES BANKRUPTCY JUDGE:

       The Official Committee of Unsecured Creditors (the "Committee")

appointed in the chapter 11 cases of Relativity Fashion, LLC, *et al.*, the above-captioned

debtors and debtors in possession herein (the "Debtors"), by and through its proposed

---

[1]   The 145 Debtors in these Chapter 11 Cases are set forth on page (i).

The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtors' federal tax identification number, are: Relativity Fashion, LLC (4571); Relativity Holdings LLC (7052); Relativity Media, LLC (0844); Relativity REAL, LLC (1653); RML Distribution Domestic, LLC (6528); RML Distribution International, LLC (6749); RMLDD Financing, LLC (9114); 21 & Over Productions, LLC (7796); 3 Days to Kill Productions, LLC (5747); A Perfect Getaway P.R., LLC (9252); A Perfect Getaway, LLC (3939); Armored Car Productions, LLC (2750); Best of Me Productions, LLC (1490); Black Or White Films, LLC (6718); Blackbird Productions, LLC (8037); Brant Point Productions, LLC (9994); Brick Mansions Acquisitions, LLC (3910); Brilliant Films, LLC (0448); Brothers Productions, LLC (9930); Brothers Servicing, LLC (5849); Catfish Productions, LLC (7728); Cine Productions, LLC (8359); CinePost, LLC (8440); Cisco Beach Media, LLC (8621); Cliff Road Media, LLC (7065); Den of Thieves Films, LLC (3046); Don Jon Acquisitions, LLC (7951); DR Productions, LLC (7803); Einstein Rentals, LLC (5861); English Breakfast Media, LLC (2240); Furnace Films, LLC (3558); Gotti Acquisitions, LLC (6562); Great Point Productions, LLC (5813); Guido Contini Films, LLC (1031); Hooper Farm Music, LLC (3773); Hooper Farm Publishing, LLC (3762); Hummock Pond Properties, LLC (9862); Hunter Killer La Productions, LLC (1939); Hunter Killer Productions, LLC (3130); In The Hat Productions, LLC (3140); J & J Project, LLC (1832); JGAG Acquisitions, LLC (9221); Left Behind Acquisitions, LLC (1367); Long Pond Media, LLC (7197); Madaket Publishing, LLC (9356); Madaket Road Music, LLC (9352); Madvine RM, LLC (0646); Malavita Productions, LLC (8636); MB Productions, LLC (4477); Merchant of Shanghai Productions, LLC (7002); Miacomet Media LLC (7371); Miracle Shot Productions, LLC (0015); Most Wonderful Time Productions, LLC (0426); Movie Productions, LLC (9860); One Life Acquisitions, LLC (9061); Orange Street Media, LLC (3089); Out Of This World Productions, LLC (2322); Paranoia Acquisitions, LLC (8747); Phantom Acquisitions, LLC (6381); Pocomo Productions, LLC (1069); Relative Motion Music, LLC (8016); Relative Velocity Music, LLC (7169); Relativity Development, LLC (5296); Relativity Film Finance II, LLC (9082); Relativity Film Finance III, LLC (8893); Relativity Film Finance, LLC (2127); Relativity Films, LLC (5464); Relativity Foreign, LLC (8993); Relativity India Holdings, LLC (8921); Relativity Jackson, LLC (6116); Relativity Media Distribution, LLC (0264); Relativity Media Films, LLC (1574); Relativity Music Group, LLC (9540); Relativity Production LLC (7891); Relativity Rogue, LLC (3333); Relativity Senator, LLC (9044); Relativity Sky Land Asia Holdings, LLC (9582); Relativity TV, LLC (0227); Reveler Productions, LLC (2191); RML Acquisitions I, LLC (9406); RML Acquisitions II, LLC (9810); RML Acquisitions III, LLC (9116); RML Acquisitions IV, LLC (4997); RML Acquisitions IX, LLC (4410); RML Acquisitions V, LLC (9532); RML Acquisitions VI, LLC (9640); RML Acquisitions VII, LLC (7747); RML Acquisitions VIII, LLC (7459); RML Acquisitions X, LLC (1009); RML Acquisitions XI, LLC (2651); RML Acquisitions XII, LLC (4226); RML Acquisitions XIII, LLC (9614); RML Acquisitions XIV, LLC (1910); RML Acquisitions XV, LLC (5518); RML Bronze Films, LLC (8636); RML Damascus Films, LLC (6024); RML Desert Films, LLC (4564); RML Documentaries, LLC (7991); RML DR Films, LLC (0022); RML Echo Films, LLC (4656); RML Escobar Films LLC (0123); RML Film Development, LLC (3567); RML Films PR, LLC (1662); RML Hector Films, LLC (6054); RML Hillsong Films, LLC (3539); RML IFWT Films, LLC (1255); RML International Assets, LLC (1910); RML Jackson, LLC (1081); RML Kidnap Films, LLC (2708); RML Lazarus Films, LLC (0107); RML Nina Films, LLC (0495); RML November Films, LLC (9701); RML Oculus Films, LLC (2596); RML Our Father Films, LLC (6485); RML Romeo and Juliet Films, LLC (9509); RML Scripture Films, LLC (7845); RML Solace Films, LLC (5125); RML Somnia Films, LLC (7195); RML Timeless Productions, LLC (1996); RML Turkeys Films, LLC (8898); RML Very Good Girls Films, LLC (3685); RML WIB Films, LLC (0102); Rogue Digital, LLC (5578); Rogue Games, LLC (4812); Roguelife LLC (3442); Safe Haven Productions, LLC (6550); Sanctum Films, LLC (7736); Santa Claus Productions, LLC (7398); Smith Point Productions, LLC (9118); Snow White Productions, LLC (3175); Spy Next Door, LLC (3043); Story Development, LLC (0677); Straight Wharf Productions, LLC (5858); Strangers II, LLC (6152); Stretch Armstrong Productions, LLC (0213); Studio Merchandise, LLC (5738); Summer Forever Productions, LLC (9211); The Crow Productions, LLC (6707); Totally Interns, LLC (9980); Tribes of Palos Verdes Production, LLC (6638); Tuckernuck Music, LLC (8713); Tuckernuck Publishing, LLC (3960); Wright Girls Films, LLC (9639); Yuma, Inc. (1669); Zero Point Enterprises, LLC (9558). The location of the Debtors' corporate headquarters is: 9242 Beverly Blvd., Suite 300, Beverly Hills, CA 90210.

counsel, Togut, Segal & Segal, LLP (the "Togut Firm"), hereby submits this preliminary objection (the "Preliminary Objection") to the *Debtors' Motion for (I) An Order (A) Establishing Bid Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Approving the Stalking Horse APA and Bidding Protections, and (C) Granting Certain Related Relief and (II) An Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related to Thereto, and (C) Granting Certain Related Relief* [Docket No. 25] (the "Sale Motion").[2]  In support of this Preliminary Objection, the Committee states as follows:

**PRELIMINARY STATEMENT**

The Debtors have entered into an asset purchase agreement (the "APA") with certain of their senior prepetition lenders ("RM Bidder Group" or the "Proposed Purchasers") providing for the sale of substantially all of the Debtors' assets in consideration for what is essentially a credit bid of $250 million plus an assumption of liabilities which have yet to be determined or finalized.  Without conducting fulsome prepetition marketing efforts to solicit interest and bids for their assets, in whole or in part, and instead conducting a search for financing that failed, the Debtors chose to enter into the APA with certain of their existing lenders and now seek, pursuant to the bid procedures outlined in the Sale Motion, an extremely expedited sale process for the Debtors' large, complex and privately-held global entertainment business, which the Debtors themselves valued significantly higher in connection with their recent capital

---

[2]  Capitalized terms used herein, but not otherwise defined, shall have the meaning ascribed to such terms in the Sale Motion.  Additionally, capitalized terms used in the Preliminary Statement, but not defined therein, shall have the meaning ascribed to such terms below.

2

and debt raising efforts. And, despite a hearing scheduled for this Friday, August 14 to consider approval of the Proposed Bid Procedures, the form of APA was filed with the Court by the Debtors only this Monday, August 10. It has been impossible to evaluate the Sale Motion in any meaningful way. Without a fair and reasonable sale process which provides third parties adequate information and the time to evaluate each of the Debtors' businesses in order to formulate competing offers, it will likewise be impossible for the proper value of those businesses to be realized. It is a deeply flawed sales process. If the Proposed Bid Procedures are approved by the Court as requested in the Sale Motion, no cash proceeds will be available for the unsecured creditors of the Debtors' estates.

Since its formation and selection of legal counsel and financial advisors a mere five days ago on Friday afternoon, August 7, the Committee's proposed professionals have worked diligently to get up to speed. No time has been wasted. They have communicated with, among others, the Debtors' professionals, as well as counsel for the Proposed Purchasers, counsel for junior secured creditors and other parties in interest. The Committee's professionals have done their best given the time constraints to review relevant documents and financial data to develop a working understanding of the very complex business operations and assets of the Debtors, which consist of more than 140 privately held entities. The Committee's professionals have only been able to begin to share with its Committee members the information learned and impressions formed over the past several days. Neither the Committee nor its professionals have yet had an opportunity to have meaningful negotiations with the Debtors or the Proposed Purchasers regarding modifications to the Proposed Bid Procedures; the Committee simply does not have sufficient information to do so.

From the perspective of maximizing value for the Debtors' estates and creditors, the Committee has material, substantive concerns with the Proposed Bid Procedures that are to govern the expedited sale of substantially all of the Debtors assets to the Proposed Purchasers. The sale process envisioned by the Proposed Bid Procedures is, on its face, inadequate and diminishes the prospect of a robust auction, and only serves to increase the likelihood that the RM Bidder Group will acquire the Debtors' assets for a price that is less than what might be realized if other potentially interested parties had a meaningful opportunity (particularly in light of the fact that the Debtors' assets were, concededly, not marketed prior to the commencement of these Chapter 11 Cases). Even as of today, the Debtors have still not established a data room containing the information and documentation necessary for interested third parties to conduct the due diligence necessary to evaluate whether to make a bid for some or all of the Debtors' assets and to determine that amount of consideration to be paid.

As this Court stated at the First Day Hearing, "[t]he parties who want to bid on these assets and want to have the DIP will have many benefits from Chapter 11 . . . . And the price of doing that is that they need to give [the Court] the time to ensure that this process is handled in a way that generates the best value to the estate." Transcript of Hearing Held on July 31, 2015 (the "First Day Hearing Transcript"), 37:21-38:1 [Docket No. 83]. As the Court went on to say, "I will not tie my hands with deadlines that will not allow me to have an appropriate sale process." *Id*. at 38:9-11. That, in a nutshell, is the Committee's view too.

At this time, the Committee must object to the Debtors' Proposed Bid Procedures and timeline. The Debtors did not undertake a marketing effort to sell their assets as a going concern prior to the Petition Date. Even though the Committee's

4

professionals have only been engaged for several days, they have been made aware of several parties that have interest in the Debtors' businesses.

During the brief 28-day marketing period proposed by the Debtors,[3] the following steps would need to occur as part of the Proposed Bid Procedures: (i) the identification of prospective strategic and financial purchasers of some or all of the Debtors' assets and the execution of a meaningful solicitation of interest and marketing process; (ii) the performance by the prospective bidder(s) of due diligence; (iii) the arrangement of potentially more than $250 million of financing; and (iv) documentation of a bid that complies with the numerous other requirements of a Qualified Bid. Forcing interested parties to accomplish these actions in such a short period of time will not maximize value for the Debtors' estates but will, instead, dissuade potential bidders from pursuing a transaction.

Moreover, the recently filed APA does not provide critical information needed to conduct a meaningful marketing of the Debtors' assets to potential third party bidders. For example, the APA does not specify which contracts and leases are to be assumed, nor does it allocate any portion of the credit bid consideration to specific assets and/or businesses being purchased, thereby rendering it virtually impossible for a strategic party interested in buying, as but one example, only the Debtors' television business and related assets, to determine a fair and competitive purchase price. In substance, the RM Bidder Group would have an exclusive "option" to purchase whichever of the Debtors' assets it chooses and to allocate its credit bid after the sale

---

[3] Assuming the Court approves the Proposed Bid Procedures at or shortly after the August 14, 2015 hearing, an interested party will have only just 28 days (until September 11) to submit initial bids. The auction would take place 5 days later, on September 16, just 33 days after entry of the Proposed Bid Procedures and only 48 days after the filing of these Chapter 11 Cases.

5

process has concluded. Absent a level playing field to permit fair and open bidding, the Committee intends to object to the sale of substantially all of the Debtors' assets to the RM Bidder Group without the prior exploration of value maximizing alternatives.

That said, the Committee is fully prepared to promptly engage the Debtors, Proposed Purchasers and other relevant parties in good faith negotiations aimed at improving both the terms of the Proposed Bid Procedures and recently filed APA and hopes a largely, if not fully, consensual arrangement can be achieved in advance of the final hearing on the Sale Motion.

## BACKGROUND

1. On July 30, 2015 (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code (collectively, the "<u>Chapter 11 Cases</u>"). Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and properties as debtors in possession.

2. No trustee or examiner has been appointed in the Chapter 11 Cases.

3. The Debtors comprise a privately held global entertainment company with a diversified media platform providing film, television, music and digital financing, production and distribution, branding and fashion consulting.

4. On the Petition Date, the Debtors also filed the Sale Motion and the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing and (B) Use Cash Collateral; (II) Granting the Prepetition Lenders Adequate Protection; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* [Docket No. 23], which seeks approval of certain postpetition financing.

5. The Sale Motion seeks approval of (a) proposed bidding procedures, as amended [Docket No. 122-5] (the "<u>Proposed Bid Procedures</u>"), and (b) authorization for the sale of substantially all of the Debtors' assets in accordance

6

with the Proposed Bid Procedures, the Term Sheet between the Debtors and the RM Bidder Group [Docket No. 25-2] and the subsequently filed APA. In addition, the Sale Motion seeks approval of the procedures concerning the assumption and assignment of executory contracts and authorization for the Debtors to assume certain contracts and to assign them to the Proposed Purchasers.

6. The Sale Motion provides that, pursuant to the Term Sheet, the RM Bidder Group has agreed to act as stalking horse bidder for the purchase of certain of the Debtors' assets, which include the TV, film and distribution businesses (including its interest in the RED and Sky Land ventures) and assume certain liabilities through the creation of a newly formed special purpose acquisition vehicle, to be financed by the holders of the certain Term A Loans and the Term B Loans ("RM Bidder Group").

7. Specifically, the RM Bidder Group will assume certain contractual liabilities, including any cure amounts under assumed contracts, and other specified liabilities to be finalized at a later date, including certain permitted senior liens. (Sale Motion ¶ 14.) The Debtors will file a schedule of contracts and leases proposed to be assumed and assigned by August 21, 2015. (*Id.*)

8. By the Sale Motion, the Debtors seek, as an initial matter, approval of the Proposed Bid Procedures which sets out the following timeline for the sale process:

- Deadline for prospective bidders to submit documents for qualification as an Interested Party: **September 3, 2015**
- Deadline to submit bids: **September 11, 2015**
- Auction Date: **September 16, 2015**
- Sale Hearing Date: **September 21, 2015**
- Deadline for closing sale: **October 2, 2015**

7

9. As part of the Proposed Bid Procedures, the Debtors are seeking approval of a Break-Up Fee of $3.75 million and, in addition, Expense Reimbursement up to $1 million to cover the RM Bidder Group's costs and expenses. (*See* Proposed Bid Procedures at p. 8.) The Sale Motion provides that the Break-Up Fee represents approximately 1.5% of the stalking horse bid (which provides no new money to the estates), and requires that the Break-Up Fee and Expense Reimbursement, if payable, be deemed an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code.

10. On July 31, 2015, the Court entered the *Interim Order Pursuant to Sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code (I) Authorizing Debtors to Obtain Superpriority Secured Debtor-in-Possession Financing, (II) Authorizing Debtors to Use Cash Collateral, (III) Granting Adequate Protection to the Cortland Parties, (IV) Scheduling A Final Hearing, and (V) Granting Related Relief* [Docket No. 48]. A second interim hearing on same will be held on August 14, 2015 at 11:00 a.m. [Docket No. 99].

11. On the afternoon of August 7, 2015, the United States Trustee for the Southern District of New York appointed a seven-member Committee, consisting of: (i) Carat USA, Inc.; (ii) NBC Universal; (iii) Cinedigm Corp.; (iv) Technicolor, Inc.; (v) Allied Advertising Limited Partnership (d/b/a Allied Integrated Marketing); (vi) Comen VFX LLC; and (vii) Create Advertising Group, LLC [Docket. No. 114].

12. Immediately following its formation, the Committee considered various law firms that offered their services and determined on August 7th to employ the Togut Firm as its counsel, as permitted by section 1103(a) of the Bankruptcy Code and Bankruptcy Rule 2014(a). The Committee likewise undertook a similar process and determined to retain Houlihan Lokey to serve as its financial advisors. The

8

Committee's retention of both the Togut Firm and Houlihan Lokey remains subject to Bankruptcy Court approval

13. On August 10, 2015, the Debtors filed, among other things, amended Proposed Bid Procedures, the proposed APA [Docket No. 122-2] and the *Declaration of C.J. Brown In Support Of Debtors' Motion For (I) An Order (A) Establishing Bid Procedures For The Sale Of Substantially All Of The Debtors' Assets, (B) Approving Stalking Horse Asset Purchase Agreement And Bidding Protections, And (C) Granting Certain Related Relief, And (Ii) An Order (A) Approving The Sale Of A Substantial Portion Of The Debtors' Assets Free And Clear Of Liens, Claims, Encumbrances, And Other Interests, (B) Approving The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases Related Thereto, And (C) Granting Certain Related Relief* [Docket No. 130].

14. The APA further describes the assets to be acquired by the Proposed Purchasers as the Debtors' sports, music, television, motion picture and distribution businesses (including its interest in the RED and Sky Land ventures) (collectively, the "Purchased Assets").[4]

15. The deadline to object to the Sale Motion is today at 4:00 p.m., and a hearing to consider the Sale Motion is scheduled for this Friday, August 14, 2015, at 11:00 a.m. [Docket No. 81].

---

[4] The scope of the Purchased Assets is not entirely defined, but will include assets used or held for use in the certain of the Debtors' businesses, including, all accounts receivable, cash and cash equivalents customer account information, equity of certain of non-debtor subsidiaries, **and avoidance actions**.

9

**PRELIMINARY OBJECTIONS**

16. The Committee respectfully submits that a brief adjournment of the hearing to consider the Proposed Bid Procedures is appropriate. Absent such an adjournment, the Committee objects to approval of the Proposed Bid Procedures because: (a) they establish an inappropriately short sale timeframe, which precludes fulsome marketing of the Debtors' assets and limits any prospective bidder's ability to adequately assess the Purchased Assets; (b) the proposed Break-Up Fee and Expense Reimbursement are unwarranted and inappropriate under the circumstances; and (c) the Proposed Bid Procedures are deficient in certain other material respects, including that they unjustifiably favor the RM Bidder Group over any other prospective bidders and allow the RM Bidder Group to credit bid before the Committee has had an opportunity to investigate and to confirm the nature and extent of the asserted claims and liens that the RM Bidder Group intends to use as consideration to purchase the Debtors' assets.

**I.    The Proposed Bid Procedures Would
       Establish an Inappropriately Short Sale Timeline**

17. The Proposed Bid Procedures would establish an unreasonably aggressive timeline for the sale process that is insufficient to ensure that the value of the Debtors' assets is maximized. Without thorough marketing efforts, which both allows sufficient time to reach all potential purchasers and affords those parties the opportunity to complete requisite due diligence, the Debtors severely limit their chances of obtaining the highest and best offer for all (or any portion) of its businesses. Among the many matters it has had to address in the five days since its appointment, the Committee has only begun identifying and analyzing alternative financing options and sale transactions. A longer timeframe would enable the Debtors' and the

Committee's advisors to canvas alternative potential acquirers, as well as to investigate alternative sale structures and financing arrangements that could increase value for the estates over the currently contemplated proposal.

18. The Debtors justify the proposed sale process as "the best means of maximizing the value of their assets and the only means of maintaining Relativity as a going concern, which will enable the Debtors to retain hundreds of jobs and significantly reduce claims against the estates." (Sale Motion ¶ 10.) Most debtors, however, proffer these justifications for almost every proposed section 363 sale, but the vast majority of such sales do not involve the disposition of substantially all of the debtor's assets without presenting potential purchasers an opportunity to fully assess the nature and value of the assets or the scope of the stalking horse offer.

19. Here, as the Debtors have conceded, prior to the Petition Date there had been no efforts to market the Debtors' assets either through a transaction similar to the RM Bidder Group offer or through separate marketing of each of the Debtors' business units. Although the Debtors have been contacted by at least one party with *bona fide* interest and the financial wherewithal to purchase the Debtors' TV business, the Debtors do not yet have a data room containing the requisite due diligence materials up and running. The Committee appreciates and acknowledges that the Debtors and their advisors are likely making every effort to gather and organize the information and materials necessary to solicit potentially interested parties in the marketplace and to support their due diligence activities, but the fact that such materials are not yet accessible underscores the fact that the Debtors need more time to allow their investment bankers to properly market the Debtors' assets so as to maximize value effectively. *See, e.g., Siddiqui v. Gardner (In re Williamson)*, 327 B.R. 578, 581 (Bankr. E.D. Va. 2005) ("The objective is to obtain the best price so as to assure the maximum

distribution to creditors. This is accomplished, in part, by assuring that the marketing is full, fair and complete and that all prospective purchasers have a fair opportunity to participate in the process.") It is unknown when such materials will be available, or how much of the 28-day marketing period provided under the Proposed Bid Procedures will have elapsed before such materials are available to potential bidders.

20. What is clear, therefore, is that given the Debtors' expansive and complex corporate structure, and the various types and tranches of debt associated with its businesses, requiring the submission of a Qualified Bid in 28-days is unrealistic. *See, e.g.*, Transcript of Hearing at 20:16-20, *In re Energy Future Holdings Corp.*, Case No. 14-10979 (CSS) (Bankr. D. Del. Nov. 3, 2014) [Docket No. 2699] (holding that "the proposed timelines must be stretched . . . to allow for sufficient time for any interested party to develop an alternative transaction"). Even for a debtor with a simple business and corporate structure, such a timeline would be ambitious and would likely render impossible such debtor's efforts to meaningfully market their assets.

21. To further complicate matters, while the Debtors promote the RM Bidder Group offer as a bid-generating "floor for the value of the Purchased Assets" (Sale Motion ¶ 19), that "floor" remains wholly undefined. *First*, the Debtors have not allocated any portion of the credit bid to specific assets or business divisions, severely limiting an interested party's ability to assess the stalking horse offer. The Term Sheet provided that the Proposed Purchasers would only acquire "all of the [Debtors'] assets used or held for use in the [Debtors'] TV, film and distribution businesses (including its interest in the RED and Sky Land ventures)" (Motion ¶ 11), yet the APA provides for the sale of additional businesses: the Sports and Music businesses (APA at Recital B; *id*. at § 2.1(b); *id*. at Exhibit A). A potential bidder can only guess as to what value the Debtors attribute to any specific business unit.

12

22.     *Second*, a component of the consideration included in the RM Bidder Group offer is the assumption of certain liabilities related to the Purchased Assets and allowance of certain permitted senior liens. (Sale Motion ¶ 6; APA §§ 2.1, 2.3) However, neither the Sale Motion, the APA nor any other materials provided by the Debtors clearly establishes the fair value of these liabilities, and it is not clear to what extent the RM Bidder Group has valid liens and/or sufficient priority in their purported senior secured liens to acquire certain assets with a credit bid. This is especially aggravated given that the corporate and capital structure of the 145 Debtors is extremely complex and the asserted claims of the RM Bidder Group cannot be fully vetted by the Committee or interested parties prior to the proposed September 16 auction date.

23.     *Third*, the Debtors have not yet filed schedules and statements of financial affairs, and are not required to until September 13, 2015 -- two days after the Bid Deadline [Docket No. 69]. Taken together, the lack of information makes it impossible to truly quantify the proper amount for a potential bidder's overbid.

24.     The highly expedited sale process proposed by the Debtors is not justified under the circumstances of these cases and is not calculated to maximize the value of the Debtors' estates for the benefit of its creditors. Accordingly, the Committee objects to the Proposed Bid Procedures requested through the Sale Motion and respectfully requests that the Court deny them at this time.

## II.    The Break-Up Fee and Expense Reimbursement Are Unwarranted and Excessive

25.     The Break-Up Fee and Expense Reimbursement for which the Debtors seek Court approval at this time are unwarranted and inappropriate for three fundamental reasons. *First*, neither the Debtors nor the RM Bidder Group have

13

explained or demonstrated how they are "actual, necessary" expenses compensable under the Bankruptcy Code. *Second*, it is unclear that a proposed purchaser who makes a credit bid as consideration for a debtor's assets (as opposed to say cash) is entitled to break-up fees and expense reimbursement. *Third*, even if a break-up fee and/or expense reimbursement were warranted, the proposed Break-Up Fee and Expense Reimbursement for which the Debtors here seek Court approval are simply too high in light of the fact that the only new money provided is the $45 million DIP loan to be credited against the purchase price.

26. As an initial matter, the Break-Up Fee and Expense Reimbursement are unwarranted under the circumstances of these cases. At least one Court of Appeals has held that break-up fees and expense reimbursement are properly analyzed as administrative expenses which must satisfy the requirements of section 503 of the Bankruptcy Code. *See Calpine Corp. v. O'Brien Env. Energy, Inc. (In re O'Brien Env. Energy, Inc.)*, 181 F.3d 527, 532 (3d Cir. 1999).[5]

27. Furthermore, break-up fees are generally meant as compensation for the diligence and efforts undertaken by bidders for companies. Here, the Proposed

---

[5] *See also In re Old Carco LLC*, No. 09-50002, 2009 WL 8189526 (Bankr. S.D.N.Y. Feb. 25, 2010) ("The Break-up Fee to be paid to the Buyer under the circumstances described is . . . an actual cost and expense necessary to maximize the value of Debtors' bankruptcy estates and, as such, is entitled to priority under sections 503(b) and 507(a)(2) of the of the Bankruptcy Code."); *In re Chrysler LLC*, No. 09-50002, 2009 WL 1360869, at *2 (Bankr. S.D.N.Y. May 7, 2009) ("The Breakup Fee . . . if triggered, shall be deemed to be an actual and necessary cost and expense of preserving these estates."); *In re Fortunoff Fine Jewelry & Silverware, LLC*, No. 08-10353, 2008 WL 618986, at *47 (Bankr. S.D.N.Y. Feb. 15, 2008) ("Any payment of the Break Up Fee and Reimbursement Amount shall be deemed to be an administrative expense, with priority over any and all claims of the kind specific in Sections 503(b) and 507(b) of the Bankruptcy Code"). *But see United States Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*, No. 02 Civ 2854, 2003 WL 21738964, at *9-10 (S.D.N.Y. July 23, 2003) (considering *In re O'Brien Env. Energy* and reaching a different conclusion). Accordingly, the determination of whether to allow break-up fees and expense reimbursements "depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *See In re O'Brien Env. Energy*, 181 F.3d at 535; *see also In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010).

Purchasers, as holders of the Term A and Term B Loans, have a deep understanding of the Debtors' capital structure and significant familiarity with the Debtors' businesses, so it is likely that very little marginal time was spent on sale-related diligence, eliminating the need to be compensated for this effort.

28. Neither the Debtors nor the RM Bidder Group have presented any evidence that the RM Bidder Group has provided actual or necessary services to the Debtors' estates warranting an award of the Break-Up Fee or the Expense Reimbursement, *let alone both*. Since the RM Bidder Group is not being required to put down a good faith deposit, and there is no indication that the RM Bidder Group has contributed in any way to the Debtors' marketing efforts, it is unclear what purpose the requested Break-Up Fee is intended to serve here other than to provide a windfall to certain secured creditors in the event that its *credit* bid is unsuccessful. Indeed, the Expense Reimbursement is apparently intended to compensate the RM Bidder Group for its actual out-of-pocket costs and expenses (*see* Sale Motion ¶ 11 at p. 8), yet the RM Bidder Group is presumptively already being adequately compensated for its provision of the DIP Loan through the terms of that loan. Neither the Debtors nor the RM Bidder Group have offered any justification as to why or how the fees and expenses for which reimbursement is requested have actually benefitted the Debtors' estates. Indeed, any expenses incurred by the RM Bidder Group were almost certainly incurred for its own benefit.

29. Second, as a credit bidder, it is unclear why the RM Bidder Group should be entitled to a break-up fee or expense reimbursement at all. *See, e.g.*, *In re Tom's Foods, Inc.*, No. 05-40683, 2005 WL 3022022, at *3 (Bankr. M.D. Ga. Sept. 23, 2005) (approving debtor's motion to schedule an auction and for certain bidding procedures where the DIP lenders serving as the stalking horse bidder "would not receive any

15

break-up fees or reimbursement of expenses."); *In re Age Ref., Inc.*, No. 10-50501, 2010 Bankr. LEXIS 5724, at *8 (Bankr. W.D. Tex. Dec. 21, 2010) ("Notwithstanding the foregoing, if a Lender is the Stalking Horse Bidder, the Lender will not be entitled to a Break Up Fee to the extent that the Stalking Horse Bid is a Credit Bid.").

30.     Finally, even if some break-up fee and/or expense reimbursement is warranted, the requested 1.5% Break-Up Fee and $1 million Expense Reimbursement are too high and have not been justified by the Debtors.  In determining whether the amount of a break-up fee is reasonable, courts must consider whether the fees "provide an incentive for an initial bidder to serve as a so-called 'stalking horse,' whose initial research, due diligence, and subsequent bid may encourage later bidders." *In re 310 Associates*, 346 F.3d 31, 34 (2d Cir. 2003) (quoting *Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 661-62 (S.D.N.Y. 1992)).  Neither the Debtors nor the RM Bidder Group has identified any of the costs incurred by the RM Bidder Group or any specific research or due diligence performed to warrant the Break-Up Fee.  Nor have the Debtors provided any factual evidence whatsoever indicating that the Break-Up Fee will encourage, rather than discourage, an active bidding process.[6]

31.     Accordingly, since both the Break-Up Fee and the Expense Reimbursement are unwarranted and excessive, the Committee respectfully requests that the Court deny that part of the Sale Motion at this time.

---

[6]  *See In re Integrated Resources*, 147 B.R. at 660 ("In assessing the incentive effect of the Break-up Fee . . . the court should consider whether the proposed acquirer attracted other bidders or simply received a potential windfall."); *Gey Assocs. Gen. P'Ship v. 310 Assocs., L.P.*, No. 02 Civ 0710, 2002 WL 31426344, at *2-3 (S.D.N.Y. Oct. 23, 2002) (holding that bankruptcy judge's decision to vacate prior order awarding appellant a breakup fee was not an abuse of discretion where breakup fee was unnecessary and did not encourage bidding), *aff'd*, 346 F.3d 31 (2d Cir. 2003).

### III. A Number of Other Features of the Proposed Bid Procedures Warrant Denial of the Sale Motion

32. Although the Committee and its professionals have had only five business days to evaluate the Sale Motion, and two days to review the APA and its exhibits, they have identified several actual and potential concerns regarding approval of the Proposed Bid Procedures. In addition to the inappropriately short sale timeline and the unwarranted and excessive Break-Up Fee and Expense Reimbursement for a credit bid sale, the Committee has identified the following objectionable features of the Proposed Bid Procedures:

(a) The Committee has not yet had sufficient time to evaluate the extent and validity of the RM Bidder Group's alleged secured claims to determine whether the RM Bidder Group is actually eligible to credit bid and, if so, to what extent. It would be appropriate to require the RM Bidder Group to provide a "good faith deposit" under these circumstances, at least until the Committee has had a full and fair opportunity to investigate the validity of the RM Bidder Group's alleged secured claims. *See In re Olde Prairie Block, LLC,* 464 B.R. 337, 348 (Bankr. N.D. Ill. 2011) ("A secured creditor's ability to credit bid is within the discretion of the court."); *In re NJ Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *16 (Bankr. D.N.J. June 29, 2006) ("[T]he language of § 363(k) does not prohibit a bankruptcy court from placing conditions upon a secured creditor's ability to credit bid."); *In re Theroux*, 169 B.R. 498, 499 n.3 (Bankr. D.R.I. 1994) ("[T]here is no absolute entitlement to credit bid.").

(b) The Purchased Assets include the Debtors' chapter 5 avoidance actions and other causes of action. (APA § 2(b)(ii).) Neither the Committee nor any other party in interest currently has sufficient information to determine the reasonable value of these causes of action. Thus, the Committee cannot determine if the proposed Purchase Price is reasonable at this time.[7]

---

[7] Moreover, although the Committee has not yet had a chance to fully investigate this issue, the Committee is concerned that a sale of the Debtors' chapter 5 avoidance actions (as opposed to proceeds of such actions) may not be possible under applicable law. *See In re Milazzo*, 450 B.R. 363, 372 (Bankr. D. Conn. 2011) ("Permitting the highest bidder at an auction to usurp the Trustee's unique statutory powers not only exceeds the scope of the narrowly defined, judicially created

*[footnote continued on the following page]*

17

  (c) The Debtors have requested a waiver of the fourteen-day stay imposed by Fed. R. Bankr. P. 6004(h) without offering a justification for such a waiver. (Sale Motion ¶¶ 42-44.)

  (d) The Committee has not yet had sufficient time to evaluate whether the RM Bidder Group is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code. (Sale Motion ¶¶ 34-35.)

33. With additional time to evaluate the Proposed Bid Procedures and other relevant documents, the Committee may identify even more issues. Alternatively, with additional time to discuss these concerns with the Debtors and the RM Bidder Group, the Committee may be able to achieve a consensual resolution of these issues. Accordingly, the Committee respectfully requests an adjournment of the hearing to consider approval of the Proposed Bid Procedures currently scheduled for Friday, August 14. Absent such an adjournment, the Committee objects to approval of the Proposed Bid Procedures for the reasons above.

## **RESERVATION OF RIGHTS**

34. The Committee and its advisors have only had five days to review the Sale Motion, including the Proposed Bid Procedures, and to prepare this preliminary objection. Exacerbating this rush, the APA was only filed this past Monday, a mere two days ago. Under these constraints, the Committee has made every effort to review relevant documents and consider the potential impact on its constituents. However, due to the limited time and information available, it would be nearly impossible to identify all material objections to the Sale Motion, particularly the

---

exception for derivative actions, but contravenes both the provisions and the underlying policy of the Bankruptcy Code itself."); *In re Metro. Elec. Mfg. Co.*, 295 B.R. 7, 16 (Bankr. E.D.N.Y. 2003) ("The Trustee's statutory rights to commence avoidance actions pursuant to Section 544(b) of the Bankruptcy Code and the enabling statutes cannot be sold or assigned where the only benefit to the estate is the purchase price received for that purchase.").

18

Proposed Bid Procedures, by the Objection Deadline. Accordingly, the Committee reserves its rights to present additional objections to the Proposed Bid Procedures, as well as any and all objections to approval of the APA at any hearing held by the Court to consider the Sale Motion.

**WHEREFORE,** for the reasons set forth herein, the Committee requests an adjournment of the hearing to consider approval of the Proposed Bid Procedures or, in the alternative, requests that the Court sustain the objection set forth herein and not approve the Proposed Bid Procedures set forth in the Sale Motion without prejudice, and grant such other and further relief as is just and proper.

DATED:  New York, New York
August 12, 2015

Respectfully submitted,

TOGUT, SEGAL & SEGAL LLP
*Proposed Counsel to the Official Committee of Unsecured Creditors*

By:

/s/ Albert Togut
ALBERT TOGUT
FRANK A. OSWALD
SCOTT E. RATNER
ANTHONY F. PIRRAGLIA
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000