TOGUT, SEGAL & SEGAL LLP  
One Penn Plaza, Suite 3335  
New York, New York 10119  
(212) 594-5000  
Albert Togut  
Frank A. Oswald  
Scott E. Ratner  
Brian F. Moore  

Hearing Time: August 14, 2015 at 11:00 a.m. (ET)

*Proposed Counsel to Official Committee of Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT  
SOUTHERN DISTRICT OF NEW YORK  
-----------------------------------------------------------------x  
 : 
In re: : Chapter 11  
 : Case No. 15-11989 (MEW)  
RELATIVITY FASHION, LLC, *et al.*[1] :  
 :  
 Debtors. :  
 :  
-----------------------------------------------------------------x  

**PRELIMINARY OBJECTION OF THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS TO THE DEBTORS' MOTION
FOR ENTRY OF A SECOND INTERIM ORDER AUTHORIZING
(I) THE DEBTORS TO (A) OBTAIN POST-PETITION FINANCING
AND (B) USE CASH COLLATERAL; AND (II) FOR RELATED RELIEF**

TO THE HONORABLE MICHAEL E. WILES,  
UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases of Relativity Fashion, LLC, *et al.*, the above-captioned debtors and debtors in possession herein (the "Debtors"), by and through its proposed counsel, Togut Segal & Segal, LLP (the "Togut Firm"), hereby submits this preliminary objection (the "Preliminary Objection") to the Debtors' Motion for Entry of a Second Interim Order Authorizing (I) the Debtors to (A) Obtain Post-Petition Financing and (B) Use Cash Collateral; and (II) for Related Relief (the "DIP Financing Motion"), and states that:

---

[1]  The Debtors in these Chapter 11 Cases are set forth on page (i).

The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtors' federal tax identification number, are: Relativity Fashion, LLC (4571); Relativity Holdings LLC (7052); Relativity Media, LLC (0844); Relativity REAL, LLC (1653); RML Distribution Domestic, LLC (6528); RML Distribution International, LLC (6749); RMLDD Financing, LLC (9114); 21 & Over Productions, LLC (7796); 3 Days to Kill Productions, LLC (5747); A Perfect Getaway P.R., LLC (9252); A Perfect Getaway, LLC (3939); Armored Car Productions, LLC (2750); Best of Me Productions, LLC (1490); Black Or White Films, LLC (6718); Blackbird Productions, LLC (8037); Brant Point Productions, LLC (9994); Brick Mansions Acquisitions, LLC (3910); Brilliant Films, LLC (0448); Brothers Productions, LLC (9930); Brothers Servicing, LLC (5849); Catfish Productions, LLC (7728); Cine Productions, LLC (8359); CinePost, LLC (8440); Cisco Beach Media, LLC (8621); Cliff Road Media, LLC (7065); Den of Thieves Films, LLC (3046); Don Jon Acquisitions, LLC (7951); DR Productions, LLC (7803); Einstein Rentals, LLC (5861); English Breakfast Media, LLC (2240); Furnace Films, LLC (3558); Gotti Acquisitions, LLC (6562); Great Point Productions, LLC (5813); Guido Contini Films, LLC (1031); Hooper Farm Music, LLC (3773); Hooper Farm Publishing, LLC (3762); Hummock Pond Properties, LLC (9862); Hunter Killer La Productions, LLC (1939); Hunter Killer Productions, LLC (3130); In The Hat Productions, LLC (3140); J & J Project, LLC (1832); JGAG Acquisitions, LLC (9221); Left Behind Acquisitions, LLC (1367); Long Pond Media, LLC (7197); Madaket Publishing, LLC (9356); Madaket Road Music, LLC (9352); Madvine RM, LLC (0646); Malavita Productions, LLC (8636); MB Productions, LLC (4477); Merchant of Shanghai Productions, LLC (7002); Miacomet Media LLC (7371); Miracle Shot Productions, LLC (0015); Most Wonderful Time Productions, LLC (0426); Movie Productions, LLC (9860); One Life Acquisitions, LLC (9061); Orange Street Media, LLC (3089); Out Of This World Productions, LLC (2322); Paranoia Acquisitions, LLC (8747); Phantom Acquisitions, LLC (6381); Pocomo Productions, LLC (1069); Relative Motion Music, LLC (8016); Relative Velocity Music, LLC (7169); Relativity Development, LLC (5296); Relativity Film Finance II, LLC (9082); Relativity Film Finance III, LLC (8893); Relativity Film Finance, LLC (2127); Relativity Films, LLC (5464); Relativity Foreign, LLC (8993); Relativity India Holdings, LLC (8921); Relativity Jackson, LLC (6116); Relativity Media Distribution, LLC (0264); Relativity Media Films, LLC (1574); Relativity Music Group, LLC (9540); Relativity Production LLC (7891); Relativity Rogue, LLC (3333); Relativity Senator, LLC (9044); Relativity Sky Land Asia Holdings, LLC (9582); Relativity TV, LLC (0227); Reveler Productions, LLC (2191); RML Acquisitions I, LLC (9406); RML Acquisitions II, LLC (9810); RML Acquisitions III, LLC (9116); RML Acquisitions IV, LLC (4997); RML Acquisitions IX, LLC (4410); RML Acquisitions V, LLC (9532); RML Acquisitions VI, LLC (9640); RML Acquisitions VII, LLC (7747); RML Acquisitions VIII, LLC (7459); RML Acquisitions X, LLC (1009); RML Acquisitions XI, LLC (2651); RML Acquisitions XII, LLC (4226); RML Acquisitions XIII, LLC (9614); RML Acquisitions XIV, LLC (1910); RML Acquisitions XV, LLC (5518); RML Bronze Films, LLC (8636); RML Damascus Films, LLC (6024); RML Desert Films, LLC (4564); RML Documentaries, LLC (7991); RML DR Films, LLC (0022); RML Echo Films, LLC (4656); RML Escobar Films LLC (0123); RML Film Development, LLC (3567); RML Films PR, LLC (1662); RML Hector Films, LLC (6054); RML Hillsong Films, LLC (3539); RML IFWT Films, LLC (1255); RML International Assets, LLC (1910); RML Jackson, LLC (1081); RML Kidnap Films, LLC (2708); RML Lazarus Films, LLC (0107); RML Nina Films, LLC (0495); RML November Films, LLC (9701); RML Oculus Films, LLC (2596); RML Our Father Films, LLC (6485); RML Romeo and Juliet Films, LLC (9509); RML Scripture Films, LLC (7845); RML Solace Films, LLC (5125); RML Somnia Films, LLC (7195); RML Timeless Productions, LLC (1996); RML Turkeys Films, LLC (8898); RML Very Good Girls Films, LLC (3685); RML WIB Films, LLC (0102); Rogue Digital, LLC (5578); Rogue Games, LLC (4812); Roguelife LLC (3442); Safe Haven Productions, LLC (6550); Sanctum Films, LLC (7736); Santa Claus Productions, LLC (7398); Smith Point Productions, LLC (9118); Snow White Productions, LLC (3175); Spy Next Door, LLC (3043); Story Development, LLC (0677); Straight Wharf Productions, LLC (5858); Strangers II, LLC (6152); Stretch Armstrong Productions, LLC (0213); Studio Merchandise, LLC (5738); Summer Forever Productions, LLC (9211); The Crow Productions, LLC (6707); Totally Interns, LLC (9980); Tribes of Palos Verdes Production, LLC (6638); Tuckernuck Music, LLC (8713); Tuckernuck Publishing, LLC (3960); Wright Girls Films, LLC (9639); Yuma, Inc. (1669); Zero Point Enterprises, LLC (9558). The location of the Debtors' corporate headquarters is: 9242 Beverly Blvd., Suite 300, Beverly Hills, CA 90210.

**PRELIMINARY STATEMENT**

      The Debtors have entered have entered into an asset purchase agreement (the "<u>APA</u>") with certain of their senior prepetition lenders (the "<u>RM Bidder Group</u>" or the "<u>Proposed Purchasers</u>") providing for the sale of substantially all of the Debtors' assets in consideration for what is essentially a credit bid of $250 million plus an assumption of liabilities which have yet to be determined or finalized.  Without conducting fulsome prepetition marketing efforts to solicit interest and bids for their assets, in whole or in part, and instead conducting a search for financing that failed, the Debtors chose to enter into the APA with certain of their existing lenders and now seek, pursuant to the bid procedures outlined in the Sale Motion (described below), an extremely expedited sale process for the Debtors' large, complex and privately-held global entertainment business which the Debtors themselves valued significantly higher in connection with their recent capital and debt raising efforts.  And, despite a hearing scheduled for this Friday, August 14, to consider approval of the bid procedures, the form of APA was filed with the Court by the Debtors only this Monday, August 10.

      In that connection, a sub-group of the Proposed Purchasers, including Cortland Capital Market Services LCC ("<u>Cortland</u>"), as administrative and collateral agent, and the lender parties thereto (including Anchorage Capital and Luxor Capital, and together with Cortland, collectively the "<u>DIP Lender</u>"), have agreed to provide a $45 million secured superpriority debtor in possession financing facility (the "<u>DIP Facility</u>") designed to consummate the APA -- and only that transaction, no later than October 2 when the DIP Facility would terminate.

As set forth in the DIP Financing Motion[2] and as authorized on a preliminary basis in the "First Interim DIP Financing Order" entered on July 31, 2015 [Docket No. 48], the Debtors seek, among other things, authority:

- to enter into the DIP Facility pursuant to, and in accordance with, the DIP Credit Agreement, the other DIP Facility Documents, the Budget and the DIP Orders;

- to use Cash Collateral as of the Petition Date pursuant to, and in accordance with, the Budget and the DIP Orders;

- to grant the DIP Agent, for the benefit of the DIP Lender, a security interest in and priming liens on the DIP Collateral and a superpriority administrative expense claim to secure the DIP Obligations; and

- to grant adequate protection to the Cortland Term A/B Lenders in exchange for their agreeing to be consensually primed by the DIP Lender.

Since its formation and selection of legal counsel and financial advisors a mere five days ago on Friday afternoon, August 7, the Committee's proposed professionals have worked diligently to get up to speed. No time has been wasted. They have communicated with, among others, the Debtors' professionals, as well as counsel for the Proposed Purchasers/DIP Lender, counsel for junior secured creditors and other parties in interest. The Committee professionals have done their best given the time constraints to review relevant documents and financial data to develop a working understanding of the very complex business operations and assets of the Debtors, which consist of more than 140 privately held entities. The Committee's professionals have only been able to begin to share with its Committee members the information learned and impressions formed over the past several days. Neither the Committee nor its professionals have yet had an opportunity to have meaningful negotiations with either the Debtors or the DIP Lender regarding modifications to the proposed (i) Second Interim DIP Financing

---

[2] Unless otherwise defined herein, capitalized terms hall have the meanings ascribe to them in the DIP Financing Motion [Docket No. 23].

3

Order and (ii) Final DIP Financing Order; the Committee simply has not had either sufficient time or information yet to do so. And, moreover, the Committee is aware that there is at least one party interested in providing the Debtors alternative financing with an increased borrowing level. The Committee believes such alternative financing should be explored before a Final Hearing on the current DIP Financing Motion is held on August 25.

As contemplated by the terms of the DIP Facility, the Debtors intend to conduct and close the sale of substantially all of their assets as going concerns by October 2, 2015 in accordance with an extremely expedited sale process, as dictated by certain so-called "Milestones." From the perspective of maximizing value for the Debtors' estates and creditors, the Committee has material, substantive concerns with the Milestones and the Proposed Sale Procedures, as defined in the Sale Motion, that are to govern the expedited sale of substantially all of the Debtors assets to the Proposed Purchasers. These concerns are indentified and discussed in the Committee's objection to the Proposed Sale Procedures for which Court approval is sought pursuant to the Sale Motion, which objection is being filed contemporaneously herewith.

As this Court stated at the First Day Hearing, "[t]he parties who want to bid on these assets and want to have the DIP will have many benefits from Chapter 11 . . . . And the price of doing that is that they need to give [the Court] the time to ensure that this process is handled in a way that generates the best value to the estate." Transcript of Hearing Held on July 31, 2015 (the "First Day Hearing Transcript"), 37:21-38:1 [Docket No. 83]. As the Court went on to say, "I will not tie my hands with deadlines that will not allow me to have an appropriate sale process." *Id*. at 38:9-11. That, in a nutshell, is the Committee's view too.

4

Thus, in tandem with its objection to the proposed sale procedures, the Committee files this Preliminary Objection to the Second Interim DIP Financing Order because it is intrinsically designed to implement the expedited sale of substantially all of the Debtors' assets and contains terms and conditions that are both unduly burdensome to the Debtors' estates and not supported as a matter of law and practice.

In that regard, this Court also stated at the First Day Hearing, "I'm not going to decide today that it has to be a 3 three-month process as opposed to a thirty-day process. But I am not going to approve provisions of a DIP that put me in the position right out of the box of not being able to have a longer sale process, if that's what I decide is necessary. And the DIP has to be changed to give me that flexibility. And that's just something that you're going to have to work out with the lenders, because I will not tie my hands with deadlines that will not allow me to have an appropriate sale process." First Day Hearing Transcript, 38:3-11 [Docket No. 83]. Again, the Committee shares this view too.

Notwithstanding the insufficient time it has had to review and analyze the proposed DIP Facility and related Sale Motion and to complete its diligence regarding those proposed transactions, this Preliminary Objection identifies the Committee's concerns with the Second Interim DIP Financing Order and also identifies additional issues with, and seeks to preserve the Committee's right to file at a later day (if necessary), a formal objection to the currently proposed form of Final DIP Financing Order scheduled to be considered by the Court on August 25.

That said, the Committee is fully prepared to promptly engage the Debtors, Proposed Purchasers/DIP Lender and other relevant parties in good faith negotiations aimed at improving both the terms of the DIP Facility and the recently filed APA, and it hopes a largely, if not fully, consensual arrangement can be achieved in advance of the

5

final hearing on the DIP Financing Motion. If, however, a consensus among the parties cannot be reached, the Committee asks the Court to condition final approval of any DIP Facility with modifications (as outlined and discussed below) that obviate the Committee's concerns and preliminary objections, and comport with prevailing law to better balance the interests of all parties.

## BACKGROUND

1. On July 30, 2015 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").  Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and properties as debtors in possession.

2. No trustee or examiner has been appointed in the Chapter 11 Cases.

3. The Debtors comprise a privately held global entertainment company with a diversified media platform providing film, television, music and digital financing, production and distribution, branding and fashion consulting.

4. On the Petition Date, the Debtors filed the DIP Financing Motion [Docket No. 23] and also filed the *Motion for (I) an Order (A) Establishing Bid Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Approving Stalking Horse APA and Bidding Protections, and (C) Granting Certain Related Relief and (II) an Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases related thereto, and (C) Granting certain related relief* (the "Sale Motion") [Docket No. 25].

5. On July 31, 2015, the Court entered the *Interim DIP Financing Order, Order Pursuant to Sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code (I) Authorizing Debtors to Obtain Superpriority Secured Debtor-in-Possession Financing,*

6

*(II) Authorizing Debtors to Use Cash Collateral, (III) Granting Adequate Protection to the Cortland Parties, (IV) Scheduling A Final Hearing, and (V) Granting Related Relief* [Docket No. 48], which authorized the Debtors to borrow up to $9.5 million under the DIP Facility. The Court also scheduled hearings for August 14, 2015 to consider (i) authorizing the borrowing of an additional $10.5 million under a Second Interim DIP Financing Order, and (ii) approve the Proposed Bid Procedures sought by the Sale Motion. A hearing to consider entry of a Final DIP Financing Order is currently scheduled for August 25, 2015.

    6.  On the afternoon of August 7, 2015, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed a seven-member Committee, consisting of: (i) Carat USA, Inc.; (ii) NBC Universal; (iii) Cinedigm Corp.; (iv) Technicolor, Inc.; (v) Allied Advertising Limited Partnership (d/b/a Allied Integrated Marketing); (vi) Comen VFX LLC; and (vii) Create Advertising Group, LLC [Docket. No. 114].

    7.  Immediately following its formation, the Committee considered various law firms who offered their services but unanimously determined late in the afternoon of August 7 to employ the Togut Firm as its counsel, as permitted by section 1103(a) of the Bankruptcy Code and Bankruptcy Rule 2014(a). The Committee likewise undertook a similar process and determined to retain Houlihan Lokey to serve as its financial advisors. The Committee's retention of both the Togut Firm and Houlihan Lokey remains subject to Bankruptcy Court approval.

    8.  On August 10, 2015, the Debtors filed, among other things, the proposed APA [Docket No. 122] and the *Declaration of C.J. Brown In Support Of Debtors' Motion For (I) An Order (A) Establishing Bid Procedures For The Sale Of Substantially All Of The Debtors' Assets, (B) Approving Stalking Horse Asset Purchase Agreement And Bidding*

7

*Protections, And (C) Granting Certain Related Relief, And (II) An Order (A) Approving The Sale Of A Substantial Portion Of The Debtors' Assets Free And Clear Of Liens, Claims, Encumbrances, And Other Interests, (B) Approving The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases Related Thereto, And (C) Granting Certain Related Relief* [Docket No. 130]. The APA further describes the assets to be acquired by the Proposed Purchasers as the Debtors' sports, music, television, motion picture and distribution businesses (including its interest in the RED and Sky Land ventures) (collectively, the "Purchased Assets").[3]

9. The deadline to object to the Sale Motion is today at 4:00 p.m. (the "Objection Deadline"), and a hearing to consider the Sale Motion is scheduled for this Friday, August 14, 2015, at 11:00 a.m. [Docket No. 81].

## PRELIMINARY OBJECTIONS

10. Postpetition financing should only be approved if its terms are not overreaching or excessively favorable to the proposed lender. *See, e.g., In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 40-41 (Bankr. S.D.N.Y. 1990); *In re Tenney Village Co., Inc.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989). Thus, the Court should not approve the proposed DIP Facility if it is not in the best interests of the Debtors' general creditor body, but instead only favors a particular creditor to the detriment of other parties in interest. *See A&K Endowment, Inc. v. Gen. Growth Props., Inc. (In re Gen. Growth Props., Inc.)*, 423 B.R. 716, 725 (S.D.N.Y. 2010) (quoting *In re Ames*, 115 B.R. at 39 ("proposed financing will not

---

[3] The scope of the Purchased Assets is not entirely defined, but will include assets used or held for use in the certain of the Debtors' businesses, including, all accounts receivable, cash and cash equivalents customer account information, equity of certain of non-debtor subsidiaries, **and avoidance actions**.

8

be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate.")).

11. The Committee has preliminarily identified certain objectionable provisions in the proposed Second Interim DIP Financing Order and, conversely, submits that the proposed Order omits certain important provisions and protections for the Debtors and their estates. Specifically, the Committee has made certain preliminary observations concerning the Second Interim DIP Financing Order (and the form of Final DIP Financing Order) and submits that modifications must be made to address the issues raised by these observations, including, but not limited, to the following:

(a) the Milestones set forth in the DIP Facility benefit only the DIP Lender and related Cortland Term A/B Lenders who have proposed to purchase substantially all of the Debtors' assets on a credit bid basis and do not benefit, but rather prejudice, the Debtors and their estates;

(b) the limitations on the Committee's lien challenge rights and investigation budget should be modified, and the budget line item in the DIP Facility intended to provide a source of compensating estate-retained professionals should be broken out to address each professional on a standalone basis rather than grouping them all together;

(c) the DIP Lender and the Proposed Purchasers cannot and should not be granted liens or superpriority claims in the Debtors' avoidance actions or claims, or in the proceeds of such avoidance actions or claims; and

(d) the proposed 5% Exit Fee is excessive and should be limited only to a percentage of the funds actually advanced under the DIP Facility.

I. **The Milestones Only Benefit the DIP Lender and Related Proposed Purchasers, Not the Debtors and their Estates.**

12. Article VIII of the DIP Facility contains onerous covenants that require an expedited sale process for the benefit of the DIP Lender and related Proposed Purchasers that is currently required to be completed by October 2, 2015.

9

The covenants impose Milestones with which the Debtors must comply in order to have sufficient funds to operate in, and administer, their Chapter 11 Cases. Notably, the Milestones require that, among other things, (i) the proposed sale procedures must be approved by August 14, 2015; (ii) an auction must held by September 16, 2015; and (iii) the hearing to approve the sale of the Debtors' assets to the Proposed Purchasers must be held by September 21, 2015, with the Court entering the Order authorizing the sale the very next day.

13. It is well established that excessive control by a post-petition lender is an appropriate ground to deny post-petition financing. As such, courts will reject financing provisions with sale-related milestones, and will refuse to "allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender." *See In re Mid-State Raceway, Inc.*, 323 B.R. 40, 59 (Bankr. N.D.N.Y. 2005); *In re Tamarack Resort, LLC,* No. 09-03911, 2010 WL 4117459, *13 (Bankr. D. Idaho Oct. 19, 2010) (denying request for post-petition financing when default was likely due to short milestones, financing imposed time sensitive obligations to file a sale procedure motion, plan, and disclosure statement, which were all subject to approval of the lender).

14. Here, the provisions contained in the DIP Facility that require an extremely expedited sale process and the penalties and harm to be visited upon the Debtors and their estates if these provisions are not satisfied are unduly onerous, unwarranted and untenable. These Milestones relating to the Sale Motion and corresponding penalties contained in the DIP Facility are especially unwarranted and unacceptable given the fact there was no pre-petition marketing effort by the Debtors and, as of the date hereof, it is the Committee's understanding that a due diligence room has not yet been put in place so as to afford competing bidders (other than the

Proposed Purchasers) to review and evaluate in any meaningful way the assets and related businesses being sold by the Debtors as going concerns. As such, the loan to own process dictated by the DIP Facility's Milestones are designed solely to accommodate the DIP Lender and related Proposed Purchasers larger effort to purchase the Debtors global entertainment business with an estimated value of $1 billion through a credit bid $250 million that leaves little if no remaining value for the Debtors' other creditors. In such a situation, a financing agreement cannot contain terms that unfairly seeks to utilize the bankruptcy process and judicial powers. *See generally, In re Ames* 115 B.R. at 40 (although reaffirming the discretion of the debtor to exercise reasonable business judgment in arranging post-petition financing, noting "a proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate"); s*ee In re Tenney* 104 B.R. at 568 (financing cannot "pervert the reoganizational process from one designed to accommodate all classes of creditors and equity interest to one specially crafted for the benefit of the [lender].").

15. Accordingly, the Milestones and related penalties imposed by the DIP Facility need to be significantly modified to enable the Debtors to conduct a more meaningful and robust post-petition marketing and sale process for the benefit of their estates and general creditors.

**II.    The Limitations on the Committee's Challenge
        Rights and Investigation Budget Should Be Modified.**

16. Onerous limitations on the Committee's rights to investigate and challenge the DIP Lender's pre-petition claims and liens should be stricken as a further curb on the DIP Lender's effort to control the conduct of these Chapter 11 Cases for their own benefit at the expense of the Debtors' estates. Again, credit access should not be exploited to enable lender control over the chapter 11 process or business to the

detriment of unsecured creditors.  *See e.g., In re Aqua Assoc.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) ("[C]redit should not be approved when it is sought for the primary benefit of a party other than the debtor.").

17.     Here, the mere size and complexity of the Debtors' capital structure (involving more than 140 privately held entities engaged in global businesses in the very secretive entertainment industry), as well as the nature of the both the pre-petition debt and liens at issue, provide sufficient reason to eliminate restrictions contained in the proposed Second Interim DIP Financing Order and Final DIP Financing Order for the Committee to conduct its investigation and assert lien challenges, if appropriate. *See In re Cuisinarts, Inc.*, 115 B.R. 744 (Bankr. D. Conn. 1990) (rejecting post petition financing provisions that restricted the estate from using monies derived from bank funding to investigate validity of bank's claims).  Instead, as discussed in its objection to the Sale Motion, the Committee has to have an opportunity to investigate and to confirm the nature, extent and allocation of the asserted claims and liens because the RM Bidder Group intends to use the value of such liens and claim as consideration to purchase the Debtors' assets.  Thus, such relief would aid the Committee in acquitting its fiduciary responsibilities, and potentially yield a much better result for all parties in these Chapter 11 Cases.  *See generally Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003).

18.     To the extent the Court were inclined to permit some form of "challenge" restriction, the current 30-day period and $75,000 budget proposed by the DIP Lender is, given the context of these Chapter 11 Cases and the proposed expedited sale of substantially all of the Debtors' assets, patently unreasonable and unwarranted. The "challenge period" proposed by the DIP Lender is far too limited, particularly as measured against both Local Rule 4001-2(g) (which requires at least 60 days) and other

12

cases in the Southern District of New York. *See, e.g., In re Eastman Kodak Co.,* No. 12-10202 (Bankr. S.D.N.Y. Feb. 16, 2012) (180-day challenge period after the entry of the final order); *In re Hostess Brands, Inc.,* No. 12-22052 (Bankr. S.D.N.Y. Feb. 3, 2012) (90-days challenge period after the entry of the final order); *In re American Media, Inc.,* No. 10–16149, 2010 WL 5141244, at *10 (Bankr. S.D.N.Y. Dec. 6, 2010) (providing for challenge period of 75 days after petition date); *see also In re AbitibiBowater Inc.,* No. 09-11296 (Bankr. D. Del. June 4, 2009) (providing for a 120-day period after the formation of the creditors' committee to assert claims and defenses against pre-petition lenders); *In re Spansion Inc.,* No. 09-10690 (Bankr. D. Del. May 18, 2009) (providing for a 90-day period after the entry of the final order approving post-petition use of cash collateral to assert claims and defenses against pre-petition lenders).

19. Likewise, the $75,000 budget proposed by the DIP Lender for the Committee's investigation is unreasonably small and should also be increased to at least $250,000 so that it is comparable to the budgets provided for in the debtor in possession financings in other bankruptcy cases of similar complexity and size. *See, e.g., In re Delta Air Lines, Inc.,* No. 05-17923 (Bankr. S.D.N.Y. Oct. 6, 2005) (no cap); *In re Quebecor World (USA) Inc.,* No. 08-10152 (Bankr. S.D.N.Y. Apr. 1, 2008) (providing for no restriction on the use of post-petition loan funds to conduct investigations into claims and defenses against pre-petition lenders); *In re Eastman Kodak Co.,* No. 12-10202 (Bankr. S.D.N.Y. Feb. 16, 2012) ($250,000 domestic investigation budget and $250,000 international investigation budget); *In re Mark IV Indus.,* No. 09-12795, 2009 Bankr. LEXIS 5378, at *48 (Bankr. S.D.N.Y. May 27, 2009) (allowing use of up to $150,000 of cash collateral to investigate validity of liens).

20. Also, as to the question of standing, it should be vested automatically in the Committee – now – to pursue the claims and causes of action of the

13

Debtors' estates, if any, against the pre-petition claims and liens of the DIP Lender to avoid, among other things, the expense and additional time constraints resulting from pre-complaint motion practice. Automatic standing has been adopted in several cases in this jurisdiction to avoid the unnecessary burden on the estate of having to seek such standing through the Court. *See, e.g., Grubb & Ellis Company, et al.*, No. 12-10685 (Bankr. S.D.N.Y. March 22, 2012) (the "Statutory Committee is hereby granted standing to commence a contested matter or adversary proceeding raising such claim, objection, defense, or other challenge, including, without limitation, any claim against the Prepetition Secured Lender in the nature of a setoff, counterclaim or defense to the applicable Prepetition Obligations"); *In re Quebecor World (USA) Inc.*, No. 08-10152 (Bankr. S.D.N.Y. Apr. 1, 2008) ("The Creditors' Committee shall be deemed to have standing and authority to prosecute any cause of action belonging to the Debtors or their estates "); *In re Dana Corp.*, No. 06-10354 (Bankr. S.D.N.Y. Mar. 29, 2006) ("[T]he Creditors' Committee and the Ad Hoc Noteholders' Committee are hereby conferred standing and authority to pursue the Claims and Defenses, and neither is required to file an Authorization Motion").

**III.    The DIP Lender and the Proposed Purchasers Cannot and
Should Not Be Granted Liens or Superpriority Claims in
the Debtors' Avoidance Actions and/or the Proceeds Thereof.**

21.    Paragraph 8 of the Interim DIP Financing Order describes the DIP Collateral against which the DIP Liens will attach for the benefit of the DIP Lender, as well as the corresponding adequate protection liens for the benefit of the prepetition Cortland Term A/B Lenders who have agreed to be "primed" by the DIP Lender. Specifically, the DIP Collateral includes "a first priority security interest and lien on all tangible and intangible unencumbered assets of the Debtors now owned or hereafter acquired (and, subject to entry of the Final Order, the Avoidance Actions and the

14

Avoidance Action Proceeds) . . . ." See First Interim DIP Financing Order at ¶ 8 [Docket No. 48].

22.  Thus, subject to entry of the Final DIP Financing Order, the DIP Lender and the Cortland Term A/B Lenders are seeking liens on unencumbered assets of the chapter 11 estates that properly belong to the Debtors' general unsecured creditors. The requested liens should therefore be denied, especially in view of the fact that the DIP Lender is a subgroup of the Proposed Purchasers in a sale transaction that does not currently involve any cash consideration to the Debtors and does not otherwise create or provide proceeds to allow for any recoveries by the Debtors' general unsecured creditors on account of the tens of millions of dollars they are owed. As such, the equities clearly support preserving any unencumbered value associated with avoidance actions potentially assertable by the Debtors' for the benefit of their estates and general unsecured creditors.

23.  Avoidance actions are not a debtor's property, but rather rights that may be exercised to benefit a debtor's creditors. *See, e.g.*, *Webster v. Nagyunyom (In re Yelverton)*, No. 09-10048, 2011 WL 6257553, at *1 (Bankr. D.D.C. Dec. 15, 2011) ("[T]he trustee's avoidance claims themselves are not property of the estate."); *In re Novak*, 383 B.R. 660, 671 n.16 (Bankr. W.D. Mich. 2008) ("Avoidance actions, though, are not property of the estate . . . ."); *see Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 243-45 (3d Cir. 2000) (state law fraudulent transfer claim is not an asset of the debtor); *In re Sapolin Paints, Inc.*, 11 B.R. 930, 937 (Bankr. E.D.N.Y. 1981) (recognizing "the well-settled principle that neither a trustee . . . nor a debtor-in-possession, can assign, sell, or otherwise transfer the right to maintain a suit to avoid preference").

15

24.     It is well established that the avoidance powers can only be exercised for the benefit of a debtor's estate. *See Bear Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 104 (S.D.N.Y. 2002) ("[T]he purpose of § 547 is to ensure fair distribution between creditors, while the purpose of § 548 is to protect the estate itself for the benefit of all creditors."). The intent behind the avoidance powers is to allow a debtor in possession, or its court-approved representative, to recover certain payments on behalf of all creditors. *See In re Integrated Testing Prods. Corp.*, 69 B.R. 901, 904 (D.N.J. 1987) (only the trustee, acting on behalf of all the creditors, has a right to recover payments made as preferences). To assign the right to pursue avoidance actions and/or to retain any proceeds recovered on account of avoidance actions to the DIP Lender and the Proposed Purchasers – without any consideration for unsecured creditors under the APA – distorts the very purpose of providing the debtor in possession, or an estate representative, with the avoidance powers in the first place and promotes an unbalanced playing field in these Chapter 11 Cases.

**IV.    The Exit Fee Is Excessive and Should Be Limited Only
to a Percentage of Funds Advanced Under the DIP Facility.**

25.     With respect to the proposed Exit Fee, paragraph 6 of the Interim DIP Financing Order was amended and clarified after the first day hearing so that "[n]otwithstanding anything contained herein or in the DIP Credit Agreement to the contrary, the Exit Fee (as defined in the DIP Credit Agreement) shall not be payable in the event that a party other than the Stalking Horse Bidder (as defined in the Motion) is the winning bidder in the 363 Sale (as defined in the DIP Credit Agreement)." *See* First Interim Financing Order at ¶ 6 [Docket No. 48].

26.     At the First Day Hearing, the Exit Fee was clarified so that the DIP Lender would not be entitled to an Exit Fee in the event there was an alternative sale

16

transaction since the DIP Lender is a subset of the Proposed Purchasers and awarding the Exit Fee could skew bidding and would be tantamount to another form of overbid protection. *See* First Day Hearing Transcript at 39:6-40:5.

27. As a preliminary matter, the Committee respectfully submits the 5% Exit Fee is too high, and the Exit Fee should be reduced. Moreover, the Exit Fee is currently defined in the DIP Facility "to any payment or prepayment prior to October 2, 2015 (other than with proceeds of the 363 Sale), a fee in the amount of 5.00% of the principal amount of the Loan prepaid on such date." The Exit Fee should be further clarified so that the Exit Fee is to be calculated only on the amount actually advanced and outstanding to the Debtors as of the date of prepayment so as to ensure it would not apply to the entire the $45 million facility unless funded and outstanding.

28. This clarification will provide the Debtors flexibility in determining whether to pursue (i) an alternative sale transaction and/or (ii) a lender to provide replacement DIP Financing on terms that would be otherwise more favorable to the Debtors and/or enhance the sale process.

## RESERVATION OF RIGHTS

29. Although the Committee and its professionals have had only five days to evaluate the DIP Financing Motion, they have identified numerous actual and potential concerns regarding approval of the DIP Facility. In that connection, the Committee reserves all of its rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Preliminary Objection, to seek discovery, and to raise additional objections in connection with the hearings on the DIP Financing Motion. As a threshold matter, however, the Committee preliminarily raises, but is not limited to, these additional objections:

(a) The Debtors cannot satisfy sections 364(c) and (d) of the Bankruptcy Code based on the Debtors' admission it made no attempt to procure debtor-in-possession financing from sources other than the Cortland Term A/B Lenders. *See* DP Financing Motion at pp 17-18.

(b) The 2% Commitment Fee (DIP Credit Agreement section 2.06) should be reduced.

(c) The $4 million wind down escrow in the Budget is insufficient for these Chapter 11 Cases involving 144 Debtors engaged in complex global businesses.

(d) The Committee should have five (5) business days to object to any revisions to a proposed DIP Facility Budget.

(e) The Committee and each of its professionals, as well as those of the Debtors, should have their own line item in the Budget (rather than all estate-retained professionals being lumped together), and any variance against the Budget should be allowed to accrue and aggregate and, thus, be measured over the life of the Budget so that exceeding the 105% variance contemplated under the DIP Facility does not unfairly penalize a professional and trigger an event of default.

(f) The carve-out provision allowing for no more than $1.5 million in fees and expenses for all estate-retained professionals after an event of should be increased to more appropriately account for the size, complexity and number of Debtors involved in these Chapter 11 Cases.

(g) The Debtors' Release of the DIP Lender and the Cortland Term A/B Lenders should be expressly without prejudice to the Committee's right to investigate and assert claims as appropriate.

(h) The Debtors should have the right to seek to use Cash Collateral on a non-consensual basis upon the occurrence of an event of default.

(i) The Committee objects to the proposed waivers of Bankruptcy Code section 506(c) and the "equities-of-the-case" statutory protections provided for in Bankruptcy Code section 552(b).

**WHEREFORE,** for the reasons set forth herein, the Committee requests that this Court (i) sustain the Objection set forth herein, (ii) direct the Debtors and the DIP Lender to make the modifications to the Second Interim and Final DIP Financing Orders requested herein to address the objections raised by the Committee and reserves all other rights to assert additional objections in advance of the Final Hearing to consider the DIP Motion, and (iii) grant such other and further relief as is just and proper.

DATED:   New York, New York
         August 12, 2015

Respectfully submitted,

TOGUT, SEGAL & SEGAL LLP
*Proposed Counsel to the Official Committee of Unsecured Creditors*

By:
/s/ Albert Togut
ALBERT TOGUT
FRANK A. OSWALD
SCOTT E. RATNER
One Penn Plaza, Suite 3335
New York, New York  10119
(212) 594-5000