Craig A. Wolfe, Esq.
Malani J. Cademartori, Esq.
Blanka K. Wolfe, Esq.
**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 653-8700
Fax: (212) 653-8701

- and -

Richard L. Wynne, Esq.
Bennett L. Spiegel, Esq.
Lori Sinanyan, Esq. (admitted *pro hac vice*)
**JONES DAY**
222 East 41st Street
New York, NY 10017
Tel: (212) 326-3939
Fax: (212) 755-7306

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RELATIVITY FASHION, LLC, *et al.*,[1] | Case No. 15-11989 (MEW) |
| Debtors. | (Jointly Administered) |

**DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 503(c) AND 363(b)(1) FOR ENTRY OF AN ORDER APPROVING DEBTORS' KEY EMPLOYEE INCENTIVE PLAN**

Relativity Fashion, LLC and its affiliated debtors and debtors in possession in these chapter 11 cases (collectively, the "**Debtors**"), hereby submit this motion (the "**Motion**"), pursuant to 11 U.S.C. §§ 503(c) and 363(b)(1) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), for entry of an order, substantially in the form attached

---

[1] The Debtors in these chapter 11 cases are as set forth on page (i).

The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Relativity Fashion, LLC (4571); Relativity Holdings LLC (7052); Relativity Media, LLC (0844); Relativity REAL, LLC (1653); RML Distribution Domestic, LLC (6528); RML Distribution International, LLC (6749); RMLDD Financing, LLC (9114); 21 & Over Productions, LLC (7796); 3 Days to Kill Productions, LLC (5747); A Perfect Getaway P.R., LLC (9252); A Perfect Getaway, LLC (3939); Armored Car Productions, LLC (2750); Best of Me Productions, LLC (1490); Black Or White Films, LLC (6718); Blackbird Productions, LLC (8037); Brant Point Productions, LLC (9994); Brick Mansions Acquisitions, LLC (3910); Brilliant Films, LLC (0448); Brothers Productions, LLC (9930); Brothers Servicing, LLC (5849); Catfish Productions, LLC (7728); Cine Productions, LLC (8359); CinePost, LLC (8440); Cisco Beach Media, LLC (8621); Cliff Road Media, LLC (7065); Den of Thieves Films, LLC (3046); Don Jon Acquisitions, LLC (7951); DR Productions, LLC (7803); Einstein Rentals, LLC (5861); English Breakfast Media, LLC (2240); Furnace Films, LLC (3558); Gotti Acquisitions, LLC (6562); Great Point Productions, LLC (5813); Guido Contini Films, LLC (1031); Hooper Farm Music, LLC (3773); Hooper Farm Publishing, LLC (3762); Hummock Pond Properties, LLC (9862); Hunter Killer La Productions, LLC (1939); Hunter Killer Productions, LLC (3130); In The Hat Productions, LLC (3140); J & J Project, LLC (1832); JGAG Acquisitions, LLC (9221); Left Behind Acquisitions, LLC (1367); Long Pond Media, LLC (7197); Madaket Publishing, LLC (9356); Madaket Road Music, LLC (9352); Madvine RM, LLC (0646); Malavita Productions, LLC (8636); MB Productions, LLC (4477); Merchant of Shanghai Productions, LLC (7002); Miacomet Media LLC (7371); Miracle Shot Productions, LLC (0015); Most Wonderful Time Productions, LLC (0426); Movie Productions, LLC (9860); One Life Acquisitions, LLC (9061); Orange Street Media, LLC (3089); Out Of This World Productions, LLC (2322); Paranoia Acquisitions, LLC (8747); Phantom Acquisitions, LLC (6381); Pocomo Productions, LLC (1069); Relative Motion Music, LLC (8016); Relative Velocity Music, LLC (7169); Relativity Development, LLC (5296); Relativity Film Finance II, LLC (9082); Relativity Film Finance III, LLC (8893); Relativity Film Finance, LLC (2127); Relativity Films, LLC (5464); Relativity Foreign, LLC (8993); Relativity India Holdings, LLC (8921); Relativity Jackson, LLC (6116); Relativity Media Distribution, LLC (0264); Relativity Media Films, LLC (1574); Relativity Music Group, LLC (9540); Relativity Production LLC (7891); Relativity Rogue, LLC (3333); Relativity Senator, LLC (9044); Relativity Sky Land Asia Holdings, LLC (9582); Relativity TV, LLC (0227); Reveler Productions, LLC (2191); RML Acquisitions I, LLC (9406); RML Acquisitions II, LLC (9810); RML Acquisitions III, LLC (9116); RML Acquisitions IV, LLC (4997); RML Acquisitions IX, LLC (4410); RML Acquisitions V, LLC (9532); RML Acquisitions VI, LLC (9640); RML Acquisitions VII, LLC (7747); RML Acquisitions VIII, LLC (7459); RML Acquisitions X, LLC (1009); RML Acquisitions XI, LLC (2651); RML Acquisitions XII, LLC (4226); RML Acquisitions XIII, LLC (9614); RML Acquisitions XIV, LLC (1910); RML Acquisitions XV, LLC (5518); RML Bronze Films, LLC (8636); RML Damascus Films, LLC (6024); RML Desert Films, LLC (4564); RML Documentaries, LLC (7991); RML DR Films, LLC (0022); RML Echo Films, LLC (4656); RML Escobar Films LLC (0123); RML Film Development, LLC (3567); RML Films PR, LLC (1662); RML Hector Films, LLC (6054); RML Hillsong Films, LLC (3539); RML IFWT Films, LLC (1255); RML International Assets, LLC (1910); RML Jackson, LLC (1081); RML Kidnap Films, LLC (2708); RML Lazarus Films, LLC (0107); RML Nina Films, LLC (0495); RML November Films, LLC (9701); RML Oculus Films, LLC (2596); RML Our Father Films, LLC (6485); RML Romeo and Juliet Films, LLC (9509); RML Scripture Films, LLC (7845); RML Solace Films, LLC (5125); RML Somnia Films, LLC (7195); RML Timeless Productions, LLC (1996); RML Turkeys Films, LLC (8898); RML Very Good Girls Films, LLC (3685); RML WIB Films, LLC (0102); Rogue Digital, LLC (5578); Rogue Games, LLC (4812); Roguelife LLC (3442); Safe Haven Productions, LLC (6550); Sanctum Films, LLC (7736); Santa Claus Productions, LLC (7398); Smith Point Productions, LLC (9118); Snow White Productions, LLC (3175); Spy Next Door, LLC (3043); Story Development, LLC (0677); Straight Wharf Productions, LLC (5858); Strangers II, LLC (6152); Stretch Armstrong Productions, LLC (0213); Studio Merchandise, LLC (5738); Summer Forever Productions, LLC (9211); The Crow Productions, LLC (6707); Totally Interns, LLC (9980); Tribes of Palos Verdes Production, LLC (6638); Tuckernuck Music, LLC (8713); Tuckernuck Publishing, LLC (3960); Wright Girls Films, LLC (9639); Yuma, Inc. (1669); Zero Point Enterprises, LLC (9558). The location of the Debtors' corporate headquarters is: 9242 Beverly Blvd., Suite 300, Beverly Hills, CA 90210.

hereto as <u>Exhibit B</u>, approving the Debtors' Key Employee Incentive Plan (the "**KEIP**") for certain insider employees (the "**Key Employees**").   In support of this Motion, the Debtors respectfully submit the *Declaration of Dr. Brian G. Kushner in Support of Debtors' Motion Pursuant to 11 U.S.C. §§ 503(c) and 363(b)(1) for Entry of an Order Approving Debtors' Key Employee Incentive Plan*, filed concurrently herewith (the "**Kushner Decl.**"), and respectfully state as follows:

<u>**Jurisdiction**</u>

1.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 503(c) and 363(b)(1) of the Bankruptcy Code and Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

<u>**Background**</u>

3.      On July 30, 2015 (the "**Petition Date**"), each of the Debtors filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.

4.      On August 7, 2015, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed the Official Committee of Unsecured Creditors [Dk. 114] (the "**Creditors' Committee**").

5.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for appointment of a trustee or examiner has been made in these chapter 11 cases.

6.      Additional factual background relating to the Debtors' businesses and the commencement of these chapter 11 cases is set forth in detail in the *Declaration of Dr. Brian G.*

-2-

*Kushner Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of Chapter 11 Petitions and First Day Pleadings*, filed on July 30, 2015 [Dk. 14] (the "**First Day Declaration**").

7.      On the Petition Date, the Debtors filed a motion seeking the authority to sell a substantially all of the Debtors' assets through an auction and sale process (the "**Sale Process**").[2] Pursuant to the Sale Motion, the Debtors will conduct an auction (the "**Auction**") on October 1, 2015 if the Debtors receive a Qualified Bid (as defined in the Sale Motion) prior to the Auction.[3] As of the date of this Motion, the sale will close on October 20, 2015 (the "**Sale Closing**")

### The Key Employee Incentive Plan

**A.      The Need for the Debtors to Implement a KEIP**

8.      As set forth in the First Day Declaration, prior to the Petition Date, the Debtors experienced severe liquidity constraints and increasing limitations imposed by the certain forbearance agreements and debt issuances.  With over $350 million in outstanding matured secured debt and without the opportunity for further financing, the Debtors determined it was in their best interests to file for bankruptcy protection.  In advance of the Petition Date, the Debtors took steps to reduce the size of the workforce by downsizing employees in the Debtors' non-core businesses and unprofitable business lines.  In total, the Debtors reduced their workforce by 72 full-time employees and 22 part-time employees.  In addition, prior to the Petition Date, the Debtors' senior management informed 15 employees that they would be subject to salary

---

[2] *See Motion for (I) an Order (A) Establishing Bid Procedures for the Sale of Substantially all of the Debtors' Assets, (B) Approving Stalking Horse APA and Bidding Protections, and (C) Granting Certain Related Relief and (II) an Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Certain Related Relief* (the "**Sale Motion**") [Dk. 25].

[3] *See* Sale Motion, Ex. A, ¶ 6.

reductions ranging from ten to twenty percent. For the five Key Employees, the salary reductions aggregated $795,000 and resulted in average pay reductions of 10.9%. Currently, the Debtors employ 84 full-time employees and one part-time employee.

9.      The Debtors and their advisors determined that the most optimal means to maximize value for the Debtors' estates in these cases was to move forward with the Sale Process. To ensure that the Sale Process is managed effectively and efficiently, the Debtors need the services of certain of the Debtors' Key Employees to prepare the company for the Sale Process, engage with potentially interested parties both in telephonic and face-to-face meetings, and interact with the Debtors' advisors who are assisting in the Sale Process.

10.      These critical tasks are in addition to the Key Employees' normal duties in running the Debtors' business and managing a rapidly unfolding process internally. The Key Employees are working the equivalent of multiple jobs and are absolutely critical to each. Accordingly, the Debtors believe that an incentive pay program for five (5) Key Employees listed below is both fair and essential to ensure that the Sale Process and the Debtors' operations continue to function well and inure to the benefit of all stakeholders of the Debtors.

**B.      The Key Employees**

11.      The Debtors have determined that the following five Key Employees, who are insiders of the Debtors, should receive payments under the KEIP:

| Name and Position | Responsibilities and Experience |
| --- | --- |
| Tucker Tooley<br><br>*President* | Tucker Tooley is the President, overseeing the company's day-to-day operations, business divisions, and personnel. In addition, Mr. Tooley oversees Relativity's film slate, and is responsible for marketing, theatrical distribution and the international business operations of Relativity's network of foreign output partners. Mr. Tooley joined Relativity Media, LLC in 2009. |

| Name and Position | Responsibilities and Experience |
|---|---|
| Carol Genis<br><br>*Managing Director* | Carol Genis is the Managing Director. She was former outside litigation and Intellectual Property counsel for Relativity Media, LLC and joined in the fall of 2014 to manage legal, including business affairs and litigation matters for all divisions, management and supervision of outside counsel, management of personnel, operations and to work on strategic planning as well as special situations. |
| Greg Shamo<br><br>*Co-Chief Operating Officer* | Greg Shamo is the Co-Chief Operating Officer, overseeing the company's corporate, business and legal affairs, technology, human resources and operations departments, working alongside Co-Chief Operating Officer Andrew Matthews to manage the company's day-to-day activities. Mr. Shamo joined Relativity Media, LLC in 2009. |
| Andrew Matthews<br><br>*Chief Financial Officer & Co-Chief Operating Officer* | Andrew Matthews is the Chief Financial Officer and Co-Chief Operating Officer, supervising the overall financial strategy and planning for Relativity. Mr. Matthews joined Relativity Media, LLC in 2013. |
| Thomas Forman<br><br>*Chief Executive Officer, Relativity Television, LLC* | Thomas Forman is the Chief Executive Officer of Relativity Television, LLC. Mr. Forman oversees the day-to-day business and operations of the Debtor's television division. Mr. Forman joined Relativity Television in 2005. |

12.     The Key Employees possess intimate knowledge of the Debtors' operations and are vital to the success of the Sale Process and these chapter 11 cases. As noted, prior to the Debtors' bankruptcy filing, the Key Employees assumed significant additional responsibilities and time commitments above and beyond their normal duties in order to assist the Debtors in managing their businesses and assisting with the Sale Process. Specifically, prior to Petition Date, the Key Employees assumed, among other, the following responsibilities: (i) assisting the Debtors' advisors in understanding the debtors' businesses and structuring the sale process, (ii) interacting with the Debtors' lenders and professional advisors as well as representatives of potential purchasers, (iii) participating in diligence meetings with potential purchasers, and (iv) assisting with the general preparation for the chapter 11 cases and Sale Process (including,

without limitation, addressing factual inquiries from all constituents, negotiation with lenders, cash collateral budgeting and assisting in the preparation of sale related documents and analysis).

13.     Moreover, the Key Employees will be expected to provide, among other things, extensive and indispensable assistance to the Debtors' counsel and advisors with respect to issues arising during these chapter 11 cases and continue to market the Debtors' business for sale. The Key Employees will also help ensure good relationships with existing vendors, landlords, and contract-counterparties so that the Debtors will be able to realize the highest value possible for their assets, and work with Debtors' professionals to address questions of both the lenders and the Creditors' Committee so that they can effectively participate in the cases. Undoubtedly, these additional responsibilities and time commitments will be burdensome, but are absolutely critical through the conclusion of the Sale Process.

14.     For the avoidance of doubt, the Debtors' Chairman of the Board and the Chief Executive Officer are not eligible to participate in the KEIP.  The Debtors have filed the *Debtors' Motion Pursuant To 11 U.S.C. §§ 503(c) And 363(b)(1) For Entry Of An Order Approving Debtors' Employee Retention Plan For Certain Non-Insider Employees* (the "**Employee Retention Plan Motion**").  Pursuant to the Employee Retention Plan Motion, the Debtors' seek the authority to implement an Employee Retention Plan for all of the non-insider employees of the Debtors.  No Key Employee will be eligible to receive a payment under the Employee Retention Plan Motion.

**C.     The Development and Structure of the KEIP**

15.     The KEIP was designed to provide incentive-based cash awards to the Key Employees who are most capable of, and crucial to, maximizing the Debtors' financial and operational performance and thereby the outcome of the Sale Process. Without the expertise, guidance and leadership provided by the Key Employees, the Debtors' ability to maximize

recoveries for creditors will be greatly hampered. Therefore, it is critical that the Debtors' Key Employees be properly incentivized and motivated to work harder than ever before.

16.    During the discussions pertaining to the Sale Process, Debtors' Board of Managers (the "**Board**") supported, and ultimately voted to approve the KEIP as an incentive based (rather than retentive-based) compensation program for the Key Employees with clearly defined targets tied specifically to achieving the highest and best offer resulting from the Sale Process.  In particular, the Board determined that there was no other metric that could be used to measure performance due to the Debtors' declining operational results and due to the reality that the Debtors' operations would be sold.  Accordingly, the only appropriate metric to which compensation could be tied was sale performance, which creates an alignment of the interests of the Key Employees and the Debtors' creditors.  Moreover, the Board understood that it was critical to the outcome of the Sale Process and the maximization of creditor recoveries in these chapter 11 cases to incentivize the Key Employees.  Indeed, without the Key Employees, there would be a vacuum of information and a lack of leadership just at the time that both were so necessary to the Sale Process.

17.    The Debtors believe that the KEIP is appropriately designed to incentivize the Key Employees to continue their substantial efforts in operating the Debtors' businesses and assisting in facilitating the Sale Process during the pendency of these chapter 11 cases.  The KEIP has been tailored to be a catalyst for the Key Employees and compensate them for the additional (and time consuming) responsibilities that they have undertaken and will continue to perform in connection with the Debtors' businesses and the Sale Process.

18.    The Debtors and their advisors developed the KEIP with targets designed to motivate the Key Employees to obtain as much value for the Debtors' assets as quickly as

-7-

possible.  The KEIP is intended to incentivize Key Employees, which possess knowledge of the industry and relationships with the Debtors' customers and competitors that are critical to this undertaking.  The KEIP is entirely performance-based – there are no guaranteed payments.

19.    The Debtors propose to implement the following KEIP:

- In exchange for entering into letter agreements (collectively, the "**KEIP Agreements**") with the Debtors, Key Employees will be able to participate in the KEIP.

- The size of the KEIP is based on a calculation of the aggregate of the following:

  - the amount of salary reduction incurred by the Key Employees from the Petition Date through October 5, 2015, and

  - 0%, 25%, 50%, 75% or 100% of an amount equal to 12.5% of salaries of the Key Employees incurred by the Debtors from the Petition Date through sale hearing on October 5, 2015 based on the following table.

| Ultimate Purchase Price Above $250 Million | Percentage of KEIP Pool Funded |
|---|---|
| $1,000,000 | 25% |
| $2,000,000 | 50% |
| $3,000,000 | 75% |
| $4,000,000 (which corresponds to aggregate bids of $254 million or more) | 100% |

- The KEIP pool will become fully funded if any one bid or aggregate of bids at the Auction exceeds $254 million.

- Individual awards to Key Employees will be paid at the sole discretion of the Board., based upon each individual Key Employee's contribution to the business during Sale Process. If any Key Employee is a member of the Board, such Key Employee will be recused from voting on his or her individual award.

- Any Key Employee that resigns or is terminated for cause will forfeit his or her KEIP award, if any.

- Payments under the KEIP will be paid in cash one day after the Sale Closing.

20.    The total cost of the KEIP is expected to be approximately $314,868 excluding employer contribution taxes.

-8-

<u>**Relief Requested**</u>

21.    By this Motion, the Debtors request entry of an order, pursuant to sections 503(c)(1) and 363(b)(1) of the Bankruptcy Code, approving the Debtors' KEIP for the Key Employees.

<u>**Basis for Relief**</u>

**A.    Implementing the KEIP Is a Sound Exercise of the Debtors' Business Judgment**

22.    Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  To approve the use of estate property under section 363 of the Bankruptcy Code, the Second Circuit requires a debtor to show that the decision to use the property outside of the ordinary course of business was based on the debtor's business judgment. *See In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (citing *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) (finding that "a judge determining a 363(b) application [must] expressly find from the evidence presented before him at the hearing a good business reason to grant such application")); *see also In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003).

23.    The business judgment rule shields a debtor's decisions from judicial second-guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) (recognizing that a "presumption of reasonableness" attaches to a debtor's decisions and courts will generally not entertain objections to the debtor's conduct after a reasonable basis is set forth).  Once a debtor articulates a valid business justification, the law vests the debtor's decision to use property outside of the ordinary course of business with a strong presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Integrated Res.,*

-9-

*Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (citations and internal quotations omitted), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

24.    In the context of applying the business judgment standard to the approval of a debtor's key employee incentive plan, bankruptcy courts have considered the following nonexhaustive factors:

> - Is there a reasonable relationship between the plan proposed and the results to be obtained, *i.e.*, will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance? . . .
>
> - Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?
>
> - Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?
>
> - Is the plan or proposal consistent with industry standards?
>
> - What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?
>
> - Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*See In re Dana Corp.,* 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006) (collecting cases); *see also In re Global Homes Prods., LLC,* 369 B.R. 778, 786 (Bankr. D. Del. 2007) (listing factors).  In this case, the Debtors believe that the proposed KEIP satisfies the requirements of the business judgment standard and conforms to the prevailing practices in this District and others.

25.     *First*, the KEIP is calibrated to achieve the desired performance but is not a "layup." As set forth in the Kushner Declaration, it will be difficult for the Key Employees to meet the KEIP targets. The KEIP targets are designed to incentivize the Key Employees to achieve as much value for the estate as possible. As Judge Glenn recognized in *In re Borders Group, Inc.*, the KEIP encourages the Key Employees "to *do more*" and "work expeditiously to meet the targets outlined in the KEIP" by, among other things, negotiating with customers and creditors, identifying potential purchasers and negotiating sales of the remaining assets during the wind-down period. 453 B.R. 459, 472 (Bankr. S.D.N.Y. 2011) (emphasis in original). Moreover, the unpredictability associated with sale auctions further demonstrates that the KEIP targets are not easy to reach. *See In re Dana Corp.*, 358 B.R. at 583.

26.     *Second*, the amounts to be paid out under the KEIP are modest in light of the total proceeds that would have to be obtained for any payout to occur. For example, even if the Key Employees were to obtain the maximum amount of compensation available under the KEIP, they would be receiving 7.87 percent of such proceeds and 0.12 percent of the Purchase Price.

27.     *Third*, the KEIP is fair and reasonable in scope. While all of the Debtors' remaining employees are crucial to the Debtors' wind-down efforts, the KEIP is narrowly tailored to incentivize five employees who have the institutional knowledge and relationships that are indispensable to the Debtors' value-maximization efforts.

28.     *Fourth,* the KEIP is consistent with the industry. The Debtors' base compensation for its employees is generally lower than other companies. According to the Croner Entertainment Study published on November 14, 2014, of the eighteen companies in the film and television production and entertainment industry, the average annual compensation increase for industry employees was between three to four percent. Among the Debtors'

employees, thirty percent have not received an annual wage increase since 2013.  Moreover, according to the study, other companies reported on in the study typically pay annual bonuses. On the other hand, historically, the Debtors do not pay year-end bonuses to its employees.

29.    *Fifth,* the Debtors performed proper and appropriate due diligence in developing the KEIP.  The Debtors also obtained the approval of the Board to adopt and implement the KEIP.  With the input of these parties, the Debtors designed the KEIP to incentivize their Key Employees who are essential to maximizing value during the wind-down period. The resulting incentive compensation package is important to this effort and will benefit all parties in interest. Absent implementation of the KEIP, the Debtors believe that their Key Employees will not be as motivated to expedite the collection of receivables and the monetization of the remaining assets. The Key Employees have been working diligently to maximize value for the Debtors' stakeholders since before the Petition Date; the Debtors believe that the KEIP will encourage them to redouble their efforts and, on that basis, is both appropriate and necessary.

30.    In light of the foregoing, the Debtors believe that the incentives created by the KEIP will motivate the Debtors' Key Employees to maximize value for the Debtors' estates and constituents in the timeframe dictated by the circumstances of these cases. Importantly, the Debtors' creditors, who indirectly will bear the economic burden of incentive compensation payments, will benefit significantly from the improved value resulting from implementation of the proposed KEIP. The Debtors therefore submit that the decision to adopt and implement the KEIP is a sound exercise of their business judgment and a proper use of the Debtors' resources under section 363(b) of the Bankruptcy Code.

**B.**      **The KEIP Satisfies the Requirements of Section 503(c)(3) of the Bankruptcy Code**

      **i.**      **The KEIP Is an Incentive-Based Plan and Thus Does Not
Violate Sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code**

31.      Section 503(c) of the Bankruptcy Code, which Congress added to the Bankruptcy Code as part of the BAPCPA, restricts transfers or payments by debtors to the extent such payments are outside the ordinary course, predominantly *with* respect to payments made to "insiders." 11 U.S.C. § 503(c).  Section 503(c) of the Bankruptcy Code includes three sections: (1) a general prohibition of retention plans (*i.e.,* a payment plan with the purpose of inducing a person to remain with a debtor); (2) limitations on severance payments; and (3) standards governing other transfers to managers outside the ordinary course of business.  *Id*.

32.      By its plain language, section 503(c)(1) of the Bankruptcy Code pertains solely to retention plans and section 503(c)(2) of the Bankruptcy Code pertains only to severance plans. 11 U.S.C. § 503(c)(1)-(2).   Neither provision applies to performance or incentive-based compensation plans.  *See In re Dana Corp.*, 358 B.R. at 571 (noting that "merely because a plan has some retentive effect does not mean that the plan, overall, is retentive rather than incentivizing in nature"); *In re Nellson Nutraceutical, Inc*., 369 B.R. 787, 804 (Bankr. D. Del. 2007) (finding plan was not retention-based because primary purpose of the plan was incentive-based and thus section 503(c)(1) of the Bankruptcy Code was inapplicable).  Indeed, the court in *Dana* noted that:

> If sections 503(c)(1) and (c)(2) are not operative, a court may consider whether the payments are permissible under section 503(c)(3), which limits payments made to management and employees, among others, outside the ordinary course, unless such payments are shown to be justified under the facts and circumstances of chapter 11 case. As one treatise points out, the test in section 503(c)(3) appears to be no more stringent a test than the one courts must apply in approving any administrative expense under 503(b)(1)(A).

-13-

358 B.R. at 576 (citing 4 COLLIER ON BANKRUPTCY § 503.17[3] (15th ed. 1982)).

33.    Although sections 503(c)(1) and 503(c)(2) may prohibit retention plans and severance payments for insiders, respectively, nothing in section 503(c) precludes a chapter 11 debtor from offering reasonable compensation or incentives to key employees, including for their contributions to a debtor's business and restructuring effort.  *Id.*; *see also In re Nellson Nutraceutical, Inc.*, 369 B.R. at 803-04.  Although it is true that an incentive plan may, as an ancillary benefit, encourage a debtor's employees to remain with the company, that, in and of itself, does not transform an incentive compensation plan into a "retention" plan. *See, e.g.*, *In re Global Homes Prods., LLC*, 369 B.R. at 785 ("Section 503(c) was not intended to foreclose a chapter 11 debtor from reasonably compensating employees, including 'insiders,' for the contribution to the debtors' reorganization") (internal citations omitted).  In fact, all successful incentive plans should have the indirect benefit of motivating employees to remain with the company. *Id.* at 786. (finding that the proposed incentive plans were "primarily incentivizing and only coincidentally retentive" and noting, "[t]he fact . . . that all compensation has a retention element" did "not reduce the Court's conviction" that the Debtors' primary goal in approving the incentive plans was "to create value by motivating performance"). So long as the primary purpose of compensation is to incentivize, and the retention benefit is merely coincidental, then the plan does not violate section 503(c) of the Bankruptcy Code.  *Id.* at 786; *In re Dana Corp.*, 358 B.R. at 571 (recognizing that even if a plan has some retentive effect does not mean that the overall plan is retentive rather than incentivizing).

34.    The Debtors' proposed KEIP does not conflict with section 503(c)(1) of the Bankruptcy Code because it does not provide payments to insiders for the primary purpose of retention. Indeed, the Debtors and their advisors are familiar with the limitations of section

-14-

503(c) of the Bankruptcy Code and, accordingly, designed the KEIP expressly to comply with the Bankruptcy Code.  As described herein and in the Kushner Declaration, the proposed KEIP is an incentive plan, the primary purpose of which is to encourage outstanding performance from the Debtors' Key Employees.

35.     As case law makes clear, there is a key distinction between incentive plans and retention plans: if a plan is tailored to provide incentives for employees to improve business performance, it is not a retention plan to which section 503(c)(1) applies.  *See*, *e.g.*, *In re Global Homes*, 369 B.R. at 787.  Thus, although it is true that the KEIP may encourage the KEIP to remain in the Debtors' employ, that ancillary benefit, in and of itself, does not convert the KEIP into an impermissible "retention" plan in violation of section 503(c). The proposed KEIP is an incentive program, with compensation contingent upon meeting the demanding, objective and pre-determined performance-based targets that are based upon the incremental proceeds generated in large part by the key employees' performance.  As set forth in the Kusher Declaration, the performance goals were developed with the advice of FTI and are not "lay-ups." The KEIP is intended to incentivize and drive superior performance in the near term, consistent with the Debtors' fiduciary duty to maximize value for all creditors. Payments are linked to performance metrics and are available only if these objective benchmarks are satisfied.

36.     Similarly, the KEIP does not violate section 503(c)(2) of the Bankruptcy Code; under no circumstance will Key Employees receive "severance" payments pursuant to the KEIP.

37.     Accordingly, the Debtors respectfully submit that sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code do not apply to the Debtors' proposed KEIP because it is purely an incentive-based plan.

ii.    **The KEIP Represents a Sound Exercise of the Debtors'
Business Judgment and Thus Satisfies the Requirements
of Section 503(c)(3) of the Bankruptcy Code**

38.    Section 503(c)(3) precludes payment as an administrative expense of "other
transfers or obligations that are outside the ordinary course of business and not justified by the
facts and circumstances of the case." 11 U.S.C. § 503(c)(3). Courts that have analyzed the
prohibition on "other transfers" to certain categories of employees set forth in section 503(c)(3)
of the Bankruptcy Code have applied the same standard under that section as they do under
section 363(b) of the Bankruptcy Code: namely, whether the decision to use estate property
outside of the ordinary course of business is based on the debtor's business judgment. *See Dana*,
358 B.R. at 576.

39.    As described in the Kushner Declaration, the KEIP is appropriately designed to
incentivize the Key Employees to continue their substantial efforts in operating the Debtors'
businesses and assisting in facilitating the Sale Process during the pendency of these chapter 11
cases.

40.    As set forth above, after consulting with the Debtors' key parties in interest and
receiving the approval of the Board, the Debtors have determined, in the exercise of their sound
business judgment, to implement the KEIP.  As the KEIP is intended to maximize value for all
parties in interest and incentivize the Key Employees by rewarding them for their outstanding
performance, the KEIP satisfies section 503(c)(3) of the Bankruptcy Code.  Accordingly, the
Debtors respectfully submit that implementation of the KEIP is justified under the facts and
circumstances of these chapter 11 cases.

## Request for Waiver of Any Applicable Stay

41.    As discussed above, the relief sought by this Motion is critical to the Debtors'
continuing business operations and is therefore in the best interests of the estates.  In order to

-16-

avoid delay in implementing such relief and the attendant potential harm to the Debtors' business operations, the Debtors request that the Court waive the notice requirements of Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), such that any order on this Motion will be effective immediately upon entry.

### Debtors' Reservation of Rights

42.     Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

### Notice

43.     No trustee or examiner has been appointed in these chapter 11 cases.  The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee for the Southern District of New York; (b) the proposed counsel to the Creditors' Committee; (c) counsel to the agent (and if there is no agent, counsel to the lender(s)) under each of the Debtors' pre-petition financing facilities; (d) counsel to the agent under the Debtors' post-petition financing facility; (e) the United States Securities and Exchange Commission; (f) the Internal Revenue Service, and (g) all parties entitled to notice pursuant to Local Rule 9013-1(b).  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

### No Prior Request

44.     No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit B, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: August 24, 2015
New York, New York

**SHEPPARD MULLIN RICHTER & HAMPTON LLP**

By: */s/ Craig A. Wolfe*
Craig A. Wolfe, Esq.
Malani J. Cademartori, Esq.
Blanka K. Wolfe, Esq.
30 Rockefeller Plaza
New York, New York 10112
Tel: (212) 653-8700
Fax: (212) 653-8701
E-mail: cwolfe@sheppardmullin.com
            mcademartori@sheppardmullin.com
            bwolfe@sheppardmullin.com

-and-

**JONES DAY**
Richard L. Wynne, Esq.
Bennett L. Spiegel, Esq.
Lori Sinanyan, Esq. (admitted *pro hac vice*)
222 East 41st Street
New York, NY 10017
Tel:  (212) 326-3939
Fax: (212) 755-7306
E-mail: rlwynne@jonesday.com
            blspiegel@jonesday.com
            lsinanyan@jonesday.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Kushner Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RELATIVITY FASHION, LLC, *et al.*,[1] | Case No. 15-11989 (MEW) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF DR. BRIAN G. KUSHNER IN SUPPORT OF DEBTORS'
MOTION PURSUANT TO 11 U.S.C. §§ 503(C) AND 363(B)(1) FOR ENTRY OF AN
ORDER APPROVING DEBTORS' KEY EMPLOYEE INCENTIVE PLAN**

I, Dr. Brian G. Kusher, make this declaration under 28 U.S.C. § 1746:

1.     I submit this Declaration in support of the *Debtors' Motion Pursuant to 11 U.S.C.
§§ 503(c) And 363(b)(1) for Entry of an Order Approving Debtors' Key Employee Incentive Plan*
(the "**Motion**").[2]

2.     Except as otherwise indicated herein, I have personal knowledge of the matters
and issues set forth herein or have gained knowledge of such matters from my review of the
relevant documents, or from information provided to me or verified by the Debtors'
management, other employees, and/or professional advisors.  If called upon to testify, I would
testify competently to the facts set forth herein.

<u>Qualifications</u>

3.     I am the Chief Restructuring Officer ("**CRO**") of (i) Relativity Fashion, LLC,
Relativity Holdings LLC, and their 143 affiliates (collectively, the "**Debtors**") that filed
voluntary petitions under chapter 11 of title 11 of the United States Code (the "**Bankruptcy**

---

[1] The Debtors in these chapter 11 cases are as set forth on page (i).

[2] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

- 1 -

The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Relativity Fashion, LLC (4571); Relativity Holdings LLC (7052); Relativity Media, LLC (0844); Relativity REAL, LLC (1653); RML Distribution Domestic, LLC (6528); RML Distribution International, LLC (6749); RMLDD Financing, LLC (9114); 21 & Over Productions, LLC (7796); 3 Days to Kill Productions, LLC (5747); A Perfect Getaway P.R., LLC (9252); A Perfect Getaway, LLC (3939); Armored Car Productions, LLC (2750); Best of Me Productions, LLC (1490); Black Or White Films, LLC (6718); Blackbird Productions, LLC (8037); Brant Point Productions, LLC (9994); Brick Mansions Acquisitions, LLC (3910); Brilliant Films, LLC (0448); Brothers Productions, LLC (9930); Brothers Servicing, LLC (5849); Catfish Productions, LLC (7728); Cine Productions, LLC (8359); CinePost, LLC (8440); Cisco Beach Media, LLC (8621); Cliff Road Media, LLC (7065); Den of Thieves Films, LLC (3046); Don Jon Acquisitions, LLC (7951); DR Productions, LLC (7803); Einstein Rentals, LLC (5861); English Breakfast Media, LLC (2240); Furnace Films, LLC (3558); Gotti Acquisitions, LLC (6562); Great Point Productions, LLC (5813); Guido Contini Films, LLC (1031); Hooper Farm Music, LLC (3773); Hooper Farm Publishing, LLC (3762); Hummock Pond Properties, LLC (9862); Hunter Killer La Productions, LLC (1939); Hunter Killer Productions, LLC (3130); In The Hat Productions, LLC (3140); J & J Project, LLC (1832); JGAG Acquisitions, LLC (9221); Left Behind Acquisitions, LLC (1367); Long Pond Media, LLC (7197); Madaket Publishing, LLC (9356); Madaket Road Music, LLC (9352); Madvine RM, LLC (0646); Malavita Productions, LLC (8636); MB Productions, LLC (4477); Merchant of Shanghai Productions, LLC (7002); Miacomet Media LLC (7371); Miracle Shot Productions, LLC (0015); Most Wonderful Time Productions, LLC (0426); Movie Productions, LLC (9860); One Life Acquisitions, LLC (9061); Orange Street Media, LLC (3089); Out Of This World Productions, LLC (2322); Paranoia Acquisitions, LLC (8747); Phantom Acquisitions, LLC (6381); Pocomo Productions, LLC (1069); Relative Motion Music, LLC (8016); Relative Velocity Music, LLC (7169); Relativity Development, LLC (5296); Relativity Film Finance II, LLC (9082); Relativity Film Finance III, LLC (8893); Relativity Film Finance, LLC (2127); Relativity Films, LLC (5464); Relativity Foreign, LLC (8993); Relativity India Holdings, LLC (8921); Relativity Jackson, LLC (6116); Relativity Media Distribution, LLC (0264); Relativity Media Films, LLC (1574); Relativity Music Group, LLC (9540); Relativity Production LLC (7891); Relativity Rogue, LLC (3333); Relativity Senator, LLC (9044); Relativity Sky Land Asia Holdings, LLC (9582); Relativity TV, LLC (0227); Reveler Productions, LLC (2191); RML Acquisitions I, LLC (9406); RML Acquisitions II, LLC (9810); RML Acquisitions III, LLC (9116); RML Acquisitions IV, LLC (4997); RML Acquisitions IX, LLC (4410); RML Acquisitions V, LLC (9532); RML Acquisitions VI, LLC (9640); RML Acquisitions VII, LLC (7747); RML Acquisitions VIII, LLC (7459); RML Acquisitions X, LLC (1009); RML Acquisitions XI, LLC (2651); RML Acquisitions XII, LLC (4226); RML Acquisitions XIII, LLC (9614); RML Acquisitions XIV, LLC (1910); RML Acquisitions XV, LLC (5518); RML Bronze Films, LLC (8636); RML Damascus Films, LLC (6024); RML Desert Films, LLC (4564); RML Documentaries, LLC (7991); RML DR Films, LLC (0022); RML Echo Films, LLC (4656); RML Escobar Films LLC (0123); RML Film Development, LLC (3567); RML Films PR, LLC (1662); RML Hector Films, LLC (6054); RML Hillsong Films, LLC (3539); RML IFWT Films, LLC (1255); RML International Assets, LLC (1910); RML Jackson, LLC (1081); RML Kidnap Films, LLC (2708); RML Lazarus Films, LLC (0107); RML Nina Films, LLC (0495); RML November Films, LLC (9701); RML Oculus Films, LLC (2596); RML Our Father Films, LLC (6485); RML Romeo and Juliet Films, LLC (9509); RML Scripture Films, LLC (7845); RML Solace Films, LLC (5125); RML Somnia Films, LLC (7195); RML Timeless Productions, LLC (1996); RML Turkeys Films, LLC (8898); RML Very Good Girls Films, LLC (3685); RML WIB Films, LLC (0102); Rogue Digital, LLC (5578); Rogue Games, LLC (4812); Roguelife LLC (3442); Safe Haven Productions, LLC (6550); Sanctum Films, LLC (7736); Santa Claus Productions, LLC (7398); Smith Point Productions, LLC (9118); Snow White Productions, LLC (3175); Spy Next Door, LLC (3043); Story Development, LLC (0677); Straight Wharf Productions, LLC (5858); Strangers II, LLC (6152); Stretch Armstrong Productions, LLC (0213); Studio Merchandise, LLC (5738); Summer Forever Productions, LLC (9211); The Crow Productions, LLC (6707); Totally Interns, LLC (9980); Tribes of Palos Verdes Production, LLC (6638); Tuckernuck Music, LLC (8713); Tuckernuck Publishing, LLC (3960); Wright Girls Films, LLC (9639); Yuma, Inc. (1669); Zero Point Enterprises, LLC (9558). The location of the Debtors' corporate headquarters is: 9242 Beverly Blvd., Suite 300, Beverly Hills, CA 90210.

i

Code") on July 30, 2015 (the "**Petition Date**") commencing these chapter 11 cases (the "**Cases**"), and (ii) the various non-Debtor subsidiaries of Relativity Holdco, both direct and indirect.

4.      I began serving as CRO of the Relativity Group upon the filing of the Chapter 11 Petition of Relativity Fashion, and immediately prior to that, served as the Chief Consultant ("**CC**") to the Relativity Group beginning on June 15, 2015.  In my capacity as CC to and CRO of Relativity, I became familiar with the Debtors' businesses, operations and financial affairs. As part of my duties as CRO, I will be overseeing and advising the Debtors on their day-to-day operations, bankruptcy compliance, budgets, cash flows, financial analysis, asset dispositions, and overall restructuring and reorganization efforts.

5.      In addition to being the CRO of Relativity, I am a senior managing director of FTI Consulting, Inc., an international financial advisory firm ("**FTI**"), and my business address is FTI's Dallas offices located at 2001 Ross Avenue, Suite 400, Dallas, Texas 75201.  Over the past 20 years, I have served as Chairman, Director, Chief Executive Officer ("**CEO**")/Interim CEO, CRO and/or CC for over a dozen public and private media, telecom, and technology companies.

6.      I have reviewed the Motion or have otherwise had the contents of the Motion explained to me and, to the best of my knowledge, insofar as I have been able to ascertain after reasonable inquiry, I believe that the approval of the relief requested therein is necessary to minimize disruption to the Debtors' business operations and maximize the value of the Debtors' estates.

### The Need for the Debtors to Implement a KEIP

7.      The Debtors currently employ 84 full-time employees and one part-time employee.  Prior to the Petition Date, the Debtors took steps to reduce the size of their workforce by downsizing employees in the Debtors' non-core businesses and unprofitable business lines.

In total, the Debtors reduced their workforce by 72 full-time employees and 22 part-time employees. In addition, 16 employees were informed by the Debtors' senior management that they would be subject to salary reductions ranging from ten to twenty percent. For the five Key Employees, the salary reductions aggregated $795,000 and resulted in average pay reductions of 10.9%.

8.      The Debtors' base and bonus practices are below that of their competitors within the industry. According to the Croner Entertainment Study published on November 14, 2014, of the eighteen companies in the film and television production and entertainment industry, the Debtors' base compensation for its employees is generally lower than other companies in the study. For example, the average annual compensation increase for industry employees in the study was between three to four percent. Among the Debtors' employees, thirty percent have not received an annual wage increase since 2013. Forty-three of the Debtors' employees have a title of vice president or above. Only two of the employees are above the mean pay point for similar position or greater than five percent above the mean. Seven of the Debtors' employees are within a five percent variance from the mean for a similar position or title. The remaining thirty-five employees are below the mean for a similar position and averaging twenty-eight percent below the mean. Moreover, according to the study, other companies reported on in the study typically pay annual bonuses. On the other hand, historically, the Debtors do not pay year-end bonuses to its employees. The last such year-end bonus paid to employees was for the fiscal year of 2012.

9.      The Debtors and their advisors have determined that the most optimal means to maximize value for the Debtors' estates in these cases was to move forward with the Sale Process. To ensure that the Sale Process is managed effectively and efficiently, the Debtors need the services of certain of the Debtors' Key Employees to prepare the company for the Sale Process,

engage with potentially interested parties both in telephonic and face-to-face meetings, and interact with the Debtors' advisors who are assisting in the Sale Process.  These critical tasks are in addition to the Key Employees' normal duties in running the Debtors' business and managing a rapidly unfolding process internally.  The Key Employees are working the equivalent of multiple jobs and are absolutely critical to each.

10.    Accordingly, I believe that an incentive pay program for five (5) Key Employees listed below is both fair and essential to ensure that the Sale Process and the Debtors' operations continue to function well and inure to the benefit of all stakeholders of the Debtors.

### The Key Employees

11.    The following are the five Key Employees, who are insiders of the Debtors and who will receive payments under the KEIP:

| Name and Position | Responsibilities and Experience |
| --- | --- |
| Tucker Tooley<br><br>*President* | Tucker Tooley is the President, overseeing the company's day-to-day operations, business divisions, and personnel.    In addition, Mr. Tooley oversees Relativity's film slate, and is responsible for marketing, theatrical distribution and the international business operations of Relativity's network of foreign output partners.  Mr. Tooley joined Relativity Media, LLC in 2009. |
| Carol Genis<br><br>*Managing Director* | Carol Genis is the Managing Director. She was former outside litigation, and Intellectual Property counsel for Relativity Media, LLC and joined in the fall of 2014 to manage legal, including business affairs and litigation matters for all divisions, management and supervision of outside counsel, management of personnel, operations and to work on strategic planning as well as special situations. |
| Greg Shamo<br><br>*Co-Chief Operating Officer* | Greg Shamo is the Co-Chief Operating Officer, overseeing the company's corporate, business and legal affairs, technology, human resources and operations departments, working alongside Co-Chief Operating Officer Andrew Matthews to manage the company's day-to-day activities.  Mr. Shamo joined Relativity Media, LLC in 2009. |

| Name and Position | Responsibilities and Experience |
|---|---|
| Andrew Matthews<br><br>*Chief Financial Officer & Co-Chief Operating Officer* | Andrew Matthews is the Chief Financial Officer and Co-Chief Operating Officer, supervising the overall financial strategy and planning for Relativity.  Mr. Matthews joined Relativity Media, LLC in 2013. |
| Thomas Forman<br><br>*Chief Executive Officer, Relativity Television, LLC* | Thomas Forman is the Chief Executive Officer of Relativity Television, LLC.  Mr. Forman oversees the day-to-day business and operations of the Debtor's television division.  Mr. Forman joined Relativity Television in 2005. |

12.     The Key Employees possess intimate knowledge of the Debtors' operations and are vital to the success of the Sale Process and these chapter 11 cases.  Prior to the Debtors' bankruptcy filing, the Key Employees assumed significant additional responsibilities and time commitments above and beyond their normal duties in order to assist the Debtors in managing their businesses and assisting with the Sale Process. Specifically, prior to Petition Date, the Key Employees assumed, among other, the following responsibilities: (i) assisting the Debtors' advisors in understanding the debtors' businesses and structuring the sale process, (ii) interacting with the Debtors' lenders and professional advisors as well as representatives of potential purchasers, (iii) participating in diligence meetings with potential purchasers, and (iv) assisting with the general preparation for the chapter 11 cases and Sale Process (including, without limitation, addressing factual inquiries from all constituents, negotiation with lenders, cash collateral budgeting and assisting in the preparation of sale related documents and analysis).

13.     Going forward, the Key Employees will be expected to provide, among other things, extensive and indispensable assistance to the Debtors' counsel and advisors with respect to issues arising during these chapter 11 cases and continue to market the Debtors' business for sale. The Key Employees will also help ensure good relationships with existing vendors, landlords, and contract-counterparties so that the Debtors will be able to realize the highest value

possible for their assets, and work with Debtors' professionals to address questions of both the lenders and the Creditors' Committee so that they can effectively participate in the cases. Undoubtedly, these additional responsibilities and time commitments will be burdensome, but are absolutely critical through the conclusion of the Sale Process.

14.    The Debtors' Chairman of the Board and the Chief Executive Officer are not eligible to participate in the KEIP.  Furthermore, no Key Employee will be eligible to receive a payment under the Employee Retention Plan Motion.

### The Development and Structure of the KEIP

15.    The KEIP was designed to provide incentive-based cash awards to the Key Employees who are most capable of, and crucial to, maximizing the Debtors' financial and operational performance and thereby the outcome of the Sale Process. Without the expertise, guidance and leadership provided by the Key Employees, I believe the Debtors' ability to maximize recoveries for creditors will be greatly hampered.

16.    During the discussions pertaining to the Sale Process, the Debtors' Board of Managers (the "**Board**") supported, and ultimately voted to approve the KEIP as an incentive based (rather than retentive-based) compensation program for the Key Employees with clearly defined targets tied specifically to achieving the highest and best offer resulting from the Sale Process. In particular, the Board determined that there was no other metric that could be used to measure performance due to the Debtors' declining operational results and due to the reality that the Debtors' operations would be sold.  Accordingly, the only appropriate metric to which compensation could be tied was sale performance, which creates an alignment of the interests of the Key Employees and the Debtors' creditors.  Moreover, the Board understood that it was critical to the outcome of the Sale Process and the maximization of creditor recoveries in these chapter 11 cases to incentivize the Key Employees.

- 6 -

17.    I believe that the KEIP is appropriately designed to incentivize the Key Employees to continue their substantial efforts in operating the Debtors' businesses and assisting in facilitating the Sale Process during the pendency of these chapter 11 cases.  The KEIP has been tailored to be a catalyst for the Key Employees and compensate them for the additional (and time consuming) responsibilities that they have undertaken and will continue to perform in connection with the Debtors' businesses and the Sale Process.  I believe it will be difficult for the Key Employees to meet the KEIP targets.

18.    The KEIP was developed with targets designed to motivate the Key Employees to obtain as much value for the Debtors' assets as quickly as possible.  The KEIP is intended to incentivize Key Employees, which possess knowledge of the industry and relationships with the Debtors' customers and competitors that are critical to this undertaking.  The KEIP is entirely performance-based – there are no guaranteed payments.

19.    The Debtors propose to implement the following KEIP:

- In exchange for entering into letter agreements (collectively, the "**KEIP Agreements**") with the Debtors, Key Employees will be able to participate in the KEIP.

- The size of the KEIP is based on a calculation of the aggregate of the following:

  - the amount of salary reduction incurred by the Key Employees from the Petition Date through October 5, 2015, and

  - 0%, 25%, 50%, 75% or 100% of an amount equal to 12.5% of salaries of the Key Employees incurred by the Debtors from the Petition Date through sale hearing on October 5, 2015 based on the following table:

| Ultimate Purchase Price Above $250 Million | Percentage of KEIP Pool Funded |
|---|---|
| $1,000,000 | 25% |
| $2,000,000 | 50% |
| $3,000,000 | 75% |
| $4,000,000 (which corresponds to aggregate bids of $254 million or more) | 100% |

- The KEIP pool will become fully funded if any one bid or aggregate of bids at the Auction exceeds $254 million.

- Individual awards to Key Employees will be paid at the sole discretion of the Board., based upon each individual Key Employee's contribution to the business during Sale Process. If any Key Employee is a member of the Board, such Key Employee will be recused from voting on his or her individual award.

- Any Key Employee that resigns or is terminated for cause will forfeit his or her KEIP award, if any.

- Payments under the KEIP will be paid in cash one day after the Sale Closing.

20.    The total cost of the KEIP is expected to be approximately $314,868 excluding employer contribution taxes.  As of the date hereof, the Debtors do not anticipate including any additional Key Employees to the KEIP.

**The KEIP Should be Approved**

21.    I believe that the KEIP will encourage them to redouble their efforts and, on that basis, is both appropriate and necessary.  In addition, I believe that the incentives created by the KEIP will motivate the Debtors' Key Employees to maximize value for the Debtors' estates and constituents in the timeframe dictated by the circumstances of these cases.

Dated: August 24, 2015
          Los Angeles, California                    */s/ Dr. Brian G. Kushner*
                                                     By:    Dr. Brian G. Kushner
                                                     Title:   Chief Restructuring Officer

## Exhibit B

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RELATIVITY FASHION, LLC, *et al.*,[1] | Case No. 15-11989 (MEW) |
| Debtors. | (Jointly Administered) |

### ORDER PURSUANT TO 11 U.S.C. §§ 503(c) AND 363(b)(1) APPROVING DEBTORS' KEY EMPLOYEE INCENTIVE PLAN

Upon the motion (the "**Motion**")[2] of Relativity Fashion, LLC, and its affiliated debtors and debtors in possession in these chapter 11 cases (collectively, the "**Debtors**"), for entry of an order, pursuant to sections 503(c)(3) and 363(b)(1) of the Bankruptcy Code, approving the Debtors' key employee incentive program (the "**KEIP**"); and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that venue of these chapter 11 cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and it appearing that proper and adequate notice of the Motion has been given and that, except as otherwise ordered herein, no other or further notice is necessary; and after due deliberation thereon; and good and sufficient cause appearing therefor;

---

[1] The Debtors in these chapter 11 cases are as set forth on page (i).

[2] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Relativity Fashion, LLC (4571); Relativity Holdings LLC (7052); Relativity Media, LLC (0844); Relativity REAL, LLC (1653); RML Distribution Domestic, LLC (6528); RML Distribution International, LLC (6749); RMLDD Financing, LLC (9114); 21 & Over Productions, LLC (7796); 3 Days to Kill Productions, LLC (5747); A Perfect Getaway P.R., LLC (9252); A Perfect Getaway, LLC (3939); Armored Car Productions, LLC (2750); Best of Me Productions, LLC (1490); Black Or White Films, LLC (6718); Blackbird Productions, LLC (8037); Brant Point Productions, LLC (9994); Brick Mansions Acquisitions, LLC (3910); Brilliant Films, LLC (0448); Brothers Productions, LLC (9930); Brothers Servicing, LLC (5849); Catfish Productions, LLC (7728); Cine Productions, LLC (8359); CinePost, LLC (8440); Cisco Beach Media, LLC (8621); Cliff Road Media, LLC (7065); Den of Thieves Films, LLC (3046); Don Jon Acquisitions, LLC (7951); DR Productions, LLC (7803); Einstein Rentals, LLC (5861); English Breakfast Media, LLC (2240); Furnace Films, LLC (3558); Gotti Acquisitions, LLC (6562); Great Point Productions, LLC (5813); Guido Contini Films, LLC (1031); Hooper Farm Music, LLC (3773); Hooper Farm Publishing, LLC (3762); Hummock Pond Properties, LLC (9862); Hunter Killer La Productions, LLC (1939); Hunter Killer Productions, LLC (3130); In The Hat Productions, LLC (3140); J & J Project, LLC (1832); JGAG Acquisitions, LLC (9221); Left Behind Acquisitions, LLC (1367); Long Pond Media, LLC (7197); Madaket Publishing, LLC (9356); Madaket Road Music, LLC (9352); Madvine RM, LLC (0646); Malavita Productions, LLC (8636); MB Productions, LLC (4477); Merchant of Shanghai Productions, LLC (7002); Miacomet Media LLC (7371); Miracle Shot Productions, LLC (0015); Most Wonderful Time Productions, LLC (0426); Movie Productions, LLC (9860); One Life Acquisitions, LLC (9061); Orange Street Media, LLC (3089); Out Of This World Productions, LLC (2322); Paranoia Acquisitions, LLC (8747); Phantom Acquisitions, LLC (6381); Pocomo Productions, LLC (1069); Relative Motion Music, LLC (8016); Relative Velocity Music, LLC (7169); Relativity Development, LLC (5296); Relativity Film Finance II, LLC (9082); Relativity Film Finance III, LLC (8893); Relativity Film Finance, LLC (2127); Relativity Films, LLC (5464); Relativity Foreign, LLC (8993); Relativity India Holdings, LLC (8921); Relativity Jackson, LLC (6116); Relativity Media Distribution, LLC (0264); Relativity Media Films, LLC (1574); Relativity Music Group, LLC (9540); Relativity Production LLC (7891); Relativity Rogue, LLC (3333); Relativity Senator, LLC (9044); Relativity Sky Land Asia Holdings, LLC (9582); Relativity TV, LLC (0227); Reveler Productions, LLC (2191); RML Acquisitions I, LLC (9406); RML Acquisitions II, LLC (9810); RML Acquisitions III, LLC (9116); RML Acquisitions IV, LLC (4997); RML Acquisitions IX, LLC (4410); RML Acquisitions V, LLC (9532); RML Acquisitions VI, LLC (9640); RML Acquisitions VII, LLC (7747); RML Acquisitions VIII, LLC (7459); RML Acquisitions X, LLC (1009); RML Acquisitions XI, LLC (2651); RML Acquisitions XII, LLC (4226); RML Acquisitions XIII, LLC (9614); RML Acquisitions XIV, LLC (1910); RML Acquisitions XV, LLC (5518); RML Bronze Films, LLC (8636); RML Damascus Films, LLC (6024); RML Desert Films, LLC (4564); RML Documentaries, LLC (7991); RML DR Films, LLC (0022); RML Echo Films, LLC (4656); RML Escobar Films LLC (0123); RML Film Development, LLC (3567); RML Films PR, LLC (1662); RML Hector Films, LLC (6054); RML Hillsong Films, LLC (3539); RML IFWT Films, LLC (1255); RML International Assets, LLC (1910); RML Jackson, LLC (1081); RML Kidnap Films, LLC (2708); RML Lazarus Films, LLC (0107); RML Nina Films, LLC (0495); RML November Films, LLC (9701); RML Oculus Films, LLC (2596); RML Our Father Films, LLC (6485); RML Romeo and Juliet Films, LLC (9509); RML Scripture Films, LLC (7845); RML Solace Films, LLC (5125); RML Somnia Films, LLC (7195); RML Timeless Productions, LLC (1996); RML Turkeys Films, LLC (8898); RML Very Good Girls Films, LLC (3685); RML WIB Films, LLC (0102); Rogue Digital, LLC (5578); Rogue Games, LLC (4812); Roguelife LLC (3442); Safe Haven Productions, LLC (6550); Sanctum Films, LLC (7736); Santa Claus Productions, LLC (7398); Smith Point Productions, LLC (9118); Snow White Productions, LLC (3175); Spy Next Door, LLC (3043); Story Development, LLC (0677); Straight Wharf Productions, LLC (5858); Strangers II, LLC (6152); Stretch Armstrong Productions, LLC (0213); Studio Merchandise, LLC (5738); Summer Forever Productions, LLC (9211); The Crow Productions, LLC (6707); Totally Interns, LLC (9980); Tribes of Palos Verdes Production, LLC (6638); Tuckernuck Music, LLC (8713); Tuckernuck Publishing, LLC (3960); Wright Girls Films, LLC (9639); Yuma, Inc. (1669); Zero Point Enterprises, LLC (9558).  The location of the Debtors' corporate headquarters is: 9242 Beverly Blvd., Suite 300, Beverly Hills, CA 90210.

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      Pursuant to sections 503(c) and 363(b)(1) of the Bankruptcy Code, the KEIP is approved.

3.      The Debtors are authorized, but not directed, to implement the KEIP.

4.      Nothing contained in this Order or in the Motion is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (c) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code. Likewise any payment made pursuant to this Order is not intended to be and shall not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

5.      Notwithstanding entry of this Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party.

6.       Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

7.      The requirements set forth in Local Rule 9013-1(b) are satisfied.

8.      Notwithstanding anything to the contrary contained herein, any payment to be made hereunder shall be subject to the terms, conditions, requirements and budgets imposed on the Debtors under the Debtors' postpetition financing agreements (the "**DIP Documents**") and any order governing the Debtors' use of cash collateral and entry into the DIP Documents.

9.      The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

10.      This Court shall retain jurisdiction to hear and determine all matters arising from

or related to the implementation, interpretation and/or enforcement of this Order.

Dated: New York, New York
          September __, 2015

_____
THE HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE