**Hearing Date and Time: September 10, 2015 at 2:00 p.m. (ET)**
**Objection Deadline: September 3, 2015 at 4:00 p.m. (ET)**

Craig A. Wolfe, Esq.
Malani J. Cademartori, Esq.
Blanka K. Wolfe, Esq.
**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
30 Rockefeller Plaza
New York, NY 10112
Tel:  (212) 653-8700
Fax: (212) 653-8701

- and -

Richard L. Wynne, Esq.
Bennett L. Spiegel, Esq.
Lori Sinanyan, Esq. (admitted *pro hac vice*)
**JONES DAY**
222 East 41st Street
New York, NY 10017
Tel:  (212) 326-3939
Fax: (212) 755-7306

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RELATIVITY FASHION, LLC, *et al.*,[1] | Case No. 15-11989 (MEW) |
| Debtors. | (Jointly Administered) |

**DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 503(c) AND**
**363(b)(1) FOR ENTRY OF AN ORDER APPROVING DEBTORS'**
**EMPLOYEE RETENTION PLAN FOR NON-INSIDER EMPLOYEES**

Relativity Fashion, LLC and its affiliated debtors and debtors in possession in these

chapter 11 cases (collectively, the "**Debtors**"), hereby submit this motion (the "**Motion**"),

pursuant to sections 503(c) and 363(b)(1) of title 11 of the United States Code, 11 U.S.C. §§ 101

---

[1] The Debtors in these chapter 11 cases are as set forth on page (i).

The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Relativity Fashion, LLC (4571); Relativity Holdings LLC (7052); Relativity Media, LLC (0844); Relativity REAL, LLC (1653); RML Distribution Domestic, LLC (6528); RML Distribution International, LLC (6749); RMLDD Financing, LLC (9114); 21 & Over Productions, LLC (7796); 3 Days to Kill Productions, LLC (5747); A Perfect Getaway P.R., LLC (9252); A Perfect Getaway, LLC (3939); Armored Car Productions, LLC (2750); Best of Me Productions, LLC (1490); Black Or White Films, LLC (6718); Blackbird Productions, LLC (8037); Brant Point Productions, LLC (9994); Brick Mansions Acquisitions, LLC (3910); Brilliant Films, LLC (0448); Brothers Productions, LLC (9930); Brothers Servicing, LLC (5849); Catfish Productions, LLC (7728); Cine Productions, LLC (8359); CinePost, LLC (8440); Cisco Beach Media, LLC (8621); Cliff Road Media, LLC (7065); Den of Thieves Films, LLC (3046); Don Jon Acquisitions, LLC (7951); DR Productions, LLC (7803); Einstein Rentals, LLC (5861); English Breakfast Media, LLC (2240); Furnace Films, LLC (3558); Gotti Acquisitions, LLC (6562); Great Point Productions, LLC (5813); Guido Contini Films, LLC (1031); Hooper Farm Music, LLC (3773); Hooper Farm Publishing, LLC (3762); Hummock Pond Properties, LLC (9862); Hunter Killer La Productions, LLC (1939); Hunter Killer Productions, LLC (3130); In The Hat Productions, LLC (3140); J & J Project, LLC (1832); JGAG Acquisitions, LLC (9221); Left Behind Acquisitions, LLC (1367); Long Pond Media, LLC (7197); Madaket Publishing, LLC (9356); Madaket Road Music, LLC (9352); Madvine RM, LLC (0646); Malavita Productions, LLC (8636); MB Productions, LLC (4477); Merchant of Shanghai Productions, LLC (7002); Miacomet Media LLC (7371); Miracle Shot Productions, LLC (0015); Most Wonderful Time Productions, LLC (0426); Movie Productions, LLC (9860); One Life Acquisitions, LLC (9061); Orange Street Media, LLC (3089); Out Of This World Productions, LLC (2322); Paranoia Acquisitions, LLC (8747); Phantom Acquisitions, LLC (6381); Pocomo Productions, LLC (1069); Relative Motion Music, LLC (8016); Relative Velocity Music, LLC (7169); Relativity Development, LLC (5296); Relativity Film Finance II, LLC (9082); Relativity Film Finance III, LLC (8893); Relativity Film Finance, LLC (2127); Relativity Films, LLC (5464); Relativity Foreign, LLC (8993); Relativity India Holdings, LLC (8921); Relativity Jackson, LLC (6116); Relativity Media Distribution, LLC (0264); Relativity Media Films, LLC (1574); Relativity Music Group, LLC (9540); Relativity Production LLC (7891); Relativity Rogue, LLC (3333); Relativity Senator, LLC (9044); Relativity Sky Land Asia Holdings, LLC (9582); Relativity TV, LLC (0227); Reveler Productions, LLC (2191); RML Acquisitions I, LLC (9406); RML Acquisitions II, LLC (9810); RML Acquisitions III, LLC (9116); RML Acquisitions IV, LLC (4997); RML Acquisitions IX, LLC (4410); RML Acquisitions V, LLC (9532); RML Acquisitions VI, LLC (9640); RML Acquisitions VII, LLC (7747); RML Acquisitions VIII, LLC (7459); RML Acquisitions X, LLC (1009); RML Acquisitions XI, LLC (2651); RML Acquisitions XII, LLC (4226); RML Acquisitions XIII, LLC (9614); RML Acquisitions XIV, LLC (1910); RML Acquisitions XV, LLC (5518); RML Bronze Films, LLC (8636); RML Damascus Films, LLC (6024); RML Desert Films, LLC (4564); RML Documentaries, LLC (7991); RML DR Films, LLC (0022); RML Echo Films, LLC (4656); RML Escobar Films LLC (0123); RML Film Development, LLC (3567); RML Films PR, LLC (1662); RML Hector Films, LLC (6054); RML Hillsong Films, LLC (3539); RML IFWT Films, LLC (1255); RML International Assets, LLC (1910); RML Jackson, LLC (1081); RML Kidnap Films, LLC (2708); RML Lazarus Films, LLC (0107); RML Nina Films, LLC (0495); RML November Films, LLC (9701); RML Oculus Films, LLC (2596); RML Our Father Films, LLC (6485); RML Romeo and Juliet Films, LLC (9509); RML Scripture Films, LLC (7845); RML Solace Films, LLC (5125); RML Somnia Films, LLC (7195); RML Timeless Productions, LLC (1996); RML Turkeys Films, LLC (8898); RML Very Good Girls Films, LLC (3685); RML WIB Films, LLC (0102); Rogue Digital, LLC (5578); Rogue Games, LLC (4812); Roguelife LLC (3442); Safe Haven Productions, LLC (6550); Sanctum Films, LLC (7736); Santa Claus Productions, LLC (7398); Smith Point Productions, LLC (9118); Snow White Productions, LLC (3175); Spy Next Door, LLC (3043); Story Development, LLC (0677); Straight Wharf Productions, LLC (5858); Strangers II, LLC (6152); Stretch Armstrong Productions, LLC (0213); Studio Merchandise, LLC (5738); Summer Forever Productions, LLC (9211); The Crow Productions, LLC (6707); Totally Interns, LLC (9980); Tribes of Palos Verdes Production, LLC (6638); Tuckernuck Music, LLC (8713); Tuckernuck Publishing, LLC (3960); Wright Girls Films, LLC (9639); Yuma, Inc. (1669); Zero Point Enterprises, LLC (9558). The location of the Debtors' corporate headquarters is: 9242 Beverly Blvd., Suite 300, Beverly Hills, CA 90210.

*et seq.* (the "**Bankruptcy Code**"), for entry of an order, substantially in the form attached hereto

as <u>Exhibit B</u>, approving the Debtors' Employee Retention Plan (the "**Retention Plan**") for

employees who are not considered "insiders," as such term is defined in section 101(31) of the

Bankruptcy Code (the "**Employees**").  In support of this Motion, the Debtors respectfully submit

the *Declaration of Dr. Brian G. Kushner in Support of Debtors' Motion for Entry of an Order*

*Approving Debtors' Employee Retention Plan for Non-Insider Employees*, filed concurrently

herewith (the "**Kushner Decl.**"), and respectfully state as follows:

<u>**Jurisdiction**</u>

1.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157

and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue

is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 503(c) and

363(b)(1) of the Bankruptcy Code and Rule 6004(h) of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**").

<u>**Background**</u>

3.      On July 30, 2015 (the "**Petition Date**"), each of the Debtors filed a voluntary

petition in this Court for relief under chapter 11 of the Bankruptcy Code.

4.      On August 7, 2015, the United States Trustee for the Southern District of New

York (the "**U.S. Trustee**") appointed the Official Committee of Unsecured Creditors [Dk. 114]

(the "**Creditors' Committee**").

5.      The Debtors continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request

for appointment of a trustee or examiner has been made in these chapter 11 cases.

6.      Additional factual background relating to the Debtors' businesses and the commencement of these chapter 11 cases is set forth in detail in the *Declaration of Dr. Brian G. Kushner Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of Chapter 11 Petitions and First Day Pleadings*, filed on July 30, 2015 [Dk. 14] (the "**First Day Declaration**").

7.      On the Petition Date, the Debtors filed a motion seeking the authority to sell substantially all of the Debtors' assets through an auction and sale process (the "**Sale Process**").[2] Pursuant to the Sale Process, the Debtors will conduct an auction (the "**Auction**") on October 1, 2015 if the Debtors receive a Qualified Bid (as defined in the Sale Motion) prior to the Auction.[3] As of the date of this Motion, the sale will close on October 20, 2015 (the "**Sale Closing**")

## The Employee Retention Plan

### A.      The Need to Retain the Debtors' Employees

8.      As set forth in the First Day Declaration, prior to the Petition Date, the Debtors experienced severe liquidity constraints and increasing limitations imposed by the certain forbearance agreements and debt issuances.  With over $350 million in outstanding matured secured debt and without the opportunity for further financing, the Debtors determined it was in their best interests to file for bankruptcy protection.  In advance of the Petition Date, the Debtors took steps to reduce the size of the workforce by downsizing employees in the Debtors' non-core businesses and unprofitable business lines.  In total, the Debtors reduced their workforce by 72

---

[2] *See Motion for (I) an Order (A) Establishing Bid Procedures for the Sale of Substantially all of the Debtors' Assets, (B) Approving Stalking Horse APA and Bidding Protections, and (C) Granting Certain Related Relief and (II) an Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Certain Related Relief*, dated July 31, 2015 [Dk. 25] (the "**Sale Motion**").

[3] *See* Sale Motion, Ex. A, ¶ 6.

-3-

full-time employees and 22 part-time employees.  In addition, prior to the Petition Date, the Debtors' senior management informed 15 employees that they would be subject to salary reductions ranging from ten to twenty percent.  These salary reductions aggregated $1,967,500 for the 15 employees, which include senior management, and resulted in average pay reductions of 17.8%.  For the Employees eligible for the Retention Plan, the salary reductions aggregated $1,172,500.  Currently, the Debtors employ 84 full-time employees and one part-time employee.

9.     Since the Petition Date, the Debtors have experienced high employee turnover. From July 30 through the date of this Motion, the Debtors lost five employees as a result of voluntary attrition.  In addition, two employees will be departing before the end of August 2015 and one employee will be departing shortly thereafter.  Of these recent or expected eight employee departures, three employees work or worked in accounting.  In addition, other employees have indicated that they are actively seeking new employment.  Of the eight recent or expected employee departures, all eight of these employees would have been asked to participate in the Retention Plan.  These eight recent or expected employee departures represent 8.9 percent of the workforce total as of the Petition Date.

10.    The Debtors base and bonus practices are below that of their competitors within the industry.  Thus, the Debtors' past compensation practices may make them vulnerable to employees departing at this time.

11.    As a result of the Debtors' upcoming sale of the substantially all of their assets, and the uncertainty regarding the size and composition of the Debtors' workforce following the sale, attracting qualified employees at this stage in the Debtors' restructuring would be extremely challenging.  Even if the Debtors were successful at finding qualified employees, such

qualifications, alone, would not make up for the loss of the institutional knowledge of the Debtors' current employees.

12.      As a result, the Debtors determined that it is necessary to implement a broad-based retention plan for non-insider employees to ensure that their workforce remains in place and motivated through the critical early stages of the Debtors' Sale Process so that the Debtors can maximize the value of their assets.[4]

**B.      The Development of the Employee Retention Plan**

13.      The Debtors' Chief Restructuring Officer, Deputy Chief Restructuring Officer, and senior members of the Debtors' management conducted a review of the Debtors' workforce requirements through the pendency of these cases.  Following extensive discussions with their professionals, the Debtors determined that a broad-based retention plan for all non-insider employees was a necessary and appropriate means of ensuring the retention of their Employees, all of whom have played, and continue to play, a critical role in the success of the Debtors' businesses and corresponding going-concern value. During this process, the Debtors' reviewed the list of Employees and scrutinized the roles and responsibilities of the Employees to ensure that any "insider" as defined by section 101(31) of the Bankruptcy Code was not included in the Retention Plan.   Thereafter, the Debtors submitted the Retention Plan for approval to the Debtors' board of directors (the "**Board**"), which reviewed and approved the Retention Plan.

---

[4] The Debtors have also filed a *Motion Pursuant to 11 U.S.C. §§ 503(c) and 363(b)(1) for Entry of an Order Approving Debtors' Key Employee Incentive Plan* (the "**KEIP Motion**") concurrently herewith.  Pursuant to the KEIP Motion, the Debtors' seek the authority to implement a Key Employee Incentive Plan for five members of senior management.

C.      **The Eligible Employees**

14.      The Employees work across a variety of disciplines and are responsible for facilitating a range of tasks critical to the Debtors' operations or businesses, including, without limitation, matters relating to finance, production and development, operations, business affairs, and human resources.   Many of the Employees have direct and regular interaction with the Debtors' key vendors and production counterparties and, therefore, play an important role in maintaining and cultivating those relationships.   In light of the significant changes in the Debtors' workforce prior to the Petition Date, including the termination of 72 full-time employees and 22 part-time employees, the remaining Employees have been required to shoulder an increased workload and significant additional responsibilities in order to compensate for the loss of other employees.   The Employees have also been subject to increased doubt and stress due to commencement of the chapter 11 cases and the impending sale of the Debtors' assets. The average annual salary for the Employees is approximately $188,156 per employee.

15.      There are 80 Employees eligible to participate in the Retention Plan.  For the avoidance of doubt, none of the Employees are "insiders" as such term is defined in section 101(31) of the Bankruptcy Code, and no insider will be eligible to participate in the Retention Plan.  Furthermore, no temporary employee, independent contractor, or any temporary personnel associated with any of the Debtors' ongoing film or television productions is eligible for the Retention Plan.

D.      **The Structure of the Retention Plan**

16.      The Debtors designed the Retention Plan in order to incentivize Employees to remain employed with the Debtors while the Debtors pursue their financial and operational restructuring and focus on stabilizing the businesses during the critical Sale Process.  The final

Retention Plan design is a reasonable, cost-effective way to provide the appropriate incentives and to retain personnel essential to these chapter 11 cases.

17.     Given the highly specialized nature of the Debtors' film and television businesses, the Debtors' success is linked to the breadth and depth of the industry knowledge, experience, and skillset of the Debtors' workforce.  The Debtors created the Retention Plan for the entire workforce of non-insider employees because each employee possesses specialized and/or technical expertise in the film or television industry, institutional know-how, and/or supervisory responsibilities over the Debtors' day-to-day operations.  The Debtors require authorization to implement the Retention Plan to ensure that they do not lose valuable talent to the detriment of the Debtors' operations and all parties in interest, for which replacement personnel of like skills and expertise will not only unnecessarily jeopardize the stability of the Debtors' highly specialized businesses, but will also serve as an unwelcome distraction and ultimate drain on the Debtors' already limited resources.  The costs associated with the Retention Plan are significantly outweighed by the benefits that have been, and will continue to be, realized by the estates by ensuring that essential personnel remain with the Debtors and encouraging participants to stay focused on the Debtors' operations to facilitate a smooth sale process that maintains the going concern value of the Debtors' businesses.

18.     The Debtors propose to implement the following Retention Plan:

- In exchange for entering into letter agreements (collectively, the "**Retention Plan Agreements**") with the Debtors, all non-insider employees will participate in the Retention Plan.

- The size of the Retention Plan pool is based on a calculation of the aggregate of the following:

    o the amount of salary reduction incurred by the Key Employees from the Petition Date through October 5, 2015, and

    ○  12.5% of salaries of the Employees incurred by the Debtors from the Petition Date through sale hearing on October 5, 2015.

- The amounts paid to each individual Employee under the Retention Plan will be determined by the Debtors' Board, based upon each individual Employee's contribution to the business during Sale Process.

- In order for an Employee to be eligible for a Retention Plan payment, the Employee must be employed with the Debtors through October 20, 2015.

- Any Employee that resigns or is terminated for cause will forfeit his or her award, if any. If an Employee is terminated without cause, said Employee may be eligible for a pro-rated award at the sole discretion of the Board.

- The payments under the Retention Plan will be paid in cash one day after the Sale Closing.

19.    The total cost of the Retention Plan is approximately $589,126, excluding employer contribution taxes.

20.    Because the payments under the Retention Plan are not scheduled to be made until after the Sale Closing, which is expected to be on October 20, 2015, the Retention Plan is expected to incentivize the Employees to remain employed with the Debtors through the Sale Closing.

**Relief Requested**

21.    By this Motion, the Debtors request entry of an order, pursuant to sections 503(c)(3) and 363(b)(1) of the Bankruptcy Code, approving the Debtors' Retention Plan for the Debtors' Employees.

**Basis for Relief**

**E.    The Employees are Not Insiders**

22.    As an initial matter, the Retention Plan is not subject to restrictions of section 503(c)(1) of the Bankruptcy Code because the Employees are not "insiders," as such term is defined by section 101(31) of the Bankruptcy Code.

23.     The Bankruptcy Code defines an "insider" to include, among other things, "director of the debtor," "officer of the debtor" and a "person in control of the debtor."   11 U.S.C. § 101(31).   Courts also have concluded that an employee may be an "insider" if such employee has "at least a controlling interest in the debtor or . . . exercise[s] sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets."   *In re Velo Holdings, Inc.*, 472 B.R. 201, 208 (Bankr. S.D.N.Y. 2012) (citation omitted). It is well established that an employee's job title, alone, does not make such employee an "insider" as defined by the Bankruptcy Code.   *See In re Borders Grp., Inc.*, 453 B.R. 459, 469 (Bankr. S.D.N.Y. 2011) (noting that "[c]ompanies often give employees the title 'director' or 'director level,' but do not give them decision-making authority akin to an executive" and concluding that certain "director level" employees in that case were not insiders).

24.     None of the Employees are "insiders," as such term is defined by section 101(31) of the Bankruptcy Code.   While Employees hold titles such as "president," "executive vice president," senior vice president," no Employee is granted any decision-making authority akin to the roles or responsibilities of members of senior management.   Such titles are only representative of the Employees' importance in their roles and no Employee is authorized to take any action materially affecting the Debtors' corporate policy without authorization from a member of the senior management.   Although the Employees are important to the Debtors' businesses and are particularly vital during these chapter 11 cases, none of the Employees (i) are part of the Debtors' senior management, (ii) are members of the Board, (iii) report directly to the Board, or (iv) receive equity of the Debtors as part of their compensation structure.   Therefore, as none of the Employees is an "insider" of the Debtors, the restrictions of section 503(c)(1) of the Bankruptcy Code are inapplicable to the Retention Plan.

**A.**     **The Retention Plan Should Be Approved Pursuant to
Section 503(c)(3) of the Bankruptcy Code**

25.     The Retention Plan should be approved pursuant to section 503(c)(3) of the Bankruptcy Code.  Specifically, section 503(c)(3) of the Bankruptcy Code permits payments to a debtor's employees outside the ordinary course of business if such payments are justified by "the facts and circumstances of the case."  11 U.S.C. § 503(c)(3).  In this and other districts, courts have concluded that whether payments to employees are justified by the "facts and circumstances" of a case is to be determined by application of the business judgment rule.  *See In re Velo* 472 B.R. 201, 209 (Bankr. S.D.N.Y. 2012) (noting that the "facts and circumstances language of 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)"); *In re Borders Grp., Inc.*, 453 B.R. 459, 473–74 (Bankr. S.D.N.Y. 2011) (evaluating debtors' key employment retention plan under business judgment rule); *In re Dana Corp.*, 358 B.R. 567, 576–77 (Bankr. S.D.N.Y. 2006) (describing six factors that courts may consider when determining whether the structure of a compensation proposal meets the "sound business judgment test" in accordance with section 503(c)(3) of the Bankruptcy Code).

26.     In *Dana*, the bankruptcy court set forth six factors for evaluating whether a debtor has satisfied the "sound business judgment" test for purposes of the approval of a compensation plan under section 503(c)(3) of the Bankruptcy Code:

> - Is there a reasonable relationship between the plan proposed and the results to be obtained, *i.e.*, will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance? . . .
>
> - Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?
>
> - Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

> - Is the plan or proposal consistent with industry standards?
>
> - What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?
>
> - Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*Dana*, 358 B.R. at 576–77 (emphasis in original). Courts within this district have generally utilized the factors identified in *Dana* when determining if the structure of a compensation proposal and the process for its development meet the business judgment test. *See, e.g., In re Residential Capital, LLC*, 491 B.R. 73, 85–86 (Bankr. S.D.N.Y. 2013) (applying the *Dana* factors to the debtors' retention plan for non-insiders, and approving the plan as an exercise of sound business judgment); *Borders*, 453 B.R. at 473–74 (same). As set forth below, the Debtors' Retention Plan should be approved under this standard.

31.     First, the Debtors believe that the Retention Plan was reasonably designed to retain the Debtors' Employees. As noted above, the Retention Plan was implemented to ensure that the Employees remain with the Debtors through the Sale Process. Given high turnover since the Petition Date and the uncertainty caused by the Debtors' chapter 11 cases, the Debtors reasonably believe that failure to implement the Retention Plan may result in a loss of the Employees. The Debtors cannot afford to lose their Employees as these employees provide highly specialized services to the Debtors and have years of industry experience and a wealth of institutional knowledge, all of which are necessary to maximize the value of the Debtors' assets during the Sale Process. Further, a failure to retain the Employees would cause the Debtors to incur significant time and money to obtain and train replacements, which would in turn hinder and delay their restructuring efforts and distract from the critical sale process. For these reasons,

the Retention Plan was carefully designed to ensure that the Employees remain employed by the Debtors through the Debtors' Sale Process.

32.     Second, the Retention Plan is reasonable in light of the Debtors' assets, liabilities and earning potential.  The maximum cost of the Retention Plan is approximately $589,126 excluding employer contribution taxes.  Furthermore, the total cost of the Retention Plan as a percentage of the Purchase Price (as defined in the Sale Motion) of the Stalking Horse Bidder (as defined in the Sale Motion ) is 0.23%.

33.     Third, the scope of the Retention Plan is fair and reasonable and does not unfairly discriminate.  As noted herein, in identifying participants for the Retention Plan, the Debtors undertook a careful process to identify their workforce requirements during the pendency of the Sale Process.  As a result of this process, the Debtors created a Retention Plan that allows all non-insiders to participate in a process where they may be compensated to ensure that they remain with the Debtors during this critical period.  Thus, the Debtors determined that the Retention Plan is reasonably designed to ensure that the Employees are incentivized to remain with the Debtors, which will ultimately contribute to the Debtors' going-concern value.

27.     Fourth, as reflected in the Kushner Declaration, the Retention Plan comports with industry standards.  As noted above, the Debtors' compensation practices indicate that the Debtors pay salaries below their competitors in the entertainment industry.  The Croner Entertainment Study surveyed eighteen companies in the film and television production and entertainment industry.  This study indicates that the base compensation for the Debtors' employees is generally lower than other companies in the study.  Accordingly, the Debtors' believe that the Retention Plan is within industry standards.

-12-

28.     Accordingly, in order to prevent a decline in employee morale and a correlative decline in the value of their estates, the Debtors respectfully believe that the Retention Plan satisfies section 503(c)(3) of the Bankruptcy Code as it is justified by the facts and circumstances of these chapter 11 cases, and should be approved.

**B.     The Implementation of the Retention Plan Is a Valid Exercise of the Debtors' Business Judgment**

34.     To the extent applicable, the Retention Plan should also be approved under section 363(b)(1) of the Bankruptcy Code.  Section 363(b)(1) provides that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Use of estate property outside the ordinary course of business is entrusted to the sound business judgment of a debtor.  *See, e.g., Official Comm. Of Unsecured Creditors v. LTV Corp. (In re Chateaugay)*, 973 F.2d 141, 143 (2d Cir. 1992) (affirming the bankruptcy's courts approval of debtors' asset sale pursuant to section 363(b) as a reasonable exercise of business judgment); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1072 (2d Cir. 1983) (holding that the application of section 363(b) creditors"); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (emphasizing the business judgment rule); *Borders*, 453 B.R. at 473 (same).

35.     As noted above, the business judgment rule is the standard courts use to evaluate whether a retention plan meets the "facts and circumstances" standard set forth in section 503(c)(3) of the Bankruptcy Code.  Thus, as set forth above, the Debtors' decision to implement the Retention Plan is a valid exercise of business judgment.  Specifically, the Debtors have determined that implementing the Retention Plan will appropriately incentivize the Employees to remain engaged with the Debtors' through the Sale Process.  As noted herein, the Employees possess the special knowledge and expertise necessary to stabilize the Debtors' operations and

allow them to effectuate a successful restructuring. Additionally, the Debtors' ability to maximize the going-concern value of their estates is dependent upon the continued employment, active participation, and ongoing commitment of the Employees. Indeed, the loss of the Employees would adversely impact the Debtors' businesses as, among other things, it would have a detrimental impact on the moral of the Employees' colleagues and subordinates as well as send a negative message to the Debtors' customers and vendors with whom the Employees have built a positive and cooperative working relationship, and most noteworthy, would be difficult to recruit replacement candidates who not only have experience in the entertainment industry, but would possess the requisite expertise regarding the same.

36. Accordingly, implementing the Retention Plan is a valid exercise of the Debtors' business judgment and approval of the Retention Plan is in the best interests of the Debtors and their estates.

### Request for Waiver of Any Applicable Stay

29. As discussed above, the relief sought by this Motion is critical to the Debtors' continuing business operations and is therefore in the best interests of the estates. In order to avoid delay in implementing such relief and the attendant potential harm to the Debtors' business operations, the Debtors request that the Court waive the notice requirements of Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), such that any order on this Motion will be effective immediately upon entry.

### Debtors' Reservation of Rights

30. Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made

-14-

pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## Notice

31.    No trustee or examiner has been appointed in these chapter 11 cases.  The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee for the Southern District of New York; (b) the proposed counsel to the Creditors' Committee; (c) counsel to the agent (and if there is no agent, counsel to the lender(s)) under each of the Debtors' pre-petition financing facilities; (d) counsel to the agent under the Debtors' post-petition financing facility; (e) the United States Securities and Exchange Commission; (f) the Internal Revenue Service, and (g) all parties entitled to notice pursuant to Local Rule 9013-1(b).  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

## No Prior Request

32.    No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the order, substantially in the form attached hereto as Exhibit B, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: August 24, 2015
      New York, New York

**SHEPPARD MULLIN RICHTER & HAMPTON LLP**

By: */s/ Craig A. Wolfe* _____
Craig A. Wolfe, Esq.
Malani J. Cademartori, Esq.
Blanka K. Wolfe, Esq.
30 Rockefeller Plaza
New York, New York 10112
Tel: (212) 653-8700
Fax: (212) 653-8701
E-mail: cwolfe@sheppardmullin.com
       mcademartori@sheppardmullin.com
       bwolfe@sheppardmullin.com

-and-

**JONES DAY**
Richard L. Wynne, Esq.
Bennett L. Spiegel, Esq.
Lori Sinanyan, Esq. (admitted *pro hac vice*)
222 East 41st Street
New York, NY 10017
Tel:  (212) 326-3939
Fax: (212) 755-7306
E-mail: rlwynne@jonesday.com
       blspiegel@jonesday.com
       lsinanyan@jonesday.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## Exhibit A

**Kushner Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RELATIVITY FASHION, LLC, *et al.*,[1] | Case No. 15-11989 (MEW) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF DR. BRIAN G. KUSHNER IN SUPPORT OF THE DEBTORS'
MOTION FOR ENTRY OF AN ORDER APPROVING DEBTORS'
EMPLOYEE RETENTION PLAN FOR NON-INSIDER EMPLOYEES**

I, Dr. Brian G. Kusher, make this declaration under 28 U.S.C. § 1746:

1.      I submit this Declaration in support of the *Debtors' Motion Pursuant to 11 U.S.C.
§§ 503(c)(3) and 363(b) of the Bankruptcy Code for Entry of an Order Approving the Debtor'
Employee Retention Plan For Non-Insider Employees* (the "**Motion**").[2]

2.      Except as otherwise indicated herein, I have personal knowledge of the matters
and issues set forth herein or have gained knowledge of such matters from my review of the
relevant documents, or from information provided to me or verified by the Debtors'
management, other employees, and/or professional advisors.  If called upon to testify, I would
testify competently to the facts set forth herein.

<u>Qualifications</u>

3.      I am the Chief Restructuring Officer ("**CRO**") of (i) Relativity Fashion, LLC,
Relativity Holdings LLC, and their 143 affiliates (collectively, the "**Debtors**") that filed
voluntary petitions under chapter 11 of title 11 of the United States Code (the "**Bankruptcy**

---

[1] The Debtors in these chapter 11 cases are as set forth on page (i).

[2] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Relativity Fashion, LLC (4571); Relativity Holdings LLC (7052); Relativity Media, LLC (0844); Relativity REAL, LLC (1653); RML Distribution Domestic, LLC (6528); RML Distribution International, LLC (6749); RMLDD Financing, LLC (9114); 21 & Over Productions, LLC (7796); 3 Days to Kill Productions, LLC (5747); A Perfect Getaway P.R., LLC (9252); A Perfect Getaway, LLC (3939); Armored Car Productions, LLC (2750); Best of Me Productions, LLC (1490); Black Or White Films, LLC (6718); Blackbird Productions, LLC (8037); Brant Point Productions, LLC (9994); Brick Mansions Acquisitions, LLC (3910); Brilliant Films, LLC (0448); Brothers Productions, LLC (9930); Brothers Servicing, LLC (5849); Catfish Productions, LLC (7728); Cine Productions, LLC (8359); CinePost, LLC (8440); Cisco Beach Media, LLC (8621); Cliff Road Media, LLC (7065); Den of Thieves Films, LLC (3046); Don Jon Acquisitions, LLC (7951); DR Productions, LLC (7803); Einstein Rentals, LLC (5861); English Breakfast Media, LLC (2240); Furnace Films, LLC (3558); Gotti Acquisitions, LLC (6562); Great Point Productions, LLC (5813); Guido Contini Films, LLC (1031); Hooper Farm Music, LLC (3773); Hooper Farm Publishing, LLC (3762); Hummock Pond Properties, LLC (9862); Hunter Killer La Productions, LLC (1939); Hunter Killer Productions, LLC (3130); In The Hat Productions, LLC (3140); J & J Project, LLC (1832); JGAG Acquisitions, LLC (9221); Left Behind Acquisitions, LLC (1367); Long Pond Media, LLC (7197); Madaket Publishing, LLC (9356); Madaket Road Music, LLC (9352); Madvine RM, LLC (0646); Malavita Productions, LLC (8636); MB Productions, LLC (4477); Merchant of Shanghai Productions, LLC (7002); Miacomet Media LLC (7371); Miracle Shot Productions, LLC (0015); Most Wonderful Time Productions, LLC (0426); Movie Productions, LLC (9860); One Life Acquisitions, LLC (9061); Orange Street Media, LLC (3089); Out Of This World Productions, LLC (2322); Paranoia Acquisitions, LLC (8747); Phantom Acquisitions, LLC (6381); Pocomo Productions, LLC (1069); Relative Motion Music, LLC (8016); Relative Velocity Music, LLC (7169); Relativity Development, LLC (5296); Relativity Film Finance II, LLC (9082); Relativity Film Finance III, LLC (8893); Relativity Film Finance, LLC (2127); Relativity Films, LLC (5464); Relativity Foreign, LLC (8993); Relativity India Holdings, LLC (8921); Relativity Jackson, LLC (6116); Relativity Media Distribution, LLC (0264); Relativity Media Films, LLC (1574); Relativity Music Group, LLC (9540); Relativity Production LLC (7891); Relativity Rogue, LLC (3333); Relativity Senator, LLC (9044); Relativity Sky Land Asia Holdings, LLC (9582); Relativity TV, LLC (0227); Reveler Productions, LLC (2191); RML Acquisitions I, LLC (9406); RML Acquisitions II, LLC (9810); RML Acquisitions III, LLC (9116); RML Acquisitions IV, LLC (4997); RML Acquisitions IX, LLC (4410); RML Acquisitions V, LLC (9532); RML Acquisitions VI, LLC (9640); RML Acquisitions VII, LLC (7747); RML Acquisitions VIII, LLC (7459); RML Acquisitions X, LLC (1009); RML Acquisitions XI, LLC (2651); RML Acquisitions XII, LLC (4226); RML Acquisitions XIII, LLC (9614); RML Acquisitions XIV, LLC (1910); RML Acquisitions XV, LLC (5518); RML Bronze Films, LLC (8636); RML Damascus Films, LLC (6024); RML Desert Films, LLC (4564); RML Documentaries, LLC (7991); RML DR Films, LLC (0022); RML Echo Films, LLC (4656); RML Escobar Films LLC (0123); RML Film Development, LLC (3567); RML Films PR, LLC (1662); RML Hector Films, LLC (6054); RML Hillsong Films, LLC (3539); RML IFWT Films, LLC (1255); RML International Assets, LLC (1910); RML Jackson, LLC (1081); RML Kidnap Films, LLC (2708); RML Lazarus Films, LLC (0107); RML Nina Films, LLC (0495); RML November Films, LLC (9701); RML Oculus Films, LLC (2596); RML Our Father Films, LLC (6485); RML Romeo and Juliet Films, LLC (9509); RML Scripture Films, LLC (7845); RML Solace Films, LLC (5125); RML Somnia Films, LLC (7195); RML Timeless Productions, LLC (1996); RML Turkeys Films, LLC (8898); RML Very Good Girls Films, LLC (3685); RML WIB Films, LLC (0102); Rogue Digital, LLC (5578); Rogue Games, LLC (4812); Roguelife LLC (3442); Safe Haven Productions, LLC (6550); Sanctum Films, LLC (7736); Santa Claus Productions, LLC (7398); Smith Point Productions, LLC (9118); Snow White Productions, LLC (3175); Spy Next Door, LLC (3043); Story Development, LLC (0677); Straight Wharf Productions, LLC (5858); Strangers II, LLC (6152); Stretch Armstrong Productions, LLC (0213); Studio Merchandise, LLC (5738); Summer Forever Productions, LLC (9211); The Crow Productions, LLC (6707); Totally Interns, LLC (9980); Tribes of Palos Verdes Production, LLC (6638); Tuckernuck Music, LLC (8713); Tuckernuck Publishing, LLC (3960); Wright Girls Films, LLC (9639); Yuma, Inc. (1669); Zero Point Enterprises, LLC (9558). The location of the Debtors' corporate headquarters is: 9242 Beverly Blvd., Suite 300, Beverly Hills, CA 90210.

Code") on July 31, 2015 (the "**Petition Date**") commencing these chapter 11 cases (the "**Cases**"), and (ii) the various non-Debtor subsidiaries of Relativity Holdco, both direct and indirect.

4.      I began serving as CRO of the Relativity Group upon the filing of the Chapter 11 Petition of Relativity Fashion, and immediately prior to that, served as the Chief Consultant ("**CC**") to the Relativity Group beginning on June 15, 2015.  In my capacity as CC to and CRO of Relativity, I became familiar with the Debtors' businesses, operations and financial affairs. As part of my duties as CRO, I will be overseeing and advising the Debtors on their day-to-day operations, bankruptcy compliance, budgets, cash flows, financial analysis, asset dispositions, and overall restructuring and reorganization efforts.

5.      In addition to being the CRO of Relativity, I am a senior managing director of FTI Consulting, Inc., an international financial advisory firm ("**FTI**"), and my business address is FTI's Dallas offices located at 2001 Ross Avenue, Suite 400, Dallas, Texas 75201.  Over the past 20 years, I have served as Chairman, Director, Chief Executive Officer ("**CEO**")/Interim CEO, CRO and/or CC for over a dozen public and private media, telecom, and technology companies.

6.      I have reviewed the Motion or have otherwise had the contents of the Motion explained to me and, to the best of my knowledge, insofar as I have been able to ascertain after reasonable inquiry, I believe that the approval of the relief requested therein is necessary to minimize disruption to the Debtors' business operations and maximize the value of the Debtors' estates.

### The Need to Retain the Debtors' Employees

33.      The Debtors currently employ 84 full-time employees and one part-time employee.  Prior to the Petition Date, the Debtors took steps to reduce the size of their workforce by downsizing employees in the Debtors' non-core businesses and unprofitable business lines.

In total, the Debtors reduced their workforce by 72 full-time employees and 22 part-time employees.  In addition, 15 employees were informed by the Debtors' senior management that they would be subject to salary reductions ranging from ten to twenty percent.  These salary reductions aggregated $1,967,500 for the sixteen employees, including senior management, and resulted in average pay reductions of 17.8%.  For the Employees, the salary reductions aggregated $1,172,500.

34.    Since the Petition Date, the Debtors have experienced high employee turnover. From July 30 through the date of this Motion, the Debtors lost five employees as a result of voluntary attrition.  In addition, two employees will be departing before the end of August 2015 and one employee will be departing shortly thereafter.  Of these recent or expected eight employee departures, three employees work or worked in accounting.  In addition, other employees have indicated that they are actively seeking new employment.  Of the eight recent or expected employee departures, all eight of these employees would have been asked to participate in the Retention Plan.  These eight recent or expected employee departures represent 8.9 percent of the workforce total as of the Petition Date.

35.    The Debtors' base and bonus practices are below that of their competitors within the industry.  According to the Croner Entertainment Study published on November 14, 2014, of the eighteen companies in the film and television production and entertainment industry, the Debtors' base compensation for its employees is generally lower than other companies in the study.  For example, the average annual compensation increase for industry employees in the study was between three to four percent.  Among the Debtors' employees, thirty percent have not received an annual wage increase since 2013.  Forty-three of the Debtors' employees have a title of vice president or above.  Only two of the employees are above the mean pay point for similar

position or greater than five percent above the mean. Seven of the Debtors' employees are within a five percent variance from the mean for a similar position or title. The remaining thirty-five employees are below the mean for a similar position and averaging twenty-eight percent below the mean. Moreover, according to the study, other companies reported on in the study typically pay annual bonuses. On the other hand, historically, the Debtors do not pay year-end bonuses to its employees. The last such year-end bonus paid to employees was for the fiscal year of 2012. As such, I believe the Debtors' past compensation practices may make them vulnerable to employees departing at this time.

36.    I believe it would be extremely challenging to attract qualified employees at this stage in the Debtors' restructuring in light of the Debtors' upcoming sale of the substantially all of their assets and the uncertainty regarding the size and composition of the Debtors' workforce following the sale. Even if the Debtors were successful at finding qualified employees, I believe such qualifications, alone, would not make up for the loss of the institutional knowledge of the Debtors' current employees.

37.    As a result of the foregoing, I believe that it is necessary to implement a broad-based retention plan for non-insider employees to ensure that the Debtors' workforce remains in place and motivated through the critical early stages of the Debtors' sale process so that the Debtors can maximize the value of their assets.

### The Development of the Employee Retention Plan

38.    I, along with the Debtors' Deputy Chief Restructuring Officer and senior members of the Debtors' management, have commenced a review of the Debtors' workforce requirements through the pendency of the Cases. I, together with the Debtors, have determined that a broad-based retention plan for all non-insider employees is a necessary and appropriate means of ensuring the retention of the Debtors' Employees, all of whom have played, and

continue to play, a critical role in the success of the Debtors' businesses and corresponding going-concern value. During this process, the list of Employees was closely scrutinized by the Debtors' senior management and other professionals. Thereafter, the Debtors submitted the Retention Plan for approval to the Debtors' board of directors (the "**Board**"), which reviewed and approved the Retention Plan.

### The Eligible Employees

39.    The Employees work across a variety of disciplines and are responsible for facilitating a range of tasks critical to the Debtors' operations or businesses, including, without limitation, matters relating to finance, production and development, operations, business affairs, and human resources. Many of the Employees have direct and regular interaction with the Debtors' key vendors and production counterparties and, therefore, play an important role in maintaining and cultivating those relationships. In light of the significant changes in the Debtors' workforce prior to the Petition Date, including the termination of 72 full-time employees and 22 part-time employees, the remaining Employees have been required to shoulder an increased workload and significant additional responsibilities in order to compensate for the loss of other employees. The Employees have also been subject to increased doubt and stress due to commencement of the chapter 11 cases and the impending sale of the Debtors' assets. The average annual salary for the Employees is approximately $188,156 per employee.

40.    Certain of the Employees hold titles such as "president," "executive vice president," senior vice president." However, no Employee is granted any decision-making authority akin to the roles or responsibilities of members of senior management. Such titles are only representative of the Employees' importance in their roles and no Employee is authorized to take any action materially affecting the Debtors' corporate policy without authorization from a member of the senior management. Although the Employees are important to the Debtors'

businesses and are particularly vital during these chapter 11 cases, none of the Employees (i) are

part of the Debtors' senior management, (ii) are members of the Board, (iii) report directly to the

Board, or (iv) receive equity of the Debtors as part of their compensation structure.

41.      There are 80 Employees eligible to participate in the Retention Plan.  I have been

advised by legal counsel that none of the Employees are "insiders" as such term is defined in

section 101(31) of the Bankruptcy Code, and that no insider will be eligible to participate in the

Retention Plan.  Furthermore, no temporary employee, independent contractor, or any temporary

personnel associating with any of the Debtors' ongoing film or television productions are eligible

for the Retention Plan.

### The Structure of the Retention Plan

42.      The Debtors propose to implement the following Retention Plan:

- In exchange for entering into letter agreements (collectively, the "**Retention Plan Agreements**") with the Debtors, all non-insider employees will participate in the Retention Plan.

- The size of the Retention Plan pool is based on a calculation of the aggregate of the following:

  - the amount of salary reduction incurred by the Key Employees from the Petition Date through October 5, 2015, and

  - 12.5% of salaries of the Employees incurred by the Debtors from the Petition Date through sale hearing on October 5, 2015.

- The amounts paid to each individual Employee under the Retention Plan will be determined by the Debtors' Board, based upon each individual Employee's contribution to the business during Sale Process.

- In order for an Employee to be eligible for a Retention Plan payment, the Employee must be employed with the Debtors through October 20, 2015.

- Any Employee that resigns or is terminated for cause will forfeit his or her award, if any.  If an Employee is terminated without cause, said Employee may be eligible for a pro-rated award at the sole discretion of the Board.

- The payments under the Retention Plan will be paid in cash one day after the Sale Closing.

43.    The total cost of the Retention Plan is approximately $589,126 excluding employer contribution taxes.

## The Retention Plan Should be Approved

44.    I believe that the final Retention Plan design is a reasonable, cost-effective way to provide the appropriate incentives and to retain personnel essential to these chapter 11 cases.

45.    I believe that the costs associated with the Retention Plan are significantly outweighed by the benefits that have been, and will continue to be, realized by the estates by ensuring that essential personnel remain with the Debtors and encouraging participants to stay focused on the Debtors' operations to facilitate a smooth sale process that maintains the going concern value of the Debtors' businesses.

46.    The Debtors created a Retention Plan that allows all non-insiders to participate in a process where they may be compensated to ensure that they remain with the Debtors during this critical period.  I believe that the Retention Plan is reasonably designed to ensure that the Employees are incentivized to remain with the Debtors, which will ultimately contribute to the Debtors' going-concern value.

47.    The Debtors cannot afford to lose their Employees as these employees provide highly specialized services to the Debtors and have years of industry experience and a wealth of institutional knowledge, all of which are necessary to maximize the value of the Debtors' assets during the Sale Process.  I believe that a failure to retain the Employees would cause the Debtors

to incur significant time and money to obtain and train replacements, which would in turn hinder

and delay their restructuring efforts and distract from the critical sale process.

Dated: August 24, 2015
      Los Angeles, California

                                              */s/ Dr. Brian G. Kushner*
                                              By:    Dr. Brian G. Kushner
                                                Title:  Chief Restructuring Officer

**<u>Exhibit B</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RELATIVITY FASHION, LLC, *et al.*,[1] | Case No. 15-11989 (MEW) |
| Debtors. | (Jointly Administered) |

**ORDER PURSUANT TO 11 U.S.C. §§ 503(c) AND 363(b)(1) APPROVING**
**DEBTORS' EMPLOYEE RETENTION PLAN FOR NON-INSIDER EMPLOYEES**

Upon the motion (the "**Motion**")[2] of Relativity Fashion, LLC, and its affiliated debtors

and debtors in possession in these chapter 11 cases (collectively, the "**Debtors**"), for entry of an

order, pursuant to sections 503(c)(3) and 363(b)(1) of the Bankruptcy Code, approving the

Debtors' employee retention program for employees who are not considered "insiders" as such

term is defined in section 101(31) of the Bankruptcy Code (the "**Retention Plan**"); and it

appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157

and 1334; and it appearing that venue of these chapter 11 cases and the Motion in this district is

proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this matter is a core

proceeding pursuant to 28 U.S.C. § 157(b); and this Court having determined that the relief

requested in the Motion is in the best interests of the Debtors, their estates, their creditors and

other parties in interest; and it appearing that proper and adequate notice of the Motion has been

given and that, except as otherwise ordered herein, no other or further notice is necessary; and

after due deliberation thereon; and good and sufficient cause appearing therefor;

---

[1] The Debtors in these chapter 11 cases are as set forth on page (i).

[2] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

-1-

The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Relativity Fashion, LLC (4571); Relativity Holdings LLC (7052); Relativity Media, LLC (0844); Relativity REAL, LLC (1653); RML Distribution Domestic, LLC (6528); RML Distribution International, LLC (6749); RMLDD Financing, LLC (9114); 21 & Over Productions, LLC (7796); 3 Days to Kill Productions, LLC (5747); A Perfect Getaway P.R., LLC (9252); A Perfect Getaway, LLC (3939); Armored Car Productions, LLC (2750); Best of Me Productions, LLC (1490); Black Or White Films, LLC (6718); Blackbird Productions, LLC (8037); Brant Point Productions, LLC (9994); Brick Mansions Acquisitions, LLC (3910); Brilliant Films, LLC (0448); Brothers Productions, LLC (9930); Brothers Servicing, LLC (5849); Catfish Productions, LLC (7728); Cine Productions, LLC (8359); CinePost, LLC (8440); Cisco Beach Media, LLC (8621); Cliff Road Media, LLC (7065); Den of Thieves Films, LLC (3046); Don Jon Acquisitions, LLC (7951); DR Productions, LLC (7803); Einstein Rentals, LLC (5861); English Breakfast Media, LLC (2240); Furnace Films, LLC (3558); Gotti Acquisitions, LLC (6562); Great Point Productions, LLC (5813); Guido Contini Films, LLC (1031); Hooper Farm Music, LLC (3773); Hooper Farm Publishing, LLC (3762); Hummock Pond Properties, LLC (9862); Hunter Killer La Productions, LLC (1939); Hunter Killer Productions, LLC (3130); In The Hat Productions, LLC (3140); J & J Project, LLC (1832); JGAG Acquisitions, LLC (9221); Left Behind Acquisitions, LLC (1367); Long Pond Media, LLC (7197); Madaket Publishing, LLC (9356); Madaket Road Music, LLC (9352); Madvine RM, LLC (0646); Malavita Productions, LLC (8636); MB Productions, LLC (4477); Merchant of Shanghai Productions, LLC (7002); Miacomet Media LLC (7371); Miracle Shot Productions, LLC (0015); Most Wonderful Time Productions, LLC (0426); Movie Productions, LLC (9860); One Life Acquisitions, LLC (9061); Orange Street Media, LLC (3089); Out Of This World Productions, LLC (2322); Paranoia Acquisitions, LLC (8747); Phantom Acquisitions, LLC (6381); Pocomo Productions, LLC (1069); Relative Motion Music, LLC (8016); Relative Velocity Music, LLC (7169); Relativity Development, LLC (5296); Relativity Film Finance II, LLC (9082); Relativity Film Finance III, LLC (8893); Relativity Film Finance, LLC (2127); Relativity Films, LLC (5464); Relativity Foreign, LLC (8993); Relativity India Holdings, LLC (8921); Relativity Jackson, LLC (6116); Relativity Media Distribution, LLC (0264); Relativity Media Films, LLC (1574); Relativity Music Group, LLC (9540); Relativity Production LLC (7891); Relativity Rogue, LLC (3333); Relativity Senator, LLC (9044); Relativity Sky Land Asia Holdings, LLC (9582); Relativity TV, LLC (0227); Reveler Productions, LLC (2191); RML Acquisitions I, LLC (9406); RML Acquisitions II, LLC (9810); RML Acquisitions III, LLC (9116); RML Acquisitions IV, LLC (4997); RML Acquisitions IX, LLC (4410); RML Acquisitions V, LLC (9532); RML Acquisitions VI, LLC (9640); RML Acquisitions VII, LLC (7747); RML Acquisitions VIII, LLC (7459); RML Acquisitions X, LLC (1009); RML Acquisitions XI, LLC (2651); RML Acquisitions XII, LLC (4226); RML Acquisitions XIII, LLC (9614); RML Acquisitions XIV, LLC (1910); RML Acquisitions XV, LLC (5518); RML Bronze Films, LLC (8636); RML Damascus Films, LLC (6024); RML Desert Films, LLC (4564); RML Documentaries, LLC (7991); RML DR Films, LLC (0022); RML Echo Films, LLC (4656); RML Escobar Films LLC (0123); RML Film Development, LLC (3567); RML Films PR, LLC (1662); RML Hector Films, LLC (6054); RML Hillsong Films, LLC (3539); RML IFWT Films, LLC (1255); RML International Assets, LLC (1910); RML Jackson, LLC (1081); RML Kidnap Films, LLC (2708); RML Lazarus Films, LLC (0107); RML Nina Films, LLC (0495); RML November Films, LLC (9701); RML Oculus Films, LLC (2596); RML Our Father Films, LLC (6485); RML Romeo and Juliet Films, LLC (9509); RML Scripture Films, LLC (7845); RML Solace Films, LLC (5125); RML Somnia Films, LLC (7195); RML Timeless Productions, LLC (1996); RML Turkeys Films, LLC (8898); RML Very Good Girls Films, LLC (3685); RML WIB Films, LLC (0102); Rogue Digital, LLC (5578); Rogue Games, LLC (4812); Roguelife LLC (3442); Safe Haven Productions, LLC (6550); Sanctum Films, LLC (7736); Santa Claus Productions, LLC (7398); Smith Point Productions, LLC (9118); Snow White Productions, LLC (3175); Spy Next Door, LLC (3043); Story Development, LLC (0677); Straight Wharf Productions, LLC (5858); Strangers II, LLC (6152); Stretch Armstrong Productions, LLC (0213); Studio Merchandise, LLC (5738); Summer Forever Productions, LLC (9211); The Crow Productions, LLC (6707); Totally Interns, LLC (9980); Tribes of Palos Verdes Production, LLC (6638); Tuckernuck Music, LLC (8713); Tuckernuck Publishing, LLC (3960); Wright Girls Films, LLC (9639); Yuma, Inc. (1669); Zero Point Enterprises, LLC (9558). The location of the Debtors' corporate headquarters is: 9242 Beverly Blvd., Suite 300, Beverly Hills, CA 90210.

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      Pursuant to sections 363(b) and 503(c)(3) of the Bankruptcy Code, the Retention Plan is approved in its entirety and the Debtors are authorized, but not directed, to implement the Retention Plan.

3.      Nothing contained in this Order or in the Motion is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (c) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code. Likewise any payment made pursuant to this Order is not intended to be and shall not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

4.      Notwithstanding entry of this Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party.

5.       Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

6.      The requirements set forth in Local Rule 9013-1(b) are satisfied.

7.      Notwithstanding anything to the contrary contained herein, any payment to be made hereunder shall be subject to the terms, conditions, requirements and budgets imposed on the Debtors under the Debtors' postpetition financing agreements (the "**DIP Documents**") and any order governing the Debtors' use of cash collateral and entry into the DIP Documents.

8.      The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

9.     This Court shall retain jurisdiction to hear and determine all matters arising from

or related to the implementation, interpretation and/or enforcement of this Order.

Dated: New York, New York
          September __, 2015

_____
THE HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE