Richard L. Wynne, Esq.
Bennett L. Spiegel, Esq.
Lori Sinanyan, Esq. (admitted *pro hac vice*)
**JONES DAY**
222 East 41st Street
New York, NY 10017
Tel:  (212) 326-3939
Fax: (212) 755-7306

- and -

Craig A. Wolfe, Esq.
Malani J. Cademartori, Esq.
Blanka K. Wolfe, Esq.
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
30 Rockefeller Plaza
New York, NY 10112
Tel:  (212) 653-8700
Fax: (212) 653-8701

*Co-Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RELATIVITY FASHION, LLC, *et al.*,[1] | Case No. 15-11989 (MEW) |
| Debtors. | (Jointly Administered) |

<u>**NOTICE OF FILING OF AMENDED PLAN AND DISCLOSURE STATEMENT**</u>

**PLEASE TAKE NOTICE** that On November 18, 2015, the above-captioned debtors

(collectively, the **"Debtors"**), along with Ryan C. Kavanaugh (**"Kavanaugh"** and, together with

the Debtors, the **"Plan Proponents"**), filed (a) *Plan Proponents' Plan of Reorganization*

*Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 992] (as may be amended, the **"Plan"**)

and (b) *Disclosure Statement for Plan Proponents' Plan of Reorganization Pursuant to Chapter*

*11 of the Bankruptcy Code* [Dkt. No. 991].

---

[1]        The Debtors in these chapter 11 cases are set forth on page (i).

The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Relativity Fashion, LLC (4571); Relativity Holdings LLC (7052); Relativity Media, LLC (0844); Relativity REAL, LLC (1653); RML Distribution Domestic, LLC (6528); RML Distribution International, LLC (6749); RMLDD Financing, LLC (9114); 21 & Over Productions, LLC (7796); 3 Days to Kill Productions, LLC (5747); A Perfect Getaway P.R., LLC (9252); A Perfect Getaway, LLC (3939); Armored Car Productions, LLC (2750); Best of Me Productions, LLC (1490); Black Or White Films, LLC (6718); Blackbird Productions, LLC (8037); Brant Point Productions, LLC (9994); Brick Mansions Acquisitions, LLC (3910); Brilliant Films, LLC (0448); Brothers Productions, LLC (9930); Brothers Servicing, LLC (5849); Catfish Productions, LLC (7728); Cine Productions, LLC (8359); CinePost, LLC (8440); Cisco Beach Media, LLC (8621); Cliff Road Media, LLC (7065); Den of Thieves Films, LLC (3046); Don Jon Acquisitions, LLC (7951); DR Productions, LLC (7803); Einstein Rentals, LLC (5861); English Breakfast Media, LLC (2240); Furnace Films, LLC (3558); Gotti Acquisitions, LLC (6562); Great Point Productions, LLC (5813); Guido Contini Films, LLC (1031); Hooper Farm Music, LLC (3773); Hooper Farm Publishing, LLC (3762); Hummock Pond Properties, LLC (9862); Hunter Killer La Productions, LLC (1939); Hunter Killer Productions, LLC (3130); In The Hat Productions, LLC (3140); J&J Project, LLC (1832); JGAG Acquisitions, LLC (9221); Left Behind Acquisitions, LLC (1367); Long Pond Media, LLC (7197); Madaket Publishing, LLC (9356); Madaket Road Music, LLC (9352); Madvine RM, LLC (0646); Malavita Productions, LLC (8636); MB Productions, LLC (4477); Merchant of Shanghai Productions, LLC (7002); Miacomet Media LLC (7371); Miracle Shot Productions, LLC (0015); Most Wonderful Time Productions, LLC (0426); Movie Productions, LLC (9860); One Life Acquisitions, LLC (9061); Orange Street Media, LLC (3089); Out Of This World Productions, LLC (2322); Paranoia Acquisitions, LLC (8747); Phantom Acquisitions, LLC (6381); Pocomo Productions, LLC (1069); Relative Motion Music, LLC (8016); Relative Velocity Music, LLC (7169); Relativity Development, LLC (5296); Relativity Film Finance II, LLC (9082); Relativity Film Finance III, LLC (8893); Relativity Film Finance, LLC (2127); Relativity Films, LLC (5464); Relativity Foreign, LLC (8993); Relativity India Holdings, LLC (8921); Relativity Jackson, LLC (6116); Relativity Media Distribution, LLC (0264); Relativity Media Films, LLC (1574); Relativity Music Group, LLC (9540); Relativity Production LLC (7891); Relativity Rogue, LLC (3333); Relativity Senator, LLC (9044); Relativity Sky Land Asia Holdings, LLC (9582); Relativity TV, LLC (0227); Reveler Productions, LLC (2191); RML Acquisitions I, LLC (9406); RML Acquisitions II, LLC (9810); RML Acquisitions III, LLC (9116); RML Acquisitions IV, LLC (4997); RML Acquisitions IX, LLC (4410); RML Acquisitions V, LLC (9532); RML Acquisitions VI, LLC (9640); RML Acquisitions VII, LLC (7747); RML Acquisitions VIII, LLC (7459); RML Acquisitions X, LLC (1009); RML Acquisitions XI, LLC (2651); RML Acquisitions XII, LLC (4226); RML Acquisitions XIII, LLC (9614); RML Acquisitions XIV, LLC (1910); RML Acquisitions XV, LLC (5518); RML Bronze Films, LLC (8636); RML Damascus Films, LLC (6024); RML Desert Films, LLC (4564); RML Documentaries, LLC (7991); RML DR Films, LLC (0022); RML Echo Films, LLC (4656); RML Escobar Films LLC (0123); RML Film Development, LLC (3567); RML Films PR, LLC (1662); RML Hector Films, LLC (6054); RML Hillsong Films, LLC (3539); RML IFWT Films, LLC (1255); RML International Assets, LLC (1910); RML Jackson, LLC (1081); RML Kidnap Films, LLC (2708); RML Lazarus Films, LLC (0107); RML Nina Films, LLC (0495); RML November Films, LLC (9701); RML Oculus Films, LLC (2596); RML Our Father Films, LLC (6485); RML Romeo and Juliet Films, LLC (9509); RML Scripture Films, LLC (7845); RML Solace Films, LLC (5125); RML Somnia Films, LLC (7195); RML Timeless Productions, LLC (1996); RML Turkeys Films, LLC (8898); RML Very Good Girls Films, LLC (3685); RML WIB Films, LLC (0102); Rogue Digital, LLC (5578); Rogue Games, LLC (4812); Roguelife LLC (3442); Safe Haven Productions, LLC (6550); Sanctum Films, LLC (7736); Santa Claus Productions, LLC (7398); Smith Point Productions, LLC (9118); Snow White Productions, LLC (3175); Spy Next Door, LLC (3043); Story Development, LLC (0677); Straight Wharf Productions, LLC (5858); Strangers II, LLC (6152); Stretch Armstrong Productions, LLC (0213); Studio Merchandise, LLC (5738); Summer Forever Productions, LLC (9211); The Crow Productions, LLC (6707); Totally Interns, LLC (9980); Tribes of Palos Verdes Production, LLC (6638); Tuckernuck Music, LLC (8713); Tuckernuck Publishing, LLC (3960); Wright Girls Films, LLC (9639); Yuma, Inc. (1669); Zero Point Enterprises, LLC (9558). The location of the Debtors' corporate headquarters is: 9242 Beverly Blvd., Suite 300, Beverly Hills, CA 90210.

**PLEASE TAKE FURTHER NOTICE** that on November 20, 2015, the Debtors filed the *Corrected Disclosure Statement for Plan Proponents' Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 1009] (as may be amended, the **"Disclosure Statement"**).

**PLEASE TAKE FURTHER NOTICE** that attached hereto and dated as of the date hereof (a) as <u>Exhibit A</u> is an amended version of the Plan and (b) as <u>Exhibit B</u> is a blackline reflecting changes made to the previously-filed version of the Plan.

**PLEASE TAKE FURTHER NOTICE** that attached hereto and dated as of the date hereof (a) as <u>Exhibit C</u> is an amended version of the Disclosure Statement and (b) as <u>Exhibit D</u> is a blackline reflecting changes made to the previously-filed version of the Disclosure Statement.

Dated: December 14, 2015      /s/ Lori Sinanyan
                                       Bennett L. Spiegel, Esq.
                                       Richard L. Wynne, Esq.
                                       Lori Sinanyan, Esq. (admitted *pro hac vice*)
                                       JONES DAY
                                       222 East 41st Street
                                       New York, NY 10017
                                       Tel:  (212) 326-3939
                                       Fax: (212) 755-7306

                                                 -and-

                                       Craig A. Wolfe, Esq.
                                       Malani J. Cademartori
                                       Blanka K. Wolfe, Esq.
                                       SHEPPARD MULLIN RICHTER & HAMPTON LLP
                                       30 Rockefeller Plaza
                                       New York, NY 10112
                                       Tel:  (212) 653-8700
                                       Fax: (212) 653-8701

                                       *Attorneys For Debtors And Debtors In Possession*

# **EXHIBIT A**

Amended Plan

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| RELATIVITY FASHION, LLC, *et al.*,[1] | Case No. 15-11989 (MEW) |
| Debtors. | (Jointly Administered) |

**FIRST AMENDED PLAN PROPONENTS' PLAN OF REORGANIZATION
PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**Nothing contained herein shall constitute an offer, acceptance, or a legally binding obligation of the Debtors or any other party in interest. This Plan is subject to approval of the Bankruptcy Court and other customary conditions. This Plan is not an offer with respect to any securities. Acceptances or rejections with respect to this Plan may not be solicited until a disclosure statement has been approved by the Bankruptcy Court in accordance with Bankruptcy Code § 1125. Such a solicitation will only be made in compliance with applicable provisions of securities and bankruptcy laws. YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.**

Richard L. Wynne
Bennett L. Spiegel
Lori Sinanyan (admitted *pro hac vice*)
**JONES DAY**
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

ATTORNEYS FOR THE PLAN CO-PROPONENT,
DEBTORS AND DEBTORS IN POSSESSION

Craig A. Wolfe
Malani J. Cademartori
Blanka K. Wolfe
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
30 Rockefeller Plaza
New York, New York
Telephone: (212) 653-8700
Facsimile: (212) 653-8701

ATTORNEYS FOR THE PLAN CO-PROPONENT,
DEBTORS AND DEBTORS IN POSSESSION

Van C. Durrer II
Shana Elberg
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
4 Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

ATTORNEYS FOR PLAN CO-PROPONENT, KAVANAUGH

Dated: December 14, 2015

---

[1]     The Debtors in these Chapter 11 Cases are as set forth on Exhibit A.

<div align="right">**Page**</div>

I.   DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME ...................... 1

    A.   Defined Terms ............................................................................................................. 1

    B.   Rules of Interpretation and Computation of Time ...................................................... 14

II.  CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ............................ 15

    A.   Treatment of Unclassified Claims ............................................................................. 15

    B.   Classification of Claims and Interests ........................................................................ 18

    C.   Treatment of Classified Claims .................................................................................. 21

    D.   Special Provision Regarding Prepetition Intercompany Claims .................................. 25

    E.   Special Provision Governing Unimpaired Claims ....................................................... 25

    F.   Postpetition Interest on General Unsecured Claims ................................................... 25

    G.   Insurance .................................................................................................................... 25

III. MEANS OF IMPLEMENTATION .................................................................................. 26

    A.   Issuance of Reorganized Relativity Holdings Preferred Units...................................... 26

    B.   Issuance of Reorganized Relativity Holdings Common Units ...................................... 26

    C.   Issuance of Reorganized Relativity Holdings Warrants ............................................... 27

    D.   Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors .................. 27

    E.   Restructuring Transactions ......................................................................................... 27

    F.   Sources of Cash for Plan Distributions ....................................................................... 28

    G.   Corporate Governance, Managers and Officers, Employment-Related Agreements and
Compensation Programs; Other Agreements ............................................................... 29

    H.   New P&A/Ultimates Facility ...................................................................................... 30

    I.   Preservation of Causes of Action ............................................................................... 30

    J.   Reinstatement and Continuation of Insurance Policies ................................................ 31

    K.   Entry into CBA Assumption Agreements .................................................................... 31

    L.   Cancellation and Surrender of Instruments, Securities and Other Documentation ...................... 31

    M.   Release of Liens ......................................................................................................... 31

    N.   Effectuating Documents; Further Transactions ........................................................... 31

IV.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................................... 32

    A.   Assumption and Rejection of Executory Contracts and Unexpired Leases ................................ 32

    B.   Cure of Defaults for Assumed Executory Contracts and Unexpired Leases................................ 32

    C.   Claims Based on Rejection of Executory Contracts and Unexpired Leases ................................ 33

    D.   Contracts and Leases Entered Into After the Petition Date .......................................... 33

    E.   Reservation of Rights ................................................................................................. 33

    F.   Pre-Existing Obligations to the Debtors Under Executory Contracts and  Unexpired
Leases......................................................................................................................... 34

    G.   Certain Compensation and Benefit Programs .............................................................. 34

    H.   Obligations to Insure and Indemnify Directors, Officers and Employees.................................... 34

    I.   Reservation of Rights................................................................................................. 34

TABLE OF CONTENTS
(continued)

|  |  |  | Page |
|---|---|---|---|
| V. | | PROVISIONS GOVERNING DISTRIBUTIONS | 35 |
| | A. | Distributions for Allowed Claims as of the Effective Date | 35 |
| | B. | Undeliverable Distributions | 35 |
| | C. | Compliance with Tax Requirements | 35 |
| | D. | Distribution Record Date | 36 |
| | E. | Setoffs | 36 |
| | F. | Distributions to Holders of Disputed Claims | 36 |
| | G. | Allocation Between Principal and Accrued Interest | 36 |
| VI. | | DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS | 36 |
| | A. | Allowance of Claims | 36 |
| | B. | Prosecution of Objections to Claims | 37 |
| | C. | Estimation of Claims | 37 |
| | D. | Expungement or Adjustment to Claims Without Objection | 37 |
| | E. | Deadline to File Objections to Claims | 37 |
| | F. | Disallowance of Certain Claims | 37 |
| | G. | Offer of Judgment | 38 |
| | H. | Amendments to Claims | 38 |
| VII. | | CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN | 38 |
| | A. | Conditions to the Effective Date | 38 |
| | B. | Waiver of Conditions to Effective Date | 38 |
| | C. | Effects of Nonoccurrence of Conditions to the Effective Date | 38 |
| VIII. | | NON-CONSENSUAL CONFIRMATION | 39 |
| IX. | | THE LITIGATION TRUST | 39 |
| | A. | Litigation Trust Agreement | 39 |
| | B. | Purpose of the Litigation Trust | 39 |
| | C. | Litigation Trust Assets | 39 |
| | D. | Administration of the Litigation Trust | 39 |
| | E. | The Litigation Trustee | 39 |
| | F. | Role of the Litigation Trustee | 39 |
| | G. | Transferability of Litigation Trust Interests | 40 |
| | H. | Cash | 40 |
| | I. | Distribution of Litigation Trust Assets/Litigation Trust Claims Reserve | 40 |
| | J. | Costs and Expenses of the Litigation Trust | 41 |
| | K. | Compensation of the Litigation Trustee | 41 |
| | L. | Retention of Professionals/Employees by the Litigation Trustee | 41 |
| | M. | Federal Income Tax Treatment of the Litigation Trust | 41 |
| | N. | Indemnification of Litigation Trustee | 42 |

TABLE OF CONTENTS
(continued)

| | | | Page |
|---|---|---|---|
| | O. | Privileges and Obligation to Respond to Ongoing Investigations | 42 |
| X. | | EFFECT OF CONFIRMATION | 42 |
| | A. | Dissolution of Official Committees | 42 |
| | B. | Discharge of Claims and Interests | 43 |
| | C. | Injunctions | 43 |
| | D. | Exculpation | 44 |
| | E. | Debtor Release | 44 |
| | F. | Third Party Release | 45 |
| | G. | Votes Solicited in Good Faith | 46 |
| XI. | | RETENTION OF JURISDICTION | 46 |
| XII. | | MISCELLANEOUS PROVISIONS | 47 |
| | A. | Amendment or Modification of the Plan | 47 |
| | B. | Revocation of the Plan | 48 |
| | C. | Conversion or Dismissal of Certain of the Chapter 11 Cases | 48 |
| | D. | Inconsistency | 48 |
| | E. | Exhibits / Schedules | 48 |
| | F. | Bankruptcy Code § 1145 Exemption | 48 |
| | G. | Exemption from Transfer Taxes | 48 |
| | H. | Request for Expedited Determination of Taxes | 49 |
| | I. | Severability | 49 |
| | J. | Governing Law | 49 |
| | K. | No Admissions | 49 |
| | L. | Successors and Assigns | 49 |
| | M. | Service of Documents | 49 |
| XIII. | | CONFIRMATION REQUEST | 51 |

# TABLE OF EXHIBITS[2]

**Exhibit A – List of Debtors**

**Exhibit  B – Revised Relativity Holdings Certificate of Formation** – to be filed with the Plan Supplement

**Exhibit  C – Revised Relativity Holdings Operating Agreement** – to be filed with the Plan Supplement

**Exhibit  D –  New Board of Managers of Reorganized Relativity Holdings** – to be filed with the Plan Supplement

**Exhibit  E – Executory Contracts and Unexpired Leases to be Rejected** – attached, but to be updated with the Plan Supplement

**Exhibit F – New P&A/Ultimates Facility** – to be filed with the Plan Supplement

**Exhibit G – Litigation Trust Agreement** – to be filed with the Plan Supplement

**Exhibit H – Warrant Agreements** – to be filed with the Plan Supplement

**Exhibit I – Proposed Alternative Plan Treatment for RKA --** attached

**Exhibit J – Causes of Action** – to be filed by the Creditors' Committee on or before December 16, 2015, but which may be updated with the Plan Supplement

**Exhibit K – Form of Replacement P&A Note**– to be filed with the Plan Supplement

**Exhibit L – Form of Replacement Production Loan Note**– to be filed with the Plan Supplement

---

[2]    The Exhibits not initially appended to the Plan will be Filed as part of the Plan Supplement.  All Exhibits will be made available, free of charge, on the Document Website once they are filed.  Copies of all Exhibits may be obtained from the Notice and Claims Agent by calling 212.771.1128.  The Debtors reserve the right to modify, amend, supplement, restate or withdraw any of the Exhibits after they are Filed and shall promptly make such changes available on the Document Website.

## INTRODUCTION

Relativity Fashion, LLC and the other Debtors in the above-captioned Chapter 11 Cases together with Ryan C. Kavanaugh, as the Plan Proponents, respectfully propose the following plan for the resolution of outstanding claims against, and interests in, the Debtors pursuant to the Bankruptcy Code (each undefined term, as defined herein). Holders of claims and interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, liabilities, results of operations, historical financial information, accomplishments during the Chapter 11 Cases, and projections of future operations, as well as a description and summary of this Plan and the distributions to be made thereunder and certain related matters. The Debtors are proponents of this Plan within the meaning of Bankruptcy Code § 1129.

Other agreements and documents supplementing this Plan are appended as Exhibits hereto and have been or will be Filed with the Bankruptcy Court. These supplemental agreements and documents are referenced in this Plan and the Disclosure Statement and will be available for review.

**ALL CREDITORS ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THE DISCLOSURE STATEMENT IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN BANKRUPTCY CODE § 1127, IN BANKRUPTCY RULE 3019 AND IN THIS PLAN, THE PLAN PROPONENTS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THIS PLAN PRIOR TO ITS SUBSTANTIAL CONSUMMATION.**

## I.    DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

### A.    Defined Terms

Capitalized terms used in this Plan and not otherwise defined shall have the meanings set forth below. Any term that is not defined in this Plan, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.    **"Administrative Claim"** means a Claim against a Debtor or its Estate arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration in the Chapter 11 Cases that is entitled to priority or superpriority under Bankruptcy Code §§ 364(c)(1), 503(b), 503(c), 507(b) or 1114(e)(2), including:  (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under Bankruptcy Code §§ 330(a) or 331, including Fee Claims; and (c) all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930.

2.    **"Administrative Claims Bar Date"** means the date that is forty-five (45) days after the Effective Date.

3.    **"Administrative Claims Objection Deadline"** means the date that is ninety (90) days after the Effective Date.

4.    **"Affiliate"** has the meaning set forth in Bankruptcy Code § 101(2).

5.    **"AFM"** means the American Federation of Musicians.

6.    **"Allowed"** means with respect to Claims:  (a) any Claim (i) for which a Proof of Claim has been timely filed on or before the applicable Claims Bar Date (or that by the Bankruptcy Code or Final Order is not or shall not be required to be filed) or (ii) that is listed in the Schedules as of the Effective Date as not disputed, not contingent and not unliquidated, and for which no Proof of Claim has been timely filed; *provided* that, in each case, any such Claim shall be considered Allowed only if and to the extent that no objection to the allowance thereof has been interposed within the applicable period of time fixed by this Plan, the Bankruptcy Code, the

Bankruptcy Rules or the Bankruptcy Court or such an objection has been interposed and the Claim has been thereafter Allowed by a Final Order; or (b) any Claim Allowed pursuant to this Plan, a Final Order of the Bankruptcy Court (including pursuant to any stipulation approved by the Bankruptcy Court) and any Stipulation of Amount and Nature of Claim; *provided, further*, that the Claims described in clauses (a) and (b) above shall not include any Claim on account of a right, option, warrant, right to convert or other right to purchase an Equity Interest.  Claims allowed solely for the purpose of voting to accept or reject this Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder.  For the avoidance of doubt, no right of setoff shall be preserved and give rise to an Allowed Claim unless such setoff right is set forth in a timely filed proof of claim.

7.      **"Armored Car Loan and Security Agreement"** means the Amended and Restated Loan and Security Agreement, dated August 5, 2014, among Debtor Armored Car Productions, LLC, as borrower, CIT Bank, as agent, and Surefire Entertainment Capital, LLC, as lender, for loans up to approximately $21,586,243 as of October 4, 2015 for the purpose of acquiring, producing, completing, and delivering a motion picture prior to release, and the payment of related financing costs.  CIT asserts a different amount outstanding as of the date shown, and the amount is also subject to reconciliation for other obligations under the LSA including, without limitation, attorneys' fees.

8.      **"Avoidance Claims"** means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including Bankruptcy Code §§ 502, 510, 542, 544, 545, and 547-553 or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

9.      **"Ballot"** means the applicable form or forms of ballot(s) distributed to Holders of Claims entitled to vote on this Plan and on which the acceptance or rejection of this Plan is to be indicated.

10.     **"Balloting Agent"** means Donlin, Recano & Company, Inc., the Bankruptcy-Court appointed balloting agent for the Debtors.

11.     **"Bankruptcy Code"** means title 11 of the United States Code, as now in effect or hereafter amended.

12.     **"Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference, the United States District Court for the Southern District of New York.

13.     **"Bankruptcy Rules"** means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended.

14.     **"Bar Date**" means the bar date by which a Proof of Claim must be or must have been Filed, as established by (a) the Bar Date Order or (b) a Final Order of the Bankruptcy Court.

15.     **"BidCo Note"** means a note to be issued by Reorganized Relativity Media, LLC, guaranteed by all of the reorganized subsidiaries (subject to certain customary exceptions), to Buyer in the principal amount of $60 million to be issued on the Effective Date, which shall, among other things, (i) have a maturity date of two (2) years, (ii) bear interest at a rate of 8.5% per annum payable quarterly in Cash, (iii) bear an additional interest of 2% during the occurrence and continuation of an event of default; (iv) be required to be repaid out of the proceeds of any indebtedness without exception (including the New P&A/Ultimates Facility) until the outstanding principal amount thereof is not greater than $30 million; and (v) be on terms acceptable to the Holders of the Allowed TLA/TLB Secured Claims, excluding Kavanaugh and Nicholas.  The principal terms of the BidCo Note are set forth in Exhibit I attached hereto.

16.     **"BidCo Note Obligors"** means each Subsidiary Debtor, excluding (i) Relativity Fashion, LLC, (ii) Yuma, Inc., (iii) J & J Project, LLC and (iv) any of the Subsidiary Debtors whose assets were sold as part of the sale of the Debtors' television business.

17.        **"Business Day"** means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18.        **"Buyer"** means RM Bidder, LLC, purchaser of certain assets of the TV Business.

19.        **"Cash"** means the lawful currency of the United States of America and equivalents thereof.

20.        "**Causes of Action**" means any Claim, Avoidance Action, cause of action, controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law; *excluding, however*, (i) RKA Causes of Action, (ii) any settlement of Claims on or prior to the Effective Date, and (iii) Claims or Avoidance Actions against Released Parties, *but including* the Excluded Released Parties.

21.        **"CBA Assumption Agreements"** means the assumption agreements for each and every Covered Picture to be entered into by Reorganized Relativity Media LLC on the Effective Date which shall obligate the Reorganized Debtors only for all obligations thereunder that accrue after the Effective Date, and which assumption agreements shall be in the standard form found in the collective bargaining agreement of each Union Entity.

22.        **"Chapter 11 Cases"** means the cases commenced under chapter 11 of the Bankruptcy Code by the Debtors in the Bankruptcy Court.

23.        **"CIT Bank"** means CIT Bank, N.A., formerly known as OneWest Bank, N.A.

24.        **"Claim"** means a claim, as such term is defined in Bankruptcy Code § 101(5), against a Debtor.

25.        **"Claims Bar Date"** means, as applicable, the Administrative Claims Bar Date and any other date or dates to be established by an Order of the Bankruptcy Court by which Proofs of Claim must be filed, including the general bar date of December 9, 2015 at 5:00 p.m. (ET) as set forth in the Court's *Order Pursuant to 11 U.S.C. §§ 501 and 502(b)(9), Fed. R. Bankr. P. 2002 and 3003(c)(3), and Local Rule 3003-1 (I) Establishing Deadline For Filing Proofs of Claim and Procedures Relating Thereto and (II) Approving Form and Manner of Notice Thereof* [Dkt. No. 927].

26.        **"Claims Objection Bar Date"** means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) one year after the Effective Date and (b) such later period of limitation as may be specifically fixed by an order of the Bankruptcy Court.

27.        **"Class"** means a class of Claims or Interests, as described in Section II of this Plan.

28.        **"Committee DIP Proceeds"** means the allocation of $275,000 in aggregate proceeds from the Debtors' debtor in possession financing to be used to pay fees and expenses of the professionals retained by the Creditors' Committee that are incurred in connection with investigation of certain specified matters pursuant to Paragraph 4(b) of the Initial Final DIP Order.

29.        **"Confirmation"** means the entry of the Confirmation Order on the docket of the Bankruptcy Court.

30.        **"Confirmation Date"** means the date on which the Bankruptcy Court enters the Confirmation Order on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

NAI-1500594528v18

31.      **"Confirmation Hearing"** means the hearing held by the Bankruptcy Court to consider Confirmation of this Plan, as such hearing may be continued from time to time.

32.      **"Confirmation Order"** means the order of the Bankruptcy Court confirming this Plan pursuant to Bankruptcy Code § 1129.

33.      **"Consenting Creditors"** means (a) any Released Party, (b) any Holder of a Claim who voted to accept this Plan, and (c) any holder of a Claim who voted to reject this Plan but who affirmatively elected to provide releases by checking the appropriate box on the ballot form.

34.      **"Covered Pictures"** means those theatrical or television motion pictures with respect to which: (i) the Debtors were obligated to pay residuals to members of Union Entities as of the Petition Date; and (ii) rights are to be transferred to the Reorganized Debtors.

35.      **"Creditors' Committee"** shall mean the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to Bankruptcy Code § 1102.

36.      **"days"** means calendar days.

37.      **"Debtors"** means, collectively, the debtors listed on <u>Exhibit A</u> attached hereto.

38.      **"DGA"** means the Directors Guild of America, Inc., on behalf of itself and the Producer-Directors Guild of America Pension and Health Plans.

39.      **"Disclosure Statement"** means the *Disclosure Statement for Plan Proponents' Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, of even date herewith (including all exhibits and schedules thereto or referenced therein), that has been prepared and distributed by the Plan Proponents, pursuant to Bankruptcy Code § 1125, as the same may be amended, modified or supplemented, and which is in form and substance reasonably acceptable to the Plan Proponents.

40.      **"Disclosure Statement Order"** means an order entered by the Bankruptcy Court, which shall be a Final Order and which shall be in form and substance reasonably satisfactory to the Plan Proponents, approving, among other things, the Disclosure Statement as containing adequate information pursuant to Bankruptcy Code § 1125, authorizing solicitation of the Disclosure Statement and this Plan and approving related solicitation materials.

41.      **"Disputed Claim"** means any portion of a Claim (a) that is neither an Allowed Claim nor a disallowed Claim, (b) that is listed as disputed, contingent or unliquidated on the Schedules or that is otherwise subject to an objection or (c) for which a Proof of Claim has been timely filed with the Bankruptcy Court or a written request for payment has been made, to the extent the Debtors have, or any party in interest entitled to do so has, interposed a timely objection or request for estimation, which objection or request for estimation has not been withdrawn or determined by a Final Order.

42.      **"Distribution Record Date"** means the close of business on the day the Bankruptcy Court enters the order confirming this Plan pursuant to Bankruptcy Code § 1129.

43.      **"Document Website"** means the internet site address https://www.donlinrecano.com/Clients/rm/Index at which all of the exhibits and schedules to this Plan and the Disclosure Statement will be available to any party in interest and the public, free of charge.

44.      **"DR Loan and Security Agreement"** means a Loan and Security Agreement, dated September 5, 2014, entered into between Debtor DR Productions, LLC, as borrower, and CIT Bank, as agent and lender, for loans up to approximately $12,272,477 as of October 4, 2015 for the purpose of acquiring, producing, completing, and delivering a motion picture prior to release, and the payment of related financing costs. CIT asserts

a different amount outstanding as of the date shown, and the amount is also subject to reconciliation for other obligations under the LSA including, without limitation, attorneys' fees.

45.     **"Effective Date"** means the day selected by the Debtors that is a Business Day as soon as reasonably practicable after the Confirmation Date on which all conditions to the Effective Date in Section VII.A shall have been satisfied or waived in accordance with Section VII.B and, if a stay of the Confirmation Order is in effect, such stay shall have expired, dissolved, or been lifted.

46.     **"Entity"** shall have the meaning set forth in Bankruptcy Code § 101(15).

47.     **"Equity (UK)"** means Equity of Guild House.

48.     **"Estate"** means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to Bankruptcy Code § 541.

49.     **"Exculpated Parties"** (i) the Plan Proponents; (ii) the Debtors' respective officers, boards of managers and the members thereof; (iii) the Creditors' Committee; and (iv) with respect to each of the foregoing entities in clauses (i) through (iii), only on or after the Petition Date, their respective Representatives (in their capacities as such).

50.     **"Exculpation"** means the exculpation provision set forth in Section X.D.

51.     **"Executory Contract"** or **"Unexpired Lease"** means a contract or lease to which a Debtor is a party that is subject to assumption, assumption and assignment or rejection under Bankruptcy Code § 365, including any modifications, amendments, addenda or supplements thereto or restatements thereof.

52.     **"Exhibit"** means an exhibit attached to this Plan or included in the Plan Supplement.

53.     **"Fee Claim"** means a Claim under Bankruptcy Code §§ 328, 330(a), 331, 503 or 1103 for compensation of a Professional or other Entity for services rendered or expenses incurred in the Chapter 11 Cases.

54.     **"Fee Order"** means any order establishing procedures for interim compensation and reimbursement of expenses of Professionals that may be entered by the Bankruptcy Court.

55.     **"File," "Filed"** or **"Filing"** means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

56.     **"Final Order"** means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in the Chapter 11 Cases or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move for a new trial, reargument, reconsideration or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument, reconsideration or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, reconsideration or rehearing shall have been denied or resulted in no modification of such order.

57.     **"FMSMF"** means Film Musicians Secondary Markets Fund, which operates pursuant to American Federation of Musicians collective bargaining agreements, to collect and distribute residuals under the collective bargaining agreements.

58.     "**General Unsecured Claim**" means any Claim that is not a (i) Administrative Claim, (ii) Professional Fee Claim, (iii) Plan Co-Proponent Fee/Expense Claim, (iv) Priority Tax Claim, (v) Priority Non-Tax Claim, (vi) TLA/TLB Secured Claim, (vii) Pre-Release P&A Secured Claim, (viii) Post-Release P&A

Secured Claim, (ix) Production Loan Secured Claim, (x) Ultimates Secured Claim, (xi) Secured Guilds Claim, (xii) Vine/Verite Secured Claim, (xiii) Other Secured Claim, or (xiv) Subordinated Claim.

59.     "**Guaranteed GUC Payment**" means (i) the $2 million Television Sale Committee Allocation, (ii) an additional $2 million payment within 12 – 24 months of the Effective Date, and (iii) an additional $5 million within 36 – 48 months of the Effective Date.  In the case of (ii) and (iii), the Reorganized Debtors shall, in their business judgment, determine the timing of such payment based on whether the Reorganized Debtors have sufficient working capital to satisfy their business plan and make such payment, but in each case, the Reorganized Debtors shall make such payment no later than 24 months and 48 months from the Effective Date respectively. Notwithstanding the foregoing, until such time as the $7.0 million payments in (ii) and (iii) herein are made, in the event that the Reorganized Debtors recover any amount on account of the Reorganized Debtors Causes of Action Interest, such amount shall be paid by the Reorganized Debtors to the Litigation Trust as an acceleration of such payment obligation.

60.     "**GUC Causes of Action Interest**" means the beneficial interests in seventy percent (70%) of the litigation recoveries from the Causes of Action, net of litigation cost.

61.     "**Guild Payroll Protocols**" means payments to the Guilds in connection with the Allowed Secured Guilds Claims, Guild Allowed Administrative Claims, Guild Priority Claims, or Guild General Unsecured Claims  that shall be payable to each applicable Guild for the benefit of each applicable Guild-represented employee.  Payments will be made to counsel for the Guilds.  The Reorganized Debtors shall provide a designated payroll service (selected mutually by the Guilds and the Reorganized Debtors) with information concerning such payments.  The payroll service shall prepare checks in the form and manner prescribed by each collective bargaining agreement.  Guild counsel will forward the payable principal amounts, and the Reorganized Debtors shall fund the payroll process and applicable taxes.  As an accommodation to the Reorganized Debtor, the Guilds shall forward such payments to the applicable Guild-represented employee.

62.     "**Guilds**" means the DGA, SAG-AFTRA, and the WGA, with reference to their status as Secured Guilds or as Unsecured Union Entities.

63.     "**Holder**" means an Entity holding a Claim or Interest, as the context requires.

64.     "**Impaired**" means, when used in reference to a Claim or an Interest, a Claim or an Interest that is impaired within the meaning of Bankruptcy Code § 1124.

65.     "**Initial DIP Agent**" means Cortland Capital Market Services LLC, in its capacity as administrative agent and collateral agent under the Initial DIP Credit Agreement.

66.     "**Initial DIP Claims**" means any Claim of the Initial DIP Agent or the Initial DIP Lenders against a Debtor under or evidenced by (a) the Initial DIP Credit Agreement and (b) the Initial Final DIP Order.

67.     "**Initial DIP Credit Agreement**" means that certain debtor in possession financing Agreement, dated as of July 30, 2015 (Dkt. No. 48, Ex. 2, as the same was subsequently, amended, supplemented or otherwise revised by the Court's Initial Final DIP Order and previously entered interim orders related thereto), among Relativity Media, LLC and each subsidiary thereof (as borrower), Relativity Holdings (as Guarantor), the Initial DIP Agent and the Initial DIP Lenders party thereto.

68.     "**Initial DIP Lenders**" means, collectively, those entities identified as "Lenders" in the Initial DIP Credit Agreement and their respective permitted successors and assigns (solely in their capacity as "DIP Lenders" under the DIP Credit Agreement).

69.     "**Initial Final DIP Order**" means the *Final Order Pursuant to Sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code (I) Authorizing Debtors to Obtain Superpriority Secured Debtor-In-*

*Possession Financing, (II) Authorizing Debtors to Use Cash Collateral, (III) Granting Adequate Protection to the Cortland Parties, and (IV) Granting Related Relief* (Dkt. No. 342).

      70.    **"Intercompany Claim"** any Allowed Claim of any Debtor against another Debtor.

      71.    **"Intercompany Interest"** any Interest (a) of any Debtor in another Debtor or (b) of any Non-Debtor Affiliate in a Debtor, in each case, that arose prior to the Petition Date.

      72.    **"Interest"** means the rights of the Holders of stock, membership interests or partnership interests issued by a Debtor and outstanding immediately prior to the Petition Date, and any options, warrants or other rights with respect thereto, or any other instruments evidencing an ownership interest in a Debtor and the rights of any Entity to purchase or demand the issuance of any of the foregoing, including: (a) redemption, conversion, exchange, voting, participation and dividend and other distribution rights (including any rights in respect of accrued and unpaid dividends or other distributions); (b) liquidation preferences; (c) stock options and warrants; (d) interests in profit and loss; and (e) rights to information concerning the business and affairs of a Debtor.

      73.    **"Kavanaugh"** means Ryan C. Kavanaugh, as CEO of the Debtors, and as Plan Proponent.

      74.    **"Liabilities"** means any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, recovery actions, Causes of Action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction or agreement.

      75.    **"Litigation Trust"** means the litigation trust to be created on or after the Confirmation Date in accordance with the provisions of Article IX hereof and the Litigation Trust Agreement.

      76.    **"Litigation Trust Agreement"** means the Litigation Trust Agreement, substantially similar in form as Exhibit G attached hereto, pursuant to which the Litigation Trustee shall manage and administer the Litigation Trust Assets and distribute the net proceeds thereof, if any.

      77.    **"Litigation Trust Assets"** means (a) initial funding of $2 million Television Sale Committee Allocation, (b) $500,000 to be funded on the Effective Date and an additional to-be-determined amount to be provided by the Reorganized Debtors to fund  pursuit of litigation claims by the Litigation Trust, (c) the GUC Causes of Action Interest, and (d) the right to prosecute the Causes of Action in the name of the Reorganized Debtor.

      78.    **"Litigation Trust Beneficiaries"** means the Holders of Allowed Claims in Class J.

      79.    **"Litigation Trust Claims Reserve"** means any Litigation Trust Assets allocable to or retained on account of, Disputed General Unsecured Claims, even if held in commingled accounts.

      80.    **"Litigation Trust Interests"** means the beneficial interests in the Litigation Trust allocable to certain Holders of Allowed Claims (and any transferee thereof) in accordance with the terms and conditions of Article IX of this Plan.

      81.    **"Litigation Trustee"** means the Person or Entity designated as the "Managing Trustee" of the Litigation Trust pursuant to the terms of the Litigation Trust Agreement.

      82.    **"Manchester Prepetition Credit Facility"** means indebtedness under the Second Amended and Restated Credit Agreement, dated as of May 30, 2012, between certain of the Debtors and Manchester Securities Corporation (as amended, supplemented, or modified from time to time) with an outstanding amount of approximately $137.1 million.

NAI-1500594528v18

83.        **"Manchester DIP Claims"** means any Claim of the Modified DIP Agent or the Modified DIP Lenders against a Debtor under or evidenced by (a) the Modified DIP Credit Agreement and (b) the Modified DIP Order.

84.        **"Modified DIP Agent"** means Heatherden Securities LLC ("**Heatherden**"), in its capacity as administrative agent and collateral agent under the Modified DIP Credit Agreement.

85.        **"Modified DIP Credit Agreement"** means the Initial DIP Credit Agreement, dated as of July 30, 2015 as the same was subsequently, amended, supplemented or otherwise revised as set forth in the Modified DIP Order among Relativity Media, LLC and each subsidiary thereof (as borrower), Relativity Holdings (as Guarantor), the Modified DIP Agent and the Modified DIP Lenders party thereto.

86.        **"Modified DIP Lenders"** means, collectively, those entities identified as "DIP Lenders" in the Modified DIP Credit Agreement and their respective permitted successors and assigns (solely in their capacity as "DIP Lenders" under the Modified DIP Credit Agreement).

87.        **"Modified DIP Order"** means the *Amended and Restated Final Order Pursuant to Sections 105, 361, 362, 363, 364, And 507 of the Bankruptcy Code (I) Authorizing Debtors to Obtain Superpriority Secured Debtor-in-Possession Financing, (II) Authorizing Debtors to Use Cash Collateral, (III) Granting Adequate Protection to the Cortland Parties and Manchester Parties and (IV) Granting Related Relief* [Dkt. No. 931].

88.        "**MPIPHP**" means the Motion Picture Industry Pension and Health Plans.

89.        **"New Board of Managers"** means the board of managers of Reorganized Relativity Holdings composed of individuals as set forth in Section III.G.2 hereof.

90.        **"New Exit Financing Documents"** means, collectively, the definitive documents, statements and filings that evidence the New P&A/Ultimates Facility.

91.        **"New P&A/Ultimates Facility"** means a financing facility or debt issuance that is entered into or issued by one or more of the Reorganized Debtors on the Effective Date, substantially similar in form as Exhibit F attached hereto, the proceeds of which shall be utilized to fund the ongoing operations of the Reorganized Debtors and shall not, without the consent of BidCo, be utilized to refinance any existing indebtedness, including, without limitation, any indebtedness under the Modified DIP Credit Agreement.

92.        "**New Securities and Documents**" means the Reorganized Relativity Holdings Preferred Units, Reorganized Relativity Holdings Common Units, the BidCo Note, New Exit Financing Documents, and any and all other securities, notes, stock, instruments, certificates, and other documents or agreements required to be issued, executed or delivered pursuant to or in connection with this Plan.

93.        **"Nicholas"** means Joseph Nicholas.

94.        **"Non-Debtor Affiliate"** means any direct or indirect subsidiary of Relativity Holdings that is not a Debtor.

95.        **"Non-Debtor Affiliate Claim"** means any Claim held by a Non-Debtor Affiliate against a Debtor that arose prior to the Petition Date.

96.        **"Notice and Claims Agent"** means  Donlin Recano & Company, Inc., in its capacity as noticing, claims and solicitation agent for the Debtors.

97.        **"Ordinary Course Professionals Order"** means any order entered by the Bankruptcy Court authorizing the Debtors to retain, employ and pay professionals and service providers, as specified in such order, which are not materially involved in the administration of the Chapter 11 Cases.

98.        **"Other Secured Claim"** means a Secured Claim that is not a TLA/TLB Secured Claim, Post-Release P&A Secured Claim, Production Loan Secured Claim, Ultimates Secured Claim, Secured Guilds Claim, or Vine/Verite Secured Claim.

99.        **"P&A Funding Agreement"** means the Second Amended and Restated Funding Agreement, dated June 30, 2014, among certain of the Debtors (as borrowers), Macquarie US Trading LLC (as post-release agent), Macquarie Investments US Inc. (as post-release lender by assignment from the original post-release lender), and RKA (as pre-release lender and pre-release lender agent), as amended by the First Amendment, dated August 26, 2014.

100.        "**Participation Agreements**" means agreements that provide for, among other things, payments from future revenues to actors, directors, writers,  producers and other entities based on prior work performed in connection with the motion pictures in the Debtors' film library, including producer royalties and fees payable for merchandising and music rights.  For the avoidance of doubt, unless otherwise provided for herein, participations owed by the Debtors under Participation Agreements executed prior to the Petition Date, whether such participations are owed prior to or on and after the Effective Date, will be treated as prepetition claims against the Debtors because they arise under prepetition agreements and contracts that are not executory contracts.

101.        **"Person"** shall have the meaning set forth in Bankruptcy Code § 101(41).

102.        **"Petition Date"** means July 30, 2015 for all of the Debtors.

103.        **"Plan"** means this plan of reorganization for the Debtors, and all Exhibits attached hereto or referenced herein, supplements, appendices, schedules, and the Plan Supplement, as the same may be amended, modified or supplemented.

104.        **"Plan Co-Proponents"** means Kavanaugh and the Debtors.

105.        "**Plan Co-Proponent Fee/Expense Claims**" means all of the reasonable and documented fees, costs and expenses of Kavanaugh incurred in connection with the Chapter 11 Cases.

106.        **"Plan Supplement"** means the compilation of documents and forms of documents as amended from time to time that constitute Exhibits to this Plan Filed with the Bankruptcy Court no later than seven days before the earlier of the (i) Voting Deadline and (ii) deadline for objections to Confirmation of this Plan (or such later date as may be approved by the Bankruptcy Court), including, without limitation, the following: (a) revised Relativity Holdings Certificate of Formation (or comparable constituent document); (b) Revised Relativity Holdings Operating Agreement (or comparable constituent document); (c) term sheet or agreement evidencing the New P&A/Ultimates Facility; (d) list of the new board of managers of Reorganized Relativity Holdings; (e) updated list of Executory Contracts and Unexpired Leases to be rejected by the Debtors; (f) Litigation Trust Agreement; (g) form of Warrant Agreements; (h) form of Replacement P&A Note; (i) Form of Replacement Production Loan Note; and (j) Restructuring Transactions exhibit, if any.

107.        **"Post-Release P&A Secured Claims"** means any Allowed Secured Claim of Macquarie US Trading LLC (as agent) and/or Macquarie Investments US Inc. (as post-release lender by assignment from the original post-release lender) against a Debtor (i) under or evidenced by the P&A Funding Agreement or (ii) any subsequent post-release print and advertising loans made thereunder or in connection therewith.  As of the Petition Date, the amount of the Post-Release P&A Secured Claims totaled $32,880,208.  As of October 31, 2015, the aggregate Post-Release P&A Secured Claim totaled $26,818,821, after taking into account a $7.2 million paydown in October.

108.        **"Pre-Release P&A Secured Claims"** means any Allowed Secured Claim of  RKA (as pre-release lender and pre-release lender agent) against a Debtor (i) under or evidenced by the P&A Funding Agreement or (ii) any subsequent pre-release print and advertising loans made thereunder or in connection therewith.  As of the Petition Date, the amount of the Pre-Release P&A Secured Claims totaled $85,005,933 which was comprised of a $28,657,280 claim against Armored Car Productions, LLC, a $18,675,350 claim against DR

Productions, LLC, a $15,045,620 claim against RML Kidnap Films, LLC, a $21,366,234 claim against RML Somnia Films, LLC, and a $1,261,450 claim against RML Lazarus Films, LLC.

      109.      **"Prepetition Intercompany Claim"** means any Claim of any Debtor against any other Debtor that arose prior to the Petition Date.

      110.      **"Priority Non-Tax Claim"** means a Claim that is entitled to priority in payment pursuant to Bankruptcy Code § 507(a) that is not an Administrative Claim or a Priority Tax Claim.

      111.      **"Priority Tax Claim"** means a Claim that is entitled to priority in payment pursuant to Bankruptcy Code § 507(a)(8).

      112.      **"Pro Rata"** means, when used in reference to a distribution of property to holders of Allowed Claims in a particular Class, a proportionate distribution of property so that the ratio of (a)(i) the amount of property distributed on account of an individual Allowed Claim to (ii) the amount of such individual Allowed Claim is the same as the ratio of (b)(i) the amount of property distributed to all Allowed Claims in the applicable Class to (ii) the total amount of all Allowed Claims in the applicable Class.

      113.      **"Production Loan Agreements"** means, collectively, the Armored Car Loan and Security Agreement and the DR Loan and Security Agreement.

      114.      **"Production Loan Settlement"** means the assumption of the Production Loan Agreements, as modified to acknowledge that any and all defaults thereunder have been cured and otherwise satisfied, and as further modified to provide for a release date for Masterminds on or before March 31, 2017 and The Disappointments Room on or before September 30, 2016.

      115.      **"Production Loan Secured Claims"** means any Allowed Secured Claim of either (i) CIT Bank or (ii) Surefire Entertainment Capital, LLC against a Debtor under or evidenced by either of the Production Loan Agreements.

      116.      **"Professional"** means any professional employed in the Chapter 11 Cases pursuant to Bankruptcy Code §§ 327, 328, 363 or 1103 or any professional or other Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to Bankruptcy Code § 503(b)(4).

      117.      **"Professional Fee Segregated Account"** means an interest-bearing account to hold and maintain an amount of Cash equal to the Professional Fee Reserve Amount funded by the Debtors on the Effective Date solely for the purpose of paying all Allowed and unpaid Fee Claims.

      118.      **"Professional Fee Reserve Amount"** means the aggregate Fee Claims through the Effective Date as estimated in accordance with Section II.A.1.d(3) hereof.

      119.      **"Proof of Claim"** means a proof of claim filed with the Bankruptcy Court or the Notice and Claims Agent in connection with the Chapter 11 Cases.

      120.      **"Reinstated"** means, unless this Plan specifies a particular method pursuant to which a Claim or Interest shall be Reinstated, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Interest so as to render such Claim or Interest Unimpaired; or (b) notwithstanding any contractual provisions or applicable law that entitles the Holder of a Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (i) curing any such default that occurred before or after the commencement of the applicable Chapter 11 Case, other than a default of a kind specified in Bankruptcy Code § 365(b)(2) or of a kind that Bankruptcy Code § 365(b)(2) expressly does not require to be cured; (ii) reinstating the maturity of a Claim or Interest as such maturity existed before such default; (iii) compensating the Holder of a Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to

- 10 -

Bankruptcy Code § 365(b)(1)(A), compensating the Holder of such Claim or Interest for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which a Claim or Interest entitles the Holder of such Claim or Interest.

        121.      **"Released Parties"** means (i) the Debtors; (ii) the Debtors' respective boards of managers and the members thereof each as of the Petition Date; (iii) the Creditors' Committee; (iv) Manchester Securities Corporation, (v) the lenders (the "**Cortland Lenders**") party to the *Financing Agreement*, dated as of May 30, 2012, but solely in their capacity as lenders and, (vi) Cortland (not individually, but solely in its separate capacities as collateral agent and administrative agent under the Existing DIP Facility and collateral agent and administrative agent under the TLA/TLB Facility), and each of the foregoing's Representatives to the extent permitted under applicable law; *provided*, *however*, on or before the date of the hearing for approval of the Disclosure Statement, the Creditors' Committee shall file a list of parties against which the Creditors' Committee (or the Litigation Trustee, or any successor post-confirmation committee organized under this Plan) may choose to initiate action, which parties on such list (the "**Excluded Release Parties**") shall not be included in the definition of Released Parties.

        122.      "**Reorganized Debtors Causes of Action Interest**" means the beneficial interests in thirty percent (30%) of the litigation recoveries from the Causes of Action, net of litigation cost.

        123.      **"Relativity Holdings"** means Relativity Holdings LLC, a Delaware limited liability company.

        124.      **"Reorganized"** means, (a) when used in reference to a particular Debtor, such Debtor on and after the Effective Date, and (b) when used in reference to the Debtors collectively, then all of the Debtors on and after the Effective Date.

        125.      **"Reorganized Relativity Holdings Common Units"** means Common Units of Reorganized Relativity Holdings having the rights set forth in the Revised Relativity Holdings Operating Agreement, such Common Units to be initially authorized pursuant to this Plan as of the Effective Date, including such Common Units to be issued pursuant to this Plan.

        126.      **"Reorganized Relativity Holdings Preferred Units"** means convertible Class A Units of Reorganized Relativity Holdings having the rights set forth in the Revised Relativity Holdings Operating Agreement, such Class A Units to be initially authorized pursuant to this Plan as of the Effective Date, including such Class A Units to be issued pursuant to this Plan.

        127.      **"Reorganized Relativity Holdings Warrants"** means warrants of Reorganized Relativity Holdings to acquire Reorganized Relativity Holdings Common Units having the rights set forth in the relevant Warrant Agreements, such Warrants to be issued to Joseph Nicholas and Heatherden (or their respective Affiliates) pursuant to this Plan.

        128.      **"Replacement P&A Notes"** means five (5) notes each bearing interest at a fixed rate equal to the prime rate plus 3.0 % payable over five (5) years that many be issued by the Reorganized Debtors on the Effective Date to the holders of the Pre-Release P&A Secured Claims. The amount of the Replacement P&A Notes shall be based on the amount of the Pre-Release P&A Secured Claims and issued by the Debtor responsible therefor. Payment obligations under the Replacement P&A Note shall be: (i) subordinate to the liens of the New P&A/Ultimates Facility, or such other print and advertising facility which may be used to fund one or more of the film titles: *Masterminds*, *Kidnap*, *The Disappointments Room* and *Somnia*, (ii) subject to the terms of the existing intercreditor agreements including with CIT, as Production Lender, with respect to *Masterminds* and *The Disappointments Room* and Macquarie, as Post-Release P&A Lender on *Lazarus* and (iii) subordinate to any applicable senior secured claims of the Guilds for residuals. A form of the Replacement P&A Note is attached hereto as Exhibit K.

        129.      **"Replacement Production Loan Notes"** means two (2) notes each bearing interest at a fixed rate equal to the prime rate plus 3.0 % payable over five (5) years that many be issued by the Reorganized

- 11 -

Debtors on the Effective Date to the holders of the Production Loan Secured Claims. The amount of the Replacement Production Loan Notes shall be based on the amount of the Production Loan Secured Claim and issued by the Debtor responsible therefor. Payment obligations under the Replacement Production Loan Note shall be: (i) subordinate to the liens of the New P&A/Ultimates Facility, or such other print and advertising facility which may be used to fund one or more of the film titles: *Masterminds* and *The Disappointments Room*, (ii) subject to the terms of any existing intercreditor agreements including with RKA, as Pre-Release Lender, with respect to *Masterminds* and *The Disappointments Room*, and (iii) subordinate to any applicable senior secured claims of the Guilds for residuals. A form of the Replacement Production Loan Note is attached hereto as <u>Exhibit L</u>.

130.    **"Representatives"** means, with respect to any Entity, any successor, officer, director, partner, shareholder, manager, member, management company, investment manager, affiliate, employee, agent, attorney, advisor, investment banker, financial advisor, accountant or other Professional of such Entity, and committee of which such Entity is a member, in each case, solely in such capacity, serving on or after the Petition Date.

131.    **"Restructuring Transactions"** means, collectively, those mergers, consolidations, conversions, restructurings, dispositions, liquidations or dissolutions that the Debtors determine to be necessary or appropriate to effect an organizational restructuring of their business or otherwise to simplify the overall organizational structure of the Reorganized Debtors, as described in greater detail in Section III.E.

132.    **"Revised Relativity Holdings Certificate of Formation"** means the certificate of formation , substantially similar in form as <u>Exhibit B</u> attached hereto.

133.    **"Revised Relativity Holdings Operating Agreement"** means the operating agreement, substantially similar in form as <u>Exhibit C</u> attached hereto.

134.    **"RKA"** means RKA Film Financing, LLC, a Delaware limited liability company.

135.    **"RKA Causes of Action"** means any Claim, Avoidance Action, cause of action, controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law against RKA.

136.    **"SAG-AFTRA"** means the Screen Actors Guild-American Federation of Television and Radio Artists, on behalf of itself and the Producer- Screen Actors Guild Pension and Health Plans.

137.    **"Schedules"** means, collectively, the (a) schedules of assets, Liabilities and Executory Contracts and Unexpired Leases and (b) statements of financial affairs, as each may be amended and supplemented from time to time, Filed by the Debtors pursuant to Bankruptcy Code § 521.

138.    **"Secured Claim"** means a Claim that is secured by a lien on property in which an Estate has an interest or that is subject to a valid right of setoff under Bankruptcy Code § 553, to the extent of the value of the Claim Holder's interest in such Estate's interest in such property or to the extent of the amount subject to such valid right of setoff, as applicable, as determined pursuant to Bankruptcy Code § 506.

139.    "**Secured Guilds**" means, collectively, (i) the DGA; (ii) the SAG-AFTRA; and (iii) the WGA (and individually, each a "**Secured Guild**").

140.    "**Secured Guilds Claims**" means any Allowed Secured Claims of a Guild asserted against one or more of the Debtors.

NAI-1500594528v18

141.        **"Secured Tax Claim"** means an Allowed Secured Claim arising out of a Debtor's liability for any Tax.

142.        **"Securities Act"** means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

143.        **"Stipulation of Amount and Nature of Claim"** means a stipulation or other agreement between the applicable Debtor or Reorganized Debtor and a Holder of a Claim or Interest establishing the allowed amount or nature of such Claim or Interest that is (a) entered into in accordance with any Claim settlement procedures established by order of the Bankruptcy Court in these Chapter 11 Cases, (b) expressly permitted by this Plan or (c) approved by order of the Bankruptcy Court.

144.        **"Subordinated Claim"** means any Claim against a Debtor (a) arising from rescission of a purchase or sale of a security of the Debtors or an Affiliate, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under Bankruptcy Code § 502 on account of such a Claim, (b) any other claim subject to subordination under Bankruptcy Code § 510, or (c) any claim addressed by Bankruptcy Code § 726(a)(3) – (a)(4).

145.        **"Subsidiary Debtor"** means any Debtor other than Relativity Holdings.

146.        **"Tax"** means:  (a) any net income, alternative or add-on minimum, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, license, property, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Entity.

147.        **"Television Sale Committee Allocation"** shall mean the $2,000,000 held in a segregated account by counsel for the Creditor's Committee funded upon the consummation of the sale of the Debtors' television business.

148.        **"TLA/TLB Secured Claims"** means any Allowed Secured Claim of the collateral and administrative agent or lenders against a Debtor under or evidenced by (a) the TLA/TLB Financing Agreement and (b) TLA/TLB Facility, as such TLA/TLB Secured Claim is now held collectively by (i) the Initial DIP Lenders in the amount of $60 million and (ii) Kavanaugh and Joseph Nicholas  in the approximate amount of $175 million.

149.        **"TLA/TLB Facility"** means secured indebtedness under the TLA/TLB Financing Agreement, consisting of a tranche A term loan and a tranche B term loan with an aggregate outstanding principal amount of approximately $361,611,038 as of the Petition Date, plus accrued interest.

150.        **"TLA/TLB Financing Agreement"** means the Financing Agreement, dated as of May 30, 2012, among certain of the Debtors, the lenders party thereto, Cortland Capital Market Services LLC, as Collateral and Administrative Agent, and CB Agency Services, LLC, as origination agent (as amended, supplemented, or modified from time to time).

151.        **"TV Debtors"** means (i) Brant Point Productions, LLC, (ii) Cisco Beach Media, LLC, (iii) Cliff Road Media, LLC, (iv) Einstein Rentals, LLC, (v) English Breakfast Media, LLC , (vi) Great Point Productions, LLC, (vii) Hummock Pond Properties, LLC, (viii) Long Pond Media, LLC, (ix) Madaket Publishing, LLC (f/k/a Broad Street Publishing, LLC), (x) Madaket Road Music, LLC (f/k/a Broad Street Music, LLC), (xi) Miacomet Media, LLC, (xii) Orange Street Media, LLC, (xiii) Pocomo Productions, LLC, (xiv) Relativity REAL, LLC d/b/a Relativity Television, (xv) Relativity TV, LLC, (xvi) Smith Point Productions, LLC, (xvii) Straight Wharf Productions, LLC, (xix) Tuckernuck Music, LLC, (xx) Tuckernuck Publishing, LLC and (xxi) Zero Point Enterprises, LLC.

152.        **"Ultimates Secured Claims"** means any Allowed Secured Claim of the administrative agent or lenders against a Debtor under or evidenced by the Ultimates Credit Documents.

153.        **"Ultimates Credit Documents"** means the (a) the Credit, Security, Guaranty and Pledge Agreement, dated as of September 25, 2012 (as the same may have been amended, restated, supplemented, or other otherwise modified) with certain of the Debtors as borrowers, CIT Bank, as administrative agent, and the lenders party thereto and (b) all other agreements, documents and instruments executed and/or delivered related thereto, including all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, and all other related agreements, documents and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto.

154.        **"Unimpaired"** means, when used in reference to a Claim or an Interest, a Claim or an Interest that is not Impaired within the meaning of Bankruptcy Code § 1124.

155.        **"Union Entities"** means the Guilds in their status as Secured Guilds, together with the Unsecured Union Entities.

156.        **"Unsecured Union Entities"** means, collectively, (i) the MPIPHP; (ii) the American Federation of Musicians; (iii) the Laborers' International Union of North America; (iv) the Operative Plasterers' and Cement Masons' International Association; (v) the International Alliance of Theatrical Stage Employees, Moving Picture Technicians, Artists and Allied Crafts of the United States, Its Territories and Canada; (vi) the International Brotherhood of Teamsters; (vii) Equity (UK); and (viii) the Secured Guilds to the extent any such Secured Guild has an Allowed General Unsecured Claim against any of the Debtors (and individually, each an "**Unsecured Union Entity**").

157.        **"U.S. Trustee"** means the United States Trustee appointed under § 581 of title 28 of the United States Code to serve in the Southern District of New York.

158.        **"Vine/Verite Secured Claims"** means any Allowed Secured Claim of Verite Capital Onshore Loan Fund LLC and/or Vine Film Finance Fund II LP against Yuma, Inc. and/or J & J Project, LLC under or evidenced by the Vine/Verite Loan Documents.

159.        **"Vine/Verite Loan Documents"** means certain loan and security agreements entered into between Debtors Yuma, Inc. or J & J Project, LLC, as borrowers, and Verite Capital Onshore Loan Fund LLC, as lender, as were subsequently transferred to Vine Film Finance Fund II LP, in connection with the production of the films *3:10 To Yuma* and *The Forbidden Kingdom*.

160.        **"Voting Deadline"** means 4:00 p.m. (Eastern time) on January __, 2016, which is the deadline for submitting Ballots to accept or reject this Plan in accordance with Bankruptcy Code § 1126.

161.        **"Warrant Agreements"** means the form of warrant agreements, substantially similar in form as Exhibit H attached hereto.

162.        **"WGA"** means the Writers Guild of America West, Inc., for itself and on behalf of its affiliate Writers Guild of America East, Inc. and both on behalf of the Producer-Writers Guild of America Pension and Health Plans.

**B.        Rules of Interpretation and Computation of Time**

**1.        Rules of Interpretation**

For purposes of this Plan, unless otherwise provided herein:  (a) whenever it is appropriate from the context, each term, whether stated in the singular or the plural, includes both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be

substantially in such form or substantially on such terms and conditions; (c) any reference in this Plan to an existing document or Exhibit Filed or to be Filed means such document or Exhibit, as it may have been or may be amended, modified or supplemented pursuant to this Plan, Confirmation Order or otherwise; (d) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors, assigns and affiliates; (e) all references in this Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to this Plan; (f) the words "herein," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) subject to the provisions of any contract, articles or certificates of formation, operating agreement , bylaws, codes of regulation, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and the Bankruptcy Rules; and (i) the rules of construction set forth in Bankruptcy Code § 102 shall apply to the extent not inconsistent with any other provision of this Section I.B.1.

### 2.    Computation of Time

In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

### 3.    Reference to Monetary Figures

All references in this Plan to monetary figures refer to the lawful currency of the United States of America, unless otherwise expressly provided.

## II.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

All Claims and Interests, except Administrative Claims and Priority Tax Claims, are placed in the Classes set forth below.  In accordance with Bankruptcy Code § 1123(a)(1), Administrative Claims and Priority Tax Claims, as described in Section II.A, are not classified herein.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes.

### A.    Treatment of Unclassified Claims

#### 1.    Administrative Claims

##### a.    Administrative Claims in General

Except as specified in this Section II.A.1 and subject to the bar date provisions herein, unless otherwise agreed by the Holder of an Administrative Claim and the applicable Reorganized Debtor, or unless an order of the Bankruptcy Court provides otherwise, each Holder of an Allowed Administrative Claim (other than a Professional's Fee Claim and a Plan Co-Proponent Fee/Expense Claim) shall receive, in full satisfaction of its Administrative Claim, Cash equal to the Allowed amount of such Administrative Claim on either (i) the latest to occur of (A) the Effective Date (or as soon thereafter as practicable), (B) the date such Claim becomes an Allowed Administrative Claim, and (C) such other date as may be agreed upon by the Reorganized Debtors and the Holder of such Claim or (ii) on such other date as the Bankruptcy Court may order.  For the avoidance of doubt, claims arising under the Modified DIP Credit Agreement are Administrative Claims.

##### b.    Statutory Fees

All fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date shall be paid by the applicable Reorganized Debtor in accordance therewith until the earlier of the conversion or dismissal of the applicable Chapter 11 Case under Bankruptcy Code § 1112 or the closing of the applicable Chapter 11 Case pursuant to Bankruptcy Code § 350(a).

NAI-1500594528v18

c.        **Ordinary Course Postpetition Administrative Liabilities**

Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business, including Administrative Claims arising from or with respect to the sale of goods or provision of services on or after the Petition Date, Administrative Claims of governmental units for Taxes (including Tax audit Claims related to Tax years or portions thereof ending after the Petition Date), Administrative Claims arising under Executory Contracts and Unexpired Leases, and Administrative Claims in connection with Union Entity collective bargaining agreements, shall be paid by the applicable Reorganized Debtor without further action by the Holders of such Administrative Claims or further approval by the Bankruptcy Court (i) pursuant to the terms and conditions of the particular transaction giving rise to those Administrative Claims and (ii) in the case of Administrative Claims arising from Union Entity collective bargaining agreements, in accordance with the Guild Payroll Protocols.  Holders of the foregoing Claims shall not be required to File or serve any request for payment of such Administrative Claims.

d.        **Professional Compensation**

(1)        Final Fee Applications

Professionals or other Entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Fee Order, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than sixty (60) days after the Effective Date; *provided*, *however*, that any party who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order without further Bankruptcy Court review or approval (except as provided in the Ordinary Course Professionals Order).  To the extent necessary, the Confirmation Order shall amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims.

(2)        Professional Fee Segregated Account

In accordance with Section II.A.1.d(3) hereof, on the Effective Date, the Debtors shall establish and fund the Professional Fee Segregated Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals.  The Professional Fee Segregated Account shall be maintained in trust for the Professionals.  Such funds shall not be considered property of the Debtors' Estates.  The amount of Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Segregated Account when such Claims are Allowed by a Final Order.  When all Allowed Professional Compensation Claims are paid in full in Cash, amounts remaining in the Professional Fee Segregated Account, if any, shall revert to the Reorganized Debtors.

(3)        Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate their Fee Claims prior to and as of the Effective Date and shall deliver such estimate to the Debtors and counsel to the Creditors' Committee no later than five (5) days prior to the anticipated Effective Date; *provided*, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional. If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

e.        **Plan Co-Proponent Fee/Expense Claims**

The Reorganized Debtor shall reimburse the Plan Co-Proponent Fee/Expense Claims incurred in connection with the Chapter 11 Cases.

f.        **Post-Effective Date Professionals' Fees and Expenses**

Except as otherwise specifically provided in this Plan, on and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented fees and expenses of the Professionals or other fees and expenses incurred by the Reorganized Debtors on or after the Effective Date, in each case, related to implementation and consummation of this Plan.  Upon the Effective Date, any requirement that Professionals comply with Bankruptcy Code §§ 327 - 331 and 1103 or any order of the Bankruptcy Court entered before the Effective Date governing the retention of, or compensation for services rendered by, Professionals after the Effective Date shall terminate, and the Reorganized Debtors may employ or pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

g.        **Bar Dates for Administrative Claims**

Except as otherwise provided herein, requests for payment of Administrative Claims (other than Fee Claims, and Administrative Claims based on Liabilities incurred by a Debtor in the ordinary course of its business as described in Section II.A.1.c) must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than the Administrative Claims Objection Deadline.

2.        **Payment of Priority Tax Claims**

Pursuant to Bankruptcy Code § 1129(a)(9)(C), and unless otherwise agreed by the Holder of a Priority Tax Claim and the Plan Proponents, each Holder of an Allowed Priority Tax Claim shall receive at the option of the Debtors or the Reorganized Debtors, as applicable, in full satisfaction of its Allowed Priority Tax Claim, on account of and in full and complete settlement, release and discharge of such Claim, (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim payable on the Effective Date (or as reasonably practicable thereafter) or (ii) Cash in the aggregate amount of such Allowed Priority Tax Claim payable in annual equal installments commencing on the later of:  (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim (or as soon as practicable thereafter); and, in each case, ending no later than five (5) years from the Petition Date.  Notwithstanding the foregoing, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the Holder for actual pecuniary loss will be treated as a Subordinated Claim, and the Holder may not assess or attempt to collect such penalty from the Reorganized Debtors or their respective property.

NAI-1500594528v18

B.        **Classification of Claims and Interests**

1.            **General**

Pursuant to Bankruptcy Code §§ 1122 and 1123, Claims and Interests are classified for voting and distribution pursuant to this Plan, as set forth herein.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such other Class.  Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim.  Notwithstanding the foregoing, and except as otherwise specifically provided for herein, the Confirmation Order or other order of the Bankruptcy Court, or required by applicable bankruptcy law, in no event shall the aggregate value of all property received or retained under this Plan on account of an Allowed Claim exceed 100% of the underlying Allowed Claim.

Bankruptcy Code § 1129(a)(10) shall be satisfied for the purposes of Confirmation by acceptance of this Plan by an Impaired Class of Claims; _provided_, _however_, that in the event no Holder of a Claim with respect to a specific Class for a particular Debtor timely submits a Ballot in compliance with the Disclosure Statement Order and/or Solicitation Order indicating acceptance or rejection of this Plan, such Class will be deemed to have accepted this Plan.  The Plan Proponents may seek Confirmation of this Plan pursuant to Bankruptcy Code § 1129(b) with respect to any rejecting Class of Claims or Interests.

For administrative convenience, this Plan assigns a number to each of the Debtors and a letter to each of the Classes of Claims against or Interests in the Debtors.  For consistency, designated Classes of Claims or Interests are assigned the same letter across each of the Debtors.  The numbers assigned to each Debtor are:

| Debtor # | Debtor Name |
|---|---|
| 1. | 21 & Over Productions, LLC |
| 2. | 3 Days to Kill Productions, LLC |
| 3. | A Perfect Getaway P.R., LLC |
| 4. | A Perfect Getaway, LLC |
| 5. | Armored Car Productions, LLC |
| 6. | Best of Me Productions, LLC |
| 7. | Black Or White Films, LLC |
| 8. | Blackbird Productions, LLC |
| 9. | Brant Point Productions, LLC |
| 10. | Brick Mansions Acquisitions, LLC |
| 11. | Brilliant Films, LLC |
| 12. | Brothers Productions, LLC |
| 13. | Brothers Servicing, LLC |
| 14. | Catfish Productions, LLC |
| 15. | Cine Productions, LLC |
| 16. | CinePost, LLC |
| 17. | Cisco Beach Media, LLC |
| 18. | Cliff Road Media, LLC |
| 19. | Den of Thieves Films, LLC |
| 20. | Don Jon Acquisitions, LLC |
| 21. | DR Productions, LLC |
| 22. | Einstein Rentals, LLC |
| 23. | English Breakfast Media, LLC |
| 24. | Furnace Films, LLC |
| 25. | Gotti Acquisitions, LLC |
| 26. | Great Point Productions, LLC |

NAI-1500594528v18

| Debtor # | Debtor Name |
|---|---|
| 27. | Guido Contini Films, LLC |
| 28. | Hooper Farm Music, LLC |
| 29. | Hooper Farm Publishing, LLC |
| 30. | Hummock Pond Properties, LLC |
| 31. | Hunter Killer La Productions, LLC |
| 32. | Hunter Killer Productions, LLC |
| 33. | In The Hat Productions, LLC |
| 34. | J&J Project, LLC |
| 35. | JGAG Acquisitions, LLC |
| 36. | Left Behind Acquisitions, LLC |
| 37. | Long Pond Media, LLC |
| 38. | Madaket Publishing, LLC |
| 39. | Madaket Road Music, LLC |
| 40. | Madvine RM, LLC |
| 41. | Malavita Productions, LLC |
| 42. | MB Productions, LLC |
| 43. | Merchant of Shanghai Productions, LLC |
| 44. | Miacomet Media LLC |
| 45. | Miracle Shot Productions, LLC |
| 46. | Most Wonderful Time Productions, LLC |
| 47. | Movie Productions, LLC |
| 48. | One Life Acquisitions, LLC |
| 49. | Orange Street Media, LLC |
| 50. | Out Of This World Productions, LLC |
| 51. | Paranoia Acquisitions, LLC |
| 52. | Phantom Acquisitions, LLC |
| 53. | Pocomo Productions, LLC |
| 54. | Relative Motion Music, LLC |
| 55. | Relative Velocity Music, LLC |
| 56. | Relativity Development, LLC |
| 57. | Relativity Fashion, LLC |
| 58. | Relativity Film Finance II, LLC |
| 59. | Relativity Film Finance III, LLC |
| 60. | Relativity Film Finance, LLC |
| 61. | Relativity Films, LLC |
| 62. | Relativity Foreign, LLC |
| 63. | Relativity Holdings LLC |
| 64. | Relativity India Holdings, LLC |
| 65. | Relativity Jackson, LLC |
| 66. | Relativity Media LLC |
| 67. | Relativity Media Distribution, LLC |
| 68. | Relativity Media Films, LLC |
| 69. | Relativity Music Group, LLC |
| 70. | Relativity Production LLC |
| 71. | Relativity REAL, LLC |
| 72. | Relativity Rogue, LLC |
| 73. | Relativity Senator, LLC |
| 74. | Relativity Sky Land Asia Holdings, LLC |
| 75. | Relativity TV, LLC |
| 76. | Reveler Productions, LLC |
| 77. | RML Acquisitions I, LLC |
| 78. | RML Acquisitions II, LLC |

NAI-1500594528v18

| Debtor # | Debtor Name |
|---|---|
| 79. | RML Acquisitions III, LLC |
| 80. | RML Acquisitions IV, LLC |
| 81. | RML Acquisitions IX, LLC |
| 82. | RML Acquisitions V, LLC |
| 83. | RML Acquisitions VI, LLC |
| 84. | RML Acquisitions VII, LLC |
| 85. | RML Acquisitions VIII, LLC |
| 86. | RML Acquisitions X, LLC |
| 87. | RML Acquisitions XI, LLC |
| 88. | RML Acquisitions XII, LLC |
| 89. | RML Acquisitions XIII, LLC |
| 90. | RML Acquisitions XIV, LLC |
| 91. | RML Acquisitions XV, LLC |
| 92. | RML Bronze Films, LLC |
| 93. | RML Damascus Films, LLC |
| 94. | RML Desert Films, LLC |
| 95. | RML Distribution Domestic, LLC |
| 96. | RML Distribution International, LLC |
| 97. | RML Documentaries, LLC |
| 98. | RML DR Films, LLC |
| 99. | RML Echo Films, LLC |
| 100. | RML Escobar Films LLC |
| 101. | RML Film Development, LLC |
| 102. | RML Films PR, LLC |
| 103. | RML Hector Films, LLC |
| 104. | RML Hillsong Films, LLC |
| 105. | RML IFWT Films, LLC |
| 106. | RML International Assets, LLC |
| 107. | RML Jackson, LLC |
| 108. | RML Kidnap Films, LLC |
| 109. | RML Lazarus Films, LLC |
| 110. | RML Nina Films, LLC |
| 111. | RML November Films, LLC |
| 112. | RML Oculus Films, LLC |
| 113. | RML Our Father Films, LLC |
| 114. | RML Romeo and Juliet Films, LLC |
| 115. | RML Scripture Films, LLC |
| 116. | RML Solace Films, LLC |
| 117. | RML Somnia Films, LLC |
| 118. | RML Timeless Productions, LLC |
| 119. | RML Turkeys Films, LLC |
| 120. | RML Very Good Girls Films, LLC |
| 121. | RML WIB Films, LLC |
| 122. | RMLDD Financing, LLC |
| 123. | Rogue Digital, LLC |
| 124. | Rogue Games, LLC |
| 125. | Roguelife LLC |
| 126. | Safe Haven Productions, LLC |
| 127. | Sanctum Films, LLC |
| 128. | Santa Claus Productions, LLC |
| 129. | Smith Point Productions, LLC |
| 130. | Snow White Productions, LLC |

NAI-1500594528v18

| Debtor # | Debtor Name |
|---|---|
| 131. | Spy Next Door, LLC |
| 132. | Story Development, LLC |
| 133. | Straight Wharf Productions, LLC |
| 134. | Strangers II, LLC |
| 135. | Stretch Armstrong Productions, LLC |
| 136. | Studio Merchandise, LLC |
| 137. | Summer Forever Productions, LLC |
| 138. | The Crow Productions, LLC |
| 139. | Totally Interns, LLC |
| 140. | Tribes of Palos Verdes Production, LLC |
| 141. | Tuckernuck Music, LLC |
| 142. | Tuckernuck Publishing, LLC |
| 143. | Wright Girls Films, LLC |
| 144. | Yuma, Inc. |
| 145. | Zero Point Enterprises, LLC |

**2.        Identification of Classes of Claims Against and Interests in the Debtors**

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are (a) Impaired or Unimpaired by this Plan, (b) entitled to vote to accept or reject this Plan in accordance with Bankruptcy Code § 1126 or (c) deemed to accept or reject this Plan.

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| A. | Priority Non-Tax Claims | Unimpaired | Deemed to Accept |
| B. | TLA/TLB Secured Claims | Impaired | Entitled to Vote |
| C. | Pre-Release P&A Secured Claims | Impaired | Entitled to Vote |
| D. | Post-Release P&A Secured Claims | Impaired | Entitled to Vote |
| E. | Production Loan Secured Claims | Impaired | Entitled to Vote |
| F. | Ultimates Secured Claims | Unimpaired | Deemed to Accept |
| G. | Secured Guilds Claims | Impaired | Entitled to Vote |
| H. | Vine/Verite Secured Claims | Unimpaired | Deemed to Accept |
| I. | Other Secured Claims | Unimpaired | Deemed to Accept |
| J. | General Unsecured Claim | Impaired | Entitled to Vote |
| K. | Subordinated Claims | Impaired | Deemed to Reject |
| L. | Interests | Impaired | Deemed to Reject |

**C.        Treatment of Classified Claims**

**1.        Priority Non-Tax Claims (Class A)**

a.        *Classification:*  Classes A1 – A145 consist of all Priority Non-Tax Claims against the respective Debtors.

b.        *Treatment:*  On the later of (a) the Effective Date and (b) the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, each Holder of an Allowed Priority Non-Tax Claim against a Debtor shall receive on account and in full and complete settlement, release and discharge of such Claim, at the Debtors' election, (i) Cash in the amount of such Allowed Priority Non-Tax Claim in accordance with Bankruptcy Code § 1129(a)(9) and/or (ii) such other treatment required to render such Claim unimpaired pursuant to Bankruptcy Code § 1124.  All Allowed Priority Non-Tax Claims against the Debtors that are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such Claims become due and payable in the ordinary course of business in accordance with the terms thereof.  All Priority Non-Tax Claims payable to the Guilds, if any, will be paid in accordance with the Guild Payroll Protocols.

NAI-1500594528v18

c.    *Voting:*  Claims in Classes  A1 – A145 are Unimpaired.  Each Holder of an Allowed Claim in Classes  A1 – A145 shall be deemed to have accepted this Plan and is, therefore, not entitled to vote.

2.    **TLA/TLB Secured Claims (Class B)**

a.    *Classification:*  Classes B1 - B33, B35 -  B56, B58 -  B143, and B145 consist of all TLA/TLB Secured Claims against the respective Debtors.

b.    *Treatment:*  Except to the extent that a Holder of an Allowed TLA/TLB Secured Claim agrees to less favorable treatment, on the Effective Date, the Holders of Allowed TLA/TLB Secured Claims are entitled to receive 100% of the equity value of the Debtors.  Holders of the Allowed TLA/TLB Secured Claims, excluding Kavanaugh and Nicholas, have agreed to less favorable treatment, and shall receive the BidCo Note in full and final satisfaction, release, and discharge of, and in exchange for, such TLA/TLB Secured Claim. For the avoidance of doubt, the BidCo Note, to the extent paid down to $30 million, will be subordinated to the New P&A/Ultimates Facility.  Kavanaugh and Nicholas have agreed to receive Reorganized Relativity Holdings Preferred Units and such other treatment on account of approximately $175 million of their TLA/TLB Secured Claims described in the Revised Relativity Holdings Operating Agreement as set forth in Section III.B below.

c.    *Voting:*  Claims in Classes B1 - B33, B35 -  B56, B58 -  B143, and B145 are Impaired.  Each Holder of an Allowed Claim in Classes B1 - B33, B35 -  B56, B58 -  B143, and B145 is entitled to vote.

3.    **Pre-Release P&A Secured Claims (Class C)**

a.    *Classification:*  Classes C5, C21, C108, C109, and C117 consist of all Pre-Release P&A Secured Claims against the Debtors.

b.    *Treatment*:  Except to the extent that a Holder of an Allowed Pre-Release P&A Secured Claim agrees to less favorable treatment, on or as soon as practicable after the Effective Date, RKA, as the Holder of the Allowed Pre-Release P&A Secured Claims, shall receive the following treatment:  (i) If RKA votes to accept this Plan, the treatment as provided for in <u>Exhibit I</u>; or (ii) if RKA votes to reject this Plan,  the five (5) Replacement P&A Notes with a present value equal to the respective Allowed Pre-Release P&A Secured Claims.

c.    *Voting:*  Claims in Classes C5, C21, C108, C109, and C117 are Impaired. Each Holder of an Allowed Claim in Classes C5, C21, C108, C109, and C117 is entitled to vote.

4.    **Post-Release P&A Claims Secured Claims (Class D)**

a.    *Classification:*  Classes D8, D109, and D121 consist of all Post-Release P&A Secured Claims against the Debtors.

b.    *Treatment:*  On or as soon as practicable after the Effective Date, Reorganized Relativity Holdings shall Allow a claim in the approximately amount of $26,818,821 (as of October 31, 2015 and as reduced in the ordinary course until the Effective Date), which such amount shall include, without limitation, additional accrued interest, legal fees, costs, expenses and other outstanding obligations of Reorganized Relativity Holdings under the P&A Funding Agreement subject to documentation of a replacement credit agreement, which shall provide among other things for an extension of the maturity dates as compared to the pre-petition terms. Subject to and except for any senior Guild lien, the obligation shall be secured by a first-priority security interest originally (i) cross-collateralized against Blackbird Productions, LLC and RML WIB Films, LLC and (ii) individually as against RML Lazarus Films, LLC; *provided*, *however*, that once amounts owing by RML Lazarus Films, LLC to RKA under the Pre-Release P&A Secured Claims are paid off in full, the obligation under this Class D shall be fully secured on a cross-collateralized basis against each of the three entities.  Reorganized Relativity Holdings shall continue to distribute each Post-Release P&A Picture until the outstanding obligations are satisfied by payment in full in Cash in accordance with the terms of the replacement credit agreement which will

- 22 -

make clear that the Classes D8, D109, and D121 lien shall apply only to the proceeds of the post-release films *Woman in Black 2*, *Lazarus* and *Beyond the Lights*, as applicable.

       c.    *Voting:* Claims in Classes D8, D109, and D121 are Impaired. Each Holder of an Allowed Claim in Classes D8, D109, and D121 is entitled to vote.

     **5.**    **Production Loan Secured Claims (Class E)**

       a.    *Classification:* Classes E5 and E21 consists of all Production Loan Secured Claims against the Debtors.

       b.    *Treatment:* Except to the extent that a Holder of an Allowed Production Loan Secured Claim agrees to less favorable treatment, on or as soon as practicable after the Effective Date, the Holder of the Allowed Production Loan Secured Claims shall receive the following treatment: (i) If the Holder votes to accept this Plan, the Production Loan Settlement ; or (ii) if the Holder votes to reject this Plan, the two (2) Replacement Production Loan Notes with a present value equal to the respective Allowed Production Loan Secured Claims. For the avoidance of doubt, nothing in this Plan is intended to affect or modify the Allowed Production Secured Claim Holder's rights under ¶ H(vi)(D) – (I) of Dkt. No. 931 in the Chapter 11 Cases.

       c.    *Voting:* Claims in Classes E5 and E21 are Impaired. Each Holder of an Allowed Claim in Classes E5 and E21 shall be entitled to vote.

     **6.**    **Ultimates Secured Claims (Class F)**

       a.    *Classification:* Classes F1, F2, F6, F7, F8, F10, F20, F24, F41, F47, F51, F77 - F83, F87, F95, F96, F99, F103, F109, F111, F112, F116, F119, F121 and F126 consists of all Ultimates Secured Claims against the Debtors.

       b.    *Treatment:* Except to the extent that a Holder of an Allowed Ultimates Secured Claim agrees to less favorable treatment, on or as soon as practicable after the Effective Date, each Holder of an Allowed Ultimates Secured Claim shall receive payment in full (in Cash) of any such Allowed Ultimates Secured Claim in full and final satisfaction of their claim upon which payment any liens securing such claim shall be immediately released.

       c.    *Voting:* Claims in Classes F1, F2, F6, F7, F8, F10, F20, F24, F41, F47, F51, F77-F83, F87, F95, F96, F99, F103, F109, F111, F112, F116, F119, F121 and F126 are Unimpaired. Each Holder of an Allowed Claim in Classes F1, F2, F6, F7, F8, F10, F20, F24, F41, F47, F51, F77 - F83, F87, F95, F96, F99, F103, F109, F111, F112, F116, F119, F121 and F126 shall be deemed to have accepted this Plan and is, therefore, not entitled to vote.

     **7.**    **Secured Guilds Claims (Class G)**

       a.    *Classification:* Classes G1, G2, G6, G7, G8, G10, G20, G24, G41, G47, G51, G77- G83, G87, G95, G96, G99, G103, G109, G111, G112, G116, G119, G121 and G126 consist of all Secured Guilds Claims against the Debtors.

       b.    *Treatment:* Except to the extent that a Holder of an Allowed Secured Guilds Claim agrees to less favorable treatment, each Holder of an Allowed Secured Guilds Claim shall receive (i) on the Effective Date or as soon thereafter as practicable, its pro rata share of $6.65 million less what is received with respect to the Secured Guilds Claims prior to the Effective Date, and (ii) one (1) year after the Effective Date or as soon as practicable thereafter, payment in full (including applicable interest and collection costs, including but not limited to attorneys fees, as specified in each applicable security agreement) on account of the remaining balance of such Allowed Secured Guilds Claim; *provided*, *however*, that if the Guilds and the Reorganized Debtor have not

NAI-1500594528v18

agreed to the amount of remaining Allowed Guild Secured Claims within 180 days after the Effective Date, the parties will refer this issue to arbitration pursuant to the Guild collective bargaining agreements; _provided_, _further however_, that the Guilds shall retain any pre-petition liens securing the Allowed Secured Guilds Claims. All payments to the Guilds in connection with the Allowed Secured Guilds Claims shall be payable in accordance with the Guild Payroll Protocols.

c.      _Voting:_  Claims in
Classes G1, G2, G6, G7, G8, G10, G20, G24, G41, G47, G51, G77-
G83, G87, G95, G96, G99, G103, G109, G111, G112, G116, G119, G121 and G126 are Impaired.  Each Holder of an Allowed Claim in Classes G1, G2, G6, G7, G8, G10, G20, G24, G41, G47, G51, G77-
G83, G87, G95, G96, G99, G103, G109, G111, G112, G116, G119, G121 and  G126 is entitled to vote.

## 8.      Vine/Verite Secured Claims (Class H)

a.      _Classification:_  Classes H34 and H144 and consists of all Vine/Verite Secured Claims against the Debtors.

b.      _Treatment:_  Except to the extent that a Holder of an Allowed Vine/Verite Secured Claim agrees to less favorable treatment, on or as soon as practicable after the Effective Date, each Holder of an Allowed Vine/Verite Secured Claim shall receive the following treatment at the option of the Plan Proponents:  (i) such Allowed Secured Claim shall be Reinstated; or (ii) satisfaction of any such Allowed Secured Claim by delivering the collateral securing any such Allowed Secured Claim.

c.      _Voting:_  Claims in Classes H34 and H144 are Unimpaired.  Each Holder of an Allowed Claim in Classes H34 and H144 shall be deemed to have accepted this Plan and is, therefore, not entitled to vote.

## 9.      Other Secured Claims (Class I)

a.      _Classification:_  Classes I1 - I145 consists of all Other Secured Claims against the Debtors.

b.      _Treatment:_  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, on or as soon as practicable after the Effective Date, each Holder of an Allowed Other Secured Claim shall receive the following treatment at the option of the Plan Proponents:  (i) such Allowed Secured Claim shall be Reinstated; (ii) payment in full (in Cash) of any such Allowed Secured Claim; or (iii) satisfaction of any such Allowed Secured Claim by delivering the collateral securing any such Allowed Secured Claim.

c.      _Voting:_  Claims in Classes I1 - I145 are Unimpaired.  Each Holder of an Allowed Claim in Classes I1 - I145 shall be deemed to have accepted this Plan and is, therefore, not entitled to vote.

## 10.      General Unsecured Claims (Class J)

a.      _Classification:_  Classes J1 - J145 consist of all General Unsecured Claims against the Debtors.

b.      _Treatment:_  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the Effective Date, the Reorganized Debtors shall be deemed substantively consolidated for plan purposes only, and each Holder of an Allowed General Unsecured Claim in Classes J1 -  J145 shall receive, subject to the terms of this Plan, in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim, interests representing its Pro Rata share of (i) the Guaranteed GUC Payment and (ii) the GUC Causes of Action Interests; _provided_, _however_, that the sum of the Guaranteed GUC Payment and the GUC Litigation Trust Interests shall not exceed par.  For the avoidance of doubt, all

NAI-1500594528v18

intercompany claims of the Debtors shall be disallowed and canceled as part of the deemed substantive consolidation of the Debtors.  For further avoidance of doubt, claims arising under the Manchester Prepetition Credit Facility are General Unsecured Claims.  The Reorganized Debtors will meet and confer in order to coordinate GUC Distributable Value and Litigation Trust Interests with the Guild Payroll Protocols.  In addition, the Guilds agree that notwithstanding the CBA Assumption Agreements and Bankruptcy Code § 1113 and any other applicable provisions of the Bankruptcy Code, any unsecured pre-petition residuals owed by any of the Debtors will be treated as General Unsecured Claims.

   c. *Voting:*  Claims in Classes J1 - J145 are Impaired.  Each Holder of an Allowed Claim in Classes J1 -  J145 is entitled to vote.

  **11.**  **Subordinated Claims (Class K)**

   a. *Classification:*  Classes K1 – K145 consist of all Subordinated Claims.

   b. *Treatment:*  No property shall be distributed to or retained by the Holders of Subordinated Claims, and such Claims shall be extinguished on the Effective Date.  Holders of Subordinated Claims shall not receive any distribution pursuant to this Plan.

   c. *Voting:*  Claims in Classes K1 – K145 are Impaired.  Each Holder of an Allowed Claim in Classes K1 – K145 shall be deemed to have rejected this Plan and, therefore, is not entitled to vote.

  **12.**  **Treatment of Interests in all Debtors (Class L)**

   a. *Classification:*  Classes L1 - L145 consists of all Interests in the Debtors.

   b. *Treatment:*  Holders of Interests in the Debtors shall retain no property under this Plan.

   c. *Voting:*  Interests in Classes L1 - L145 are Impaired.  Each Holder of an Allowed Interest in Relativity Holdings in Classes L1 - L145 shall be deemed to have rejected this Plan and, therefore, is not entitled to vote.

  **D.**  **Special Provision Regarding Prepetition Intercompany Claims**

  For purposes of distributions under this Plan, Prepetition Intercompany Claims shall be disallowed and cancelled as part of the deemed substantive consolidation of the Debtors.

  **E.**  **Special Provision Governing Unimpaired Claims**

  Except as otherwise provided in this Plan, nothing under this Plan will affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

  **F.**  **Postpetition Interest on General Unsecured Claims**

  Except as required by applicable bankruptcy law, postpetition interest will not accrue or be payable on account of any General Unsecured Claim.

  **G.**  **Insurance**

  Notwithstanding anything to the contrary herein, if any Allowed Claim is covered by an insurance policy, such Claim will first be paid from proceeds of such insurance policy, with the balance, if any, treated in accordance with the provisions of this Plan governing the Class applicable to such Claim.

NAI-1500594528v18

### III.    MEANS OF IMPLEMENTATION

#### A.    Issuance of Reorganized Relativity Holdings Preferred Units

On the Effective Date, Reorganized Relativity Holdings Preferred Units shall be authorized as set forth in the Operating Agreement.  Reorganized Relativity Holdings shall issue, pursuant to the treatment provided for in this Plan, Reorganized Relativity Holdings Preferred Units to each of Nicholas and Kavanaugh.  The rights of holders of Reorganized Relativity Holdings Preferred Units shall be set forth in the Revised Relativity Holdings Operating Agreement.

Each distribution and issuance of the Reorganized Relativity Holdings Preferred Units under this Plan shall be governed by the terms and conditions set forth in this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date, Reorganized Holdings will be authorized to and shall issue or execute and deliver, as applicable, the Reorganized Relativity Holdings Preferred Units and the New Securities and Documents (including, without limitation, in connection with a new equity raise), in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

The issuance or execution and delivery of the New Securities and Documents, as applicable, and the distribution thereof under this Plan shall be exempt from registration under applicable securities laws pursuant to Bankruptcy Code § 1145(a) and/or any other applicable exemptions.  Without limiting the effect of Bankruptcy Code § 1145, all documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of this Plan shall become and shall remain effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

#### B.    Issuance of Reorganized Relativity Holdings Common Units

On the Effective Date, Reorganized Relativity Holdings Common Units shall be authorized as set forth in the Operating Agreement.  Reorganized Relativity Holdings shall issue, pursuant to the treatment provided for in this Plan, Reorganized Relativity Holdings Common Units to each of Nicholas and Kavanaugh.  Any shares not necessary to satisfy obligations under this Plan shall have the status of authorized but not issued shares of Reorganized Relativity Holdings.  The rights of holders of Reorganized Relativity Holdings Common Units shall be set forth in the Revised Relativity Holdings Operating Agreement.

Each distribution and issuance of the Reorganized Relativity Holdings Common Units under this Plan shall be governed by the terms and conditions set forth in this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date, each of the applicable Reorganized Debtors will be authorized to and shall issue or execute and deliver, as applicable, the Reorganized Relativity Holdings Common Units and the New Securities and Documents (including, without limitation, in connection with a new equity raise), in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

The issuance or execution and delivery of the New Securities and Documents, as applicable, and the distribution thereof under this Plan shall be exempt from registration under applicable securities laws pursuant to Bankruptcy Code § 1145(a) and/or any other applicable exemptions.  Without limiting the effect of Bankruptcy Code § 1145, all documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of this Plan shall become and shall remain effective and binding in accordance

with their respective terms and conditions upon the parties thereto, in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

### C.    Issuance of Reorganized Relativity Holdings Warrants

On the Effective Date, Reorganized Relativity Holdings shall issue Reorganized Relativity Holdings Warrants to each of Nicholas and Heatherden (or their respective Affiliates) with such terms and conditions set forth in their respective Warrant Agreements.

On the Effective Date, Reorganized Relativity Holdings will be authorized to and shall issue or execute and deliver, as applicable, the Reorganized Relativity Holdings Warrants and the New Securities and Documents (including, without limitation, in connection with a new equity raise), in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

The issuance or execution and delivery of the New Securities and Documents, as applicable, and the distribution thereof under this Plan shall be exempt from registration under applicable securities laws pursuant to Bankruptcy Code § 1145(a) and/or any other applicable exemptions.  Without limiting the effect of Bankruptcy Code § 1145, all documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of this Plan shall become and shall remain effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

### D.    Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors

Except as otherwise provided herein (including with respect to the Restructuring Transactions described in Section III.E.1:  (1) as of the Effective Date, Reorganized Relativity Holdings shall exist as a separate legal entity, with all organizational powers in accordance with the laws of the state of Delaware and the certificates of formation and operating agreement, appended hereto as Exhibit B and Exhibit C, respectively; (2) subject to the Restructuring Transactions, each of the Debtors shall, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal entity, with all of the powers of such a legal entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, conversion, dissolution or otherwise) under applicable law; and (3) on the Effective Date, all property of the Estate of a Debtor, the Causes of Action, and any property acquired by a Debtor or Reorganized Debtor under this Plan, shall vest, subject to the Restructuring Transactions, in the applicable Reorganized Debtors, free and clear of all Claims, liens, charges, other encumbrances, Interests and other interests.  On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire and dispose of property and compromise or settle any Claims, Interests or the RKA Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan or the Confirmation Order.  Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for appropriate Professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to, or the approval of, the Bankruptcy Court.

### E.    Restructuring Transactions

#### 1.    Restructuring Transactions Generally

On or after the Effective Date, the Reorganized Debtors shall undertake such Restructuring Transactions as may be necessary or appropriate to effect, in accordance with applicable non-bankruptcy law, a restructuring of the Debtors' or Reorganized Debtors' respective business or simplify the overall organizational structure of the Reorganized Debtors, , including but not limited to resolving intercompany claims, all to the extent not inconsistent with any other terms of this Plan, including any such Restructuring Transactions described in any Restructuring

Transactions documents, including the Restructuring Transactions Exhibit, if any, to be filed with this Plan Supplement within the Debtors' discretion.

Without limiting the foregoing, unless otherwise provided by the terms of a Restructuring Transaction, all such Restructuring Transactions will be deemed to occur on the Effective Date and may include one or more mergers, conversions, or consolidations, restructurings, dispositions, liquidations or dissolutions, as may be determined by the Debtors or the Reorganized Debtors to be necessary or appropriate.

The actions taken by the Debtors or the Reorganized Debtors, as applicable, to effect the Restructuring Transactions may include: (i) the execution, delivery, adoption, and/or amendment of appropriate agreements or other documents of merger, conversion, consolidation, restructuring, disposition, liquidation or dissolution containing terms that are consistent with the terms of this Plan, the Restructuring Transactions documents, and any ancillary documents and that satisfy the applicable requirements of applicable state law and any other terms to which the applicable Entities may agree; (ii) the execution, delivery, adoption, and/or amendment of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan, the Disclosure Statement, the Restructuring Transactions documents, and any ancillary documents and having other terms for which the applicable Entities may agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, conversion, merger, consolidation, dissolution or change in corporate form pursuant to applicable state law; (iv) the cancellation of shares, membership interests and warrants; and (v) all other actions that the Debtors or the Reorganized Debtors, as applicable, determine to be necessary, desirable, or appropriate to implement, effectuate, and consummate this Plan or the Restructuring Transactions contemplated hereby, including making filings or recordings that may be required by applicable state law in connection with the Restructuring Transactions. Any such transactions may be effected on or subsequent to the Effective Date without any further action by the equityholders or directors of any of the Debtors or the Reorganized Debtors.

### 2.      Obligations of Any Successor Entity in a Restructuring Transaction

The Restructuring Transactions may result in substantially all of the respective assets, properties, rights, liabilities, duties, and obligations of certain of the Reorganized Debtors vesting in one or more surviving, resulting, or acquiring entities. In any case in which the surviving, resulting, or acquiring entity in any such transaction is a successor to a Reorganized Debtor, such surviving, resulting, or acquiring entity will perform the obligations of the applicable Reorganized Debtor pursuant to this Plan to pay or otherwise satisfy the Allowed Claims against such Reorganized Debtor, except as provided in this Plan or in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring corporation, which may provide that another Reorganized Debtor will perform such obligations.

### F.      Sources of Cash for Plan Distributions

The Debtors or Reorganized Debtors, as applicable, are authorized to execute and deliver any documents necessary or appropriate to obtain Cash for funding this Plan. All consideration necessary for the Reorganized Debtors to make payments or distributions pursuant hereto shall be obtained through a combination of one or more of the following: (a) Cash on hand of the Debtors, including Cash from business operations, or distributions from Non-Debtor Affiliates; (b) proceeds of the sale of assets; (c) the New P&A/Ultimates Facility; (d) the proceeds of any tax refunds and the RKA Causes of Action; (e) the proceeds of any equity raise; and (f) any other means of financing or funding that the Debtors or the Reorganized Debtors determine is necessary or appropriate. Further, the Debtors and the Reorganized Debtors shall be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under this Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers shall be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and shall not violate the terms of this Plan or any orders entered by the Bankruptcy Court with respect to the Debtors' cash management system.

NAI-1500594528v18

**G.      Corporate Governance, Managers and Officers, Employment-Related Agreements and Compensation Programs; Other Agreements**

**1.          Certificates of Formation and Operating Agreement**

As of the Effective Date, the certificate of formation and the operating agreement (or comparable constituent documents) of Reorganized Relativity Holdings shall be substantially in the forms appended hereto as Exhibit B and Exhibit C, respectively.  The certificate of formation and operating agreement (or comparable constituent documents) of each Reorganized Debtor, among other things, shall prohibit the issuance of nonvoting equity securities to the extent required by Bankruptcy Code § 1123(a)(6).  After the Effective Date, each Reorganized Debtor may amend and restate its certificate of formation or operating agreement (or comparable constituent documents) as permitted by applicable non-bankruptcy law, subject to the terms and conditions of such constituent documents.  On the Effective Date, or as soon thereafter as is practicable, each Reorganized Debtor shall file such certificate of formation (or comparable constituent documents) with the secretary of state or jurisdiction or similar office of the state or jurisdiction in which such Reorganized Debtor is incorporated or organized, to the extent required by and in accordance with the applicable corporate law of such state.

**2.          Managers and Officers of the Reorganized Debtors**

In accordance with Bankruptcy Code § 1129(a)(5), from and after the Effective Date, the initial officers and directors of Reorganized Relativity Holdings shall be comprised of the individuals identified in a disclosure to be Filed as part of the Plan Supplement.  The directors for the boards of managers/directors of the direct and indirect subsidiaries of Reorganized Relativity Holdings shall be identified and selected by the New Board of Managers.

**3.          Employment-Related Agreements and Compensation Programs**

Except as otherwise provided herein, as of the Effective Date, each of the Reorganized Debtors shall have authority to:  (i) maintain, reinstate, amend or revise existing employment, retirement, welfare, incentive, severance, indemnification and other agreements with its active and retired directors, officers and employees, subject to the terms and conditions of any such agreement and applicable non-bankruptcy law; and (ii) enter into new employment, retirement, welfare, incentive, severance, indemnification and other agreements for active and retired employees.

On the Effective Date, Reorganized Relativity shall assume the existing employment plans and employment agreements, as the same may be modified, other than those identified on Exhibit E as designated for rejection.

On or after the Effective Date, the Reorganized Debtors shall continue to administer and pay the Claims arising before the Petition Date under the Debtors' workers' compensation programs in accordance with their prepetition practices and procedures.

**4.          Other Matters**

Notwithstanding anything to the contrary in this Plan, no provision in any contract, agreement or other document with the Debtors that is rendered unenforceable against the Debtors or the Reorganized Debtors pursuant to Bankruptcy Code §§ 541(c), 363(*l*) or 365(e)(1), or any analogous decisional law, shall be enforceable against the Debtors or Reorganized Debtors as a result of this Plan.

**5.          Payment of Manchester Fees**

If and to the extent Relativity shall not have paid, prior to the Effective Date, all of the fees, expenses, and other amounts payable to Manchester or Heatherden, whether incurred prepetition or postpetition, including without limitation all amounts paid for legal and other professional fees and expenses of Manchester and Heatherden for O'Melveny & Myers LLP, Ropes & Gray LLP, and Moelis & Company, then all such unpaid fees, expenses, and other amounts shall be paid to Manchester and Heatherden on the Effective Date of this Plan; *provided* that such

fees and expenses incurred between October 26, 2015 and January 31, 2016, shall be subject to a budget in an aggregate amount of $3,750,000 for such period; provided, that the budget shall not limit fees and expenses related to a litigation or investigation of Manchester, Heatherden.

### 6.    Transactions Effective as of the Effective Date

Pursuant to Bankruptcy Code § 1142 and the Delaware Limited Liability Company Act and any comparable provisions of the business corporation or limited liability company law of any other state or jurisdiction the following shall occur and be effective as of the Effective Date, if no such other date is specified in such other documents, and shall be authorized and approved in all respects and for all purposes without any requirement of further action by the members or managers of the Debtors or any of the Reorganized Debtors: (a) the Restructuring Transactions; (b) the adoption of new or amended and restated certificates of formation and operating agreements (or comparable constituent documents) for each Reorganized Debtor; (c) the initial selection of managers and officers for each Reorganized Debtor; (d) the distribution of Cash and other property pursuant to this Plan; (e) the authorization and issuance of Reorganized Relativity Holdings Common Units pursuant to this Plan; (f) the entry into and performance of the New Exit Financing Documents; (g) any amendments to any of the credit agreements; (h) the adoption, execution, delivery and implementation of all contracts, leases, instruments, releases and other agreements or documents related to any of the foregoing; (i) the design, execution and implementation of employment, retirement and indemnification agreements, incentive compensation programs, retirement income plans, welfare benefit plans and other employee plans and related agreements; and (j) any other matters provided for under this Plan involving the organizational structure of the Debtors or Reorganized Debtors or organizational action to be taken by or required of a Debtor or Reorganized Debtor.

### H.    New P&A/Ultimates Facility

On the Effective Date, one or more of the Reorganized Debtors shall be authorized to consummate the New P&A/Ultimates Facility and to execute, deliver and enter into the New Exit Financing Documents, and any related agreements or filings without the need for any further corporate or other organizational action and without further action by the Holders of Claims or Interests, and the New Exit Financing Documents and any related agreements or filings shall be executed and delivered and the applicable Reorganized Debtors shall enter into the New P&A/Ultimates Facility and be permitted to incur or issue the indebtedness available thereunder.

Any final material terms of the New P&A/Ultimates Facility shall be included in the Plan Supplement.

### I.    Preservation of Causes of Action

Except as provided in this Plan or in any contract, instrument, release, or other agreement entered into, or delivered in connection with, or assumed by this Plan (including, for the avoidance of doubt, pursuant to Section X.E and X.F), in accordance with Bankruptcy Code § 1123(b) and to the fullest extent possible under applicable law, (i) the Reorganized Debtors will retain the Causes of Action and the RKA Causes of Action, (ii) only the Reorganized Debtors will have the right to enforce and prosecute the RKA Causes of Action, and (iii) the Reorganized Debtors shall grant to the Litigation Trust the sole right to enforce and prosecute the Causes of Action in the name of the Reorganized Debtor, whether such Causes of Action arose before or after the Petition Date, including any actions specifically enumerated in Exhibit J.   The Reorganized Debtors' and Litigation Trust's rights to commence, prosecute, or settle such RKA Causes of Action and Causes of Action, respectively, shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors or their successors, and/or the Litigation Trust, may pursue, or not pursue, such RKA Causes of Action and Causes of Action, as applicable, as they deem appropriate in their discretion.

No Person or Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against them as any indication that the Litigation Trust will not pursue any and all available Causes of Action against them.  Except with respect to Causes of Action as to which the Debtors or the Reorganized Debtors have released any Person or Entity on or prior to the Effective Date (pursuant to the Debtor Release or otherwise), the Reorganized Debtors and the Litigation Trust, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person or Entity, except as otherwise expressly provided in this Plan.

J.        **Reinstatement and Continuation of Insurance Policies**

From and after the Effective Date, each of the Debtors' insurance policies in existence as of the Effective Date will be reinstated and continued in accordance with their terms and, to the extent applicable, will be deemed assumed by the applicable Reorganized Debtor pursuant to Bankruptcy Code § 365 and Section IV.A of this Plan. Nothing in this Plan will affect, impair or prejudice the rights of the insurance carriers or the Reorganized Debtors under the insurance policies in any manner, and such insurance carriers and Reorganized Debtors will retain all rights and defenses under such insurance policies, and such insurance policies shall apply to, and be enforceable by and against, the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date.

K.        **Entry into CBA Assumption Agreements**

On the Effective Date, the applicable Reorganized Debtors shall enter into the CBA Assumption Agreements.

L.        **Cancellation and Surrender of Instruments, Securities and Other Documentation**

On the Effective Date and except as otherwise specifically provided for in this Plan, (i) the obligations of the Debtors under any other certificate, share, note, purchase right, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest, equity, or profits interest in, the Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest (except the Intercompany Interests), will be cancelled as to the Debtors, and the Reorganized Debtors will have no continuing obligations thereunder; (ii) the obligations of the Debtors under the Modified DIP Credit Agreement will be fully released, settled, and compromised as to the Debtors, and the Reorganized Debtors will have no continuing obligations thereunder; and (iii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation/formation or similar documents governing the shares, units, certificates, notes, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors will be fully released, settled, and compromised except as expressly provided herein.

With respect to any agreement (including, without limitation, any applicable credit agreement) that governs the rights of the Holder of a Claim or Interest and will be cancelled hereunder, and notwithstanding the occurrence of the Effective Date, such agreement will continue in effect solely for purposes of allowing such Holders to receive distributions under this Plan as provided herein.

M.        **Release of Liens**

Except as otherwise provided in this Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, on the Effective Date and consistent with the treatment provided for Claims and Interests in Section II, all mortgages, deeds of trust, liens or other security interests, including any liens granted as adequate protection against the property of any Estate, shall be fully released and discharged, and all of the right, title and interest of any Holder of such mortgages, deeds of trust, liens or other security interests, including any rights to any collateral thereunder, shall revert to the applicable Reorganized Debtor and its successors and assigns.  As of the Effective Date, the Reorganized Debtors shall be authorized to execute and file on behalf of creditors Form UCC-3 termination statements, mortgage releases or such other forms as may be necessary or appropriate to implement the provisions of this Section III.M.

N.        **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of managers or directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of this Plan, the Restructuring

- 31 -

Transactions, the Reorganized Relativity Holdings Preferred Units, the Reorganized Relativity Holdings Common Units issued pursuant to this Plan, the New P&A/Ultimates Facility authorized pursuant to this Plan (including, but not limited to, the New Exit Financing Documents), and any amendments to any of the Debtors' credit agreements, in each case, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization or consents except those expressly required pursuant to this Plan.

## IV.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein, each of the Debtors' Executory Contracts and Unexpired Leases not previously assumed or rejected pursuant to an order of the Bankruptcy Court shall be deemed assumed as of the Effective Date in accordance with the provisions and requirements of Bankruptcy Code §§ 365 and 1123 except any Executory Contract or Unexpired Lease (1) identified on Exhibit E to this Plan (which shall be Filed as part of the Plan Supplement, and as may be amended) as an Executory Contract or Unexpired Lease designated for rejection, (2) which is the subject of a pending objection as to cure or assumability of such Executory Contract(s) or Unexpired Lease(s), (3) which is the subject of a separate motion or notice to assume or reject Filed by the Debtors and pending as of the Effective Date, (4) that previously expired or terminated pursuant to its own terms, or (5) that was previously assumed by any of the Debtors.  In the event that an Executory Contract or Unexpired Lease is the subject of a pending objection, at any time (i) on or before the Effective Date, the Debtors reserve the right to supplement the list of rejected contracts on Exhibit E or (ii) after the Effective Date, the Reorganized Debtors reserve the right to supplement the list of rejected contracts on Exhibit E.

Pursuant to Bankruptcy Code § 365, Participation Agreements for yet to be released films are executory contracts and, as such, shall be assumed by the Reorganized Debtors as of the Effective Date.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections of such Executory Contracts and Unexpired Leases as set forth in this Plan, all pursuant to Bankruptcy Code §§ 365(a) and 1123.  Each Executory Contract and Unexpired Lease assumed pursuant to this Plan or by Bankruptcy Court order, and not assigned to a third party by previous order of the Bankruptcy Court on or prior to the Effective Date, shall revest in, and be fully enforceable by, the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court.  To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including, without limitation, any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the counterparty thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Notwithstanding anything to the contrary in this Plan, the Debtors or Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement Exhibit E hereto  in their discretion prior to the Effective Date on no less than five (5) business days' notice to the counterparty thereto.

### B.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to this Plan shall be satisfied, pursuant to Bankruptcy Code § 365(b)(1), by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of Bankruptcy Code § 365) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by Bankruptcy Code § 365(b)(1) shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.

No later than the date on which the Plan Supplement is Filed, to the extent not previously Filed with the Bankruptcy Court and served on affected counterparties, the Debtors shall provide for notices of proposed

assumption and proposed cure amounts to be sent to applicable Executory Contract and Unexpired Lease counterparties, together with procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a contract or lease counterparty to a proposed assumption (but not related to cure amount) must be Filed, served, and actually received by the Debtors by the date on which objections to Confirmation are due (or such other date as may be provided in the applicable assumption notice). Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption shall be deemed to have assented to such assumption. For the avoidance of doubt, as ordered by the Bankruptcy Court in these Chapter 11 Cases (Dkt. No. 369), failure of the non-Debtor counterparty previously served with a cure notice to have filed an objection or raised an informal objection with Debtors' counsel has resulted in a deemed waiver to object to, contest, condition or otherwise restrict the assumption of the noticed assumed contracts or lease and otherwise forever barred the non-Debtor counterparty from objecting to the amount of the cure payment. Every non-Debtor counterparty may, however, object as to adequate assurance of future performance of the Reorganized Debtors.

Assumption of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged without further notice to or action, order or approval of the Bankruptcy Court.

### C. Claims Based on Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases pursuant to this Plan or otherwise must be filed with the Notice and Claims Agent within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Proofs of Claim arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases that are not timely filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any Reorganized Debtor without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall constitute General Unsecured Claims and shall be treated in accordance with Section II.C.10.

The Plan Proponents reserve the right to object to, settle, compromise or otherwise resolve any Claim Filed on account of a rejected Executory Contract or Unexpired Lease.

### D. Contracts and Leases Entered Into After the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, shall be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

### E. Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in this Plan, nor the Debtors' delivery of a notice of proposed assumption and proposed cure amount to applicable contract and lease counterparties shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

NAI-1500594528v18

F.      **Pre-Existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors or Reorganized Debtors under such Executory Contracts or Unexpired Leases.  Notwithstanding any applicable non-bankruptcy law to the contrary, the Debtors and Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors from counterparties to rejected Executory Contracts or Unexpired Leases.

G.      **Certain Compensation and Benefit Programs**

Notwithstanding anything to the contrary in this Plan, all contracts, agreements, policies, programs and plans in existence on the Petition Date that provided for the issuance of Interests in any of the Debtors to current or former employees or directors of the Debtors are, to the extent not previously terminated or rejected by the Debtors, to be treated as Class K Subordinated Claims and shall be rejected or otherwise terminated as of the Effective Date without any further action of the Debtors or Reorganized Debtors or any order of the Court, any unvested Interests granted under any such agreements, policies, programs and plans in addition to any Interests granted under such agreements previously terminated or rejected by the Debtors to the extent not previously cancelled shall be cancelled pursuant to Section III.K of this Plan.  Objections to the treatment of these plans or the Claims for rejection or termination damages arising from the rejection or termination of any such plans, if any, must be submitted and resolved in accordance with the procedures and subject to the conditions for objections to Confirmation.  If any such objection is not timely Filed and served before the deadline set for objections to this Plan, each participant in or counterparty to any agreement described in this Section IV.G shall be forever barred from (1) objecting to the rejection or termination provided hereunder, and shall be precluded from being heard at the Confirmation Hearing with respect to such objection; (2) asserting against any Reorganized Debtor, or its property, any default existing as of the Effective Date or any counterclaim, defense, setoff or any other interest asserted or assertable against the Debtors; and (3) imposing or charging against any Reorganized Debtor any accelerations, assignment fees, increases or any other fees as a result of any rejection pursuant to this Section IV.G.

H.      **Obligations to Insure and Indemnify Directors, Officers and Employees**

Any and all managers/directors and officers liability and fiduciary insurance or tail policies in existence as of the Effective Date shall be reinstated and continued in accordance with their terms and, to the extent applicable, shall be deemed assumed or assumed and assigned by the applicable Debtor or Reorganized Debtor, pursuant to Bankruptcy Code § 365 and Section IV.A of this Plan.  Each insurance carrier under such policies shall continue to honor their coverage obligation, if any, and administer the policies with respect to the Reorganized Debtors in the same manner and according to the same terms, conditions, and practices applicable to the Debtors prior to the Effective Date.

The applicable Reorganized Debtor shall only be obligated to indemnify any Person who is serving or has served as one of the Debtors' directors, officers, managers, employees or consultants at any time from and after the Petition Date for any losses, claims, costs, damages or Liabilities resulting from such Person's service in such a capacity at any time from and after the Petition Date or as a director, officer, managers or employee of a Non-Debtor Affiliate at any time from and after the Petition Date, to the extent provided in the applicable certificates of incorporation or formation, by-laws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor.  Accordingly, such indemnification obligations shall survive and be unaffected by entry of the Confirmation Order.

I.      **Reservation of Rights**

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in this Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtors have any liability thereunder.

NAI-1500594528v18

## V.    PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Distributions for Allowed Claims as of the Effective Date

Except as otherwise provided in this Section V, distributions to be made on the Effective Date to Holders of Allowed Claims as provided by Section II or this Section V shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable by the Debtors or the Reorganized Debtors, as applicable.

### B.    Undeliverable Distributions

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Reorganized Debtors, the Litigation Trust or the Guild counsel (as applicable) has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; _provided_, _however_, that such Distribution shall be deemed unclaimed property under Bankruptcy Code § 347(b) at the expiration of the latter of six (6) months from (i) the Effective Date or (ii) Allowance of such claim.  After such date, all unclaimed property shall become available cash for distribution to all other Holders of Litigation Trust Interests (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such unclaimed property shall be released and forever barred from assertion against such Debtor and its Estate.

### C.    Compliance with Tax Requirements

In connection with this Plan and all instruments issued in connection herewith and distributed hereunder, to the extent applicable, the Debtors, the Reorganized Debtors, the Litigation Trust, or any other party issuing any instruments or making any distributions under this Plan shall comply with all applicable Tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant to this Plan and all related agreements shall be subject to such withholding and reporting requirements.  Each of the Debtors, the Reorganized Debtors, and the Litigation Trust, as applicable, shall be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including applying a portion of any Cash distribution to be made under this Plan to pay applicable Tax withholding.  In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax. Any amounts withheld pursuant to the immediately preceding sentence shall be deemed to have been distributed and received by the applicable recipient for all purposes of this Plan.  For the avoidance of doubt, the employer shall pay the "employer share" of any applicable employment taxes.  Notwithstanding any other provision of this Plan, each Holder of an Allowed Claim receiving a distribution pursuant to this Plan shall have the sole and exclusive responsibility for the satisfying and paying of any Tax obligations imposed on it by any governmental unit on account of such distribution, including income, withholding and other Tax obligations.  Any party issuing any instrument or making any distribution pursuant to this Plan has the right, but not the obligation, to not make a distribution until such Holder has made arrangements satisfactory to the issuing or disbursing party for the payment of any tax obligations.

Any party entitled to receive any property as an issuance or distribution under this Plan shall be required, if so requested, to deliver to the Debtors, the Reorganized Debtors, the Litigation Trust or any other party issuing any instruments or making any distributions under this Plan (or such other Entity designated by any of the foregoing), as applicable, an IRS Form W-9 or (if the payee is a foreign Entity) an IRS Form W-8BEN, IRS Form W-8BEN-E, or such other IRS Form W-8, as applicable, unless such Entity is exempt under the Internal Revenue Code and so notifies the making the distribution. If a properly completed IRS Form W-9 or IRS Form W-8, as appropriate, is not delivered to the distributing party (or such other Entity), and the Holder fails to comply with the requirement to deliver the IRS Form W-9 or IRS Form W-8 within the 180 days prescribed in Section IX.B.2 above, such distribution shall be deemed undeliverable.

D.      **Distribution Record Date**

       **1.**          The Debtor or Reorganized Debtors will have no obligation to recognize the transfer, or the sale, of any participation in, any Claim that occurs after the close of business on the Distribution Record Date and will be entitled for all purposes herein to recognize and make distributions only to those holders of Allowed Claims that are holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.

       **2.**          Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date will be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

E.      **Setoffs**

      Except with respect to claims of a Debtor or Reorganized Debtor released pursuant to this Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, the Reorganized Debtors or the Litigation Trust, as applicable, may, pursuant to Bankruptcy Code § 553 or applicable non-bankruptcy law, set off against any Claim and the payments or distributions to be made on account of the Claims, rights and Causes of Action of any nature that the applicable Reorganized Debtor or Litigation Trust may hold against the Holder of the Claim; *provided*, *however*, that the failure to effect a setoff shall not constitute a waiver or release by the applicable Reorganized Debtor or Litigation Trust of any Claims, rights and Causes of Action that the Reorganized Debtor or Litigation Trust may possess against the Holder of a Claim.

F.      **Distributions to Holders of Disputed Claims**

      Notwithstanding any other provision of this Plan, (1) no payments or distributions will be made on account of a Disputed Claim until such Claim becomes an Allowed Claim, if ever and (2) except as otherwise agreed to by the relevant parties, no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.

      To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Holder of such Claim shall receive the distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.  Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

G.      **Allocation Between Principal and Accrued Interest**

      Except as otherwise provided in this Plan, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to this Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof as determined for U.S. federal income tax purposes) and, thereafter, to interest and the remaining portion, if any, of such Allowed Claims.

VI.      **DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS**

A.      **Allowance of Claims**

      After the Effective Date, the Reorganized Debtors and/or the Litigation Trust, as applicable, shall have and retain any and all rights and defenses the Debtors had with respect to any Claim immediately prior to the Effective Date, except with respect to any Claim deemed Allowed under this Plan.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no

Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) in the Chapter 11 Cases allowing such Claim.  All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

Any Claim that has been listed in the Schedules as disputed, contingent or unliquidated, and for which no Proof of Claim has been timely filed, is not considered Allowed and shall be expunged without further action and without any further notice to or action, order or approval of the Bankruptcy Court.

### B.    Prosecution of Objections to Claims

Except as otherwise specifically provided in this Plan, the Debtors, prior to the Effective Date, and the Reorganized Debtors or the Litigation Trust, as applicable, after the Effective Date, shall have the sole authority: (1) to File, withdraw or litigate to judgment, objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (3) to administer and adjust the claims register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Bankruptcy Court.

### C.    Estimation of Claims

The Debtors, prior to the Effective Date, and the Reorganized Debtors or the Litigation Trust, as applicable, after the Effective Date, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to Bankruptcy Code § 502(c) for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under this Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

### D.    Expungement or Adjustment to Claims Without Objection

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors or the Reorganized Debtors, as applicable, without a claim objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

### E.    Deadline to File Objections to Claims

The Reorganized Debtors or Liquidating Trust, as applicable may object to any Claims not previously Allowed by an order of the Bankruptcy Court or pursuant to this Plan prior to the Claims Objection Bar Date.

### F.    Disallowance of Certain Claims

**EXCEPT AS PROVIDED HEREIN, IN AN ORDER OF THE BANKRUPTCY COURT OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS.**

NAI-1500594528v18

### G.    Offer of Judgment

The Reorganized Debtors are authorized to serve upon a Holder of a Disputed Claim an offer to allow judgment to be taken on account of such Disputed Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment.  To the extent the Holder of a Disputed Claim must pay the costs incurred by the Reorganized Debtors after the making of such offer, the Reorganized Debtors are entitled to set off such amounts against the amount of any distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

### H.    Amendments to Claims

On or after the Effective Date, except as provided herein, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such prior authorization is not received, any such new or amended Claim filed shall be deemed disallowed in full and expunged without any further action.

## VII.    CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN

### A.    Conditions to the Effective Date

The Effective Date shall not occur, and this Plan shall not be consummated unless and until the following conditions have been satisfied or duly waived pursuant to Section VII.B:

**1.**    All documents and agreements necessary to consummate this Plan shall have been effected or executed.

**2.**    The Bankruptcy Court shall have entered the Confirmation Order, and the Confirmation Order shall be (i) a Final Order and (ii) in form and substance reasonably acceptable to the Plan Proponents.

**3.**    Receipt of required governmental approvals (if any) and any and all other steps necessary to consummate the Debtors' proposed restructuring in any applicable jurisdictions have been received and/or effectuated.

**4.**    All other documents and agreements necessary to implement this Plan on the Effective Date that are required to be in form and substance reasonably acceptable to the Plan Proponents shall have been executed and delivered and all other actions required to be taken in connection with the Effective Date shall have occurred.

**5.**    All statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full.

### B.    Waiver of Conditions to Effective Date

The conditions to the Effective Date may be waived in whole or part at any time by the Plan Proponents, without an order of the Bankruptcy Court.

### C.    Effects of Nonoccurrence of Conditions to the Effective Date

If the Effective Date does not occur, then (i) this Plan will be null and void in all respects; (ii) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan, and any document or agreement executed pursuant to this Plan, will be deemed null and void; and (iii) nothing contained in this Plan or the Disclosure Statement will (a) constitute a waiver or release of any Claims or Interests, (b) prejudice in any manner the rights of the Debtors or any other Person or Entity, or

- 38 -

(c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Person or Entity.

## VIII.    NON-CONSENSUAL CONFIRMATION

In the event that any Impaired Class of Claims or Interests rejects this Plan, the Plan Proponents reserve the right, without any delay in the occurrence of the Confirmation Hearing or Effective Date, to (A) request that the Bankruptcy Court confirm this Plan in accordance with Bankruptcy Code § 1129(b) with respect to such non-accepting Class, in which case this Plan shall constitute a motion for such relief and/or (B) amend this Plan in accordance with Section XII.A.

## IX.    THE LITIGATION TRUST

### A.    Litigation Trust Agreement

On or before the Effective Date, the Plan Proponents and the Litigation Trustee shall execute the Litigation Trust Agreement, and shall take all other necessary steps to establish the Litigation Trust and the Litigation Trust Interests therein, which shall be for the benefit of the Litigation Trust Beneficiaries and the Reorganized Debtors, as provided in Section II.C.10 herein, whether their Claims are Allowed before, on or after the Effective Date. The Litigation Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the Litigation Trust as a "liquidating trust," to the extent provided herein, for United States federal income tax purposes.

### B.    Purpose of the Litigation Trust

The Litigation Trust shall be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulation § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

### C.    Litigation Trust Assets

On the Effective Date, the Debtors shall transfer all of the Litigation Trust Assets, and the Creditors' Committee shall transfer the Television Sale Committee Allocation, to the Litigation Trust. The Litigation Trust Assets may be transferred subject to certain liabilities, as provided in this Plan or the Litigation Trust Agreement. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar Tax, pursuant to Bankruptcy Code § 1146(a). Upon delivery of the Litigation Trust Assets to the Litigation Trust, the Debtors and their predecessors, successors and assigns, and each other Entity released pursuant to Article X herein shall be discharged and released from all liability with respect to the delivery of such distributions.

### D.    Administration of the Litigation Trust

The Litigation Trust shall be administered by the Litigation Trustee according to the Litigation Trust Agreement and this Plan. In the event of any inconsistency between this Plan and the Litigation Trust Agreement, the Litigation Trust Agreement shall govern.

### E.    The Litigation Trustee

In the event the Litigation Trustee dies, is terminated, or resigns for any reason, a successor shall be designated in accordance with the Litigation Trust Agreement; _provided_, _however_, that under no circumstance shall the Litigation Trustee be a director or officer with respect to any Affiliate of the Litigation Trust.

### F.    Role of the Litigation Trustee

In furtherance of and consistent with the purpose of the Litigation Trust and this Plan, and subject to the terms of the Confirmation Order, this Plan and the Litigation Trust Agreement, the Litigation Trustee shall, among

NAI-1500594528v18

other things, have the following rights, powers and duties: (i) to hold, manage, convert to Cash, and distribute the Litigation Trust Assets, including prosecuting and resolving the Claims belonging to the Litigation Trust, (ii) to hold the Litigation Trust Assets for the benefit of the Litigation Trust Beneficiaries and the Reorganized Debtors, whether their Claims are Allowed on or after the Effective Date, (iii) in the Litigation Trustee's reasonable business judgment, to investigate, prosecute, settle and/or abandon rights, any litigation that may constitute Litigation Trust Assets, or the Causes of Action, and (iv) to file all tax and regulatory forms, returns, reports, and other documents required with respect to the Litigation Trust.

G.    **Transferability of Litigation Trust Interests**

The Litigation Trust Interests shall not be transferable or assignable except by will, intestate succession or operation of law.

H.    **Cash**

The Litigation Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by Bankruptcy Code § 345; *provided*, *however*, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation § 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

I.    **Distribution of Litigation Trust Assets/Litigation Trust Claims Reserve**

The Litigation Trustee shall distribute to the holders of Allowed General Unsecured Claims on account of their Litigation Trust Interests, on or immediately after the Effective Date and on a quarterly basis thereafter, all unrestricted Cash on hand (including any Cash received from the Debtors on the Effective Date, and treating any permissible investment as Cash for purposes of this Section IX.I), except (i) Cash reserved pursuant to the Litigation Trust Agreement to fund the activities of the Litigation Trust, which amount shall not exceed $500,000 on the Effective Date, but which may be increased thereafter in accordance with the provisions of the Litigation Trust Agreement, (ii) such amounts as are allocable to or retained on account of Disputed General Unsecured Claims in accordance with this Section IX.I, and (iii) such additional amounts as are reasonably necessary to (A) meet contingent liabilities and to maintain the value of the Litigation Trust Assets during liquidation, (B) pay reasonable incurred or anticipated expenses (including, but not limited to, any Taxes imposed on or payable by the Litigation Trust or in respect of the Litigation Trust Assets), or (C) as are necessary to satisfy other liabilities incurred or anticipated by the Litigation Trust in accordance with this Plan, or the Litigation Trust Agreement.

Each such Distribution in the aggregate shall be in an amount not less than $100,000 of Available Cash. Notwithstanding the foregoing, the Litigation Trustee may determine, in its sole discretion (i) that the Disbursing Agent shall make a Distribution that is less than $100,000 in the aggregate of Available Cash, or (ii) that the Disbursing Agent shall not make a Distribution to the Holder of a Claim on the basis that the Litigation Trustee has not yet determined whether to object to such Claim and such Claim shall be treated as a Disputed Claim for purposes of Distributions under this Plan until the Litigation Trustee (x) determines not to object to such Claim (or the Claims Objection Bar Date has passed), (y) agrees with the Holder of such Claim to Allow such Claim in an agreed upon amount or (z) objects to such Claim, or objects to the Holder of such Claim's request for allowance of such Claim, and such Claim is Allowed by a Final Order.

On each date of Distribution, the Litigation Trustee shall only distribute Cash to the Holder of an Allowed Claim if the amount of Cash to be distributed on account of such Claim is greater than or equal to $100 in the aggregate unless a request therefor is made in writing to the Litigation Trustee. Any distributions withheld because they are below $100 with respect to any particular holder of an Allowed Claim will be aggregated and distributed when the aggregate amount exceeds $100 or on the final distribution date of the Litigation Trust.

1.    **Amounts Retained on Account of Disputed Claims**

From and after the Effective Date, and until such time as all Disputed Claims have been compromised and settled or determined by order of the Bankruptcy Court, the Litigation Trustee shall retain for the benefit of each

holder of a Disputed Claim, Litigation Trust Interests (and the Cash attributable thereto), in an amount equal to the distributions which would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the Disputed Claim Amount, (ii) the amount in which the Disputed Claim shall be estimated by the Bankruptcy Court pursuant to Bankruptcy Code § 502 for purposes of allowance, which amount, unless otherwise ordered by the Bankruptcy Court, shall constitute and represent the maximum amount in which such Claim may ultimately become an Allowed Claim or (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and the Reorganized Debtors. Except as otherwise provided in this Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the Distributions provided for in this Plan, regardless of whether such Distributions are delivered on or at any time after the Effective Date. No payments or distributions shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof by Final Order.

### 2. Allowance of Disputed Claims

At such time as a Disputed Claim becomes an Allowed Claim, the Litigation Trustee shall distribute to the Holder thereof the distributions, if any, to which such Holder is then entitled under this Plan together, with any interest that has accrued on the amount of Cash, but only to the extent that such interest is attributable to the amount of the Allowed Claim. Such distribution, if any, shall be made as soon as practicable after an order or judgment of the Bankruptcy Court is entered allowing such Disputed Claim becomes a Final Order but in no event more than sixty (60) days thereafter (net of any expenses, including any taxes imposed on or with respect to the Litigation Trust Claims Reserve relating to such Claim).

### J. Costs and Expenses of the Litigation Trust

The reasonable costs and expenses of the Litigation Trust, including the fees and expenses of the Litigation Trustee and its retained professionals and any applicable insurance policies required by the Litigation Trust, shall be paid solely from the Litigation Trust Assets.

### K. Compensation of the Litigation Trustee

The individual(s) serving as or comprising the Litigation Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar roles, the payment of which shall not be subject to the approval of the Bankruptcy Court and be made solely from the assets of the Litigation Trust.

### L. Retention of Professionals/Employees by the Litigation Trustee

The Litigation Trustee may retain and compensate attorneys, other professionals, and employees to assist in its duties as Litigation Trustee on such terms as the Litigation Trustee deems appropriate without Bankruptcy Court approval.

### M. Federal Income Tax Treatment of the Litigation Trust

The Litigation Trust generally is intended to be treated for United States federal income Tax purposes, (i) in part as a grantor trust that is a liquidating trust within the meaning of Treasury Regulations § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, and (ii) in part as one or more disputed ownership funds within the meaning of Treasury Regulations § 1.468B-9(b)(1). For United States federal income tax purposes, the transfer of the Litigation Trust Assets to the Litigation Trust will be treated as a transfer of the Litigation Trust Assets from the Debtors to the Litigation Trust Beneficiaries, followed by the Litigation Trust Beneficiaries' transfer of the Litigation Trust Assets to the Litigation Trust. The Litigation Trust Beneficiaries will thereafter be treated for U.S. federal income tax purposes as the grantors and deemed owners of their respective shares of the Litigation Trust Assets. The Litigation Trust Beneficiaries shall include in their annual taxable incomes, and pay tax to the extent due on, their allocable shares of each item of income, gain, deduction, loss and credit, and all other such items shall be allocated by the Litigation Trustee to the Litigation Trust Beneficiaries using any reasonable allocation method.

NAI-1500594528v18

The Litigation Trustee will be required by the Litigation Trust Agreement to file income Tax returns for the Litigation Trust as a grantor trust of the Litigation Trust Beneficiaries (and file separate returns for the disputed ownership fund(s) pursuant to Treasury Regulations § 1.468B-9(b)(1) and pay all Taxes owed on any net income or gain of the disputed ownership fund(s), on a current basis from Litigation Trust Assets). In addition, the Litigation Trust Agreement will require consistent valuation by the Litigation Trustee and the Litigation Trust Beneficiaries, for all federal income Tax and reporting purposes, of any property held by the Litigation Trust. The Litigation Trust Agreement will provide that termination of the trust will occur no later than five years after the Effective Date, unless the Bankruptcy Court approves an extension based upon a finding that such an extension is necessary for the Litigation Trust to complete its liquidating purpose. The Litigation Trust Agreement also will limit the investment powers of the Litigation Trustee in accordance with IRS Rev. Proc. 94-45 and will require the Litigation Trust to distribute at least annually to the Litigation Trust Beneficiaries (as such may have been determined at such time) its net income (net of any payment of or provision for Taxes), except for amounts retained as reasonably necessary to maintain the value of the Litigation Trust Assets.

### N.        Indemnification of Litigation Trustee

The Litigation Trustee or the individual(s) comprising the Litigation Trustee, as the case may be, and the Litigation Trustee's employees, agents and professionals, shall not be liable to the Litigation Trust Beneficiaries or the Reorganized Debtor for actions taken or omitted in their capacity, except those acts that are determined in a Final Order to have constituted willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all actions or inactions in their capacity, except for any actions or inactions involving willful misconduct or gross negligence.  Any indemnification claim of the Litigation Trustee (and the other parties entitled to indemnification under this subsection) shall be satisfied solely from the Litigation Trust Assets and shall be entitled to a priority distribution therefrom, ahead of the Litigation Trust Interests and any other claim to or interest in such assets.  The Litigation Trustee  shall be entitled to rely, in good faith, on the advice of their retained professionals.

### O.        Privileges and Obligation to Respond to Ongoing Investigations

All attorney-work privileges, work product protections and other immunities or protections from disclosure held by the Debtors shall be transferred, assigned, and delivered to the Litigation Trust, without waiver, and shall vest in the Litigation Trustee solely in its capacity as such (and any other individual the Litigation Trustee may designate, as well as any other individual designated in the Litigation Trust Agreement).  Pursuant to Federal Rule of Evidence 502(d), no Privileges shall be waived by disclosure to the Litigation Trustee of the Debtors' information subject to attorney-client privileges, work product protections, or other immunities or protections from disclosure.

## X.    EFFECT OF CONFIRMATION

### A.        Dissolution of Official Committees

Except to the extent provided herein, upon the Effective Date, the current and former members of the Creditors' Committee and any other creditor, equity or other committee appointed in the Chapter 11 Cases pursuant to Bankruptcy Code § 1102, and their respective officers, employees, counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases; *provided*, *however*, that following the Effective Date the Creditors' Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (1) Claims and/or applications for compensation by Professionals and requests for allowance of Administrative Claims for substantial contribution pursuant to Bankruptcy Code § 503(b)(3)(D); (2) any appeals to which the Creditors' Committee is a party; (3) any adversary proceedings or contested matters as of the Effective Date to which the Creditors' Committee is a party; and (4) responding to creditor inquiries for sixty (60) days following the Effective Date.  Following the completion of the Creditors' Committee's remaining duties set forth above,  the Creditors' Committee shall be dissolved, and the retention or employment of the Creditors' Committee's respective attorneys, accountants and other agents shall terminate.  As discussed in Section III.I above, the Litigation Trust shall have the authority to prosecute and settle the Causes of Action after the Effective Date.

B.      **Discharge of Claims and Interests**

Except as provided in this Plan or in the Confirmation Order, the rights afforded under this Plan and the treatment of Claims and Interests under this Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims and Interests arising or existing on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date.  From and after the Effective Date, the Debtors shall be discharged from any and all Claims and Interests that arose or existed prior to the Effective Date, subject to the obligations of the Debtors under this Plan.

C.      **Injunctions**

AS OF THE EFFECTIVE DATE, EXCEPT WITH RESPECT TO THE OBLIGATIONS OF THE REORGANIZED DEBTORS UNDER THIS PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, CURRENTLY HOLD OR MAY HOLD ANY CLAIMS OR INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION OR LIABILITIES THAT ARE WAIVED, DISCHARGED OR RELEASED UNDER THIS PLAN SHALL BE PERMANENTLY ENJOINED FROM TAKING ANY OF THE FOLLOWING ENFORCEMENT ACTIONS AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED PARTIES OR ANY OF THEIR RESPECTIVE ASSETS OR PROPERTY ON ACCOUNT OF ANY SUCH WAIVED, DISCHARGED OR RELEASED CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION OR LIABILITIES: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING; (2) ENFORCING, LEVYING, ATTACHING, COLLECTING OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE OR ORDER; (3) CREATING, PERFECTING OR ENFORCING ANY LIEN OR ENCUMBRANCE; (4) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY DEBT, LIABILITY OR OBLIGATION DUE TO ANY DEBTOR, REORGANIZED DEBTOR OR RELEASED PARTY; AND (5) COMMENCING OR CONTINUING ANY ACTION, IN ANY MANNER, IN ANY PLACE TO ASSERT ANY CLAIM WAIVED, DISCHARGED OR RELEASED UNDER THIS PLAN OR THAT DOES NOT OTHERWISE COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THIS PLAN.

EXCEPT AS EXPRESSLY PROVIDED IN THIS PLAN, THE CONFIRMATION ORDER, OR A SEPARATE ORDER OF THE BANKRUPTCY COURT, OR AS AGREED TO BY A HOLDER OF A CLAIM OR INTEREST AND THE REORGANIZED DEBTORS (ON BEHALF OF THE TV DEBTORS), ALL ENTITIES (OTHER THAN THE DEBTORS) WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN ANY OR ALL OF THE TV DEBTORS (WHETHER PROOF OF SUCH CLAIMS OR INTERESTS HAS BEEN FILED OR NOT), ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS OR PRINCIPALS, ARE PERMANENTLY ENJOINED, ON AND AFTER THE EFFECTIVE DATE, SOLELY WITH RESPECT TO ANY CLAIMS OR INTERESTS THAT ARE TREATED PURSUANT TO THIS PLAN, FROM (I) COMMENCING, CONDUCTING, OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION, OR OTHER PROCEEDING OF ANY KIND (INCLUDING, WITHOUT LIMITATION, ANY PROCEEDING IN A JUDICIAL, ARBITRAL, ADMINISTRATIVE OR OTHER FORUM) AGAINST OR AFFECTING THE PROPERTY OF THE DEBTORS, (II) ENFORCING, LEVYING, ATTACHING (INCLUDING, WITHOUT LIMITATION, ANY PREJUDGMENT ATTACHMENT), COLLECTING, OR OTHERWISE RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE PROPERTY OF ANY OF THE DEBTORS, (III) CREATING, PERFECTING, OR OTHERWISE ENFORCING IN ANY MANNER DIRECTLY OR INDIRECTLY, ANY ENCUMBRANCE OF ANY KIND AGAINST THE PROPERTY OF ANY OF THE DEBTORS, (IV) ASSERTING ANY RIGHT OF SETOFF, DIRECTLY OR INDIRECTLY, AGAINST ANY OBLIGATION DUE OF ANY OF THE DEBTORS, EXCEPT AS CONTEMPLATED OR ALLOWED BY THIS PLAN; (V) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THIS PLAN; AND (VI) TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THIS PLAN.

- 43 -

D.    Exculpation

FROM AND AFTER THE EFFECTIVE DATE, THE EXCULPATED PARTIES, THE DEBTORS AND THE REORGANIZED DEBTORS SHALL NEITHER HAVE NOR INCUR ANY LIABILITY TO ANY ENTITY, AND NO HOLDER OF A CLAIM OR INTEREST, NO OTHER PARTY IN INTEREST AND NONE OF THEIR RESPECTIVE REPRESENTATIVES SHALL HAVE ANY RIGHT OF ACTION AGAINST ANY DEBTOR, REORGANIZED DEBTOR, EXCULPATED PARTY OR ANY OF THEIR RESPECTIVE REPRESENTATIVES FOR ANY ACT TAKEN OR OMITTED TO BE TAKEN BEFORE THE EFFECTIVE DATE IN CONNECTION WITH, RELATED TO OR ARISING OUT OF THE CHAPTER 11 CASES, THE DEBTORS OR THE NEGOTIATION, CONSIDERATION, FORMULATION, PREPARATION, DISSEMINATION, IMPLEMENTATION, CONFIRMATION OR CONSUMMATION OF THIS PLAN, THE EXHIBITS, THE DISCLOSURE STATEMENT, ANY AMENDMENTS TO ANY OF THE FOREGOING OR ANY OTHER TRANSACTIONS PROPOSED IN CONNECTION WITH THE CHAPTER 11 CASES OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO OR ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION THEREWITH OR IN CONNECTION WITH ANY OTHER OBLIGATIONS ARISING UNDER THIS PLAN OR THE OBLIGATIONS ASSUMED HEREUNDER; *PROVIDED*, *HOWEVER*, THAT THE FOREGOING PROVISIONS OF THIS SECTION X.D SHALL HAVE NO EFFECT ON:  (1) THE LIABILITY OF ANY ENTITY THAT WOULD OTHERWISE RESULT FROM THE FAILURE TO PERFORM OR PAY ANY OBLIGATION OR LIABILITY UNDER THIS PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT PREVIOUSLY ASSUMED OR TO BE ENTERED INTO OR DELIVERED IN CONNECTION WITH THIS PLAN OR (2) THE LIABILITY OF ANY EXCULPATED PARTY THAT WOULD OTHERWISE RESULT FROM ANY ACT OR OMISSION OF SUCH EXCULPATED PARTY TO THE EXTENT THAT SUCH ACT OR OMISSION IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT (INCLUDING FRAUD).

E.    Debtor Release

WITHOUT LIMITING ANY OTHER APPLICABLE PROVISIONS OF, OR RELEASES CONTAINED IN, THIS PLAN, AS OF THE EFFECTIVE DATE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEBTORS AND THE REORGANIZED DEBTORS, ON BEHALF OF THEMSELVES AND THEIR AFFILIATES, THE ESTATES AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS AND ANY AND ALL ENTITIES WHO MAY PURPORT TO CLAIM BY, THROUGH, FOR OR BECAUSE OF THEM, SHALL FOREVER RELEASE, WAIVE AND DISCHARGE ALL LIABILITIES THAT THEY HAVE, HAD OR MAY HAVE AGAINST A DEBTOR, THE ESTATES, ANY RELEASED PARTY WITH RESPECT TO THE CHAPTER 11 CASES, THE NEGOTIATION, CONSIDERATION, FORMULATION, PREPARATION, DISSEMINATION, IMPLEMENTATION, CONFIRMATION OR CONSUMMATION OF THIS PLAN, THE EXHIBITS, THE DISCLOSURE STATEMENT, ANY AMENDMENTS THERETO, THE INITIAL DIP CREDIT AGREEMENT, THE INITIAL DIP ORDER, THE MODIFIED DIP CREDIT AGREEMENT, THE MODIFIED DIP ORDER, ANY OF THE NEW SECURITIES AND DOCUMENTS, THE RESTRUCTURING TRANSACTIONS OR ANY OTHER TRANSACTIONS PROPOSED IN CONNECTION WITH THE CHAPTER 11 CASES OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO OR ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION THEREWITH OR IN CONNECTION WITH ANY OTHER OBLIGATIONS ARISING UNDER THIS PLAN OR THE OBLIGATIONS ASSUMED HEREUNDER; *PROVIDED, HOWEVER*, THAT THE FOREGOING PROVISIONS OF THIS SECTION X.E SHALL NOT AFFECT (A) THE LIABILITY OF ANY RELEASED PARTY THAT OTHERWISE WOULD RESULT FROM ANY ACT OR OMISSION TO THE EXTENT THAT ACT OR OMISSION SUBSEQUENTLY IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT (INCLUDING FRAUD), (B) ANY RIGHTS TO ENFORCE THIS PLAN OR THE OTHER CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS OR DOCUMENTS PREVIOUSLY ASSUMED OR TO BE ENTERED INTO OR DELIVERED IN CONNECTION WITH THIS PLAN, (C) EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS PLAN, ANY OBJECTIONS BY THE DEBTORS OR THE REORGANIZED DEBTORS TO CLAIMS OR INTERESTS FILED BY ANY ENTITY AGAINST

ANY DEBTOR AND/OR THE ESTATES, INCLUDING RIGHTS OF SETOFF, REFUND OR OTHER ADJUSTMENTS, (D) THE RIGHTS OF THE DEBTORS TO ASSERT ANY APPLICABLE DEFENSES IN LITIGATION OR OTHER PROCEEDINGS WITH THEIR EMPLOYEES (INCLUDING THE RIGHTS TO SEEK SANCTIONS, FEES AND OTHER COSTS) AND (E) ANY CLAIM OF THE DEBTORS OR REORGANIZED DEBTORS, INCLUDING (BUT NOT LIMITED TO) CROSS-CLAIMS OR COUNTERCLAIMS OR OTHER CAUSES OF ACTION AGAINST EMPLOYEES OR OTHER PARTIES, ARISING OUT OF OR RELATING TO ACTIONS FOR PERSONAL INJURY, WRONGFUL DEATH, PROPERTY DAMAGE, PRODUCTS LIABILITY OR SIMILAR LEGAL THEORIES OF RECOVERY TO WHICH THE DEBTORS OR REORGANIZED DEBTORS ARE A PARTY.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSES OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.  NOTHING HEREIN SHALL ABROGATE APPLICABLE ATTORNEY DISCIPLINARY RULES.

F.      **Third Party Release**

WITHOUT LIMITING ANY OTHER APPLICABLE PROVISIONS OF, OR RELEASES CONTAINED IN, THIS PLAN, AS OF THE EFFECTIVE DATE, IN CONSIDERATION FOR THE OBLIGATIONS OF THE DEBTORS AND THE REORGANIZED DEBTORS UNDER THIS PLAN AND THE CONSIDERATION AND OTHER CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS OR DOCUMENTS TO BE ENTERED INTO OR DELIVERED IN CONNECTION WITH THIS PLAN, EACH CONSENTING CREDITOR SHALL BE DEEMED TO HAVE FOREVER RELEASED AND COVENANTED WITH THE RELEASED PARTIES TO FOREVER RELEASE, WAIVE AND DISCHARGE ALL LIABILITIES IN ANY WAY THAT SUCH ENTITY HAS, HAD OR MAY HAVE AGAINST ANY RELEASED PARTY (WHICH RELEASE SHALL BE IN ADDITION TO THE DISCHARGE OF CLAIMS AND TERMINATION OF INTERESTS PROVIDED HEREIN AND UNDER THE CONFIRMATION ORDER AND THE BANKRUPTCY CODE), IN EACH CASE, RELATING TO A DEBTOR, THE ESTATES, THE CHAPTER 11 CASES, THE NEGOTIATION, CONSIDERATION, FORMULATION, PREPARATION, DISSEMINATION, IMPLEMENTATION, CONFIRMATION OR CONSUMMATION THIS PLAN, THE EXHIBITS, THE DISCLOSURE STATEMENT, ANY AMENDMENTS THERETO, THE INITIAL DIP CREDIT AGREEMENT, THE INITIAL DIP ORDER, THE MODIFIED DIP CREDIT AGREEMENT, THE MODIFIED DIP ORDER, ANY OF THE NEW SECURITIES AND DOCUMENTS, THE RESTRUCTURING TRANSACTIONS OR ANY OTHER TRANSACTIONS IN CONNECTION WITH THE CHAPTER 11 CASES OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO OR ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION THEREWITH OR IN CONNECTION WITH ANY OTHER OBLIGATIONS ARISING UNDER THIS PLAN OR THE OBLIGATIONS ASSUMED HEREUNDER; *PROVIDED*, *HOWEVER*, THAT THE FOREGOING PROVISION OF THIS SECTION X.F SHALL HAVE NO EFFECT ON:  (A) THE LIABILITY OF ANY ENTITY THAT WOULD OTHERWISE RESULT FROM THE FAILURE TO PERFORM OR PAY ANY OBLIGATION OR LIABILITY UNDER THIS PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT PREVIOUSLY ASSUMED OR TO BE ENTERED INTO OR DELIVERED IN CONNECTION WITH THIS PLAN; (B) THE LIABILITY OF ANY RELEASED PARTY THAT WOULD OTHERWISE RESULT FROM ANY ACT OR OMISSION OF SUCH RELEASED PARTY TO THE EXTENT THAT SUCH ACT OR OMISSION IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT (INCLUDING FRAUD); OR (C) ANY NON-CONSENTING CREDITOR.

NAI-1500594528v18

**ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE AN ORDER APPROVING THE ASSUMPTIONS OR REJECTIONS OF SUCH EXECUTORY CONTRACTS AND UNEXPIRED LEASES AS SET FORTH IN THIS PLAN, ALL PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSES OF ACTION RELEASED PURSUANT TO THE THIRD PARTY RELEASE.  NOTHING HEREIN SHALL ABROGATE APPLICABLE ATTORNEY DISCIPLINARY RULES.**

G.      **Votes Solicited in Good Faith**

The Plan Proponents have, and upon confirmation of this Plan shall be deemed to have, solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Plan Proponents (and each of their respective affiliates, agents, directors, officers, members, employees, advisors, and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of the securities offered and sold under this Plan and therefore have not, and on account of such offer and issuance will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or the offer or issuance of the securities offered and distributed under this Plan.

**XI.      RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases after the Effective Date as is legally permissible, including jurisdiction to:

(1)      Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the amount, allowance, priority or classification of Claims or Interests;

(2)      Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan for periods ending on or before the Effective Date;

(3)      Resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

(4)      Ensure that distributions to Holders of Claims are accomplished pursuant to the provisions of this Plan;

(5)      Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications Filed in the Bankruptcy Court involving any Debtor or any Reorganized Debtor that may be pending on the Effective Date or brought thereafter;

(6)      Enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with this Plan, the Disclosure Statement or the Confirmation Order;

NAI-1500594528v18

(7)     Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of this Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to this Plan or any Entity's rights arising from or obligations incurred in connection with this Plan or such documents, *provided*, *however* that such retention of jurisdiction shall not extend to the New P&A/Ultimates Facility or other indebtedness documents on and after the Effective Date;

(8)     Modify this Plan before or after the Effective Date pursuant to Bankruptcy Code § 1127; modify the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with this Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan;

(9)     Hear and determine any matter, case, controversy, suit, dispute, RKA Causes of Action, or Causes of Action regarding the existence, nature and scope of the releases, injunctions, and exculpation provided under this Plan, and issue injunctions, enforce the injunctions contained in this Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to implement, enforce or restrain interference by any Entity with respect to the consummation, implementation or enforcement of this Plan or the Confirmation Order, including the releases, injunctions, and exculpation provided under this Plan;

(10)    Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or distributions pursuant to this Plan are enjoined or stayed;

(11)    Determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, the Disclosure Statement or the Confirmation Order;

(12)    Enforce, clarify or modify any orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

(13)    Enter a final decree closing the Chapter 11 Cases;

(14)    Determine matters concerning state, local and federal Taxes in accordance with Bankruptcy Code §§ 346, 505 and 1146, including any Disputed Claims for Taxes;

(15)    Recover all assets of the Debtors and their Estates, wherever located; and

(16)    Hear any other matter over which with the Bankruptcy Court has jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set forth in Section XI, the provisions of this Section XI shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## XII.    MISCELLANEOUS PROVISIONS

### A.    Amendment or Modification of this Plan

Subject to the restrictions on modifications set forth in Bankruptcy Code § 1127, the Plan Proponents reserve the right to alter, amend or modify this Plan before its substantial consummation; *provided* any such alterations, amendments or modifications are in form and substance reasonably acceptable to each of the Plan Proponents.  Prior to the Effective Date, the Plan Proponents may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court.  Holders of Claims that have

accepted this Plan shall be deemed to have accepted this Plan, as amended, modified, or supplemented, if the proposed amendment, modification, or supplement does not materially and adversely change the treatment of the Claim of such Holder; *provided*, *however*, that any Holders of Claims who were deemed to accept this Plan because such Claims were Unimpaired shall continue to be deemed to accept this Plan only if, after giving effect to such amendment, modification, or supplement, such Claims continue to be Unimpaired.

### B.    Revocation of this Plan

The Plan Proponents reserve the right to revoke or withdraw this Plan as to any or all of the Debtors prior to the Confirmation Date or at the Confirmation Hearing.  If the Plan Proponents revoke or withdraw this Plan as to any or all of the Debtors, or if Confirmation as to any or all of the Debtors does not occur, then this Plan shall be null and void in all respects with respect to such Debtors for whom this Plan has been revoked or withdrawn, and nothing contained in this Plan shall:  (1) prejudice in any manner the rights of any such Debtor(s) or any other party in interest with respect to such Debtor(s); or (2) constitute an admission of any sort by any such Debtor(s) or any other party in interest with respect to such Debtor(s).  The revocation or withdrawal of this Plan with respect to one or more Debtors shall not require the re-solicitation of this Plan with respect to the remaining Debtors.

### C.    Conversion or Dismissal of Certain of the Chapter 11 Cases

If the requisite Classes do not vote to accept this Plan or the Bankruptcy Court does not confirm this Plan, the Plan Proponents reserve the right to have any Debtor's Chapter 11 Case dismissed or converted, or to liquidate or dissolve any Debtor under applicable non-bankruptcy procedure or chapter 7 of the Bankruptcy Code.

### D.    Inconsistency

In the event of any inconsistency among this Plan, the Disclosure Statement, or any exhibit or schedule to the Disclosure Statement, the provisions of this Plan shall govern.

### E.    Exhibits / Schedules

All exhibits and schedules to this Plan, including the Plan Supplement, are incorporated into and constitute a part of this Plan as if set forth herein.

### F.    Bankruptcy Code § 1145 Exemption

To the maximum extent provided by Bankruptcy Code § 1145(a), the Reorganized Relativity Holdings Preferred Units and Reorganized Relativity Holdings Common Units issued under this Plan shall be exempt from registration under the Securities Act and any state's securities law registration requirements and all rules and regulations promulgated thereunder.

### G.    Exemption from Transfer Taxes

Pursuant to Bankruptcy Code § 1146(a), the issuance, transfer, or exchange of notes or equity securities under or in connection with this Plan, including the Reorganized Relativity Holdings Preferred Units and Reorganized Relativity Holdings Common Units issued pursuant to this Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Plan, including any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under this Plan (including, without limitation, the New P&A/Ultimates Facility, the Restructuring Transactions, and the creation of the Litigation Trust), shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

**H.**      **Request for Expedited Determination of Taxes**

Reorganized Relativity Holdings or any Reorganized Debtor may request an expedited determination under Bankruptcy Code § 505(b) with respect to tax returns filed, or to be filed, on behalf of the Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date.

**I.**      **Severability**

If prior to the entry of the Confirmation Order, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court may, at the request of the Plan Proponents, alter and interpret such term or provision to the extent necessary to render it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as so altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remaining terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**J.**      **Governing Law**

Except to the extent that (1) the Bankruptcy Code or other federal law is applicable or (2) an exhibit or schedule to this Plan or the Disclosure Statement or any agreement entered into with respect to any of the Restructuring Transactions provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit, schedule or agreement), the rights, duties, and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws that would require application of the laws of another jurisdiction.

**K.**      **No Admissions**

If the Effective Date does not occur, this Plan shall be null and void in all respects, and nothing contained in this Plan shall (1) constitute a waiver or release of any claims by or against, or any interests in, any of the Debtors or any other Entity, (2) prejudice in any manner the rights of any of the Debtors or any other Entity, or (3) constitute an admission of any sort by any of the Debtors or any other Entity.

**L.**      **Successors and Assigns**

The rights, benefits and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

**M.**      **Service of Documents**

To be effective, any pleading, notice or other document required by this Plan or the Confirmation Order to be served on or delivered to counsel to the Debtors, the Reorganized Debtors and the Creditors' Committee must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

NAI-1500594528v18

| Attorneys for the Plan Co-Proponent and Debtors | Attorneys for the Manchester Parties |
|---|---|
| JONES DAY | |
| Richard L. Wynne, Esq. | O'MELVENY & MYERS LLP |
| Bennett L. Spiegel, Esq. | Evan M. Jones |
| Lori Sinanyan, Esq. (admitted *pro hac vice*) | Daniel S. Shamah |
| 222 East 41st Street | 400 South Hope Street |
| New York, NY 10017 | Los Angeles, CA 90071 |
| Tel: (212) 326-3939 | Telephone: (213) 430-6236 |
| Fax: (212) 755-7306 | Facsimile: (213) 430-6407 |
| - and - | |
| | - and - |
| SHEPPARD MULLIN RICHTER & HAMPTON  LLP | |
| Craig A. Wolfe, Esq. | ROPES & GRAY LLP |
| Malani J. Cademartori, Esq. | Keith H. Wofford |
| Blanka K. Wolfe, Esq. | James A. Wright III |
| 30 Rockefeller Plaza | 1211 Avenue of the Americas |
| New York, NY 10112 | New York, NY 10036-8704 |
| Tel:  (212) 653-8700 | Telephone: (212) 596-9000 |
| Fax: (212) 653-8701 | Facsimile: (212) 596-9090 |
| **Attorneys for Plan Co-Proponent Kavanaugh** | |
| SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP | SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP |
| Van C. Durrer II | Shana Elberg |
| David C. Eisman | 4 Times Square |
| 300 South Grand Avenue, Suite 3400 | New York, New York 10036 |
| Los Angeles, California 90071 | Telephone: (212) 735-3000 |
| Telephone: (213) 687-5000 | Facsimile: (212) 735-2000 |
| Facsimile: (213) 687-5600 | |
| **United States Trustee** | **Attorneys for the Creditors' Committee** |
| OFFICE OF THE UNITED STATES TRUSTEE | TOGUT, SEGAL & SEGAL LLP |
| Serene Nakano | Albert Togut |
| Susan D. Golden | Frank Oswald |
| 201 Varick Street, Room 1006 | One Penn Plaza, Suite 3335 |
| New York, New York 10014 | New York, NY 10119 |
| Telephone:  (212) 510-0500 | Telephone: (212) 594-5000 |
| Facsimile:  (212) 668-2255 | Facsimile: (212) 967-4258 |

**XIII.    CONFIRMATION REQUEST**

The Plan Proponents request Confirmation of this Plan pursuant to Bankruptcy Code § 1129.

Dated: December 14, 2015

Respectfully submitted,

Relativity Holdings, LLC, on its own behalf and on behalf of each affiliate Debtor

By:      /s/ **Ryan Kavanaugh**
Name:    Ryan Kavanaugh
Title:    Chief Executive Officer of Relativity Holdings, LLC.

**JONES DAY**
Richard L. Wynne
Bennett L. Spiegel
Lori Sinanyan (admitted *pro hac vice*)
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

ATTORNEYS FOR THE PLAN CO-PROPONENT,
DEBTORS AND DEBTORS IN POSSESSION

**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
Craig A. Wolfe
Malani J. Cademartori
Blanka K. Wolfe
30 Rockefeller Plaza
New York, New York
Telephone:  (212) 653-8700
Facsimile:  (212) 653-8701

ATTORNEYS FOR THE
DEBTORS AND DEBTORS IN POSSESSION

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
Van C. Durrer II
Shana Elberg
4 Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

ATTORNEYS FOR THE PLAN CO-PROPONENT KAVANAUGH

NAI-1500594528v18

# **EXHIBIT A**

## **LIST OF DEBTORS**

| # | Debtor | Last Four Digits of Tax ID Number |
|---|---|---|
| 1. | 21 & Over Productions, LLC | 7796 |
| 2. | 3 Days to Kill Productions, LLC | 5747 |
| 3. | A Perfect Getaway P.R., LLC | 9252 |
| 4. | A Perfect Getaway, LLC | 3939 |
| 5. | Armored Car Productions, LLC | 2750 |
| 6. | Best of Me Productions, LLC | 1490 |
| 7. | Black Or White Films, LLC | 6718 |
| 8. | Blackbird Productions, LLC | 8037 |
| 9. | Brant Point Productions, LLC | 9994 |
| 10. | Brick Mansions Acquisitions, LLC | 3910 |
| 11. | Brilliant Films, LLC | 0448 |
| 12. | Brothers Productions, LLC | 9930 |
| 13. | Brothers Servicing, LLC | 5849 |
| 14. | Catfish Productions, LLC | 7728 |
| 15. | Cine Productions, LLC | 8359 |
| 16. | CinePost, LLC | 8440 |
| 17. | Cisco Beach Media, LLC | 8621 |
| 18. | Cliff Road Media, LLC | 7065 |
| 19. | Den of Thieves Films, LLC | 3046 |
| 20. | Don Jon Acquisitions, LLC | 7951 |
| 21. | DR Productions, LLC | 7803 |
| 22. | Einstein Rentals, LLC | 5861 |
| 23. | English Breakfast Media, LLC | 2240 |
| 24. | Furnace Films, LLC | 3558 |
| 25. | Gotti Acquisitions, LLC | 6562 |
| 26. | Great Point Productions, LLC | 5813 |
| 27. | Guido Contini Films, LLC | 1031 |
| 28. | Hooper Farm Music, LLC | 3773 |
| 29. | Hooper Farm Publishing, LLC | 3762 |
| 30. | Hummock Pond Properties, LLC | 9862 |
| 31. | Hunter Killer La Productions, LLC | 1939 |
| 32. | Hunter Killer Productions, LLC | 3130 |
| 33. | In The Hat Productions, LLC | 3140 |
| 34. | J&J Project, LLC | 1832 |
| 35. | JGAG Acquisitions, LLC | 9221 |
| 36. | Left Behind Acquisitions, LLC | 1367 |
| 37. | Long Pond Media, LLC | 7197 |
| 38. | Madaket Publishing, LLC | 9356 |
| 39. | Madaket Road Music, LLC | 9352 |
| 40. | Madvine RM, LLC | 0646 |
| 41. | Malavita Productions, LLC | 8636 |
| 42. | MB Productions, LLC | 4477 |
| 43. | Merchant of Shanghai Productions, LLC | 7002 |
| 44. | Miacomet Media LLC | 7371 |
| 45. | Miracle Shot Productions, LLC | 0015 |
| 46. | Most Wonderful Time Productions, LLC | 0426 |
| 47. | Movie Productions, LLC | 9860 |
| 48. | One Life Acquisitions, LLC | 9061 |
| 49. | Orange Street Media, LLC | 3089 |
| 50. | Out Of This World Productions, LLC | 2322 |
| 51. | Paranoia Acquisitions, LLC | 8747 |
| 52. | Phantom Acquisitions, LLC | 6381 |

| #    | Debtor                                    | Last Four Digits of Tax ID Number |
|------|-------------------------------------------|-----------------------------------|
| 53.  | Pocomo Productions, LLC                   | 1069                              |
| 54.  | Relative Motion Music, LLC                | 8016                              |
| 55.  | Relative Velocity Music, LLC              | 7169                              |
| 56.  | Relativity Development, LLC               | 5296                              |
| 57.  | Relativity Fashion, LLC                   | 4571                              |
| 58.  | Relativity Film Finance II, LLC           | 9082                              |
| 59.  | Relativity Film Finance III, LLC          | 8893                              |
| 60.  | Relativity Film Finance, LLC              | 2127                              |
| 61.  | Relativity Films, LLC                     | 5464                              |
| 62.  | Relativity Foreign, LLC                   | 8993                              |
| 63.  | Relativity Holdings LLC                   | 7052                              |
| 64.  | Relativity India Holdings, LLC            | 8921                              |
| 65.  | Relativity Jackson, LLC                   | 6116                              |
| 66.  | Relativity Media LLC                      | 0844                              |
| 67.  | Relativity Media Distribution, LLC        | 0264                              |
| 68.  | Relativity Media Films, LLC               | 1574                              |
| 69.  | Relativity Music Group, LLC               | 9540                              |
| 70.  | Relativity Production LLC                 | 7891                              |
| 71.  | Relativity REAL, LLC                      | 1653                              |
| 72.  | Relativity Rogue, LLC                     | 3333                              |
| 73.  | Relativity Senator, LLC                   | 9044                              |
| 74.  | Relativity Sky Land Asia Holdings, LLC    | 9582                              |
| 75.  | Relativity TV, LLC                        | 0227                              |
| 76.  | Reveler Productions, LLC                  | 2191                              |
| 77.  | RML Acquisitions I, LLC                   | 9406                              |
| 78.  | RML Acquisitions II, LLC                  | 9810                              |
| 79.  | RML Acquisitions III, LLC                 | 9116                              |
| 80.  | RML Acquisitions IV, LLC                  | 4997                              |
| 81.  | RML Acquisitions IX, LLC                  | 4410                              |
| 82.  | RML Acquisitions V, LLC                   | 9532                              |
| 83.  | RML Acquisitions VI, LLC                  | 9640                              |
| 84.  | RML Acquisitions VII, LLC                 | 7747                              |
| 85.  | RML Acquisitions VIII, LLC                | 7459                              |
| 86.  | RML Acquisitions X, LLC                   | 1009                              |
| 87.  | RML Acquisitions XI, LLC                  | 2651                              |
| 88.  | RML Acquisitions XII, LLC                 | 4226                              |
| 89.  | RML Acquisitions XIII, LLC                | 9614                              |
| 90.  | RML Acquisitions XIV, LLC                 | 1910                              |
| 91.  | RML Acquisitions XV, LLC                  | 5518                              |
| 92.  | RML Bronze Films, LLC                     | 8636                              |
| 93.  | RML Damascus Films, LLC                   | 6024                              |
| 94.  | RML Desert Films, LLC                     | 4564                              |
| 95.  | RML Distribution Domestic, LLC            | 6528                              |
| 96.  | RML Distribution International, LLC        | 7796                              |
| 97.  | RML Documentaries, LLC                    | 7991                              |
| 98.  | RML DR Films, LLC                         | 0022                              |
| 99.  | RML Echo Films, LLC                       | 4656                              |
| 100. | RML Escobar Films LLC                     | 0123                              |
| 101. | RML Film Development, LLC                 | 3567                              |
| 102. | RML Films PR, LLC                         | 1662                              |
| 103. | RML Hector Films, LLC                     | 6054                              |
| 104. | RML Hillsong Films, LLC                   | 3539                              |

| # | Debtor | Last Four Digits of Tax ID Number |
|---|---|---|
| 105. | RML IFWT Films, LLC | 1255 |
| 106. | RML International Assets, LLC | 1910 |
| 107. | RML Jackson, LLC | 1081 |
| 108. | RML Kidnap Films, LLC | 2708 |
| 109. | RML Lazarus Films, LLC | 0107 |
| 110. | RML Nina Films, LLC | 0495 |
| 111. | RML November Films, LLC | 9701 |
| 112. | RML Oculus Films, LLC | 2596 |
| 113. | RML Our Father Films, LLC | 6485 |
| 114. | RML Romeo and Juliet Films, LLC | 9509 |
| 115. | RML Scripture Films, LLC | 7845 |
| 116. | RML Solace Films, LLC | 5125 |
| 117. | RML Somnia Films, LLC | 7195 |
| 118. | RML Timeless Productions, LLC | 1996 |
| 119. | RML Turkeys Films, LLC | 8898 |
| 120. | RML Very Good Girls Films, LLC | 3685 |
| 121. | RML WIB Films, LLC | 0102 |
| 122. | RMLDD Financing, LLC | 9114 |
| 123. | Rogue Digital, LLC | 5578 |
| 124. | Rogue Games, LLC | 4812 |
| 125. | Roguelife LLC | 3442 |
| 126. | Safe Haven Productions, LLC | 6550 |
| 127. | Sanctum Films, LLC | 7736 |
| 128. | Santa Claus Productions, LLC | 7398 |
| 129. | Smith Point Productions, LLC | 9118 |
| 130. | Snow White Productions, LLC | 3175 |
| 131. | Spy Next Door, LLC | 3043 |
| 132. | Story Development, LLC | 0677 |
| 133. | Straight Wharf Productions, LLC | 5858 |
| 134. | Strangers II, LLC | 6152 |
| 135. | Stretch Armstrong Productions, LLC | 0213 |
| 136. | Studio Merchandise, LLC | 5738 |
| 137. | Summer Forever Productions, LLC | 9211 |
| 138. | The Crow Productions, LLC | 6707 |
| 139. | Totally Interns, LLC | 9980 |
| 140. | Tribes of Palos Verdes Production, LLC | 6638 |
| 141. | Tuckernuck Music, LLC | 8713 |
| 142. | Tuckernuck Publishing, LLC | 3960 |
| 143. | Wright Girls Films, LLC | 9639 |
| 144. | Yuma, Inc. | 1669 |
| 145. | Zero Point Enterprises, LLC | 9558 |

# **EXHIBIT E**

## **EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE REJECTED**

| NAME OF COUNTERPARTY | TITLE OF CONTRACT | FILM / TV SHOW CONTRACT RELATES TO | DATE OF CONTRACT, IF ANY | DOC. ID | NAME OF RELATIVITY ENTITY PARTY TO AGREEMENT |
|---|---|---|---|---|---|
| **Terminated International Output or Distribution Agreements** | | | | | |
| Tanweer Films FZ, LLC | Output Distribution Agreement | | 3/24/2014 | 20394 | RML Distribution International, LLC |
| Tanweer Films FZ, LLC | Tanweer/ Relativity Output Agreement | | 2/1/2013 | 20391 | RML Distribution International, LLC |
| Tanweer Films FZ, LLC | Output Distribution Agreement | "Best of Me" "Loomis Fargo" | 2/1/2013 | 20377 | RML Distribution International, LLC |
| | | | | | |
| **Cancelled, Unsigned or Otherwise Terminated Contracts** | | | | | |
| Dreamgold Group Corp. | Distribution License Agreement | Dreamgold swem-Latin America | 2/28/2014 | 1107 | Relativity Foreign, LLC |
| KRISCO MEDIA FZC | TRANSMISSION REPORT | MOJAVE. MAN ON CARRION ROAD. | | 23987 | Relativity Foreign, LLC |
| KRISCO MEDIAFZC | LETTER REGARDING TERMINATIOPN NOTICE WITH RESPECT TO MOJAVE/INDIA (THE TERRITORY) | MOJAVE | 8/11/2014 | 3007 | Relativity Foreign, LLC |
| W2MEDIA B.V. | PICTURE CERTIFICATE | UNTITLED AMORED CAR PROJECT | 7/4/2008 | 23006 | Relativity Media Distribution, LLC |
| | | | | | |
| **Operations** | | | | | |
| PGI | Customer Service Order | | | 23690 | Relativity Media, LLC |
| TalentWise Solutions LLC | Sales Order Form | | 12/14/2011 | 41 | Relativity Media, LLC |
| | | | | | |
| **Distribution** | | | | | |
| Overture Films | Sargoy Stein Rosen & Shapiro Letter & Retainer Agreement | | | 3133 | Relativity Media, LLC |
| PENN, SCHOEN, BERLAND ASSOCIATES, LLC (D/B/A VERITES) | AGREEMENT | | | 23697 | RML Distribution Domestic, LLC |

| Terminated Employment Agreements | | | | | |
|---|---|---|---|---|---|
| **LAST NAME** | **FIRST NAME** | **TITLE** | **DEPARTMENT** | **CONTRACT EXPIRATION DATE** | **LAST DAY OF EMPLOYMENT** |
| Adelman | Jason | VP Strategic Partnerships | Joint Venture - Madvine | 9/2/2015 | 7/29/2015 |
| Alvarez | Matt | EVP, Production/President, Multicultural | Production | 8/10/2015 | 10/15/2015 |
| Bevins | Chris | Design Director, M3 Fashion Accelerator | Relativity Fashion | 10/12/2015 | 7/29/2015 |
| Bowen | Robert | President, Music | Music | 12/31/2015 | 10/27/2015 |
| Brenner | Robbie | President, Production & President, 278 Films | Production | 2/23/2017 | 9/18/2015 |
| Brodie | Matthew | EVP, Acquistions | Production | 5/31/2016 | 12/4/2015 |
| Compton | Matthew | VP, Information Technology | IT | 2/17/2015 | 10/6/2015 |
| Courtin | Angela | Chief Marketing Officer | Relativity Digital Corp Ops | 6/30/2017 | 7/29/2015 |
| Dolfi | Martin James | Fashion Agent | Relativity Fashion | 9/15/2016 | 7/29/2015 |
| Fairbourn | Zoe | SVP Strategic Partnership | Joint Venture - Madvine | 1/6/2015 | 7/29/2015 |
| Galano | Laurette | SVP, Marketing Partnerships | International | At Will | 7/29/2015 |
| Goldberg | Lauren | EVP, Corporate Affairs/Deputy General Counsel | Legal - Corporate | 2/4/2015 | 10/21/2015 |
| Goldman | Colin | Editor in Chief | Relativity Digital Corp Ops | 2/17/2016 | 7/29/2015 |
| Grossbach | Mitchell | President | Relativity Fashion | 9/15/2016 | 7/29/2015 |
| Horvath | Sean | President, Strategic Partnerships | Joint Venture - Madvine | 11/9/2016 | 7/29/2015 |
| Hunt | Matthew Leslie | Fashion Agent | Relativity Fashion | 9/15/2016 | 7/29/2015 |
| Matthews | Andrew | Chief Financial Officer | Finance and Accounting | 4/7/2016 | 10/5/2015 |
| Monti | Christian | SVP, International Sales | International | 8/4/2015 | 7/29/2015 |
| Shamo | Greg | Co-Chief Operating Officer | Operations | 2/10/2017 | 10/13/2015 |
| Walters | Happy | Co-President RML & CEO, Relativity Sports | Operations | 6/2/2019 | 7/29/2015 |
| Wilcox | Dylan | SVP, Acquisitions | Production | 10/14/2014 | 7/29/2015 |

## EXHIBIT I

**PROPOSED ALTERNATIVE PLAN TREATMENT FOR RKA**

## Proposed Alternative Plan Treatment

This proposal of alternative treatment pursuant to Relativity's plan or reorganization (the "**Proposal**"), dated as of December 13, 2015, sets forth the principal terms and conditions with the transactions and other matters set forth below. This Proposed Alternative Plan Treatment can be modified as agreed to between the Debtors and RKA.

| | |
|---|---|
| **Background** | Under that certain Second Amended and Restated Funding Agreement, entered into as of June 30, 2014, by and among the Credit Parties, Macquarie US Trading LLC ("**Macquarie**"), as agent for the Lenders (as defined therein), and the Lenders and the joinders thereto (as amended, the "**P&A Funding Agreement**"), RKA Film Financing, LLC ("**RKA**") made Pre-Release Loans (as defined in the P&A Funding Agreement) to the following entities in connection with certain films (and in the following amounts as of August 3, 2015, plus accrued fees and interest): |
| | (i)  Armored Car Productions, LLC  (*Masterminds*) ("**Armored Car**"): $28,657,279.91. |
| | (ii)  DR Productions, LLC (*The Disappointments Room*) ("**DR Productions**"): $18,675,349.75. |
| | (iii)  RML Kidnap Films, LLC (*Kidnap*): $15,045,619.75. |
| | (iv)  RML Somnia Films, LLC (*Somnia*): $21,366,233.61. |
| | (collectively, the "**P&A Borrowers**" and such loans the "**Prepetition P&A Loans**"). *Masterminds, Kidnap, Somnia and Disappointments Room* collectively the "**Films**". RML Distribution Domestic, LLC ("**RML Dist**") and RMLDD Financing, LLC are Credit Parties under the Funding Agreement, along with the P&A Borrowers. The P&A Loans are secured by liens on collateral specified in the applicable loan documents (the "**P&A Collateral**") (consisting principally of the domestic rights with respect to the applicable film). |
| **Domestic Film Release / Governance** | Relativity Media and its affiliates (collectively, "**Relativity**") will release, distribute and/or exploit the Films consistent with how it would release such film in the ordinary course of business. |
| | With respect to *Masterminds* and *Kidnap*, RKA may designate one party ("**RKA Agent**") to, approve: (i) P&A spend (ii) total number of screen release and (iii) release date ("**Release Plans**"). If there is a Third Party Lender, Third Party Lender also shall be entitled to designate one party to approve the Release Plans ("**Third Party Agent**"). In the event the RKA Agent (if there is no Third Party Lender) or, both RKA Agent and Third Party Agent (if there is a Third Party Lender), disagree with Relativity on any of Release Plans, the Parties shall bring such matter to Roy Salter[1] (the "**Independent Manager**") who will be hired by all parties, costs borne equally, who will have final say in such decision. |
| | For all other decisions concerning *Masterminds* or *Kidnap*, RML will |

---

[1]      **NTD**: Subject to confirmation by RKA that Roy Salter is an acceptable Independent Manager. If not, another third party will be mutually selected as Independent Manager.

| | |
|---|---|
| | provide information regarding   all matters relating to the release, distribution and/or exploitation at the request of RKA.<br><br>Relativity shall engage a third-party accountant acceptable to RKA, who shall be provided information regarding all expenditures in connection with *Masterminds* and *Kidnap* and shall provide RKA with such reporting as RKA may reasonably require.<br><br>Relativity may finance and release the Films other than *Masterminds* and *Kidnap* in its discretion, consistent with its normal practices, provided that Relativity shall consult with RKA Agent with respect to the release of such Films.  Relativity shall be entitled to obtain additional financing in connection with the release of such other Films, and such financing may be senior to the Prepetition P&A Loans, provided that there shall be adequate protection for such Prepetition P&A Loans. |
| **Milestones / Remedies** | The documentation of this transaction shall include the following specific milestones in connection with the release of *Masterminds* and *Kidnap*, (the "Milestones and Budget Conditions"):<br><br>(1)    Debtors will have emerged from bankruptcy on or before February 1, 2016;<br><br>(2)    *Masterminds* shall be released on or before September 30, 2016; and<br><br>(3) *Kidnap* shall be released on or before May 13, 2016.<br><br>If (a) any of the Milestones and Budget Conditions does not occur and is not cured within 60 days after notice of such failure is provided to Relativity;  or (b) any event of default occurs under the loan documents related to the Supplemental Funding (as defined below), then, (x) the Litigation Standstill, addressed below, shall cease, and the Stay/Tolling period shall end, allowing for the lifting of any Court-ordered stay in all three actions and the re-filing of any or all those actions by the appropriate party, as applicable and (y) RKA and Third Party Lender (if there is a Third Party Lender) shall have the rights and remedies of a typical secured creditor, including, but not limited to, the right to immediately foreclose and take possession of the films *Masterminds* and *Kidnap* and cause the release and/or exploitation of *Masterminds* or *Kidnap*, subject to the Supplemental Funding documentation. |
| **Supplemental Funding** | In connection with the release plans and an approved budget for each of *Masterminds* and *Kidnap*, RKA and Relativity and/or a third-party (the "**Third Party Lender**") shall provide additional P&A funding  (the "**Supplemental Funding**") in the amounts set forth below.  The parties acknowledge that funding for each of *Masterminds* and *Kidnap* is solely for use in connection with that film and in accordance with the P&A spend and release plan as approved by the RKA Agent, Third Party Agent or Independent Manager as set forth above. |

2

The Supplemental Funding shall be provided on the following terms:

1. <u>Amount</u>. Commitment of up to the amounts set forth below for each of *Masterminds* and *Kidnap* (individually a "**Supplemental Film**," collectively the "**Supplemental Films**"): (the "**Supplemental Funding Amount**"), as needed.

   - *Masterminds* -- \$40,607,686

   - *Kidnap* -- \$27,048,593

2. <u>Funding</u>. The Supplemental Funding shall be provided 51% by RKA and 49% by either Relativity, Third Party Lender or any combination thereof. The principal amount of each lender's Supplemental Funding shall rank pari passu and be funded simultaneously on a dollar-for-dollar pro rata basis. As and when funded by RKA, RKA's portion of the Supplemental Funding Amount shall be held in a segregated account controlled by RKA and to which RKA will retain title with any funds released therefrom solely in accordance with the P&A spend and release plan as approved by the RKA Agent, Third Party Agent or the Independent Manager as set forth above.

3. <u>Use of Funds</u>. Supplemental Funding shall be spent solely in accordance with the approved budget for the applicable Supplemental Film for which the funds were disbursed.

4. <u>Interest/Fees</u>. The Supplemental Funding shall bear interest at the a market rate as agreed to by a supermajority of the Lenders.

5. <u>Control</u>. Enforcement of rights and remedies concerning the Supplemental Funding shall be by authorization by 51% of the lenders under the Supplemental Funding. A supermajority of 66 2/3% of lenders under the Supplemental Funding shall be required to modify the interest rate, outstanding principal amount, maturity date, liens or major covenants of the Supplemental Funding. The documentation of the Supplemental Funding also shall include the terms set forth in Exhibit A.

6. <u>Film Proceeds</u>. Any and all non-refundable receipts (domestic or foreign) actually received by or irrevocably credited to Relativity from the distribution of *Masterminds and Kidnap* (net of applicable third party fees and expenses, including third party collection account/tax intermediary fees and subject to the exclusions listed on Exhibit C hereto)[2] shall be applied on a continuing and rolling basis as follows (for avoidance of doubt, the netflix base rate, soft money and foreign proceeds of the collateral securing the OneWest production loan for *Masterminds* shall first be applied to the production loan for *Masterminds* until such loan is paid in full, before being subjected to the waterfall set forth in this section) without offset or reduction of any kind: [NOTE: FOREIGN PROCEEDS

---

[2]    **NTD:**    These fees are typical costs incurred in connection with the distribution of any film. These fees and expenses are not to be paid to Relativity. A conference can be scheduled to discuss in more detail.

3

ARE INCLUDED IN THE WATERFALL.    NOTE: The waterfall now is cross-collateralized which benefits DR and Before I Wake with proceeds from Masterminds and Kidnap.]

(a) First, to any "off the tops" (as defined in Exhibit B) Residuals, Participations or Guild Payments as set forth on Exhibit C hereto.[3]

(b) Second, to any outstanding principal pursuant to the Supplemental Funding, distributed pro rata on a pari passu basis until the principal amount of the Supplemental Funding has been repaid.

(c) Third, to any additional third party distribution costs actually incurred by Relativity, including, without limitation, trade dues, claims, copyright, trademark and patent costs which are not included in the Supplemental Funding.[4]

(d) Fourth, to any outstanding interest accrued in connection with the Supplemental Financing, distributed in proportion to the amount of interest owing to each.

(e) Fifth, to repay the Prepetition P&A Loans associated with *Masterminds* and *Kidnap*, payable in proportion to the amount outstanding on the respective Prepetition P&A Loan.

(f) Sixth, (A) 50% to the applicable Relativity subsidiary or its designee and (B) 50% to RKA for application to the remaining outstanding Prepetition P&A Loans, with such funds to be allocated in the following priority order:

(i) First, to amounts owed by DR Productions, until that debt that debt is satisfied in full;

(ii) Then, to amounts owed by RML Somnia Films, LLC, until that debt is satisfied in full; and

(iii) Thereafter, 100% to Relativity.

For purposes of clarity, once any Prepetition P&A Loan has been paid in full, RKA will no longer have any rights, remedies or claims with respect to that Film and that Film will be the sole property of RML.

Notwithstanding the foregoing:(i) if Relativity directly distributes soundtrack albums for a Supplemental Film, Relativity shall include a royalty in the receipts of the applicable Supplemental P&A Film equal to 4% of the suggested retail price (or the equivalent wholesale royalty)

---

[3]    **NTD**: Exhibit C to be the participation schedule provided by Sevan Ogulluk on November 10, 2014 with respect to *Masterminds* and *Kidnap*.  These are typical costs, and are not being paid to Relativity.  A conference can be scheduled to discuss in more detail.

[4]    These are typical costs, and are not being paid to Relativity.  A conference can be scheduled to discuss in more detail.

4

|  | for net sales of the album through normal retail channels in the United States and which rate shall be otherwise defined, computed, reduced and accounted for on the most favorable basis that Relativity customarily accounts to third party recipients of royalties in connection with its motion pictures; and (ii) receipts of Puerto Rico, the US Virgin Islands, China and India or the applicable Supplemental P&A Film shall be calculated at the level that RML Dist receives such receipts |
|---|---|
|  | 7. <u>Security</u>.  The Supplemental Funding will be secured by a first priority lien (senior to the Prepetition P&A Loan) on all assets of Armored Car and RML Kidnap Films, LLC (subject to the liens securing the OneWest production loans).  In addition, RKA's portion of the Supplemental Funding Amount  shall be secured in the aggregate by a pledge by Ryan Kavanaugh of 3% of the equity in the reorganized Relativity entities.    NOTE – the security for the Supplemental Financing is now cross-collateralized. |
| **RKA Equity** | Upon closing of the Supplemental Funding, River Birch Funds LLC agrees to transfer to RKA all equity of RKA owned by River Birch Funds LLC, subject to the following:  immediately upon repayment of: (i) the Supplemental Funding; and (ii) the Prepetition P&A Loans, RKA shall waive its rights to the transfer of all equity of RKA owned by River Birch Funds LLC.  Pending the disposition of the equity of RKA held by River Birch Funds LLC, RKA shall hold in escrow any distributions or payments to which River Birch Funds LLC would otherwise be entitled (the "**Escrowed Distributions**") pending the potential waiver. |
| **RKA Attorney Fees** | Relativity shall pay all accrued fees and expenses of RKA (including legal fees) relating to the bankruptcy case of Relativity (not to exceed $2 million in the aggregate) as described below.  For the avoidance of doubt, all accrued fees and expenses, including legal fees, relating to the litigation subject to the Litigation Standstill are deemed not related to the bankruptcy case of Relativity.  The payment of legal fees described above shall be made in equal amortized payments over a period of __ years.  Upon the payment in full of such legal fees, RKA shall waive its right to receive the transfer of the equity of RKA owned by River Birch Funds LLC and shall pay to River Birch Funds LLC all of the Escrowed Distributions. |
| **Litigation Standstill** | All of the parties to the actions styled *RKA Film Financing, LLC v. Ryan Kavanaugh and John Does 1-12*, Index No. 652592/2015 (Sup. Ct. N.Y. Cty.) and *Relativity Media v. RKA Film Financing, LLC*,  Index No. 652594/2015 (Sup. Ct. N.Y. Cty.), shall make a joint application to the Court to stay the actions through the Stay/Tolling Period, which is the earlier of (a) finalization of the 10-year ultimate following the release of *Masterminds* and *Kidnap*; (b) December 1, 2016; or (c) the date upon which any event of default occurs under the Supplemental Funding, including in the event one of the Milestones and Budget Conditions does not occur or is not met and is not cured (to the extent cure is permitted); |

NY\7378039.5
H:\My Documents\Dec 13 RKA Term Sheet-923750-v1.docx

| | |
|---|---|
| | *provided* that if the Court denies the joint application for a stay in whole or part as to any one or all of the three actions, all parties to the three actions agree that each action will be voluntarily dismissed without prejudice and all limitations periods thereafter tolled until the end of the Stay/Tolling Period.  The litigation standstill contemplated herein shall not release or dispose of any claims any party has against any other party and no party may make any representation to any party that any claims have been released or otherwise disposed or settled.<br><br>All of the parties to the action styled *RKA Film Financing, LLC v. Ryan Kavanaugh and River Birch Funds LLC*, Index No. 652481/2015 (Sup. Ct. N.Y. Cty.) shall execute a stipulation of discontinuance with prejudice. |
| **Extension / Amendment of Release Deadlines and Requirements** | Any and all requirements under the applicable intercreditor or other agreements shall be modified to effectuate the transactions contemplated herein, and each party shall take all actions necessary to protect and preserve the respective rights, priorities and liens presently securing the other parties. |
| **Press Release** | RKA will issue a press release mutually agreed by the parties. Notwithstanding the foregoing, such press release shall include, at a minimum, the following messages: "RKA Film Financing, Relativity Media and Ryan Kavanaugh are pleased to jointly announce they have agreed to work cooperatively and constructively to release Relativity's upcoming films—*Masterminds* and *Kidnap*—which they anticipate will be highly successful."<br><br>The parties agree that the above press release shall not be used by Relativity, Ryan Kavanaugh or any successors in interest against RKA, in any Court, mediation, or arbitration, or similar nor shall the same cause the press release to be submitted to any Court or arbitrator without the express consent of RKA |
| **Further Assurances / Information Rights** | The parties will cooperate with one another in good faith to facilitate the foregoing, including using commercially reasonable efforts to obtain any consents from third parties and otherwise to facilitate the arrangements set forth herein. |

6

## Exhibit A

1. Release Milestones/Requirements

    a. Masterminds
        i. Release and marketing plan finalized by debtors and approved by RKA/Third Party Lender or the Independent Manager, as applicable, on or before [____], including a weekly funding schedule
        ii. Trailers and posters to be finalized and approved by film release board on or before [    , 2016]

    b. Kidnap
        i. Release and marketing plan finalized by debtors and approved by RKA/Third Party Lender or the Independent Manager, as applicable, on or before [____]
        ii. Trailers and posters to be finalized and approved by film release board on or before [    , 2016]

    c. Budget controls:
        i. All expenditures will occur solely per the approved release and marketing plan; with any variance approved by RKA/Third Party Lender or the Independent Manager, as applicable.
        ii. Loans will be funded per weekly funding schedule
        iii. RKA/Third Party Lender shall have customary expenditure audit/review rights

2. Process Milestones/Requirements (in addition to customary terms for facilities of this nature)
    a. An order approving the Masterminds/Kidnap P&A facilities acceptable to RKA/Third Party Lender shall have been entered on or before February 1, 2015, shall have become final and non-appealable on or before February 15, 2015(and shall not have been appealed)

3. Conditions Precedent/Additional Defaults (in addition to customary defaults for facilities of this nature)
    a. CIT shall have consented to waterfall and structure
    b.
    c. Reorganized Debtors shall have sufficient liquidity and committed financing to operate in the ordinary course of business through emergence and for at least six months following the  latest release deadline for the films
    d. Reorganized Debtors will have a committed post-release P&A facility and ultimates facility with a commitments to make post-release P&A loans on Masterminds and Kidnap on terms reasonably acceptable to RKA

EXHIBIT "B"

**EXCLUSIONS FROM RECEIPTS; OFF THE TOPS**

EXCLUSIONS FROM RECEIPTS:

(1)    Box office receipts, concession receipts, entrance or ride receipts, and any other receipts of any theater or other exhibitor or any amusement/theme park; and receipts of: broadcasters and other transmitters, including radio and television broadcasters/transmitters (such as "free", "pay", "basic cable", and "pay-per-view") that are broadcasting and/or transmitting by any means or devices whether now known or hereafter devised, including over-the-air, cable, closed circuit, satellite, microwave, laser, and the like; book or music publishers; wholesale or retail distributors, licensors, or sellers of video devices; phonograph record or tape producers, distributors, or stores; and merchandisers or any other similar users.  [NOTE:  A portion of this has been deleted to be consistent with the footnotes required by RKA – deletion reflected in the redline.]

(2)    Amounts collected or withheld as taxes or for payment of taxes, such as admission, sales, use, or value added taxes.

(3)    Amounts received from advance payments or security deposits unless non-refundable, earned by exhibition or broadcast, or forfeited or applied by Relativity to the applicable Supplemental Film.

(4)    The amounts of all actual adjustments, credits, allowances, rebates and refunds given or made to subdistributors, exhibitors and licensees made in good faith on an arm's length basis.

(5)    Amounts are not deemed Receipts or received unless paid in U.S. dollars in the U.S. or payable in a foreign currency that is not restricted and could be remitted in U.S. dollars to the U.S.; provided, however, if such currency is restricted and Relativity or any of its or their affiliated or related entities receives the benefit of such funds outside the United States, the amount of such funds shall be included in Receipts hereunder.

(6)    Receipts from subsequent productions or any other derivative productions.

(7)    Receipts shall not include reimbursements to Relativity of expenses, "soft money," or other revenues not derived from the license of rights.

"Off The Tops" shall mean on a continuing and rolling basis: conversion, checking and

collection costs; trade association fees and piracy costs; licensing costs; taxes; copyright,

8

trademark and patent costs (including royalties); third party administration costs of a collection

account; and reserves for the foregoing costs (to be liquidated within twelve (12) months (unless

there is any claim or litigation pending [for which formal legal action must be commenced

within a one year period from and after the date such reserve was established, failing which, such

reserved amounts shall be liquidated at the end of such one year period], or twenty four (24)

months with respect to residual reserves).   With respect to the foregoing there shall be (1) a cap

of 1% of the Receipts of the applicable Supplemental Film for checking costs, and (2) a cap of

$250,000  in the aggregate for United States trade association fees.

NY\7378039.5
H:\My Documents\Dec 13 RKA Term Sheet-923750-v1.docx

## **EXHIBIT B**

Blackline Against Plan Filed on November 18, 2015

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RELATIVITY FASHION, LLC, *et al.*,[1] | Case No. 15-11989 (MEW) |
| Debtors. | (Jointly Administered) |

**FIRST AMENDED PLAN PROPONENTS' PLAN OF REORGANIZATION
PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**Nothing contained herein shall constitute an offer, acceptance, or a legally binding obligation of the Debtors or any other party in interest.  This Plan is subject to approval of the Bankruptcy Court and other customary conditions.  This Plan is not an offer with respect to any securities.  Acceptances or rejections with respect to this Plan may not be solicited until a disclosure statement has been approved by the Bankruptcy Court in accordance with Bankruptcy Code § 1125.  Such a solicitation will only be made in compliance with applicable provisions of securities and bankruptcy laws.  YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.**

| | |
|---|---|
| Richard L. Wynne | Craig A. Wolfe |
| Bennett L. Spiegel | Malani J. Cademartori |
| Lori Sinanyan (admitted *pro hac vice*) | Blanka K. Wolfe |
| **JONES DAY** | **SHEPPARD MULLIN RICHTER & HAMPTON LLP** |
| 222 East 41st Street | 30 Rockefeller Plaza |
| New York, New York 10017 | New York, New York |
| Telephone:  (212) 326-3939 | Telephone:  (212) 653-8700 |
| Facsimile:  (212) 755-7306 | Facsimile:  (212) 653-8701 |
| ATTORNEYS FOR THE PLAN CO-PROPONENT, DEBTORS AND DEBTORS IN POSSESSION | ATTORNEYS FOR THE PLAN CO-PROPONENT, DEBTORS AND DEBTORS IN POSSESSION |

Van C. Durrer II
Shana Elberg
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
4 Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

ATTORNEYS FOR PLAN CO-PROPONENT, KAVANAUGH

Dated: ~~November 18,~~ December 14, 2015

---

[1]     The Debtors in these ~~chapter~~Chapter 11 ~~cases~~Cases are as set forth on Exhibit A.

TABLE OF CONTENTS

Page

I.    DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION
      OF TIME ...................................................................................................... 1
      A.    Defined Terms .................................................................................. 1
      B.    Rules of Interpretation and Computation of Time ....................... 13̶14

II.   CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ........... 13̶15
      A.    Treatment of Unclassified Claims ................................................ 13̶15
      B.    Classification of Claims and Interests ......................................... 15̶17
      C.    Treatment of Classified Claims .................................................... 19̶21
      D.    Special Provision Regarding Prepetition Intercompany Claims .......... 25
      D̶E.   Special Provision Governing Unimpaired Claims ...................... 23̶25
      E̶F.   Postpetition Interest on General Unsecured Claims .................. 23̶25
      F̶G.   Insurance ........................................................................................ 23̶25

III.  MEANS OF IMPLEMENTATION ................................................................. 23̶25
      A.    Issuance of Reorganized Relativity Holdings Preferred Units ........... 23̶25
      B.    Issuance of Reorganized Relativity Holdings Common Units ........... 24̶26
      C.    Issuance of Reorganized Relativity Holdings Warrants ............. 24̶26
      D.    Continued Corporate Existence and Vesting of Assets in the Reorganized
            Debtors ......................................................................................... 25̶27
      E.    Restructuring Transactions ........................................................... 25̶27
      F.    Sources of Cash for Plan Distributions ....................................... 26̶28
      G.    Corporate Governance, Managers and Officers, Employment-Related
            Agreements and Compensation Programs; Other Agreements ........... 26̶28
      H.    New P&A/Ultimates Facility ....................................................... 28̶30
      I.    Preservation of Rights̶Causes of Action ..................................... 28̶30
      J.    Reinstatement and Continuation of Insurance Policies ............... 28̶30
      K.    Entry into CBA Assumption Agreements .................................... 28̶30
      L.    Cancellation and Surrender of Instruments, Securities and Other
            Documentation .............................................................................. 28̶30
      M.    Release of Liens ............................................................................ 29̶31
      N.    Effectuating Documents; Further Transactions ........................... 29̶31

IV.   TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........ 29̶31
      A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ....... 29̶31
      B.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ..... 30̶32
      C.    Claims Based on Rejection of Executory Contracts and Unexpired Leases ...... 30̶33

<div align="center">

**TABLE OF CONTENTS**
**(continued)**

</div>

<div align="right">

**Page**

</div>

| | | | |
|---|---|---|---|
| D. | Contracts and Leases Entered Into After the Petition Date | | 3133 |
| E. | Reservation of Rights | | 3133 |
| F. | Pre-Existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases | | 3133 |
| G. | Certain Compensation and Benefit Programs | | 3133 |
| H. | Obligations to Insure and Indemnify Directors, Officers and Employees | | 3234 |
| I. | Reservation of Rights | | 34 |
| V. | PROVISIONS GOVERNING DISTRIBUTIONS | | 3234 |
| A. | Distributions for Allowed Claims as of the Effective Date | | 3234 |
| B. | Undeliverable Distributions | | 3234 |
| C. | Compliance with Tax Requirements | | 3235 |
| D. | Distribution Record Date | | 3335 |
| E. | Setoffs | | 3335 |
| F. | Distributions to Holders of Disputed Claims | | 3336 |
| G. | Allocation Between Principal and Accrued Interest | | 3436 |
| VI. | DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS | | 3436 |
| A. | Allowance of Claims | | 3436 |
| B. | Prosecution of Objections to Claims | | 3436 |
| C. | Estimation of Claims | | 3436 |
| D. | Expungement or Adjustment to Claims Without Objection | | 3537 |
| E. | Deadline to File Objections to Claims | | 37 |
| EF. | Disallowance of Certain Claims | | 3537 |
| FG. | Offer of Judgment | | 3537 |
| GH. | Amendments to Claims | | 3537 |
| VII. | CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN | | 3537 |
| A. | Conditions to the Effective Date | | 3537 |
| B. | Waiver of Conditions to Effective Date | | 3638 |
| C. | EffectEffects of Nonoccurrence of Conditions to the Effective Date | | 3638 |
| VIII. | NON-CONSENSUAL CONFIRMATION | | 3638 |
| IX. | THE LITIGATION TRUST | | 3638 |
| A. | Litigation Trust Agreement | | 3638 |
| B. | Purpose of the Litigation Trust | | 3639 |
| C. | Litigation Trust Assets | | 3639 |

<div align="center">

- ii -

</div>

TABLE OF CONTENTS
(continued)

| | | | |
|---|---|---|---|
| D. | Administration of the Litigation Trust | | 3739 |
| E. | The Litigation Trustee | | 3739 |
| F. | Role of the Litigation Trustee | | 3739 |
| G. | Transferability of Litigation Trust Interests | | 3739 |
| H. | Cash | | 3739 |
| I. | Distribution of Litigation Trust Assets/Litigation Trust Claims Reserve | | 3740 |
| J. | Costs and Expenses of the Litigation Trust | | 3841 |
| K. | Compensation of the Litigation Trustee | | 3841 |
| L. | Retention of Professionals/Employees by the Litigation Trustee | | 3841 |
| M. | Federal Income Tax Treatment of the Litigation Trust | | 3941 |
| N. | Indemnification of Litigation Trustee | | 3941 |
| O. | Privileges and Obligation to Respond to Ongoing Investigations | | 3942 |
| X. | EFFECT OF CONFIRMATION | | 4042 |
| A. | Dissolution of Official Committees | | 4042 |
| B. | Discharge of Claims and Interests | | 4042 |
| C. | Injunctions | | 4042 |
| D. | Exculpation | | 4143 |
| E. | Debtor Release | | 4144 |
| F. | Third Party Release | | 4245 |
| G. | Votes Solicited in Good Faith | | 4245 |
| XI. | RETENTION OF JURISDICTION | | 4346 |
| XII. | MISCELLANEOUS PROVISIONS | | 4447 |
| A. | Amendment or Modification of the Plan | | 4447 |
| B. | Revocation of the Plan | | 4447 |
| C. | Conversion or Dismissal of Certain of the Chapter 11 Cases | | 4448 |
| D. | Inconsistency | | 4548 |
| E. | Exhibits / Schedules | | 4548 |
| F. | Bankruptcy Code § 1145 Exemption | | 4548 |
| G. | Exemption from Transfer Taxes | | 4548 |
| H. | Request for Expedited Determination of Taxes | | 4548 |
| I. | Severability | | 4548 |
| J. | Governing Law | | 4549 |
| K. | No Admissions | | 4649 |

**TABLE OF CONTENTS**
**(continued)**

|  |  |  | Page |
|---|---|---|---|
| L. | Successors and Assigns | ........................................................ | ~~46~~49 |
| M. | Service of Documents | ........................................................ | ~~46~~49 |
| XIII. | CONFIRMATION REQUEST | ........................................................ | ~~47~~50 |

NAI-1500594528v~~12~~18

**TABLE OF EXHIBITS**[2]

**Exhibit A – List of Debtors**

**Exhibit  B – Revised Relativity Holdings Certificate of Formation** – to be filed with the Plan Supplement

**Exhibit  C – Revised Relativity Holdings Operating Agreement** – to be filed with the Plan Supplement

**Exhibit  D –  New Board of Managers of Reorganized Relativity Holdings** – to be filed with the Plan Supplement

**Exhibit  E – Executory Contracts and Unexpired Leases to be Rejected** – ~~to be filed before December 16, 2015 Disclosure Statement Hearing, and amended as necessary~~<u>attached, but to be updated with the Plan Supplement</u>

**Exhibit F – New P&A/Ultimates Facility** – to be filed with the Plan Supplement

**Exhibit G – Litigation Trust Agreement** – to be filed with the Plan Supplement

**Exhibit H – Warrant Agreements** – to be filed with the Plan Supplement

**Exhibit I –** ~~**Retained Claim Term Sheet**~~**<u>Proposed Alternative Plan Treatment for RKA</u>** -- <u>attached</u>

**<u>Exhibit J – Causes of Action</u>** <u>– to be filed by the Creditors' Committee on or before December 16, 2015, but which may be updated with the Plan Supplement</u>

**<u>Exhibit K – Form of Replacement P&A Note</u>**<u>– to be filed with the Plan Supplement</u>

**<u>Exhibit L – Form of Replacement Production Loan Note</u>**<u>– to be filed with the Plan Supplement</u>

---

[2]    The Exhibits not initially appended to the Plan will be Filed as part of the Plan Supplement.  All Exhibits will be made available, free of charge, on the Document Website once they are filed.  Copies of all Exhibits may be obtained from the Notice and Claims Agent by calling 212.771.1128.  The Debtors reserve the right to modify, amend, supplement, restate or withdraw any of the Exhibits after they are Filed and shall promptly make such changes available on the Document Website.

**INTRODUCTION**

Relativity Fashion, LLC and the other Debtors in the above-captioned Chapter 11 Cases together with Ryan C. Kavanaugh, as the Plan Proponents, respectfully propose the following plan for the resolution of outstanding claims against, and interests in, the Debtors pursuant to the Bankruptcy Code (each undefined term, as defined herein).  Holders of claims and interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, liabilities, results of operations, historical financial information, accomplishments during the Chapter 11 Cases, and projections of future operations, as well as a description and summary of ~~the~~this Plan and the distributions to be made thereunder and certain related matters.  The Debtors are proponents of this Plan within the meaning of Bankruptcy Code § 1129.

Other agreements and documents supplementing ~~the~~this Plan are appended as Exhibits hereto and have been or will be Filed with the Bankruptcy Court.  These supplemental agreements and documents are referenced in this Plan and the Disclosure Statement and will be available for review.

**ALL CREDITORS ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THE DISCLOSURE STATEMENT IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.  SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN BANKRUPTCY CODE § 1127, IN BANKRUPTCY RULE 3019 AND IN ~~THE~~THIS PLAN, THE PLAN PROPONENTS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW ~~THE~~THIS PLAN PRIOR TO ITS SUBSTANTIAL CONSUMMATION.**

**I.     DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME**

**A.     Defined Terms**

Capitalized terms used in ~~the~~this Plan and not otherwise defined shall have the meanings set forth below. Any term that is not defined in this Plan, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

**1.     "Administrative Claim"** means a Claim against a Debtor or its Estate arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration in the Chapter 11 Cases that is entitled to priority or superpriority under Bankruptcy Code §§ 364(c)(1), 503(b), 503(c), 507(b) or 1114(e)(2), including:  (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under Bankruptcy Code §§ 330(a) or 331, including Fee Claims; and (c) all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930.

**2.     "Administrative Claims Bar Date"** means the date that is forty-five (45) days after the Effective Date.

**3.     "Administrative Claims Objection Deadline"** means the date that is ninety (90) days after the Effective Date.

**4.     "Affiliate"** has the meaning set forth in Bankruptcy Code § 101(2).

**5.     "AFM"** means the American Federation of Musicians.

**6.     "Allowed"** means with respect to Claims:  (a) any Claim (i) for which a Proof of Claim has been timely filed on or before the applicable Claims Bar Date (or that by the Bankruptcy Code or Final Order is not or shall not be required to be filed) or (ii) that is listed in the Schedules as of the Effective Date as not disputed, not contingent and not unliquidated, and for which no Proof of Claim has been timely filed; *provided* that, in each case, any such Claim shall be considered Allowed only if and to the extent that no objection to the allowance thereof has been interposed within the applicable period of time fixed by ~~the~~this Plan, the Bankruptcy Code, the

Bankruptcy Rules or the Bankruptcy Court or such an objection has been interposed and the Claim has been thereafter Allowed by a Final Order; or (b) any Claim Allowed pursuant to ~~the~~this Plan, a Final Order of the Bankruptcy Court (including pursuant to any stipulation approved by the Bankruptcy Court) and any Stipulation of Amount and Nature of Claim; *provided, further*, that the Claims described in clauses (a) and (b) above shall not include any Claim on account of a right, option, warrant, right to convert or other right to purchase an Equity Interest.  Claims allowed solely for the purpose of voting to accept or reject ~~the~~this Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder.  For the avoidance of doubt, no right of setoff shall be preserved and give rise to an Allowed Claim unless such setoff right is set forth in a timely filed proof of claim.

7.      **"Armored Car Loan and Security Agreement"** means the Amended and Restated Loan and Security Agreement, dated August 5, 2014, among Debtor Armored Car Productions, LLC, as borrower, CIT Bank, as agent, and Surefire Entertainment Capital, LLC, as lender, for loans up to approximately $21,586,243 as of October 4, 2015 for the purpose of acquiring, producing, completing, and delivering a motion picture prior to release, and the payment of related financing costs.  CIT asserts a different amount outstanding as of the date shown, and the amount is also subject to reconciliation for other obligations under the LSA including, without limitation, attorneys' fees.

8.      **"Avoidance Claims"** means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including Bankruptcy Code §§ 502, 510, 542, 544, 545, and 547-553 or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

9.      **"Ballot"** means the applicable form or forms of ballot(s) distributed to Holders of Claims entitled to vote on ~~the~~this Plan and on which the acceptance or rejection of ~~the~~this Plan is to be indicated.

10.     **"Balloting Agent"** means Donlin, Recano & Company, Inc., the Bankruptcy-Court appointed balloting agent for the Debtors.

11.     **"Bankruptcy Code"** means title 11 of the United States Code, as now in effect or hereafter amended.

12.     **"Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference, the United States District Court for the Southern District of New York.

13.     **"Bankruptcy Rules"** means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended.

14.     ''Bar Date'' means the bar date by which a Proof of Claim must be or must have been Filed, as established by (a) the Bar Date Order or (b) a Final Order of the Bankruptcy Court.

15.     **"BidCo Note"** means a note to be issued by Reorganized Relativity Media, LLC, guaranteed by all of the reorganized subsidiaries (subject to certain customary exceptions), to Buyer in the principal amount of $60 million to be issued on the Effective Date, which shall, among other things, (i) have a maturity date of two (2) years, (ii) bear interest at a rate of 8.5% per annum payable quarterly in ~~cash~~Cash, (iii) bear an additional interest of 2% during the occurrence and continuation of an event of default; (iv) be required to be repaid out of the proceeds of any indebtedness without exception (including the New P&A/Ultimates Facility) until the outstanding principal amount thereof is not greater than $30 million; and (v) be on terms acceptable to the Holders of the Allowed TLA/TLB Secured Claims, excluding Kavanaugh and Nicholas.  The principal terms of the BidCo Note are set forth in Exhibit I attached hereto.

16.     **"BidCo Note Obligors"** means each Subsidiary Debtor, excluding (i) Relativity Fashion, LLC, (ii) Yuma, Inc., (iii) J & J Project, LLC and (iv) any of the Subsidiary Debtors whose assets were sold as part of the sale of the Debtors' television business.

17.        **"Business Day"** means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18.        **"Buyer"** means RM Bidder, LLC, purchaser of certain assets of the TV Business.

19.        **"Cash"** means the lawful currency of the United States of America and equivalents thereof.

20.        "**Causes of Action**" means any Claim, Avoidance Action, cause of action, controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law; *excluding, however*, (i) RKA Causes of Action, (ii) any settlement of Claims on or prior to the Effective Date, and (iii) Claims or Avoidance Actions against Released Parties, *but including* the Excluded Released Parties.

~~20~~21.        **"CBA Assumption Agreements"** means the assumption agreements for ~~the~~each and every Covered Picture to be entered into by ~~the~~ Reorganized ~~Debtors~~Relativity Media LLC on the Effective Date which shall obligate the Reorganized Debtors only for all obligations thereunder that accrue after the Effective Date, and which assumption agreements shall be in the standard form found in the collective bargaining agreement of~~(i)~~ each ~~applicable Guild, (ii) the AFM, and (iii) the Equity (UK)~~Union Entity.

~~21~~22.        **"Chapter 11 Cases"** means the cases commenced under chapter 11 of the Bankruptcy Code by the Debtors in the Bankruptcy Court.

~~22~~23.        **"CIT Bank"** means CIT Bank, N.A., formerly known as OneWest Bank, N.A.

~~23~~24.        **"Claim"** means a claim, as such term is defined in Bankruptcy Code § 101(5), against a Debtor.

~~24~~25.        **"Claims Bar Date"** means, as applicable, the Administrative Claims Bar Date and any other date or dates to be established by an Order of the Bankruptcy Court by which Proofs of Claim must be filed, including the general bar date of December 9, 2015 at 5:00 p.m. (ET) as set forth in the Court's *Order Pursuant to 11 U.S.C. §§ 501 and 502(b)(9), Fed. R. Bankr. P. 2002 and 3003(c)(3), and Local Rule 3003-1 (I) Establishing Deadline For Filing Proofs of Claim and Procedures Relating Thereto and (II) Approving Form and Manner of Notice Thereof* [~~Docket~~Dkt. No. 927].

26.        "**Claims Objection Bar Date**" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) one year after the Effective Date and (b) such later period of limitation as may be specifically fixed by an order of the Bankruptcy Court.

~~25~~27.        **"Class"** means a class of Claims or Interests, as described in Section II of this Plan.

~~26~~28.        **"Committee DIP Proceeds"** means the allocation of $275,000 in aggregate proceeds from the Debtors' debtor in possession financing to be used to pay fees and expenses of the professionals retained by the Creditors' Committee that are incurred in connection with investigation of certain specified matters pursuant to Paragraph 4(b) of the Initial Final DIP Order.

~~27~~29.        **"Confirmation"** means the entry of the Confirmation Order on the docket of the Bankruptcy Court.

~~28~~30.        **"Confirmation Date"** means the date on which the Bankruptcy Court enters the Confirmation Order on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

**29~~31~~.**          **"Confirmation Hearing"** means the hearing held by the Bankruptcy Court to consider Confirmation of ~~the~~this Plan, as such hearing may be continued from time to time.

**30~~32~~.**          **"Confirmation Order"** means the order of the Bankruptcy Court confirming ~~the~~this Plan pursuant to Bankruptcy Code § 1129.

~~**31.**          **"Contributed Avoidance Claims"** means any and all Avoidance Claims that may be asserted by the Debtors, but specifically excluding any and all Avoidance Claims that could be asserted against any of the Released Parties.~~

**33.**          **"Consenting Creditors"** means (a) any Released Party, (b) any Holder of a Claim who voted to accept this Plan, and (c) any holder of a Claim who voted to reject this Plan but who affirmatively elected to provide releases by checking the appropriate box on the ballot form.

**32~~34~~.**          **"Covered Pictures"** means those theatrical or television motion pictures ~~of the Debtors that were produced subject to collective bargaining agreements with or on behalf of one or more Guilds, FMSMF, AFM or Equity (UK), for which~~with respect to which: (i) the Debtors were obligated to pay residuals to members of Union Entities as of the Petition Date; and (ii) rights are~~e~~ to be transferred to the Reorganized Debtors.

**33~~35~~.**          **"Creditors' Committee"** shall mean the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to Bankruptcy Code § 1102.

**34~~36~~.**          **"days"** means calendar days.

**35~~37~~.**          **"Debtors"** means, collectively, the debtors listed on <u>Exhibit A</u> attached hereto.

**38.**          **"DGA"** means the Directors Guild of America, Inc., on behalf of itself and the Producer-Directors Guild of America Pension and Health Plans.

**36~~39~~.**          **"Disclosure Statement"** means the *Disclosure Statement for Plan Proponents' Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, of even date herewith (including all exhibits and schedules thereto or referenced therein), that has been prepared and distributed by the Plan Proponents, pursuant to Bankruptcy Code § 1125, as the same may be amended, modified or supplemented, and which is in form and substance reasonably acceptable to the Plan Proponents.

**37~~40~~.**          **"Disclosure Statement Order"** means an order entered by the Bankruptcy Court, which shall be a Final Order and which shall be in form and substance reasonably satisfactory to the Plan Proponents, approving, among other things, the Disclosure Statement as containing adequate information pursuant to Bankruptcy Code § 1125, authorizing solicitation of the Disclosure Statement and ~~the~~this Plan and approving related solicitation materials.

**38~~41~~.**          **"Disputed Claim"** means any portion of a Claim (a) that is neither an Allowed Claim nor a disallowed Claim, (b) that is listed as disputed, contingent or unliquidated on the Schedules or that is otherwise subject to an objection or (c) for which a Proof of Claim has been timely filed with the Bankruptcy Court or a written request for payment has been made, to the extent the Debtors have, or any party in interest entitled to do so has, interposed a timely objection or request for estimation, which objection or request for estimation has not been withdrawn or determined by a Final Order.

**39~~42~~.**          **"Distribution Record Date"** means the close of business on the day the Bankruptcy Court enters the order confirming this Plan pursuant to Bankruptcy Code § 1129.

**40~~43~~.**          **"Document Website"** means the internet site address https://www.donlinrecano.com/Clients/rm/Index at which all of the exhibits and schedules to ~~the~~this Plan and the Disclosure Statement will be available to any party in interest and the public, free of charge.

4144.          **"DR Loan and Security Agreement"** means a Loan and Security Agreement, dated September 5, 2014, entered into between Debtor DR Productions, LLC, as borrower, and CIT Bank, as agent and lender, for loans up to approximately $12,272,477 as of October 4, 2015 for the purpose of acquiring, producing, completing, and delivering a motion picture prior to release, and the payment of related financing costs.  CIT asserts a different amount outstanding as of the date shown, and the amount is also subject to reconciliation for other obligations under the LSA including, without limitation, attorneys' fees.

4245.          **"Effective Date"** means the day selected by the Debtors that is a Business Day as soon as reasonably practicable after the Confirmation Date on which all conditions to the Effective Date in Section VII.A shall have been satisfied or waived in accordance with Section VII.B and, if a stay of the Confirmation Order is in effect, such stay shall have expired, dissolved, or been lifted.

4346.          **"Entity"** shall have the meaning set forth in Bankruptcy Code § 101(15).

4447.          **"Equity (UK)"** means Equity of Guild House.

4548.          **"Estate"** means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to Bankruptcy Code § 541.

4649.          **"Exculpated Parties"** (i) the Plan Proponents; (ii) the Debtors' respective officers, boards of managers and the members thereof; (iii) the Creditors' Committee; and (iv) with respect to each of the foregoing entities in clauses (i) through (iii), only on or after the Petition Date, their respective Representatives (in their capacities as such).

4750.          **"Exculpation"** means the exculpation provision set forth in Section X.D.

4851.          **"Executory Contract"** or **"Unexpired Lease"** means a contract or lease to which a Debtor is a party that is subject to assumption, assumption and assignment or rejection under Bankruptcy Code § 365, including any modifications, amendments, addenda or supplements thereto or restatements thereof.

4952.          **"Exhibit"** means an exhibit attached to this Plan or included in the Plan Supplement.

5053.          **"Fee Claim"** means a Claim under Bankruptcy Code §§ 328, 330(a), 331, 503 or 1103 for compensation of a Professional or other Entity for services rendered or expenses incurred in the Chapter 11 Cases.

5154.          **"Fee Order"** means any order establishing procedures for interim compensation and reimbursement of expenses of Professionals that may be entered by the Bankruptcy Court.

5255.          **"File," "Filed"** or **"Filing"** means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

5356.          **"Final Order"** means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in the Chapter 11 Cases or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move for a new trial, reargument, reconsideration or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument, reconsideration or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, reconsideration or rehearing shall have been denied or resulted in no modification of such order.

5457.          **"FMSMF"** means Film Musicians Secondary Markets Fund, which operates pursuant to American Federation of Musicians collective bargaining agreements, to collect and distribute residuals under the collective bargaining agreements.

**5558.** "**General Unsecured Claim**" means any Claim that is not a (i) Administrative Claim, (ii) Professional Fee Claim, (iii) Plan Co-Proponent Fee/Expense Claim, (iv) Priority Tax Claim, (v) Priority Non-Tax Claim, (vi) TLA/TLB Secured Claim, (vii) Pre-Release P&A Secured Claim, (viii) Post-Release P&A Secured Claim, (ix) Production Loan Secured Claim, (x) Ultimates Secured Claim, (xi) Secured Guilds Claim, (xii) Vine/Verite Secured Claim, (xiii) Other Secured Claim, or (xiv) Subordinated Claim.

**56.** "**Guaranteed GUC Distributable Value**" means the $2,000,000 Television Sale Committee Allocation and an additional $2,000,000 payment within 12 – 24 months of the Effective Date, timing of which is subject to certain performance metrics.

**59.** "**Guaranteed GUC Payment**" means (i) the $2 million Television Sale Committee Allocation, (ii) an additional $2 million payment within 12 – 24 months of the Effective Date, and (iii) an additional $5 million within 36 – 48 months of the Effective Date.  In the case of (ii) and (iii), the Reorganized Debtors shall, in their business judgment, determine the timing of such payment based on whether the Reorganized Debtors have sufficient working capital to satisfy their business plan and make such payment, but in each case, the Reorganized Debtors shall make such payment no later than 24 months and 48 months from the Effective Date respectively.  Notwithstanding the foregoing, until such time as the $7.0 million payments in (ii) and (iii) herein are made, in the event that the Reorganized Debtors recover any amount on account of the Reorganized Debtors Causes of Action Interest, such amount shall be paid by the Reorganized Debtors to the Litigation Trust as an acceleration of such payment obligation.

**5760.** "**GUC Litigation TrustCauses of Action Interest**" means the beneficial interests in the Litigation Trustseventy percent (70%) of the litigation recoveries from the Causes of Action, net of litigation cost.

**61.** "**Guild Payroll Protocols**" means payments to the Guilds in connection with the Allowed Secured Guilds Claims, Guild Allowed Administrative Claims, Guild Priority Claims, or Guild General Unsecured Claims that shall be payable to each applicable Guild for the benefit of each applicable Guild-represented employee.  Payments will be made to counsel for the Guilds.  The Reorganized Debtors shall provide a designated payroll service (selected mutually by the Guilds and the Reorganized Debtors) with information concerning such payments.  The payroll service shall prepare checks in the form and manner prescribed by each collective bargaining agreement.  Guild counsel will forward the payable principal amounts, and the Reorganized Debtors shall fund the payroll process and applicable taxes.  As an accommodation to the Reorganized Debtor, the Guilds shall forward such payments to the applicable Guild-represented employee.

**5862.** "**Guilds**" means the DGA, SAG-AFTRA, and the WGA, with reference to their status as Secured Guilds together with theor as Unsecured GuildsUnion Entities.

**5963.** "**Holder**" means an Entity holding a Claim or Interest, as the context requires.

**6064.** "**Impaired**" means, when used in reference to a Claim or an Interest, a Claim or an Interest that is impaired within the meaning of Bankruptcy Code § 1124.

**6165.** "**Initial DIP Agent**" means Cortland Capital Market Services LLC, in its capacity as administrative agent and collateral agent under the Initial DIP Credit Agreement.

**6266.** "**Initial DIP Claims**" means any Claim of the Initial DIP Agent or the Initial DIP Lenders against a Debtor under or evidenced by (a) the Initial DIP Credit Agreement and (b) the Initial Final DIP Order.

**6367.** "**Initial DIP Credit Agreement**" means that certain debtor in possession financing Agreement, dated as of July 30, 2015 (DocketDkt. No. 48, Ex. 2, as the same was subsequently, amended, supplemented or otherwise revised by the Court's Initial Final DIP Order and previously entered interim orders related thereto), among Relativity Media, LLC and each subsidiary thereof (as borrower), Relativity Holdings (as Guarantor), the Initial DIP Agent and the Initial DIP Lenders party thereto.

64<u>68</u>.        **"Initial DIP Lenders"** means, collectively, those entities identified as "Lenders" in the Initial DIP Credit Agreement and their respective permitted successors and assigns (solely in their capacity as "DIP Lenders" under the DIP Credit Agreement).

65<u>69</u>.        **"Initial Final DIP Order"** means the *Final Order Pursuant to Sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code (I) Authorizing Debtors to Obtain Superpriority Secured Debtor-In-Possession Financing, (II) Authorizing Debtors to Use Cash Collateral, (III) Granting Adequate Protection to the Cortland Parties, and (IV) Granting Related Relief* (~~Docket~~<u>Dkt.</u> No. 342).

66<u>70</u>.        **"Intercompany Claim"** any Allowed Claim of any Debtor against another Debtor.

67<u>71</u>.        **"Intercompany Interest"** any Interest (a) of any Debtor in another Debtor or (b) of any Non-Debtor Affiliate in a Debtor, in each case, that arose prior to the Petition Date.

68<u>72</u>.        **"Interest"** means the rights of the Holders of stock, membership interests or partnership interests issued by a Debtor and outstanding immediately prior to the Petition Date, and any options, warrants or other rights with respect thereto, or any other instruments evidencing an ownership interest in a Debtor and the rights of any Entity to purchase or demand the issuance of any of the foregoing, including: (a) redemption, conversion, exchange, voting, participation and dividend and other distribution rights (including any rights in respect of accrued and unpaid dividends or other distributions); (b) liquidation preferences; (c) stock options and warrants; (d) interests in profit and loss; and (e) rights to information concerning the business and affairs of a Debtor.

69<u>73</u>.        **"Kavanaugh"** means Ryan C. Kavanaugh, as CEO of the Debtors, and as Plan Proponent.

70<u>74</u>.        **"Liabilities"** means any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, ~~Recovery Actions, causes of action~~<u>recovery actions, Causes of Action</u> and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction or agreement.

71<u>75</u>.        **"Litigation Trust"** means the litigation trust to be created on or after the Confirmation Date in accordance with the provisions of Article IX hereof and the Litigation Trust Agreement.

72<u>76</u>.        **"Litigation Trust Agreement"** means the Litigation Trust Agreement, substantially similar in form as <u>Exhibit G</u> attached hereto, pursuant to which the Litigation Trustee shall manage and administer the Litigation Trust Assets and distribute the net proceeds thereof, if any.

73<u>77</u>.        **"Litigation Trust Assets"** means <u>(a)</u> initial funding of ~~(a)    % interest in (i) the Contributed Avoidance Claims and (ii) such other Claims as may be contributed, and (b) an~~<u>$2 million Television Sale Committee Allocation, (b) $500,000 to be funded on the Effective Date and an additional to-be-determined</u> amount to be ~~specified pursuant to an agreed budget whereby~~<u>provided by</u> the Reorganized Debtors ~~will~~<u>to</u> fund pursuit of litigation claims by the Litigation Trust. ~~For the avoidance of doubt, the Litigation Trust Assets shall not include any Claims against the Released Parties that are released pursuant to Section X.E of the Plan.~~<u>, (c) the GUC Causes of Action Interest, and (d) the right to prosecute the Causes of Action in the name of the Reorganized Debtor.</u>

74<u>78</u>.        **"Litigation Trust Beneficiaries"** means the Holders of Allowed Claims in Class J.

75<u>79</u>.        **"Litigation Trust Claims Reserve"** means any Litigation Trust Assets allocable to or retained on account of, Disputed General Unsecured Claims, even if held in commingled accounts.

76<u>80</u>.        **"Litigation Trust Interests"** means the beneficial interests in the Litigation Trust allocable to certain Holders of Allowed Claims (and any transferee thereof) in accordance with the terms and conditions of Article IX of ~~the~~<u>this</u> Plan.

7781.        "**Litigation Trustee**" means the ~~person or entity~~Person or Entity designated as the "Managing Trustee" of the Litigation Trust pursuant to the terms of the Litigation Trust Agreement.

7882.        "**Manchester Prepetition Credit Facility**" means indebtedness under the Second Amended and Restated Credit Agreement, dated as of May 30, 2012, between certain of the Debtors and Manchester Securities Corporation (as amended, supplemented, or modified from time to time) with an outstanding amount of approximately $137.1 million.

7983.        "**Manchester DIP Claims**" means any Claim of the Modified DIP Agent or the Modified DIP Lenders against a Debtor under or evidenced by (a) the Modified DIP Credit Agreement and (b) the Modified DIP Order.

8084.        "**Modified DIP Agent**" means Heatherden Securities LLC ("**Heatherden**"), in its capacity as administrative agent and collateral agent under the Modified DIP Credit Agreement.

8185.        "**Modified DIP Credit Agreement**" means the Initial DIP Credit Agreement, dated as of July 30, 2015 as the same was subsequently, amended, supplemented or otherwise revised as set forth in the Modified DIP Order among Relativity Media, LLC and each subsidiary thereof (as borrower), Relativity Holdings (as Guarantor), the Modified DIP Agent and the Modified DIP Lenders party thereto.

8286.        "**Modified DIP Lenders**" means, collectively, those entities identified as "DIP Lenders" in the Modified DIP Credit Agreement and their respective permitted successors and assigns (solely in their capacity as "DIP Lenders" under the Modified DIP Credit Agreement).

8387.        "**Modified DIP Order**" means the *Amended and Restated Final Order Pursuant to Sections 105, 361, 362, 363, 364, And 507 of the Bankruptcy Code (I) Authorizing Debtors to Obtain Superpriority Secured Debtor-in-Possession Financing, (II) Authorizing Debtors to Use Cash Collateral, (III) Granting Adequate Protection to the Cortland Parties and Manchester Parties and (IV) Granting Related Relief* [~~Docket~~Dkt. No. 931].

88.        "**MPIPHP**" means the Motion Picture Industry Pension and Health Plans.

8489.        "**New Board of Managers**" means the board of managers of Reorganized Relativity Holdings composed of individuals as set forth in Section III.G.2 hereof.

8590.        "**New Exit Financing Documents**" means, collectively, the definitive documents, statements and filings that evidence the New P&A/Ultimates Facility.

8691.        "**New P&A/Ultimates Facility**" means a financing facility or debt issuance that is entered into or issued by one or more of the Reorganized Debtors on the Effective Date, substantially similar in form as Exhibit F attached hereto, the proceeds of which shall be utilized to fund  the ongoing operations of the Reorganized Debtors and shall not, without the consent of BidCo, be utilized to refinance any existing indebtedness, including, without limitation, any indebtedness under the Modified DIP Credit Agreement.

8792.        "**New Securities and Documents**" means the Reorganized Relativity Holdings Preferred Units, Reorganized Relativity Holdings Common Units, the BidCo Note, New Exit Financing Documents, and any and all other securities, notes, stock, instruments, certificates, and other documents or agreements required to be issued, executed or delivered pursuant to or in connection with this Plan.

8893.        "**Nicholas**" means Joseph Nicholas.

8994.        "**Non-Debtor Affiliate**" means any direct or indirect subsidiary of Relativity Holdings that is not a Debtor.

9095.        "**Non-Debtor Affiliate Claim**" means any Claim held by a Non-Debtor Affiliate against a Debtor that arose prior to the Petition Date.

**9196.** **"Notice and Claims Agent"** means  Donlin Recano & Company, Inc., in its capacity as noticing, claims and solicitation agent for the Debtors.

**9297.** **"Ordinary Course Professionals Order"** means any order entered by the Bankruptcy Court authorizing the Debtors to retain, employ and pay professionals and service providers, as specified in such order, which are not materially involved in the administration of the Chapter 11 Cases.

**9398.** **"Other Secured Claim"** means a Secured Claim that is not a TLA/TLB Secured Claim, Post-Release P&A Secured Claim, Production Loan Secured Claim, Ultimates Secured Claim, Secured Guilds Claim, or Vine/Verite Secured Claim.

**9499.** **"P&A Funding Agreement"** means the Second Amended and Restated Funding Agreement, dated June 30, 2014, among certain of the Debtors (as borrowers), Macquarie US Trading LLC (as post-release agent), Macquarie Investments US Inc. (as post-release lender by assignment from the original post-release lender), and RKA Film Financing, LLC (as pre-release lender and pre-release lender agent), as amended by the First Amendment, dated August 26, 2014.

**100.** "**Participation Agreements**" means agreements that provide for, among other things, payments from future revenues to actors, directors, writers,  producers and other entities based on prior work performed in connection with the motion pictures in the Debtors' film library, including producer royalties and fees payable for merchandising and music rights.  For the avoidance of doubt, unless otherwise provided for herein, participations owed by the Debtors under Participation Agreements executed prior to the Petition Date, whether such participations are owed prior to or on and after the Effective Date, will be treated as prepetition claims against the Debtors because they arise under prepetition agreements and contracts that are not executory contracts.

**101.** **"Person"** shall have the meaning set forth in Bankruptcy Code § 101(41).

**95102.** **"Petition Date"** means July 30, 2015 for all of the Debtors.

**96103.** **"Plan"** means this plan of reorganization for the Debtors, and all Exhibits attached hereto or referenced herein, supplements, appendices, schedules, and the Plan Supplement, as the same may be amended, modified or supplemented.

**97104.** **"Plan Co-Proponents"** means Kavanaugh and the Debtors.

**98105.** "**Plan Co-Proponent Fee/Expense Claims**" means all of the reasonable and documented fees, costs and expenses of Kavanaugh incurred in connection with the Chapter 11 Cases.

**99106.** **"Plan Supplement"** means the compilation of documents and forms of documents as amended from time to time that constitute Exhibits to the this Plan Filed with the Bankruptcy Court no later than seven days before the (i) Voting Deadline and (ii) deadline for objections to Confirmation of this Plan (or such later date as may be approved by the Bankruptcy Court), including, without limitation, the following: (a) revised Relativity Holdings certificate of formation Certificate of Formation (or comparable constituent document); (b) Revised Relativity Holdings Operating Agreement (or comparable constituent document); (c) term sheet or agreement evidencing the New P&A/Ultimates Facility; (d) list of the new board of managers of Reorganized Relativity Holdings; (e) updated list of Executory Contracts and Unexpired Leases to be rejected by the Debtors; (f) Litigation Trust Agreement; (g) form of Warrant Agreements; and (h) form of Replacement P&A Note; (i) Form of Replacement Production Loan Note; and (j) Restructuring Transaction Transactions exhibit, if any.

**100107.** **"Post-Release P&A Secured Claims"** means any Allowed Secured Claim of Macquarie US Trading LLC (as agent) and/or Macquarie Investments US Inc. (as post-release lender by assignment from the original post-release lender) against a Debtor (i) under or evidenced by the P&A Funding Agreement or (ii) any subsequent post-release print and advertising loans made thereunder or in connection therewith.  As of the Petition Date, the amount of the Post-Release P&A Secured Claims totaled $32,880,208.  As of October 31, 2015,

the aggregate Post-Release P&A Secured Claim totaled $26,818,821, after taking into account a $7.2 million paydown in October.

101108.    **"Pre-Release P&A Secured Claims"** means any Allowed Secured Claim of  RKA Film Financing, LLC (as pre-release lender and pre-release lender agent) against a Debtor (i) under or evidenced by the P&A Funding Agreement or (ii) any subsequent pre-release print and advertising loans made thereunder or in connection therewith.  As of October 31, 2015the Petition Date, the amount of the Pre-Release P&A Secured ClaimClaims totaled $88,224,68285,005,933 which was comprised of a $29,742,38728,657,280 claim against Armored Car Productions, LLC, a $19,382,49218,675,350 claim against DR Productions, LLC, a $15,615,32215,045,620 claim against RML Kidnap Films, LLC, a $22,175,26621,366,234 claim against RML Somnia Films, LLC, and a $1,309,2151,261,450 claim against RML Lazarus Films, LLC.

102109.    **"Prepetition Intercompany Claim"** means any Claim of any Debtor against any other Debtor that arose prior to the Petition Date.

103110.    **"Priority Non-Tax Claim"** means a Claim that is entitled to priority in payment pursuant to Bankruptcy Code § 507(a) that is not an Administrative Claim or a Priority Tax Claim.

104111.    **"Priority Tax Claim"** means a Claim that is entitled to priority in payment pursuant to Bankruptcy Code § 507(a)(8).

105112.    **"Pro Rata"** means, when used in reference to a distribution of property to holders of Allowed Claims in a particular Class, a proportionate distribution of property so that the ratio of (a)(i) the amount of property distributed on account of an individual Allowed Claim to (ii) the amount of such individual Allowed Claim is the same as the ratio of (b)(i) the amount of property distributed to all Allowed Claims in the applicable Class to (ii) the total amount of all Allowed Claims in the applicable Class.

106113.    **"Production Loan Agreements"** means, collectively, the Armored Car Loan and Security Agreement and the DR Loan and Security Agreement.

114.    **"Production Loan Settlement"** means the assumption of the Production Loan Agreements, as modified to acknowledge that any and all defaults thereunder have been cured and otherwise satisfied, and as further modified to provide for a release date for Masterminds on or before March 31, 2017 and The Disappointments Room on or before September 30, 2016.

107115.    **"Production Loan Secured Claims"** means any Allowed Secured Claim of either (i) CIT Bank or (ii) Surefire Entertainment Capital, LLC against a Debtor under or evidenced by either of the Production Loan Agreements.

108116.    **"Professional"** means any professional employed in the Chapter 11 Cases pursuant to Bankruptcy Code §§ 327, 328, 363 or 1103 or any professional or other Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to Bankruptcy Code § 503(b)(4).

109117.    **"Professional Fee Segregated Account"** means an interest-bearing account to hold and maintain an amount of Cash equal to the Professional Fee Reserve Amount funded by the Debtors on the Effective Date solely for the purpose of paying all Allowed and unpaid Fee Claims.

110118.    **"Professional Fee Reserve Amount"** means the aggregate Fee Claims through the Effective Date as estimated in accordance with Section II.A.1.d(3) hereof.

111119.    **"Proof of Claim"** means a proof of claim filed with the Bankruptcy Court or the Notice and Claims Agent in connection with the Chapter 11 Cases.

112120.    **"Reinstated"** means, unless thethis Plan specifies a particular method pursuant to which a Claim or Interest shall be Reinstated, (a) leaving unaltered the legal, equitable, and contractual rights to

which a Claim or Interest so as to render such Claim or Interest Unimpaired; or (b) notwithstanding any contractual provisions or applicable law that entitles the Holder of a Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (i) curing any such default that occurred before or after the commencement of the applicable Chapter 11 Case, other than a default of a kind specified in Bankruptcy Code § 365(b)(2) or of a kind that Bankruptcy Code § 365(b)(2) expressly does not require to be cured; (ii) reinstating the maturity of a Claim or Interest as such maturity existed before such default; (iii) compensating the Holder of a Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to Bankruptcy Code § 365(b)(1)(A), compensating the Holder of such Claim or Interest for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which a Claim or Interest entitles the Holder of such Claim or Interest.

113121.     "**Released Parties**" means (i) the Debtors; (ii) the Debtors' respective boards of managers and the members thereof each as of the Petition Date; (iii) the Creditors' Committee; (iv) Manchester Securities Corporation, (v) the lenders (the "**Cortland Lenders**") party to the *Financing Agreement*, dated as of May 30, 2012, but solely in their capacity as lenders and, (vi) ~~upon the prior written direction of the required lenders under the Initial DIP Credit Agreement and the TLA/TLB Facility, respectively,~~ Cortland (not individually, but solely in its separate capacities as collateral agent and administrative agent under the Existing DIP Facility and collateral agent and administrative agent under the TLA/TLB Facility), and each of the foregoing's Representatives to the extent permitted under applicable law; *provided*, *however*, on or before the date of the hearing for approval of the Disclosure Statement, the Creditors' Committee shall file a list of parties against which the Creditors' Committee (or the Litigation Trustee, or any successor post-confirmation committee organized under ~~the~~this Plan) may choose to initiate action, which parties on such list (the "**Excluded Release Parties**") shall not be included in the definition of Released Parties.

**122.**          "**Reorganized Debtors Causes of Action Interest**" means the beneficial interests in thirty percent (30%) of the litigation recoveries from the Causes of Action, net of litigation cost.

114123.     "**Relativity Holdings**" means Relativity Holdings LLC, a Delaware limited liability company.

115124.     "**Reorganized**" means, (a) when used in reference to a particular Debtor, such Debtor on and after the Effective Date, and (b) when used in reference to the Debtors collectively, then all of the Debtors on and after the Effective Date.

116125.     "**Reorganized Relativity Holdings Common Units**" means Common Units of Reorganized Relativity Holdings having the rights set forth in the Revised Relativity Holdings Operating Agreement, such Common Units to be initially authorized pursuant to ~~the~~this Plan as of the Effective Date, including such Common Units to be issued pursuant to ~~the~~this Plan.

117126.     "**Reorganized Relativity Holdings Preferred Units**" means convertible Class A Units of Reorganized Relativity Holdings having the rights set forth in the Revised Relativity Holdings Operating Agreement, such Class A Units to be initially authorized pursuant to ~~the~~this Plan as of the Effective Date, including such Class A Units to be issued pursuant to ~~the~~this Plan.

118127.     "**Reorganized Relativity Holdings Warrants**" means warrants of Reorganized Relativity Holdings to acquire Reorganized Relativity Holdings Common Units having the rights set forth in the relevant Warrant Agreements, such Warrants to be issued to Joseph Nicholas and Heatherden (or their respective Affiliates) pursuant to ~~the~~this Plan.

**128.**          "**Replacement P&A Notes**" means five (5) notes each bearing interest at a fixed rate equal to the prime rate plus 3.0 % payable over five (5) years that many be issued by the Reorganized Debtors on the Effective Date to the holders of the Pre-Release P&A Secured Claims.  The amount of the Replacement P&A Notes shall be based on the amount of the Pre-Release P&A Secured Claims and issued by the Debtor responsible therefor.  Payment obligations under the Replacement P&A Note shall be: (i) subordinate to the liens of the New

P&A/Ultimates Facility, or such other print and advertising facility which may be used to fund one or more of the film titles: *Masterminds, Kidnap, The Disappointments Room* and *Somnia*, (ii) subject to the terms of the existing intercreditor agreements including with CIT, as Production Lender, with respect to *Masterminds* and *The Disappointments Room* and Macquarie, as Post-Release P&A Lender on *Lazarus* and (iii) subordinate to any applicable senior secured claims of the Guilds for residuals.  A form of the Replacement P&A Note is attached hereto as Exhibit K.

**129.**        **"Replacement Production Loan Notes"** means two (2) notes each bearing interest at a fixed rate equal to the prime rate plus 3.0 % payable over five (5) years that many be issued by the Reorganized Debtors on the Effective Date to the holders of the Production Loan Secured Claims.  The amount of the Replacement Production Loan Notes shall be based on the amount of the Production Loan Secured Claim and issued by the Debtor responsible therefor.  Payment obligations under the Replacement Production Loan Note shall be: (i) subordinate to the liens of the New P&A/Ultimates Facility, or such other print and advertising facility which may be used to fund one or more of the film titles: *Masterminds* and *The Disappointments Room*, (ii) subject to the terms of any existing intercreditor agreements including with RKA, as Pre-Release Lender, with respect to *Masterminds* and *The Disappointments Room*, and (iii) subordinate to any applicable senior secured claims of the Guilds for residuals.  A form of the Replacement Production Loan Note is attached hereto as Exhibit L.

~~119~~**130.**        **"Representatives"** means, with respect to any Entity, any successor, officer, director, partner, shareholder, manager, member, management company, investment manager, affiliate, employee, agent, attorney, advisor, investment banker, financial advisor, accountant or other Professional of such Entity, and committee of which such Entity is a member, in each case, solely in such capacity, serving on or after the Petition Date.

~~120~~**131.**        **"Restructuring Transactions"** means, collectively, those mergers, consolidations, conversions, restructurings, dispositions, liquidations or dissolutions that the Debtors determine to be necessary or appropriate to effect an organizational restructuring of their business or otherwise to simplify the overall organizational structure of the Reorganized Debtors, as described in greater detail in Section III.E.

~~121~~**132.**        **"Revised Relativity Holdings Certificate of Formation"** means the certificate of formation , substantially similar in form as Exhibit B attached hereto.

~~122~~**133.**        **"Revised Relativity Holdings Operating Agreement"** means the operating agreement, substantially similar in form as Exhibit C attached hereto.

~~123~~**134.**        **"RKA"** means RKA Film Financing, LLC, a Delaware ~~Limited Liability Company~~limited liability company.

**135.**        **"RKA Causes of Action"** means any Claim, Avoidance Action, cause of action, controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law against RKA.

**136.**        **"SAG-AFTRA"** means the Screen Actors Guild-American Federation of Television and Radio Artists, on behalf of itself and the Producer- Screen Actors Guild Pension and Health Plans.

~~124~~**137.**        **"Schedules"** means, collectively, the (a) schedules of assets, Liabilities and Executory Contracts and Unexpired Leases and (b) statements of financial affairs, as each may be amended and supplemented from time to time, Filed by the Debtors pursuant to Bankruptcy Code § 521.

~~125~~**138.**        **"Secured Claim"** means a Claim that is secured by a lien on property in which an Estate has an interest or that is subject to a valid right of setoff under Bankruptcy Code § 553, to the extent of the

value of the Claim Holder's interest in such Estate's interest in such property or to the extent of the amount subject to such valid right of setoff, as applicable, as determined pursuant to Bankruptcy Code § 506.

126139.    "Secured Guilds" means, collectively, (i) Directors Guild of America, Inc.DGA; (ii) Screen Actors Guild, Inc.  American Federation of Television and Radio ArtistsSAG-AFTRA; and (iii) the Writers Guild of America West, Inc.WGA (and individually, each a "Secured Guild").

127140.    "Secured Guilds Claims" means any Allowed Secured Claims of a Guild asserted against one or more of the Debtors.

128141.    "Secured Tax Claim" means an Allowed Secured Claim arising out of a Debtor's liability for any Tax.

129142.    "Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

130143.    "Stipulation of Amount and Nature of Claim" means a stipulation or other agreement between the applicable Debtor or Reorganized Debtor and a Holder of a Claim or Interest establishing the allowed amount or nature of such Claim or Interest that is (a) entered into in accordance with any Claim settlement procedures established by order of the Bankruptcy Court in these Chapter 11 Cases, (b) expressly permitted by thethis Plan or (c) approved by order of the Bankruptcy Court.

131144.    "Subordinated Claim" means any Claim against a Debtor (a) arising from rescission of a purchase or sale of a security of the Debtors or an Affiliate, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under Bankruptcy Code § 502 on account of such a Claim, (b) any other claim subject to subordination under Bankruptcy Code § 510, or (c) any claim addressed by Bankruptcy Code § 726(a)(3) – (a)(4).

132145.    "Subsidiary Debtor" means any Debtor other than Relativity Holdings.

133146.    "Tax" means:  (a) any net income, alternative or add-on minimum, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, license, property, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Entity.

134147.    "Television Sale Committee Allocation" shall mean the $2,000,000 held in a segregated account by counsel for the Creditor's Committee funded upon the consummation of the sale of the Debtors' television business.

135148.    "TLA/TLB Secured Claims" means any Allowed Secured Claim of the collateral and administrative agent or lenders against a Debtor under or evidenced by (a) the TLA/TLB Financing Agreement and (b) TLA/TLB Facility, as such TLA/TLB Secured Claim is now held collectively by (i) the Initial DIP Lenders in the amount of $60 million and (ii) Kavanaugh and Joseph Nicholas  in the approximate amount of $175 million.

136149.    "TLA/TLB Facility" means secured indebtedness under the TLA/TLB Financing Agreement, consisting of a tranche A term loan and a tranche B term loan with an aggregate outstanding principal amount of approximately $361,611,038 as of the Petition Date, plus accrued interest.

137150.    "TLA/TLB Financing Agreement" means the Financing Agreement, dated as of May 30, 2012, among certain of the Debtors, the lenders party thereto, Cortland Capital Market Services LLC, as Collateral and Administrative Agent, and CB Agency Services, LLC, as origination agent (as amended, supplemented, or modified from time to time).

138151.    **"TV Debtors"** means (i) Brant Point Productions, LLC, (ii) Cisco Beach Media, LLC, (iii) Cliff Road Media, LLC, (iv) Einstein Rentals, LLC, (v) English Breakfast Media, LLC , (vi) Great Point Productions, LLC, (vii) Hummock Pond Properties, LLC, (viii) Long Pond Media, LLC, (ix) Madaket Publishing, LLC (f/k/a Broad Street Publishing, LLC), (x) Madaket Road Music, LLC (f/k/a Broad Street Music, LLC), (xi) Miacomet Media, LLC, (xii) Orange Street Media, LLC, (xiii) Pocomo Productions, LLC, (xiv) Relativity REAL, LLC d/b/a Relativity Television, (xv) Relativity TV, LLC, (xvi) Smith Point Productions, LLC, (xvii) Straight Wharf Productions, LLC, (xix) Tuckernuck Music, LLC, (xx) Tuckernuck Publishing, LLC and (xxi) Zero Point Enterprises, LLC.

139152.    **"Ultimates Secured Claims"** means any Allowed Secured Claim of the administrative agent or lenders against a Debtor under or evidenced by the Ultimates Credit Documents.

140153.    **"Ultimates Credit Documents"** means the (a) the Credit, Security, Guaranty and Pledge Agreement, dated as of September 25, 2012 (as the same may have been amended, restated, supplemented, or other otherwise modified) with certain of the Debtors as borrowers, CIT Bank, as administrative agent, and the lenders party thereto and (b) all other agreements, documents and instruments executed and/or delivered related thereto, including  all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, and all other related agreements, documents and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto.

141154.    **"Unimpaired"** means, when used in reference to a Claim or an Interest, a Claim or an Interest that is not Impaired within the meaning of Bankruptcy Code § 1124.

155.    **"Union Entities"** means the Guilds in their status as Secured Guilds, together with the Unsecured Union Entities.

142156.    **"Unsecured GuildsUnion Entities"** means, collectively, (i) the Writers Guild of America, East, Inc.MPIPHP; (ii) the American Federation of Musicians.; (iii) the Laborers' International Union of North America; (iiiiv) the Operative Plasterers' and Cement Masons' International Association; (ivv) the International Alliance of Theatrical Stage Employees, Moving Picture Technicians, Artists and Allied Crafts of the United States, Its Territories and Canada; (vvi) the International Brotherhood of Teamsters; (vii) Equity (UK); and (viviii) the Secured Guilds to the extent any such Secured Guild has an Allowed General Unsecured Claim against any of the Debtors (and individually, each an "**Unsecured GuildUnion Entity**").

143157.    **"U.S. Trustee"** means the United States Trustee appointed under § 581 of title 28 of the United States Code to serve in the Southern District of New York.

144158.    **"Vine/Verite Secured Claims"** means any Allowed Secured Claim of Verite Capital Onshore Loan Fund LLC and/or Vine Film Finance Fund II LP against Yuma, Inc. and/or J & J Project, LLC under or evidenced by the Vine/Verite Loan Documents.

145159.    **"Vine/Verite Loan Documents"** means certain loan and security agreements entered into between Debtors Yuma, Inc. or J & J Project, LLC, as borrowers, and Verite Capital Onshore Loan Fund LLC, as lender, as were subsequently transferred to Vine Film Finance Fund II LP, in connection with the production of the films *3:10 To Yuma* and *The Forbidden Kingdom*.

146160.    **"Voting Deadline"** means 4:00 p.m. (Eastern time) on January __, 2016, which is the deadline for submitting Ballots to accept or reject thethis Plan in accordance with Bankruptcy Code § 1126.

147161.    **"Warrant Agreements"** means the form of warrant agreements, substantially similar in form as Exhibit H attached hereto.

162.    **"WGA"** means the Writers Guild of America West, Inc., for itself and on behalf of its affiliate Writers Guild of America East, Inc. and both on behalf of the Producer-Writers Guild of America Pension and Health Plans.

**B.**        **Rules of Interpretation and Computation of Time**

**1.**        **Rules of Interpretation**

For purposes of ~~the~~this Plan, unless otherwise provided herein:  (a) whenever it is appropriate from the context, each term, whether stated in the singular or the plural, includes both the singular and the plural; (b) unless otherwise provided in ~~the~~this Plan, any reference in ~~the~~this Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in ~~the~~this Plan to an existing document or Exhibit Filed or to be Filed means such document or Exhibit, as it may have been or may be amended, modified or supplemented pursuant to ~~the~~this Plan, Confirmation Order or otherwise; (d) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors, assigns and affiliates; (e) all references in ~~the~~this Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to ~~the~~this Plan; (f) the words "herein," "hereunder" and "hereto" refer to ~~the~~this Plan in its entirety rather than to a particular portion of ~~the~~this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of ~~the~~this Plan; (h) subject to the provisions of any contract, articles or certificates of formation, operating agreement , bylaws, codes of regulation, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with ~~the~~this Plan, the rights and obligations arising under ~~the~~this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and the Bankruptcy Rules; and (i) the rules of construction set forth in Bankruptcy Code § 102 shall apply to the extent not inconsistent with any other provision of this Section .1.B.I

**2.**        **Computation of Time**

In computing any period of time prescribed or allowed by ~~the~~this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**3.**        **Reference to Monetary Figures**

All references in ~~the~~this Plan to monetary figures refer to the lawful currency of the United States of America, unless otherwise expressly provided.

**II.**    **CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

All Claims and Interests, except Administrative Claims and Priority Tax Claims, are placed in the Classes set forth below.  In accordance with Bankruptcy Code § 1123(a)(1), Administrative Claims and Priority Tax Claims, as described in Section A Claim or Interest is classified in a particular   .are not classified herein ,A.II only to the extent that the Claim or Interest qualifies withinthe description of that Class and is classified in other Classes to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes.

**A.**        **Treatment of** Unclassified Claims

**1.**        **Administrative Claims**

a.        **Administrative Claims in General**

Except as specified in this Section II.A.1 and subject to the bar date provisions herein, unless otherwise agreed by the Holder of an Administrative Claim and the applicable Reorganized Debtor, or unless an order of the Bankruptcy Court provides otherwise, each Holder of an Allowed Administrative Claim (other than a Professional's Fee Claim and a Plan Co-Proponent Fee/Expense Claim) shall receive, in full satisfaction of its Administrative Claim, Cash equal to the Allowed amount of such Administrative Claim on either (i) the latest to occur of (A) the Effective Date (or as soon thereafter as practicable), (B) the date such Claim becomes an Allowed Administrative Claim, and (C) such other date as may be agreed upon by the Reorganized Debtors and the Holder of such Claim or

(ii) on such other date as the Bankruptcy Court may order.  For the avoidance of doubt, claims arising under the Modified DIP Credit Agreement are Administrative Claims.

b.    **Statutory Fees**

All fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date shall be paid by the applicable Reorganized Debtor in accordance therewith until the earlier of the conversion or dismissal of the applicable Chapter 11 Case under Bankruptcy Code § 1112 or the closing of the applicable Chapter 11 Case pursuant to Bankruptcy Code § 350(a).

c.    **Ordinary Course Postpetition Administrative Liabilities**

Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business, including Administrative Claims arising from or with respect to the sale of goods or provision of services on or after the Petition Date, Administrative Claims of governmental units for Taxes (including Tax audit Claims related to Tax years or portions thereof ending after the Petition Date), ~~and~~ Administrative Claims arising under Executory Contracts and Unexpired Leases, and Administrative Claims  in connection with Union Entity collective bargaining agreements, shall be paid by the applicable Reorganized Debtor~~, pursuant to the terms and conditions of the particular transaction giving rise to those Administrative Claims,~~ without further action by the Holders of such Administrative Claims or further approval by the Bankruptcy Court (i) pursuant to the terms and conditions of the particular transaction giving rise to those Administrative Claims and (ii) in the case of Administrative Claims arising from Union Entity collective bargaining agreements, in accordance with the Guild Payroll Protocols.  Holders of the foregoing Claims shall not be required to File or serve any request for payment of such Administrative Claims.

d.    **Professional Compensation**

(1)    Final Fee Applications

Professionals or other Entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Fee Order, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than sixty (60) days after the Effective Date; *provided*, *however*, that any party who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order without further Bankruptcy Court review or approval (except as provided in the Ordinary Course Professionals Order).  To the extent necessary, the Confirmation Order shall amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims.

(2)    Professional Fee Segregated Account

In accordance with Section  the Debtors shall ,on the Effective Date ,hereof (3)d.1.A.II establish and fund the Professional Fee Segregated Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals.  The Professional Fee Segregated Account shall be maintained in trust for the Professionals.  Such funds shall not be considered property of the Debtors' Estates.  The amount of Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Segregated Account when such Claims are Allowed by a Final Order.  When all Allowed Professional Compensation Claims are paid in full in Cash, amounts remaining in the Professional Fee Segregated Account, if any, shall revert to the Reorganized Debtors.

(3)    Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate their Fee Claims prior to and as of the Effective Date and shall deliver such estimate to the Debtors and counsel to the Creditors' Committee no later than five (5) days prior to the anticipated Effective Date; *provided*, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional.

If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

    e.   **Plan Co-Proponent Fee/Expense Claims**

   The Reorganized Debtor shall reimburse the Plan Co-Proponent Fee/Expense Claims incurred in connection with the Chapter 11 Cases.

    f.   **Post-Effective Date Professionals' Fees and Expenses**

   Except as otherwise specifically provided in ~~the~~this Plan, on and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented fees and expenses of the Professionals or other fees and expenses incurred by the Reorganized Debtors on or after the Effective Date, in each case, related to implementation and consummation of ~~the~~this Plan.  Upon the Effective Date, any requirement that Professionals comply with Bankruptcy Code §§ 327 - 331 and 1103 or any order of the Bankruptcy Court entered before the Effective Date governing the retention of, or compensation for services rendered by, Professionals after the Effective Date shall terminate, and the Reorganized Debtors may employ or pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

    g.   **Bar Dates for Administrative Claims**

   Except as otherwise provided herein, requests for payment of Administrative Claims (other than Fee Claims, and Administrative Claims based on Liabilities incurred by a Debtor in the ordinary course of its business as described in Section must be Filed and served on the Reorganized Debtors pursuant to the (c.1.A.II procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than the Administrative Claims Objection Deadline.

    2.   **Payment of Priority Tax Claims**

   Pursuant to Bankruptcy Code § 1129(a)(9)(C), and unless otherwise agreed by the Holder of a Priority Tax Claim and the Plan Proponents, each Holder of an Allowed Priority Tax Claim shall receive at the option of the Debtors or the Reorganized Debtors, as applicable, in full satisfaction of its Allowed Priority Tax Claim, on account of and in full and complete settlement, release and discharge of such Claim, (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim payable on the Effective Date (or as reasonably practicable thereafter) or (ii) Cash in the aggregate amount of such Allowed Priority Tax Claim payable in annual equal installments commencing on the later of:  (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim (or as soon as practicable thereafter); and, in each case, ending no later than five (5) years from the Petition Date.  Notwithstanding the foregoing, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the Holder for actual pecuniary loss will be treated as a Subordinated Claim, and the Holder may not assess or attempt to collect such penalty from the Reorganized Debtors or their respective property.

    B.   **Classification of Claims and Interests**

    1.   **General**

   Pursuant to Bankruptcy Code §§ 1122 and 1123, Claims and Interests are classified for voting and distribution pursuant to this Plan, as set forth herein.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed

classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such other Class. Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim. Notwithstanding the foregoing, and except as otherwise specifically provided for herein, the Confirmation Order or other order of the Bankruptcy Court, or required by applicable bankruptcy law, in no event shall the aggregate value of all property received or retained under ~~the~~this Plan on account of an Allowed Claim exceed 100% of the underlying Allowed Claim.

Bankruptcy Code § 1129(a)(10) shall be satisfied for the purposes of Confirmation by acceptance of ~~the~~this Plan by an Impaired Class of Claims; *provided*, *however*, that in the event no Holder of a Claim with respect to a specific Class for a particular Debtor timely submits a Ballot in compliance with the Disclosure Statement Order and/or Solicitation Order indicating acceptance or rejection of this Plan, such Class will be deemed to have accepted this Plan. The Plan Proponents may seek Confirmation of this Plan pursuant to Bankruptcy Code § 1129(b) with respect to any rejecting Class of Claims or Interests.

For administrative convenience, ~~the~~this Plan assigns a number to each of the Debtors and a letter to each of the Classes of Claims against or Interests in the Debtors. For consistency, designated Classes of Claims or Interests are assigned the same letter across each of the Debtors. The numbers assigned to each Debtor are:

| Debtor # | Debtor Name |
|---|---|
| 1. | 21 & Over Productions, LLC |
| 2. | 3 Days to Kill Productions, LLC |
| 3. | A Perfect Getaway P.R., LLC |
| 4. | A Perfect Getaway, LLC |
| 5. | Armored Car Productions, LLC |
| 6. | Best of Me Productions, LLC |
| 7. | Black Or White Films, LLC |
| 8. | Blackbird Productions, LLC |
| 9. | Brant Point Productions, LLC |
| 10. | Brick Mansions Acquisitions, LLC |
| 11. | Brilliant Films, LLC |
| 12. | Brothers Productions, LLC |
| 13. | Brothers Servicing, LLC |
| 14. | Catfish Productions, LLC |
| 15. | Cine Productions, LLC |
| 16. | CinePost, LLC |
| 17. | Cisco Beach Media, LLC |
| 18. | Cliff Road Media, LLC |
| 19. | Den of Thieves Films, LLC |
| 20. | Don Jon Acquisitions, LLC |
| 21. | DR Productions, LLC |
| 22. | Einstein Rentals, LLC |
| 23. | English Breakfast Media, LLC |
| 24. | Furnace Films, LLC |
| 25. | Gotti Acquisitions, LLC |
| 26. | Great Point Productions, LLC |
| 27. | Guido Contini Films, LLC |
| 28. | Hooper Farm Music, LLC |
| 29. | Hooper Farm Publishing, LLC |
| 30. | Hummock Pond Properties, LLC |
| 31. | Hunter Killer La Productions, LLC |
| 32. | Hunter Killer Productions, LLC |
| 33. | In The Hat Productions, LLC |

| Debtor # | Debtor Name |
|---|---|
| 34. | J&J Project, LLC |
| 35. | JGAG Acquisitions, LLC |
| 36. | Left Behind Acquisitions, LLC |
| 37. | Long Pond Media, LLC |
| 38. | Madaket Publishing, LLC |
| 39. | Madaket Road Music, LLC |
| 40. | Madvine RM, LLC |
| 41. | Malavita Productions, LLC |
| 42. | MB Productions, LLC |
| 43. | Merchant of Shanghai Productions, LLC |
| 44. | Miacomet Media LLC |
| 45. | Miracle Shot Productions, LLC |
| 46. | Most Wonderful Time Productions, LLC |
| 47. | Movie Productions, LLC |
| 48. | One Life Acquisitions, LLC |
| 49. | Orange Street Media, LLC |
| 50. | Out Of This World Productions, LLC |
| 51. | Paranoia Acquisitions, LLC |
| 52. | Phantom Acquisitions, LLC |
| 53. | Pocomo Productions, LLC |
| 54. | Relative Motion Music, LLC |
| 55. | Relative Velocity Music, LLC |
| 56. | Relativity Development, LLC |
| 57. | Relativity Fashion, LLC |
| 58. | Relativity Film Finance II, LLC |
| 59. | Relativity Film Finance III, LLC |
| 60. | Relativity Film Finance, LLC |
| 61. | Relativity Films, LLC |
| 62. | Relativity Foreign, LLC |
| 63. | Relativity Holdings LLC |
| 64. | Relativity India Holdings, LLC |
| 65. | Relativity Jackson, LLC |
| 66. | Relativity Media LLC |
| 67. | Relativity Media Distribution, LLC |
| 68. | Relativity Media Films, LLC |
| 69. | Relativity Music Group, LLC |
| 70. | Relativity Production LLC |
| 71. | Relativity REAL, LLC |
| 72. | Relativity Rogue, LLC |
| 73. | Relativity Senator, LLC |
| 74. | Relativity Sky Land Asia Holdings, LLC |
| 75. | Relativity TV, LLC |
| 76. | Reveler Productions, LLC |
| 77. | RML Acquisitions I, LLC |
| 78. | RML Acquisitions II, LLC |
| 79. | RML Acquisitions III, LLC |
| 80. | RML Acquisitions IV, LLC |
| 81. | RML Acquisitions IX, LLC |
| 82. | RML Acquisitions V, LLC |
| 83. | RML Acquisitions VI, LLC |
| 84. | RML Acquisitions VII, LLC |
| 85. | RML Acquisitions VIII, LLC |

| Debtor # | Debtor Name |
|---|---|
| 86. | RML Acquisitions X, LLC |
| 87. | RML Acquisitions XI, LLC |
| 88. | RML Acquisitions XII, LLC |
| 89. | RML Acquisitions XIII, LLC |
| 90. | RML Acquisitions XIV, LLC |
| 91. | RML Acquisitions XV, LLC |
| 92. | RML Bronze Films, LLC |
| 93. | RML Damascus Films, LLC |
| 94. | RML Desert Films, LLC |
| 95. | RML Distribution Domestic, LLC |
| 96. | RML Distribution International, LLC |
| 97. | RML Documentaries, LLC |
| 98. | RML DR Films, LLC |
| 99. | RML Echo Films, LLC |
| 100. | RML Escobar Films LLC |
| 101. | RML Film Development, LLC |
| 102. | RML Films PR, LLC |
| 103. | RML Hector Films, LLC |
| 104. | RML Hillsong Films, LLC |
| 105. | RML IFWT Films, LLC |
| 106. | RML International Assets, LLC |
| 107. | RML Jackson, LLC |
| 108. | RML Kidnap Films, LLC |
| 109. | RML Lazarus Films, LLC |
| 110. | RML Nina Films, LLC |
| 111. | RML November Films, LLC |
| 112. | RML Oculus Films, LLC |
| 113. | RML Our Father Films, LLC |
| 114. | RML Romeo and Juliet Films, LLC |
| 115. | RML Scripture Films, LLC |
| 116. | RML Solace Films, LLC |
| 117. | RML Somnia Films, LLC |
| 118. | RML Timeless Productions, LLC |
| 119. | RML Turkeys Films, LLC |
| 120. | RML Very Good Girls Films, LLC |
| 121. | RML WIB Films, LLC |
| 122. | RMLDD Financing, LLC |
| 123. | Rogue Digital, LLC |
| 124. | Rogue Games, LLC |
| 125. | Roguelife LLC |
| 126. | Safe Haven Productions, LLC |
| 127. | Sanctum Films, LLC |
| 128. | Santa Claus Productions, LLC |
| 129. | Smith Point Productions, LLC |
| 130. | Snow White Productions, LLC |
| 131. | Spy Next Door, LLC |
| 132. | Story Development, LLC |
| 133. | Straight Wharf Productions, LLC |
| 134. | Strangers II, LLC |
| 135. | Stretch Armstrong Productions, LLC |
| 136. | Studio Merchandise, LLC |
| 137. | Summer Forever Productions, LLC |

| Debtor # | Debtor Name |
|---|---|
| 138. | The Crow Productions, LLC |
| 139. | Totally Interns, LLC |
| 140. | Tribes of Palos Verdes Production, LLC |
| 141. | Tuckernuck Music, LLC |
| 142. | Tuckernuck Publishing, LLC |
| 143. | Wright Girls Films, LLC |
| 144. | Yuma, Inc. |
| 145. | Zero Point Enterprises, LLC |

**2.      Identification of Classes of Claims Against and Interests in the Debtors**

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are (a) Impaired or Unimpaired by this Plan, (b) entitled to vote to accept or reject this Plan in accordance with Bankruptcy Code § 1126 or (c) deemed to accept or reject this Plan.

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| A. | Priority Non-Tax Claims | Unimpaired | Deemed to Accept |
| B. | TLA/TLB Secured Claims | Impaired | Entitled to Vote |
| C. | Pre-Release P&A Secured Claims | ~~Unimpaired~~Impaired | ~~Deemed~~Entitled to ~~Accept~~Vote |
| D. | Post-Release P&A Secured Claims | Impaired | Entitled to Vote |
| E. | Production Loan Secured Claims | ~~Unimpaired~~Impaired | ~~Deemed~~Entitled to ~~Accept~~Vote |
| F. | Ultimates Secured Claims | Unimpaired | Deemed to Accept |
| G. | Secured Guilds Claims | Impaired | Entitled to Vote |
| H. | Vine/Verite Secured Claims | Unimpaired | Deemed to Accept |
| I. | Other Secured Claims | Unimpaired | Deemed to Accept |
| J. | General Unsecured Claim | Impaired | Entitled to Vote |
| K. | Subordinated Claims | Impaired | Deemed to Reject |
| L. | Interests | Impaired | Deemed to Reject |

**C.      Treatment of Classified Claims**

**1.      Priority Non-Tax Claims (Class A)**

a.      *Classification:*  Classes A1 – A145 consist of all Priority Non-Tax Claims against the respective Debtors.

b.      *Treatment:*  On the later of (a) the Effective Date and (b) the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, each Holder of an Allowed Priority Non-Tax Claim against a Debtor shall receive on account and in full and complete settlement, release and discharge of such Claim, at the Debtors' election, (i) Cash in the amount of such Allowed Priority Non-Tax Claim in accordance with Bankruptcy Code § 1129(a)(9) and/or (ii) such other treatment required to render such Claim unimpaired pursuant to Bankruptcy Code § 1124.  All Allowed Priority Non-Tax Claims against the Debtors that are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such Claims become due and payable in the ordinary course of business in accordance with the terms thereof.  All Priority Non-Tax Claims payable to the Guilds, if any, will be paid in accordance with the Guild Payroll Protocols.

c.      *Voting:*  Claims in Classes  A1 – A145 are Unimpaired.  Each Holder of an Allowed Claim in Classes  A1 – A145 shall be deemed to have accepted ~~the~~this Plan and is, therefore, not entitled to vote.

2.        **TLA/TLB Secured Claims (Class B)**

a.    *Classification:*  Classes B1 - B33, B35 - B56, B58 - B143, and B145 consist of all TLA/TLB Secured Claims against the respective Debtors.

b.    *Treatment:*  Except to the extent that a Holder of an Allowed TLA/TLB Secured Claim agrees to less favorable treatment, on the Effective Date, the Holders of Allowed TLA/TLB Secured Claims are entitled to receive 100% of the equity value of the Debtors.  Holders of the Allowed TLA/TLB Secured Claims, excluding Kavanaugh and Nicholas, have agreed to less favorable treatment, and shall receive the BidCo Note in full and final satisfaction, release, and discharge of, and in exchange for, such TLA/TLB Secured Claim. For the avoidance of doubt, the BidCo Note, to the extent paid down to $30 million ~~out of the proceeds thereof~~, will be subordinated to the New P&A/Ultimates Facility.  Kavanaugh and Nicholas have agreed to receive Reorganized Relativity Holdings Preferred Units and such other treatment on account of approximately $175 million of their TLA/TLB Secured Claims described in the Revised Relativity Holdings Operating Agreement as set forth in Section III.B below.

c.    *Voting:*  Claims in Classes B1 - B33, B35 - B56, B58 - B143, and B145 are Impaired.  Each Holder of an Allowed Claim in Classes B1 - B33, B35 - B56, B58 - B143, and B145 is entitled to vote.

3.        **Pre-Release P&A Secured Claims (Class C)**

a.    *Classification:*  Classes C5, C21, C108, C109, and C117 consist of all Pre-Release P&A Secured Claims against the Debtors.

b.    *Treatment*:  Except to the extent that a Holder of an Allowed Pre-Release P&A Secured Claim agrees to less favorable treatment, on or as soon <u>as practicable</u> after the Effective Date ~~as practicable~~, RKA, as the Holder of the Allowed Pre-Release P&A Secured ~~Claim~~<u>Claims</u>, shall receive the following treatment ~~at the option of the Plan Proponents:  (i) such Allowed Secured Claim shall be Reinstated; (ii) payment in full (in Cash) of any such Allowed Secured Claim; or (iii) satisfaction of any such Allowed Secured Claim by delivering the collateral securing any such Allowed Secured Claim; *provided, however,* that if the Debtors and RKA conclude their currently pending settlement negotiations, the terms of any agreement shall dictate the treatment of RKA and Class C claims~~<u>:  (i) If RKA votes to accept this Plan, the treatment as provided for in Exhibit I; or (ii) if RKA votes to reject this Plan,  the five (5) Replacement P&A Notes with a present value equal to the respective Allowed Pre-Release P&A Secured Claims.</u>

c.    *Voting:*  Claims in Classes C5, C21, C108, C109, and C117 are ~~Unimpaired~~<u>Impaired</u>.  Each Holder of an Allowed Claim in Classes C5, C21, C108, C109, and C117 ~~shall be deemed to have accepted the Plan and is, therefore, not~~<u>is</u> entitled to vote.

4.        **Post-Release P&A Claims Secured Claims (Class D)**

a.    *Classification:*  Classes D8, D109, and D121 consist of all Post-Release P&A Secured Claims against the Debtors.

b.    *Treatment:*  On or as soon <u>as practicable</u> after the Effective Date ~~as practicable~~, Reorganized Relativity Holdings shall Allow a claim in the approximately amount of $26,818,821 (as of October 31, 2015 and as reduced in the ordinary course until the Effective Date), which such amount shall include, without limitation, additional accrued interest, legal fees, costs, expenses and other outstanding obligations of Reorganized Relativity Holdings under the P&A Funding Agreement subject to documentation of a replacement credit agreement, which shall provide among other things for an extension of the maturity dates as compared to the pre-petition terms.  ~~The~~<u>Subject to and except for any senior Guild lien, the</u> obligation shall be secured by a first-priority security interest originally (i) cross-collateralized against Blackbird Productions, LLC and RML WIB Films, LLC and (ii) individually as against RML Lazarus Films, LLC; *provided, however,* that once amounts owing by RML Lazarus Films, LLC to RKA under the Pre-Release P&A Secured ~~Claim~~<u>Claims</u> are paid off in full, the obligation

under this Class D shall be fully secured on a cross-collateralized basis against each of the three entities. Reorganized Relativity Holdings shall continue to distribute each Post-Release P&A Picture until the outstanding obligations are satisfied by payment in full in ~~cash~~Cash in accordance with the terms of the replacement credit agreement which will make clear that the Classes D8, D109, and D121  lien shall apply only to the proceeds of the post-release films *Woman in Black 2*, *Lazarus* and *Beyond the Lights*, as applicable.

      c.    *Voting:*  Claims in Classes D8, D109, and D121 are Impaired.  Each Holder of an Allowed Claim in Classes D8, D109, and D121 is entitled to vote.

    **5.**      **Production Loan Secured Claims (Class E)**

      a.    *Classification:*  Classes E5 and E21 consists of all Production Loan Secured Claims against the Debtors.

      b.    *Treatment:*  Except to the extent that a Holder of an Allowed Production Loan Secured Claim agrees to less favorable treatment, on or as soon as practicable after the Effective Date, ~~such~~the Holder of the Allowed Production Loan Secured ~~Claim shall be Reinstated~~Claims shall receive the following treatment:  (i) If the Holder votes to accept this Plan, the Production Loan Settlement ; or (ii) if the Holder votes to reject this Plan, the two (2) Replacement Production Loan Notes with a present value equal to the respective Allowed Production Loan Secured Claims.  For the avoidance of doubt, nothing in this Plan is intended to affect or modify the Allowed Production Secured Claim Holder's rights under ¶ H(vi)(D) – (I) of ~~Docket~~Dkt. No. 931 in the Chapter 11 Cases.

      c.    *Voting:*  Claims in Classes E5 and E21 are ~~Unimpaired~~Impaired.  Each Holder of an Allowed Claim in Classes E5 and E21 shall be ~~deemed to have accepted the Plan and is, therefore, not~~ entitled to vote.

    **6.**      **Ultimates Secured Claims (Class F)**

      a.    *Classification:*  Classes F1, F2, F6, F7, F8, F10, F20, F24, F41, F47, F51, F77 - F83, F87, F95, F96, F99, F103, F109, F111, F112, F116, F119, F121 and  F126 consists of all Ultimates Secured Claims against the Debtors.

      b.    *Treatment:*  Except to the extent that a Holder of an Allowed Ultimates Secured Claim agrees to less favorable treatment, on or as soon ~~as~~ as practicable after the Effective Date~~as practicable~~, each Holder of a~~a~~n Allowed Ultimates Secured Claim shall receive ~~the following treatment at the option of the Plan Proponents:  (i) such Allowed Secured Claim shall be Reinstated or (ii)~~ payment in full (in Cash) of any such Allowed Ultimates Secured Claim in full and final satisfaction of their claim upon which payment any liens securing such claim shall be immediately released.

      c.    *Voting:*  Claims in Classes F1, F2, F6, F7, F8, F10, F20, F24, F41, F47, F51, F77- F83, F87, F95, F96, F99, F103, F109, F111, F112, F116, F119, F121 and  F126 are Unimpaired.  Each Holder of an Allowed Claim in Classes F1, F2, F6, F7, F8, F10, F20, F24, F41, F47, F51, F77 - F83, F87, F95, F96, F99, F103, F109, F111, F112, F116, F119, F121 and  F126 shall be deemed to have accepted ~~the~~this Plan and is, therefore, not entitled to vote.

### 7.        Secured Guilds Claims (Class G)

a.        *Classification:*
Classes G1, G2, G6, G7, G8, G10, G20, G24, G41, G47, G51, G77-
G83, G87, G95, G96, G99, G103, G109, G111, G112, G116, G119, G121 and G126 consist of all Secured Guilds Claims against the Debtors.

b.        *Treatment:* Except to the extent that a Holder of an Allowed Secured Guilds Claim agrees to less favorable treatment, each Holder of an Allowed Secured Guilds Claim shall receive (i) on the Effective Date or as soon thereafter as practicable, its pro rata share of $6.65 million less what is received with respect to the Secured Guilds Claims prior to the Effective Date, and (ii) one (1) year after the Effective Date or as soon ~~thereafter~~ as practicable, ~~each Holder of an Allowed Secured Guilds Claim shall receive~~ thereafter, payment in full (including applicable interest and collection costs, including but not limited to attorneys fees, as specified in each applicable security agreement) on account of the remaining balance of such Allowed Secured Guilds Claim; *provided, however,* that if the Guilds and the Reorganized Debtor have not agreed to the amount of remaining Allowed Guild Secured Claims within 180 days after the Effective Date, the parties will refer this issue to arbitration pursuant to the Guild collective bargaining agreements; *provided, further however,* that the Guilds shall retain any pre-petition liens securing the Allowed Secured Guilds Claims.  All payments to the Guilds in connection with the Allowed Secured Guilds Claims shall be payable ~~to each applicable Guild for the benefit of each applicable Guild-represented employee.  The Reorganized Debtors shall provide a designated payroll service (selected mutually by the Guilds and the Reorganized Debtors) with information concerning such payments.  The payroll service shall prepare checks in the~~ ~~prescribed form~~, and the Reorganized Debtors shall fund the payroll process and applicable taxes.  As an accommodation to the Reorganized Debtor, the Guilds shall forward such payments to the applicable Guild-represented employee. in accordance with the Guild Payroll Protocols.

c.        *Voting:* Claims in
Classes G1, G2, G6, G7, G8, G10, G20, G24, G41, G47, G51, G77-
G83, G87, G95, G96, G99, G103, G109, G111, G112, G116, G119, G121 and G126 are Impaired.  Each Holder of an Allowed Claim in Classes G1, G2, G6, G7, G8, G10, G20, G24, G41, G47, G51, G77-
G83, G87, G95, G96, G99, G103, G109, G111, G112, G116, G119, G121 and  G126 is entitled to vote.

### 8.        Vine/Verite Secured Claims (Class H)

a.        *Classification:*  Classes H34 and H144 and consists of all Vine/Verite Secured Claims against the Debtors.

b.        *Treatment:*  Except to the extent that a Holder of an Allowed Vine/Verite Secured Claim agrees to less favorable treatment, on or as soon as practicable after the Effective Date ~~as practicable~~, each Holder of a an Allowed Vine/Verite Secured Claim shall receive the following treatment at the option of the Plan Proponents:  (i) such Allowed Secured Claim shall be Reinstated; or (ii) satisfaction of any such Allowed Secured Claim by delivering the collateral securing any such Allowed Secured Claim.

c.        *Voting:*  Claims in Classes H34 and H144 are Unimpaired.  Each Holder of an Allowed Claim in Classes H34 and H144 shall be deemed to have accepted ~~the~~ this Plan and is, therefore, not entitled to vote.

### 9.        Other Secured Claims (Class I)

a.        *Classification:*  Classes I1 - I145 consists of all Other Secured Claims against the Debtors.

b.        *Treatment:*  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, on or as soon as practicable after the Effective Date ~~as practicable~~, each Holder of an Allowed Other Secured Claim shall receive the following treatment at the option of the Plan Proponents:  (i) such Allowed Secured Claim shall be Reinstated; (ii) payment in full (in Cash) of any such

Allowed Secured Claim; or (iii) satisfaction of any such Allowed Secured Claim by delivering the collateral securing any such Allowed Secured Claim.

c.      *Voting:*  Claims in Classes I1 - I145 are Unimpaired.  Each Holder of an Allowed Claim in Classes I1 - I145 shall be deemed to have accepted ~~the~~this Plan and is, therefore, not entitled to vote.

**10.          General Unsecured Claims (Class J)**

a.      *Classification:*  Classes J1 - J145 consist of all General Unsecured Claims against the Debtors.

b.      *Treatment:*  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the Effective Date, the Reorganized Debtors shall be deemed substantively consolidated for plan purposes only, and each Holder of an Allowed General Unsecured Claim in Classes J1 -  J145 shall receive, subject to the terms of this Plan, in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim, interests representing its Pro Rata share of (i) the Guaranteed GUC ~~Distributable Value~~Payment and (ii) the GUC ~~Litigation Trust~~Causes of Action Interests; *provided*, *however*, that the sum of the Guaranteed GUC ~~Distributable Value~~Payment and the GUC Litigation Trust Interests shall not exceed par.  For the avoidance of doubt, all intercompany claims of the Debtors shall be disallowed and canceled as part of the deemed substantive consolidation of the Debtors.  For ~~the~~further avoidance of doubt, claims arising under the Manchester Prepetition Credit Facility are General Unsecured Claims.  The Reorganized Debtors will meet and confer in order to coordinate GUC Distributable Value and Litigation Trust Interests with the Guild Payroll Protocols.  In addition, the Guilds agree that notwithstanding the CBA Assumption Agreements and Bankruptcy Code § 1113 and any other applicable provisions of the Bankruptcy Code, any unsecured pre-petition residuals owed by any of the Debtors will be treated as General Unsecured Claims.

c.      *Voting:*  Claims in Classes J1 -  J145 are Impaired.  Each Holder of an Allowed Claim in Classes J1 -  J145 is entitled to vote.

**11.          Subordinated Claims (Class K)**

a.      *Classification:*  Classes K1 – K145 consist of all Subordinated Claims.

b.      *Treatment:*  No property shall be distributed to or retained by the Holders of Subordinated Claims, and such Claims shall be extinguished on the Effective Date.  Holders of Subordinated Claims shall not receive any distribution pursuant to ~~the~~this Plan.

c.      *Voting:*  Claims in Classes K1 – K145 are Impaired.  Each Holder of an Allowed Claim in Classes K1 – K145 shall be deemed to have rejected ~~the~~this Plan and, therefore, is not entitled to vote.

**12.          Treatment of Interests in all Debtors (Class L)**

a.      *Classification:*  Classes L1 - L145 consists of all Interests in the Debtors.

b.      *Treatment:*  Holders of Interests in the Debtors shall retain no property under this Plan.

c.      *Voting:*  Interests in Classes L1 - L145 are Impaired.  Each Holder of an ~~Other~~Allowed Interest in Relativity Holdings in Classes L1 - L145 shall be deemed to have rejected ~~the~~this Plan and, therefore, is not entitled to vote.

### **D.** **Special Provision Regarding Prepetition Intercompany Claims**

For purposes of distributions under this Plan, Prepetition Intercompany Claims shall be disallowed and cancelled as part of the deemed substantive consolidation of the Debtors.

### **~~D~~E.** **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in ~~the~~this Plan, nothing under ~~the~~this Plan ~~shall~~will affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

### **~~E~~F.** **Postpetition Interest on General Unsecured Claims**

Except as required by applicable bankruptcy law, postpetition interest ~~shall~~will not accrue or be payable on account of any General Unsecured Claim.

### **~~F~~G.** **Insurance**

Notwithstanding anything to the contrary herein, if any Allowed Claim is covered by an insurance policy, such Claim ~~shall~~will first be paid from proceeds of such insurance policy, with the balance, if any, treated in accordance with the provisions of ~~the~~this Plan governing the Class applicable to such Claim.

## III.    MEANS OF IMPLEMENTATION

### A.    Issuance of Reorganized Relativity Holdings Preferred Units

On the Effective Date, Reorganized Relativity Holdings Preferred Units shall be authorized as set forth in the Operating Agreement.  Reorganized Relativity Holdings shall issue, pursuant to the treatment provided for in this Plan, Reorganized Relativity Holdings Preferred Units to each of Nicholas and Kavanaugh.  The rights of holders of Reorganized Relativity Holdings Preferred Units shall be set forth in the Revised Relativity Holdings Operating Agreement.

Each distribution and issuance of the Reorganized Relativity Holdings Preferred Units under ~~the~~this Plan shall be governed by the terms and conditions set forth in ~~the~~this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date, Reorganized Holdings will be authorized to and shall issue or execute and deliver, as applicable, the Reorganized Relativity Holdings Preferred Units and the New Securities and Documents (including, without limitation, in connection with a new equity raise), in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

The issuance or execution and delivery of the New Securities and Documents, as applicable, and the distribution thereof under this Plan shall be exempt from registration under applicable securities laws pursuant to Bankruptcy Code § 1145(a) and/or any other applicable exemptions.  Without limiting the effect of Bankruptcy Code § 1145, all documents, agreements, and instruments entered into on or as of the Effective Date contemplated by or in furtherance of this Plan shall become and shall remain effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

**B.       Issuance of Reorganized Relativity Holdings Common Units**

On the Effective Date, Reorganized Relativity Holdings Common Units shall be authorized as set forth in the Operating Agreement.  Reorganized Relativity Holdings shall issue, pursuant to the treatment provided for in this Plan, Reorganized Relativity Holdings Common Units to each of Nicholas and Kavanaugh.  Any shares not necessary to satisfy obligations under ~~the~~this Plan shall have the status of authorized but not issued shares of Reorganized Relativity Holdings.  The rights of holders of Reorganized Relativity Holdings Common Units shall be set forth in the Revised Relativity Holdings Operating Agreement.

Each distribution and issuance of the Reorganized Relativity Holdings Common Units under ~~the~~this Plan shall be governed by the terms and conditions set forth in ~~the~~this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date, each of the applicable Reorganized Debtors will be authorized to and shall issue or execute and deliver, as applicable, the Reorganized Relativity Holdings Common Units and the New Securities and Documents (including, without limitation, in connection with a new equity raise), in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

The issuance or execution and delivery of the New Securities and Documents, as applicable, and the distribution thereof under this Plan shall be exempt from registration under applicable securities laws pursuant to Bankruptcy Code § 1145(a) and/or any other applicable exemptions.  Without limiting the effect of Bankruptcy Code § 1145, all documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of this Plan shall become and shall remain effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

**C.       Issuance of Reorganized Relativity Holdings Warrants**

On the Effective Date, Reorganized Relativity Holdings shall issue Reorganized Relativity Holdings Warrants to each of Nicholas and Heatherden (or their respective Affiliates) with such terms and conditions set forth in their respective Warrant Agreements.

On the Effective Date, Reorganized Relativity Holdings will be authorized to and shall issue or execute and deliver, as applicable, the Reorganized Relativity Holdings Warrants and the New Securities and Documents (including, without limitation, in connection with a new equity raise), in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

The issuance or execution and delivery of the New Securities and Documents, as applicable, and the distribution thereof under this Plan shall be exempt from registration under applicable securities laws pursuant to Bankruptcy Code § 1145(a) and/or any other applicable exemptions.  Without limiting the effect of Bankruptcy Code § 1145, all documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of this Plan shall become and shall remain effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

**D.       Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided herein (including with respect to the Restructuring Transactions described in Section nized Relativity HoldReorga ,as of the Effective Date (1)  :1.E.IIIings shall exist as a separate legal entity, with all organizational powers in accordance with the laws of the state of Delaware and the certificates

of formation and operating agreement, appended hereto as Exhibit B and Exhibit C, respectively; (2) subject to the Restructuring Transactions, each of the Debtors shall, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal entity, with all of the powers of such a legal entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, conversion, dissolution or otherwise) under applicable law; and (3) on the Effective Date, all property of the Estate of a Debtor, the Causes of Action, and any property acquired by a Debtor or Reorganized Debtor under the~~the~~this Plan, shall vest, subject to the Restructuring Transactions, in the applicable Reorganized Debtors, free and clear of all Claims, liens, charges, other encumbrances, Interests and other interests.  On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire and dispose of property and compromise or settle any ~~claims~~Claims, Interests or the RKA Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by ~~the~~this Plan or the Confirmation Order.  Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for appropriate Professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to, or the approval of, the Bankruptcy Court.

E.      **Restructuring Transactions**

1.      **Restructuring Transactions Generally**

On or after the Effective Date, the Reorganized Debtors shall undertake such Restructuring Transactions as may be necessary or appropriate to effect, in accordance with applicable non-bankruptcy law, a restructuring of the Debtors' or Reorganized Debtors' respective business or simplify the overall organizational structure of the Reorganized Debtors, , including but not limited to resolving intercompany claims, all to the extent not inconsistent with any other terms of ~~the~~this Plan, including any such Restructuring Transactions described in any Restructuring ~~Transaction~~Transactions documents, including the Restructuring Transactions Exhibit, if any, to be filed with ~~the~~this Plan Supplement within the Debtors' discretion.

Without limiting the foregoing, unless otherwise provided by the terms of a Restructuring Transaction, all such Restructuring Transactions will be deemed to occur on the Effective Date and may include one or more mergers, conversions, or consolidations, restructurings, dispositions, liquidations or dissolutions, as may be determined by the Debtors or the Reorganized Debtors to be necessary or appropriate.

The actions taken by the Debtors or the Reorganized Debtors, as applicable, to effect the Restructuring Transactions may include:  (i) the execution, delivery, adoption, and/or amendment of appropriate agreements or other documents of merger, conversion, consolidation, restructuring, disposition, liquidation or dissolution containing terms that are consistent with the terms of this Plan, the Restructuring ~~Transaction~~Transactions documents, and any ancillary documents and that satisfy the applicable requirements of applicable state law and any other terms to which the applicable Entities may agree; (ii) the execution, delivery, adoption, and/or amendment of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of ~~the~~this Plan, the Disclosure Statement, the Restructuring ~~Transaction~~Transactions documents, and any ancillary documents and having other terms for which the applicable Entities may agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, conversion, merger, consolidation, dissolution or change in corporate form pursuant to applicable state law; (iv) the cancellation of shares, membership interests and warrants; and (v) all other actions that the Debtors or the Reorganized Debtors, as applicable, determine to be necessary, desirable, or appropriate to implement, effectuate, and consummate ~~the~~this Plan or the Restructuring Transactions contemplated hereby, including making filings or recordings that may be required by applicable state law in connection with the Restructuring Transactions.  Any such transactions may be effected on or subsequent to the Effective Date without any further action by the equityholders or directors of any of the Debtors or the Reorganized Debtors.

2.      **Obligations of Any Successor Entity in a Restructuring Transaction**

The Restructuring Transactions may result in substantially all of the respective assets, properties, rights, liabilities, duties, and obligations of certain of the Reorganized Debtors vesting in one or more surviving, resulting, or acquiring entities.  In any case in which the surviving, resulting, or acquiring entity in any such transaction is a

successor to a Reorganized Debtor, such surviving, resulting, or acquiring entity will perform the obligations of the applicable Reorganized Debtor pursuant to ~~the~~this Plan to pay or otherwise satisfy the Allowed Claims against such Reorganized Debtor, except as provided in ~~the~~this Plan or in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring corporation, which may provide that another Reorganized Debtor will perform such obligations.

### F.    Sources of Cash for Plan Distributions

The Debtors or Reorganized Debtors, as applicable, are authorized to execute and deliver any documents necessary or appropriate to obtain Cash for funding ~~the~~this Plan.  All consideration necessary for the Reorganized Debtors to make payments or distributions pursuant hereto shall be obtained through a combination of one or more of the following:  (a) Cash on hand of the Debtors, including Cash from business operations, or distributions from Non-Debtor Affiliates; (b) proceeds of the sale of assets; (c) the New P&A/Ultimates Facility; (d) the proceeds of any tax refunds and ~~other causes of action~~the RKA Causes of Action; (e) the proceeds of any equity raise; and (f) any other means of financing or funding that the Debtors or the Reorganized Debtors determine is necessary or appropriate.  Further, the Debtors and the Reorganized Debtors shall be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under ~~the~~this Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers shall be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and shall not violate the terms of ~~the~~this Plan or any orders entered by the Bankruptcy Court with respect to the Debtors' cash management system.

### G.    Corporate Governance, Managers and Officers, Employment-Related Agreements and Compensation Programs; Other Agreements

#### 1.    Certificates of Formation and Operating Agreement

As of the Effective Date, the certificate of formation and the operating agreement (or comparable constituent documents) of Reorganized Relativity Holdings shall be substantially in the forms appended hereto as Exhibit B and Exhibit C, respectively.  The certificate of formation and operating agreement (or comparable constituent documents) of each Reorganized Debtor, among other things, shall prohibit the issuance of nonvoting equity securities to the extent required by Bankruptcy Code § 1123(a)(6).  After the Effective Date, each Reorganized Debtor may amend and restate its certificate of formation or operating agreement (or comparable constituent documents) as permitted by applicable non-bankruptcy law, subject to the terms and conditions of such constituent documents.  On the Effective Date, or as soon thereafter as is practicable, each Reorganized Debtor shall file such certificate of formation (or comparable constituent documents) with the secretary of state or jurisdiction or similar office of the state or jurisdiction in which such Reorganized Debtor is incorporated or organized, to the extent required by and in accordance with the applicable corporate law of such state.

#### 2.    Managers and Officers of the Reorganized Debtors

In accordance with Bankruptcy Code § 1129(a)(5), from and after the Effective Date, the initial officers and directors of Reorganized Relativity Holdings shall be comprised of the individuals identified in a disclosure to be Filed as part of the Plan Supplement.  The directors for the boards of managers/directors of the direct and indirect subsidiaries of Reorganized Relativity Holdings shall be identified and selected by the New Board of Managers.

#### 3.    Employment-Related Agreements and Compensation Programs

Except as otherwise provided herein, as of the Effective Date, each of the Reorganized Debtors shall have authority to:  (i) maintain, reinstate, amend or revise existing employment, retirement, welfare, incentive, severance, indemnification and other agreements with its active and retired directors, officers and employees, subject to the terms and conditions of any such agreement and applicable non-bankruptcy law; and (ii) enter into new employment, retirement, welfare, incentive, severance, indemnification and other agreements for active and retired employees.

On the Effective Date, ~~the~~ Reorganized Relativity shall ~~enter into new~~assume the existing employment plans and ~~execute new~~ employment agreements ~~as required; all existing plans and agreements shall be terminated and rejected pursuant to Bankruptcy Code § 365 and Section .~~A of this Plan.IV, as the same may be modified, other than those identified on Exhibit E as designated for rejection.

On or after the Effective Date, the Reorganized Debtors shall continue to administer and pay the Claims arising before the Petition Date under the Debtors' workers' compensation programs in accordance with their prepetition practices and procedures.

### 4.        Other Matters

Notwithstanding anything to the contrary in ~~the~~this Plan, no provision in any contract, agreement or other document with the Debtors that is rendered unenforceable against the Debtors or the Reorganized Debtors pursuant to Bankruptcy Code §§ 541(c), 363(*l*) or 365(e)(1), or any analogous decisional law, shall be enforceable against the Debtors or Reorganized Debtors as a result of this Plan.

### 5.        Payment of Manchester Fees

If and to the extent Relativity shall not have paid, prior to the Effective Date, all of the fees, expenses, and other amounts payable to Manchester or Heatherden, whether incurred prepetition or postpetition, including without limitation all amounts paid for legal and other professional fees and expenses of Manchester and Heatherden for O'Melveny & Myers LLP, Ropes & Gray LLP, and Moelis & Company, then all such unpaid fees, expenses and other amounts shall be paid to Manchester and Heatherden on the Effective Date of ~~the~~this Plan; *provided* that such fees and expenses incurred between October 26, 2015 and January 31, 2016, shall be subject to a budget in an aggregate amount of $3,750,000 for such period; provided, that the budget shall not limit fees and expenses related to a litigation or investigation of Manchester, Heatherden.

### 6.        Transactions Effective as of the Effective Date

Pursuant to Bankruptcy Code § 1142 and the Delaware Limited Liability Company Act and any comparable provisions of the business corporation or limited liability company law of any other state or jurisdiction the following shall occur and be effective as of the Effective Date, if no such other date is specified in such other documents, and shall be authorized and approved in all respects and for all purposes without any requirement of further action by the members or managers of the Debtors or any of the Reorganized Debtors: (a) the Restructuring Transactions; (b) the adoption of new or amended and restated certificates of formation and operating agreements (or comparable constituent documents) for each Reorganized Debtor; (c) the initial selection of managers and officers for each Reorganized Debtor; (d) the distribution of Cash and other property pursuant to ~~the~~this Plan; (e) the authorization and issuance of Reorganized Relativity Holdings Common Units pursuant to ~~the~~this Plan; (f) the entry into and performance of the New Exit Financing Documents; (g) any amendments to any of the credit agreements; (h) the adoption, execution, delivery and implementation of all contracts, leases, instruments, releases and other agreements or documents related to any of the foregoing; (i) the adoption, execution and implementation of employment, retirement and indemnification agreements, incentive compensation programs, retirement income plans, welfare benefit plans and other employee plans and related agreements; and (j) any other matters provided for under ~~the~~this Plan involving the organizational structure of the Debtors or Reorganized Debtors or organizational action to be taken by or required of a Debtor or Reorganized Debtor.

### H.        New P&A/Ultimates Facility

On the Effective Date, one or more of the Reorganized Debtors shall be authorized to consummate the New P&A/Ultimates Facility and to execute, deliver and enter into the New Exit Financing Documents, and any related agreements or filings without the need for any further corporate or other organizational action and without further action by the Holders of Claims or Interests, and the New Exit Financing Documents and any related agreements or filings shall be executed and delivered and the applicable Reorganized Debtors shall enter into the New P&A/Ultimates Facility and be permitted to incur or issue the indebtedness available thereunder.

Any final material terms of the New P&A/Ultimates Facility shall be included in the Plan Supplement.

**I.        Preservation of ~~Rights~~Causes of Action**

Except as provided in ~~the~~this Plan or in any contract, instrument, release, or other agreement entered into, or delivered in connection with, or assumed by ~~the~~this Plan (including, for the avoidance of doubt, pursuant to Section E and .XX.F), in accordance with Bankruptcy Code § 1123(b) and to the fullest extent possible under applicable law, (i) the Reorganized Debtors will retain ~~and may enforce, and will have~~the Causes of Action and the RKA Causes of Action, (ii) only the Reorganized Debtors will have the right to enforce and prosecute the RKA Causes of Action, and (iii) the Reorganized Debtors shall grant to the Litigation Trust the sole right to enforce~~, any claims, demands, rights, and causes of action that any Debtor or their respective estates may hold against any Entity including the Excluded Release Parties~~ and prosecute the Causes of Action in the name of the Reorganized Debtor, whether such Causes of Action arose before or after the Petition Date, including any actions specifically enumerated in Exhibit J.   The Reorganized Debtors' and Litigation Trust's rights to commence, prosecute, or settle such RKA Causes of Action and Causes of Action, respectively, shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors or their successors, and/or the Litigation Trust, may pursue, or not pursue, such ~~retained claims, demands, rights or causes of action~~RKA Causes of Action and Causes of Action, as applicable, as they deem appropriate in their discretion.

No Person or Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against them as any indication that the Litigation Trust will not pursue any and all available Causes of Action against them.  Except with respect to Causes of Action as to which the Debtors or the Reorganized Debtors have released any Person or Entity on or prior to the Effective Date (pursuant to the Debtor Release or otherwise), the Reorganized Debtors and the Litigation Trust, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person or Entity, except as otherwise expressly provided in this Plan.

**J.        Reinstatement and Continuation of Insurance Policies**

From and after the Effective Date, each of the Debtors' insurance policies in existence as of the Effective Date ~~shall~~will be reinstated and continued in accordance with their terms and, to the extent applicable, ~~shall~~will be deemed assumed by the applicable Reorganized Debtor pursuant to Bankruptcy Code § 365 and Section A of.IV ~~the~~this Plan.  Nothing in ~~the~~this Plan ~~shall~~will affect, impair or prejudice the rights of the insurance carriers or the Reorganized Debtors under the insurance policies in any manner, and such insurance carriers and Reorganized Debtors ~~shall~~will retain all rights and defenses under such insurance policies, and such insurance policies shall apply to, and be enforceable by and against, the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date.

**K.        Entry into CBA Assumption Agreements**

On the Effective Date, the applicable Reorganized Debtors shall enter into the CBA Assumption Agreements.

**L.        Cancellation and Surrender of Instruments, Securities and Other Documentation**

On the Effective Date and except as otherwise specifically provided for in ~~the~~this Plan, (i) the obligations of the Debtors under any other certificate, share, note, purchase right, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest, equity, or profits interest in, the Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest (except the Intercompany Interests), will be cancelled as to the Debtors, and the Reorganized Debtors will have no continuing obligations thereunder; (ii) the obligations of the Debtors under the Modified DIP Credit Agreement will be fully released, settled, and compromised as to the Debtors, and the Reorganized Debtors will have no continuing obligations thereunder; and (iii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation/formation or similar documents

governing the shares, units, certificates, notes, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors will be fully released, settled, and compromised except as expressly provided herein.

With respect to any agreement (including, without limitation, any applicable credit agreement) that governs the rights of the Holder of a Claim or Interest and will be cancelled hereunder, and notwithstanding the occurrence of the Effective Date, such agreement will continue in effect solely for purposes of allowing such Holders to receive distributions under ~~the~~this Plan as provided herein.

### M.    Release of Liens

Except as otherwise provided in ~~the~~this Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with ~~the~~this Plan, on the Effective Date and consistent with the treatment provided for Claims and Interests in Section liens or other  ,deeds of trust ,all mortgages ,II including any liens granted as adequate protection ag ,security interestsainst the property of any Estate, shall be fully released and discharged, and all of the right, title and interest of any Holder of such mortgages, deeds of trust, liens or other security interests, including any rights to any collateral thereunder, shall revert to the applicable Reorganized Debtor and its successors and assigns.  As of the Effective Date, the Reorganized Debtors shall be authorized to execute and file on behalf of creditors Form UCC-3 termination statements, mortgage releases or such other forms as may be necessary or appropriate to implement the provisions of this Section .M.III

### N.    Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of managers or directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of ~~the~~this Plan, the Restructuring Transactions, the Reorganized Relativity Holdings Preferred Units, the Reorganized Relativity Holdings Common Units issued pursuant to ~~the~~this Plan, the New P&A/Ultimates Facility authorized pursuant to ~~the~~this Plan (including, but not limited to, the New Exit Financing Documents), and any amendments to any of the Debtors' credit agreements, in each case, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization or consents except those expressly required pursuant to ~~the~~this Plan.

## IV.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein, each of the Debtors' Executory Contracts and Unexpired Leases not previously assumed or rejected pursuant to an order of the Bankruptcy Court shall be deemed assumed as of the Effective Date in accordance with the provisions and requirements of Bankruptcy Code §§ 365 and 1123 <u>except</u> any Executory Contract or Unexpired Lease (1) identified on <u>Exhibit</u> ~~F~~E to this Plan (which shall be Filed as part of the Plan Supplement, and as may be amended) as an Executory Contract or Unexpired Lease designated for rejection, (2) which is the subject of a pending objection as to cure or assumability of such Executory Contract(s) or Unexpired Lease(s), (3) which is the subject of a separate motion or notice to assume or reject Filed by the Debtors and pending as of the Effective Date, (3~~4~~) that previously expired or terminated pursuant to its own terms, or (4~~5~~) that was previously assumed by any of the Debtors.  In the event that an Executory Contract or Unexpired Lease is the subject of a pending objection, at any time (i) on or before the Effective Date, the Debtors reserve the right to supplement the list of rejected contracts on <u>Exhibit</u> ~~F~~E or (ii) after the Effective Date, the Reorganized Debtors reserve the right to supplement the list of rejected contracts on <u>Exhibit</u> ~~F~~E.

<u>Pursuant to Bankruptcy Code § 365, Participation Agreements for yet to be released films are executory contracts and, as such, shall be assumed by the Reorganized Debtors as of the Effective Date.</u>

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections of such Executory Contracts and Unexpired Leases as set forth in ~~the~~this Plan, all pursuant

to Bankruptcy Code §§ 365(a) and 1123.  Each Executory Contract and Unexpired Lease assumed pursuant to ~~the~~this Plan or by Bankruptcy Court order, and not assigned to a third party by previous order of the Bankruptcy Court on or prior to the Effective Date, shall revest in, and be fully enforceable by, the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court.  To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to ~~the~~this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including, without limitation, any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by ~~the~~this Plan shall not entitle the counterparty thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Notwithstanding anything to the contrary in ~~the~~this Plan, the Debtors or Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement Exhibit ~~E to the Plan~~E hereto  in their discretion prior to the Effective Date on no less than ~~three~~five (~~3~~5) business days' notice to the counterparty thereto.

**B.**      **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to ~~the~~this Plan shall be satisfied, pursuant to Bankruptcy Code § 365(b)(1), by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of Bankruptcy Code § 365) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by Bankruptcy Code § 365(b)(1) shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.

No later than the date on which the Plan Supplement is Filed, to the extent not previously Filed with the Bankruptcy Court and served on affected counterparties, the Debtors shall provide for notices of proposed assumption and proposed cure amounts to be sent to applicable Executory Contract and Unexpired Lease counterparties, together with procedures for objecting thereto and resolution of disputes by the Bankruptcy Court.  Any objection by a contract or lease counterparty to a proposed assumption (but not related to cure amount) must be Filed, served, and actually received by the Debtors by the date on which objections to Confirmation are due (or such other date as may be provided in the applicable assumption notice).  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption shall be deemed to have assented to such assumption.  For the avoidance of doubt, as ordered by the Bankruptcy Court in these Chapter 11 Cases (~~Docket~~Dkt. No. 369), failure of the non-Debtor counterparty previously served with a cure notice to have filed an objection or raised an informal objection with Debtors' counsel has resulted in a deemed waiver to object to, contest, condition or otherwise restrict the assumption of the noticed assumed contracts or lease and otherwise forever barred the non-Debtor counterparty from objecting to the amount of the cure payment.  Every non-Debtor counterparty may, however, object as to adequate assurance of future performance of the Reorganized Debtors.

Assumption of any Executory Contract or Unexpired Lease pursuant to ~~the~~this Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged without further notice to or action, order or approval of the Bankruptcy Court.

**C.**      **Claims Based on Rejection of Executory Contracts and Unexpired Leases**

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases pursuant to ~~the~~this Plan or otherwise must be filed with the Notice and Claims Agent within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  Any Proofs of Claim arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases that are not timely filed shall be disallowed automatically,

forever barred from assertion, and shall not be enforceable against any Reorganized Debtor without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court.  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall constitute General Unsecured Claims and shall be treated in accordance with Section .10.C.II

The Plan Proponents reserve the right to object to, settle, compromise or otherwise resolve any Claim Filed on account of a rejected Executory Contract or Unexpired Lease.

**D.**      **Contracts and Leases Entered Into After the Petition Date**

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, shall be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

**E.**      **Reservation of Rights**

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in ~~the~~this Plan, nor the Debtors' delivery of a notice of proposed assumption and proposed cure amount to applicable contract and lease counterparties shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**F.**      **Pre-Existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection of any Executory Contract or Unexpired Lease pursuant to ~~the~~this Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors or Reorganized Debtors under such Executory Contracts or Unexpired Leases.  Notwithstanding any applicable non-bankruptcy law to the contrary, the Debtors and Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors from counterparties to rejected Executory Contracts or Unexpired Leases.

**G.**      **Certain Compensation and Benefit Programs**

Notwithstanding anything to the contrary in this Plan, all contracts, agreements, policies, programs and plans in existence on the Petition Date that provided for the issuance of Interests in any of the Debtors to current or former employees or directors of the Debtors are, to the extent not previously terminated or rejected by the Debtors, to be treated as Class  K Subordinated Claims and shall be rejected or otherwise terminated as of the Effective Date without any further action of the Debtors or Reorganized Debtors or any order of the Court, any unvested Interests granted under any such agreements, policies, programs and plans in addition to any Interests granted under such agreements previously terminated or rejected by the Debtors to the extent not previously cancelled shall be cancelled pursuant to Section Objections to the treatment of these  .K of this Plan.III plans or the Claims for rejection or termination damages arising from the rejection or termination of any such plans, if any, must be submitted and resolved in accordance with the procedures and subject to the conditions for objections to Confirmation.  If any such objection is not timely Filed and served before the deadline set for objections to ~~the~~this Plan, each participant in or counterparty to any agreement described in this Section objecting to the rejection or termination pr (1) G shall be forever barred from.IVovided hereunder, and shall be precluded from being heard at the Confirmation Hearing with respect to such objection; (2) asserting against any Reorganized Debtor, or its property, any default existing as of the Effective Date or any counterclaim, defense, setoff or any other interest asserted or assertable against the Debtors; and (3) imposing or

charging against any Reorganized Debtor any accelerations, assignment fees, increases or any other fees as a result of any rejection pursuant to this Section IV.G.

**H.    Obligations to Insure and Indemnify Directors, Officers and Employees**

Any and all managers/directors and officers liability and fiduciary insurance or tail policies in existence as of the Effective Date shall be reinstated and continued in accordance with their terms and, to the extent applicable, shall be deemed assumed or assumed and assigned by the applicable Debtor or Reorganized Debtor, pursuant to Bankruptcy Code § 365 and Section IV.A of this Plan. Each insurance carrier under such policies shall continue to honor its coverage obligation, if any, and administer the policies with respect to the Reorganized Debtors in the same manner and according to the same terms, conditions, and practices applicable to the Debtors prior to the Effective Date.

The applicable Reorganized Debtor shall only be obligated to indemnify any ~~person~~Person who is serving or has served as one of the Debtors' directors, officers, managers ~~or~~, employees or consultants at any time from and after the Petition Date for any losses, claims, costs, damages or Liabilities resulting from such ~~person~~Person's service in such a capacity at any time from and after the Petition Date or as a director, officer, managers or employee of a Non-Debtor Affiliate at any time from and after the Petition Date, to the extent provided in the applicable certificates of incorporation or formation, by-laws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor.  Accordingly, such indemnification obligations shall survive and be unaffected by entry of the Confirmation Order.

**I.    Reservation of Rights**

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in this Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtors have any liability thereunder.

**V.    PROVISIONS GOVERNING DISTRIBUTIONS**

**A.    Distributions for Allowed Claims as of the Effective Date**

Except as otherwise provided in this Section V, distributions to be made on the Effective Date to Holders of Allowed Claims as provided by Section II or this Section V shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable by the Reorganized Debtors or the Reorganized Debtors, as applicable.

**B.    Undeliverable Distributions**

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Reorganized Debtors, the Litigation Trust or the Guild counsel (as applicable) has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided, however,* that such Distribution shall be deemed unclaimed property under Bankruptcy Code § 347(b) at the expiration of the latter of six (6) months from (i) the Effective Date or (ii) Allowance of such claim.  After such date, all unclaimed property shall become available cash for distribution to all other Holders of Litigation Trust Interests (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such unclaimed property shall be released and forever barred from assertion against such Debtor and its Estate.

~~1.    Holding of Undeliverable Distributions~~

~~The Reorganized Debtors shall make one attempt to make the distributions contemplated hereunder in accordance with the procedures set forth herein.  Any distributions returned to the Reorganized Debtors, or~~

distributions that are otherwise undeliverable, shall remain in the possession of the applicable Reorganized Debtor until such time as a distribution becomes deliverable.

**2.    Failure to Claim Undeliverable Distributions**

Any Holder of an Allowed Claim entitled to a distribution of property under this Plan that does not assert a claim pursuant to the Plan for an undeliverable distribution within 180 days after the Effective Date shall have its claim for such undeliverable distribution discharged and shall be forever barred from asserting any such claim against the Reorganized Debtors or their respective property.

### C.    Compliance with Tax Requirements

In connection with ~~the~~this Plan and all instruments issued in connection herewith and distributed hereunder, to the extent applicable, the Debtors, the Reorganized Debtors, the Litigation ~~Trustee~~Trust, or any other party issuing any instruments or making any distributions under ~~the~~this Plan shall comply with all applicable Tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant to ~~the~~this Plan and all related agreements shall be subject to such withholding and reporting requirements.  Each of the Debtors, the Reorganized Debtors, and the Litigation ~~Trustee~~Trust, as applicable, shall be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including applying a portion of any Cash distribution to be made under ~~the~~this Plan to pay applicable Tax withholding.  In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax.  Any amounts withheld pursuant to the immediately preceding sentence shall be deemed to have been distributed and received by the applicable recipient for all purposes of ~~the~~this Plan.  For the avoidance of doubt, the employer shall pay the "employer share" of any applicable employment taxes.  Notwithstanding any other provision of ~~the~~this Plan, each Holder of an Allowed Claim receiving a distribution pursuant to ~~the~~this Plan shall have the sole and exclusive responsibility for the satisfying and paying of any Tax obligations imposed on it by any governmental unit on account of such distribution, including income, withholding and other Tax obligations.  Any party issuing any instrument or making any distribution pursuant to ~~the~~this Plan has the right, but not the obligation, to not make a distribution until such Holder has made arrangements satisfactory to the issuing or disbursing party for the payment of any tax obligations.

Any party entitled to receive any property as an issuance or distribution under ~~the~~this Plan shall be required, if so requested, to deliver to the Debtors, the Reorganized Debtors, the Litigation ~~Trustee~~Trust or any other party issuing any instruments or making any distributions under this Plan (or such other Entity designated by any of the foregoing), as applicable, an IRS Form W-9 or (if the payee is a foreign Entity) an IRS Form W-8BEN, IRS Form W-8BEN-E, or such other IRS Form W-8, as applicable, unless such Entity is exempt under the Internal Revenue Code and so notifies the making the distribution.  ~~Unless~~If a properly completed IRS Form W-9 or IRS Form W-8, as appropriate, is not delivered to the distributing party (or such other Entity)~~, the distributing party, in its sole discretion, may (a) make a distribution net of any applicable withholding, including backup withholding, or (b) reserve such distribution.  If the distributing party reserves such distribution,~~ and the Holder fails to comply with the requirement to deliver the IRS Form W-9 or IRS Form W-8 within ~~the~~ 180 days ~~after the Effective Date~~prescribed in Section above 2.B.IX, such distribution shall be deemed undeliverable ~~in accordance with Section B.V~~.

### D.    Distribution Record Date

**1.**        The Debtor or Reorganized Debtors will have no obligation to recognize the transfer, or the sale, of any participation in, any Claim that occurs after the close of business on the Distribution Record Date and will be entitled for all purposes herein to recognize and make distributions only to those holders of Allowed Claims that are holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.

**2.**        Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record

Date will be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

### E.    Setoffs

Except with respect to claims of a Debtor or Reorganized Debtor released pursuant to ~~the~~this Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with ~~the~~this Plan, the Reorganized Debtors or the Litigation Trust, as applicable, may, pursuant to Bankruptcy Code § 553 or applicable non-bankruptcy law, set off against any Claim and the payments or distributions to be made on account of the ~~Claim the claims~~Claims, rights and ~~causes~~Causes of ~~action~~Action of any nature that the applicable ~~Debtor or~~ Reorganized Debtor or Litigation Trust may hold against the Holder of the Claim; *provided*, *however*, that the failure to effect a setoff shall not constitute a waiver or release by the applicable ~~Debtor or~~ Reorganized Debtor or Litigation Trust of any ~~claims~~Claims, rights and ~~causes~~Causes of ~~action~~Action that the ~~Debtor or~~ Reorganized Debtor or Litigation Trust may possess against the Holder of a Claim.

### F.    Distributions to Holders of Disputed Claims

Notwithstanding any other provision of ~~the~~this Plan, (1) no payments or distributions will be made on account of a Disputed Claim until such Claim becomes an Allowed Claim, if ever and (2) except as otherwise agreed to by the relevant parties, no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the ~~the~~this Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Holder of such Claim shall receive the distribution (if any) to which such Holder is entitled under ~~the~~this Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.  Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### G.    Allocation Between Principal and Accrued Interest

Except as otherwise provided in ~~the~~this Plan, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to ~~the~~this Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof as determined for U.S. federal income tax purposes) and, thereafter, to interest and the remaining portion, if any, of such Allowed Claims.

## VI.    DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS

### A.    Allowance of Claims

After the Effective Date, the Reorganized Debtors and/or the Litigation Trust, as applicable, shall have and retain any and all rights and defenses the Debtors had with respect to any Claim immediately prior to the Effective Date, except with respect to any Claim deemed Allowed under ~~the~~this Plan.  Except as expressly provided in ~~the~~this Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under ~~the~~this Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) in the Chapter 11 Cases allowing such Claim.  All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

Any Claim that has been listed in the Schedules as disputed, contingent or unliquidated, and for which no Proof of Claim has been timely filed, is not considered Allowed and shall be expunged without further action and without any further notice to or action, order or approval of the Bankruptcy Court.

### B.    Prosecution of Objections to Claims

Except as otherwise specifically provided in ~~the~~this Plan, the Debtors, prior to the Effective Date, and the Reorganized Debtors or the Litigation Trust, as applicable, after the Effective Date, shall have the sole authority: (1) to File, withdraw or litigate to judgment, objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (3) to administer and adjust the claims register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Bankruptcy Court.

### C.    Estimation of Claims

The Debtors, prior to the Effective Date, and the Reorganized Debtors or the Litigation Trust, as applicable, after the Effective Date~~, as applicable~~, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to Bankruptcy Code § 502(c) for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under ~~the~~this Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

### D.    Expungement or Adjustment to Claims Without Objection

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors or the Reorganized Debtors, as applicable, without a claim objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

### E.    Deadline to File Objections to Claims

The Reorganized Debtors or Liquidating Trust, as applicable may object to any Claims not previously Allowed by an order of the Bankruptcy Court or pursuant to this Plan prior to the Claims Objection Bar Date.

### ~~E~~F.    Disallowance of Certain Claims

**EXCEPT AS PROVIDED HEREIN, IN AN ORDER OF THE BANKRUPTCY COURT OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS.**

### ~~F~~G.    Offer of Judgment

The Reorganized Debtors are authorized to serve upon a Holder of a Disputed Claim an offer to allow judgment to be taken on account of such Disputed Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment.  To the extent the Holder of a Disputed Claim must pay the costs incurred by the Reorganized Debtors after the making of such offer, the Reorganized Debtors are entitled to set off such amounts against the amount of any distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

### ~~G~~H.    Amendments to Claims

On or after the Effective Date, except as provided herein, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such prior authorization is not received, any such new or amended Claim filed shall be deemed disallowed in full and expunged without any further action.

## VII.    CONDITIONS PRECEDENT TO CONSUMMATION OF ~~THE~~THIS PLAN

### A.    Conditions to the Effective Date

The Effective Date shall not occur, and ~~the~~this Plan shall not be consummated unless and until the following conditions have been satisfied or duly waived pursuant to Section :B.VII

          1.        All documents and agreements necessary to consummate ~~the~~this Plan shall have been effected or executed.

          2.        The Bankruptcy Court shall have entered the Confirmation Order, and the Confirmation Order shall be (i) a Final Order and (ii) in form and substance reasonably acceptable to the Plan Proponents.

          3.        Receipt of required governmental approvals (if any) and any and all other steps necessary to consummate the Debtors' proposed restructuring in any applicable jurisdictions have been received and/or effectuated.

          4.        All other documents and agreements necessary to implement ~~the~~this Plan on the Effective Date that are required to be in form and substance reasonably acceptable to the Plan Proponents shall have been executed and delivered and all other actions required to be taken in connection with the Effective Date shall have occurred.

          5.        All statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full.

### B.    Waiver of Conditions to Effective Date

The conditions to the Effective Date may be waived in whole or part at any time by the Plan Proponents, without an order of the Bankruptcy Court.

### C.    ~~Effect~~Effects of Nonoccurrence of Conditions to the Effective Date

If the Effective Date does not occur, then (i) ~~the~~this Plan will be null and void in all respects; (ii) any settlement or compromise embodied in ~~the~~this Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by ~~the~~this Plan, and any document or agreement executed pursuant to ~~the~~this Plan, will be deemed null and void; and (iii) nothing contained in ~~the~~this Plan or the Disclosure Statement will (a) constitute a waiver or release of any Claims or Interests, (b) prejudice in any manner the rights of the Debtors or any other Person or Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Person or Entity.

## VIII.    NON-CONSENSUAL CONFIRMATION

In the event that any Impaired Class of Claims or Interests rejects this Plan, the Plan Proponents reserve the right, without any delay in the occurrence of the Confirmation Hearing or Effective Date, to (A) request that the Bankruptcy Court confirm this Plan in accordance with Bankruptcy Code § 1129(b) with respect to such non-

accepting Class, in which case this Plan shall constitute a motion for such relief and/or (B) amend this Plan in accordance with Section XII.A.

## IX.    THE LITIGATION TRUST

### A.    Litigation Trust Agreement

On or before the Effective Date, the Plan Proponents and the Litigation Trustee shall execute the Litigation Trust Agreement, and shall take all other necessary steps to establish the Litigation Trust and the Litigation Trust Interests therein, which shall be for the benefit of the Litigation Trust Beneficiaries and the Reorganized Debtors, as provided in Section II.10.C. herein, whether their Claims are Allowed before, on or after the Effective Date. The Litigation Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the Litigation Trust as a "liquidating trust," to the extent provided herein, for United States federal income tax purposes.

### B.    Purpose of the Litigation Trust

The Litigation Trust shall be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulation § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

### C.    Litigation Trust Assets

On the Effective Date, the Debtors shall transfer all of the Litigation Trust Assets, and the Creditors' Committee shall transfer the Television Sale Committee Allocation, to the Litigation Trust.  The Litigation Trust Assets may be transferred subject to certain liabilities, as provided in the~~the~~this Plan or the Litigation Trust Agreement. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar Tax, pursuant to Bankruptcy Code § 1146(a).  Upon delivery of the Litigation Trust Assets to the Litigation Trust, the Debtors and their predecessors, successors and assigns, and each other Entity released pursuant to Article X herein shall be discharged and released from all liability with respect to the delivery of such distributions.

### D.    Administration of the Litigation Trust

The Litigation Trust shall be administered by the Litigation Trustee according to the Litigation Trust Agreement and ~~the~~this Plan.  In the event of any inconsistency between ~~the~~this Plan and the Litigation Trust Agreement, the Litigation Trust Agreement shall govern.

### E.    The Litigation Trustee

In the event the Litigation Trustee dies, is terminated, or resigns for any reason, a successor shall be designated in accordance with the Litigation Trust Agreement; *provided*, *however*, that under no circumstance shall the Litigation Trustee be a director or officer with respect to any Affiliate of the Litigation Trust.

### F.    Role of the Litigation Trustee

In furtherance of and consistent with the purpose of the Litigation Trust and ~~the~~this Plan, and subject to the terms of the Confirmation Order, ~~the~~this Plan and the Litigation Trust Agreement, the Litigation Trustee shall, among other things, have the following rights, powers and duties: (i) to hold, manage, convert to Cash, and distribute the Litigation Trust Assets, including prosecuting and resolving the Claims belonging to the Litigation Trust, (ii) to hold the Litigation Trust Assets for the benefit of the Litigation Trust Beneficiaries and the Reorganized Debtors, whether their Claims are Allowed on or after the Effective Date, (iii) in the Litigation Trustee's reasonable business judgment, to investigate, prosecute, settle and/or abandon rights, ~~causes of action, or~~any litigation that may

constitute Litigation Trust Assets, or the Causes of Action, and (iv) to file all tax and regulatory forms, returns, reports, and other documents required with respect to the Litigation Trust.

### G.    Transferability of Litigation Trust Interests

The Litigation Trust Interests shall not be transferable or assignable except by will, intestate succession or operation of law.

### H.    Cash

The Litigation Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by Bankruptcy Code § 345; *provided*, *however*, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation § 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

### I.    Distribution of Litigation Trust Assets/Litigation Trust Claims Reserve

The Litigation Trustee shall distribute to the holders of Allowed General Unsecured Claims on account of their Litigation Trust Interests, on or immediately after the Effective Date and on a quarterly basis thereafter, all unrestricted Cash on hand (including any Cash received from the Debtors on the Effective Date, and treating any permissible investment as Cash for purposes of this Section Cash reserved pursuant to (i) except ,(I.IX the Litigation Trust Agreement to fund the activities of the Litigation Trust, which amount shall not exceed $~~150,000~~500,000 on the Effective Date, but which may be increased thereafter in accordance with the provisions of the Litigation Trust Agreement, (ii) such amounts as are allocable to or retained on account of Disputed General Unsecured Claims in accordance with this Section such additional amounts as are  (iii) and ,I.IX reasonably necessary to (A) meet contingent liabilities and to maintain the value of the Litigation Trust Assets during liquidation, (B) pay reasonable incurred or anticipated expenses (including, but not limited to, any Taxes imposed on or payable by the Litigation Trust or in respect of the Litigation Trust Assets), or (C) as are necessary to satisfy other liabilities incurred or anticipated by the Litigation Trust in accordance with ~~the~~this Plan, or the Litigation Trust Agreement.

Each such Distribution in the aggregate shall be in an amount not less than $100,000 of Available Cash. Notwithstanding the foregoing, the Litigation Trustee may determine, in its sole discretion (i) that the Disbursing Agent shall make a Distribution that is less than $100,000 in the aggregate of Available Cash, or (ii) that the Disbursing Agent shall not make a Distribution to the Holder of a Claim on the basis that the Litigation Trustee has not yet determined whether to object to such Claim and such Claim shall be treated as a Disputed Claim for purposes of Distributions under this Plan until the Litigation Trustee (x) determines not to object to such Claim (or the Claims Objection Bar Date has passed), (y) agrees with the Holder of such Claim to Allow such Claim in an agreed upon amount or (z) objects to such Claim, or objects to the Holder of such Claim's request for allowance of such Claim, and such Claim is Allowed by a Final Order.

On each date of Distribution, the Litigation Trustee shall only distribute Cash to the Holder of an Allowed Claim if the amount of Cash to be distributed on account of such Claim is greater than or equal to $100 in the aggregate unless a request therefor is made in writing to the Litigation Trustee.  Any distributions withheld because they are below $100 with respect to any particular holder, of an Allowed Claim will be aggregated and distributed when the aggregate amount exceeds $100 or on the final distribution date of the Litigation Trust.

#### 1.    Amounts Retained on Account of Disputed Claims

From and after the Effective Date, and until such time as all Disputed Claims have been compromised and settled or determined by order of the Bankruptcy Court, the Litigation Trustee shall retain for the benefit of each holder of a Disputed Claim, Litigation Trust Interests (and the Cash attributable thereto), in an amount equal to the distributions which would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the Disputed Claim Amount, (ii) the amount in which the Disputed Claim shall be estimated by the Bankruptcy Court pursuant to Bankruptcy Code § 502 for purposes of allowance, which amount,

unless otherwise ordered by the Bankruptcy Court, shall constitute and represent the maximum amount in which such Claim may ultimately become an Allowed Claim or (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and the Reorganized Debtors.  Except as otherwise provided in this Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the Distributions provided for in this Plan, regardless of whether such Distributions are delivered on or at any time after the Effective Date.  No payments or distributions shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof by Final Order.

<p style="text-align:center;">2.        Allowance of Disputed Claims</p>

At such time as a Disputed Claim becomes an Allowed Claim, the Litigation Trustee shall distribute to the Holder thereof the distributions, if any, to which such Holder is then entitled under ~~the~~this Plan together, with any interest that has accrued on the amount of Cash, but only to the extent that such interest is attributable to the amount of the Allowed Claim.  Such distribution, if any, shall be made as soon as practicable after an order or judgment of the Bankruptcy Court is entered allowing such Disputed Claim becomes a Final Order but in no event more than sixty (60) days thereafter (net of any expenses, including any taxes imposed on or with respect to the Litigation Trust Claims Reserve relating to such Claim).

**J.        Costs and Expenses of the Litigation Trust**

The reasonable costs and expenses of the Litigation Trust, including the fees and expenses of the Litigation Trustee and its retained professionals and any applicable insurance policies required by the Litigation Trust, shall be paid solely from the Litigation Trust Assets.

**K.        Compensation of the Litigation Trustee**

The individual(s) serving as or comprising the Litigation Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar roles, the payment of which shall not be subject to the approval of the Bankruptcy Court and be made solely from the assets of the Litigation Trust.

**L.        Retention of Professionals/Employees by the Litigation Trustee**

The Litigation Trustee may retain and compensate attorneys, other professionals, and employees to assist in its duties as Litigation Trustee on such terms as the Litigation Trustee deems appropriate without Bankruptcy Court approval.

**M.        Federal Income Tax Treatment of the Litigation Trust**

The Litigation Trust generally is intended to be treated for United States federal income Tax purposes, (i) in part as a grantor trust that is a liquidating trust within the meaning of Treasury Regulations § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, and (ii) in part as one or more disputed ownership funds within the meaning of Treasury Regulations § 1.468B-9(b)(1).  For United States federal income tax purposes, the transfer of the Litigation Trust Assets to the Litigation Trust will be treated as a transfer of the Litigation Trust Assets from the Debtors to the Litigation Trust Beneficiaries, followed by the Litigation Trust Beneficiaries' transfer of the Litigation Trust Assets to the Litigation Trust.  The Litigation Trust Beneficiaries will thereafter be treated for U.S. federal income tax purposes as the grantors and deemed owners of their respective shares of the Litigation Trust Assets. The Litigation Trust Beneficiaries shall include in their annual taxable incomes, and pay tax to the extent due on, their allocable shares of each item of income, gain, deduction, loss and credit, and all other such items shall be allocated by the Litigation Trustee to the Litigation Trust Beneficiaries using any reasonable allocation method.

The Litigation Trustee will be required by the Litigation Trust Agreement to file income Tax returns for the Litigation Trust as a grantor trust of the Litigation Trust Beneficiaries (and file separate returns for the disputed ownership fund(s) pursuant to Treasury Regulations § 1.468B-9(b)(1) and pay all Taxes owed on any net income or gain of the disputed ownership fund(s), on a current basis from Litigation Trust Assets). In addition, the Litigation

Trust Agreement will require consistent valuation by the Litigation Trustee and the Litigation Trust Beneficiaries, for all federal income Tax and reporting purposes, of any property held by the Litigation Trust. The Litigation Trust Agreement will provide that termination of the trust will occur no later than five years after the Effective Date, unless the Bankruptcy Court approves an extension based upon a finding that such an extension is necessary for the Litigation Trust to complete its liquidating purpose. The Litigation Trust Agreement also will limit the investment powers of the Litigation Trustee in accordance with IRS Rev. Proc. 94-45 and will require the Litigation Trust to distribute at least annually to the Litigation Trust Beneficiaries (as such may have been determined at such time) its net income (net of any payment of or provision for Taxes), except for amounts retained as reasonably necessary to maintain the value of the Litigation Trust Assets.

### N.        Indemnification of Litigation Trustee

The Litigation Trustee or the individual(s) comprising the Litigation Trustee, as the case may be, and the Litigation Trustee's employees, agents and professionals, shall not be liable to the Litigation Trust Beneficiaries or the Reorganized Debtor for actions taken or omitted in their capacity, except those acts that are determined in a Final Order to have constituted willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all actions or inactions in their capacity, except for any actions or inactions involving willful misconduct or gross negligence. Any indemnification claim of the Litigation Trustee (and the other parties entitled to indemnification under this subsection) shall be satisfied solely from the Litigation Trust Assets and shall be entitled to a priority distribution therefrom, ahead of the Litigation Trust Interests and any other claim to or interest in such assets. The Litigation Trustee  shall be entitled to rely, in good faith, on the advice of their retained professionals.

### O.        Privileges and Obligation to Respond to Ongoing Investigations

All attorney-work privileges, work product protections and other immunities or protections from disclosure held by the Debtors shall be transferred, assigned, and delivered to the Litigation Trust, without waiver, and shall vest in the Litigation Trustee solely in its capacity as such (and any other individual the Litigation Trustee may designate, as well as any other individual designated in the Litigation Trust Agreement).  Pursuant to Federal Rule of Evidence 502(d), no Privileges shall be waived by disclosure to the Litigation Trustee of the Debtors' information subject to attorney-client privileges, work product protections, or other immunities or protections from disclosure.

## X.    EFFECT OF CONFIRMATION

### A.        Dissolution of Official Committees

Except to the extent provided herein, upon the Effective Date, the current and former members of the Creditors' Committee and any other creditor, equity or other committee appointed in the Chapter 11 Cases pursuant to Bankruptcy Code § 1102, and their respective officers, employees, counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases; _provided_, _however_, that following the Effective Date the Creditors' Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (1) Claims and/or applications for compensation by Professionals and requests for allowance of Administrative Claims for substantial contribution pursuant to Bankruptcy Code § 503(b)(3)(D); (2) any appeals to which the Creditors' Committee is a party; (3) any adversary proceedings or contested matters as of the Effective Date to which the Creditors' Committee is a party; and (4) responding to creditor inquiries for sixty (60) days following the Effective Date.  Following the completion of the Creditors' Committee's remaining duties set forth above,  the Creditors' Committee shall be dissolved, and the retention or employment of the Creditors' Committee's respective attorneys, accountants and other agents shall terminate.  As discussed in Section III.I above, the Litigation Trust shall have the authority to prosecute and settle the Causes of Action after the Effective Date.

### B.        Discharge of Claims and Interests

Except as provided in ~~the~~this Plan or in the Confirmation Order, the rights afforded under ~~the~~this Plan and the treatment of Claims and Interests under ~~the~~this Plan shall be in exchange for and in complete satisfaction,

discharge and release of all Claims and Interests arising or existing on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date.  From and after the Effective Date, the Debtors shall be discharged from any and all Claims and Interests that arose or existed prior to the Effective Date, subject to the obligations of the Debtors under ~~the~~this Plan.

**C.      Injunctions**

AS OF THE EFFECTIVE DATE, EXCEPT WITH RESPECT TO THE OBLIGATIONS OF THE REORGANIZED DEBTORS UNDER ~~the~~THIS PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, CURRENTLY HOLD OR MAY HOLD ANY CLAIMS OR INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION OR LIABILITIES THAT ARE WAIVED, DISCHARGED OR RELEASED UNDER ~~the~~THIS PLAN SHALL BE PERMANENTLY ENJOINED FROM TAKING ANY OF THE FOLLOWING ENFORCEMENT ACTIONS AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED PARTIES OR ANY OF THEIR RESPECTIVE ASSETS OR PROPERTY ON ACCOUNT OF ANY SUCH WAIVED, DISCHARGED OR RELEASED CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION OR LIABILITIES: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING; (2) ENFORCING, LEVYING, ATTACHING, COLLECTING OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE OR ORDER; (3) CREATING, PERFECTING OR ENFORCING ANY LIEN OR ENCUMBRANCE; (4) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY DEBT, LIABILITY OR OBLIGATION DUE TO ANY DEBTOR, REORGANIZED DEBTOR OR RELEASED PARTY; AND (5) COMMENCING OR CONTINUING ANY ACTION, IN ANY MANNER, IN ANY PLACE TO ASSERT ANY CLAIM WAIVED, DISCHARGED OR RELEASED UNDER ~~the~~THIS PLAN OR THAT DOES NOT OTHERWISE COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF ~~the~~THIS PLAN.

EXCEPT AS EXPRESSLY PROVIDED IN THIS PLAN, THE CONFIRMATION ORDER, OR A SEPARATE ORDER OF THE BANKRUPTCY COURT, OR AS AGREED TO BY A HOLDER OF A CLAIM OR INTEREST AND THE REORGANIZED DEBTORS (ON BEHALF OF THE TV DEBTORS), ALL ENTITIES (OTHER THAN THE DEBTORS) WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN ANY OR ALL OF THE TV DEBTORS (WHETHER PROOF OF SUCH CLAIMS OR INTERESTS HAS BEEN FILED OR NOT), ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS OR PRINCIPALS, ARE PERMANENTLY ENJOINED, ON AND AFTER THE EFFECTIVE DATE, SOLELY WITH RESPECT TO ANY CLAIMS OR INTERESTS THAT ARE TREATED PURSUANT TO THIS PLAN, FROM (I) COMMENCING, CONDUCTING, OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION, OR OTHER PROCEEDING OF ANY KIND (INCLUDING, WITHOUT LIMITATION, ANY PROCEEDING IN A JUDICIAL, ARBITRAL, ADMINISTRATIVE OR OTHER FORUM) AGAINST OR AFFECTING THE PROPERTY OF THE DEBTORS, (II) ENFORCING, LEVYING, ATTACHING (INCLUDING, WITHOUT LIMITATION, ANY PREJUDGMENT ATTACHMENT), COLLECTING, OR OTHERWISE RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE PROPERTY OF ANY OF THE DEBTORS, (III) CREATING, PERFECTING, OR OTHERWISE ENFORCING IN ANY MANNER DIRECTLY OR INDIRECTLY, ANY ENCUMBRANCE OF ANY KIND AGAINST THE PROPERTY OF ANY OF THE DEBTORS, (IV) ASSERTING ANY RIGHT OF SETOFF, DIRECTLY OR INDIRECTLY, AGAINST ANY OBLIGATION DUE OF ANY OF THE DEBTORS, EXCEPT AS CONTEMPLATED OR ALLOWED BY THIS PLAN; (V) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THIS PLAN; AND (VI) TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THIS PLAN.

**D.      Exculpation**

FROM AND AFTER THE EFFECTIVE DATE, THE EXCULPATED PARTIES, THE DEBTORS AND THE REORGANIZED DEBTORS SHALL NEITHER HAVE NOR INCUR ANY LIABILITY TO

ANY ENTITY, AND NO HOLDER OF A CLAIM OR INTEREST, NO OTHER PARTY IN INTEREST AND NONE OF THEIR RESPECTIVE REPRESENTATIVES SHALL HAVE ANY RIGHT OF ACTION AGAINST ANY DEBTOR, REORGANIZED DEBTOR, EXCULPATED PARTY OR ANY OF THEIR RESPECTIVE REPRESENTATIVES FOR ANY ACT TAKEN OR OMITTED TO BE TAKEN BEFORE THE EFFECTIVE DATE IN CONNECTION WITH, RELATED TO OR ARISING OUT OF THE CHAPTER 11 CASES, THE DEBTORS OR THE NEGOTIATION, CONSIDERATION, FORMULATION, PREPARATION, DISSEMINATION, IMPLEMENTATION, CONFIRMATION OR CONSUMMATION OF ~~the~~THIS PLAN, THE EXHIBITS, THE DISCLOSURE STATEMENT, ANY AMENDMENTS TO ANY OF THE FOREGOING OR ANY OTHER TRANSACTIONS PROPOSED IN CONNECTION WITH THE CHAPTER 11 CASES OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO OR ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION THEREWITH OR IN CONNECTION WITH ANY OTHER OBLIGATIONS ARISING UNDER ~~the~~THIS PLAN OR THE OBLIGATIONS ASSUMED HEREUNDER; *PROVIDED*, *HOWEVER*, THAT THE FOREGOING PROVISIONS OF THIS SECTION  :D shall have no effect on.X ure to perform or pay any the liability of any Entity that would otherwise result from the fail (1)  obligation or liability under~~the~~THIS PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT PREVIOUSLY ASSUMED OR TO BE ENTERED INTO OR DELIVERED IN CONNECTION WITH ~~the~~THIS PLAN OR (2) THE LIABILITY OF ANY EXCULPATED PARTY THAT WOULD OTHERWISE RESULT FROM ANY ACT OR OMISSION OF SUCH EXCULPATED PARTY TO THE EXTENT THAT SUCH ACT OR OMISSION IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT (INCLUDING FRAUD).

      E.      **Debtor Release**

      WITHOUT LIMITING ANY OTHER APPLICABLE PROVISIONS OF, OR RELEASES CONTAINED IN, ~~the~~THIS PLAN, AS OF THE EFFECTIVE DATE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEBTORS AND THE REORGANIZED DEBTORS, ON BEHALF OF THEMSELVES AND THEIR AFFILIATES, THE ESTATES AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS AND ANY AND ALL ENTITIES WHO MAY PURPORT TO CLAIM BY, THROUGH, FOR OR BECAUSE OF THEM, SHALL FOREVER RELEASE, WAIVE AND DISCHARGE ALL LIABILITIES THAT THEY HAVE, HAD OR MAY HAVE AGAINST A DEBTOR, THE ESTATES, ANY RELEASED PARTY WITH RESPECT TO THE CHAPTER 11 CASES, THE NEGOTIATION, CONSIDERATION, FORMULATION, PREPARATION, DISSEMINATION, IMPLEMENTATION, CONFIRMATION OR CONSUMMATION OF ~~the~~THIS PLAN, THE EXHIBITS, THE DISCLOSURE STATEMENT, ANY AMENDMENTS THERETO, THE INITIAL DIP CREDIT AGREEMENT, THE INITIAL DIP ORDER, THE MODIFIED DIP CREDIT AGREEMENT, THE MODIFIED DIP ORDER, ANY OF THE NEW SECURITIES AND DOCUMENTS, THE RESTRUCTURING TRANSACTIONS OR ANY OTHER TRANSACTIONS PROPOSED IN CONNECTION WITH THE CHAPTER 11 CASES OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO OR ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION THEREWITH OR IN CONNECTION WITH ANY OTHER OBLIGATIONS ARISING UNDER ~~the~~THIS PLAN OR THE OBLIGATIONS ASSUMED HEREUNDER; *PROVIDED*, *HOWEVER*, THAT THE FOREGOING PROVISIONS OF THIS SECTION (a) E the liability of any Released  Party that otherwise would result from any act or omission to the extent that act or omiSSION SUBSEQUENTLY IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT (INCLUDING FRAUD), (B) ANY RIGHTS TO ENFORCE ~~the~~THIS PLAN OR THE OTHER CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS OR DOCUMENTS PREVIOUSLY ASSUMED OR TO BE~~, or previously,~~ TO BE ENTERED INTO OR DELIVERED IN CONNECTION WITH ~~the~~THIS PLAN, (C) EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS PLAN, ANY OBJECTIONS BY THE DEBTORS OR THE REORGANIZED DEBTORS TO CLAIMS OR INTERESTS FILED BY ANY ENTITY AGAINST ANY DEBTOR AND/OR THE ESTATES, INCLUDING RIGHTS OF SETOFF, REFUND OR OTHER ADJUSTMENTS, (D) THE RIGHTS OF THE DEBTORS TO ASSERT ANY APPLICABLE DEFENSES IN LITIGATION OR OTHER PROCEEDINGS WITH THEIR EMPLOYEES (INCLUDING THE RIGHTS TO SEEK SANCTIONS,

FEES AND OTHER COSTS) AND (E) ANY CLAIM OF THE DEBTORS OR REORGANIZED DEBTORS, INCLUDING (BUT NOT LIMITED TO) CROSS-CLAIMS OR COUNTERCLAIMS OR OTHER CAUSES OF ACTION AGAINST EMPLOYEES OR OTHER PARTIES, ARISING OUT OF OR RELATING TO ACTIONS FOR PERSONAL INJURY, WRONGFUL DEATH, PROPERTY DAMAGE, PRODUCTS LIABILITY OR SIMILAR LEGAL THEORIES OF RECOVERY TO WHICH THE DEBTORS OR REORGANIZED DEBTORS ARE A PARTY.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR ~~cause~~CAUSES OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.  NOTHING HEREIN SHALL ABROGATE APPLICABLE ATTORNEY DISCIPLINARY RULES.

F.    **Third Party Release**

WITHOUT LIMITING ANY OTHER APPLICABLE PROVISIONS OF, OR RELEASES CONTAINED IN, ~~the~~THIS PLAN, AS OF THE EFFECTIVE DATE, IN CONSIDERATION FOR THE OBLIGATIONS OF THE ~~Plan~~ DEBTORS AND THE REORGANIZED DEBTORS UNDER ~~the~~THIS PLAN AND THE CONSIDERATION AND OTHER CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS OR DOCUMENTS TO BE ENTERED INTO OR DELIVERED IN CONNECTION WITH ~~the~~THIS PLAN, EACH ~~Holder of a Claim or Interest in Classes  ,B ,Dand  ,GJ~~CONSENTING CREDITOR SHALL BE DEEMED TO HAVE FOREVER RELEASED AND COVENANTED WITH THE RELEASED PARTIES TO FOREVER RELEASE, WAIVE AND DISCHARGE ALL LIABILITIES IN ANY WAY THAT SUCH ENTITY HAS, HAD OR MAY HAVE AGAINST ANY RELEASED PARTY (WHICH RELEASE SHALL BE IN ADDITION TO THE DISCHARGE OF CLAIMS AND TERMINATION OF INTERESTS PROVIDED HEREIN AND UNDER THE CONFIRMATION ORDER AND THE BANKRUPTCY CODE), IN EACH CASE, RELATING TO A DEBTOR, THE ESTATES, THE CHAPTER 11 CASES, THE NEGOTIATION, CONSIDERATION, FORMULATION, PREPARATION, DISSEMINATION, IMPLEMENTATION, CONFIRMATION OR CONSUMMATION ~~the~~THIS PLAN, THE EXHIBITS, THE DISCLOSURE STATEMENT, ANY AMENDMENTS THERETO, THE INITIAL DIP CREDIT AGREEMENT, THE INITIAL DIP ORDER, THE MODIFIED DIP CREDIT AGREEMENT, THE MODIFIED DIP ORDER, ANY OF THE NEW SECURITIES AND DOCUMENTS, THE RESTRUCTURING TRANSACTIONS OR ANY OTHER TRANSACTIONS IN CONNECTION WITH THE CHAPTER 11 CASES OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO OR ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION THEREWITH OR IN CONNECTION WITH ANY OTHER OBLIGATIONS ARISING UNDER ~~the~~THIS PLAN OR THE OBLIGATIONS ASSUMED HEREUNDER; *PROVIDED*, *HOWEVER*, THAT THE FOREGOING ~~provisions~~PROVISION OF THIS SECTION F .X the liability of any Entity that would otherwise result from the failure  (a)  :shall have no effect on to perform or pay any obligation or liability under~~the~~THIS PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT PREVIOUSLY ASSUMED OR TO BE ENTERED INTO OR DELIVERED IN CONNECTION WITH ~~the~~THIS PLAN; (B) THE LIABILITY OF ANY RELEASED PARTY THAT WOULD OTHERWISE RESULT FROM ANY ACT OR OMISSION OF SUCH RELEASED PARTY TO THE EXTENT THAT SUCH ACT OR OMISSION IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT (INCLUDING FRAUD); OR (C) ANY ~~Holder of a Claim or Interest in Classes  ,B ,D ,G and J who elects not to provide such Third Party Release by notation on the Ballot~~NON-CONSENTING CREDITOR.

**ENTRY OF THE CONFIRMATION ORDER ~~shall constitute~~BY THE BANKRUPTCY COURT~~'s approval,~~ SHALL CONSTITUTE AN ORDER APPROVING THE ASSUMPTIONS OR REJECTIONS OF SUCH EXECUTORY CONTRACTS AND UNEXPIRED LEASES AS SET FORTH IN THIS PLAN, ALL PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR ~~cause~~CAUSES OF ACTION RELEASED PURSUANT TO THE THIRD PARTY RELEASE.  NOTHING HEREIN SHALL ABROGATE APPLICABLE ATTORNEY DISCIPLINARY RULES.**

### G.    Votes Solicited in Good Faith

The Plan Proponents have, and upon confirmation of ~~the~~this Plan shall be deemed to have, solicited acceptances of ~~the~~this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Plan Proponents (and each of their respective affiliates, agents, directors, officers, members, employees, advisors, and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of the securities offered and sold under ~~the~~this Plan and therefore have not, and on account of such offer and issuance will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of ~~the~~this Plan or the offer or issuance of the securities offered and distributed under ~~the~~this Plan.

## XI.    RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases after the Effective Date as is legally permissible, including jurisdiction to:

(1)    Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the amount, allowance, priority or classification of Claims or Interests;

(2)    Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or ~~the~~this Plan for periods ending on or before the Effective Date;

(3)    Resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

(4)    Ensure that distributions to Holders of Claims are accomplished pursuant to the provisions of ~~the~~this Plan;

(5)    Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications Filed in the Bankruptcy Court involving any Debtor or any Reorganized Debtor that may be pending on the Effective Date or brought thereafter;

(6)    Enter such orders as may be necessary or appropriate to implement or consummate the provisions of ~~the~~this Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with ~~the~~this Plan, the Disclosure Statement or the Confirmation Order;

(7)        Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of ~~the~~this Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to ~~the~~this Plan or any Entity's rights arising from or obligations incurred in connection with ~~the~~this Plan or such documents, *provided*, *however* that such retention of jurisdiction shall not extend to the New P&A/Ultimates Facility or other indebtedness documents on and after the Effective Date;

(8)        Modify ~~the~~this Plan before or after the Effective Date pursuant to Bankruptcy Code § 1127; modify the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with ~~the~~this Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, ~~the~~this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with ~~the~~this Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate ~~the~~this Plan;

(9)        Hear and determine any matter, case, controversy, suit, dispute, ~~or causes of action~~RKA Causes of Action, or Causes of Action regarding the existence, nature and scope of the releases, injunctions, and exculpation provided under ~~the~~this Plan, and issue injunctions, enforce the injunctions contained in ~~the~~this Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to implement, enforce or restrain interference by any Entity with respect to the consummation, implementation or enforcement of ~~the~~this Plan or the Confirmation Order, including the releases, injunctions, and exculpation provided under ~~the~~this Plan;

(10)        Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or distributions pursuant to ~~the~~this Plan are enjoined or stayed;

(11)        Determine any other matters that may arise in connection with or relate to ~~the~~this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with ~~the~~this Plan, the Disclosure Statement or the Confirmation Order;

(12)        Enforce, clarify or modify any orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

(13)        Enter a final decree closing the Chapter 11 Cases;

(14)        Determine matters concerning state, local and federal Taxes in accordance with Bankruptcy Code §§ 346, 505 and 1146, including any Disputed Claims for Taxes;

(15)        Recover all assets of the Debtors and their Estates, wherever located; and

(16)        Hear any other matter over which with the Bankruptcy Court has jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set forth in Section the provisions of this ,XI Section XI shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## XII.    MISCELLANEOUS PROVISIONS

### A.    **Amendment or Modification of ~~the~~this Plan**

Subject to the restrictions on modifications set forth in Bankruptcy Code § 1127, the Plan Proponents reserve the right to alter, amend or modify ~~the~~this Plan before its substantial consummation; *provided any such alterations, amendments or modifications are in form and substance reasonably acceptable to each of the Plan*

Proponents.  Prior to the Effective Date, the Plan Proponents may make appropriate technical adjustments and modifications to ~~the~~this Plan without further order or approval of the Bankruptcy Court.  Holders of Claims that have accepted ~~the~~this Plan shall be deemed to have accepted ~~the~~this Plan, as amended, modified, or supplemented, if the proposed amendment, modification, or supplement does not materially and adversely change the treatment of the Claim of such Holder; _provided_, _however_, that any Holders of Claims who were deemed to accept ~~the~~this Plan because such Claims were Unimpaired shall continue to be deemed to accept ~~the~~this Plan only if, after giving effect to such amendment, modification, or supplement, such Claims continue to be Unimpaired.

**B.    Revocation of ~~the~~this Plan**

The Plan Proponents reserve the right to revoke or withdraw ~~the~~this Plan as to any or all of the Debtors prior to the Confirmation Date or at the Confirmation Hearing.  If the Plan Proponents revoke or withdraw ~~the~~this Plan as to any or all of the Debtors, or if Confirmation as to any or all of the Debtors does not occur, then ~~the~~this Plan shall be null and void in all respects with respect to such Debtors for whom ~~the~~this Plan has been revoked or withdrawn, and nothing contained in ~~the~~this Plan shall:  (1) prejudice in any manner the rights of any such Debtor(s) or any other party in interest with respect to such Debtor(s); or (2) constitute an admission of any sort by any such Debtor(s) or any other party in interest with respect to such Debtor(s).  The revocation or withdrawal of ~~the~~this Plan with respect to one or more Debtors shall not require the re-solicitation of ~~the~~this Plan with respect to the remaining Debtors.

**C.    Conversion or Dismissal of Certain of the Chapter 11 Cases**

If the requisite Classes do not vote to accept this Plan or the Bankruptcy Court does not confirm this Plan, the Plan Proponents reserve the right to have any Debtor's Chapter 11 Case dismissed or converted, or to liquidate or dissolve any Debtor under applicable non-bankruptcy procedure or chapter 7 of the Bankruptcy Code.

**D.    Inconsistency**

In the event of any inconsistency among ~~the~~this Plan, the Disclosure Statement, or any exhibit or schedule to the Disclosure Statement, the provisions of ~~the~~this Plan shall govern.

**E.    Exhibits / Schedules**

All exhibits and schedules to ~~the~~this Plan, including the Plan Supplement, are incorporated into and constitute a part of ~~the~~this Plan as if set forth herein.

**F.    Bankruptcy Code § 1145 Exemption**

To the maximum extent provided by Bankruptcy Code § 1145(a), the Reorganized Relativity Holdings Preferred Units and Reorganized Relativity Holdings Common Units issued under ~~the~~this Plan shall be exempt from registration under the Securities Act and any state's securities law registration requirements and all rules and regulations promulgated thereunder.

**G.    Exemption from Transfer Taxes**

Pursuant to Bankruptcy Code § 1146(a), the issuance, transfer, or exchange of notes or equity securities under or in connection with ~~the~~this Plan, including the Reorganized Relativity Holdings Preferred Units and Reorganized Relativity Holdings Common Units issued pursuant to ~~the~~this Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with ~~the~~this Plan, including any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under ~~the~~this Plan (including, without limitation, the New P&A/Ultimates Facility, the Restructuring Transactions, and the creation of the Litigation Trust), shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

**H.        Request for Expedited Determination of Taxes**

Reorganized Relativity Holdings or any Reorganized Debtor may request an expedited determination under Bankruptcy Code § 505(b) with respect to tax returns filed, or to be filed, on behalf of the Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date.

**I.        Severability**

If prior to the entry of the Confirmation Order, any term or provision of ~~the~~this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court may, at the request of the Plan Proponents, alter and interpret such term or provision to the extent necessary to render it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as so altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remaining terms and provisions of ~~the~~this Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of ~~the~~this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**J.        Governing Law**

Except to the extent that (1) the Bankruptcy Code or other federal law is applicable or (2) an exhibit or schedule to ~~the~~this Plan or the Disclosure Statement or any agreement entered into with respect to any of the Restructuring Transactions provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit, schedule or agreement), the rights, duties, and obligations arising under ~~the~~this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws that would require application of the laws of another jurisdiction.

**K.        No Admissions**

If the Effective Date does not occur, ~~the~~this Plan shall be null and void in all respects, and nothing contained in ~~the~~this Plan shall (1) constitute a waiver or release of any claims by or against, or any interests in, any of the Debtors or any other Entity, (2) prejudice in any manner the rights of any of the Debtors or any other Entity, or (3) constitute an admission of any sort by any of the Debtors or any other Entity.

**L.        Successors and Assigns**

The rights, benefits and obligations of any Entity named or referred to in ~~the~~this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

**M.        Service of Documents**

To be effective, any pleading, notice or other document required by ~~the~~this Plan or the Confirmation Order to be served on or delivered to counsel to the Debtors, the Reorganized Debtors and the Creditors' Committee must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

| Attorneys for the Plan Co-Proponent and Debtors | Attorneys for the Manchester Parties |
|---|---|
| JONES DAY<br>Richard L. Wynne, Esq.<br>Bennett L. Spiegel, Esq.<br>Lori Sinanyan, Esq. (admitted *pro hac vice*)<br>222 East 41st Street<br>New York, NY 10017<br>Tel: (212) 326-3939<br>Fax: (212) 755-7306<br>- and -<br><br>SHEPPARD MULLIN RICHTER & HAMPTON  LLP<br>Craig A. Wolfe, Esq.<br>Malani J. Cademartori, Esq.<br>Blanka K. Wolfe, Esq.<br>30 Rockefeller Plaza<br>New York, NY 10112<br>Tel:  (212) 653-8700<br>Fax: (212) 653-8701 | O'MELVENY & MYERS LLP<br>Evan M. Jones<br>Daniel S. Shamah<br>400 South Hope Street<br>Los Angeles, CA 90071<br>Telephone: (213) 430-6236<br>Facsimile: (213) 430-6407<br><br>- and -<br><br>ROPES & GRAY LLP<br>Keith H. Wofford<br>James A. Wright III<br>1211 Avenue of the Americas<br>New York, NY 10036-8704<br>Telephone: (212) 596-9000<br>Facsimile: (212) 596-9090 |
| **Attorneys for Plan Co-Proponent Kavanaugh** | |
| SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP<br>Van C. Durrer II<br>David C. Eisman<br>300 South Grand Avenue, Suite 3400<br>Los Angeles, California 90071<br>Telephone: (213) 687-5000<br>Facsimile: (213) 687-5600 | SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP<br>Shana Elberg<br>4 Times Square<br>New York, New York 10036<br>Telephone: (212) 735-3000<br>Facsimile: (212) 735-2000 |
| **United States Trustee** | **Attorneys for the Creditors' Committee** |
| OFFICE OF THE UNITED STATES TRUSTEE<br>Serene Nakano<br>Susan D. Golden<br>201 Varick Street, Room 1006<br>New York, New York 10014<br>Telephone:  (212) 510-0500<br>Facsimile:  (212) 668-2255 | TOGUT, SEGAL & SEGAL LLP<br>Albert Togut<br>Frank Oswald<br>One Penn Plaza, Suite 3335<br>New York, NY 10119<br>Telephone: (212) 594-5000<br>Facsimile: (212) 967-4258 |

XIII.    CONFIRMATION REQUEST

The Plan Proponents request Confirmation of ~~the~~this Plan pursuant to Bankruptcy Code § 1129.

Dated: ~~November 18,~~December 14, 2015          Respectfully submitted,

Relativity Holdings, LLC, on its own behalf and on behalf of
each affiliate Debtor

By:      /s/ **Ryan Kavanaugh**

Name:    Ryan Kavanaugh

Title:   Chief Executive Officer of Relativity Holdings,
         LLC.

**JONES DAY**                                    **SHEPPARD MULLIN RICHTER & HAMPTON LLP**
Richard L. Wynne                                 Craig A. Wolfe
Bennett L. Spiegel                               Malani J. Cademartori
Lori Sinanyan (admitted *pro hac vice*)          Blanka K. Wolfe
222 East 41st Street                             30 Rockefeller Plaza
New York, New York 10017                         New York, New York
Telephone:  (212) 326-3939                       Telephone:  (212) 653-8700
Facsimile:  (212) 755-7306                       Facsimile:  (212) 653-8701

ATTORNEYS FOR THE PLAN CO-PROPONENT,             ATTORNEYS FOR THE
DEBTORS AND DEBTORS IN POSSESSION                DEBTORS AND DEBTORS IN POSSESSION

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
Van C. Durrer II
Shana Elberg
4 Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

ATTORNEYS FOR THE PLAN CO-PROPONENT KAVANAUGH

## EXHIBIT A

**LIST OF DEBTORS**

| # | Debtor | Last Four Digits of Tax ID Number |
|---|--------|-----------------------------------|
| 1. | 21 & Over Productions, LLC | 7796 |
| 2. | 3 Days to Kill Productions, LLC | 5747 |
| 3. | A Perfect Getaway P.R., LLC | 9252 |
| 4. | A Perfect Getaway, LLC | 3939 |
| 5. | Armored Car Productions, LLC | 2750 |
| 6. | Best of Me Productions, LLC | 1490 |
| 7. | Black Or White Films, LLC | 6718 |
| 8. | Blackbird Productions, LLC | 8037 |
| 9. | Brant Point Productions, LLC | 9994 |
| 10. | Brick Mansions Acquisitions, LLC | 3910 |
| 11. | Brilliant Films, LLC | 0448 |
| 12. | Brothers Productions, LLC | 9930 |
| 13. | Brothers Servicing, LLC | 5849 |
| 14. | Catfish Productions, LLC | 7728 |
| 15. | Cine Productions, LLC | 8359 |
| 16. | CinePost, LLC | 8440 |
| 17. | Cisco Beach Media, LLC | 8621 |
| 18. | Cliff Road Media, LLC | 7065 |
| 19. | Den of Thieves Films, LLC | 3046 |
| 20. | Don Jon Acquisitions, LLC | 7951 |
| 21. | DR Productions, LLC | 7803 |
| 22. | Einstein Rentals, LLC | 5861 |
| 23. | English Breakfast Media, LLC | 2240 |
| 24. | Furnace Films, LLC | 3558 |
| 25. | Gotti Acquisitions, LLC | 6562 |
| 26. | Great Point Productions, LLC | 5813 |
| 27. | Guido Contini Films, LLC | 1031 |
| 28. | Hooper Farm Music, LLC | 3773 |
| 29. | Hooper Farm Publishing, LLC | 3762 |
| 30. | Hummock Pond Properties, LLC | 9862 |
| 31. | Hunter Killer La Productions, LLC | 1939 |
| 32. | Hunter Killer Productions, LLC | 3130 |
| 33. | In The Hat Productions, LLC | 3140 |
| 34. | J&J Project, LLC | 1832 |
| 35. | JGAG Acquisitions, LLC | 9221 |
| 36. | Left Behind Acquisitions, LLC | 1367 |
| 37. | Long Pond Media, LLC | 7197 |
| 38. | Madaket Publishing, LLC | 9356 |
| 39. | Madaket Road Music, LLC | 9352 |
| 40. | Madvine RM, LLC | 0646 |
| 41. | Malavita Productions, LLC | 8636 |
| 42. | MB Productions, LLC | 4477 |
| 43. | Merchant of Shanghai Productions, LLC | 7002 |
| 44. | Miacomet Media LLC | 7371 |
| 45. | Miracle Shot Productions, LLC | 0015 |
| 46. | Most Wonderful Time Productions, LLC | 0426 |
| 47. | Movie Productions, LLC | 9860 |
| 48. | One Life Acquisitions, LLC | 9061 |
| 49. | Orange Street Media, LLC | 3089 |
| 50. | Out Of This World Productions, LLC | 2322 |
| 51. | Paranoia Acquisitions, LLC | 8747 |
| 52. | Phantom Acquisitions, LLC | 6381 |

| # | Debtor | Last Four Digits of Tax ID Number |
|---|--------|-----------------------------------|
| 53. | Pocomo Productions, LLC | 1069 |
| 54. | Relative Motion Music, LLC | 8016 |
| 55. | Relative Velocity Music, LLC | 7169 |
| 56. | Relativity Development, LLC | 5296 |
| 57. | Relativity Fashion, LLC | 4571 |
| 58. | Relativity Film Finance II, LLC | 9082 |
| 59. | Relativity Film Finance III, LLC | 8893 |
| 60. | Relativity Film Finance, LLC | 2127 |
| 61. | Relativity Films, LLC | 5464 |
| 62. | Relativity Foreign, LLC | 8993 |
| 63. | Relativity Holdings LLC | 7052 |
| 64. | Relativity India Holdings, LLC | 8921 |
| 65. | Relativity Jackson, LLC | 6116 |
| 66. | Relativity Media LLC | 0844 |
| 67. | Relativity Media Distribution, LLC | 0264 |
| 68. | Relativity Media Films, LLC | 1574 |
| 69. | Relativity Music Group, LLC | 9540 |
| 70. | Relativity Production LLC | 7891 |
| 71. | Relativity REAL, LLC | 1653 |
| 72. | Relativity Rogue, LLC | 3333 |
| 73. | Relativity Senator, LLC | 9044 |
| 74. | Relativity Sky Land Asia Holdings, LLC | 9582 |
| 75. | Relativity TV, LLC | 0227 |
| 76. | Reveler Productions, LLC | 2191 |
| 77. | RML Acquisitions I, LLC | 9406 |
| 78. | RML Acquisitions II, LLC | 9810 |
| 79. | RML Acquisitions III, LLC | 9116 |
| 80. | RML Acquisitions IV, LLC | 4997 |
| 81. | RML Acquisitions IX, LLC | 4410 |
| 82. | RML Acquisitions V, LLC | 9532 |
| 83. | RML Acquisitions VI, LLC | 9640 |
| 84. | RML Acquisitions VII, LLC | 7747 |
| 85. | RML Acquisitions VIII, LLC | 7459 |
| 86. | RML Acquisitions X, LLC | 1009 |
| 87. | RML Acquisitions XI, LLC | 2651 |
| 88. | RML Acquisitions XII, LLC | 4226 |
| 89. | RML Acquisitions XIII, LLC | 9614 |
| 90. | RML Acquisitions XIV, LLC | 1910 |
| 91. | RML Acquisitions XV, LLC | 5518 |
| 92. | RML Bronze Films, LLC | 8636 |
| 93. | RML Damascus Films, LLC | 6024 |
| 94. | RML Desert Films, LLC | 4564 |
| 95. | RML Distribution Domestic, LLC | 6528 |
| 96. | RML Distribution International, LLC | 7796 |
| 97. | RML Documentaries, LLC | 7991 |
| 98. | RML DR Films, LLC | 0022 |
| 99. | RML Echo Films, LLC | 4656 |
| 100. | RML Escobar Films LLC | 0123 |
| 101. | RML Film Development, LLC | 3567 |
| 102. | RML Films PR, LLC | 1662 |
| 103. | RML Hector Films, LLC | 6054 |
| 104. | RML Hillsong Films, LLC | 3539 |

| # | Debtor | Last Four Digits of Tax ID Number |
|---|---|---|
| 105. | RML IFWT Films, LLC | 1255 |
| 106. | RML International Assets, LLC | 1910 |
| 107. | RML Jackson, LLC | 1081 |
| 108. | RML Kidnap Films, LLC | 2708 |
| 109. | RML Lazarus Films, LLC | 0107 |
| 110. | RML Nina Films, LLC | 0495 |
| 111. | RML November Films, LLC | 9701 |
| 112. | RML Oculus Films, LLC | 2596 |
| 113. | RML Our Father Films, LLC | 6485 |
| 114. | RML Romeo and Juliet Films, LLC | 9509 |
| 115. | RML Scripture Films, LLC | 7845 |
| 116. | RML Solace Films, LLC | 5125 |
| 117. | RML Somnia Films, LLC | 7195 |
| 118. | RML Timeless Productions, LLC | 1996 |
| 119. | RML Turkeys Films, LLC | 8898 |
| 120. | RML Very Good Girls Films, LLC | 3685 |
| 121. | RML WIB Films, LLC | 0102 |
| 122. | RMLDD Financing, LLC | 9114 |
| 123. | Rogue Digital, LLC | 5578 |
| 124. | Rogue Games, LLC | 4812 |
| 125. | Roguelife LLC | 3442 |
| 126. | Safe Haven Productions, LLC | 6550 |
| 127. | Sanctum Films, LLC | 7736 |
| 128. | Santa Claus Productions, LLC | 7398 |
| 129. | Smith Point Productions, LLC | 9118 |
| 130. | Snow White Productions, LLC | 3175 |
| 131. | Spy Next Door, LLC | 3043 |
| 132. | Story Development, LLC | 0677 |
| 133. | Straight Wharf Productions, LLC | 5858 |
| 134. | Strangers II, LLC | 6152 |
| 135. | Stretch Armstrong Productions, LLC | 0213 |
| 136. | Studio Merchandise, LLC | 5738 |
| 137. | Summer Forever Productions, LLC | 9211 |
| 138. | The Crow Productions, LLC | 6707 |
| 139. | Totally Interns, LLC | 9980 |
| 140. | Tribes of Palos Verdes Production, LLC | 6638 |
| 141. | Tuckernuck Music, LLC | 8713 |
| 142. | Tuckernuck Publishing, LLC | 3960 |
| 143. | Wright Girls Films, LLC | 9639 |
| 144. | Yuma, Inc. | 1669 |
| 145. | Zero Point Enterprises, LLC | 9558 |

**EXHIBIT E**

**EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE REJECTED**

| NAME OF COUNTERPARTY | TITLE OF CONTRACT | FILM / TV SHOW CONTRACT RELATES TO | DATE OF CONTRACT, IF ANY | DOC. ID | NAME OF RELATIVITY ENTITY PARTY TO AGREEMENT |
|---|---|---|---|---|---|
| **Terminated International Output or Distribution Agreements** | | | | | |
| Tanweer Films FZ, LLC | Output Distribution Agreement | | 3/24/2014 | 20394 | RML Distribution International, LLC |
| Tanweer Films FZ, LLC | Tanweer/ Relativity Output Agreement | | 2/1/2013 | 20391 | RML Distribution International, LLC |
| Tanweer Films FZ, LLC | Output Distribution Agreement | "Best of Me" "Loomis Fargo" | 2/1/2013 | 20377 | RML Distribution International, LLC |
| **Cancelled, Unsigned or Otherwise Terminated Contracts** | | | | | |
| Dreamgold Group Corp. | Distribution License Agreement | Dreamgold swem-Latin America | 2/28/2014 | 1107 | Relativity Foreign, LLC |
| KRISCO MEDIA FZC | TRANSMISSION REPORT | MOJAVE. MAN ON CARRION ROAD. | | 23987 | Relativity Foreign, LLC |
| KRISCO MEDIAFZC | LETTER REGARDING TERMINATION NOTICE WITH RESPECT TO MOJAVE/INDIA (THE TERRITORY) | MOJAVE | 8/11/2014 | 3007 | Relativity Foreign, LLC |
| W2MEDIA B.V. | PICTURE CERTIFICATE | UNTITLED AMORED CAR PROJECT | 7/4/2008 | 23006 | Relativity Media Distribution, LLC |
| **Operations** | | | | | |
| PGI | Customer Service Order | | | 23690 | Relativity Media, LLC |
| TalentWise Solutions LLC | Sales Order Form | | 12/14/2011 | 41 | Relativity Media, LLC |
| **Distribution** | | | | | |
| Overture Films | Sargoy Stein Rosen & Shapiro Letter & Retainer Agreement | | | 3133 | Relativity Media, LLC |
| PENN, SCHOEN, BERLAND ASSOCIATES, LLC (D/B/A VERITES) | AGREEMENT | | | 23697 | RML Distribution Domestic, LLC |

| | | Terminated Employment Agreements | | | |
|---|---|---|---|---|---|
| LAST NAME | FIRST NAME | TITLE | DEPARTMENT | CONTRACT EXPIRATION DATE | LAST DAY OF EMPLOYMENT |
| Adelman | Jason | VP Strategic Partnerships | Joint Venture - Madvine | 9/2/2015 | 7/29/2015 |
| Alvarez | Matt | EVP, Production/President, Multicultural | Production | 8/10/2015 | 10/15/2015 |
| Bevins | Chris | Design Director, M3 Fashion Accelerator | Relativity Fashion | 10/12/2015 | 7/29/2015 |
| Bowen | Robert | President, Music | Music | 12/31/2015 | 10/27/2015 |
| Brenner | Robbie | President, Production & President, 278 Films | Production | 2/23/2017 | 9/18/2015 |
| Brodie | Matthew | EVP, Acquistions | Production | 5/31/2016 | 12/4/2015 |
| Compton | Matthew | VP, Information Technology | IT | 2/17/2016 | 10/6/2015 |
| Courtin | Angela | Chief Marketing Officer | Relativity Digital Corp Ops | 6/30/2017 | 7/29/2015 |
| Dolfi | Martin James | Fashion Agent | Relativity Fashion | 9/15/2016 | 7/29/2015 |
| Fairbourn | Zoe | SVP Strategic Partnership | Joint Venture - Madvine | 1/6/2015 | 7/29/2015 |
| Galano | Laurette | SVP, Marketing Partnerships | International | At Will | 7/29/2015 |
| Goldberg | Lauren | EVP, Corporate Affairs/Deputy General Counsel | Legal - Corporate | 2/4/2015 | 10/21/2015 |
| Goldman | Colin | Editor in Chief | Relativity Digital Corp Ops | 2/17/2016 | 7/29/2015 |
| Grossbach | Mitchell | President | Relativity Fashion | 9/15/2016 | 7/29/2015 |
| Horvath | Sean | President, Strategic Partnerships | Joint Venture - Madvine | 11/9/2016 | 7/29/2015 |
| Hunt | Matthew Leslie | Fashion Agent | Relativity Fashion | 9/15/2016 | 7/29/2015 |
| Matthews | Andrew | Chief Financial Officer | Finance and Accounting | 4/7/2016 | 10/5/2015 |
| Monti | Christian | SVP, International Sales | International | 8/4/2015 | 7/29/2015 |
| Shamo | Greg | Co-Chief Operating Officer | Operations | 2/10/2017 | 10/13/2015 |
| Walters | Happy | Co-President RML & CEO, Relativity Sports | Operations | 6/2/2019 | 7/29/2015 |
| Wilcox | Dylan | SVP, Acquisitions | Production | 10/14/2014 | 7/29/2015 |

**EXHIBIT I**

**PROPOSED ALTERNATIVE PLAN TREATMENT FOR RKA**

| Summary report: Litéra® Change-Pro TDC 7.5.0.96 Document comparison done on 12/14/2015 9:34:23 AM | |
|---|---|
| **Style name:** JD Color With Moves | |
| **Intelligent Table Comparison:** Inactive | |
| **Original DMS:**iw://NAI/NAI/1500594528/12 | |
| **Modified DMS:** iw://NAI/NAI/1500594528/18 | |
| **Changes:** | |
| Add | 707 |
| Delete | 617 |
| Move From | 5 |
| Move To | 5 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 2 |
| Embedded Excel | 0 |
| Format Changes | 0 |
| **Total Changes:** | 1336 |

**EXHIBIT C**

Amended Disclosure Statement

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN PROPONENTS' PLAN OF REORGANIZATION (THE "**PLAN**").  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT (THE "**DISCLOSURE STATEMENT**") IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT MAY BE REVISED TO REFLECT EVENTS THAT OCCUR AFTER THE DATE HEREOF BUT PRIOR TO BANKRUPTCY COURT APPROVAL OF THE DISCLOSURE STATEMENT.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RELATIVITY FASHION, LLC, *et al.*,[1] | Case No. 15-11989 (MEW) |
| Debtors. | (Jointly Administered) |

**FIRST AMENDED  DISCLOSURE STATEMENT FOR**
**FIRST AMENDED PLAN PROPONENTS' PLAN OF REORGANIZATION**
**PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Richard L. Wynne
Bennett L. Spiegel
Lori Sinanyan (admitted *pro hac vice*)
**JONES DAY**
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

ATTORNEYS FOR THE PLAN CO-PROPONENT, DEBTORS AND DEBTORS IN POSSESSION

Craig A. Wolfe
Malani J. Cademartori
Blanka K. Wolfe
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
30 Rockefeller Plaza
New York, New York
Telephone:  (212) 653-8700
Facsimile:  (212) 653-8701

ATTORNEYS FOR THE PLAN CO-PROPONENT, DEBTORS AND DEBTORS IN POSSESSION

Van C. Durrer II
Shana Elberg
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
4 Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

ATTORNEYS FOR PLAN CO-PROPONENT, KAVANAUGH

Dated: December 14, 2015

---

[1]     The Debtors in these Chapter 11 Cases are as set forth on page (i).

The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Relativity Fashion, LLC (4571); Relativity Holdings LLC (7052); Relativity Media, LLC (0844); Relativity REAL, LLC (1653); RML Distribution Domestic, LLC (6528); RML Distribution International, LLC (6749); RMLDD Financing, LLC (9114); 21 & Over Productions, LLC (7796); 3 Days to Kill Productions, LLC (5747); A Perfect Getaway P.R., LLC (9252); A Perfect Getaway, LLC (3939); Armored Car Productions, LLC (2750); Best of Me Productions, LLC (1490); Black Or White Films, LLC (6718); Blackbird Productions, LLC (8037); Brant Point Productions, LLC (9994); Brick Mansions Acquisitions, LLC (3910); Brilliant Films, LLC (0448); Brothers Productions, LLC (9930); Brothers Servicing, LLC (5849); Catfish Productions, LLC (7728); Cine Productions, LLC (8359); CinePost, LLC (8440); Cisco Beach Media, LLC (8621); Cliff Road Media, LLC (7065); Den of Thieves Films, LLC (3046); Don Jon Acquisitions, LLC (7951); DR Productions, LLC (7803); Einstein Rentals, LLC (5861); English Breakfast Media, LLC (2240); Furnace Films, LLC (3558); Gotti Acquisitions, LLC (6562); Great Point Productions, LLC (5813); Guido Contini Films, LLC (1031); Hooper Farm Music, LLC (3773); Hooper Farm Publishing, LLC (3762); Hummock Pond Properties, LLC (9862); Hunter Killer La Productions, LLC (1939); Hunter Killer Productions, LLC (3130); In The Hat Productions, LLC (3140); J&J Project, LLC (1832); JGAG Acquisitions, LLC (9221); Left Behind Acquisitions, LLC (1367); Long Pond Media, LLC (7197); Madaket Publishing, LLC (9356); Madaket Road Music, LLC (9352); Madvine RM, LLC (0646); Malavita Productions, LLC (8636); MB Productions, LLC (4477); Merchant of Shanghai Productions, LLC (7002); Miacomet Media LLC (7371); Miracle Shot Productions, LLC (0015); Most Wonderful Time Productions, LLC (0426); Movie Productions, LLC (9860); One Life Acquisitions, LLC (9061); Orange Street Media, LLC (3089); Out Of This World Productions, LLC (2322); Paranoia Acquisitions, LLC (8747); Phantom Acquisitions, LLC (6381); Pocomo Productions, LLC (1069); Relative Motion Music, LLC (8016); Relative Velocity Music, LLC (7169); Relativity Development, LLC (5296); Relativity Film Finance II, LLC (9082); Relativity Film Finance III, LLC (8893); Relativity Film Finance, LLC (2127); Relativity Films, LLC (5464); Relativity Foreign, LLC (8993); Relativity India Holdings, LLC (8921); Relativity Jackson, LLC (6116); Relativity Media Distribution, LLC (0264); Relativity Media Films, LLC (1574); Relativity Music Group, LLC (9540); Relativity Production LLC (7891); Relativity Rogue, LLC (3333); Relativity Senator, LLC (9044); Relativity Sky Land Asia Holdings, LLC (9582); Relativity TV, LLC (0227); Reveler Productions, LLC (2191); RML Acquisitions I, LLC (9406); RML Acquisitions II, LLC (9810); RML Acquisitions III, LLC (9116); RML Acquisitions IV, LLC (4997); RML Acquisitions IX, LLC (4410); RML Acquisitions V, LLC (9532); RML Acquisitions VI, LLC (9640); RML Acquisitions VII, LLC (7747); RML Acquisitions VIII, LLC (7459); RML Acquisitions X, LLC (1009); RML Acquisitions XI, LLC (2651); RML Acquisitions XII, LLC (4226); RML Acquisitions XIII, LLC (9614); RML Acquisitions XIV, LLC (1910); RML Acquisitions XV, LLC (5518); RML Bronze Films, LLC (8636); RML Damascus Films, LLC (6024); RML Desert Films, LLC (4564); RML Documentaries, LLC (7991); RML DR Films, LLC (0022); RML Echo Films, LLC (4656); RML Escobar Films LLC (0123); RML Film Development, LLC (3567); RML Films PR, LLC (1662); RML Hector Films, LLC (6054); RML Hillsong Films, LLC (3539); RML IFWT Films, LLC (1255); RML International Assets, LLC (1910); RML Jackson, LLC (1081); RML Kidnap Films, LLC (2708); RML Lazarus Films, LLC (0107); RML Nina Films, LLC (0495); RML November Films, LLC (9701); RML Oculus Films, LLC (2596); RML Our Father Films, LLC (6485); RML Romeo and Juliet Films, LLC (9509); RML Scripture Films, LLC (7845); RML Solace Films, LLC (5125); RML Somnia Films, LLC (7195); RML Timeless Productions, LLC (1996); RML Turkeys Films, LLC (8898); RML Very Good Girls Films, LLC (3685); RML WIB Films, LLC (0102); Rogue Digital, LLC (5578); Rogue Games, LLC (4812); Roguelife LLC (3442); Safe Haven Productions, LLC (6550); Sanctum Films, LLC (7736); Santa Claus Productions, LLC (7398); Smith Point Productions, LLC (9118); Snow White Productions, LLC (3175); Spy Next Door, LLC (3043); Story Development, LLC (0677); Straight Wharf Productions, LLC (5858); Strangers II, LLC (6152); Stretch Armstrong Productions, LLC (0213); Studio Merchandise, LLC (5738); Summer Forever Productions, LLC (9211); The Crow Productions, LLC (6707); Totally Interns, LLC (9980); Tribes of Palos Verdes Production, LLC (6638); Tuckernuck Music, LLC (8713); Tuckernuck Publishing, LLC (3960); Wright Girls Films, LLC (9639); Yuma, Inc. (1669); Zero Point Enterprises, LLC (9558).  The location of the Debtors' corporate headquarters is: 9242 Beverly Blvd., Suite 300, Beverly Hills, CA 90210.

-i-

---

**IMPORTANT INFORMATION FOR YOU TO READ**

---

**THE DEADLINE TO VOTE ON THE PLAN IS JANUARY [__], 2016
AT 4:00 P.M. (EASTERN TIME), UNLESS EXTENDED BY THE PLAN PROPONENTS (THE "VOTING
DEADLINE").**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE *ACTUALLY RECEIVED* BY
THE VOTING AGENT BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

**PLEASE BE ADVISED THAT ARTICLE X OF THE PLAN CONTAINS RELEASE, EXCULPATION,
AND INJUNCTION PROVISIONS.  YOU SHOULD REVIEW AND CONSIDER THE PLAN
CAREFULLY BECAUSE YOUR RIGHTS MAY BE AFFECTED THEREUNDER.**

---

On July 30, 2015 (the "**Petition Date**") Relativity Fashion, LLC and 144 of its direct and indirect subsidiaries (collectively, the "**Debtors**") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Plan Proponents are providing you with the information in this Disclosure Statement because you may be a creditor of the Debtors and entitled to vote on the Plan.[2]

---

The Plan Proponents believe that the Plan is in the best interests of the Debtors' creditors and other stakeholders.  All creditors entitled to vote thereon are urged to vote in favor of the Plan.  A summary of the voting instructions is set forth beginning on page 7 of this Disclosure Statement and in the Solicitation Order.  More detailed instructions are contained on the Ballots distributed to the creditors entitled to vote on the Plan.  To be counted, your Ballot must be duly completed, executed and actually received by the Voting Agent (defined below) by 4:00 p.m. (Eastern Time), on January [_], 2016, unless the Voting Deadline is extended by the Plan Proponents.

---

The effectiveness of the proposed Plan is subject to material conditions precedent, some of which may not be satisfied or waived.  See Section IX.D below and Article VII of the Plan.  There is no assurance that these conditions will be satisfied or waived.

---

This Disclosure Statement and any accompanying letters are the only documents to be used in connection with the solicitation of votes on the Plan.  Subject to the statutory obligations of the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "**Creditors' Committee**") to provide access to information to creditors, no Person is authorized by any of the Plan Proponents in connection with the Plan or the solicitation of acceptances of the Plan to give any information or to make any representation other than as contained in this Disclosure Statement and the exhibits attached hereto or incorporated by reference or referred to herein.  If given or made, such information or representation may not be relied upon as having been authorized by any of the Plan Proponents.  Although the Plan Proponents will make available to creditors entitled to vote on the Plan such additional information as may be required by applicable law prior to the Voting Deadline, the delivery of this Disclosure Statement will not under any circumstances imply that the information herein is correct as of any time after the date hereof.

---

---

[2]    Except as otherwise provided herein, capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan, attached hereto as <u>Exhibit A</u>.

**ALL CREDITORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE PLAN ATTACHED AS <u>EXHIBIT A</u>, AND THE RISK FACTORS DESCRIBED UNDER SECTION XI, PRIOR TO SUBMITTING BALLOTS IN RESPONSE TO THIS SOLICITATION.**

_____

The summaries of the Plan and other documents contained in this Disclosure Statement are qualified in their entirety by reference to the Plan itself, the exhibits thereto (the "**Confirmation Exhibits**") and the documents described therein as filed prior to approval of this Disclosure Statement or subsequently as Plan Supplement materials.  In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control.  Except as otherwise indicated, the Plan Proponents will file all Confirmation Exhibits with the Bankruptcy Court and make them available for review at the Debtors' document website located online at https://www.donlinrecano.com/Clients/rm/Index (the "**Document Website**") no later than seven (7) calendar days before the Confirmation Hearing to the extent not filed earlier; _provided_, _however_, that (a) exhibits relating to the assumption and rejection of Executory Contracts and Unexpired Leases under the Plan will be filed no later than seven calendar days prior to the Voting Deadline and (b) other key exhibits to the Plan will be either (i) included in any solicitation materials distributed to Holders of Claims in Classes entitled to vote to accept or reject the Plan or (ii) filed as part of the Plan Supplement no later than seven (7) calendar days prior to the Voting Deadline; _provided_, _further_, that only in the event that an Executory Contract or Unexpired Lease is the subject of a pending objection, at any time (i) on or before the Effective Date, the Debtors reserve the right to supplement the list of rejected contracts on <u>Exhibit E</u> or (ii) after the Effective Date, the Reorganized Debtors reserve the right to supplement the list of rejected contracts on <u>Exhibit E</u> to the Plan if unable to otherwise reach a resolution related to the Executory Contract or Unexpired Lease.

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan being proposed by the Plan Proponents.  The Plan Proponents reserve the right to modify the Plan consistent with Bankruptcy Code § 1127 of and Bankruptcy Rule 3019.

The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there can be no assurance that the statements contained herein will be correct at any time after this date.  The information contained in this Disclosure Statement, including the information regarding the history, businesses and operations of the Debtors, the financial information regarding the Debtors, and the liquidation analysis relating to the Debtors, is included for purposes of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as admissions or stipulations, but rather as statements made in settlement negotiations as part of the Debtors' attempt to settle and resolve their Liabilities pursuant to the Plan.  This Disclosure Statement will not be admissible in any nonbankruptcy proceeding, nor will it be construed to be conclusive advice on the tax, securities or other legal effects of the Plan as to Holders of Claims against, or Interests in, either the Debtors or the Reorganized Debtors.  Except where specifically noted, the financial information contained in this Disclosure Statement and in its exhibits has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States.

_____

**FORWARD-LOOKING STATEMENTS**

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the Debtors and projections about future events and financial trends affecting the financial condition of the Debtors' businesses and assets.  The words "believe," "may," "estimate," "continue," "anticipate," "intend," "expect" and similar expressions identify these forward-looking statements.  These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described below under the caption "**Risk Factors**" in Section XI.  In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements.  The Plan Proponents do not undertake any obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

This Disclosure Statement has been prepared in accordance with Bankruptcy Code § 1125 and Bankruptcy Rule 3016 and not necessarily in accordance with federal or state securities laws or other nonbankruptcy laws.  This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC"), any state securities commission or any securities exchange or association nor has the SEC, any state securities commission or any securities exchange or association passed upon the accuracy or adequacy of the statements contained herein.

## QUESTIONS AND ADDITIONAL INFORMATION

If you would like to obtain copies of this Disclosure Statement, the Plan or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or the Debtors' Chapter 11 Cases generally, please contact Donlin, Recano & Company, Inc. (the "Voting Agent"), by either (i) visiting the Document Website at **https://www.donlinrecano.com/Clients/rm/Index** or (ii) calling (212) 771-1128.

**TABLE OF CONTENTS**

FORWARD-LOOKING STATEMENTS ................................................................................. 2

QUESTIONS AND ADDITIONAL INFORMATION ............................................................... 3

I.    **INTRODUCTION** ........................................................................................................ 1

    A.    Material Terms of the Plan ................................................................................ 1

    B.    Parties Entitles to Vote on the Plan ................................................................... 5

    C.    Solicitation Package .......................................................................................... 7

    D.    Voting Procedures, Ballots and Voting Deadline ............................................. 7

    E.    Confirmation Exhibits ....................................................................................... 8

    F.    Confirmation Hearing and Deadline for Objections to Confirmation ............... 8

II.   **OVERVIEW OF THE COMPANY** ........................................................................... 8

    A.    Corporate Structure of the Company ................................................................. 8

    B.    Business Overview ............................................................................................ 8

    C.    Business Operations .......................................................................................... 9

        1.    *Key Business Units* ............................................................................... 9

        2.    *Joint Ventures* ..................................................................................... 12

    D.    Relativity Equity Classes ................................................................................ 12

    E.    Corporate History ............................................................................................ 13

    F.    Prepetition Capital Structure ........................................................................... 13

        1.    *Cortland Term Loan A and Term Loan B Financing Facility* ........... 14

        2.    *Manchester Prepetition Credit Facility* ............................................ 14

        3.    *Production Loans* ............................................................................... 14

        4.    *The P&A Facility* ............................................................................... 16

        5.    *The Ultimates Facility* ....................................................................... 17

        6.    *Unsecured Trade Debt* ....................................................................... 18

        7.    *Unsecured RED Loan* ........................................................................ 18

    G.    Events Leading to Chapter 11 Cases ............................................................... 18

III.  **THE CHAPTER 11 CASES** ...................................................................................... 19

    A.    Voluntary Petitions ......................................................................................... 19

    B.    First and Second Day Motions ........................................................................ 20

    C.    Retention of the Debtors' Advisors ................................................................. 20

    D.    The Creditors' Committee ............................................................................... 20

    E.    Further Motions in the Chapter 11 Cases ........................................................ 21

        1.    *The Sale Motion (Dkt. No. 25)* ......................................................... 21

        2.    *The KEIP and KERP Motions (Dkt. Nos. 281, 282)* ........................ 22

        3.    *The Motions to Assume Certain Producer Agreements (Dkt. Nos. 289-295)* ................. 23

        4.    *The Miscellaneous/De Minimis Assets Motion (Dkt. No. 345)* ....... 23

5.    *The Motions to Reject Leases or Executory Contracts (Dkt. Nos. 396, 691)* .................. 24

6.    *The Motion to Extend the Exclusive Periods for Filing a Plan and Soliciting Acceptances* ..................................................................................................... 24

7.    *Litigation* ................................................................................................................. 24

8.    *Claims Process and Bar Date* ................................................................................. 26

9.    *Cash Collateral Stipulation* .................................................................................... 26

IV.    **POSTPETITION SALE AND PLAN NEGOTIATIONS** ........................................ 27

    A.    Television Business Sale and Related Term Sheets ................................................ 27

        1.    *TLA/TLB Transactions* ............................................................................... 27

        2.    *Investor Transactions* .................................................................................. 27

        3.    *DIP Stipulations* .......................................................................................... 28

    B.    Fintage Omnibus Stipulation .................................................................................. 28

    C.    Post-Emergence Financing and Management ......................................................... 29

V.    **THE PLAN OF REORGANIZATION** .................................................................... 29

VI.    **CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ..................... 29

    A.    Unclassified Claims ................................................................................................ 30

        1.    *Administrative Claims* ................................................................................ 30

        2.    *Payment of Priority Tax Claims* ................................................................. 31

    B.    Classification of Claims and Interests .................................................................... 31

        1.    *General* ........................................................................................................ 31

        2.    *Identification of Classes of Claims Against and Interests in the Debtors* ...................... 35

    C.    Treatment of Unclassified Claims .......................................................................... 35

        1.    *Administrative Claims* ................................................................................ 35

        2.    *Payment of Priority Tax Claims* ................................................................. 37

    D.    Treatment of Classified Claims .............................................................................. 37

        1.    *Priority Non-Tax Claims (Class A)* ............................................................ 37

        2.    *TLA/TLB Secured Claims (Class B)* ........................................................ 37

        3.    *Pre-Release P&A Secured Claims (Class C)* ............................................. 38

        4.    *Post-Release P&A Claims Secured Claims (Class D)* ............................... 38

        5.    *Production Loan Secured Claims (Class E)* ............................................... 38

        6.    *Ultimates Secured Claims (Class F)* .......................................................... 39

        7.    *Secured Guilds Claims (Class G)* .............................................................. 39

        8.    *Vine/Verite Secured Claims (Class H)* ...................................................... 40

        9.    *Other Secured Claims (Class I)* ................................................................. 40

        10.    *General Unsecured Claims (Class J)* ......................................................... 40

        11.    *Subordinated Claims (Class K)* ................................................................. 41

    E.    Treatment of Interests in all Debtors (Class L) ...................................................... 41

F.    Special Provision Regarding Prepetition Intercompany Claims ................................... 41

G.    Special Provision Governing Unimpaired Claims ................................................... 41

H.    Postpetition Interest on General Unsecured Claims ............................................... 41

I.    Insurance .......................................................................................................... 41

J.    Treatment of Executory Contracts and Unexpired Leases ....................................... 41

    1.    *Assumption and Rejections of Executory Contracts and Unexpired Leases* ............... 41

    2.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases* ............... 42

    3.    *Claims Based on Rejection of Executory Contracts and Unexpired Leases* ............... 43

    4.    *Contracts and Leases Entered Into After the Petition Date* ................................... 43

    5.    *Reservation of Rights* ............................................................................... 43

    6.    *Pre-Existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases* ................................................................................... 43

    7.    *Certain Compensation and Benefit Programs* ................................................. 43

    8.    *Obligations to Insure and Indemnify Directors, Officers and Employees* ............... 44

    9.    *Reservation of Rights* ............................................................................... 44

**VII.    VOTING REQUIREMENTS** ................................................................................. 44

A.    Voting Deadline ............................................................................................ 45

B.    Holders of Claims or Interests Entitled to Vote ................................................... 45

C.    Vote Required for Acceptance by a Class ........................................................... 45

**VIII.    CONFIRMATION OF THE PLAN** ...................................................................... 46

A.    Requirements for Confirmation of the Plan ....................................................... 46

    1.    *Acceptance of the Plan* ............................................................................. 46

    2.    *Feasibility* ............................................................................................. 47

    3.    *Bests Interests of Creditors* ....................................................................... 48

    4.    *Confirmation Without Acceptance of All Impaired Classes: The 'Cramdown' Alternative* ............................................................................................. 48

B.    Alternatives to Confirmation and Consummation of the Plan ................................. 49

**IX.    MEANS OF IMPLEMENTATION OF THE PLAN** ................................................ 50

A.    Effects of Plan Confirmation ........................................................................... 50

    1.    *Issuance of Reorganized Relativity Holdings Preferred Units* ............................ 50

    2.    *Issuance of Reorganized Relativity Holdings Common Units* ............................. 50

    3.    *Issuance of Reorganized Relativity Holdings Warrants* ................................... 51

    4.    *Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors* ................................................................................................. 51

    5.    *Restructuring Transactions* ....................................................................... 52

    6.    *Sources of Cash for Plan Distributions* ......................................................... 53

    7.    *Corporate Governance, Managers and Officers, Employment-Related Agreements and Compensation Programs; Other Agreements* ........................... 54

| | 8. | *The Litigation Trust* ....................................................................... | 55 |
| | 9. | *Preservation of Causes of Action* ................................................... | 58 |
| | 10. | *Reinstatement and Continuation of Insurance Policies* ................... | 58 |
| | 11. | *Entry into CBA Assumption Agreements* ........................................ | 58 |
| | 12. | *Cancellation and Surrender of Instruments, Securities and Other Documentation* ................................................................................ | 58 |
| | 13. | *Release of Liens* ............................................................................. | 59 |
| | 14. | *Effectuating Documents; Further Transactions* ............................. | 59 |
| | 15. | *Dissolution of Official Committee* ................................................. | 59 |
| | 16. | *Discharge of Claims and Interests* ................................................ | 59 |
| | 17. | *Injunctions* ..................................................................................... | 60 |
| | 18. | *Exculpation* .................................................................................... | 60 |
| | 19. | *Releases* .......................................................................................... | 60 |
| | 20. | *Votes Solicited in Good Faith* ........................................................ | 62 |
| | 21. | *Termination of Certain Subordination Rights* .............................. | 62 |
| B. | | Provisions Governing Distributions ................................................... | 62 |
| | 1. | *Distributions for Allowed Claims as of the Effective Date* ............ | 62 |
| | 2. | *Undeliverable Distributions* .......................................................... | 62 |
| | 3. | *Compliance with Tax Requirements* .............................................. | 62 |
| | 4. | *Distribution Record Date* .............................................................. | 63 |
| | 5. | *Setoffs* ............................................................................................ | 63 |
| | 6. | *Allocation Between Principal and Accrued Interest* ...................... | 63 |
| | 7. | *Distributions to Holders of Disputed Claims* ............................... | 63 |
| C. | | Disputed, Contingent and Unliquidated Claims ................................ | 64 |
| | 1. | *Allowance of Claims* ..................................................................... | 64 |
| | 2. | *Prosecution of Objections to Claims* ............................................ | 64 |
| | 3. | *Estimation of Claims* ..................................................................... | 64 |
| | 4. | *Expungement or Adjustment to Claims Without Objection* ........... | 64 |
| | 5. | *Deadline to File Objections to Claims* .......................................... | 65 |
| | 6. | *Disallowance of Certain Claims* ................................................... | 65 |
| | 7. | *Offer of Judgment* ......................................................................... | 65 |
| | 8. | *Amendments to Claims* .................................................................. | 65 |
| D. | | Conditions Precedent to Consummation of the Plan .......................... | 65 |
| | 1. | *Conditions to the Effective Date* ................................................... | 65 |
| | 2. | *Waiver of Conditions to the Effective Date* ................................... | 66 |
| | 3. | *Effects of Nonoccurrence of Conditions to the Effective Date* ...... | 66 |
| E. | | Miscellaneous Provisions ................................................................... | 66 |

|   |   |   |   |
|---|---|---|---|
| | 1. | *Retention of Jurisdiction by the Bankruptcy Court* | 66 |
| | 2. | *Failure of Bankruptcy Court to Exercise Jurisdiction* | 67 |
| | 3. | *Amendment or Modification of the Plan* | 67 |
| | 4. | *Revocation of the Plan* | 68 |
| | 5. | *Severability* | 68 |
| | 6. | *Successors and Assigns* | 68 |
| X. | **FINANCIAL PROJECTIONS** | | 68 |
| XI. | **RISK FACTORS TO BE CONSIDERED** | | 69 |
| | A. | Certain Bankruptcy Considerations | 69 |
| | | 1. | *If the Plan is not confirmed or consummated, or the reorganization is delayed, distributions to Holders of Allowed Claims would be materially reduced.* | 69 |
| | | 2. | *The Plan may not be consummated if the conditions to Effectiveness of the Plan are not satisfied.* | 69 |
| | | 3. | *If the Effective Date is delayed or projected proceeds are not timely received, the Debtors may need to seek postpetition financing.* | 70 |
| | | 4. | *If current estimates of Allowed Claims prove inaccurate, Reorganized Relativity's financial condition could be materially and adversely affected.* | 70 |
| | | 5. | *The Debtors may not be able to fully satisfy their obligations under the Ultimates Credit Agreement, which could impair their ability to obtain exit financing.* | 70 |
| | | 6. | *Existing intercreditor agreements may preclude Debtors' from granting the releases set forth in the plan.* | 70 |
| | B. | Financial Condition and Indebtedness | 70 |
| | | 1. | *Reorganized Relativity faces substantial capital requirements.* | 70 |
| | | 2. | *Restrictions imposed by agreements governing indebtedness incurred by Reorganized Relativity or market conditions may limit Reorganized Relativity's ability to obtain additional liquidity.* | 71 |
| | | 3. | *Projections of future performance by Reorganized Relativity are based on assumptions which may not prove accurate and many of which are outside the control of Reorganized Relativity.* | 71 |
| | | 4. | *Changes to Reorganized Relativity's business plan may cause material adverse changes to Reorganized Relativity's business.* | 71 |
| | | 5. | *Reorganized Relativity cannot assure future profitability.* | 71 |
| | C. | General Economic Risk Factors and Business Risk Factors | 72 |
| | | 1. | *Unpredictability Of Entertainment Industry.* | 72 |
| | | 2. | *Rapid Technological Changes And Alternative Forms Of Delivery Or Storage Of Filmed Entertainment.* | 72 |
| | | 3. | *Piracy Of Motion Pictures, Including Digital And Internet Piracy, May Reduce The Gross Receipts From The Exploitation Of Our Films.* | 72 |
| | | 4. | *Reorganized Relativity could be adversely affected by strikes, union actions or other work stoppages.* | 73 |
| | | 5. | *Increased costs of prints, advertising and promotion.* | 73 |

6. *The motion picture industry is highly competitive and at times may create an oversupply of motion pictures in the market.* ................................................................ 73

7. *Reorganized Relativity faces litigation risk.* ................................................................ 73

8. *Reorganized Relativity faces risks from doing business internationally.* ....................... 74

9. *In the Sport Representation and Management Business, Relativity is heavily reliant on its key agents.* ................................................................ 74

10. *Relativity does not and currently cannot own any equity interest in Sky Land (Beijing) Film-Television Culture Development Ltd., a PRC entity due to government regulation on foreign companies owning equity in China companies engaged in the entertainment and media industry.* ................................................................ 74

11. *Relativity will need to attract and retain key employees to rebuild management its management team post-confirmation.* ................................................................ 74

**XII.    FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN** ............... 75

A. General ................................................................ 75

B. U.S. Federal Income Tax Consequences to the Debtors ................................................................ 76

C. U.S. Federal Income Tax Consequences to Holders of Allowed Claims ................................................................ 76

1. *Recognition of Gain or Loss* ................................................................ 76

2. *Litigation Trust* ................................................................ 77

D. Certain Other U.S. Federal Income Tax Considerations for Holders of Allowed Claims ............ 77

1. *Medicare Surtax* ................................................................ 77

2. *Accrued but Unpaid Interest* ................................................................ 77

3. *Post-Effective Date Distributions* ................................................................ 78

4. *Bad Debt and/or Worthless Securities Deduction* ................................................................ 78

5. *Market Discount* ................................................................ 78

6. *Holding Reorganized Relativity Holdings Warrants* ................................................................ 78

7. *Information Reporting and Backup Withholding* ................................................................ 79

E. Importance of Obtaining Professional Tax Assistance ................................................................ 79

**XIII.    RECOMMENDATION AND CONCLUSION** ................................................................ 79

**TABLE OF EXHIBITS**

**EXHIBIT A**    First Amended Plan of Reorganization

**EXHIBIT B**    Prospective Financial Information

**EXHIBIT C**    Unaudited Financial Statements for the YE2014, 1Q2015, and 2Q2015

**EXHIBIT D**    Audited Financial Statements for the YE2012 and YE2013

**EXHIBIT E**    Chapter 7 Liquidation Analysis

I.    **INTRODUCTION**

The Plan Proponents submit this Disclosure Statement pursuant to Bankruptcy Code § 1125 in connection with the solicitation of acceptances of the Plan.  A copy of the Plan is attached hereto as Exhibit A.

This Disclosure Statement sets forth certain information regarding the prepetition operating and financial history of the Debtors, the events leading up to the commencement of the Chapter 11 Cases, events that have occurred during the Chapter 11 Cases and the anticipated organization, operations and capital structure of the reorganized Debtors on or after the Effective Date (the "**Reorganized Debtors**") if the Plan is confirmed and becomes effective.  This Disclosure Statement also describes terms and provisions of the Plan, including certain effects of Confirmation of the Plan, certain risk factors (including those associated with securities to be issued under the Plan), certain alternatives to the Plan and the manner in which distributions will be made under the Plan.  The Confirmation process and the voting procedures that Holders of Claims entitled to vote on the Plan must follow for their votes to be counted are also discussed herein.

The Plan Proponents believe that the Plan is the best means to efficiently and effectively implement the restructuring of the Debtors' capital structure and provide for their emergence from bankruptcy.

Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.  Except as otherwise stated herein, all dollar amounts provided in this Disclosure Statement and in the Plan are given in United States dollars.

On December [_], 2015, the Bankruptcy Court entered an order approving this Disclosure Statement as containing "adequate information," i.e., information of a kind and in sufficient detail to enable a hypothetical reasonable investor typical of the Holders of Claims or Interests to make an informed judgment about the Plan.  See Dkt. No. [_].

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT CONSTITUTES NEITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN NOR AN ENDORSEMENT OF THE MERITS OF THE PLAN BY THE BANKRUPTCY COURT.

A.    **Material Terms of the Plan**

As discussed in more detail below, the Plan will allow the Debtors to reorganize Relativity's non-TV Business units with a substantially de-levered balance sheet utilizing new equity investments and new financing. Relativity's balance sheet will be de-levered in the approximate amount of $500 million by paying off or eliminating the Manchester DIP Claims, TLA/TLB Secured Claims, Ultimates Secured Claims, Vine/Verite Secured Claims, and claim under the Manchester Prepetition Credit Facility in exchange for a $60 million BidCo Note and a $100 million New P&A/Ultimates Facility.

THE PLAN PROPONENTS BELIEVE THAT THE IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF EACH OF THE DEBTORS AND ITS STAKEHOLDERS. FOR ALL OF THE REASONS DESCRIBED IN THIS DISCLOSURE STATEMENT.  THE PLAN PROPONENTS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN BY THE VOTING DEADLINE, WHICH IS JANUARY [_], 2016 AT [_]:00 P.M. (EASTERN TIME).

As set forth in further detail below, the material terms of the Plan are as follows:

| Treatment of Claims and Interests | For administrative purposes, the Plan assigns a letter to each Debtor (as set forth in the table in Section VI.B.1 below) and a number to each of the Classes of Claims against or Interests in the Debtors.
For consistency, similarly designated Classes of Claims and Interests are assigned the same number across each of the Debtors.  Claims against and Interests in each of the Debtors are classified in up to 12 separate Classes, which are set forth in the table below in Section B. As further detailed in the Plan, the Plan contemplates the following treatment of Claims and Interests: |
| --- | --- |

- Administrative Claims – Each Holder of an Allowed Administrative Claim will receive Cash equal to the full Allowed amount of such Claim. These Claims are unclassified under the Plan.
- Priority Tax Claims – Each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors or the Reorganized Debtors, as applicable, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, on account of and in full and complete settlement, release and discharge of such Claim, (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim or (ii) Cash in the aggregate amount of such Allowed Priority Tax Claim payable in installments over a period of time not to exceed five (5) years after the Petition Date, pursuant to section Bankruptcy Code § 1129(a)(9)(C). These Claims are unclassified under the Plan.
- Priority Non-Tax Claims – On the later of (a) the Effective Date and (b) the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, each Holder of an Allowed Priority Non-Tax Claim against the Debtors shall receive on account and in full and complete settlement, release and discharge of such Claim, at the Debtors' election, (i) Cash in the amount of such Allowed Priority Non-Tax Claim in accordance with Bankruptcy Code § 1129(a)(9) and/or (ii) such other treatment required to render such Claim unimpaired pursuant to Bankruptcy Code § 1124. Such claims are Unimpaired and classified in Classes A1 through A145 under the Plan.
- TLA/TLB Secured Claims – On the Effective Date, the Holders of Allowed TLA/TLB Secured Claims are entitled to receive 100% of the equity value of the Debtors. Holders of the Allowed TLA/TLB Secured Claims, excluding Kavanaugh and Nicholas, have agreed to less favorable treatment, and shall receive the BidCo Note in full and final satisfaction, release, and discharge of, and in exchange for, such TLA/TLB Secured Claim. For the avoidance of doubt, the BidCo Note, to the extent paid down to $30 million, will be subordinated to the New P&A/Ultimates Facility. Kavanaugh and Nicholas have agreed to receive Reorganized Relativity Holdings Preferred Units and such other treatment on account of approximately $175 million of their TLA/TLB Secured Claims described in the Revised Relativity Holdings Operating Agreement as set forth in Section III.B of the Plan. Such claims are Impaired and are classified in Classes B1 through B33, B35 through B56, B58 through B143 and B145 under the Plan.
- Pre-Release P&A Secured Claims – On or as soon as practicable after the Effective Date, RKA, as the Holder of the Allowed Pre-Release P&A Secured Claims, shall receive the following treatment: (i) If RKA votes to accept the Plan, the treatment as provided for in Exhibit I to the Plan; or (ii) if RKA votes to reject the Plan, the five (5) Replacement P&A Notes with a present value equal to the respective Allowed Pre-Release P&A Secured Claims. Such Claims are Impaired and are classified in Classes C5, C21, C108, C109 and C117 under the Plan.
- Post-Release P&A Secured Claims – On or as soon as practicable after the Effective Date, Reorganized Relativity Holdings shall Allow a claim in the approximately amount of $26,818,821 (as of October 31, 2015 and as reduced in the ordinary course until the Effective Date), which such amount shall include, without limitation, additional accrued interest, legal fees, costs, expenses and other outstanding obligations of Reorganized Relativity Holdings under the P&A Funding Agreement subject to documentation of a replacement credit agreement, which shall provide among other things for an extension of the maturity dates as compared to the pre-petition terms. The obligation shall be secured by a first-priority security interest originally (i) cross-collateralized against Blackbird Productions, LLC and RML WIB Films, LLC and (ii) individually as against RML Lazarus Films, LLC. Such Claims are Impaired and are classified in Classes D8, D109 and D121 under the Plan.

- Production Loan Secured Claims – On or as soon as practicable after the Effective Date, the Holder of the Allowed Production Loan Secured Claims shall receive the following treatment: (i) If the Holder votes to accept the Plan, the Production Loan Settlement; or (ii) if the Holder votes to reject the Plan, the two (2) Replacement Production Loan Notes with a present value equal to the respective Allowed Production Loan Secured Claims. For the avoidance of doubt, nothing in the Plan is intended to affect or modify the Allowed Production Secured Claim Holder's rights under ¶ H(vi)(D) – (I) of Dkt. No. 931 in the Chapter 11 Cases. Such Claims are Impaired and are classified in Classes E5 and E21 under the Plan.

- Ultimates Secured Claims – On or as soon as practicable after the Effective Date, each Holder of an Allowed Ultimates Secured Claim shall receive payment in full (in Cash) of any such Allowed Ultimates Secured Claim in full and final satisfaction of their claim upon which payment any liens securing such claim shall be immediately released. Such Claims are Unimpaired and are classified in Classes F1, F2, F6, F7, F8, F10, F20, F24, F41, F47, F51, F77 through F83, F87, F95, F96, F99, F103, F109, F111, F112, F116, F119, F121 and F126 under the Plan.

- Secured Guilds Claims – Each Holder of an Allowed Secured Guilds Claim shall receive (i) on the Effective Date or as soon thereafter as practicable, its pro rata share of $6.65 million less what is received with respect to the Secured Guilds Claims prior to the Effective Date, and (ii) one (1) year after the Effective Date or as soon as practicable thereafter, payment in full (including applicable interest and collection costs, including but not limited to attorneys fees, as specified in each applicable security agreement) on account of the remaining balance of such Allowed Secured Guilds Claim; *provided, however,* that if the Guilds and the Reorganized Debtor have not agreed to the amount of remaining Allowed Guild Secured Claims within 180 days after the Effective Date, the parties will refer this issue to arbitration pursuant to the Guild collective bargaining agreements*; provided, further however,* that the Guilds shall retain any pre-petition liens securing the Allowed Secured Guilds Claims. All payments to the Guilds in connection with the Allowed Secured Guilds Claims shall be payable in accordance with the Guild Payroll Protocols. Such Claims are Impaired and are classified in Classes G1, G2, G6, G7, G8, G10, G20, G24, G41, G47, G51, G77 through G83, G87, G95, G96, G99, G103, G109, G11, G112, G116, G119, G121 and G126 under the Plan.

- Vine/Verite Secured Claims – On or as soon as practicable after the Effective Date, each Holder of an Allowed Vine/Verite Secured Claim shall receive the following treatment at the option of the Plan Proponents: (i) such Allowed Secured Claim shall be Reinstated; or (ii) satisfaction of any such Allowed Secured Claim by delivering the collateral securing any such Allowed Secured Claim. Such Claims are Unimpaired and are classified in Classes H34 and H144 under the Plan.

- Other Secured Claims – On or as soon as practicable after the Effective Date, each Holder of an Allowed Other Secured Claim shall receive the following treatment at the option of the Plan Proponents: (i) such Allowed Secured Claim shall be Reinstated; (ii) payment in full (in Cash) of any such Allowed Secured Claim; or (iii) satisfaction of any such Allowed Secured Claim by delivering the collateral securing any such Allowed Secured Claim. Such Claims are Unimpaired and are classified in Classes I1 through I145 under the Plan.

- General Unsecured Claims – On the Effective Date, the Reorganized Debtors shall be deemed substantively consolidated for plan purposes only, and each Holder of an Allowed General Unsecured Claim in Classes J1 – J145 shall receive, subject to the terms of the Plan, in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim, interests representing its Pro Rata share of (i) the Guaranteed GUC Payment and (ii) the GUC Litigation Trust Interests; *provided,*

|  | however, that the sum of the Guaranteed GUC Payment and the GUC Litigation Trust Interests shall not exceed par.  For the avoidance of doubt, all intercompany claims of the Debtors shall be disallowed and canceled as part of the deemed substantive consolidation of the Debtors.  For further avoidance of doubt, claims arising under the Manchester Prepetition Credit Facility are General Unsecured Claims.  The Reorganized Debtors will meet and confer in order to coordinate GUC Distributable Value with Guild and Litigation Trust Interests with the Guild Payroll Protocols.  In addition, the Guilds agree that notwithstanding the CBA Assumption Agreements and Bankruptcy Code § 1113 and any other applicable provisions of the Bankruptcy Code, any unsecured pre-petition residuals owed by any of the Debtors will be treated as General Unsecured Claims.  Such Claims are <u>Impaired</u> and are classified in Classes J1 through J145 under the Plan.<br>• <u>Subordinated Claims</u> – No property shall be distributed to or retained by the Holders of Subordinated Claims, and such Claims shall be extinguished on the Effective Date.  Holders of Subordinated Claims shall not receive any distribution pursuant to the Plan.  Such Claims are <u>Impaired</u> and are classified in Classes K1 through K145 under the Plan.<br>• <u>Interests</u> – Holders of Interests in the Debtors shall retain no property under the Plan.  Such Claims are <u>Impaired</u> and are classified in Classes L1 through L145 under the Plan. |
|---|---|
| **New P&A/Ultimates Facility** | On the Effective Date, one or more of the Reorganized Debtors shall be authorized to consummate the New P&A/Ultimates Facility and to execute, deliver and enter into the New Exit Financing Documents, and any related agreements or filings without the need for any further corporate or other organizational action and without further action by the Holders of Claims or Interests, and the New Exit Financing Documents and any related agreements or filings shall be executed and delivered and the applicable Reorganized Debtors shall enter into the New P&A/Ultimates Facility and be permitted to incur or issue the indebtedness available thereunder.  The Plan contemplates entering into a revolving credit facility of up to $250 million in the form of the New P&A/Ultimates Facility.  Subject to Bankruptcy Court approval, Aperture Media Partners, LLP and EMP Media Partners LLP will act as the co-lead arrangers of the New P&A/Ultimates Facility.  Finally, the Plan contemplates that Relativity will secure one or more multi-year media buying agreements, for traditional and digital media, that includes payment terms acceptable to the Debtors.  Any final material terms of the New P&A/Ultimates Facility shall be included in the Plan Supplement. |
| **New Equity Investment** | Jim Cantelupe, of Summit Trail Advisors, LLC, has committed to work with the Debtors to raise up to $100 million of new equity to fund the Plan, which funds are to be escrowed on or before December 31, 2015. |
| **Means of Implementation** | The Plan contains standard means of implementation, including provisions for the continued existence of the Reorganized Debtors, the cancellation of certain prepetition debt and debt agreements, the  issuance of the Reorganized Relativity Equity Interests and the revesting of Debtors' assets in the Reorganized Debtors. |

| Releases | The Plan provides certain customary release provisions (i) by the Debtors and Reorganized Debtors for the benefit of the Released Parties and (ii) by Consenting Creditors for the benefit of the Released Parties, in each case, relating to any of the Debtors or the Estates, the Chapter 11 Cases or the negotiation, consideration, formulation, preparation, dissemination, implementation, confirmation or consummation of the Plan, the Exhibits, the Disclosure Statement, any amendments thereto, the Initial DIP Credit Agreement, the Initial DIP Order, the Modified DIP Credit Agreement, the Modified DIP Order, any of the New Securities and Documents, the Restructuring Transactions or any other transactions in connection with the Chapter 11 Cases or any contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken in connection therewith or in connection with any other obligations arising under the Plan or the obligations assumed hereunder; _provided_, _however_, that the Releases provided under the Plan shall have no effect on the Released Party's liability under certain circumstances as set forth in the Plan.  For the avoidance of doubt, the Released Parties shall not include any of the Excluded Release Parties. |
|---|---|
| Exculpation | The Plan provides certain customary exculpation provisions, which include a full exculpation from liability in favor of the Exculpated Parties, the Debtors, the Reorganized Debtors and any of their respective Representatives from any and all claims and causes of action arising on or before the Effective Date in connection with, related to or arising out of the Chapter 11 Cases, any of the Debtors or the Estates, the negotiation, consideration, formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Exhibits, the Disclosure Statement, any amendments to the foregoing or any other transaction proposed in connection with the Chapter 11 Cases or any contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken in connection therewith or in connection with any other obligations arising under the Plan or the obligations assumed hereunder; _provided_, _however_, that the exculpations provided under the Plan shall have no effect on the liability of (1) any Entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document previously assumed or to be entered into or delivered in connection with the Plan or (2) any Exculpated Party that would otherwise result from any act or omission of such Released Party to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct (including fraud). |

## B.    Parties Entitles to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan.  Creditors or equity interest holders whose claims or interests are not impaired by a plan are deemed to accept the plan under Bankruptcy Code § 1126(f) and are not entitled to vote.  In addition, creditors or equity interest holders whose claims or interests are impaired by the plan and will receive no distribution under the plan are also not entitled to vote because they are deemed to have rejected the plan under Bankruptcy Code § 1126(g).  For a discussion of these matters, see Section I.B below.

The following table sets forth which Classes are entitled to vote on the Plan and which are not, and sets forth the estimated Allowed amount, the estimated recovery, and the impairment status for each of the separate Classes of Claims and Interests provided for in the Plan:

| Class | Designation | Impairment | Estimated Allowed Amount[3] | Estimated Recovery Rate[4] | Voting Status |
|-------|-------------|------------|------------------------------|-----------------------------|---------------|
| A. | Priority Non-Tax Claims | Unimpaired | $0 | 100% | Deemed to Accept |
| B. | TLA/TLB Secured Claims | Impaired | $236,611,038 | 100% to BidCo Note Holders and remainder TBD | Entitled to Vote |
| C. | Pre-Release P&A Secured Claims | Impaired | $88,224,682 | 100% | Entitled to Vote |
| D. | Post-Release P&A Secured Claims | Impaired | $26,818,821 | 100% | Entitled to Vote |
| E. | Production Loan Secured Claims | Impaired | $33,848,694 | 100% | Entitled to Vote |
| F. | Ultimates Secured Claims | Unimpaired | $27,789,945 | 100% | Deemed to Accept |
| G. | Secured Guilds Claims | Impaired | $3.04 million | 100% | Entitled to Vote |
| H. | Vine/Verite Secured Claims | Unimpaired | $69,405,434 | 100% | Deemed to Accept |
| I. | Other Secured Claims | Unimpaired | $0 - $8 million[5] | 100% | Deemed to Accept |
| J. | General Unsecured Claim | Impaired | $215,329,877 | 11.5 %[6] | Entitled to Vote |
| K. | Subordinated Claims | Impaired | $0 | 0% | Deemed to Reject |
| L. | Interests | Impaired | $0 | 0% | Deemed to Reject |

Bankruptcy Code § 1126 defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims actually voted to accept or reject the plan.  Your vote on the Plan is important.  The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is impaired and entitled to vote under a plan votes to accept such plan, unless the plan is being confirmed under the "cramdown" provisions of Bankruptcy Code § 1129(b).  Bankruptcy Code § 1129(b) permits confirmation of a plan of reorganization, notwithstanding the nonacceptance of the plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims votes to accept a proposed plan. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

For a detailed description of the Classes of Claims and Interests and their treatment under the Plan, see Section VI.B.

---

[3]    The Estimated Allowed Amounts are estimates only and actual amounts may be materially greater or less than those set forth herein.

[4]    The Estimated Recovery Rates are estimates only and actual recoveries may be materially greater or less than those set forth herein based on, among other things, Allowed Claims arising from the rejection of Executory Contracts or Unexpired Leases and resolution of disputed or unliquidated Claims.  In addition, the Estimated Recovery Rates do not include an estimate of value attributable to the Litigation Trust Assets.

[5]    Certain creditors have asserted secured claims under their agreements with the Debtors.  This revised estimate resolves certain informal comments to the Disclosure Statement; all rights regarding this treatment are reserved for confirmation.

[6]    Estimated recovery is calculated subject to the following assumptions: (a) the numerator includes guaranteed payments of $9 million and excludes proceeds of Litigation and (b) the denominator excludes $137.1 million for the Manchester Prepetition Credit Facility which is the subject of ongoing discussions among Manchester and the Committee.

C.       **Solicitation Package**

The package of materials (the "**Solicitation Package**") to be sent to Holders of Claims and Interests entitled to vote on the Plan will contain:

- a cover letter describing (a) the contents of the Solicitation Package, (b) the contents of any enclosed CD-ROM and instructions for use of the CD-ROM and (c) information about how to obtain, at no charge, hard copies of any materials provided on the CD-ROM;

- a paper copy of the notice of the Confirmation Hearing (the "**Confirmation Hearing Notice**");

- a copy – either as a paper copy or in an enclosed CD-ROM – of the Disclosure Statement together with the exhibits thereto, including the Plan, that have been Filed with the Bankruptcy Court before the date of the mailing;

- the Disclosure Statement Order;

- the Solicitation Order; and

- for Holders of Claims in voting Classes (i.e., Holders of Claims in Classes B, C, D, E, G and J), an appropriate form of Ballot, instructions on how to complete the Ballot, and a Ballot return envelope and such other materials as the Bankruptcy Court may direct.

In addition to the service procedures outlined above (and to accommodate creditors who wish to review exhibits not included in the Solicitation Packages in the event of paper service): (1) the Plan, the Disclosure Statement and, once they are filed, all exhibits to both documents will be made available online at no charge at the Document Website and (2) the Plan Proponents will provide parties in interest (at no charge) with hard copies of the Plan and/or Disclosure Statement upon written request to Donlin, Recano & Company, Inc., re: Relativity Fashion, LLC, et al., Attn: Ballot Processing, P. O. Box 2034, Murray Hill Station, New York, NY 10156-0701.

D.       **Voting Procedures, Ballots and Voting Deadline**

If you are entitled to vote to accept or reject the Plan, a Ballot(s) has been enclosed in your Solicitation Package for the purpose of voting on the Plan.  Each Ballot has been coded to reflect the Class of Claims it represents.  Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.  If you (1) hold Claims in more than one voting Class or (2) hold multiple Claims within one Class, you may receive more than one Ballot.

After carefully reviewing (1) the Plan, (2) this Disclosure Statement, (3) the Disclosure Statement Order, (4) the Solicitation Order that, among other things, established the voting procedures, scheduled a Confirmation Hearing and set the voting deadline and the deadline for objecting to Confirmation of the Plan, and (5) the detailed instructions accompanying your Ballot, please indicate on your Ballot your vote to accept or reject the Plan.

All Ballots, in order to be counted, must be properly completed in accordance with the voting instructions on the Ballot and actually received by the Voting Agent by the Voting Deadline (i.e., January [___], 2016 at 4:00 p.m. (Eastern Time)).  Please vote and return your Ballot(s) no later than the Voting Deadline to Donlin, Recano & Company, Inc. (the "**Voting Agent**") at P. O. Box 2034, Murray Hill Station, New York, NY 10156-0701 (first class mail) or 6201 15th Avenue, Brooklyn, NY 11219 (hand delivery or overnight mail).  Ballots should not be sent directly to the Plan Proponents, the Creditors' Committee, or their agents (other than the Voting Agent).  No Ballots may be submitted by electronic mail or any other means of electronic transmission, and any Ballots submitted by electronic mail or other means of electronic transmission will not be accepted by the Voting Agent.

If a Holder of a Claim delivers to the Voting Agent more than one timely, properly completed Ballot with respect to such Claim prior to the Voting Deadline, the Ballot that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the timely, properly completed Ballot determined by the Voting Agent to have been received last from such Holder with respect to such Claim.

If you are a Holder of a Claim who is entitled to vote on the Plan as set forth in the Solicitation Order and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan, the Ballot or the procedures for voting on the Plan, please contact the Voting Agent (1) by telephone at (212) 771-1128, (2) by email at DRCVote@donlinrecano.com, or (3) in writing at Donlin, Recano & Company, Inc., Re: Relativity Fashion, LLC, et al., Attn: Ballot Processing, P. O. Box 2034, Murray Hill Station, New York, NY 10156-0701.

FOR FURTHER INFORMATION AND INSTRUCTIONS ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE SECTION VI.J.9.

Before voting on the Plan, each Holder of a Claim in Classes B, C, D, E, G and J should read, in its entirety, this Disclosure Statement, the Plan, the Disclosure Statement Order, the Solicitation Order, the Confirmation Hearing Notice, and the instructions accompanying the Ballots. These documents contain important information concerning how Claims are classified for voting purposes and how votes will be tabulated. Holders of Claims entitled to vote are also encouraged to review the relevant provisions of the Bankruptcy Code and Bankruptcy Rules and/or consult their own attorney.

### E.    Confirmation Exhibits

The Plan Proponents will separately file copies of all Confirmation Exhibits with the Bankruptcy Court no later than seven (7) days before the Voting Deadline (or such later date as may be approved by the Bankruptcy Court). All Confirmation Exhibits will be made available on the Document Website once they are Filed. The Plan Proponents reserve the right, in accordance with the terms of the Plan, to modify, amend, supplement, restate or withdraw any of the Confirmation Exhibits after they are Filed and will promptly make such changes available on the Document Website.

### F.    Confirmation Hearing and Deadline for Objections to Confirmation

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on whether the Plan Proponents have fulfilled the confirmation requirements of Bankruptcy Code § 1129. The Confirmation Hearing has been scheduled for January [__], 2016 at [__:__] [a][p].m. (Eastern Time) before the Honorable Judge Michael E. Wiles, United States Bankruptcy Judge for the Southern District of New York, in Courtroom 617 at the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, New York, New York 10004. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice.

Any objection to Confirmation must (1) be in writing, (2) state the name and address of the objecting party and the nature of the Claim or Interest of such party, and (3) state with particularity the basis and nature of such objection. Any such objections must be Filed and served upon the Persons designated in the Confirmation Hearing Notice in the manner and by the deadline described therein.

## II.    OVERVIEW OF THE COMPANY

### A.    Corporate Structure of the Company

The company operates its businesses through separate but affiliated companies that are generally organized by business lines or units. Relativity Holdings LLC ("**Relativity Holdco**") owns 100% of the equity of Relativity Media, LLC ("**RML**") and RML is the direct or indirect owner of the Debtors (the "**Debtor Subsidiaries**") and the non-Debtor subsidiaries of Relativity Holdco (the "**Non-Debtor Subsidiaries**" and, together with Relativity Holdco, RML and the Debtors, "**Relativity**").

### B.    Business Overview

Relativity is a privately-held entertainment company with an integrated and diversified global media platform that provides, among other things, film and unscripted television financing, production and distribution. In addition to its film studio, the Company maintains an integrated suite of complementary and synergistic business units that make up the "360 degree" global media platform. Relativity benefits from the convergence of filmed

entertainment with other forms of entertainment and global brands.  Specifically, Relativity couples its traditional media and content offerings with a roster of world-class athletes, artists and global consumer brands.  By bringing these businesses together, the Company drives value to its films, television shows, brands and managed portfolio of clients through highly unique, integrated promotion opportunities.  As of the Petition Date, Relativity had approximately 89 full and part-time employees and 54 independent contractors.  In addition, in connection with Relativity's film and scripted television productions, as of the Petition Date, Relativity employed approximately 760 temporary production personnel that provide Relativity cast and crew services, as well as other production support.  As of October 31, 2015 following the sale of the unscripted television business unit described in further detail in Section IV.A below, Relativity has approximately 48 employees.

Relativity's corporate headquarters are located at 9242 Beverly Blvd., Suite 300, Beverly Hills, California 90210, and Relativity's primary telephone number is 310-724-7700.  Attached hereto as Exhibit C and Exhibit D respectively, are (i) Relativity's unaudited financial statements for the fiscal year ending December 31, 2014 and for the first two quarters of 2015, and (ii) Relativity's audited financial statements for the fiscal years ending December 31, 2012 and 2013 (collectively, the "**Financial Statements**").

C.    **Business Operations**

1.    *Key Business Units*

Relativity's operations are conducted through various subsidiaries and affiliates, which are grouped by business units.  Relativity's key business units include (i) film production and distribution, (ii) scripted television production and distribution, (iii) sports talent management, (iv) marketing/branding, (v) digital media, (vi) music publishing, (vii) education, and (viii) international strategic partnerships.  Each business unit is further described below.

a.    *Relativity's Film Studio Division*

The Relativity film business provides a full-service studio with development, production, financing and distribution capabilities (the "**Film Business**").  Since its inception, the Film Business has distributed, produced or arranged financing for over 200 films that have earned over $23 billion in worldwide box office receipts, with 78 films generating more than $100 million in worldwide box office receipts, 49 films opening at number one at the domestic box office and 73 films earning Oscar nominations with 11 wins.  Relativity has produced 20 films in-house and 169 through distribution or financing arrangements including 127 as part of major studio co-production and financing arrangements.

As Relativity moved away from its slate co-financing arrangements, it developed capabilities to efficiently source, finance, produce and distribute approximately 15 – 20 films theatrically and up to 30 films on television and digital media per year.  Relativity's business model mitigates the traditional risk of a film studio.  Through international output deals and tax credits, Relativity typically limits its at-risk capital to domestic Prints and Advertising ("**P&A**") costs plus 0-25% of a film's budget versus 100% for a traditional film studio.  Relativity's distribution agreements include: (i) long-dated output arrangements in numerous foreign territories that often cover the majority of a film's budget, (ii) pre-sale of distribution rights in the foreign territories not covered by output arrangements typically covers an additional significant portion of a film's budget, and (iii) guaranteed minimum Pay TV revenues from the Netflix output arrangement and government film production tax incentives that further reduce production costs in some territories.

Relativity's proprietary film selection process is rooted in an analytical methodology which considers both quantitative and qualitative factors.  Relativity calculates the estimated range of revenue performance for the film by evaluating historical box office performance, looking at the performance of films with similar genre, budget and talent, assessing the competitive landscape around release dates and analyzing the performance of films released on similar dates in previous years.  Each film's production and marketing budgets are developed to ensure a film of first class technical quality can be made within the anticipated "below-the-line" (i.e., non-talent related) costs in the production budget and that the "above-the-line" (i.e., talent) costs and profit participations properly align incentives to maximize film profit.  Additionally, Relativity utilizes potential "soft money" benefits frequently and creates the

P&A budget to efficiently support the intended marketing and distribution plans.  Ultimately, the total estimated cost is then compared against the estimated revenue performance to determine the film's profit potential.

The Film Business consists of (i) an acquisition division that purchases film rights; (ii) a single picture division that oversees production of Relativity's films and a group of Special Purpose Entities ("**SPEs**") that produce particular Relativity films and retain the rights to said films; and (iii) a marketing and distribution division that arranges the domestic and international distribution of Relativity's films.  Relativity arranges for the purchases of rights to movies through SPEs, one for each movie.  The SPEs own the rights to the movies, and enter into funding agreements with lenders using the movies as collateral.  The SPEs, themselves, do not distribute the movies or otherwise directly pay for movie-related expenses.  Rather, they license their rights to the movies to one of Relativity's subsidiaries, RML Distribution Domestic, LLC ("**RML Distribution**"), for purposes of distributing the movies in the United States.

As of October 31, 2015, there are seven (7) films that have completed principal photography.  The upcoming film slate with anticipated releases over the next 24 months consists of:  *Disappointments Room, Before I Wake*, *Kidnap, Solace, Masterminds, Shot Caller, Strangers 2, The Crow, Hunter Killer*, *Act of Valor: SWAT, Fletch, Immortals 2*, and *Secret Scripture*.  In addition, there are over 25 film projects in active development and other anticipated acquisitions of film titles.

For the twelve months ending December 31, 2014, the Relativity Film Business generated approximately $340.7 million in revenue.

b.    *Relativity's Television Studio Division*

The Relativity television business (the "**TV Business**") started as a television production company in 2008 and, as of the Petition Date, included over 29 television series in production across 25 different networks and more than 46 contracted pilots and presentations, including eight upcoming scripted shows.  Examples of these series include:  *Catfish: The TV Show* (MTV), *The Great Food Truck Race* (Food Network), *Kim of Queens* (Lifetime Network), *Young & Hungry* (ABC Family), and *Limitless* (CBS).  Prior to the Petition Date, the TV Business had approximately 24 employees and 510 temporary production personnel.  For the twelve months ending December 31, 2014, the Relativity TV Business generated approximately $96.6 million in revenue.

On October 20, 2015, the sale of the unscripted TV Business to certain of the Debtors' secured lenders closed.

Following the sale of Relativity's unscripted (reality) TV Business, the Company's television strategy is now focused exclusively on developing and providing scripted television shows in partnerships with major networks, cable companies, and online platforms.  The scripted content will be based on existing Relativity IP (films, digital content, etc.) and original IP.

Relativity has already demonstrated the capability for feature film IP to be successfully converted into television content:

- Catfish (The TV Show):  based on a documentary released by Relativity in 2010, now one of the top-rated shows on MTV.
- Limitless (The TV Show):  based on Relativity's 2011 feature film starring Bradley Cooper which grossed over $160 million worldwide, now one of the top new primetime shows airing at 10:00 p.m. on Tuesday on CBS (immediately following NCIS).

Starting in 2016, Relativity expects to produce 1-2 major scripted shows per year.  In scripted television, the revenue model typically consists of two (2) main components:  (i) producer/EP fees (per episode) and (ii) profit participation in the event a show reaches syndication.  Syndication upside for popular shows can potentially be worth hundreds of millions of dollars.

c.    *Relativity's Music Division*

The Relativity music business (the "**Relativity Music Group**") was founded in 2009 to provide in-house music supervision and soundtrack services for films produced and/or financed by Relativity.  Relativity Music Group also releases soundtracks internationally and provides services for films produced and/or financed by other film studios.  Relativity Music Group has released soundtrack albums for some of Hollywood's biggest films, including: *Bridesmaids*, *Hanna*, *The Adjustment Bureau*, *30 Rock*, *Dear John*, *Love Happens*, *Couples Retreat*, *Zombieland*, *A Single Man*, *MacGruber*, *Repo Men*, *Brothers*, *The Spy Next Door*, *The Perfect Getaway*, *Machine Gun Preacher*, *Like Crazy* and *Immortals*.  Relativity Music Group is exclusively distributed by EMI Label Services/Universal.

For the twelve months ending December 31, 2014, the Relativity Music Business generated approximately $1.5 million in revenue.  Relativity Music Group continues to service its agreements and expects to bring in new management on or before the Effective Date.

d.    *Relativity Marketing*

Madvine RM, LLC ("**Madvine**") is Relativity's branded entertainment and consumer products company. Madvine creates and offers full product and brand integration for companies, major brands and other strategic partners outside of Relativity.  Madvine works with both established and emerging brand partners.  Madvine's work for established brands is paid for in Cash and its work for emerging brands is compensated through equity participations in the brandholder.

Relativity Digital Studios ("**RDS**") develops, produces and distributes original content and other promotional material for digital distribution.  RDS also develops branded entertainment campaigns that connect brand partners with other Relativity businesses, such as the Music Business.  The entities in RDS own and manage websites and website content, and their assets include the intellectual property related to digital shorts and the equipment necessary to produce such content.  For the twelve months ending December 31, 2014, RDS generated approximately $242,000 in revenue.

In 2015, Relativity launched Quantum Distribution Network ("**Quantum**"), a content distribution network consisting of owned and operated and third-party websites, with an emphasis on video content syndication. Quantum is designed to generate incremental sponsorship/media campaign revenue against RML produced content, provide a more efficient and cost effective marking platform for RML assets and generate additional premium inventory against which RML can sell sponsorships and media campaigns.

e.    *Relativity's Fashion Division*

Relativity Fashion (also known by its d/b/a, M3/Relativity), is a New York limited liability company that was organized on October 22, 2013.  Relativity Fashion was a consultancy service company that represented fashion designers and provided services to other clients in connection with building and launching their brands and expanding them into various forms of media through involvement with other Relativity entities.  Prior to the Petition Date, Relativity Fashion terminated all of its employees and ceased all activities.

f.    *Global Distribution Platform*

Relativity has positioned itself at the center of several growth trends in the film industry, particularly in China and India.  Sky Land Entertainment ("**Sky Land**") is a 90%-owned subsidiary of Relativity that provides direct distribution access to the Chinese market for Relativity and other third-party film content.  Relativity, through Sky Land, is the only U.S. studio to have a government-issued distribution license in China, the world's fastest-growing and second largest film market, and de facto guaranteed distribution slots annually supported by Sky Land's Beijing-based management team.  Relativity already has released four films in China:  *Immortals*, *Mirror Mirror*, *Freebirds*, and *21 & Over*.

Replicating its strategy in China, Relativity entered into a 50/50 joint venture in India - now the 6th largest film market in the world with over 1 billion people - focusing on theatrical distribution of Relativity and third-party produced films as well as production of U.S. and Bollywood content.

2.    *Joint Ventures*

Certain Non-Debtor Subsidiaries that are in the Film Business, the Digital Business, and the Music Business are only partially owned by Relativity (collectively, the "**Joint Ventures**").  Each Joint Venture is discussed below.

a.    *RED*

Relativity EuropaCorp Distribution, LLC ("**RED**") is a domestic distribution and marketing joint venture formed and owned 50-50 by RML and EuropaCorp Films USA, Inc. ("**EuropaCorp**").  RED was created in February 2014 to support each party's domestic distribution for their respective film slates and to provide marketing and distribution services to both entities.  Under the terms of the deal, EuropaCorp paid approximately $70 million for a 50% stake in the joint venture.  As of the Petition Date, RED had approximately 56 employees.  As of October 31, 2015, RED employed 51 employees.

b.    *Relativity Sports*

The Relativity Sports Group is comprised of Relativity Sports Management, LLC ("**Sports Management**"), Relativity Sports, LLC, Relativity Sports Enterprises, LLC, and their subsidiaries (collectively, "**Sports Group**").  The Sports Group represents the first major professional sports management agency that operates as part of a global media company with film production and distribution capabilities "under the same roof."  As of the date hereof, the Sports Group is one of the largest sports management companies in the United States, representing and managing over 300 professional athletes in Major League Baseball, the National Basketball Association, and the National Football League with greater than $2.5 billion in contracts.

On July 28, 2015, YC Athletic Holdings, LLC exercised warrants to purchase 50% of the equity in Sports Management.  As such, RML now owns 50% of Sports Management.  Sports Management, in turn, owns 59.71% of Relativity Sports LLC, with the remaining 40.29% owned by certain individuals and other entities.

Relativity Sports, LLC currently holds warrants to purchase 11.48% of Major League Gaming, Inc ("**MLG**").  In addition, Relativity Media also directly holds warrants to purchase 4.86% of MLG.  Major League Gaming is in advanced discussions regarding a sale to a buyer for an amount that the Debtors believe to be in the range of $200 million.

As of October 31, 2015, the Sports Group had 73 employees, including over 20 agents and representatives across the country.  For the twelve months ending December 31, 2014, the Relativity Sports Group generated approximately $26.9 million in revenue.

c.    *Relativity University*

Relativity Education, LLC and its direct and indirect subsidiaries (collectively, "**Relativity University**") is a for-profit accredited branch campus of the Hussian School of Art with 82 students as of November 18, 2015.  Relativity University offers an array of film, media, performing arts and graphic arts Bachelor of Fine Arts programs.  The programs include curricula developed in collaboration with industry insiders and classes are taught by working professionals operating from an active Hollywood production studio.  Relativity owns a minority stake in the Relativity University subsidiaries.  Relativity Education, LLC is 36% owned by RML with the remaining 64% owned by a number of third-party and/or affiliate entities outside of Relativity.

## D.    **Relativity Equity Classes**

Relativity Holdco's five classes of equity are held by approximately 55 holders.  The following is a general description of the five equity classes:

- Class A Units:  Relativity Holdco currently has 120.75 million Class A Units outstanding.  The Class A Units have voting rights on a 1 vote per unit basis.  These units are not subject to any mandatory dividends.  One holder of the Class A Units has a put right, and certain other rights, in the event an IPO or other specified liquidity event does not occur prior to November 26, 2018.

- Class B Units:  Relativity Holdco currently has 59.95 million Class B Units outstanding.  The Class B Units do not have any voting rights, and are held by members of Relativity's management team, either directly or indirectly through a holding company, as well as by members of the Board of Managers and certain consultants to Relativity.  The Class B Units are profits interests and only have value to the extent Relativity Holdco's valuation per unit exceeds the applicable threshold amount.

- Class C Preferred Equity:  Relativity Holdco currently has 3.4704 Class C Units outstanding.  The Class C Units do not have any voting rights and are held by Dune Capital Partners IV LLC.  The Class C Units accrue dividends at 12.5% paid in kind ("**PIK**"), must be exchanged into Class E Units or debt no later than December 31, 2015, and are otherwise non-convertible.[7]

- Class D Units:  Relativity Holdco currently has 1.36 million Class D Units outstanding.  The Class D Units do not have any voting rights, and are held by Tom Forman. The Class D Units permit Mr. Forman to cause Relativity Holdco, under certain circumstances, to repurchase all or any portion of the Class D Units held by Mr. Forman in approximately 3.5 years for either $6.25 per Class D Unit in a lump sum or $12.50 per Class D Unit paid over time (at Relativity Holdco's election).

- Class E Units:  Relativity Holdco currently has 11.7 million Class E Units outstanding.  The Class E Units have voting rights on a 2 vote per unit basis and accrue dividends at 12.5% PIK.  The Class E Units are convertible into Class A Units at the option of the holders thereof and, in certain circumstances, on a mandatory basis.

### E.    Corporate History

Relativity was founded in 2004 by its current Chairman and CEO, Ryan Kavanaugh ("**Kavanaugh**"), as a film slate co-financier partnering with major studios such as Sony and Universal.  Between 2005 and 2010, a NYC-based hedge fund (the "**Hedge Fund**") made a significant investment in Relativity, investing over $1.3 billion in equity and debt primarily through slate co-financing activities.

In 2010, Relativity acquired Overture Films' marketing and distribution operations and began to transform its business into a full-service Hollywood studio.  Since 2010, Relativity has distributed, produced, or arranged financing for more than 200 feature films, including pictures such as *The Fighter*, *Limitless*, *Immortals, Safe Haven* and *Act of Valor,* and generated more than $23 billion in box-office revenues and earned 73 Oscar nominations.  In 2011, Yucaipa purchased a significant equity stake in Relativity.

Relativity is now one of the largest privately-held Hollywood movie studios with a fully integrated and diversified global media platform spanning major studio level film and scripted television production and distribution, professional sports talent management, branding, digital media, music publishing, education and gaming.

In 2012, the Hedge Fund forced a buyout of its interest in Relativity.  To satisfy this, Relativity borrowed $360 million in debt, and sold its then-existing film library to the Hedge Fund (~30+ titles) leaving Relativity in an over-leveraged, under-capitalized position.

### F.    Prepetition Capital Structure

The following is a summary of Relativity's prepetition secured indebtedness (all terms as defined below).  Each debt is further described below.

| Debt | Amount Outstanding as of the Petition Date |
|---|---|
| Cortland TLA/TLB Facility (corporate level debt) | $361,611,038 plus accrued interest |
| Manchester Prepetition Credit Facility (corporate level debt) | $137,078,557 plus accrued interest |

---

[7]    Historically, the Debtors have treated the Class C Preferred Equity as debt for both financial reporting and income tax purposes, and there is a contractual obligation to a holder of the Class C Preferred Equity to continue treating the units as indebtedness for income tax purposes.  The cumulative preference per Class C Unit through May 30, 2015 is $871,301.83 and the total Class C Unit preference is $8,251,576.87.

| P&A Facility (SPV debt) | $117,886,141 plus accrued interest |
|---|---|
| Production Loans (SPV debt) | $33,848,694 plus accrued interest |
| Ultimates Facility (SPV debt) | $27,789,945 plus accrued interest |
| Vine/Verite Loans (SPV debt) | $69,405,434 plus accrued interest |

1.    *Cortland Term Loan A and Term Loan B Financing Facility*

On May 30, 2012, RML and certain of its subsidiaries[8] (the "**Cortland Borrowers**") entered into a Financing Agreement with a variety of lenders that are parties to the agreement (the "**Cortland Lenders**"), including Cortland Capital Market Services LLC ("**Cortland**"), as collateral and administrative agent, and CBA Agency Services, LLC, as origination agent.  The financing extended under this facility was divided into two tranches:  (i) a tranche A term loan in the aggregate principal amount of $125,000,000 (the "**Cortland Term Loan A**") and (ii) a tranche B term loan in the aggregate initial principal amount of $125,000,000 (the "**Cortland Term Loan B**", and together with the Cortland Term Loan A, the "**Cortland TLA/TLB Facility**").  Prior to an event of default, the Cortland Term Loan A bore interest at 10% per annum, payable quarterly in Cash, while the Cortland Term Loan B bore PIK interest at 15% per annum.  Following an event of default, the Cortland Term Loan A bears interest at 12% per annum, payable quarterly in Cash, while the Cortland Term Loan B bears PIK interest at 17% per annum.  The Cortland TLA/TLB Facility is secured by substantially all of the assets of the Cortland Borrowers.  Pursuant to the Cortland TLA/TLB Facility, Relativity Holdco (together with the Cortland Borrowers, the "**Cortland Obligors**") guaranteed the obligations of the Cortland Borrowers and pledged 100% of its equity interest in RML.

Pursuant to the Cortland TLA/TLB Facility, prior to the occurrence of an event of default, payments of principal are distributed ratably to all of the Cortland Lenders.  Upon the occurrence and during the continuance of an event of default, Cortland may (and at the direction of certain of the Cortland Lenders shall) apply the proceeds of the collateral in an order that repays interest and principal on the Cortland Term Loan A in full before repaying any of the interest or principal on the Cortland Term Loan B.  The Cortland TLA/TLB Facility matured on June 1, 2015 and was extended by forbearance to July 27, 2015.  As of the Petition Date, approximately $145,834,693 was outstanding under the Cortland Term Loan A and approximately $215,776,345 was outstanding under the Cortland Term Loan B, for a total of approximately $361,611,038 plus accrued interest outstanding under the Cortland TLA/TLB Facility.  As more fully described in the section below regarding the events that have led to the filing of the Chapter 11 Petitions, the lenders in the Cortland Term Loan A (the "**TLA Lenders**") have traded their debt to the lenders in the Cortland Term Loan B (the "**TLB Lenders**").

2.    *Manchester Prepetition Credit Facility*

On May 30, 2012, RML and each of the Cortland Borrowers (the "**Manchester Borrowers**") entered into an additional credit facility with Manchester Securities Corporation ("**Manchester**") under the Second Amended and Restated Credit Agreement, as amended by Amendment No. 1 thereto, dated September 30, 2014 (collectively with all the related loan and other documents identified therein, the "**Manchester Prepetition Credit Facility**").  The obligations under the Manchester Prepetition Credit Facility bear PIK interest at 7.5% per annum and mature on May 30, 2016.  Any event of default under the Cortland TLA/TLB Facility constitutes an event of default under the Manchester Prepetition Credit Facility.  The Manchester Prepetition Credit Facility is subordinate to the Cortland TLA/TLB Facility and is secured by substantially all of the assets of the Manchester Borrowers (the same collateral securing the repayment of the Cortland TLA/TLB Facility).  Relativity Holdco (together with the Manchester Borrowers, the "**Manchester Obligors**") guaranteed the obligations of the Manchester Borrowers under the Manchester Prepetition Credit Facility.

3.    *Production Loans*

Relativity finances the production of its films through a combination of equity (i.e., RML contributing funds to the production entity as equity) and individual production loans (the "**Production Loans**") that are secured

---

[8]    The three (3) Debtors that are not Cortland Borrowers are J&J Project, LLC, Yuma, Inc. and Relativity Fashion.

by the respective films and their related assets, including tax credits, rebates, international sales estimates and international receivables. As of the Petition Date, the following Production Loans were outstanding:

- On August 5, 2014, Armored Car Productions, LLC, as borrower, entered into an Amended and Restated Loan and Security Agreement with CIT Bank, N.A., f/k/a CIT Bank, N.A., f/k/a OneWest Bank, N.A., as agent, and Surefire Entertainment Capital, LLC, as lender (the "**A&R Armored Car LSA**"), for loans up to $24,090,353 (inclusive of fees and the Interest and Fee Reserve (as defined in the A&R Armored Car LSA)) for the purpose of acquiring, producing, completing and delivering a motion picture not yet released, and the payment of related financing costs (the "**Armored Car Loan**").[9] A portion of the Armored Car Loan was syndicated to City National Bank. The Armored Car Loan matures on May 31, 2016, bears interest at a rate of the Prime Rate plus 3.875% or LIBOR plus 5.875%, and is secured by substantially all of the assets of the SPE. As of October 4, 2015, approximately $21,586,243[10] was outstanding under the Armored Car Loan.

- On September 5, 2014, DR Productions, LLC, as borrower, entered into a Loan and Security Agreement with CIT Bank, N.A., f/k/a CIT Bank, N.A., f/k/a OneWest Bank, N.A., as agent and lender (the "**DR LSA**"), for loans up to $14,688,456 (inclusive of fees and the Interest and Fee Reserve (as defined in the DR LSA)) for the purpose of acquiring, producing, completing and delivering a motion picture not yet released, and the payment of related financing costs (the "**DR Loan**"). The DR Loan matures on July 29, 2016, bears interest at a rate of the Prime Rate plus 1.00% or LIBOR plus 3.00%, and is secured by substantially all of the assets of the SPE. As of October 4, 2015, approximately $12,272,477[11] was outstanding under the DR Loan.

In addition, in connection with the production of the films *3:10 to Yuma* and *The Forbidden Kingdom*, Yuma, Inc. and J & J Project, LLC (the "**Vine/Verite Borrowers**") entered into certain loan and security agreements with Verite Capital Onshore Loan Fund LLC ("**Verite**"), which were subsequently transferred to Vine Film Finance Fund II, LP ("**Vine**") (such loans, collectively, the "**Vine/Verite Loans**"). Each of the Vine/Verite Loans bear interest at LIBOR plus 5.00%, are collateralized by the assets of the respective films and other assets of the respective Vine/Verite Borrowers, including, without limitation, all related music rights, copyrights, and production and distribution rights (collectively, the "**Vine/Verite Collateral**"), and are otherwise non-recourse to the Vine/Verite Borrowers. The Vine/Verite Loans have a first-priority security interest in all of the Vine/Verite Collateral.

The Vine/Verite Loans have matured and are in default. As of the Petition Date, $69,405,434 ($36,912,271 related to Yuma, Inc., and $32,493,163 related to J&J Project, LLC), plus default interest, was outstanding under the Vine/Verite Loans.

In conjunction with the Debtors' entry into the Original DIP Facility, counsel to the Debtors, the Original DIP Lenders, and Vine engaged in good-faith discussions concerning the adequate protection of Vine and resolution of any potential motion for relief from the automatic stay. More specifically, the Debtors agreed in the Final DIP Order to promptly direct Fintage Collection Account Management B.V. to distribute cash flows in accordance with the terms of the Collection Account Agreements governing the collection and distribution of revenues generated by the films held by the Vine/Verite Borrowers. The Debtors also stipulated to the validity of the security interests and claims held by Vine in/on the Vine/Verite Collateral. Further, Vine and the Debtors agreed to a standstill period, during which Vine agreed to not exercise its rights or remedies with respect to the Vine/Verite Loans. During the standstill period, counsel to the Debtors agreed to facilitate diligence and collaborate in good faith with Vine and the Original DIP Lenders to determine the best mechanism for transferring the Vine/Verite Collateral to Vine. In negotiating the standstill period, it was the Debtors' and the Original DIP Lenders' hope that the sale process would

---

[9]    The A&R Armored Car LSA amends and restates in its entirety that certain Loan and Security Agreement, dated as of July 9, 2014, by and among the Borrower, the Agent and CIT Bank, N.A., f/k/a CIT Bank, N.A., f/k/a OneWest Bank, N.A.

[10]    CIT asserts a different amount outstanding as of the date shown, and the amount is also subject to reconciliation for other obligations under the LSA including, without limitation, attorneys' fees.

[11]    CIT asserts a different amount outstanding as of the date shown, and the amount is also subject to reconciliation for other obligations under the LSA including, without limitation, attorneys' fees.

generate a buyer interested in the Vine/Verite Collateral.  No party, however, expressed any interest in, and no bids were made for, the Vine/Verite collateral.

The Debtors and Vine believe that the value of the Vine/Verite Collateral is significantly less than the amounts outstanding under the Vine/Verite Loans such that no value from the collateral extends to any junior creditors or interest holders of the Vine/Verite Borrowers.  Notwithstanding Section 8 of the Plan, including the contemplated treatment for the Allowed Vine/Verite Secured Claim set forth therein, the Plan Proponents and Vine have agreed, consistent with the terms of the DIP Order, to work collaboratively to determine the best means to transfer the Vine/Verite Collateral free and clear of any claims, liens, security interests, encumbrances, pledges, or interests of junior creditors or interest holders, including through a potential transfer as part of these chapter 11 cases or an agreed upon foreclosure.  Claims in Classes H34 and H144 shall remain Unimpaired.

In the event that the Debtors and Vine agree to a consensual transfer of the Vine/Verite Collateral to Vine, and such transfer is actually completed according to the terms of such agreement, that transfer shall be in full and final satisfaction of the obligations owed to Vine under the Vine/Verite Loans.

4.    *The P&A Facility*

As film production finishes and the film moves into post-production, editing occurs, special effects and music are added, trailers are created, the release of the film is advertised, and then the film prepares for distribution.  Relativity has historically financed its operations with lending facilities called "P&A facilities" for print and advertising marketing.

The current P&A facility is the Second Amended and Restated Funding Agreement entered into by certain of RML's subsidiaries (the "**P&A Borrowers**"),[12] together with RML Distribution and RMLDD Financing, LLC, as accommodation pledgors, on June 30, 2014 and amended on August 26, 2014, with Macquarie US Trading LLC LLC ("**Macquarie**"), as agent for the lenders, Macquarie Bank Limited, as post-release lender and RKA Film Financing, LLC ("**RKA**"), as pre-release lender and pre-release lender agent (collectively, the "**P&A Lenders**")[13] (collectively with all the related loan and other documents identified therein, the "**P&A Funding Agreement**").  The loans under the P&A Funding Agreement are divided into two types:  (i) specific loans made in connection with an individual film prior to its theatrical release that bear interest at 5.5% per annum for the first 12 months and 11.5% thereafter (the "**Pre-Release P&A Loans**") and (ii) specific loans made in connection with an individual film in the opening weekend or calendar week following the theatrical release of a film that bear interest at 6.9% per annum for the first 12 months and 9.9% per annum thereafter (the "**Post-Release P&A Loans**" and together with the Pre-Release P&A Loans, the "**P&A Facility**").  In addition, each loan under the P&A Facility is subject to an original issue discount of 6.5% for the Pre-Release P&A Loans and 3% for Post-Release P&A Loans.  To secure their obligations under the P&A Facility, the P&A Borrowers granted liens and security interests to the P&A Lenders in certain collateral which generally consists of the proceeds from domestic distribution agreements for the films financed under the P&A Facility and the intellectual property, picture rights and receipts related to such films.

The Pre-Release P&A Loans mature the earlier of December 31, 2015 or 18 months after each loans respective funding date.  Each Post-Release P&A Loan matures 18 months after its respective funding date.  The P&A Facility is secured by the assets of the film-specific SPEs, including the proceeds from domestic distribution agreements for the films financed under the P&A Facility, the intellectual property, picture rights and the receipts from such films, but it is not cross collateralized.  RML Distribution and RMLDD Financing guaranteed the obligations of the P&A Borrowers under the P&A Facility.  RKA has lent Relativity approximately $115 million for seven films that have been produced and released, and been repaid in full.  As of October 31, 2015, approximately $88,224,682 was outstanding under the Pre-Release P&A Loans and $26,818,821 was outstanding under the Post-Release P&A Loans.

---

[12]    The P&A Borrowers are:  Best of Me Productions, LLC; Blackbird Productions, LLC; RML Lazarus Films, LLC; RML WIB Films, LLC; DR Productions, LLC; Armored Car Productions, LLC; RML Solace Films, LLC; and RML Somnia Films, LLC.

[13]    Claren Road Credit Master Fund Ltd., an original lender under the P&A Funding Agreement, is no longer a party thereto.

5.    *The Ultimates Facility*

Following a film's theatrical release, the value of the future cash flows for the film in all media (e.g., theatrical, DVD, digital and television), (the "**Ultimates**") serves as collateral for a loan facility to fund the studio's operations.

On September 25, 2012, RMLDD Financing entered into a Credit, Security, Guaranty and Pledge Agreement with CIT Bank, N.A., f/k/a CIT Bank, N.A., f/k/a OneWest Bank, N.A., as administrative agent, issuing bank, joint lead arranger and joint bookrunner (as such terms are defined therein), as amended from time to time, by those certain and various amendments thereto, including and through Amendment No. 17, dated April 29, 2015 (collectively with all the related loan and other documents identified therein, the "**Ultimates Credit Agreement**"). Following the closing date of September 25, 2012, the Ultimates facility was syndicated to Barclays Bank PLC, City National Bank, Comerica Bank, First Republic Bank, Bank Hapoalim B.M. and Wilshire Bank (collectively, with CIT Bank, N.A., the "**Ultimates Lenders**"). The Ultimates Credit Agreement provides RMLDD Financing with a senior secured revolving credit facility for up to $202.5 million (the "**Ultimates Facility**"). As of July 9, 2015, the Ultimates Lenders terminated their commitments, terminated the revolver and converted the agreement into a term loan. Pursuant to the Ultimates Credit Agreement, the obligations under the Ultimates Facility incur interest at LIBOR plus 3.75% with a LIBOR floor of 0.50% or the Alternate Base Rate (as defined in the Ultimates Credit Agreement) plus 2.75%, as well as commitment, unused and collateral and administrative fees, which are calculated and payable quarterly. Since May 30, 2015, the Ultimates Facility has been accruing interest at the default rate (currently 9.00%). The obligations of RMLDD Financing under the Ultimates Facility are guaranteed by certain of the Debtors (the "**Ultimates Guarantors**").[14]

The Ultimates Facility originally was scheduled to mature on September 30, 2016 but, due to defaults under other cross-defaulted agreements, the maturity date was accelerated to May 30, 2015. The Ultimates Facility is secured by the right, title and interest in all personal property and tangible and intangible property of RMLDD Financing and the Ultimates Guarantors. This covers all currently owned property, property that is later created or acquired and included all goods, accounts, instruments, intercompany obligations, contract rights, partnership and joint venture interests, documents, chattel paper, general intangibles, goodwill, equipment, machinery, inventory, investment property, copyrights, trademarks, trade names and insurance policies.

Beginning in April of 2015, funds that would otherwise be available to be transferred to the cash collateral account and subsequently transferred to the Debtors' operating accounts to be used for working capital, were swept by the Ultimates Lenders. The sweeps continued through July of 2015, and in aggregate totaled approximately $32,541,661.20. In addition, on July 17, 2015, the Ultimates Lenders swept an additional $17,881,299.24 on deposit in the participations and residuals account, a bank account at OneWest in RMLDD Financing's name that is used to pay participations and residuals to the producers, performers, writers and other individuals or entities entitled to compensation for the exhibition of the content developed, produced, and/or distributed by the Debtors and the Non-Debtor Subsidiaries. The swept funds were applied to the outstanding balance of the Ultimates Facility. As a result of these principal balance application and reductions, among others, as of the Petition Date, approximately $27,789,945 plus accrued interest was outstanding under the Ultimates Facility. As of October 31, 2015, the outstanding amounts under the Ultimates Facility was $27,789,945 plus accrued interest of $919,707.00. Per diem interest is accruing interest at a daily rate of $6,852.32.

As of November 18, 2015, the Debtors have over $47.0 million in various accounts at CIT.

---

[14]    The Ultimates Guarantors are:  RML Distribution Domestic, LLC; RML Distribution International, LLC; RML Acquisition I, LLC; RML Acquisition II, LLC; RML Acquisition III, LLC; RML Acquisition IV, LLC; RML Acquisition V, LLC; RML Acquisition VI, LLC; RML Acquisition IX, LLC; RML Acquisition XI, LLC; Movie Productions, LLC; Safe Haven Productions, LLC; 21 and Over Productions, LLC; Mala Vita Productions, LLC; Don Jon Acquisitions, LLC; Paranoia Acquisitions, LLC; RML Turkey Films, LLC; Furnace Films, LLC; 3 Days to Kill Productions, LLC; RML Oculus Films, LLC; Brick Mansions Acquisitions, LLC; RML November Films, LLC; RML Echo Films, LLC; RML Hector Films, LLC; Best of Me Productions, LLC; RML Solace Films, LLC; Blackbird Productions, LLC; RML Lazarus Films, LLC; RML WIB Films, LLC; and Black or White Films, LLC.

6.    *Unsecured Trade Debt*

The Debtors' unsecured trade creditors include vendors providing services to Relativity for print and advertising services, production-related services and products and other services necessary to run a business on a day-to-day basis. According to Relativity's books and records, as of the Petition Date, there is approximately $78.0 million in unsecured trade vendor debt.

7.    *Unsecured RED Loan*

As part of the formation of RED, RED made an unsecured loan to RML (the "**RED Loan**"), which RML repays through amortization payments equal to 50% of the quarterly overhead of RED. If RML fails to make the amortization payments, it becomes obligated to make capital contributions in an amount equal to the corresponding amortization payment. However, as the sole holder of Class B membership interests in RED, RML is also the sole beneficiary of the amounts repaid with respect to the loan and has the unilateral right to forgive the balance of the loan at any time. As of the Petition Date, $70,550,262 was outstanding under the RED Loan. As of October 31, 2015, the outstanding amount under the RED Loan is $71,235,773. RML plans to cause the loan to be forgiven on the Effective Date.

**G.    Events Leading to Chapter 11 Cases**

Prior to the maturity date of the Cortland TLA/TLB Facility, Relativity sought to raise additional funds for its operations and to service existing debt. On or about May 11, 2015, these efforts resulted in the issuance of 5,000,000 Class E Units in Relativity Holdco to entities affiliated with an individual investor and VII Peaks in exchange for $62,500,000 gross cash proceeds. Simultaneously with the issuance of such equity interests, and at various times subsequent thereto, holders of the aggregate amount of 96.5296 Class C Units exchanged such Class C Units for an aggregate of 6,695,648 Class E Units pursuant to exchange agreements entered into concurrently with the Class E Unit issuance on May 11, 2015. In addition, Relativity had lined up in excess of $400 million in a combination of debt and equity commitments to refinance or pay off the Cortland TLA/TLB Facility prior to its maturity date. However, unbeknownst to Relativity, certain insiders and fiduciaries of the Company thwarted Relativity's debt and equity raise in breach of their fiduciary duties and in interference with Relativity's refinancing process.

Specifically, Colbeck Capital Management ("**Colbeck**"), while acting in multiple capacities including while having representation on Relativity Holdings's Board of Managers, while being paid as consultants to Relativity, and while acting as agent for the TLA/TLB facility with significant management and financial oversight powers and duties, breached their fiduciary duties and other obligations and agreements, through a clandestine plan designed to effectuate a change in control of Relativity for their benefit and to the detriment of the company and its other stakeholders. With full knowledge of Relativity's debt and equity financing efforts, Colbeck intentionally diverted sources of equity and debt financing away from the company's efforts and instead sought to have such sources committed to their clandestine plan. Colbeck recruited Relativity's then CFO Andrew Matthews and then President of Production Matthew Alvarez to join meetings with investors to further promulgate the false perception that Relativity, its Chairman and CEO, and the Board were aware of and supportive of the Colbeck plan. Relativity believes that Colbeck represented to third parties that its efforts were Board authorized and approved, when they were not.

In exchange for mutual general releases, effective as of May 11, 2015, Colbeck promised Relativity that it would no longer disparage Relativity in the marketplace. Relativity believes that release is a voidable transfer, however, and also that the release is ineffective, for among other reasons, on the ground that Colbeck continued to breach its obligations, including its obligation not to disparage Relativity, through its communications with third parties (including, but not limited to, other investors and lenders) as Relativity continued to seek refinancing of its existing debt. The Debtors intend to continue to investigate and pursue any appropriate claims against Colbeck, its principals who served on Relativity's Board of Managers, and any other parties who acted in concert with them.

As a result of the actions of Colbeck and its co-conspirators, Relativity was unable to conclude its debt and equity refinance efforts and on the maturity date of the Cortland TLA/TLB Facility, over $360 million in debt

became due and payable as of the Petition Date and Relativity was unable to make payment on the Cortland TLA/TLB Facility.

On June 1, 2015, Relativity entered into a forbearance agreement with a majority of TLA Lenders and a majority of TLB Lenders (the "**TLA/TLB Forbearance Agreement**"). On the same day, Relativity executed a forbearance agreement with the Ultimates Lenders under the Ultimates Facility (the "**Ultimates Forbearance Agreement**"), and thereafter, on June 5, 2015, Relativity entered into a forbearance agreement with the P&A Lenders under the P&A Facility (the "**P&A Forbearance Agreement**," and collectively with the TLA/TLB Forbearance Agreement and the Ultimates Forbearance Agreement, the "**Forbearance Agreements**"). On June 25, 2015, the Forbearance Agreements expired in accordance with their terms.

In early July 2015, Catalyst Capital Group, a Toronto-based hedge fund ("**Catalyst**") purchased the outstanding Cortland Term Loan A debt and became the sole lender under the Cortland Term Loan A. Anchorage Capital Master Offshore, Ltd. and Luxor Capital LLC, as lenders under the Cortland Term Loan B (the "**Purchasing TLB Lenders**"), promptly provided notice of their intent to exercise their right under Section 10.17 of the Cortland TLA/TLB Financing Agreement to purchase the outstanding debt under the Cortland Term Loan A. On July 9, 2015, the Purchasing TLB Lenders, along with Catalyst (also a lender under the Cortland Term Loan B) purchased all of the Cortland Term Loan A debt.

On July 16, 2015, the Cortland Borrowers and the Cortland Lenders entered into Amendment No. 1 to the Cortland TLA/TLB Financing Agreement, pursuant to which certain of the Cortland Lenders funded $15 million of additional Term Loans ("**Term A-1 Loans**") of which $7.5 million was funded on July 16, 2015 and $7.5 million was funded on July 20, 2015. The Term A-1 Loans had a maturity date of July 27, 2015 and interest was payable in Cash at a rate of 15% per annum. On July 27, 2015, the Term A-1 Loans matured.

Beginning in April of 2015, funds that would otherwise be available to be transferred to the cash collateral account and subsequently transferred to the Debtors' operating accounts to be used for working capital, were swept by the Ultimates Lenders. The sweeps continued through July of 2015, and in aggregate totaled approximately $32,541,661.20. On July 17, 2015, the Ultimates Lenders swept an additional $17,881,299.24 on deposit in the participations and residuals account, a bank account at OneWest in RMLDD Financing's name that is used to pay participations and residuals to the producers, performers, writers and other individuals or entities entitled to compensation for the exhibition of the content developed, produced, and/or distributed by the Debtors and the Non-Debtor Subsidiaries. The swept funds were applied to the outstanding balance of the Ultimates Facility.

Relativity experienced severe liquidity constraints and increasing limitations imposed by the Forbearance Agreements and the new debt issuances. With over $350 million in outstanding matured secured debt and unable to finalize any further financing due to a variety of factors, Relativity determined it was in its best interest to file for bankruptcy protection.

## III.    THE CHAPTER 11 CASES

### A.    Voluntary Petitions

On July 30, 2015, the Debtors commenced these Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Pursuant to the bankruptcy court's order on July 31, 2015, the Debtors' Chapter 11 Cases have been consolidated for procedural purposes only and are being administered jointly.

The Debtors have continued, and will continue until the Effective Date, to manage their properties as debtors-in-possession, subject to the supervision of the Bankruptcy Court and in accordance with the provisions of the Bankruptcy Code. An immediate effect of the filing of the Chapter 11 Cases was the imposition of the automatic stay pursuant to Bankruptcy Code § 362, which, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, enforcement of liens against any assets of the Debtors and litigation against the Debtors.

B.      **First and Second Day Motions**

On the Petition Date, the Debtors filed a number of motions and other pleadings (the "**First Day Motions**").  The First Day Motions were proposed to ensure the Debtors' orderly transition into the chapter 11 proceedings.  The court granted the following First Day Motions with certain adjustments or modifications to accommodate the concerns of the Bankruptcy Court, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") and other parties in interest:

- orders relating to case administration, joint administration and the use of Donlin Recano as the Debtors' Notice and Claims Agent (Dkt. Nos. 36, 185, 79);

- order approving the Debtors' ability to continue prepetition insurance coverage and pay related prepetition obligations (Dkt. Nos. 70, 340);

- order approving the Debtors' ability to pay and continue using prepetition critical vendors and utility services providers (Dkt. Nos. 334, 336);

- order approving the payment of certain employee wages and benefits (Dkt. Nos. 49, 341);

- order approving the Debtors' ability to make certain prepetition residuals and participations payments incurred in the ordinary course of business (Dkt. Nos. 72, 357);

- order approving the Debtors' ability to honor prize obligations under existing production agreements (Dkt. Nos. 50, 338);

- order approving the continued use of the Debtors' existing cash management system (Dkt. No. 51); and

- order approving the Debtors' ability to obtain postpetition financing and use cash collateral (Dkt. Nos. 48, 342) (the "**Final DIP Order**").  Pursuant to the Final DIP Order, the Court authorized the Debtors to obtain $49,500,000 in postpetition debtor-in-possession financing (the "**Original DIP Facility**").

C.      **Retention of the Debtors' Advisors**

Soon after the commencement of the Chapter 11 Cases, the Debtors obtained Bankruptcy Court approval to retain (a) Jones Day and Sheppard Mullin Richter & Hampton LLP as co-counsel (Dkt. Nos. 473, 479), (b) FTI Consulting, Inc. as crisis and turnaround manager (Dkt. No. 669), (c) Blackstone Advisory Partners L.P. (n/k/a PJT Partners) as financial advisor (Dkt. No. 550), (d) Kasowitz, Benson, Torres & Friedman LLP as special litigation and conflicts counsel (Dkt. No. 477), and (e) Holthouse Carlin & Van Trigt LLP and McGladrey LLP as tax advisors (Dkt. Nos. 551, 847).

The applications to retain these firms were granted with certain adjustments or modifications to accommodate the concerns of the Bankruptcy Court, the U.S. Trustee, the Creditors' Committee and other parties in interest.  In connection with these applications, the Debtors sought and obtained (Dkt. No. 905) approval to establish procedures for interim monthly compensation of professionals.  The Debtors also sought and obtained (Dkt. No. 673) approval to employ certain professionals not involved in the administration of the Chapter 11 Cases in the ordinary course of business.

D.      **The Creditors' Committee**

On August 7, 2015, the U.S. Trustee appointed the Creditors' Committee in these Chapter 11 Cases pursuant to Bankruptcy Code § 1102 (Dkt. No. 114).

The Creditors' Committee consists of the following seven members:  (1) Carat USA, Inc.; (2) NBC Universal; (3) Cinedigm Corp.; (4) Technicolor, Inc.; (5) Allied Advertising Limited Partnership; (6) Comen VFX LLC; (7) Create Advertising Group, LLC.  The Creditors' Committee obtained Bankruptcy Court approval to retain

Togut, Segal & Segal LLP as counsel (Dkt. No. 676) and Alvarez & Marsal North America, LLC as financial
advisor (Dkt. No. 969).

Since its appointment, the Creditors' Committee has been actively involved with the Debtors in overseeing
the administration of the Chapter 11 Cases as a fiduciary for all of the Debtors' unsecured creditors and has
consulted with the Debtors on various matters relevant to the Chapter 11 Cases.  The Debtors have also discussed
their business operations with the Creditors' Committee and their advisors and have negotiated with the Creditors'
Committee regarding actions and transactions outside of the ordinary course of business.  The Creditors' Committee
has participated actively in reviewing the Debtors' business operations, operating performance and business plan.

During the course of the Chapter 11 Cases, the Creditors' Committee has negotiated and secured a transfer
of $2 million previously allocated in the Debtors' DIP Budget into a segregated account to be maintained by counsel
for the Creditors' Committee, with the understanding that such funds ultimately may be used for the investigation,
prosecution and/ or settlement of any Retained Claims[15] not otherwise released pursuant to a plan of reorganization
or order of the Bankruptcy Court.  See Dkt. No. 768, ¶ 15.  Additionally, the Creditors' Committee settled its
challenge rights with respect to the Cortland Obligations by agreement, resulting in a $10 million reduction in the
amount of the principal amount of the Cortland Term Loan B.  Finally, as part of the new DIP Facility (the "**New
DIP Facility**"), the Creditors' Committee negotiated a period of 45 days from closing of the New DIP Facility and
the right to use $275,000 of cash collateral to investigate the claims of and potential claims against Manchester and
its affiliates; _provided_ that the obligations owing to Manchester in connection with the New DIP Facility shall not be
subject to offset, setoff, defense or counterclaim in any way.

Thereafter, the Creditors' Committee began its investigation of the claims and security interests asserted by
Manchester and its affiliates (the "**Manchester Parties**") against the Debtors, as well as the claims and causes of
action potentially assertable by the Debtors' estates against the Manchester Parties.  The Creditors' Committee
requested and obtained documents and information from the Debtors and the Manchester Parties, and interviewed
various  individuals, including Ryan Kavanaugh, as part of this investigation.  In particular, the Creditors'
Committee examined:  (i) the Manchester Prepetition Credit Facility pursuant to which the Manchester Parties assert
an undersecured claim of $137,078,557 as of the Petition Date plus accrued interest, and (ii) a May 11, 2011
membership interest transfer agreement among Relativity Holdings LLC, Heatherden Securities Corp., and
Heatherden Holdings LLC (the "**2011 Manchester Transaction**," collectively, with the Manchester Prepetition
Credit Facility, the "**Manchester Transactions**").  To conduct the necessary diligence to complete its
investigations, as well as to facilitate discussions among the various parties, the Creditors' Committee requested and
the Manchester Parties agreed to extend deadline to assert any claims and/or causes of action against the Manchester
Parties to December 18, 2015 at 11:59 p.m. (Dkt No. 1056).

As a result of its investigation, the Creditors' Committee may commence one or more adversary
proceedings asserting claims and causes of action against the Manchester Parties seeking affirmative recoveries
and/or to subordinate claims purportedly arising under the Manchester Transactions.  The result of any potential
cause of action is unknown.

E.    **Further Motions in the Chapter 11 Cases**

Since the Petition Date, the Debtors have sought and obtained approval for a number of additional motions
to aid in the efficient administration of the Chapter 11 Cases.  The most significant additional motions are described
below.

1.    _The Sale Motion (Dkt. No. 25)_

On July 30, 2015, the Debtors filed the _Debtors' Motion For (I) An Order (A) Establishing Bid Procedures
For the Sale of Substantially All of the Debtors' Assets, (B) Approving Stalking Horse APA and Bidding Protections,
and (C) Granting Certain Related Relief and (II) An Order (A) Approving the Sale of Substantially All of the
Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests, (B) Approving the Assumption_

---

[15]    "**Retained Claims**" are any and all actual or potential claims and causes of action in favor of the Debtors
and their estates against any and all third parties, including actions arising under Chapter 5 of the
Bankruptcy Code and applicable non-bankruptcy law, tort claims, and director and officer claims.

and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Certain Related Relief (Dkt. No. 25) (the "**Sale Motion**"). The Stalking Horse APA contemplated a sale of substantially all of the Debtors' assets and an assumption and assignment of executory contracts associated with such assets for a credit bid of $250 million and certain other consideration. Accordingly, on September 3, 4, and 5 2015, in furtherance of the Sale Motion, the Debtors served the *Notice of (I) Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with the Sale and (II) Associated Cure Costs* (the "**Notice of Assignment and Cure**") on all of the parties entitled to notice. The Debtors filed supplemental Notices of Assignment and Cure on September 16, 2015 and September 28, 2015. The Buyer provided its adequate assurance package on September 3, 2015 at https://www.donlinrecano.com/Clients/rm/Static/adequateassurance and provided objecting parties an updated adequate assurance package on October 8 and October 9, 2015.

The Debtors received no bids for substantially all of the assets of either the TV Business, or the Film Business. Instead the Debtors received multiple purchase agreements for certain assets. Prior to the Debtors' auction (the "**Auction**"), the Buyer amended the Stalking Horse APA to acquire only the Television Business and not the previously contemplated film, sports or music businesses. On October 2, 2015, the Debtors filed a *Notice of Successful Bidder for Sale of Substantially All of the Debtors' Television Assets and Proposed Form of Sale Order* (Dkt. No. 732), and on October 5, 2015, the Debtors filed a *Notice of Filing Third Amended & Restated Asset Purchase Agreement and Redline* (Dkt. No. 740), which was revised on October 6, 2015 (Dkt. No. 763) (as revised, the "**October APA**").

On October 6, 2015, the court entered the *Order (A) Approving the Sale of Substantially All of the Debtors' Television Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (Dkt. No. 768) (the "**Sale Order**") approving the sale to the Buyer pursuant to the terms of the October APA.

On October 16 and 20, 2015, the court entered the *First Omnibus Order Supplementing Order (A) Approving the Sale of Substantially All of the Debtors' Television Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* and the *Second Omnibus Order Supplementing Order (A) Approving the Sale of Substantially All of the Debtors' Television Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (Dkt. Nos. 852, 876), which, among other things, resolved the continued objections concerning the Television Business.

On October 20, 2015, the transaction concerning the Television Business closed and, on October 23, 2015, the Debtors filed a *Notice of Filing of List of Contracts Assumed by Debtors and Assigned to Buyer Entities Pursuant to the Third Amended and Restated Asset Purchase Agreement* (Dkt. No. 912), which the Debtors intend to revise shortly to correct certain inaccuracies.

On December 9, 2015, the Debtors filed a Notice of Presentment seeking approval of the sale of one of the Debtors' music related investments -- the Debtors' memberships interests in Select Music LLC – to Select Music LLC pursuant to the Sale Motion.

2.      *The KEIP and KERP Motions (Dkt. Nos. 281, 282)*

a.      *KEIP*

On August 24, 2015, the Debtors sought approval of their Key Employee Incentive Plan (the "**KEIP**") for five (5) of the Debtors' senior management employees (the "**Senior Management Employees**") who, prepetition, took aggregate salary reductions of $795,000 at a cost of $314,868 excluding employer contribution taxes. The Senior Management Employees were vital in preparing the company for the sale process, engaging with potentially interested parties and interacting with the Debtors' advisors assisting in the sale process.

On September 29, 2015, the court approved (Dkt. No. 683) the Debtors' KEIP in a modified form as follows. The maximum potential cost of the KEIP is $1,235,122. The KEIP had two segments: (1) the sale metrics segment, which has a total maximum potential cost of $580,122 and (2) the television metrics segment, which has a total maximum potential cost of $655,000. The sale metrics segment of the KEIP was unearned as it was

preconditioned on funding if the bidding on the Debtors' assets increased by at least $1 million dollars over the Stalking Horse Purchase Price, which did not materialize. However, the two (2) employees in the television metrics portion of the KEIP fully earned and were paid their portion of the KEIP since the performance targets that were set as preconditions were met.

b.    *KERP*

On August 24, 2015, the Debtors sought approval of their Key Employee Retention Plan (the "**KERP**") for 80 of the Debtors' non insider employees (the "**Key Employees**") who are critical to the Debtors' continued operation and a successful restructuring. Given significant headcount reductions, the Debtors formulated the KERP to incentivize Key Employees, many of whom have unique institutional knowledge of the Debtors, to remain with the Debtors before, during and after these Chapter 11 Cases, both to ensure the Debtors' continued operation and to avoid the significant costs associated with obtaining and training replacements.

On September 29, 2015, the court approved (Dkt. No. 684) the Debtors' KERP as follows. The maximum cost of the KERP is $345,390 and 71 employees are eligible to participate. The "**KERP Formula**" is as follows. The Key Employees that were subject to pay reductions prior to the Petition Date will have the opportunity to recapture 100% of such pay reductions, *provided* that they remain employed with the Debtors during the sale process through and including October 20, 2015 or the sale closing, whichever is later, plus an additional incentive of up to 12.5% of their original base pay that would have been earned during the period between the Petition Date and October 5, 2015 (the "**Measuring Period**") without taking into consideration any pay reduction. The 12.5% incentive metric does not mean 12.5% of any such employee's full annual salary. The opportunity to recapture the prepetition salary reduction and to earn up to 12.5% of their original base pay pertains only to the Measuring Period. Those employees who did not receive a pay reduction will have the opportunity to receive an incentive of up to 12.5% of their respective salaries, *provided* that they remain employed by the Debtors during the sale process through the later of October 20, 2015 or the sale closing. The KERP Formula cannot be modified by the officers, management and the Board of Managers of the Debtors. Any Key Employee who resigns or is terminated for cause will forfeit his or her right to any payment under the KERP. If a KERP participant is terminated without cause, the KERP participant may still be eligible for a prorated award. Finally, no employee will receive payment from more than one of the following three programs: (i) the sale metrics segment of the KEIP, (ii) the television metrics of the KEIP, and (iii) the KERP.

The Key Employees were paid their KERP bonuses on or about October 20, 2015.

3.    *The Motions to Assume Certain Producer Agreements (Dkt. Nos. 289-295)*

On August 24, 2015, the Debtors filed seven (7) motions seeking to assume certain producer agreements (the "**Producer Agreements**") and fix their related cure amounts. The Debtors sought to assume the Producer Agreements because the loss of any of the Producer Agreements would damage the Television Business and potentially depress the Debtors' going concern value in connection with the sale process.

On October 5, 2015, the court entered orders permitting the Debtors to assume the following producer agreements: Brian Lando Productions, Inc. (Dkt. No. 755), Jay and Tony Show f/s/o Jay Blumenfield and Tony Marsh (Dkt. No. 756), Ellen Rakieten Productions, LLC (Dkt. No. 757), Bogner Entertainment (Dkt. No. 758), Press Start, Inc. (Dkt. No. 759), Bill Thompson Productions, Inc. (Dkt. No. 760), and Alibi TV (Dkt. No. 761).

4.    *The Miscellaneous/De Minimis Assets Motion (Dkt. No. 345)*

On August 27, 2015, the Debtors filed a motion seeking to (1) implement procedures that would allow them to sell, transfer or abandon miscellaneous assets (the "**Miscellaneous Assets**"), or groups of such assets, and address related contracts, on an expedited basis without incurring the delay and costs of preparing, filing, serving and having hearings on motions for approval of each such disposition (the "**Miscellaneous Asset Procedures**").

On September 17, 2015, the court entered an order approving the Miscellaneous Asset Procedures as follows. The Miscellaneous Asset Procedures only apply to: (i) the sale or transfer of Miscellaneous Assets involving $1,500,000 or less in total consideration (the "**Sale Cap**"), as measured by the amount of Cash and other consideration (such as assumption of liabilities) to be received by the Debtors on account of the Miscellaneous

Assets to be sold or transferred in any one transaction or in any series of related transactions; and (ii) the abandonment of Miscellaneous Assets with a book value of $250,000 or less. Interested Parties shall have five (5) business days after the date of service of the sale notice or abandonment notice to object. However, for (a) any transaction involving the sale or transfer of a Miscellaneous Asset for less than $100,000 in total consideration, as measured by the amount of Cash and other consideration (such as assumption of liabilities) to be received by the Debtors on account of the Miscellaneous Assets to be sold or transferred in any one transaction or in any series of related transactions (a "**De Minimis Sale**") or (b) the abandonment of any asset with a book value of less than $100,000 (a "**De Minimis Abandonment**"), the applicable Debtor or Debtors will be authorized, without following the Notice Procedures and without further notice and further Court approval except five business days written notice to Counsel for the Creditors' Committee and any other party in interest who has filed a notice of appearance and a request for service pursuant to Bankruptcy Rules 2002 and 9010(b), to consummate the De Minimis Sale or De Minimis Abandonment and such De Minimis Sales or De Minimis Abandonments will be deemed fully authorized by the Court, _provided_ that the Debtors have obtained any necessary consent required.

The Debtors completed the following sales pursuant to the court's order:

- following a September 26, 2015, notice (Dkt. No. 660) concerning the sale of their rights and other interests in the film, Collide p/k/a Autobahn, the Debtors completed a sale to IM Global Film Fund, LLC for $830,000 on October 3, 2015;

- following a November 3, 2015 notice (Dkt. No. 933) concerning the sale of all of their rights and interests in a certain tax credit, the Debtors anticipate shortly completing a sale to Macy's Puerto Rico, Inc. for $1,144,882.88; and

- following a December 9, 2015 notice (Dkt. No. 1094) concerning the sale of all of their rights and interests under the Exclusive License Agreement dated as of February 12, 2015, related to the feature film entitled "Hillsong: Let Hope Rise."

5.      *The Motions to Reject Leases or Executory Contracts (Dkt. Nos. 396, 691)*

On September 8, 2015, the Debtors filed a motion seeking to reject 21 consulting and advisory agreements, one real estate brokerage agreement, one production services agreement related to aerial production work and one nonresidential real property lease. On September 29, 2015, the Debtors filed a motion seeking to abandon certain property and reject a nonresidential real property lease, a license and an automobile lease. On September 30, 2015 and October 15, 2015, the court entered orders (Dkt. Nos. 697, 850) permitting the Debtors to reject each of these agreements and abandon certain property.

On November 11, 2012, the court granted the Debtors' motion seeking to extend the time within which the Debtors must assume or reject unexpired leases of nonresidential real property to February 25, 2016. (Dkt. No. 966).

6.      *The Motion to Extend the Exclusive Periods for Filing a Plan and Soliciting Acceptances*

On November 12, 2015, the court granted the Debtors' motion seeking to extend the exclusive periods for filing a plan and soliciting acceptances thereof to February 1, 2016 and April 1, 2016, respectively. (Dkt. No. 967).

7.      *Litigation*

a.      *Manchester*

Heatherden Securities LLC, a Delaware Limited Liability Company ("**Heatherden**") is a minority equity holder of Relativity Holdco and an affiliate of Manchester Library Company and Manchester Securities Corporation (collectively, "**Manchester**"). Manchester Securities Corporation and Manchester Library Company LLC are parties to the following agreements with the Debtors, each dated as of May 30, 2012: a Libraries Asset Transfer Agreement, a Sales and Distribution Services Agreement, and a Security Agreement and Mortgage of Copyright (collectively the "**Manchester Agreements**"). Pursuant to the Manchester Agreements, Manchester was granted a continuing security interest in, and copyright mortgage on, any interest that the Debtors might have in certain

collateral. In addition, the Manchester Agreements grant Manchester a first priority lien and security interest in a certain collection account, which is governed by a collection account management agreement dated as of October 1, 2012.

Manchester filed objections to the Sale Motion (Dkt. Nos. 162, 168, 169, 190) generally objecting to the speed of the sale process and the authority of the Debtors to sell their assets, an objection to the Debtors' motion seeking to pay prepetition residuals and participations in the ordinary course of business (Dkt. No. 223), and an objection to the Debtors' motion seeking postpetition financing (Dkt. Nos. 223, 225, 226). Then, on August 24, 2015, Manchester filed an emergency motion (Dkt. No. 260) seeking to adjourn a hearing on the Debtors' proposed bid procedures and DIP financing. On September 18, 2015, Manchester filed a limited objection to the Debtors' motion seeking to sell substantially all of their assets (Dkt. Nos. 521, 522). After much contested litigation, the Debtors were able to negotiate a resolution with Manchester which permitted the DIP Financing Order and the Bid Procedures Order to be entered and the sale process to move forward.

        b.     *RKA*

In June and July 2015, RKA and Relativity entered into a series of forbearance agreements related to RKA's loans to Relativity under the P&A Funding Agreement. At the time, Relativity was engaged in refinancing efforts and RKA had threatened litigation which Relativity believed to be meritless, but would have interfered with Relativity's refinancing efforts. Pursuant to one of the forbearance agreements, River Birch Funds LLC (an entity in which Kavanaugh is the sole member) provided RKA with a guarantee of its equity interest in RKA of approximately $10 million in value.

On July 15, 2015, RKA filed a complaint in the Supreme Court of the State of New York, County of New York against defendants Kavanaugh, in his personal capacity, and RKA-member River Birch Funds LLC, alleging breach of contract under the guaranty provided in connection with the aforementioned forbearance agreement. On July 24, 2015, RKA filed a separate action in the Supreme Court of the State of New York, County of New York against Kavanaugh and a series of John Does alleging misconduct in connection with the P&A Funding Agreement. In response, on July 24, 2015, RML filed an action the same day against RKA in New York County Supreme Court.

Relativity's action seeks a declaratory judgment that the P&A Funding Agreement had not been breached and damages against RKA. Relativity alleges that RKA and its predecessor P&A lenders operated for the past several years in the same manner and under documents that, in pertinent part, are materially similar. Specifically, Relativity would provide the P&A lenders with a budget for the marketing expenses it expected to incur for each movie, and at various intervals an SPE that owned a specific film would make a draw request for loan funds from the P&A facilities. RKA and the two prior P&A lenders made these loan payments into RML's general operating account, not to the SPE that owned the individual films, even though RML itself, was not a borrower under the facility. The loan proceeds would go into RML's main operating account, which then funded P&A expenses. Relativity alleges that the P&A Agreements did not require that loan funds to be segregated in any manner, that the funds be deposited into a blocked or control account, or that they be escrowed or otherwise restricted for use in connection with particular films or expenses.

Relativity's lawsuit alleges that, under these well-documented funding arrangements and practices, RKA and the predecessor P&A lenders consistently made loans to Relativity-affiliated SPEs that were not earmarked for use in paying only those P&A expenses that had already been paid for a particular film. As Relativity alleges, the operative language in all of these funding agreements contemplates and allows for that practice, as the agreements refer to loans made for marketing expenses that are either "paid, committed or incurred" or expenses that are, in the future, "to be paid, committed or incurred."

Relativity's lawsuit claims that the P&A facility did not require that the funds loaned under it be used to pay only those P&A expenses that had actually been incurred; and, indeed, the parties transacted under the P&A facility in this manner, in accordance with the lending agreement, during most of the life of their agreement.

In April, 2015, however, following media accounts of Relativity's refinancing efforts, RKA began claiming that Relativity may have violated the P&A facility. Thereafter, on July 15, 2015, RKA filed its lawsuit against Kavanaugh, in his personal capacity, and River Birch Funds LLC. Then, on July 24, 2015, RKA filed another lawsuit against Kavanaugh and unnamed "John Doe" seeking damages against them in connection with Relativity's

performance under the RKA P&A facility.  The RKA lawsuits allege that Relativity improperly used the funds advanced by RKA for purposes other than P&A, and RKA has regularly and repeatedly claimed that the actual use of the funds violated its agreements.  Relativity responded by filing its lawsuit against RKA, which seeks a declaratory judgment that Relativity did not violate the terms of the RKA P&A facility and also damages of at least $200 million as against RKA for its alleged conduct in intentionally interfering with Relativity's efforts to refinance.  Pursuant to the Plan, this litigation and all related claims that the Debtors have against RKA (the "**RKA Causes of Action**") will be retained and prosecuted by the Reorganized Debtors and not the Litigation Trust.

All three of the above-discussed actions have been stayed as the parties sought to resolve their outstanding claims by participating in mediation and discussing a resolution that would allow for the release of four films (*Before I Wake*, *Disappointments Room*, *Masterminds*, and *Kidnap*) in which RKA has a security interest.  In these bankruptcy proceedings, RKA has also filed multiple pleadings in the Chapter 11 Cases, including a motion seeking adequate protection or relief from the automatic stay to protect its liens and security interests (Dkt. No. 147), objections to the Sale Motion (Dkt. Nos. 164, 508, 644, 748), objections to the Debtors' motion seeking postpetition financing (Dkt. Nos. 158, 219), a motion seeking leave to conduct discovery pursuant to Bankruptcy Code § 105(a) and Federal Rule of Bankruptcy Procedure 2004 (Dkt. No. 176), and a limited joinder (Dkt. No. 644) in Macquarie's motion seeking adequate protection or relief from the automatic stay to protect its interests and compelling compliance with the final DIP order prohibiting the use of cash collateral that constitutes P&A Collateral.  Each of these matters has been resolved or adjourned.

c.    *Macquarie*

Macquarie US Trading LLC and Macquarie Investments US Inc. (collectively, "**Macquarie**") serve as agent and lender, respectively, under a prepetition Second Amended and Restated Funding Agreement, dated as of June 30, 2014 (as amended, the "**Funding Agreement**").  Pursuant to the Funding Agreement, Macquarie holds security interests in certain of the Debtors' property, rights of setoff and rights of recoupment.

Macquarie filed several objections during the course of the Chapter 11 Cases -- a limited objection and reservation of rights to the Debtors' motion seeking postpetition financing (Dkt. No. 43), an objection to the Sale Motion and the Debtors' motion seeking postpetition financing (Dkt. No. 156), and a limited objection and reservation of rights to the Debtors' motion seeking to sell, transfer or abandon miscellaneous and de minimis assets (Dkt. No. 415).  Additionally, Macquarie filed a motion (Dkt. Nos. 409, 410, 411; reply at 627) seeking adequate protection or relief from the automatic stay to protect its interest.  The parties were able to reach an amicable resolution which included a release of certain funds to Macquarie at which time Macquarie withdrew its motion.

8.    *Claims Process and Bar Date*

On October 30, 2015, the court entered an order (Dkt. No. 927) establishing December 9, 2015 at 5:00 p.m. (Eastern Time) as the deadline for each Person or Entity (including, without limitation, individuals, partnerships, corporations, joint ventures and trusts) to file a proof of claim in respect of a prepetition claim (as defined in Bankruptcy Code§ 101(5)) against any of the Debtors (the "**General Bar Date**") and January 26, 2016 at 5:00 p.m. (Eastern Time) as the deadline for governmental units (as defined in Bankruptcy Code § 101(27)) to file a proof of claim in respect of a prepetition claim against any of the Debtors (the "**Governmental Bar Date**").  As of the General Bar Date, approximately 1400 claims were filed.

9.    *Cash Collateral Stipulation*

On November 26, 2015, the Debtors filed a motion for entry of an order permitting the Debtors to use cash collateral (Dkt. No. 1033).  On December 11, 2015, the Debtors, CIT Bank, in its capacity as administrative agent for certain lenders (in such capacity, the "Ultimates Agent"), and certain of the Union Entities submitted a stipulation and order to the Bankruptcy Court which, among other things, grants the Debtors the right to use cash collateral in accordance with an agreed-to budget after payment from the cash collateral of $17.04 million to CIT Bank and $3.61 million to the Guilds.  The Debtors would then maintain and preserve $17 million of cash collateral in the cash collateral account as to which the Guilds subordinate to the first $13.96 million to CIT as first priority.

IV.    **POSTPETITION SALE AND PLAN NEGOTIATIONS**

A.    **Television Business Sale and Related Term Sheets**

As discussed in detail in Section III.E.1 above, immediately prior to the Auction, the Buyer amended the Stalking Horse APA to acquire only the Television Business and not the previously contemplated film, sports or music businesses as a consequence of a series of arms-length negotiations among the Buyer and several investors in the Debtors. Such negotiations continued among several of the parties up to and including the drafting of the Plan. A summary of the transactions arising from such negotiations is provide below.

1.    *TLA/TLB Transactions*

Substantially contemporaneously with the closing of the sale of the Television Business to the Buyer under the Stalking Horse APA (and in partial consideration for the amendment of the Stalking Horse APA), a group of investors including Kavanaugh, Manchester and Joseph Nicholas ("**Nicholas**") paid $65 million to the Buyer and further agreed that the Buyer would retain $60 million in TLA claims until exchanged for a $60 million note from reorganized Relativity Holdings under the Plan.

In connection with the payments described above, the Buyer also agreed to (a) confirm the partial satisfaction and reduction of the DIP Facility to $35 million; (b) transfer to Manchester $35 million of its claims under the DIP Facility and (c) transfer $5.8 million of its claims under the TLA and TLB Loans to Kavanaugh and $169.2 million of its claims under the TLA and TLB Loans to Nicholas.

2.    *Investor Transactions*

In connection with the Auction and the closing of the sale of the Television Business, Manchester, Kavanaugh, Nicholas, OA3, LLC ("**OA3**"), VII Peaks Capital, LLC ("**VII Peaks**") all executed equity commitment letters (collectively, the "**Commitment Letters**") with the Debtors which were also enforceable by an affiliate of RM Bidder. OA3 and VII Peaks did not consummate their Commitment Letters, and the Debtors commenced an adversary proceeding against VII Peaks (discussed below). The Debtors have engaged in settlement discussions to resolve the issues of the Commitment Letter issued by VII Peaks. The Debtors reserve all rights with respect to the Commitment Letter issued by OA3. In consideration of the performance of the Commitment Letters, Kavanaugh, Nicholas and Manchester agreed to treatment of their various claims under the Plan. As of November 17, 2015, the Debtors continued to negotiate with such parties to confirm that the Plan accurately reflects their agreements.

a.    *Relativity Holdings LLC v. VII Peaks Capital, LLC (In re Relativity Fashion, LLC), No. 15-01361 (Bankr. S.D.N.Y.)*

On October 19, 2015, Relativity commenced an adversary proceeding against VII Peaks. See *Complaint for Emergency Order Requiring VII Peaks Capital, LLC to Pay $30 Million Into the Court's Registry and/or Issuing a Restraining Order and Directing Specific Performance*, Relativity Holdings LLC v. VII Peaks Capital, LLC (In re Relativity Fashion, LLC), No. 15-01361 (Bankr. S.D.N.Y.) (Dkt. No. 1). Relativity's Complaint alleged that VII Peaks entered into an "absolute and unconditional" agreement to fund $30 million on or before October 20, 2015, as part of a transaction pursuant to which certain assets from the Debtors' television business were to be sold to specific creditors and the remainder of Relativity would be restructured and continue as a going concern. As the Complaint set forth, VII Peaks had indicated it would not commit the agreed $30 million in funding, on the ground that certain purported conditions precedent to VII Peaks' obligation to fund had not been satisfied.

Relativity claimed that VII Peaks was in breach of its obligation to commit the $30 million in funds and sought specific performance of this obligation. Relativity also sought a preliminary injunction and an order temporarily restraining VII Peaks from transferring certain funds from two VII Peaks' accounts. See Dkt. No. 4. The Bankruptcy Court thereafter scheduled a hearing on Relativity's motion for a preliminary injunction for October 27, 2015. On October 27, 2015, Relativity and VII Peaks entered into a stipulation, so ordered by the Bankruptcy Court the next day, that vacated the TRO and adjourned the expedited hearing until November 13, 2015. See Dkt. No. 10. Pursuant to the parties' so-ordered stipulation, VII Peaks agreed to cause $3 million to be deposited into its

counsel's client trust account, to remain there during an agreed-upon period of time, and the parties agreed in the meantime to negotiate in good faith regarding a potential settlement of their dispute.  See id.

The parties subsequently entered into two further stipulations to adjourn the hearing on Relativity's motion for a preliminary injunction, first until November 24, 2015, and then to December 16, 2015.  On December 9, 2015, VII Peaks informed its counsel and Relativity's counsel that negotiations between VII Peaks and Relativity had concluded without a settlement.  Pursuant to the parties' original October 27, 2015 stipulation, VII Peaks therefore informed its counsel to disburse the $3 million deposited into VII Peaks' counsel's trust account to VII Peaks within one business day.  Thereafter, on December 11, 2015, VII Peaks submitted an opposition to Relativity's motion for a preliminary injunction, disputing Relativity's allegations and indicating that it will defend the underlying complaint.  Pursuant to the Plan, this litigation and all related claims that the Debtors have against VII Peaks will be retained by the Reorganized Debtors and pursued by the Litigation Trust in the name of the Reorganized Debtors.

3.    *DIP Stipulations*

On October 6, 2015, the Bankruptcy Court approved a stipulation (Dkt. No. 769) among (a) the Debtors, (b) the Original DIP Lenders, (c) the Manchester Parties (as defined in the stipulation), and (d) Kavanaugh, which was also signed by the Creditors' Committee.  The stipulation is another piece of a global agreement between the Parties to provide the Debtors with an opportunity to reorganize their business around their non-unscripted TV Business Assets (the "**Global Agreement**").  As noted in Section III.B above, on August 27, 2015, the Court entered the Final DIP Order authorizing the Debtors to obtain the Original DIP Facility in the amount of $49.5 million.  As part of the Global Agreement, Heatherden agreed to purchase the Original DIP Facility, as modified to $35,000,000, for $35,000,000 on or before October 20, 2015.

As the Final DIP Order expired on October 21, 2015, the Bankruptcy Court entered the Amended DIP Order (Dkt No. 931) and, in the meantime, eight (8) extension orders (Dkt. Nos. 889, 896, 921, 934, 945, 945, 950, 964) extending the maturity to November 16, 2015 (which date shall be updated as further extension orders may be granted) as certain predicate agreements had not yet been reached.  Heather maintains that its election to unilaterally refrain from exercising its rights under the New DIP Facility is neither an express nor implied waiver of those rights.  Heather further reserves all rights with respect to the New DIP Facility, including the right to declare one or more events of default and/or exercise remedies.  Heatherden maintains that there are no valid claims or causes of action that can be brought against the Manchester Parties and reserves all rights with respect thereto.

**B.    Fintage Omnibus Stipulation**

The Debtors and Fintage Collection Account Management B.V. ("**Fintage**") are each a party, among other parties, to various collection account management agreements ("**CAMAs**") governing the collection and distribution of revenues generated from the exploitation of certain Relativity film projects.  As of the Petition Date, Fintage ceased making distributions on account of each CAMA to which one or more of the Debtors are a party and refused to resume distributions until Fintage received Court authorization.  Such CAMAs include:  (a) an Amended and Restated Collection Account Management Agreement, dated May 14, 2013, with Debtor RML Acquisitions IV, LLC, IATM, LLC and CIT Bank, N.A. relating to the collection of worldwide revenues generated from the exploitation of the film project entitled *Act of Valor*; (b) an Amended and Restated Collection Account Management Agreement, dated October 31, 2013, with Debtor Paranoia Acquisitions, LLC, CIT Bank, N.A., and Paranoia Productions, LLC relating to the collection of the U.S. revenues generated from the exploitation of the film project entitled *Paranoia*; (c) an Amended and Restated Collection Account Management Agreement, dated October 1, 2012, with Debtor Relativity Media, LLC and Manchester Library Company relating to the collection of revenues generated from, among others, the exploitation of the following film projects entitled:  (i) *The Fighter*, (ii) *Limitless*, (iii) *Season Of The Witch*, (iv) *Skyline*, (v) *Take Me Home Tonight*, (vi) *The Warrior's Way*, (vii) *Catfish*, (viii) *Catfish TV*, (ix) *Dear John*, (x) *Fighting*, (xi) *Haywire*; (xii) *Immortals*; (xiii) *Judy Moody and the Not Bummer Summer*; (xiv) *Last House on the Left*; (xv) *MacGruber*, (xvi) *My Soul to Take* and (xvii) *Shark Night 3D*.

On December 8, 2015, the Bankruptcy Court entered the order (Dkt. No. 1078) approving the *Omnibus Stipulation and Agreed Order Governing Fintage Collection Account Management B.V. Release of Funds*.  The aforementioned stipulation and agreed order, *inter alia*, authorized Fintage to disburse funds that were being held in

trust pursuant to the CAMAs and authorized Fintage to continue to resume distributions under the CAMAs on a going forward basis.

### C.    Post-Emergence Financing and Management

Jim Cantelupe, of Summit Trail Advisors, LLC, has committed to work with the Debtors to raise up to $100 million of new equity to fund the Plan, which funds are to be escrowed on or before December 31, 2015. Additionally, the Plan contemplates entering into a revolving credit facility of up to $250 million in the form of the New P&A/Ultimates Facility.  Subject to Bankruptcy Court approval, Aperture Media Partners, LLP and EMP Media Partners LLP will act as the co-lead arrangers of the New P&A/Ultimates Facility.  Finally, the Plan contemplates that Relativity will secure one or more multi-year media buying agreements, for traditional and digital media, that includes payment terms acceptable to the Debtors.

## V.    THE PLAN OF REORGANIZATION

THE FOLLOWING SUMMARY HIGHLIGHTS CERTAIN OF THE SUBSTANTIVE PROVISIONS OF THE PLAN, AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE PLAN.  THE PLAN PROPONENTS URGE ALL HOLDERS OF CLAIMS AND INTERESTS TO READ AND STUDY CAREFULLY THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT A.

Bankruptcy Code § 1123 provides that, except for Administrative Claims and Priority Tax Claims, a plan of reorganization must categorize claims against and equity interests in a debtor into individual classes.  Although the Bankruptcy Code gives a debtor significant flexibility in classifying claims and interests, Bankruptcy Code § 1123 dictates that a plan of reorganization may only classify a claim or an equity interest with claims or equity interests, respectively, that are substantially similar.

The Plan creates 11 Classes of Claims and one (1) Class of Interests per Debtor.  These Classes take into account the differing nature and priority of Claims against and Interests in the Debtors.  Administrative Claims and Priority Tax Claims are not classified for purposes of voting or receiving distributions under the Plan (as is permitted by Bankruptcy Code § 1123) but are treated separately as unclassified Claims.

The Plan provides specific treatment for each Class of Claims and Interests.  Only Holders of Claims that are impaired under the Plan and who will receive distributions under the Plan are entitled to vote on the Plan.

The following discussion sets forth the classification and treatment of all Claims against, or Interests in, the Debtors.  It is qualified in its entirety by the terms of the Plan, which is attached hereto as Exhibit A, and which you should read carefully before deciding whether to vote to accept or reject the Plan.

## VI.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

All Claims and Interests, except Administrative Claims and Priority Tax Claims, are placed in the Classes set forth below.  In accordance with Bankruptcy Code § 1123(a)(1), Administrative Claims and Priority Tax Claims, as described in Section II.A of the Plan, are not classified in the Plan.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes.

If the Plan is confirmed by the Bankruptcy Court, unless a Holder of an Allowed Claim consents to different treatment, (A) each Allowed Claim in a particular Class will receive the same treatment as the other Allowed Claims in such Class, whether or not the Holder of such Claim voted to accept the Plan and (B) each Allowed Interest in a particular Class will receive the same treatment as the other Allowed Interests in such Class. Such treatment will be in exchange for and in full satisfaction, release and discharge of, the Holder's respective Claims against or Interests in a Debtor, except as otherwise provided in the Plan.  Moreover, upon Confirmation, the Plan will be binding on (A) all Holders of Claims regardless of whether such Holders voted to accept the Plan and (B) all Holders of Interests.

A.    **Unclassified Claims**

    1.    *Administrative Claims*

        a.    *Overview*

Except as specified in Section II.A.1 of the Plan and subject to the bar date provisions herein, unless otherwise agreed by the Holder of an Administrative Claim and the applicable Reorganized Debtor, or unless an order of the Bankruptcy Court provides otherwise, each Holder of an Allowed Administrative Claim (other than a Professional's Fee Claim and a Plan Co-Proponent Fee/Expense Claim) shall receive, in full satisfaction of its Administrative Claim, Cash equal to the Allowed amount of such Administrative Claim on either (i) the latest to occur of (A) the Effective Date (or as soon thereafter as practicable), (B) the date such Claim becomes an Allowed Administrative Claim, and (C) such other date as may be agreed upon by the Reorganized Debtors and the Holder of such Claim or (ii) on such other date as the Bankruptcy Court may order. For the avoidance of doubt, claims arising under the Modified DIP Credit Agreement are Administrative Claims.

        b.    *Statutory Fees*

All fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date shall be paid by the applicable Reorganized Debtor in accordance therewith until the earlier of the conversion or dismissal of the applicable Chapter 11 Case under Bankruptcy Code § 1112 or the closing of the applicable Chapter 11 Case pursuant to Bankruptcy Code § 350(a).

        c.    *Ordinary Course Postpetition Administrative Liabilities*

Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business, including Administrative Claims arising from or with respect to the sale of goods or provision of services on or after the Petition Date, Administrative Claims of governmental units for Taxes (including Tax audit Claims related to Tax years or portions thereof ending after the Petition Date), Administrative Claims arising under Executory Contracts and Unexpired Leases, and Administrative Claims in connection with Union Entity collective bargaining agreements, shall be paid by the applicable Reorganized Debtor without further action by the Holders of such Administrative Claims or further approval by the Bankruptcy Court (i) pursuant to the terms and conditions of the particular transaction giving rise to those Administrative Claims and (ii) in the case of Administrative Claims arising from Union Entity collective bargaining agreements, in accordance with the Guild Payroll Protocols. Holders of the foregoing Claims shall not be required to File or serve any request for payment of such Administrative Claims.

        d.    *Professional Compensation*

Professionals or other Entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Fee Order, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than sixty (60) days after the Effective Date; *provided*, *however*, that any party who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order without further Bankruptcy Court review or approval (except as provided in the Ordinary Course Professionals Order). To the extent necessary, the Confirmation Order shall amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims.

        e.    *Plan Co-Proponent Fee/ Expense Claims*

The Reorganized Debtor shall reimburse the Plan Co-Proponent Fee/Expense Claims incurred in connection with the Chapter 11 Cases.

f.      *Post-Effective Date Professionals' Fees and Expenses*

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented fees and expenses of the Professionals or other fees and expenses incurred by the Reorganized Debtors on or after the Effective Date, in each case, related to implementation and consummation of the Plan.  Upon the Effective Date, any requirement that Professionals comply with Bankruptcy Code §§ 327 - 331 and 1103 or any order of the Bankruptcy Court entered before the Effective Date governing the retention of, or compensation for services rendered by, Professionals after the Effective Date shall terminate, and the Reorganized Debtors may employ or pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

g.      *Bar Dates for Administrative Claims*

Except as otherwise provided herein, requests for payment of Administrative Claims (other than Fee Claims, and Administrative Claims based on Liabilities incurred by a Debtor in the ordinary course of its business as described in Section II.A.1.c of the Plan) must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than the Administrative Claims Objection Deadline.

2.      *Payment of Priority Tax Claims*

Pursuant to Bankruptcy Code § 1129(a)(9)(C), and unless otherwise agreed by the Holder of a Priority Tax Claim and the Plan Proponents, each Holder of an Allowed Priority Tax Claim shall receive at the option of the Debtors or the Reorganized Debtors, as applicable, in full satisfaction of its Allowed Priority Tax Claim, on account of and in full and complete settlement, release and discharge of such Claim, (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim payable on the Effective Date (or as reasonably practicable thereafter) or (ii) Cash in the aggregate amount of such Allowed Priority Tax Claim payable in annual equal installments commencing on the later of:  (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim (or as soon as practicable thereafter); and, in each case, ending no later than five (5) years from the Petition Date.  Notwithstanding the foregoing, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the Holder for actual pecuniary loss will be treated as a Subordinated Claim, and the Holder may not assess or attempt to collect such penalty from the Reorganized Debtors or their respective property.

**B.      Classification of Claims and Interests**

1.      *General*

Pursuant to Bankruptcy Code §§ 1122 and 1123, Claims and Interests are classified for voting and distribution pursuant to the Plan, as set forth herein.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such other Class.  Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim.  Notwithstanding the foregoing, and except as otherwise specifically provided for herein, the Confirmation Order or other order of the Bankruptcy Court, or required by applicable bankruptcy law, in no event shall the aggregate value of all property received or retained under the Plan on account of an Allowed Claim exceed 100% of the underlying Allowed Claim.

Bankruptcy Code § 1129(a)(10) shall be satisfied for the purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims; *provided*, *however*, that in the event no Holder of a Claim with respect to a

specific Class for a particular Debtor timely submits a Ballot in compliance with the Disclosure Statement Order and/or Solicitation Order indicating acceptance or rejection of the Plan, such Class will be deemed to have accepted the Plan. The Plan Proponents may seek Confirmation of the Plan pursuant to Bankruptcy Code § 1129(b) with respect to any rejecting Class of Claims or Interests.

For administrative convenience, the Plan assigns a number to each of the Debtors and a letter to each of the Classes of Claims against or Interests in the Debtors. For consistency, designated Classes of Claims or Interests are assigned the same letter across each of the Debtors. The numbers assigned to each Debtor are:

| Debtor # | Debtor Name |
|---|---|
| 1. | 21 & Over Productions, LLC |
| 2. | 3 Days to Kill Productions, LLC |
| 3. | A Perfect Getaway P.R., LLC |
| 4. | A Perfect Getaway, LLC |
| 5. | Armored Car Productions, LLC |
| 6. | Best of Me Productions, LLC |
| 7. | Black Or White Films, LLC |
| 8. | Blackbird Productions, LLC |
| 9. | Brant Point Productions, LLC |
| 10. | Brick Mansions Acquisitions, LLC |
| 11. | Brilliant Films, LLC |
| 12. | Brothers Productions, LLC |
| 13. | Brothers Servicing, LLC |
| 14. | Catfish Productions, LLC |
| 15. | Cine Productions, LLC |
| 16. | CinePost, LLC |
| 17. | Cisco Beach Media, LLC |
| 18. | Cliff Road Media, LLC |
| 19. | Den of Thieves Films, LLC |
| 20. | Don Jon Acquisitions, LLC |
| 21. | DR Productions, LLC |
| 22. | Einstein Rentals, LLC |
| 23. | English Breakfast Media, LLC |
| 24. | Furnace Films, LLC |
| 25. | Gotti Acquisitions, LLC |
| 26. | Great Point Productions, LLC |
| 27. | Guido Contini Films, LLC |
| 28. | Hooper Farm Music, LLC |
| 29. | Hooper Farm Publishing, LLC |
| 30. | Hummock Pond Properties, LLC |
| 31. | Hunter Killer La Productions, LLC |
| 32. | Hunter Killer Productions, LLC |
| 33. | In The Hat Productions, LLC |
| 34. | J&J Project, LLC |
| 35. | JGAG Acquisitions, LLC |
| 36. | Left Behind Acquisitions, LLC |
| 37. | Long Pond Media, LLC |
| 38. | Madaket Publishing, LLC |
| 39. | Madaket Road Music, LLC |
| 40. | Madvine RM, LLC |
| 41. | Malavita Productions, LLC |
| 42. | MB Productions, LLC |
| 43. | Merchant of Shanghai Productions, LLC |
| 44. | Miacomet Media LLC |

| Debtor # | Debtor Name |
|---|---|
| 45. | Miracle Shot Productions, LLC |
| 46. | Most Wonderful Time Productions, LLC |
| 47. | Movie Productions, LLC |
| 48. | One Life Acquisitions, LLC |
| 49. | Orange Street Media, LLC |
| 50. | Out Of This World Productions, LLC |
| 51. | Paranoia Acquisitions, LLC |
| 52. | Phantom Acquisitions, LLC |
| 53. | Pocomo Productions, LLC |
| 54. | Relative Motion Music, LLC |
| 55. | Relative Velocity Music, LLC |
| 56. | Relativity Development, LLC |
| 57. | Relativity Fashion, LLC |
| 58. | Relativity Film Finance II, LLC |
| 59. | Relativity Film Finance III, LLC |
| 60. | Relativity Film Finance, LLC |
| 61. | Relativity Films, LLC |
| 62. | Relativity Foreign, LLC |
| 63. | Relativity Holdings LLC |
| 64. | Relativity India Holdings, LLC |
| 65. | Relativity Jackson, LLC |
| 66. | Relativity Media LLC |
| 67. | Relativity Media Distribution, LLC |
| 68. | Relativity Media Films, LLC |
| 69. | Relativity Music Group, LLC |
| 70. | Relativity Production LLC |
| 71. | Relativity REAL, LLC |
| 72. | Relativity Rogue, LLC |
| 73. | Relativity Senator, LLC |
| 74. | Relativity Sky Land Asia Holdings, LLC |
| 75. | Relativity TV, LLC |
| 76. | Reveler Productions, LLC |
| 77. | RML Acquisitions I, LLC |
| 78. | RML Acquisitions II, LLC |
| 79. | RML Acquisitions III, LLC |
| 80. | RML Acquisitions IV, LLC |
| 81. | RML Acquisitions IX, LLC |
| 82. | RML Acquisitions V, LLC |
| 83. | RML Acquisitions VI, LLC |
| 84. | RML Acquisitions VII, LLC |
| 85. | RML Acquisitions VIII, LLC |
| 86. | RML Acquisitions X, LLC |
| 87. | RML Acquisitions XI, LLC |
| 88. | RML Acquisitions XII, LLC |
| 89. | RML Acquisitions XIII, LLC |
| 90. | RML Acquisitions XIV, LLC |
| 91. | RML Acquisitions XV, LLC |
| 92. | RML Bronze Films, LLC |
| 93. | RML Damascus Films, LLC |
| 94. | RML Desert Films, LLC |
| 95. | RML Distribution Domestic, LLC |
| 96. | RML Distribution International, LLC |

| Debtor # | Debtor Name |
|---|---|
| 97. | RML Documentaries, LLC |
| 98. | RML DR Films, LLC |
| 99. | RML Echo Films, LLC |
| 100. | RML Escobar Films LLC |
| 101. | RML Film Development, LLC |
| 102. | RML Films PR, LLC |
| 103. | RML Hector Films, LLC |
| 104. | RML Hillsong Films, LLC |
| 105. | RML IFWT Films, LLC |
| 106. | RML International Assets, LLC |
| 107. | RML Jackson, LLC |
| 108. | RML Kidnap Films, LLC |
| 109. | RML Lazarus Films, LLC |
| 110. | RML Nina Films, LLC |
| 111. | RML November Films, LLC |
| 112. | RML Oculus Films, LLC |
| 113. | RML Our Father Films, LLC |
| 114. | RML Romeo and Juliet Films, LLC |
| 115. | RML Scripture Films, LLC |
| 116. | RML Solace Films, LLC |
| 117. | RML Somnia Films, LLC |
| 118. | RML Timeless Productions, LLC |
| 119. | RML Turkeys Films, LLC |
| 120. | RML Very Good Girls Films, LLC |
| 121. | RML WIB Films, LLC |
| 122. | RMLDD Financing, LLC |
| 123. | Rogue Digital, LLC |
| 124. | Rogue Games, LLC |
| 125. | Roguelife LLC |
| 126. | Safe Haven Productions, LLC |
| 127. | Sanctum Films, LLC |
| 128. | Santa Claus Productions, LLC |
| 129. | Smith Point Productions, LLC |
| 130. | Snow White Productions, LLC |
| 131. | Spy Next Door, LLC |
| 132. | Story Development, LLC |
| 133. | Straight Wharf Productions, LLC |
| 134. | Strangers II, LLC |
| 135. | Stretch Armstrong Productions, LLC |
| 136. | Studio Merchandise, LLC |
| 137. | Summer Forever Productions, LLC |
| 138. | The Crow Productions, LLC |
| 139. | Totally Interns, LLC |
| 140. | Tribes of Palos Verdes Production, LLC |
| 141. | Tuckernuck Music, LLC |
| 142. | Tuckernuck Publishing, LLC |
| 143. | Wright Girls Films, LLC |
| 144. | Yuma, Inc. |
| 145. | Zero Point Enterprises, LLC |

2.      *Identification of Classes of Claims Against and Interests in the Debtors*

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with Bankruptcy Code § 1126 or (c) deemed to accept or reject the Plan.

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| A | Priority Non-Tax Claims | Unimpaired | Deemed to Accept |
| B | TLA/TLB Secured Claims | Impaired | Entitled to Vote |
| C | Pre-Release P&A Secured Claims | Impaired | Entitled to Vote |
| D | Post-Release P&A Secured Claims | Impaired | Entitled to Vote |
| E | Production Loan Secured Claims | Impaired | Entitled to Vote |
| F | Ultimates Secured Claims | Unimpaired | Deemed to Accept |
| G | Secured Guilds Claims | Impaired | Entitled to Vote |
| H | Vine/Verite Secured Claims | Unimpaired | Deemed to Accept |
| I. | Other Secured Claims | Unimpaired | Deemed to Accept |
| J. | General Unsecured Claim | Impaired | Entitled to Vote |
| K. | Subordinated Claims | Impaired | Deemed to Reject |
| L. | Interests | Impaired | Deemed to Reject |

## C.      **Treatment of Unclassified Claims**

1.      *Administrative Claims*

a.      ***Administrative Claims in General***

Except as specified in Section II.A.1 of the Plan and subject to the bar date provisions therein, unless otherwise agreed by the Holder of an Administrative Claim and the applicable Reorganized Debtor, or unless an order of the Bankruptcy Court provides otherwise, each Holder of an Allowed Administrative Claim (other than a Professional's Fee Claim and a Plan Co-Proponent Fee/Expense Claim) shall receive, in full satisfaction of its Administrative Claim, Cash equal to the Allowed amount of such Administrative Claim on either (i) the latest to occur of (A) the Effective Date (or as soon thereafter as practicable), (B) the date such Claim becomes an Allowed Administrative Claim, and (C) such other date as may be agreed upon by the Reorganized Debtors and the Holder of such Claim or (ii) on such other date as the Bankruptcy Court may order.  For the avoidance of doubt, claims arising under the Modified DIP Credit Agreement are Administrative Claims.

b.      ***Statutory Fees***

All fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date shall be paid by the applicable Reorganized Debtor in accordance therewith until the earlier of the conversion or dismissal of the applicable Chapter 11 Case under Bankruptcy Code § 1112 or the closing of the applicable Chapter 11 Case pursuant to Bankruptcy Code § 350(a).

c.      ***Ordinary Course Postpetition Administrative Liabilities***

Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business, including Administrative Claims arising from or with respect to the sale of goods or provision of services on or after the Petition Date, Administrative Claims of governmental units for Taxes (including Tax audit Claims related to Tax years or portions thereof ending after the Petition Date), and Administrative Claims arising under Executory Contracts and Unexpired Leases, shall be paid by the applicable Reorganized Debtor, pursuant to the terms and conditions of the particular transaction giving rise to those Administrative Claims, without further action by the Holders of such Administrative Claims or further approval by the Bankruptcy Court.  Holders of the foregoing Claims shall not be required to File or serve any request for payment of such Administrative Claims.

d.    ***Professional Compensation***

(1)    Final Fee Applications

Professionals or other Entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Fee Order, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than sixty (60) days after the Effective Date; *provided*, *however*, that any party who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order without further Bankruptcy Court review or approval (except as provided in the Ordinary Course Professionals Order).  To the extent necessary, the Confirmation Order shall amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims.

(2)    Professional Fee Segregated Account

In accordance with Section II.A.1.d(3) of the Plan, on the Effective Date, the Debtors shall establish and fund the Professional Fee Segregated Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals.  The Professional Fee Segregated Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Debtors' Estates.  The amount of Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Segregated Account when such Claims are Allowed by a Final Order.  When all Allowed Professional Compensation Claims are paid in full in Cash, amounts remaining in the Professional Fee Segregated Account, if any, shall revert to the Reorganized Debtors.

(3)    Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate their Fee Claims prior to and as of the Effective Date and shall deliver such estimate to the Debtors and counsel to the Creditors' Committee no later than five (5) days prior to the anticipated Effective Date; *provided*, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional. If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

e.    ***Plan Co-Proponent Fee/Expense Claims***

The Reorganized Debtor shall reimburse the Plan Co-Proponent Fee/Expense Claims incurred in connection with the Chapter 11 Cases.

f.    ***Post-Effective Date Professionals' Fees and Expenses***

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented fees and expenses of the Professionals or other fees and expenses incurred by the Reorganized Debtors on or after the Effective Date, in each case, related to implementation and consummation of the Plan.  Upon the Effective Date, any requirement that Professionals comply with Bankruptcy Code §§ 327 - 331 and 1103 or any order of the Bankruptcy Court entered before the Effective Date governing the retention of, or compensation for services rendered by, Professionals after the Effective Date shall terminate, and the Reorganized Debtors may employ or pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

g.    ***Bar Dates for Administrative Claims***

Except as otherwise provided in the Plan, requests for payment of Administrative Claims (other than Fee Claims, and Administrative Claims based on Liabilities incurred by a Debtor in the ordinary course of its business as

described in Section II.A.1.c of the Plan) must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than the Administrative Claims Objection Deadline.

2.    *Payment of Priority Tax Claims*

Pursuant to Bankruptcy Code § 1129(a)(9)(C), and unless otherwise agreed by the Holder of a Priority Tax Claim and the Plan Proponents, each Holder of an Allowed Priority Tax Claim shall receive at the option of the Debtors or the Reorganized Debtors, as applicable, in full satisfaction of its Allowed Priority Tax Claim, on account of and in full and complete settlement, release and discharge of such Claim, (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim payable on the Effective Date (or as reasonably practicable thereafter) or (ii) Cash in the aggregate amount of such Allowed Priority Tax Claim payable in annual equal installments commencing on the later of:  (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim (or as soon as practicable thereafter; and, in each case, ending no later than five (5) years from the Petition Date.  Notwithstanding the foregoing, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the Holder for actual pecuniary loss will be treated as a Subordinated Claim, and the Holder may not assess or attempt to collect such penalty from the Reorganized Debtors or their respective property.

D.    **Treatment of Classified Claims**

1.    *Priority Non-Tax Claims (Class A)*

a.    **Classification**:  Classes A1 – A145 consist of all Priority Non-Tax Claims against the respective Debtors.

b.    **Treatment**:  On the later of (a) the Effective Date and (b) the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, each Holder of an Allowed Priority Non-Tax Claim against a Debtor shall receive on account and in full and complete settlement, release and discharge of such Claim, at the Debtors' election, (i) Cash in the amount of such Allowed Priority Non-Tax Claim in accordance with Bankruptcy Code § 1129(a)(9) and/or (ii) such other treatment required to render such Claim unimpaired pursuant to Bankruptcy Code § 1124.  All Allowed Priority Non-Tax Claims against the Debtors that are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such Claims become due and payable in the ordinary course of business in accordance with the terms thereof.  All Priority Non-Tax Claims payable to the Guilds, if any, will be paid in accordance with the Guild Payroll Protocols.

c.    **Voting**:  Claims in Classes A1 – A145 are Unimpaired.  Each Holder of an Allowed Claim in Classes A1 – A145 shall be deemed to have accepted the Plan and is, therefore, not entitled to vote.

2.    *TLA/TLB Secured Claims (Class B)*

a.    **Classification**:  Classes B1- B33, B35 – B56, B58 – B143, and B145 consist of all TLA/TLB Secured Claims against the respective Debtors.

b.    **Treatment**:  Except to the extent that a Holder of an Allowed TLA/TLB Secured Claim agrees to less favorable treatment, on the Effective Date, the Holders of Allowed TLA/TLB Secured Claims are entitled to receive 100% of the equity value of the Debtors.  Holders of the Allowed TLA/TLB Secured Claims, excluding Kavanaugh and Nicholas, have agreed to less favorable treatment, and shall receive the BidCo Note in full and final satisfaction, release, and discharge of, and in exchange for, such TLA/TLB Secured Claim.  For the avoidance of doubt, the BidCo Note, to the extent paid down to $30 million, will be subordinated to the

New P&A/Ultimates Facility.  Kavanaugh and Nicholas have agreed to receive Reorganized Relativity Holdings Preferred Units and such other treatment on account of approximately $175 million of their TLA/TLB Secured Claims described in the Revised Relativity Holdings Operating Agreement as set forth in Section III.B of the Plan.

        c.      **Voting**:  Claims in Classes B1- B33, B35 – B56, B58 – B143, and B145 are Impaired.  Each Holder of an Allowed Claim in Classes B1- B33, B35 – B56, B58 – B143, and B145 is entitled to vote.

        3.      *Pre-Release P&A Secured Claims (Class C)*

        a.      **Classification**:  Classes C5, C21, C108, C109 and C117 consist of all Pre-Release P&A Secured Claims against the Debtors.

        b.      **Treatment**:  Except to the extent that a Holder of an Allowed Pre-Release P&A Secured Claim agrees to less favorable treatment, on or as soon as practicable after the Effective Date, RKA, as the Holder of the Allowed Pre-Release P&A Secured Claims, shall receive the following treatment:  (i) If RKA votes to accept the Plan, the treatment as provided for in Exhibit I to the Plan; or (ii) if RKA votes to reject the Plan,  the five (5) Replacement P&A Notes with a present value equal to the respective Allowed Pre-Release P&A Secured Claims.

        c.      **Voting**:  Claims in Classes C5, C21, C108, C109 and C117 are Impaired.  Each Holder of an Allowed Claim in Classes C5, C21, C108, C109, and C117 is entitled to vote.

        4.      *Post-Release P&A Claims Secured Claims (Class D)*

        a.      **Classification**:  Classes D8, D109, and D121 consist of all Post-Release P&A Secured Claims against the Debtors.

        b.      **Treatment**:  On or as soon as practicable after the Effective Date, Reorganized Relativity Holdings shall Allow a claim in the approximately amount of $26,818,821 (as of October 31, 2015 and as reduced in the ordinary course until the Effective Date), which such amount shall include, without limitation, additional accrued interest, legal fees, costs, expenses and other outstanding obligations of Reorganized Relativity Holdings under the P&A Funding Agreement subject to documentation of a replacement credit agreement, which shall provide among other things for an extension of the maturity dates as compared to the pre-petition terms.  Subject to and except for any senior Guild lien, the obligation shall be secured by a first-priority security interest originally (i) cross-collateralized against Blackbird Productions, LLC and RML WIB Films, LLC and (ii) individually as against RML Lazarus Films, LLC; *provided, however*, that once amounts owing by RML Lazarus Films, LLC to RKA under the Pre-Release P&A Secured Claims are paid off in full, the obligation under this Class D shall be fully secured on a cross-collateralized basis against each of the three entities.  Reorganized Relativity Holdings shall continue to distribute each Post-Release P&A Picture until the outstanding obligations are satisfied by payment in full in Cash in accordance with the terms of the replacement credit agreement which will make clear that the Classes D8, D109, and D121 lien shall apply only to the proceeds of the post-release films Woman in Black 2, Lazarus and Beyond the Lights, as applicable.

        c.      **Voting**:  Claims in Classes D8, D109, and D121 are Impaired.  Each Holder of an Allowed Claim in Classes D8, D109, and D121 is entitled to vote.

        5.      *Production Loan Secured Claims (Class E)*

        a.      **Classification**:  Classes E5 and E21 consists of all Production Loan Secured Claims against the Debtors.

        b.      **Treatment**:  Except to the extent that a Holder of an Allowed Production Loan Secured Claim agrees to less favorable treatment, on or as soon as practicable after the Effective Date, the Holder of the Allowed Production Loan Secured Claims shall receive the following treatment:  (i) If the Holder votes to

accept the Plan, the Production Loan Settlement ; or (ii) if the Holder votes to reject the Plan, the two (2) Replacement Production Loan Notes with a present value equal to the respective Allowed Production Loan Secured Claims. For the avoidance of doubt, nothing in the Plan is intended to affect or modify the Allowed Production Secured Claim Holder's rights under ¶ H(vi)(D) – (I) of Dkt. No. 931 in the Chapter 11 Cases.

      c.    **Voting**: Claims in Classes E5 and E21 are Impaired. Each Holder of an Allowed Claim in Classes E5 and E21 shall be entitled to vote.

      6.    *Ultimates Secured Claims (Class F)*

      a.    **Classification**: Classes F1, F2, F6, F7, F8, F10, F20, F24, F41, F47, F51, F77-F83, F87, F95, F96, F99, F103, F109, F111, F112, F116, F119, F121 and F126 consists of all Ultimates Secured Claims against the Debtors.

      b.    **Treatment**: Except to the extent that a Holder of an Allowed Ultimates Secured Claim agrees to less favorable treatment, on or as soon as practicable after the Effective Date, each Holder of an Allowed Ultimates Secured Claim shall receive payment in full (in Cash) of any such Allowed Ultimates Secured Claim in full and final satisfaction of their claim upon which payment any liens securing such claim shall be immediately released.

      c.    **Voting**: Claims in Classes F1, F2, F6, F7, F8, F10, F20, F24, F41, F47, F51, F77-F83, F87, F95, F96, F99, F103, F109, F111, F112, F116, F119, F121 and F126 are Unimpaired. Each Holder of an Allowed Claim in Classes F1, F2, F6, F7, F8, F10, F20, F24, F41, F47, F51, F77-F83, F87, F95, F96, F99, F103, F109, F111, F112, F116, F119, F121 and F126 shall be deemed to have accepted the Plan and is, therefore, not entitled to vote.

      7.    *Secured Guilds Claims (Class G)*

      a.    **Classification**: Classes G1, G2, G6, G7, G8, G10, G20, G24, G41, G47, G51, G77 - G83, G87, G95, G96, G99, G103, G109, G111, G112, G116, G119, G121 and G126 consist of all Secured Guilds Claims against the Debtors.

      b.    **Treatment**: Except to the extent that a Holder of an Allowed Secured Guilds Claim agrees to less favorable treatment, each Holder of an Allowed Secured Guilds Claim shall receive (i) on the Effective Date or as soon thereafter as practicable, its pro rata share of $6.65 million less what is received with respect to the Secured Guilds Claims prior to the Effective Date, and (ii) one (1) year after the Effective Date or as soon thereafter as practicable, payment in full (including applicable interest and collection costs, including but not limited to attorneys fees, as specified in each applicable security agreement) on account of the remaining balance of such Allowed Secured Guilds Claim; *provided, however*, that if the Guilds and the Reorganized Debtor have not agreed to the amount of remaining Allowed Guild Secured Claims within 180 days after the Effective Date, the parties will refer this issue to arbitration pursuant to the Guild collective bargaining agreements; *provided, further however*, that the Guilds shall retain any pre-petition liens securing the Allowed Secured Guilds Claims. All payments to the Guilds in connection with the Allowed Secured Guilds Claims shall be payable in accordance with the Guild Payroll Protocols.

      c.    **Voting**: Claims in Classes G1, G2, G6, G7, G8, G10, G20, G24, G41, G47, G51, G77 - G83, G87, G95, G96, G99, G103, G109, G111, G112, G116, G119, G121 and G126 are Impaired. Each Holder of an Allowed Claim in Classes G1, G2, G6, G7, G8, G10, G20, G24, G41, G47, G51, G77 - G83, G87, G95, G96, G99, G103, G109, G111, G112, G116, G119, G121 and G126 is entitled to vote.

      8.      *Vine/Verite Secured Claims (Class H)*

      a.      **Classification**:  Classes H34 and H144 and consists of all Vine/Verite Secured Claims against the Debtors.

      b.      **Treatment**:  Except to the extent that a Holder of an Allowed Vine/Verite Secured Claim agrees to less favorable treatment, on or as soon as practicable after the Effective Date, each Holder of an Allowed Vine/Verite Secured Claim shall receive the following treatment at the option of the Plan Proponents:  (i) such Allowed Secured Claim shall be Reinstated; or (ii) satisfaction of any such Allowed Secured Claim by delivering the collateral securing any such Allowed Secured Claim.

      c.      **Voting**:  Claims in Classes H34 and H144 are Unimpaired.  Each Holder of an Allowed Claim in Classes H34 and H144 shall be deemed to have accepted the Plan and is, therefore, not entitled to vote.

      9.      *Other Secured Claims (Class I)*

      a.      **Classification**:  Classes I1 – I145 consists of all Other Secured Claims against the Debtors.

      b.      **Treatment**:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, on or as soon as practicable after the Effective Date, each Holder of an Allowed Other Secured Claim shall receive the following treatment at the option of the Plan Proponents:  (i) such Allowed Secured Claim shall be Reinstated; (ii) payment in full (in Cash) of any such Allowed Secured Claim; or (iii) satisfaction of any such Allowed Secured Claim by delivering the collateral securing any such Allowed Secured Claim.

      c.      **Voting**:  Claims in Classes I1 – I145 are Unimpaired.  Each Holder of an Allowed Claim in Classes I1 – I145 shall be deemed to have accepted the Plan and is, therefore, not entitled to vote.

      10.      *General Unsecured Claims (Class J)*

      a.      **Classification**:  Classes J1 – J145 consist of all General Unsecured Claims against the Debtors.

      b.      **Treatment**:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the Effective Date, the Reorganized Debtors shall be deemed substantively consolidated for plan purposes only, and each Holder of an Allowed General Unsecured Claim in Classes J1 – J145 shall receive, subject to the terms of the Plan, in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim, interests representing its Pro Rata share of (i) the Guaranteed GUC Payment and (ii) the GUC Causes of Action Interests; *provided, however,* that the sum of the Guaranteed GUC Payment and the GUC Litigation Trust Interests shall not exceed par.  For the avoidance of doubt, all intercompany claims of the Debtors shall be disallowed and canceled as part of the deemed substantive consolidation of the Debtors.  For further avoidance of doubt, claims arising under the Manchester Prepetition Credit Facility are General Unsecured Claims.  The Reorganized Debtors will meet and confer in order to coordinate GUC Distributable Value and Litigation Trust Interests with the Guild Payroll Protocols.  In addition, the Guilds agree that notwithstanding the CBA Assumption Agreements and Bankruptcy Code § 1113 and any other applicable provisions of the Bankruptcy Code, any unsecured pre-petition residuals owed by any of the Debtors will be treated as General Unsecured Claims.

      c.      **Voting**:  Claims in Classes J1 – J145 are Impaired.  Each Holder of an Allowed Claim in Classes J1 – J145 is entitled to vote.

11.     *Subordinated Claims (Class K)*

a.      **Classification**: Classes K1 – K145 consist of all Subordinated Claims.

b.      **Treatment**:  No property shall be distributed to or retained by the Holders of Subordinated Claims, and such Claims shall be extinguished on the Effective Date.  Holders of Subordinated Claims shall not receive any distribution pursuant to the Plan.

c.      **Voting**:  Claims in Classes K1 – K145 are Impaired.  Each Holder of an Allowed Claim in Classes K1 – K145 shall be deemed to have rejected the Plan and, therefore, is not entitled to vote.

E.      **Treatment of Interests in all Debtors (Class L)**

1.      **Classification**:  Classes L1 - L145 consists of all Interests in the Debtors.

2.      **Treatment**:  Holders of Interests in the Debtors shall retain no property under the Plan.

3.      **Voting**:  Interests in Classes L1 - L145 are Impaired.  Each Holder of an Allowed Interest in Relativity Holdings in Classes L1 - L145 shall be deemed to have rejected the Plan and, therefore, is not entitled to vote.

F.      **Special Provision Regarding Prepetition Intercompany Claims**

For purposes of distributions under the Plan, Prepetition Intercompany Claims shall be disallowed and cancelled as part of the deemed substantive consolidation of the Debtors.

G.      **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

H.      **Postpetition Interest on General Unsecured Claims**

Except as required by applicable bankruptcy law, postpetition interest will not accrue or be payable on account of any General Unsecured Claim.

I.      **Insurance**

Notwithstanding anything to the contrary in the Plan, if any Allowed Claim is covered by an insurance policy, such Claim will first be paid from proceeds of such insurance policy, with the balance, if any, treated in accordance with the provisions of the Plan governing the Class applicable to such Claim.

J.      **Treatment of Executory Contracts and Unexpired Leases**

1.      *Assumption and Rejections of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, each of the Debtors' Executory Contracts and Unexpired Leases not previously assumed or rejected pursuant to an order of the Bankruptcy Court shall be deemed assumed as of the Effective Date in accordance with the provisions and requirements of Bankruptcy Code §§ 365 and 1123 except any Executory Contract or Unexpired Lease (1) identified on Exhibit E to the Plan (which shall be Filed as part of the Plan Supplement, and as may be amended) as an Executory Contract or Unexpired Lease designated for rejection, (2) which is the subject of a pending objection as to cure or assumability of such Executory Contract(s) or Unexpired Lease(s), (3) which is the subject of a separate motion or notice to assume or reject Filed by the Debtors and pending as of the Effective Date, (4) that previously expired or terminated pursuant to its own

terms, or (5) that was previously assumed by any of the Debtors.  In the event that an Executory Contract or Unexpired Lease is the subject of a pending objection, at any time (i) on or before the Effective Date, the Debtors reserve the right to supplement the list of rejected contracts on Exhibit E to the Plan or (ii) after the Effective Date, the Reorganized Debtors reserve the right to supplement the list of rejected contracts on Exhibit E to the Plan.

Pursuant to Bankruptcy Code § 365, Participation Agreements for yet to be released films are executory contracts and, as such, shall be assumed by the Reorganized Debtors as of the Effective Date.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections of such Executory Contracts and Unexpired Leases as set forth in the Plan, all pursuant to Bankruptcy Code §§ 365(a) and 1123.  Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party by previous order of the Bankruptcy Court on or prior to the Effective Date, shall revest in, and be fully enforceable by, the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court.  To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including, without limitation, any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the counterparty thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Notwithstanding anything to the contrary in the Plan, the Debtors or Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement Exhibit E to the Plan in their discretion prior to the Effective Date on no less than five (5) business days' notice to the counterparty thereto.

2.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to Bankruptcy Code § 365(b)(1), by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of Bankruptcy Code § 365) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by Bankruptcy Code § 365(b)(1) shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.

No later than the date on which the Plan Supplement is Filed, to the extent not previously Filed with the Bankruptcy Court and served on affected counterparties, the Debtors shall provide for notices of proposed assumption and proposed cure amounts to be sent to applicable Executory Contract and Unexpired Lease counterparties, together with procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a contract or lease counterparty to a proposed assumption (but not related to cure amount) must be Filed, served, and actually received by the Debtors by the date on which objections to Confirmation are due (or such other date as may be provided in the applicable assumption notice).  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption shall be deemed to have assented to such assumption.  For the avoidance of doubt, as ordered by the Bankruptcy Court in these Chapter 11 Cases (Dkt. No. 369), failure of the non-Debtor counterparty previously served with a cure notice to have filed an objection or raised an informal objection with Debtors' counsel has resulted in a deemed waiver to object to, contest, condition or otherwise restrict the assumption of the noticed assumed contracts or lease and otherwise forever barred the non-Debtor counterparty from objecting to the amount of the cure payment.  Every non-Debtor counterparty may, however, object as to adequate assurance of future performance of the Reorganized Debtors.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been

assumed shall be deemed disallowed and expunged without further notice to or action, order or approval of the Bankruptcy Court.

3.　　*Claims Based on Rejection of Executory Contracts and Unexpired Leases*

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise must be filed with the Notice and Claims Agent within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  Any Proofs of Claim arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases that are not timely filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any Reorganized Debtor without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court.  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall constitute General Unsecured Claims and shall be treated in accordance with Section II.C.10 of the Plan.

The Plan Proponents reserve the right to object to, settle, compromise or otherwise resolve any Claim Filed on account of a rejected Executory Contract or Unexpired Lease.

4.　　*Contracts and Leases Entered Into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, shall be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

5.　　*Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, nor the Debtors' delivery of a notice of proposed assumption and proposed cure amount to applicable contract and lease counterparties shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

6.　　*Pre-Existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors or Reorganized Debtors under such Executory Contracts or Unexpired Leases.  Notwithstanding any applicable non-bankruptcy law to the contrary, the Debtors and Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors from counterparties to rejected Executory Contracts or Unexpired Leases.

7.　　*Certain Compensation and Benefit Programs*

Notwithstanding anything to the contrary in the Plan, all contracts, agreements, policies, programs and plans in existence on the Petition Date that provided for the issuance of Interests in any of the Debtors to current or former employees or directors of the Debtors are, to the extent not previously terminated or rejected by the Debtors, to be treated as Class K Subordinated Claims and shall be rejected or otherwise terminated as of the Effective Date without any further action of the Debtors or Reorganized Debtors or any order of the Court, any unvested Interests granted under any such agreements, policies, programs and plans in addition to any Interests granted under such agreements previously terminated or rejected by the Debtors to the extent not previously cancelled shall be cancelled pursuant to Section III.K of the Plan.  Objections to the treatment of these plans or the Claims for rejection or

termination damages arising from the rejection or termination of any such plans, if any, must be submitted and resolved in accordance with the procedures and subject to the conditions for objections to Confirmation.  If any such objection is not timely Filed and served before the deadline set for objections to the Plan, each participant in or counterparty to any agreement described in Section IV.G of the Plan shall be forever barred from (1) objecting to the rejection or termination provided hereunder, and shall be precluded from being heard at the Confirmation Hearing with respect to such objection; (2) asserting against any Reorganized Debtor, or its property, any default existing as of the Effective Date or any counterclaim, defense, setoff or any other interest asserted or assertable against the Debtors; and (3) imposing or charging against any Reorganized Debtor any accelerations, assignment fees, increases or any other fees as a result of any rejection pursuant to Section IV.G of the Plan.

8.        *Obligations to Insure and Indemnify Directors, Officers and Employees*

Any and all managers/directors and officers liability and fiduciary insurance or tail policies in existence as of the Effective Date shall be reinstated and continued in accordance with their terms and, to the extent applicable, shall be deemed assumed or assumed and assigned by the applicable Debtor or Reorganized Debtor, pursuant to Bankruptcy Code § 365 and Section IV.A of the Plan.  Each insurance carrier under such policies shall continue to honor their coverage obligation, if any, and administer the policies with respect to the Reorganized Debtors in the same manner and according to the same terms, conditions, and practices applicable to the Debtors prior to the Effective Date.

The applicable Reorganized Debtor shall only be obligated to indemnify any Person who is serving or has served as one of the Debtors' directors, officers, managers, employees or consultants at any time from and after the Petition Date for any losses, claims, costs, damages or Liabilities resulting from such Person's service in such a capacity at any time from and after the Petition Date or as a director, officer, managers or employee of a Non-Debtor Affiliate at any time from and after the Petition Date, to the extent provided in the applicable certificates of incorporation or formation, by-laws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor.  Accordingly, such indemnification obligations shall survive and be unaffected by entry of the Confirmation Order.

9.        *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtors have any liability thereunder.

## VII.    VOTING REQUIREMENTS

The Disclosure Statement Order and Solicitation Order entered by the Bankruptcy Court approved certain procedures for the Plan Proponents' solicitation of votes to approve the Plan, including setting the deadline for voting, which Holders of Claims or Interests are eligible to receive Ballots to vote on the Plan, and certain other voting procedures.

THE DISCLOSURE STATEMENT ORDER AND SOLICITATION ORDER ARE HEREBY INCORPORATED BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN. YOU SHOULD READ THE DISCLOSURE STATEMENT ORDER, THE SOLICITATION ORDER, THE CONFIRMATION HEARING NOTICE, AND THE INSTRUCTIONS ATTACHED TO YOUR BALLOT IN CONNECTION WITH THIS SECTION, AS THEY SET FORTH IN DETAIL, AMONG OTHER THINGS, PROCEDURES GOVERNING VOTING DEADLINES AND OBJECTION DEADLINES.

If you have any questions about the procedure for voting your Claim or the Solicitation Package you received, or if you wish to obtain a paper copy of the Plan, this Disclosure Statement or any exhibits to such documents, please contact the Voting Agent (1) by telephone at (212) 771-1128, (2) by e mail at DRCVote@donlinrecano.com, or (3) in writing at Donlin, Recano & Company, Inc., Re: Relativity Fashion, LLC, et al., Attn: Ballot Processing, P. O. Box 2034, Murray Hill Station, New York, NY 10156-0701.

A.    **Voting Deadline**

This Disclosure Statement and the appropriate Ballot(s) are being distributed to all Holders of Claims that are entitled to vote on the Plan.  In order to facilitate vote tabulation, there is a separate Ballot designated for each impaired voting Class; however, all Ballots are substantially similar in form and substance, and the term "Ballot" is used without intended reference to the Ballot of any specific Class of Claims.

IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER AND SOLICITATION ORDER, IN ORDER TO BE CONSIDERED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN, ALL BALLOTS MUST BE RECEIVED BY THE VOTING AGENT NO LATER THAN **4:00 P.M. (EASTERN TIME) ON JANUARY [__], 2016**, WHICH IS THE VOTING DEADLINE.  ONLY THOSE BALLOTS ACTUALLY RECEIVED BY THE VOTING AGENT BEFORE THE VOTING DEADLINE WILL BE COUNTED AS EITHER ACCEPTING OR REJECTING THE PLAN.

FOR DETAILED VOTING INSTRUCTIONS, SEE THE DISCLOSURE STATEMENT ORDER AND SOLICITATION ORDER.

B.    **Holders of Claims or Interests Entitled to Vote**

Under Bankruptcy Code § 1124, a class of claims or equity interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or equity interest entitles the holder thereof; or (2) notwithstanding any legal right to an accelerated payment of such claim or equity interest, the plan (a) cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy), (b) reinstates the maturity of such claim or equity interest as it existed before the default, (c) compensates the holder of such claim or equity interest for any damages resulting from such holder's reasonable reliance on such legal right to an accelerated payment and (d) does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

In general, a holder of a claim or equity interest may vote to accept or reject a plan if (1) the claim or equity interest is "allowed," which means generally that it is not disputed, contingent or unliquidated, and (2) the claim or equity interest is impaired by a plan.  However, if the holder of an impaired claim or equity interest will not receive any distribution under the plan on account of such claim or equity interest, the Bankruptcy Code deems such holder to have rejected the plan and provides that the holder of such claim or equity interest is not entitled to vote on the plan.  If the claim or equity interest is not impaired, the Bankruptcy Code conclusively presumes that the holder of such claim or equity interest has accepted the plan and provides that the holder is not entitled to vote on the plan.

Except as otherwise provided in the Disclosure Statement Order or Solicitation Order, the Holder of a Claim against one or more Debtors that is "impaired" under the Plan is entitled to vote to accept or reject the Plan if (1) the Plan provides a distribution in respect of such Claim; and (2) the Claim has been scheduled by the appropriate Debtor (and is not scheduled as disputed, contingent, or unliquidated), the Holder of such Claim has timely Filed a Proof of Claim or a Proof of Claim was deemed timely Filed by an order of the Bankruptcy Court prior to the Voting Deadline.

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to Bankruptcy Code § 1126(e), that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  The Solicitation Order also sets forth assumptions and procedures for determining the amount of Claims that each creditor is entitled to vote in these Chapter 11 Cases, and how votes will be counted under various scenarios.

C.    **Vote Required for Acceptance by a Class**

A Class of Claims will have accepted the Plan if it is accepted by at least two-thirds (⅔) in amount and more than one-half (½) in number of the Allowed Claims in such Class that have voted on the Plan in accordance with the Solicitation Order.

VIII.    **CONFIRMATION OF THE PLAN**

A.        **Requirements for Confirmation of the Plan**

Among the requirements for confirmation of the Plan are that the Plan (1) is accepted by all impaired Classes of Claims and Interests or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (2) is feasible, and (3) is in the "best interests" of creditors and stockholders that are impaired under the Plan.

1.        *Acceptance of the Plan*

A moneyed, business, commercial corporation or trust must satisfy the following requirements pursuant to Bankruptcy Code § 1129(a) before the Bankruptcy Court may confirm its reorganization plan:

- The plan complies with the applicable provisions of the Bankruptcy Code.

- The proponent(s) of the plan complies with the applicable provisions of the Bankruptcy Code.

- The plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under a plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

- The proponent(s) of a plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor or a successor to the debtor under the plan, and the appointment to, or continuance in, such office of such individual must be consistent with the interests of creditors and equity security holders and with public policy.

- The proponent(s) of the plan has disclosed the identity of any insider (as defined in Bankruptcy Code § 101) that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

- Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

- With respect to each impaired class of claims or interests—

  o   each holder of a claim or interest of such class (a) has accepted the plan; or (b) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date; or

  o   if Bankruptcy Code § 1111(b)(2) applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim, property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

- With respect to each class of claims or interests, such class has (a) accepted the plan; or (b) such class is not impaired under the plan (subject to the "cramdown" provisions discussed below).

- Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

○ with respect to a claim of a kind specified in Bankruptcy Code §§ 507(a)(2) or 507(a)(3), on the effective date of the plan, the holder of the claim will receive, on account of such claim, Cash equal to the allowed amount of such claim, unless such holder consents to a different treatment;

○ with respect to a class of claim of the kind specified in Bankruptcy Code §§ 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) , each holder of a claim of such class will receive (a) if such class has accepted the plan, deferred Cash payments of a value, on the effective date of the plan, equal to the allowed amount of such claim; or (b) if such class has not accepted the plan, Cash on the effective date of the plan equal to the allowed amount of such claim, unless such holder consents to a different treatment;

○ with respect to a claim of a kind specified in Bankruptcy Code § 507(a)(8), unless the holder of such a claim consents to a different treatment, the holder of such claim will receive on account of such claim, regular installment payments in Cash, of a total value, as of the effective date of the plan, equal to the allowed amount of such claim over a period ending not later than five (5) years after the date of the order for relief under Bankruptcy Code §§ 301, 302, or 303 and in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than Cash payments made to a class of creditors under Bankruptcy Code § 1122(b)); and

○ with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under Bankruptcy Code § 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, Cash payments, in the same manner and over the same period, as prescribed in the immediately preceding bullet points above.

• If a class of claims is impaired under the plan, at least one (1) class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider (as defined in Bankruptcy Code § 101).

• Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

• All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

• The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in Bankruptcy Code § 1114, at the level established pursuant to Bankruptcy Code §§ 1114(e)(1)(B) or (g), at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

The Plan Proponents believe that the Plan meets all the applicable requirements of Bankruptcy Code § 1129(a) other than those pertaining to voting, which has not yet taken place.

2.    *Feasibility*

The Plan Proponents believe that the Reorganized Debtors will be able to perform their obligations under the Plan and continue to operate their businesses without further financial reorganization or liquidation. In connection with Confirmation of the Plan, the Bankruptcy Court must determine that the Plan is feasible in accordance with Bankruptcy Code § 1129(a)(11) (which requires that the Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors).

To support the Plan Proponents' belief that the Plan is feasible, the Debtors have prepared the projections for the Reorganized Debtors, as set forth in <u>Exhibit B</u> to this Disclosure Statement and discussed in greater detail in Section VIII.A.3 below.

<div align="center">

3.    *Bests Interests of Creditors*

</div>

Bankruptcy Code § 1129(a)(7) requires that any holder of an impaired claim or interest voting against a proposed plan of reorganization must be provided in the plan with a value, as of the effective date of the plan, at least equal to the value that the holder would receive if the debtor's assets were liquidated under chapter 7 of the Bankruptcy Code.  To determine what the Holders of claims and interests in each impaired class would receive if the debtors' assets were liquidated, the Bankruptcy Court must determine the dollar amount that would be generated from a liquidation of the debtors' assets in the context of a hypothetical liquidation.  Such a determination must take into account the fact that secured claims, and any administrative claims resulting from the original Chapter 11 Cases and from the chapter 7 cases, would have to be paid in full from the liquidation proceeds before the balance of those proceeds were made available to pay unsecured creditors and make distributions (if any) to holders of interests.

Pursuant to the Initial DIP Credit Agreement, the Debtors engaged FTI Consulting, Inc. as crisis and turnaround manager and Blackstone Advisory Partners L.P. (n/k/a PJT Partners) to run a sale process for substantially all of the Debtors' assets.  That sale process was run pursuant to the applicable Bankruptcy Court orders.  The Stalking Horse APA provided for a credit bid of $250 million and other Cash consideration, which amount is over $100 million less than the secured debt represented by the TLA/TLB Secured Claims and the Manchester Prepetition Credit Facility.  As described in Section III.E.1 and IV.A above, the Debtors received no other bids for substantially all of the assets of either the TV Business, or the Film Business and ultimately concluded a sale of only the unscripted TV Business for a credit bid of $125 million, and certain other consideration, on October 20, 2015.  Accordingly, the Plan Proponents believe that the Holders of Claims and Interests in each impaired Class will receive more under the Plan than if these Chapter 11 cases were converted to chapter 7 cases and each Debtor's assets were liquidated under the direction of a chapter 7 trustee.

<div align="center">

4.    *Confirmation Without Acceptance of All Impaired Classes:  The 'Cramdown' Alternative*

</div>

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted the plan without taking into consideration the votes of any insiders in such class and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan.  These so-called "cramdown" provisions are set forth in Bankruptcy Code § 1129(b).

<div align="center">

a.    *"Fair and Equitable"*

</div>

The Bankruptcy Code establishes different "cramdown" tests for determining whether a plan is "fair and equitable" to dissenting impaired classes of secured creditors, unsecured creditors and equity interest holders as follows:

- <u>Secured Creditors</u>.  A plan is fair and equitable to a class of secured claims that rejects the plan if the plan provides:  (a) that each holder of a secured claim included in the rejecting class (i) retains the liens securing its claim to the extent of the allowed amount of such claim, whether the property subject to those liens is retained by the debtor or transferred to another entity, and (ii) receives on account of its secured claim deferred Cash payments having a present value, as of the effective date of the plan, at least equal to such holder's interest in the estate's interest in such property; (b) that each holder of a secured claim included in the rejecting class realizes the "indubitable equivalent" of its allowed secured claim; or (c) for the sale, subject to Bankruptcy Code § 363(k), of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens with such liens to attach to the proceeds of the sale, and the treatment of such liens on proceeds in accordance with clause (i) or (ii) of this paragraph.

- <u>Unsecured Creditors</u>.  A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides that:  (a) each holder of a claim included in the rejecting class receives or retains

under the plan property of a value, as of the effective date of the plan, equal to the amount of its allowed claim; or (b) the holders of claims and interests that are junior to the claims of the rejecting class will not receive or retain any property under the plan on account of such junior claims or interests.

- <u>Holders of Interests</u>.  A plan is fair and equitable as to a class of interests that rejects the plan if the plan provides that:  (a) each holder of an equity interest included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of (i) any fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which such holder is entitled or (iii) the value of the interest; or (b) the holder of any interest that is junior to the interests of the rejecting class will not receive or retain any property under the plan on account of such junior interest.

The Plan Proponents believe the Plan is fair and equitable as to unsecured creditors and Holders of Interests because no Holders of Claims or Interests junior to such parties are receiving any distributions under the Plan on account of such claims or interests.  To the extent any of the Debtors' secured creditors are Impaired, the Plan Proponents anticipate that they will vote in favor of the plan.

<div align="center">

b.    <i>"Unfair Discrimination"</i>

</div>

A plan of reorganization does not "discriminate unfairly" if a dissenting class is treated substantially equally with respect to other classes similarly situated, and no class receives more than it is legally entitled to receive for its claims or interests.  The Plan Proponents carefully designed the Plan, including calculating the distributions to Holders of General Unsecured Claims against each of the Debtors, to ensure recoveries on account of Claims in a particular Class against each of the Debtors did not result in unfair discrimination among similarly situated Classes.  The Plan Proponents do not believe that the Plan discriminates unfairly against any impaired Class of Claims or Interests.

The Plan Proponents believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for, "cramdown," or non-consensual Confirmation of the Plan pursuant to Bankruptcy Code § 1129(b).

**B.    Alternatives to Confirmation and Consummation of the Plan**

If the requisite acceptances are not received or if the Plan is not confirmed, the Plan Proponents could attempt to formulate and propose a different plan or plans of reorganization.  Such a plan or plan(s) might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of assets.

Further, although the Plan Proponents could theoretically solicit votes with respect to an alternative plan if the requisite acceptances are not received, or the Plan is not confirmed and effectuated, a possible result would be the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.  As set forth above, in a chapter 7 liquidation, a trustee is elected or appointed to liquidate the debtor's assets for distribution to creditors in accordance with the priorities established by the Bankruptcy Code.  Further, because there are over a hundred separate Debtors, there could be multiple chapter 7 trustees – one for each Debtor – whose interests and obligations conflict.  This, in turn, would result in additional legal and other expenses.  It is impossible to predict precisely how the proceeds of a chapter 7 liquidation would be distributed to the respective Holders of Claims against or Interests in the Debtors.  The Plan Proponents believe that in a liquidation under chapter 7, before prepetition unsecured creditors received any distribution, additional administrative expenses incurred by a trustee or trustees and attorneys, accountants, and other professionals to assist such trustee(s) would cause a substantial diminution in the value of the Estates.  Additionally, the Plan Proponents believe that conversion of the Debtors from chapter 11 to chapter 7 of the Bankruptcy Code would result in (i) significant delay in distributions to all creditors who would have received a distribution under the Plan and (ii) diminished recoveries for Holders of Impaired Claims.  Accordingly, the Plan Proponents believe the Plan is superior to a chapter 7 liquidation because of the greater return that is anticipated to be provided by the Plan.

## IX.    MEANS OF IMPLEMENTATION OF THE PLAN

### A.    Effects of Plan Confirmation

1.    *Issuance of Reorganized Relativity Holdings Preferred Units*

On the Effective Date, Reorganized Relativity Holdings Preferred Units shall be authorized as set forth in the Operating Agreement.  Reorganized Relativity Holdings shall issue, pursuant to the treatment provided for in the Plan, Reorganized Relativity Holdings Preferred Units to each of Nicholas and Kavanaugh.  The rights of holders of Reorganized Relativity Holdings Preferred Units shall be set forth in the Revised Relativity Holdings Operating Agreement.

Each distribution and issuance of the Reorganized Relativity Holdings Preferred Units under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date, Reorganized Holdings will be authorized to and shall issue or execute and deliver, as applicable, the Reorganized Relativity Holdings Preferred Units and the New Securities and Documents (including, without limitation, in connection with a new equity raise), in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

The issuance or execution and delivery of the New Securities and Documents, as applicable, and the distribution thereof under the Plan shall be exempt from registration under applicable securities laws pursuant to Bankruptcy Code § 1145(a) and/or any other applicable exemptions.  Without limiting the effect of Bankruptcy Code § 1145, all documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan shall become and shall remain effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

2.    *Issuance of Reorganized Relativity Holdings Common Units*

On the Effective Date, Reorganized Relativity Holdings Common Units shall be authorized as set forth in the Operating Agreement.  Reorganized Relativity Holdings shall issue, pursuant to the treatment provided for in the Plan, Reorganized Relativity Holdings Common Units to each of Nicholas and Kavanaugh.  Any shares not necessary to satisfy obligations under the Plan shall have the status of authorized but not issued shares of Reorganized Relativity Holdings.  The rights of holders of Reorganized Relativity Holdings Common Units shall be set forth in the Revised Relativity Holdings Operating Agreement.

Each distribution and issuance of the Reorganized Relativity Holdings Common Units under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date, each of the applicable Reorganized Debtors will be authorized to and shall issue or execute and deliver, as applicable, the Reorganized Relativity Holdings Common Units and the New Securities and Documents (including, without limitation, in connection with a new equity raise), in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

The issuance or execution and delivery of the New Securities and Documents, as applicable, and the distribution thereof under the Plan shall be exempt from registration under applicable securities laws pursuant to Bankruptcy Code § 1145(a) and/or any other applicable exemptions.  Without limiting the effect of Bankruptcy Code § 1145, all documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan shall become and shall remain effective and binding in accordance

with their respective terms and conditions upon the parties thereto, in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

3.    *Issuance of Reorganized Relativity Holdings Warrants*

On the Effective Date, Reorganized Relativity Holdings shall issue Reorganized Relativity Holdings Warrants to each of Nicholas and Heatherden (or their respective Affiliates) with such terms and conditions set forth in their respective Warrant Agreements.

On the Effective Date, Reorganized Relativity Holdings will be authorized to and shall issue or execute and deliver, as applicable, the Reorganized Relativity Holdings Warrants and the New Securities and Documents (including, without limitation, in connection with a new equity raise), in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

The issuance or execution and delivery of the New Securities and Documents, as applicable, and the distribution thereof under the Plan shall be exempt from registration under applicable securities laws pursuant to Bankruptcy Code § 1145(a) and/or any other applicable exemptions.  Without limiting the effect of Bankruptcy Code § 1145, all documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan shall become and shall remain effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case, without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

4.    *Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided herein (including with respect to the Restructuring Transactions described in Section III.E.1 of the Plan:  (1) as of the Effective Date, Reorganized Relativity Holdings shall exist as a separate legal entity, with all organizational powers in accordance with the laws of the state of Delaware and the certificates of formation and operating agreement, appended to the Plan as Exhibit B and Exhibit C, respectively; (2) subject to the Restructuring Transactions, each of the Debtors shall, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal entity, with all of the powers of such a legal entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, conversion, dissolution or otherwise) under applicable law; and (3) on the Effective Date, all property of the Estate of a Debtor, all Causes of Action, and any property acquired by a Debtor or Reorganized Debtor under the Plan, shall vest, subject to the Restructuring Transactions, in the applicable Reorganized Debtors, free and clear of all Claims, liens, charges, other encumbrances, Interests and other interests.  On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire and dispose of property and compromise or settle any Claims, Interests or the RKA Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for appropriate Professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to, or the approval of, the Bankruptcy Court.



5.      *Restructuring Transactions*

        a.      *Restructuring Transactions Generally*

On or after the Effective Date, the Reorganized Debtors shall undertake such Restructuring Transactions as may be necessary or appropriate to effect, in accordance with applicable non-bankruptcy law, a restructuring of the Debtors' or Reorganized Debtors' respective business or simplify the overall organizational structure of the Reorganized Debtors, including but not limited to resolving intercompany claims, all to the extent not inconsistent with any other terms of the Plan, including any such Restructuring Transactions described in any Restructuring Transactions documents, including the Restructuring Transactions Exhibit, if any, to be filed with the Plan Supplement within the Debtors' discretion.

Without limiting the foregoing, unless otherwise provided by the terms of a Restructuring Transaction, all such Restructuring Transactions will be deemed to occur on the Effective Date and may include one or more mergers, conversions, or consolidations, restructurings, dispositions, liquidations or dissolutions, as may be determined by the Debtors or the Reorganized Debtors to be necessary or appropriate.

The actions taken by the Debtors or the Reorganized Debtors, as applicable, to effect the Restructuring Transactions may include:  (i) the execution, delivery, adoption, and/or amendment of appropriate agreements or other documents of merger, conversion, consolidation, restructuring, disposition, liquidation or dissolution containing terms that are consistent with the terms of the Plan, the Restructuring Transactions documents, and any ancillary documents and that satisfy the applicable requirements of applicable state law and any other terms to which the applicable Entities may agree; (ii) the execution, delivery, adoption, and/or amendment of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Disclosure Statement, the Restructuring Transactions documents, and any ancillary documents and having other terms for which the applicable Entities may agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, conversion, merger, consolidation, dissolution or change in corporate form pursuant to applicable state law; (iv) the cancellation of shares, membership interests and warrants; and (v) all other actions that the Debtors or the Reorganized Debtors, as applicable, determine to be necessary, desirable, or appropriate to implement, effectuate, and consummate the Plan or the Restructuring Transactions contemplated hereby, including making filings or recordings that may be required by applicable state law in connection with the Restructuring Transactions.  Any such transactions may be

effected on or subsequent to the Effective Date without any further action by the equityholders or directors of any of the Debtors or the Reorganized Debtors.

> b.    *Obligations of Any Successor Entity in a Restructuring Transaction*

The Restructuring Transactions may result in substantially all of the respective assets, properties, rights, liabilities, duties, and obligations of certain of the Reorganized Debtors vesting in one or more surviving, resulting, or acquiring entities.  In any case in which the surviving, resulting, or acquiring entity in any such transaction is a successor to a Reorganized Debtor, such surviving, resulting, or acquiring entity will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Reorganized Debtor, except as provided in the Plan or in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring corporation, which may provide that another Reorganized Debtor will perform such obligations.

> 6.    *Sources of Cash for Plan Distributions*

The Debtors or Reorganized Debtors, as applicable, are authorized to execute and deliver any documents necessary or appropriate to obtain Cash for funding the Plan.  All consideration necessary for the Reorganized Debtors to make payments or distributions pursuant hereto shall be obtained through a combination of one or more of the following:  (a) Cash on hand of the Debtors, including Cash from business operations, or distributions from Non-Debtor Affiliates; (b) proceeds of the sale of assets; (c) the New P&A/Ultimates Facility; (d) the proceeds of any tax refunds and the RKA Causes of Action; (e) the proceeds of any equity raise; and (f) any other means of financing or funding that the Debtors or the Reorganized Debtors determine is necessary or appropriate.  Further, the Debtors and the Reorganized Debtors shall be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers shall be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and shall not violate the terms of the Plan or any orders entered by the Bankruptcy Court with respect to the Debtors' cash management system.

| Estimated Sources and Uses at Emergence (Feb 1, 2016) | |
| --- | --- |
| **Sources** | |
| New P&A/Ultimates Facility | $62,347.00 |
| Cash Collateral | 17,000.00 |
| Cash on Balance Sheet | 2,342.00 |
| New Common Equity | 100,000.00 |
| **Total Sources** | **181,689.00** |
| | |
| **Uses** | |
| Full Repayment of New DIP Facility | $35,000.00 |
| Ultimates Facility | 13,960.00 |
| Secured Guilds Claims | 3,040.00 |
| Effective Date Payments | 15,000.00 |
| Transaction Fees | 20,000.00 |
| Pay Down BidCo Note | 30,000.00 |
| Cash To Balance Sheet | 64,689.00 |
| **Total Uses** | **181,689.00** |

7.      *Corporate Governance, Managers and Officers, Employment-Related Agreements and Compensation Programs; Other Agreements*

a.      *Certificates of Formation and Operating Agreement*

As of the Effective Date, the certificate of formation and the operating agreement (or comparable constituent documents) of Reorganized Relativity Holdings shall be substantially in the forms appended to the Plan as Exhibit B and Exhibit C, respectively.  The certificate of formation and operating agreement (or comparable constituent documents) of each Reorganized Debtor, among other things, shall prohibit the issuance of nonvoting equity securities to the extent required by Bankruptcy Code § 1123(a)(6).  After the Effective Date, each Reorganized Debtor may amend and restate its certificate of formation or operating agreement (or comparable constituent documents) as permitted by applicable non-bankruptcy law, subject to the terms and conditions of such constituent documents.  On the Effective Date, or as soon thereafter as is practicable, each Reorganized Debtor shall file such certificate of formation (or comparable constituent documents) with the secretary of state or jurisdiction or similar office of the state or jurisdiction in which such Reorganized Debtor is incorporated or organized, to the extent required by and in accordance with the applicable corporate law of such state.

b.      *Managers and Officers of the Reorganized Debtors*

In accordance with Bankruptcy Code § 1129(a)(5), from and after the Effective Date, the initial officers and directors of Reorganized Relativity Holdings shall be comprised of the individuals identified in a disclosure to be Filed as part of the Plan Supplement.  The directors for the boards of managers/directors of the direct and indirect subsidiaries of Reorganized Relativity Holdings shall be identified and selected by the New Board of Managers.

c.      *Employment-Related Agreements and Compensation Programs*

Except as otherwise provided herein, as of the Effective Date, each of the Reorganized Debtors shall have authority to:  (i) maintain, reinstate, amend or revise existing employment, retirement, welfare, incentive, severance, indemnification and other agreements with its active and retired directors, officers and employees, subject to the terms and conditions of any such agreement and applicable non-bankruptcy law; and (ii) enter into new employment, retirement, welfare, incentive, severance, indemnification and other agreements for active and retired employees.

On the Effective Date, Reorganized Relativity shall assume the existing employment plans and employment agreements, as the same may be modified, other than those identified on Exhibit E to the Plan as designated for rejection.

On or after the Effective Date, the Reorganized Debtors shall continue to administer and pay the Claims arising before the Petition Date under the Debtors' workers' compensation programs in accordance with their prepetition practices and procedures.

d.      *Other Matters*

Notwithstanding anything to the contrary in the Plan, no provision in any contract, agreement or other document with the Debtors that is rendered unenforceable against the Debtors or the Reorganized Debtors pursuant to Bankruptcy Code §§ 541(c), 363(l) or 365(e)(1), or any analogous decisional law, shall be enforceable against the Debtors or Reorganized Debtors as a result of the Plan.

e.      *Payment of Manchester Fees*

If and to the extent Relativity shall not have paid, prior to the Effective Date, all of the fees, expenses, and other amounts payable to Manchester or Heatherden, whether incurred prepetition or postpetition, including without limitation all amounts paid for legal and other professional fees and expenses of Manchester and Heatherden for O'Melveny & Myers LLP, Ropes & Gray LLP, and Moelis & Company, then all such unpaid fees, expenses and other amounts shall be paid to Manchester and Heatherden on the Effective Date of the Plan; *provided* that such fees

and expenses incurred between October 26, 2015 and January 31, 2016, shall be subject to a budget in an aggregate amount of $3,750,000 for such period; provided, that the budget shall not limit fees and expenses related to a litigation or investigation of Manchester, Heatherden.

   f.  *Transactions Effective as of the Effective Date*

   Pursuant to Bankruptcy Code § 1142 and the Delaware Limited Liability Company Act and any comparable provisions of the business corporation or limited liability company law of any other state or jurisdiction the following shall occur and be effective as of the Effective Date, if no such other date is specified in such other documents, and shall be authorized and approved in all respects and for all purposes without any requirement of further action by the members or managers of the Debtors or any of the Reorganized Debtors: (a) the Restructuring Transactions; (b) the adoption of new or amended and restated certificates of formation and operating agreements (or comparable constituent documents) for each Reorganized Debtor; (c) the initial selection of managers and officers for each Reorganized Debtor; (d) the distribution of Cash and other property pursuant to the Plan; (e) the authorization and issuance of Reorganized Relativity Holdings Common Units pursuant to the Plan; (f) the entry into and performance of the New Exit Financing Documents; (g) any amendments to any of the credit agreements; (h) the adoption, execution, delivery and implementation of all contracts, leases, instruments, releases and other agreements or documents related to any of the foregoing; (i) the adoption, execution and implementation of employment, retirement and indemnification agreements, incentive compensation programs, retirement income plans, welfare benefit plans and other employee plans and related agreements; and (j) any other matters provided for under the Plan involving the organizational structure of the Debtors or Reorganized Debtors or organizational action to be taken by or required of a Debtor or Reorganized Debtor.

   g.  *New P&A/Ultimates Facility*

   On the Effective Date, one or more of the Reorganized Debtors shall be authorized to consummate the New P&A/Ultimates Facility and to execute, deliver and enter into the New Exit Financing Documents, and any related agreements or filings without the need for any further corporate or other organizational action and without further action by the Holders of Claims or Interests, and the New Exit Financing Documents and any related agreements or filings shall be executed and delivered and the applicable Reorganized Debtors shall enter into the New P&A/Ultimates Facility and be permitted to incur or issue the indebtedness available thereunder.

   Any final material terms of the New P&A/Ultimates Facility shall be included in the Plan Supplement.

   8.  *The Litigation Trust*

   a.  *Formation of the Litigation Trust*

   On the Effective Date, the Litigation Trust will be established pursuant to the Litigation Trust Agreement for the purpose of prosecuting the Causes of Action (as determined by the Litigation Trustee) and making distributions (if any) to holders of Allowed General Unsecured Claims (in their capacities as Litigation Trust Beneficiaries) in accordance with the terms of the Plan. The Litigation Trust will have a separate existence from all of the Reorganized Debtors. The Litigation Trust's prosecution of any of the Causes of Action will be on behalf of and for the benefit of the Litigation Trust Beneficiaries.

   On the Effective Date, the Litigation Trust Assets will be transferred or issued to, and vest in, the Litigation Trust. In addition, standing to commence, prosecute and compromise all Causes of Action will transfer to the Litigation Trust; *provided*, *however*, that the RKA Causes of Action will be retained and prosecuted by the Reorganized Debtors and will not be transferred to the Litigation Trust. A list of all known Causes of Action to be retained by the Reorganized Debtors will be filed with the Plan Supplement.

   Subject to, and to the extent set forth in, the Plan, the Confirmation Order, the Litigation Trust Agreement or any other agreement (or any other order of the Bankruptcy Court entered pursuant to, or in furtherance of, the Plan), the Litigation Trust and the Litigation Trustee will be empowered to take the following actions, and any other actions, as the Litigation Trustee determines to be necessary or appropriate to implement the Litigation Trust, all without further order of the Bankruptcy Court:

- adopt, execute, deliver or file all plans, agreements, certificates and other documents and instruments necessary or appropriate to implement the Litigation Trust;

- accept, preserve, receive, collect, manage, invest, supervise, prosecute, settle and protect the Causes of Action;

- calculate and make distributions to the Litigation Trust Beneficiaries;

- retain Third Party Disbursing Agents and professionals and other Entities;

- file appropriate Tax returns and other reports on behalf of the Litigation Trust and pay Taxes or other obligations owed by the Litigation Trust; and

- dissolve the Litigation Trust.

The Litigation Trust has no objective to, and will not, engage in a trade or business and will conduct its activities consistent with the Plan and the Litigation Trust Agreement.

On the Effective Date, the Debtors will transfer, and will be deemed to have irrevocably transferred, the Litigation Trust Assets to the Litigation Trust. Furthermore, the Plan Proponents' and Creditors' Committee's counsel and financial advisors will provide to the Litigation Trustee (or such professionals designated by the Litigation Trustee) documents and other information gathered, and relevant work product developed, during the Chapter 11 Cases in connection with its investigation of the Causes of Action, *provided* that the provision of any such documents and information will be without waiver of any evidentiary privileges, including, without limitation, the attorney-client privilege, work-product privilege or other privileges or immunities attaching to any such documents or information (whether written or oral). The Plan will be considered a motion pursuant to Bankruptcy Code §§ 105, 363 and 365 for such relief.

The Litigation Trust and the Litigation Trustee will each be a "representative" of the Estates under Bankruptcy Code § 1123(b)(3)(B), and the Litigation Trustee will be the trustee of the Litigation Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), and, as such, the Litigation Trustee succeeds to all of the rights, powers and obligations of a trustee in bankruptcy with respect to collecting, maintaining, administering and liquidating the Litigation Trust Assets. Without limiting other such rights, powers, and obligations, on the Effective Date, the Creditors' Committee will transfer, and will be deemed to have irrevocably transferred, to the Litigation Trust and will vest in the Litigation Trust, the Litigation Trustee and all of his or her professionals the Creditors' Committee's evidentiary privileges, including, without limitation, the attorney-client privilege, work product privilege and other privileges and immunities that they possess related to the Causes of Action. The Creditors' Committee and its financial advisors will provide to the Litigation Trustee (or such professionals designated by the Litigation Trustee) documents, other information, and work product relating to the Causes of Action, *provided* that the provision of any such documents and information will be without waiver of any evidentiary privileges or immunity.

To the extent that any Litigation Trust Assets cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by Bankruptcy Code § 1123 or any other provision of the Bankruptcy Code, such Litigation Trust Assets will be deemed to have been retained by the Debtors or Reorganized Debtors, as the case may be, and the Litigation Trustee will be deemed to have been designated as a representative of the Debtors or Reorganized Debtors, as the case may be, pursuant to Bankruptcy Code § 1123(b)(3)(B) to enforce and pursue such Litigation Trust Assets on behalf of the Debtors or the Reorganized Debtors, as the case may be.

b.    *The Litigation Trustee*

The Litigation Trustee will be the exclusive trustee of the Litigation Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3) and, solely with respect to the Litigation Trust Assets, the representative of the Estate of each of the Debtors appointed pursuant to Bankruptcy Code § 1123(b)(3)(B). The powers, rights and responsibilities of the Litigation Trustee will be specified in the Litigation Trust Agreement. The Litigation Trustee

will distribute the Litigation Trust Assets (or the proceeds thereof) in accordance with the provisions of the Plan and the Litigation Trust Agreement. Other rights and duties of the Litigation Trustee and the beneficiaries of the Litigation Trust will be as set forth in the Litigation Trust Agreement.

c.      *Litigation Trust Assets*

On the Effective Date, the Debtors shall transfer all of the Litigation Trust Assets to the Litigation Trust. The Litigation Trust Assets may be transferred subject to certain liabilities, as provided in the Plan or the Litigation Trust Agreement. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar Tax, pursuant to Bankruptcy Code § 1146(a). Upon delivery of the Litigation Trust Assets to the Litigation Trust, the Debtors and their predecessors, successors and assigns, and each other Entity released pursuant to Article X of the Plan shall be discharged and released from all liability with respect to the delivery of such distributions.

d.      *Fees and Expenses of the Litigation Trust*

Except as otherwise ordered by the Bankruptcy Court, the Litigation Trust Expenses will be paid from the Litigation Trust Assets in accordance with the Plan and the Litigation Trust Agreement.

e.      *Indemnification of the Litigation Trust*

The Litigation Trust Agreement may include reasonable and customary indemnification provisions in favor of the Litigation Trustee. Any such indemnification will be the sole responsibility of the Litigation Trust.

f.      *Tax Treatment*

The Litigation Trust generally is intended to be treated for United States federal income Tax purposes, (i) in part as a grantor trust that is a liquidating trust within the meaning of Treasury Regulations § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, and (ii) in part as one or more disputed ownership funds within the meaning of Treasury Regulations § 1.468B-9(b)(1). For United States federal income tax purposes, the transfer of the Litigation Trust Assets to the Litigation Trust will be treated as a transfer of the Litigation Trust Assets from the Debtors to the Litigation Trust Beneficiaries, followed by the Litigation Trust Beneficiaries' transfer of the Litigation Trust Assets to the Litigation Trust. The Litigation Trust Beneficiaries will thereafter be treated for U.S. federal income tax purposes as the grantors and deemed owners of their respective shares of the Litigation Trust Assets. The Litigation Trust Beneficiaries shall include in their annual taxable incomes, and pay tax to the extent due on, their allocable shares of each item of income, gain, deduction, loss and credit, and all other such items shall be allocated by the Litigation Trustee to the Litigation Trust Beneficiaries using any reasonable allocation method.

The Litigation Trustee will be required by the Litigation Trust Agreement to file income Tax returns for the Litigation Trust as a grantor trust of the Litigation Trust Beneficiaries (and file separate returns for the disputed ownership fund(s) pursuant to Treasury Regulations § 1.468B-9(b)(1) and pay all Taxes owed on any net income or gain of the disputed ownership fund(s), on a current basis from Litigation Trust Assets). In addition, the Litigation Trust Agreement will require consistent valuation by the Litigation Trustee and the Litigation Trust Beneficiaries, for all federal income Tax and reporting purposes, of any property held by the Litigation Trust. The Litigation Trust Agreement will provide that termination of the trust will occur no later than five years after the Effective Date, unless the Bankruptcy Court approves an extension based upon a finding that such an extension is necessary for the Litigation Trust to complete its liquidating purpose. The Litigation Trust Agreement also will limit the investment powers of the Litigation Trustee in accordance with IRS Rev. Proc. 94-45 and will require the Litigation Trust to distribute at least annually to the Litigation Trust Beneficiaries (as such may have been determined at such time) its net income (net of any payment of or provision for Taxes), except for amounts retained as reasonably necessary to maintain the value of the Litigation Trust Assets

g.      *No Revesting of Litigation Trust Assets*

No Litigation Trust Asset will revest in any Reorganized Debtor on or after the date such Litigation Trust Asset is transferred to the Litigation Trust but will vest upon such transfer in the Litigation Trust to be administered by the Litigation Trustee in accordance with the Plan and the Litigation Trust Agreement.

9.      *Preservation of Causes of Action*

Except as provided in the Plan or in any contract, instrument, release, or other agreement entered into, or delivered in connection with, or assumed by the Plan (including, for the avoidance of doubt, pursuant to Section X.E and X.F of the Plan), in accordance with Bankruptcy Code § 1123(b) and to the fullest extent possible under applicable law, (i) the Reorganized Debtors will retain the Causes of Action and the RKA Causes of Action, (ii) only the Reorganized Debtors will have the right to enforce and prosecute the RKA Causes of Action, and (iii) the Reorganized Debtors shall grant to the Litigation Trust the sole right to enforce and prosecute the Causes of Action in the name of the Reorganized Debtor, whether such Causes of Action arose before or after the Petition Date, including any actions specifically enumerated in Exhibit J to the Plan.   The Reorganized Debtors' and Litigation Trust's rights to commence, prosecute, or settle such RKA Causes of Action and Causes of Action, respectively, shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors or their successors, and/or the Litigation Trust, may pursue, or not pursue, such RKA Causes of Action and Causes of Action, as applicable, as they deem appropriate in their discretion.

No Person or Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against them as any indication that the Litigation Trust will not pursue any and all available Causes of Action against them.  Except with respect to Causes of Action as to which the Debtors or the Reorganized Debtors have released any Person or Entity on or prior to the Effective Date (pursuant to the Debtor Release or otherwise), the Reorganized Debtors and the Litigation Trust, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person or Entity, except as otherwise expressly provided in the Plan.

10.      *Reinstatement and Continuation of Insurance Policies*

From and after the Effective Date, each of the Debtors' insurance policies in existence as of the Effective Date will be reinstated and continued in accordance with their terms and, to the extent applicable, will be deemed assumed by the applicable Reorganized Debtor pursuant to Bankruptcy Code § 365 and Section III.J and IV.A of the Plan.  Nothing in the Plan will affect, impair or prejudice the rights of the insurance carriers or the Reorganized Debtors under the insurance policies in any manner, and such insurance carriers and Reorganized Debtors will retain all rights and defenses under such insurance policies, and such insurance policies will apply to, and be enforceable by and against, the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date.

11.      *Entry into CBA Assumption Agreements*

On the Effective Date, the applicable Reorganized Debtors shall enter into the CBA Assumption Agreements.

12.      *Cancellation and Surrender of Instruments, Securities and Other Documentation*

On the Effective Date and except as otherwise specifically provided for in the Plan, (i) the obligations of the Debtors under any other certificate, share, note, purchase right, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest, equity, or profits interest in, the Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest (except the Intercompany Interests), will be cancelled as to the Debtors, and the Reorganized Debtors will have no continuing obligations thereunder; (ii) the obligations of the Debtors under the Modified DIP Credit Agreement will be fully released, settled, and compromised as to the Debtors, and the Reorganized Debtors will have no continuing obligations thereunder; and (iii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures,

certificates of designation, bylaws, or certificate or articles of incorporation/formation or similar documents governing the shares, units, certificates, notes, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors will be fully released, settled, and compromised except as expressly provided herein.

With respect to any agreement (including, without limitation, any applicable credit agreement) that governs the rights of the Holder of a Claim or Interest and will be cancelled hereunder, and notwithstanding the occurrence of the Effective Date, such agreement will continue in effect solely for purposes of allowing such Holders to receive distributions under the Plan as provided herein.

13.    *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and consistent with the treatment provided for Claims and Interests in Section VI.C above, all mortgages, deeds of trust, liens or other security interests, including any liens granted as adequate protection against the property of any Estate, shall be fully released and discharged, and all of the right, title and interest of any Holder of such mortgages, deeds of trust, liens or other security interests, including any rights to any collateral thereunder, shall revert to the applicable Reorganized Debtor and its successors and assigns.  As of the Effective Date, the Reorganized Debtors shall be authorized to execute and file on behalf of creditors Form UCC-3 termination statements, mortgage releases or such other forms as may be necessary or appropriate to implement the provisions of Section III.L of the Plan.

14.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of managers or directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan, the Restructuring Transactions, the Reorganized Relativity Holdings Preferred Units, the Reorganized Relativity Holdings Common Units issued pursuant to the Plan, the New P&A/Ultimates Facility authorized pursuant to the Plan (including, but not limited to, the New Exit Financing Documents), and any amendments to any of the Debtors' credit agreements, in each case, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan.

15.    *Dissolution of Official Committee*

Except to the extent provided herein, upon the Effective Date, the current and former members of the Creditors' Committee and any other creditor, equity or other committee appointed in the Chapter 11 Cases pursuant to Bankruptcy Code § 1102, and their respective officers, employees, counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases; *provided, however*, that following the Effective Date the Creditors' Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (1) Claims and/or applications for compensation by Professionals and requests for allowance of Administrative Claims for substantial contribution pursuant to Bankruptcy Code § 503(b)(3)(D); (2) any appeals to which the Creditors' Committee is a party; (3) any adversary proceedings or contested matters as of the Effective Date to which the Creditors' Committee is a party; and (4) responding to creditor inquiries for sixty (60) days following the Effective Date.  Following the completion of the Creditors' Committee's remaining duties set forth above, the Creditors' Committee shall be dissolved, and the retention or employment of the Creditors' Committee's respective attorneys, accountants and other agents shall terminate.  As discussed in Section IX.A.8 above, the Litigation Trust shall have the authority to prosecute and settle the Causes of Action after the Effective Date.

16.    *Discharge of Claims and Interests*

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims and Interests arising or existing on or before the Effective Date, including any interest accrued

on Claims from and after the Petition Date.  From and after the Effective Date, the Debtors shall be discharged from any and all Claims and Interests that arose or existed prior to the Effective Date, subject to the obligations of the Debtors under the Plan.

17.    *Injunctions*

As of the Effective Date, except with respect to the obligations of the Reorganized Debtors under the Plan or the Confirmation Order, all Entities that have held, currently hold or may hold any Claims or Interests, obligations, suits, judgments, damages, demands, debts, rights, causes of action or Liabilities that are waived, discharged or released under the Plan shall be permanently enjoined from taking any of the following enforcement actions against the Debtors, the Reorganized Debtors, the Released Parties or any of their respective assets or property on account of any such waived, discharged or released Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or Liabilities:  (1) commencing or continuing in any manner any action or other proceeding; (2) enforcing, levying, attaching, collecting or recovering in any manner any judgment, award, decree or order; (3) creating, perfecting or enforcing any lien or encumbrance; (4) asserting any right of setoff, subrogation or recoupment of any kind against any debt, liability or obligation due to any Debtor, Reorganized Debtor or Released Party; and (5) commencing or continuing any action, in any manner, in any place to assert any Claim waived, discharged or released under the Plan or that does not otherwise comply with or is inconsistent with the provisions of the Plan.

18.    *Exculpation*

From and after the Effective Date, the Exculpated Parties, the Debtors and the Reorganized Debtors shall neither have nor incur any liability to any Entity, and no Holder of a Claim or Interest, no other party in interest and none of their respective Representatives shall have any right of action against any Debtor, Reorganized Debtor, Exculpated Party or any of their respective Representatives for any act taken or omitted to be taken before the Effective Date in connection with, related to or arising out of the Chapter 11 Cases, the Debtors or the negotiation, consideration, formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Exhibits, the Disclosure Statement, any amendments to any of the foregoing or any other transactions proposed in connection with the Chapter 11 Cases or any contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken in connection therewith or in connection with any other obligations arising under the Plan or the obligations assumed hereunder; *provided, however*, that the foregoing provisions of Section X.D of the Plan shall have no effect on:  (1) the liability of any Entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document previously assumed or to be entered into or delivered in connection with the Plan or (2) the liability of any Exculpated Party that would otherwise result from any act or omission of such Exculpated Party to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct (including fraud).

19.    *Releases*

a.    *Debtor Release*

Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, to the fullest extent permitted by law, the Debtors and the Reorganized Debtors, on behalf of themselves and their affiliates, the Estates and their respective successors, assigns and any and all Entities who may purport to claim by, through, for or because of them, shall forever release, waive and discharge all Liabilities that they have, had or may have against a Debtor, the Estates, any Released Party with respect to the Chapter 11 Cases, the negotiation, consideration, formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Exhibits, the Disclosure Statement, any amendments thereto, the Initial DIP Credit Agreement, the Initial DIP Order, the Modified DIP Credit Agreement, the Modified DIP Order, any of the New Securities and Documents, the Restructuring Transactions or any other transactions proposed in connection with the Chapter 11 Cases or any contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken in connection therewith or in connection with any other obligations arising under the Plan or the obligations assumed hereunder; *provided, however*, that the foregoing provisions of Section X.E of the Plan shall not affect (a) the liability of any Released Party that otherwise would result from any act or omission to the

extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct (including fraud), (b) any rights to enforce the Plan or the other contracts, instruments, releases, agreements or documents previously assumed or to be entered into or delivered in connection with the Plan, (c) except as otherwise expressly set forth in the Plan, any objections by the Debtors or the Reorganized Debtors to Claims or Interests filed by any Entity against any Debtor and/or the Estates, including rights of setoff, refund or other adjustments, (d) the rights of the Debtors to assert any applicable defenses in litigation or other proceedings with their employees (including the rights to seek sanctions, fees and other costs) and (e) any claim of the Debtors or Reorganized Debtors, including (but not limited to) cross-claims or counterclaims or other causes of action against employees or other parties, arising out of or relating to actions for personal injury, wrongful death, property damage, products liability or similar legal theories of recovery to which the Debtors or Reorganized Debtors are a party.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Debtor Release.  Nothing herein shall abrogate applicable attorney disciplinary rules.

b.      *Third Party Releases*

Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each Consenting Creditor shall be deemed to have forever released and covenanted with the Released Parties to forever release, waive and discharge all Liabilities in any way that such Entity has, had or may have against any Released Party (which release shall be in addition to the discharge of Claims and termination of Interests provided herein and under the Confirmation Order and the Bankruptcy Code), in each case, relating to a Debtor, the Estates, the Chapter 11 Cases, the negotiation, consideration, formulation, preparation, dissemination, implementation, Confirmation or consummation the Plan, the Exhibits, the Disclosure Statement, any amendments thereto, the Initial DIP Credit Agreement, the Initial DIP Order, the Modified DIP Credit Agreement, the Modified DIP Order, any of the New Securities and Documents, the Restructuring Transactions or any other transactions in connection with the Chapter 11 Cases or any contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken in connection therewith or in connection with any other obligations arising under the Plan or the obligations assumed hereunder; *provided*, *however*, that this provision shall have no effect on:  (a) the liability of any Entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document previously assumed or to be entered into or delivered in connection with the Plan; (b) the liability of any Released Party that would otherwise result from any act or omission of such Released Party to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct (including fraud); or (c) any non-Consenting Creditor.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Third Party Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third Party Release.  Nothing herein shall abrogate applicable attorney disciplinary rules.

20.    *Votes Solicited in Good Faith*

The Plan Proponents have, and upon confirmation of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Plan Proponents (and each of their respective affiliates, agents, directors, officers, members, employees, advisors, and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of the securities offered and sold under the Plan and therefore have not, and on account of such offer and issuance will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer or issuance of the securities offered and distributed under the Plan.

21.    *Termination of Certain Subordination Rights*

The classification and manner of satisfying Claims under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, Bankruptcy Code §§ 510(a) and 510(c) or otherwise, that a Holder of a Claim or Interest may have against other Claim or Interest Holders with respect to any distribution made pursuant to the Plan, including, without limitation, any such rights that are resolved in connection with the settlement of the Avoidance Claims. All subordination rights that a Holder of a Claim, other than a Holder of a Claim Reinstated hereunder, may have with respect to any distribution to be made pursuant to the Plan will be discharged and terminated, and all actions related to the enforcement of such subordination rights will be permanently enjoined. Accordingly, distributions pursuant to the Plan will not be subject to payment to a beneficiary of such terminated subordination rights or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

B.    **Provisions Governing Distributions**

1.    *Distributions for Allowed Claims as of the Effective Date*

Except as otherwise provided in Section V of the Plan, distributions to be made on the Effective Date to Holders of Allowed Claims as provided by Sections II or V of the Plan shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable by the Debtors or the Reorganized Debtors, as applicable.

2.    *Undeliverable Distributions*

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Reorganized Debtors, the Litigation Trust or the Guild counsel (as applicable) has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, that such Distribution shall be deemed unclaimed property under Bankruptcy Code § 347(b) at the expiration of the latter of six (6) months from (i) the Effective Date or (ii) Allowance of such claim. After such date, all unclaimed property shall become available cash for distribution to all other Holders of Litigation Trust Interests (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such unclaimed property shall be released and forever barred from assertion against such Debtor and its Estate.

3.    *Compliance with Tax Requirements*

In connection with the Plan and all instruments issued in connection herewith and distributed hereunder, to the extent applicable, the Debtors, the Reorganized Debtors, the Litigation Trust or any other party issuing any instruments or making any distributions under the Plan shall comply with all applicable Tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant to the Plan and all related agreements shall be subject to such withholding and reporting requirements. Each of the Debtors, the Reorganized Debtors, and the Litigation Trust, as applicable, shall be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including applying a portion of any Cash distribution to be made under the Plan to pay applicable Tax withholding. In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such

distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax. Any amounts withheld pursuant to the immediately preceding sentence shall be deemed to have been distributed and received by the applicable recipient for all purposes of the Plan.  For the avoidance of doubt, the employer shall pay the "employer share" of any applicable employment taxes.  Notwithstanding any other provision of the Plan, each Holder of an Allowed Claim receiving a distribution pursuant to the Plan shall have the sole and exclusive responsibility for the satisfying and paying of any Tax obligations imposed on it by any governmental unit on account of such distribution, including income, withholding and other Tax obligations.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such Holder has made arrangements satisfactory to the issuing or disbursing party for the payment of any tax obligations.

Any party entitled to receive any property as an issuance or distribution under the Plan shall be required, if so requested, to deliver to the Debtors, the Reorganized Debtors, the Litigation Trust or any other party issuing any instruments or making any distributions under the Plan (or such other Entity designated by any of the foregoing), as applicable, an IRS Form W-9 or (if the payee is a foreign Entity) an IRS Form W-8BEN, IRS Form W-8BEN-E, or such other IRS Form W-8, as applicable, unless such Entity is exempt under the Internal Revenue Code and so notifies the making the distribution.  If a properly completed IRS Form W-9 or IRS Form W-8, as appropriate, is not delivered to the distributing party (or such other Entity), and the Holder fails to comply with the requirement to deliver the IRS Form W-9 or IRS Form W-8 within the 180 days prescribed in Section IX.B.2 above, such distribution shall be deemed undeliverable.

4.    *Distribution Record Date*

The Debtor or Reorganized Debtors will have no obligation to recognize the transfer, or the sale, of any participation in, any Claim that occurs after the close of business on the Distribution Record Date and will be entitled for all purposes herein to recognize and make distributions only to those holders of Allowed Claims that are holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date will be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

5.    *Setoffs*

Except with respect to claims of a Debtor or Reorganized Debtor released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Reorganized Debtors or the Litigation Trust, as applicable, may, pursuant to Bankruptcy Code § 553 or applicable non-bankruptcy law, set off against any Claim and the payments or distributions to be made on account of the Claims, rights and causes of action of any nature that the applicable Reorganized Debtor or Litigation Trust may hold against the Holder of the Claim; *provided*, *however*, that the failure to effect a setoff shall not constitute a waiver or release by the applicable Reorganized Debtor or Litigation Trust of any Claims, rights and Causes of Action that the Reorganized Debtor or Litigation Trust may possess against the Holder of a Claim.

6.    *Allocation Between Principal and Accrued Interest*

Except as otherwise provided in the Plan, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof as determined for U.S. federal income tax purposes) and, thereafter, to interest and the remaining portion, if any, of such Allowed Claims.

7.    *Distributions to Holders of Disputed Claims*

Notwithstanding any other provision of the Plan, (1) no payments or distributions will be made on account of a Disputed Claim until such Claim becomes an Allowed Claim, if ever and (2) except as otherwise agreed to by

the relevant parties, no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Holder of such Claim shall receive the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.  Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### C.    Disputed, Contingent and Unliquidated Claims

1.    *Allowance of Claims*

After the Effective Date, the Reorganized Debtors and/or the Litigation Trust, as applicable, shall have and retain any and all rights and defenses the Debtors had with respect to any Claim immediately prior to the Effective Date, except with respect to any Claim deemed Allowed under the Plan.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) in the Chapter 11 Cases allowing such Claim.  All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

Any Claim that has been listed in the Schedules as disputed, contingent or unliquidated, and for which no Proof of Claim has been timely filed, is not considered Allowed and shall be expunged without further action and without any further notice to or action, order or approval of the Bankruptcy Court.

2.    *Prosecution of Objections to Claims*

Except as otherwise specifically provided in the Plan, the Debtors, prior to the Effective Date, and the Reorganized Debtors or the Litigation Trust, as applicable, after the Effective Date, shall have the sole authority: (1) to File, withdraw or litigate to judgment, objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (3) to administer and adjust the claims register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Bankruptcy Court.

3.    *Estimation of Claims*

The Debtors, prior to the Effective Date, and the Reorganized Debtors or the Litigation Trust, as applicable after the Effective Date, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to Bankruptcy Code § 502(c) for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

4.    *Expungement or Adjustment to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors or the Reorganized Debtors, as applicable, without a

claim objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

### 5.    *Deadline to File Objections to Claims*

The Reorganized Debtors or Liquidating Trust, as applicable may object to any Claims not previously Allowed by an order of the Bankruptcy Court or pursuant to the Plan prior to the Claims Objection Bar Date.

### 6.    *Disallowance of Certain Claims*

**EXCEPT AS PROVIDED IN SECTION VI.A OF THE PLAN, IN AN ORDER OF THE BANKRUPTCY COURT OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS.**

### 7.    *Offer of Judgment*

The Reorganized Debtors are authorized to serve upon a Holder of a Disputed Claim an offer to allow judgment to be taken on account of such Disputed Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment.  To the extent the Holder of a Disputed Claim must pay the costs incurred by the Reorganized Debtors after the making of such offer, the Reorganized Debtors are entitled to set off such amounts against the amount of any distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

### 8.    *Amendments to Claims*

On or after the Effective Date, except as provided herein, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such prior authorization is not received, any such new or amended Claim filed shall be deemed disallowed in full and expunged without any further action.

### D.    **Conditions Precedent to Consummation of the Plan**

### 1.    *Conditions to the Effective Date*

The Effective Date shall not occur, and the Plan shall not be consummated unless and until the following conditions have been satisfied or duly waived pursuant to Section VII.A of the Plan:

- All documents and agreements necessary to consummate the Plan shall have been effected or executed.

- The Bankruptcy Court shall have entered the Confirmation Order, and the Confirmation Order shall be (i) a Final Order and (ii) in form and substance reasonably acceptable to the Plan Proponents.

- Receipt of required governmental approvals (if any) and any and all other steps necessary to consummate the Debtors' proposed restructuring in any applicable jurisdictions have been received and/or effectuated.

- All other documents and agreements necessary to implement the Plan on the Effective Date that are required to be in form and substance reasonably acceptable to the Plan Proponents shall have been executed and delivered and all other actions required to be taken in connection with the Effective Date shall have occurred.

- All statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full.

2.    *Waiver of Conditions to the Effective Date*

The conditions to the Effective Date may be waived in whole or part at any time by the Plan Proponents, without an order of the Bankruptcy Court.

3.    *Effects of Nonoccurrence of Conditions to the Effective Date*

If the Effective Date does not occur, then (i) the Plan will be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, will be deemed null and void; and (iii) nothing contained in the Plan or the Disclosure Statement will (a) constitute a waiver or release of any Claims or Interests, (b) prejudice in any manner the rights of the Debtors or any other Person or Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Person or Entity.

**E.    Miscellaneous Provisions**

1.    *Retention of Jurisdiction by the Bankruptcy Court*

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain such jurisdiction over the Chapter 11 Cases after the Effective Date as is legally permissible, including jurisdiction to:

- Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the amount, allowance, priority or classification of Claims or Interests;

- Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

- Resolve any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

- Ensure that distributions to Holders of Claims are accomplished pursuant to the provisions of the Plan;

- Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications Filed in the Bankruptcy Court involving any Debtor or any Reorganized Debtor that may be pending on the Effective Date or brought thereafter;

- Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

- Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents, *provided*, *however* that such retention of jurisdiction shall not extend to the New P&A/Ultimates Facility or other indebtedness documents on and after the Effective Date;

- Modify the Plan before or after the Effective Date pursuant to Bankruptcy Code § 1127; modify the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

- Hear and determine any matter, case, controversy, suit, dispute, Causes of Action or RKA Causes of Action regarding the existence, nature and scope of the releases, injunctions, and exculpation provided under the Plan, and issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to implement, enforce or restrain interference by any Entity with respect to the consummation, implementation or enforcement of the Plan or the Confirmation Order, including the releases, injunctions, and exculpation provided under the Plan;

- Hear and determine any matter pertaining to the Litigation Trust;

- Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or distributions pursuant to the Plan are enjoined or stayed;

- Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

- Enforce, clarify or modify any orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

- Enter a final decree closing the Chapter 11 Cases;

- Determine matters concerning state, local and federal Taxes in accordance with Bankruptcy Code §§ 346, 505 and 1146, including any Disputed Claims for Taxes;

- Recover all assets of the Debtors and their Estates, wherever located; and

- Hear any other matter over which with the Bankruptcy Court has jurisdiction.

2. *Failure of Bankruptcy Court to Exercise Jurisdiction*

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set forth in Section XI of the Plan, the provisions of Section XI of the Plan will have no effect upon and will not control, prohibit or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

3. *Amendment or Modification of the Plan*

Subject to the restrictions on modifications set forth in Bankruptcy Code § 1127, the Plan Proponents reserve the right to alter, amend or modify the Plan before its substantial consummation; *provided* any such alterations, amendments or modifications are in form and substance reasonably acceptable to each of the Plan Proponents.  Prior to the Effective Date, the Plan Proponents may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court.  Holders of Claims that have accepted the Plan shall be deemed to have accepted the Plan, as amended, modified, or supplemented, if the proposed amendment, modification, or supplement does not materially and adversely change the treatment of the Claim of such Holder; *provided*, *however*, that any Holders of Claims who were deemed to accept the Plan because

such Claims were Unimpaired shall continue to be deemed to accept the Plan only if, after giving effect to such amendment, modification, or supplement, such Claims continue to be Unimpaired.

### 4.    *Revocation of the Plan*

The Plan Proponents reserve the right to revoke or withdraw the Plan as to any or all of the Debtors prior to the Confirmation Date or at the Confirmation Hearing.  If the Plan Proponents revoke or withdraw the Plan as to any or all of the Debtors, or if Confirmation as to any or all of the Debtors does not occur, then the Plan shall be null and void in all respects with respect to such Debtors for whom the Plan has been revoked or withdrawn, and nothing contained in the Plan shall:  (1) prejudice in any manner the rights of any such Debtor(s) or any other party in interest with respect to such Debtor(s); or (2) constitute an admission of any sort by any such Debtor(s) or any other party in interest with respect to such Debtor(s).  The revocation or withdrawal of the Plan with respect to one or more Debtors shall not require the re-solicitation of the Plan with respect to the remaining Debtors.

### 5.    *Severability*

If prior to the entry of the Confirmation Order, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court may, at the request of the Plan Proponents, alter and interpret such term or provision to the extent necessary to render it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as so altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remaining terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 6.    *Successors and Assigns*

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

## X.    FINANCIAL PROJECTIONS

As further discussed below, the Plan Proponents believe the Plan meets the feasibility requirement set forth in Bankruptcy Code § 1129(a)(11), as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Debtors.

In connection with developing the Plan, and for purposes of determining whether the Plan satisfies feasibility standards, the Debtors' management has, through the development of financial projections for the years 2016 through 2018 as attached hereto as Exhibit B (the "**Financial Projections**"), analyzed the Reorganized Debtors' ability to meet their obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct their business.  The Plan Proponents believe that the Reorganized Debtors will have sufficient liquidity to fund obligations as they arise, thereby maintaining value.  Accordingly, the Plan Proponents believe the Plan satisfies the feasibility requirement of Bankruptcy Code § 1129(a)(11).  The Plan Proponents prepared the Financial Projections in good faith, based upon estimates and assumptions made by the Debtors' management.

The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated by the assumed Effective Date.  Any significant delay in the assumed Effective Date of the Plan may have a significant negative impact on the operations and financial performance of the Debtors.  Additionally, the estimates and assumptions in the Financial Projections, while considered reasonable by management, may not be realized, and are inherently subject to uncertainties and contingencies.  They also are based on factors such as industry performance, general business, economic, competitive, regulatory, market, and financial conditions, all of which are difficult to predict and generally beyond the Debtors' control.  Because future events and circumstances may well differ from those assumed and unanticipated events or circumstances may occur, the Debtors expect that the actual and projected results will differ

and the actual results may be materially different from those reflected in the Financial Projections. No representations can be made as to the accuracy of the Financial Projections or the Reorganized Debtors' ability to achieve the projected results. Therefore, the Financial Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur. The inclusion of the Financial Projections should not be regarded as an indication that the Debtors considered or consider the Financial Projections to reliably predict future performance. The Financial Projections are subjective in many respects, and thus are susceptible to interpretations and periodic revisions based on actual experience and recent developments. The Plan Proponents do not intend to update or otherwise revise the Financial Projections to reflect the occurrence of future events, even in the event that assumptions underlying the Financial Projections are not borne out. The Financial Projections should be read in conjunction with the assumptions and qualifications set forth herein.

## XI.    RISK FACTORS TO BE CONSIDERED

Parties in interest should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan. This information, however, does not describe the only risks involved in connection with the Plan and its implementation.

### A.    Certain Bankruptcy Considerations

1.    *If the Plan is not confirmed or consummated, or the reorganization is delayed, distributions to Holders of Allowed Claims would be materially reduced.*

If the Plan is not confirmed or consummated, there can be no assurance that the Chapter 11 Cases will continue rather than be converted to chapter 7 liquidation cases, or that any alternative plan of reorganization would be on terms as favorable to Holders of Claims as the terms of the Plan. The Plan Proponents anticipate that certain parties in interest may file objections to the Plan in an effort to persuade the Bankruptcy Court that the Plan Proponents have not satisfied the confirmation requirements under Bankruptcy Code §§ 1129(a) and (b). Even if (a) no objections are filed, (b) all impaired Classes of Claims accept or are deemed to have accepted the Plan or (c) with respect to any Class that rejects or is deemed to reject the Plan, the requirements for "cramdown" are met, the Bankruptcy Court, which can exercise substantial discretion, may determine that the Plan does not meet the requirements for confirmation under Bankruptcy Code §§ 1129(a) and (b). Bankruptcy Code § 1129(a) requires, among other things, (a) a demonstration that the Confirmation of the Plan will not be followed by liquidation or need for further financial reorganization of the Debtors, except as contemplated by the Plan, and (b) that the value of distributions to parties entitled to vote on the Plan who vote to reject the Plan not be less than the value of distributions such creditors would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Plan Proponents believe that the Plan will meet the requirements for confirmation, there can be no assurance that the Bankruptcy Court will reach the same conclusion. If the Bankruptcy Court determines that the Plan violates Bankruptcy Code § 1129 in any manner, including, among other things, the cramdown requirements under Bankruptcy Code § 1129(b), the Plan Proponents have reserved the right to amend the Plan in such a manner so as to satisfy the requirements of Bankruptcy Code § 1129. If a liquidation or protracted reorganization were to occur, the distributions to Holders of Allowed Claims would be drastically reduced. In particular, the Plan Proponents believe that, as set forth in the Liquidation Analysis, in a liquidation under chapter 7, Holders of Allowed Claims would receive substantially less because of the inability in a liquidation to realize the greater going-concern value of the Debtors' assets. Furthermore, administrative expenses of a chapter 7 trustee and the trustee's attorneys, accountants and other professionals would cause a substantial erosion of the value of the Debtors' estates. Substantial additional Claims may also arise by reason of the liquidation and from the rejection of previously assumed unexpired leases and other executory contracts further reducing distributions to Holders of Allowed Claims.

2.    *The Plan may not be consummated if the conditions to Effectiveness of the Plan are not satisfied.*

Section VII.A of the Plan provides for certain conditions that must be satisfied (or waived) prior to the Effective Date. Many of the conditions are outside of the control of the Debtors. There can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by

the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed. If the Plan is not consummated, there can be no assurance that the Chapter 11 Cases would not be converted to chapter 7 liquidation cases or that any new chapter 11 plan would be as favorable to Holders of Claims as the current Plan. Either outcome may materially reduce distributions to Holders of Claims. See Section IX.D.1 of this Disclosure Statement for a description of the conditions to the effectiveness of the Plan.

3.    *If the Effective Date is delayed or projected proceeds are not timely received, the Debtors may need to seek postpetition financing.*

The Debtors may not have sufficient Cash available in order to operate their business if the Effective Date is delayed or projected proceeds are not timely received by the Debtors. In that case, the Debtors may need new postpetition financing, which may increase the costs of consummating the Plan. There is no assurance of the terms on which such financing may be available or if such financing will be available. Any increased costs as a result of the incurrence of additional indebtedness may reduce amounts available to distribute to Holders of Allowed Claims.

4.    *If current estimates of Allowed Claims prove inaccurate, Reorganized Relativity's financial condition could be materially and adversely affected.*

The estimates of Allowed Claims in this Disclosure Statement are based on the Debtors' books and records. Upon the passage of all applicable Bar Dates, the completion of further analyses of the Proofs of Claim, the completion of Claims litigation and related matters, the total amount of Claims that ultimately become Allowed Claims in the Chapter 11 Cases may differ from the Debtors' estimates, and such difference could be material. For example, the amount of any Disputed Claim that ultimately is allowed may be significantly more or less than the estimated amount of such Claim. Particular risks exist with respect to those Claims such as Priority Non-Tax Claims, Priority Tax Claims and Secured Claims. If estimates of such Claims are inaccurate, it may materially and adversely affect Reorganized Relativity's financial condition.

5.    *The Debtors may not be able to fully satisfy their obligations under the Ultimates Credit Agreement, which could impair their ability to obtain exit financing.*

The Plan provides for payment of the Ultimates Secured Claims in full in cash on the Effective Date or as soon thereafter as practicable. The Debtors have advised, however, that they and the Committee plan to defer resolution of any alleged claims against the Ultimates Agent and Ultimates Lenders until after the Effective Date. The Ultimates Agent has informed the Debtors that because the Ultimates Agent and Ultimates Lenders have additional rights under the Ultimates Credit Documents, including secured indemnification rights, the Ultimates Agent will not be in a position to release the liens (the "**Ultimates Liens**") securing the Debtors' obligations under the Ultimates Credit Documents so long as there is any risk that claims will be brought against either the Ultimates Agent or the Ultimates Lenders, creating doubt as to the Debtors' ability to obtain financing secured by liens on the Ultimates Agent's and Ultimates Lenders collateral. The Debtors and the Ultimates Agent and Ultimates Lenders each reserve their rights to seek to have the Court determine whether or not the payment and treatment provided for in the Plan pays the Ultimates Lenders in full and whether or not their liens are fully satisfied and shall be defeased.

6.    *Existing intercreditor agreements may preclude Debtors' from granting the releases set forth in the plan.*

The Plan contains broad release provisions in favor of the Released Parties. Existing intercreditor agreements and the Bankruptcy Code, however, may preclude the Debtors' ability to obtain the third-party releases and related provisions set forth in the Plan.

**B.    Financial Condition and Indebtedness**

1.    *Reorganized Relativity faces substantial capital requirements.*

Relativity has utilized significant amounts of Cash to invest in motion pictures and marketing and relies heavily on obtaining government incentives, as well as its ability to borrow capital against its distribution agreements, to meet its working capital requirements. There can be no assurance that such future sources of funding

will be available to Reorganized Relativity on terms that are economically feasible or at all.  The unavailability of such sources could potentially prevent Reorganized Relativity from meeting the objectives set forth in its business plan or from meeting its working capital needs.

> 2. *Restrictions imposed by agreements governing indebtedness incurred by Reorganized Relativity or market conditions may limit Reorganized Relativity's ability to obtain additional liquidity.*

If Reorganized Relativity requires working capital greater than that provided by operating cash flow as a result of these sources of liquidity not meeting current projected needs or if additional Cash is needed to fund additional business opportunities, Reorganized Relativity may be required either to obtain other sources of financing or curtail its operations.  The availability of such financing may be limited by market conditions prevailing at the time Reorganized Relativity seeks to obtain such financing and by the terms of the agreements governing any New P&A/Ultimates Facility and indebtedness incurred by Reorganized Relativity.  No assurance can be given, however, that any additional financing will be available on terms that are favorable or acceptable to Reorganized Relativity.  Any inability to raise needed capital could have a material impact on Reorganized Relativity's business, financial condition, cash flows and results of operations.

> 3. *Projections of future performance by Reorganized Relativity are based on assumptions which may not prove accurate and many of which are outside the control of Reorganized Relativity.*

The Projections attached to this Disclosure Statement as Exhibit B were prepared by Relativity's management and are based on implementing management's business plan, but they are inherently uncertain and are dependent upon the reliability of certain assumptions regarding the performance of Reorganized Relativity in the markets in which it operates.  The Projections reflect numerous assumptions, including Confirmation and consummation of the Plan in accordance with its terms, the terms of the amendments of the operative agreements, the anticipated future performance of Reorganized Relativity, industry performance, general business and economic conditions and other matters, and are subject to many risks, most of which are beyond the control of Reorganized Relativity.  Unanticipated events and circumstances occurring after the preparation of the Projections may affect the actual financial results of Reorganized Relativity.  Therefore, the actual results achieved throughout the periods covered by the Projections may vary from the projected results.  These variations may be material and may adversely affect the ability of Reorganized Relativity to satisfy its obligations following the Effective Date.  In addition, this Disclosure Statement does not reflect any events that may occur after the date of this Disclosure Statement.  Any failure to successfully implement Reorganized Relativity's business strategy or the Projections within the time frames currently expected, or at all, may have a material adverse impact on the information contained in this Disclosure Statement, and on Reorganized Relativity's business, financial condition, cash flows and results of operations.

> 4. *Changes to Reorganized Relativity's business plan may cause material adverse changes to Reorganized Relativity's business.*

Reorganized Relativity may make changes to its business, operations and current business plan, which may have a material adverse impact on Reorganized Relativity's future business, financial condition, cash flows and results of operations.

> 5. *Reorganized Relativity cannot assure future profitability.*

Relativity has had historical net losses with an accumulated deficit that was $618.8 million as of December 31, 2014.  Although Reorganized Relativity expects to be profitable in future periods, there can be no assurance that Reorganized Relativity will operate profitably as Relativity's primary business – motion picture production and distribution – is highly unpredictable, subject to significant competition and requires significant capital to compete effectively.

C.      **General Economic Risk Factors and Business Risk Factors**

1.      *Unpredictability Of Entertainment Industry.*

Motion picture production and distribution is highly speculative and inherently risky.  There can be no assurance of the economic success of such motion pictures since the revenues derived from the production and distribution (which do not necessarily bear a direct correlation to the production or distribution costs incurred) depend primarily upon their acceptance by the public, which cannot be predicted.

The production, completion and distribution of motion pictures are subject to a number of uncertainties, including delays and increased expenditures due to creative differences among key cast, other creative personnel, strikes, disruptions caused by weather, cast or crew illness, or accidents or other events beyond the producer's control.  As such, the costs of a Relativity-produced film may increase significantly from the original budget, and the date of completion may be substantially delayed due to the exigencies of production.  Increased costs may make it less likely that such film will recoup its production costs, and delays in production may result in such film not being ready for release at the intended time and postponement to a potentially less favorable time, all of which could cause a decline in gross receipts for such a film.

The commercial success of a motion picture also depends upon the quality and acceptance of other competing films released into the marketplace at or near the same time, the availability of alternative forms of entertainment and leisure time activities, general economic conditions and other tangible and intangible factors, all of which can change and cannot be predicted with certainty.  Further, the theatrical success of a motion picture is generally a key factor in generating revenues from other distribution channels.

There is a substantial risk that some or all of Relativity's future motion pictures will not be commercially successful, resulting in costs not being recouped or anticipated profit not being realized.

2.      *Rapid Technological Changes And Alternative Forms Of Delivery Or Storage Of Filmed Entertainment.*

The entertainment industry in general and the motion picture industry in particular continue to undergo significant technological developments.  Advances in technologies or alternative methods of product delivery or storage or certain changes in consumer behavior driven by these or other technologies and methods of delivery and storage could have a negative effect on Relativity's business.  Examples of such advances in technologies include VOD, new video formats and downloading and streaming from the internet.  An increase in VOD could decrease home video rentals.  Similarly, further increases in the use of portable digital devices that allow users to view content of their own choosing while avoiding traditional commercial advertisements could adversely affect Relativity's revenues.  Other larger entertainment distribution companies will have larger budgets to exploit these growing trends.  Relativity cannot predict how it will financially participate in the exploitation of our motion pictures through these emerging technologies or whether it has the right to do so for certain of its library titles. If Relativity cannot successfully exploit these and other emerging technologies, it could have a material adverse effect on its business, results of operations and financial condition.

3.      *Piracy Of Motion Pictures, Including Digital And Internet Piracy, May Reduce The Gross Receipts From The Exploitation Of Our Films.*

Motion picture piracy is extensive in many parts of the world, including South America, Asia, and former Eastern bloc countries, and is made easier by technological advances and the conversion of motion pictures into digital formats.  This trend facilitates the creation, transmission and sharing of high quality unauthorized copies of motion pictures in theatrical release on DVDs, Blu-ray discs, from pay-per-view through set top boxes and other devices and through unlicensed broadcasts on free television and the internet.  The proliferation of unauthorized copies of these products has had and will likely continue to have an adverse effect on Relativity's business, because these products reduce the revenue Relativity receives from its products.

4.    *Reorganized Relativity could be adversely affected by strikes, union actions or other work stoppages.*

The motion pictures by Relativity, and the other major studios in the United States, generally employ actors, writers and directors who are members of the Screen Actors Guild, Writers Guild of America and Directors Guild of America, respectively, pursuant to industry-wide collective bargaining agreements. Many productions also employ members of a number of other labor organizations including, without limitation, the International Alliance of Theatrical and Stage Employees and the International Brotherhood of Teamsters. A strike, union action or other work stoppage by one or more of the unions that provide personnel essential to the production of motion pictures could delay or halt our ongoing production activities. Such a halt or delay, depending on the length of time involved, could cause delay or interruption in Reorganized Relativity's release of new motion pictures and thereby could adversely affect Reorganized Relativity's cash flow and revenues.

5.    *Increased costs of prints, advertising and promotion.*

The costs of marketing and distributing feature films have generally increased in recent years. These costs may continue to increase in the future. If gross receipts from motion pictures do not increase at the same rate as any increase in costs, there will be a negative impact on Reorganized Relativity's financial performance. Historically, marketing and distribution costs have risen at a higher rate than the combined effect of increases in the number of domestic admissions to movie theaters and in domestic admission ticket prices. A continuation of this trend would leave Reorganized Relativity more dependent on other media, such as home video, international markets and new media for revenue, and the revenues from such sources may not be sufficient to offset an increase in the cost of marketing and distributing motion pictures. Any of these occurrences could have a material adverse effect on Relativity's revenues and therefore on Reorganized Relativity's business, financial condition and results of operations.

6.    *The motion picture industry is highly competitive and at times may create an oversupply of motion pictures in the market.*

Relativity faces competition from companies within the entertainment business, as well as alternative forms of leisure entertainment. Relativity competes with the other major studios, numerous independent motion picture companies, television networks and pay television systems for the acquisition of literary properties, the services of performing artists, directors, producers and other creative and technical personnel and production financing. Numerous organizations with which Relativity competes in the motion picture industry have significantly greater financial and other resources than Relativity, while the independent production companies may have less overhead than Relativity.

The number of motion pictures released by competitors, particularly the major studios, may also create an oversupply of product in the market, reduce share of box office receipts and make it more difficult for motion pictures to succeed commercially. Oversupply may become most pronounced during peak release times.

In addition, with only three major domestic pay television services, there is intense competition among film production companies for the distribution of film projects through these limited channels. There is also significant concentration of the control of retail distribution of DVD units in the United States through a handful of retailers. Similarly, there is significant concentration in the ownership and control of television and other media in a number of overseas markets. As a result, there is a risk that Reorganized Relativity may not be able to distribute its motion pictures in the United States and foreign markets on terms favorably to Relativity, or at all, which could have an adverse effect on Reorganized Relativity's business, financial condition and results of operations.

7.    *Reorganized Relativity faces litigation risk.*

Relativity is, from time to time, subject to various asserted or unasserted legal proceedings and claims. Any such claims, regardless of merit, could be time-consuming and expensive to defend and could divert management's attention and resources. While management believes Relativity has adequate insurance coverage and accrues loss contingencies for all known matters that are probable and can be reasonably estimated, Relativity

cannot ensure that the outcome of all current or future litigation will not have a material adverse effect on Relativity and its results of operations.

8.    *Reorganized Relativity faces risks from doing business internationally.*

Reorganized Relativity pre-sells foreign motion picture distribution rights through multiple output arrangements in 140 countries.  It also receives a variety of other income from international territories as part of its business operations.  Revenues and results of operations in these territories are subject to risk inherent in international businesses, many of which are beyond Reorganized Relativity's control, including:  laws and policies affecting trade, investment and taxes, laws and policies relating to the repatriation of funds and withholding taxes and changes in these laws, differing cultural tastes and attitudes including varied censorship laws, differing degrees of protection for intellectual property and piracy, potential difficult enforcing contracts in some jurisdictions, financial instability and increased market concentration of buyers in foreign markets, the instability of foreign economies and governments, war and acts of terrorism, and fluctuating foreign exchange rates.

9.    *In the Sport Representation and Management Business, Relativity is heavily reliant on its key agents.*

Athlete representation is a personal services and relationship business that relies on its agents to remain within the structure to maximize revenues by maintaining and attracting clients.  The compensation structure of key agents is aligned with the success of the sports representation and management business.  All current agents have been signed to long-term service agreements with restrictive covenants.  Relativity's principal agents received equity as a significant portion of the consideration for Relativity's acquisition of their businesses, to better align their interests with those of other owners of Relativity and to incentivize long-term service to Relativity.  If, despite these measures, key agents leave, their departure could adversely affect future revenues and business prospects, and accordingly could have an adverse effect on Reorganized Relativity's business, financial condition, and results of operations.

10.    *Relativity does not and currently cannot own any equity interest in Sky Land (Beijing) Film-Television Culture Development Ltd., a PRC entity due to government regulation on foreign companies owning equity in China companies engaged in the entertainment and media industry.*

Relativity's PRC operations are conducted through Sky Land (Beijing) Film-Television Culture Development Ltd. ("**Sky Land Beijing**").  Foreign companies, such as Sky Land Entertainment Ltd. (BVI) ("**Relativity Sky Land**"), are not permitted to own equity interest in PRC entities that conduct business in the PRC entertainment and media industry.  Relativity relies on Sky Land Beijing to comply with its obligations under contractual business arrangements that have been agreed upon by Relativity and its partners to operate Relativity's motion picture production and distribution business in China, which arrangements may not have been evidenced by written contracts.  Such arrangements, whether or not evidenced in writing, may not be as effective in providing the Company with control over Sky Land Beijing as direct ownership.  If Sky Land Beijing fails to perform under these arrangement including, without limitation, failing to distribute Relativity's motion pictures or to remit to Relativity 100% of its profits, Relativity may have to incur substantial costs to enforce these arrangements, which may be unsuccessful.  Any claims Reorganized Relativity brings would require it to rely on legal remedies under PRC laws, regulations and policies, which may not be favorable to Reorganized Relativity.  In the event that Sky Land Beijing no longer cooperates with the Company and the Company is unable to enforce these arrangements, there would be a material adverse effect on Reorganized Relativity's ability to continue to conduct business in the PRC, which could negatively affect Reorganized Relativity's business, financial condition and results of operations.

11.    *Relativity will need to attract and retain key employees to rebuild management its management team post-confirmation.*

Reorganized Relativity's ability to compete as a business, and more particularly in the entertainment industry, will depend in part on its ability to attract and retain key personnel.  If Reorganized Relativity is unable to hire and retain qualified management or if any key member of management leaves, such departure could adversely affect Reorganized Relativity's operations.  In addition, if Reorganized Relativity experiences material growth, it

will need to attract and retain additional qualified personnel.  The market for qualified and talented personnel in the entertainment industry is intensely competitive, and Reorganized Relativity cannot be sure that it will be able to attract and retain a sufficient number of qualified personnel in future periods.  If Reorganized Relativity is unable to attract or retain qualified personnel as needed, its growth will be hampered and operating results could be materially adversely affected.

**XII.    FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN**

**A.    General**

A DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS PROVIDED BELOW.  THE DESCRIPTION IS BASED ON THE INTERNAL REVENUE CODE (THE "**IRC**"), TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT AND ALL SUBJECT TO CHANGE, POSSIBLY WITH RETROACTIVE EFFECT.  CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION COULD CAUSE THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN IMPORTANT RESPECTS, UNCERTAIN.  NO RULING HAS BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE (THE "**IRS**"); NO OPINION HAS BEEN REQUESTED FROM DEBTORS' COUNSEL CONCERNING ANY TAX CONSEQUENCES OF THE PLAN; AND NO TAX OPINION IS GIVEN BY THIS DISCLOSURE STATEMENT.

THE DESCRIPTION THAT FOLLOWS DOES NOT COVER ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS IN THE DEBTORS.  FOR EXAMPLE, THE DESCRIPTION DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, TAX-EXEMPT ORGANIZATIONS, PARTNERSHIPS OR PARTNERS IN PARTNERSHIPS; NOR DOES IT ADDRESS TAX CONSEQUENCES TO HOLDERS OF CLAIMS OR INTERESTS IN THE DEBTORS WHO ARE NOT ENTITLED TO VOTE ON THE PLAN.  THE DESCRIPTION ALSO DOES NOT DISCUSS STATE, LOCAL, NON-U.S. OR NON-INCOME TAX CONSEQUENCES, NOR DOES IT DISCUSS TAX CONSEQUENCES TO NON-U.S. HOLDERS OF CLAIMS.

FOR THESE REASONS, THE DESCRIPTION THAT FOLLOWS IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTERESTS IN THE DEBTORS.  HOLDERS OF CLAIMS OR INTERESTS IN THE DEBTORS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

B.       U.S. Federal Income Tax Consequences to the Debtors

Relativity Holdings is a limited liability company that is treated as a partnership for U.S. federal income tax purposes, and the vast majority of Relativity Holdings' subsidiaries that are Debtors are disregarded entities for U.S. federal income tax purposes. Accordingly, Relativity Holdings and such Debtors are not subject to U.S. federal income tax, and Holders of Interests in Relativity Holdings, as partners in Relativity Holdings, generally are liable for U.S. federal income tax on their distributive (i.e., allocable) shares of Relativity Holdings' and such Debtors' income, gain, loss and deductions, including discharge of indebtedness (i.e., cancellation of debt) income.

C.       U.S. Federal Income Tax Consequences to Holders of Allowed Claims

The U.S. federal income tax consequences of the implementation of the Plan to each Holder of an Allowed Claim will depend on, among other things, the consideration to be received by the Holder, whether the Holder reports income on the accrual or cash method, whether the Holder's Claim is Allowed or Disputed on the Effective Date, whether the Holder receives distributions under the Plan in more than one (1) taxable year and whether the Holder has taken a bad debt deduction or a worthless security deduction with respect to its Claim.

1.       *Recognition of Gain or Loss*

In general, a Holder of an Allowed Claim will recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the Holder's tax basis in the Claim. Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Allowed Claim and the Holder, the length of time the Holder held the Claim and whether the Claim was acquired with market discount. If the Holder realizes a capital loss, the Holder's deduction with respect to such loss may be subject to limitation. The Holder's tax basis for any property received under the Plan generally will equal the amount realized. The Holder's amount realized generally will equal such Holder's share of the sum of the Cash and the fair market value of any other property received by the Holder on the Effective Date (including with respect to a Holder of an Allowed General Unsecured Claim, the fair market value of such Holder's Pro Rata share of Litigation Trust Assets (as discussed below in "**Litigation Trust**") or a subsequent distribution date, less the amount, if any, treated as interest (as discussed below in "Accrued but Unpaid Interest").

To the extent a Holder of an Allowed Claim receives Reorganized Relativity Holdings Common Units or Reorganized Relativity Holdings Preferred Units in exchange for such Allowed Claim, the Holder generally will not recognize gain or loss, except to the extent the transfer of Reorganized Relativity Holdings Common Units or Reorganized Relativity Holdings Preferred Units to a Holder is in exchange for an Allowed Claim for unpaid rent, royalties or interest (including accrued original issue discount) that accrued on or after the beginning of the Holder's holding period for the Allowed Claim. The Holder's tax basis in Reorganized Relativity Holdings Common Units or Reorganized Relativity Holdings Preferred Units generally will include the Holder's adjusted tax basis in the Allowed Claim exchanged, and the Holder's holding period of the Allowed Claim exchanged generally will be taken into account in determining the Holder's holding period for the Reorganized Relativity Holdings Common Units or Reorganized Relativity Holdings Preferred Units received. As equityholders of Reorganized Relativity, certain Holders of Allowed Claims generally would be required to take into account their shares of income, gain, loss and deduction of Relativity Holdings (as set forth in the Revised Relativity Holdings Operating Agreement) regardless of whether any actual distributions are made, and any Cash distributions generally would be treated as tax-free return of basis (to the extent thereof) and then capital gain.

To the extent a Holder of an Allowed Claim receives a new obligation of Reorganized Relativity or a subsidiary of Reorganized Relativity (such as the BidCo Note) in exchange for such Allowed Claim, the Holder generally will recognize gain or loss, *provided* that the exchange constitutes a "significant modification" of the Allowed Claim. Assuming neither the Allowed Claim nor the new obligation is "publicly traded" within the meaning of applicable Treasury Regulations, such Holder's gain or loss generally would equal the difference between the principal amount of the new obligation and the Holder's adjusted basis in the Allowed Claim. If either the Allowed Claim or the new obligation is publicly traded within the meaning of applicable Treasury Regulations, then the Holder's amount realized would be the fair market value of such publicly traded debt. Alternatively, if, based on all relevant facts and circumstances, the exchange does not constitute a significant modification, then no gain or loss will be recognized on the exchange of an Allowed Claim for the new obligation. It is unclear whether

receipt of the new obligation would constitute a significant modification because the terms of such obligations are not finalized.

2. *Litigation Trust*

As more fully described in the Plan and herein, the Litigation Trust is intended to be treated for U.S. federal income tax purposes (1) in part as a liquidating trust within the meaning of Treasury Regulation § 301.7701-4(d) and (2) in part as one or more disputed ownership funds pursuant to Treasury Regulation § 1.468B-9(b)(1). Except to the extent discussed below with respect to Disputed Claims and any reserves established therefore, the Litigation Trust will not be treated as a separate entity for U.S. federal income tax purposes. Instead, the Litigation Trust Beneficiaries (or the beneficial owners thereof) will be treated as owning their respective Pro Rata shares of the applicable Litigation Trust Assets, subject to any liabilities of the Debtors assumed by the Litigation Trust and any liabilities of the Litigation Trust itself. For U.S. federal income tax purposes, the transfer of the Litigation Trust Assets to the Litigation Trust will be treated as a transfer of the Litigation Trust Assets from the Debtors to the Litigation Trust Beneficiaries on a Pro Rata basis, followed by a transfer of the Litigation Trust Assets by the Litigation Trust Beneficiaries to the Litigation Trust. The Litigation Trust Beneficiaries will thereafter be treated for U.S. federal income tax purposes as the grantors and deemed owners of their respective shares of the Litigation Trust Assets. The Litigation Trust Beneficiaries will include in their annual taxable incomes, and pay tax to the extent due on, their Pro Rata shares of each item of income, gain, deduction, loss and credit, and all other such items will be allocated by the Litigation Trustee to the Litigation Trust Beneficiaries using any reasonable allocation method. The Litigation Trustee will be required by the Litigation Trust Agreement to file U.S. federal income tax returns for the Litigation Trust as a grantor trust of the Litigation Trust Beneficiaries. In addition, the Litigation Trust Agreement will require consistent valuation by the Litigation Trustee and the Litigation Trust Beneficiaries, for all U.S. federal income tax and reporting purposes, of any property held by the Litigation Trust. Accordingly, references herein to "units in the Litigation Trust" shall be construed to mean the Holder's Pro Rata share of the Litigation Trust Assets.

Any reserves for Disputed Claims or other similar reserves that may be established by the Litigation Trustee will be treated as one or more disputed ownership funds pursuant to Treasury Regulation § 1.468B-9(b)(1). Income and gain recognized with respect to the Litigation Trust Assets in any Disputed Claims reserve will be subject to an entity-level tax. Regarding Litigation Trust Assets contributed to any Disputed Claims reserve, Litigation Trust Beneficiaries are not intended to be treated for U.S. federal income tax purposes as receiving such Litigation Trust Assets until such time as such Disputed Claims reserve makes distributions, in which case (and at which time) the Litigation Trust Beneficiaries are intended to be treated as receiving the distributions actually received from the Disputed Claims reserve.

**D.    Certain Other U.S. Federal Income Tax Considerations for Holders of Allowed Claims**

1. *Medicare Surtax*

Subject to certain limitations and exceptions, Holders who are individuals, estates or trusts may be required to pay a 3.8% Medicare surtax on all or part of their "net investment income," which includes, among other items, dividends on stock and interest (including original issue discount) on, and capital gains from the sale or other taxable disposition of, debt. Holders should consult their own tax advisors regarding the effect, if any, of this surtax on their receipt and ownership of Reorganized Relativity Holdings Common Units, Reorganized Relativity Holdings Preferred Units, the BidCo Note and/or units in the Litigation Trust issued pursuant to the Plan.

2. *Accrued but Unpaid Interest*

In general, a Holder that was not previously required to include in taxable income any accrued but unpaid interest on the Holder's Allowed Claim may be required to include such amount as taxable interest income upon receipt of a distribution under the Plan. The Plan provides that, to the extent applicable, all distributions to a Holder of an Allowed Claim will apply first to the principal amount of such Allowed Claim until such principal amount is paid in full and then to any accrued but unpaid interest on such Allowed Claim. There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of amounts distributed to such Holder and attributable to principal under the Plan is properly allocable to interest. A Holder that was previously

required to include in taxable income any accrued but unpaid interest on the Holder's Allowed Claim may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Plan. Each Holder of a Claim on which interest has accrued is urged to consult its tax advisor regarding the tax treatment of distributions under the Plan and the deductibility of any accrued but unpaid interest for U.S. federal income tax purposes.

<div align="center">3.    <em>Post-Effective Date Distributions</em></div>

Because certain Holders of Allowed Claims may receive distributions subsequent to the Effective Date, the imputed interest provisions of the IRC may apply and cause a portion of any post-Effective Date distribution to be treated as imputed interest. Imputed interest may, with respect to certain Holders, accrue over time using the constant interest method, in which event such Holders may, under some circumstances, be required to include imputed interest in income prior to receipt of a post-Effective Date distribution. Additionally, to the extent Holders may receive distributions with respect to Allowed Claims in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by such Holders may be deferred. Holders of Allowed Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their Allowed Claims.

<div align="center">4.    <em>Bad Debt and/or Worthless Securities Deduction</em></div>

A Holder who, under the Plan, receives in respect of an Allowed Claim an amount less than the Holder's tax basis in the Allowed Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under § 166(a) of the IRC or a worthless securities deduction under § 165 of the IRC. The rules governing the character, timing and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such deductions.

<div align="center">5.    <em>Market Discount</em></div>

A Holder that purchased its Allowed Claim from a prior Holder with market discount will be subject to the market discount rules of the IRC. Under those rules, assuming that the Holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Holder's Allowed Claim (subject to a <em>de minimis</em> rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Allowed Claim as of the date of the exchange.

To the extent that a Holder's Allowed Claim is exchanged in a transaction in which gain or loss is not recognized for U.S. federal income tax purposes, any accrued market discount not treated as ordinary income upon such exchange should carry over, on an allocable basis, to any Reorganized Relativity Holdings Common Units or Reorganized Relativity Holdings Preferred Units received, such that any gain recognized by the Holder upon a subsequent disposition of such Reorganized Relativity Holdings Common Units or Reorganized Relativity Holdings Preferred Units would be treated as ordinary income to the extent of any accrued market discount not previously included in income.

<div align="center">6.    <em>Holding Reorganized Relativity Holdings Warrants</em></div>

A Holder of Allowed Claims that receives Reorganized Relativity Holdings Warrants pursuant to the Plan generally will recognize no income, gain or loss upon a subsequent exercise of such warrants. Such Holder's tax basis in the Reorganized Relativity Holdings Common Units acquired on such Holder's exercise of warrants will equal the sum of the exercise price paid for such units and the Holder's tax basis in the warrants. Such Holder's holding period for the acquired Reorganized Relativity Holdings Common Units will begin on the date the warrants are exercised. <u>See</u> Section XII.C.1 above for a discussion of consequences of receiving Reorganized Relativity Holdings Warrants in exchange for an Allowed Claim.

If a Holder sells the Reorganized Relativity Holdings Warrants or they expire unexercised, such Holder would recognize capital gain or loss upon the date of the sale or expiration of the warrants, reflecting the amount by

which the consideration received, or the fair market value of the warrants, exceeds, or is less than, such Holder's tax basis in the warrants.

Upon receipt, Reorganized Relativity Holdings Warrants may be treated as partnership interests under certain circumstances. While it is not expected that such warrants would be treated as partnership interests, to the extent they are treated as partnership interests, then a Holder would be treated as a partner. See XII.C.1 above for a discussion of consequences of holding units in a partnership.

7.    *Information Reporting and Backup Withholding*

All distributions under the Plan will be subject to applicable U.S. federal income tax reporting and withholding. The IRC imposes "backup withholding" (currently at a rate of 28%) on certain "reportable" payments to certain taxpayers, including payments of interest. Under the IRC's backup withholding rules, a Holder of an Allowed Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan, unless the Holder (a) comes within certain exempt categories of payees (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional U.S. federal income tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of U.S. federal income tax. A Holder of an Allowed Claim may be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

**E.    Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**XIII.    RECOMMENDATION AND CONCLUSION**

The Plan Proponents believe that the confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors urge all parties entitled to vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before the Voting Deadline.

Dated:  December 14, 2015                     Respectfully submitted,

                                              Relativity Fashion, LLC (on its own behalf and on behalf of
                                              each affiliate Debtor)


                                              By:      /s/ *Ryan Kavanaugh*
                                              Name:    Ryan Kavanaugh
                                              Title:   Chief Executive Officer of Relativity Holdings, LLC

**<u>EXHIBIT A</u>**

The Plan

[Filed Concurrently Herewith]

**EXHIBIT B**

Prospective Financial Information

**Model Assumptions Dashboard**

### Holdco Debt Financing Assumptions

*($ in millions)*

| | |
|---|---|
| Minimum cash | $10.0 |
| Interest income on cash | 1.0% |
| LIBOR | 1.0% |

**Debt**

| | |
|---|---|
| Interest | 10.0% |

### New P&A / Ultimates Facility Assumptions

*($ in thousands)*

| | |
|---|---|
| Combined facility size | $250,000 |
| Ultimates draw on facility | 2.0 |
| (months after theatrical release) | |
| Interest rate (drawn; L + 1100) | 12.0% |
| Interest rate (undrawn) | 1.0% |
| Interest reserve (months) | 6.0 |

**Ultimates Borrowing Base (Film Studio)**

| | |
|---|---|
| Pay TV Advance Rate | 90.0% |
| PPV/VOD Advance Rate | 90.0% |
| Home Video Advance Rate | 90.0% |
| Free TV Advance Rate | 90.0% |
| Discount Rate | 10.0% |
| Library Credit | 10.0% |

**Ultimates Borrowing Base (Film Library)**

| | |
|---|---|
| Discount Rate | 10.0% |
| Advance Rate (Library Cash Flows) | 90.0% |
| Library Credit | 10.0% |
| Advance Rate (Against Library Credit) | 40.0% |

**P&A (Film Studio)**

| | |
|---|---|
| % of P&A Credit | 90.0% |
| Interest rate (L + 1100) (PIK) | 12.0% |

### Sources and Uses at Emergence (February 1, 2016)

*($ in thousands)*

**Sources**

| | |
|---|---|
| New P&A / Ultimates Facility | $62,347 |
| Cash Collateral | 17,000 |
| Cash on Balance Sheet | 2,342 |
| New Common Equity | 100,000 |
| **Total Sources** | **$181,689** |

**Uses**

| | |
|---|---|
| Full Repayment of New DIP Facility | $35,000 |
| Ultimates Facility (CIT) | 13,960 |
| Secured Guilds Claims | 3,040 |
| Effective Date Payments | 15,000 |
| Transaction Fees | 20,000 |
| Pay Down BidCo Note | 30,000 |
| Cash to Balance Sheet | 64,689 |
| **Total Uses** | **$181,689** |

*Note: Management forecast.*

**RML**

| PROJECTED INCOME STATEMENT ($ in millions) (Includes Non-Wholly Owned Businesses) | Q1 2016 | Q2 2016 | Q3 2016 | Q4 2016 | Q1 2017 | Q2 2017 | Q3 2017 | Q4 2017 | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | |
| Film Studio | $40.4 | $63.5 | $87.9 | $110.0 | $128.2 | $185.4 | $102.8 | $207.3 | $301.8 | $623.7 | $772.3 |
| Digital / Madvine | -- | 6.4 | 21.7 | 14.0 | 42.2 | 13.2 | 29.9 | 17.7 | 42.1 | 103.0 | 108.9 |
| Scripted Television & Music | 0.3 | 0.5 | 3.1 | 3.1 | 3.2 | 3.2 | 5.5 | 5.5 | 7.1 | 17.3 | 28.1 |
| **Total Revenue** | **$40.7** | **$70.5** | **$112.7** | **$127.1** | **$173.6** | **$201.7** | **$138.2** | **$230.5** | **$351.0** | **$744.0** | **$909.4** |
| | | | | | | | | | | | |
| **Expenses** | | | | | | | | | | | |
| Film Studio | ($49.9) | ($76.6) | ($105.5) | ($102.9) | ($109.6) | ($156.7) | ($77.0) | ($195.7) | ($334.8) | ($539.0) | ($611.8) |
| Digital / Madvine | -- | (5.0) | (11.0) | (7.0) | (11.2) | (6.7) | (11.7) | (8.6) | (23.0) | (38.3) | (46.2) |
| Scripted Television & Music | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.3) | (0.3) | (0.4) |
| **Total Expenses** | **($49.9)** | **($81.7)** | **($116.6)** | **($110.0)** | **($120.9)** | **($163.5)** | **($88.8)** | **($204.4)** | **($358.2)** | **($577.7)** | **($658.4)** |
| | | | | | | | | | | | |
| **Gross Margin** | **($9.2)** | **($11.2)** | **($3.9)** | **$17.2** | **$52.8** | **$38.2** | **$49.3** | **$26.1** | **($7.2)** | **$166.4** | **$251.0** |
| | | | | | | | | | | | |
| Corporate Overhead[1] | ($7.2) | ($10.1) | ($10.1) | ($10.1) | ($11.4) | ($11.4) | ($11.4) | ($11.4) | ($37.5) | ($45.5) | ($46.9) |
| Development Costs | (0.8) | (1.3) | (1.3) | (1.3) | (2.5) | (2.5) | (2.5) | (2.5) | (4.6) | (10.0) | (10.3) |
| Relativity China Overhead | (0.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (1.1) | (1.3) | (1.5) |
| **Total Overhead** | **($8.2)** | **($11.7)** | **($11.7)** | **($11.7)** | **($14.2)** | **($14.2)** | **($14.2)** | **($14.2)** | **($43.2)** | **($56.8)** | **($58.6)** |
| | | | | | | | | | | | |
| **EBITDA (Before Minority Interest)** | **($17.4)** | **($22.9)** | **($15.6)** | **$5.5** | **$38.5** | **$24.0** | **$35.1** | **$11.9** | **($50.4)** | **$109.5** | **$192.4** |
| | | | | | | | | | | | |
| Less: Minority Interest (Relativity China) | $0.2 | $0.3 | $0.3 | $0.3 | $1.0 | $1.0 | $1.0 | $1.0 | $1.3 | $4.0 | ($19.6) |
| | | | | | | | | | | | |
| **EBITDA (After Minority Interest)** | **($17.6)** | **($23.3)** | **($15.9)** | **$5.2** | **$37.6** | **$23.0** | **$34.1** | **$10.9** | **($51.6)** | **$105.6** | **$212.0** |

Note: Q1 2016 represents February and March 2016 only.

(1) Includes litigation expenses of $0.5 million in Q1 2016 and monthly payments of ~$42k per month for 36 months thereafter.

**RML**

| NEW P&A / ULTIMATES FACILITY SUMMARY ($ in millions) | Q1 2016 | Q2 2016 | Q3 2016 | Q4 2016 | Q1 2017 | Q2 2017 | Q3 2017 | Q4 2017 | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **P&A Facility (Excluding RKA)** | | | | | | | | | | | |
| Beginning Balance | $ -- | $53.2 | $48.6 | $79.7 | $35.3 | $59.3 | $27.2 | $64.7 | $ -- | $35.3 | $47.6 |
| P&A Facility Drawdowns | 52.2 | 27.0 | 58.6 | 37.8 | 56.4 | 27.6 | 63.2 | 48.7 | 175.7 | 195.8 | 205.6 |
| Interest (PIK) | 1.1 | 1.9 | 2.0 | 2.0 | 1.3 | 1.6 | 0.8 | 2.2 | 7.0 | 5.9 | 6.3 |
| Repayment | (0.1) | (33.5) | (29.6) | (84.1) | (33.8) | (61.2) | (26.5) | (68.0) | (147.4) | (189.4) | (208.0) |
| **Ending Balance** | **$53.2** | **$48.6** | **$79.7** | **$35.3** | **$59.3** | **$27.2** | **$64.7** | **$47.6** | **$35.3** | **$47.6** | **$51.5** |
| **Ultimates Facility** | | | | | | | | | | | |
| Beginning Balance | $62.3 | $56.0 | $52.8 | $74.8 | $99.2 | $122.4 | $129.1 | $114.8 | $62.3 | $99.2 | $130.7 |
| Drawdowns | 5.0 | 4.0 | 29.0 | 35.9 | 43.5 | 44.7 | 22.5 | 46.4 | 74.0 | 157.1 | 148.7 |
| Repayment | (11.4) | (7.2) | (7.0) | (11.5) | (20.4) | (38.0) | (36.8) | (30.4) | (37.1) | (125.6) | (145.4) |
| **Ending Balance** | **$56.0** | **$52.8** | **$74.8** | **$99.2** | **$122.4** | **$129.1** | **$114.8** | **$130.7** | **$99.2** | **$130.7** | **$134.1** |

| SUMMARY OF OPERATING CASH FLOW ($ in millions) | Q1 2016 | Q2 2016 | Q3 2016 | Q4 2016 | Q1 2017 | Q2 2017 | Q3 2017 | Q4 2017 | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash by Business** | | | | | | | | | | | |
| Film Studio[1] | ($3.7) | ($10.6) | $1.4 | $7.0 | ($0.3) | $30.8 | $3.2 | $20.9 | ($5.8) | $54.6 | $91.5 |
| Digital / Madvine | -- | 1.4 | 10.7 | 7.0 | 31.0 | 6.4 | 18.2 | 9.1 | 19.1 | 64.7 | 62.7 |
| Scripted Television & Music | 0.3 | 0.4 | 3.0 | 3.0 | 3.1 | 3.1 | 5.4 | 5.4 | 6.8 | 17.0 | 27.7 |
| **Total Cash (Pre-Overhead)** | **($3.4)** | **($8.8)** | **$15.1** | **$17.1** | **$33.8** | **$40.4** | **$26.7** | **$35.4** | **$20.0** | **$136.3** | **$181.9** |
| Overhead[2] | ($8.0) | ($11.4) | ($11.4) | ($11.4) | ($13.9) | ($13.9) | ($13.9) | ($13.9) | ($42.1) | ($55.5) | ($57.2) |
| Net Interest Expense | ($0.6) | ($0.6) | ($0.7) | ($0.7) | ($0.6) | ($0.6) | ($0.5) | ($0.5) | ($2.6) | ($2.3) | ($1.3) |
| **Total Cash Available from Operations** | **($12.0)** | **($20.8)** | **$3.1** | **$5.0** | **$19.3** | **$25.9** | **$12.3** | **$21.1** | **($24.7)** | **$78.5** | **$123.4** |

Note: Q1 2016 represents February and March 2016 only.
(1) Relativity China is excluded from Film Studio cash.
(2) Includes litigation expenses of $0.5 million in Q1 2016 and monthly payments of ~$42k per month for 36 months thereafter.

| Supplemental Information: | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Pre-Release P&A Facility (RKA)** | | | | | | | | | | | |
| Beginning Balance[3] | $85.1 | $85.9 | $87.3 | $72.7 | $73.8 | $40.2 | $39.3 | $31.0 | $85.1 | $73.8 | $30.7 |
| Net Interest Expense | 0.9 | 1.3 | 1.3 | 1.1 | 1.1 | 0.6 | 0.6 | 0.5 | 4.7 | 2.9 | 2.0 |
| Repayment | -- | -- | (15.8) | (0.1) | (34.7) | (1.5) | (8.9) | (0.7) | (16.0) | (45.9) | (1.0) |
| **Ending Balance** | **$85.9** | **$87.3** | **$72.7** | **$73.8** | **$40.2** | **$39.3** | **$31.0** | **$30.7** | **$73.8** | **$30.7** | **$31.7** |
| **Post-Release P&A Facility (Macquarie)** | | | | | | | | | | | |
| Beginning Balance[4] | $27.4 | $19.4 | $11.9 | $8.4 | $8.1 | $8.0 | $7.8 | $7.5 | $27.4 | $8.1 | $6.9 |
| Net Interest Expense | 0.4 | 0.5 | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 1.4 | 0.9 | 0.9 |
| Repayment | (8.3) | (8.0) | (3.8) | (0.5) | (0.3) | (0.4) | (0.6) | (0.8) | (20.6) | (2.1) | (2.3) |
| **Ending balance** | **$19.4** | **$11.9** | **$8.4** | **$8.1** | **$8.0** | **$7.8** | **$7.5** | **$6.9** | **$8.1** | **$6.9** | **$5.5** |

(3) Beginning balances for the RKA pre-release P&A loans as of January 31, 2016 include accrued interest between October 31, 2015 and January 31, 2016.
(4) Beginning balances for the Macquarie post-release P&A loans as of January 31, 2016 do not account for cash that may have been collected between October 31, 2015 and January 31, 2016 for the benefit of these loans.

**RML**

| SUMMARY OF CASH FLOW FOR DEBT ($ in millions) | Q1 2016 | Q2 2016 | Q3 2016 | Q4 2016 | Q1 2017 | Q2 2017 | Q3 2017 | Q4 2017 | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Flow Calculation** | | | | | | | | | | | |
| Beginning Cash | $64.7 | $51.7 | $29.8 | $31.9 | $32.9 | $51.2 | $76.1 | $87.3 | $64.7 | $32.9 | $105.3 |
| Total Cash Available from Operations | (12.0) | (20.8) | 3.1 | 5.0 | 19.3 | 25.9 | 12.3 | 21.1 | (24.7) | 78.5 | 123.4 |
| Less: Debt Repayment | (1.0) | (1.0) | (1.0) | (4.0) | (1.0) | (1.0) | (1.0) | (3.0) | (7.1) | (6.1) | -- |
| **Ending Cash** | **$51.7** | **$29.8** | **$31.9** | **$32.9** | **$51.2** | **$76.1** | **$87.3** | **$105.3** | **$32.9** | **$105.3** | **$228.8** |
| | | | | | | | | | | | |
| **Debt Repayment** | | | | | | | | | | | |
| BidCo Note | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- |
| Secured Guilds Claims | -- | -- | -- | (3.0) | -- | -- | -- | -- | (3.0) | -- | -- |
| Deferred Cure Amounts | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (3.0) | (4.1) | (6.1) | -- |
| Total Debt Repayment | ($1.0) | ($1.0) | ($1.0) | ($4.0) | ($1.0) | ($1.0) | ($1.0) | ($3.0) | ($4.0) | ($3.0) | $ -- |

| DEBT (Excludes New P&A / Ultimates Facility) ($ in millions) | Q1 2016 | Q2 2016 | Q3 2016 | Q4 2016 | Q1 2017 | Q2 2017 | Q3 2017 | Q4 2017 | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **BidCo Note** | | | | | | | | | | | |
| Beginning[1] | $30.0 | $30.0 | $30.0 | $30.0 | $30.0 | $30.0 | $30.0 | $30.0 | $30.0 | $30.0 | $30.0 |
| Repayment | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Ending** | **$30.0** | **$30.0** | **$30.0** | **$30.0** | **$30.0** | **$30.0** | **$30.0** | **$30.0** | **$30.0** | **$30.0** | **$30.0** |
| **Secured Guilds Claims** | | | | | | | | | | | |
| Beginning | $3.0 | $3.0 | $3.0 | $3.0 | $ -- | $ -- | $ -- | $ -- | $3.0 | $ -- | $ -- |
| Repayment | 0.0 | 0.0 | 0.0 | (3.0) | 0.0 | 0.0 | 0.0 | 0.0 | (3.0) | 0.0 | -- |
| **Ending** | **$3.0** | **$3.0** | **$3.0** | **$ --** | **$ --** | **$ --** | **$ --** | **$ --** | **$ --** | **$ --** | **$ --** |
| **Deferred Cure Amounts** | | | | | | | | | | | |
| Beginning | $10.2 | $9.2 | $8.1 | $7.1 | $6.1 | $5.1 | $4.0 | $3.0 | $10.2 | $6.1 | $ -- |
| Repayment | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (3.0) | (4.1) | (6.1) | -- |
| **Ending** | **$9.2** | **$8.1** | **$7.1** | **$6.1** | **$5.1** | **$4.0** | **$3.0** | **$ --** | **$6.1** | **$ --** | **$ --** |

Note: Q1 2016 represents February and March 2016 only.
(1) Assumes in Q1 2018, the Company refinances its debt facility at the same interest rate.

**Film**
**Release Schedule**
*($ in thousands)*

| Film | Title | Release Date* | Total Lifetime Revenue[1] | Distribution Costs[2] | Net Production Costs[3] |
|------|-------|---------------|---------------------------|------------------------|--------------------------|
| 1 | Disappointments Room | 03/31/16 | $71,129 | ($58,200) | - |
| 2 | Before I Wake (Somnia) | 04/30/16 | 62,939 | (41,922) | - |
| 3 | Kidnap | 05/31/16 | 85,635 | (56,678) | - |
| 4 | Solace | 08/31/16 | 37,820 | (27,321) | (1,500) |
| 5 | Masterminds | 09/30/16 | 125,418 | (78,346) | - |
| 6 | Shot Caller | 10/31/16 | 42,672 | (30,206) | (3,000) |
| 7 | Strangers 2 | 12/31/16 | 48,363 | (41,686) | 295 |
| 8 | The Crow | 02/28/17 | 107,703 | (70,461) | 1,246 |
| 9 | Hunter Killer | 04/01/17 | 124,345 | (96,623) | (4,000) |
| 10 | Act of Valor: SWAT | 05/01/17 | 91,197 | (76,866) | (2,869) |
| 11 | Fletch | 10/31/17 | 81,850 | (56,422) | (3,035) |
| 12 | TBD Acquisition 1 | 09/30/17 | 56,760 | (37,094) | (4,150) |
| 13 | Immortals 2 | 11/30/17 | 146,070 | (119,326) | 1,321 |
| 14 | Secret Scripture | 12/31/17 | 4,540 | (4,415) | (1,500) |

*\* Mid-month releases are included at end of month for modeling purposes*

*Note: Release schedule per management.*

*(1) Includes first cycle revenues (theatrical, home entertainment, Pay TV, PPV, Free TV and other) and library value.*

*(2) Includes P&A, third-party distribution fees, participations, residuals, third-party shares and other costs.*

*(3) Net of equity, pre-sales and soft money; for completed films, all net production costs incurred prior to exit; Strangers 2 and Immortals 2*
*have a positive balance due to foreign pre-sales and overages that exceed the net budget; The Crow has a positive balance due to*
*the reimbursement of previously invested funds.*

**Pro-Forma Capitalization Table**

| ($ in thousands) | October 20, 2015 | Non Cash Reduction ($) | Cash In / (Cash Out) ($) | Post Closing October 21, 2015 | Non Cash Reduction ($) | Interim Period Cash Flow | Cash In / (Cash Out) ($) | Post Emergence February 1, 2016 |
|---|---|---|---|---|---|---|---|---|
| **Cash to Balance Sheet**[1] | $10,204 | | -- | $10,204 | | (7,862) | 62,347 | $64,689 |
| Cash Collateral | $27,550 | | -- | $27,550 | | 10,100 | 37,650 | $ -- |
| Transaction Fees | | | | | | | (20,000) | |
| **Debt** | | | | | | | | |
| *Holdco Debt* | | | | | | | | |
| Existing DIP Facility[2] | $49,500 | (14,500) | -- | $35,000 | -- | | (35,000) | $ -- |
| Term Loan A & B | 374,500 | (125,000) | -- | 249,500 | (189,500) | | (30,000) | 30,000 |
| Total Term Loans | $374,500 | (125,000) | -- | $249,500 | (189,500) | | (30,000) | $30,000 |
| Elliott Subordinated Debt | $138,900 | | -- | $138,900 | (138,900) | | | $ -- |
| **Total Secured Facilities** | **$562,900** | **(139,500)** | -- | **$423,400** | **(328,400)** | -- | **(65,000)** | **$30,000** |
| *Asset Level Debt* | | | | | | | | |
| *Pre-Release P&A Facility* | | | | | | | | |
| Lazarus Effect | $1,259 | -- | -- | $1,259 | -- | -- | -- | $1,259 |
| Masterminds | 28,657 | -- | -- | 28,657 | -- | -- | -- | 28,657 |
| Before I Wake | 21,366 | -- | -- | 21,366 | -- | -- | -- | 21,366 |
| Kidnap | 15,046 | -- | -- | 15,046 | -- | -- | -- | 15,046 |
| Disappointments Room | 18,675 | -- | -- | 18,675 | -- | -- | -- | 18,675 |
| Total Pre-Release P&A Facility | $85,003 | -- | -- | $85,003 | -- | -- | -- | $85,003 |
| *Post-Release P&A Facility* | | | | | | | | |
| Beyond the Lights | $3,181 | -- | -- | $3,181 | -- | -- | -- | $3,181 |
| Woman in Black 2 | 13,078 | -- | -- | 13,078 | -- | -- | -- | 13,078 |
| Lazarus Effect | 10,376 | -- | -- | 10,376 | -- | -- | -- | 10,376 |
| Total Post-Release P&A Facility | $26,634 | -- | -- | $26,634 | -- | -- | -- | $26,634 |
| Total P&A Facilities | $111,638 | -- | -- | $111,638 | -- | -- | -- | $111,638 |
| *Production Loans* | | | | | | | | |
| Masterminds | $21,707 | -- | -- | $21,707 | -- | -- | -- | $21,707 |
| Disappointments Room | 12,316 | -- | -- | 12,316 | -- | -- | -- | 12,316 |
| Total Production Loans | $34,023 | -- | -- | $34,023 | -- | -- | -- | $34,023 |
| *Vine/Verite* | | | | | | | | |
| Yuma | $37,226 | (37,226) | -- | $ -- | -- | -- | -- | $ -- |
| Forbidden Kingdom | 32,769 | (32,769) | -- | -- | -- | -- | -- | -- |
| Bank Job | 9,775 | (9,775) | -- | -- | -- | -- | -- | -- |
| Total Vine/Verite Loans | $79,770 | (79,770) | -- | $ -- | -- | -- | -- | $ -- |
| Ultimates Facility (CIT)[3] | $28,726 | -- | -- | $28,726 | -- | 2,274 | (31,000) | $ -- |
| New Ultimates Facility | -- | -- | -- | -- | -- | -- | 62,347 | 62,347 |
| Total Ultimates Facilities | $28,726 | -- | -- | $28,726 | -- | 2,274 | 31,347 | $62,347 |
| **Total Asset Level Debt** | **$254,157** | **(79,770)** | -- | **$174,387** | -- | **2,274** | **31,347** | **$208,007** |
| Vendor Debt & General Unsecured | $82,795 | -- | -- | $82,795 | (57,608) | -- | (15,000) | $10,187 |
| Secured Guilds Claims[4] | 9,650 | -- | -- | 9,650 | -- | -- | (6,650) | 3,000 |
| **Total Unsecured Debt** | **$92,445** | -- | -- | **$92,445** | **(57,608)** | -- | **(21,650)** | **$13,187** |
| **Total Debt** | **$909,501** | **(219,270)** | -- | **$690,231** | **(386,008)** | **2,274** | **(55,303)** | **$251,194** |
| **Equity** | | | | | | | | |
| New Equity | $ -- | -- | -- | $ -- | -- | -- | 100,000 | $100,000 |
| **Total Capitalization**[5] | **$909,501** | **(219,270)** | -- | **$690,231** | **(386,008)** | **2,274** | **44,697** | **$351,194** |

(1) Cash as of October 20, 2015 and Interim Period Cash Flow per current 19-week budget and RML management. Excludes cash collateral on account for CIT Ultimates and secured guild claims. Also excludes cash for professional fees in segregated account.

(2) At close, Elliott purchased the $49.5 million interim DIP in exchange for $35 million. The balance is expected to be repaid at emergence through new equity.

(3) The existing CIT ultimates facility is to be repaid at or before emergence from cash collateral as of October 20, 2015, plus library cash flows received and retained as cash collateral on or before December 9, 2015.

(4) Secured guilds claims of $9.65 million. The $6.65 million of secured residuals is assumed to be paid at or before emergence and the remaining $3.0 million of secured guilds claims is assumed to be paid in Q4 2016.

(5) Represents Total Debt plus New Equity.

Note: Excludes a potential TV working capital adjustment which may be a benefit or obligation to the Company in an amount no greater than $5 million.

**<u>EXHIBIT C</u>**

Unaudited Financial Statements

# Relativity Holdings LLC

## Consolidated Statements of Operations
*(In Thousands)*

| | Year Ended December 31 | |
| | 2013 | 2012 |
|---|---|---|
| Revenues | $ **421,033** | $ 527,372 |
| | | |
| Expenses: | | |
| Direct operating expenses | **222,138** | 343,459 |
| Marketing and distribution expenses | **248,094** | 252,689 |
| General and administrative expenses | **76,936** | 57,931 |
| Depreciation and non-film amortization | **30,326** | 6,590 |
| Gain on transfer of operating assets to a related party | | (183,602) |
| Total operating expenses | **577,494** | 477,067 |
| | | |
| Income from operations | **(156,461)** | 50,305 |
| | | |
| Other (expenses) income: | | |
| Interest expense and fees, net of interest income | **(165,258)** | (181,776) |
| Writedown of amounts receivable from Beverly Blvd 2 Holdings, LLC | **(6,702)** | |
| Gain on acquisition of a controlling interest in Sky Land Entertainment Limited | **–** | 120,000 |
| Change in fair value of derivatives | **2,348** | 6,278 |
| Net (loss) income | **(326,073)** | (5,193) |
| | | |
| Less: net loss attributable to noncontrolling interests | **(6,582)** | (1,704) |
| Net (loss) income attributable to Relativity Holdings LLC members | $ **(319,491)** | $ (3,489) |
| | | |
| **EBITDA** | | |
| Income from Operations | (156,461) | 50,305 |
| Add back depreciation and non-film amortization | 30,326 | 6,590 |
| Add back gain on transfer of operating assets to related party | - | (183,602) |
| **EBITDA** | (126,135) | (126,707) |
| | | |
| **AEBITDA** | **(791)** | **(19,830)** |

**RELATIVITY HOLDINGS, LLC**
**CONSOLIDATED BALANCE SHEET**
**DECEMBER 31, 2014**
**(in $000's)**

|  | 12/31/2014 |
|---|---|
| **Assets** | |
| Cash | $ 92,293 |
| Restricted cash | 1,114 |
| Accounts receivable, net | 98,436 |
| Prepaids and other assets | 11,566 |
| Property and equipment, net | 5,629 |
| Film costs, net | 139,585 |
| Goodwill | 34,008 |
| Intangible assets, net | 171,278 |
| Deferred finance costs, net | 6,063 |
| **Total assets** | **$   559,973** |
| | |
| Liabilities and Members' Deficit | |
| | |
| Liabilities | |
| Accounts payable and accrued liabilities | $ 209,601 |
| Accrued participations and residuals | 52,503 |
| Advances and deferred revenue | 54,080 |
| Notes payable | 22,114 |
| Bank debt | 123,767 |
| Production loans | 49,395 |
| Related-party borrowings | 667,350 |
| Total liabilities | 1,178,810 |
| | |
| Members' deficit | (618,837) |
| | |
| **Total liabilities and members' deficit** | **$   559,973** |

**RELATIVITY HOLDINGS, LLC**
**CONSOLIDATED BALANCE SHEET**
**MARCH 31, 2015**
**(in $000's)**

|  |  | unaudited |
|---|---|---|
| **Assets** | | |
| Cash | $ | 107,559 |
| Restricted cash | | 759 |
| Accounts receivable, net | | 92,315 |
| Prepaids and other assets | | 9,404 |
| Property and equipment, net | | 5,395 |
| Film costs, net | | 111,528 |
| Goodwill | | 34,008 |
| Intangible assets, net | | 167,606 |
| Deferred finance costs, net | | 3,598 |
| **Total assets** | $ | **532,171** |
| | | |
| Liabilities and Members' Deficit | | |
| | | |
| Liabilities | | |
| Accounts payable and accrued liabilities | $ | 195,922 |
| Accrued participations and residuals | | 71,916 |
| Advances and deferred revenue | | 35,204 |
| Notes payable | | 74,594 |
| Bank debt | | 128,906 |
| Production loans | | 50,184 |
| Related-party borrowings | | 679,226 |
| Total liabilities | | 1,235,952 |
| | | |
| Members' deficit | | (703,781) |
| | | |
| **Total liabilities and members' deficit** | $ | **532,171** |

**RELATIVITY HOLDINGS, LLC**
**CONSOLIDATED STATEMENT OF OPERATIONS**
**FOR THREE MONTHS ENDING MARCH 31, 2015**
**(in $000's)**

|                                                          | 3 Months ending 3/31/2015 (unaudited) |
|----------------------------------------------------------|-----------------:|
| Revenues                                                 | $     150,648    |
| Expenses:                                                |                  |
|    Direct operating expenses              | 75,283           |
|    Marketing and distribution             | 77,362           |
|    General and administrative             | 18,703           |
|    Depreciation and non-film amortization | 8,153            |
| Loss from operations                                     | (28,853)         |
| Other expenses                                           |                  |
|    Interest expense and fees, net of interest income | (23,029) |
| **Net loss**                                             | **$     (51,882)** |
| **EBITDA**                                               |                  |
|    Net loss                               | $     (51,882)   |
|    add back interest expense net of interest income | 23,029 |
|    add back non film depreciation and amortization | 8,153  |
| **EBITDA**                                               | **$     (20,700)** |
| **AEBITDA**                                              | **$     48,548**  |

**RELATIVITY HOLDINGS, LLC**
**CONSOLIDATED STATEMENT OF CASH FLOWS**
**FOR THREE MONTHS ENDING MARCH 31, 2015**
**(in $000's)**

|  | 3 Months ended 3/31/2015 (unaudited) |
|---|---|
| Net Loss | $ (51,882) |
| Amortization of film costs | 56,364 |
| Depreciation and non film amort | 8,176 |
| Non-cash interest expense, including comm. fees and guarantee fees | 16,762 |
| Amortization of deferred financing costs | 1,997 |
| Changes in Operating Assets and Liabilities |  |
| Accounts receivable | 7,340 |
| Prepaid and other assets | 324 |
| Additions to Film Costs | (25,765) |
| Accounts payable and accrued liabilities | (38,842) |
| Accrued participations and residuals | 11,732 |
| Deferred Revenue | (25,644) |
| **Cash used in Operating Activities** | **(39,438)** |
| Purchases of property and equipment | (58) |
| **Cash Used in Investing Activities** | **(58)** |
| Deferred financing costs | 469 |
| Change in restricted cash | 355 |
| Principal borrowings on notes payable, net of paydowns | 53,657 |
| **Cash provided by Financing Activities** | **54,480** |
| Change in Cash | 14,984 |
| Cash at Beginning of Period | 92,574 |
| **Cash at End of Period** | **$ 107,559** |

**RELATIVITY HOLDINGS LLC**
**CONSOLIDATED STATEMENT OF OPERATIONS**
**FOR YEARS ENDING DECEMBER 31, 2014**
**(in $000's)**

|  | Year ending 12/31/2014 |
|---|---|
| Revenues | $     501,074 |
|  |  |
| Expenses: |  |
| Direct operating expenses | 215,052 |
| Marketing and distribution | 285,980 |
| General and administrative | 87,560 |
| Depreciation and non-film amortization | 32,150 |
| Loss from operations | (119,669) |
|  |  |
| Other expenses |  |
| Interest expense and other, net of interest income | (266,349) |
|  |  |
| **Net loss** | **$     (386,018)** |
|  |  |
| **EBITDA** |  |
| Net loss | $     (386,018) |
| add back interest expense net of interest income | 266,349 |
| add back non film depreciation and amortization | 32,150 |
| **EBITDA** | **$     (87,519)** |
|  |  |
| **AEBITDA** | **$     (14,803)** |

**RELATIVITY HOLDINGS, LLC**
**CONSOLIDATED STATEMENT OF CASH FLOWS**
**FOR YEAR ENDING DECEMBER 31, 2014**
**(in $000's)**

|  | 12 Months ended 12/31/2014 (unaudited) |
|---|---|
| Net Loss | $    (386,018) |
|  |  |
| Amortization of film costs | 151,816 |
| Depreciation and non film amort | 32,154 |
| Non-cash interest expense, including comm. fees and guarantee fees | 184,397 |
| Amortization of deferred financing costs | 8,316 |
|  |  |
| Changes in Operating Assets and Liabilities |  |
| Accounts receivable | (51,728) |
| Prepaid and other assets | (4,182) |
| Additions to Film Costs | (190,942) |
| Accounts payable and accrued liabilities | 62,551 |
| Deferred Revenue | (4,522) |
| **Cash used in Operating Activities** | **(198,158)** |
|  |  |
| Purchases of property and equipment | (1,926) |
| **Cash Used in Investing Activities** | **(1,926)** |
|  |  |
| Deferred financing costs | (1,081) |
| Change in restricted cash | 2,155 |
| Principal borrowings on notes payable, net of paydowns | 174,812 |
| Capital contributions | 10,000 |
| **Cash provided by Financing Activities** | **185,886** |
|  |  |
| Change in Cash | (14,198) |
| Cash at Beginning of Period | 106,491 |
| **Cash at End of Period** | **$    92,293** |

**RELATIVITY HOLDINGS, LLC**
**CONSOLIDATED BALANCE SHEET**
**JUNE 30, 2015**
**(in $000's)**

|  |  | unaudited |
|---|---|---|
| **Assets** |  |  |
| Cash | $ | 53,593 |
| Restricted cash |  | 1,100 |
| Accounts receivable, net |  | 91,888 |
| Prepaids and other assets |  | 9,672 |
| Property and equipment, net |  | 5,428 |
| Film costs, net |  | 135,487 |
| Goodwill |  | 34,008 |
| Intangible assets, net |  | 155,701 |
| Deferred finance costs, net |  | 2,157 |
| **Total assets** | **$** | **489,035** |
|  |  |  |
| Liabilities and Members' Deficit |  |  |
|  |  |  |
| Liabilities |  |  |
| Accounts payable and accrued liabilities | $ | 135,074 |
| Accrued participations and residuals |  | 79,547 |
| Advances and deferred revenue |  | 65,927 |
| Notes payable |  | 74,332 |
| Bank debt |  | 86,464 |
| Production loans |  | 39,219 |
| Related-party borrowings |  | 754,322 |
| Total liabilities |  | 1,234,885 |
|  |  |  |
| Members' deficit |  | (745,850) |
|  |  |  |
| **Total liabilities and members' deficit** | **$** | **489,035** |

**RELATIVITY HOLDINGS, LLC**
**CONSOLIDATED STATEMENT OF OPERATIONS**
**FOR SIX MONTHS ENDING JUNE 30, 2015**
**(in $000's)**

|  | 6 Months ending 6/30/2015 (unaudited) |
|---|---:|
| Revenues | $    245,837 |
|  |  |
| Expenses: |  |
| Direct operating expenses | 121,969 |
| Marketing and distribution | 92,115 |
| General and administrative | 44,804 |
| Depreciation and non-film amortization | 16,637 |
| Loss from operations | (29,688) |
|  |  |
| Other expenses |  |
| Interest expense and fees, net of interest income | (64,264) |
|  |  |
| **Net loss** | **$    (93,952)** |
|  |  |
| **EBITDA** |  |
| Net loss | $    (93,952) |
| add back interest expense net of interest income | 64,264 |
| add back non film depreciation and amortization | 16,637 |
| **EBITDA** | **$    (13,051)** |
|  |  |
| **AEBITDA** | **$    22,259** |

**RELATIVITY HOLDINGS, LLC**
**CONSOLIDATED STATEMENT OF CASH FLOWS**
**FOR SIX MONTHS ENDING JUNE 30, 2015**
**(in $000's)**

|  | (unaudited) |
|---|---|
| Net Loss | $ (93,952) |
| Amortization of film costs | 79,947 |
| Depreciation and non film amort. | 20,554 |
| Non-cash interest expense, including comm. fees and guarantee fees | 45,213 |
| Amortization of deferred financing costs | 3,437 |
| Changes in Operating Assets and Liabilities |  |
| Accounts receivable | 7,767 |
| Prepaid and other assets | 56 |
| Additions to Film Costs | (73,306) |
| Accounts payable and accrued liabilities | (99,690) |
| Accrued participations and residuals | 19,363 |
| Deferred Revenue | 5,079 |
| **Cash used in Operating Activities** | **(85,530)** |
| Purchases of property and equipment | (566) |
| **Cash Used in Investing Activities** | **(566)** |
| Deferred financing costs | 469 |
| Change in restricted cash | 14 |
| Principal borrowings on notes payable, net of paydowns | 52,798 |
| Principal borrowings on bank debt, net of paydowns | (37,303) |
| Principal borrowings on production loans, net of paydowns | (10,954) |
| Principal borrowings on loans due to related parties, net of paydowns | 42,091 |
| **Cash provided by Financing Activities** | **47,115** |
| Change in Cash | (38,981) |
| Cash at Beginning of Period | 92,574 |
| **Cash at End of Period** | **$ 53,593** |

**EXHIBIT D**

Audited Financial Statements

CONSOLIDATED FINANCIAL STATEMENTS

Relativity Holdings LLC
Years Ended December 31, 2013 and 2012
With Report of Independent Auditors

Ernst & Young LLP





**EY**
Building a better
working world

Relativity Holdings LLC

Consolidated Financial Statements

Years Ended December 31, 2013 and 2012

# Contents

Report of Independent Auditors.................................................................................................1

Consolidated Financial Statements

Consolidated Balance Sheets ....................................................................................................3
Consolidated Statements of Operations ....................................................................................4
Consolidated Statements of Changes in Deficit........................................................................5
Consolidated Statements of Cash Flows...................................................................................6
Notes to Consolidated Financial Statements.............................................................................8



Ernst & Young LLP
Suite 500
725 South Figueroa Street
Los Angeles, CA  90017-5418

Tel: +1 213 977 3200
Fax: +1 213 977 3729
ey.com

# Report of Independent Auditors

The Management and the Members
Relativity Holdings LLC

We have audited the accompanying consolidated financial statements of Relativity Holdings LLC, which comprise the consolidated balance sheets as of December 31, 2013 and 2012, and the related consolidated statements of operations, changes in deficit and cash flows for the years then ended, and the related notes to the consolidated financial statements.

## Management's Responsibility for the Financial Statements

Management is responsible for the preparation and fair presentation of these financial statements in conformity with U.S. generally accepted accounting principles; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free of material misstatement, whether due to fraud or error.

## Auditor's Responsibility

Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

A member firm of Ernst & Young Global Limited



**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Relativity Holdings LLC at December 31, 2013 and 2012, and the consolidated results of its operations and its cash flows for the years then ended in conformity with U.S. generally accepted accounting principles.

*Ernst & Young LLP*

May 30, 2014

2

A member firm of Ernst & Young Global Limited

# Relativity Holdings LLC

## Consolidated Balance Sheets
*(In Thousands)*

|  | December 31 | | |
|---|---|---|---|
|  | **2013** | | 2012 |
| **Assets** | | | |
| Cash and cash equivalents | **$** | **106,491** | $ 63,909 |
| Restricted cash | | **3,269** | 4,635 |
| Accounts receivable, net | | **46,708** | 61,754 |
| Prepaid and other assets | | **7,395** | 6,820 |
| Property and equipment, net | | **5,406** | 5,325 |
| Film costs, net | | **130,055** | 191,009 |
| Goodwill | | **33,903** | 25,162 |
| Other intangible assets, net | | **201,836** | 222,746 |
| Deferred finance costs, net | | **14,433** | 21,083 |
| Total assets | **$** | **549,496** | $ 602,443 |
| | | | |
| **Liabilities and deficit** | | | |
| Liabilities: | | | |
|    Accounts payable and other accrued liabilities | **$** | **123,096** | $ 34,174 |
|    Accrued participations and residuals | | **38,095** | 26,998 |
|    Advances and deferred revenue | | **58,607** | 49,619 |
|    Notes payable | | **524,841** | 489,497 |
|    Bank debt | | **116,609** | 43,244 |
|    Production loans | | **8,372** | 61,620 |
|    Related-party borrowings | | **501,417** | 443,615 |
|    Interest rate swaps | | **–** | 2,348 |
| Total liabilities | | **1,371,037** | 1,151,115 |
| | | | |
| Commitments and contingencies | | | |
| | | | |
| Deficit: | | | |
|    Relativity Holdings LLC members' deficit | | **(838,813)** | (569,322) |
|    Noncontrolling interests | | **17,272** | 20,650 |
| Total deficit | | **(821,541)** | (548,672) |
| Total liabilities and deficit | **$** | **549,496** | $ 602,443 |

*See accompanying notes.*

## Relativity Holdings LLC

### Consolidated Statements of Operations
*(In Thousands)*

|  | Year Ended December 31 | |
|  | 2013 | 2012 |
|---|---|---|
| Revenues | $ 421,033 | $ 527,372 |
|  |  |  |
| Expenses: |  |  |
| Direct operating expenses | 222,138 | 343,459 |
| Marketing and distribution expenses | 248,094 | 252,689 |
| General and administrative expenses | 76,936 | 57,931 |
| Depreciation and non-film amortization | 30,326 | 6,590 |
| Gain on transfer of operating assets to a related party | – | (183,602) |
| Total operating expenses | 577,494 | 477,067 |
|  |  |  |
| (Loss) income from operations | (156,461) | 50,305 |
|  |  |  |
| Other (expenses) income: |  |  |
| Interest expense and fees, net of interest income | (165,258) | (181,776) |
| Writedown of amounts receivable from Beverly Blvd 2 Holdings LLC | (6,702) | – |
| Gain on acquisition of a controlling interest in Sky Land Entertainment Limited | – | 120,000 |
| Change in fair value of derivatives | 2,348 | 6,278 |
| Net loss | (326,073) | (5,193) |
|  |  |  |
| Less: net loss attributable to noncontrolling interests | (6,582) | (1,704) |
| Net loss attributable to Relativity Holdings LLC members | $ (319,491) | $ (3,489) |

*See accompanying notes.*

# Relativity Holdings LLC

## Consolidated Statements of Changes in Deficit
### *(In Thousands)*

| | Relativity Holdings LLC | | | |
| | Members' Deficit | Receivable From Member | Noncontrolling Interests | Total Deficit |
|---|---|---|---|---|
| Balance as of December 31, 2011 | $ (691,083) | $ – | $ (2,621) | $ (693,704) |
| Issuance of Member Units | 34,250 | (9,000) | – | 25,250 |
| Acquisition of a controlling interest in Sky Land Entertainment Limited | 100,000 | – | 17,250 | 117,250 |
| Issuance of units in Relativity Sports, LLC | – | – | 7,725 | 7,725 |
| Net loss | (3,489) | – | (1,704) | (5,193) |
| Balance as of December 31, 2012 | (560,322) | (9,000) | 20,650 | (548,672) |
| Issuance of Member Units | **48,000** | **2,000** | **–** | **50,000** |
| Issuance of units in Relativity Sports, LLC | **–** | **–** | **3,204** | **3,204** |
| Net loss | **(319,491)** | **–** | **(6,582)** | **(326,073)** |
| Balance as of December 31, 2013 | $ **(831,813)** | $ **(7,000)** | $ **17,272** | $ **(821,541)** |

*See accompanying notes.*

5

1403-1216996

Relativity Holdings LLC

## Consolidated Statements of Cash Flows
*(In Thousands)*

|  | Year Ended December 31 | |
|  | 2013 | 2012 |
|---|---|---|
| **Operating activities** | | |
| Net loss | $ **(326,073)** | $ (5,193) |
| Adjustments to reconcile net loss to net cash | | |
| provided by operating activities: | | |
| Amortization of film costs | **163,723** | 272,861 |
| Depreciation and non-film amortization | **30,853** | 6,426 |
| Amortization of deferred finance costs | **9,007** | 14,731 |
| Non-cash interest expense | **120,432** | 134,458 |
| Change in fair value of derivatives | **(2,348)** | (6,278) |
| Gain on transfer of operating assets to a related party | **–** | (183,602) |
| Gain on acquisition of a controlling interest in Sky Land | | |
| Entertainment Limited | **–** | (120,000) |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | **17,290** | 84,086 |
| Prepaid and other assets | **(37)** | (1,046) |
| Film costs | **(102,769)** | (105,602) |
| Accounts payable, accrued liabilities | | |
| and accrued participations and residuals | **92,828** | (32,891) |
| Advances and deferred revenue | **8,988** | (39,811) |
| Net cash provided by operating activities | **11,894** | 18,139 |
| | | |
| **Investing activities** | | |
| Purchase of property and equipment | **(1,522)** | (4,738) |
| Investment in unconsolidated entity | **(500)** | – |
| Cash paid to acquire businesses, net of cash acquired | **(11,529)** | (20,933) |
| Net cash used in investing activities | **(13,551)** | (25,671) |

## Relativity Holdings LLC

### Consolidated Statements of Cash Flows (continued)
*(In Thousands)*

|  | Year Ended December 31 | |
|  | 2013 | 2012 |
|---|---:|---:|
| **Financing activities** | | |
| Deferred finance costs | $ **(2,366)** | $ (26,475) |
| Payment for interest rate cap | **(29)** | (29) |
| Repayment of notes payable | **(39,250)** | (66,937) |
| Additions to bank debt | **147,452** | 51,337 |
| Repayment of bank debt | **(74,157)** | (7,770) |
| Additions to production loans | **5,319** | 54,535 |
| Repayment of production loans | **(61,671)** | (68,341) |
| Additions to related-party borrowings | **62,701** | 368,263 |
| Repayment of related-party borrowings | **(45,126)** | (313,333) |
| Issuance of Member Units | **50,000** | 25,250 |
| Decrease in restricted cash | **1,366** | 26,833 |
| Net cash provided by financing activities | **44,239** | 43,333 |
| | | |
| Net change in cash and cash equivalents | **42,582** | 35,801 |
| Cash and cash equivalents at beginning of year | **63,909** | 28,108 |
| Cash and cash equivalents at end of year | $ **106,491** | $ 63,909 |
| | | |
| **Supplemental disclosures of cash flow information** | | |
| Cash paid for interest and commitment fees | $ **27,048** | $ 21,846 |

*See accompanying notes.*

Relativity Holdings LLC

Notes to Consolidated Financial Statements

December 31, 2013

## 1. Description of Business

**Company Overview**

Relativity Holdings LLC (RH) was incorporated in the state of Delaware as a limited liability company. RH is governed by the terms of its operating agreement, as amended, and is engaged in the development, production, financing, and distribution of feature films and television programs. Relativity Sports, LLC (RS), a subsidiary of RH, is engaged in sports management and representation, providing career development and other services to professional athletes, managers, and broadcasters.

Relativity Media LLC (RML); Relativity Capital Holdings LLC; Relativity Media Holdings I LLC (RMH); Beverly Blvd LLC (BB); Relativity Productions LLC; Relativity Distribution LLC (RD); Relativity Real LLC; Relativity Rogue LLC; Relativity Jackson LLC; Relativity Sports Management, LLC; RS; and Sky Land Entertainment Limited (Sky Land BVI) are wholly-owned or controlled subsidiaries of RH (collectively, the Company).

## 2. Summary of Significant Accounting Policies

**Use of Estimates**

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts in the consolidated financial statements and accompanying notes. The most significant estimates made by management in the preparation of the consolidated financial statements relate to ultimate revenue and cost projections, impairment assessment of films, the determination of the fair values of assets acquired in business acquisitions, and the fair value of derivative and certain other financial instruments. Actual results could differ materially from those estimates.

**Credit Risk**

Financial instruments that potentially subject the Company to concentrations of credit risk consist primarily of cash and cash equivalents, restricted cash, and accounts receivable. The Company limits its exposure to credit loss by placing its cash, cash equivalents and restricted cash with financial institutions it believes to be of high credit quality. At times, such instruments may be in excess of the Federal Deposit Insurance Corporation limit.

Relativity Holdings LLC

Notes to Consolidated Financial Statements (continued)

**2. Summary of Significant Accounting Policies (continued)**

**Basis of Presentation**

The consolidated financial statements include the accounts of RH and all of its wholly-owned and controlled subsidiaries. The Company's investments in related companies, over which the Company has significant influence but not control, are accounted for using the equity method. All significant intercompany balances and transactions have been eliminated.

As permitted by the accounting standards for filmed entertainment companies, the Company has presented unclassified consolidated balance sheets.

**Cash and Cash Equivalents**

The Company considers highly liquid debt instruments purchased with original maturities of three months or less and investments in money market funds to be cash equivalents. The carrying amounts reported in the consolidated balance sheets for cash and cash equivalents approximate fair value.

**Restricted Cash**

Restricted cash includes proceeds related to the exploitation of films that, as of December 31, 2013 and 2012, were to be utilized to repay amounts under production loans and the CB P&A Loan.

**Accounts Receivable**

Accounts receivable primarily represent amounts due from the theatrical distribution of films, a third-party home entertainment distributor, television licensing fee receivables, and tax credit receivables. Accounts receivable balances exclude future billings from executed contracts, which will be recorded as receivables at the earlier of contractual billing dates or when the related revenue is recognized.

**Allowance for Doubtful Accounts**

The Company determines its allowance by monitoring its delinquent accounts, if any, and estimating a reserve based on contractual terms and other customer-specific issues. The allowance for doubtful accounts was $405,000 and $305,000 as of December 31, 2013 and 2012, respectively.

Relativity Holdings LLC

Notes to Consolidated Financial Statements (continued)

**2. Summary of Significant Accounting Policies (continued)**

**Prepaid and Other Assets**

Prepaid and other assets primarily consist of prepaid costs, deposits, short-term investments, an equity method investment, and home entertainment inventory. Short-term investments represent amounts invested in an investment fund consisting primarily of debt securities. The Company may withdraw its investments at any time. Home entertainment inventory consists of DVD and Blu-ray product that is stated at the lower of cost or market using the first-in first-out method. In December 2013, the Company acquired a 45% interest in Select Music LLC, a record label and festival and concert promotion company, for $4,000,000. The Company accounts for its investment under the equity method of accounting.

**Property and Equipment**

Property and equipment are stated at cost and are depreciated over their estimated useful lives using the straight-line method. Maintenance and repairs are charged to expense as incurred. Additions, improvements, and replacements that extend asset lives are capitalized. Leasehold improvements are amortized over the lesser of their estimated useful lives or the remaining lease term.

Property and equipment consist of the following (in thousands):

| | December 31 | |
| --- | --- | --- |
| | 2013 | 2012 |
| Leasehold improvements | $ 3,680 | $ 2,857 |
| Computers and software | 2,431 | 1,997 |
| Machinery and equipment | 3,088 | 3,108 |
| Furniture and fixtures | 963 | 809 |
| | 10,162 | 8,771 |
| Accumulated depreciation and amortization | (4,756) | (3,446) |
| Total property and equipment | $ 5,406 | $ 5,325 |

Relativity Holdings LLC

Notes to Consolidated Financial Statements (continued)

**2. Summary of Significant Accounting Policies (continued)**

Depreciation is provided principally over the following useful lives:

| | |
|---|---|
| Leasehold improvements | Shorter of useful life or the term of the lease |
| Computers and software | 2 years |
| Machinery and equipment | 2 to 7 years |
| Furniture and fixtures | 5 years |

**Film Costs**

Film costs represent capitalized costs for the production of films and television programs. For films produced by the Company, capitalized costs include all direct production costs, capitalized interest, and production overhead. The amount of overhead capitalized is an allocation of overhead of departments with exclusive or significant responsibility for the production of films. The amount of overhead capitalized was $13,012,000 and $11,267,000 during the years ended December 31, 2013 and 2012, respectively. The amount of interest capitalized is an allocation of interest cost incurred during the production period. The amount of interest capitalized was $808,000 and $1,497,000 during the years ended December 31, 2013 and 2012, respectively. For co-financed films distributed under the Sony Co-Financing and Distribution Agreement, film costs represent the Company's share of costs for the production of films entered into with Sony.

Film costs are amortized when the related project is completed and released, and revenues begin to be recognized. Film costs are amortized in the same proportion that the current period revenue bears to the estimated remaining unrecognized ultimate revenue as of the beginning of the current year. Ultimate revenue includes estimates over a period not to exceed ten years following the date of initial release or from the date of delivery of the first episode for episodic television series. Film costs are stated at the lower of amortized cost or estimated fair value on an individual film basis and are evaluated for impairment each reporting period. If events or changes in circumstance indicate that the estimated fair value of a specific project is less than its carrying value, an impairment charge is recognized in the amount by which the unamortized costs exceed the project's estimated fair value as determined using a discounted cash flow calculation. Key inputs employed in the discounted cash flow calculation include estimates of the film's ultimate revenue and costs as well as a discount rate. The discount rate utilized in the discounted cash flow calculation includes a risk premium. The Company recognized impairment losses of $13,260,000 and $13,680,000 on films with carrying values that were higher than estimated fair value during the years ended December 31, 2013 and 2012, respectively. Such impairment charges are included in direct operating expenses in the accompanying consolidated statements of operations.

11

Relativity Holdings LLC

Notes to Consolidated Financial Statements (continued)

**2. Summary of Significant Accounting Policies (continued)**

Films in production include the accumulated costs of productions that have not yet been completed. Films in development include costs of acquiring film rights to books and original screenplays and the costs to adapt such projects. Such costs are capitalized and, upon commencement of production, are transferred to films in production. Projects in development are written off at the earlier of the date they are determined not to be recoverable, when abandoned, or three years from the date of initial investment. Development cost write-offs were $3,509,000 and $5,699,000 for the years ended December 31, 2013 and 2012, respectively, which are included in direct operating expenses in the accompanying consolidated statements of operations.

**Goodwill**

Goodwill represents the excess of acquisition costs over the tangible and intangible assets acquired and liabilities assumed in business acquisitions by the Company. Goodwill is not amortized but is reviewed for potential impairment on an annual basis, or when events or circumstances indicate a potential impairment, at the reporting unit level.

A reporting unit is a business segment or one level below a business segment. The Company first assesses qualitative factors to determine whether it is more likely-than-not (i.e., a likelihood of more than 50%) that the fair value of a reporting unit is less than its carrying value. This step serves as the basis for determining whether it is necessary to perform the two-step quantitative impairment test. The first step of the quantitative impairment test involves a comparison of the estimated fair value of each reporting unit to its carrying amount, including goodwill. If the estimated fair value of the reporting unit exceeds its carrying amount, goodwill of the reporting unit is not impaired; however, if the carrying amount of the reporting unit exceeds its estimated fair value, then the second step of the quantitative impairment test must be performed. The second step compares the implied fair value of the reporting unit's goodwill with its carrying amount to measure the amount of impairment loss, if any. The implied fair value of goodwill is determined in the same manner as the amount of goodwill recognized in a business combination. If the carrying amount of the reporting unit's goodwill exceeds the implied fair value of that goodwill, an impairment loss is recognized in an amount equal to that excess. There was no goodwill impairment during the years ended December 31, 2013 and 2012.

Relativity Holdings LLC

Notes to Consolidated Financial Statements (continued)

**2. Summary of Significant Accounting Policies (continued)**

**Other Intangible Assets**

Other intangible assets consist of a right to distribute films in the People's Republic of China (PRC), PRC distributor relationship, PRC business license, athlete relationships and trademarks and are amortized on a straight-line basis over their estimated useful lives. The Company reviews long-lived assets including other intangible assets, for impairment whenever events or changes in circumstances indicate that the carrying amount of the asset may not be recoverable. The carrying amount of the asset is considered not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use of the asset. No such impairment indicators were identified by the Company, and no impairment losses were recorded by the Company during the year ended December 31, 2013.

**Deferred Finance Costs**

Deferred finance costs relate to amounts incurred in connection with the Company's outstanding borrowings and were $37,100,000 and $34,715,000, less accumulated amortization of $22,667,000 and $13,632,000 as of December 31, 2013 and 2012, respectively. In 2013, additional deferred finance costs of $2,366,000 were incurred, primarily in connection with the bank debt.

Deferred finance costs are amortized over the expected term of the underlying debt agreements. Amortization of deferred finance costs for the years ended December 31, 2013 and 2012, was $9,035,000 and $14,731,000, respectively, and is included in interest expense in the accompanying consolidated statements of operations.

**Interest Rate Swap and Cap**

The Company utilizes an interest rate cap on the SunTrust Bank Debt as of December 31, 2013 and 2012. The Company utilized an interest rate swap to hedge interest rate exposure on the Class A Notes as of December 31, 2012, which was terminated on May 1, 2013. The Company does not use derivatives for speculative purposes. These derivatives are measured at fair value using significant observable inputs other than quoted prices in active markets for identical assets or liabilities. The interest rate swap was a liability of $2,348,000 as of December 31, 2012 and the interest rate cap was an asset of $4,000 and $33,000 as of December 31, 2013 and 2012, respectively. The interest rate cap is recorded in prepaid and other assets in the accompanying

Relativity Holdings LLC

Notes to Consolidated Financial Statements (continued)

**2. Summary of Significant Accounting Policies (continued)**

consolidated balance sheets. The Company has not designated these derivatives as hedging instruments. Changes in the fair value of the interest rate cap are recorded in the accompanying consolidated statements of operations.

**Fair Value Measurements**

Fair value measurements are determined based on the assumptions that a market participant would use in pricing an asset or liability. A three-tiered hierarchy draws distinctions between market participant assumptions based on (i) observable inputs such as quoted prices in active markets for identical assets or liabilities (Level 1), (ii) inputs other than quoted prices for similar assets or liabilities in active markets that are observable either directly or indirectly (Level 2) and (iii) unobservable inputs that require the Company to use present value and other valuation techniques in the determination of fair value (Level 3).

The Company's interest rate swap and cap are measured at fair value using Level 2 inputs such as credit ratings and LIBOR rates. The Company's short-term investments are measured at fair value using Level 3 inputs based on information reported by the custodian. Fair value measurements for the Company's film cost impairment calculations are based on Level 3 inputs.

The Vine Loans (see Note 11) are measured at fair value using Level 3 inputs such as the expected future first-cycle cash receipts related to the distribution of the related films, discounted at a rate of 13% at December 31, 2013 and 2012. The Vine Loans are included in production loans in the accompanying consolidated balance sheets. Changes in the fair value of these liabilities are included in interest expense and fees, net in the accompanying consolidated statements of operations. The effect of the fair value measurement of the Vine Loans was interest expense of $192,000 and $1,324,000 for the years ended December 31, 2013 and 2012, respectively.

14

Relativity Holdings LLC

Notes to Consolidated Financial Statements (continued)

**2. Summary of Significant Accounting Policies (continued)**

The following table presents information about the Company's financial assets and liabilities carried at fair value on a recurring basis (in thousands):

|  | Balance | | Fair Value Measurements at December 31, 2013 | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | | | Level 1 | | Level 2 | | Level 3 | |
| Assets: | | | | | | | | |
| Short-term investments | $ | 85 | $ | – | $ | – | $ | 85 |
| Interest rate cap | | 4 | | – | | 4 | | – |
| Liabilities: | | | | | | | | |
| Vine Loans | | 4,310 | | – | | – | | 4,310 |

|  | Balance | | Fair Value Measurements at December 31, 2012 | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | | | Level 1 | | Level 2 | | Level 3 | |
| Assets: | | | | | | | | |
| Short-term investments | $ | 472 | $ | – | $ | – | $ | 472 |
| Interest rate cap | | 33 | | – | | 33 | | – |
| Liabilities: | | | | | | | | |
| Vine Loans | | 4,502 | | – | | – | | 4,502 |
| Interest rate swap | | 2,348 | | – | | 2,348 | | – |

**Revenue Recognition**

Revenue from theatrical distribution of films is recognized on the dates of exhibition based on the Company's participation of box office receipts. Revenue from direct home entertainment distribution is recognized, net of an allowance for estimated returns, together with related costs, in the period in which the product is shipped and is available for sale to the public. Revenue from television licensing is recognized when the film is initially available to the licensee for telecast. Payments received in advance of initial availability are classified as deferred revenue until all revenue recognition requirements have been met.

For films distributed under the Sony Co-Financing and Distribution Agreement, as well as other third-party distributed films, the Company recognizes revenue from the distribution of its films when earned and reported by the distributor. The Company recognizes net revenues derived from films after the distributor has (i) retained its distribution fee; (ii) recovered all of its distribution

Relativity Holdings LLC

Notes to Consolidated Financial Statements (continued)

**2. Summary of Significant Accounting Policies (continued)**

expenses; and, (iii) recovered all participations and residuals incurred on a title-by-title basis. The Company then shares in the profits based on its share of total financing required for the project. Revenue is recognized on a 60-day "lag" basis for statements that are received monthly and a quarter "lag" basis for statements that are received quarterly.

As a result of the Company's use of distributors for certain of its films, the amount of revenue that is recognized from films in any given period is dependent on the timing, accuracy, and sufficiency of the information received from these distributors. As is typical in the film industry, these distributors may make adjustments in future periods to information previously provided to the Company that could have a material impact on the Company's operating results in later periods.

The Company recognizes agent fees generated from the negotiation of an athlete's contract with a professional sports team on a straight-line basis over each individual season, commensurate with the period over which the client (athlete) performs under his contract and for which the client is compensated. Revenues from fees related to players performance bonuses and marketing appearances or endorsements are recorded when such amounts are earned and determinable by the Company.

**Participation and Residual Costs**

Participation and residual costs are expensed using the individual film forecast method, which expenses those costs in the same ratio as the current period revenue bears to estimated remaining ultimate revenue as of the beginning of the year. The accrued participation and residual costs related to a film begin to be expensed once the film is released and the Company begins to recognize revenue from that film. Participation and residual expense for the years ended December 31, 2013 and 2012, was $37,951,000 and $41,058,000, respectively, and is included in direct operating expenses in the accompanying consolidated statements of operations.

**Advertising and Marketing Expenses**

The costs of advertising and marketing expenses are expensed as incurred. Advertising expenses for the years ended December 31, 2013 and 2012, were $195,066,000 and $155,412,000, respectively, which were recorded in marketing and distribution expenses in the accompanying consolidated statements of operations.

Relativity Holdings LLC

Notes to Consolidated Financial Statements (continued)

**2. Summary of Significant Accounting Policies (continued)**

**Commitment and Guaranty Fees**

The Company has entered into credit facilities which require monthly payments of commitment and guaranty fees on the unused facility amounts. For certain credit facility arrangements, the payment of the fees are paid through an increase of the face value of the credit facility.

**Income Taxes**

The Company is a disregarded entity for income tax purposes, and substantially all federal and state income taxes are recorded by its members. Accordingly, the Company does not provide for income taxes.

The Company may incur certain state taxes imposed by states in which it conducts business, which are included in general and administrative expenses in the accompanying consolidated statements of operations.

The results of operations reflected in the accompanying statements of operations differ from amounts reported in the members' federal income tax returns because of differences in accounting policies adopted for financial and tax reporting purposes.

The Company periodically evaluates its tax positions with respect to all open years, as defined by the statute of limitations, to evaluate whether it is "more-likely-than-not" that such positions would be sustained upon examination by a tax authority based on its technical merits. For federal income purposes, the Company remains open to examination for fiscal years 2010 and after. For state income tax purposes, the Company remains open to examination for fiscal years 2009 and after.

**3. Film Asset Transfer**

On May 30, 2012, the Company transferred 30 of its films, including related assets, to Manchester Library Company LLC (MLC), an affiliate of Heatherden Securities Corp., a member of RH, and issued 100 RH class C units to Beverly Blvd 2 Holdings LLC (BB2H), a controlled subsidiary of the Company until May 11, 2011, for total consideration valued at approximately $288,840,000, which was credited as payment of certain related-party borrowings. As a result of this transfer, the Company's borrowings under the Manchester B, Manchester D,

Relativity Holdings LLC

Notes to Consolidated Financial Statements (continued)

**3. Film Asset Transfer (continued)**

and BB2H Notes were paid in full and amounts outstanding under the remaining Manchester Loan were reduced to $96,213,000. Since the Company transferred control of all of its right, title and interest to these films to MLC, the Company recognized a gain on the transfer of these operating assets of $183,602,000. The gain on transfer represented the difference between the fair value of the film assets transferred and their carrying value, including the related accrued participations, residuals and unearned deferred revenue. The value of the assets transferred was determined using a discounted cash flow calculation. Key inputs employed in the discounted cash flow calculation included estimates of the films' projected revenue and costs as well as a risk-adjusted discount rate. The total unamortized value of film costs transferred to MLC was $106,484,000 as of the date of transfer.

**4. Sony Co-Financing and Distribution Agreement**

On January 19, 2007, BB and Sony entered into the Sony Co-Financing and Distribution Agreement for a term of five years. Under the terms of this agreement, Sony was to present to BB all of its qualified film projects which it intended to produce and, in turn, BB was required to select 75% of those projects to co-finance each year. BB receives a pro rata share of the profits and ownership for the projects it co-financed based on its share of the total financing required.

On December 16, 2011, BB and Sony amended the Sony Co-Financing and Distribution Agreement to end the requirement of Sony to offer pictures to BB to co-finance and to provide that the total amount that Sony would pay to the Company in future periods is a maximum of $214,810,000 or a minimum of $194,810,000, dependent on the performance of the underlying films, of which a minimum cumulative amount of $122,880,000 will be paid on or before April 30, 2014, and a minimum cumulative amount of $174,080,000 will be paid on or before April 30, 2017. Sony will pay all such amounts by April 30, 2020, after which it will have no obligation to the Company under the Sony Co-Financing and Distribution Agreement. During the year ended December 31, 2013, Sony made payments to the Company of $41,321,000. Aggregate payments made through December 31, 2013 are $121,831,000.

There will be no further proceeds received from the exploitation of BB's films once Sony has paid the required contractual payments (see Note 8).

Relativity Holdings LLC

Notes to Consolidated Financial Statements (continued)

**5. Film Costs**

Film costs consist of the following (in thousands):

|  | December 31 | |
|  | 2013 | 2012 |
|---|---|---|
| In release, net of amortization | $ 93,175 | $ 106,521 |
| Completed not released | 11,198 | – |
| In production | 23,241 | 83,366 |
| In development | 2,441 | 1,122 |
| Total film costs | $ 130,055 | $ 191,009 |

The Company expects that approximately 47% of films in release will be amortized during the one-year period ending December 31, 2014, approximately 74% will be amortized during the three-year period ending December 31, 2016, and approximately 81% will be amortized during the four-year period ending December 31, 2017.

**6. Business Acquisitions**

In July 2013, RS acquired certain assets from Dan Fegan, a basketball player representative based in Los Angeles, California, who provides representation for more than 20 professional basketball players.

The acquisition of Dan Fegan's assets, which were merged into RS, was accounted for as a business combination. The assets were acquired for a purchase consideration of $12,250,000 in cash, 46,700 class A membership units in RS, which were valued at $766,000 as of the acquisition date, and up to $8,000,000 of contingent future cash payments. The contingent consideration was recorded at the acquisition date fair value of $5,800,000. The purchase consideration was allocated to the assets acquired and liabilities assumed based on their respective fair values.

Relativity Holdings LLC

Notes to Consolidated Financial Statements (continued)

**6. Business Acquisitions (continued)**

The purchase price allocation is summarized as follows (in thousands):

| | | |
|---|---|---:|
| Assets acquired: | | |
| Cash | $ | 721 |
| Accounts receivable | | 2,245 |
| Athlete relationships | | 8,503 |
| Goodwill | | 8,741 |
| | | |
| Liabilities assumed: | | |
| Accounts payable and accrued liabilities | | (1,395) |
| Total purchase price | $ | 18,815 |

In October 2012, the Company acquired a controlling interest in Sky Land BVI, which controls a variable interest entity, Beijing Xing Yun Tian Di Film & Television Culture Development Co., Ltd. (Sky Land Beijing), through its wholly-owned subsidiary Sky Land Be Si Kai Lan De (Beijing) Science and Technology Co., Ltd. (Sky Land WFOE).

Sky Land BVI is a film and television production and distribution company that operates in the PRC through Sky Land Beijing. PRC regulations restrict foreign investments in the film and television industry, and as a British Virgin Islands corporation, Sky Land BVI is deemed a foreign legal person under PRC laws. Accordingly, Sky Land BVI is not allowed to directly own and operate its business in the PRC. Sky Land BVI therefore conducts its operations through Sky Land WFOEs contractual arrangements with Sky Land Beijing. Sky Land Beijing holds the requisite license and permits necessary to conduct business in the PRC. Sky Land WFOE, as variable interest holder, consolidates Sky Land Beijing, the variable interest entity, as it has the power and benefits and is the primary beneficiary of Sky Land Beijing.

The Company previously held a 50% interest in Sky Land BVI that was accounted for using the equity method. As the Company's acquisition of an additional 40% interest in October 2012, represented its acquisition of a controlling interest, this transaction was accounted for as a business combination achieved in stages. The Company remeasured its previously held equity interest and recognized a gain on acquisition of a controlling interest of $120,000,000 in the accompanying 2012 consolidated statement of operations.

The Company acquired this additional 40% interest for 80,000 shares of RH class A units, which were valued at $100,000,000 as of the acquisition date. The purchase price was allocated to the

Relativity Holdings LLC

Notes to Consolidated Financial Statements (continued)

**6. Business Acquisitions (continued)**

net assets acquired based on their respective fair values. The purchase price allocation is summarized as follows (in thousands):

| Purchase price allocation: | | |
|---|---|---|
| Cash | $ | 9,009 |
| Other assets | | 1,463 |
| Film costs | | 2,962 |
| Goodwill | | 4,023 |
| PRC film distribution right | | 140,000 |
| PRC distributor relationship | | 60,000 |
| PRC business license | | 20,000 |
| Accounts payable and accrued liabilities | | (207) |
| Noncontrolling interests | | (17,250) |
| Subtotal | | 220,000 |
| Less: previously held equity interest | | (120,000) |
| Total purchase price | $ | 100,000 |

In August 2012, RS acquired the assets of NBK Baseball Group, LLC (commonly referred to as SFX Baseball). SFX Baseball, based in Northbrook, Illinois, provides representation for more than 200 professional baseball players, managers, and broadcasters. The acquisition of SFX Baseball, which is now Relativity Baseball, LLC and Relativity Managers & Broadcasters, was accounted for as a business combination. The assets were acquired for purchase consideration of $23,206,000 in cash and 200,000 class A membership units in RS, which were valued at $4,120,000 as of the acquisition date. The purchase price was allocated to the assets acquired based on their respective fair values. The purchase price allocation is summarized as follows (in thousands):

| Purchase price allocation: | | |
|---|---|---|
| Cash | $ | 1,177 |
| Accounts receivable | | 8,616 |
| Other assets | | 28 |
| Property and equipment | | 64 |
| Athlete relationships | | 4,800 |
| Trademark | | 10 |
| Goodwill | | 12,631 |
| Total purchase price | $ | 27,326 |

Relativity Holdings LLC

Notes to Consolidated Financial Statements (continued)

**6. Business Acquisitions (continued)**

In August 2012, RS acquired the assets of PB Management, Inc. (commonly referred to as Maximum Sports Management). Maximum Sports Management, based in Fort Wayne, Indiana, provides representation for more than 30 professional football players. The acquisition of Maximum Sports Management, which is now Relativity Football, LLC, was accounted for as a business combination. The assets were acquired for purchase consideration of $8,413,000 in cash and 175,000 class A membership units in RS, which were valued at $3,605,000 as of the acquisition date. The purchase price was allocated to the assets acquired based on their respective fair values. The purchase price allocation is summarized as follows (in thousands):

| Purchase price allocation: | | |
|---|---|---:|
| Cash | $ | 500 |
| Athlete relationships | | 3,000 |
| Trademark | | 10 |
| Goodwill | | 8,508 |
| Total purchase price | $ | 12,018 |

**7. Intangible Assets**

Intangible assets consist of a right to distribute films in the PRC, PRC distributor relationship, PRC business license, athlete relationships, trademarks and goodwill resulting from the Company's business acquisitions. No impairment losses were recognized during the years ended December 31, 2013 and 2012, on intangible assets (in thousands):

| | Life | Gross Fair Value | Accumulated Amortization | Balance at December 31, 2013 |
|---|---|---:|---:|---:|
| Goodwill | Indefinite | $ 33,903 | $ – | $ 33,903 |
| PRC film distribution right | 10 years | 140,000 | 16,333 | 123,667 |
| PRC distributor relationship | 5 years | 60,000 | 14,000 | 46,000 |
| PRC business license | 19 years | 20,000 | 1,228 | 18,772 |
| Athlete relationships | 5 years | 16,303 | 2,906 | 13,397 |
| Trademarks | 1 year | 20 | 20 | – |
| Total intangible assets | | $ 270,226 | $ 34,487 | $ 235,739 |

Relativity Holdings LLC

Notes to Consolidated Financial Statements (continued)

**7. Intangible Assets (continued)**

| | Life | Gross Fair Value | Accumulated Amortization | Balance at December 31, 2012 |
|---|---|---|---|---|
| Goodwill | Indefinite | $    25,162 | $        – | $    25,162 |
| PRC film distribution right | 10 years | 140,000 | 2,333 | 137,667 |
| PRC distributor relationship | 5 years | 60,000 | 2,000 | 58,000 |
| PRC business license | 19 years | 20,000 | 175 | 19,825 |
| Athlete relationships | 5 years | 7,800 | 559 | 7,241 |
| Trademarks | 1 year | 20 | 7 | 13 |
| Total intangible assets | | $    252,982 | $    5,074 | $    247,908 |

The Company expects future amortization expense for the next five years to be as follows (in thousands):

Years ending December 31:

| | |
|---|---|
| 2014 | $    30,313 |
| 2015 | 30,313 |
| 2016 | 30,313 |
| 2017 | 27,754 |
| 2018 | 15,967 |

Relativity Holdings LLC

Notes to Consolidated Financial Statements (continued)

**8. Notes Payable**

RMH issued Class A Notes, Class B Notes and Class D Notes. RMH will not be able to repay all of these notes payable when they become due as there will be no further proceeds received from the exploitation of BB's films once Sony has paid the required contractual payments under the amended Sony co-financing and Distribution Agreement (see Note 4). The Class A Notes, Class B Notes and Class D Notes are nonrecourse to RH and its other subsidiaries.

At December 31, 2013 and 2012, RMH and RD had amounts outstanding under their notes payable as follows (in thousands):

|  | Outstanding Principal | | Outstanding PIK | | Premium | | Total | |
|---|---|---|---|---|---|---|---|---|
| **December 31, 2013** | | | | | | | | |
| Class A | $ | **115,024** | $ | **-** | $ | **1,417** | $ | **116,441** |
| Class B | | **120,000** | | **288,400** | | **-** | | **408,400** |
| Total notes payable | $ | **235,024** | $ | **288,400** | $ | **1,417** | $ | **524,841** |
| | | | | | | | | |
| **December 31, 2012** | | | | | | | | |
| Class A | $ | 152,880 | $ | – | $ | 3,566 | $ | 156,446 |
| Class B | | 120,000 | | 211,657 | | – | | 331,657 |
| Fortress Note | | 1,394 | | – | | – | | 1,394 |
| Total notes payable | $ | 274,274 | $ | 211,657 | $ | 3,566 | $ | 489,497 |

**Class A Notes**

On January 19, 2007, RMH issued Class A Notes with an aggregate face value of $352,000,000, which were subsequently increased to $375,000,000 on November 5, 2007. The Class A Notes were purchased by Citibank, N.A. (Citibank) and, pursuant to the Class A Note Purchase Agreement, the notes were a senior, secured revolving facility.

On December 16, 2011, Citibank transferred the Class A Notes to a subsidiary of Fortress Investment Group (Fortress), and the Class A Note Purchase Agreement was amended, which effectively modified the Class A Notes from a revolving-debt arrangement to a term-debt arrangement and reduced the effective interest rate of the Class A Notes from one-month LIBOR plus 6.00% to one-month LIBOR plus 5.00%. As consideration for the Company's consent to the transfer, Fortress paid the Company a consent fee of $6,500,000. The Company accounted for

Relativity Holdings LLC

Notes to Consolidated Financial Statements (continued)

**8. Notes Payable (continued)**

the modification to the Class A Notes as a troubled debt restructuring as RMH has a history of recurring losses and is in an accumulated deficit position and the creditor granted a concession in the form of a reduced effective interest rate. Since the troubled debt restructuring involved only a modification of terms, the carrying amount of the Class A Notes was not adjusted, and the effects of the changes are reflected in future periods. The consideration paid for the Company's consent has been reflected as a debt premium and is included in the effective interest rate calculation to be amortized over the remaining term of the Class A Notes.

Interest was payable in arrears at the one-month LIBOR plus 6.00% per annum through December 16, 2011, and at the one-month LIBOR plus 5.00% per annum after that date. At December 31, 2013 and 2012, LIBOR was 0.17% and 0.21%, respectively. The maturity date for the Class A Notes is December 22, 2014. The Class A Notes are collateralized by the related film assets of RMH.

**Class B Notes**

On January 19, 2007, RMH issued Class B Notes with an aggregate face value of $132,000,000, which were subsequently decreased to $120,000,000 on November 5, 2007. The Class B Notes were purchased by Citibank. The Class B Notes are subordinate to the Class A Notes. On January 19, 2008, RMH borrowed the entire available amount on the Class B Notes.

On December 16, 2011, Citibank transferred 77% of the Class B Notes to Fortress, and the Class B Note Purchase Agreement was amended, which only updated certain definitions in the agreement.

Interest is paid-in-kind at a rate of 21% per annum. RMH issued $76,743,000 and $62,339,000 in paid-in-kind interest during the years ended December 31, 2013 and 2012, respectively. Paid-in-kind interest has the same terms and rights as the Class B Notes, except that interest on the paid-in-kind will accrue from the date the paid-in-kind interest is issued. As of December 31, 2013 and 2012, RMH has issued $288,400,000 and $211,657,000, respectively, in paid-in-kind interest. The maturity date for the Class B Notes is December 22, 2014. The Class B Notes are collateralized by the related film assets of RMH.

Relativity Holdings LLC

Notes to Consolidated Financial Statements (continued)

**8. Notes Payable (continued)**

**Fortress Note**

On December 16, 2011, Fortress advanced RD $8,084,000 (the Fortress Note). The maturity date for the Fortress Note was June 16, 2014. The Fortress Note was collateralized by RD's distribution fees. During 2013, the outstanding balance was paid in full.

**Class D Notes**

On January 19, 2007, RMH issued Class D Notes in connection with the issuance of the Class B Notes. Each purchaser of Class B Notes was entitled to purchase for $1,000 one Class D Note per $1,000,000 of face amount of Class B Notes purchased. On January 22, 2008, all Class D Notes were purchased.

No interest accrues on the Class D Notes, nor do they have a maturity date. After the repayment of all outstanding debt on Class A, Class B, and certain other intercompany notes, if RMH begins producing a residual net profit, the Class D noteholders are entitled to a pro-rata share of such net profits, up to a maximum of 39% based on the amount of Class D Notes purchased. Class D Notes are not entitled to any derivative right participations or any profits beyond first cycle and do not share in the copyrights. Management expects that there will not be residual net profits to pay the Class D note holders. As there is no maturity date and payments are contingent upon net profits being generated by certain film projects which, as noted previously are not expected, the Company considers the Class D Notes to be a contingent liability whose fair value is zero.

Estimating the fair value of all classes of notes is not practicable without incurring excessive costs.

**9. Interest Rate Swap**

On November 6, 2007, the Company entered into an interest rate swap with Citibank to hedge the variable rate on its Class A Notes. Under its terms, the Company paid Citibank a fixed rate of interest and Citibank paid the Company a floating rate of interest based on the notional amount. The interest rate swap had monthly payment dates with a stated fixed rate of 4.83% per annum and terminated on May 1, 2013.

Relativity Holdings LLC

Notes to Consolidated Financial Statements (continued)

**10. Bank Debt**

**OneWest Bank**

On September 25, 2012, the Company entered into a credit facility for up to $300,000,000 and received an initial commitment of $50,000,000 from OneWest Bank, FSB (OneWest Bank; the OneWest Bank Debt). Commitments under the OneWest Bank Debt have subsequently increased to $160,000,000. Interest is payable in arrears on each applicable interest payment date with an interest rate of LIBOR plus 3.75% with a LIBOR floor of 0.50%. At December 31, 2013 and 2012, LIBOR was 0.17% and 0.21%, respectively. The OneWest Bank Debt is to mature on September 25, 2016, and incurs commitment fees, which are calculated and payable quarterly. The available credit facility amount is subject to a commitment fee rate of 0.75% per annum.

At December 31, 2013 and 2012, the Company had outstanding borrowings under the OneWest Bank Debt of $86,566,000 and $21,767,000. At December 31, 2013 and 2012, the borrowing base limited available borrowings to $86,566,000 and $21,767,000.

**SunTrust Bank**

In August 2012, RS entered into a revolving credit and term loan agreement with SunTrust Bank (the SunTrust Bank Debt). The SunTrust Bank Debt provided RS with a $35,000,000 credit facility that matures on August 14, 2017. Loans under the SunTrust Bank Debt accrue interest at a variable interest rate indexed to LIBOR plus 3.50%. At December 31, 2013 and 2012, LIBOR was 0.17% and 0.21%, respectively.

The SunTrust Bank Debt consists of a $15,000,000 term loan, which is an amortizing loan requiring mandatory principal payments at each calendar quarter end and a revolving line of credit with a maximum borrowing capacity of $20,000,000. RS is required to pay unused commitment fees equal to 0.50% of the unused portion of the revolving line of credit.

The debt issued under the SunTrust Bank Debt was funded net of an original issue discount of $350,000. Amortization of the original issue discount during the years ended December 31, 2013 and 2012 was $66,000 and $27,000, respectively, and is included in interest expense in the accompanying consolidated statements of operations. Borrowings under the SunTrust Bank Debt are secured by substantially all of the assets of RS.

The SunTrust Bank debt agreement was amended on May 30, 2014 to revise certain provisions in the agreement.

# Relativity Holdings LLC

## Notes to Consolidated Financial Statements (continued)

### 10. Bank Debt (continued)

At December 31, 2013 and 2012, RS had outstanding borrowings under the SunTrust Bank Debt of $30,300,000 and $21,800,000, respectively. At December 31, 2013 and 2012, the borrowing base limited available borrowings to $36,200,000 and $22,300,000, respectively.

The following sets forth the annual maturities of the Company's Bank Debt (in thousands):

| Years ending December 31: | | |
|---|---|---|
| 2014 | $ | 3,250 |
| 2015 | | 3,000 |
| 2016 | | 89,566 |
| 2017 | | 21,050 |
| Total bank debt | $ | 116,866 |

### 11. Production Loans

At December 31, 2013 and 2012, the Company had amounts outstanding under its production loans as follows (in thousands):

| | December 31 | |
|---|---|---|
| | 2013 | 2012 |
| UB Loans | $        – | $      17,976 |
| OneWest Loans | 4,062 | 39,142 |
| Vine Loans (at fair value) | 4,310 | 4,502 |
| Total production loans | $    8,372 | $      61,620 |

Relativity Holdings LLC

Notes to Consolidated Financial Statements (continued)

**11. Production Loans (continued)**

The Company entered into loan and security agreements with UB in connection with the production or acquisition of certain films (the UB Loans). The UB Loans were secured by the assets of the respective films and are otherwise non-recourse to the Company. The UB Loans were fully paid in 2013. There were no additional amounts available under the UB Loans. Borrowings under the UB Loans bore interest at LIBOR plus 3.00%. At December 31, 2012, LIBOR was 0.21% and the total outstanding borrowings under the UB Loans were $17,976,000.

The Company has also entered into loan agreements with OneWest Bank (the OneWest Loans). The OneWest Loans are secured by the assets of the respective films. The aggregate maximum amount available to the Company under the OneWest Loans was $53,855,000 and $48,130,000 at December 31, 2013 and 2012, respectively. Amounts are only able to be borrowed in connection with the production or acquisition of specified films. There was $49,793,000 and $15,302,000 available under the OneWest Loans at December 31, 2013 and 2012, respectively. Borrowings under the OneWest Loans bear interest at LIBOR plus 3.25%. At December 31, 2013 and 2012, LIBOR was 0.17% and 0.21%, respectively. The total outstanding borrowings under the OneWest Loans were $4,062,000 and $39,142,000 at December 31, 2013 and 2012.

In connection with the production of the films *3:10 to Yuma*, *The Bank Job*, and *The Forbidden Kingdom* (collectively, the Vine Films), the Company entered into loan and security agreements for each film (the Vine Loans). Each of the Vine Loans has substantially the same terms, and is collateralized by the assets of the respective films and is otherwise non-recourse to the Company. Borrowings under the Vine Loans bear interest at LIBOR plus 5.00%. At December 31, 2013 and 2012, LIBOR was 0.17% and 0.21%, respectively. As of the date of issuance of these consolidated financial statements, all three the Vine Loans are past their maturity date, as the receipts generated from the related films were not sufficient to repay the loans at that date. The Company will continue to repay the Vine Loans from the cash receipts received on the underlying films. The Company chose to elect fair value measurement for these Vine Loans because the Company's analysis of future receipts related to the distribution of the Vine Films indicated future receipts would be insufficient to repay the Vine Loans in full. At December 31, 2013 and 2012, the aggregate unpaid principal balances of the Vine Loans amounted to $75,117,000 and $69,810,000, respectively, and the aggregate fair value totaled $4,310,000 and $4,502,000, respectively.

# Relativity Holdings LLC

## Notes to Consolidated Financial Statements (continued)

### 12. Related-Party Borrowings

At December 31, 2013 and 2012, the Company had amounts outstanding under its related-party borrowings as follows (in thousands):

| | Outstanding Principal | Outstanding PIK | Discount | Total |
|---|---|---|---|---|
| **December 31, 2013** | | | | |
| CB Term Loan A | $ 119,672 | $ – | $ (1,181) | $ 118,491 |
| CB Term Loan B | 125,000 | 33,902 | – | 158,902 |
| CB RS Term Loan | 11,643 | – | (2,476) | 9,167 |
| Macquarie P&A Loan | 36,051 | – | – | 36,051 |
| Manchester Loan | 96,272 | 11,793 | (1,729) | 106,336 |
| Class C Units | 60,000 | 12,470 | – | 72,470 |
| Total related-party borrowings | $ 448,638 | $ 58,165 | $ (5,386) | $ 501,417 |
| | | | | |
| **December 31, 2012** | | | | |
| CB Term Loan A | $ 122,604 | $ – | $ (2,014) | $ 120,590 |
| CB Term Loan B | 125,000 | 10,039 | – | 135,039 |
| CB RS Term Loan | 7,643 | – | (197) | 7,446 |
| CB P&A Loan | 13,042 | – | – | 13,042 |
| Manchester Loan | 96,272 | 4,253 | (2,445) | 98,080 |
| Class C Units | 60,000 | 4,418 | – | 64,418 |
| IDG Note | 2,500 | – | – | 2,500 |
| SAIF Note | 2,500 | – | – | 2,500 |
| Total related-party borrowings | $ 429,561 | $ 18,710 | $ (4,656) | $ 443,615 |

Related-party borrowings include amounts for which a related-party, or an affiliate of a related party, acts in the capacity of a lender or an agent, among other relationships.

In May 2012, the Company entered into a financing agreement with CB Agency Services, LLC, as origination agent, and Cortland Capital Market Services LLC, as administrative and collateral agent, and various lenders party thereto, which provided for a $125,000,000 term loan A (the CB Term Loan A) which bears interest at 10.00% per annum payable in arrears monthly and a $125,000,000 term loan B (the CB Term Loan B) which bears interest at 15.00% per annum

# Relativity Holdings LLC

## Notes to Consolidated Financial Statements (continued)

### 12. Related-Party Borrowings (continued)

payable-in-kind and accruing monthly. There are no additional amounts available under the CB Term Loan A and the CB Term Loan B. The CB Term Loan A and the CB Term Loan B mature on May 30, 2015.

On November 2, 2011, the Company entered into a funding agreement with YCCM Funding, LLC, an affiliate of Yucaipa Companies, a member of RH beginning in 2013, (the CB P&A Loan). The loan bore interest at 10.00% per annum and was payable in arrears monthly beginning on January 1, 2012. The CB P&A Loan was paid in full on May 14, 2013.

On December 21, 2012, the Company entered into a funding agreement with Macquarie Bank Limited (the Macquaire P&A Loan). The loan bears interest at 6.90% per annum payable-in-kind and accruing monthly. The balance of the loan at December 31, 2013 was $36,051,000. At December 31, 2013, the loan has maturity dates of March 17, 2015, April 1, 2015, and June 10, 2015 of $14,812,000, $10,702,000, and $10,537,000, respectively.

In August 2012, RS entered into an agreement with CB CA Lending, LLC (the CB RS Term Loan). The CB RS Term Loan provided RS with term loan that is subordinated to the SunTrust Bank Loan. The CB RS Term Loan matures in August 2018, and accrues interest at a fixed interest rate of 10.0%. The CB RS Term Loan was funded net of an original issue discount of $210,000. In July 2013, RS amended the CB RS Term Loan and increased outstanding borrowings by $4,000,000. In connection with the financing, the debt was funded net of an original discount of $2,700,000.

At December 31, 2013 and 2012, the Company had $9,167,000 and $7,643,000, respectively, outstanding under the CB RS Term Loan. Amortization of the original issue discount during the year ended December 31, 2013 and 2012, was $278,000 and $13,000, respectively, and is included in interest expense in the accompanying consolidated statement of operations.

The Manchester Loan matures on May 30, 2016, and bears interest at 7.50% per annum payable-in-kind and accruing monthly. There are no additional amounts available under the Manchester Loan. The balance of the loan at December 31, 2013 and 2012 was $106,336,000 and $96,272,000, respectively.

The amended RH LLC agreement provided for the issuance to BB2H of 100 new class C units of RH, which had an initial fair value of $600,000 per unit (Class C Units). The Class C Units accrue a return of 12.50% per annum, compounded monthly, and are payable on May 30, 2018, or earlier upon certain redemption events.

Relativity Holdings LLC

Notes to Consolidated Financial Statements (continued)

## 12. Related-Party Borrowings (continued)

On December 12, 2012, Sky Land BVI entered into promissory notes in the aggregate amount of $5,000 with its noncontrolling interest holders, IDG China Media Fund II, L.P. (IDG) and SAIF Partners IV L.P. (SAIF). The IDG and SAIF notes matured and were fully paid in October 2013, and bore interest at 10.00% per annum.

The following sets forth the annual maturities of the Company's related-party borrowings (in thousands):

| Years ending December 31: | | |
|---|---|---:|
| 2014 | $ | – |
| 2015 | | 314,625 |
| 2016 | | 108,065 |
| 2017 | | – |
| 2018 | | 84,113 |
| Total related-party borrowings | $ | 506,803 |

## 13. Commitments and Contingencies

### Litigation

The Company is involved in legal proceedings arising in the ordinary course of business. These matters are not expected to have a material adverse effect upon the Company's consolidated financial statements.

### Operating Lease Commitments

The Company leases office facilities under operating lease commitments expiring in 2017. For the years ended December 31, 2013 and 2012, rent expense under all operating leases was $3,729,000 and $2,702,000, respectively.

Relativity Holdings LLC

Notes to Consolidated Financial Statements (continued)

**13. Commitments and Contingencies (continued)**

At December 31, 2013, the estimated future minimum operating lease payments under operating leases were as follows (in thousands):

| Years ending December 31: | | |
|---|---|---|
| 2014 | $ | 1,835 |
| 2015 | | 1,556 |
| 2016 | | 1,700 |
| 2017 | | 1,751 |
| 2018 | | 1,190 |
| Total | $ | 8,032 |

**Employment Agreement Commitments**

The Company has entered into certain long-term employment agreements expiring at various dates throughout 2018. For the years ended December 31, 2013 and 2012, expenses under all employment agreements were $27,608,000 and $25,537,000, respectively.

At December 31, 2013, the estimated future minimum payroll payments under employment agreements are as follows (in thousands):

| Years ending December 31: | | |
|---|---|---|
| 2014 | $ | 25,124 |
| 2015 | | 13,309 |
| 2016 | | 7,568 |
| 2017 | | 3,153 |
| 2018 | | 479 |
| Total | $ | 49,633 |

Relativity Holdings LLC

Notes to Consolidated Financial Statements (continued)

**14. Subsequent Events**

The Company has considered subsequent events through May 30, 2014, the date the financial statements were available to be issued.

On February 21, 2014, the Company formed a new U.S. distribution and marketing joint venture, Relativity Europa Distribution, LLC ("RED") with EuropaCorp. Under the terms of the deal, EuropaCorp will contribute into RED approximately $130 million in exchange for a 50% stake. The Company will own the other 50% of RED. Each company will exclusively use the services of RED to market and distribute its respective films. The overhead of RED will be borne 50/50 by the Company and EuropaCorp.

34

**About EY**

EY is a global leader in assurance, tax, transaction and advisory services. The insights and quality services we deliver help build trust and confidence in the capital markets and in economies the world over. We develop outstanding leaders who team to deliver on our promises to all of our stakeholders. In so doing, we play a critical role in building a better working world for our people, for our clients and for our communities.

EY refers to the global organization, and may refer to one or more, of the member firms of Ernst & Young Global Limited, each of which is a separate legal entity. Ernst & Young Global Limited, a UK company limited by guarantee, does not provide services to clients. For more information about our organization, please visit ey.com.

© 2013 Ernst & Young LLP.
All Rights Reserved.

**ey.com**



**<u>EXHIBIT E</u>**

Chapter 7 Liquidation Analysis

| | Liquidation Value Calculation (2) (3) (4) |
|---|---|
| **Assets** | |
| Unrestricted Cash | 3,997,000 |
| Asset Value (1) | 125,000,000 |
| | |
| **Debt** (5) | |
| DIP Loan | -35,000,000 |
| | |
| TLA/TLB Secured Debt retained by R Kavanaugh and J Nicholas | -175,000,000 |
| | |
| TLA/TLB Secured Debt retained by Prepetition TLA/TLB holders | -60,000,000 |
| | |
| Administrative Expenses | -5,000,000 |
| | |
| Liquidation Costs (6) (7) | -5,000,000 |
| | |
| **Total** | -$151,003,000 |

| | Plan Treatment (8) |
|---|---|
| Guaranteed Recovery for Unsecured Creditors (excluding litigation proceeds) | 9,000,000 |
| | |
| Unsecured Claims Pool | 78,229,877 |
| | |
| Recovery % | 11.50% |

**NOTES FOR LIQUIDATION ANALYSIS:**

1.  For purposes of this hypothetical Liquidation Analysis, it is assumed that the Debtors' remaining assets at February 1, 2016 are sold for an amount consistent with the high bid received at the October 1-2 auction which was a credit bid in the amount of $250 million resulting in little to no cash consideration to the Debtors. Specifically, the Stalking Horse bidders offered to purchase all of the Debtors assets, free and clear of all liabilities, for a credit bid of $250mm following a marketing process conducted under the jurisdiction of the Bankruptcy Court. Nonetheless, the Stalking Horse bidders determined to purchase the Debtors' non-scripted television business for $125 million, in exchange for the transfer of their remaining claims for $65 million in cash and a retained note in the amount of $60 million.

2.  The presumed date of the hypothetical chapter 7 liquidation is February 1, 2016. As of that date, the Debtors project unrestricted cash in the amount of $3,997,000, administrative claims in the amount of approximately $5,000,000 and remaining assets, as described above, of a liquidation value insufficient to satisfy remaining secured claims. In addition, even absent such shortfall with respect to the payment of the Debtors' remaining secured claims, the Debtors would remain unable to satisfy its remaining, administrative claims in the context of a liquidation.

3.  Although Relativity Fashion is not obligated with respect to the Debtors' pre-petition borrowed obligations, a substantial portion of Relativity Fashion's operations ceased prior to the auction during the Debtors' chapter 11 cases. Likewise, the Debtors do not anticipate that there is value in their two Vine/Verite entities beyond the amount of their primary obligations.

4.  The Debtors have not made any effort to allocate remaining asset value among their multiple entities. As noted above, because the $235 million of senior secured TLA/TLB debt remaining after the credit bid for Relativity's unscripted television assets, plus DIP financing in the approximate amount of $35 million was jointly and severally guaranteed by substantially all of the Debtors (other than the Vine/Verite entities—J&J Project and Yuma, and Relativity Fashion), and the obligations of each of those Debtors are secured by all of the assets of those Debtors, in a hypothetical chapter 7 liquidation, there would not be any value beyond the guaranteed and secured obligations available in any of the Debtors (other than J&J Project,Yuma, and Relativity Fashion).

5.  In addition to the debt shown, the Debtors are also obligated with respect to approximately (i) $138.9mm of Elliott debt, which is treated as unsecured for liquidation analysis purposes (but which would be treated as secured by substantially all of Debtors' assets and entitled to payment ahead of the unsecured creditors if the value of Debtors assets was sufficient to repay all prior claims); (ii) $85mm of pre-release P&A claims; (iii) $26.6mm of post-release P&A claims, and (iv) $34mm of production loans; each of the pre-release P&A loans, the post-release P&A loans and the production loans are secured by certain of Debtors' assets. Those

amounts represent additional secured debt on assets of certain specific debtors which further supports the conclusion that there is no value available for unsecured creditors.

6.  It is assumed that additional liquidation costs could be up to 4% of asset value ($5mm) in order to satisfy the costs of a Chapter 7 Trustee and related legal fees and expenses.  A chapter 7 Trustee would likely have to seek consensual funding from the Debtors secured lenders, or seek to surcharge their collateral for those costs and expenses.

7.  In a hypothetical chapter 7 liquidation, it is highly unlikely that a chapter 7 trustee would pursue the Debtors' litigation causes of action given the absence of funding for such litigation, and the potential defenses of the parties.

8.  Estimated recovery is calculated based upon the following assumptions: (a) the numerator includes guaranteed payments of $9 million and excludes proceeds of Litigation and (b) the denominator is based upon an estimated Unsecured Claim pool of $215,329,877, but excludes $137.1 million under the Manchester Prepetition Credit Facility which is the subject of ongoing discussions among Manchester and the Committee.

**<u>EXHIBIT D</u>**

Blackline Against Disclosure Statement Filed on November 20, 2015

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN PROPONENTS' PLAN OF REORGANIZATION (THE "PLAN").  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT MAY BE REVISED TO REFLECT EVENTS THAT OCCUR AFTER THE DATE HEREOF BUT PRIOR TO BANKRUPTCY COURT APPROVAL OF THE DISCLOSURE STATEMENT.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RELATIVITY FASHION, LLC, *et al.*,[1] | Case No. 15-11989 (MEW) |
| Debtors. | (Jointly Administered) |

**~~CORRECTED~~ FIRST AMENDED DISCLOSURE STATEMENT FOR FIRST AMENDED PLAN PROPONENTS' PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Richard L. Wynne
Bennett L. Spiegel
Lori Sinanyan (admitted *pro hac vice*)
**JONES DAY**
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

ATTORNEYS FOR THE PLAN CO-PROPONENT, DEBTORS AND DEBTORS IN POSSESSION

Van C. Durrer II
Shana Elberg
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
4 Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

ATTORNEYS FOR PLAN CO-PROPONENT, KAVANAUGH

Craig A. Wolfe
Malani J. Cademartori
Blanka K. Wolfe
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
30 Rockefeller Plaza
New York, New York
Telephone:  (212) 653-8700
Facsimile:  (212) 653-8701

ATTORNEYS FOR THE PLAN CO-PROPONENT, DEBTORS AND DEBTORS IN POSSESSION

Dated: ~~November 18,~~ December 14, 2015

---

[1]     The Debtors in these Chapter 11 Cases are as set forth on page (i).

The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Relativity Fashion, LLC (4571); Relativity Holdings LLC (7052); Relativity Media, LLC (0844); Relativity REAL, LLC (1653); RML Distribution Domestic, LLC (6528); RML Distribution International, LLC (6749); RMLDD Financing, LLC (9114); 21 & Over Productions, LLC (7796); 3 Days to Kill Productions, LLC (5747); A Perfect Getaway P.R., LLC (9252); A Perfect Getaway, LLC (3939); Armored Car Productions, LLC (2750); Best of Me Productions, LLC (1490); Black Or White Films, LLC (6718); Blackbird Productions, LLC (8037); Brant Point Productions, LLC (9994); Brick Mansions Acquisitions, LLC (3910); Brilliant Films, LLC (0448); Brothers Productions, LLC (9930); Brothers Servicing, LLC (5849); Catfish Productions, LLC (7728); Cine Productions, LLC (8359); CinePost, LLC (8440); Cisco Beach Media, LLC (8621); Cliff Road Media, LLC (7065); Den of Thieves Films, LLC (3046); Don Jon Acquisitions, LLC (7951); DR Productions, LLC (7803); Einstein Rentals, LLC (5861); English Breakfast Media, LLC (2240); Furnace Films, LLC (3558); Gotti Acquisitions, LLC (6562); Great Point Productions, LLC (5813); Guido Contini Films, LLC (1031); Hooper Farm Music, LLC (3773); Hooper Farm Publishing, LLC (3762); Hummock Pond Properties, LLC (9862); Hunter Killer La Productions, LLC (1939); Hunter Killer Productions, LLC (3130); In The Hat Productions, LLC (3140); J&J Project, LLC (1832); JGAG Acquisitions, LLC (9221); Left Behind Acquisitions, LLC (1367); Long Pond Media, LLC (7197); Madaket Publishing, LLC (9356); Madaket Road Music, LLC (9352); Madvine RM, LLC (0646); Malavita Productions, LLC (8636); MB Productions, LLC (4477); Merchant of Shanghai Productions, LLC (7002); Miacomet Media LLC (7371); Miracle Shot Productions, LLC (0015); Most Wonderful Time Productions, LLC (0426); Movie Productions, LLC (9860); One Life Acquisitions, LLC (9061); Orange Street Media, LLC (3089); Out Of This World Productions, LLC (2322); Paranoia Acquisitions, LLC (8747); Phantom Acquisitions, LLC (6381); Pocomo Productions, LLC (1069); Relative Motion Music, LLC (8016); Relative Velocity Music, LLC (7169); Relativity Development, LLC (5296); Relativity Film Finance II, LLC (9082); Relativity Film Finance III, LLC (8893); Relativity Film Finance, LLC (2127); Relativity Films, LLC (5464); Relativity Foreign, LLC (8993); Relativity India Holdings, LLC (8921); Relativity Jackson, LLC (6116); Relativity Media Distribution, LLC (0264); Relativity Media Films, LLC (1574); Relativity Music Group, LLC (9540); Relativity Production LLC (7891); Relativity Rogue, LLC (3333); Relativity Senator, LLC (9044); Relativity Sky Land Asia Holdings, LLC (9582); Relativity TV, LLC (0227); Reveler Productions, LLC (2191); RML Acquisitions I, LLC (9406); RML Acquisitions II, LLC (9810); RML Acquisitions III, LLC (9116); RML Acquisitions IV, LLC (4997); RML Acquisitions IX, LLC (4410); RML Acquisitions V, LLC (9532); RML Acquisitions VI, LLC (9640); RML Acquisitions VII, LLC (7747); RML Acquisitions VIII, LLC (7459); RML Acquisitions X, LLC (1009); RML Acquisitions XI, LLC (2651); RML Acquisitions XII, LLC (4226); RML Acquisitions XIII, LLC (9614); RML Acquisitions XIV, LLC (1910); RML Acquisitions XV, LLC (5518); RML Bronze Films, LLC (8636); RML Damascus Films, LLC (6024); RML Desert Films, LLC (4564); RML Documentaries, LLC (7991); RML DR Films, LLC (0022); RML Echo Films, LLC (4656); RML Escobar Films LLC (0123); RML Film Development, LLC (3567); RML Films PR, LLC (1662); RML Hector Films, LLC (6054); RML Hillsong Films, LLC (3539); RML IFWT Films, LLC (1255); RML International Assets, LLC (1910); RML Jackson, LLC (1081); RML Kidnap Films, LLC (2708); RML Lazarus Films, LLC (0107); RML Nina Films, LLC (0495); RML November Films, LLC (9701); RML Oculus Films, LLC (2596); RML Our Father Films, LLC (6485); RML Romeo and Juliet Films, LLC (9509); RML Scripture Films, LLC (7845); RML Solace Films, LLC (5125); RML Somnia Films, LLC (7195); RML Timeless Productions, LLC (1996); RML Turkeys Films, LLC (8898); RML Very Good Girls Films, LLC (3685); RML WIB Films, LLC (0102); Rogue Digital, LLC (5578); Rogue Games, LLC (4812); Roguelife LLC (3442); Safe Haven Productions, LLC (6550); Sanctum Films, LLC (7736); Santa Claus Productions, LLC (7398); Smith Point Productions, LLC (9118); Snow White Productions, LLC (3175); Spy Next Door, LLC (3043); Story Development, LLC (0677); Straight Wharf Productions, LLC (5858); Strangers II, LLC (6152); Stretch Armstrong Productions, LLC (0213); Studio Merchandise, LLC (5738); Summer Forever Productions, LLC (9211); The Crow Productions, LLC (6707); Totally Interns, LLC (9980); Tribes of Palos Verdes Production, LLC (6638); Tuckernuck Music, LLC (8713); Tuckernuck Publishing, LLC (3960); Wright Girls Films, LLC (9639); Yuma, Inc. (1669); Zero Point Enterprises, LLC (9558). The location of the Debtors' corporate headquarters is: 9242 Beverly Blvd., Suite 300, Beverly Hills, CA 90210.

-i-

---

**IMPORTANT INFORMATION FOR YOU TO READ**

---

**THE DEADLINE TO VOTE ON THE PLAN IS JANUARY [\_\_], 2016
AT 4:00 P.M. (EASTERN TIME), UNLESS EXTENDED BY THE PLAN PROPONENTS (THE "VOTING
DEADLINE").**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE *ACTUALLY RECEIVED* BY
THE VOTING AGENT BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

**PLEASE BE ADVISED THAT ARTICLE X OF THE PLAN CONTAINS RELEASE, EXCULPATION,
AND INJUNCTION PROVISIONS.  YOU SHOULD REVIEW AND CONSIDER THE PLAN
CAREFULLY BECAUSE YOUR RIGHTS MAY BE AFFECTED THEREUNDER.**

---

   On July 30, 2015 (the "**Petition Date**") Relativity Fashion, LLC and 144 of its direct and indirect subsidiaries (collectively, the "**Debtors**") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Plan Proponents are providing you with the information in this Disclosure Statement because you may be a creditor of the Debtors and entitled to vote on the Plan.[2]

---

   The Plan Proponents believe that the Plan is in the best interests of the Debtors' creditors and other stakeholders.  All creditors entitled to vote thereon are urged to vote in favor of the Plan.  A summary of the voting instructions is set forth beginning on page 6 7 of this Disclosure Statement and in the Solicitation Order.  More detailed instructions are contained on the Ballots distributed to the creditors entitled to vote on the Plan.  To be counted, your Ballot must be duly completed, executed and actually received by the Voting Agent (defined below) by 4:00 p.m. (Eastern Time), on January [\_], 2016, unless the Voting Deadline is extended by the Plan Proponents.

---

   The effectiveness of the proposed Plan is subject to material conditions precedent, some of which may not be satisfied or waived.  See Section There is no assurance that   .D below and Article VII of the Plan.IX these conditions will be satisfied or waived.

---

   This Disclosure Statement and any accompanying letters are the only documents to be used in connection with the solicitation of votes on the Plan.  Subject to the statutory obligations of the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "**Creditors' Committee**") to provide access to information to creditors, no personPerson is authorized by any of the Plan Proponents in connection with the Plan or the solicitation of acceptances of the Plan to give any information or to make any representation other than as contained in this Disclosure Statement and the exhibits attached hereto or incorporated by reference or referred to herein.  If given or made, such information or representation may not be relied upon as having been authorized by any of the Plan Proponents.  Although the Plan Proponents will make available to creditors entitled to vote on the Plan such additional information as may be required by applicable law prior to the Voting Deadline, the delivery of this Disclosure Statement will not under any circumstances imply that the information herein is correct as of any time after the date hereof.

---

---

[2]   Except as otherwise provided herein, capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan, attached hereto as Exhibit A.

**ALL CREDITORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE PLAN ATTACHED AS <u>EXHIBIT A</u>, AND THE RISK FACTORS DESCRIBED UNDER SECTION XI, PRIOR TO SUBMITTING BALLOTS IN RESPONSE TO THIS SOLICITATION.**

––––––––––––––––––––––––

The summaries of the Plan and other documents contained in this Disclosure Statement are qualified in their entirety by reference to the Plan itself, the exhibits thereto (the "**Confirmation Exhibits**") and the documents described therein as filed prior to approval of this Disclosure Statement or subsequently as Plan Supplement materials.  In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control.  Except as otherwise indicated, the Plan Proponents will file all Confirmation Exhibits with the Bankruptcy Court and make them available for review at the Debtors' document website located online at https://www.donlinrecano.com/Clients/rm/Index (the "**Document Website**") no later than seven (7) calendar days before the Confirmation Hearing to the extent not filed earlier; *provided*, *however*, that (a) exhibits relating to the assumption and rejection of Executory Contracts and Unexpired Leases under the Plan will be filed no later than seven calendar days prior to the Voting Deadline and (b) other key exhibits to the Plan will be either (i) included in any solicitation materials distributed to Holders of Claims in Classes entitled to vote to accept or reject the Plan or (ii) filed as part of the Plan Supplement no later than seven (7) calendar days prior to the Voting Deadline; *provided*, *further*, that only in the event that an Executory Contract or Unexpired Lease is the subject of a pending objection, at any time (i) on or before the Effective Date, the Debtors reserve the right to supplement the list of rejected contracts on Exhibit FE or (ii) after the Effective Date, the Reorganized Debtors reserve the right to supplement the list of rejected contracts on Exhibit FE to the Plan if unable to otherwise reach a resolution related to the Executory Contract or Unexpired Lease.

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan being proposed by the Plan Proponents.  The Plan Proponents reserve the right to modify the Plan consistent with Bankruptcy Code § 1127 of and Bankruptcy Rule 3019.

The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there can be no assurance that the statements contained herein will be correct at any time after this date.  The information contained in this Disclosure Statement, including the information regarding the history, businesses and operations of the Debtors, the financial information regarding the Debtors, and the liquidation analysis relating to the Debtors, is included for purposes of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as admissions or stipulations, but rather as statements made in settlement negotiations as part of the Debtors' attempt to settle and resolve their Liabilities pursuant to the Plan.  This Disclosure Statement will not be admissible in any nonbankruptcy proceeding, nor will it be construed to be conclusive advice on the tax, securities or other legal effects of the Plan as to Holders of Claims against, or Interests in, either the Debtors or the Reorganized Debtors.  Except where specifically noted, the financial information contained in this Disclosure Statement and in its exhibits has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States.

––––––––––––––––––––––––

**FORWARD-LOOKING STATEMENTS**

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the Debtors and projections about future events and financial trends affecting the financial condition of the Debtors' businesses and assets.  The words "believe," "may," "estimate," "continue," "anticipate," "intend," "expect" and similar expressions identify these forward-looking statements.  These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described below under the caption "**Risk Factors**" in Section XI. In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur and actual results could differ materially from those anticipated in the forward-looking statements. The Plan Proponents do not undertake any obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

**This Disclosure Statement has been prepared in accordance with Bankruptcy Code § 1125 and Bankruptcy Rule 3016 and not necessarily in accordance with federal or state securities laws or other nonbankruptcy laws. This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC"), any state securities commission or any securities exchange or association nor has the SEC, any state securities commission or any securities exchange or association passed upon the accuracy or adequacy of the statements contained herein.**

---

**QUESTIONS AND ADDITIONAL INFORMATION**

---

**If you would like to obtain copies of this Disclosure Statement, the Plan or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or the Debtors' Chapter 11 Cases generally, please contact Donlin, Recano & Company, Inc. (the "Voting Agent"), by either (i) visiting the Document Website at https://www.donlinrecano.com/Clients/rm/Index or (ii) calling (212) 771-1128.**

**TABLE OF CONTENTS**

FORWARD-LOOKING STATEMENTS .................................................................................. 2

QUESTIONS AND ADDITIONAL INFORMATION ....................................................... 3

I.      INTRODUCTION ....................................................................................................... 1

     A.      Material Terms of the Plan ................................................................................ 1

     B.      Parties Entitles to Vote on the Plan .................................................................. 5

     C.      Solicitation Package ........................................................................................ ~~6~~7

     D.      Voting Procedures, Ballots and Voting Deadline ........................................... ~~6~~7

     E.      Confirmation Exhibits ..................................................................................... ~~7~~8

     F.      Confirmation Hearing and Deadline for Objections to Confirmation ............ ~~7~~8

II.     OVERVIEW OF THE COMPANY ............................................................................ 8

     A.      Corporate Structure of the Company ................................................................ 8

     B.      Business Overview ........................................................................................... 8

     C.      Business Operations ......................................................................................... 9

          1.      *Key Business Units* ............................................................................ 9

          2.      *Joint Ventures* ................................................................................. ~~11~~12

     D.      Relativity Equity Classes ................................................................................ 12

     E.      Corporate History ............................................................................................ 13

     F.      Prepetition Capital Structure ........................................................................... 13

          1.      *Cortland Term Loan A and Term Loan B Financing Facility* ..................... 14

          2.      *Manchester* *Prepetition* *Credit Facility* .......................................... 14

          3.      *Production Loans* .......................................................................... 14

          4.      *The P&A Facility* ......................................................................... ~~15~~16

          5.      *The Ultimates Facility* .................................................................. ~~16~~17

          6.      *Unsecured Trade Debt* .................................................................. ~~17~~18

          7.      *Unsecured RED Loan* .................................................................. ~~17~~18

     G.      Events Leading to Chapter 11 Cases ............................................................ ~~17~~18

III.    THE CHAPTER 11 CASES ..................................................................................... ~~18~~19

     A.      Voluntary Petitions ....................................................................................... ~~18~~19

     B.      First and Second Day Motions ..................................................................... ~~18~~20

     C.      Retention of the Debtors' Advisors .............................................................. ~~19~~20

     D.      The Creditors' Committee ............................................................................ ~~19~~20

     E.      Further Motions in the Chapter 11 Cases .................................................... ~~20~~21

|   |   |   |   |
|---|---|---|---|
| 1. | *The Sale Motion (Dkt. No. 25)* | ........................................... | ~~20~~21 |
| 2. | *The KEIP and KERP Motions (Dkt. Nos. 281, 282)* | ................... | ~~21~~22 |
| 3. | *The Motions to Assume Certain Producer Agreements (Dkt. Nos. 289-295)* | ................... | ~~21~~23 |
| 4. | *The Miscellaneous/De Minimis Assets Motion (Dkt. No. 345)* | ............... | ~~22~~23 |
| 5. | *The Motions to Reject Leases or Executory Contracts (Dkt. Nos. 396, 691)* | ................... | ~~22~~24 |
| 6. | *The Motion to Extend the Exclusive Periods for Filing a Plan and Soliciting Acceptances* | ................... | ~~22~~24 |
| 7. | *Litigation* | ........................................... | ~~23~~24 |
| 8. | *Claims Process and Bar Date* | ........................................... | ~~24~~26 |
| 9. | *Cash Collateral Stipulation* | ........................................... | 26 |

**IV.   POSTPETITION SALE AND PLAN NEGOTIATIONS** ........................................... ~~24~~27

A.   Television Business Sale and Related Term Sheets ........................... ~~24~~27

| 1. | *TLA/TLB Transactions* | ........................................... | ~~24~~27 |
| 2. | *Investor Transactions* | ........................................... | ~~24~~27 |
| 3. | *DIP Stipulations* | ........................................... | ~~25~~28 |

B.   Fintage Omnibus Stipulation ........................................... ~~25~~28

C.   Post-Emergence Financing and Management ........................... ~~26~~29

**V.   THE PLAN OF REORGANIZATION** ........................................... ~~26~~29

**VI.   CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ........ ~~26~~29

A.   Unclassified Claims ........................................... ~~27~~30

| 1. | *Administrative Claims* | ........................................... | ~~27~~30 |
| 2. | *Payment of Priority Tax Claims* | ........................................... | ~~28~~31 |

B.   ~~Classified~~Classification of Claims and Interests ........................... ~~28~~31

| 1. | *General* | ........................................... | ~~28~~31 |
| 2. | *Identification of Classes of Claims Against and Interests in the Debtors* | ................... | ~~32~~34 |

C.   Treatment of Unclassified Claims ........................................... ~~32~~35

| 1. | *Administrative Claims* | ........................................... | ~~32~~35 |
| 2. | *Payment of Priority Tax Claims* | ........................................... | ~~34~~37 |

D.   Treatment of Classified Claims ........................................... ~~34~~37

| 1. | *Priority Non-Tax Claims (Class A)* | ........................................... | ~~34~~37 |
| 2. | *TLA/TLB Secured Claims (Class B)* | ........................................... | ~~34~~37 |

3.      *Pre-Release P&A Secured Claims (Class C)* ........................................... 35̶38

4.      *Post-Release P&A Claims Secured Claims (Class D)* ............................. 35̶38

5.      *Production Loan Secured Claims (Class E)* .......................................... 36̶38

6.      *Ultimates Secured Claims (Class F)* ...................................................... 36̶39

7.      *Secured Guilds Claims (Class G)* ........................................................... 36̶39

8.      *Vine/Verite Secured Claims (Class H)* ................................................. 37̶39

9.      *Other Secured Claims (Class I)* ............................................................. 37̶40

10.     *General Unsecured Claims (Class J)* ..................................................... 37̶40

11.     *Subordinated Claims (Class K)* .............................................................. 37̶40

E.      Treatment of Interests in all Debtors (Class L) ......................................... 38̶41

        1.      ~~Classification: Classes L1 – L145 consists of all Interests in the Debtors~~ ................. 38

        2.      ~~Treatment: Holders of Interests in the Debtors shall retain no property under the Plan~~ ................................................................................ 38

        3.      ~~Voting: Interests in Classes L1 – L145 are Impaired~~ ................. 38

F.      Special Provision Regarding Prepetition Intercompany Claims .......................... 38̶41

G.      Special Provision Governing Unimpaired Claims ...................................... 38̶41

H.      Postpetition Interest on General Unsecured Claims .................................. 38̶41

I.      Insurance ..................................................................................................... 38̶41

J.      Treatment of Executory Contracts and Unexpired Leases ....................... 38̶41

        1.      *Assumption and Rejections of Executory Contracts and Unexpired Leases* ........................................................................ 38̶41

        2.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases* ........................................................................ 39̶42

        3.      *Claims Based on Rejection of Executory Contracts and Unexpired Leases* ........................................................................ 39̶42

        4.      *Contracts and Leases Entered Into After the Petition Date* ............... 40̶43

        5.      *Reservation of Rights* .................................................................. 40̶43

        6.      ~~*Preexisting*~~*Pre-Existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases* ................................ 40̶43

        7.      *Certain Compensation and Benefit Programs* ............................ 40̶43

        8.      *Obligations to Insure and Indemnify Directors, Officers and Employees* ................................................................................. 41̶44

        9.      *Reservation of Rights* .................................................................. 44

VII.    **VOTING REQUIREMENTS** .............................................................. 41̶44

A.      Voting Deadline ......................................................................................... 41̶44

B.    Holders of Claims or Interests Entitled to Vote ................................... 42̶45

C.    Vote Required for Acceptance by a Class ......................................... 42̶45

VIII.    **CONFIRMATION OF THE PLAN** ................................................ 42̶45

A.    Requirements for Confirmation of the Plan.................................... 42̶45

1.    *Acceptance of the Plan* ................................................... 42̶45

2.    *Feasibility* ...................................................................... 44̶47

3.    *Bests Interests of Creditors* .......................................... 44̶47

4.    *Confirmation Without Acceptance of All Impaired Classes:  The 'Cramdown' Alternative* ........................................ 45̶48

B.    Alternatives to Confirmation and Consummation of the Plan .................... 46̶49

IX.    **MEANS OF IMPLEMENTATION OF THE PLAN** .......................... 46̶49

A.    Effects of Plan Confirmation ............................................... 46̶49

1.    *Issuance of Reorganized Relativity Holdings Preferred Units* .............. 46̶49

2.    *Issuance of Reorganized Relativity Holdings Common Units* ........... 47̶50

3.    *Issuance of Reorganized Relativity Holdings Warrants* ........................ 47̶50

4.    *Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors* ........................................... 48̶51

5.    *Restructuring Transactions* .......................................... 48̶52

6.    *Sources of Cash for Plan Distributions* ......................... 49̶52

7.    *Corporate Governance, Managers and Officers, Employment-Related Agreements and Compensation Programs; Other Agreements* ..................................................... 49̶53

8.    *The Litigation Trust* ...................................................... 50̶55

9.    *Preservation of R̶i̶g̶h̶t̶s̲C̲a̲u̲s̲e̲s̲ of Action* ........................... 53̶57

10.    *Reinstatement and Continuation of Insurance Policies* ................. 53̶58

11̲.̲    *E̲n̲t̲r̲y̲ ̲i̲n̲t̲o̲ ̲C̲B̲A̲ ̲A̲s̲s̲u̲m̲p̲t̲i̲o̲n̲ ̲A̲g̲r̲e̲e̲m̲e̲n̲t̲s̲* ................................. 58

1̶1̲1̲2̲.    *Cancellation and Surrender of Instruments, Securities and Other Documentation* ....................................... 53̶58

1̶2̲1̲3̲.    *Release of Liens* ............................................................ 54̶58

1̶3̲1̲4̲.    *Effectuating Documents; Further Transactions* ................... 54̶59

1̶4̲1̲5̲.    *Dissolution of Official C̶o̶m̶m̶i̶t̶t̶e̶e̶s̲C̲o̲m̲m̲i̲t̲t̲e̲e̲* .............................. 54̶59

1̶5̲1̲6̲.    *Discharge of Claims and Interests* ............................... 54̶59

1̶6̲1̲7̲.    *Injunctions* ................................................................... 55̶59

1̶7̲1̲8̲.    *Exculpation* ................................................................... 55̶60

NAI-1500589103v20
NAI-1500589103v15

               18*19*. *Releases* .................................................................................. *55*60

               19*20*. *Votes Solicited in Good Faith* ............................................... *56*61

               20*21*. *Termination of Certain Subordination Rights* ................... *57*61

    B.      Provisions Governing Distributions................................................. *57*62

          1.    *Distributions for Allowed Claims as of the Effective Date* ..... *57*62

          2.    *Undeliverable Distribution Distributions* ............................. *57*62

          3.    *Compliance with Tax Requirements* ..................................... *57*62

          4.    *Distribution Record Date* ...................................................... *58*63

          5.    *Setoffs* ..................................................................................... *58*63

          6.    *Allocation Between Principal and Accrued Interest*............. *58*63

          7.    *Distributions to Holders of Disputed Claims*...................... *58*63

    C.      Disputed, Contingent and Unliquidated Claims .............................. *59*63

          1.    *Allowance of Claims* .............................................................. *59*63

          2.    *Prosecution of Objections to Claims* .................................... *59*64

          3.    *Estimation of Claims* ............................................................. *59*64

          4.    *Expungement or Adjustment to Claims Without Objection* ........ *59*64

          *5.*    *Deadline to File Objections to Claims* .................................. 64

          5*6*.    *Disallowance of Certain Claims* ........................................... *60*64

          6*7*.    *Offer of Judgment* .................................................................. *60*64

          7*8*.    *Amendments to Claims* .......................................................... *60*65

    D.      Conditions Precedent to Consummation of the Plan ....................... *60*65

          1.    *Condition Conditions to the Effective Date* .......................... *60*65

          2.    *Waiver of Conditions to the Effective Date* ......................... *60*65

          3.    *Effects of Nonoccurrence of Conditions to the Effective Date*............... *61*65

    E.      Miscellaneous Provisions.................................................................. *61*65

          1.    *Retention of Jurisdiction by the Bankruptcy Court*............. *61*65

          2.    *Failure of Bankruptcy Court to Exercise Jurisdiction* ........ *62*67

          3.    *Amendment or Modification of the Plan* ............................... *62*67

          *4.*    *Revocation of the Plan* .......................................................... 67

          4*5*.    *Severability* ............................................................................ *62*67

          5*6*.    *Successors and Assigns* ......................................................... *63*68

X.      **FINANCIAL PROJECTIONS**.................................................... *63*68

XI.     **RISK FACTORS TO BE CONSIDERED**................................... *63*68

A.   Certain Bankruptcy Considerations ........................................................................ 6469

    1.   *If the Plan is not confirmed or consummated, or the reorganization is delayed, distributions to Holders of Allowed Claims would be materially reduced.* ........................................................................ 6469

    2.   *The Plan may not be consummated if the conditions to Effectiveness of the Plan are not satisfied.* ........................................................................ 6469

    3.   *If the Effective Date is delayed or projected proceeds are not timely received, the Debtors may need to seek postpetition financing.* ........................................................................ 6469

    4.   *If current estimates of Allowed Claims prove inaccurate, Reorganized Relativity's financial condition could be materially and adversely affected.* ........................................................................ 6570

    5.   *The Debtors may not be able to fully satisfy their obligations under the Ultimates Credit Agreement, which could impair their ability to obtain exit financing.* ........................................................................ 70

    6.   *Existing intercreditor agreements may preclude Debtors' from granting the releases set forth in the plan.* ........................................................................ 70

B.   Financial Condition and Indebtedness ........................................................................ 6570

    1.   *Reorganized Relativity faces substantial capital requirements.* ........................................................................ 6570

    2.   *Restrictions imposed by agreements governing indebtedness incurred by Reorganized Relativity or market conditions may limit Reorganized Relativity's ability to obtain additional liquidity.* ........................................................................ 6570

    3.   *Projections of future performance by Reorganized Relativity are based on assumptions which may not prove accurate and many of which are outside the control of Reorganized Relativity.* ........................................................................ 6571

    4.   *Changes to Reorganized Relativity's business plan may cause material adverse changes to Reorganized Relativity's business.* ........................................................................ 6671

    5.   *Reorganized Relativity cannot assure future profitability.* ........................................................................ 6671

C.   General Economic Risk Factors and Business Risk Factors ........................................................................ 6671

    1.   *Unpredictability Of Entertainment Industry.* ........................................................................ 6671

    2.   *Rapid Technological Changes And Alternative Forms Of Delivery Or Storage Of Filmed Entertainment.* ........................................................................ 6672

    3.   *Piracy Of Motion Pictures, Including Digital And Internet Piracy, May Reduce The Gross Receipts From The Exploitation Of Our Films.* ........................................................................ 6772

    4.   *Reorganized Relativity could be adversely affected by strikes, union actions or other work stoppages.* ........................................................................ 6772

    5.   *Increased costs of prints, advertising and promotion.* ........................................................................ 6772

6.  *The motion picture industry is highly competitive and at times may create an oversupply of motion pictures in the market.* ............... ~~67~~73

7.  *Reorganized Relativity faces litigation risk.* ............... ~~68~~73

8.  *Reorganized Relativity faces risks from doing business internationally.* ............... ~~68~~73

9.  *In the Sport Representation and Management Business, Relativity is heavily reliant on its key agents.* ............... ~~68~~73

10. *Relativity does not and currently cannot own any equity interest in Sky Land (Beijing) Film-Television Culture Development Ltd., a PRC entity due to government regulation on foreign companies owning equity in China companies engaged in the entertainment and media industry.* ............... ~~68~~74

11. *Relativity will need to attract and retain key employees to rebuild management its management team post-confirmation.* ............... ~~69~~74

XII.    **FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN** ............... ~~69~~74

A.  General ............... ~~69~~74

B.  U.S. Federal Income Tax Consequences to the Debtors ............... ~~70~~75

C.  U.S. Federal Income Tax Consequences to Holders of Allowed Claims ............... ~~70~~75

1.  *Recognition of Gain or Loss* ............... ~~70~~75

2.  *Litigation Trust* ............... ~~71~~76

D.  Certain Other U.S. Federal Income Tax Considerations for Holders of Allowed Claims ............... ~~71~~77

1.  *Medicare Surtax* ............... ~~71~~77

2.  *Accrued but Unpaid Interest* ............... ~~72~~77

3.  *Post-Effective Date Distributions* ............... ~~72~~77

4.  *Bad Debt and/or Worthless Securities Deduction* ............... ~~72~~77

5.  *Market Discount* ............... ~~72~~78

6.  *Holding Reorganized Relativity Holdings Warrants* ............... ~~73~~78

7.  *Information Reporting and Backup Withholding* ............... ~~73~~78

E.  Importance of Obtaining Professional Tax Assistance ............... ~~73~~79

XIII.   **RECOMMENDATION AND CONCLUSION** ............... ~~74~~79

**TABLE OF EXHIBITS**

**EXHIBIT A**    ~~First Amended~~ Plan of Reorganization

**EXHIBIT B**    Prospective Financial Information ~~— to be filed~~

**EXHIBIT C**    Unaudited Financial Statements for the YE2014 ~~and~~, 1Q~~12015~~2015, and 2Q2015

**EXHIBIT D**    Audited Financial Statements for the YE2012 and YE2013

**EXHIBIT E**    Chapter 7 Liquidation Analysis

## I.    INTRODUCTION

The Plan Proponents submit this Disclosure Statement pursuant to Bankruptcy Code § 1125 in connection with the solicitation of acceptances of the Plan.  A copy of the Plan is attached hereto as <u>Exhibit A</u>.

This Disclosure Statement sets forth certain information regarding the prepetition operating and financial history of the Debtors, the events leading up to the commencement of the Chapter 11 Cases, events that have occurred during the Chapter 11 Cases and the anticipated organization, operations and capital structure of the reorganized Debtors on or after the Effective Date (the "**Reorganized Debtors**") if the Plan is confirmed and becomes effective.  This Disclosure Statement also describes terms and provisions of the Plan, including certain effects of Confirmation of the Plan, certain risk factors (including those associated with securities to be issued under the Plan), certain alternatives to the Plan and the manner in which distributions will be made under the Plan.  The Confirmation process and the voting procedures that Holders of Claims entitled to vote on the Plan must follow for their votes to be counted are also discussed herein.

The Plan Proponents believe that the Plan is the best means to efficiently and effectively implement the restructuring of the Debtors' capital structure and provide for their emergence from bankruptcy.

Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.  Except as otherwise stated herein, all dollar amounts provided in this Disclosure Statement and in the Plan are given in United States dollars.

On December [_], 2015, the Bankruptcy Court entered an order approving this Disclosure Statement as containing "adequate information," i.e., information of a kind and in sufficient detail to enable a hypothetical reasonable investor typical of the Holders of Claims or Interests to make an informed judgment about the Plan.  <u>See</u> Dkt. No. [_].

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT CONSTITUTES NEITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN NOR AN ENDORSEMENT OF THE MERITS OF THE PLAN BY THE BANKRUPTCY COURT.

### A.    Material Terms of the Plan

As discussed in more detail below, the Plan will allow the Debtors to reorganize Relativity's non-TV Business units with a substantially de-levered balance sheet utilizing new equity investments and new financing. Relativity's balance sheet will be de-levered in the approximate amount of $500 million by paying off or eliminating the Manchester DIP Claims, TLA/TLB Secured Claims, Ultimates Secured Claims, Vine/Verite Secured Claims, and claim under the Manchester Prepetition Credit Facility in exchange for a $60 million BidCo Note and a $100 million New P&A/Ultimates Facility.

THE PLAN PROPONENTS BELIEVE THAT THE IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF EACH OF THE DEBTORS AND ITS STAKEHOLDERS. FOR ALL OF THE REASONS DESCRIBED IN THIS DISCLOSURE STATEMENT.  THE PLAN PROPONENTS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN BY THE VOTING DEADLINE, WHICH IS JANUARY [_], 2016 AT [_]:00 P.M. (EASTERN TIME).

As set forth in further detail below, the material terms of the Plan are as follows:

| Treatment of Claims and Interests | For administrative purposes, the Plan assigns a letter to each Debtor (as set forth in the table in Section and a number to each of the Classes of Claims (below 1.B.VI .against or Interests in the Debtors For consistency, similarly designated Classes of Claims and Interests are assigned the same number across each of the Debtors.  Claims against and Interests in each of the Debtors are classified in up to 12 separate Classes, which are set forth in the table below in Section .B As further detailed in the Plan, the Plan contemplates the following treatment of Claims and |
|---|---|

Interests:

- Administrative Claims – Each Holder of an Allowed Administrative Claim will receive Cash equal to the full Allowed amount of such Claim.  These Claims are unclassified under the Plan.

- Priority Tax Claims – Each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors or the Reorganized Debtors, as applicable, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, on account of and in full and complete settlement, release and discharge of such Claim, (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim or (ii) Cash in the aggregate amount of such Allowed Priority Tax Claim payable in installments over a period of time not to exceed five (5) years after the Petition Date, pursuant to section Bankruptcy Code § 1129(a)(9)(C).  These Claims are unclassified under the Plan.

- Priority Non-Tax Claims – ~~Each~~On the later of (a) the Effective Date and (b) the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, each Holder of an Allowed Priority Non-Tax Claim against the Debtors shall receive on account and in full and complete settlement, release and discharge of such Claim, at the Debtors' election, (i) Cash in the amount of such Allowed Priority Non-Tax Claim in accordance with Bankruptcy Code § 1129(a)(9) and/or (ii) such other treatment required to render such Claim unimpaired pursuant to Bankruptcy Code § 1124.  Such claims are Unimpaired and classified in Classes A1 through A145 under the Plan.

- TLA/TLB Secured Claims – On the Effective Date, the Holders of Allowed TLA/TLB Secured Claims are entitled to receive 100% of the equity value of the Debtors.  ~~Certain holders~~Holders of the Allowed TLA/TLB Secured Claims, excluding Kavanaugh and Nicholas, have agreed to less favorable treatment, and shall receive the BidCo Note in full and final satisfaction, release, and discharge of, and in exchange for, such TLA/TLB Secured Claim.  For the avoidance of doubt, the BidCo Note, to the extent paid down to $30 million, will be subordinated to the New P&A/Ultimates Facility.  Kavanaugh and Nicholas have agreed to receive Reorganized Relativity Holdings Preferred Units and such other treatment on account of approximately $175 million of their TLA/TLB Secured Claims described in the Revised Relativity Holdings Operating Agreement as set forth in Section III.B of the Plan.  Such claims are Impaired and are classified in Classes B1 through B33, B35 through B56, B58 through B143 and B145 under the Plan.

- Pre-Release P&A Secured Claims – On or as soon as practicable after the Effective Date, RKA, as the Holder of the Allowed Pre-Release P&A Secured ~~Claim~~Claims, shall receive the following treatment ~~at the option of the Plan Proponents:  (i) such Allowed Secured Claim shall be Reinstated; (ii) payment in full (in Cash) of any such Allowed Secured Claim; or (iii) satisfaction of any such Allowed Secured Claim by delivering the collateral securing any such Allowed Secured Claim; provided, however, that if the Debtors and RKA conclude their currently pending settlement negotiations, the terms of any agreement shall dictate the treatment of RKA and Class C claims~~:  (i) If RKA votes to accept the Plan, the treatment as provided for in Exhibit I to the Plan; or (ii) if RKA votes to reject the Plan, the five (5) Replacement P&A Notes with a present value equal to the respective Allowed Pre-Release P&A Secured Claims.  Such Claims are ~~Unimpaired~~Impaired and are classified in Classes C5, C21, C108, C109 and C117 under the Plan.

- Post-Release P&A Secured Claims – On or as soon as practicable after the Effective Date, Reorganized Relativity Holdings shall Allow a claim in the approximately amount of $26,818,821 (as of October 31, 2015 and as reduced in the ordinary course until the Effective Date), which such amount shall include,

without limitation, additional accrued interest, legal fees, costs, expenses and other outstanding obligations of Reorganized Relativity Holdings under the P&A Funding Agreement subject to documentation of a replacement credit agreement, which shall provide among other things for an extension of the maturity dates as compared to the pre-petition terms.  The obligation shall be secured by a first-priority security interest originally (i) cross-collateralized against Blackbird Productions, LLC and RML WIB Films, LLC and (ii) individually as against RML Lazarus Films, LLC.  Such Claims are Impaired and are classified in Classes D8, D109 and D121 under the Plan.

- Production Loan Secured Claims – Except to the extent that aOn or as soon as practicable after the Effective Date, the Holder of anthe Allowed Production Loan Secured Claim agrees to less favorable treatment, on the Effective Date, suchClaims shall receive the following treatment:  (i) If the Holder votes to accept the Plan, the Production Loan Settlement; or (ii) if the Holder votes to reject the Plan, the two (2) Replacement Production Loan Notes with a present value equal to the respective Allowed Production Loan Secured Claim shall be ReinstatedClaims.  For the avoidance of doubt, nothing in the Plan is intended to affect or modify the Allowed Production Secured Claim Holder's rights under ¶ H(vi)(D) – (I) of Dkt. No. 931 in the Chapter 11 Cases.  Such Claims are UnimpairedImpaired and are classified in Classes E5 and E21 under the Plan.

- Ultimates Secured Claims – EachOn or as soon as practicable after the Effective Date, each Holder of aan Allowed Ultimates Secured Claim shall receive the following treatment at the option of the Plan Proponents:  (i) such Allowed Secured Claim shall be Reinstated or (ii)payment in full (in Cash) of any such Allowed Ultimates Secured Claim in full and final satisfaction of their claim upon which payment any liens securing such claim shall be immediately released.  Such Claims are Unimpaired and are classified in Classes F1, F2, F6, F7, F8, F10, F20, F24, F41, F47, F51, F77 through F83, F87, F95, F96, F99, F103, F109, F111, F112, F116, F119, F121 and F126 under the Plan.

- Secured Guilds Claims – Each Holder of aan Allowed Secured Guilds Claim shall receive a distribution(i) on the Effective Date or as soon thereafter as practicable, its pro rata share of $6.65 million less what is received with respect to the Secured Guilds Claims prior to the Effective Date, and (ii) one (1) year after the Effective Date or as soon thereafteras practicable thereafter, payment in full (including applicable interest and collection costs, including but not limited to attorneys fees, as specified in each applicable security agreement) on account of the remaining balance of such Allowed Secured Guilds Claim, payable to each applicable Guild for the benefit of each applicable Guild-represented employee.  The Reorganized Debtors shall provide a designated payroll service with information concerning such payments.  The payroll service shall prepare checks in the prescribed form.; provided, however, that if the Guilds and the Reorganized Debtors shall fund the payroll process and applicable taxes.  As an accommodation to the Reorganized Debtor, the Guilds shall forward such payments to the applicable Guild-represented employeeDebtor have not agreed to the amount of remaining Allowed Guild Secured Claims within 180 days after the Effective Date, the parties will refer this issue to arbitration pursuant to the Guild collective bargaining agreements; provided, further however, that the Guilds shall retain any pre-petition liens securing the Allowed Secured Guilds Claims.  All payments to the Guilds in connection with the Allowed Secured Guilds Claims shall be payable in accordance with the Guild Payroll Protocols.  Such Claims are Impaired and are classified in Classes G1, G2, G6, G7, G8, G10, G20, G24, G41, G47, G51, G77 through G83, G87, G95, G96, G99, G103, G109, G11, G112, G116, G119, G121 and G126 under the Plan.

- Vine/VerteVerite Secured Claims – EachOn or as soon as practicable after the Effective Date, each Holder of aan Allowed Vine/Verite Secured Claim shall receive the following treatment at the option of the Plan Proponents:  (i) such

| | |
|---|---|
| | Allowed Secured Claim shall be Reinstated; or (ii) satisfaction of any such Allowed Secured Claim by delivering the collateral securing any such Allowed Secured Claim.  Such Claims are <u>Unimpaired</u> and are classified in Classes H34 and H144 under the Plan.
<ul><li><u>Other Secured Claims</u> – <s>Each</s><u>On or as soon as practicable after the Effective Date, each</u> Holder of an Allowed Other Secured Claim shall receive the following treatment at the option of the Plan Proponents:  (i) such Allowed Secured Claim shall be Reinstated; (ii) payment in full (in Cash) of any such Allowed Secured Claim; or (iii) satisfaction of any such Allowed Secured Claim by delivering the collateral securing any such Allowed Secured Claim.  Such Claims are <u>Unimpaired</u> and are classified in Classes I1 through I145 under the Plan.</li><li><u>General Unsecured Claims</u> – On the Effective Date, the Reorganized Debtors shall be deemed substantively consolidated for plan purposes only, and each Holder of an Allowed General Unsecured Claim <u>in Classes J1 – J145</u> shall receive<u>, subject to the terms of the Plan, in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim, interests representing</u> its Pro Rata share of (i) the Guaranteed GUC <s>Distributable Value</s><u>Payment</u> and (ii) the GUC Litigation Trust Interests<u>; provided, however, that the sum of the Guaranteed GUC Payment and the GUC Litigation Trust Interests shall not exceed par</u>.  For the avoidance of doubt, all intercompany claims of the Debtors shall be disallowed and canceled as part of the deemed substantive consolidation of the Debtors.  For <s>the</s><u>further</u> avoidance of doubt, claims arising under the Manchester Prepetition Credit Facility are <u>General Unsecured Claims.  The Reorganized Debtors will meet and confer in order to coordinate GUC Distributable Value and Litigation Trust Interests with the Guild Payroll Protocols.  In addition, the Guilds agree that notwithstanding the CBA Assumption Agreements and Bankruptcy Code § 1113 and any other applicable provisions of the Bankruptcy Code, any unsecured pre-petition residuals owed by any of the Debtors will be treated as</u> General Unsecured Claims.  Such Claims are <u>Impaired</u> and are classified in Classes J1 through J145 under the Plan.</li><li><u>Subordinated Claims</u> – No property shall be distributed to or retained by the Holders of Subordinated Claims, and such Claims shall be extinguished on the Effective Date.  Holders of Subordinated Claims shall not receive any distribution pursuant to the Plan.  Such Claims are <u>Impaired</u> and are classified in Classes K1 through K145 under the Plan.</li><li><u>Interests</u> – Holders of Interests in the Debtors shall retain no property under the Plan.  Such Claims are <u>Impaired</u> and are classified in Classes L1 through L145 under the Plan.</li></ul> |
| **New P&A/Ultimates Facility** | On the Effective Date, one or more of the Reorganized Debtors shall be authorized to consummate the New P&A/Ultimates Facility and to execute, deliver and enter into the New Exit Financing Documents, and any related agreements or filings without the need for any further corporate or other organizational action and without further action by the Holders of Claims or Interests, and the New Exit Financing Documents and any related agreements or filings shall be executed and delivered and the applicable Reorganized Debtors shall enter into the New P&A/Ultimates Facility and be permitted to incur or issue the indebtedness available thereunder.  The Plan contemplates entering into a revolving credit facility of up to $250 million in the form of the New P&A/Ultimates Facility.  <u>Subject to Bankruptcy Court approval, Aperture Media Partners, LLP and EMP Media Partners LLP will act as the co-lead arrangers of the New P&A/Ultimates Facility.</u>  Finally, the Plan contemplates that Relativity will secure a<s>one</s><u>one or more</u> multi-year media buying <s>agreement</s><u>agreements</u>, for traditional and digital media, that includes payment terms <s>of at least 90 days</s><u>acceptable to the Debtors</u>.  Any final material terms of the New P&A/Ultimates Facility shall be included in the Plan Supplement. |
| **New Equity Investment** | Jim Cantelupe, of Summit Trail Advisors, LLC, has committed to work with the Debtors to raise up to $100 million of new equity to fund the Plan, which funds are to be escrowed on |

| | or before December 31, 2015. |
|---|---|
| **Means of Implementation** | The Plan contains standard means of implementation, including provisions for the continued existence of the Reorganized Debtors, the cancellation of certain prepetition debt and debt agreements, the  issuance of the Reorganized Relativity Equity Interests and the revesting of Debtors' assets in the Reorganized Debtors. |
| **Releases** | **The Plan provides certain customary release provisions (i) by the Debtors and Reorganized Debtors for the benefit of the Released Parties and (ii) by ~~Holders of Claims~~Consenting Creditors for the benefit of the Released Parties, in each case, relating to any of the Debtors or the Estates, the Chapter 11 Cases or the negotiation, consideration, formulation, preparation, dissemination, implementation, confirmation or consummation of the Plan, the Exhibits, the Disclosure Statement, any amendments thereto, the Initial DIP Credit Agreement, the Initial DIP Order, the Modified DIP Credit Agreement, the Modified DIP Order, any of the New Securities and Documents, the Restructuring Transactions or any other transactions in connection with the Chapter 11 Cases or any contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken in connection therewith or in connection with any other obligations arising under the Plan or the obligations assumed hereunder; _provided_, _however_, that the Releases provided under the Plan shall have no effect on the Released Party's liability under certain circumstances as set forth in the Plan.  For the avoidance of doubt, the Released Parties shall not include any of the Excluded Release Parties.** |
| **Exculpation** | **The Plan provides certain customary exculpation provisions, which include a full exculpation from liability in favor of the Exculpated Parties, the Debtors, the Reorganized Debtors and any of their respective Representatives from any and all claims and causes of action arising on or before the Effective Date in connection with, related to or arising out of the Chapter 11 Cases, any of the Debtors or the Estates, the negotiation, consideration, formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Exhibits, the Disclosure Statement, any amendments to the foregoing or any other transaction proposed in connection with the Chapter 11 Cases or any contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken in connection therewith or in connection with any other obligations arising under the Plan or the obligations assumed hereunder; _provided_, _however_, that the exculpations provided under the Plan shall have no effect on the liability of (1) any Entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document previously assumed or to be entered into or delivered in connection with the Plan or (2) any Exculpated Party that would otherwise result from any act or omission of such Released Party to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct (including fraud).** |

B.    **Parties Entitles to Vote on the Plan**

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan.  Creditors or equity interest holders whose claims or interests are not impaired by a plan are deemed to accept the plan under Bankruptcy Code § 1126(f) and are not entitled to vote.  In addition, creditors or equity interest holders whose claims or interests are impaired by the plan and will receive no distribution under the plan are also not entitled to vote because they are deemed to have rejected the plan under Bankruptcy Code § 1126(g).  For a discussion of these matters, see Section .B below.I

The following table sets forth which Classes are entitled to vote on the Plan and which are not, and sets forth the estimated Allowed amount, the estimated recovery, and the impairment status for each of the separate Classes of Claims and Interests provided for in the Plan:

| Class | Designation | Impairment | Estimated Allowed Amount[3] | Estimated Recovery Rate[4] | Voting Status |
|---|---|---|---|---|---|
| A. | Priority Non-Tax Claims | Unimpaired | $0 | 100% | Deemed to Accept |
| B. | TLA/TLB Secured Claims | Impaired | $236,611,038 | 100% to BidCo Note Holders and remainder TBD | Entitled to Vote |
| C. | Pre-Release P&A Secured Claims | ~~Unimpaired~~Impaired | $88,224,682 | 100% | ~~Deemed~~Entitled to ~~Accept~~Vote |
| D. | Post-Release P&A Secured Claims | Impaired | $26,818,821 | 100% | Entitled to Vote |
| E. | Production Loan Secured Claims | ~~Unimpaired~~Impaired | $33,848,694 | 100% | ~~Deemed~~Entitled to ~~Accept~~Vote |
| F. | Ultimates Secured Claims | Unimpaired | $27,789,945 | 100% | Deemed to Accept |
| G. | Secured Guilds Claims | Impaired | ~~$12,071,834~~3.04 million | 100% | Entitled to Vote |
| H. | Vine/Verite Secured Claims | Unimpaired | $69,405,434 | 100% | Deemed to Accept |
| I. | Other Secured Claims | Unimpaired | $0 - $8 million[5] | 100% | Deemed to Accept |
| J. | General Unsecured Claim | Impaired | $215,329,877 | ~~TBD~~11.5 %[6] | Entitled to Vote |
| K. | Subordinated Claims | Impaired | $0 | 0% | Deemed to Reject |
| L. | Interests | Impaired | $0 | 0% | Deemed to Reject |

Bankruptcy Code § 1126 defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims actually voted to accept or reject the plan. Your vote on the Plan is important. The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is impaired and entitled to vote under a plan votes to accept such plan, unless the plan is being confirmed under the "cramdown" provisions of Bankruptcy Code § 1129(b). Bankruptcy Code § 1129(b) permits confirmation of a plan of reorganization, notwithstanding the nonacceptance of the plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims votes to accept a proposed plan. Under that section, a plan may be confirmed by a

---

[3]    The Estimated Allowed Amounts are estimates only and actual amounts may be materially greater or less than those set forth herein.

[4]    The Estimated Recovery Rates are estimates only and actual recoveries may be materially greater or less than those set forth herein based on, among other things, Allowed Claims arising from the rejection of Executory Contracts or Unexpired Leases and resolution of disputed or unliquidated Claims. In addition, the Estimated Recovery Rates do not include an estimate of value attributable to the Litigation Trust Assets.

[5]    Certain creditors have asserted secured claims under their agreements with the Debtors. This revised estimate resolves certain informal comments to the Disclosure Statement; all rights regarding this treatment are reserved for confirmation.

[6]    Estimated recovery is calculated subject to the following assumptions: (a) the numerator includes guaranteed payments of $9 million and excludes proceeds of Litigation and (b) the denominator excludes $137.1 million for the Manchester Prepetition Credit Facility which is the subject of ongoing discussions among Manchester and the Committee.

bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

For a detailed description of the Classes of Claims and Interests and their treatment under the Plan, see Section VI.B.

### C.    Solicitation Package

The package of materials (the "**Solicitation Package**") to be sent to Holders of Claims and Interests entitled to vote on the Plan will contain:

- a cover letter describing (a) the contents of the Solicitation Package, (b) the contents of any enclosed CD-ROM and instructions for use of the CD-ROM and (c) information about how to obtain, at no charge, hard copies of any materials provided on the CD-ROM;

- a paper copy of the notice of the Confirmation Hearing (the "**Confirmation Hearing Notice**");

- a copy – either as a paper copy or in an enclosed CD-ROM – of the Disclosure Statement together with the exhibits thereto, including the Plan, that have been Filed with the Bankruptcy Court before the date of the mailing;

- the Disclosure Statement Order;

- the Solicitation Order; and

- for Holders of Claims in voting Classes (i.e., Holders of Claims in Classes B, C, D, E, G and J), an appropriate form of Ballot, instructions on how to complete the Ballot, and a Ballot return envelope and such other materials as the Bankruptcy Court may direct.

In addition to the service procedures outlined above (and to accommodate creditors who wish to review exhibits not included in the Solicitation Packages in the event of paper service): (1) the Plan, the Disclosure Statement and, once they are filed, all exhibits to both documents will be made available online at no charge at the Document Website and (2) the Plan Proponents will provide parties in interest (at no charge) with hard copies of the Plan and/or Disclosure Statement upon written request to Donlin, Recano & Company, Inc., re: Relativity Fashion, LLC, et al., Attn: Ballot Processing, P. O. Box 2034, Murray Hill Station, New York, NY 10156-0701.

### D.    Voting Procedures, Ballots and Voting Deadline

If you are entitled to vote to accept or reject the Plan, a Ballot(s) has been enclosed in your Solicitation Package for the purpose of voting on the Plan. Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement. If you (1) hold Claims in more than one voting Class or (2) hold multiple Claims within one Class, you may receive more than one Ballot.

After carefully reviewing (1) the Plan, (2) this Disclosure Statement, (3) the Disclosure Statement Order, (4) the Solicitation Order that, among other things, established the voting procedures, scheduled a Confirmation Hearing and set the voting deadline and the deadline for objecting to Confirmation of the Plan, and (5) the detailed instructions accompanying your Ballot, please indicate on your Ballot your vote to accept or reject the Plan.

All Ballots, in order to be counted, must be properly completed in accordance with the voting instructions on the Ballot and actually received by the Voting Agent by the Voting Deadline (i.e., January [____], 2016 at 4:00 p.m. (Eastern Time)). Please vote and return your Ballot(s) no later than the Voting Deadline to Donlin, Recano & Company, Inc. (the "**Voting Agent**") at P. O. Box 2034, Murray Hill Station, New York, NY 10156-0701 (first class mail) or 6201 15th Avenue, Brooklyn, NY 11219 (hand delivery or overnight mail). Ballots should not be sent directly to the Plan Proponents, the Creditors' Committee, or their agents (other than the Voting Agent). No Ballots may be submitted by electronic mail or any other means of electronic transmission, and any Ballots submitted by electronic mail or other means of electronic transmission will not be accepted by the Voting Agent.

If a Holder of a Claim delivers to the Voting Agent more than one timely, properly completed Ballot with respect to such Claim prior to the Voting Deadline, the Ballot that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the timely, properly completed Ballot determined by the Voting Agent to have been received last from such Holder with respect to such Claim.

If you are a Holder of a Claim who is entitled to vote on the Plan as set forth in the Solicitation Order and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan, the Ballot or the procedures for voting on the Plan, please contact the Voting Agent (1) by telephone at (212) 771-1128, (2) by email at DRCVote@donlinrecano.com, or (3) in writing at Donlin, Recano & Company, Inc., Re: Relativity Fashion, LLC, et al., Attn: Ballot Processing, P. O. Box 2034, Murray Hill Station, New York, NY 10156-0701.

FOR FURTHER INFORMATION AND INSTRUCTIONS ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE SECTION ~~VII~~VI.J.9.

Before voting on the Plan, each Holder of a Claim in Classes B, C, D, E, G and J should read, in its entirety, this Disclosure Statement, the Plan, the Disclosure Statement Order, the Solicitation Order, the Confirmation Hearing Notice, and the instructions accompanying the Ballots.  These documents contain important information concerning how Claims are classified for voting purposes and how votes will be tabulated.  Holders of Claims entitled to vote are also encouraged to review the relevant provisions of the Bankruptcy Code and Bankruptcy Rules and/or consult their own attorney.

### E.    Confirmation Exhibits

The Plan Proponents will separately file copies of all Confirmation Exhibits with the Bankruptcy Court no later than seven (7) days before the Voting Deadline (or such later date as may be approved by the Bankruptcy Court).  All Confirmation Exhibits will be made available on the Document Website once they are Filed.  The Plan Proponents reserve the right, in accordance with the terms of the Plan, to modify, amend, supplement, restate or withdraw any of the Confirmation Exhibits after they are Filed and will promptly make such changes available on the Document Website.

### F.    Confirmation Hearing and Deadline for Objections to Confirmation

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on whether the Plan Proponents have fulfilled the confirmation requirements of Bankruptcy Code § 1129.  The Confirmation Hearing has been scheduled for January [__], 2016 at [__:__] [a][p].m. (Eastern Time) before the Honorable Judge Michael E. Wiles, United States Bankruptcy Judge for the Southern District of New York, in Courtroom 617 at the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, New York, New York 10004.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice.

Any objection to Confirmation must (1) be in writing, (2) state the name and address of the objecting party and the nature of the Claim or Interest of such party, and (3) state with particularity the basis and nature of such objection.  Any such objections must be Filed and served upon the ~~persons~~Persons designated in the Confirmation Hearing Notice in the manner and by the deadline described therein.

## II.    OVERVIEW OF THE COMPANY

### A.    Corporate Structure of the Company

The company operates its businesses through separate but affiliated companies that are generally organized by business lines or units.  Relativity Holdings LLC ("**Relativity Holdco**") owns 100% of the equity of Relativity Media, LLC ("**RML**") and RML is the direct or indirect owner of the Debtors (the "**Debtor Subsidiaries**") and the non-Debtor subsidiaries of Relativity Holdco (the "**Non-Debtor Subsidiaries**" and, together with Relativity Holdco, RML and the Debtors, "**Relativity**").

### B.    Business Overview

Relativity is a privately-held entertainment company with an integrated and diversified global media platform that provides, among other things, film and ~~scripted~~unscripted television financing, production and distribution.  In addition to its film studio, the Company maintains an integrated suite of complementary and synergistic business units that make up the "360 degree" global media platform.  Relativity benefits from the convergence of filmed entertainment with other forms of entertainment and global brands.  Specifically, Relativity couples its traditional media and content offerings with a roster of world-class athletes, artists and global consumer brands.  By bringing these businesses together, the Company drives value to its films, television shows, brands and managed portfolio of clients through highly unique, integrated promotion opportunities.  As of the Petition Date, Relativity had approximately 89 full and part-time employees and 54 independent contractors.  In addition, in connection with Relativity's film and scripted television productions, as of the Petition Date, Relativity employed approximately 760 temporary production personnel that provide Relativity cast and crew services, as well as other production support.  As of October 31, 2015 following the sale of the unscripted television business unit described in further detail in Section .employees 48 Relativity has approximately ,A below.IV

Relativity's corporate headquarters are located at 9242 Beverly Blvd., Suite 300, Beverly Hills, California 90210, and Relativity's primary telephone number is 310-724-7700.  Attached hereto as <u>Exhibit C</u> and <u>Exhibit D</u> respectively, are (i) Relativity's unaudited financial statements for the fiscal year ending December 31, 2014 and for the first two quarters of 2015, and (ii) Relativity's audited financial ~~statement~~statements for the fiscal years ending December 31, 2012 and 2013 (collectively, the "**Financial Statements**").

### C.    Business Operations

1.    *Key Business Units*

Relativity's operations are conducted through various subsidiaries and affiliates, which are grouped by business units.  Relativity's key business units include (i) film production and distribution, (ii) scripted television production and distribution, (iii) sports talent management, (iv) marketing/branding, (v) digital media, (vi) music publishing, (vii) education, and (viii) international strategic partnerships.  Each business unit is further described below.

a.    *Relativity's Film Studio Division*

The Relativity film business provides a full-service studio with development, production, financing and distribution capabilities (the "**Film Business**").  Since its inception, the Film Business has distributed, produced or arranged financing for over 200 films that have earned over $23 billion in worldwide box office receipts, with 78 films generating more than $100 million in worldwide box office receipts, 49 films opening at number one at the domestic box office and 73 films earning Oscar nominations with 11 wins.  Relativity has produced 20 films in-house and 169 through distribution or financing arrangements including 127 as part of major studio co-production and financing arrangements.

As Relativity moved away from its slate co-financing arrangements, it developed capabilities to efficiently source, finance, produce and distribute approximately 15 – 20 films theatrically and up to 30 films on television and digital media per year.  Relativity's business model mitigates the traditional risk of a film studio.  Through international output deals and tax credits, Relativity typically limits its at-risk capital to domestic Prints and Advertising ("**P&A**") costs plus 0-25% of a film's budget versus 100% for a traditional film studio.  Relativity's distribution agreements include: (i) long-dated output arrangements in numerous foreign territories that often cover the majority of a film's budget, (ii) pre-sale of distribution rights in the foreign territories not covered by output arrangements typically covers an additional significant portion of a film's budget, and (iii) guaranteed minimum Pay TV revenues from the Netflix output arrangement and government film production tax incentives that further reduce production costs in some territories.

Relativity's proprietary film selection process is rooted in an analytical methodology which considers both quantitative and qualitative factors.  Relativity calculates the estimated range of revenue performance for the film by evaluating historical box office performance, looking at the performance of films with similar genre, budget and

talent, assessing the competitive landscape around release dates and analyzing the performance of films released on similar dates in previous years.  Each film's production and marketing budgets are developed to ensure a film of first class technical quality can be made within the anticipated "below-the-line" (i.e., non-talent related) costs in the production budget and that the "above-the-line" (i.e., talent) costs and profit participations properly align incentives to maximize film profit.  Additionally, Relativity utilizes potential "soft money" benefits frequently and creates the P&A budget to efficiently support the intended marketing and distribution plans.  Ultimately, the total estimated cost is then compared against the estimated revenue performance to determine the film's profit potential.

The Film Business consists of (i) an acquisition division that purchases film rights; (ii) a single picture division that oversees production of Relativity's films and a group of Special Purpose Entities ("**SPEs**") that produce particular Relativity films and retain the rights to said films; and (iii) a marketing and distribution division that arranges the domestic and international distribution of Relativity's films.  Relativity arranges for the purchases of rights to movies through SPEs, one for each movie.  The SPEs own the rights to the movies, and enter into funding agreements with lenders using the movies as collateral.  The SPEs, themselves, do not distribute the movies or otherwise directly pay for movie-related expenses.  Rather, they license their rights to the movies to one of Relativity's subsidiaries, RML Distribution Domestic, LLC ("**RML Distribution**"), for purposes of distributing the movies in the United States.

As of October 31, 2015, there are seven (7) films that have completed principal photography.  The upcoming film slate with anticipated releases over the next ~~18~~24 months consists of:  *Disappointments Room, Before I Wake, Kidnap, Solace,* Masterminds, ~~*Disappointments Room, Secret Scripture*~~, Shot Caller, ~~Solace~~ and ~~Kidnap~~*Strangers 2, The Crow, Hunter Killer, Act of Valor: SWAT, Fletch, Immortals 2,* and *Secret Scripture*.  In addition, there are over 25 film projects in active development and other anticipated acquisitions of film titles.

For the twelve months ending December 31, 2014, the Relativity Film Business generated approximately $340.7 million in revenue.

        b.     *Relativity's Television Studio Division*

The Relativity television business (the "**TV Business**") started as a television production company in 2008 and, as of the Petition Date, included over 29 television series in production across 25 different networks and more than 46 contracted pilots and presentations, including eight upcoming scripted shows.  Examples of these series include:  *Catfish: The TV Show* (MTV), *The Great Food Truck Race* (Food Network), *Kim of Queens* (Lifetime Network), *Young & Hungry* (ABC Family), and *Limitless* (CBS).  Prior to the Petition Date, the TV Business had approximately 24 employees and 510 temporary production personnel.  For the twelve months ending December 31, 2014, the Relativity TV Business generated approximately $96.6 million in revenue.

On October 20, 2015, the sale of the unscripted TV Business to certain of the Debtors' secured lenders closed.

Following the sale of Relativity's unscripted (reality) TV Business, the Company's television strategy is now focused exclusively on developing and providing scripted television shows in partnerships with major networks, cable companies, and online platforms.  The scripted content will be based on existing Relativity IP (films, digital content, etc.) and original IP.

Relativity has already demonstrated the capability for feature film IP to be successfully converted into television content:

- Catfish (The TV Show):  based on a documentary released by Relativity in 2010, now one of the top-rated shows on MTV.
- Limitless (The TV Show):  based on Relativity's 2011 feature film starring Bradley Cooper which grossed over $160 million worldwide, now one of the top new primetime shows airing at 10:00 p.m. on Tuesday on CBS (immediately following NCIS).

Starting in 2016, Relativity expects to produce 1-2 major scripted shows per year.  In scripted television, the revenue model typically consists of two (2) main components:  (i) producer/EP fees (per episode) and (ii) profit

participation in the event a show reaches syndication.  Syndication upside for popular shows can potentially be worth hundreds of millions of dollars.

c.      *Relativity's Music Division*

The Relativity music business (the "**Relativity Music Group**") was founded in 2009 to provide in-house music supervision and soundtrack services for films produced and/or financed by Relativity.  Relativity Music Group also releases soundtracks internationally and provides services for films produced and/or financed by other film studios.  Relativity Music Group has released soundtrack albums for some of Hollywood's biggest films, including: *Bridesmaids*, *Hanna*, *The Adjustment Bureau*, *30 Rock*, *Dear John*, *Love Happens*, *Couples Retreat*, *Zombieland*, *A Single Man*, *MacGruber*, *Repo Men*, *Brothers*, *The Spy Next Door*, *The Perfect Getaway*, *Machine Gun Preacher*, *Like Crazy* and *Immortals*.  Relativity Music Group is exclusively distributed by EMI Label Services/Universal.

For the twelve months ending December 31, 2014, the Relativity Music Business generated approximately $1.5 million in revenue.  Relativity Music Group continues to service its agreements and expects to bring in new management on or before the Effective Date.

d.      *Relativity Marketing*

Madvine RM, LLC ("**Madvine**") is Relativity's branded entertainment and consumer products company.  Madvine creates and offers full product and brand integration for companies, major brands and other strategic partners outside of Relativity.  Madvine works with both established and emerging brand partners.  Madvine's work for established brands is paid for in ~~cash~~Cash and its work for emerging brands is compensated through equity participations in the brandholder.

Relativity Digital Studios ("**RDS**") develops, produces and distributes original content and other promotional material for digital distribution.  RDS also develops branded entertainment campaigns that connect brand partners with other Relativity businesses, such as the Music Business.  The entities in RDS own and manage websites and website content, and their assets include the intellectual property related to digital shorts and the equipment necessary to produce such content.  For the twelve months ending December 31, 2014, RDS generated approximately $242,000 in revenue.

In 2015, Relativity launched Quantum Distribution Network ("**Quantum**"), a content distribution network consisting of owned and operated and third-party websites, with an emphasis on video content syndication.  Quantum is designed to generate incremental sponsorship/media campaign revenue against RML produced content, provide a more efficient and cost effective marking platform for RML assets and generate additional premium inventory against which RML can sell sponsorships and media campaigns.

e.      *Relativity's Fashion Division*

Relativity Fashion (also known by its d/b/a, M3/Relativity), is a New York limited liability company that was organized on October 22, 2013.  Relativity Fashion was a consultancy service company that represented fashion designers and provided services to other clients in connection with building and launching their brands and expanding them into various forms of media through involvement with other Relativity entities.  Prior to the Petition Date, Relativity Fashion terminated all of its employees and ceased all activities.

f.      *Global Distribution Platform*

Relativity has positioned itself at the center of several growth trends in the film industry, particularly in China and India.  Sky Land Entertainment ("**Sky Land**") is a 90%-owned subsidiary of Relativity that provides direct distribution access to the Chinese market for Relativity and other third-party film content.  Relativity, through Sky Land, is the only U.S. studio to have a government-issued distribution license in China, the world's fastest-growing and second largest film market, and de facto guaranteed distribution slots annually supported by Sky Land's Beijing-based management team.  Relativity already has released four films in China: *Immortals*, *Mirror Mirror*, *Freebirds*, and *21 & Over*.

Replicating its strategy in China, Relativity entered into a 50/50 joint venture in India - now the 6th largest film market in the world with over 1 billion people - focusing on theatrical distribution of Relativity and third-party produced films as well as production of U.S. and Bollywood content.

      2.    *Joint Ventures*

Certain Non-Debtor Subsidiaries that are in the Film Business, the Digital Business, and the Music Business are only partially owned by Relativity (collectively, the "**Joint Ventures**").  Each Joint Venture is discussed below.

      a.    *RED*

~~b.~~    Relativity EuropaCorp Distribution, LLC ("**RED**") is a domestic distribution and marketing joint venture formed and owned 50-50 by RML and EuropaCorp Films USA, Inc. ("**EuropaCorp**").  RED was created in February 2014 to support each party's domestic distribution for their respective film slates and to provide marketing and distribution services to both entities.  Under the terms of the deal, EuropaCorp paid approximately $70 million for a 50% stake in the joint venture.  As of the Petition Date, RED had approximately 56 employees.  As of October 31, 2015, RED employed 51 employees.

      b.    *Relativity Sports*

The Relativity Sports Group is comprised of Relativity Sports Management, LLC ("**Sports Management**"), Relativity Sports, LLC, Relativity Sports Enterprises, LLC, and their subsidiaries (collectively, "**Sports Group**").  The Sports Group represents the first major professional sports management agency that operates as part of a global media company with film production and distribution capabilities "under the same roof."  As of the date hereof, the Sports Group is one of the largest sports management companies in the United States, representing and managing over 300 professional athletes in Major League Baseball, the National Basketball Association, and the National Football League with greater than $2.5 billion in contracts.

On July 28, 2015, YC Athletic Holdings, LLC exercised warrants to purchase 50% of the equity in Sports Management.  As such, RML now owns 50% of Sports Management.  Sports Management, in turn, owns 59.71% of Relativity Sports LLC, with the remaining 40.29% owned by certain individuals and other entities.

Relativity Sports, LLC currently holds warrants to purchase 11.48% of Major League Gaming, Inc ("**MLG**").  In addition, Relativity Media also directly holds warrants to purchase 4.86% of MLG.  Major League Gaming is in advanced discussions regarding a sale to a buyer for an amount that the Debtors believe to be in the range of $200 million.

As of October 31, 2015, the Sports Group had 73 employees, including over 20 agents and representatives across the country.  For the twelve months ending December 31, 2014, the Relativity Sports Group generated approximately $26.9 million in revenue.

      c.    *Relativity University*

Relativity Education, LLC and its direct and indirect subsidiaries (collectively, "**Relativity University**") is a for-profit accredited branch campus of the Hussian School of Art with 82 students as of November 18, 2015.  Relativity University offers an array of film, media, performing arts and graphic arts Bachelor of Fine Arts programs.  The programs include curricula developed in collaboration with industry insiders and classes are taught by working professionals operating from an active Hollywood production studio.  Relativity owns a minority stake in the Relativity University subsidiaries.  Relativity Education, LLC is 36% owned by RML with the remaining 64% owned by a number of third-party and/or affiliate entities outside of Relativity.

**D.    Relativity Equity Classes**

Relativity Holdco's five classes of equity are held by approximately 55 holders.  The following is a general description of the five equity classes:

- Class A Units:  Relativity Holdco currently has 120.75 million Class A Units outstanding.  The Class A Units have voting rights on a 1 vote per unit basis.  These units are not subject to any mandatory dividends.  One holder of the Class A Units has a put right, and certain other rights, in the event an IPO or other specified liquidity event does not occur prior to November 26, 2018.

- Class B Units:  Relativity Holdco currently has 59.95 million Class B Units outstanding.  The Class B Units do not have any voting rights, and are held by members of Relativity's management team, either directly or indirectly through a holding company, as well as by members of the Board of Managers and certain consultants to Relativity.  The Class B Units are profits interests and only have value to the extent Relativity Holdco's valuation per unit exceeds the applicable threshold amount.

- Class C Preferred Equity:  Relativity Holdco currently has 3.4704 Class C Units outstanding.  The Class C Units do not have any voting rights and are held by Dune Capital Partners IV LLC.  The Class C Units accrue dividends at 12.5% paid in kind ("**PIK**"), must be exchanged into Class E Units or debt no later than December 31, 2015, and are otherwise non-convertible.[57]

- Class D Units:  Relativity Holdco currently has 1.36 million Class D Units outstanding.  The Class D Units do not have any voting rights, and are held by Tom Forman.  The Class D Units permit Mr. Forman to cause Relativity Holdco, under certain circumstances, to repurchase all or any portion of the Class D Units held by Mr. Forman in approximately 3.5 years for either $6.25 per Class D Unit in a lump sum or $12.50 per Class D Unit paid over time (at Relativity Holdco's election).

- Class E Units:  Relativity Holdco currently has 11.7 million Class E Units outstanding.  The Class E Units have voting rights on a 2 vote per unit basis and accrue dividends at 12.5% PIK.  The Class E Units are convertible into Class A Units at the option of the holders thereof and, in certain circumstances, on a mandatory basis.

### E.    Corporate History

Relativity was founded in 2004 by its current Chairman and CEO, Ryan Kavanaugh ("**Kavanaugh**"), as a film slate co-financier partnering with major studios such as Sony and Universal.  Between 2005 and 2010, a NYC-based hedge fund (the "**Hedge Fund**") made a significant investment in Relativity, investing over $1.3 billion in equity and debt primarily through slate co-financing activities.

In 2010, Relativity acquired Overture Films' marketing and distribution operations and began to transform its business into a full-service Hollywood studio.  Since 2010, Relativity has distributed, produced, or arranged financing for more than 200 feature films, including pictures such as *The Fighter*, *Limitless*, *Immortals, Safe Haven* and *Act of Valor,* and generated more than $23 billion in box-office revenues and earned 73 Oscar nominations.  In 2011, Yucaipa purchased a significant equity stake in Relativity.

Relativity is now one of the largest privately-held Hollywood movie studios with a fully integrated and diversified global media platform spanning major studio level film and scripted television production and distribution, professional sports talent management, branding, digital media, music publishing, education and gaming.

In 2012, the Hedge Fund forced a buyout of its interest in Relativity.  To satisfy this, Relativity borrowed $360 million in debt, and sold its then-existing film library to the Hedge Fund (~30+ titles) leaving Relativity in an over-leveraged, under-capitalized position.

---

[57]    Historically, the Debtors have treated the Class C Preferred Equity as debt for both financial reporting and income tax purposes, and there is a contractual obligation to a holder of the Class C Preferred Equity to continue treating the units as indebtedness for income tax purposes.  The cumulative preference per Class C Unit through May 30, 2015 is $871,301.83 and the total Class C Unit preference is $8,251,576.87.

F.        **Prepetition Capital Structure**

The following is a summary of Relativity's prepetition secured indebtedness (all terms as defined below). Each debt is further described below.

| Debt | Amount Outstanding as of the Petition Date |
|---|---|
| Cortland TLA/TLB Facility (corporate level debt) | $361,611,038 plus accrued interest |
| Manchester Prepetition Credit Facility (corporate level debt) | $137,078,557 plus accrued interest |
| P&A Facility (SPV debt) | $~~115,043,503~~117,886,141 plus accrued interest |
| Production Loans (SPV debt) | $33,848,694 plus accrued interest |
| Ultimates Facility (SPV debt) | $27,789,945 plus accrued interest |
| Vine/Verite Loans (SPV debt) | $69,405,434 plus accrued interest |

1.        *Cortland Term Loan A and Term Loan B Financing Facility*

On May 30, 2012, RML and certain of its subsidiaries[68] (the "**Cortland Borrowers**") entered into a Financing Agreement with a variety of lenders that are parties to the agreement (the "**Cortland Lenders**"), including Cortland Capital Market Services LLC ("**Cortland**"), as collateral and administrative agent, and CBA Agency Services, LLC, as origination agent.  The financing extended under this facility was divided into two tranches:  (i) a tranche A term loan in the aggregate principal amount of $125,000,000 (the "**Cortland Term Loan A**") and (ii) a tranche B term loan in the aggregate initial principal amount of $125,000,000 (the "**Cortland Term Loan B**", and together with the Cortland Term A Loan, the "**Cortland TLA/TLB Facility**").  Prior to an event of default, the Cortland Term Loan A bore interest at 10% per annum, payable quarterly in ~~cash~~Cash, while the Cortland Term Loan B bore PIK interest at 15% per annum.  Following an event of default, the Cortland Term Loan A bears interest at 12% per annum, payable quarterly in ~~cash~~Cash, while the Cortland Term Loan B bears PIK interest at 17% per annum.  The Cortland TLA/TLB Facility is secured by substantially all of the assets of the Cortland Borrowers.  Pursuant to the Cortland TLA/TLB Facility, Relativity Holdco (together with the Cortland Borrowers, the "**Cortland Obligors**") guaranteed the obligations of the Cortland Borrowers and pledged 100% of its equity interest in RML.

Pursuant to the Cortland TLA/TLB Facility, prior to the occurrence of an event of default, payments of principal are distributed ratably to all of the Cortland Lenders.  Upon the occurrence and during the continuance of an event of default, Cortland may (and at the direction of certain of the Cortland Lenders shall) apply the proceeds of the collateral in an order that repays interest and principal on the Cortland Term Loan A in full before repaying any of the interest or principal on the Cortland Term Loan B.  The Cortland TLA/TLB Facility matured on June 1, 2015 and was extended by forbearance to July 27, 2015.  As of the Petition Date, approximately $145,834,693 was outstanding under the Cortland Term Loan A and approximately $215,776,345 was outstanding under the Cortland Term Loan B, for a total of approximately $361,611,038 plus accrued interest outstanding under the Cortland TLA/TLB Facility.  As more fully described in the section below regarding the events that have led to the filing of the Chapter 11 Petitions, the lenders in the Cortland Term Loan A (the "**TLA Lenders**") have traded their debt to the lenders in the Cortland Term Loan B (the "**TLB Lenders**").

2.        *Manchester Prepetition Credit Facility*

On May 30, 2012, RML and each of the Cortland Borrowers (the "**Manchester Borrowers**") entered into an additional credit facility with Manchester Securities Corporation ("**Manchester**") under the Second Amended and Restated Credit Agreement, as amended by Amendment No. 1 thereto, dated September 30, 2014 (collectively with all the related loan and other documents identified therein, the "**Manchester Prepetition Credit Facility**"). The obligations under the Manchester Prepetition Credit Facility bear PIK interest at 7.5% per annum and mature on May 30, 2016.  Any event of default under the Cortland TLA/TLB Facility constitutes an event of default under the Manchester Prepetition Credit Facility.  The Manchester Prepetition Credit Facility is subordinate to the Cortland

---

[68]        The three (3) Debtors that are not Cortland Borrowers are J&J Project, LLC, Yuma, Inc. and Relativity Fashion.

TLA/TLB Facility and is secured by substantially all of the assets of the Manchester Borrowers (the same collateral securing the repayment of the Cortland TLA/TLB Facility). Relativity Holdco (together with the Manchester Borrowers, the "**Manchester Obligors**") guaranteed the obligations of the Manchester Borrowers under the Manchester Prepetition Credit Facility.

3.      *Production Loans*

Relativity finances the production of its films through a combination of equity (i.e., RML contributing funds to the production entity as equity) and individual production loans (the "**Production Loans**") that are secured by the respective films and their related assets, including tax credits, rebates, international sales estimates and international receivables. As of the Petition Date, the following Production Loans were outstanding:

- On August 5, 2014, Armored Car Productions, LLC, as borrower, entered into an Amended and Restated Loan and Security Agreement with CIT Bank, N.A., f/k/a CIT Bank, N.A., f/k/a OneWest Bank, N.A., as agent, and Surefire Entertainment Capital, LLC, as lender (the "**A&R Armored Car LSA**"), for loans up to $24,090,353 (inclusive of fees and the Interest and Fee Reserve (as defined in the A&R Armored Car LSA)) for the purpose of acquiring, producing, completing and delivering a motion picture not yet released, and the payment of related financing costs (the "**Armored Car Loan**").[79] A portion of the Armored Car Loan was syndicated to City National Bank. The Armored Car Loan matures on May 31, 2016, bears interest at a rate of the Prime Rate plus 3.875% or LIBOR plus 5.875%, and is secured by substantially all of the assets of the SPE. As of October 4, 2015, approximately $21,586,243[810] was outstanding under the Armored Car Loan.

- On September 5, 2014, DR Productions, LLC, as borrower, entered into a Loan and Security Agreement with CIT Bank, N.A., f/k/a CIT Bank, N.A., f/k/a OneWest Bank, N.A., as agent and lender (the "**DR LSA**"), for loans up to $14,688,456 (inclusive of fees and the Interest and Fee Reserve (as defined in the DR LSA)) for the purpose of acquiring, producing, completing and delivering a motion picture not yet released, and the payment of related financing costs (the "**DR Loan**"). The DR Loan matures on July 29, 2016, bears interest at a rate of the Prime Rate plus 1.00% or LIBOR plus 3.00%, and is secured by substantially all of the assets of the SPE. As of October 4, 2015, approximately $12,272,477[911] was outstanding under the DR Loan.

In addition, in connection with the production of the films *3:10 to Yuma* and *The Forbidden Kingdom*, Yuma, Inc. and J & J Project, LLC (the "**Vine/Verite Borrowers**") entered into certain loan and security agreements with Verite Capital Onshore Loan Fund LLC ("**Verite**"), which were subsequently transferred to Vine Film Finance Fund II, LP ("**Vine**") (such loans, collectively, the "**Vine/Verite Loans**"). Each of the Vine/Verite Loans bear interest at LIBOR plus 5.00%, are collateralized by the assets of the respective films and other assets of the respective Vine/Verite Borrowers, including, without limitation, all related music rights, copyrights, and production and distribution rights (collectively, the "**Vine/Verite Collateral**"), and are otherwise non-recourse to the Vine/Verite Borrowers. The Vine/Verite Loans have a first-priority security interest in all of the Vine/Verite Collateral.

The Vine/Verite Loans have matured and are in default. As of the Petition Date, $69,405,434 ($36,912,271 ~~outstanding with~~related to Yuma, Inc., and $32,493,163 ~~outstanding with~~related to J&J Project, LLC), plus default interest, was outstanding under the Vine/Verite Loans.

In conjunction with the Debtors' entry into the Original DIP Facility, counsel to the Debtors, the Original DIP Lenders, and Vine engaged in good-faith discussions concerning the adequate protection of Vine and resolution

---

[79]     The A&R Armored Car LSA amends and restates in its entirety that certain Loan and Security Agreement, dated as of July 9, 2014, by and among the Borrower, the Agent and CIT Bank, N.A., f/k/a CIT Bank, N.A., f/k/a OneWest Bank, N.A.

[810]     CIT asserts a different amount outstanding as of the date shown, and the amount is also subject to reconciliation for other obligations under the LSA including, without limitation, attorneys' fees.

[911]     CIT asserts a different amount outstanding as of the date shown, and the amount is also subject to reconciliation for other obligations under the LSA including, without limitation, attorneys' fees.

of any potential motion for relief from the automatic stay. More specifically, the Debtors agreed in the Final DIP Order to promptly direct Fintage Collection Account Management B.V. to distribute cash flows in accordance with the terms of the Collection Account Agreements governing the collection and distribution of revenues generated by the films held by the Vine/Verite Borrowers. The Debtors also stipulated to the validity of the security interests and claims held by Vine in/on the Vine/Verite Collateral. Further, Vine and the Debtors agreed to a standstill period, during which Vine agreed to not exercise its rights or remedies with respect to the Vine/Verite Loans. During the standstill period, counsel to the Debtors agreed to facilitate diligence and collaborate in good faith with Vine and the Original DIP Lenders to determine the best mechanism for transferring the Vine/Verite Collateral to Vine. In negotiating the standstill period, it was the Debtors' and the Original DIP Lenders' hope that the sale process would generate a buyer interested in the Vine/Verite Collateral. No party, however, expressed any interest in, and no bids were made for, the Vine/Verite collateral.

The Debtors and Vine believe that the value of the Vine/Verite Collateral is significantly less than the amounts outstanding under the Vine/Verite Loans such that no value from the collateral extends to any junior creditors or interest holders of the Vine/Verite Borrowers. Notwithstanding Section 8 of the Plan, including the contemplated treatment for the Allowed Vine/Verite Secured Claim set forth therein, the Plan Proponents and Vine have agreed, consistent with the terms of the DIP Order, to work collaboratively to determine the best means to transfer the Vine/Verite Collateral free and clear of any claims, liens, security interests, encumbrances, pledges, or interests of junior creditors or interest holders, including through a potential transfer as part of these chapter 11 cases or an agreed upon foreclosure. Claims in Classes H34 and H144 shall remain Unimpaired.

In the event that the Debtors and Vine agree to a consensual transfer of the Vine/Verite Collateral to Vine, and such transfer is actually completed according to the terms of such agreement, that transfer shall be in full and final satisfaction of the obligations owed to Vine under the Vine/Verite Loans.

4.    *The P&A Facility*

As film production finishes and the film moves into post-production, editing occurs, special effects and music are added, trailers are created, the release of the film is advertised, and then the film prepares for distribution. Relativity has historically financed its operations with lending facilities called "P&A facilities" for print and advertising marketing.

The current P&A facility is the Second Amended and Restated Funding Agreement entered into by certain of RML's subsidiaries (the "**P&A Borrowers**"),[1012] together with RML Distribution and RMLDD Financing, LLC, as accommodation pledgors, on June 30, 2014 and amended on August 26, 2014, with Macquarie US Trading LLC LLC ("**Macquarie**"), as agent for the lenders, Macquarie Bank Limited, as post-release lender and RKA Film Financing, LLC ("**RKA**"), as pre-release lender and pre-release lender agent (collectively, the "**P&A Lenders**")[1113] (collectively with all the related loan and other documents identified therein, the "**P&A Funding Agreement**"). The loans under the P&A Funding Agreement are divided into two types: (i) specific loans made in connection with an individual film prior to its theatrical release that bear interest at 5.5% per annum for the first 12 months and 11.5% thereafter (the "**Pre-Release P&A Loans**") and (ii) specific loans made in connection with an individual film in the opening weekend or calendar week following the theatrical release of a film that bear interest at 6.9% per annum for the first 12 months and 9.9% per annum thereafter (the "**Post-Release P&A Loans**" and together with the Pre-Release P&A Loans, the "**P&A Facility**"). In addition, each loan under the P&A Facility is subject to an original issue discount of 6.5% for the Pre-Release P&A Loans and 3% for Post-Release P&A Loans. To secure their obligations under the P&A Facility, the P&A Borrowers granted liens and security interests to the P&A Lenders in certain collateral which generally consists of the proceeds from domestic distribution agreements for the films financed under the P&A Facility and the intellectual property, picture rights and receipts related to such films.

---

[1012]    The P&A Borrowers are: Best of Me Productions, LLC; Blackbird Productions, LLC; RML Lazarus Films, LLC; RML WIB Films, LLC; DR Productions, LLC; Armored Car Productions, LLC; RML Solace Films, LLC; and RML Somnia Films, LLC.

[1113]    Claren Road Credit Master Fund Ltd., an original lender under the P&A Funding Agreement, is no longer a party thereto.

The Pre-Release P&A Loans mature the earlier of December 31, 2015 or 18 months after each loans respective funding date.  Each Post-Release P&A Loan matures 18 months after its respective funding date. The P&A Facility is secured by the assets of the film-specific SPEs, including the proceeds from domestic distribution agreements for the films financed under the P&A Facility, the intellectual property, picture rights and the receipts from such films, but it is not cross collateralized.  RML Distribution and RMLDD Financing guaranteed the obligations of the P&A Borrowers under the P&A Facility.  RKA has lent Relativity approximately $115 million for seven films that have been produced and released, and been repaid in full.  As of October 31, 2015, approximately $88,224,682 was outstanding under the Pre-Release P&A Loans and $26,818,821 was outstanding under the Post-Release P&A Loans.

5.    *The Ultimates Facility*

Following a film's theatrical release, the value of the future cash flows for the film in all media (e.g., theatrical, DVD, digital and television), (the "**Ultimates**") serves as collateral for a loan facility to fund the studio's operations.

On September 25, 2012, RMLDD Financing entered into a Credit, Security, Guaranty and Pledge Agreement with CIT Bank, N.A., f/k/a CIT Bank, N.A., f/k/a OneWest Bank, N.A., as administrative agent, issuing bank, joint lead arranger and joint bookrunner (as such terms are defined therein), as amended from time to time, by those certain and various amendments thereto, including and through Amendment No. 17, dated April 29, 2015 (collectively with all the related loan and other documents identified therein, the "**Ultimates Credit Agreement**"). Following the closing date of September 25, 2012, the Ultimates facility was syndicated to Barclays Bank PLC, City National Bank, Comerica Bank, First Republic Bank, Bank Hapoalim B.M. and Wilshire Bank (collectively, with CIT Bank, N.A., the "**Ultimates Lenders**").  The Ultimates Credit Agreement provides RMLDD Financing with a senior secured revolving credit facility for up to $202.5 million (the "**Ultimates Facility**").  As of July 9, 2015, the Ultimates Lenders terminated their commitments, terminated the revolver and converted the agreement into a term loan.  Pursuant to the Ultimates Credit Agreement, the obligations under the Ultimates Facility incur interest at LIBOR plus 3.75% with a LIBOR floor of 0.50% or the Alternate Base Rate (as defined in the Ultimates Credit Agreement) plus 2.75%, as well as commitment, unused and collateral and administrative fees, which are calculated and payable quarterly.  Since May 30, 2015, the Ultimates Facility has been accruing interest at the default rate (currently 9.00%).  The obligations of RMLDD Financing under the Ultimates Facility are guaranteed by certain of the Debtors (the "**Ultimates Guarantors**").[12][14]

The Ultimates Facility originally was scheduled to mature on September 30, 2016 but, due to defaults under other cross-defaulted agreements, the maturity date was accelerated to May 30, 2015.  The Ultimates Facility is secured by the right, title and interest in all personal property and tangible and intangible property of RMLDD Financing and the Ultimates Guarantors.  This covers all currently owned property, property that is later created or acquired and included all goods, accounts, instruments, intercompany obligations, contract rights, partnership and joint venture interests, documents, chattel paper, general intangibles, goodwill, equipment, machinery, inventory, investment property, copyrights, trademarks, trade names and insurance policies.

Beginning in April of 2015, funds that would otherwise be available to be transferred to the cash collateral account and subsequently transferred to the Debtors' operating accounts to be used for working capital, were swept by the Ultimates Lenders.  The sweeps continued through July of 2015, and in aggregate totaled approximately $32,541,661.20.  In addition, on July 17, 2015, the Ultimates Lenders swept an additional $17,881,299.24 on deposit in the participations and residuals account, a bank account at OneWest in RMLDD Financing's name that is used to

---

[12][14]    The Ultimates Guarantors are:  RML Distribution Domestic, LLC; RML Distribution International, LLC; RML Acquisition I, LLC; RML Acquisition II, LLC; RML Acquisition III, LLC; RML Acquisition IV, LLC; RML Acquisition V, LLC; RML Acquisition VI, LLC; RML Acquisition IX, LLC; RML Acquisition XI, LLC; Movie Productions, LLC; Safe Haven Productions, LLC; 21 and Over Productions, LLC; Mala Vita Productions, LLC; Don Jon Acquisitions, LLC; Paranoia Acquisitions, LLC; RML Turkey Films, LLC; Furnace Films, LLC; 3 Days to Kill Productions, LLC; RML Oculus Films, LLC; Brick Mansions Acquisitions, LLC; RML November Films, LLC; RML Echo Films, LLC; RML Hector Films, LLC; Best of Me Productions, LLC; RML Solace Films, LLC; Blackbird Productions, LLC; RML Lazarus Films, LLC; RML WIB Films, LLC; and Black or White Films, LLC.

pay participations and residuals to the producers, performers, writers and other individuals or entities entitled to compensation for the exhibition of the content developed, produced, and/or distributed by the Debtors and the Non-Debtor Subsidiaries.  The swept funds were applied to the outstanding balance of the Ultimates Facility.  As a result of these principal balance application and reductions, among others, as of the Petition Date, approximately $27,789,945 plus accrued interest was outstanding under the Ultimates Facility.  As of October 31, 2015, the outstanding amounts under the Ultimates Facility was $27,789,945 plus accrued interest of $919,707.00.  Per diem interest is accruing interest at a daily rate of $6,852.32.

As of November 18, 2015, the Debtors have over $47.0 million in various accounts at CIT.

6.    *Unsecured Trade Debt*

The Debtors' unsecured trade creditors include vendors providing services to Relativity for print and advertising services, production-related services and products and other services necessary to run a business on a day-to-day basis.  According to Relativity's books and records, as of the Petition Date, there is approximately $78.0 million in unsecured trade vendor debt.

7.    *Unsecured RED Loan*

As part of the formation of RED, RED made an unsecured loan to RML (the "**RED Loan**"), which RML repays through amortization payments equal to 50% of the quarterly overhead of RED.  If RML fails to make the amortization payments, it becomes obligated to make capital contributions in an amount equal to the corresponding amortization payment.  However, as the sole holder of Class B membership interests in RED, RML is also the sole beneficiary of the amounts repaid with respect to the loan and has the unilateral right to forgive the balance of the loan at any time.  As of the Petition Date, $70,550,262 was outstanding under the RED Loan.  As of October 31, 2015, the outstanding amount under the RED Loan is $71,235,773.  RML plans to cause the loan to be forgiven on the Effective Date.

G.    **Events Leading to Chapter 11 Cases**

Prior to the maturity date of the Cortland TLA/TLB Facility, Relativity sought to raise additional funds for its operations and to service existing debt.  On or about May 11, 2015, these efforts resulted in the issuance of 5,000,000 Class E Units in Relativity Holdco to entities affiliated with an individual investor and VII Peaks in exchange for $62,500,000 gross cash proceeds.  Simultaneously with the issuance of such equity interests, and at various times subsequent thereto, holders of the aggregate amount of 96.5296 Class C Units exchanged such Class C Units for an aggregate of 6,695,648 Class E Units pursuant to exchange agreements entered into concurrently with the Class E Unit issuance on May 11, 2015.  In addition, Relativity had lined up in excess of $400 million in a combination of debt and equity commitments to refinance or pay off the Cortland TLA/TLB Facility prior to its maturity date.  However, unbeknownst to Relativity, certain insiders and fiduciaries of the Company thwarted Relativity's debt and equity raise in breach of their fiduciary duties and in interference with Relativity's refinancing process.

Specifically, Colbeck Capital Management ("**Colbeck**"), while acting in multiple capacities including while having representation on Relativity Holdings's Board of Managers, while being paid as consultants to Relativity, and while acting as agent for the TLA/TLB facility with significant management and financial oversight powers and duties, breached their fiduciary duties and other obligations and agreements, through a clandestine plan designed to effectuate a change in control of Relativity for their benefit and to the detriment of the company and its other stakeholders.  With full knowledge of Relativity's debt and equity financing efforts, Colbeck intentionally diverted sources of equity and debt financing away from the company's efforts and instead sought to have such sources committed to their clandestine plan.  Colbeck recruited Relativity's then CFO Andrew Matthews and then President of Production Matthew Alvarez to join meetings with investors to further promulgate the false perception that Relativity, its Chairman and CEO, and the Board were aware of and supportive of the Colbeck plan.  Relativity believes that Colbeck represented to third parties that its efforts were Board authorized and approved, when they were not.

In exchange for mutual general releases, effective as of May 11, 2015, Colbeck promised Relativity that it would no longer disparage Relativity in the marketplace.  Relativity believes that release is a voidable transfer,

however, and also that the release is ineffective, for among other reasons, on the ground that Colbeck continued to breach its obligations, including its obligation not to disparage Relativity, through its communications with third parties (including, but not limited to, other investors and lenders) as Relativity continued to seek refinancing of its existing debt.  The Debtors intend to continue to investigate and pursue any appropriate claims against Colbeck, its principals who served on Relativity's Board of Managers, and any other parties who acted in concert with them.

As a result of the actions of Colbeck and its co-conspirators, Relativity was unable to conclude its debt and equity refinance efforts and on the maturity date of the Cortland TLA/TLB Facility, over $360 million in debt became due and payable as of the Petition Date and Relativity was unable to make payment on the Cortland TLA/TLB Facility.

On June 1, 2015, Relativity entered into a forbearance agreement with a majority of TLA Lenders and a majority of TLB Lenders (the "**TLA/TLB Forbearance Agreement**").  On the same day, Relativity executed a forbearance agreement with the Ultimates Lenders under the Ultimates Facility (the "**Ultimates Forbearance Agreement**"), and thereafter, on June 5, 2015, Relativity entered into a forbearance agreement with the P&A Lenders under the P&A Facility (the "**P&A Forbearance Agreement**," and collectively with the TLA/TLB Forbearance Agreement and the Ultimates Forbearance Agreement, the "**Forbearance Agreements**").  On June 25, 2015, the Forbearance Agreements expired in accordance with their terms.

In early July 2015, Catalyst Capital Group, a Toronto-based hedge fund ("**Catalyst**") purchased the outstanding Cortland Term Loan A debt and became the sole lender under the Cortland Term Loan A.  Anchorage Capital Master Offshore, Ltd. and Luxor Capital LLC, as lenders under the Cortland Term Loan B (the "**Purchasing TLB Lenders**"), promptly provided notice of their intent to exercise their right under Section 10.17 of the Cortland TLA/TLB Financing Agreement to purchase the outstanding debt under the Cortland Term Loan A. On July 9, 2015, the Purchasing TLB Lenders, along with Catalyst (also a lender under the Cortland Term Loan B) purchased all of the Cortland Term Loan A debt.

On July 16, 2015, the Cortland Borrowers and the Cortland Lenders entered into Amendment No. 1 to the Cortland TLA/TLB Financing Agreement, pursuant to which certain of the Cortland Lenders funded $15 million of additional Term Loans ("**Term A-1 Loans**") of which $7.5 million was funded on July 16, 2015 and $7.5 million was funded on July 20, 2015.  The Term A-1 Loans had a maturity date of July 27, 2015 and interest was payable in ~~cash~~Cash at a rate of 15% per annum.  On July 27, 2015, the Term A-1 Loans matured.

Beginning in April of 2015, funds that would otherwise be available to be transferred to the cash collateral account and subsequently transferred to the Debtors' operating accounts to be used for working capital, were swept by the Ultimates Lenders.  The sweeps continued through July of 2015, and in aggregate totaled approximately $32,541,661.20.  On July 17, 2015, the Ultimates Lenders swept an additional $17,881,299.24 on deposit in the participations and residuals account, a bank account at OneWest in RMLDD Financing's name that is used to pay participations and residuals to the producers, performers, writers and other individuals or entities entitled to compensation for the exhibition of the content developed, produced, and/or distributed by the Debtors and the Non-Debtor Subsidiaries.  The swept funds were applied to the outstanding balance of the Ultimates Facility.

Relativity experienced severe liquidity constraints and increasing limitations imposed by the Forbearance Agreements and the new debt issuances.  With over $350 million in outstanding matured secured debt and unable to finalize any further financing due to a variety of factors, Relativity determined it was in its best interest to file for bankruptcy protection.

## III.    THE CHAPTER 11 CASES

### A.    Voluntary Petitions

On July 30, 2015, the Debtors commenced these Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Pursuant to the bankruptcy court's order on July 31, 2015, the Debtors' Chapter 11 Cases have been consolidated for procedural purposes only and are being administered jointly.

The Debtors have continued, and will continue until the Effective Date, to manage their properties as debtors-in-possession, subject to the supervision of the Bankruptcy Court and in accordance with the provisions

of the Bankruptcy Code.  An immediate effect of the filing of the Chapter 11 Cases was the imposition of the automatic stay pursuant to Bankruptcy Code § 362, which, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, enforcement of liens against any assets of the Debtors and litigation against the Debtors.

### B.    First and Second Day Motions

On the Petition Date, the Debtors filed a number of motions and other pleadings (the "**First Day Motions**").  The First Day Motions were proposed to ensure the Debtors' orderly transition into the chapter 11 proceedings.  The court granted the following First Day Motions with certain adjustments or modifications to accommodate the concerns of the Bankruptcy Court, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") and other parties in interest:

- orders relating to case administration, joint administration and the use of Donlin Recano as the Debtors' Notice and Claims Agent (Dkt. Nos. 36, 185, 79);

- order approving the Debtors' ability to continue prepetition insurance coverage and pay related prepetition obligations (Dkt. Nos. 70, 340);

- order approving the Debtors' ability to pay and continue using prepetition critical vendors and utility services providers (Dkt. Nos. 334, 336);

- order approving the payment of certain employee wages and benefits (Dkt. Nos. 49, 341);

- order approving the Debtors' ability to make certain prepetition residuals and participations payments incurred in the ordinary course of business (Dkt. Nos. 72, 357);

- order approving the Debtors' ability to honor prize obligations under existing production agreements (Dkt. Nos. 50, 338);

- order approving the continued use of the Debtors' existing cash management system (Dkt. No. 51); and

- order approving the Debtors' ability to obtain postpetition financing and use cash collateral (Dkt. Nos. 48, 342) (the "**Final DIP Order**").  Pursuant to the Final DIP Order, the Court authorized the Debtors to obtain $49,500,000 in postpetition debtor-in-possession financing (the "**Original DIP Facility**").

### C.    Retention of the Debtors' Advisors

Soon after the commencement of the Chapter 11 Cases, the Debtors obtained Bankruptcy Court approval to retain (a) Jones Day and Sheppard Mullin Richter & Hampton LLP as co-counsel (Dkt. Nos. 473, 479), (b) FTI Consulting, Inc. as crisis and turnaround manager (Dkt. No. 669), (c) Blackstone Advisory Partners L.P. (n/k/a PJT Partners) as financial advisor (Dkt. No. 550), (d) Kasowitz, Benson, Torres & Friedman LLP as special litigation and conflicts counsel (Dkt. No. 477), and (e) Holthouse Carlin & Van Trigt LLP and McGladrey LLP as tax advisors (Dkt. Nos. 551, 847).

The applications to retain these firms were granted with certain adjustments or modifications to accommodate the concerns of the Bankruptcy Court, the U.S. Trustee, the Creditors' Committee and other parties in interest.  In connection with these applications, the Debtors sought and obtained (Dkt. No. 905) approval to establish procedures for interim monthly compensation of professionals.  The Debtors also sought and obtained (Dkt. No. 673) approval to employ certain professionals not involved in the administration of the Chapter 11 Cases in the ordinary course of business.

### D.    The Creditors' Committee

On August 7, 2015, the U.S. Trustee appointed the Creditors' Committee in these Chapter 11 Cases pursuant to Bankruptcy Code § 1102 (Dkt. No. 114).

The Creditors' Committee consists of the following seven members:  (1) Carat USA, Inc.; (2) NBC Universal; (3) Cinedigm Corp.; (4) Technicolor, Inc.; (5) Allied Advertising Limited Partnership; (6) Comen VFX LLC; (7) Create Advertising Group, LLC.  The Creditors' Committee obtained Bankruptcy Court approval to retain Togut, Segal & Segal LLP as counsel (Dkt. No. 676) and Alvarez & Marsal North America, LLC as financial advisor (Dkt. No. 969).

Since its appointment, the Creditors' Committee has been actively involved with the Debtors in overseeing the administration of the Chapter 11 Cases as a fiduciary for all of the Debtors' unsecured creditors and has consulted with the Debtors on various matters relevant to the Chapter 11 Cases.  The Debtors have also discussed their business operations with the Creditors' Committee and their advisors and have negotiated with the Creditors' Committee regarding actions and transactions outside of the ordinary course of business.  The Creditors' Committee has participated actively in reviewing the Debtors' business operations, operating performance and business plan.

During the course of the Chapter 11 Cases, the Creditors' Committee has negotiated and secured a transfer of $2 million previously allocated in the Debtors' DIP Budget into a segregated account to be maintained by counsel for the Creditors' Committee, with the understanding that such funds ultimately may be used for the investigation, prosecution and/ or settlement of any Retained Claims[1315] not otherwise released pursuant to a plan of reorganization or order of the Bankruptcy Court.  See Dkt. No. 768, ¶ 15.  Additionally, the Creditors' Committee settled its challenge rights with respect to the Cortland Obligations by agreement, resulting in a $10 million reduction in the amount of the principal amount of the Cortland Term Loan B.  Finally, as part of the new DIP Facility (the "**New DIP Facility**"), the Creditors' Committee negotiated a period of 45 days from closing of the New DIP Facility and the right to use $275,000 of cash collateral to investigate the claims of and potential claims against Manchester and its affiliates; *provided* that the obligations owing to Manchester in connection with the New DIP Facility shall not be subject to offset, setoff, defense or counterclaim in any way.

Thereafter, the Creditors' Committee began its investigation of the claims and security interests asserted by Manchester and its affiliates (the "**Manchester Parties**") against the Debtors, as well as the claims and causes of action potentially assertable by the Debtors' estates against the Manchester Parties.  The Creditors' Committee requested and obtained documents and information from the Debtors and the Manchester Parties, and interviewed various  individuals, including Ryan Kavanaugh, as part of this investigation.  In particular, the Creditors' Committee examined:  (i) the Manchester Prepetition Credit Facility pursuant to which the Manchester Parties assert an undersecured claim of $137,078,557 as of the Petition Date plus accrued interest, and (ii) a May 11, 2011 membership interest transfer agreement among Relativity Holdings LLC, Heatherden Securities Corp., and Heatherden Holdings LLC (the "**2011 Manchester Transaction**," collectively, with the Manchester Prepetition Credit Facility, the "**Manchester Transactions**").  To conduct the necessary diligence to complete its investigations, as well as to facilitate discussions among the various parties, the Creditors' Committee requested and the Manchester Parties agreed to extend deadline to assert any claims and/or causes of action against the Manchester Parties to December 18, 2015 at 11:59 p.m. (Dkt No. 1056).

As a result of its investigation, the Creditors' Committee may commence one or more adversary proceedings asserting claims and causes of action against the Manchester Parties seeking affirmative recoveries and/or to subordinate claims purportedly arising under the Manchester Transactions.  The result of any potential cause of action is unknown.

### E.    Further Motions in the Chapter 11 Cases

Since the Petition Date, the Debtors have sought and obtained approval for a number of additional motions to aid in the efficient administration of the Chapter 11 Cases.  The most significant additional motions are described below.

---

[1315]    "**Retained Claims**" are any and all actual or potential claims and causes of action in favor of the Debtors and their estates against any and all third parties, including actions arising under Chapter 5 of the Bankruptcy Code and applicable non-bankruptcy law, tort claims, and director and officer claims.

1.    *The Sale Motion (Dkt. No. 25)*

On July 30, 2015, the Debtors filed the *Debtors' Motion For (I) An Order (A) Establishing Bid Procedures For the Sale of Substantially All of the Debtors' Assets, (B) Approving Stalking Horse APA and Bidding Protections, and (C) Granting Certain Related Relief and (II) An Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Certain Related Relief* (Dkt. No. 25) (the "**Sale Motion**").  The Stalking Horse APA contemplated a sale of substantially all of the Debtors' assets and an assumption and assignment of executory contracts associated with such assets for a credit bid of $250 million and certain other consideration. Accordingly, on September 3, 4, and 5 2015, in furtherance of the Sale Motion, the Debtors served the *Notice of (I) Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with the Sale and (II) Associated Cure Costs* (the "**Notice of Assignment and Cure**") on all of the parties entitled to notice.  The Debtors filed supplemental Notices of Assignment and Cure on September 16, 2015 and September 28, 2015.  The Buyer provided its adequate assurance package on September 3, 2015 at https://www.donlinrecano.com/Clients/rm/Static/adequateassurance and provided objecting parties an updated adequate assurance package on October 8 and October 9, 2015.

The Debtors received no bids for substantially all of the assets of either the TV Business, or the Film Business.  Instead the Debtors received multiple purchase agreements for certain assets.  Prior to the Debtors' auction (the "**Auction**"), the Buyer amended the Stalking Horse APA to acquire only the Television Business and not the previously contemplated film, sports or music businesses.  On October 2, 2015, the Debtors filed a *Notice of Successful Bidder for Sale of Substantially All of the Debtors' Television Assets and Proposed Form of Sale Order* (Dkt. No. 732), and on October 5, 2015, the Debtors filed a *Notice of Filing Third Amended & Restated Asset Purchase Agreement and Redline* (Dkt. No. 740), which was revised on October 6, 2015 (Dkt. No. 763) (as revised, the "**October APA**").

On October 6, 2015, the court entered the *Order (A) Approving the Sale of Substantially All of the Debtors' Television Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (Dkt. No. 768) (the "**Sale Order**") approving the sale to the Buyer pursuant to the terms of the October APA.

On October 16 and 20, 2015, the court entered the *First Omnibus Order Supplementing Order (A) Approving the Sale of Substantially All of the Debtors' Television Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* and the *Second Omnibus Order Supplementing Order (A) Approving the Sale of Substantially All of the Debtors' Television Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (Dkt. Nos. 852, 876), which, among other things, resolved the continued objections concerning the Television Business.

On October 20, 2015, the transaction concerning the Television Business closed and, on October 23, 2015, the Debtors filed a *Notice of Filing of List of Contracts Assumed by Debtors and Assigned to Buyer Entities Pursuant to the Third Amended and Restated Asset Purchase Agreement* (Dkt. No. 912), which the Debtors intend to revise shortly to correct certain inaccuracies.

On December 9, 2015, the Debtors filed a Notice of Presentment seeking approval of the sale of one of the Debtors' music related investments -- the Debtors' memberships interests in Select Music LLC – to Select Music LLC pursuant to the Sale Motion.

2.    *The KEIP and KERP Motions (Dkt. Nos. 281, 282)*

a.    *KEIP*

On August 24, 2015, the Debtors sought approval of their Key Employee Incentive Plan (the "**KEIP**") for five (5) of the Debtors' senior management employees (the "**Senior Management Employees**") who, prepetition, took aggregate salary reductions of $795,000 at a cost of $314,868 excluding employer contribution taxes.  The

Senior Management Employees were vital in preparing the company for the sale process, engaging with potentially interested parties and interacting with the Debtors' advisors assisting in the sale process.

On September 29, 2015, the court approved (Dkt. No. 683) the Debtors' KEIP in a modified form as follows.  The maximum potential cost of the KEIP is $1,235,122.  The KEIP had two segments:  (1) the sale metrics segment, which has a total maximum potential cost of $580,122 and (2) the television metrics segment, which has a total maximum potential cost of $655,000.  The sale metrics segment of the KEIP was unearned as it was preconditioned on funding if the bidding on the Debtors' assets increased by at least $1 million dollars over the Stalking Horse Purchase Price, which did not materialize.  However, the two (2) employees in the television metrics portion of the KEIP fully earned and were paid their portion of the KEIP since the performance targets that were set as preconditions were met.

> b.    *KERP*

On August 24, 2015, the Debtors sought approval of their Key Employee Retention Plan (the "**KERP**") for 80 of the Debtors' non insider employees (the "**Key Employees**") who are critical to the Debtors' continued operation and a successful restructuring.  Given significant headcount reductions, the Debtors formulated the KERP to incentivize Key Employees, many of whom have unique institutional knowledge of the Debtors, to remain with the Debtors before, during and after these Chapter 11 Cases, both to ensure the Debtors' continued operation and to avoid the significant costs associated with obtaining and training replacements.

On September 29, 2015, the court approved (Dkt. No. 684) the Debtors' KERP as follows.  The maximum cost of the KERP is $345,390 and 71 employees are eligible to participate.  The "**KERP Formula**" is as follows.  The Key Employees that were subject to pay reductions prior to the Petition Date will have the opportunity to recapture 100% of such pay reductions, *provided* that they remain employed with the Debtors during the sale process through and including October 20, 2015 or the sale closing, whichever is later, plus an additional incentive of up to 12.5% of their original base pay that would have been earned during the period between the Petition Date and October 5, 2015 (the "**Measuring Period**") without taking into consideration any pay reduction.  The 12.5% incentive metric does not mean 12.5% of any such employee's full annual salary.  The opportunity to recapture the prepetition salary reduction and to earn up to 12.5% of their original base pay pertains only to the Measuring Period.  Those employees who did not receive a pay reduction will have the opportunity to receive an incentive of up to 12.5% of their respective salaries, *provided* that they remain employed by the Debtors during the sale process through the later of October 20, 2015 or the sale closing.  The KERP Formula cannot be modified by the officers, management and the Board of Managers of the Debtors.  Any Key Employee who resigns or is terminated for cause will forfeit his or her right to any payment under the KERP.  If a KERP participant is terminated without cause, the KERP participant may still be eligible for a prorated award.  Finally, no employee will receive payment from more than one of the following three programs:  (i) the sale metrics segment of the KEIP, (ii) the television metrics of the KEIP, and (iii) the KERP.

The Key Employees were paid their KERP bonuses on or about October 20, 2015.

> 3.    *The Motions to Assume Certain Producer Agreements (Dkt. Nos. 289-295)*

On August 24, 2015, the Debtors filed seven (7) motions seeking to assume certain producer agreements (the "**Producer Agreements**") and fix their related cure amounts.  The Debtors sought to assume the Producer Agreements because the loss of any of the Producer Agreements would damage the Television Business and potentially depress the Debtors' going concern value in connection with the sale process.

On October 5, 2015, the court entered orders permitting the Debtors to assume the following producer agreements:  Brian Lando Productions, Inc. (Dkt. No. 755), Jay and Tony Show f/s/o Jay Blumenfield and Tony Marsh (Dkt. No. 756), Ellen Rakieten Productions, LLC (Dkt. No. 757), Bogner Entertainment (Dkt. No. 758), Press Start, Inc. (Dkt. No. 759), Bill Thompson Productions, Inc. (Dkt. No. 760), and Alibi TV (Dkt. No. 761).

> 4.    *The Miscellaneous/De Minimis Assets Motion (Dkt. No. 345)*

On August 27, 2015, the Debtors filed a motion seeking to (1) implement procedures that would allow them to sell, transfer or abandon miscellaneous assets (the "**Miscellaneous Assets**"), or groups of such assets, and

address related contracts, on an expedited basis without incurring the delay and costs of preparing, filing, serving and having hearings on motions for approval of each such disposition (the "**Miscellaneous Asset Procedures**").

On September 17, 2015, the court entered an order approving the Miscellaneous Asset Procedures as follows. The Miscellaneous Asset Procedures only apply to: (i) the sale or transfer of Miscellaneous Assets involving $1,500,000 or less in total consideration (the "**Sale Cap**"), as measured by the amount of ~~cash~~Cash and other consideration (such as assumption of liabilities) to be received by the Debtors on account of the Miscellaneous Assets to be sold or transferred in any one transaction or in any series of related transactions; and (ii) the abandonment of Miscellaneous Assets with a book value of $250,000 or less. Interested Parties shall have five (5) business days after the date of service of the sale notice or abandonment notice to object. However, for (a) any transaction involving the sale or transfer of a Miscellaneous Asset for less than $100,000 in total consideration, as measured by the amount of ~~cash~~Cash and other consideration (such as assumption of liabilities) to be received by the Debtors on account of the Miscellaneous Assets to be sold or transferred in any one transaction or in any series of related transactions (a "**De Minimis Sale**") or (b) the abandonment of any asset with a book value of less than $100,000 (a "**De Minimis Abandonment**"), the applicable Debtor or Debtors will be authorized, without following the Notice Procedures and without further notice and further Court approval except five business days written notice to Counsel for the Creditors' Committee and any other party in interest who has filed a notice of appearance and a request for service pursuant to Bankruptcy Rules 2002 and 9010(b), to consummate the De Minimis Sale or De Minimis Abandonment and such De Minimis Sales or De Minimis Abandonments will be deemed fully authorized by the Court, _provided_ that the Debtors have obtained any necessary consent required.

The Debtors completed the following sales pursuant to the court's order: ~~Following~~

- following a September 26, 2015, notice (Dkt. No. 660) concerning the sale of their rights and other interests in the film, Collide p/k/a Autobahn, the Debtors completed a sale to IM Global Film Fund, LLC for $830,000 on October 3, 2015.~~ Following~~;

- following a November 3, 2015 notice (Dkt. No. 933) concerning the sale of all of their rights and interests in a certain tax credit, the Debtors anticipate shortly completing a sale to Macy's Puerto Rico, Inc. for $1,144,882.88~~.~~; and

- following a December 9, 2015 notice (Dkt. No. 1094) concerning the sale of all of their rights and interests under the Exclusive License Agreement dated as of February 12, 2015, related to the feature film entitled "Hillsong: Let Hope Rise."

5.    *The Motions to Reject Leases or Executory Contracts (Dkt. Nos. 396, 691)*

On September 8, 2015, the Debtors filed a motion seeking to reject 21 consulting and advisory agreements, one real estate brokerage agreement, one production services agreement related to aerial production work and one nonresidential real property lease. On September 29, 2015, the Debtors filed a motion seeking to abandon certain property and reject a nonresidential real property lease, a license and an automobile lease. On September 30, 2015 and October 15, 2015, the court entered orders (Dkt. Nos. 697, 850) permitting the Debtors to reject each of these agreements and abandon certain property.

On November 11, 2012, the court granted the Debtors' motion seeking to extend the time within which the Debtors must assume or reject unexpired leases of nonresidential real property to February 25, 2016. (Dkt. No. 966).

6.    *The Motion to Extend the Exclusive Periods for Filing a Plan and Soliciting Acceptances*

On November 12, 2015, the court granted the Debtors' motion seeking to extend the exclusive periods for filing a plan and soliciting acceptances thereof to February 1, 2016 and April 1, 2016, respectively. (Dkt. No. 967).

7.    *Litigation*

a.    *Manchester*

Heatherden Securities LLC, a Delaware Limited Liability Company ("**Heatherden**") is a minority equity holder of Relativity Holdco and an affiliate of Manchester Library Company and Manchester Securities Corporation (collectively, "**Manchester**").  Manchester Securities Corporation and Manchester Library Company LLC are parties to the following agreements with the Debtors, each dated as of May 30, 2012:  a Libraries Asset Transfer Agreement, a Sales and Distribution Services Agreement, and a Security Agreement and Mortgage of Copyright (collectively the "**Manchester Agreements**").  Pursuant to the Manchester Agreements, Manchester was granted a continuing security interest in, and copyright mortgage on, any interest that the Debtors might have in certain collateral.  In addition, the Manchester Agreements grant Manchester a first priority lien and security interest in a certain collection account, which is governed by a collection account management agreement dated as of October 1, 2012.

Manchester filed objections to the Sale Motion (Dkt. Nos. 162, 168, 169, 190) generally objecting to the speed of the sale process and the authority of the Debtors to sell their assets, an objection to the Debtors' motion seeking to pay prepetition residuals and participations in the ordinary course of business (Dkt. No. 223), and an objection to the Debtors' motion seeking postpetition financing (Dkt. Nos. 223, 225, 226).  Then, on August 24, 2015, Manchester filed an emergency motion (Dkt. No. 260) seeking to adjourn a hearing on the Debtors' proposed bid procedures and DIP financing.  On September 18, 2015, Manchester filed a limited objection to the Debtors' motion seeking to sell substantially all of their assets (Dkt. Nos. 521, 522).  After much contested litigation, the Debtors were able to negotiate a resolution with Manchester which permitted the DIP Financing Order and the Bid Procedures Order to be entered and the sale process to move forward.

b.    *RKA*

In June and July 2015, RKA and Relativity entered into a series of forbearance agreements related to RKA's loans to Relativity under the P&A Funding Agreement.  At the time, Relativity was engaged in refinancing efforts and RKA had threatened litigation which Relativity believed to be meritless, but would have interfered with Relativity's refinancing efforts.  Pursuant to one of the forbearance agreements, River Birch Funds LLC (an entity in which Kavanaugh is the sole member) provided RKA with a guarantee of its equity interest in RKA of approximately $10 million in value.

On July 15, 2015, RKA filed a complaint in the Supreme Court of the State of New York, County of New York against defendants Kavanaugh, in his personal capacity, and RKA-member River Birch Funds LLC, alleging breach of contract under the guaranty provided in connection with the aforementioned forbearance agreement.  On July 24, 2015, RKA filed a separate action in the Supreme Court of the State of New York, County of New York against Kavanaugh and a series of John Does alleging misconduct in connection with the P&A Funding Agreement.  In response, on July 24, 2015, RML filed an action ~~the same day~~ against RKA ~~seeking a declaratory judgment that the P&A Funding Agreement had not been breached and damages in excess of $200 million for RKA's tortious conduct and alleged unfair business practices.  The~~ in New York County Supreme Court.

Relativity's action seeks a declaratory judgment that the P&A Funding Agreement had not been breached and damages against RKA.  Relativity alleges that RKA and its predecessor P&A lenders operated for the past several years in the same manner and under documents that, in pertinent part, are materially similar.  Specifically, Relativity would provide the P&A lenders with a budget for the marketing expenses it expected to incur for each movie, and at various intervals an SPE that owned a specific film would make a draw request for loan funds from the P&A facilities.  RKA and the two prior P&A lenders made these loan payments into RML's general operating account, not to the SPE that owned the individual films, even though RML itself, was not a borrower under the facility.  The loan proceeds would go into RML's main operating account, which then funded P&A expenses.  Relativity alleges that the P&A Agreements did not require that loan funds to be segregated in any manner, that the funds be deposited into a blocked or control account, or that they be escrowed or otherwise restricted for use in connection with particular films or expenses.

Relativity's lawsuit alleges that, under these well-documented funding arrangements and practices, RKA and the predecessor P&A lenders consistently made loans to Relativity-affiliated SPEs that were not earmarked for use in paying only those P&A expenses that had already been paid for a particular film. As Relativity alleges, the operative language in all of these funding agreements contemplates and allows for that practice, as the agreements refer to loans made for marketing expenses that are either "paid, committed or incurred" or expenses that are, in the future, "to be paid, committed or incurred."

Relativity's lawsuit claims that the P&A facility did not require that the funds loaned under it be used to pay only those P&A expenses that had actually been incurred; and, indeed, the parties transacted under the P&A facility in this manner, in accordance with the lending agreement, during most of the life of their agreement.

In April, 2015, however, following media accounts of Relativity's refinancing efforts, RKA began claiming that Relativity may have violated the P&A facility. Thereafter, on July 15, 2015, RKA filed its lawsuit against Kavanaugh, in his personal capacity, and River Birch Funds LLC. Then, on July 24, 2015, RKA filed another lawsuit against Kavanaugh and unnamed "John Doe" seeking damages against them in connection with Relativity's performance under the RKA P&A facility. The RKA lawsuits allege that Relativity improperly used the funds advanced by RKA for purposes other than P&A, and RKA has regularly and repeatedly claimed that the actual use of the funds violated its agreements. Relativity responded by filing its lawsuit against RKA, which seeks a declaratory judgment that Relativity did not violate the terms of the RKA P&A facility and also damages of at least $200 million as against RKA for its alleged conduct in intentionally interfering with Relativity's efforts to refinance. Pursuant to the Plan, this litigation and all related claims that the Debtors have against RKA (the "**RKA Causes of Action**") will be retained and prosecuted by the Reorganized Debtors and not the Litigation Trust.

All three ~~matters are currently~~ of the above-discussed actions have been stayed as the parties ~~are seeking~~ sought to resolve ~~the~~ their outstanding claims by participating in ~~a~~ mediation and discussing a resolution that would allow for the release of ~~the~~ four films (*Before I Wake*, *Disappointments Room*, *Masterminds*, and *Kidnap*) in which RKA has a security interest. In ~~parallel~~ these bankruptcy proceedings, RKA has also filed multiple pleadings in the Chapter 11 Cases, including a motion seeking adequate protection or relief from the automatic stay to protect its liens and security interests (Dkt. No. 147), objections to the Sale Motion (Dkt. Nos. 164, 508, 644, 748), objections to the Debtors' motion seeking postpetition financing (Dkt. Nos. 158, 219), a motion seeking leave to conduct discovery pursuant to Bankruptcy Code § 105(a) and Federal Rule of Bankruptcy Procedure 2004 (Dkt. No. 176), and a limited joinder (Dkt. No. 644) in Macquarie's motion seeking adequate protection or relief from the automatic stay to protect its interests and compelling compliance with the final DIP order prohibiting the use of cash collateral that constitutes P&A Collateral. Each of these matters has been resolved or adjourned.

c.    *Macquarie*

Macquarie US Trading LLC and Macquarie Investments US Inc. (collectively, "**Macquarie**") serve as agent and lender, respectively, under a prepetition Second Amended and Restated Funding Agreement, dated as of June 30, 2014 (as amended, the "**Funding Agreement**"). Pursuant to the Funding Agreement, Macquarie holds security interests in certain of the Debtors' property, rights of setoff and rights of recoupment.

Macquarie filed several objections during the course of the Chapter 11 Cases -- a limited objection and reservation of rights to the Debtors' motion seeking postpetition financing (Dkt. No. 43), an objection to the Sale Motion and the Debtors' motion seeking postpetition financing (Dkt. No. 156), and a limited objection and reservation of rights to the Debtors' motion seeking to sell, transfer or abandon miscellaneous and de minimis assets (Dkt. No. 415). Additionally, Macquarie filed a motion (Dkt. Nos. 409, 410, 411; reply at 627) seeking adequate protection or relief from the automatic stay to protect its interest. The parties were able to reach an amicable resolution which included a release of certain funds to Macquarie at which time Macquarie withdrew its motion.

8.    *Claims Process and Bar Date*

On October 30, 2015, the court entered an order (Dkt. No. 927) establishing December 9, 2015 at 5:00 p.m. (Eastern Time) as the deadline for each ~~person~~ Person or ~~entity~~ Entity (including, without limitation, individuals, partnerships, corporations, joint ventures and trusts) to file a proof of claim in respect of a prepetition claim (as defined in Bankruptcy Code § 101(5)) against any of the Debtors (the "**General Bar Date**") and January 26, 2016 at 5:00 p.m. (Eastern Time) as the deadline for governmental units (as defined in Bankruptcy Code § 101(27)) to file a

proof of claim in respect of a prepetition claim against any of the Debtors (the "**Governmental Bar Date**").  As of the General Bar Date, approximately 1400 claims were filed.

<div align="center">

9.    *Cash Collateral Stipulation*

</div>

On November 26, 2015, the Debtors filed a motion for entry of an order permitting the Debtors to use cash collateral (Dkt. No. 1033).  On December 11, 2015, the Debtors, CIT Bank, in its capacity as administrative agent for certain lenders (in such capacity, the "Ultimates Agent"), and certain of the Union Entities submitted a stipulation and order to the Bankruptcy Court which, among other things, grants the Debtors the right to use cash collateral in accordance with an agreed-to budget after payment from the cash collateral of $17.04 million to CIT Bank and $3.61 million to the Guilds.  The Debtors would then maintain and preserve $17 million of cash collateral in the cash collateral account as to which the Guilds subordinate to the first $13.96 million to CIT as first priority.

**IV.    POSTPETITION SALE AND PLAN NEGOTIATIONS**

**A.    Television Business Sale and Related Term Sheets**

As discussed in detail in Section the Buyer ,immediately prior to the Auction ,above 1.E.III amended the Stalking Horse APA to acquire only the Television Business and not the previously contemplated film, sports or music businesses as a consequence of a series of arms-length negotiations among the Buyer and several investors in the Debtors.  Such negotiations continued among several of the parties up to and including the drafting of the Plan.  A summary of the transactions arising from such negotiations is provide below.

1.    *TLA/TLB Transactions*

Substantially contemporaneously with the closing of the sale of the Television Business to the Buyer under the Stalking Horse APA (and in partial consideration for the amendment of the Stalking Horse APA), a group of investors including Kavanaugh, Manchester and Joseph Nicholas ("**Nicholas**") paid $65 million to the Buyer and further agreed that the Buyer would retain $60 million in TLA claims until exchanged for a $60 million note from reorganized Relativity Holdings under the Plan.

In connection with the payments described above, the Buyer also agreed to (a) confirm the partial satisfaction and reduction of the DIP Facility to $35 million; (b) transfer to Manchester $35 million of its claims under the DIP Facility and (c) transfer $5.8 million of its claims under the TLA and TLB Loans to Kavanaugh and $169.2 million of its claims under the TLA and TLB Loans to Nicholas.

2.    *Investor Transactions*

In connection with the Auction and the closing of the sale of the Television Business, Manchester, Kavanaugh, Nicholas, OA3, LLC ("**OA3**"), VII Peaks Capital, LLC ("**VII Peaks**") all executed equity commitment letters (collectively, the "**Commitment Letters**") with the Debtors which were also enforceable by an affiliate of RM Bidder.  OA3 and VII Peaks did not consummate their Commitment Letters, and the Debtors commenced an adversary proceeding against VII Peaks (discussed below).  The Debtors have engaged in settlement discussions to resolve the issues of the Commitment Letter issued by VII Peaks.  The Debtors reserve all rights with respect to the Commitment Letter issued by OA3.  In consideration of the performance of the Commitment Letters, Kavanaugh, Nicholas and Manchester agreed to treatment of their various claims under the Plan.  As of November 17, 2015, the Debtors continued to negotiate with such parties to confirm that the Plan accurately reflects their agreements.

a.    *Relativity Holdings LLC v. VII Peaks Capital, LLC (In re Relativity Fashion, LLC), No. 15-01361 (Bankr. S.D.N.Y.)*

On October 19, 2015, Relativity commenced an adversary proceeding against VII Peaks.  See *Complaint for Emergency Order Requiring VII Peaks Capital, LLC to Pay $30 Million Into the Court's Registry and/or Issuing a Restraining Order and Directing Specific Performance*, Relativity Holdings LLC v. VII Peaks Capital, LLC (In re Relativity Fashion, LLC), No. 15-01361 (Bankr. S.D.N.Y.) (Dkt. No. 1).  Relativity's Complaint alleged that VII Peaks entered into an "absolute and unconditional" agreement to fund $30 million on or before October 20, 2015, as

part of a transaction pursuant to which certain assets from the Debtors' television business were to be sold to specific creditors and the remainder of Relativity would be restructured and continue as a going concern.  As the Complaint set forth, VII Peaks had indicated it would not commit the agreed $30 million in funding, on the ground that certain purported conditions precedent to VII Peaks' obligation to fund had not been satisfied.

Relativity claimed that VII Peaks was in breach of its ~~absolute and unconditional~~ obligation to commit the $30 million in funds and sought specific performance of this obligation.  Relativity also sought a preliminary injunction and ~~a temporary restraining order, and an expedited hearing on its request for a preliminary injunction.  On October 20, 2015, the Bankruptcy Court entered~~ an order temporarily restraining VII Peaks from transferring certain funds from two ~~of~~ VII Peaks' accounts.  See Dkt. No. 4.  The Bankruptcy Court thereafter scheduled a hearing on Relativity's motion for a preliminary injunction for October 27, 2015.  On October 27, 2015, Relativity and VII Peaks entered into a stipulation, so ordered by the Bankruptcy Court the next day, that vacated the TRO and adjourned the expedited hearing until November 13, 2015.  See Dkt. No. 10.  Pursuant to the parties' so-ordered stipulation, VII Peaks agreed to cause $3 million to be deposited into its counsel's client trust account, to remain there during an agreed-upon period of time, and the parties agreed in the meantime to negotiate in good faith regarding a potential settlement of their dispute.  See id.

The parties ~~have~~ subsequently entered into ~~another stipulation to~~ two further stipulations to adjourn the hearing on Relativity's motion for a preliminary injunction, first until November 24, 2015, ~~as they continue to negotiate a potential settlement of their dispute.~~ and then to December 16, 2015.  On December 9, 2015, VII Peaks informed its counsel and Relativity's counsel that negotiations between VII Peaks and Relativity had concluded without a settlement.  Pursuant to the parties' original October 27, 2015 stipulation, VII Peaks therefore informed its counsel to disburse the $3 million deposited into VII Peaks' counsel's trust account to VII Peaks within one business day.  Thereafter, on December 11, 2015, VII Peaks submitted an opposition to Relativity's motion for a preliminary injunction, disputing Relativity's allegations and indicating that it will defend the underlying complaint.  Pursuant to the Plan, this litigation and all related claims that the Debtors have against VII Peaks will be retained by the Reorganized Debtors and pursued by the Litigation Trust in the name of the Reorganized Debtors.

3.    *DIP Stipulations*

On October 6, 2015, the Bankruptcy Court approved a stipulation (Dkt. No. 769) among (a) the Debtors, (b) the Original DIP Lenders, (c) the Manchester Parties (as defined in the stipulation), and (d) Kavanaugh, which was also signed by the Creditors' Committee.  The stipulation is another piece of a global agreement between the Parties to provide the Debtors with an opportunity to reorganize their business around their non-unscripted TV Business Assets (the "**Global Agreement**").  As noted in Section the ,2015 ,27 on August ,B above.III Court entered the Final DIP Order authorizing the Debtors to obtain the Original DIP Facility in ,greementAs part of the Global A  .million 49.5$ the amount of Heatherden agreed to purchase the Original DIP Facility, as modified to $35,000,000, for $35,000,000 on or before October 20, 2015.

As the Final DIP Order expired on October 21, 2015, the Bankruptcy Court entered the Amended DIP Order (Dkt No. 931) and, in the meantime, eight (8) extension orders (Dkt. Nos. 889, 896, 921, 934, 945, 945, 950, 964) extending the maturity to November 16, 2015 (which date shall be updated as further extension orders may be granted) as certain predicate agreements had not yet been reached.  Heather maintains that its election to unilaterally refrain from exercising its rights under the New DIP Facility is neither an express nor implied waiver of those rights.  Heather further reserves all rights with respect to the New DIP Facility, including the right to declare one or more events of default and/or exercise remedies.  Heatherden maintains that there are no valid claims or causes of action that can be brought against the Manchester Parties and reserves all rights with respect thereto.

**B.    Fintage Omnibus Stipulation**

The Debtors and Fintage Collection Account Management B.V. ("**Fintage**") are each a party, among other parties, to various collection account management agreements ("**CAMAs**") governing the collection and distribution of revenues generated from the exploitation of certain Relativity film projects.  As of the Petition Date, Fintage ceased making distributions on account of each CAMA to which one or more of the Debtors are a party and refused to resume distributions until Fintage received Court authorization.  Such CAMAs include:  (a) an Amended and Restated Collection Account Management Agreement, dated May 14, 2013, with Debtor RML Acquisitions IV,

LLC, IATM, LLC and CIT Bank, N.A. relating to the collection of worldwide revenues generated from the exploitation of the film project entitled *Act of Valor*; (b) an Amended and Restated Collection Account Management Agreement, dated October 31, 2013, with Debtor Paranoia Acquisitions, LLC, CIT Bank, N.A., and Paranoia Productions, LLC relating to the collection of the U.S. revenues generated from the exploitation of the film project entitled *Paranoia*; (c) an Amended and Restated Collection Account Management Agreement, dated October 1, 2012, with Debtor Relativity Media, LLC and Manchester Library Company relating to the collection of revenues generated from, among others, the exploitation of the following film projects entitled: (i) *The Fighter*, (ii) *Limitless*, (iii) *Season Of The Witch*, (iv) *Skyline*, (v) *Take Me Home Tonight*, (vi) *The Warrior's Way*, (vii) *Catfish*, (viii) *Catfish TV*, (ix) *Dear John*, (x) *Fighting*, (xi) *Haywire*; (xii) *Immortals*; (xiii) *Judy Moody and the Not Bummer Summer*; (xiv) *Last House on the Left*; (xv) *MacGruber*, (xvi) *My Soul to Take* and (xvii) *Shark Night 3D*.

~~The Debtors anticipate filing shortly a notice of presentment of~~On December 8, 2015, the Bankruptcy Court entered the order (Dkt. No. 1078) approving the *Omnibus Stipulation and Agreed Order Governing Fintage Collection Account Management B.V. Release of Funds*. The aforementioned stipulation and agreed order, *inter alia*, authorized Fintage to disburse funds that were being held in trust pursuant to the CAMAs and authorized Fintage to continue to resume distributions under the CAMAs on a going forward basis.

      **C.**      **Post-Emergence Financing and Management**

      Jim Cantelupe, of Summit Trail Advisors, LLC, has committed to work with the Debtors to raise up to $100 million of new equity to fund the Plan, which funds are to be escrowed on or before December 31, 2015. Additionally, the Plan contemplates entering into a revolving credit facility of up to $250 million in the form of the New P&A/Ultimates Facility. Subject to Bankruptcy Court approval, Aperture Media Partners, LLP and EMP Media Partners LLP will act as the co-lead arrangers of the New P&A/Ultimates Facility. Finally, the Plan contemplates that Relativity will secure ~~a~~one or more multi-year media buying ~~agreement~~agreements, for traditional and digital media, that includes payment terms ~~of at least 90 days~~acceptable to the Debtors.

**V.**      **THE PLAN OF REORGANIZATION**

      THE FOLLOWING SUMMARY HIGHLIGHTS CERTAIN OF THE SUBSTANTIVE PROVISIONS OF THE PLAN, AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE PLAN. THE PLAN PROPONENTS URGE ALL HOLDERS OF CLAIMS AND INTERESTS TO READ AND STUDY CAREFULLY THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS <u>EXHIBIT A</u>.

      Bankruptcy Code § 1123 provides that, except for Administrative Claims and Priority Tax Claims, a plan of reorganization must categorize claims against and equity interests in a debtor into individual classes. Although the Bankruptcy Code gives a debtor significant flexibility in classifying claims and interests, Bankruptcy Code § 1123 dictates that a plan of reorganization may only classify a claim or an equity interest with claims or equity interests, respectively, that are substantially similar.

      The Plan creates 11 Classes of Claims and one (1) Class of Interests per Debtor. These Classes take into account the differing nature and priority of Claims against and Interests in the Debtors. Administrative Claims and Priority Tax Claims are not classified for purposes of voting or receiving distributions under the Plan (as is permitted by Bankruptcy Code § 1123) but are treated separately as unclassified Claims.

      The Plan provides specific treatment for each Class of Claims and Interests. Only Holders of Claims that are impaired under the Plan and who will receive distributions under the Plan are entitled to vote on the Plan.

      The following discussion sets forth the classification and treatment of all Claims against, or Interests in, the Debtors. It is qualified in its entirety by the terms of the Plan, which is attached hereto as <u>Exhibit A</u>, and which you should read carefully before deciding whether to vote to accept or reject the Plan.

**VI.**      **CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

      All Claims and Interests, except Administrative Claims and Priority Tax Claims, are placed in the Classes set forth below. In accordance with Bankruptcy Code § 1123(a)(1), Administrative Claims and Priority Tax Claims,

as described in Section II.A of the Plan, are not classified in the Plan.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes.

If the Plan is confirmed by the Bankruptcy Court, unless a Holder of an Allowed Claim consents to different treatment, (A) each Allowed Claim in a particular Class will receive the same treatment as the other Allowed Claims in such Class, whether or not the Holder of such Claim voted to accept the Plan and (B) each Allowed Interest in a particular Class will receive the same treatment as the other Allowed Interests in such Class. Such treatment will be in exchange for and in full satisfaction, release and discharge of, the Holder's respective Claims against or Interests in a Debtor, except as otherwise provided in the Plan.  Moreover, upon Confirmation, the Plan will be binding on (A) all Holders of Claims regardless of whether such Holders voted to accept the Plan and (B) all Holders of Interests.

**A.     Unclassified Claims**

1.    *Administrative Claims*

a.    *Overview*

Except as specified in Section of th 1.A.IIe Plan and subject to the bar date provisions herein, unless otherwise agreed by the Holder of an Administrative Claim and the applicable Reorganized Debtor, or unless an order of the Bankruptcy Court provides otherwise, each Holder of an Allowed Administrative Claim (other than a Professional's Fee Claim and a Plan Co-Proponent Fee/Expense Claim) shall receive, in full satisfaction of its Administrative Claim, Cash equal to the Allowed amount of such Administrative Claim on either (i) the latest to occur of (A) the Effective Date (or as soon thereafter as practicable), (B) the date such Claim becomes an Allowed Administrative Claim, and (C) such other date as may be agreed upon by the Reorganized Debtors and the Holder of such Claim or (ii) on such other date as the Bankruptcy Court may order.  For the avoidance of doubt, claims arising under the Modified DIP Credit Agreement are Administrative Claims.

b.    *Statutory Fees*

All fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date shall be paid by the applicable Reorganized Debtor in accordance therewith until the earlier of the conversion or dismissal of the applicable Chapter 11 Case under Bankruptcy Code § 1112 or the closing of the applicable Chapter 11 Case pursuant to Bankruptcy Code § 350(a).

c.    *Ordinary Course Postpetition Administrative Liabilities*

Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business, including Administrative Claims arising from or with respect to the sale of goods or provision of services on or after the Petition Date, Administrative Claims of governmental units for Taxes (including Tax audit Claims related to Tax years or portions thereof ending after the Petition Date), ~~and~~ Administrative Claims arising under Executory Contracts and Unexpired Leases, and Administrative Claims in connection with Union Entity collective bargaining agreements, shall be paid by the applicable Reorganized Debtor, ~~pursuant to the terms and conditions of the particular transaction giving rise to those Administrative Claims,~~ without further action by the Holders of such Administrative Claims or further approval by the Bankruptcy Court (i) pursuant to the terms and conditions of the particular transaction giving rise to those Administrative Claims and (ii) in the case of Administrative Claims arising from Union Entity collective bargaining agreements, in accordance with the Guild Payroll Protocols.  Holders of the foregoing Claims shall not be required to File or serve any request for payment of such Administrative Claims.

d.    *Professional Compensation*

Professionals or other Entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Fee Order, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such

Fee Claim no later than sixty (60) days after the Effective Date; _provided_, _however_, that any party who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order without further Bankruptcy Court review or approval (except as provided in the Ordinary Course Professionals Order).  To the extent necessary, the Confirmation Order shall amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims.

        e.       *Plan Co-Proponent Fee/ Expense Claims*

The Reorganized Debtor shall reimburse the Plan Co-Proponent Fee/Expense Claims incurred in connection with the Chapter 11 Cases.

        f.       *Post-Effective Date Professionals' Fees and Expenses*

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented fees and expenses of the Professionals or other fees and expenses incurred by the Reorganized Debtors on or after the Effective Date, in each case, related to implementation and consummation of the Plan.  Upon the Effective Date, any requirement that Professionals comply with Bankruptcy Code §§ 327 - 331 and 1103 or any order of the Bankruptcy Court entered before the Effective Date governing the retention of, or compensation for services rendered by, Professionals after the Effective Date shall terminate, and the Reorganized Debtors may employ or pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

        g.       *Bar Dates for Administrative Claims*

Except as otherwise provided herein, requests for payment of Administrative Claims (other than Fee Claims, and Administrative Claims based on Liabilities incurred by a Debtor in the ordinary course of its business as described in Section II.A.1.c of the Plan) must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than the Administrative Claims Objection Deadline.

        2.       *Payment of Priority Tax Claims*

Pursuant to Bankruptcy Code § 1129(a)(9)(C), and unless otherwise agreed by the Holder of a Priority Tax Claim and the Plan Proponents, each Holder of an Allowed Priority Tax Claim shall receive at the option of the Debtors or the Reorganized Debtors, as applicable, in full satisfaction of its Allowed Priority Tax Claim, on account of and in full and complete settlement, release and discharge of such Claim, (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim payable on the Effective Date (or as reasonably practicable thereafter) or (ii) Cash in the aggregate amount of such Allowed Priority Tax Claim payable in annual equal installments commencing on the later of:  (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim (or as soon as practicable thereafter); and, in each case, ending no later than five (5) years from the Petition Date.  Notwithstanding the foregoing, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the Holder for actual pecuniary loss will be treated as a Subordinated Claim, and the Holder may not assess or attempt to collect such penalty from the Reorganized Debtors or their respective property.

**B.**      ~~Classified~~Classification of **Claims and Interests**

1.      *General*

Pursuant to Bankruptcy Code §§ 1122 and 1123, Claims and Interests are classified for voting and distribution pursuant to the Plan, as set forth herein.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such other Class.  Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim.  Notwithstanding the foregoing, and except as otherwise specifically provided for herein, the Confirmation Order or other order of the Bankruptcy Court, or required by applicable bankruptcy law, in no event shall the aggregate value of all property received or retained under the Plan on account of an Allowed Claim exceed 100% of the underlying Allowed Claim.

Bankruptcy Code § 1129(a)(10) shall be satisfied for the purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims; *provided, however,* that in the event no Holder of a Claim with respect to a specific Class for a particular Debtor timely submits a Ballot in compliance with the Disclosure Statement Order and/or Solicitation Order indicating acceptance or rejection of the Plan, such Class will be deemed to have accepted the Plan.  The Plan Proponents may seek Confirmation of the Plan pursuant to Bankruptcy Code § 1129(b) with respect to any rejecting Class of Claims or Interests.

For administrative convenience, the Plan ~~organizes the Debtors into two (2) groups and~~ assigns a number to each of the Debtors and a letter to each of the Classes of Claims against or Interests in the Debtors.  For consistency, designated Classes of Claims or Interests are assigned the same letter across each of the Debtors.  The numbers assigned to each Debtor are:

| Debtor # | Debtor Name |
|----------|-------------|
| 1. | 21 & Over Productions, LLC |
| 2. | 3 Days to Kill Productions, LLC |
| 3. | A Perfect Getaway P.R., LLC |
| 4. | A Perfect Getaway, LLC |
| 5. | Armored Car Productions, LLC |
| 6. | Best of Me Productions, LLC |
| 7. | Black Or White Films, LLC |
| 8. | Blackbird Productions, LLC |
| 9. | Brant Point Productions, LLC |
| 10. | Brick Mansions Acquisitions, LLC |
| 11. | Brilliant Films, LLC |
| 12. | Brothers Productions, LLC |
| 13. | Brothers Servicing, LLC |
| 14. | Catfish Productions, LLC |
| 15. | Cine Productions, LLC |
| 16. | CinePost, LLC |
| 17. | Cisco Beach Media, LLC |
| 18. | Cliff Road Media, LLC |
| 19. | Den of Thieves Films, LLC |
| 20. | Don Jon Acquisitions, LLC |
| 21. | DR Productions, LLC |
| 22. | Einstein Rentals, LLC |
| 23. | English Breakfast Media, LLC |
| 24. | Furnace Films, LLC |
| 25. | Gotti Acquisitions, LLC |
| 26. | Great Point Productions, LLC |
| 27. | Guido Contini Films, LLC |

| Debtor # | Debtor Name |
|---|---|
| 28. | Hooper Farm Music, LLC |
| 29. | Hooper Farm Publishing, LLC |
| 30. | Hummock Pond Properties, LLC |
| 31. | Hunter Killer La Productions, LLC |
| 32. | Hunter Killer Productions, LLC |
| 33. | In The Hat Productions, LLC |
| 34. | J&J Project, LLC |
| 35. | JGAG Acquisitions, LLC |
| 36. | Left Behind Acquisitions, LLC |
| 37. | Long Pond Media, LLC |
| 38. | Madaket Publishing, LLC |
| 39. | Madaket Road Music, LLC |
| 40. | Madvine RM, LLC |
| 41. | Malavita Productions, LLC |
| 42. | MB Productions, LLC |
| 43. | Merchant of Shanghai Productions, LLC |
| 44. | Miacomet Media LLC |
| 45. | Miracle Shot Productions, LLC |
| 46. | Most Wonderful Time Productions, LLC |
| 47. | Movie Productions, LLC |
| 48. | One Life Acquisitions, LLC |
| 49. | Orange Street Media, LLC |
| 50. | Out Of This World Productions, LLC |
| 51. | Paranoia Acquisitions, LLC |
| 52. | Phantom Acquisitions, LLC |
| 53. | Pocomo Productions, LLC |
| 54. | Relative Motion Music, LLC |
| 55. | Relative Velocity Music, LLC |
| 56. | Relativity Development, LLC |
| 57. | Relativity Fashion, LLC |
| 58. | Relativity Film Finance II, LLC |
| 59. | Relativity Film Finance III, LLC |
| 60. | Relativity Film Finance, LLC |
| 61. | Relativity Films, LLC |
| 62. | Relativity Foreign, LLC |
| 63. | Relativity Holdings LLC |
| 64. | Relativity India Holdings, LLC |
| 65. | Relativity Jackson, LLC |
| 66. | Relativity Media LLC |
| 67. | Relativity Media Distribution, LLC |
| 68. | Relativity Media Films, LLC |
| 69. | Relativity Music Group, LLC |
| 70. | Relativity Production LLC |
| 71. | Relativity REAL, LLC |
| 72. | Relativity Rogue, LLC |
| 73. | Relativity Senator, LLC |
| 74. | Relativity Sky Land Asia Holdings, LLC |
| 75. | Relativity TV, LLC |
| 76. | Reveler Productions, LLC |
| 77. | RML Acquisitions I, LLC |
| 78. | RML Acquisitions II, LLC |
| 79. | RML Acquisitions III, LLC |

| Debtor # | Debtor Name |
|---|---|
| 80. | RML Acquisitions IV, LLC |
| 81. | RML Acquisitions IX, LLC |
| 82. | RML Acquisitions V, LLC |
| 83. | RML Acquisitions VI, LLC |
| 84. | RML Acquisitions VII, LLC |
| 85. | RML Acquisitions VIII, LLC |
| 86. | RML Acquisitions X, LLC |
| 87. | RML Acquisitions XI, LLC |
| 88. | RML Acquisitions XII, LLC |
| 89. | RML Acquisitions XIII, LLC |
| 90. | RML Acquisitions XIV, LLC |
| 91. | RML Acquisitions XV, LLC |
| 92. | RML Bronze Films, LLC |
| 93. | RML Damascus Films, LLC |
| 94. | RML Desert Films, LLC |
| 95. | RML Distribution Domestic, LLC |
| 96. | RML Distribution International, LLC |
| 97. | RML Documentaries, LLC |
| 98. | RML DR Films, LLC |
| 99. | RML Echo Films, LLC |
| 100. | RML Escobar Films LLC |
| 101. | RML Film Development, LLC |
| 102. | RML Films PR, LLC |
| 103. | RML Hector Films, LLC |
| 104. | RML Hillsong Films, LLC |
| 105. | RML IFWT Films, LLC |
| 106. | RML International Assets, LLC |
| 107. | RML Jackson, LLC |
| 108. | RML Kidnap Films, LLC |
| 109. | RML Lazarus Films, LLC |
| 110. | RML Nina Films, LLC |
| 111. | RML November Films, LLC |
| 112. | RML Oculus Films, LLC |
| 113. | RML Our Father Films, LLC |
| 114. | RML Romeo and Juliet Films, LLC |
| 115. | RML Scripture Films, LLC |
| 116. | RML Solace Films, LLC |
| 117. | RML Somnia Films, LLC |
| 118. | RML Timeless Productions, LLC |
| 119. | RML Turkeys Films, LLC |
| 120. | RML Very Good Girls Films, LLC |
| 121. | RML WIB Films, LLC |
| 122. | RMLDD Financing, LLC |
| 123. | Rogue Digital, LLC |
| 124. | Rogue Games, LLC |
| 125. | Roguelife LLC |
| 126. | Safe Haven Productions, LLC |
| 127. | Sanctum Films, LLC |
| 128. | Santa Claus Productions, LLC |
| 129. | Smith Point Productions, LLC |
| 130. | Snow White Productions, LLC |
| 131. | Spy Next Door, LLC |

| Debtor # | Debtor Name |
|---|---|
| 132. | Story Development, LLC |
| 133. | Straight Wharf Productions, LLC |
| 134. | Strangers II, LLC |
| 135. | Stretch Armstrong Productions, LLC |
| 136. | Studio Merchandise, LLC |
| 137. | Summer Forever Productions, LLC |
| 138. | The Crow Productions, LLC |
| 139. | Totally Interns, LLC |
| 140. | Tribes of Palos Verdes Production, LLC |
| 141. | Tuckernuck Music, LLC |
| 142. | Tuckernuck Publishing, LLC |
| 143. | Wright Girls Films, LLC |
| 144. | Yuma, Inc. |
| 145. | Zero Point Enterprises, LLC |

      2.    *Identification of Classes of Claims Against and Interests in the Debtors*

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with Bankruptcy Code § 1126 or (c) deemed to accept or reject the Plan.

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| A | Priority Non-Tax Claims | Unimpaired | Deemed to Accept |
| B | TLA/TLB Secured Claims | Impaired | Entitled to Vote |
| C | Pre-Release P&A Secured Claims | ~~Unimpaired~~Impaired | ~~Deemed~~Entitled to ~~Accept~~Vote |
| D | Post-Release P&A Secured Claims | Impaired | Entitled to Vote |
| E | Production Loan Secured Claims | ~~Unimpaired~~Impaired | ~~Deemed~~Entitled to ~~Accept~~Vote |
| F | Ultimates Secured Claims | Unimpaired | Deemed to Accept |
| G | Secured Guilds Claims | Impaired | Entitled to Vote |
| H | Vine/Verite Secured Claims | Unimpaired | Deemed to Accept |
| I. | Other Secured Claims | Unimpaired | Deemed to Accept |
| J. | General Unsecured Claim | Impaired | Entitled to Vote |
| K. | Subordinated Claims | Impaired | Deemed to Reject |
| L. | Interests | Impaired | Deemed to Reject |

**C.**    **Treatment of Unclassified Claims**

      1.    *Administrative Claims*

          a.    ***Administrative Claims in General***

Except as specified in Section II.A.1 of the Plan and subject to the bar date provisions therein, unless otherwise agreed by the Holder of an Administrative Claim and the applicable Reorganized Debtor, or unless an order of the Bankruptcy Court provides otherwise, each Holder of an Allowed Administrative Claim (other than a Professional's Fee Claim and a Plan Co-Proponent Fee/Expense Claim) shall receive, in full satisfaction of its Administrative Claim, Cash equal to the Allowed amount of such Administrative Claim on either (i) the latest to occur of (A) the Effective Date (or as soon thereafter as practicable), (B) the date such Claim becomes an Allowed Administrative Claim, and (C) such other date as may be agreed upon by the Reorganized Debtors and the Holder of such Claim or (ii) on such other date as the Bankruptcy Court may order. For the avoidance of doubt, claims arising under the Modified DIP Credit Agreement are Administrative Claims.

b.     *Statutory Fees*

All fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date shall be paid by the applicable Reorganized Debtor in accordance therewith until the earlier of the conversion or dismissal of the applicable Chapter 11 Case under Bankruptcy Code § 1112 or the closing of the applicable Chapter 11 Case pursuant to Bankruptcy Code § 350(a).

c.     *Ordinary Course Postpetition Administrative Liabilities*

Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business, including Administrative Claims arising from or with respect to the sale of goods or provision of services on or after the Petition Date, Administrative Claims of governmental units for Taxes (including Tax audit Claims related to Tax years or portions thereof ending after the Petition Date), and Administrative Claims arising under Executory Contracts and Unexpired Leases, shall be paid by the applicable Reorganized Debtor, pursuant to the terms and conditions of the particular transaction giving rise to those Administrative Claims, without further action by the Holders of such Administrative Claims or further approval by the Bankruptcy Court.  Holders of the foregoing Claims shall not be required to File or serve any request for payment of such Administrative Claims.

d.     *Professional Compensation*

(1)     Final Fee Applications

Professionals or other Entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Fee Order, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than sixty (60) days after the Effective Date; *provided*, *however*, that any party who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order without further Bankruptcy Court review or approval (except as provided in the Ordinary Course Professionals Order).  To the extent necessary, the Confirmation Order shall amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims.

(2)     Professional Fee Segregated Account

In accordance with Section II.A.1.d(3) of the Plan, on the Effective Date, the Debtors shall establish and fund the Professional Fee Segregated Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals.  The Professional Fee Segregated Account shall be maintained in trust for the Professionals.  Such funds shall not be considered property of the Debtors' Estates.  The amount of Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Segregated Account when such Claims are Allowed by a Final Order.  When all Allowed Professional Compensation Claims are paid in full in Cash, amounts remaining in the Professional Fee Segregated Account, if any, shall revert to the Reorganized Debtors.

(3)     Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate their Fee Claims prior to and as of the Effective Date and shall deliver such estimate to the Debtors and counsel to the Creditors' Committee no later than five (5) days prior to the anticipated Effective Date; *provided*, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional. If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

e.    ***Plan Co-Proponent Fee/Expense Claims***

The Reorganized Debtor shall reimburse the Plan Co-Proponent Fee/Expense Claims incurred in connection with the Chapter 11 Cases.

f.    ***Post-Effective Date Professionals' Fees and Expenses***

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented fees and expenses of the Professionals or other fees and expenses incurred by the Reorganized Debtors on or after the Effective Date, in each case, related to implementation and consummation of the Plan.  Upon the Effective Date, any requirement that Professionals comply with Bankruptcy Code §§ 327 - 331 and 1103 or any order of the Bankruptcy Court entered before the Effective Date governing the retention of, or compensation for services rendered by, Professionals after the Effective Date shall terminate, and the Reorganized Debtors may employ or pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

g.    ***Bar Dates for Administrative Claims***

Except as otherwise provided in the Plan, requests for payment of Administrative Claims (other than Fee Claims, and Administrative Claims based on Liabilities incurred by a Debtor in the ordinary course of its business as described in Section II.A.1.c of the Plan) must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than the Administrative Claims Objection Deadline.

2.    *Payment of Priority Tax Claims*

Pursuant to Bankruptcy Code § 1129(a)(9)(C), and unless otherwise agreed by the Holder of a Priority Tax Claim and the Plan Proponents, each Holder of an Allowed Priority Tax Claim shall receive at the option of the Debtors or the Reorganized Debtors, as applicable, in full satisfaction of its Allowed Priority Tax Claim, on account of and in full and complete settlement, release and discharge of such Claim, (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim payable on the Effective Date (or as reasonably practicable thereafter) or (ii) Cash in the aggregate amount of such Allowed Priority Tax Claim payable in annual equal installments commencing on the later of:  (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim (or as soon as practicable thereafter; and, in each case, ending no later than five (5) years from the Petition Date.  Notwithstanding the foregoing, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the Holder for actual pecuniary loss will be treated as a Subordinated Claim, and the Holder may not assess or attempt to collect such penalty from the Reorganized Debtors or their respective property.

D.    **Treatment of Classified Claims**

1.    *Priority Non-Tax Claims (Class A)*

a.    **Classification**:  Classes A1 – A145 consist of all Priority Non-Tax Claims against the respective Debtors.

b.    **Treatment**:  On the later of (a) the Effective Date and (b) the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, each Holder of an Allowed Priority Non-Tax Claim against a Debtor shall receive on account and in full and complete settlement, release and discharge of such Claim, at the Debtors' election, (i) Cash in the amount of such Allowed Priority Non-Tax Claim in accordance with

Bankruptcy Code § 1129(a)(9) and/or (ii) such other treatment required to render such Claim unimpaired pursuant to Bankruptcy Code § 1124.  All Allowed Priority Non-Tax Claims against the Debtors that are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such Claims become due and payable in the ordinary course of business in accordance with the terms thereof.  All Priority Non-Tax Claims payable to the Guilds, if any, will be paid in accordance with the Guild Payroll Protocols.

      c.      **Voting**:  Claims in Classes A1 – A145 are Unimpaired.  Each Holder of an Allowed Claim in Classes A1 – A145 shall be deemed to have accepted the Plan and is, therefore, not entitled to vote.

      2.      *TLA/TLB Secured Claims (Class B)*

      a.      **Classification**:  Classes B1- B33, B35 – B56, B58 – B143, and B145 consist of all TLA/TLB Secured Claims against the respective Debtors.

      b.      **Treatment**:  Except to the extent that a Holder of an Allowed TLA/TLB Secured Claim agrees to less favorable treatment, on the Effective Date, the Holders of Allowed TLA/TLB Secured Claims are entitled to receive 100% of the equity value of the Debtors.  Holders of the Allowed TLA/TLB Secured Claims, excluding Kavanaugh and Nicholas, have agreed to less favorable treatment, and shall receive the BidCo Note in full and final satisfaction, release, and discharge of, and in exchange for, such TLA/TLB Secured Claim.  For the avoidance of doubt, the BidCo Note, to the extent paid down to $30 million out of the proceeds thereof, will be subordinated to the New P&A/Ultimates Facility.  Kavanaugh and Nicholas have agreed to receive Reorganized Relativity Holdings Preferred Units and such other treatment on account of approximately $175 million of their TLA/TLB Secured Claims described in the Revised Relativity Holdings Operating Agreement as set forth in Section III.B of the Plan.

      c.      **Voting**:  Claims in Classes B1- B33, B35 – B56, B58 – B143, and B145 are Impaired.  Each Holder of an Allowed Claim in Classes B1- B33, B35 – B56, B58 – B143, and B145 is entitled to vote.

      3.      *Pre-Release P&A Secured Claims (Class C)*

      a.      **Classification**:  Classes C5, C21, C108, C109 and C117 consist of all Pre-Release P&A Secured Claims against the Debtors.

      b.      **Treatment**:  Except to the extent that a Holder of an Allowed Pre-Release P&A Secured Claim agrees to less favorable treatment, on or as soon as practicable after the Effective Date as practicable, RKA, as the Holder of the Allowed Pre-Release P&A Secured ClaimClaims, shall receive the following treatment at the option of the Plan Proponents:  (i) such Allowed Secured Claim shall be Reinstated; (ii) payment in full (in Cash) of any such Allowed Secured Claim; or (iii) satisfaction of any such Allowed Secured Claim by delivering the collateral securing any such Allowed Secured Claim; provided, however, that if the Debtors and RKA conclude their currently pending settlement negotiations, the terms of any agreement shall dictate the treatment of RKA and Class C claims.:  (i) If RKA votes to accept the Plan, the treatment as provided for in Exhibit I to the Plan; or (ii) if RKA votes to reject the Plan,  the five (5) Replacement P&A Notes with a present value equal to the respective Allowed Pre-Release P&A Secured Claims.

      c.      **Voting**:  Claims in Classes Classes C5, C21, C108, C109 and C117 are UnimpairedImpaired.  Each Holder of an Allowed Claim in Classes C5, C21, C108, C109, and C117 shall be deemed to have accepted the Plan and is, therefore, notis entitled to vote.

4. *Post-Release P&A Claims Secured Claims (Class D)*

a. **Classification**: Classes D8, D109, and D121 consist of all Post-Release P&A Secured Claims against the Debtors.

b. **Treatment**: On or as soon as practicable after the Effective Date as practicable, Reorganized Relativity Holdings shall Allow a claim in the approximately amount of $26,818,821 (as of October 31, 2015 and as reduced in the ordinary course until the Effective Date), which such amount shall include, without limitation, additional accrued interest, legal fees, costs, expenses and other outstanding obligations of Reorganized Relativity Holdings under the P&A Funding Agreement subject to documentation of a replacement credit agreement, which shall provide among other things for an extension of the maturity dates as compared to the pre-petition terms. TheSubject to and except for any senior Guild lien, the obligation shall be secured by a first-priority security interest originally (i) cross-collateralized against Blackbird Productions, LLC and RML WIB Films, LLC and (ii) individually as against RML Lazarus Films, LLC; *provided, however*, that once amounts owing by RML Lazarus Films, LLC to RKA under the Pre-Release P&A Secured ClaimClaims are paid off in full, the obligation under this Class D shall be fully secured on a cross-collateralized basis against each of the three entities. Reorganized Relativity Holdings shall continue to distribute each Post-Release P&A Picture until the outstanding obligations are satisfied by payment in full in cashCash in accordance with the terms of the replacement credit agreement which will make clear that the Classes D8, D109, and D121 lien shall apply only to the proceeds of the post-release films Woman in Black 2, Lazarus and Beyond the Lights, as applicable.

c. **Voting**: Claims in Classes D8, D109, and D121 are Impaired. Each Holder of an Allowed Claim in Classes D8, D109, and D121 is entitled to vote.

5. *Production Loan Secured Claims (Class E)*

a. **Classification**: Classes E5 and E21 consists of all Production Loan Secured Claims against the Debtors.

b. **Treatment**: Except to the extent that a Holder of an Allowed Production Loan Secured Claim agrees to less favorable treatment, on or as soon as practicable after the Effective Date, suchthe Holder of the Allowed Production Loan Secured Claim shall be ReinstatedClaims shall receive the following treatment: (i) If the Holder votes to accept the Plan, the Production Loan Settlement ; or (ii) if the Holder votes to reject the Plan, the two (2) Replacement Production Loan Notes with a present value equal to the respective Allowed Production Loan Secured Claims. For the avoidance of doubt, nothing in the Plan is intended to affect or modify the Allowed Production Secured Claim Holder's rights under ¶ H(vi)(D) – (I) of DocketDkt. No. 931 in the Chapter 11 Cases.

c. **Voting**: Claims in Classes E5 and E21 are UnimpairedImpaired. Each Holder of an Allowed Claim in Classes *E* E5 and E21 shall be deemed to have accepted the Plan and is, therefore, not entitled to vote.

6. *Ultimates Secured Claims (Class F)*

a. **Classification**: Classes F1, F2, F6, F7, F8, F10, F20, F24, F41, F47, F51, F77-F83, F87, F95, F96, F99, F103, F109, F111, F112, F116, F119, F121 and F126 consists of all Ultimates Secured Claims against the Debtors.

b. **Treatment**: Except to the extent that a Holder of an Allowed Ultimates Secured Claim agrees to less favorable treatment, on or as soon as practicable after the Effective Date as practicable, each Holder of aan Allowed Ultimates Secured Claim shall receive the following treatment at the option of the Plan Proponents: (i) such Allowed Secured Claim shall be Reinstated or (ii) payment in full (in Cash) of any such Allowed Ultimates Secured Claim in full and final satisfaction of their claim upon which payment any liens securing such claim shall be immediately released.

c.        **Voting**:  Claims in Classes F1, F2, F6, F7, F8, F10, F20, F24, F41, F47, F51, F77-F83, F87, F95, F96, F99, F103, F109, F111, F112, F116, F119, F121 and F126 are Unimpaired.  Each Holder of an Allowed Claim in Classes F1, F2, F6, F7, F8, F10, F20, F24, F41, F47, F51, F77-F83, F87, F95, F96, F99, F103, F109, F111, F112, F116, F119, F121 and F126 shall be deemed to have accepted the Plan and is, therefore, not entitled to vote.

7.        *Secured Guilds Claims (Class G)*

a.        **Classification**:  Classes G1, G2, G6, G7, G8, G10, G20, G24, G41, G47, G51, G77 - G83, G87, G95, G96, G99, G103, G109, G111, G112, G116, G119, G121 and G126 consist of all Secured Guilds Claims against the Debtors.

b.        **Treatment**: Except to the extent that a Holder of an Allowed Secured Guilds Claim agrees to less favorable treatment, each Holder of an Allowed Secured Guilds Claim shall receive (i) on the Effective Date or as soon thereafter as practicable, its pro rata share of $6.65 million less what is received with respect to the Secured Guilds Claims prior to the Effective Date, and (ii) one (1) year after the Effective Date or as soon thereafter as practicable, ~~each Holder of an Allowed Secured Guilds Claim shall receive~~ payment in full (including applicable interest and collection costs, including but not limited to attorneys fees, as specified in each applicable security agreement) on account of the remaining balance of such Allowed Secured Guilds Claim; *provided, however,* that if the Guilds and the Reorganized Debtor have not agreed to the amount of remaining Allowed Guild Secured Claims within 180 days after the Effective Date, the parties will refer this issue to arbitration pursuant to the Guild collective bargaining agreements; *provided, further however,* that the Guilds shall retain any pre-petition liens securing the Allowed Secured Guilds Claims.  All payments to the Guilds in connection with the Allowed Secured Guilds Claims shall be payable ~~to each applicable Guild for the benefit of each applicable Guild-represented employee.  The Reorganized Debtors shall provide a designated payroll service (selected mutually by the Guilds and the Reorganized Debtors) with information concerning such payments.  The payroll service shall prepare checks in the prescribed form, and the Reorganized Debtors shall fund the payroll process and applicable taxes.  As an accommodation to the Reorganized Debtor, the Guilds shall forward such payments to the applicable Guild-represented employee.~~ in accordance with the Guild Payroll Protocols.

c.        **Voting**:  Claims in Classes G1, G2, G6, G7, G8, G10, G20, G24, G41, G47, G51, G77 - G83, G87, G95, G96, G99, G103, G109, G111, G112, G116, G119, G121 and G126 are Impaired.  Each Holder of an Allowed Claim in Classes G1, G2, G6, G7, G8, G10, G20, G24, G41, G47, G51, G77 - G83, G87, G95, G96, G99, G103, G109, G111, G112, G116, G119, G121 and G126 is entitled to vote.

8.        *Vine/Verite Secured Claims (Class H)*

a.        **Classification**:  Classes H34 and H144 and consists of all Vine/Verite Secured Claims against the Debtors.

b.        **Treatment**:  Except to the extent that a Holder of an Allowed Vine/Verite Secured Claim agrees to less favorable treatment, on or as soon as practicable after the Effective Date ~~as practicable~~, each Holder of a~~n~~ an Allowed Vine/Verite Secured Claim shall receive the following treatment at the option of the Plan Proponents:  (i) such Allowed Secured Claim shall be Reinstated; or (ii) satisfaction of any such Allowed Secured Claim by delivering the collateral securing any such Allowed Secured Claim.

c.        **Voting**:  Claims in Classes H34 and H144 are Unimpaired.  Each Holder of an Allowed Claim in Classes H34 and H144 shall be deemed to have accepted the Plan and is, therefore, not entitled to vote.

9.      *Other Secured Claims (Class I)*

a.      **Classification**:  Classes I1 – I145 consists of all Other Secured Claims against the Debtors.

b.      **Treatment**:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, on or as soon as practicable after the Effective Date ~~as practicable~~, each Holder of an Allowed Other Secured Claim shall receive the following treatment at the option of the Plan Proponents:  (i) such Allowed Secured Claim shall be Reinstated; (ii) payment in full (in Cash) of any such Allowed Secured Claim; or (iii) satisfaction of any such Allowed Secured Claim by delivering the collateral securing any such Allowed Secured Claim.

c.      **Voting**:  Claims in Classes I1 – I145 are Unimpaired.  Each Holder of an Allowed Claim in Classes I1 – I145 shall be deemed to have accepted the Plan and is, therefore, not entitled to vote.

10.     *General Unsecured Claims (Class J)*

a.      **Classification**:  Classes J1 – J145 consist of all General Unsecured Claims against the Debtors.

b.      **Treatment**:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the Effective Date, the Reorganized Debtors shall be deemed substantively consolidated for plan purposes only, and each Holder of an Allowed General Unsecured Claim in Classes J1 – J145 shall receive, subject to the terms of the Plan, in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim, interests representing its Pro Rata share of (i) the Guaranteed GUC ~~Distributable Value~~Payment and (ii) the GUC ~~Litigation Trust~~Causes of Action Interests; *provided*, *however*, that the sum of the Guaranteed GUC ~~Distributable Value~~Payment and the GUC Litigation Trust Interests shall not exceed par.  For the avoidance of doubt, all intercompany claims of the Debtors shall be disallowed and canceled as part of the deemed substantive consolidation of the Debtors.  For ~~the~~further avoidance of doubt, claims arising under the Manchester Prepetition Credit Facility are General Unsecured Claims.  The Reorganized Debtors will meet and confer in order to coordinate GUC Distributable Value and Litigation Trust Interests with the Guild Payroll Protocols.  In addition, the Guilds agree that notwithstanding the CBA Assumption Agreements and Bankruptcy Code § 1113 and any other applicable provisions of the Bankruptcy Code, any unsecured pre-petition residuals owed by any of the Debtors will be treated as General Unsecured Claims.

c.      **Voting**:  Claims in Classes J1 – J145 are Impaired.  Each Holder of an Allowed Claim in Classes J1 – J145 is entitled to vote.

11.     *Subordinated Claims (Class K)*

a.      **Classification**:  Classes K1 – K145 consist of all Subordinated Claims.

b.      **Treatment**:  No property shall be distributed to or retained by the Holders of Subordinated Claims, and such Claims shall be extinguished on the Effective Date.  Holders of Subordinated Claims shall not receive any distribution pursuant to the Plan.

c.      **Voting**:  Claims in Classes K1 – K145 are Impaired.  Each Holder of an Allowed Claim in Classes K1 – K145 shall be deemed to have rejected the Plan and, therefore, is not entitled to vote.

**E.      Treatment of Interests in all Debtors (Class L)**

1.      **Classification**:  Classes L1 - L145 consists of all Interests in the Debtors.

2.     **Treatment**:  Holders of Interests in the Debtors shall retain no property under the Plan.

3.     **Voting**:  Interests in Classes L1 - L145 are Impaired.  Each Holder of an ~~Other~~Allowed Interest in Relativity Holdings in Classes L1 - L145 shall be deemed to have rejected the Plan and, therefore, is not entitled to vote.

### F.     Special Provision Regarding Prepetition Intercompany Claims

For purposes of distributions under the Plan, Prepetition Intercompany Claims shall be disallowed and cancelled as part of the deemed substantive consolidation of the Debtors.

### G.     Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

### H.     Postpetition Interest on General Unsecured Claims

Except as required by applicable bankruptcy law, postpetition interest will not accrue or be payable on account of any General Unsecured Claim.

### I.     Insurance

Notwithstanding anything to the contrary in the Plan, if any Allowed Claim is covered by an insurance policy, such Claim will first be paid from proceeds of such insurance policy, with the balance, if any, treated in accordance with the provisions of the Plan governing the Class applicable to such Claim.

### J.     Treatment of Executory Contracts and Unexpired Leases

1.     *Assumption and Rejections of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, each of the Debtors' Executory Contracts and Unexpired Leases not previously assumed or rejected pursuant to an order of the Bankruptcy Court shall be deemed assumed as of the Effective Date in accordance with the provisions and requirements of Bankruptcy Code §§ 365 and 1123 except any Executory Contract or Unexpired Lease (1) identified on Exhibit ~~F~~E to the Plan (which shall be Filed as part of the Plan Supplement, and as may be amended) as an Executory Contract or Unexpired Lease designated for rejection, (2) which is the subject of a pending objection as to cure or assumability of such Executory Contract(s) or Unexpired Lease(s), (3) which is the subject of a separate motion or notice to assume or reject Filed by the Debtors and pending as of the Effective Date, (4) that previously expired or terminated pursuant to its own terms, or (5) that was previously assumed by any of the Debtors.  In the event that an Executory Contract or Unexpired Lease is the subject of a pending objection, at any time (i) on or before the Effective Date, the Debtors reserve the right to supplement the list of rejected contracts on Exhibit ~~F~~E to the Plan or (ii) after the Effective Date, the Reorganized Debtors reserve the right to supplement the list of rejected contracts on Exhibit ~~F~~E to the Plan.

Pursuant to Bankruptcy Code § 365, Participation Agreements for yet to be released films are executory contracts and, as such, shall be assumed by the Reorganized Debtors as of the Effective Date.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections of such Executory Contracts and Unexpired Leases as set forth in the Plan, all pursuant to Bankruptcy Code §§ 365(a) and 1123.  Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party by previous order of the Bankruptcy Court on or prior to the Effective Date, shall revest in, and be fully enforceable by, the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may be modified by order of the Bankruptcy Court.  To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached

or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including, without limitation, any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the counterparty thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Notwithstanding anything to the contrary in the Plan, the Debtors or Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement Exhibit FE to the Plan in their discretion prior to the Effective Date on no less than threefive (35) business days' notice to the counterparty thereto.

2.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to Bankruptcy Code § 365(b)(1), by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of Bankruptcy Code § 365) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by Bankruptcy Code § 365(b)(1) shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.

No later than the date on which the Plan Supplement is Filed, to the extent not previously Filed with the Bankruptcy Court and served on affected counterparties, the Debtors shall provide for notices of proposed assumption and proposed cure amounts to be sent to applicable Executory Contract and Unexpired Lease counterparties, together with procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a contract or lease counterparty to a proposed assumption (but not related to cure amount) must be Filed, served, and actually received by the Debtors by the date on which objections to Confirmation are due (or such other date as may be provided in the applicable assumption notice).  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption shall be deemed to have assented to such assumption.  For the avoidance of doubt, as ordered by the Bankruptcy Court in these Chapter 11 Cases (Dkt. No. 369), failure of the non-Debtor counterparty previously served with a cure notice to have filed an objection or raised an informal objection with Debtors' counsel has resulted in a deemed waiver to object to, contest, condition or otherwise restrict the assumption of the noticed assumed contracts or lease and otherwise forever barred the non-Debtor counterparty from objecting to the amount of the cure payment.  Every non-Debtor counterparty may, however, object as to adequate assurance of future performance of the Reorganized Debtors.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged without further notice to or action, order or approval of the Bankruptcy Court.

3.      *Claims Based on Rejection of Executory Contracts and Unexpired Leases*

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise must be filed with the Notice and Claims Agent within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  Any Proofs of Claim arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases that are not timely filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any Reorganized Debtor without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall constitute General Unsecured Claims and shall be treated in accordance with Section .of the Plan 10.C.II

The Plan Proponents reserve the right to object to, settle, compromise or otherwise resolve any Claim Filed on account of a rejected Executory Contract or Unexpired Lease.

       4.      *Contracts and Leases Entered Into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, shall be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

       5.      *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, nor the Debtors' delivery of a notice of proposed assumption and proposed cure amount to applicable contract and lease counterparties shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

       6.      *Preexisting Pre-Existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors or Reorganized Debtors under such Executory Contracts or Unexpired Leases.  Notwithstanding any applicable non-bankruptcy law to the contrary, the Debtors and Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors from counterparties to rejected Executory Contracts or Unexpired Leases.

       7.      *Certain Compensation and Benefit Programs*

Notwithstanding anything to the contrary in the Plan, all contracts, agreements, policies, programs and plans in existence on the Petition Date that provided for the issuance of Interests in any of the Debtors to current or former employees or directors of the Debtors are, to the extent not previously terminated or rejected by the Debtors, to be treated as Class ise terminated as of the K Subordinated Claims and shall be rejected or otherw Effective Date without any further action of the Debtors or Reorganized Debtors or any order of the Court, any unvested Interests granted under any such agreements, policies, programs and plans in addition to any Interests granted under such agreements previously terminated or rejected by the Debtors to the extent not previously cancelled shall be cancelled pursuant to Section Objections to the treatment   .K of the Plan.III damages arising from the rejection or  of these plans or the Claims for rejection or termination must be submitted and resolved in accordan ,if any ,termination of any such plansce with the procedures and subject to the conditions for objections to Confirmation.  If any such objection is not timely Filed and served before the deadline set for objections to the Plan, each participant in or counterparty to any agreement described in Section objecting to the rejection or  (1) G of the Plan shall be forever barred from.IV ecluded from being heard at the Confirmation and shall be pr ,termination provided hereunder asserting against any Reorgani (2) ;Hearing with respect to such objectionzed Debtor, or its property, any default existing as of the Effective Date or any counterclaim, defense, setoff or any other interest asserted or assertable against the Debtors; and (3) imposing or charging against any Reorganized Debtor any accelerations, assignment fees, increases or any other fees as a result of any rejection pursuant to Section .G of the Plan.IV

       8.      *Obligations to Insure and Indemnify Directors, Officers and Employees*

Any and all managers/directors and officers liability and fiduciary insurance or tail policies in existence as of the Effective Date shall be reinstated and continued in accordance with their terms and, to the extent applicable, shall be deemed assumed or assumed and assigned by the applicable Debtor or Reorganized Debtor, pursuant to Bankruptcy Code § 365 and Section Each insurance carrier under such policies shall   .A of the Plan.IV and administer the policies with respect to the  ,if any ,ir coverage obligationcontinue to honor the Reorganized Debtors in the same mannerand according to the same terms, conditions, and practices applicable to the Debtors prior to the Effective Date.

The applicable Reorganized Debtor shall only be obligated to indemnify any ~~person~~Person who is serving or has served as one of the Debtors' directors, officers, managers ~~or,~~ employees or consultants at any time from and after the Petition Date for any losses, claims, costs, damages or Liabilities resulting from such ~~person~~Person's service in such a capacity at any time from and after the Petition Date or as a director, officer, managers or employee of a Non-Debtor Affiliate at any time from and after the Petition Date, to the extent provided in the applicable certificates of incorporation or formation, by-laws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor.  Accordingly, such indemnification obligations shall survive and be unaffected by entry of the Confirmation Order.

       9.      *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtors have any liability thereunder.

## VII.  VOTING REQUIREMENTS

The Disclosure Statement Order and Solicitation Order entered by the Bankruptcy Court approved certain procedures for the Plan Proponents' solicitation of votes to approve the Plan, including setting the deadline for voting, which Holders of Claims or Interests are eligible to receive Ballots to vote on the Plan, and certain other voting procedures.

THE DISCLOSURE STATEMENT ORDER AND SOLICITATION ORDER ARE HEREBY INCORPORATED BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN. YOU SHOULD READ THE DISCLOSURE STATEMENT ORDER, THE SOLICITATION ORDER, THE CONFIRMATION HEARING NOTICE, AND THE INSTRUCTIONS ATTACHED TO YOUR BALLOT IN CONNECTION WITH THIS SECTION, AS THEY SET FORTH IN DETAIL, AMONG OTHER THINGS, PROCEDURES GOVERNING VOTING DEADLINES AND OBJECTION DEADLINES.

If you have any questions about the procedure for voting your Claim or the Solicitation Package you received, or if you wish to obtain a paper copy of the Plan, this Disclosure Statement or any exhibits to such documents, please contact the Voting Agent (1) by telephone at (212) 771-1128, (2) by e mail at DRCVote@donlinrecano.com, or (3) in writing at Donlin, Recano & Company, Inc., Re: Relativity Fashion, LLC, et al., Attn: Ballot Processing, P. O. Box 2034, Murray Hill Station, New York, NY 10156-0701.

      A.      **Voting Deadline**

This Disclosure Statement and the appropriate Ballot(s) are being distributed to all Holders of Claims that are entitled to vote on the Plan.  In order to facilitate vote tabulation, there is a separate Ballot designated for each impaired voting Class; however, all Ballots are substantially similar in form and substance, and the term "Ballot" is used without intended reference to the Ballot of any specific Class of Claims.

IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER AND SOLICITATION ORDER, IN ORDER TO BE CONSIDERED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN, ALL BALLOTS MUST BE RECEIVED BY THE VOTING AGENT NO LATER THAN **4:00 P.M. (EASTERN TIME) ON JANUARY [__], 2016**, WHICH IS THE VOTING DEADLINE.  ONLY THOSE BALLOTS

ACTUALLY RECEIVED BY THE VOTING AGENT BEFORE THE VOTING DEADLINE WILL BE COUNTED AS EITHER ACCEPTING OR REJECTING THE PLAN.

        FOR DETAILED VOTING INSTRUCTIONS, SEE THE DISCLOSURE STATEMENT ORDER AND SOLICITATION ORDER.

        **B.**        **Holders of Claims or Interests Entitled to Vote**

        Under Bankruptcy Code § 1124, a class of claims or equity interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or equity interest entitles the holder thereof; or (2) notwithstanding any legal right to an accelerated payment of such claim or equity interest, the plan (a) cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy), (b) reinstates the maturity of such claim or equity interest as it existed before the default, (c) compensates the holder of such claim or equity interest for any damages resulting from such holder's reasonable reliance on such legal right to an accelerated payment and (d) does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

        In general, a holder of a claim or equity interest may vote to accept or reject a plan if (1) the claim or equity interest is "allowed," which means generally that it is not disputed, contingent or unliquidated, and (2) the claim or equity interest is impaired by a plan. However, if the holder of an impaired claim or equity interest will not receive any distribution under the plan on account of such claim or equity interest, the Bankruptcy Code deems such holder to have rejected the plan and provides that the holder of such claim or equity interest is not entitled to vote on the plan. If the claim or equity interest is not impaired, the Bankruptcy Code conclusively presumes that the holder of such claim or equity interest has accepted the plan and provides that the holder is not entitled to vote on the plan.

        Except as otherwise provided in the Disclosure Statement Order or Solicitation Order, the Holder of a Claim against one or more Debtors that is "impaired" under the Plan is entitled to vote to accept or reject the Plan if (1) the Plan provides a distribution in respect of such Claim; and (2) the Claim has been scheduled by the appropriate Debtor (and is not scheduled as disputed, contingent, or unliquidated), the Holder of such Claim has timely Filed a Proof of Claim or a Proof of Claim was deemed timely Filed by an order of the Bankruptcy Court prior to the Voting Deadline.

        A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to Bankruptcy Code § 1126(e), that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The Solicitation Order also sets forth assumptions and procedures for determining the amount of Claims that each creditor is entitled to vote in these Chapter 11 Cases, and how votes will be counted under various scenarios.

        **C.**        **Vote Required for Acceptance by a Class**

        A Class of Claims will have accepted the Plan if it is accepted by at least two-thirds (⅔) in amount and more than one-half (½) in number of the Allowed Claims in such Class that have voted on the Plan in accordance with the Solicitation Order.

**VIII.**        **CONFIRMATION OF THE PLAN**

        **A.**        **Requirements for Confirmation of the Plan**

        Among the requirements for confirmation of the Plan are that the Plan (1) is accepted by all impaired Classes of Claims and Interests or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (2) is feasible, and (3) is in the "best interests" of creditors and stockholders that are impaired under the Plan.

        1.        *Acceptance of the Plan*

        A moneyed, business, commercial corporation or trust must satisfy the following requirements pursuant to Bankruptcy Code § 1129(a) before the Bankruptcy Court may confirm its reorganization plan:

- The plan complies with the applicable provisions of the Bankruptcy Code.

- The proponent(s) of the plan complies with the applicable provisions of the Bankruptcy Code.

- The plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under a plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

- The proponent(s) of a plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor or a successor to the debtor under the plan, and the appointment to, or continuance in, such office of such individual must be consistent with the interests of creditors and equity security holders and with public policy.

- The proponent(s) of the plan has disclosed the identity of any insider (as defined in Bankruptcy Code § 101) that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

- Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

- With respect to each impaired class of claims or interests—

    o    each holder of a claim or interest of such class (a) has accepted the plan; or (b) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date; or

    o    if Bankruptcy Code § 1111(b)(2) applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim, property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

- With respect to each class of claims or interests, such class has (a) accepted the plan; or (b) such class is not impaired under the plan (subject to the "cramdown" provisions discussed below).

- Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

    o    with respect to a claim of a kind specified in Bankruptcy Code §§ 507(a)(2) or 507(a)(3), on the effective date of the plan, the holder of the claim will receive, on account of such claim cash, Cash equal to the allowed amount of such claim, unless such holder consents to a different treatment;

    o    with respect to a class of claim of the kind specified in Bankruptcy Code §§ 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) , each holder of a claim of such class will receive (a) if such class has accepted the plan, deferred cashCash payments of a value, on the effective date of the plan, equal to the allowed amount of such claim; or (b) if such class has not accepted the plan, cashCash on the effective date of the plan equal to the allowed amount of such claim, unless such holder consents to a different treatment;

- ○　with respect to a claim of a kind specified in Bankruptcy Code § 507(a)(8), unless the holder of such a claim consents to a different treatment, the holder of such claim will receive on account of such claim, regular installment payments in ~~cash~~Cash, of a total value, as of the effective date of the plan, equal to the allowed amount of such claim over a period ending not later than five (5) years after the date of the order for relief under Bankruptcy Code §§ 301, 302, or 303 and in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than ~~cash~~Cash payments made to a class of creditors under Bankruptcy Code § 1122(b)); and

- ○　with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under Bankruptcy Code § 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, ~~cash~~Cash payments, in the same manner and over the same period, as prescribed in the immediately preceding bullet points above.

- If a class of claims is impaired under the plan, at least one (1) class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider (as defined in Bankruptcy Code § 101).

- Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

- All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

- The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in Bankruptcy Code § 1114, at the level established pursuant to Bankruptcy Code §§ 1114(e)(1)(B) or (g), at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

The Plan Proponents believe that the Plan meets all the applicable requirements of Bankruptcy Code § 1129(a) other than those pertaining to voting, which has not yet taken place.

2.　　*Feasibility*

The Plan Proponents believe that the Reorganized Debtors will be able to perform their obligations under the Plan and continue to operate their businesses without further financial reorganization or liquidation. In connection with Confirmation of the Plan, the Bankruptcy Court must determine that the Plan is feasible in accordance with Bankruptcy Code § 1129(a)(11) (which requires that the Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors).

To support the Plan Proponents' belief that the Plan is feasible, the Debtors have prepared the projections for the Reorganized Debtors, as set forth in <u>Exhibit B</u> to this Disclosure Statement and discussed in greater detail in Section ~~3~~VIII.A.3 below.

3.　　*Bests Interests of Creditors*

Bankruptcy Code § 1129(a)(7) requires that any holder of an impaired claim or interest voting against a proposed plan of reorganization must be provided in the plan with a value, as of the effective date of the plan, at least equal to the value that the holder would receive if the debtor's assets were liquidated under chapter 7 of the Bankruptcy Code. To determine what the Holders of claims and interests in each impaired class would receive if the debtors' assets were liquidated, the Bankruptcy Court must determine the dollar amount that would be generated from a liquidation of the debtors' assets in the context of a hypothetical liquidation. Such a determination must take into account the fact that secured claims, and any administrative claims resulting from the original Chapter 11 Cases

and from the chapter 7 cases, would have to be paid in full from the liquidation proceeds before the balance of those proceeds were made available to pay unsecured creditors and make distributions (if any) to holders of interests.

Pursuant to the Initial DIP Credit Agreement, the Debtors engaged FTI Consulting, Inc. as crisis and turnaround manager and Blackstone Advisory Partners L.P. (n/k/a PJT Partners) to run a sale process for substantially all of the Debtors' assets. That sale process was run pursuant to the applicable Bankruptcy Court orders. The Stalking Horse APA provided for a credit bid of $250 million and other ~~cash~~Cash consideration, which amount is over $100 million less than the secured debt represented by the TLA/TLB Secured Claims and the Manchester Prepetition Credit Facility. As described in Section 1.E.III and the Debtor ,A above.IVs received no other bids for substantially all of the assets of either the TV Business, or the Film Business and ultimately concluded a sale of only the unscripted TV Business for a credit bid of $125 million, and certain other consideration, on October 20, 2015. Accordingly, the Plan Proponents believe that the Holders of Claims and Interests in each impaired Class will receive more under the Plan than if these Chapter 11 cases were converted to chapter 7 cases and each Debtor's assets were liquidated under the direction of a chapter 7 trustee.

4.    *Confirmation Without Acceptance of All Impaired Classes: The 'Cramdown' Alternative*

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted the plan without taking into consideration the votes of any insiders in such class and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan. These so-called "cramdown" provisions are set forth in Bankruptcy Code § 1129(b).

a.    *"Fair and Equitable"*

The Bankruptcy Code establishes different "cramdown" tests for determining whether a plan is "fair and equitable" to dissenting impaired classes of secured creditors, unsecured creditors and equity interest holders as follows:

- <u>Secured Creditors</u>. A plan is fair and equitable to a class of secured claims that rejects the plan if the plan provides: (a) that each holder of a secured claim included in the rejecting class (i) retains the liens securing its claim to the extent of the allowed amount of such claim, whether the property subject to those liens is retained by the debtor or transferred to another entity, and (ii) receives on account of its secured claim deferred ~~cash~~Cash payments having a present value, as of the effective date of the plan, at least equal to such holder's interest in the estate's interest in such property; (b) that each holder of a secured claim included in the rejecting class realizes the "indubitable equivalent" of its allowed secured claim; or (c) for the sale, subject to Bankruptcy Code § 363(k), of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens with such liens to attach to the proceeds of the sale, and the treatment of such liens on proceeds in accordance with clause (i) or (ii) of this paragraph.

- <u>Unsecured Creditors</u>. A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides that: (a) each holder of a claim included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan, equal to the amount of its allowed claim; or (b) the holders of claims and interests that are junior to the claims of the rejecting class will not receive or retain any property under the plan on account of such junior claims or interests.

- <u>Holders of Interests</u>. A plan is fair and equitable as to a class of interests that rejects the plan if the plan provides that: (a) each holder of an equity interest included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of (i) any fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which such holder is entitled or (iii) the value of the interest; or (b) the holder of any interest that is junior to the interests of the rejecting class will not receive or retain any property under the plan on account of such junior interest.

The Plan Proponents believe the Plan is fair and equitable as to unsecured creditors and Holders of Interests because no Holders of Claims or Interests junior to such parties are receiving any distributions under the Plan on account of such claims or interests. To the extent any of the Debtors' secured creditors are Impaired, the Plan Proponents anticipate that they will vote in favor of the plan.

b.    *"Unfair Discrimination"*

A plan of reorganization does not "discriminate unfairly" if a dissenting class is treated substantially equally with respect to other classes similarly situated, and no class receives more than it is legally entitled to receive for its claims or interests. The Plan Proponents carefully designed the Plan, including calculating the distributions to Holders of General Unsecured Claims against each of the Debtors, to ensure recoveries on account of Claims in a particular Class against each of the Debtors did not result in unfair discrimination among similarly situated Classes. The Plan Proponents do not believe that the Plan discriminates unfairly against any impaired Class of Claims or Interests.

The Plan Proponents believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for, "cramdown," or non-consensual Confirmation of the Plan pursuant to Bankruptcy Code § 1129(b).

**B.    Alternatives to Confirmation and Consummation of the Plan**

If the requisite acceptances are not received or if the Plan is not confirmed, the Plan Proponents could attempt to formulate and propose a different plan or plans of reorganization. Such a plan or plan(s) might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of assets.

Further, although the Plan Proponents could theoretically solicit votes with respect to an alternative plan if the requisite acceptances are not received, or the Plan is not confirmed and effectuated, a possible result would be the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code. As set forth above, in a chapter 7 liquidation, a trustee is elected or appointed to liquidate the debtor's assets for distribution to creditors in accordance with the priorities established by the Bankruptcy Code. Further, because there are over a hundred separate Debtors, there could be multiple chapter 7 trustees – one for each Debtor – whose interests and obligations conflict. This, in turn, would result in additional legal and other expenses. It is impossible to predict precisely how the proceeds of a chapter 7 liquidation would be distributed to the respective Holders of Claims against or Interests in the Debtors. The Plan Proponents believe that in a liquidation under chapter 7, before prepetition unsecured creditors received any distribution, additional administrative expenses incurred by a trustee or trustees and attorneys, accountants, and other professionals to assist such trustee(s) would cause a substantial diminution in the value of the Estates. Additionally, the Plan Proponents believe that conversion of the Debtors from chapter 11 to chapter 7 of the Bankruptcy Code would result in (i) significant delay in distributions to all creditors who would have received a distribution under the Plan and (ii) diminished recoveries for Holders of Impaired Claims. Accordingly, the Plan Proponents believe the Plan is superior to a chapter 7 liquidation because of the greater return that is anticipated to be provided by the Plan.

**IX.    MEANS OF IMPLEMENTATION OF THE PLAN**

**A.    Effects of Plan Confirmation**

1.    *Issuance of Reorganized Relativity Holdings Preferred Units*

On the Effective Date, Reorganized Relativity Holdings Preferred Units shall be authorized as set forth in the Operating Agreement. Reorganized Relativity Holdings shall issue, pursuant to the treatment provided for in the Plan, Reorganized Relativity Holdings Preferred Units to each of Nicholas and Kavanaugh. The rights of holders of Reorganized Relativity Holdings Preferred Units shall be set forth in the Revised Relativity Holdings Operating Agreement.

Each distribution and issuance of the Reorganized Relativity Holdings Preferred Units under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the

terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date, Reorganized Holdings will be authorized to and shall issue or execute and deliver, as applicable, the Reorganized Relativity Holdings Preferred Units and the New Securities and Documents (including, without limitation, in connection with a new equity raise), in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

The issuance or execution and delivery of the New Securities and Documents, as applicable, and the distribution thereof under the Plan shall be exempt from registration under applicable securities laws pursuant to Bankruptcy Code § 1145(a) and/or any other applicable exemptions. Without limiting the effect of Bankruptcy Code § 1145, all documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan shall become and shall remain effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

2.      *Issuance of Reorganized Relativity Holdings Common Units*

On the Effective Date, Reorganized Relativity Holdings Common Units shall be authorized as set forth in the Operating Agreement. Reorganized Relativity Holdings shall issue, pursuant to the treatment provided for in the Plan, Reorganized Relativity Holdings Common Units to each of Nicholas and Kavanaugh. Any shares not necessary to satisfy obligations under the Plan shall have the status of authorized but not issued shares of Reorganized Relativity Holdings. The rights of holders of Reorganized Relativity Holdings Common Units shall be set forth in the Revised Relativity Holdings Operating Agreement.

Each distribution and issuance of the Reorganized Relativity Holdings Common Units under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date, each of the applicable Reorganized Debtors will be authorized to and shall issue or execute and deliver, as applicable, the Reorganized Relativity Holdings Common Units and the New Securities and Documents (including, without limitation, in connection with a new equity raise), in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

The issuance or execution and delivery of the New Securities and Documents, as applicable, and the distribution thereof under the Plan shall be exempt from registration under applicable securities laws pursuant to Bankruptcy Code § 1145(a) and/or any other applicable exemptions. Without limiting the effect of Bankruptcy Code § 1145, all documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan shall become and shall remain effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

3.      *Issuance of Reorganized Relativity Holdings Warrants*

On the Effective Date, Reorganized Relativity Holdings shall issue Reorganized Relativity Holdings Warrants to each of Nicholas and Heatherden Securities LLC (or their respective Affiliates) with such terms and conditions set forth in their respective Warrant Agreements.

On the Effective Date, Reorganized Relativity Holdings will be authorized to and shall issue or execute and deliver, as applicable, the Reorganized Relativity Holdings Warrants and the New Securities and Documents (including, without limitation, in connection with a new equity raise), in each case, without further notice to or order

of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

The issuance or execution and delivery of the New Securities and Documents, as applicable, and the distribution thereof under the Plan shall be exempt from registration under applicable securities laws pursuant to Bankruptcy Code § 1145(a) and/or any other applicable exemptions.  Without limiting the effect of Bankruptcy Code § 1145, all documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan shall become and shall remain effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

4.      *Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided herein (including with respect to the Restructuring Transactions described in Section III.E.1 of the Plan) as of the Effective Date (1) Reorganized Relativity Holdings shall exist as a separate legal entity, with all organizational powers in accordance with the laws of the state of Delaware and the certificates of formation and operating agreement, appended to the Plan as Exhibit B and Exhibit C, respectively; (2) subject to the Restructuring Transactions, each of the Debtors shall, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal entity, with all of the powers of such a legal entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, conversion, dissolution or otherwise) under applicable law; and (3) on the Effective Date, all property of the Estate of a Debtor, all Causes of Action, and any property acquired by a Debtor or Reorganized Debtor under the Plan, shall vest, subject to the Restructuring Transactions, in the applicable Reorganized Debtors, free and clear of all Claims, liens, charges, other encumbrances, Interests and other interests.  On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire and dispose of property and compromise or settle any ~~claims~~Claims, Interests or the RKA Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for appropriate Professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to, or the approval of, the Bankruptcy Court.



5.      *Restructuring Transactions*

a.      *Restructuring Transactions Generally*

On or after the Effective Date, the Reorganized Debtors shall undertake such Restructuring Transactions as may be necessary or appropriate to effect, in accordance with applicable non-bankruptcy law, a restructuring of the Debtors' or Reorganized Debtors' respective business or simplify the overall organizational structure of the Reorganized Debtors, including but not limited to resolving intercompany claims, all to the extent not inconsistent with any other terms of the Plan, including any such Restructuring Transactions described in any Restructuring TransactionTransactions documents, including the Restructuring Transactions Exhibit, if any, to be filed with the Plan Supplement within the Debtors' discretion.

Without limiting the foregoing, unless otherwise provided by the terms of a Restructuring Transaction, all such Restructuring Transactions will be deemed to occur on the Effective Date and may include one or more mergers, conversions, or consolidations, restructurings, dispositions, liquidations or dissolutions, as may be determined by the Debtors or the Reorganized Debtors to be necessary or appropriate.

The actions taken by the Debtors or the Reorganized Debtors, as applicable, to effect the Restructuring Transactions may include:  (i) the execution, delivery, adoption, and/or amendment of appropriate agreements or other documents of merger, conversion, consolidation, restructuring, disposition, liquidation or dissolution containing terms that are consistent with the terms of the Plan, the Restructuring TransactionTransactions documents, and any ancillary documents and that satisfy the applicable requirements of applicable state law and any other terms to which the applicable Entities may agree; (ii) the execution, delivery, adoption, and/or amendment of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Disclosure Statement, the Restructuring TransactionTransactions documents, and any ancillary documents and having other terms for which the applicable Entities may agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, conversion, merger, consolidation, dissolution or change in corporate form pursuant to applicable state law; (iv) the cancellation of shares, membership interests and warrants; and (v) all other actions that the Debtors or the Reorganized Debtors, as applicable, determine to be necessary, desirable, or appropriate to implement, effectuate, and consummate the Plan or the Restructuring Transactions contemplated hereby, including making filings or recordings that may be required by applicable state law in connection with the Restructuring Transactions.  Any such transactions may be effected on or subsequent to the Effective Date without any further action by the equityholders or directors of any of the Debtors or the Reorganized Debtors.

b.      *Obligations of Any Successor Entity in a Restructuring Transaction*

The Restructuring Transactions may result in substantially all of the respective assets, properties, rights, liabilities, duties, and obligations of certain of the Reorganized Debtors vesting in one or more surviving, resulting, or acquiring entities.  In any case in which the surviving, resulting, or acquiring entity in any such transaction is a successor to a Reorganized Debtor, such surviving, resulting, or acquiring entity will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Reorganized Debtor, except as provided in the Plan or in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring corporation, which may provide that another Reorganized Debtor will perform such obligations.

6.      *Sources of Cash for Plan Distributions*

The Debtors or Reorganized Debtors, as applicable, are authorized to execute and deliver any documents necessary or appropriate to obtain Cash for funding the Plan.  All consideration necessary for the Reorganized Debtors to make payments or distributions pursuant hereto shall be obtained through a combination of one or more of the following:  (a) Cash on hand of the Debtors, including Cash from business operations, or distributions from Non-Debtor Affiliates; (b) proceeds of the sale of assets; (c) the New P&A/Ultimates Facility; (d) the proceeds of any tax refunds and other causes of actionthe RKA Causes of Action; (e) the proceeds of any equity raise; and (f) any other means of financing or funding that the Debtors or the Reorganized Debtors determine is necessary or appropriate.  Further, the Debtors and the Reorganized Debtors shall be entitled to transfer funds between and

among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers shall be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and shall not violate the terms of the Plan or any orders entered by the Bankruptcy Court with respect to the Debtors' cash management system.

| Estimated Sources and Uses at Emergence (Feb 1, 2016) | |
|---|---|
| **Sources** | |
| New P&A/Ultimates Facility | $62,347.00 |
| Cash Collateral | 17,000.00 |
| Cash on Balance Sheet | 2,342.00 |
| New Common Equity | 100,000.00 |
| **Total Sources** | **181,689.00** |
| | |
| **Uses** | |
| Full Repayment of New DIP Facility | $35,000.00 |
| Ultimates Facility | 13,960.00 |
| Secured Guilds Claims | 3,040.00 |
| Effective Date Payments | 15,000.00 |
| Transaction Fees | 20,000.00 |
| Pay Down BidCo Note | 30,000.00 |
| Cash To Balance Sheet | 64,689.00 |
| **Total Uses** | **181,689.00** |

7.      *Corporate Governance, Managers and Officers, Employment-Related Agreements and Compensation Programs; Other Agreements*

a.      *Certificates of Formation and Operating Agreement*

As of the Effective Date, the certificate of formation and the operating agreement (or comparable constituent documents) of Reorganized Relativity Holdings shall be substantially in the forms appended to the Plan as Exhibit B and Exhibit C, respectively.  The certificate of formation and operating agreement (or comparable constituent documents) of each Reorganized Debtor, among other things, shall prohibit the issuance of nonvoting equity securities to the extent required by Bankruptcy Code § 1123(a)(6).  After the Effective Date, each Reorganized Debtor may amend and restate its certificate of formation or operating agreement (or comparable constituent documents) as permitted by applicable non-bankruptcy law, subject to the terms and conditions of such constituent documents.  On the Effective Date, or as soon thereafter as is practicable, each Reorganized Debtor shall file such certificate of formation (or comparable constituent documents) with the secretary of state or jurisdiction or similar office of the state or jurisdiction in which such Reorganized Debtor is incorporated or organized, to the extent required by and in accordance with the applicable corporate law of such state.

b.      *Managers and Officers of the Reorganized Debtors*

In accordance with Bankruptcy Code § 1129(a)(5), from and after the Effective Date, the initial officers and directors of Reorganized Relativity Holdings shall be comprised of the individuals identified in a disclosure to be Filed as part of the Plan Supplement.  The directors for the boards of managers/directors of the direct and indirect subsidiaries of Reorganized Relativity Holdings shall be identified and selected by the New Board of Managers.

c.      *Employment-Related Agreements and Compensation Programs*

Except as otherwise provided herein, as of the Effective Date, each of the Reorganized Debtors shall have authority to:  (i) maintain, reinstate, amend or revise existing employment, retirement, welfare, incentive, severance, indemnification and other agreements with its active and retired directors, officers and employees, subject to the terms and conditions of any such agreement and applicable non-bankruptcy law; and (ii) enter into new employment, retirement, welfare, incentive, severance, indemnification and other agreements for active and retired employees.

On the Effective Date, the Reorganized Relativity shall enter into newassume the existing employment plans and execute new employment agreements, as required; all existing plans and agreements shall be terminated and rejected pursuant to Bankruptcy Code § 365 and Section IV.A ofthe same may be modified, other than those identified on Exhibit E to the Plan as designated for rejection.

On or after the Effective Date, the Reorganized Debtors shall continue to administer and pay the Claims arising before the Petition Date under the Debtors' workers' compensation programs in accordance with their prepetition practices and procedures.

d.      *Other Matters*

Notwithstanding anything to the contrary in the Plan, no provision in any contract, agreement or other document with the Debtors that is rendered unenforceable against the Debtors or the Reorganized Debtors pursuant to Bankruptcy Code §§ 541(c), 363(l) or 365(e)(1), or any analogous decisional law, shall be enforceable against the Debtors or Reorganized Debtors as a result of the Plan.

e.      *Payment of Manchester Fees*

If and to the extent Relativity shall not have paid, prior to the Effective Date, all of the fees, expenses, and other amounts payable to Manchester or Heatherden, whether incurred prepetition or postpetition, including without limitation all amounts paid for legal and other professional fees and expenses of Manchester and Heatherden for O'Melveny & Myers LLP, Ropes & Gray LLP, and Moelis & Company, then all such unpaid fees, expenses and other amounts shall be paid to Manchester and Heatherden on the Effective Date of the Plan; *provided* that such fees and expenses incurred between October 26, 2015 and January 31, 2016, shall be subject to a budget in an aggregate amount of $3,750,000 for such period; provided, that the budget shall not limit fees and expenses related to a litigation or investigation of Manchester, Heatherden.

ef.      *Transactions Effective as of the Effective Date*

Pursuant to Bankruptcy Code § 1142 and the Delaware Limited Liability Company Act and any comparable provisions of the business corporation or limited liability company law of any other state or jurisdiction the following shall occur and be effective as of the Effective Date, if no such other date is specified in such other documents, and shall be authorized and approved in all respects and for all purposes without any requirement of further action by the members or managers of the Debtors or any of the Reorganized Debtors:  (a) the Restructuring Transactions; (b) the adoption of new or amended and restated certificates of formation and operating agreements (or comparable constituent documents) for each Reorganized Debtor; (c) the initial selection of managers and officers for each Reorganized Debtor; (d) the distribution of Cash and other property pursuant to the Plan; (e) the authorization and issuance of Reorganized Relativity Holdings Common Units pursuant to the Plan; (f) the entry into and performance of the New Exit Financing Documents; (g) any amendments to any of the credit agreements; (h) the adoption, execution, delivery and implementation of all contracts, leases, instruments, releases and other agreements or documents related to any of the foregoing; (i) the adoption, execution and implementation of employment, retirement and indemnification agreements, incentive compensation programs, retirement income plans, welfare benefit plans and other employee plans and related agreements; and (j) any other matters provided for under the Plan involving the organizational structure of the Debtors or Reorganized Debtors or organizational action to be taken by or required of a Debtor or Reorganized Debtor.

f<u>g</u>.        *New P&A/Ultimates Facility*

On the Effective Date, one or more of the Reorganized Debtors shall be authorized to consummate the New P&A/Ultimates Facility and to execute, deliver and enter into the New Exit Financing Documents, and any related agreements or filings without the need for any further corporate or other organizational action and without further action by the Holders of Claims or Interests, and the New Exit Financing Documents and any related agreements or filings shall be executed and delivered and the applicable Reorganized Debtors shall enter into the New P&A/Ultimates Facility and be permitted to incur or issue the indebtedness available thereunder.

Any final material terms of the New P&A/Ultimates Facility shall be included in the Plan Supplement.

8.        *The Litigation Trust*

a.        *Formation of the Litigation Trust*

On the Effective Date, the Litigation Trust will be established pursuant to the Litigation Trust Agreement for the purpose of prosecuting the ~~Specified~~ Causes of Action (as determined by the Litigation Trustee) and making distributions (if any) to holders of Allowed General Unsecured Claims (in their capacities as Litigation Trust Beneficiaries) in accordance with the terms of the Plan. The Litigation Trust will have a separate existence from all of the Reorganized Debtors. The Litigation Trust's prosecution of any of the ~~Specified~~ Causes of Action will be on behalf of and for the benefit of the Litigation Trust Beneficiaries.

On the Effective Date, the Litigation Trust Assets will be transferred or issued to, and vest in, the Litigation Trust. In addition, standing to commence, prosecute and compromise all ~~Specified~~ Causes of Action will transfer to the Litigation Trust; *provided*, *however*, that ~~all Causes of Action other than~~ the ~~Specified~~RKA Causes of Action will be retained <u>and prosecuted</u> by the Reorganized Debtors and will not be transferred to the Litigation Trust. A list of all known Causes of Action to be retained by the Reorganized Debtors will be filed with the Plan Supplement.

Subject to, and to the extent set forth in, the Plan, the Confirmation Order, the Litigation Trust Agreement or any other agreement (or any other order of the Bankruptcy Court entered pursuant to, or in furtherance of, the Plan), the Litigation Trust and the Litigation Trustee will be empowered to take the following actions, and any other actions, as the Litigation Trustee determines to be necessary or appropriate to implement the Litigation Trust, all without further order of the Bankruptcy Court:

- adopt, execute, deliver or file all plans, agreements, certificates and other documents and instruments necessary or appropriate to implement the Litigation Trust;

- accept, preserve, receive, collect, manage, invest, supervise, prosecute, settle and protect the ~~Specified~~ Causes of Action;

- calculate and make distributions to the Litigation Trust Beneficiaries;

- retain Third Party Disbursing Agents and professionals and other Entities;

- file appropriate Tax returns and other reports on behalf of the Litigation Trust and pay Taxes or other obligations owed by the Litigation Trust; and

- dissolve the Litigation Trust.

The Litigation Trust has no objective to, and will not, engage in a trade or business and will conduct its activities consistent with the Plan and the Litigation Trust Agreement.

On the Effective Date, the Debtors will transfer, and will be deemed to have irrevocably transferred, the Litigation Trust Assets to the Litigation Trust. Furthermore, the Plan Proponents' and Creditors' Committee's counsel and financial advisors will provide to the Litigation Trustee (or such professionals designated by the Litigation Trustee) documents and other information gathered, and relevant work product developed, during the

Chapter 11 Cases in connection with its investigation of the ~~Specified~~ Causes of Action, *provided* that the provision of any such documents and information will be without waiver of any evidentiary privileges, including, without limitation, the attorney-client privilege, work-product privilege or other privileges or immunities attaching to any such documents or information (whether written or oral).  The Plan will be considered a motion pursuant to Bankruptcy Code §§ 105, 363 and 365 for such relief.

The Litigation Trust and the Litigation Trustee will each be a "representative" of the Estates under Bankruptcy Code § 1123(b)(3)(B), and the Litigation Trustee will be the trustee of the Litigation Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), and, as such, the Litigation Trustee succeeds to all of the rights, powers and obligations of a trustee in bankruptcy with respect to collecting, maintaining, administering and liquidating the Litigation Trust Assets.  Without limiting other such rights, powers, and obligations, on the Effective Date, the Creditors' Committee will transfer, and will be deemed to have irrevocably transferred, to the Litigation Trust and will vest in the Litigation Trust, the Litigation Trustee and all of his or her professionals the Creditors' Committee's evidentiary privileges, including, without limitation, the attorney-client privilege, work product privilege and other privileges and immunities that they possess related to the ~~Specified~~ Causes of Action. The Creditors' Committee and its financial advisors will provide to the Litigation Trustee (or such professionals designated by the Litigation Trustee) documents, other information, and work product relating to the ~~Specified~~ Causes of Action, *provided* that the provision of any such documents and information will be without waiver of any evidentiary privileges or immunity.

To the extent that any Litigation Trust Assets cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by Bankruptcy Code § 1123 or any other provision of the Bankruptcy Code, such Litigation Trust Assets will be deemed to have been retained by the Debtors or Reorganized Debtors, as the case may be, and the Litigation Trustee will be deemed to have been designated as a representative of the Debtors or Reorganized Debtors, as the case may be, pursuant to Bankruptcy Code § 1123(b)(3)(B) to enforce and pursue such Litigation Trust Assets on behalf of the Debtors or the Reorganized Debtors, as the case may be.

b.     *The Litigation Trustee*

The Litigation Trustee will be the exclusive trustee of the Litigation Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3) and, solely with respect to the Litigation Trust Assets, the representative of the Estate of each of the Debtors appointed pursuant to Bankruptcy Code § 1123(b)(3)(B).  The powers, rights and responsibilities of the Litigation Trustee will be specified in the Litigation Trust Agreement.  The Litigation Trustee will distribute the Litigation Trust Assets (or the proceeds thereof) in accordance with the provisions of the Plan and the Litigation Trust Agreement.  Other rights and duties of the Litigation Trustee and the beneficiaries of the Litigation Trust will be as set forth in the Litigation Trust Agreement.

c.     *Litigation Trust Assets*

On the Effective Date, the Debtors shall transfer all of the Litigation Trust Assets to the Litigation Trust. The Litigation Trust Assets may be transferred subject to certain liabilities, as provided in the Plan or the Litigation Trust Agreement.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar Tax, pursuant to Bankruptcy Code § 1146(a).  Upon delivery of the Litigation Trust Assets to the Litigation Trust, the Debtors and their predecessors, successors and assigns, and each other Entity released pursuant to Article X of the Plan shall be discharged and released from all liability with respect to the delivery of such distributions.

d.     *Fees and Expenses of the Litigation Trust*

Except as otherwise ordered by the Bankruptcy Court, the Litigation Trust Expenses will be paid from the Litigation Trust Assets in accordance with the Plan and the Litigation Trust Agreement.

    e.    *Indemnification of the Litigation Trust*

The Litigation Trust Agreement may include reasonable and customary indemnification provisions in favor of the Litigation Trustee.  Any such indemnification will be the sole responsibility of the Litigation Trust.

    f.    *Tax Treatment*

The Litigation Trust generally is intended to be treated for United States federal income Tax purposes, (i) in part as a grantor trust that is a liquidating trust within the meaning of Treasury Regulations § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, and (ii) in part as one or more disputed ownership funds within the meaning of Treasury Regulations § 1.468B-9(b)(1).  For United States federal income tax purposes, the transfer of the Litigation Trust Assets to the Litigation Trust will be treated as a transfer of the Litigation Trust Assets from the Debtors to the Litigation Trust Beneficiaries, followed by the Litigation Trust Beneficiaries' transfer of the Litigation Trust Assets to the Litigation Trust.  The Litigation Trust Beneficiaries will thereafter be treated for U.S. federal income tax purposes as the grantors and deemed owners of their respective shares of the Litigation Trust Assets.  The Litigation Trust Beneficiaries shall include in their annual taxable incomes, and pay tax to the extent due on, their allocable shares of each item of income, gain, deduction, loss and credit, and all other such items shall be allocated by the Litigation Trustee to the Litigation Trust Beneficiaries using any reasonable allocation method.

The Litigation Trustee will be required by the Litigation Trust Agreement to file income Tax returns for the Litigation Trust as a grantor trust of the Litigation Trust Beneficiaries (and file separate returns for the disputed ownership fund(s) pursuant to Treasury Regulations § 1.468B-9(b)(1) and pay all Taxes owed on any net income or gain of the disputed ownership fund(s), on a current basis from Litigation Trust Assets).  In addition, the Litigation Trust Agreement will require consistent valuation by the Litigation Trustee and the Litigation Trust Beneficiaries, for all federal income Tax and reporting purposes, of any property held by the Litigation Trust.  The Litigation Trust Agreement will provide that termination of the trust will occur no later than five years after the Effective Date, unless the Bankruptcy Court approves an extension based upon a finding that such an extension is necessary for the Litigation Trust to complete its liquidating purpose.  The Litigation Trust Agreement also will limit the investment powers of the Litigation Trustee in accordance with IRS Rev. Proc. 94-45 and will require the Litigation Trust to distribute at least annually to the Litigation Trust Beneficiaries (as such may have been determined at such time) its net income (net of any payment of or provision for Taxes), except for amounts retained as reasonably necessary to maintain the value of the Litigation Trust Assets

    g.    *No Revesting of Litigation Trust Assets*

No Litigation Trust Asset will revest in any Reorganized Debtor on or after the date such Litigation Trust Asset is transferred to the Litigation Trust but will vest upon such transfer in the Litigation Trust to be administered by the Litigation Trustee in accordance with the Plan and the Litigation Trust Agreement.

    9.    *Preservation of ~~Rights~~Causes of Action*

Except as provided in the Plan or in any contract, instrument, release, or other agreement entered into, or delivered in connection with, or assumed by the Plan (including, for the avoidance of doubt, pursuant to Section X.E and X.F of the Plan), in accordance with Bankruptcy Code § 1123(b) and to the fullest extent possible under applicable law, (i) the Reorganized Debtors will retain ~~and may enforce, and will have~~the Causes of Action and the RKA Causes of Action, (ii) only the Reorganized Debtors will have the right to enforce and prosecute the RKA Causes of Action, and (iii) the Reorganized Debtors shall grant to the Litigation Trust the sole right to enforce~~, any claims, demands, rights, and causes of action that any Plan Debtor or their respective estates may hold against any Entity~~ and prosecute the Causes of Action in the name of the Reorganized Debtor, whether such Causes of Action arose before or after the Petition Date, including any actions specifically enumerated in Exhibit J to the Plan.  The Reorganized Debtors' and Litigation Trust's rights to commence, prosecute, or settle such RKA Causes of Action and Causes of Action, respectively, shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors or their successors, and/or the Litigation Trust, may pursue, or not pursue, such ~~retained claims, demands, rights or causes of action~~RKA Causes of Action and Causes of Action, as applicable, as they deem appropriate in their discretion.

No Person or Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against them as any indication that the Litigation Trust will not pursue any and all available Causes of Action against them.  Except with respect to Causes of Action as to which the Debtors or the Reorganized Debtors have released any Person or Entity on or prior to the Effective Date (pursuant to the Debtor Release or otherwise), the Reorganized Debtors and the Litigation Trust, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person or Entity, except as otherwise expressly provided in the Plan.

10.      *Reinstatement and Continuation of Insurance Policies*

From and after the Effective Date, each of the Debtors' insurance policies in existence as of the Effective Date will be reinstated and continued in accordance with their terms and, to the extent applicable, will be deemed assumed by the applicable Reorganized Debtor pursuant to Bankruptcy Code § 365 and Section III.J and IV.A of the Plan.  Nothing in the Plan will affect, impair or prejudice the rights of the insurance carriers or the Reorganized Debtors under the insurance policies in any manner, and such insurance carriers and Reorganized Debtors will retain all rights and defenses under such insurance policies, and such insurance policies will apply to, and be enforceable by and against, the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date.

11.      *Entry into CBA Assumption Agreements*

On the Effective Date, the applicable Reorganized Debtors shall enter into the CBA Assumption Agreements.

~~11~~12.      *Cancellation and Surrender of Instruments, Securities and Other Documentation*

On the Effective Date and except as otherwise specifically provided for in the Plan, (i) the obligations of the Debtors under any other certificate, share, note~~, bond, indenture~~, purchase right, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest, equity, or profits interest in, the Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest (except the Intercompany Interests), will be cancelled as to the Debtors, and the Reorganized Debtors will have no continuing obligations thereunder; (ii) the obligations of the Debtors under the Modified DIP Credit Agreement will be fully released, settled, and compromised as to the Debtors, and the Reorganized Debtors will have no continuing obligations thereunder; and (iii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation/formation or similar documents governing the shares, units, certificates, notes, ~~bonds, indentures,~~ purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors will be fully released, settled, and compromised except as expressly provided herein.

With respect to any agreement (including, without limitation, any applicable credit agreement) that governs the rights of the Holder of a Claim or Interest and will be cancelled hereunder, and notwithstanding the occurrence of the Effective Date, such agreement will continue in effect solely for purposes of allowing such Holders to receive distributions under the Plan as provided herein.

~~12~~13.      *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and consistent with the treatment provided for Claims and Interests in Section liens or  ,deeds of trust ,all mortgages ,C above.VI including any liens granted as adequate protection against the property of  ,other security interests titl ,and all of the right ,shall be fully released and discharged ,any Estate and interest of any Holder of such mortgages, deeds of trust, liens or other security interests, including any rights to any collateral thereunder, shall revert to the applicable Reorganized Debtor and its successors and assigns.  As of the Effective Date, the Reorganized Debtors shall be authorized to execute and file on behalf of creditors Form UCC-3 termination

statements, mortgage releases or such other forms as may be necessary or appropriate to implement the provisions of Section III.L of the Plan.

~~13~~14.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of managers or directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan, the Restructuring ~~Transaction~~Transactions, the Reorganized Relativity Holdings Preferred Units, the Reorganized Relativity Holdings Common Units issued pursuant to the Plan, the New P&A/Ultimates Facility ~~(if obtained)~~ authorized pursuant to the Plan (including, but not limited to, the New Exit Financing Documents), and any amendments to any of the Debtors' credit agreements, in each case, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan.

~~14~~15.    *Dissolution of Official ~~Committees~~Committee*

Except to the extent provided herein, upon the Effective Date, the current and former members of the Creditors' Committee and any other creditor, equity or other committee appointed in the Chapter 11 Cases pursuant to Bankruptcy Code § 1102, and their respective officers, employees, counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases; *provided, however*, that following the Effective Date the Creditors' Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (1) Claims and/or applications for compensation by Professionals and requests for allowance of Administrative Claims for substantial contribution pursuant to Bankruptcy Code § 503(b)(3)(D); (2) any appeals to which the Creditors' Committee is a party; (3) any adversary proceedings or contested matters as of the Effective Date to which the Creditors' Committee is a party; and (4) responding to creditor inquiries for sixty (60) days following the Effective Date.  Following the completion of the Creditors' Committee's remaining duties set forth above, the Creditors' Committee shall be dissolved, and the retention or employment of the Creditors' Committee's respective attorneys, accountants and other agents shall terminate.  As discussed in Section 8.A.IX above, the Litigation Trust shall have the authority to prosecute and settle the Causes of Action after the Effective Date.

~~15~~16.    *Discharge of Claims and Interests*

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims and Interests arising or existing on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date.  From and after the Effective Date, the Debtors shall be discharged from any and all Claims and Interests that arose or existed prior to the Effective Date, subject to the obligations of the Debtors under the Plan.

~~16~~17.    *Injunctions*

As of the Effective Date, except with respect to the obligations of the Reorganized Debtors under the Plan or the Confirmation Order, all Entities that have held, currently hold or may hold any Claims or Interests, obligations, suits, judgments, damages, demands, debts, rights, causes of action or Liabilities that are waived, discharged or released under the Plan shall be permanently enjoined from taking any of the following enforcement actions against the Debtors, the Reorganized Debtors, the Released Parties or any of their respective assets or property on account of any such waived, discharged or released Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or Liabilities:  (1) commencing or continuing in any manner any action or other proceeding; (2) enforcing, levying, attaching, collecting or recovering in any manner any judgment, award, decree or order; (3) creating, perfecting or enforcing any lien or encumbrance; (4) asserting any right of setoff, subrogation or recoupment of any kind against any debt, liability or obligation due to any Debtor, Reorganized Debtor or Released Party; and (5) commencing or continuing any action, in any manner, in any place to assert any

Claim waived, discharged or released under the Plan or that does not otherwise comply with or is inconsistent with the provisions of the Plan.

17<u>18</u>.    *Exculpation*

From and after the Effective Date, the Exculpated Parties, the Debtors and the Reorganized Debtors shall neither have nor incur any liability to any Entity, and no Holder of a Claim or Interest, no other party in interest none of their respective Representatives shall have any right of action against any Debtor, Reorganized Debtor, Exculpated Party or any of their respective Representatives for any act taken or omitted to be taken before the Effective Date in connection with, related to or arising out of the Chapter 11 Cases, the Debtors or the negotiation, consideration, formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Exhibits, the Disclosure Statement, any amendments to any of the foregoing or any other transactions proposed in connection with the Chapter 11 Cases or any contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken in connection therewith or in connection with any other obligations arising under the Plan or the obligations assumed hereunder; *provided*, *however*, that the foregoing provisions of Section the liability of any Entity that (1)  :effect on D of the Plan shall have no.X would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document <u>previously assumed or</u> to be entered into or delivered in connection with the Plan or (2) the liability of any Exculpated Party that would otherwise result from any act or omission of such Exculpated Party to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct (including fraud).

18<u>19</u>.    *Releases*

a.    *Debtor Release*

Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, to the fullest extent permitted by law, the Debtors and the Reorganized Debtors, on behalf of themselves and their affiliates, the Estates and their respective successors, assigns and any and all Entities who may purport to claim by, through, for or because of them, shall forever release, waive and discharge all Liabilities that they have, had or may have against a Debtor, the Estates, any Released Party with respect to the Chapter 11 Cases, the negotiation, consideration, formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Exhibits, the Disclosure Statement, any amendments thereto, the Initial DIP Credit Agreement, the Initial DIP Order, the Modified DIP Credit Agreement, the Modified DIP Order, any of the New Securities and Documents, the Restructuring Transactions or any other transactions proposed in connection with the Chapter 11 Cases or any contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken in connection therewith or in connection with any other obligations arising under the Plan or the obligations assumed hereunder; *provided, however*, that the foregoing provisions of Section E of the .X result from any  the liability of any Released Party that otherwise would (a) Plan shall not affect  act or omissionto the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct (including fraud), (b) any rights to enforce the Plan or the other contracts, instruments, releases, agreements or documents <u>previously assumed or</u> to be, <s>or previously,</s> entered into or delivered in connection with the Plan, (c) except as otherwise expressly set forth in the Plan, any objections by the Debtors or the Reorganized Debtors to Claims or Interests filed by any Entity against any Debtor and/or the Estates, including rights of setoff, refund or other adjustments, (d) the rights of the Debtors to assert any applicable defenses in litigation or other proceedings with their employees (including the rights to seek sanctions, fees and other costs) and (e) any claim of the Debtors or Reorganized Debtors, including (but not limited to) cross-claims or counterclaims or other causes of action against employees or other parties, arising out of or relating to actions for personal injury, wrongful death, property damage, products liability or similar legal theories of recovery to which the Debtors or Reorganized Debtors are a party.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and

compromise of the claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Debtor Release. Nothing herein shall abrogate applicable attorney disciplinary rules.

        b.      *Third Party Releases*

      Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, in consideration for the obligations of the ~~Plan~~ Debtors and the Reorganized Debtors under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each ~~Holder of a Claim or Interest in Classes B, D, G, and J~~ Consenting Creditor shall be deemed to have forever released and covenanted with the Released Parties to forever release, waive and discharge all Liabilities in any way that such Entity has, had or may have against any Released Party (which release shall be in addition to the discharge of Claims and termination of Interests provided herein and under the Confirmation Order and the Bankruptcy Code), in each case, relating to a Debtor, the Estates, the Chapter 11 Cases, the negotiation, consideration, formulation, preparation, dissemination, implementation, Confirmation or consummation the Plan, the Exhibits, the Disclosure Statement, any amendments thereto, the Initial DIP Credit Agreement, the Initial DIP Order, the Modified DIP Credit Agreement, the Modified DIP Order, any of the New Securities and Documents, the Restructuring Transactions or any other transactions in connection with the Chapter 11 Cases or any contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken in connection therewith or in connection with any other obligations arising under the Plan or the obligations assumed hereunder; *provided*, *however*, that this ~~provisions~~ provision shall have no effect on:  (a) the liability of any Entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document previously assumed or to be entered into or delivered in connection with the Plan; (b) the liability of any Released Party that would otherwise result from any act or omission of such Released Party to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct (including fraud); or (c) any ~~Holder of a Claim or Interest in Classes B, D, G, and J who elects not to provide such Third Party Release by notation on the Ballot~~ non-Consenting Creditor.

      Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Third Party Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third Party Release. Nothing herein shall abrogate applicable attorney disciplinary rules.

        ~~19~~20.      *Votes Solicited in Good Faith*

      The Plan Proponents have, and upon confirmation of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Plan Proponents (and each of their respective affiliates, agents, directors, officers, members, employees, advisors, and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of the securities offered and sold under the Plan and therefore have not, and on account of such offer and issuance will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer or issuance of the securities offered and distributed under the Plan.

        ~~20~~21.      *Termination of Certain Subordination Rights*

      The classification and manner of satisfying Claims under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, Bankruptcy Code §§ 510(a) and 510(c) or otherwise, that a Holder of a Claim or Interest may have against other Claim or Interest Holders with respect to any distribution made pursuant to the Plan, including, without limitation, any such rights that are resolved

in connection with the settlement of the Avoidance Claims.  All subordination rights that a Holder of a Claim, other than a Holder of a Claim Reinstated hereunder, may have with respect to any distribution to be made pursuant to the Plan will be discharged and terminated, and all actions related to the enforcement of such subordination rights will be permanently enjoined.  Accordingly, distributions pursuant to the Plan will not be subject to payment to a beneficiary of such terminated subordination rights or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

### B.      Provisions Governing Distributions

1.      *Distributions for Allowed Claims as of the Effective Date*

Except as otherwise provided in Section V of the Plan, distributions to be made on the Effective Date to Holders of Allowed Claims as provided by Sections II or V of the Plan shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable by the Debtors or the Reorganized Debtors, as applicable.

2.      *Undeliverable ~~Distribution~~Distributions*

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Reorganized Debtors, the Litigation Trust or the Guild counsel (as applicable) has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided, however*, that such Distribution shall be deemed unclaimed property under Bankruptcy Code § 347(b) at the expiration of the latter of six (6) months from (i) the Effective Date or (ii) Allowance of such claim.  After such date, all unclaimed property shall become available cash for distribution to all other Holders of Litigation Trust Interests (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such unclaimed property shall be released and forever barred from assertion against such Debtor and its Estate.

a.      *Holding of Undeliverable Distributions*

The Reorganized Debtors shall make one attempt to make the distributions contemplated hereunder in accordance with the procedures set forth herein.  Any distributions returned to the Reorganized Debtors, or distributions that are otherwise undeliverable, shall remain in the possession of the applicable Reorganized Debtor until such time as a distribution becomes deliverable.

b.      *Failure to Claim Undeliverable Distributions*

Any Holder of an Allowed Claim entitled to a distribution of property under the Plan that does not assert a claim pursuant to the Plan for an undeliverable distribution within 180 days after the Effective Date shall have its claim for such undeliverable distribution discharged and shall be forever barred from asserting any such claim against the Reorganized Debtors or their respective property.

3.      *Compliance with Tax Requirements*

In connection with the Plan and all instruments issued in connection herewith and distributed hereunder, to the extent applicable, the Debtors, the Reorganized Debtors, the Litigation ~~Trustee~~Trust or any other party issuing any instruments or making any distributions under the Plan shall comply with all applicable Tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant to the Plan and all related agreements shall be subject to such withholding and reporting requirements.  Each of the Debtors, the Reorganized Debtors, and the Litigation ~~Trustee~~Trust, as applicable, shall be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including applying a portion of any Cash distribution to be made under the Plan to pay applicable Tax withholding.  In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax.  Any amounts withheld pursuant to the immediately preceding sentence shall be deemed to have been distributed and received by the applicable recipient for all purposes of the Plan.  For the avoidance of doubt, the employer shall pay

the "employer share" of any applicable employment taxes.  Notwithstanding any other provision of the Plan, each Holder of an Allowed Claim receiving a distribution pursuant to the Plan shall have the sole and exclusive responsibility for the satisfying and paying of any Tax obligations imposed on it by any governmental unit on account of such distribution, including income, withholding and other Tax obligations.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such Holder has made arrangements satisfactory to the issuing or disbursing party for the payment of any tax obligations.

Any party entitled to receive any property as an issuance or distribution under the Plan shall be required, if so requested, to deliver to the Debtors, the Reorganized Debtors, the Litigation ~~Trustee~~Trust or any other party issuing any instruments or making any distributions under the Plan (or such other Entity designated by any of the foregoing), as applicable, an IRS Form W-9 or (if the payee is a foreign Entity) an IRS Form W-8BEN, IRS Form W-8BEN-E, or such other IRS Form W-8, as applicable, unless such Entity is exempt under the Internal Revenue Code and so notifies the making the distribution.  ~~Unless~~If a properly completed IRS Form W-9 or IRS Form W-8, as appropriate, is ~~not~~ delivered to the distributing party (or such other Entity)~~, the distributing party, in its sole discretion, may (a) make a distribution net of any applicable withholding, including backup withholding, or (b) reserve such distribution.  If the distributing party reserves such distribution~~, and the Holder fails to comply with the requirement to deliver the IRS Form W-9 or IRS Form W-8 within the 180 days ~~after the Effective Date, such distribution shall be deemed undeliverable in accordance with~~prescribed in Section above 2.B.IX, such distribution shall be deemed undeliverable.

4.        *Distribution Record Date*

The ~~Plan~~Debtor or Reorganized Debtors will have no obligation to recognize the transfer, or the sale, of any participation in, any Claim that occurs after the close of business on the Distribution Record Date and will be entitled for all purposes herein to recognize and make distributions only to those holders of Allowed Claims that are holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date will be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

5.        *Setoffs*

Except with respect to claims of a ~~Plan~~Debtor or Reorganized Debtor released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Reorganized Debtors or the Litigation Trust, as applicable, may, pursuant to Bankruptcy Code § 553 or applicable non-bankruptcy law, set off against any Claim and the payments or distributions to be made on account of the ~~Claim the claims~~Claims, rights and causes of action of any nature that the applicable ~~Debtor or~~Reorganized Debtor or Litigation Trust may hold against the Holder of the Claim; *provided*, *however*, that the failure to effect a setoff shall not constitute a waiver or release by the applicable ~~Debtor or~~Reorganized Debtor or Litigation Trust of any ~~claims~~Claims, rights and ~~causes~~Causes of ~~action~~Action that the ~~Plan Debtor or~~Reorganized Debtor or Litigation Trust may possess against the Holder of a Claim.

6.        *Allocation Between Principal and Accrued Interest*

Except as otherwise provided in the Plan, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof as determined for U.S. federal income tax purposes) and, thereafter, to ~~the~~interest and the remaining portion, if any, ~~accrued through the Effective Date~~of such Allowed Claims.

7.        *Distributions to Holders of Disputed Claims*

Notwithstanding any other provision of the Plan, (1) no payments or distributions will be made on account of a Disputed Claim until such Claim becomes an Allowed Claim, if ever and (2) except as otherwise agreed to by

the relevant parties, no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Holder of such Claim shall receive the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.  Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### C.    Disputed, Contingent and Unliquidated Claims

#### 1.    *Allowance of Claims*

After the Effective Date, the Reorganized Debtors and/or the Litigation Trust, as applicable, shall have and retain any and all rights and defenses the Debtors had with respect to any Claim immediately prior to the Effective Date, except with respect to any Claim deemed Allowed under the Plan.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) in the Chapter 11 Cases allowing such Claim.  All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

Any Claim that has been listed in the Schedules as disputed, contingent or unliquidated, and for which no Proof of Claim has been timely filed, is not considered Allowed and shall be expunged without further action and without any further notice to or action, order or approval of the Bankruptcy Court.

#### 2.    *Prosecution of Objections to Claims*

Except as otherwise specifically provided in the Plan, the Debtors, prior to the Effective Date, and the Reorganized Debtors or the Litigation Trust, as applicable, after the Effective Date, shall have the sole authority: (1) to File, withdraw or litigate to judgment, objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (3) to administer and adjust the claims register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Bankruptcy Court.

#### 3.    *Estimation of Claims*

The Debtors, prior to the Effective Date, and the Reorganized Debtors or the Litigation Trust, as applicable after the Effective Date, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to Bankruptcy Code § 502(c) for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

#### 4.    *Expungement or Adjustment to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors or the Reorganized Debtors, as applicable, without a

claim objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

5.        *Deadline to File Objections to Claims*

The Reorganized Debtors or Liquidating Trust, as applicable may object to any Claims not previously Allowed by an order of the Bankruptcy Court or pursuant to the Plan prior to the Claims Objection Bar Date.

5̶6.        *Disallowance of Certain Claims*

**EXCEPT AS PROVIDED IN SECTION VI.A OF THE PLAN, IN AN ORDER OF THE BANKRUPTCY COURT OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS.**

6̶7.        *Offer of Judgment*

The Reorganized Debtors are authorized to serve upon a Holder of a Disputed Claim an offer to allow judgment to be taken on account of such Disputed Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment.  To the extent the Holder of a Disputed Claim must pay the costs incurred by the Reorganized Debtors after the making of such offer, the Reorganized Debtors are entitled to set off such amounts against the amount of any distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

7̶8.        *Amendments to Claims*

On or after the Effective Date, except as provided herein, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such prior authorization is not received, any such new or amended Claim filed shall be deemed disallowed in full and expunged without any further action.

**D.        Conditions Precedent to Consummation of the Plan**

1.        *C̶o̶n̶d̶i̶t̶i̶o̶n̶Conditions to the Effective Date*

The Effective Date shall not occur, and the Plan shall not be consummated unless and until the following conditions have been satisfied or duly waived pursuant to Section VII.A of the Plan:

- All documents and agreements necessary to consummate the Plan shall have been effected or executed.

- The Bankruptcy Court shall have entered the Confirmation Order, and the Confirmation Order shall be (i) a Final Order and (ii) in form and substance reasonably acceptable to the Plan Proponents.

- Receipt of required governmental approvals (if any) and any and all other steps necessary to consummate the Debtors' proposed restructuring in any applicable jurisdictions have been received and/or effectuated.

- All other documents and agreements necessary to implement the Plan on the Effective Date that are required to be in form and substance reasonably acceptable to the Plan Proponents shall have been executed and delivered and all other actions required to be taken in connection with the Effective Date shall have occurred.

- All statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full.

2.        *Waiver of Conditions to the Effective Date*

The conditions to the Effective Date may be waived in whole or part at any time by the Plan Proponents, without an order of the Bankruptcy Court.

3.        *Effects of Nonoccurrence of Conditions to the Effective Date*

If the Effective Date does not occur, then (i) the Plan will be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, will be deemed null and void; and (iii) nothing contained in the Plan or the Disclosure Statement will (a) constitute a waiver or release of any Claims or Interests, (b) prejudice in any manner the rights of the Debtors or any other Person or Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Person or Entity.

**E.        Miscellaneous Provisions**

1.        *Retention of Jurisdiction by the Bankruptcy Court*

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain such jurisdiction over the Chapter 11 Cases after the Effective Date as is legally permissible, including jurisdiction to:

- Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the amount, allowance, priority or classification of Claims or Interests;

- Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

- Resolve any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

- Ensure that distributions to Holders of Claims are accomplished pursuant to the provisions of the Plan;

- Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications Filed in the Bankruptcy Court involving any Debtor or any Reorganized Debtor that may be pending on the Effective Date or brought thereafter;

- Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

- Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents*, provided, however that such retention of jurisdiction shall not extend to the New P&A/Ultimates Facility or other indebtedness documents on and after the Effective Date;*

- Modify the Plan before or after the Effective Date pursuant to Bankruptcy Code § 1127; modify the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

- Hear and determine any matter, case, controversy, suit, dispute, Causes of Action or RKA Causes of Action regarding the existence, nature and scope of the releases, injunctions, and exculpation provided under the Plan, and issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to implement, enforce or restrain interference by any Entity with respect to the consummation, implementation or enforcement of the Plan or the Confirmation Order, including the releases, injunctions, and exculpation provided under the Plan;

- Hear and determine any matter pertaining to the Litigation Trust;

- Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or distributions pursuant to the Plan are enjoined or stayed;

- Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

- Enforce, clarify or modify any orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

- Enter a final decree closing the Chapter 11 Cases;

- Determine matters concerning state, local and federal Taxes in accordance with Bankruptcy Code §§ 346, 505 and 1146, including any Disputed Claims for Taxes;

- Recover all assets of the Debtors and their Estates, wherever located; and

- Hear any other matter over which with the Bankruptcy Court has jurisdiction.

2.      *Failure of Bankruptcy Court to Exercise Jurisdiction*

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set forth in Section XI of the Plan, the provisions of Section XI of the Plan will have no effect upon and will not control, prohibit or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

3.      *Amendment or Modification of the Plan*

Subject to the restrictions on modifications set forth in Bankruptcy Code § 1127, the Plan Proponents reserve the right to alter, amend or modify the Plan before its substantial consummation; *provided* any such alterations, amendments or modifications are in form and substance reasonably acceptable to each of the Plan Proponents.  Prior to the Effective Date, the Plan Proponents may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court.  Holders of Claims that have accepted the Plan shall be deemed to have accepted the Plan, as amended, modified, or supplemented, if the proposed amendment, modification, or supplement does not materially and adversely change the treatment of the Claim of such Holder; *provided*, *however*, that any Holders of Claims who were deemed to accept the Plan because

such Claims were Unimpaired shall continue to be deemed to accept the Plan only if, after giving effect to such amendment, modification, or supplement, such Claims continue to be Unimpaired.

4.    *Revocation of the Plan*

The Plan Proponents reserve the right to revoke or withdraw the Plan as to any or all of the Debtors prior to the Confirmation Date or at the Confirmation Hearing.  If the Plan Proponents revoke or withdraw the Plan as to any or all of the Debtors, or if Confirmation as to any or all of the Debtors does not occur, then the Plan shall be null and void in all respects with respect to such Debtors for whom the Plan has been revoked or withdrawn, and nothing contained in the Plan shall:  (1) prejudice in any manner the rights of any such Debtor(s) or any other party in interest with respect to such Debtor(s); or (2) constitute an admission of any sort by any such Debtor(s) or any other party in interest with respect to such Debtor(s).  The revocation or withdrawal of the Plan with respect to one or more Debtors shall not require the re-solicitation of the Plan with respect to the remaining Debtors.

4~~5~~.    *Severability*

If prior to the entry of the Confirmation Order, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court may, at the request of the Plan Proponents, alter and interpret such term or provision to the extent necessary to render it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as so altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remaining terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

5~~6~~.    *Successors and Assigns*

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

## X.    FINANCIAL PROJECTIONS

As further discussed below, the Plan Proponents believe the Plan meets the feasibility requirement set forth in Bankruptcy Code § 1129(a)(11), as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Debtors.

In connection with developing the Plan, and for purposes of determining whether the Plan satisfies feasibility standards, the Debtors' management has, through the development of financial projections for the years 2016 through ~~2020~~2018 as attached hereto as Exhibit B (the "**Financial Projections**"), analyzed the Reorganized Debtors' ability to meet their obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct their business.  The Plan Proponents believe that the Reorganized Debtors will have sufficient liquidity to fund obligations as they arise, thereby maintaining value.  Accordingly, the Plan Proponents believe the Plan satisfies the feasibility requirement of Bankruptcy Code § 1129(a)(11).  The Plan Proponents prepared the Financial Projections in good faith, based upon estimates and assumptions made by the Debtors' management.

The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated by the assumed Effective Date.  Any significant delay in the assumed Effective Date of the Plan may have a significant negative impact on the operations and financial performance of the Debtors.  Additionally, the estimates and assumptions in the Financial Projections, while considered reasonable by management, may not be realized, and are inherently subject to uncertainties and contingencies.  They also are based on factors such as industry performance, general business, economic, competitive, regulatory, market, and financial conditions, all of which are difficult to predict and generally beyond the Debtors' control.  Because future events and circumstances may well differ from those assumed and unanticipated events or circumstances may occur, the Debtors expect that the actual and projected results will differ

and the actual results may be materially different from those reflected in the Financial Projections. No representations can be made as to the accuracy of the Financial Projections or the Reorganized Debtors' ability to achieve the projected results. Therefore, the Financial Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur. The inclusion of the Financial Projections should not be regarded as an indication that the Debtors considered or consider the Financial Projections to reliably predict future performance. The Financial Projections are subjective in many respects, and thus are susceptible to interpretations and periodic revisions based on actual experience and recent developments. The Plan Proponents do not intend to update or otherwise revise the Financial Projections to reflect the occurrence of future events, even in the event that assumptions underlying the Financial Projections are not borne out. The Financial Projections should be read in conjunction with the assumptions and qualifications set forth herein.

## XI.    RISK FACTORS TO BE CONSIDERED

Parties in interest should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan. This information, however, does not describe the only risks involved in connection with the Plan and its implementation.

### A.    Certain Bankruptcy Considerations

1.    *If the Plan is not confirmed or consummated, or the reorganization is delayed, distributions to Holders of Allowed Claims would be materially reduced.*

If the Plan is not confirmed or consummated, there can be no assurance that the Chapter 11 Cases will continue rather than be converted to chapter 7 liquidation cases, or that any alternative plan of reorganization would be on terms as favorable to Holders of Claims as the terms of the Plan. The Plan Proponents anticipate that certain parties in interest may file objections to the Plan in an effort to persuade the Bankruptcy Court that the Plan Proponents have not satisfied the confirmation requirements under Bankruptcy Code §§ 1129(a) and (b). Even if (a) no objections are filed, (b) all impaired Classes of Claims accept or are deemed to have accepted the Plan or (c) with respect to any Class that rejects or is deemed to reject the Plan, the requirements for "cramdown" are met, the Bankruptcy Court, which can exercise substantial discretion, may determine that the Plan does not meet the requirements for confirmation under Bankruptcy Code §§ 1129(a) and (b). Bankruptcy Code § 1129(a) requires, among other things, (a) a demonstration that the Confirmation of the Plan will not be followed by liquidation or need for further financial reorganization of the Debtors, except as contemplated by the Plan, and (b) that the value of distributions to parties entitled to vote on the Plan who vote to reject the Plan not be less than the value of distributions such creditors would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Plan Proponents believe that the Plan will meet the requirements for confirmation, there can be no assurance that the Bankruptcy Court will reach the same conclusion. If the Bankruptcy Court determines that the Plan violates Bankruptcy Code § 1129 in any manner, including, among other things, the cramdown requirements under Bankruptcy Code § 1129(b), the Plan Proponents have reserved the right to amend the Plan in such a manner so as to satisfy the requirements of Bankruptcy Code § 1129. If a liquidation or protracted reorganization were to occur, the distributions to Holders of Allowed Claims would be drastically reduced. In particular, the Plan Proponents believe that, as set forth in the Liquidation Analysis, in a liquidation under chapter 7, Holders of Allowed Claims would receive substantially less because of the inability in a liquidation to realize the greater going-concern value of the Debtors' assets. Furthermore, administrative expenses of a chapter 7 trustee and the trustee's attorneys, accountants and other professionals would cause a substantial erosion of the value of the Debtors' estates. Substantial additional Claims may also arise by reason of the liquidation and from the rejection of previously assumed unexpired leases and other executory contracts further reducing distributions to Holders of Allowed Claims.

2.    *The Plan may not be consummated if the conditions to Effectiveness of the Plan are not satisfied.*

Section VII.A of the Plan provides for certain conditions that must be satisfied (or waived) prior to the Effective Date. Many of the conditions are outside of the control of the Debtors. There can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by

the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed. If the Plan is not consummated, there can be no assurance that the Chapter 11 Cases would not be converted to chapter 7 liquidation cases or that any new chapter 11 plan would be as favorable to Holders of Claims as the current Plan. Either outcome may materially reduce distributions to Holders of Claims. See Section of this 1.D.IX .Disclosure Statement for a description of the conditions to the effectiveness of the Plan

3.    *If the Effective Date is delayed or projected proceeds are not timely received, the Debtors may need to seek postpetition financing.*

The Debtors may not have sufficient ~~cash~~Cash available in order to operate their business if the Effective Date is delayed or projected proceeds are not timely received by the Debtors. In that case, the Debtors may need new postpetition financing, which may increase the costs of consummating the Plan. There is no assurance of the terms on which such financing may be available or if such financing will be available. Any increased costs as a result of the incurrence of additional indebtedness may reduce amounts available to distribute to Holders of Allowed Claims.

4.    *If current estimates of Allowed Claims prove inaccurate, Reorganized Relativity's financial condition could be materially and adversely affected.*

The estimates of Allowed Claims in this Disclosure Statement are based on the Debtors' books and records. Upon the passage of all applicable Bar Dates, the completion of further analyses of the Proofs of Claim, the completion of Claims litigation and related matters, the total amount of Claims that ultimately become Allowed Claims in the Chapter 11 Cases may differ from the Debtors' estimates, and such difference could be material. For example, the amount of any Disputed Claim that ultimately is allowed may be significantly more or less than the estimated amount of such Claim. Particular risks exist with respect to those Claims such as Priority Non-Tax Claims, Priority Tax Claims and Secured Claims. If estimates of such Claims are inaccurate, it may materially and adversely affect Reorganized Relativity's financial condition.

5.    *The Debtors may not be able to fully satisfy their obligations under the Ultimates Credit Agreement, which could impair their ability to obtain exit financing.*

The Plan provides for payment of the Ultimates Secured Claims in full in cash on the Effective Date or as soon thereafter as practicable. The Debtors have advised, however, that they and the Committee plan to defer resolution of any alleged claims against the Ultimates Agent and Ultimates Lenders until after the Effective Date. The Ultimates Agent has informed the Debtors that because the Ultimates Agent and Ultimates Lenders have additional rights under the Ultimates Credit Documents, including secured indemnification rights, the Ultimates Agent will not be in a position to release the liens (the "**Ultimates Liens**") securing the Debtors' obligations under the Ultimates Credit Documents so long as there is any risk that claims will be brought against either the Ultimates Agent or the Ultimates Lenders, creating doubt as to the Debtors' ability to obtain financing secured by liens on the Ultimates Agent's and Ultimates Lenders collateral. The Debtors and the Ultimates Agent and Ultimates Lenders each reserve their rights to seek to have the Court determine whether or not the payment and treatment provided for in the Plan pays the Ultimates Lenders in full and whether or not their liens are fully satisfied and shall be defeased.

6.    *Existing intercreditor agreements may preclude Debtors' from granting the releases set forth in the plan.*

The Plan contains broad release provisions in favor of the Released Parties. Existing intercreditor agreements and the Bankruptcy Code, however, may preclude the Debtors' ability to obtain the third-party releases and related provisions set forth in the Plan.

**B.    Financial Condition and Indebtedness**

1.    *Reorganized Relativity faces substantial capital requirements.*

Relativity has utilized significant amounts of ~~cash~~Cash to invest in motion pictures and marketing and relies heavily on obtaining government incentives, as well as its ability to borrow capital against its distribution

agreements, to meet its working capital requirements.  There can be no assurance that such future sources of funding will be available to Reorganized Relativity on terms that are economically feasible or at all.  The unavailability of such sources could potentially prevent Reorganized Relativity from meeting the objectives set forth in its business plan or from meeting its working capital needs.

        2.      *Restrictions imposed by agreements governing indebtedness incurred by Reorganized Relativity or market conditions may limit Reorganized Relativity's ability to obtain additional liquidity.*

If Reorganized Relativity requires working capital greater than that provided by operating cash flow as a result of these sources of liquidity not meeting current projected needs or if additional ~~cash~~Cash is needed to fund additional business opportunities, Reorganized Relativity may be required either to obtain other sources of financing or curtail its operations.  The availability of such financing may be limited by market conditions prevailing at the time Reorganized Relativity seeks to obtain such financing and by the terms of the agreements governing any New P&A/Ultimates Facility and indebtedness incurred by Reorganized Relativity.  No assurance can be given, however, that any additional financing will be available on terms that are favorable or acceptable to Reorganized Relativity.  Any inability to raise needed capital could have a material impact on Reorganized Relativity's business, financial condition, cash flows and results of operations.

        3.      *Projections of future performance by Reorganized Relativity are based on assumptions which may not prove accurate and many of which are outside the control of Reorganized Relativity.*

The Projections attached to this Disclosure Statement as ~~Exhibits~~Exhibit B ~~and C~~were prepared by Relativity's management and are based on implementing management's business plan, but they are inherently uncertain and are dependent upon the reliability of certain assumptions regarding the performance of Reorganized Relativity in the markets in which it operates.  The Projections reflect numerous assumptions, including Confirmation and consummation of the Plan in accordance with its terms, the terms of the amendments of the operative agreements, the anticipated future performance of Reorganized Relativity, industry performance, general business and economic conditions and other matters, and are subject to many risks, most of which are beyond the control of Reorganized Relativity.  Unanticipated events and circumstances occurring after the preparation of the Projections may affect the actual financial results of Reorganized Relativity.  Therefore, the actual results achieved throughout the periods covered by the Projections may vary from the projected results.  These variations may be material and may adversely affect the ability of Reorganized Relativity to satisfy its obligations following the Effective Date.  In addition, this Disclosure Statement does not reflect any events that may occur after the date of this Disclosure Statement.  Any failure to successfully implement Reorganized Relativity's business strategy or the Projections within the time frames currently expected, or at all, may have a material adverse impact on the information contained in this Disclosure Statement, and on Reorganized Relativity's business, financial condition, cash flows and results of operations.

        4.      *Changes to Reorganized Relativity's business plan may cause material adverse changes to Reorganized Relativity's business.*

Reorganized Relativity may make changes to its business, operations and current business plan, which may have a material adverse impact on Reorganized Relativity's future business, financial condition, cash flows and results of operations.

        5.      *Reorganized Relativity cannot assure future profitability.*

Relativity has had historical net losses with an accumulated deficit that was $~~821.5~~618.8 million as of December 31, ~~2013~~2014.  Although Reorganized Relativity expects to be profitable in future periods, there can be no assurance that Reorganized Relativity will operate profitably as Relativity's primary business – motion picture production and distribution – is highly unpredictable, subject to significant competition and requires significant capital to compete effectively.

### C.    General Economic Risk Factors and Business Risk Factors

1.    *Unpredictability Of Entertainment Industry.*

Motion picture production and distribution is highly speculative and inherently risky.  There can be no assurance of the economic success of such motion pictures since the revenues derived from the production and distribution (which do not necessarily bear a direct correlation to the production or distribution costs incurred) depend primarily upon their acceptance by the public, which cannot be predicted.

The production, completion and distribution of motion pictures are subject to a number of uncertainties, including delays and increased expenditures due to creative differences among key cast, other creative personnel, strikes, disruptions caused by weather, cast or crew illness, or accidents or other events beyond the producer's control.  As such, the costs of a Relativity-produced film may increase significantly from the original budget, and the date of completion may be substantially delayed due to the exigencies of production.  Increased costs may make it less likely that such film will recoup its production costs, and delays in production may result in such film not being ready for release at the intended time and postponement to a potentially less favorable time, all of which could cause a decline in gross receipts for such a film.

The commercial success of a motion picture also depends upon the quality and acceptance of other competing films released into the marketplace at or near the same time, the availability of alternative forms of entertainment and leisure time activities, general economic conditions and other tangible and intangible factors, all of which can change and cannot be predicted with certainty.  Further, the theatrical success of a motion picture is generally a key factor in generating revenues from other distribution channels.

There is a substantial risk that some or all of Relativity's future motion pictures will not be commercially successful, resulting in costs not being recouped or anticipated profit not being realized.

2.    *Rapid Technological Changes And Alternative Forms Of Delivery Or Storage Of Filmed Entertainment.*

The entertainment industry in general and the motion picture industry in particular continue to undergo significant technological developments.  Advances in technologies or alternative methods of product delivery or storage or certain changes in consumer behavior driven by these or other technologies and methods of delivery and storage could have a negative effect on Relativity's business.  Examples of such advances in technologies include VOD, new video formats and downloading and streaming from the internet.  An increase in VOD could decrease home video rentals.  Similarly, further increases in the use of portable digital devices that allow users to view content of their own choosing while avoiding traditional commercial advertisements could adversely affect Relativity's revenues.  Other larger entertainment distribution companies will have larger budgets to exploit these growing trends.  Relativity cannot predict how it will financially participate in the exploitation of our motion pictures through these emerging technologies or whether it has the right to do so for certain of its library titles.  If Relativity cannot successfully exploit these and other emerging technologies, it could have a material adverse effect on its business, results of operations and financial condition.

3.    *Piracy Of Motion Pictures, Including Digital And Internet Piracy, May Reduce The Gross Receipts From The Exploitation Of Our Films.*

Motion picture piracy is extensive in many parts of the world, including South America, Asia, and former Eastern bloc countries, and is made easier by technological advances and the conversion of motion pictures into digital formats.  This trend facilitates the creation, transmission and sharing of high quality unauthorized copies of motion pictures in theatrical release on DVDs, Blu-ray discs, from pay-per-view through set top boxes and other devices and through unlicensed broadcasts on free television and the internet.  The proliferation of unauthorized copies of these products has had and will likely continue to have an adverse effect on Relativity's business, because these products reduce the revenue Relativity receives from its products.

4.      *Reorganized Relativity could be adversely affected by strikes, union actions or other work stoppages.*

The motion pictures by Relativity, and the other major studios in the United States, generally employ actors, writers and directors who are members of the Screen Actors Guild, Writers Guild of America and Directors Guild of America, respectively, pursuant to industry-wide collective bargaining agreements.  Many productions also employ members of a number of other labor organizations including, without limitation, the International Alliance of Theatrical and Stage Employees and the International Brotherhood of Teamsters.  A strike, union action or other work stoppage by one or more of the unions that provide personnel essential to the production of motion pictures could delay or halt our ongoing production activities.  Such a halt or delay, depending on the length of time involved, could cause delay or interruption in Reorganized Relativity's release of new motion pictures and thereby could adversely affect Reorganized Relativity's cash flow and revenues.

5.      *Increased costs of prints, advertising and promotion.*

The costs of marketing and distributing feature films have generally increased in recent years.  These costs may continue to increase in the future.  If gross receipts from motion pictures do not increase at the same rate as any increase in costs, there will be a negative impact on Reorganized Relativity's financial performance.  Historically, marketing and distribution costs have risen at a higher rate than the combined effect of increases in the number of domestic admissions to movie theaters and in domestic admission ticket prices.  A continuation of this trend would leave Reorganized Relativity more dependent on other media, such as home video, international markets and new media for revenue, and the revenues from such sources may not be sufficient to offset an increase in the cost of marketing and distributing motion pictures.  Any of these occurrences could have a material adverse effect on Relativity's revenues and therefore on Reorganized Relativity's business, financial condition and results of operations.

6.      *The motion picture industry is highly competitive and at times may create an oversupply of motion pictures in the market.*

Relativity faces competition from companies within the entertainment business, as well as alternative forms of leisure entertainment.  Relativity competes with the other major studios, numerous independent motion picture companies, television networks and pay television systems for the acquisition of literary properties, the services of performing artists, directors, producers and other creative and technical personnel and production financing.  Numerous organizations with which Relativity competes in the motion picture industry have significantly greater financial and other resources than Relativity, while the independent production companies may have less overhead than Relativity.

The number of motion pictures released by competitors, particularly the major studios, may also create an oversupply of product in the market, reduce share of box office receipts and make it more difficult for motion pictures to succeed commercially.  Oversupply may become most pronounced during peak release times.

In addition, with only three major domestic pay television services, there is intense competition among film production companies for the distribution of film projects through these limited channels.  There is also significant concentration of the control of retail distribution of DVD units in the United States through a handful of retailers.  Similarly, there is significant concentration in the ownership and control of television and other media in a number of overseas markets.  As a result, there is a risk that Reorganized Relativity may not be able to distribute its motion pictures in the United States and foreign markets on terms favorably to Relativity, or at all, which could have an adverse effect on Reorganized Relativity's business, financial condition and results of operations.

7.      *Reorganized Relativity faces litigation risk.*

Relativity is, from time to time, subject to various asserted or unasserted legal proceedings and claims.  Any such claims, regardless of merit, could be time-consuming and expensive to defend and could divert management's attention and resources.  While management believes Relativity has adequate insurance coverage and accrues loss contingencies for all known matters that are probable and can be reasonably estimated, Relativity

cannot ensure that the outcome of all current or future litigation will not have a material adverse effect on Relativity and its results of operations.

8.       *Reorganized Relativity faces risks from doing business internationally.*

Reorganized Relativity pre-sells foreign motion picture distribution rights through multiple output arrangements in 140 countries.  It also receives a variety of other income from international territories as part of its business operations.  Revenues and results of operations in these territories are subject to risk inherent in international businesses, many of which are beyond Reorganized Relativity's control, including:  laws and policies affecting trade, investment and taxes, laws and policies relating to the repatriation of funds and withholding taxes and changes in these laws, differing cultural tastes and attitudes including varied censorship laws, differing degrees of protection for intellectual property and piracy, potential difficult enforcing contracts in some jurisdictions, financial instability and increased market concentration of buyers in foreign markets, the instability of foreign economies and governments, war and acts of terrorism, and fluctuating foreign exchange rates.

9.       *In the Sport Representation and Management Business, Relativity is heavily reliant on its key agents.*

Athlete representation is a personal services and relationship business that relies on its agents to remain within the structure to maximize revenues by maintaining and attracting clients.  The compensation structure of key agents is aligned with the success of the sports representation and management business.  All current agents have been signed to long-term service agreements with restrictive covenants.  Relativity's principal agents received equity as a significant portion of the consideration for Relativity's acquisition of their businesses, to better align their interests with those of other owners of Relativity and to incentivize long-term service to Relativity.  If, despite these measures, key agents leave, their departure could adversely affect future revenues and business prospects, and accordingly could have an adverse effect on Reorganized Relativity's business, financial condition, and results of operations.

10.     *Relativity does not and currently cannot own any equity interest in Sky Land (Beijing) Film-Television Culture Development Ltd., a PRC entity due to government regulation on foreign companies owning equity in China companies engaged in the entertainment and media industry.*

Relativity's PRC operations are conducted through Sky Land (Beijing) Film-Television Culture Development Ltd. ("**Sky Land Beijing**").  Foreign companies, such as Sky Land Entertainment Ltd. (BVI) ("**Relativity Sky Land**"), are not permitted to own equity interest in PRC entities that conduct business in the PRC entertainment and media industry.  Relativity relies on Sky Land Beijing to comply with its obligations under contractual business arrangements that have been agreed upon by Relativity and its partners to operate Relativity's motion picture production and distribution business in China, which arrangements may not have been evidenced by written contracts.  Such arrangements, whether or not evidenced in writing, may not be as effective in providing the Company with control over Sky Land Beijing as direct ownership.  If Sky Land Beijing fails to perform under these arrangement including, without limitation, failing to distribute Relativity's motion pictures or to remit to Relativity 100% of its profits, Relativity may have to incur substantial costs to enforce these arrangements, which may be unsuccessful.  Any claims Reorganized Relativity brings would require it to rely on legal remedies under PRC laws, regulations and policies, which may not be favorable to Reorganized Relativity.  In the event that Sky Land Beijing no longer cooperates with the Company and the Company is unable to enforce these arrangements, there would be a material adverse effect on Reorganized Relativity's ability to continue to conduct business in the PRC, which could negatively affect Reorganized Relativity's business, financial condition and results of operations.

11.     *Relativity will need to attract and retain key employees to rebuild management its management team post-confirmation.*

Reorganized Relativity's ability to compete as a business, and more particularly in the entertainment industry, will depend in part on its ability to attract and retain key personnel.  If Reorganized Relativity is unable to hire and retain qualified management or if any key member of management leaves, such departure could adversely affect Reorganized Relativity's operations.  In addition, if Reorganized Relativity experiences material growth, it

will need to attract and retain additional qualified personnel.  The market for qualified and talented personnel in the entertainment industry is intensely competitive, and Reorganized Relativity cannot be sure that it will be able to attract and retain a sufficient number of qualified personnel in future periods.  If Reorganized Relativity is unable to attract or retain qualified personnel as needed, its growth will be hampered and operating results could be materially adversely affected.

**XII.    FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN**

**A.    General**

A DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS PROVIDED BELOW.  THE DESCRIPTION IS BASED ON THE INTERNAL REVENUE CODE (THE "**IRC**"), TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT AND ALL SUBJECT TO CHANGE, POSSIBLY WITH RETROACTIVE EFFECT.  CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION COULD CAUSE THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN IMPORTANT RESPECTS, UNCERTAIN.  NO RULING HAS BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE (THE "**IRS**"); NO OPINION HAS BEEN REQUESTED FROM DEBTORS' COUNSEL CONCERNING ANY TAX CONSEQUENCES OF THE PLAN; AND NO TAX OPINION IS GIVEN BY THIS DISCLOSURE STATEMENT.

THE DESCRIPTION THAT FOLLOWS DOES NOT COVER ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS IN THE DEBTORS.  FOR EXAMPLE, THE DESCRIPTION DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, TAX-EXEMPT ORGANIZATIONS, PARTNERSHIPS OR PARTNERS IN PARTNERSHIPS; NOR DOES IT ADDRESS TAX CONSEQUENCES TO HOLDERS OF CLAIMS OR INTERESTS IN THE DEBTORS WHO ARE NOT ENTITLED TO VOTE ON THE PLAN.  THE DESCRIPTION ALSO DOES NOT DISCUSS STATE, LOCAL, NON-U.S. OR NON-INCOME TAX CONSEQUENCES, NOR DOES IT DISCUSS TAX CONSEQUENCES TO NON-U.S. HOLDERS OF CLAIMS.

FOR THESE REASONS, THE DESCRIPTION THAT FOLLOWS IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTERESTS IN THE DEBTORS.  HOLDERS OF CLAIMS OR INTERESTS IN THE DEBTORS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

B.        **U.S. Federal Income Tax Consequences to the Debtors**

Relativity Holdings is a limited liability company that is treated as a partnership for U.S. federal income tax purposes, and the vast majority of Relativity Holdings' subsidiaries that are Debtors are disregarded entities for U.S. federal income tax purposes. Accordingly, Relativity Holdings and such Debtors are not subject to U.S. federal income tax, and Holders of Interests in Relativity Holdings, as partners in Relativity Holdings, generally are liable for U.S. federal income tax on their distributive (i.e., allocable) shares of Relativity Holdings' and such Debtors' income, gain, loss and deductions, including discharge of indebtedness (i.e., cancellation of debt) income.

C.        **U.S. Federal Income Tax Consequences to Holders of Allowed Claims**

The U.S. federal income tax consequences of the implementation of the Plan to each Holder of an Allowed Claim will depend on, among other things, the consideration to be received by the Holder, whether the Holder reports income on the accrual or cash method, whether the Holder's Claim is Allowed or Disputed on the Effective Date, whether the Holder receives distributions under the Plan in more than one (1) taxable year and whether the Holder has taken a bad debt deduction or a worthless security deduction with respect to its Claim.

1.        *Recognition of Gain or Loss*

In general, a Holder of an Allowed Claim will recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the Holder's tax basis in the Claim. Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Allowed Claim and the Holder, the length of time the Holder held the Claim and whether the Claim was acquired with market discount. If the Holder realizes a capital loss, the Holder's deduction with respect to such loss may be subject to limitation. The Holder's tax basis for any property received under the Plan generally will equal the amount realized. The Holder's amount realized generally will equal such Holder's share of the sum of the Cash and the fair market value of any other property received by the Holder on the Effective Date (including with respect to a Holder of an Allowed General Unsecured Claim, the fair market value of such Holder's Pro Rata share of Litigation Trust Assets (as discussed below in "**Litigation Trust**")) or a subsequent distribution date, less the amount, if any, treated as interest (as discussed below in "Accrued but Unpaid Interest").

To the extent a Holder of an Allowed Claim receives Reorganized Relativity Holdings Common Units or Reorganized Relativity Holdings Preferred Units in exchange for such Allowed Claim, the Holder generally will not recognize gain or loss, except to the extent the transfer of Reorganized Relativity Holdings Common Units or Reorganized Relativity Holdings Preferred Units to a Holder is in exchange for an Allowed Claim for unpaid rent, royalties or interest (including accrued original issue discount) that accrued on or after the beginning of the Holder's holding period for the Allowed Claim. The Holder's tax basis in Reorganized Relativity Holdings Common Units or Reorganized Relativity Holdings Preferred Units generally will include the Holder's adjusted tax basis in the Allowed Claim exchanged, and the Holder's holding period of the Allowed Claim exchanged generally will be taken into account in determining the Holder's holding period for the Reorganized Relativity Holdings Common Units or Reorganized Relativity Holdings Preferred Units received. As equityholders of Reorganized Relativity, certain Holders of Allowed Claims generally would be required to take into account their shares of income, gain, loss and deduction of Relativity Holdings (as set forth in the Revised Relativity Holdings Operating Agreement) regardless of whether any actual distributions are made, and any Cash distributions generally would be treated as tax-free return of basis (to the extent thereof) and then capital gain.

To the extent a Holder of an Allowed Claim receives a new obligation of Reorganized Relativity or a subsidiary of Reorganized Relativity (such as the BidCo Note) in exchange for such Allowed Claim, the Holder generally will recognize gain or loss, *provided* that the exchange constitutes a "significant modification" of the Allowed Claim. Assuming neither the Allowed Claim nor the new obligation is "publicly traded" within the meaning of applicable Treasury Regulations, such Holder's gain or loss generally would equal the difference between the principal amount of the new obligation and the Holder's adjusted basis in the Allowed Claim. If either the Allowed Claim or the new obligation is publicly traded within the meaning of applicable Treasury Regulations, then the Holder's amount realized would be the fair market value of such publicly traded debt. Alternatively, if, based on all relevant facts and circumstances, the exchange does not constitute a significant modification, then no gain or loss will be recognized on the exchange of an Allowed Claim for the new obligation. It is unclear whether

receipt of the new obligation would constitute a significant modification because the terms of such obligations are not finalized.

### 2.    *Litigation Trust*

As more fully described in the Plan and herein, the Litigation Trust is intended to be treated for U.S. federal income tax purposes (1) in part as a liquidating trust within the meaning of Treasury Regulation § 301.7701-4(d) and (2) in part as one or more disputed ownership funds pursuant to Treasury Regulation § 1.468B-9(b)(1).  Except to the extent discussed below with respect to Disputed Claims and any reserves established therefore, the Litigation Trust will not be treated as a separate entity for U.S. federal income tax purposes.  Instead, the Litigation Trust Beneficiaries (or the beneficial owners thereof) will be treated as owning their respective Pro Rata shares of the applicable Litigation Trust Assets, subject to any liabilities of the Debtors assumed by the Litigation Trust and any liabilities of the Litigation Trust itself.  For U.S. federal income tax purposes, the transfer of the Litigation Trust Assets to the Litigation Trust will be treated as a transfer of the Litigation Trust Assets from the Debtors to the Litigation Trust Beneficiaries on a Pro Rata basis, followed by a transfer of the Litigation Trust Assets by the Litigation Trust Beneficiaries to the Litigation Trust.  The Litigation Trust Beneficiaries will thereafter be treated for U.S. federal income tax purposes as the grantors and deemed owners of their respective shares of the Litigation Trust Assets.  The Litigation Trust Beneficiaries will include in their annual taxable incomes, and pay tax to the extent due on, their Pro Rata shares of each item of income, gain, deduction, loss and credit, and all other such items will be allocated by the Litigation Trustee to the Litigation Trust Beneficiaries using any reasonable allocation method.  The Litigation Trustee will be required by the Litigation Trust Agreement to file U.S. federal income tax returns for the Litigation Trust as a grantor trust of the Litigation Trust Beneficiaries.  In addition, the Litigation Trust Agreement will require consistent valuation by the Litigation Trustee and the Litigation Trust Beneficiaries, for all U.S. federal income tax and reporting purposes, of any property held by the Litigation Trust.  Accordingly, references herein to "units in the Litigation Trust" shall be construed to mean the Holder's Pro Rata share of the Litigation Trust Assets.

Any reserves for Disputed Claims or other similar reserves that may be established by the Litigation Trustee will be treated as one or more disputed ownership funds pursuant to Treasury Regulation § 1.468B-9(b)(1).  Income and gain recognized with respect to the Litigation Trust Assets in any Disputed Claims reserve will be subject to an entity-level tax.  Regarding Litigation Trust Assets contributed to any Disputed Claims reserve, Litigation Trust Beneficiaries are not intended to be treated for U.S. federal income tax purposes as receiving such Litigation Trust Assets until such time as such Disputed Claims reserve makes distributions, in which case (and at which time) the Litigation Trust Beneficiaries are intended to be treated as receiving the distributions actually received from the Disputed Claims reserve.

### D.    **Certain Other U.S. Federal Income Tax Considerations for Holders of Allowed Claims**

### 1.    *Medicare Surtax*

Subject to certain limitations and exceptions, Holders who are individuals, estates or trusts may be required to pay a 3.8% Medicare surtax on all or part of their "net investment income," which includes, among other items, dividends on stock and interest (including original issue discount) on, and capital gains from the sale or other taxable disposition of, debt.  Holders should consult their own tax advisors regarding the effect, if any, of this surtax on their receipt and ownership of Reorganized Relativity Holdings Common Units, Reorganized Relativity Holdings Preferred Units, the BidCo Note and/or units in the Litigation Trust issued pursuant to the Plan.

### 2.    *Accrued but Unpaid Interest*

In general, a Holder that was not previously required to include in taxable income any accrued but unpaid interest on the Holder's Allowed Claim may be required to include such amount as taxable interest income upon receipt of a distribution under the Plan.  The Plan provides that, to the extent applicable, all distributions to a Holder of an Allowed Claim will apply first to the principal amount of such Allowed Claim until such principal amount is paid in full and then to any accrued but unpaid interest on such Allowed Claim.  There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of amounts distributed to such Holder and attributable to principal under the Plan is properly allocable to interest.  A Holder that was previously

required to include in taxable income any accrued but unpaid interest on the Holder's Allowed Claim may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Plan.  Each Holder of a Claim on which interest has accrued is urged to consult its tax advisor regarding the tax treatment of distributions under the Plan and the deductibility of any accrued but unpaid interest for U.S. federal income tax purposes.

<div align="center">3.    <em>Post-Effective Date Distributions</em></div>

Because certain Holders of Allowed Claims may receive distributions subsequent to the Effective Date, the imputed interest provisions of the IRC may apply and cause a portion of any post-Effective Date distribution to be treated as imputed interest.  Imputed interest may, with respect to certain Holders, accrue over time using the constant interest method, in which event such Holders may, under some circumstances, be required to include imputed interest in income prior to receipt of a post-Effective Date distribution.  Additionally, to the extent Holders may receive distributions with respect to Allowed Claims in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by such Holders may be deferred.  Holders of Allowed Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their Allowed Claims.

<div align="center">4.    <em>Bad Debt and/or Worthless Securities Deduction</em></div>

A Holder who, under the Plan, receives in respect of an Allowed Claim an amount less than the Holder's tax basis in the Allowed Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under § 166(a) of the IRC or a worthless securities deduction under § 165 of the IRC.  The rules governing the character, timing and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed.  Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such deductions.

<div align="center">5.    <em>Market Discount</em></div>

A Holder that purchased its Allowed Claim from a prior Holder with market discount will be subject to the market discount rules of the IRC.  Under those rules, assuming that the Holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Holder's Allowed Claim (subject to a <em>de minimis</em> rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Allowed Claim as of the date of the exchange.

To the extent that a Holder's Allowed Claim is exchanged in a transaction in which gain or loss is not recognized for U.S. federal income tax purposes, any accrued market discount not treated as ordinary income upon such exchange should carry over, on an allocable basis, to any Reorganized Relativity Holdings Common Units or Reorganized Relativity Holdings Preferred Units received, such that any gain recognized by the Holder upon a subsequent disposition of such Reorganized Relativity Holdings Common Units or Reorganized Relativity Holdings Preferred Units would be treated as ordinary income to the extent of any accrued market discount not previously included in income.

<div align="center">6.    <em>Holding Reorganized Relativity Holdings Warrants</em></div>

A Holder of Allowed Claims that receives Reorganized Relativity Holdings Warrants pursuant to the Plan generally will recognize no income, gain or loss upon a subsequent exercise of such warrants.  Such Holder's tax basis in the Reorganized Relativity Holdings Common Units acquired on such Holder's exercise of warrants will equal the sum of the exercise price paid for such units and the Holder's tax basis in the warrants.  Such Holder's holding period for the acquired Reorganized Relativity Holdings Common Units will begin on the date the warrants are exercised.  <u>See</u> Section ab 1.C.XIIove for a discussion of consequences of receiving Reorganized Relativity Holdings Warrants in exchange for an Allowed Claim.

If a Holder sells the Reorganized Relativity Holdings Warrants or they expire unexercised, such Holder would recognize capital gain or loss upon the date of the sale or expiration of the warrants, reflecting the amount by

which the consideration received, or the fair market value of the warrants, exceeds, or is less than, such Holder's tax basis in the warrants.

Upon receipt, Reorganized Relativity Holdings Warrants may be treated as partnership interests under certain circumstances. While it is not expected that such warrants would be treated as partnership interests, to the extent they are treated as partnership interests, then a Holder would be treated as a partner. <u>See</u> above 1.C.XII .for a discussion of consequences of holding units in a partnership

7.    *Information Reporting and Backup Withholding*

All distributions under the Plan will be subject to applicable U.S. federal income tax reporting and withholding. The IRC imposes "backup withholding" (currently at a rate of 28%) on certain "reportable" payments to certain taxpayers, including payments of interest. Under the IRC's backup withholding rules, a Holder of an Allowed Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan, unless the Holder (a) comes within certain exempt categories of payees (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional U.S. federal income tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of U.S. federal income tax. A Holder of an Allowed Claim may be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

E.    **Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**XIII.    RECOMMENDATION AND CONCLUSION**

The Plan Proponents believe that the confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors urge all parties entitled to vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before the Voting Deadline.

Dated:  ~~November 18,~~December 14, 2015                Respectfully submitted,

Relativity Fashion, LLC (on its own behalf and on behalf of each affiliate Debtor)


By:    */s/ Ryan Kavanaugh*
Name:    Ryan Kavanaugh
Title:    Chief Executive Officer of Relativity Holdings, LLC

**EXHIBIT A**

The Plan

[filed concurrently herewith]

## EXHIBIT B

Prospective Financial Information

**<u>EXHIBIT C</u>**

Unaudited Financial Statements

**<u>EXHIBIT D</u>**

Audited Financial Statements

**EXHIBIT E**

Chapter 7 Liquidation Analysis

| Summary report: Litéra® Change-Pro TDC 7.5.0.96 Document comparison done on 12/14/2015 9:29:41 AM | |
|---|---|
| **Style name:** JD Color With Moves | |
| **Intelligent Table Comparison:** Inactive | |
| **Original DMS:**iw://NAI/NAI/1500589103/15 | |
| **Modified DMS:** iw://NAI/NAI/1500589103/20 | |
| **Changes:** | |
| Add | 608 |
| Delete | 451 |
| Move From | 3 |
| Move To | 3 |
| Table Insert | 3 |
| Table Delete | 2 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 2 |
| Embedded Excel | 0 |
| Format Changes | 0 |
| **Total Changes:** | 1072 |