**GIPSON HOFFMAN & PANCIONE**
A Professional Corporation
1901 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone:  (310) 556-4660
Facsimile:  (310) 556-8945
Jason Wallach, Esq.
Email: jwallach@ghplaw.com

*Attorneys for MICA FUND 1, L.P.*

**HEARING DATE:  1/26/16**
**RESPONSE DEADLINE: 1/19/16**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re:<br><br>RELATIVITY FASHION, LLC<br><br>Debtor. | Chapter 11<br><br>Case No.  15-11989 (MEW)<br>(and Jointly Administered Cases) |

**OBJECTION OF MICA FUND 1, L.P TO DEBTORS' OMNIBUS MOTION TO ESTIMATE THE AMOUNT ETC. OF CERTAIN CLAIMS SOLELY FOR PURPOSES OF VOTING ETC. (Docket #1195)**

Creditor MICA FUND 1, L.P. ("MICA") through its undersigned counsel, hereby

opposes DEBTORS' OMNIBUS MOTION TO ESTIMATE THE AMOUNT OR

ESTABLISH THE CLASSIFICATION OF CERTAIN CLAIMS SOLELY FOR

PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN PROPONENTS'

SECOND AMENDED PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11

OF THE BANKRUPTCY CODE,  dated January 6, 2016 ("Voting Estimation Motion")

(Docket #1195), and respectfully states as follows in connection with such opposition:

1. **Quick Background and Context**

Mica was the production lender on two films, *Man on Carrion Road f/k/a The Hollow Point* ("MOCR") and *Mojave* ("Mojave" and collectively, the "Films") on which Relativity Foreign, LLC ("RFL") was appointed Foreign Sales Agent for both Films by way of a Sales Agency Agreement dated July 8, 2013 for MOCR, and a Sales Agency Agreement dated May 8, 2013 for Mojave. These Agreements provided Mica with a minimum sales guaranty ("MG") of $1,000,000 for MOCR and $1,902,500 for Mojave.

RFL failed to meet those MGs and failed to make good the shortfalls. Mica terminated the Agreements by notice on July 29, 2015, effective immediately. RFL apparently acknowledges these terminations since it listed both termination notices in its prior contract schedules, and did not list either Sales Agency Agreement.

Mica timely filed its proof of claim for $2,902,500, which was docketed as claim #1300.

2. **Relativity's Sole Basis for Reducing Mica's Claim for Voting Purposes is Entirely Incorrect.**

The sole stated basis of the objection[1] is as follows:

> "Claim No. 1300 alleges $2,902,500 due and owing in connection with certain minimum guaranties. But upon review, the Debtors have no liability based on the claimant's express waiver of the amounts due."

---

[1] Mica reserves its rights to object, at any hearing, that the Declaration of Ramon Wilson does not sufficiently authenticate this objection to Mica's claims, or the content thereof.

**There is no such express waiver, nor any implied waiver.**

Paragraph 18 of both Sales Agency Agreements expressly provides for termination by Licensor and expressly reserves "an action at law for direct money damages…" The failure to achieve the MG's or to pay the shortfall, are both direct money damages.

Moreover, the Termination Letters each state, "The foregoing is not a complete statement of the rights of the Lender and is not intended as a waiver of any of the Lender's claims, remedies or recourse, all of which are expressly reserved."

Copies of the two Sales Agency Agreements and the two Termination Letters are attached hereto as Exhibits 1-4 and are incorporated herein.

### 3. Contact Information Per Notice of Hearing

As set forth in the Notice of Hearing,

    a.   Any reply shall be served on the undersigned counsel.

    b.   The person who has ultimate authority to reconcile, settle or otherwise resolve the Disputed Voting Claim is Dale Johnson, who may be contacted through the undersigned counsel.

### 4. Conclusion

Thus, the agreements and documents support Mica's $2,902,500 claim and there is no evidence to support the Debtors' claim of "express waiver." The evidence in the record establishes that damages are available, and have not been waived. As such, the Objection should be denied as to the claim of Mica, and Mica's claim for voting purposes should be established as $2,902,500, as filed.

**WHEREFORE**, for the reasons set forth above, and upon the evidence and

authorities as may be received by the Court, the Mica's damages claim for $2,902,500 is

supported, there has been no waiver, and the Debtors' motion to estimate the Mica claim

as "zero" must be denied, Mica's claim for voting purposes must be established as the

amount of its claim, $2,902,500, and Mica should be granted such other and further relief

as is just and proper.


_____*/s/ Jason Wallach, Esq.*_____

**GIPSON HOFFMAN & PANCIONE, APC**
1901 Avenue of the Stars, Suite 1100
Los Angeles, Ca 90067
Telephone: (310) 556-4660
Facsimile: (310) 556-8945
Jason Wallach, Esq.

*Attorneys for Mica Fund 1, L.P.*


Attached Exhibits 1-4

# EXHIBIT 1

**SALES AGENCY AGREEMENT**

**"THE MAN ON CARRION ROAD"**

This **"Agreement"** is entered into as of July 8, 2013 by and between Carrion Road Productions, LLC ("**Licensor**"), a Delaware limited liability company, and Relativity Foreign, LLC ("**Agent**"), a California limited liability company and wholly owned subsidiary of Relativity Media, LLC.

This Agreement sets forth the agreement between Licensor and Agent (collectively referred to herein as the **"Parties"**) in connection with Licensor's appointment of Agent as Licensor's sole and exclusive sales agent for the Rights in the Picture in the Territory (subject to the provisions below regarding the portion of the Territory related to the United States Distribution Agreement, as such term is defined in Paragraph 3 below) during the Term. For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties have agreed to the following:

**Conditions Precedents**: All of Agent's obligations herein are expressly conditioned upon and subject to the following (collectively, the "Conditions Precedent"): Licensor shall deliver to Agent and Agent shall have the approval in its sole discretion of (i) the chain of title of the Picture (as defined below) (including, but not limited to, receipt of copyright and title reports) and all underlying agreements; (ii) security interest, copyright mortgage and such other documents as requested by Agent to evidence its rights hereunder (which shall be further reflected in an Interparty Agreement to be executed by MICA as production financier ("MICA"), Licensor, Agent, and the Completion Guarantor (as defined below); (iii) The Budget (as defined below) (excluding financing charges and interest and any residual reserve) of the Picture (as defined below) is not less than $3,400,000, evidenced by a signed budget topsheet ("**Bonded Budget**") (from Film Finances, Inc. ("**Completion Guarantor**")) and delivered to Agent no later than eight (8) weeks prior to the start of principal photography of the Picture; (iv) Completion Guarantor approval of the Bonded Budget; (v) the Picture's writer (Nils Lyew) and director (Gonzalo Lopez Gallego is pre-approved), and the lead actor (Patrick Wilson is pre-approved); (vi) full execution of this Agreement; and (vii) the outside start date of the commencement of principal photography of the Picture to be no later than December 31, 2014.

1.  **Picture Specifications**: The "**Picture**" shall mean the new and original theatrical motion picture currently entitled "The Man on Carrion Road", which shall conform to the screenplay written by Nils Lyew and dated  June 3, 2012, and which shall be directed by Gonzalo Lopez Gallego, produced by William Green and Aaron Ginsburg and star Patrick Wilson in all languages and in all versions, including, without limitation, the director's cut (if any), and all unrated, rated, and television versions thereof. The Picture will be shot in English, in color, delivered on 35mm film (and DCP) with an aspect ratio of 1.85:1 or 2:39:1 and entirely shot, finished and assembled with fully synchronized sound, music and effects, and ready in all respects upon its delivery to Agent for exploitation in first class theatres throughout the Territory.  All individuals and entities appearing in the Picture shall have provided written releases to Licensor permitting Licensor to use their name and likeness in the Picture, worldwide and in perpetuity and without the requirement for any further payment. The Picture shall be delivered with a running time, inclusive of main and end titles of between 90 and 120 minutes and shall be capable of receiving an MPAA rating no more restrictive than "R".   Collectively, the foregoing are the **"Picture Specifications"**. The Picture shall not, either in whole or in part, constitute or contain any material which constitutes a violation of any US law or regulation, or infringe any right or any interest of a third party, and shall have been produced in accordance with the laws of the applicable jurisdiction in which the Picture was made.

2.  **Budget**: The Budget (or "Final Approved Production Budget") means the following actual costs (all as defined below): (i) Production Costs, (ii) Contingency, and (iii) Bond Fee.

    (a)  **"Production Costs"** means all of the costs of development, production, completion and delivery including, without limitation, the acquisition of the underlying rights to the Picture and outside legal fees incurred in connection therewith, and all costs of financing of the Picture, and deposits or reserves of amounts required by the applicable guilds (e.g., WGA. SAG, DGA), and excluding only the following: performance and/or contingent deferments unless included in the bonded budget; bonuses and/or participations tied only to performance of the Picture; the Contingency; and the Bond Fee (it being agreed, however, that the Contingency and Bond Fee are included in the Budget as items separate from Production Costs);

    (b)  **"Contingency"** means the contingency required by the completion bond insurer in connection with the Picture (including completion bond insurer required fee holdbacks, if applicable).

    (c)  **"Bond Fee"** means an amount equal to the fee actually charged to and paid by Licensor for a completion guarantee to a third party completion guarantor (e.g., Film Finances, IFG).

3.  **Territory**: The "Territory" shall mean the Universe excluding the Excluded Territory. The Excluded Territory means the United States and, subject to the last sentence of this paragraph, Canada, and their territories and possessions (including without limitation all government installations, armed forces installations, embassies, oil wells, oil rigs and marine rigs) and airlines flying the flag of such countries (and countries outside of the Territory which are English-speaking) and ships based or registered in or flying the flag of such countries (and countries outside of the Territory which are English-speaking), and the Bahamas and Bermuda.  To the extent that the Territory includes the Caribbean Basin, the rights granted will be non-exclusive. Notwithstanding the foregoing, (i) in the event that Agent does not sell Canadian rights prior to the time that Licensor executes its distribution agreement for the Picture in the United States ("United States Distribution Agreement"), Licensor shall have the right to include Canada in such United States Distribution Agreement and, in such event, Canada shall be excluded from the Territory and (ii) in the event that territories within the Territory remain unsold within four (4) weeks following the first major market screening of the completed Picture, Licensor shall have the right to include such unsold territories in the United States Distribution Agreement by notice to Agent within one week thereafter, and in such event, such included unsold territories shall be excluded from the Territory.

4.  **Term**: The "Term" shall commence upon execution of this Agreement and subject to Paragraphs 19 and 20 below shall continue until the date that is twelve (12) years from Delivery (as defined below); provided, however, that during the Term, Agent is permitted to license the Picture to third parties for license periods of up to fifteen (15) years in all instances, and eighteen (18) years or twenty (20) years (in those instances where certain territories customarily require such longer terms) from Delivery. Ninety (90) days prior to the expiration of the Term, Agent shall have an exclusive ten (10) day right of first negotiation to extend the Term. In the event that the Parties are unable to reach an agreement on such extension, then Licensor shall be free to negotiate with third parties to represent the Picture at the conclusion of the Term, without limitation (subject to payment of all amounts due to Agent).

5.  **Rights Granted**: Licensor hereby appoints Agent to be its sole and exclusive sales agent with respect to the licensing and/or sale of all delineated distribution rights in and to the Picture as described below, expressly excluding the Reserved Rights (all as defined below), under copyright and otherwise, and only to the extent necessary to perform such sales agency services the underlying material with respect thereto, in the Territory during the Term, in all languages, in all

media, whether now known or hereafter devised, including, without limitation, all forms of theatrical, home video, television, and non-theatrical rights (including, without limitation, hotel, airline and ship rights, as set forth herein), internet and wireless (exploitation of both internet and wireless distribution rights shall be limited to reception within the Territory by means of customary geofiltering and encryption technology), by any and all methods of delivery, whether now known or hereafter devised (collectively, "**Rights**").

Without limiting the generality of the foregoing, the Rights that may be licensed by Agent hereunder shall include, without limitation, the right for each distributor to market, advertise, promote and publicize the Picture in all media whether now known or hereafter devised, subject to third party restrictions as provided by Licensor on Delivery, all exclusive rights in all languages and versions of the Picture and, subject to customary and reasonable third party restrictions as provided by Licensor as part of Delivery, all portions and elements thereof, including, without limitation, for promotional use only all available "behind-the-scenes" and "making of" documentaries of the Picture and, if and to the extent approved by Licensor for such use, all bloopers, trims and outtakes of the Picture.

Notwithstanding the above, Licensor expressly reserves all subsequent production rights (including, without limitation, all film, television, live stage, musical and other productions), video, computer, internet and all other game rights, merchandising, commercial clip, theme park, live television, soundtrack album, music publishing and performance rights (other than those required for exploitation of the Picture in synchronization with such music in accordance with this Agreement), all publication rights (except for Japanese souvenir program rights which Licensor expressly agrees to grant to applicable distributors in Japan only on customary terms), and all other rights not expressly licensed (collectively, "**Reserved Rights**"). Licensor acknowledges and agrees to negotiate in good faith with Agent on granting the Reserved Rights on a territory-by-territory basis if needed by Agent to close distribution deals for the Picture, but only to the extent that Licensor does not intend to license any such rights on a worldwide basis.

Provided that Licensor is permitted (i.e. Licensor has not sold rights to Subsequent Productions to a studio or multi territorial buyer) to appoint a sales agent to represent any sequel, remake or other production based on the Picture or a character in the Picture ("**Subsequent Productions**"), then Agent shall be entitled to a customary right of first negotiation to sell international distribution rights in and to such Subsequent Productions.

6.  **Distribution Agreements**. All distribution agreements ("**Distribution Agreements**") shall be concluded on Agent's approved standard form distribution license agreement attached hereto as Exhibit "A" subject to non-material modifications in negotiation with distributors in the Territory ("**Distributors**"). (Each such Distribution Agreement may be executed by Agent on behalf of Licensor; provided each Distribution Agreement shall be in the name of Licensor). Agent shall not conclude any Distribution Agreement for a gross advance less than the amount mutually agreed to by both parties, listed on Schedule 1 hereto ("**Takes**") without Licensor's prior written approval; provided, such approval shall be deemed given if Licensor fails to respond to Agent's written request within five (5) business days of receipt of such request (reducible to one (1) business day during film and television markets. Licensor acknowledges that the notwithstanding the gross amount of the Takes, the actual amounts paid under the Distribution Agreements shall be subject to customary deductions (e.g. withholding tax, bank fees, VAT, foreign currency exchange, etc., and subject to Agent being timely furnished by Licensor of the applicable tax residency certification (i.e. 6166) in the name of the designated payee hereunder from the country to which payment is to be made. Agent shall not authorize any distributor to change the name of the Picture (other than a direct translation into a local language) without Licensor's prior approval of same, such approval not to be unreasonably withheld or delayed. Agent shall arrange for the delivery of

the Picture under each Distribution Agreement in accordance with the terms of each such agreement.

Agent shall perform the customary services of a sales agent selling international rights to independent motion pictures provided that Licensor understands that Agent may represent other motion pictures in addition to representing the Picture and as such, Agent will devote such time and resources to the Picture as Agent in its good faith judgment deems appropriate, but Agent need not render services exclusively for the Picture. In addition to the foregoing, Agent's services do not include undertaking any audit or any legal proceeding (including arbitration) of or in connection with any Distribution Agreement or with respect to the distribution of the Picture in the Territory.

Agent does not make any guarantee, representation or warranty, express or implied, regarding the ability to conclude any Distribution Agreements to exploit the Picture, or (except with respect to the minimum guarantee provided below) to earn or collect any Gross Receipts or that there will be any Gross Receipts. Further, there is no requirement that the Picture be released in any media in the Territory by a Distributor and Agent makes no representation that despite payment of a minimum guarantee under any Distribution Agreement that a Distributor will actually exploit the Picture in their licensed territory. Any estimates or projections about possible Distribution Agreements or performance of the Picture are statements of Agent's reasonable good faith opinion. Agent does not guarantee that Gross Receipts will be earned or Licensor's share of Gross Receipts will be payable in any amount, further Agent does not guarantee the performance of any Distributor under any Distribution Agreement.

7.    **Gross Receipts**:    Each Distribution Agreement shall require payment of all amounts (e.g. advances, minimum guarantees, overages, secondary use royalties, and other fees) ("**Gross License Fees**") (other than reasonable and customary costs actually paid separately by distributors for any delivery materials) first directly into the designated collection account at City National Bank ("Escrow Account"), to be held and distributed pursuant to the terms of the Escrow Agreement attached hereto as Exhibit "B" (to be mutually agreed and executed by all parties simultaneously with this Agreement. If not executed, then Agent MG is not payable unless and until such escrow agreement is mutually agreed and executed.); thereafter, to the collection account of the financier of the Picture, MICA, until MICA has recouped its production financing and premium thereon and any fees, expenses and charges that MICA is entitled to recoup (with MICA to make payment upon receipt of such revenues to Agent of any amounts which Agent is entitled to receive prior to MICA recoupment, all as set forth in greater detail in the Interparty Agreement) and thereafter directly into a specifically designated collection account ("**Collection Account**") pursuant to a mutually approved collection account management agreement on customary terms ("**CAMA**"), administered by and in the name of (A) Fintage Magyar Kft. or Freeway Entertainment Kft., each of which shall be pre-approved third-party collection agents following execution of a CAMA or (B) Union Bank or OneWest Bank or another institutional lender specializing in entertainment finance to be mutually approved of by both parties.    In the event any party receives any sums due to the Collection Account, such party will immediately pay all such amounts to the Collection Account without off-set or deduction.

One Hundred Percent (100%) of all revenues actually collected pursuant to each Distribution Agreement (including deposits) and otherwise from exploitation of the Rights (e.g. minimum guarantees, distributor advances, license fees, overages, secondary use royalties) it being acknowledged that the Distributors may be required to withhold applicable withholding taxes from the Gross License Fees after deduction (if applicable) of reasonable (i) fees and expenses charged by tax mitigation distribution intermediaries, (iii) currency conversion and transmission costs and (iv) costs of collecting (all of the foregoing, "**Gross Receipts**") in the Territory pursuant to

4

Distribution Agreements entered into during the Term shall be applied on a continuing basis in the following order:

    a.   <u>Collection Account Fee and Expenses</u>: The collection agent (if any) (**"Collection Agent"**) shall retain its fee which shall not exceed One Percent (1%) of Gross Receipts.

    b.   <u>Sales Agency Fee</u>: In connection with the Territory, Agent will be entitled to be paid the following "Sales Agency Fees", which will be inclusive of any fees of sub-sales agents calculated as follows; an amount equal to Ten Percent (10%) which shall be calculated on One Hundred Percent (100%) of all Gross Receipts in the Territory without deduction until Gross Receipts collected equals the Agent MG.

        For clarity, Agent shall be in first position as to the Sales Agency Fees (subject to the Collection Agent) with respect to the One Hundred Percent (100%) of the Gross Receipts derived in the Territory.

    c.   <u>Agent MG</u>: Provided the Conditions Precedents are fulfilled as and when required (time being of the essence) and Licensor is not in material uncured breach hereof, then no later than September 14, 2015 (the "MG Payment Date", Agent shall pay the Agent MG (as defined below) to the Escrow Account. The Agent MG shall be an (A) amount equal to One Million US Dollars (US$1,000,000), less 100% of the Gross Receipts collected as of the MG Payment Date from the Distribution Agreements ("Shortfall Amount"); reduced by (B) the difference between (i) One Hundred Thousand Dollars ($100,000.00) and (ii) the actual amount of any Non-Deferred Foreign Sales Agent Distribution Expenses that have been invoiced by Agent, approved by Licensor and previously reimbursed to Sales Agent; and further reduced by (C) 14.4678     % of the Shortfall Amount.) . The Agent MG is an advance against Gross Receipts collected from the Territory. Agent shall be entitled to a refund of any portion of the Agent MG actually paid to the Escrow Account, as additional Gross Receipts are collected subsequent to the MG Payment Date, pursuant to the Escrow Agreement. **"Notice of Delivery"** means Licensor's notification to Distributors stating that the elements necessary for the manufacture and delivery of the Delivery Materials (as defined in Schedule 2 (at Agent's discretion or as required by the applicable Distribution Agreement) are ready and available for immediate order and Delivery. Licensor's failure to complete timely delivery of all materials necessary for Agent to service all Distribution Agreements as provided in Schedule 2 will constitute a material breach of this Agreement. Furthermore, it is hereby agreed that Notice of Delivery to Distributors shall not occur earlier than ninety (90) days prior to the elimination of any holdback to initial release by Distributor (the "NOD Outside Date"), and all parties agree the NOD Outside Date shall be no later than June 15, 2015; and the Agent MG shall be paid to the Escrow Account no later than September 14, 2015 (if applicable). Licensor must provide the customary forms Agent reasonably requires in order to collect full payment of the Distributor minimum guarantees (e.g. 6166, W-8 BEN) on a timely basis promptly following Agent's written request for such forms (such that the Distributors can pay in full as and when required, e.g. 10 days after NOD) and Licensor's obligation to do so is of the essence of this Agreement and a material inducement for Agent's agreement to provide the Agent MG. Licensor's failure to comply shall be a material breach of this Agreement.

    d.   <u>Distribution Expenses</u>:  Agent shall advance One Hundred Percent (100%) of all Distribution Expenses up to the Distribution Expense Cap (defined below) (excluding the Additional Distribution Expenses, which shall be advanced by Licensor) actually

incurred by Agent or on Agent's behalf in connection with the Picture in accordance with the terms herein, and Agent shall be entitled to recoup such Distribution Expenses as provided herein; provided, however, the Distribution Expenses shall not include any double or duplicate deductions or recoveries, and shall not include any overhead, salaries or other internal or general company expenses for Agent. As used herein, **"Distribution Expenses"** shall mean, with respect to all rights granted to Agent hereunder, One Hundred Percent (100%) of the aggregate of all direct, out-of-pocket, auditable, actual and verifiable costs customarily paid directly in connection with the distribution and exploitation of motion pictures or customarily treated as a cost of distribution for sales agents throughout the Territory in all media, including, without limitation, all manufacturing, duplication, shipping, marketing, advertising, promotion and publicity costs (excluding DDA and other publicity agency costs if incurred and paid by Licensor), and all costs to complete Delivery of the Picture, if any, consistent with the terms of this Agreement. Agent's Distribution Expenses (excluding the Additional Distribution Expenses as defined below) for each Picture shall be deemed at One Hundred Thousand US Dollars (US$100,000), which shall be non-accountable ("Distribution Expense Cap"). If the Budget of the Picture is over $5mm, then the Distribution Expense Cap shall increase to Fifty Thousand Dollars ($50,000).

e.  Additional Distribution Expenses:  The following expenses shall be excluded from the Distribution Expenses and, if not paid by Distributors, shall be advanced by Licensor, subject to Licensor's prior written approval on a case by case basis, such approval not to be unreasonably withheld or delayed (it being understood that Licensor's costs in connection with materials under i. or ii. will be relevant (but not dispositive) in determining whether such materials are reasonable) and which shall be deemed given if no response is provided within ten (10) business days of such written request:

  i.   All costs of delivery to Distributors including film elements and delivery items for the Picture to the extent such items are not delivered to Agent;
  ii.  Additional internegatives, music and effects tracks and other Picture elements and delivery items required to effect delivery of the Picture to Distributors;
  iii. Picture as a "special event" at film festivals including the Picture's premiere (including the transportation, accommodations and expense allowances for the principal actors, director and any other persons contractually entitled or required by the festival to attend such event) or for awards, nominations and other honors;
  iv.  Press junkets, star tours etc.;
  v.   payment to DDA, or other international publicity firm; and
  vi.  Preparation of DLT.

Gross Receipts, Distribution Expenses, and Additional Distribution Expenses shall be treated on a Picture-by-Picture basis, uncrossed in all respects between Pictures. Agent shall be reimbursed for all Additional Distribution Expenses within thirty (30) days, if the same have been approved by Licensor and advanced by Agent and subject to Agent providing receipts and invoices in a form reasonably acceptable to Licensor.

Gross Receipts shall exclude reasonable and customary costs actually paid separately by distributors for any delivery materials. For clarity, such monies will not be deposited into the Escrow Account or Collection Account and neither Licensor, MICA, or any financiers shall have any right to these monies.

f.  One Hundred Percent (100%) of remaining Gross Receipts shall be paid to Licensor.

6

8.  **Collection Account And Tax Intermediaries**: Until such time as a specifically designated collection account is in place with a fully executed CAMA, Agent shall cause all monies paid in relation to any sale, license or other exploitation of the Picture to be paid to the Escrow Account as further set forth in Exhibit "B", and thereafter as provided. Agent shall work with the necessary tax intermediary(ies) (approved by Licensor) where possible to minimize withholding taxes for certain territories. To this end, Licensor hereby authorizes Agent to negotiate and, subject to approval by Licensor, enter into such arrangements with the respective approved tax intermediaries. Licensor acknowledges that there are some countries where Agent is or may be unable to use tax intermediaries and that Licensor will be required to submit tax residency documentation to establish exemptions under applicable double taxation treaties. Licensor shall timely supply Agent (at Licensor's sole cost and expense) with all documentation and information required in connection therewith.

9.  **Accounting**:

    a.  Agent shall provide customary written accountings in reasonable detail in English, setting forth the Distribution Expenses and Additional Distribution Expenses to the collection agent, and Licensor on a quarterly basis for the first twenty four (24) months from incurring any Distribution Expenses and Additional Distribution Expenses, and thereafter on a semi-annual basis until one year after the end of the Term. Each accounting shall be provided no later than sixty (60) days after the end of each accounting period.

    b.  Until such time as the Collection Account is in place, Agent shall provide Licensor with quarterly accountings of Gross Receipts received for each month within which Gross Receipts are received within sixty (60) days of the end of the reporting period. Agent shall treat the Gross Receipts and the Distribution Expenses separately and apart from other motion pictures represented or sold by Agent. If at any time after the Collection Account is in place Agent receives any Gross Receipts, Agent will promptly remit them to the Collection account and will provide an accounting to Licensor of any amounts so received by Agent within sixty (60) days after Agent's receipt thereof.

    c.  Not more frequently than annually and subject to having given not less than thirty (30) days prior written notice to Agent, Licensor shall be entitled, on business days and without disruption to Agent business, either directly or through certified public accountant working in the entertainment industry pre-approved by Agent, to audit and inspect all books of account and records, whether manual or electronic, relating to exploitation of the Picture pursuant to this Agreement. Agent will keep all of its records pertaining to the Picture at Agent/Licensor's primary place of business, currently in the County of Los Angeles, California. In the event there is an agreed and settled discrepancy in Agent audited reports of Ten Percent (10%) or more of for the relevant accounting periods which are the subject of the audit, Agent will pay to Licensor the actual cost of such audit. All records shall be deemed final and accepted by Licensor thirty-six (36) months following delivery of such accountings.

    d.  Licensor acknowledges and agrees to provide Agent with Final Actual Cost Statement (as defined in Schedule 2) executed by the bond company (i.e. Film Finances) and the production accountant and/or Licensor's CFO.

10. **Residuals, Participations and Deferments**: Licensor shall be solely responsible for all third party payments with respect to the Picture, including, without limitation:

a.   any and all production and financing costs of any kind;

b.   any and all deferments and any form of profit and gross participations;

c.   any and all royalty payments, music synchronization or other music costs, license fees (other than music performance rights, which will be paid by licensees and distributors); and

d.   any and all residuals (including, but not limited to SAG, WGA, DGA, AFTRA, AF of M); supplemental market or other payments to any guild or union.

Neither Agent nor any Distributor shall be responsible for or shall be required to pay any of the foregoing third party obligations which may arise from Agent's exploitation of the Picture or a Distributor's exploitation of the Distribution Rights, all of which shall be solely and exclusively the responsibility of the Licensor.

11.   **Delivery:** Licensor will deliver to Agent, free of charge, at such place in Los Angeles as Agent shall reasonably direct, all of the materials for the Picture ("**Delivery Materials**") in accordance with the delivery schedule attached hereto as <u>Schedule 2</u> ("**Delivery Schedule**"). The Delivery Materials shall conform to the Delivery Schedule and the Picture Specifications, be of first class technical quality consistent with current industry standards within the motion picture industry for first run features and be fully cleared for use in all media whatsoever in the Territory without additional payment other than for customary music performance rights.

Delivery (as defined below) shall be made no later than the earlier of (i) twelve (12) months from commencement of principal photography of the Picture; and (ii) ninety (90) days prior to the NOD Outside Date ("**Delivery Date**"), time being of the essence.

"**Delivery**" means the delivery by or for Licensor and technical acceptance by Agent of the Delivery Materials. Delivery shall not be deemed to have occurred unless and until: (i) the Picture conforms to the Picture Specifications and the descriptions contained in the Delivery Schedule and (ii) the Picture conforms to the technical standards set forth above, and (iii) Agent has technically approved in writing all of the Delivery Materials (which Agent will do in good faith and soon as practicable). Agent will have a thirty (30) day inspection period from its receipt of all Delivery Materials ("First Defect Notice Period") and Licensor will have a ten (10) business day cure right. Following such cure, Agent will have a fifteen (15) business day inspection period from its receipt of all redelivered items ("Second Defect Notice Period"), followed by a period of ten (10) business days in which Licensor may cure any remaining deficiencies in Delivery. If Agent does not provide deficiency notice, in reasonable detail during the First Defect Notice Period and Second Defect Notice Period, delivery of such defective Delivery Material is deemed accepted. If Licensor fails to cure the defects set forth in the deficiency notice for the Second Defect Notice Period, then Agent shall have the right but not obligation to cure such defects and/or secure acceptable replacements and Licensor will promptly (following receipt of an invoice and supporting documentation) reimburse Agent for all reasonable, actual third-party costs paid by Agent in connection with obtaining such replacements and/or curing such defects. Agent will be responsible for delivery of materials to distributors under their Distribution Agreements and any payment by distributors for the cost of these materials or the cost of their shipment shall be made directly to Agent, and for clarification, are not part of Gross Receipts.

If Agent rejects delivery following the cure procedure outlined above, this agreement will be deemed to have been terminated by Agent pursuant to paragraph 19 below. Agent will also have

the right but not the obligation to create and manufacture any required Delivery Materials which are not delivered by Licensor, and to use them to service applicable Distribution Agreements as Agent deems appropriate and in the event that Agent creates any of the Delivery Materials, such creation shall not constitute a waiver of any right or remedy which Agent may have for a failure to make timely and complete Delivery hereunder.

Subject to payment of the applicable distributor's customary access fee, Licensor shall use reasonable good faith efforts to provide Agent with unimpeded and access to all marketing materials created by or for the US domestic distributor of the Picture ("**U.S. Domestic Distributor**") including but not limited to all key art, theatrical, outdoor ads, in theatre marketing, internet spots and banners, newspaper ads, home video artwork, EPKs, trailers, TV spots, radio spots, website files, generic interviews, "making of", premiere footage, DLT, and DVD menus and chapters ("**Promotional Materials**"). If the US Domestic Distributor requires Agent to pay an access fee, then U.S. Domestic Distributor may be required by Agent an access fee to Agent for Promotional Materials created by Agent ("**Agent Created Promotional Materials**"), provided that the such Agent Created Promotional Materials are created prior to Licensor's full execution of a U.S. domestic distribution agreement of each Picture. Any such access fee received by Agent shall be applied against and shall reduce the Distribution Expenses recoupable by Agent, or if such Distribution Expenses have already been recouped, the access fee will be paid to the Collection Account as Gross Receipts not subject to any Sales Agency Fees. If any or all the foregoing are not approved by all parties having relevant approval rights or are not fully cleared for all uses, in any media, worldwide, Agent shall be so advised.

12. **Credits**: In the Territory only and provided that Licensor has not terminated pursuant to paragraph 18 below: (a) a presentation credit substantially in the form of "In Association with Relativity International" in the main titles on screen on a separate card and in second position on each Picture (or most favored nations in all respects); (b) if approved by Distributors (which approval shall be the responsibility of Agent to obtain), a static "bug" logo in all paid ads, subject to the customary exceptions of Distributors; and (c) Agent may include its logo on all artwork and promotional materials throughout the Territory created by Agent. Licensor shall use commercially reasonable efforts to get the foregoing credits approved by the US distributor outside the Territory (i.e., worldwide); provided, however, in the event such efforts fail, Agent shall be entitled to a "Worldwide Sales by Relativity International" credit in the end credits outside the Territory. The foregoing credits, if approved by the Distributors, shall also appear in the billing block of all paid advertising in the Territory subject to customary exclusions. Agent shall notify Distributors in writing of all credit obligations and use all commercially reasonable endeavors to ensure that Distributors use all credits appearing on the Picture as delivered to them and comply with all their obligations to accord credits on paid advertising for the Picture, and for sales and marketing trailers, one-sheets and artwork (including without limitation providing for such use and compliance in each Distribution Agreement) and shall co-operate with Licensor in connection with any action to enforce such credit obligations or requirements; provided, however, that no casual or inadvertent failure to comply with the credit obligations, nor any failure by third parties to comply with such obligations, shall be deemed a breach hereof by Agent, Agent will use reasonable efforts to correct such failure on a prospective basis and will also obligate distributors to do so. Agent reserves the right to allow Distributors' customary distribution credit in their specific distribution territory, to the extent set forth in the applicable Distribution Agreement.

13. **Publicity**: Licensor shall promptly create a trailer or promotional piece (and provide the same to Agent) following the commencement of principal photography. Shortly following completion of principal photography, Licensor agrees to provide Agent with access to not less than 100 different, fully cleared, high resolution stills taken during principal photography to enable timely preparation of promotional and sales materials by Agent. Agent will honor all cast and other contractual

restrictions and requirements regarding use of images, credits and likenesses, and Agent will consult regarding and coordinate such activities with Licensor.

14. **Screenings and Festivals**: Licensor shall not screen the Picture or excerpts from the Picture in the Territory without prior consultation with Agent. For any screenings and festival launch for the Picture in the Territory, Agent will obtain Licensor's written approval and will coordinate same with Licensor and the domestic sales agent or U.S. distributor.

15. **Cutting and Access Rights:** Subject to third party contractual restrictions and in coordination with Licensor, the Distributors shall have the complete and unconditional right to cut, edit, add to, subtract from, arrange, rearrange and revise the Picture for distribution thereof in their applicable Territory, solely for reasons of television broadcaster timing, commercial insertion and standards and practices purposes, or applicable in territory censorship law, but Agent will use good faith efforts to provide the Licensor with the first opportunity to make any such changes required by Distributors, if Licensor is able to do so in a timely fashion; provided in the event certain Distributors do not agree to such first opportunity, Agent shall not be deemed in breach hereof. Agent will notify Distributors of all such third party contractual restrictions of any kind of which Agent is timely notified in writing.

16. **E&O Insurance**: The production of the Picture shall be covered by customary Errors and Omissions Insurance which shall be in effect as of three (3) years from delivery of the Picture to Agent and shall have coverage amounts not less than Three Million US Dollars (US$3,000,000) per incident and Five Million US Dollars (US$5,000,000) in the aggregate, and having a deductible not exceeding Twenty Five Thousand US Dollars (US$25,000). Said insurance policy shall provide for notification to Agent not later than thirty (30) days prior to any cancellation or change in coverage. Licensor shall add Agent and Agent's directors, officers, shareholders, employees and all related companies as additional insureds for the full term of the above policy.

17. **Assignment**: Licensor may assign this Agreement at any time during the Term, provided that such party is a financially responsible party which assumes in writing all of Licensor's obligations hereunder, provided further that if Licensor assigns this Agreement to a third party prior to Licensor's full and complete delivery of the Picture to Agent and Agent's full delivery of the Picture to territorial distributors, Licensor shall notify Agent and territorial distributors in writing of such assignment. This Agreement may be assigned freely by Agent (provided, however, that Agent shall not delegate the performance of its duties hereunder to a third party), in whole or in part, to any financially responsible party that is a successor entity or other party acquiring all or substantially all of the business or assets of Agent or into which Agent is merged or consolidated, and such assignment shall be binding upon Licensor and inure to the benefit of Agent's successors, assignees, licensees, grantees and associated, affiliated and subsidiary entities, and, provided such party assumes in writing all of Agent's obligations hereunder. However, notwithstanding any assignment, Camela Galano shall remain primarily personally responsible for performance of Agent's obligations hereunder, and if at any time she ceases to be directly personally involved, Licensor may terminate this Agreement and have no further obligations to Agent, except that Agent shall remain entitled to its Sales Agency Fees with respect to those Distribution Agreements entered into prior to Licensor's written notice to Agent of its exercise of the aforesaid termination right provided that Agent continues to service such Distribution Agreements, and to recoup its Distribution Expenses and any Additional Distribution Expenses (if paid by Agent) as set forth herein from Gross Receipts generated by Distribution Agreements entered into prior to termination.

18. **Termination by Licensor:** This Agreement may be terminated on a prospective basis by Licensor if: (a) Agent ceases to be in the business of acting as a sales agent for motion pictures, (b) Agent is in material breach of any of its representations, covenants and/or obligations hereunder and such

breach remains uncured for a period of ten (10) business days or more following Agent's receipt of written notice thereof from or for Licensor, or (c) Agent files for bankruptcy protection or is deemed insolvent ("Agent Default"); Licensor's remedies shall be limited to termination and an action at law for direct money damages only (i.e. no loss of profits or consequential damages) and in no event may Licensor enjoin or restrain or otherwise interfere with the distribution or exploitation of the Picture or any part or element thereof except to the extent that Agent exceeds the granted rights (e.g., as an example, but not by way of limitation, in the event Agent granted merchandise rights, and a Distributor was exploiting the same, Licensor may enjoin such exploitation of merchandise rights), or the use, publication or dissemination of any advertising issued in connection with the Picture pursuant to any Distribution Agreement.  In the event of termination, Agent shall remain entitled to its Sales Agency Fees with respect to those Distribution Agreements entered into (and including with respect to those open offers and substantially negotiated agreements which are entered into within 90 days thereafter) prior to Licensor's written notice to Agent of its exercise of the aforesaid termination right provided if so requested by Licensor, Agent shall conclude such negotiations and continue to service such Distribution Agreements, and provided further that Agent may continue to recoup its Agent MG, Distribution Expenses and any Additional Distribution Expenses (if paid by Agent) as set forth herein from Gross Receipts generated by Distribution Agreements as further set forth in the IPA.

18.  **Termination by Agent**:  This Agreement may be terminated by Agent if: (a) the Conditions Precedents are not waived or met and prior to the commencement of principal photography; (b) the Picture is not delivered to Agent on the dates and in the manner required under the IPA; (c) the Picture does not conform to the Picture Specifications; or (d) Licensor fails to perform any of its obligations hereunder including but not limited to making full and complete material Delivery of the Picture in accordance with this Agreement or Licensor materially breaches any of its warranties, representations and covenants hereunder and such breach remains uncured for a period of ten (10) business days or more following Licensor's receipt of written notice thereof from Agent, or (e) Licensor files for bankruptcy protection or is unable to pay its debts as and when due. Agent agrees that its remedies shall be limited to termination and an action at law for direct money damages only (i.e. no loss of profits or consequential damages) and that Agent shall not have the right to enjoin or restrain or otherwise interfere with the distribution or exploitation of the Picture or any part or element thereof, or the use, publication or dissemination of any advertising issued in connection with the Picture. In the event Agent wishes to exercise such termination right it shall do so in writing within ninety (90) days of the occurrence of (a), (b), (c) (d) or (e) above. In the event of such termination, all Rights shall revert to Licensor, Agent shall return all Delivery Materials and any materials delivered by Licensor or prepared by or for or delivered to Agent, and Agent shall remain entitled to its Sales Agency Fee with respect to those Distribution Agreements entered into (and including with respect to those open offers and substantially negotiated agreements which are entered into within 90 days thereafter) prior to Agent's written notice to Licensor of its exercise of the aforesaid termination right provided that if so requested by Licensor,  Agent concludes such negotiations  and continues to service such Distribution Agreements, and Agent shall continue to be entitled to recoup its Agent MG, Distribution Expenses and any Additional Distribution Expenses (if paid by Agent) incurred prior to the date of termination as set forth herein from Gross Receipts generated by Distribution Agreements as further set forth in the IPA.

19.  **Holdbacks**:  All Distribution Agreements shall include customary holdback provisions to the effect that the distributors may not commence exhibition of the Picture until the earliest of (i) September 14, 2015; or (ii) initial general theatrical release of the Picture in the United States (excluding test screenings), provided that in the event Distributor(s) require a shorter Holdback, Licensor shall consider in good faith reducing such Holdback to six (6) months.

20. **No Third Party Beneficiaries**: Nothing contained in this Agreement shall be construed so as to create any third party beneficiary hereunder. In this regard, nothing under this Agreement shall entitle any third party to any remedies against Agent, at law, in equity, or otherwise, including, without limitation, any additional audit rights or the right to seek of obtain injunctive relief against Agent's distribution or licensing of the Picture.

21. **Licensor Representations and Warranties**: Licensor represents and warrants as of the date hereof and also upon Delivery of the Picture that: (a) Licensor is the sole and exclusive owner of or solely controls all Rights granted to Agent under this Agreement and that all such Rights are free of all liens (other than customary guild, completion guarantor, financier and production lender liens all of which shall not interfere with Agent's rights hereunder), claims, charges, encumbrances, restrictions, and commitments; (b) the copyright in the Picture, and to the best of Licensor's knowledge in the exercise of reasonable prudence and due inquiry, the screenplay and all literary, dramatic and musical material on which it is based or which is used in the Picture are valid and neither the Picture or any material part thereof is or will be in the public domain in any part of the Territory where copyright protection is available; (c) there is no agreement concerning the Picture with any person or entity which, if breached, would or could in any way impair, interfere with, abrogate or adversely or otherwise affect any of the Rights granted to Agent under this Agreement; (d) it is a limited liability company duly formed and validly existing in good standing under the laws of California and has the full right, power, legal capacity and authority to enter into and carry out the terms of this Agreement and is not threatened with insolvency; (e) to the best of Licensor's knowledge in the exercise of reasonable prudence and due inquiry, neither the Picture as delivered to Agent hereunder nor any part thereof, nor any materials contained therein or synchronized therewith, nor the title thereof, nor the exercise of any Right, license or privilege granted to Agent hereunder, violates or will violate, or infringes or will infringe, any trademark, trade name, service mark, patent, copyright (whether common law or statutory), or, the literary, dramatic, musical, artistic, personal, private, civil, "droit moral" or property right or rights of privacy or any other right of any person or entity whatsoever, or unfairly competes with or slanders or libels (or constitutes a trade disparagement of) any person or entity whatsoever; (f) it has no agreement with or obligations to any third party with respect to the Picture which will conflict or interfere with any of the provisions of this Agreement or the use or quiet enjoyment by Agent of any of the Rights granted; (g) the Rights granted to Agent herein have not been previously granted, licensed, sold, assigned, transferred, conveyed or exploited by any person or entity in the Territory and Licensor shall not sell, assign, transfer, convey to or authorize any person or entity any right, title or interest in and to the Picture or any part thereof or in and to the dramatic or literary material upon which the Picture is based, which is adverse to or in derogation of the Rights granted to Agent; (h) to the best of Licensor's knowledge in the exercise of reasonable prudence and due inquiry, there is no litigation, arbitration, claim, demand, or investigation pending or threatened with respect to the Picture, or the literary, dramatic or musical material upon which the Picture is based or which is contained therein, or concerning the physical properties thereof; (i) full Delivery of the Picture to Agent in accordance with the terms of this Agreement has been budgeted and Licensor has or will have the financial means to fully perform its obligations hereunder throughout the Term; (j) Licensor has secured, or by the Delivery Date will have secured, and shall for the duration of this Agreement maintain, all clearances (including, without limitation, all music rights and music clearances (except for music performing rights available through performing rights societies) (i) for in-context use for all licensed music and (ii) both in-context and out-of-context use for all composed music) which are necessary for Agent to use and enjoy the Rights granted to Agent in and to the Picture throughout the Territory for the duration of the Term and that no supplemental or additional use payments shall be required with respect to the exploitation of the Picture (or any portion or element thereof, including, without limitation, the music contained therein) and/or any use or exploitation of any advertising or promotion of the Picture which contains the music as embodied in the Picture including (i) for in-context use for all licensed music and (ii) both in-context and out-of-context use

for all composed music, (j) the Picture shall be produced in accordance with the Picture Specifications which are true and correct at the date of this Agreement and the Picture shall be of first class technical quality suitable for exhibition in first class cinemas in the Territory, (k) the list of credits delivered to Agent is true and correct and there are no material non-customary credit, name or likeness obligations or restrictions or approval or consultation rights applicable to the Picture (all of which, if any, shall be Delivered to Agent and Agent shall have the right to rely thereon), and that, subject to such obligations or restrictions, Agent shall have the right, but not the obligation, to utilize the likeness and name of each of the principal cast members in the artwork and in trailers for the Picture.

22.     **Agent Representations And Warranties**: Agent represents and warrants to Licensor that (i) Agent is a limited liability company duly organized and existing under the laws of the state of California; (ii) Agent has full right, power and authority to enter into and perform this Agreement; (iii) Agent's execution and performance of this Agreement does not cause it to be in breach of any third party agreement, (iv) to the best of Agent's knowledge in the exercise of reasonable prudence and due inquiry, no materials created by Agent hereunder will violate or infringe any trademark, trade name, service mark, patent, copyright (whether common law or statutory), or, the literary, dramatic, musical, artistic, personal, private, civil, "droit moral" or property right or rights of privacy or any other right of any person or entity whatsoever, or unfairly compete with or slander or libel (or constitutes a trade disparagement of) any person or entity whatsoever, (v) it has no agreement with or obligations to any third party which will conflict or interfere with any of the provisions of this Agreement, and (vi) to the best of Agent's knowledge in the exercise of reasonable prudence and due inquiry, there is and will be no litigation, arbitration, claim, demand, or investigation pending or threatened affecting the performance of Agent's obligations hereunder.

23.     **Indemnities**: Licensor shall indemnify and hold harmless Agent, its subsidiaries, affiliates, assignees, licensees, sublicensees, distributors, sub-distributors and dealers, and the directors, officers, Agents, consultants and representatives of the foregoing (the "**Agent Indemnitees**"), from all third party claims, costs, liabilities, obligations, judgments or damages (including reasonable outside attorneys' fees), arising out of or for the purpose of avoiding any suit, claim, proceeding or demand or the settlement thereof, which may be brought against any of the Agent Indemnitees by reason of the breach or alleged breach of any of the warranties, representations or obligations made by Licensor, unless resulting from a material breach of this Agreement by Agent. Agent shall indemnify and hold harmless Licensor, its subsidiaries, affiliates, assignees, licensees, sublicensees, distributors, sub-distributors and dealers, and the directors, officers, agents, consultants and representatives of the foregoing (the "**Licensor Indemnitees**"), from all third party claims, costs, liabilities, obligations, judgments or damages (including reasonable outside attorneys' fees), arising out of or for the purpose of avoiding any suit, claim, proceeding or demand or the settlement thereof, which may be brought against any of the Licensor Indemnitees by reason of the breach or alleged breach of any of the warranties, representations or obligations made by Agent or otherwise from Agent's exploitation of the Rights, unless resulting from a material breach of this Agreement by Licensor.

24.     **Notices**: All notices issued hereunder shall be in writing and shall be given by personal delivery or by US postal service or sent via facsimile to the appropriate party at the address listed below, and the date of such personal delivery or faxing or three (3) days following mailing, shall be the date of the giving of such notice. The names and addresses below concerning notices to all parties hereto shall also be deemed to be the place where accounting statements and payments as may be required under this Agreement shall be sent as follows:

To Licensor:
9200 Sunset Boulevard

10th Floor
Los Angeles, CA 90069
Attn: Ted MacKinney

With a copy to:

Bloom Hergott Diemer Rosenthal LaViolette Feldman Schenkman & Goodman
150 S. Rodeo Drive
Beverly Hills, CA 90212
Attn.: Richard Thompson, Esq.

To Agent:
Relativity Foreign, LLC
Attn: Head of Business & Legal Affairs
9242 Beverly Blvd., #300
Beverly Hills, CA 90210

With a copy to:

Relativity Media, LLC
Attn.: President of International Sales
9242 Beverly Blvd., Suite 300
Beverly Hills, CA 90210

25.   **Miscellaneous**: Agent shall render the services hereunder in the manner of a first class sales agent of third party motion pictures, provided, however, that Agent makes no guarantee, representation or warranty that there will be any Gross Receipts. There is no requirement that the Picture be released in any medium in the Territory. The terms of this Agreement are strictly confidential, but may be disclosed as required to finance, produce, bond, insure, distribute and exploit the Picture and to Licensor's professional advisors. The parties shall mutually approve the initial press release announcing this Agreement and neither party shall make or authorize any of its representatives or advisors to make any public statement regarding any confidential element of this Agreement without the prior agreement of the other party. Following the initial press release announcing this Agreement, Agent shall have the right of meaningful consultation in regards to press releases outside of the Territory prior to the Picture's festival or other premiere and the right to pre-approve all press releases in the Territory in connection with the Picture; provided Licensor shall have the tie-break in connection therewith (provided further that Licensor must abide by all contractual restrictions in connection therewith of which Agent has made Licensor aware). Nothing in this Agreement is intended to or shall be deemed to constitute a partnership between the parties hereto and save as contained herein, neither of them shall have any authority to bind the other in any way. This Agreement constitutes the entire agreement between the parties, and may not be varied save by written instrument signed by both parties.

26.   **Sales Agent Interparty Agreement**: In the event that completion and delivery of the Picture is guaranteed by a third party completion guarantor, Agent agrees to enter into a sales agent interparty agreement with the completion guarantor, subject to good faith negotiation.

27.   **Arbitration**: This Agreement is subject to binding IFTA arbitration in English in Los Angeles, California under the rules of International Arbitration of the IFTA ("**IFTA Arbitration**") and is to be construed, interpreted, and enforced in accord with the laws of the State of California, excluding California's choice of law provisions, and by the laws of the United States of America as applied by

a federal court sitting in the Central district of California. Accordingly, Licensor and Agent, each as to and for the benefit of the other hereby irrevocably submit to the jurisdiction of the courts of the State of California and the United States for the purpose of any action, suit or proceeding arising out of or related to the subject matter of or transactions contemplated by this Agreement. The prevailing party in any action related to or arising out of this Agreement is entitled to recover all reasonable outside attorney's fees and costs (including expert costs) in bringing or defending such action.

28. **Counterpart Signatures**: This Agreement may be executed in one or more counterparts and transmitted by courier, personal delivery, facsimile or electronically, each transmission of which is deemed an original, and all of which, when taken together, constitute one and the same instrument.

IN WITNESS HEREOF, the parties hereto have entered into this Agreement and agree to be bound by its terms and conditions as of the date of this Agreement.

Agreed and accepted:

Carrion Road Productions, LLC                    Relativity Foreign, LLC

By: _____                      By: _____

Its: _____                      Its: _____
William Green, Producer

15

a federal court sitting in the Central district of California. Accordingly, Licensor and Agent, each as to and for the benefit of the other hereby irrevocably submit to the jurisdiction of the courts of the State of California and the United States for the purpose of any action, suit or proceeding arising out of or related to the subject matter of or transactions contemplated by this Agreement. The prevailing party in any action related to or arising out of this Agreement is entitled to recover all reasonable outside attorney's fees and costs (including expert costs) in bringing or defending such action.

28.    **Counterpart Signatures**: This Agreement may be executed in one or more counterparts and transmitted by courier, personal delivery, facsimile or electronically, each transmission of which is deemed an original, and all of which, when taken together, constitute one and the same instrument.

IN WITNESS HEREOF, the parties hereto have entered into this Agreement and agree to be bound by its terms and conditions as of the date of this Agreement.

Agreed and accepted:


Carrion Road Productions, LLC          Relativity Foreign, LLC

By:                                    By: _____
_____

Its:                                   Its: _AUTHORIZED SIGNATORY_____
_____

**SCHEDULE 1**

**MINIMUM ADVANCES**

**SCHEDULE 2**

**DELIVERY SCHEDULE**

**EXHIBIT "A"**

**STANDARD DISTRIBUTION AGREEMENT AND STANDARD DEAL MEMO**

**EXHIBIT "B"**

**ESCROW AGREEMENT**

**EXHIBIT "C"**

**NOTICE OF ASSIGNMENT FORM**

# EXHIBIT 2

# SALES AGENCY AGREEMENT

## "MOJAVE"

This "**Agreement**" is entered into as of May 8, 2013 by and between Evajom Productions, LLC ("**Licensor**"), a California limited liability company and wholly owned subsidiary of Evajom, Inc., and Relativity Foreign, LLC ("**Agent**"), a California limited liability company and wholly owned subsidiary of Relativity Media, LLC.

This Agreement sets forth the agreement between Licensor and Agent (collectively referred to herein as the "**Parties**") in connection with Licensor's appointment of Agent as Licensor's sole and exclusive sales agent for the Rights in the Picture in the Territory (subject to the provisions below regarding the portion of the Territory related to the United States Distribution Agreement, as such term is defined in Paragraph 3 below) during the Term. For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties have agreed to the following:

**Conditions Precedents**: All of Agent's obligations herein are expressly conditioned upon and subject to the following (collectively, the "Conditions Precedent"): Licensor shall deliver to Agent and Agent shall have the approval in its sole discretion of (i) the chain of title of the Picture (as defined below) (including, but not limited to, receipt of copyright and title reports) and all underlying agreements; (ii) security interest, copyright mortgage and such other documents as requested by Agent to evidence its rights hereunder (which shall be further reflected in an Interparty Agreement to be executed by MICA as production financier ("MICA"), Licensor, Agent, and the Completion Guarantor (as defined below); (iii) The Budget (as defined below) (excluding financing charges and interest and any residual reserve) of the Picture (as defined below) is not less than $3,795,000, evidenced by a signed budget topsheet ("**Bonded Budget**") (from either International Film Guarantors or Film Finances, Inc. ("**Completion Guarantor**")) and delivered to Agent no later than eight (8) weeks prior to the start of principal photography of the Picture; (iv) Completion Guarantor approval of the Bonded Budget; (v) the Picture's writer and director (William Monahan is pre-approved), and the two lead actors (Oscar Isaac and Garrett Hedlund are pre-approved); (vi) full execution of this Agreement; and (vii) the outside start date of the commencement of principal photography of the Picture to be no later than December 31, 2013.

1. **Picture Specifications**: The "**Picture**" shall mean the new and original theatrical motion picture currently entitled "Mojave", which shall conform to the screenplay written by William Monahan and dated May 7, 2013, and which shall be directed by William Monahan, produced by William Green and Aaron Ginsburg and star Oscar Isaac and Garrett Hedlund in all languages and in all versions, including, without limitation, the director's cut (if any), and all unrated, rated, and television versions thereof. The Picture will be shot in English, in color, delivered on 35mm film (and DCP) with an aspect ratio of 1.85:1 or 2:39:1 and entirely shot, finished and assembled with fully synchronized sound, music and effects, and ready in all respects upon its delivery to Agent for exploitation in first class theatres throughout the Territory. All individuals and entities appearing in the Picture shall have provided written releases to Licensor permitting Licensor to use their name and likeness in the Picture, worldwide and in perpetuity and without the requirement for any further payment. The Picture shall be delivered with a running time, inclusive of main and end titles of between 90 and 120 minutes and shall be capable of receiving an MPAA rating no more restrictive than "R".    Collectively, the foregoing are the "**Picture Specifications**". The Picture shall not, either in whole or in part, constitute or contain any material which constitutes a violation of any US law or regulation, or infringe any right or any interest of a third party, and shall have been produced in accordance with the laws of the applicable jurisdiction in which the Picture was made.

2.  **Budget:** The Budget (or "Final Approved Production Budget") means the following actual costs (all as defined below): (i) Production Costs, (ii) Contingency, and (iii) Bond Fee.

(a)  **"Production Costs"** means all of the costs of development, production, completion and delivery including, without limitation, the acquisition of the underlying rights to the Picture and outside legal fees incurred in connection therewith, and all costs of financing of the Picture, and deposits or reserves of amounts required by the applicable guilds (e.g., WGA. SAG, DGA), and excluding only the following: performance and/or contingent deferments unless included in the bonded budget; bonuses and/or participations tied only to performance of the Picture; the Contingency; and the Bond Fee (it being agreed, however, that the Contingency and Bond Fee are included in the Budget as items separate from Production Costs);

(b)  **"Contingency"** means the contingency required by the completion bond insurer in connection with the Picture (including completion bond insurer required fee holdbacks, if applicable).

(c)  **"Bond Fee"** means an amount equal to the fee actually charged to and paid by Licensor for a completion guarantee to a third party completion guarantor (e.g., Film Finances, IFG).

3.  **Territory:** The "Territory" shall mean the Universe excluding the Excluded Territory. The Excluded Territory means the United States and, subject to the last sentence of this paragraph, Canada, and their territories and possessions (including without limitation all government installations, armed forces installations, embassies, oil wells, oil rigs and marine rigs) and airlines flying the flag of such countries (and countries outside of the Territory which are English-speaking) and ships based or registered in or flying the flag of such countries (and countries outside of the Territory which are English-speaking), and the Bahamas and Bermuda. To the extent that the Territory includes the Caribbean Basin, the rights granted will be non-exclusive. Notwithstanding the foregoing, (i) in the event that Agent does not sell Canadian rights prior to the time that Licensor executes its distribution agreement for the Picture in the United States ("United States Distribution Agreement"), Licensor shall have the right to include Canada in such United States Distribution Agreement and, in such event, Canada shall be excluded from the Territory and (ii) in the event that territories within the Territory remain unsold within four (4) weeks following the first major market screening of the completed Picture, Licensor shall have the right to include such unsold territories in the United States Distribution Agreement by notice to Agent within one week thereafter, and in such event, such included unsold territories shall be excluded from the Territory.

4.  **Term:** The "Term" shall commence upon execution of this Agreement and subject to Paragraphs 19 and 20 below shall continue until the date that is twelve (12) years from Delivery (as defined below); provided, however, that during the Term, Agent is permitted to license the Picture to third parties for license periods of up to fifteen (15) years in all instances, and eighteen (18) years or twenty (20) years (in those instances where certain territories customarily require such longer terms) from Delivery. Ninety (90) days prior to the expiration of the Term, Agent shall have an exclusive ten (10) day right of first negotiation to extend the Term. In the event that the Parties are unable to reach an agreement on such extension, then Licensor shall be free to negotiate with third parties to represent the Picture at the conclusion of the Term, without limitation (subject to payment of all amounts due to Agent).

5.  **Rights Granted:** Licensor hereby appoints Agent to be its sole and exclusive sales agent with respect to the licensing and/or sale of all delineated distribution rights in and to the Picture as described below, expressly excluding the Reserved Rights (all as defined below), under copyright and otherwise, and only to the extent necessary to perform such sales agency services the underlying material with respect thereto, in the Territory during the Term, in all languages, in all

2

media, whether now known or hereafter devised, including, without limitation, all forms of theatrical, home video, television, and non-theatrical rights (including, without limitation, hotel, airline and ship rights, as set forth herein), internet and wireless (exploitation of both internet and wireless distribution rights shall be limited to reception within the Territory by means of customary geofiltering and encryption technology), by any and all methods of delivery, whether now known or hereafter devised (collectively, "Rights").

Without limiting the generality of the foregoing, the Rights that may be licensed by Agent hereunder shall include, without limitation, the right for each distributor to market, advertise, promote and publicize the Picture in all media whether now known or hereafter devised, subject to third party restrictions as provided by Licensor on Delivery, all exclusive rights in all languages and versions of the Picture and, subject to customary and reasonable third party restrictions as provided by Licensor as part of Delivery, all portions and elements thereof, including, without limitation, for promotional use only all available "behind-the-scenes" and "making of" documentaries of the Picture and, if and to the extent approved by Licensor for such use, all bloopers, trims and outtakes of the Picture.

Notwithstanding the above, Licensor expressly reserves all subsequent production rights (including, without limitation, all film, television, live stage, musical and other productions), video, computer, internet and all other game rights, merchandising, commercial clip, theme park, live television, soundtrack album, music publishing and performance rights (other than those required for exploitation of the Picture in synchronization with such music in accordance with this Agreement), all publication rights (except for Japanese souvenir program rights which Licensor expressly agrees to grant to applicable distributors in Japan only on customary terms), and all other rights not expressly licensed (collectively, "Reserved Rights"). Licensor acknowledges and agrees to negotiate in good faith with Agent on granting the Reserved Rights on a territory-by-territory basis if needed by Agent to close distribution deals for the Picture, but only to the extent that Licensor does not intend to license any such rights on a worldwide basis.

Provided that Licensor is permitted (i.e. Licensor has not sold rights to Subsequent Productions to a studio or multi territorial buyer) to appoint a sales agent to represent any sequel, remake or other production based on the Picture or a character in the Picture ("Subsequent Productions"), then Agent shall be entitled to a customary right of first negotiation to sell international distribution rights in and to such Subsequent Productions.

6.    **Distribution Agreements.** All distribution agreements ("Distribution Agreements") shall be concluded on Agent's approved standard form distribution license agreement attached hereto as Exhibit "A" subject to non-material modifications in negotiation with distributors in the Territory ("Distributors"). (Each such Distribution Agreement may be executed by Agent on behalf of Licensor; provided each Distribution Agreement shall be in the name of Licensor). Agent shall not conclude any Distribution Agreement for a gross advance less than the amount mutually agreed to by both parties, listed on Schedule 1 hereto ("Takes") without Licensor's prior written approval; provided, such approval shall be deemed given if Licensor fails to respond to Agent's written request within five (5) business days of receipt of such request (reducible to one (1) business day during film and television markets). Licensor acknowledges that the notwithstanding the gross amount of the Takes, the actual amounts paid under the Distribution Agreements shall be subject to customary deductions (e.g. withholding tax, bank fees, VAT, foreign currency exchange, etc., and subject to Agent being timely furnished by Licensor of the applicable tax residency certification (i.e. 6166) in the name of the designated payee hereunder from the country to which payment is to be made. Agent shall not authorize any distributor to change the name of the Picture (other than a direct translation into a local language) without Licensor's prior approval of same, such approval

not to be unreasonably withheld or delayed. Agent shall arrange for the delivery of the Picture under each Distribution Agreement in accordance with the terms of each such agreement.

Agent shall perform the customary services of a sales agent selling international rights to independent motion pictures provided that Licensor understands that Agent may represent other motion pictures in addition to representing the Picture and as such, Agent will devote such time and resources to the Picture as Agent in its good faith judgment deems appropriate, but Agent need not render services exclusively for the Picture. In addition to the foregoing, Agent's services do not include undertaking any audit or any legal proceeding (including arbitration) of or in connection with any Distribution Agreement or with respect to the distribution of the Picture in the Territory.

Agent does not make any guarantee, representation or warranty, express or implied, regarding the ability to conclude any Distribution Agreements to exploit the Picture, or (except with respect to the minimum guarantee provided below) to earn or collect any Gross Receipts or that there will be any Gross Receipts. Further, there is no requirement that the Picture be released in any media in the Territory by a Distributor and Agent makes no representation that despite payment of a minimum guarantee under any Distribution Agreement that a Distributor will actually exploit the Picture in their licensed territory. Any estimates or projections about possible Distribution Agreements or performance of the Picture are statements of Agent's reasonable good faith opinion. Agent does not guarantee that Gross Receipts will be earned or Licensor's share of Gross Receipts will be payable in any amount, further Agent does not guarantee the performance of any Distributor under any Distribution Agreement.

7.  **Gross Receipts:**  Each Distribution Agreement shall require payment of all amounts (e.g. advances, minimum guarantees, overages, secondary use royalties, and other fees) ("Gross License Fees") (other than reasonable and customary costs actually paid separately by distributors for any delivery materials) first directly into the designated collection account at City National Bank ("Escrow Account"), to be held and distributed pursuant to the terms of the Escrow Agreement attached hereto as Exhibit "B" [to be mutually agreed and executed by all parties simultaneously with this Agreement.  If not executed, then Agent MG is not payable unless and until such escrow agreement is mutually agreed and executed.]; thereafter, to the collection account of the financier of the Picture, MICA, until MICA has recouped its production financing and premium thereon and any fees, expenses and charges that MICA is entitled to recoup (with MICA to make payment upon receipt of such revenues to Agent of any amounts which Agent is entitled to receive prior to MICA recoupment, all as set forth in greater detail in the Interparty Agreement) and thereafter directly into a specifically designated collection account ("Collection Account") pursuant to a mutually approved collection account management agreement on customary terms ("CAMA"), administered by and in the name of (A) Finnage Magyar Kft. or Freeway Entertainment Kft., each of which shall be pre-approved third-party collection agents following execution of a CAMA or (B) Union Bank or OneWest Bank or another institutional lender specializing in entertainment finance to be mutually approved of by both parties.    In the event any party receives any sums due to the Collection Account, such party will immediately pay all such amounts to the Collection Account without off-set or deduction.

One Hundred Percent (100%) of all revenues actually collected pursuant to each Distribution Agreement (including deposits) and otherwise from exploitation of the Rights (e.g. minimum guarantees, distributor advances, license fees, overages, secondary use royalties) it being acknowledged that the Distributors may be required to withhold applicable withholding taxes from the Gross License Fees after deduction (if applicable) of reasonable (i) fees and expenses charged by tax mitigation distribution intermediaries, (iii) currency conversion and transmission costs and (iv) costs of collecting (all of the foregoing, "Gross Receipts") in the Territory pursuant to

4

Distribution Agreements entered into during the Term shall be applied on a continuing basis in the following order:

    a.   <u>Collection Account Fee and Expenses</u>: The collection agent (if any) ("Collection Agent") shall retain its fee which shall not exceed One Percent (1%) of Gross Receipts.

    b.   <u>Sales Agency Fee</u>:  In connection with the Territory, Agent will be entitled to be paid the following "Sales Agency Fees", which will be inclusive of an any fees of sub-sales agents calculated as follows; an amount equal to Ten Percent (10%) which shall be calculated on One Hundred Percent (100%) of all Gross Receipts in the Territory without deduction until Gross Receipts collected equals the Agent MG (the "First Benchmark").

From and after the "First Benchmark", Agent will be entitled to be paid, an amount equal to  Twelve and Five Tenths Percent (12.5%) calculated on One Hundred Percent (100%) of all Gross Receipts in the Territory without deduction (on a retroactive basis) from the point at which  Gross Receipts equal or exceed the Agent MG until Gross Receipts are equal to the Budget (the "Second Benchmark").  Agent shall additionally be entitled to receive two and one-half percent (2.5%) of one hundred percent (100%) of Gross Receipts (the "Corridor Fee") payable at the "First Benchmark" and continuing until Agent retroactively receives from all Gross Receipts a sum equal to twelve and one-half percent (12.5%) calculated on one hundred percent (100%) of Gross Receipts.

From and After the "Second Benchmark", Agent will be entitled to be paid an amount equal to Fifteen Percent (15%) calculated on One Hundred Percent (100%) of all Gross Receipts in the territory without deduction (on a retroactive basis) once Gross Receipts equal or exceed the Budget (the "Third Benchmark"). Agent shall additionally be entitled to receive two and one-half percent (2.5%) of one hundred percent (100%) of Gross Receipts (the "Corridor Fee") payable at the "Second Benchmark" and continuing until Agent retroactively receives from all Gross Receipts a sum equal to fifteen percent (15%) calculated on one hundred percent (100%) of Gross Receipts.

Notwithstanding anything to the contrary contained in this Agreement, in no event shall the Agency Fee exceed fifteen percent (15%) of one hundred percent (100%) of Gross Receipts.

For clarity, Agent shall be in first position as to the Sales Agency Fees (subject to the Collection Agent) with respect to the One Hundred Percent (100%) of the Gross Receipts derived in the Territory.

    c.   <u>Agent MG</u>: Provided the Conditions Precedents are fulfilled as and when required (time being of the essence) and Licensor is not in material uncured breach hereof, then no later than February 20, 2015 (the "MG Payment Date", Agent shall pay the Agent MG (as defined below) to the Escrow Account.  The Agent MG shall be an (A) amount equal to Fifty Percent (50%) of the Takes (i.e. $1,902,500), less 100% of the Gross Receipts collected as of the MG Payment Date from the Distribution Agreements ("Shortfall Amount"); reduced by (B) the difference between (i) One Hundred Thousand Dollars ($100,000.00) and (ii) the actual amount of any Non-Deferred Foreign Sales Agent Distribution Expenses that have been invoiced by Agent, approved by Licensor and previously reimbursed to Sales Agent; and further reduced by (C) 14.4678% of the Shortfall Amount.) .  The Agent MG is an advance against Gross Receipts collected from the Territory.  Agent shall be entitled to a refund of any portion of the Agent MG actually paid to the Escrow Account, as additional Gross Receipts are collected subsequent to the

MG Payment Date, pursuant to the Escrow Agreement. "Notice of Delivery" means Licensor's notification to Distributors stating that the elements necessary for the manufacture and delivery of the Delivery Materials (as defined in Schedule 2 (at Agent's discretion or as required by the applicable Distribution Agreement) are ready and available for immediate order and Delivery. Licensor's failure to complete timely delivery of all materials necessary for Agent to service all Distribution Agreements as provided in Schedule 2 will constitute a material breach of this Agreement. Furthermore, it is hereby agreed that Notice of Delivery to Distributors shall not occur earlier than ninety (90) days prior to the elimination of any holdback to initial release by Distributor (the "NOD Outside Date"), and all parties agree the NOD Outside Date shall be no later than November 12, 2014; and the Agent MG shall be paid to the Escrow Account no later than February 20, 2015 (if applicable). Licensor must provide the customary forms Agent reasonably requires in order to collect full payment of the Distributor minimum guarantees (e.g. 6166, W-8 BEN) on a timely basis promptly following Agent's written request for such forms (such that the Distributors can pay in full as and when required, e.g. 10 days after NOD) and Licensor's obligation to do so is of the essence of this Agreement and a material inducement for Agent's agreement to provide the Agent MG. Licensor's failure to comply shall be a material breach of this Agreement.

d. <u>Distribution Expenses</u>: Agent shall advance One Hundred Percent (100%) of all Distribution Expenses up to the Distribution Expense Cap (defined below) (excluding the Additional Distribution Expenses, which shall be advanced by Licensor) actually incurred by Agent or on Agent's behalf in connection with the Picture in accordance with the terms herein, and Agent shall be entitled to recoup such Distribution Expenses as provided herein; provided, however, the Distribution Expenses shall not include any double or duplicate deductions or recoveries, and shall not include any overhead, salaries or other internal or general company expenses for Agent. As used herein, "Distribution Expenses" shall mean, with respect to all rights granted to Agent hereunder, One Hundred Percent (100%) of the aggregate of all direct, out-of-pocket, auditable, actual and verifiable costs customarily paid directly in connection with the distribution and exploitation of motion pictures or customarily treated as a cost of distribution for sales agents throughout the Territory in all media, including, without limitation, all manufacturing, duplication, shipping, marketing, advertising, promotion and publicity costs (excluding DDA and other publicity agency costs if incurred and paid by Licensor), and all costs to complete Delivery of the Picture, if any, consistent with the terms of this Agreement. Agent's Distribution Expenses (excluding the Additional Distribution Expenses as defined below) for each Picture shall be deemed at One Hundred Thousand US Dollars (US$100,000), which shall be non-accountable ("Distribution Expense Cap"). If the Budget of the Picture is over $5mm, then the Distribution Expense Cap shall increase to Fifty Thousand Dollars ($50,000).

e. <u>Additional Distribution Expenses</u>: The following expenses shall be excluded from the Distribution Expenses and, if not paid by Distributors, shall be advanced by Licensor, subject to Licensor's prior written approval on a case by case basis, such approval not to be unreasonably withheld or delayed (it being understood that Licensor's costs in connection with materials under i. or ii. will be relevant (but not dispositive) in determining whether such materials are reasonable) and which shall be deemed given if no response is provided within ten (10) business days of such written request:

    i. All costs of delivery to Distributors including film elements and delivery items for the Picture to the extent such items are not delivered to Agent;

  ii. Additional internegatives, music and effects tracks and other Picture elements and delivery items required to effect delivery of the Picture to Distributors;

  iii. Picture as a "special event" at film festivals including the Picture's premiere (including the transportation, accommodations and expense allowances for the principal actors, director and any other persons contractually entitled or required by the festival to attend such event) or for awards, nominations and other honors;

  iv. Press junkets, star tours etc.;

  v. payment to DDA, or other international publicity firm; and

  vi. Preparation of DLT.

Gross Receipts, Distribution Expenses, and Additional Distribution Expenses shall be treated on a Picture-by-Picture basis, uncrossed in all respects between Pictures. Agent shall be reimbursed for all Additional Distribution Expenses within thirty (30) days, if the same have been approved by Licensor and advanced by Agent and subject to Agent providing receipts and invoices in a form reasonably acceptable to Licensor.

Gross Receipts shall exclude reasonable and customary costs actually paid separately by distributors for any delivery materials. For clarity, such monies will not be deposited into the Escrow Account or Collection Account and neither Licensor, MICA, or any financiers shall have any right to these monies.

 f. One Hundred Percent (100%) of remaining Gross Receipts shall be paid to Licensor.

8. **Collection Account And Tax Intermediaries**: Until such time as a specifically designated collection account is in place with a fully executed CAMA, Agent shall cause all monies paid in relation to any sale, license or other exploitation of the Picture to be paid to the Escrow Account as further set forth in Exhibit "B", and thereafter as provided. Agent shall work with the necessary tax intermediary(ies) (approved by Licensor) where possible to minimize withholding taxes for certain territories. To this end, Licensor hereby authorizes Agent to negotiate and, subject to approval by Licensor, enter into such arrangements with the respective approved tax intermediaries. Licensor acknowledges that there are some countries where Agent is or may be unable to use tax intermediaries and that Licensor will be required to submit tax residency documentation to establish exemptions under applicable double taxation treaties. Licensor shall timely supply Agent (at Licensor's sole cost and expense) with all documentation and information required in connection therewith.

9. **Accounting**:

 a. Agent shall provide customary written accountings in reasonable detail in English, setting forth the Distribution Expenses and Additional Distribution Expenses to the collection agent, and Licensor on a quarterly basis for the first twenty four (24) months from incurring any Distribution Expenses and Additional Distribution Expenses, and thereafter on a semi-annual basis until one year after the end of the Term. Each accounting shall be provided no later than sixty (60) days after the end of each accounting period.

 b. Until such time as the Collection Account is in place, Agent shall provide Licensor with quarterly accountings of Gross Receipts received for each month within which Gross Receipts are received within sixty (60) days of the end of the reporting period. Agent shall treat the Gross Receipts and the Distribution Expenses separately and apart from other motion pictures represented or sold by Agent. If at any time after the Collection Account is in place Agent receives any Gross Receipts, Agent will promptly remit them

7

to the Collection account and will provide an accounting to Licensor of any amounts so received by Agent within sixty (60) days after Agent's receipt thereof.

c. Not more frequently than annually and subject to having given not less than thirty (30) days prior written notice to Agent, Licensor shall be entitled, on business days and without disruption to Agent business, either directly or through certified public accountant working in the entertainment industry pre-approved by Agent, to audit and inspect all books of account and records, whether manual or electronic, relating to exploitation of the Picture pursuant to this Agreement. Agent will keep all of its records pertaining to the Picture at Agent/Licensor's primary place of business, currently in the County of Los Angeles, California. In the event there is an agreed and settled discrepancy in Agent audited reports of Ten Percent (10%) or more for the relevant accounting periods which are the subject of the audit, Agent will pay to Licensor the actual cost of such audit. All records shall be deemed final and accepted by Licensor thirty-six (36) months following delivery of such accountings.

d. Licensor acknowledges and agrees to provide Agent with Final Actual Cost Statement (as defined in Schedule 2) executed by the bond company (i.e. Film Finances) and the production accountant and/or Licensor's CFO.

10. **Residuals, Participations and Deferments**: Licensor shall be solely responsible for all third party payments with respect to the Picture, including, without limitation:

a. any and all production and financing costs of any kind;

b. any and all deferments and any form of profit and gross participations;

c. any and all royalty payments, music synchronization or other music costs, license fees (other than music performance rights, which will be paid by licensees and distributors); and

d. any and all residuals (including, but not limited to SAG, WGA, DGA, AFTRA, AF of M); supplemental market or other payments to any guild or union.

Neither Agent nor any Distributor shall be responsible for or shall be required to pay any of the foregoing third party obligations which may arise from Agent's exploitation of the Picture or a Distributor's exploitation of the Distribution Rights, all of which shall be solely and exclusively the responsibility of the Licensor.

11. **Delivery**: Licensor will deliver to Agent, free of charge, at such place in Los Angeles as Agent shall reasonably direct, all of the materials for the Picture ("Delivery Materials") in accordance with the delivery schedule attached hereto as Schedule 2 ("Delivery Schedule"). The Delivery Materials shall conform to the Delivery Schedule and the Picture Specifications, be of first class technical quality consistent with current industry standards within the motion picture industry for first run features and be fully cleared for use in all media whatsoever in the Territory without additional payment other than for customary music performance rights.

Delivery (as defined below) shall be made no later than the earlier of (i) twelve (12) months from commencement of principal photography of the Picture; and (ii) ninety (90) days prior to the NOD Outside Date ("Delivery Date"), time being of the essence.

8

"Delivery" means the delivery by or for Licensor and technical acceptance by Agent of the Delivery Materials. Delivery shall not be deemed to have occurred unless and until: (i) the Picture conforms to the Picture Specifications and the descriptions contained in the Delivery Schedule and (ii) the Picture conforms to the technical standards set forth above, and (iii) Agent has technically approved in writing all of the Delivery Materials (which Agent will do in good faith and soon as practicable). Agent will have a thirty (30) day inspection period from its receipt of all Delivery Materials ("First Defect Notice Period") and Licensor will have a ten (10) business day cure right. Following such cure, Agent will have a fifteen (15) business day inspection period from its receipt of all redelivered items ("Second Defect Notice Period"), followed by a period of ten (10) business days in which Licensor may cure any remaining deficiencies in Delivery. If Agent does not provide deficiency notice, in reasonable detail during the First Defect Notice Period and Second Defect Notice Period, delivery of such defective Delivery Material is deemed accepted. If Licensor fails to cure the defects set forth in the deficiency notice for the Second Defect Notice Period, then Agent shall have the right but not obligation to cure such defects and/or secure acceptable replacements and Licensor will promptly (following receipt of an invoice and supporting documentation) reimburse Agent for all reasonable, actual third-party costs paid by Agent in connection with obtaining such replacements and/or curing such defects. Agent will be responsible for delivery of materials to distributors under their Distribution Agreements and any payment by distributors for the cost of these materials or the cost of their shipment shall be made directly to Agent, and for clarification, are not part of Gross Receipts.

If Agent rejects delivery following the cure procedure outlined above, this agreement will be deemed to have been terminated by Agent pursuant to paragraph 19 below. Agent will also have the right but not the obligation to create and manufacture any required Delivery Materials which are not delivered by Licensor, and to use them to service applicable Distribution Agreements as Agent deems appropriate and in the event that Agent creates any of the Delivery Materials, such creation shall not constitute a waiver of any right or remedy which Agent may have for a failure to make timely and complete Delivery hereunder.

Subject to payment of the applicable distributor's customary access fee, Licensor shall use reasonable good faith efforts to provide Agent with unimpeded and access to all marketing materials created by or for the US domestic distributor of the Picture ("U.S. Domestic Distributor") including but not limited to all key art, theatrical, outdoor ads, in theatre marketing, internet spots and banners, newspaper ads, home video artwork, EPKs, trailers, TV spots, radio spots, website files, generic interviews, "making of", premiere footage, DLT, and DVD menus and chapters ("Promotional Materials"). If the US Domestic Distributor requires Agent to pay an access fee, then U.S. Domestic Distributor may be required by Agent an access fee to Agent for Promotional Materials created by Agent ("Agent Created Promotional Materials"), provided that the such Agent Created Promotional Materials are created prior to Licensor's full execution of a U.S. domestic distribution agreement of each Picture. Any such access fee received by Agent shall be applied against and shall reduce the Distribution Expenses recoupable by Agent, or if such Distribution Expenses have already been recouped, the access fee will be paid to the Collection Account as Gross Receipts not subject to any Sales Agency Fees. If any or all the foregoing are not approved by all parties having relevant approval rights or are not fully cleared for all uses, in any media, worldwide, Agent shall be so advised.

12.  Credits: In the Territory only and provided that Licensor has not terminated pursuant to paragraph 18 below: (a) a presentation credit substantially in the form of "In Association with Relativity International" in the main titles on screen on a separate card and in second position on each Picture (or most favored nations in all respects); (b) if approved by Distributors (which approval shall be the responsibility of Agent to obtain), a static "bug" logo in all paid ads, subject to the customary exceptions of Distributors; and (c) Agent may include its logo on all artwork and promotional

materials throughout the Territory created by Agent. Licensor shall use commercially reasonable efforts to get the foregoing credits approved by the US distributor outside the Territory (i.e., worldwide); provided, however, in the event such efforts fail, Agent shall be entitled to a "Worldwide Sales by Relativity International" credit in the end credits outside the Territory. The foregoing credits, if approved by the Distributors, shall also appear in the billing block of all paid advertising in the Territory subject to customary exclusions. Agent shall notify Distributors in writing of all credit obligations and use all commercially reasonable endeavors to ensure that Distributors use all credits appearing on the Picture as delivered to them and comply with all their obligations to accord credits on paid advertising for the Picture, and for sales and marketing trailers, one-sheets and artwork (including without limitation providing for such use and compliance in each Distribution Agreement) and shall co-operate with Licensor in connection with any action to enforce such credit obligations or requirements; provided, however, that no casual or inadvertent failure to comply with the credit obligations, nor any failure by third parties to comply with such obligations, shall be deemed a breach hereof by Agent, Agent will use reasonable efforts to correct such failure on a prospective basis and will also obligate distributors to do so. Agent reserves the right to allow Distributors' customary distribution credit in their specific distribution territory, to the extent set forth in the applicable Distribution Agreement.

13. **Publicity**: Licensor shall promptly create a trailer or promotional piece (and provide the same to Agent) following the commencement of principal photography. Shortly following completion of principal photography, Licensor agrees to provide Agent with access to not less than 100 different, fully cleared, high resolution stills taken during principal photography to enable timely preparation of promotional and sales materials by Agent. Agent will honor all cast and other contractual restrictions and requirements regarding use of images, credits and likenesses, and Agent will consult regarding and coordinate such activities with Licensor.

14. **Screenings and Festivals**: Licensor shall not screen the Picture or excerpts from the Picture in the Territory without prior consultation with Agent. For any screenings and festival launch for the Picture in the Territory, Agent will obtain Licensor's written approval and will coordinate same with Licensor and the domestic sales agent or U.S. distributor.

15. **Cutting and Access Rights**:  Subject to third party contractual restrictions and in coordination with Licensor, the Distributors shall have the complete and unconditional right to cut, edit, add to, subtract from, arrange, rearrange and revise the Picture for distribution thereof in their applicable Territory, solely for reasons of television broadcaster timing, commercial insertion and standards and practices purposes, or applicable in territory censorship law, but Agent will use good faith efforts to provide the Licensor with the first opportunity to make any such changes required by Distributors, if Licensor is able to do so in a timely fashion; provided in the event certain Distributors do not agree to such first opportunity, Agent shall not be deemed in breach hereof. Agent will notify Distributors of all such third party contractual restrictions of any kind of which Agent is timely notified in writing.

16. **E&O Insurance**: The production of the Picture shall be covered by customary Errors and Omissions Insurance which shall be in effect as of three (3) years from delivery of the Picture to Agent and shall have coverage amounts not less than Three Million US Dollars (US$3,000,000) per incident and Five Million US Dollars (US$5,000,000) in the aggregate, and having a deductible not exceeding Twenty Five Thousand US Dollars (US$25,000). Said insurance policy shall provide for notification to Agent not later than thirty (30) days prior to any cancellation or change in coverage. Licensor shall add Agent and Agent's directors, officers, shareholders, employees and all related companies as additional insureds for the full term of the above policy.

17. **Assignment**: Licensor may assign this Agreement at any time during the Term, provided that such party is a financially responsible party which assumes in writing all of Licensor's obligations hereunder, provided further that if Licensor assigns this Agreement to a third party prior to Licensor's full and complete delivery of the Picture to Agent and Agent's full delivery of the Picture to territorial distributors, Licensor shall notify Agent and territorial distributors in writing of such assignment. This Agreement may be assigned freely by Agent (provided, however, that Agent shall not delegate the performance of its duties hereunder to a third party), in whole or in part, to any financially responsible party that is a successor entity or other party acquiring all or substantially all of the business or assets of Agent or into which Agent is merged or consolidated, and such assignment shall be binding upon Licensor and inure to the benefit of Agent's successors, assignees, licensees, grantees and associated, affiliated and subsidiary entities, and, provided such party assumes in writing all of Agent's obligations hereunder. However, notwithstanding any assignment, Camela Galano shall remain primarily personally responsible for performance of Agent's obligations hereunder, and if at any time she ceases to be directly personally involved, Licensor may terminate this Agreement and have no further obligations to Agent, except that Agent shall remain entitled to its Sales Agency Fees with respect to those Distribution Agreements entered into prior to Licensor's written notice to Agent of its exercise of the aforesaid termination right provided that Agent continues to service such Distribution Agreements, and to recoup its Distribution Expenses and any Additional Distribution Expenses (if paid by Agent) as set forth herein from Gross Receipts generated by Distribution Agreements entered into prior to termination.

18. **Termination by Licensor**: This Agreement may be terminated on a prospective basis by Licensor if: (a) Agent ceases to be in the business of acting as a sales agent for motion pictures, (b) Agent is in material breach of any of its representations, covenants and/or obligations hereunder and such breach remains uncured for a period of ten (10) business days or more following Agent's receipt of written notice thereof from or for Licensor, or (c) Agent files for bankruptcy protection or is deemed insolvent ("Agent Default"); Licensor's remedies shall be limited to termination and an action at law for direct money damages only (i.e. no loss of profits or consequential damages) and in no event may Licensor enjoin or restrain or otherwise interfere with the distribution or exploitation of the Picture or any part or element thereof except to the extent that Agent exceeds the granted rights (e.g., as an example, but not by way of limitation, in the event Agent granted merchandise rights, and a Distributor was exploiting the same, Licensor may enjoin such exploitation of merchandise rights), or the use, publication or dissemination of any advertising issued in connection with the Picture pursuant to any Distribution Agreement. In the event of termination, Agent shall remain entitled to its Sales Agency Fees with respect to those Distribution Agreements entered into (and including with respect to those open offers and substantially negotiated agreements which are entered into within 90 days thereafter) prior to Licensor's written notice to Agent of its exercise of the aforesaid termination right provided if so requested by Licensor, Agent shall conclude such negotiations and continue to service such Distribution Agreements, and provided further that Agent may continue to recoup its Agent MG, Distribution Expenses and any Additional Distribution Expenses (if paid by Agent) as set forth herein from Gross Receipts generated by Distribution Agreements as further set forth in the IPA.

18. **Termination by Agent**: This Agreement may be terminated by Agent if: (a) the Conditions Precedents are not waived or met and prior to the commencement of principal photography; (b) the Picture is not delivered to Agent on the dates and in the manner required under the IPA; (c) the Picture does not conform to the Picture Specifications; or (d) Licensor fails to perform any of its obligations hereunder including but not limited to making full and complete material Delivery of the Picture in accordance with this Agreement or Licensor materially breaches any of its warranties, representations and covenants hereunder and such breach remains uncured for a period of ten (10) business days or more following Licensor's receipt of written notice thereof from Agent, or (e) Licensor files for bankruptcy protection or is unable to pay its debts as and when due.

Agent agrees that its remedies shall be limited to termination and an action at law for direct money damages only (i.e. no loss of profits or consequential damages) and that Agent shall not have the right to enjoin or restrain or otherwise interfere with the distribution or exploitation of the Picture or any part or element thereof, or the use, publication or dissemination of any advertising issued in connection with the Picture. In the event Agent wishes to exercise such termination right it shall do so in writing within ninety (90) days of the occurrence of (a), (b), (c) (d) or (e) above. In the event of such termination, all Rights shall revert to Licensor, Agent shall return all Delivery Materials and any materials delivered by Licensor or prepared by or for or delivered to Agent, and Agent shall remain entitled to its Sales Agency Fee with respect to those Distribution Agreements entered into (and including with respect to those open offers and substantially negotiated agreements which are entered into within 90 days thereafter) prior to Agent's written notice to Licensor of its exercise of the aforesaid termination right provided that if so requested by Licensor, Agent concludes such negotiations and continues to service such Distribution Agreements, and Agent shall continue to be entitled to recoup its Agent MG, Distribution Expenses and any Additional Distribution Expenses (if paid by Agent) incurred prior to the date of termination as set forth herein from Gross Receipts generated by Distribution Agreements as further set forth in the IPA.

19. **Holdbacks**: All Distribution Agreements shall include customary holdback provisions to the effect that the distributors may not commence exhibition of the Picture until the earliest of (i) February 20, 2015; or (ii) initial general theatrical release of the Picture in the United States (excluding test screenings), provided that in the event Distributor(s) require a shorter Holdback, Licensor shall consider in good faith reducing such Holdback to six (6) months.

20. **No Third Party Beneficiaries**: Nothing contained in this Agreement shall be construed so as to create any third party beneficiary hereunder. In this regard, nothing under this Agreement shall entitle any third party to any remedies against Agent, at law, in equity, or otherwise, including, without limitation, any additional audit rights or the right to seek of obtain injunctive relief against Agent's distribution or licensing of the Picture.

21. **Licensor Representations and Warranties**: Licensor represents and warrants as of the date hereof and also upon Delivery of the Picture that: (a) Licensor is the sole and exclusive owner of or solely controls all Rights granted to Agent under this Agreement and that all such Rights are free of all liens (other than customary guild, completion guarantor, financier and production lender liens all of which shall not interfere with Agent's rights hereunder), claims, charges, encumbrances, restrictions, and commitments; (b) the copyright in the Picture, and to the best of Licensor's knowledge in the exercise of reasonable prudence and due inquiry, the screenplay and all literary, dramatic and musical material on which it is based or which is used in the Picture are valid and neither the Picture or any material part thereof is or will be in the public domain in any part of the Territory where copyright protection is available; (c) there is no agreement concerning the Picture with any person or entity which, if breached, would or could in any way impair, interfere with, abrogate or adversely or otherwise affect any of the Rights granted to Agent under this Agreement; (d) it is a limited liability company duly formed and validly existing in good standing under the laws of California and has the full right, power, legal capacity and authority to enter into and carry out the terms of this Agreement and is not threatened with insolvency; (e) to the best of Licensor's knowledge in the exercise of reasonable prudence and due inquiry, neither the Picture as delivered to Agent hereunder nor any part thereof, nor any materials contained therein or synchronized therewith, nor the title thereof, nor the exercise of any Right, license or privilege granted to Agent hereunder, violates or will violate, or infringes or will infringe, any trademark, trade name, service mark, patent, copyright (whether common law or statutory), or, the literary, dramatic, musical, artistic, personal, private, civil, "droit moral" or property right or rights of privacy or any other right of any person or entity whatsoever, or unfairly competes with or slanders or libels (or constitutes a trade disparagement of) any person or entity whatsoever; (f) it has no agreement with or obligations

12

to any third party with respect to the Picture which will conflict or interfere with any of the provisions of this Agreement or the use or quiet enjoyment by Agent of any of the Rights granted; (g) the Rights granted to Agent herein have not been previously granted, licensed, sold, assigned, transferred, conveyed or exploited by any person or entity in the Territory and Licensor shall not sell, assign, transfer, convey to or authorize any person or entity any right, title or interest in and to the Picture or any part thereof or in and to the dramatic or literary material upon which the Picture is based, which is adverse to or in derogation of the Rights granted to Agent; (h) to the best of Licensor's knowledge in the exercise of reasonable prudence and due inquiry, there is no litigation, arbitration, claim, demand, or investigation pending or threatened with respect to the Picture, or the literary, dramatic or musical material upon which the Picture is based or which is contained therein, or concerning the physical properties thereof; (i) full Delivery of the Picture to Agent in accordance with the terms of this Agreement has been budgeted and Licensor has or will have the financial means to fully perform its obligations hereunder throughout the Term; (j) Licensor has secured, or by the Delivery Date will have secured, and shall for the duration of this Agreement maintain, all clearances (including, without limitation, all music rights and music clearances (except for music performing rights available through performing rights societies) (i) for in-context use for all licensed music and (ii) both in-context and out-of-context use for all composed music) which are necessary for Agent to use and enjoy the Rights granted to Agent in and to the Picture throughout the Territory for the duration of the Term and that no supplemental or additional use payments shall be required with respect to the exploitation of the Picture (or any portion or element thereof, including, without limitation, the music contained therein) and/or any use or exploitation of any advertising or promotion of the Picture which contains the music as embodied in the Picture including (i) for in-context use for all licensed music and (ii) both in-context and out-of-context use for all composed music, (j) the Picture shall be produced in accordance with the Picture Specifications which are true and correct at the date of this Agreement and the Picture shall be of first class technical quality suitable for exhibition in first class cinemas in the Territory, (k) the list of credits delivered to Agent is true and correct and there are no material non-customary credit, name or likeness obligations or restrictions or approval or consultation rights applicable to the Picture (all of which, if any, shall be Delivered to Agent and Agent shall have the right to rely thereon), and that, subject to such obligations or restrictions, Agent shall have the right, but not the obligation, to utilize the likeness and name of each of the principal cast members in the artwork and in trailers for the Picture.

22.  **Agent Representations And Warranties**: Agent represents and warrants to Licensor that (i) Agent is a limited liability company duly organized and existing under the laws of the state of California; (ii) Agent has full right, power and authority to enter into and perform this Agreement; (iii) Agent's execution and performance of this Agreement does not cause it to be in breach of any third party agreement, (iv) to the best of Agent's knowledge in the exercise of reasonable prudence and due inquiry, no materials created by Agent hereunder will violate or infringe any trademark, trade name, service mark, patent, copyright (whether common law or statutory), or, the literary, dramatic, musical, artistic, personal, private, civil, "droit moral" or property right or rights of privacy or any other right of any person or entity whatsoever, or unfairly compete with or slander or libel (or constitutes a trade disparagement of) any person or entity whatsoever, (v) it has no agreement with or obligations to any third party which will conflict or interfere with any of the provisions of this Agreement, and (vi) to the best of Agent's knowledge in the exercise of reasonable prudence and due inquiry, there is and will be no litigation, arbitration, claim, demand, or investigation pending or threatened affecting the performance of Agent's obligations hereunder.

23.  **Indemnities**: Licensor shall indemnify and hold harmless Agent, its subsidiaries, affiliates, assignees, licensees, sublicensees, distributors, sub-distributors and dealers, and the directors, officers, Agents, consultants and representatives of the foregoing (the "Agent Indemnitees"), from all third party claims, costs, liabilities, obligations, judgments or damages (including reasonable

13

outside attorneys' fees), arising out of or for the purpose of avoiding any suit, claim, proceeding or demand or the settlement thereof, which may be brought against any of the Agent Indemnitees by reason of the breach or alleged breach of any of the warranties, representations or obligations made by Licensor, unless resulting from a material breach of this Agreement by Agent.  Agent shall indemnify and hold harmless Licensor, its subsidiaries, affiliates, assignees, licensees, sublicensees, distributors, sub-distributors and dealers, and the directors, officers, agents, consultants and representatives of the foregoing (the "Licensor Indemnitees"), from all third party claims, costs, liabilities, obligations, judgments or damages (including reasonable outside attorneys' fees), arising out of or for the purpose of avoiding any suit, claim, proceeding or demand or the settlement thereof, which may be brought against any of the Licensor Indemnitees by reason of the breach or alleged breach of any of the warranties, representations or obligations made by Agent or otherwise from Agent's exploitation of the Rights, unless resulting from a material breach of this Agreement by Licensor.

24.  **Notices:** All notices issued hereunder shall be in writing and shall be given by personal delivery or by US postal service or sent via facsimile to the appropriate party at the address listed below, and the date of such personal delivery or faxing or three (3) days following mailing, shall be the date of the giving of such notice. The names and addresses below concerning notices to all parties hereto shall also be deemed to be the place where accounting statements and payments as may be required under this Agreement shall be sent as follows:

> To Licensor:
> 9200 Sunset Boulevard
> 10th Floor
> Los Angeles, CA 90069
> Attn: Ted MacKinney
>
> With a copy to:
>
> Bloom Hergott Diemer Rosenthal LaViolette Feldman Schenkman & Goodman
> 150 S. Rodeo Drive
> Beverly Hills, CA 90212
> Attn.: Richard Thompson, Esq.
>
> To Agent:
> Relativity Foreign, LLC
> Attn: Head of Business & Legal Affairs
> 9242 Beverly Blvd., #300
> Beverly Hills, CA 90210
>
> With a copy to:
>
> Relativity Media, LLC
> Attn.: President of International Sales
> 9242 Beverly Blvd., Suite 300
> Beverly Hills, CA 90210

25.  **Miscellaneous:** Agent shall render the services hereunder in the manner of a first class sales agent of third party motion pictures, provided, however, that Agent makes no guarantee, representation or warranty that there will be any Gross Receipts. There is no requirement that the Picture be released in any medium in the Territory. The terms of this Agreement are strictly confidential, but may be

14

disclosed as required to finance, produce, bond, insure, distribute and exploit the Picture and to Licensor's professional advisors. The parties shall mutually approve the initial press release announcing this Agreement and neither party shall make or authorize any of its representatives or advisors to make any public statement regarding any confidential element of this Agreement without the prior agreement of the other party. Following the initial press release announcing this Agreement, Agent shall have the right of meaningful consultation in regards to press releases outside of the Territory prior to the Picture's festival or other premiere and the right to pre-approve all press releases in the Territory in connection with the Picture; provided Licensor shall have the tie-break in connection therewith (provided further that Licensor must abide by all contractual restrictions in connection therewith of which Agent has made Licensor aware). Nothing in this Agreement is intended to or shall be deemed to constitute a partnership between the parties hereto and save as contained herein, neither of them shall have any authority to bind the other in any way. This Agreement constitutes the entire agreement between the parties, and may not be varied save by written instrument signed by both parties.

26. **Sales Agent Interparty Agreement:** In the event that completion and delivery of the Picture is guaranteed by a third party completion guarantor, Agent agrees to enter into a sales agent interparty agreement with the completion guarantor, subject to good faith negotiation.

27. **Arbitration:** This Agreement is subject to binding IFTA arbitration in English in Los Angeles, California under the rules of International Arbitration of the IFTA ("IFTA Arbitration") and is to be construed, interpreted, and enforced in accord with the laws of the State of California, excluding California's choice of law provisions, and by the laws of the United States of America as applied by a federal court sitting in the Central district of California. Accordingly, Licensor and Agent, each as to and for the benefit of the other hereby irrevocably submit to the jurisdiction of the courts of the State of California and the United States for the purpose of any action, suit or proceeding arising out of or related to the subject matter of or transactions contemplated by this Agreement. The prevailing party in any action related to or arising out of this Agreement is entitled to recover all reasonable outside attorney's fees and costs (including expert costs) in bringing or defending such action.

28. **Counterpart Signatures:** This Agreement may be executed in one or more counterparts and transmitted by courier, personal delivery, facsimile or electronically, each transmission of which is deemed an original, and all of which, when taken together, constitute one and the same instrument.

IN WITNESS HEREOF, the parties hereto have entered into this Agreement and agree to be bound by its terms and conditions as of the date of this Agreement.

Agreed and accepted:

Evajom Productions, LLC                          Relativity Foreign, LLC

By:                                              By:

Its: Authorized Signatory                        Its: Authorized Signatory

**SCHEDULE 1**

**MINIMUM ADVANCES**

**SCHEDULE 2**

**DELIVERY SCHEDULE**

1

EXHIBIT "A"

STANDARD DISTRIBUTION AGREEMENT AND STANDARD DEAL MEMO

EXHIBIT "B"

ESCROW AGREEMENT

**EXHIBIT "C"**

**NOTICE OF ASSIGNMENT FORM**

# EXHIBIT 3

MICA FUND I, LP
251 MERRILL
SUITE 202
BURMINGHAM, MI 48009


July 29, 2015


**VIA FACSIMILE: 310-724-7701**
**EMAIL: ROSALINDL@RELATIVITYMEDIA.COM**

Relativity Foreign, LLC
Relativity Media, LLC
9242 Beverly Blvd., #300
Beverly Hills, CA 90210

Attn: Head of Business and Legal Affairs

      Re:    "The Man on Carrion Road" (the "Film") – Termination of Sales Agent

Ladies and Gentlemen:

      Reference is hereby made to that certain Interparty Agreement ("Interparty Agreement") dated as of February 24, 2014, as amended, by and among Carrion Road Productions, LLC (the "Production Company") and Carrion Road, Inc.(the "Production Services Company") (collectively, the "Borrower"), Mica Fund I, LP ("Lender"), Film Finances, Inc. ("Completion Guarantor") and Relativity Foreign, LLC ("Sales Agent"). Capitalized terms not otherwise defined herein shall have the meaning set forth in the Interparty Agreement.

      Pursuant to paragraph 10.2 of the Interparty Agreement, Lender has the right upon the occurrence of any Event of Default to terminate the Sales Agent's Interest and all the rights of the Sales Agent to exploit the Film. As Events of Default have occurred pursuant to sections 10.1(a), 10.1(e) and 10.1(h) of the Interparty Agreement, Lender hereby notifies Sales Agent that all of Sales Agent's Interests and all rights of the Sales Agent to exploit Film are hereby immediately terminated as of the date hereof and all such Sales Agent's Interests have automatically reverted to the Borrower.

      Sales Agent is in violation of the representations, warranties and covenants set forth in sections 9.1(d) and 9.1(g) of the Interparty Agreement. In addition, Events of Default have occurred pursuant to sections 11.1 (f) and 11.1 (p) of the Loan Agreement.

      The foregoing is not a complete statement of the rights of the Lender and is not intended as a waiver of any of the Lender claims, remedies or recourse, all of which are expressly reserved.

MICA FUND I, LP

Relativity Foreign, LLC
July 29, 2015
Page 2

Very truly yours,

**MICA FUND 1, L.P.**
("Lender")

By: MICA Entertainment, LLC
Its General Partner

By: _____

Its: Manager
(Authorized Signatory)

cc:    Carrion Road Productions, LLC
       Carrion Road, Inc.
       Film Finances, Inc.

# Signature Certificate



**RightSignature**
Easy Online Document Signing

Document Reference: VWUGIGJD2K5Z9EDTIUTPW2



**Dale Johnson**
Party ID: BJJWDDISG3MD57Z32R3XSY
IP Address: 70.194.33.175
VERIFIED EMAIL: djohnson@micaentertainment.net

Electronic Signature:



**Multi-Factor**
**Digital Fingerprint Checksum**    376a95ad73af4bf6dc99bd4831fc52a46986ece0

| Timestamp | Audit |
|---|---|
| 2015-07-29 16:40:07 -0700 | All parties have signed document. Signed copies sent to: Dale Johnson and Sarah Obomsawin. |
| 2015-07-29 16:40:06 -0700 | Document signed by Dale Johnson (djohnson@micaentertainment.net) with drawn signature. - 70.194.33.175 |
| 2015-07-29 16:39:13 -0700 | Document viewed by Dale Johnson (djohnson@micaentertainment.net). - 70.194.33.175 |
| 2015-07-29 16:39:01 -0700 | Document created by Sarah Obomsawin (sarah@micaentertainment.net). - 99.36.124.197 |



This signature page provides a record of the online
activity executing this contract.

**Page 1 of 1**

# EXHIBIT 4

MICA FUND I, LP
251 MERRILL
SUITE 202
BURMINGHAM, MI 48009

July 29, 2015

**VIA FACSIMILE: 310-724-7701**
**EMAIL: ROSALINDL@RELATIVITYMEDIA.COM**

Relativity Foreign, LLC
Relativity Media, LLC
9242 Beverly Blvd., #300
Beverly Hills, CA 90210

Attn: Head of Business and Legal Affairs

      Re:    "Mojave" (the "Film") – Termination of Sales Agent

Ladies and Gentlemen:

      Reference is hereby made to that certain Interparty Agreement ("Interparty Agreement") dated as of August 30, 2013, as amended, by and among Evajom Productions, LLC ("Borrower"), Mica Fund I, LLP ("Lender"), Film Finances, Inc. ("Completion Guarantor") and Relativity Foreign, LLC ("Sales Agent"). Capitalized terms not otherwise defined herein shall have the meaning set forth in the Interparty Agreement.

      Pursuant to paragraph 10.2 of the Interparty Agreement, Lender has the right upon the occurrence of any Event of Default to terminate the Sales Agent's Interest and all the rights of the Sales Agent to exploit the Film. As Events of Default have occurred pursuant to sections 10.1(a), 10.1(e) and 10.1(h) of the Interparty Agreement, Lender hereby notifies Sales Agent that all of Sales Agent's Interests and all rights of the Sales Agent to exploit Film are hereby immediately terminated as of the date hereof and all such Sales Agent's Interests have automatically reverted to the Borrower.

      Sales Agent is in violation of the representations, warranties and covenants set forth in sections 9.1(d) and 9.1(g) of the Interparty Agreement. In addition, Events of Default have occurred pursuant to sections 11.1 (a), 11.1 (f) and 11.1 (p) of the Loan Agreement.

      The foregoing is not a complete statement of the rights of the Lender and is not intended as a waiver of any of the Lender claims, remedies or recourse, all of which are expressly reserved.

MICA FUND I, LP

Relativity Foreign, LLC
July 29, 2015
Page 2

Very truly yours,

**MICA FUND 1, L.P.**
("Lender")

By: MICA Entertainment, LLC
Its General Partner

By: _____

Its: _Manager_____
(Authorized Signatory)

cc:    Evajom Productions LLC
       Bloom Hergott Diemer Rosenthal LaViolette
       Film Finances, Inc.

# Signature Certificate

🔒 **Document Reference:**   G5LEWMJUJ32IDLDAZRRKJU

# RightSignature

Easy Online Document Signing



**Dale Johnson**
Party ID: BAJSDBJPR3VYRB6C7KL2XE
IP Address: 70.194.33.175
VERIFIED EMAIL: djohnson@micaentertainment.net

Electronic Signature



**Multi-Factor
Digital Fingerprint Checksum**     376a95ad73af4bf6dc99bd4831fc52a46986ece0

| Timestamp | Audit |
|-----------|-------|
| 2015-07-29 16:38:29 -0700 | All parties have signed document. Signed copies sent to: Dale Johnson and Sarah Obomsawin. |
| 2015-07-29 16:38:29 -0700 | Document signed by Dale Johnson (djohnson@micaentertainment.net) with drawn signature. - 70.194.33.175 |
| 2015-07-29 16:37:40 -0700 | Document viewed by Dale Johnson (djohnson@micaentertainment.net). - 70.194.33.175 |
| 2015-07-29 16:37:21 -0700 | Document created by Sarah Obomsawin (sarah@micaentertainment.net). - 99.36.124.197 |



This signature page provides a record of the online
activity executing this contract.

**Page 1 of 1**