**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

In re:

**RELATIVITY FASHION, LLC,** *et al.*,
                                    **Debtors.**

Chapter 11
**Case No. 15-11989 (MEW)**
**(Jointly Administered)**

---

### CORRECTED BENCH DECISION REGARDING REORGANIZED
### DEBTORS' PLAN ENFORCEMENT MOTION AND RELATED MOTIONS

United States Bankruptcy Court
One Bowling Green
New York, New York
May 27, 2016, 11:08 AM

APPEARANCES:

JONES DAY
*Attorneys for Debtors*
222 East 41st Street
New York, NY 10017
            By:    Richard L. Wynne, Esq.
                   Todd R. Geremia, Esq.


            - and -


555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
            By:    Bennett L. Spiegel, Esq.

TOGUT, SEGAL & SEGAL LLP
*Attorneys for the Litigation Trust*
One Penn Plaza
New York, NY 10119
            By:    Frank A. Oswald, Esq.


SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
*Attorneys for Ryan Kavanaugh*
300 South Grand Avenue
Suite 3400
Los Angeles, CA 90071
            By:    Van C. Durrer II, Esq.

- and -

4 Times Square
New York, NY 10036
        By:    Jonathan L. Frank, Esq.

MCNUTT LAW GROUP LLP
*Attorneys for Netflix*
219 9th Street
San Francisco, CA 94103
        By:    Scott H. McNutt, Esq.
               Shane J. Moses, Esq.

BARNES & THORNBURG LLP
*Attorneys for Netflix*
2029 Century Park East
Suite 300
Los Angeles, CA 90067
        By:    Stephen R. Mick, Esq.

LOEB & LOEB LLP
*Attorneys for CIT*
345 Park Avenue
New York, NY 10154
        By:    Walter H. Curchack, Esq.

**MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

        THE COURT:  Please be seated.  All right, do we have the Debtors' and Netflix's

representatives on the telephone?

        MR. WYNNE:  Yes, we do, Your Honor.  Richard Wynne from Jones Day on behalf of

the Reorganized Debtors, along with Bennett Spiegel and Todd Geremia.

        MR. MICK:  Stephen Mick, Your Honor, on behalf of Netflix along with Scott McNutt

and Shane Moses.

        MR. DURRER:  And Van Durrer is on the line as well, Your Honor.  Good morning.

        MR. OSWALD:  Frank Oswald for the trust, Your Honor.  Good morning.

THE COURT:  Good morning to you all.  We have a few people in the courtroom, I think not the main combatants themselves but some interested onlookers.

So I'm going to dictate into the record my decision on these matters.  As I mentioned the other day, I'm going to ask the Debtors to have a transcript prepared in Word format as quickly as reasonably they can and to submit that to us so that we can correct the inevitable typographical errors and errors in transcribing legal citations that I will be reading into the record, and with the idea that the corrected version will be entered on the docket as the formal version of my decision in this matter.

This matter is brought before me nominally by all of the Reorganized Debtors in these cases, but in fact primarily, if not solely, on behalf of three of them:  RML Distribution Domestic, LLC; DR Productions, LLC; and Armored Car Productions, LLC.  I'm going to refer to them throughout my decision as either the Reorganized Debtors or the Debtors, unless for some reason the context requires that I single them out.

The Reorganized Debtors ask that I compel Netflix . . .

MR. DURRER:  Your Honor, I don't know if others are having difficulty, but I'm getting a lot of static.  Is it just me?

THE COURT:  There's no static here.  Does anybody else have a problem?

MR. WYNNE:  Richard Wynne.  We can hear you fine.

UNIDENTIFIED SPEAKER:  Yeah, I'm not hearing static either.

MR. DURRER:  Well, I apologize, Your Honor.  I may try and dial in on a different phone.

THE COURT:  All right.  We'll give you a minute to dial back in.  Let us know when you're back on.

(Pause)

COURTCALL OPERATOR:  And Your Honor, Mr. Van Durrer is back live.

THE COURT:  Mr. Durrer, can you hear us clearly now?

MR. DURRER:  Yes, I can.  Thank you very much, Your Honor.

THE COURT:  Okay.  All right.  We'll return to where we were.

The Reorganized Debtors have asked the Court to compel Netflix to execute proposed amendments to two Notices of Assignment that relate to the films "Masterminds" and "The Disappointments Room."  The original Notices of Assignment were issued under a license agreement between Netflix and RML Distribution.

The license agreement and its three amendments have been submitted as part of Relativity Exhibit 43, and the original license agreement without its three amendments also is Netflix Exhibit 1.  The original Notices of Assignment were submitted as Relativity Exhibits 21 and 22, and the proposed amendments were submitted as Relativity Exhibit 2-D.

Netflix contends that the current Notices of Assignment give Netflix the right to distribute and stream the two movies beginning June 17th, 2016 in the case of "Masterminds" and June 30, 2016 in the case of the "Disappointments Room."  Netflix claims that it has that right notwithstanding the fact that the films have not been theatrically released and notwithstanding the contrary plans for these films that the Reorganized Debtors previously announced and that were the subject of testimony at the confirmation hearing before me in February 2016 and in the confirmatory findings hearing in March 2016.

The Reorganized Debtors dispute Netflix's contentions and also argue that Netflix should be barred from taking the position that it now takes and from refusing to execute the proposed amendments to the Notices of Assignment on grounds of *res judicata* and judicial estoppel.

Netflix responds that any dispute over whether Netflix is required to do what the Debtors ask must be arbitrated.  The Debtors argue that arbitration is not required by the parties' agreements.  They also argue that I have powers and responsibilities to enforce the plan and my prior orders and the right to compel Netflix to execute amendments to the Notices of Assignment pursuant to my powers under section 1142(b) of the Bankruptcy Code.  The Debtors also argue that the bankruptcy interests in having this Court enforce the plan take precedence over any interests that might otherwise favor arbitration, even if arbitration were required under the parties' agreements.

At, according to the official records, 2:12 a.m. today, Netflix filed an additional objection contending that I do not have the constitutional power to issue a final ruling in this dispute, citing *Stern v. Marshall*, 564 U.S. 462 (2011).  This argument is made after a three-day trial, substantial briefing, submission of numerous exhibits, and substantial preparation to deliver this opinion this morning.  And with little time to react to it, although I have considered it carefully and, being extremely familiar with *Stern v. Marshall*, I am prepared to address it.

Now, I cannot address all these issues, the legal issues and defenses, without first reviewing the prior proceedings that occurred before me and the findings that I previously made.

The Debtors filed their cases in July 2015.  They proposed a plan of reorganization which was amended a few times, and a confirmation hearing to consider the proposed plan was scheduled for February 1 and 2 of 2016.

There were disputes at the time of confirmation over the Debtors' legal rights to exploit and distribute the films "Masterminds" and "The Disappointments Room."  For example, objections were filed by a party that identified itself as a completion guarantor, that was UniFi, U-N-I-F-I, and also by the production lenders, CIT.

CIT contended that the loan agreements for the production of these movies had dates by which the releases of the films, or what CIT referred to as the "sufficient releases of the films," had to occur. Those dates were October 31 of 2015 for "The Disappointments Room" and August 31 of 2015 for "Masterminds." CIT argued that because a sufficient release of the movies had not occurred by those dates, CIT had the right to control the distribution of the films. UniFi contended that it had its own rights to control the completion and distribution of the films under its completion contracts and guarantees.

Netflix itself pointed to these objections and took the position that these issues regarding the Debtors' rights to distribute the films were matters that I needed to resolve before I could find that the Debtors' plan was feasible. Netflix took that position, among other places, in its objection to the assumption of its contract, docket 1352, submitted to me here as Relativity Exhibit 10, paragraph 80.

In the plan and in the disclosure statement and at the confirmation hearing, the Debtors described their plans to release various films, including "Masterminds" and "The Disappointments Room." They identified dates on which they proposed to release "Masterminds" and "The Disappointments Room" in 2016 and provided financial projections based on those plans.

The Debtors took the position that they had the legal right to exploit the films in the manner indicated in their financial projections and the factual ability to do so. As I noted, they proposed specific theatrical release dates for the films. Those dates changed from time to time as the plan evolved, sometimes getting later, sometimes earlier. Prior to the time the ultimate findings were made by me, the release date proposed for "The Disappointments Room" was to be December 2016, and the release date for "Masterminds" was to be September 2016.

The Debtors' ability and right to exploit the films in the manner set forth in the projections was key to the Debtors' financial viability and to the feasibility of the plan, and therefore to the plan itself. This could not have been clearer at the confirmation hearing.

Two witnesses – Mr. Niemann and Ms. Wieshofer – testified about the projections. I asked them for specific explanations of how the revenue projections worked and whether they were reasonable. In fact, the testimony of the second witness, Ms. Wieshofer, actually was offered at my specific request, as I wanted further comfort as to the projections and how they had been derived, because they were so key to the financial viability of the plan.

The witnesses' testimony showed specific planned release dates for these two films and others, and specific results that were planned and expected from the distributions of these films. They made clear that they anticipated a theatrical release of the movies, and then at a later date, a distribution of the movies by Netflix, under the terms of the Netflix license agreement.

The idea that theatrical release would occur first was a key part of the plan and of the proposed financial arrangements and projections. Mr. Niemann testified about these two movies in particular and the outstanding debts that were to be paid from the proceeds of their distribution. He testified about that at pages 129 and 130 of the transcript of the February 1st hearing. And he answered my questions about the projections at pages 140 to 142 and 178 to - 79.

He also testified at length about how the projected revenues would be sufficient to cover debt payments and expenses. That's at pages 142 to 170 of the transcript.

Ms. Wieshofer testified further about the projections and said that all of the projections needed to feed off of the domestic box office results. She said that at pages 218 and 219 of the transcript. In her description, the theatrical releases would cover the production costs and loans

and the later distributions would be, in her words, "the gravy." She said that at page 214 of the transcript.

She also said that the later distribution through Netflix, after the theatrical release of the movies, was an important component of the financing plan. She said that at page 228 of the transcript.

Now, the planned distribution sequence and the rights to release the films in this sequence were key, not only to the Debtors' financial projections, but also to the rights that the plan granted to other parties. As I mentioned, CIT had objected to the Debtors' plan specifically with regard to the rights to "Masterminds" and "The Disappointments Room." The Debtors proposed to issue new replacement notes to CIT that would continue the lenders' security interest with respect to those films but that would alter the contractually required release dates for the movies. Earlier versions of those replacement notes were filed on the docket and available to all parties; and the final versions were submitted to me as Relativity Exhibits 48-A and 48-B during this proceeding.

It was painfully evident to everyone involved in the process in general, and in the confirmation hearing in particular, that the planned theatrical releases of these movies were key to the proposed treatment of CIT's secured claims under the plan. We must have been told at least ten or twelve times during the confirmation hearing that the last details as to those production notes were being worked out for approval by CIT.

It was equally obvious that RKA's treatment under the plan was dependent on the theatrical release of these films on the planned scheduled. That was clear in the form of the notes that were filed in the plan supplement as part of the proposed plan itself and in the final

versions of the notes to be issued to RKA, which have been submitted to me in this proceeding as Relativity Exhibits 49-A and 49-B.

The projected recoveries and the proposed exploitation of the films in the manner that the Debtors described also affected the UCC recoveries, as explained by Mr. Oswald at the hearing this past Monday.  All of these parties were depending specifically on the release of the films in the projected way and in the projected sequence, to provide them with the recoveries they expected under the plan and with the collateral rights that they were granted under the plan. Those proposals were key to the resolution of their claims and their treatments under the plan. And furthermore, as I've said, not just those parties, but everyone in the case, depended on the release of the films in the projected way, as that was key to the financial viability of the plan and therefore to everything that everybody was getting pursuant to the plan.

The plan provided for the assumption of the Debtors' license agreement with Netflix. Netflix objected to confirmation and also objected to the assumption of the Netflix license agreement.  Netflix was an active participant in the confirmation process in general and in the confirmation hearing in particular.

Netflix knew that the Debtors' rights to exploit the films in the sequence described at the confirmation hearing was a legal issue being litigated and that the Debtors' ability to do so was also a key part of the factual issue, feasibility, that was being debated.  In fact, as I said earlier, Netflix itself pointed to the objections made by CIT and other parties and said it was important that I decide that the Debtors had the legal right to do what they proposed as well as the factual ability to do so.

Netflix also took the position that the forecasted benefits under the Netflix agreement were key to the Debtors' survival and to the feasibility of the plan.  It said so, among other times,

at page 49 of the transcript of the February 1st hearing, which has been submitted to me in this

proceeding as Netflix Exhibit 49.

Netflix also pointed to the new proposed release dates for these particular movies,

"Masterminds" and "The Disappointments Room," and argued to me that the Debtors needed to

show that they could release the films on that schedule.  Netflix took that position in its

objection, Exhibit 10 here, at paragraphs 39 and 74.  And Netflix argued that this was required

not only to show feasibility in general but also to qualify the movies for distribution under the

Netflix license agreement.  It contended, in paragraph 39 of its objection, that the theatrical

release of the movies had to occur, because that was a material requirement to the Netflix

contract.  It further contended at paragraph 74 that the release of the movies in the manner

projected was necessary to qualify them for distribution under the license agreement.  And it

questioned whether the Debtors could do this as – to quote from the objection – "accomplishing

this would require negotiating a distribution agreement for each film with one of the small

number of major theater chains in the United States, that in turn would require that Relativity be

able to commit a substantial print and advertising budget for each film."

Netflix's objections and statements made clear what Netflix itself thought that I needed to

determine in order to find feasibility, both factually and legally.  In those respects, Netflix was

right.  These disputed points absolutely were matters to be resolved in connection with the

confirmation hearing and the various plan objections that parties had made, including Netflix

itself.  The feasibility of the plan and the ability to treat creditors in the manner proposed in the

plan depended on these points.

Now, it's important for me to note here that feasibility is a finding and determination that

I was required by statute to make, and I was required to do so even in the absence of any

objections by any of the parties.  I have two case citations here:  *In re Young Broad. Inc.*, 430

B.R. 99, 128 (Bankr. S.D.N.Y. 2010), and *Williams v. Hibernia National Bank (In re Williams)*,

850 F.2d 250, 253 (5th Cir. 1988); and also 7 Collier on Bankruptcy ¶ 1129.05[1][e].  I'm not

going to try to dictate in the record the punctuation for those citations.  We'll just fix them later.

In particular, Collier notes that "the court has a mandatory, independent duty to review

plans and ensure they comply with the requirements of section 1129," and that "[t]he judge's

independent duty will come into play often with respect to the feasibility requirement."

So because of that statutory responsibility, all of the matters I have just described were

matters that I needed to resolve at confirmation.  And this was true even though, at the second

day of trial, and after I had made some preliminary comments about further showings that I

would require, Netflix technically withdrew its objection on feasibility grounds, although it did

not withdraw its objection to the assumption of the contract on adequate assurance of

performance grounds.  The factual and legal findings necessary to the feasibility determination

still were required.  They still included the issues that Netflix itself had previously addressed,

and those issues did not change just because parties did or did not resolve their individual

disputes.

While Netflix itself identified the issues that I described above as matters I needed to

determine, Netflix never once contended that its own contracts stood in the way of the Debtors

doing what they proposed, or that the Debtors did not have the right to proceed in the sequence

that they suggested because of Netflix's own agreements, or that Netflix believed it would have

the right to release these films on its own network in June 2016, prior to a theatrical release.

Those are material contentions that if true, would not only have altered the Debtors' projections,

but would have destroyed the feasibility projections for the plan.  As a party to the litigation over

11

these issues and as the party who knew the nature of the determinations being made, Netflix had an obligation to raise these points if it believed it had those legal rights. The only material Netflix offered to me regarding Netflix's own rights was the license agreement itself.

Netflix referred to other parties' disputes over the distribution dates and release dates for the films but never once contended that if the license agreement was assumed and other agreements were assumed, and if the Debtors released the movies on the schedules they proposed, that Netflix would have any rights to distribute the movies on any dates prior to those specified in the license agreement itself.

Netflix's own witness, I will note, testified in this proceeding that if Netflix believed it had the rights that it currently claimed, it should have brought that to my attention during the confirmation hearing. Clearly, that's correct; but Netflix did not do so.

In fact, Netflix took positions at the confirmation hearing that are irreconcilable with the positions it now takes. Netflix argued specifically that a prior theatrical release was a material provision and requirement in its contract. Among other places it said that at paragraph 34 of its objection, which is Relativity Exhibit 10 in this proceeding. It took that position with respect to the two movies that we're addressing now, "The Disappointments Room" and "Masterminds." It argued that Netflix was not contractually protected without a showing that these movies would be theatrically released. It said that, among other places, at paragraph 74 of its objection. It tries to argue in the current hearing before me that these were just waivable terms that were solely for the benefit of Netflix itself. But that is not what Netflix previously said. Instead, Netflix took the affirmative position that the movies had to be theatrically released first and would not even qualify for distribution under the Netflix contract if that did not happen. And I've already cited to paragraphs 39 and 74 of the Netflix objection, in that regard.

There was no suggestion at any time that the theatrical release was not necessary to Netflix or that it was not a precondition to Netflix's right and obligations.  Instead, there was a direct contention to the contrary, including Netflix's contention at paragraph 53 of its objection that the "core benefit" of the license agreement, "bargained for by Netflix, is the receipt of high-quality, widely released films" from Relativity on a regular basis.

Mr. Roy's statements – Netflix's witness – in his declaration, were to that same effect. His declaration has been submitted as Exhibit 43 in this proceeding.  He argued at paragraph 21 of his declaration that the contract imposed substantive obligations regarding films that can be submitted to Netflix, including the material requirement that the films provided must be first-run theatrically released films and also had to be released on a minimum number of screens.  He did not say that it was enough if they were hypothetically films that could be theatrically released in the future.  He more specifically said they had to be theatrically released as part of Netflix's contention that I needed to find that, in fact, the Debtors could accomplish that theatrical release in order to trigger the Netflix obligations.

Mr. Roy's own declarations and Netflix's position at the confirmation trial confirms that Netflix itself understood that a prior theatrical release was a precondition to Netflix's rights to distribute a film.

The Debtors' witnesses in this proceeding have testified credibly that a release of "Masterminds" and "The Disappointments Room" on the Netflix system in the manner that Netflix now contends it can do, would destroy, as a practical matter, the Debtors' ability to accomplish the theatrical release on which all of the projections depend, and destroy the collateral on which the lenders and other parties depend, and in fact, would destroy the theatrical release on which even Netflix's own obligations under the license agreement depend.

Netflix's current interpretation of the rights would, as I mentioned, thwart the Debtors' ability to perform under the license agreement and to reap the benefits thereof.  The license agreement says that Netflix will pay a license fee that is based on the domestic box office receipts.  These are expected to be very big movies.  The Debtors made that clear and their witnesses made that clear at the confirmation hearing.  If they are released in the sequence expected, there will be a large domestic box office and a large Netflix license fee that will be proportionate to that.  Under Netflix's proposal of its current interpretation of the contract, Netflix would temporarily pay a fee of 3.7 million dollars for each movie to the lenders, but then would immediately have the right to recapture that fee because there wouldn't have been a domestic box office release, and therefore no license fee under the calculation of the license agreement; and there would never be a license fee that would actually be payable from Netflix to Relativity unless and until some theatrical release could be accomplished after a distribution by Netflix.  And the Debtors testified credibly, that could never happen.

Indeed, Netflix took the position in front of me that it did not know what the consequence for a theatrical distribution would be if Netflix streamed the movies.  I found that the least credible testimony at the entire hearing in front of me.  Netflix is in this business.  It knows perfectly well what a Netflix distribution of these movies would accomplish, and in fact, and I specifically find, Netflix is counting on that distribution to try to exact leverage against the Debtors.

That brings us to this hearing and to the relief requested.  Netflix claims that it has a contractual right to do what it is proposing to do, and that the only people who can say otherwise are arbitrators, and that arbitration is required.

14

The Second Circuit has made clear that I need to consider if there is a binding arbitration agreement between the parties that actually governs the determination of these issues, and that I also have to consider if deferring to arbitration would be inconsistent with important bankruptcy policies and provisions. And I'll cite to the *In re U.S. Lines, Inc.* case, 197 F.3d 631, 639 (2d Cir. 1999); *see also MBNA America Bank, N.A. v. Hill*, 436 F.3d 104, 108 (2d Cir. 2006). In the *Hill* decision, the Court explained that "the objectives of the Bankruptcy Code relevant to this inquiry include 'the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders.'" That's from page 108 of the *Hill* decision.

I do not believe Netflix has the right to have this matter sent to arbitration or that it would be appropriate to do so. I will address each of the factors, although not necessarily in the order listed by the Second Circuit. As to the *Stern v. Marshall* issues: since I organized what I'm saying now in advance and long prior to the raising of the *Stern v. Marshall* objection, I will address the *Stern v. Marshall* issues last. I address them last only because it is easier for me to do so and to explain my reasoning, not because I think that they necessarily need to come after I address the other issues. It's just easier to explain in that order.

As to the arbitration issue:

First, Relativity contends that Netflix is barred by judicial estoppel and by res judicata from taking the position that it can exploit the movies now. Those contentions are based on the proceedings that occurred before me. I believe Netflix conceded at the outset of this hearing that these points therefore should be decided by me, not by arbitrators. I am the one who knows what I decided and what I relied upon in making those decisions.

15

Now, I can't tell for sure, but Netflix's counsel appeared to try to walk back from this prior concession at closing argument, although exactly in what ways were not clear to me. He still conceded that at least in some respects judicial estoppel and res judicata were matters that should be decided by me.

And I conclude that they should be decided by me. And it would be especially peculiar to send these matters to arbitration here. While I was required to make factual findings in order to confirm the plan, I was not required to enter a detailed explanation of my factual findings or to write an opinion setting forth the basis for my factual determinations, because ultimately the parties withdrew their objections to feasibility. So as a result, on the record, I am the only one who knows exactly what I previously decided and why, and what points were important to my prior decisions. No arbitrator could read my mind and provide an accurate answer to that question. All an arbitrator could do would be to guess and be at risk of being wrong by being steered in directions that were not important to me.

Second, the issues that are relevant here affect other parties, not just Netflix and the Reorganized Debtors, and not just the parties to the alleged arbitration agreement. The UCC, for example, has joined in the relief sought, but it is not a party to any arbitration agreement. The issues actually affect the entire case and the entire confirmation process that was conducted before me, and therefore affect all creditors. They affect RKA, which is not a party to the alleged agreements. And the fact that a few of the participants were parties to an alleged arbitration agreement would not be enough, in my mind, to call for arbitration of a matter that affects all of the parties in this case – in these Chapter 11 cases.

Third, section 1142(b) of the Bankruptcy Code states that: "The court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery

of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to

perform any other act, including the satisfaction of any lien, that is necessary for the

consummation of the plan." It is my responsibility to ensure that the plan I have confirmed is

carried out. That is a core responsibility that Congress has entrusted to me under the statute.

As to whether I need to send a matter to arbitration, notwithstanding section 1142(b), the

Second Circuit says that in such a case, I should weigh the competing bankruptcy interests and

arbitration interests. In that regard, it directs me to make a particularized inquiry into the nature

of the claim and the facts of the specific bankruptcy. I should consider the objectives of the

Bankruptcy Code, the goal of centralized resolution of purely bankruptcy issues, the need to

protect creditors and Reorganized Debtors from piecemeal litigation, and as I mentioned earlier,

my power to enforce my own orders.

I have considered these points carefully and I find that these factors weigh in favor of a

decision by me. Part of that is based on the estoppel issues I have already discussed above and

the fact that the proceedings occurred before me. Part of my determination rests on the fact that

this is not simply an issue that is merely incidental to the post-emergence business of the

Debtors. Instead, it is, in reality, a collateral attack on the factual findings and distributions of

property that were essential to this plan. This issue is key to the confirmation of the plan, as it

was in the *U.S. Lines* case. The entire thing collapses otherwise. And as I already mentioned,

the issues here and the decisions that were made were not just for the benefit of the contracting

parties, but for the benefit of everyone who was affected by the plan, who are not bound by the

proposed arbitration agreement.

Finally, and independently, after reviewing the contracts and considering the evidence, I

also don't believe this is an issue that is subject to an arbitration agreement in any event. That is

based on some separate comments that I will make in a short while regarding the interpretation of the parties' agreements.

But first let me address the res judicata and judicial estoppel points.  As to res judicata, it is well established that the confirmation of a plan is a resolution of a proceeding that can have res judicata effects.  *Corbett v. MacDonald Moving Servs., Inc.*, 124 F.3d 82, 87-88 (2d Cir. 1997); *see also CoreStates Bank, N.A. v. Huls America, Inc.*, 176 F.3d 187 (3d Cir. 1999); *Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.)*, 898 F.2d 1544, 1552 (11th Cir. 1990).  The same point has been confirmed in many other decisions too numerous to cite here.

The test in the Second Circuit for res judicata in the bankruptcy context and in the plan confirmation context has been described in the *Corbett* case as follows:  "To determine whether the doctrine of res judicata bars a subsequent action, we consider whether 1) the prior decision was a final judgment on the merits, 2) the litigants were the same parties, 3) the prior court was of competent jurisdiction, and 4) the causes of action were the same."  And it cites to *In re Teltronics Servs., Inc.*, 762 F.2d 185, 190 (2d Cir. 1985).  "In the bankruptcy context, we ask as well whether an independent judgment in a separate proceeding would 'impair, destroy, challenge, or invalidate the enforceability or effectiveness' of the reorganization plan.  *Sure-Snap Corp. v. State Street Bank and Trust Co.*, 948 F.2d 869, 875-76 (2d Cir. 1991).  This last inquiry may also be viewed as an aspect of the test for identity of the causes of action.  *See Herendeen v. Champion International Corp.*, 525 F.2d 130, 133 (2d Cir. 1975)."  That's the end of the quotation from *Corbett*.

Now, applying these factors:

First, my prior decision on confirmation was a final judgment on the merits.  It is well settled that a bankruptcy court's order confirming a plan of reorganization constitutes a final

18

judgment with preclusive effect for res judicata purposes. *In re Layo*, 460 F.3d 289, 284 (2d Cir.

2006). The confirmation of a plan binds the Debtors and creditors as to all of the plan's

provisions and all related property- or nonproperty-based claims that could have been litigated at

the time. *Sure-Snap*, 948 F.2d at 873.

This is true not only as to issues actually raised and actually addressed, but as to issues

that could have been raised but that were not. As the Third Circuit held in *CoreStates Bank*, 176

F.3d at 195 note 5: "CoreStates also submits that claim preclusion should not apply because the

bankruptcy proceeding did not modify or adjudicate its rights under the agreement. This

argument misapprehends the fundamental nature of the doctrine of claim preclusion, which

applies whether or not the particular issue was actually raised or decided by the prior court."

Citations omitted.

A party who raises an objection to a reorganization plan in a confirmation proceeding has

interposed a claim for claim preclusion purposes. The objection requires the bankruptcy judge to

adjudicate whether the proposed plan of reorganization meets the requirements of section 1129.

And that determination includes the feasibility determinations that I have mentioned above. The

Courts' confirmation order rejecting objections and finding that the plan satisfies section 1129

including the feasibility requirement is a final adjudication of the issues necessary to reach that

conclusion. And that is a final adjudication that is sufficient to preclude inconsistent claims at a

later time.

As to the next element: the same parties were involved. Netflix was a party to the

confirmation hearing and does not contend otherwise.

Third, I entered the confirmation order as a court having competent jurisdiction to do so.
Plainly, I had jurisdiction over the confirmation of the plan.  No party has contended otherwise
or could contend otherwise.

Finally, my prior rulings encompassed the issues and claims regarding Netflix's rights
and encompasses the matters that are now addressed in this proceeding.  Courts in the Second
Circuit look at whether the same transaction, evidence, and factual issues are involved in both
proceedings in deciding whether res judicata applies.  *Sure-Snap*, 948 F.2d at 874; *NLRB v.
United Technologies Corp.*, 706 F.2d 1254, 1260 (2d Cir. 1983).  The critical question for res
judicata purposes is whether the party could or should have asserted the claim in the earlier
proceeding.  *Layo*, 460 F.3d at 292 (quoting *In re Howe*, 913 F.2d 1138, 1146 n. 28 (5th Cir.
1990)).  If a party had adequate information about prospective claims prior to the
commencement of the bankruptcy proceeding, that is evidence that it could have brought the
action in the first instance.  *In re Arcapita Bank, B.S.C.*, 50 B.R. 15, 21 (Bankr. S.D.N.Y. 2014)
(citing *Sure-Snap*, 948 F.2d at 873).

A claim may be precluded in the bankruptcy context by the parties failure to raise it prior
to plan confirmation even if no specific adversary proceeding or contested matter between the
parties would itself have separately given rise to claim preclusion.  *Sure-Snap*, 948 F.2d at 874
(finding a liability lender liability claim precluded by bankruptcy plan confirmation, even where
the claim would not have been precluded pursuant to a lien avoidance adversary proceeding
litigated contemporaneously with the confirmation hearing).

In this case the legal right and the practical ability to exploit these movies and to
distribute them in the way projected, at the times projected, and in the sequence projected were
all key to the feasibility findings that I made.  Netflix itself, as I have noted, said that I needed to

decide those things in order to find feasibility.  I would not have confirmed the plan except based on the finding that the Debtors had the legal rights and factual ability to release the movies in the manner projected.

It is important for me now to uphold those prior rulings in order to protect the integrity of the confirmation process and of the plan itself.  And to repeat, Netflix referred to other parties' disputes over the release dates for the movies and distribution rights, but never once contended before me that if its agreements were assumed and if the plan were confirmed, that Netflix would have any rights to distribute the movies on any dates prior to those specified in the license agreement itself.  I relied on that in making my decisions and finding that the plan was feasible and in granting property rights to other parties under the plan.

I should note that Netflix's silence has continued even since the confirmation hearing itself.  Netflix asked me to consider some additional exhibits relating to positions taken by UniFi, which had provided the completion guarantee.  These are set forth in some additional exhibits that the parties stipulated at the end of trial could be included in the record; and I have read those exhibits after the conclusion of the trial.  One of the exhibits is Netflix Exhibit 48, which was a motion for relief from the automatic stay filed by UniFi on March 14th of 2016.  UniFi argued in that motion that it should be allowed to deliver copies of "Masterminds" and "The "Disappointments Room" films to Netflix.  It said specifically that a failure to deliver them could void some of the underlying arrangements on which the plan depended.  But it also refers specifically to the new proposed release dates for these movies, on page 23 of the objection, and said explicitly that the delivery of the movies to Netflix would cause no harm to the Debtors and no interference with the arrangements that were the focus of the plan and the confirmation hearing.

The whole point of this was to assure me that deliveries of the movies to Netflix would not change the arrangements on which I depended in ruling on the feasibility of the plan, and I ultimately approved the stipulation and settlement with UniFi on that basis.

I am at a loss as to how these exhibits allegedly help Netflix. They are just further evidence that Netflix now wants to take positions that are irreconcilable with the determinations that I previously made and on which I previously relied.

As to judicial estoppel: in *New Hampshire v. Maine*, the Supreme Court made clear that the circumstances under which judicial estoppel may be appropriately invoked are probably not reducible to any general formulation of principle. 532 U.S. 742, 749-51 (2001). The Court, however, outlined several factors which "typically inform the decision whether to apply the doctrine of judicial estoppel in a particular case: First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. . . . A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." That's from the same Supreme Court decision; that page is 750-51 (citations omitted)

Notwithstanding the enumeration of these factors, the Supreme Court emphasized that the factors did not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel.

The Second Circuit has confirmed that the doctrine of judicial estoppel applies in the bankruptcy context, and it noted the risk to judicial integrity that is inherent in allowing a party,

after the consummation of a bankruptcy plan, to take a position that unravels key decisions made in the confirmation proceedings. *Adelphia Recovery Trust v. Goldman Sachs & Co.*, 748 F.3d 110, 117 (2d Cir. 2014). And again, in the context of judicial estoppel, the doctrine is not limited to affirmative statements made by a party. Silence may be sufficiently inconsistent with a subsequent position to estop the subsequent claim; the Court so held in the *Adelphia* case.

In this case, I have already described how Netflix's prior statements were utterly inconsistent with the position it now takes. It could not have been clearer to me at confirmation that Netflix contended that its own rights and the Debtors' rights each depended on a prior theatrical release of these two movies. The idea that Netflix could release them first is utterly inconsistent with the findings that I was asked to make and that I did make, and with the contentions that Netflix actually made at the confirmation hearing.

Furthermore, Netflix's silence is enough to bar its contentions now. If it thought it had rights to do what it now contends, it should have raised it when, as Netflix itself suggested, the feasibility determinations were made and the Debtors' legal rights to exploit these movies were on the table. These issues were relevant under Netflix's own description of the issues that I had to decide.

The second factor is judicial adoption of the prior position. Netflix urged me to find that theatrical release was required, and it took the position that the debtor could not accomplish that theatrical release. I accepted Netflix's position that theatrical release was required. I also accepted its position that the benefits under the Netflix contract that would be triggered by that theatrical release were important to feasibility, and I required proof by the Debtors that these things could be accomplished. In fact, I went out of my way to satisfy myself as to the reasonableness of the projected revenues and expenses and the Debtors' ability to do what they

proposed to do.  And I made the Debtors prove these points in order to obtain confirmation of the plan.

Netflix now contends differently.  It contends that it has contractual rights that are materially different from those that it presented to me and that are materially different from those that Netflix itself contended that it had at the time of confirmation.  This is exactly what judicial estoppel was meant to prevent.  Allowing Netflix to pursue these different rights would threaten the integrity of the bankruptcy process, allow parties to play fast and loose with the relevant issues, and inject an unacceptable level of uncertainty into the results of the confirmation hearing, with devastating consequences to all of the many parties who are now bound by the confirmed plan and who now depend on the release of these movies, in the projected manner and schedule and sequence, for the payment of their claims, and therefore would call for the application of judicial estoppel under the terms of the *Adelphia* decision.

As to the final element, unfair advantage, that one seems very clear here.  In fact, I do not believe Netflix is asserting the alleged contractual rights in good faith.  It is very clear that the license agreement here is better than the ones Netflix has negotiated more recently with other parties and that Netflix would like to get out of it.  Netflix waited until very late in the process to spring this new issue on the Debtors in the hopes that it could gain leverage to force a contract change or maybe even a contract cancellation.  Netflix knew perfectly well – it said so in the declarations it submitted – that in order to release the movies on the schedules that the Debtors proposed, they would have to put distribution agreements in place in advance and would have to make arrangements in advance for the promotion of the films.  Netflix also knew that the Debtors, CIT, RKA and the UCC were all counting on the release of these films in the manner, at the times, and in the sequence that was projected for the payments their claims.  Netflix

waited so that it could interfere with the implementation of these arrangements in the hope that it would have leverage to accomplish something different, which was a termination of a contract that it did not like.  That's just an additional reason why Netflix did not raise these issues before and an additional reason why estoppel should be applied now.

I therefore find that Netflix is barred by res judicata and judicial estoppel from asserting distribution rights based on the terms of the prior Notices of Assignment, and from taking the position that the Debtors cannot release the movies in the sequence and at the times projected at the confirmation hearing, and from contending that Netflix may stream the movies at any time earlier than the time specified in the license agreement itself, which is the only contractual right that Netflix claimed at the confirmation hearing.

The Debtors have also sought relief under section 1142(b).  As to those issues: section 1142(b) requires Netflix's cooperation to the extent necessary to implement the plan.  section 5.6(d) of the license agreement also requires Netflix's cooperation.  It says that Netflix "shall" promptly execute "all agreements reasonably requested" by Relativity, or by any lender, which extends or is willing to extend credit against the license fees payable under the license agreement, "provided such agreements are of a nature which are customarily entered into in connection with comparable credit facilities and shall not result in any additional material obligations on Netflix's part or otherwise adjust any term or provision of this agreement" other than the waiver of defenses by Netflix.

The Debtors' witnesses – Ms. Benjamin, Ms. Stall, and Mr. Hohauser – testified credibly that the standard practice in the industry is for the distributor to agree to assign payment to the lenders and also to include an outside date for payment to the lenders in order to ensure that the lenders receive money before the loans come due.  These witnesses further testified credibly that

it is a standard and customary practice for the distributors to waive defenses to such payments.
The distributors do so because the lenders are helping to finance the films that the distributors
one day hope to distribute.

We now have revised financing terms under the plan and through the issuance of
replacement notes to CIT.  The lenders have requested a revised Notice of Assignment.  It is
customary to provide one; the testimony makes that clear.  Netflix's refusal to cooperate seeks to
turn the customs on their head.  Netflix wants to seize the rights to release these movies first, but
Netflix itself has submitted declarations to me saying that prior theatrical releases are the
customary practice, not only the customary practice, were essential preconditions to Netflix's
own rights.

I can and should require cooperation by Netflix in confirming that the payments it owes
under the license agreement have been assigned to the lenders just as the plan contemplated and
as my confirmation order approves.  The separate question of whether I can and should compel
Netflix to sign the specific agreements that the Debtors and lenders have proposed is something
I'll discuss in a few minutes.

Now, I rely on res judicata and judicial estoppel and the terms of section 1142(b) in
making the rulings I have discussed so far.  I should note, as an additional and independent
ground for my rulings, that I also find that Netflix's position on the application of section 5.6 of
the license agreement is without merit and is not arbitrable.

As to section 5.6 of the license agreement: Netflix is obligated to comply and to
cooperate so long as the terms of the document it is asked to sign does not change Netflix's
rights under the license agreement itself.  There is nothing about the new amended Notices of
Assignment that the Debtors and lenders have requested that would be inconsistent with the

license agreement itself.  To the contrary, Netflix's refusal to sign the amendments would create rights that would be inconsistent with the license agreement.

What Netflix really is saying is that it doesn't want to sign an amended Notice of Assignment that would be inconsistent with a prior Notice of Assignment.  But there's nothing in section 5.6 of the license agreement that says that Netflix can refuse to cooperate on that ground.  So long as the agreements requested by the Debtors and the lenders are consistent with the license agreement itself, section 5.6 requires Netflix to cooperate.  In fact, it requires all agreements reasonably requested to accommodate the Debtors and lenders in that regard.  The reference to "all" agreements includes amendments, cancellations and replacements of prior agreements just as much as it covers the initial agreements themselves.

And I note that there is no arbitration clause in section 5.6 or in the license agreement itself.  Netflix argues that the agreement being amended has an arbitration clause, but that does not stop the application of section 5.6 or make section 5.6 itself subject to arbitration.  If the parties had so intended, they should have said so in the arbitration provision, but the Notice of Assignment noticeably stops short of saying that it applies to disputes under section 5.6 of the license agreement itself.

Netflix says that it did not just execute the prior Notices of Assignment for the lenders' benefit but, instead, that it allegedly bargained for something else: that it allegedly bargained for not just protections in the event it was required to make a payment, but that it bargained for the right to make a payment on a specific date and the right to show the movies on that date even if the Debtors and lenders no longer wanted the earlier payment to be made, and even if the lenders and the Debtors wanted to proceed with a theatrical release of the movies first.

For the reasons I have already explained, Netflix is estopped and barred from taking this position. But as a separate basis for my rulings, I have to note that there are three other problems with Netflix's contention.

The first problem is that its position is just not consistent with other terms of the parties' agreements. The license agreement makes clear that a prior theatrical release is a requirement. You can't even calculate a license fee without it, and no distribution rights are granted in the absence of a movie meeting that condition. Netflix does not have distribution rights unless a film is a "Title," and it cannot be a Title unless it is theatrically released at a minimum number of theatres. In fact, a film can never be a first-run theatrically released film, as required by the license agreement, if it has been previously released on Netflix itself. The testimony by Ms. Benjamin on that issue was credible. The testimony by Mr. Roy, to the contrary, was not.

Furthermore, the release of the movies by Netflix before a theatrical release would actually destroy the ability to meet the theatrical release requirement. It would create the absurd situation in which Netflix would have displayed a film only to find out later that it had no legal right to do so.

The second problem is that the Notices of Assignment do not say what Netflix contends. They say explicitly that they are for the benefit of the lenders only. They also say that they take priority over the distribution agreement only as to the lenders and the agent. They do not say that the definition of Title is altered or that these movies qualify as Titles even if they are not yet theatrically released.

The third problem is that Netflix's current interpretation is not consistent with the evidence that both parties offered at trial. At trial, Mr. Roy took the position that a theatrical release could happen after the distribution of a movie by Netflix. That testimony was not

credible and it also was not consistent with his prior statements.  It is absurd for Mr. Roy to contend that the material requirement of a theatrical release could be satisfied after the fact.  It is the prior theatrical release that generates the popular interest in the movie on which Netflix relied, and that was clearly the point that Netflix was making to me at the confirmation hearing.

The requirement of a theatrical release is also incorporated into the very definition of a Title under the license agreement.  Netflix argued, in this proceeding, that the reference to a theatrical release was just a way of describing the quality of the films that had to be distributed or provided to Netflix.  That contention is absurd.  If quality was the issue, the parties would have said so.  Netflix itself said, in its prior papers, that theatrical release was a material requirement and that what Netflix was entitled to was films that already had been widely released.

Ms. Gagan testified that Netflix allegedly bargained, in the Notices of Assignment, for a set date, for its own benefit, that would give Netflix an immediate distribution right.  But that's belied by the credible testimony of the Debtors' witnesses, which was to the effect that the designation of an outside payment date and a waiver of defenses to payment at that time was customary and was for the benefit of the lenders.  It was not something that Netflix separately bargained to do for its own benefit; it was simply something that it was required and expected to do under section 5.6.

And I have to note that Ms. Gagan's testimony about the alleged rights that Netflix negotiated for itself is undercut by the other evidence that Netflix submitted.  Ms. Gagan testified that Netflix allegedly bargained, in the very first Notice of Assignment that it did for a movie called "The Fighter," for the right to show the films on the Netflix system, if Netflix made a payment, even if the movie had not yet been theatrically released.  She testified that this

allegedly meant that there would never be a gap between a payment by Netflix and the actual
start of distribution rights.

But Relativity Exhibit 26-C is an e-mail exchange about these provisions in Notices of
Assignment.  Netflix actually asked for assurance that Relativity would likely repay its debts
from the theatrical proceeds for the movies being discussed, and that if Netflix, nevertheless, was
required to pay the lenders, Netflix could claim an immediate refund from Relativity.  The e-mail
said that Netflix could not accept the idea that it might have to make a payment a full year in
advance of its distribution right without an immediate refund right from Relativity.  But this e-
mail was in July of 2011.  Ms. Gagan claimed that she had already ironed this out in 2010 and
that, based on the agreements put in place in 2010, Netflix always would be able to distribute a
movie on the date it made payment to the lenders.  That cannot be reconciled with the concerns
Netflix itself expressed in the e-mails marked as Exhibit 26C.

I believe and find that Netflix has always understood that, as between it and Relativity, a
prior theatrical release of movies was required before Netflix could distribute them.  The
testimony by Ms. Gagan and Mr. Roy to the contrary was not credible and was contradicted by
Netflix's prior papers, Mr. Roy's prior declaration, and the exhibits Netflix offered at trial,
including Netflix Exhibits 26 and 27, some of which contained other statements, including by
Ms. Gagan herself, I believe, that the prior theatrical release is what Netflix bargained for and
required and which was necessary before a movie could be distributed by Netflix.

The evidence shows that Netflix did not want to make a payment to the lenders before it
could begin showing a movie, but Netflix is not at risk of any such thing here.  The lenders and
Relativity are in agreement.  Netflix is trying to turn the prior Notices of Assignment into
something that its own evidence shows was never intended.

30

So as I've already said, I primarily rely on judicial estoppel and res judicata in foreclosing Netflix from taking the position that it currently takes, but as an independent ground, I find that the contracts don't support it, and also note, as I've already said, that it's not an arbitrable issue because section 5.6 of the license agreement is not subject to arbitration.

But that brings me to the harder question of whether I can and should compel Netflix to agree to the specific amendments of the Notices of Assignment that the Debtors have proposed. Those proposals include new outside dates by which Netflix would be required to make payments to the lenders even if, for some reason, the theatrical releases of the movies have not occurred. I raised this as a question during the proceedings in front of me several times.

While the new schedule for the release of the movies was clear at confirmation, there was no prior testimony at confirmation as to any specific new outside date that would be requested from Netflix, nor do I recall seeing any such provision in the plan documents or in the notes that were issued to CIT and other parties. CIT has told me, at this proceeding, that it wants such a provision and that it is customary for Netflix to provide it. And as a matter of custom, CIT is probably right, and it is probably entitled to one. But the question is whether I can impose those dates and whether my power under section 1142 goes that far.

Now, in addressing this question, I have tried to determine if there is any actual legitimate dispute among the parties as to the dates the Debtors have proposed. I would have been open to any suggestion that the dates suggested by the Debtors were improper and that there was some legitimate dispute over the dates themselves rather than a dispute over the very concept that an amendment could be requested. I practically begged Netflix's counsel, at closing arguments, to tell me if Netflix had any objection to these dates, and if so, what it was. And Netflix refused to engage on the point. There is no evidence that it has ever expressed any

opposition to the requested dates.  The Debtors offered unchallenged testimony as to how the dates were selected and why they were contractually customary and reasonable.  Netflix refused to take issue with that.  At my urging, the lenders even offered longer terms and offered to set outside dates at any time prior to the date the loans came due.  And again, Netflix just refused to engage on the point, rather than offering any reason to think those dates were anything but customary and reasonable.

I am very tempted to find, as a result, that there is no legitimate dispute, and no legitimate ground for dispute as to the dates requested, and to impose them on that basis.  It is quite clear to me that Netflix's refusal to agree to particular dates is tactical, not principled.  I believe, however, that it is best for me to stop short of imposing the dates the Debtors and the lenders have proposed or from selecting new outside dates myself.

It appears quite clear to me from the evidence that, as a matter of custom, the Debtors and CIT are entitled to new Notices of Assignment that will incorporate reasonable new outside dates.  But the agreement to specific new outside dates was not so clearly part of the plan itself or the confirmation hearing, I believe, as to confer on me the power and jurisdiction to impose them.  So I will make rulings and issue injunctions that are consistent with the other findings that I have made, but I will not impose new dates myself.  If the Debtors and lenders want to seek new Notices of Assignment that have such new dates in them, they will be free to try to compel them in other court proceedings, pursuant to section 5.6 of the license agreement.

And just to be absolutely clear, my refusal to issue those dates has nothing to do with whether I think, contractually, the Debtors are entitled to them; it has everything to do with the limits of what I see as my authority under section 1142(b) and is without prejudice to the Debtors seeking such dates in other proceedings.

Also to be absolutely clear, the rulings I am making today are a bar to any contention by Netflix that it has any distribution rights under the prior Notices of Assignment, or to any rights to distribute these movies at any time other than the dates specified in the license agreements themselves, without regard to the prior Notices of Assignment. And Netflix is estopped from seeking relitigation of those issues, and it will be enjoined from seeking relitigation of those issues in any other court.

The only thing that my order is without prejudice to is the Debtors' and lenders' rights to seek to compel the execution of new NOAs that have new outside dates in them, and their contention in other proceedings that the proposed new terms are customary and in accord with section 5.6 of the license agreement.

And that brings me back to the *Stern v. Marshall* issues. In *Stern v. Marshall*, the Supreme Court said that certain issues in bankruptcy proceedings cannot be finally adjudicated by an Article I bankruptcy court because that would violate the terms of the United States Constitution. However, the Supreme Court noted that there are issues that are essential to the bankruptcy process itself, on which bankruptcy courts can and regularly do make final decisions.

Now, first, it cannot be the case that *Stern v. Marshall* bars me from enforcing my own prior orders and from making final rulings as to res judicata and judicial estoppel. The confirmation order was entered in a core bankruptcy proceeding. While there are questions about matters that a bankruptcy court may handle, to my knowledge, nobody has ever suggested that a confirmation hearing is not within the core jurisdiction of a bankruptcy court or that the bankruptcy court cannot enter final orders in a confirmation proceeding.

Second, section 1142(b) of the Bankruptcy Code gives me the power to direct Netflix to cooperate to the extent necessary to implement the plan. My approval of the plan, and the

protections that confirmation provides to all creditors, would be meaningless if I could not

enforce section 1142(b) and compel Netflix's cooperation in granting to other parties the rights

that the plan grants to them.

Third, the issues raised here are not just an incidental counterclaim by a debtor, as Netflix

seeks to depict it in the objection that it filed.  These are issues raised by the Debtors to enforce

the findings that I made in the confirmation of the plan and to enforce the distributions of

property that are set forth in the plan.  It is not an effort to pursue a counterclaim; it is an effort to

enforce the terms of the plan and my prior orders.

I might have been more inclined to see more strength to the *Stern v. Marshall* argument

as to the imposition of specific outside release dates if I had been inclined to force such new

dates on Netflix, but I have decided not to do so for the reasons I have stated.

So for all of these reasons, I will enter an order today that enjoins Netflix from

contending that the prior Notices of Assignment have given Netflix the rights to distribute

"Masterminds" and "The Disappointments Room" at any time prior to the times when they

would be available for distribution under the terms of the license agreement itself without regard

to those prior Notices of Assignment; requiring Netflix to confirm, for the benefit of the

production lenders, that the license fees payable with respect to these movies have been assigned

to the lenders as collateral, and will be paid to the lenders when such amounts are due; enjoining

any continuation of the arbitration proceeding that Netflix purported to commence, as its sole

purpose is to attempt to obtain rulings that would override the ones that I have made; and

providing that all of these terms will take immediately, and be without prejudice, as I have

already said, to further proceedings in which the Debtors and lenders may seek to obtain specific

new outside dates in new Notices of Assignment from Netflix.

That is my ruling.  So if you'll please have that transcribed and submitted, we will correct it in the manner that I have indicated.  Thank you.

All right.  We are adjourned.

MR. DURRER:  Thank you, Your Honor.

THE COURT:  Okay.  We are adjourned.

MR. MICK:  Your Honor, this is Steve Mick on behalf of Netflix.

THE COURT:  Yes.

MR. MICK:  For point of clarity, is it your intent that the Court's order be entered at the point in time in which the written document that you've previously described is submitted and entered on the docket, or is it the Court's view that the Court's order is entered effective as of now without regard to the written entry on the docket?

THE COURT:  It's my intention that you be barred immediately, as of now, and my order to that effect will be entered very soon.

MR. MICK:  As I'm sure Your Honor is aware, the Bankruptcy Rule 7062 and Federal Rule 62(a) contain a period of time prior to the point at which an order of the Court can be enforced in order to provide a party with an opportunity to seek review or stay in the district court.  To the extent that the Court intends to enter an immediate order with some effects on Netflix, we ask that the Court, in accordance with Rule 62(a), provide us with either the 62(a) period, prior to enforceability, or alternatively, some brief period of time in which we can seek that relief from the district court.

THE COURT:  As to the injunction against distribution and proceeding with the arbitration, I will not stay those rulings.  They need to have immediate effect or else they would be subverted.  As to the require --

MR. MICK:  Understood.

THE COURT:  -- as to the requirement that Netflix execute a confirmation for the lenders that they will indeed receive from Netflix what is owed under the license agreement, I will give you a short stay, not the time period otherwise specified in the rule, but a short stay before you sign such a document, in case you seek a further stay from another court.  Okay?

MR. MICK:  Obviously, Rule 62 contemplates a fourteen-day stay, which would expire prior to the point in time in which the underlying NOA issues would be joined by the June 17 date, but I would ask Your Honor for a ten-day period, given that Monday is a federal holiday, so that my client can raise the matter in the district court and get the district court's attention.

THE COURT:  I will give you till next Friday, but I have the authority to shorten the periods that would otherwise apply.  And as I said, the injunctions take effect immediately; no stay on those.  Okay?

MR. MICK:  Understood.

THE COURT:  Anything else?

MR. MICK:  No, Your Honor.

THE COURT:  Okay.  Relativity, anything?

MR. DURRER:  No, Your Honor.  I think Mr. Wynne may have signed off, but . . .

THE COURT:  Okay.

MR. DURRER:  . . . I just wanted to point out, consistent with your order, 62(a) does not require stay for an injunction.

THE COURT:  Okay.  Thank you.  We are adjourned.

Thank you to the court staff for coming here the day before the holiday weekend.

Dated: New York, New York
May 27, 2016 (dictation date)
June 1, 2016 (date of corrected transcript)

**s/Michael E. Wiles**
UNITED STATES BANKRUPTCY JUDGE