BERNSTEIN SHUR SAWYER & NELSON, P.A.
100 Middle Street
P.O. Box 9729
Portland, ME 04104
Telephone: (207) 774-1200
Robert J. Keach, Esq. (*Admitted pro hac vice*)

*Fee Examiner*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                                          :
                                                          :
**In re**                                                 :
                                                          :        **Chapter 11**
**RELATIVITY FASHION, LLC, <u>et al.</u>,**               :
                                                          :        **Case No. 15-11989 (MEW)**
                                      **Debtors.**        :
                                                          :        **(Jointly Administered)**
-------------------------------------------------------------------x

**FEE EXAMINER'S CONSOLIDATED FINAL REPORT PERTAINING TO THE
FINAL FEE APPLICATIONS OF CERTAIN RETAINED PROFESSIONALS FOR THE
<u>PERIOD FROM JULY 30, 2015 THROUGH APRIL 14, 2016</u>**

Robert J. Keach (the "<u>Fee Examiner</u>") submits this Consolidated Final Report (the

"<u>Final Report</u>") pursuant to the Order Approving the Stipulation to Appoint a Fee Examiner

[Docket No. 1742] (the "<u>Fee Examiner Order</u>") in connection with the applications for

allowance of compensation for professional services rendered and for reimbursement of actual

and necessary expenses (the "<u>Fee Applications</u>") of certain professionals retained in the above-

captioned, jointly administered cases (the "<u>Retained Professionals</u>").[1] The Fee Applications are

final applications and relate to the compensation for professional services rendered and

reimbursement of expenses requested from the effective date of each such Retained

---

[1] This report encompasses the fee applications and/or fee statements of all professionals subject to review by the
Fee Examiner except for the final fee applications of PJT Partners and Houlihan Lokey Capital, Inc., both of which
are adjourned to the December 8, 2016 hearing date, and the fee statements of FTI Consulting, Inc. ("<u>FTI</u>"), which
have not been set for hearing.

Professional's retention through April 14, 2016 (the "Compensation Period") for all such Retained Professionals.

## I.    INTRODUCTION

1.    The Final Report covers the Fee Applications of thirteen (13) Retained Professionals subject to the Stipulation and Agreed Order Extending the Professional Fees Bar Date for Certain Parties [Docket No. 2011].[2]  As a consequence of the process described below, the Fee Examiner has reached an agreement with each of the thirteen (13) Retained Professionals, and those agreements and the Fee Examiner's recommendations as to fees to be allowed and expenses to be reimbursed for the Compensation Period are detailed below and also set forth, for the convenience of the Court, in summary form, on **Exhibit A** to this Final Report.

2.    The Fee Examiner also takes this opportunity to commend the Retained Professionals on their cooperation, good will and professionalism.  The fact that the fee review process has resulted in agreed reductions in fees and expenses does not suggest that anyone did anything wrong or overcharged or was "caught"; to the contrary, the "savings" achieved by this process reflect, fundamentally, the exercise of commendable billing judgment by those Retained Professionals, assisted by the Fee Examiner.  The Retained Professionals in these cases deserve credit for the manner in which they have conducted themselves in this fee review process.  The Fee Examiner has been honored to serve the Court, the process, and the Retained Professionals,

---

[2] The Retained Professionals covered by the Final Report are listed on Exhibit A hereto.  As noted, the fee applications of PJT Partners and Houlihan Lokey Capital, Inc. are adjourned.  The fee applications of the Fee Examiner and Bernstein Shur are also scheduled for hearing on December 8, 2016; those applications will be reviewed by the Office of the United States Trustee.  In addition, the Fee Examiner will file a separate report with respect to FTI pursuant to the Stipulation and Order Between Litigation Trustee, Reorganized Debtors, FTI, Consulting, Inc., and Fee Examiner [Docket No. 1916].

and in that spirit tenders this Final Report which he hopes will be of assistance to the Court in its adjudication of the Fee Applications.[3]

## II.      THE APPOINTMENT OF THE FEE EXAMINER AND THE FEE EXAMINATION PROCESS

3.      In light of the size and complexity of these chapter 11 cases, this Court appointed the Fee Examiner to "review, report on, and object to (if appropriate) the requests for final approval by this Court of the fees and expenses of . . . the Professionals for compliance with various applicable orders, rules and guidelines, and, to the extent such requests are found to not be in compliance, to object to the allowance of fees or expenses sought by any Professional on any grounds, including, without limitation, the reasonableness of the fees and expenses sought. Fee Examiner Order, ¶ 2 and Ex. A, ¶¶ 1, 2.[4]   After reviewing each Fee Application filed by a Retained Professional, "the Fee Examiner shall prepare and transmit a separate report on each Application (each, a "Report") . . . inform[ing] the [Professional] of any issue or objection relating to the [Professional's] Application."   Id. at Ex. A, ¶ 4.a.   The Fee Examiner shall transmit the Report to counsel to Relativity Fashion, LLC and certain of its affiliates (collectively, the "Debtors"), counsel to the official committee of unsecured creditors (the "Committee"), the United States Trustee (the "UST"), and the Retained Professional that is the subject of the Report.   Id.[5]   The Fee Examiner "shall provide the [Professional] with a

---

[3] See Nancy B. Rapoport, Rethinking Professional Fees in Chapter 11 Cases, 5 JOURNAL OF BUSINESS & TECHNOLOGY LAW 263, 293 (June 2010) (characterizing fee examiner as a "neutral, like the court and like the U.S. Trustee, designed to help the system by asking questions …").   The Fee Examiner has taken the position throughout these cases that the goal of a fee examiner should not be to achieve a predetermined level of "savings." Indeed, ideally, there would be no savings to be achieved.   Rather, the role of the fee examiner is to (a) assist the Court in what would otherwise be a difficult task in a case of this size and complexity; and (b) help insure public confidence in, and the appearance of integrity of, the chapter 11 process.
[4] Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Fee Examiner Order.
[5] These Preliminary Reports were not filed with the Court.   Necessary aspects of those reports are incorporated herein, and this report is presented as a consolidated report, consistent with the approach taken by the Fee Examiner in AMR Corp. and other cases.   Should the court desire to see the original Preliminary Reports, the Fee Examiner is prepared to file them with the Court, at the Court's instruction and upon such conditions as the Court shall require.

reasonable opportunity to address, and resolve to the mutual satisfaction of the Fee Examiner and the [Professional] the issues identified or to amend its Application . . . ." Id. at ¶ 4.b. After a reasonable opportunity to respond to resolve the issues identified in the Report or to amend the Application, the Fee Examiner shall file a report with the Court and note any remaining objections to the Application. Id. at ¶ 4.c.[6]

4.       Additionally, pursuant to the Fee Examiner Order,

> [T]o the extent that any order approving the retention of any Professional in whole or in part under section 328 of the Bankruptcy Code authorizes any party, including, without limitation, the United States Trustee, to object to the allowance of fees or expenses sought by such Professional on any grounds, including, without limitation, the reasonableness of the fees and expenses sought, the Fee Examiner shall also be authorized (and shall have standing) to object to the allowance of such fees and expenses . . . .

Fee Examiner Order, ¶ 1.  All of the orders approving the retention of Retained Professionals ("Section 328 Professionals") in whole or in part under section 328 of title 11 of the United States Code (the "Bankruptcy Code") entered as of the date of this Final Report also authorize the UST (and in some cases other parties) to object to the allowance of the Retained Professional's fees or expenses on reasonableness grounds.

5.       Under the Plan Proponents' Fourth Amended Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan"), to receive reimbursement for fees and expenses incurred, the Plan proponents must file and serve fee statements on the Debtors, the Litigation Trust (as defined in the Plan), the UST, and the Fee Examiner.  See Plan, Part II, ¶ A.1.e.  The fee statements may be redacted for privileged information and, while not required to

---

[6] Given the somewhat unique procedural aspects of this case, draft final fee applications were served upon the Fee Examiner for review and the Retained Professionals received the Preliminary Reports prior to the deadline for filing final fee applications.  Perhaps as a result of that timing, and through the exercise of independent billing judgment, some of the Retained Professionals made voluntary fee and expense reductions in connection with the filed final fee applications and prior to further interaction with the Fee Examiner.  Those voluntary reductions total at least $819,451.74 and are not reflected on Exhibit A or herein, but are in addition thereto.  Without limitation, Jones Day wrote off $311,362.85 and Skadden Arps wrote off $508,088.89.

set forth time records and invoices in a particular format, must provide sufficient detail to allow the Fee Examiner to review the fees and expenses incurred for reasonableness.  Id.

6.     Accordingly, the Fee Examiner reviewed each Fee Application, including each Fee Application of a Section 328 Professional and Plan proponent, under the reasonableness standard set forth in section 330 of the Bankruptcy Code.

7.     The Fee Examiner reviewed the Fee Applications for compliance with applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), the Order Establishing Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals dated December 10, 2010 (General Order M-412), the Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. 330, 28 C.F.R. Pt. 58, App. A (the "UST Appendix A Guidelines"), and, as to counsel, the Appendix B—Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. 330 by Attorneys in Larger Chapter 11 Cases, 78 F.R. 36248 (the "UST Appendix B Guidelines, and collectively with the UST Appendix A Guidelines, the "UST Guidelines"), as supplemented by the Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases ("M-447").[7]   The Fee Examiner also reviewed the Fee Applications for general compliance with legal precedent established by the District Courts and Bankruptcy Courts for the Southern District of New York, the Second Circuit Court of Appeals, and other applicable precedent.

8.     Following that review, the Fee Examiner issued a detailed Preliminary Report as to each Retained Professional.  Each Preliminary Report set forth the legal and other standards

---

[7] M-447 has been incorporated into Local Rule 2016-1.  See S.D.N.Y. LBR 2016-1.

governing the review, and raised questions as to certain categories of time or expense, as well as designated time entries or expenses. Each Retained Professional was invited to respond to the Preliminary Report, and all of the Retained Professionals covered by this Final Report produced responses addressing the questions raised in the Preliminary Report, in some cases more detailed and extensive than the original Fee Application. E-mail exchanges were conducted and telephone conferences were held. Face-to-face meetings were held with the Retained Professionals that elected that option. Through this process, substantial additional information was provided to the Fee Examiner.

9. Following receipt of the additional information, which information often clarified or resolved many of the questions raised by the Fee Examiner, the Fee Examiner communicated revised proposals to the Retained Professionals as to his recommendations for allowance of fees and reimbursement of expenses. As a consequence of exchanges with the Retained Professionals following the delivery of these revised proposals, resolutions were reached with each of the Retained Professionals whose Fee Applications are covered by this Final Report.

### III. STANDARDS APPLIED BY THE FEE EXAMINER

#### A. Review of Fees under Section 330 of the Bankruptcy Code

10. Pursuant to section 330 of the Bankruptcy Code, the Court may award professionals "reasonable compensation for actual, necessary services[.]" 11 U.S.C. § 330(a)(1)(A). The Court may, on its own motion or an objection filed by a party in interest, "award compensation that is less than the amount of compensation that is requested." Id. at § 330(a)(2). In evaluating the amount of reasonable compensation to be awarded, the Court should consider:

the nature, the extent, and the value of such services, taking into account all relevant factors, including:

> (A)    the time spent on such services;

> (B)    the rates charged for such services;

> (C)    whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

> (D)    whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

> (E)    with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

> (F)    whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

Id. at § 330(a)(3)(A-F). In certain circumstances, the Court's discretion is limited; pursuant to section 330(a)(4), "the court shall not allow compensation for—(i) unnecessary duplication of services; or (ii) services that were not—(I) reasonably likely to benefit the debtor's estate; or (II) necessary to the administration of the case." Id. at § 330(a)(4); see also In re Teraforce Tech. Corp., 347 B.R. 838, 847 (Bankr. N.D. Tex. 2006) (noting mandatory nature of § 330(a)(4)).

11. A fee applicant bears the burden of proof on all of the elements of a fee application, including proving that the services provided were necessary and reasonable and that the billed expenses were necessary, reasonable, and actually incurred. E.g., Howard v. High River L.P., 369 B.R. 111, 115 (S.D.N.Y. 2007); In re Keene Corp., 205 B.R. 690, 695 (Bankr. S.D.N.Y. 1997); In re 530 W. 28th St., L.P., No. 08-13266 (SMB), 2009 WL 4893287, at *8 (Bankr. S.D.N.Y. Dec. 11, 2009). The failure of an applicant to sustain the burden of proof as to the reasonableness of the compensation may result in the denial of the request for

compensation. <u>See</u> <u>Brake v. Tavormina (In re Beverly Mfg. Corp.)</u>, 841 F.2d 365 (11th Cir. 1988). "Generally, fee applications, standing alone, must contain sufficient detail to demonstrate compliance with § 330. . . . Any uncertainties due to poor record keeping are resolved against the applicant." <u>530 W. 28th St.</u>, 2009 WL 4893287, at *8. "To meet this burden, the applicant must support its request for fees and expenses with specific, detailed and itemized documentation." <u>In re Bennett Funding Grp., Inc.</u>, 213 B.R. 234, 244 (Bankr. N.D.N.Y. 1997). Moreover, the exercise of billing judgment by attorneys is ethically mandated; it is an inherent and unavoidable component of every fee application. <u>Id.</u> at 241. A fee applicant must make a good faith effort to exclude excessive, redundant or otherwise unnecessary hours from a fee request. <u>Id.</u>

12. In determining if services are "necessary," the courts in the Southern District of New York employ an objective test, which asks "what a reasonable lawyer would have done at the time." <u>In re Cenargo Int'l PLC</u>, 294 B.R. 571, 595 (Bankr. S.D.N.Y. 2003). Stated differently, "the test is an objective one and considers 'what services a reasonable lawyer or legal firm would have performed in the same circumstances.'" <u>Keene</u>, 205 B.R. at 696 (<u>quoting</u> <u>In re Ames Dep't Stores, Inc.</u>, 76 F.3d 66, 72 (2d Cir. 1996)). In applying the test, courts do not attempt to "invoke perfect hindsight." <u>Cenargo</u>, 294 B.R. at 595.

13. Likewise, the "reasonableness" of a professional's fees is a forward-looking concept and is not determined by hindsight. <u>See</u> <u>In re Quigley Co.</u>, 500 B.R. 347, 357 (Bankr. S.D.N.Y. 2013); <u>In re Brous</u>, 370 B.R. 563, 570 (Bankr. S.D.N.Y. 2007); <u>see also</u> <u>In re CCT Commc'ns, Inc.</u>, No. 07-10210 (SMB), 2010 WL 3386947, at *5 (Bankr. S.D.N.Y. Aug. 24, 2010). "A decision reasonable at first may turn out wrong in the end." <u>Brous, 370 B.R. at 570.</u> "The test is an objective one, and considers what services a reasonable lawyer or legal firm

would have performed in the same circumstances." Id. (internal quotations omitted); see also In re W. End Fin. Advisors, LLC, No. 11-11152 (SMB), 2012 WL 2590613, at *4 (Bankr. S.D.N.Y. July 3, 2012).

14.     When evaluating the "benefit" of the services to the estate, the courts in the Southern District employ a similarly forward-looking, objective test. Under this objective test, a professional is not required to be 100% successful; rather, section 330(a)'s "benefit" and "necessary" criteria "are satisfied if a reasonable attorney would have believed at the time that a particular service would benefit the estate, taking into consideration the chances of success and the reasonably-projected attendant costs." Cenargo, 294 B.R. at 596; see also In re Angelika Films 57th, Inc., 227 B.R. 29, 42 (Bankr. S.D.N.Y. 1998) (stating that "[a]n attorney should only proceed with a legal service if the potential benefit of the service, which takes into consideration the chances of success, outweighs the costs."). The professional is required to undertake an appropriate cost-benefit analysis before rendering the service. Keene, 205 B.R. at 696.

15.     "Actual," not surprisingly, means that the service must have actually been rendered and the time actually spent; in other words, the bill must not be "padded." See Keene, 205 B.R. at 696 n.6.

16.     In determining comparability, i.e., whether the compensation sought is "commensurate with the fees awarded for comparable services in non-bankruptcy matters," the court's inquiry into the value of the services is "described as a market-driven approach. That is, if the . . . professionals charge the same amount as the applicable market for comparable services, the Court would need good and articulated reasons to reduce their fee request as excessive." Cenargo, 294 B.R. at 596. "The general market acceptance of a practice, especially

given the changing, dynamic nature of markets, must control overly rigid, inflexible, and individualized preconceived notions."  In re Drexel Burnham Lambert Grp., Inc., 133 B.R. 13, 21 (Bankr. S.D.N.Y. 1991) (holding that one of the criteria under section 330 must include that attorneys' rates and practices are accepted by the market).  However, the "bankruptcy courts must not become slaves to the prevailing 'markets,' and thus be prevented from making judgments as to the necessity of services performed and the reasonableness of fees charged." Bennett Funding, 213 B.R. at 247.  Market theory does not relieve the courts of the duty to review and scrutinize fee requests.  Id.

**B. Application of "Reasonableness" Analysis to Professionals Retained under Section 328 of the Bankruptcy Code**

17.     As noted above, the Fee Examiner Order requires the Fee Examiner to examine the fees requested by the Section 328 Professionals for reasonableness.  The exact contours of that examination, given that retention is otherwise under section 328, are not fully articulated. However, courts have addressed, in other contexts, application of a reasonableness standard to fee requests by the types of professionals typically retained under section 328.

18.     In applying the "reasonableness" analysis to the services of a financial advisor, investment banker, or other professional whose compensation is normally approved under section 328, the "court's function is surely not restricted to the comparison of fees awarded to other financial advisors in comparable cases."  In re Nw. Airlines Corp., 400 B.R. 393, 398 (Bankr. S.D.N.Y. 2009).  Rather, the court should consider "all relevant factors," including the factors enumerated in section 330(a)(3).  Id.

i.      Monthly Fees; Effective Hourly Rate Comparison.

19.     Where the section 328 professional is paid a flat fee, on whatever interval, "this arrangement does not prevent the Court from using an hourly rate to determine the

reasonableness of that fee." In re Stations Holding Co., Inc., 2004 WL 1857116 at *3 (Bankr. D. Del. 2004) (Court calculates effective hourly rate represented by flat fee to determine reasonableness of flat fee).

20.     As the Court noted in X.O. Communications, the compensation structure for section 328 professionals is: "[t]ypically. . . an engagement is entered into in which the financial advisor's compensation includes a monthly retainer and a transaction fee paid after a successful restructuring has concluded." In re X.O. Commc'ns, Inc., 398 B.R. 106, 111 (Bankr. S.D.N.Y. 2008).  With respect to the monthly retainer component, courts typically treat the monthly retainer as with any flat fee; courts calculate the effective hourly rate represented by the monthly retainer and compare that rate with the hourly rates charged by other financial advisors, including those already employed in the same case.  See, e.g., Miller Buckfire & Co., LLC v. Citation Corp. (In re Citation Corp.), 493 F. 3d 1313, 1320–21 (11th Cir. 2007) (court uses lodestar analysis to determine reasonableness of investment banker's fees); Houlihan Lokey Howard & Zukin Capital v. Unsecured Creditors Liquidating Trust (In re Commercial Fin. Serv., Inc.), 427 F. 3d 804, 811–12 (10th Cir. 2005) (lodestar analysis relevant to reasonableness of monthly fee investment banker; that there was no objection to monthly rates does not mean that such rates are immune from a review for reasonableness); In re Gillett Holding, Inc., 137 B.R. 475, 478–81 (Bankr. D. Colo. 1992) (lodestar analysis used to assess reasonableness of investment banker's monthly fee).

21.     To complete the relevant lodestar analysis, the court (or the fee examiner) must first calculate the number of hours that are allowable, using applicable standards.  That total is then divided into the monthly fees sought to determine the effective hourly rate.  Thus, to permit a reasonableness review of monthly flat fees, or other flat fee arrangements, such professionals

must keep time records that are sufficiently detailed, and sufficiently reflective of **actual** time spent, to permit a determination of the reasonableness of the time spent, the number of allowable hours, and the construction of the effective hourly rate reflected by the flat fee. If the fee application and the time records, as they may be supplemented by other evidence supplied by the professional, do not permit a lodestar analysis and an assessment of the reasonableness of the financial advisor's flat fee, the fee will be reduced or payment of the fee denied. In re Circle K Corp., 294 B.R. 111, 116–119 (Bankr. D. Ariz. 2003) (investment banker's monthly fee denied due to inadequate time records); In re Act Mfg, Inc., 281 B.R. 468, 492 (Bankr. D. Mass. 2002) (same); In re Hillsborough Holdings Corp., 142 B. R. 1006, 1007 (Bankr. M.D. Fla. 1992) (same); In re Office Prods. Of America, 136 B.R. 675, 680–82 (Bankr. W.D. Tex. 1992) (same).

               ii.      Success and Other Contingent Transaction Fees.

22.      With respect to the "success," "transactional, "restructuring," or similar, contingent fee components of a financial advisor's compensation, not all of the factors set forth in section 330 deserve equal emphasis:

> In considering a transaction fee, courts recognize that certain of these factors do not apply, such as "time spent" or the "rates charged." In re Intelogic Trace, Inc., 188 B.R. 557, 559 (Bankr. W.D. Tex. 1995). Rather, relevant factors to consider in assessing a financial advisor's transaction fee are (i) whether the financial advisor's services were necessary and beneficial to the estates at the time they were rendered, and (ii) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases outside of bankruptcy.

X.O. Commc'ns, 398 B.R. at 113; but see Nw. Airlines Corp., 400 B.R. at 398 (applying all elements of section 330 to investment banker compensation, including success fee, and

concluding that investment banker was adequately compensated by monthly fees that translated into high effective hourly rate).[8]

23. The first element that must be established is that the contractual trigger to payment of "success," "transactional, "restructuring," or similar, contingent fees, as set forth in the applicable retention documents, has been met. If the applicant cannot prove entitlement to a success fee under its contract, the inquiry ends and the fee will be disallowed. In re CDC Corp., 484 B.R. 496, 499 (Bankr. N.D. Ga. 2012) (fees denied where triggering event did not occur); In re River Road Partners, LLC., 2012 WL 6585506 (Bankr. N.D. Ill. Dec. 17, 2012) (same). However, proof of entitlement under the contract is a necessary but not sufficient condition to payment of "success," "transactional, "restructuring," or similar, contingent fees.

24. As an element of the first prong of the two-part test of X.O. Communications (regarding whether the services were beneficial when rendered), where a "success fee" or like fee is at issue, there must also be a sufficient nexus between the professional's effort and the outcome to trigger the fee, and a success fee will not be paid where the result was brought about by the efforts of other professionals. Nw. Airlines Corp., 400 B.R. at 398. The "nexus" standard examines whether the "direct benefit to the estate [was] realized through the efforts of some other entity or professional." Id. at 400; see also X.O. Commc'ns, 398 B.R. at 114 (stating that "the 'reasonable standard' of section 330 allows a court to view, on an ongoing basis, the nexus between the tasks performed and the results achieved."); In re Iron Horse Bicycle Co., LLC, 2010 WL 474560 at *8 (Bankr. E.D.N.Y., Feb. 4. 2010) (detailing nexus test).

---

[8] In Northwest Airlines, Judge Morris stated that the "court's function is surely not restricted to the comparison of fees awarded to other financial advisors in comparable cases." Nw. Airlines Corp., 400 B.R. at 398. Rather, the court should consider "all relevant factors," including the factors enumerated in section 330(a)(3). Id. The court first calculated the effective hourly rate of the professional without the success fee, considered the presence or absence of a nexus between the professional's efforts and the outcome of the case (finding it lacking), and, finally, as a form of check, calculated the effective hourly rate of the professional if the success fee were included. Id. at 396–401.

25.     In the <u>Texas Rangers</u> case, the court reduced the amount of a transaction fee sought by the investment banker based on lack of a sufficient nexus between the professional's efforts and the triggering event, a sale of the debtor.  <u>In re Texas Rangers Baseball Partners</u>, 2011 WL 1323777 (Bankr. N.D. Tex., April 6, 2011).  First, the court noted the lack of any real risk that the underlying transaction would occur, and held that, given that the risk to the professional was minimized, "it is reasonable that the rewards of success be less."  <u>Id.</u> at *3.  Second, the court considered (1) the prepetition work done by other professionals, as well as the applicant, toward the transaction; (2) the claims of other professionals for fees; (3) the work done by the applicant during the chapter 11 case; (4) the applicant's contribution relative to that of the other professionals and participants in the case; and (5) the positive—and negative—contributions of the applicant to the successful outcome of the debtor's case.  <u>Id.</u> at *4.  Third, the court looked to "fees typically earned by financial advisors in chapter 11 cases," or market factors.  <u>Id.</u>  Finding that the applicant banker had "stepped into a situation in which much had been done to encourage bidding and there existed a proposed transaction designed and obtained by the work of others"—and those other professionals were also seeking fees—"[the applicant] is not now entitled to the Transaction Fee as if it were the principal architect of the sale of the Rangers to Express."  <u>Id.</u> at *5.  The court then examined more closely "the extent to which the [applicant's] impact on the chapter 11 process was positive, the extent to which it was negative, and what other participants brought to the table."  <u>Id.</u>  While finding that the applicant "made a positive contribution to the case," the court also noted that the final sale transaction "was in form and substance the work of others."  <u>Id.</u>  Noting that the applicant's work was also not entirely satisfactory, the court held that:

> The court concludes that, while [the applicant] was an important member of a team that produced an excellent result, its contribution was not all that

ordinarily would be required of a financial advisor, and was not wholly positive. This court has previously noted that a financial advisor should have to justify its fees—particularly a transaction fee-based on either the results achieved by the advisor or the effort—i.e., hours—expended. *See* In re Mirant Corp., 354 B.R. 113, 128–29 (Bankr. N.D. Tex. 2006). In the case at bar, while the result of Debtor's case was excellent, the court concludes that [the applicant's] role in producing it was not, in and of itself, sufficient to warrant an award of the entire Transaction Fee. The court thus turns to the other factors delineated by section 330(a)(3) to determine whether the Transaction Fee would be justified under all of that section's tests.

Id. at *6. Applying the other section 330 factors, the court also concluded that the resulting effective hourly rate—if a reduced transaction fee was added to monthly fees previously paid—would be sufficient, reasonable and comparable. Accordingly, the court awarded a reduced transaction fee.[9] Id. at *7; see also In re Stations Holdings Co., 2004 WL 1857116 (Court uses blended hourly rate calculation to determine reasonableness of termination fee and reduces fee).

26. In establishing adequate "nexus," the applicant for a success fee must prove that it added value over and above that created by the process itself or the efforts of others, including the entire "team" of professionals employed in the case; the applicant must establish a unique and distinct contribution resulting in value added. In re Pub. Serv. Co. of N.H., 160 B.R. 404, 434 (Bankr. D.N.H. 1993) ("The question before this Court on [the] M&A fee request is what added value [the applicant] created apart from the competition inherent in the multiple plans going forward."). As another court put a similar sentiment, "payment of the 'success fee' should be contingent upon the professional being the agent of that success." In re Mirant Corp., 354 B.R.at 129.

---

[9] Notably, the Texas Rangers case resulted in payment "in full of all general unsecured claims with interest." In re Texas Rangers Baseball Partners, 2012 WL 4464550, at *7 (Bankr. N.D. Tex., Sept. 25, 2012).

**C.** **Standards Applicable to Specific Issues Related to Fees**

27.     In applying the reasonableness standard to the fees requested in the Fee Applications, the Fee Examiner reviewed the Fee Applications and the fees requested for the following specific issues, where applicable to each specific Fee Application and Retained Professional. The standards applicable to each of the issues identified below are described in detail.

i.     Firm Staffing and Overstaffing.

28.     The UST Guidelines and M-447 state that fee applications should identify the "[n]ames and hourly rates of all applicant's professionals and paraprofessionals who billed time, [an] explanation of any changes in hourly rates from those previously charged, and [a] statement of whether the compensation is based on the customary compensation charged by comparably skilled practitioners in cases other than cases under title 11." UST Appendix A Guidelines, ¶ (b)(1)(iii); M-447, § A(1)(iii); see also UST Appendix B Guidelines, § C(2)(k). The rates charged should not be greater than those the timekeeper charges for similar services in non-bankruptcy matters. See In re Motors Liquidation Co., First Interim Fee Hr'g Tr. at 18:1-4, 19:4-7; No. 09-50026 (REG) (Bankr. S.D.N.Y. Apr. 29, 2010, 5:24 p.m.). Courts will scrutinize overstaffing, i.e., too many attorneys working on the same tasks. Teraforce Tech., 347 B.R. at 861-62; see also GSC Grp., 2012 WL 676409, at *7 (Bankr. S.D.N.Y. Feb. 29, 2012) (disallowing 15% of fees related to sale of the debtors' business for "staffing inefficiencies"). Additionally, "top heavy" arrangements whereby partners or senior professionals bill a disproportionate amount of time are impermissible. In re Fleming Cos., 304 B.R. 85, 93 (Bankr. D. Del. 2003); see also Teraforce Tech., 347 B.R. at 862 (reducing fees because firm was "top heavy" in partner hours spent on the case; noting that "ratio of partner-to-associate hours is not what the Court would expect to see in a

reasonably staffed case of this size and complexity."). Considerations of overstaffing or "top heavy" billing go to the "overall reasonableness and necessity" of hours billed. Teraforce Tech., 347 B.R. at 862; see also UST Appendix B Guidelines, § B(2)(c) ("The United States Trustee may also object if the skill level of the professional rendering a particular services is not commensurate with the task.").

> ii.   Hourly Rate Increases.

29.   The subject of rate increases during the course of a chapter 11 case has generated some controversy.[10]  Such rate increases are not generally prohibited; indeed a number of courts have allowed mid-case implementation of reasonable, routine, across-the-board rate increases otherwise applicable to all of the professional's clients.  See In re Lee Tractor Co., No. 07-03928-8-RDD, 2008 WL 2788413, at *2 (Bankr. E.D.N.C. July 16, 2008) (allowing rate increase in the middle of a pending case where the letter of engagement notified the client of the possibility of a rate increase during the case, client was not objecting, and "[e]ven though the proposed increases in the hourly rates represent increases ranging from 7.7 to 32 percent, such amounts are not out of line with what other experienced Chapter 11 practitioners charge in this district".); Teraforce Tech., 347 B.R. at 860 ("[A]s [the professional] explained at the Final Fee Application Hearing, and as is common knowledge in this district, it is the customary practice of local law firms to review and adjust their billable rates on an annual basis . . . the Court is satisfied by the explanation offered . . . [and] the rate increases objected to were not so large as to overly concern the Court"; court also noted that retention application preserved the option of raising rates periodically); In re Dimas, LLC, 357 B.R. at 577-78 (overruling objection to rate

---

[10] See Stipulation and Agreed Order Resolving the Fee Examiner's Objection to the Final Fee Applications of Weil, Gotshal & Manges LLP; Kramer Levin Naftalis & Frankel LLP; and Butzel Long, a Professional Corporation [Docket No. 11844], In re Motors Liquidation Co., Chapter 11 Case No. 09-50026 (REG) (Bankr. S.D.N.Y. June 20, 2012) (settlement relating to fees attributable to rate increases).

increases: "Where counsel bills the estate on an hourly basis, it is contemplated that there will be periodic upward adjustments of the hourly rates to keep pace with the market. Moreover, the fee agreement attached to the employment application expressly discloses the hourly rates 'at this time' and states that the billing policies and procedures 'are subject to change.'").

30.     As these cases suggest, there are procedural and ethical prerequisites to implementing mid-case increases in rates. A recent ABA Ethics Opinion provides that:

> Modification of an existing fee agreement is permissible under the Model Rules, but the lawyer must show that any modification was reasonable under the circumstances at the time of the modification as well as communicated and accepted by the client. Periodic, incremental increases in a lawyer's regular hourly billing rates are generally permissible if such practice is communicated clearly to and accepted by the client at the commencement of the client-lawyer relationship and any periodic increases are reasonable under the circumstances. Modifications sought by a lawyer that change the basic nature of a fee arrangement or significantly increase the lawyer's compensation absent an unanticipated change in circumstances ordinarily will be unreasonable.

ABA Formal Op. 11-458, Changing Fee Arrangements During Representation (Aug. 4, 2011). The requirement of prior notice and consent of the client can be accomplished in the engagement letter or retention agreement:

> In some cases, the client's acceptance of a modified fee arrangement may be inferred from the circumstances. For example, many lawyers who bill for their services on an hourly basis routinely increase their "normal" or "regular" hourly billing rates incrementally from time to time, often on an annual basis, without negotiating every increase separately with each client. Such billing practices, if communicated clearly to clients at the commencement of the client-lawyer relationship, generally are permissible. The lawyer nevertheless remains responsible for showing that current clients are adequately informed of the lawyer's billing practices, that those clients have consented to those practices, and that any periodic rate increase is reasonable under the circumstances within the meaning of Rule 1.5(a).

Id.; see also Lee Tractor, supra; Teraforce Tech., supra; Dimas LLC, supra. However, if the option of raising rates was not preserved in the retention documents, and the client has not otherwise consented after full disclosure, the rate increases must be disallowed. Holland v.

EMC Mortgage Corp. (In re Holland), 374 B.R. 409, 435 (Bankr. D. Mass. 2007) (not allowing rate increase where no prior disclosure or agreement). Moreover, changes in rates should be conspicuously disclosed in the notice of the fee application sent to creditors and clearly identified and discussed in the fee application itself; the UST, fee examiner and creditors—and more importantly, the Court—should not have to search the exhibits to the fee application to unearth a rate increase. In re Computer Learning Ctrs., Inc., 285 B.R. 191, 236-7 (Bankr. E.D. Va. 2002) ("Without a prominent discussion in the fee application itself, the change may easily be overlooked.").

31. Following the rate change, the resulting rates must be reasonable, including being in line with market rates in the professional's district. Teraforce Tech., 347 B.R. at 860 (Rate increase objection "goes to the reasonableness of [the professional's] rates . . . thus, a comparison with the local market is in order"); Lee Tractor, 2008 WL 2788413, at *2 ("Even though the proposed increases in the hourly rates represent increases ranging from 7.7 to 32 percent, such amounts are not out of line with what other experienced Chapter 11 practitioners charge in this district"); see also Computer Learning Ctrs., Inc., 285 B.R. at 237 ("The issue remains the prevailing market hourly rates . . . . The [professional] offered no evidence of a change in the prevailing hourly rate and the court's review reveals none. The mere passage of time is not sufficient to justify a change in [a professional's] hourly rate and does not necessarily indicate a change in the prevailing market hourly rates. The fees requested will be re-computed at the rates previously applied."). As noted above, courts are likely to approve modest across-the-board annual increases that apply uniformly to the majority, if not all, of a professional firm's clients. Teraforce Tech., 347 B.R. at 860.

32.     Accordingly, where the applicant seeks approval of fees resulting from a mid-case rate increase, the professional must establish, within the contours of the fee application, that the client, the parties-in-interest and the court were given prior notice of the possibility of periodic rate increases in the retention documents and that the client agreed to the same, that all other procedural prerequisites are met, and that, following the increase, the rates remain reasonable in the sense that such new rates are in line with the market rates in the prevailing district.  Additionally, the fee application should disclose the effect of the rate increases and include a calculation of the total compensation sought in the fee application using the rates originally disclosed in the retention application.  UST Appendix B Guidelines, § C(2).  As with all elements of the fee application, the burden is on the professional to establish that all of these preconditions have been met.  Teraforce Tech., 347 B.R. at 860.  All applications to approve proposed rate increases, and the fees generated thereby, were scrutinized under these standards.

33.     So-called "step-up" increases in the rate for a particular professional are treated differently from across-the-board increases in the firm's billing rates.  A "step-up" increase refers to the progress of a professional or paraprofessional (or such professional's or paraprofessional's class within the firm, such as an associate or partner class) to a higher billing rate (although among the rates approved at retention), by virtue of such professional or paraprofessional gaining additional experience and seniority, despite the fact that the firm's rates have not generally increased.  Although the reported case law on step-up increases is sparse, the available authority suggests that step-up increases are generally allowed during the progress of the chapter 11 case.  See In re Pintlar Corp., Nos. 93-02986, 93-02987, 1994 WL 704476, at *2 (Bankr. D. Idaho Nov. 30, 1994) (court approves increase in professional's billing rate upon his election to partner over objection by retiree committee that professional's "expertise did not increase with his promotion";

such an increase was customary within the firm); <u>In re Heck's Props., Inc.</u>, 151 B.R. 739, 754 (S.D.W. Va. 1992) (district court reversed, as clearly erroneous, bankruptcy court's disallowance of increase in rates for two associates: "Inasmuch as the bankruptcy case progressed over a period of two and one-half years and the billing rates for those two associates would be expected to increase during that period, no adequate reason for the denial has been assigned."). However, a step-up increase presumes that the professional's or paraprofessional's experience, professional growth and increased responsibility over the prior period justify the increase, rather than the mere passage of time. Accordingly, in the event a professional seeks allowance of step-up increases in rates for particular professionals or paraprofessionals during the case, the professional should provide, for each such person, information as to (a) the time of service with the firm for such person since the setting of his or her immediately prior billing rate; and (b) the evolution of the individual's role in the case, including any change in the professional's or paraprofessional's level or type of work and/or responsibility in the case (including, for example, assumption of a supervisory or leadership role with respect to other junior professionals or paraprofessionals, even though the type of work may be unchanged).[11]

       iii.      <u>Application of Retainer.</u>

34. Generally, in cases where there is no significant risk of non-payment, retainers should first be applied to approved fees and expenses until exhausted. <u>See</u> <u>In re Motors Liquidation Co.</u>, First Interim Fee Hr'g Tr. at 29; No. 09-50026 (Bankr. S.D.N.Y. Apr. 29, 2010, 5:24 p.m.). Professionals holding pre-retention retainers should apply those retainers to the fees and costs awarded by the Court and to identify in each interim fee application the amount, if any, that the professional continues to hold in trust after application of the retainer to prior interim fee

---

[11] In this case, the retention orders entered by the Court also mandated various procedural steps <u>prior</u> to the implementation of any rate increase.

awards.

                iv.        Lumping of Time Entries.

35.      The UST Guidelines provide that where a timekeeper's daily time entries exceed 0.50 hours on a daily aggregate, "[s]ervices should be noted in detail and not combined or 'lumped' together, with each service showing a separate time entry . . . ."  UST Appendix A Guidelines, ¶ (b)(4)(v); accord M-447, § A(4)(vii); see also UST Appendix B Guidelines, § C(9)(c) ("A disproportionate number of entries billed in half- or whole-hour increments may indicate that actions are being lumped or not accurately billed."); Brous, 370 B.R. at 570 (noting that "multiple project services rendered on the same day should be listed in separate entries unless the aggregate daily time does not exceed one half hour.").  "[C]ourts will summarily disallow time for discrete legal services merged together in a fee application."  In re GSC Grp., Inc., 2012 WL 676409, at *3; see also In re 415 W. 150 LLC, No. 12-13141 (SMB), 2013 WL 4603162, at *5 (Bankr. S.D.N.Y. Aug. 28, 2013) (allowing fees attributable to 30 minutes for each lumped entry); W. End Fin. Advisors, 2012 WL 2590613, at *5 (endorsing percentage reduction for lumping); CCT Commc'ns, 2010 WL 3386947, at *8 (allowing 30 minutes for each lumped entry, regardless of aggregate time billed for each entry).[12]

                v.        Time Increments.

36.      The UST Guidelines and M-447 provide that time entries "should be kept contemporaneously with the services rendered in time periods of tenths of an hour."  UST Appendix A Guidelines, ¶ (b)(4)(v); M-447, § A(4)(vii); see also In re GSC Grp. Inc., No. 10-14653, 2013 WL 6639217, at *52 (Bankr. S.D.N.Y. December 12, 2013) (disallowing 20% of

---

[12] The Fee Examiner uses the term "lumping" to describe the practice of including multiple tasks in a single time entry on an invoice without identifying the amount of time attributable to each task.  This is distinguished from the practice of billing time in increments other than those authorized (e.g., recording time in 0.5 or 1.0 increments instead of 0.1 increments).  The Fee Examiner refers to this latter practice as "block billing" or "time increments," and discusses that practice later in this Final Report.

fees attributable to a particular timekeeper who did not keep time contemporaneously); W. End Fin. Advisors, 2012 WL 2590613, at *4 (noting requirement of "contemporaneously created time records that specify, for each attorney, the date, the hours expended, and the nature of the work done.") (internal quotations omitted); 530 W. 28th St., 2009 WL 4893287, at *8. Billing in greater than 0.10 hour increments is a practice that lends itself to the potential of increased rounding of time, thereby increasing the likelihood that the reported time charged is inflated. See UST Appendix B Guidelines, § C (9)(c) ("A disproportionate number of entries billed in half- or whole-hour increments may indicate that actions are being lumped or not accurately billed."). This practice is widely criticized by courts and legal scholars and is typically prohibited by sophisticated consumers of legal services as it can result in the billing of time over and above the amount of time actually expended to perform a particular activity. See W. End Fin. Advisors, 2012 WL 2590613, at *15 (noting that the most entries were billed in half-hour or whole hour increments; this "indicates that time was recorded in round numbers without any significant effort to detail the actual time spent on services.").[13]

vi.    Timekeepers' Roles (including Transitory Timekeepers).

37.    A court may not allow compensation for unnecessary duplication of services. See 11 U.S.C. § 330(a)(4)(i). Timekeepers who work on a case for only a few hours or less are referred to as "transitory timekeepers." See Objection of the United States Trustee to Third Interim Applications for Compensation and Reimbursement of Expenses, In re Hostess Brands, Inc., Chapter 11 Case No. 12-22052 (RDD), Docket No. 2398, at 6–7 (Bankr. S.D.N.Y. March 6, 2013). As this Court noted:

> The primary concern with too many attorneys billing too little time is the
> learning curve. Every attorney must be brought up to speed to the extent

---

[13] In certain circumstances, as to non-lawyers, retention orders in this case permitted time-keeping in increments of greater than .10. Those professionals were subjected only to the measurement mandated by such orders.

necessary to perform his or her task, and the theory goes that the cost of this education can be saved or minimized if attorneys already familiar with the case perform the service instead. This concern diminishes where the "transitory" timekeeper provides services on an <u>ad hoc</u> basis within an area of expertise that is not possessed by the attorneys regularly assigned to the case or the task is so focused that it is unnecessary to spend time learning the details of the case.

<u>In re Quigley Co.</u>, 500 B.R. at 362 (allowing time billed by timekeepers who each billed less than six hours during the duration of the case where those timekeepers "dealt with discrete issues"); <u>see also</u> <u>In re Jefsaba, Inc.</u>, 172 B.R. 786, 800 n.9 (Bankr. E.D. Pa. 1994) ("Requests to compensate for services of professionals whose time is de minimis raises a red flag in our review. Other than professionals with a special expertise, the fleeting involvement of bankruptcy attorneys in a case often results from a staffing inefficiency. Given the itinerant attorney's lack of knowledge of the case the attorney's time may be less productive than attorneys regularly assigned to the case."); <u>In re Maruko,Inc.</u>, 160 B.R. 633, 639 (Bankr. S.D. Cal. 1993) (criticizing the occurrence of "transient billing" where an individual timekeeper "visit[s] the file on a limited basis" without accomplishing a discreet task and with no apparent continuing involvement in the matter).

        vii.    <u>Vague Time Entries.</u>

38.    Time entries which "fail to adequately describe the services provided" and which "make a fair evaluation of the work done and the reasonableness and necessity for the work extremely difficult, if not impossible," are considered vague and are "routinely disallowed." <u>GSC Grp.</u>, 2012 WL 676409, at *3 (internal quotations omitted); <u>see also</u> <u>In re Quigley Co.</u>, 500 B.R. at 365 (disallowing 50% of the fees attributable to vague entries such as those containing "follow up" and "addressing issues"); <u>In re 415 W. 150 LLC</u>, 2013 WL 4603162, at *5 (disallowing 20% of fees attributable to vague entries); <u>W. End Fin. Advisors</u>, 2012 WL 2590613, at *5 (endorsing across the board reductions in fee request for vague entries); <u>530 W. 28th St.</u>, 2009 WL 4893287,

at *10 (disallowing 42% of fees associated with vague time entries that "generally refer to research projects so inadequately described that the Court cannot determine what the timekeeper actually did or whether the timekeeper spent a reasonable amount of time doing it."); <u>CCT Commc'ns</u>, 2010 WL 3386947, at *7 (finding that the use of the phrase "attention to" renders time entry vague); <u>Bennett Funding</u>, 213 B.R. at 244 (discussing necessary reduction in fees requested for vague entries). Furthermore, the UST Guidelines and M-447 provide that "[t]ime entries for telephone calls, letters, and other communications should give sufficient detail to identify the parties to and the nature of the communication. Time entries for court hearings and conferences should identify the subject of the hearing or conference." <u>UST Appendix A Guidelines</u>, ¶ (b)(4)(v); <u>M-447</u>, § A(4)(vii). Time entries for conferences, including intra-office conferences, should indicate the participants and the nature and purpose of the conference. <u>Bennett Funding</u>, 213 B.R. at 245. "When compensation for legal research is sought, the time records should identify the issues researched with enough specificity to assess their relevancy and necessity to the case." <u>In re Quigley Co.</u>, 500 B.R. at 368.

viii.     <u>Services Rendered Outside the Scope of Retention.</u>

39.     Services rendered outside of the scope of a professional's retention are non-compensable. <u>See</u> <u>W. End Fin. Advisors</u>, 2012 WL 2590613 at *14; <u>In re Cuisine Magazine, Inc.</u>, 61 B.R. 210, 216 (Bankr. S.D.N.Y. 1986). "The fact that such unauthorized services may have been beneficial to the estate is immaterial." <u>Id.</u>

ix.     <u>Repetitive Time Entries.</u>

40.     Repetitive time entries (<u>i.e.</u>, those billed on more than one occasion by the same timekeeper with identical or nearly identical descriptions and time increments) generally draw scrutiny. <u>See</u> <u>In re Motors Liquidation Co.</u>, Hr'g Tr. at 26:8-25, 27:1-8; No. 09-50026 (REG)

(Bankr. S.D.N.Y. July 6, 2010, 2:33 p.m.).  As explained by Judge Gerber in <u>Motors Liquidation</u>, "professional work, at least at the lawyer and especially partner level, will rarely be so repetitive that it can fairly be described with identical descriptions especially with such frequency.  . . . [T]he guidelines don't require professionals to be 'creative' in their time entries, but the guidelines in case law do require time entries to be minimally descriptive." <u>Id.</u>

        x.       <u>Duplicative Tasks.</u>

41.      Fees incurred in the performance of duplicative tasks may not be compensable, or may be reduced.  <u>See</u> <u>Brous</u>, 370 B.R. at 573 (disallowing fees for performing the same task as was performed by another firm); <u>Kovalesky v. Carpenter</u>, No. 95 CIV 3700 (SAS), 1997 WL 666299, at *6 (S.D.N.Y. Oct. 23, 1997) (reducing fees in part on the basis that work performed by bankruptcy examiner and his counsel was duplicative).  Duplication arises primarily in two ways: (a) professionals from the same firm attending to the same task; and (b) professionals from different firms attending to the same tasks.  <u>See</u> <u>In re Act Mfg., Inc.</u>, 281 B.R. 468, 484 (Bankr. D. Mass. 2002).

        xi.      <u>Legal Research.</u>

42.      While time spent on legal research may be compensable, such research must not be "excessive and beyond that reasonable and necessary for the handling of the Case." <u>Teraforce Tech.</u>, 347 B.R. at 863.  Where the research issues are not novel, and involve issues of substantive law that are within the knowledge and expertise of more senior lawyers working on the case, including other co-counsel, such research time is neither reasonable nor necessary and is not compensable. <u>Id.</u>

        xii.     <u>Clerks.</u>

43.      Generally, fees for services provided by summer clerks (<u>i.e.</u>, law students clerking

at a firm for the summer between school years) are not compensable.  See In re Motors Liquidation Co., First Interim Fee Hr'g Tr. at 20:2-12, 20-25; No. 09-50026 (Bankr. S.D.N.Y. Apr. 29, 2010, 5:24 p.m.).

               xiii.      Multiple Attendees.

      44.      The UST Guidelines and M-447 provide that "[i]f more than one professional from the applicant firm attends a hearing or conference, the applicant should explain the need for multiple attendees."  UST Appendix A Guidelines, ¶ (b)(4)(v); M-447, § A(4)(vii).  Large, complex cases, such as these cases, may require multiple attorneys from the same firm at hearings and conferences:  "The Court acknowledges . . . that in complex chapter 11 cases the need for multiple professionals' involvement will be more common and that in hearings involving multiple or complex issues, a law firm may justifiably be required to utilize multiple attorneys as the circumstances of the case require."  Teraforce Tech., 347 B.R. at 858.  While it may be appropriate to have multiple attendees at some meetings, conferences, hearings or other events, the applicant bears the burden to justify overlapping staffing and to identify each participant's role.  See, e.g., Brous, 370 B.R. at 575; see also In re Kohl, 421 B.R. 115, 129 (Bankr. S.D.N.Y. 2009) (stating that "the applicant must give an adequate explanation for more than a single attorney charging for internal meetings . . . .  An applicant can meet this standard by identifying the other participants and explaining the nature and purpose of the meeting."); In re Fleming Cos., 304 B.R. at 91 (reducing fees whether debtors failed to adequately demonstrate that each attorney present at hearing contributed to the hearing in a meaningful way).

               xiv.      Intra-Office Conferences.

45.     Intra-office conferences may raise issues of reasonableness; however, time spent attending intra-office conferences is not per se not compensable.  As Judge Bernstein stated in CCT Communications:

> I do not take issue with the proposition that multiple lawyers billing for unnecessary conferences is unreasonable and should not be compensated.  It does not follow, however, that two or more lawyers billing their time attending the same conference is per se unreasonable.  In particular, the early stages of a chapter 11 case are often chaotic, require the performance of multiple tasks in a compressed time frame, and, hence, necessitate frequent communication among lawyers in the same firm, between the lawyers and the client, and where required, between general and special counsel.  Furthermore, lawyers inevitably meet and confer during the entire case regarding what must be done.

2010 WL 3386947, at *10; see also Fleming Cos., 304 B.R. at 91-92 ("All participants may bill for time spent in the intra-office conferences with the caveat that the normal requirements of specificity and reasonableness apply.").  The "normal requirements of specificity and reasonableness" dictate that the fee application itself establish that having numerous intra-office conferences was necessary and beneficial, or that having three or more professionals attend an intra-office conference was necessary and beneficial.  See, e.g., In re Fibermark, Inc., 349 B.R. 385, 396 (Bankr. D. Vt. 2006) ("[W]here a professional seeks compensation for meetings and conferences among multiple professionals, such as internal meetings and conferences, the professional must demonstrate benefit [to] the estate and document consistent amounts of time by all participants."); Kohl, 421 B.R. at 128 (stating that "the applicant must give an adequate explanation for more than a single attorney charging for internal meetings . . . .  An applicant can meet this standard by identifying the other participants and explaining the nature and purpose of the meeting.").  Accordingly, intra-office conferences of three or more attorneys were subject to scrutiny as to specificity of the reasons why attendance at the conference was necessary and beneficial, as were an excessive number of intra-office conferences on the same topic.  Questions

may be raised under the rubric of multiple attendees, excessive time or reasonableness in general.

### xv. Excessive Time.

46.     Excessive time spent on a particular task is generally not compensable.  See In re Cuisine Magazine, Inc., 61 B.R. 210, 217 (Bankr. S.D.N.Y. 1986).

### xvi. Administrative or Clerical Activities; Overhead Expenses.

47.     Typically, clerical or administrative activities are those tasks that do not require legal acumen and may effectively be performed by administrative assistants, secretaries, or support personnel, and are generally reflected in the hourly rates charged by a firm.  Such tasks are considered within "overhead" and are not compensable, whether or not the particular firm treats them as such.  See In re Fibermark, 349 B.R. at 396-97 (Bankr. D. Vt. 2006) (stating that "[d]uties appropriate for office staff are considered part of a professional's overhead expenses and may not be billed to the estate . . . .  This includes secretarial overtime."); Bennett Funding, 213 B.R. at 248 (finding that word processing time is clerical, and not compensable, regardless of who does it and whether or not specifically allowable to a particular client or matter).

### xvii. Non-Working Travel.

48.     Non-working travel time is compensable at a rate of 50% of regular hourly rates. See In re Motors Liquidation Co., Hr'g Tr. at 14:5-12; No. 09-50026 (Bankr. S.D.N.Y. July 6, 2010, 2:33 p.m.); but see In re 415 W. 150 LLC, 2013 WL 4603162, at *6 (allowing fees for de minimis local travel "billed by timekeepers at low rates ($150.00) and incident to some other service such as delivering, filing or retrieving documents").

### xviii. Professional Retention Activities.

49.     Professional retention activities, such as the preparation of a retention application, are compensable, but must be reasonable.  See In re Motors Liquidation Co., First Interim Fee

Hr'g Tr. at 38:10-24, 39:6-22; No. 09-50026 (REG) (Bankr. S.D.N.Y. Apr. 29, 2010, 5:24 p.m.). However, time spent performing conflicts checks is generally not compensable, as such time is generally not billed to non-bankruptcy clients. See Act Mfg., 281 B.R. at 484.

xix.     Preparation of Fee Application.

50.     Section 330(a)(6) expressly provides that "[a]ny compensation awarded for the preparation of a fee application shall be based on the level and skill reasonably required to prepare the application." 11 U.S.C. § 330(a)(6). Accordingly, the cost of preparing a fee application is generally compensable. See CCT Commc'ns, 2010 WL 3386947, at *8. Nonetheless, "[i]t is proper for the bankruptcy court to examine the amount and value of the time spent preparing the fee application, and reasonable limits may be placed on compensation for such work." In re Mesa Air Grp., Inc., 449 B.R. 441, 445 (Bankr. S.D.N.Y. 2011) (internal quotations omitted) (applying a 3-5% metric); see also In re 415 W. 150 LLC, 2013 WL 4603162, at *6 (reducing fees requested for preparation of fee application by applying a 5% metric).

xx.     Reviewing/Editing Time Records.

51.     The reviewing and editing of time records (independent of preparation of a fee application) is not compensable. See In re 415 W. 150 LLC, 2013 WL 4603162, at *6 n.3 ("The Firm is not entitled to compensation for maintaining, reviewing or editing time records"); In re Borders Grp., Inc., 456 B.R. 195, 212 (Bankr. S.D.N.Y. 2011); Mesa Air Grp., 449 B.R. at 445-46; CCT Commc'ns, 2010 WL 3386947, at *9. "Outside of bankruptcy, lawyers presumably do not charge their clients for preparing time records;" accordingly, such charges should not be compensable. CCT Commc'ns, at *9. This is true even if the review and editing is for the purpose of preserving privilege or confidentiality; properly kept time entries, in the first instance, should not reveal either privileged or confidential information or

communications; accordingly, review for this purpose is unnecessary and therefore noncompensable. In re Motors Liquidation Co., Second Interim Fee H'rg Tr. at 6-16, No. 09-50026 (REG) (Bankr. S.D.N.Y., July 6, 2010, 2:33 p.m.). In a recent case, however, Judge Stuart Bernstein allowed a *minimal* amount for reviewing time entries for privilege. In re Quigley Co., 500 B.R. at 366. Noting that "time spent preparing, reviewing and editing the bills is not generally compensable," Judge Bernstein stated that:

> [I]t is reasonable for the attorney responsible for preparing the fee application to spend some amount of time reviewing the time records to ensure that that description of a service does not reveal a secret or confidential communication or waive a privilege. The time records are attached to the fee application and made publicly available. Although the fee applicant could seek permission to file a redacted fee application and submit an unredacted copy in camera, Amended Guidelines, at ¶ C, the time spent reviewing and redacting the time records would not be any different than the time spent reviewing and editing the time records. Timekeepers can and should be instructed whenever possible not to describe their services in a manner that might waive a privilege, but not all timekeepers are attorneys, some timekeepers may nonetheless include privileged material in their time entries, it may be impossible to record certain time without revealing confidential material and someone will have to conduct a privilege review anyway.

Id.

## IV.     STANDARDS APPLICABLE TO EXPENSES

52.     Section 330 provides that a court may award "reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1). The UST Guidelines provide that expenses "must be actual and necessary and supported by documentation as appropriate." UST Appendix A Guidelines, ¶ (b)(5)(i), (ii). Additionally, expenses should be "reasonable and economical" and of the sort "customarily charged to non-bankruptcy clients of the applicant." Id. at ¶ (b)(5)(i), (ii); accord M-447, § A(5)(i), (ii). Amounts requested for reimbursement of expenses should "reflect the actual cost of such expenses to the applicant;" the applicant must be able to demonstrate that the expenses incurred in-house reflect the actual cost of such expenses to the

applicant. <u>UST Appendix A Guidelines</u>, ¶ (b)(5)(vi); <u>accord</u> <u>M-447</u>, § A(5)(vi). Expenses incurred by the applicant to third parties are limited to the amounts billed to, or paid by, the applicant. <u>UST Appendix A Guidelines</u>, ¶ (b)(5)(v); <u>M-447</u>, § A(5)(v). "[D]isbursements sought must be billed at rates, and in accordance with, practices customarily employed by the applicant and generally accepted by the applicant's clients." <u>M-447</u>, § E.

      i.   <u>Itemization of Expenses.</u>

53. Applicants should disclose "a detailed itemization of all expenses including the date incurred, description of expense (<u>e.g.</u>, type of travel, type of fare, rate, destination), [the] method of computation, and, where relevant, name of the person incurring the expense and purpose of the expense. Itemized expenses should be identified by their nature (<u>e.g.</u>, long distance telephone, copy costs, messengers, computer research, airline travel, etc.) and by the month incurred." <u>UST Appendix A Guidelines</u> at ¶ (b)(5)(iii); <u>M-447</u>, § A(5)(iii).

      ii.   <u>Proration of Expenses.</u>

54. Expenses should be prorated "where appropriate between the estate and other cases (<u>e.g.</u>, travel expenses applicable to more than one case)," and the applicant should "adequately explain[] the basis for any such proration." <u>UST Appendix A Guidelines</u>, ¶ (b)(5)(iv); <u>M-447</u>, § A(5)(iv).

      iii.   <u>Travel Expenses.</u>

55. Travel expenses must be "reasonable and economical;" first-class air travel and luxury travel accommodations (<u>i.e.</u>, hotel room in excess of $500/night) are not compensable. <u>UST Appendix A Guidelines</u>, ¶ (b)(5)(i); <u>see also</u> <u>In re Motors Liquidation Co.</u>, First Interim Fee Hr'g Tr. at 22:17-25, 23:0-20; No. 09-50026 (REG) (Bankr. S.D.N.Y. Apr. 29, 2010, 5:24 p.m.).

      iv.   <u>Photocopies.</u>

56.     M-447 provides that copying charges shall be reimbursed at the lesser of $.10 per page or cost.  M-447, § F(2).

v.      Computer-Assisted Legal Research.

57.     The UST Guidelines provide that amounts requested for reimbursement of expenses, including amounts incurred in relation to computer-assisted legal research, should "reflect the actual cost of such expenses to the applicant."  UST Appendix A Guidelines, ¶ (b)(5)(vi).  However, fixed cost subscriber fees for computerized research are in the nature of overhead and may not be billed, even if the cost can be allocated among clients.  Fibermark, 349 B.R. at 399.  Time or transaction charges for accessing databases for particular client-specific searches are reimbursable.  Id.

vi.      Overtime Expenses.

58.     M-447 provides that "[n]o overtime expense for non-professional and paraprofessional staff shall be reimbursable unless fully explained and justified.  Any such justification must indicate, at a minimum, that: (i) [s]ervices after normal closing hours are absolutely necessary for the case; and (ii) [t]hat charges are for overtime expenses paid."  M-447, § F(3).  Generally, the individual must have worked six or more hours that day for overtime expenses to be reimbursable.  See In re Motors Liquidation Co., Hr'g Tr. at 23:6-16, 25, 24:1-13; No. 09-50026 (REG) (Bankr. S.D.N.Y. July 6, 2010, 2:33 p.m.).

vii.      Meal Expenses.

59.     M-447 provides that the "reasonable expenses of a professional required to work on the case after 8:00 p.m. are reimbursable provided that, if the professional dines before 8:00 p.m., the expense is reimbursable only if the professional returns to the office to work for at least one and one half hours;" the expense for any such individual's meal may not exceed $20.00.  M-

447, § F(3)(ii).  Generally, reimbursement of late-night meals is contingent on the professional having worked at least six hours that day.  See In re Motors Liquidation Co., Hr'g Tr. at 23:6-16, 25, 24:1-13; No. 09-50026 (REG) (Bankr. S.D.N.Y. July 6, 2010, 2:33 p.m.).

viii.    Overhead Expenses.

60.    The UST Guidelines state that non-reimbursable overhead "includes, but is not limited to, word processing, proofreading, secretarial and other clerical services, rent, utilities, office equipment and furnishings, insurance, taxes, local telephones and monthly car phone charges, lighting, heating and cooling, and library and publication charges." UST Appendix A Guidelines, ¶ (b)(5)(vii); accord M-447, § A(5)(vii); see also GSC Grp., 2012 WL 676409, at *5 (noting that overhead costs are "expenses incurred day to day by a professional's office regardless of whom it represents or what services it renders.") (internal quotations omitted).

ix.    Car Service/Cabs.

61.    Local travel is generally non-compensable.  See In re Kohl, 421 B.R. at 129 (reducing expenses incurred as a result of travel within Manhattan).  On the other hand, M-447 provides that the "reasonable expenses of a professional required to work on the case after 8:00 p.m. are reimbursable."  M-447, § F(3)(ii).  Generally, reimbursement of late-night expenses is contingent on the professional having worked at least six hours that day.  See In re Motors Liquidation Co., Hr'g Tr. at 23:6-16, 25, 24:1-13; No. 09-50026 (REG) (Bankr. S.D.N.Y. July 6, 2010, 2:33 p.m.).

x.    Personal Expenses.

62.    Personal expenses (e.g., periodical purchased at airport, hotel movie, laundry expenses while out of town) are not compensable.  See In re Motors Liquidation Co., First Interim Fee Hr'g Tr. at 24:17-23; No. 09-50026 (REG) (Bankr. S.D.N.Y. Apr. 29, 2010, 5:24 p.m.).

## V.     THE FEE EXAMINER'S RECOMMENDATIONS AS TO THE FEE APPLICATIONS

63.     The Fee Examiner sets forth below the process with respect to each Retained Professional[14] and makes the following specific recommendations as to the Fee Applications:

**Alvarez & Marsal North America, LLC**

64.     Alvarez & Marsal North America, LLC ("Alvarez") served as financial advisors to the Committee.  For its services, Alvarez was compensated on a monthly flat fee basis, plus an additional fixed fee payable at the conclusion of the engagement. Application Pursuant to Bankruptcy Code Sections 327, 328, 330 and 1103, Bankruptcy Rules 2014(A) and 2016(A) and Local Rules 2014-1 and 2016-1 For Order Authorizing Employment and Retention of Alvarez & Marsal North America, LLC as Financial Advisors to the Official Committee of Unsecured Creditors Effective as of August 13, 2015 [Docket No. 843], ¶ 16(b), (c).  On October 4, 2016, Alvarez filed the Final Fee Application of Alvarez & Marsal North America, LLC in its Capacity as Financial Advisors to the Official Committee of Unsecured Creditors, For Compensation and Reimbursement of Expenses Incurred for the Period August 13, 2015 Through April 14 [Docket No. 2099] ("Alvarez's Final Fee Application").  Alvarez's Final Fee Application seeks interim and final approval of fees in the amount of $1,755,913.98 and reimbursement of expenses in the amount of $13,081.35 for the period from August 13, 2015 through April 14, 2016 (the "Compensation Period").

65.     The Fee Examiner reviewed Alvarez's Final Fee Application to ensure compliance with the applicable rules, orders and guidelines.  Based on this review, the Fee Examiner generated a Preliminary Report that identified the following issues with Alvarez's Final Fee Application:

---

[14] Within each section of this Final Report, the Compensation Period is individually defined for each Retained Professional, as necessary.

(a)     Technical compliance with the UST Guidelines and M-447;

(b)     Meal rates in excess of the allowable amount;

(c)     Hotel rates in excess of the allowable amount; and

(d)     Non-supported expenses.

66.     Although the Preliminary Report raised issues relating to all of the above, the Fee Examiner simply requested additional information and additional supporting documentation in relation to the expense categories.

67.     In response to the Preliminary Report, Alvarez provided additional information regarding the minor expense issues raised by the Preliminary Report.  As a result of this process, in relation to the Compensation Period, Alvarez and the Fee Examiner have agreed to a final recommended reduction in expenses in the amount of **$1,484.07** and no reduction in fees. The final reduction results in a recommended allowance of fees in the amount of **$1,755,913.98** and reimbursement for expenses in the amount of **$11,597.28** in relation to the Compensation Period.    Consistent   with   these   recommendations,   the   Fee   Examiner   recommends   that **$1,755,913.98** in fees and **$11,597.28** in expenses be approved on a final basis.

**Castellammare Advisors, LLC**

68.     Robert A. Kors of Castellammare Advisors, LLC ("Castellammare") served as chief consultant for the Debtors.  Pursuant to its retention, Castellammare was eligible to earn two forms of compensation:

> a.   Base Compensation.    The Debtors were to pay Castellammare base compensation in the aggregate amount of $325,000 (the "Base Compensation").   The Base Compensation shall be paid by the Debtors irrespective of the days or hours worked or the tasked performed for the period from the retention date through the earlier of (x) the effective date of the a plan or plans or reorganization, (y) the date on which the case converts to a case under chapter 7 of the Bankruptcy Code or otherwise liquidated, or (z) April 30, 2016, if a plan is not effective by such date.

b. <u>Restructuring Fee</u>. The Debtors were to pay an additional fee (the "<u>Restructuring Fee</u>") upon confirmation of a plan of reorganization in the amount of: (i) $225,000; plus (ii) (a) $150,000 if the Effective Date occurs in January 2016; (b) $100,000 if the Effective Date occurs in February 2016; (c) $50,000 if the Effective Date occurs in March 2016; or (d) $0 if the Effective Date occurs in April 2016, for a maximum total Restructuring Fee of $375,000.

Debtors' Motion for an Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to Employ and Retain Robert A. Kors as Chief Consultant <u>Nunc Pro Tunc</u> to the Engagement Date [Docket No. 1030], ¶ 18; <u>see also</u> Order Authorizing the Debtors Pursuant to 11 U.S.C. §§ 327(a) and 328(a) to Emply and Retain Robert A. Kors as Chief Consultant <u>Nunc Pro Tunc</u> to the Engagement Date [Docket No. 1139], ¶ 7 and attached exhibit (Engagement Letter).

69. On September 30, 2016, Castellammare filed its First and Final Application of [Castellammare], Chief Consultant for the Reorganized Debtors, for Allowance of Compensation for Professional Services Rendered and for Reimbursement of Actual and Necessary Expenses Incurred for the Period November 4, 2015 through April 14, 2016 [Docket No. 2085] ("<u>Castellammare's Final Fee Application</u>"). Castellammare's Final Fee Application seeks final approval of fees in the amount of $550,000.00 and reimbursement of expenses in the amount of $3,992.38 for the period from November 4, 2015 through April 14, 2016.

70. The Fee Examiner reviewed Castellammare's Final Fee Application to ensure compliance with the applicable rules, orders and guidelines. Based on that review, the Fee Examiner generated a Preliminary Report that identified the following issues with Castellammare's Final Fee Application:

(a) Technical compliance with the UST Guidelines, M-447, and Bankruptcy Rule 2016;

(b) Non-supported expenses;

(c) Meal expenses that exceeded the prescribed guidelines; and

(d)     Luxury Hotel charges.

71.     Although the Preliminary Report raised issues relating to all of the above, the Fee Examiner simply requested additional information and additional supporting documentation in relation to the relevant expense categories.

72.     In response to the Preliminary Report, the Fee Examiner and Castellammare engaged in a brief dialogue to address and resolve the issues raised by the Preliminary Report. As a result of these discussions, Castellammare and the Fee Examiner have agreed to a final recommended reduction in fees in the amount of **$0.00** and a reduction of **$144.40** in expenses. The final reduction results in a recommended allowance of fees in the amount of **$550,000.00** and reimbursement for expenses in the amount of **$3,847.98** in relation to Castellammare's Final Fee Application.

**Donlin, Recano & Company, Inc.**

73.     Donlin, Recano & Company, Inc. ("DRC") serves as administrative agent for the Debtors.  For its services, DRC was compensated on an hourly fee basis.  See Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Donlin, Recano & Company, Inc., as Administrative Agent for the Debtors *Nunc Pro Tunc* to the Petition Date, [Docket No. 285], ¶ 14.  On September 30, 2016, DRC filed the Final Fee Application of Donlin, Recano & Company, Inc., Administrative Agent for the Debtors, for Allowance of Compensation and Reimbursement of Expenses for the Period From July 30, 2015 Through April 14, 2016 [Docket No. 2086] ("DRC's Final Fee Application").   DRC's Final Fee

Application seeks interim and final approval of fees in the amount of $426,134.00[15] for the period from July 30, 2015 through April 14, 2016 (the "Compensation Period").

74.     The Fee Examiner reviewed DRC's Final Fee Application to ensure compliance with the applicable rules, orders and guidelines.  Based on this review, the Fee Examiner generated a Preliminary Report that identified the following issues with DRC's Final Fee Application:

     (a)    Post-effective date fees;

     (b)    Time increments/block billing time entries;

     (c)    Lumped time entries;

     (d)    Extended days; and

     (e)    Multiple attendees.

75.     Although the Preliminary Report raised issues relating to all of the above, the Fee Examiner simply requested additional information and additional supporting documentation in relation to many of the above categories.

76.     In response to the Preliminary Report, DRC supplied additional information and clarified time entries.  The Fee Examiner and DRC engaged in a dialogue to address and resolve the issues raised by the Preliminary Report.  As a result of these negotiations, in relation to the Compensation Period, DRC and the Fee Examiner have agreed to a final recommended reduction in fees in the amount of **$9,961.15**.  The final reduction results in a recommended allowance of fees in the amount of **$416,172.85** in relation to the Compensation Period. Consistent with these recommendations, the Fee Examiner recommends that **$416,172.85** in fees be approved on a final basis.

---

[15] This amount includes $2,627.00 for fees incurred after the Effective Date.  DRC agrees that it will submit these post-effective date fees directly to the Debtor, outside of the fee examination process.  The reduction set forth below includes this amount, but the Fee Examiner takes no position on the allowance of such fees.

**Drinker Biddle & Reath LLP**

77.     Drinker Biddle & Reath LLP ("<u>Drinker Biddle</u>") served as special litigation counsel to the Committee.  For its services, Drinker Biddle was compensated on an hourly fee basis.  Application of the Official Committee of Unsecured Creditors of Relativity Fashion, LLC, <u>et</u> <u>al.</u> for Entry of an Order Pursuant to Bankruptcy Code Sections 327(a) and 1103(a), Bankruptcy Rules 2014(a) and 2016(a) and Local Rules 2014-1 and 2016-1 Authorizing Retention and Employment of Drinker Biddle & Reath LLP as its Special Counsel, nunc pro tunc to August 27, 2015, [Docket No. 924], ¶ 13.  On October 3, 2016, Drinker Biddle filed the Final Fee Application of Drinker Biddle & Reath LLP as Special Counsel to the Official Committee of Unsecured Creditors for the Final Allowance of Compensation for Professional Services Rendered and for Reimbursement of Actual and Necessary Expenses Incurred From August 27, 2015 Through April 14, 2016 [Docket No. 2089] ("<u>Drinker Biddle's Final Fee Application</u>"). Drinker Biddle's Final Fee Application seeks interim and final approval of fees in the amount of $247,813.50 and reimbursement of expenses in the amount of $59,168.95 for the period from August 27, 2015 through April 14, 2016 (the "<u>Compensation Period</u>").

78.     The Fee Examiner reviewed Drinker Biddle's Final Fee Application to ensure compliance with the applicable rules, orders and guidelines.  Based on this review, the Fee Examiner generated a Preliminary Report that identified the following issues with Drinker Biddle's Final Fee Application:

  (a)     Technical compliance with the UST Guidelines and M-447;

  (b)     Fee overcharge;

  (c)     Duplicative time;

  (d)     Vague time entries;

  (e)     Lumped time entries;

(f)    Repetitive time entries;

(g)    Time entries involving non-working travel;

(h)    Multiple attendees; and

(i)    Transitory timekeepers.

79.    Although the Preliminary Report raised issues relating to all of the above, the Fee Examiner simply requested additional information and additional supporting documentation in relation to many of the above categories.

80.    In response to the Preliminary Report, Drinker Biddle supplied additional relevant information.  The Fee Examiner and Drinker Biddle met in New York to address and resolve the issues raised by the Preliminary Report.  As a result of these discussions, in relation to the Compensation Period, Drinker Biddle and the Fee Examiner have agreed to a final recommended reduction in fees in the amount of **$6,936.50** and no reduction in expenses.  The final reduction results in a recommended allowance of fees in the amount of **$240,877.00** and reimbursement for expenses in the amount of **$59,168.95** in relation to the Compensation Period.    Consistent with these recommendations, the Fee Examiner recommends that **$240,877.00** in fees and **$59,168.95** in expenses be approved on a final basis.

**Holthouse Carlin & Van Trigt LLP**

81.    Holthouse Carlin & Van Trigt LLP ("Holthouse") serves as tax advisor to the Debtors.  Pursuant to its retention, Holthouse was permitted to record its services performed in one-half hour increments.  See Order Pursuant to 11 U.S.C. § 327(a), Fed. R. Bankr. P. 2014 and 2016, and Local Rules 2014-1 and 2016-1 for Authority to Retain and Employ [Holthouse] as Tax Advisor Nunc Pro Tunc to the Petition Date [Docket No. 551], ¶¶ 5-6.  On October 3, 2016, Holthouse filed the First and Final Application of [Holthouse] as Tax Advisor to the Debtors for Allowance and Approval of Compensation for Necessary Services Rendered and

the Reimbursement of All Actual and Necessary Expenses Incurred for the Period of July 30, 3015 through April 14, 2016 [Docket No. 2094] ("Holthouse's Final Fee Application"). Holthouse's Final Fee Application seeks final approval of fees in the amount of $297,306.37 and reimbursement of expenses in the amount of $380.63 for the period from July 30, 2015 through April 14, 2016.

82.     The Fee Examiner reviewed Holthouse's Final Fee Application to ensure compliance with the applicable rules, orders and guidelines. Based on that review, the Fee Examiner generated a Preliminary Report that identified the following issues with Holthouse's Final Fee Application:

    (a)     Technical compliance with the UST Guidelines and M-447;

    (b)     Lumping and/or vague time entries;

    (c)     Transitory timekeepers; and

    (d)     Overtime meal charges.

83.     Although the Preliminary Report raised issues relating to all of the above, the Fee Examiner simply requested additional information and additional supporting documentation in relation to many of the above categories.

84.     In response to the Preliminary Report, the Fee Examiner and Holthouse engaged in exchanges to address and resolve the issues raised by the Preliminary Report. As a result of these exchanges, Holthouse and the Fee Examiner have agreed to a final recommended reduction in fees in the amount of **$7,058.50** and a reduction of **$0.00** in expenses. The final reduction results in a recommended allowance of fees in the amount of **$290,247.87** and reimbursement for expenses in the amount of **$380.63** in relation to Holthouse's Final Fee Application.

**Jones Day**

85.     Jones Day ("Jones Day") served as bankruptcy co-counsel to the Debtors and Debtors-in-Possession. For its services, Jones Day was compensated on an hourly fee basis. Debtors' Application for an Order Authorizing the Retention and Employment of Jones Day as Counsel, Nunc Pro Tunc to the Petition Date [Docket No. 332], ¶¶ 19, 20.  On September 30, 2016, Jones Day filed the Second and Final Application of Jones Day, Co-Counsel for the Reorganized Debtors, for Allowance of Compensation for Professional Services Rendered and for Reimbursement of Actual and Necessary Expenses Incurred for the Period December 1, 2015 Through April 14, 2016 [Docket No. 2084] ("Jones Day's Final Fee Application").  Jones Day's Final Fee Application seeks interim and final approval of fees in the amount of $11,790,638.75 and reimbursement of expenses in the amount of $153,748.37 for the period from July 30, 2015 through April 14, 2016 (the "Compensation Period").

86.     The Fee Examiner reviewed Jones Day's Final Fee Application to ensure compliance with the applicable rules, orders and guidelines.  Based on this review, the Fee Examiner generated a Preliminary Report that identified the following issues with Jones Day's Final Fee Application:

     (a)     Technical compliance with the UST Guidelines and M-447;

     (b)     Overstaffing/"top-heavy" staffing;

     (c)     Hourly rate increases;

     (d)     Scope of work;

     (e)     Excessive time;

     (f)     Administrative/clerical time;

     (g)     Block-billed time;

     (h)     Duplicative time;

     (i)     Vague time entries;

(j)     Lumped time entries;

(k)     Repetitive time entries;

(l)     Multiple attendees;

(m)     Paraprofessional tasks billed at attorney rates;

(n)     Time spent on retention activities;

(o)     Time spent on reviewing or editing billing detail;

(p)     Extended days;

(q)     Transitory timekeepers; and

(r)     Local travel expenses.

87.     Although the Preliminary Report raised issues relating to all of the above, the Fee Examiner initially requested additional information and additional supporting documentation in relation to many of the above categories.

88.     In response to the Preliminary Report, Jones Day provided a detailed response, including additional information.  The Fee Examiner and Jones Day engaged in substantial dialogue, including a meeting in New York, to address and resolve the issues raised by the Preliminary Report.  As a result of these negotiations, in relation to the Compensation Period, Jones Day and the Fee Examiner have agreed to a final recommended reduction in fees in the amount of **$444,903.00** and **$187.63** in expenses.  The final reduction results in a recommended allowance of fees in the amount of **$11,345,735.75** and reimbursement for expenses in the amount of **$153,560.74** in relation to the Compensation Period.  Consistent with these recommendations, the Fee Examiner recommends that **$11,345,735.75** in fees and **$153,560.74** in expenses be approved on a final basis.

**Kasowitz, Benson, Torres & Friedman LLP**

89.     Kasowitz, Benson, Torres & Friedman LLP ("Kasowitz") served as special litigation and conflicts counsel to the Debtors and Debtors-in-Possession. For its services,

Kasowitz was compensated on an hourly fee basis. Debtors' Application under Section 327(E) of the Bankruptcy Code, Bankruptcy Rules 2014 and 2016 and Local Rules 2014-1 and 2016-1 For Authorization to Employ and Retain Kasowitz, Benson, Torres & Friedman, LLP as Special Litigation and Conflicts Counsel nunc pro tunc to August 7, 2015 [Docket No. 286], ¶¶ 15-16. On October 3, 2016, Kasowitz filed the First Interim and Final Fee Application of Kasowitz, Benson, Torres & Friedman LLP as Special Litigation and Conflicts Counsel to Former Debtors and Debtors in Possession From August 7, 2015 Through April 14, 2016 [Docket No. 2093] ("Kasowitz's Final Fee Application"). Kasowitz's Final Fee Application seeks interim and final approval of fees in the amount of $512,478.00 and reimbursement of expenses in the amount of $14,462.37 for the period from August 7, 2015 through April 14, 2016 (the "Compensation Period").

90.      The Fee Examiner reviewed Kasowitz's Final Fee Application to ensure compliance with the applicable rules, orders and guidelines. Based on this review, the Fee Examiner generated a Preliminary Report that identified the following issues with Kasowitz's Final Fee Application:

(a)      Technical compliance with the UST Guidelines and M-447;

(b)      Overstaffing/"top-heavy" staffing;

(c)      Excessive time;

(d)      Administrative/clerical time;

(e)      Duplicative time;

(f)      Vague time entries;

(g)      Lumped time entries;

(h)      Time spent on reviewing or editing billing detail;

(i)      Transitory timekeepers; and

(j)      Non-supported expenses.

45

91.     Although the Preliminary Report raised issues relating to all of the above, the Fee Examiner initially requested additional information and additional supporting documentation in relation to many of the above categories.

92.     In response to the Preliminary Report, Kasowitz submitted a response.  The Fee Examiner and Kasowitz engaged in exchanges to address and resolve the issues raised by the Preliminary Report.  As a result of these negotiations, in relation to the Compensation Period, Kasowitz and the Fee Examiner have agreed to a final recommended reduction in fees in the amount of **$13,662.20** and **$1,305.74** in expenses.  The final reduction results in a recommended allowance of fees in the amount of **$498,815.80** and reimbursement for expenses in the amount of **$13,156.63** in relation to the Compensation Period.  Consistent with these recommendations, the Fee Examiner recommends that **$498,815.80** in fees and **$13,156.63** in expenses be approved on a final basis.

**LeClair Ryan, P.C.**

93.     LeClair Ryan, P.C. ("LeClair") serves as counsel to the Plan co-proponent Joseph G. Nicholas.  For its services, LeClair is paid on an hourly basis.  On October 3, 2016, LeClair filed its First and Final Request of [LeClair] for Payment of Compensation and Expense Reimbursement as Counsel for Plan Proponent Joseph G. Nicholas [Docket No. 2088] ("LeClair's Final Fee Application").  LeClair's Final Fee Application seeks final approval of fees in the amount of $30,638.00 and reimbursement of expenses in the amount of $391.59 for the period from December 11, 2015 through April 26, 2016.

94.     The Fee Examiner reviewed LeClair's Final Fee Application to ensure compliance with the applicable rules, orders and guidelines.  Based on that review, the Fee

Examiner generated a Preliminary Report that identified the following issues with LeClair's Final Fee Application:

    (a)     Rate increases;

    (b)     Fees charges for time billed after the Effective Date; and

    (c)     Non-supported expenses.

95.     Although the Preliminary Report raised issues relating to all of the above, the Fee Examiner simply requested additional information and additional supporting documentation in relation to many of the above categories.

96.     In response to the Preliminary Report, LeClair submitted a response addressing and resolving the issues raised by the Preliminary Report. As a result, LeClair and the Fee Examiner have agreed to a final recommended reduction in fees in the amount of **$0.00** and a reduction of **$0.00** in expenses. The final reduction results in a recommended allowance of fees in the amount of **$30,638.00** and reimbursement for expenses in the amount of **$391.59** in relation to LeClair's Final Fee Application.

**RSM US LLP**

97.     RSM US LLP ("RSM") serves as tax advisor to the Debtors. Pursuant to its retention, RSM was permitted to record its services performed in one-half hour increments. See Order Pursuant to 11 U.S.C. § 327(a), Fed. R. Bankr. P. 2014 and 2016, and Local Rules 2014-1 and 2016-1 for Authority to Retain and Employ [RSM f/ka] McGladrey LLP to Provide Certain Tax Advisory Services Nunc Pro Tunc to the Date of the Engagement Letter [Docket No. 847], ¶ 7. On October 5, 2016, RSM filed the First and Final Application of [RSM] for Allowance of Compensation for Services Rendered During the Period September 17, 2015 to April 14, 2016 [Docket No. 2102] ("RSM's Final Fee Application"). RSM's Final Fee Application seeks final

approval of fees in the amount of $51,069.50 for the period from September 17, 2015 through April 14, 2016.[16]

98.     The Fee Examiner reviewed RSM's Final Fee Application to ensure compliance with the applicable rules, orders and guidelines.  Based on that review, the Fee Examiner generated a Preliminary Report that identified the following issues with RSM's Final Fee Application:

    (a)     Technical compliance with the UST Guidelines and M-447;

    (b)     Fees charged for time recorded after the Effective Date;

    (c)     Vague time entries (see p. 40);

    (d)     Time recorded for conflict checks; and

    (e)     Transitory timekeepers.

99.     Although the Preliminary Report raised issues relating to all of the above, the Fee Examiner initially requested additional information and additional supporting documentation in relation to many of the above categories.

100.     In response to the Preliminary Report, the Fee Examiner and RSM engaged in an exchange to address and resolve the issues raised by the Preliminary Report.  As a result of these negotiations, RSM and the Fee Examiner have agreed to a final recommended reduction in fees in the amount of **$9,135.70**.  The final reduction results in a recommended allowance of fees in the amount of **$41,933.80** in relation to RSM's Final Fee Application.

**Sheppard Mullin Richter & Hampton, LLP**

101.     Sheppard Mullin Richter & Hampton, LLP ("Sheppard Mullin") served as co-counsel to the Debtors and Debtors-in-Possession. For its services, Sheppard Mullin was compensated on an hourly fee basis.  Order Pursuant to 11 U.S.C. ¶ 327(a), Fed. R. Bank. P.

---

[16] This amount includes certain post-effective date fees as well.  The reduction below eliminates that request.  The Fee Examiner takes no further position on allowance of such fees.

2014(a) and 2016, and Local Rules 2014-1 and 2016-1 Authorizing the Retention and Employment of Sheppard Mullin Richter & Hampton, LLP as Co-Counsel to the Debtors <u>Nunc Pro Tunc</u> to the Petition Date [Docket No. 479], ¶ 2. On October 3, 2016, Sheppard Mullin filed the Final Application of Sheppard Mullin Richter & Hampton, LLP For Compensation For Services Rendered And Reimbursement Of Expenses Incurred As Co-Counsel To The Debtors For The Period From July 30, 2015 Through April 14 [Docket No. 2092] ("<u>Sheppard Mullin's Final Fee Application</u>"). Sheppard Mullin's Final Fee Application seeks interim and final approval of fees in the amount of $6,044,693.50[17] and reimbursement of expenses in the amount of $123,511.08 for the period from July 30, 2015 through April 14, 2016 (the "<u>Compensation Period</u>").

102. The Fee Examiner reviewed Sheppard Mullin's Final Fee Application to ensure compliance with the applicable rules, orders and guidelines. Based on this review, the Fee Examiner generated a Preliminary Report that identified the following issues with Sheppard Mullin's Final Fee Application:

(a)   Technical compliance with the UST Guidelines and M-447;

(b)   Overstaffing;

(c)   Hourly rate increases;

(d)   Scope of work;

(e)   Excessive time;

(f)   Administrative/clerical time;

(g)   Vague time entries;

(h)   Lumped time entries;

(i)   Repetitive time entries;

(j)   Time spent redacting time entries;

---

[17] This amount includes $35,433.00 for fees incurred after the Effective Date. Sheppard Mullin agrees that it will submit these post-effective date fees directly to the Debtor, outside of the fee examination process. The reduction set forth below includes this amount, but the Fee Examiner takes no position on the allowance of such fees.

(k)     Transitory timekeepers;

(l)     Non-working travel time billed at full rate;

(m)    Paraprofessional tasks billed at attorney rates;

(n)     Extended days;

(o)     Multiple attendees;

(p)     Copy rate;

(q)     Late-night meals;

(r)     Meal rate;

(s)     Local transportation; and

(t)     Non-supported expenses.

103.     Although the Preliminary Report raised issues relating to all of the above, the Fee Examiner initially requested additional information and additional supporting documentation in relation to many of the above categories.

104.     In response to the Preliminary Report, Sheppard Mullin filed a detailed response. The Fee Examiner and Sheppard Mullin engaged in substantial dialogue, including meeting in New York, to address and resolve the issues raised by the Preliminary Report.  As a result of these negotiations, Sheppard Mullin and the Fee Examiner have agreed to a final recommended reduction in fees in the amount of **$551,697.65** and **$1,703.99** in expenses.  The final reduction results in a recommended allowance of fees in the amount of **$5,492,995.85** and reimbursement for expenses in the amount of **$121,807.09** in relation to the Compensation Period.  Consistent with these recommendations, the Fee Examiner recommends that **$5,492,995.85** in fees and **$121,807.09** in expenses be approved on a final basis.

105.     Of particular note, the discussions with Sheppard Mullin focused intensely on the question of whether Sheppard Mullin exceeded the scope of its retention.  As the Court is aware, the retention applications and retention orders divided tasks between two firms— Sheppard Mullin and Jones Day—as co-lead chapter 11 counsel.  Those documents included a

two-column chart allocating such duties. Among the duties specifically allocated to Jones Day were work on the DIP and exit financings and the major asset sale. As the case evolved, Sheppard Mullin unquestionably performed significant services in those categories. While a portion of the agreed reduction reflects the Fee Examiner's concerns in this respect, the Fee Examiner concluded that it would be draconian and unfair to reduce Sheppard Mullin's fees to the full extent that its designated scope of services may have been exceeded. First, the Fee Examiner, through discussions with both other professionals and certain principals, concluded that Sheppard Mullin performed certain tasks, by agreement with Jones Day and the Debtors, to the exclusion of Jones Day; there was little or no resulting duplication. Second, the Fee Examiner concluded that delegation of such tasks to Sheppard Mullin, particularly in the financing categories, was in recognition of the superior background knowledge of certain Sheppard Mullin attorneys as to the Debtors' prior financing structures and agreements, and that such delegation was both necessary and more efficient, resulting in a savings to the estates rather than an increase in cost. While the prior precedent on "scope" cited above, consisting of one or two cases involving distinguishable facts, appears to suggest an all or nothing approach—that work outside of the scope of retention is not compensable even if it benefits the estate—the Fee Examiner concluded that taking such an approach here would be simply punitive and not result in the payment of a reasonable fee to Sheppard Mullin. The Fee Examiner would suggest that the original division of responsibilities reflected in the two-column chart was likely somewhat aspirational, as the traffic of the case was likely to require some deviation despite best intentions at the time of retention, and certain of the designated tasks could not be done in total isolation from the tasks allocated to the other counsel. The Fee

Examiner highlights this aspect of his analysis and recommendation given that the application of the law noted above to these facts is, of course, ultimately the responsibility of the Court.

**Skadden, Arps, Slate, Meagher & Flom LLP**

106. Skadden Arps Slate Meagher & Flom LLP ("Skadden") serves as counsel to the Plan co-proponent Ryan Kavanaugh. For its services, Skadden is paid on an hourly basis. On October 3, 2016, Skadden filed the Fee Statement of [Skadden] as Counsel to Plan Co-Proponent Ryan Kavanaugh [Docket No. 2095] ("Skadden's Final Fee Application"). Skadden's Final Fee Application seeks final approval of fees in the amount of $4,688,979.50 and reimbursement of expenses in the amount of $199,508.03 for the period from July 30, 2015 through April 14, 2016.

107. The Fee Examiner reviewed Skadden's Final Fee Application to ensure compliance with the applicable rules, orders and guidelines. Based on that review, the Fee Examiner generated a Preliminary Report that identified the following issues with Skadden's Final Fee Application:

    (a)    RKA litigation;

    (b)    Rate increases;

    (c)    Administrative or clerical activities;

    (d)    Time billed in excess of 16 hours per day;

    (e)    Non-working travel time;

    (f)    Transitory timekeepers;

    (g)    Copy charges exceeding the prescribed guidelines;

    (h)    Charges for first class airfare;

    (i)    Meal expenses which exceed the prescribed guidelines;

    (j)    Non-supported expenses; and

    (k)    Personal expenses.

108.     Although the Preliminary Report raised issues relating to all of the above, the Fee Examiner simply requested additional information and additional supporting documentation in relation to many of the above categories.

109.     In response to the Preliminary Report, the Fee Examiner and Skadden engaged in a dialogue to address and resolve the issues raised by the Preliminary Report.  As a result of these negotiations, Skadden and the Fee Examiner have agreed to a final recommended reduction in fees in the amount of **$95,320.79** and a reduction of **$27,961.57** in expenses.  The final reduction results in a recommended allowance of fees in the amount of **$4,593,658.71** and reimbursement for expenses in the amount of **$171,546.46** in relation to Skadden's Final Fee Application.

**Taft Stettinius & Hollister LLP**

110.     Taft Stettinius & Hollister LLP ("Taft") serves as counsel to the Plan co-proponent Joseph G. Nicholas.  For its services, Taft is paid on an hourly basis.  On October 3, 2016, Taft filed its First and Final Request of [Taft] for Payment of Compensation and Expense Reimbursement as Counsel for Plan Proponent Joseph G. Nicholas [Docket No. 2088] ("Taft's Final Fee Application").  Taft's Final Fee Application seeks final approval of fees in the amount of $259,923.50 and reimbursement of expenses in the amount of $3,891.12 for the period from September 1, 2015 through April 30, 2016.

111.     The Fee Examiner reviewed Taft's Final Fee Application to ensure compliance with the applicable rules, orders and guidelines.  Based on that review, the Fee Examiner generated a Preliminary Report that identified the following issues with Taft's Final Fee Application:

(a)     Rate increases;

(b)     Fees charges for time billed after the Effective Date;

(c)      Transitory timekeepers; and

(d)      Meal expenses which exceed the prescribed guidelines.

112.    Although the Preliminary Report raised issues relating to all of the above, the Fee Examiner initially requested additional information and additional supporting documentation in relation to many of the above categories.

113.    In response to the Preliminary Report, Taft provided a response. The Fee Examiner and Taft engaged in a dialogue to address and resolve the issues raised by the Preliminary Report. As a result of these negotiations, Taft and the Fee Examiner have agreed to a final recommended reduction in fees in the amount of **$7,443.00** and a reduction of **$62.68** in expenses. The final recommended reduction for fees includes certain reductions attributable to the fees sought by LeClair's Final Fee Application for which Taft has agreed to bear the reduction.[18] The final reduction results in a recommended allowance of fees in the amount of **$252,480.50** and reimbursement for expenses in the amount of **$3,828.44** in relation to Taft's Final Fee Application.

**Togut, Segal & Segal LLP**

114.    Togut, Segal & Segal LLP ("Togut Segal") served as counsel to the Committee. For its services, Togut Segal was compensated on an hourly fee basis. Application of the Official Committee of Unsecured Creditors of Relativity Fashion, LLC, et al. for Entry of an Order Pursuant to Bankruptcy Code Section 328(A) and 1103(A), Bankruptcy Rules 2014(A) and 2016(A) and Local Rules 2014-1 and 2016-1 Authorizing Retention and Employment of Togut, Segal & Segal LLP as its Counsel, nunc pro tunc to August 7, 2015, [Docket No. 393], ¶¶ 13, 18. On October 4, 2016, Togut Segal filed the Supplemental Interim and Final Application of Togut, Segal & Segal LLP, as Counsel to the Official Committee of Unsecured Creditors, for

---

[18] As a result, no reduction was recommended for LeClair Ryan, as noted above.

Allowance of Pre-Effective Date Compensation for Services Rendered and for Reimbursement of Actual and Necessary Expenses Incurred from December 1, 2015 Through April 14, 2016, the Effective Date of the Debtors' Plan of Reorganization, and for the Allowance on a Final Basis of all Previous Fees and Expenses Paid [Docket No. 2098] ("Togut Segal's Final Fee Application").  Togut Segal's Final Fee Application seeks interim and final approval of fees in the amount of $3,717,199.50 and reimbursement of expenses in the amount of $34,736.11 for the period from August 7, 2015 through April 14, 2016 (the "Compensation Period").

115.    The Fee Examiner reviewed Togut Segal's Final Fee Application to ensure compliance with the applicable rules, orders and guidelines.  Based on this review, the Fee Examiner generated a Preliminary Report that identified the following issues with Togut Segal's Final Fee Application:

(a)    Technical compliance with the UST Guidelines and M-447;

(b)    Hourly rate increases;

(c)    "Top-heavy" staffing;

(d)    Duplicative time;

(e)    Reviewing or editing of billing detail;

(f)    Vague time entries;

(g)    Lumped time entries;

(h)    Time entries involving clerical or administrative work;

(i)    Multiple attendees;

(j)    Time spent on retention activities;

(k)    Late night meals;

(l)    Local meals;

(m)    Meal rate; and

(n)    Non-supported expenses.

116.     Although the Preliminary Report raised issues relating to all of the above, the Fee Examiner initially requested additional information and additional supporting documentation in relation to many of the above categories.

117.     In response to the Preliminary Report, Togut submitted a detailed response with substantial additional information.  The Fee Examiner and Togut Segal engaged in a dialogue, including meeting in New York, to address and resolve the issues raised by the Preliminary Report.  As a result of these negotiations, in relation to the Compensation Period, Togut Segal and the Fee Examiner have agreed to a final recommended reduction in fees in the amount of **$6,480.80** and **$1,138.04** in expenses.  The final reduction results in a recommended allowance of fees in the amount of **$3,710,718.70** and reimbursement for expenses in the amount of **$33,598.07** in relation to the Compensation Period.  Consistent with these recommendations, the Fee Examiner recommends that **$3,710,718.70** in fees and **$33,598.07** in expenses be approved on a final basis.

## VI.     CONCLUSION

118.     Accordingly, the Fee Examiner recommends that fees be allowed and expenses be reimbursed as set forth above and on Exhibit A hereto.

Dated:  October 27, 2016              **FEE EXAMINER**

Portland, Maine                       */s/ Robert J. Keach, Esq.*
                                      Robert J. Keach, Esq. *(admitted pro hac vice)*
                                      BERNSTEIN, SHUR, SAWYER & NELSON, P.A.
                                      100 Middle Street
                                      P.O. Box 9729
                                      Portland, ME 04104-5029
                                      Tel: (207) 774-1200
                                      Email: rkeach@bernsteinshur.com