**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RELATIVITY FASHION, LLC, *et al.*, | Case No. 15-11989 (MEW) |
| Debtors. | (Jointly Administered) |

**BENCH DECISION REGARDING OBJECTIONS TO FINAL FEE APPLICATIONS
OF PJT PARTNERS L.P. AND HOULIHAN LOKEY CAPITAL INC.**

MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE

We are here so that I can announce my decision on the final fee applications of PJT

Partners LP (formerly Blackstone Advisory Partners L.P.) and Houlihan Lokey Capital, Inc.  I

will refer to them today as "PJT" and as "Houlihan."

This will constitute my bench ruling on the applications.  I will instruct the attorneys for

Relativity to prepare and submit a transcript of what I say.  We will use that transcript as the

basis for a written opinion that will clean up the citations and fix any other mistakes that I might

make in the course of explaining my rulings today.  It will be that final written opinion that will

constitute my opinion on the applications, rather than the transcript of what I say today.

PJT and Houlihan are investment banking firms that were retained in these cases.  Their

retention agreements provided for compensation using a structure that is common to most

investment banker retentions, both within and outside bankruptcy.  More specifically, PJT and

Houlihan were to be paid monthly fees plus a transaction fee.  The monthly fees were to be paid

on an ongoing basis.  The transaction fee was to be paid if and when a transaction was

consummated, so long as any other conditions in the agreement were met.  Each agreement also

provided for expense reimbursement.

1

In its final application, PJT seeks approval of compensation that includes a transaction fee of $4.5 million.  This amount represents an agreed-upon reduction from the $5 million transaction fee that was set forth in the retention agreement.  Objections to the PJT application have been filed by Robert Keach, who is the fee examiner, and by Relativity Secured Lender, LLC.  I will refer to those objectors as "the fee examiner" and as "RSL."  The fee examiner and RSL object to the transaction fee sought by PJT, but all issues as to other parts of the applications have been resolved by agreement between the parties.

Houlihan seeks compensation that includes a transaction fee of $5 million.  The fee examiner and RSL, joined in this instance by Relativity Fashion, LLC, which is a debtor in these cases, have objected to the transaction fee.  All other issues about the Houlihan final fee application have been resolved.

By way of summary and introduction: the fee examiner and RSL (and in the case of Houlihan, Relativity Fashion) contend:

- That PJT did not fulfill the contractual conditions to the payment of the transaction fee that it seeks;

- That the Court should review the PJT and Houlihan applications for reasonableness using the standards set forth in Section 330 of the Bankruptcy Code and not using the standard of review that would apply under Section 328(a) of the Bankruptcy Code;

- That the applications do not satisfy the Section 330 criteria and requirements with respect to the proposed transaction fees; and

- That the transaction fees should be denied in their entirety.

The Court reconfirmed at the outset of the hearing yesterday that no other party objects to the applications. That included confirmation that neither the United States Trustee nor the Official Committee of Unsecured Creditors has objections to the fee requests.

In considering the objections, I have reviewed all of the briefs and other materials that the parties submitted and cited. I have also reviewed, and taken judicial notice of, my own prior orders in this case. I have also considered the testimony offered on December 8, 2016 in open court by Mr. Van Durrer and the declarations that the parties agreed to submit in evidence. As is appropriate in connection with my review of any fee application, I also bring to these matters my own sense of the results that were achieved and the role of the professionals in achieving these results, having supervised these cases since they were filed in 2015.

Before getting to the specifics of the applications and the objections, some general comments on a few points are in order to put my rulings in context.

First, it is appropriate to make some comments about the terms of Section 328(a) of the Bankruptcy Code and how the standards under Section 328(a) differ from those under Section 330 of the Bankruptcy Code. Section 328(a) says that a trustee, with the court's approval, may approve the retention of a professional "on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis." 11 U.S.C. § 328(a). In a Chapter 11 case, the debtor-in-possession has that same power, pursuant to 11 U.S.C. § 1107(a).

Different standards apply to the review of fee applications depending on whether or not the terms of employment have been approved under Section 328(a). Now, no matter whether Section 328 or Section 330 applies, a professional does not earn compensation if the terms and

conditions of the retention agreement do not call for it.  Some allegations to that effect were made in the objections to the PJT application, and I will deal with those later.

Apart from that, though, Section 328(a) states that once approved, fees are payable unless the approved terms and conditions "prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions."  11 U.S.C. § 328(a).  Essentially, under Section 328(a), reasonableness is judged in advance, and the issue is not revisited except in the very narrow circumstances permitted by the statute.

Without a Section 328(a) approval, however, Section 330 calls for a review of reasonableness that, to some extent, is made after-the-fact, although the case law makes clear that the judgment is not supposed to be done completely with 20/20 hindsight.  Under Section 330, a court reviews all "relevant" factors, including time spent, rates charged, whether services were necessary or beneficial at the time such services were rendered, whether the services were performed in a reasonable amount of time, and whether the compensation is reasonable based on customary compensation charged by comparably skilled practitioners in nonbankruptcy cases. 11 U.S.C. § 330(a)(3)(A-F).  In addition, under Section 330 compensation is not supposed to be provided if there is an unnecessary duplication of services or if services were not reasonably likely to benefit the estate or necessary to the administration of the case.  11 U.S.C. § 330(a)(4)(A).

The reason for the different approach set forth in Section 328(a) was explained by the Fifth Circuit Court of Appeals in its decision in *Donaldson Lufkin & Jenrette Securities Corp. v. National Gypsum Co.* (*In re National Gypsum Co.*), 123 F.3d 861 (5th Cir. 1997).  In that case the court held:

> Prior to 1978 the most able professionals were often unwilling to work for
> bankruptcy estates where their compensation would be subject to the

4

uncertainties of what a judge thought the work was worth after it had been done.  That uncertainty continues under the present § 330 of the Bankruptcy Code, which provides that the court award to professional consultants 'reasonable compensation' based on relevant factors of time and comparable costs, etc.  Under present § 328 the professional may avoid that uncertainty by obtaining court approval of compensation agreed to with the trustee (or debtor or committee).

*Id.* at 862.  The Court in *National Gypsum* went on to say:

If the most competent professionals are to be available for complicated capital restructuring and the development of successful corporate reorganization, they must know what they will receive for their expertise and commitment.  Courts must protect those agreements and expectations, once found to be acceptable.

*Id.* at 862-63.

In other words, Section 328(a) reflects the view that professionals are entitled to know what they are likely to be paid for their work.  If you agree to hire someone on a flat fee or percentage-fee basis, there should be some comfort that the compensation will be paid and that a court will not simply impose a new and different deal after all the work has been done.

Second, it is appropriate to make some comments about investment banker compensation in general, and in particular about so-called transaction fees, because there is often a lot of confusion about just what they represent.

As I explained above, it is common that an investment banker retention includes a provision for payment of monthly fees as well as transaction fees.  Investment bankers' main compensation is through transaction fees.  Those fees usually are contingent on the consummation of a transaction so that they are not paid if a transaction does not occur.  But apart from that condition, they often have no other requirements.  They often merely require that the transaction occur with no other conditions whatsoever.

Usually, but not always, the transaction fees are independent of the amount of time it takes to complete the transaction, the involvement of other people, et cetera.  They are just tied to

the fact that a transaction occurred, although the parties are free to add other conditions and qualifications if they think it is appropriate and if they negotiate such terms.

Transaction fees are not unique to bankruptcy. It has long been the practice of investment bankers to charge for their services in this exact same way outside of bankruptcy. There is also a long line of cases in which New York courts in particular have reviewed and upheld and enforced this transaction fee structure. *See*, for example, *Oppenheimer & Co. Inc. v. Metal Management, Inc.*, 2011 U.S. Dist. LEXIS 67762, at *24-30 (S.D.N.Y. 2011); *Deutsche Bank Securities, Inc. v. Rhodes*, 578 F.Supp.2d 652, 668 (S.D.N.Y. 2008); *CIBC World Markets Corp. v. TechTrader, Inc.*, 183 F.Supp.2d 605, 611-12 (S.D.N.Y. 2001); *Chase Manhattan Bank, N.A. v. Remington Products, Inc.*, 865 F.Supp. 194, 198-99 (S.D.N.Y. 1994); *PaineWebber Inc. v. Campeau Corp.*, 670 F.Supp. 100, 105 (S.D.N.Y. 1987); *see also FleetBoston Robertson Stephens Inc. v. Innovex Inc.*, 172 F.Supp.2d 1190, 1197 (D.Minn. 2001) (upholding such fee structures and terms of employment after applying New York law). These cases make clear that the transaction fee structure is common in the investment banking industry. Each of these decisions also confirmed that the banker only needed to comply with the terms of its retention agreement in order to be paid. Each case rejected efforts by parties to import other terms in the agreement; they rejected claims, for example, that a banker had not played a pivotal role in a transaction, or had not identified the party with whom the final transaction actually was completed, unless those requirements explicitly appeared in the bankers' retention agreement.

In bankruptcy cases, some decisions and many submissions by parties reflect a misunderstanding about the transaction fees that are charged by investment bankers. Sometimes this is a problem of labels that are loosely applied. For example, in some cases the parties' submissions treat transaction fees as though they are requests for bonuses—what some courts

refer to as "fee enhancements."  Other parties and courts refer to transaction fees as "success

fees" and, having applied that label, then treat the transaction fees as though they implicitly

require a special kind of success in order to be earned.

There are, in fact, instances in bankruptcy in which a professional reserves the right to

seek (or without having reserved such a right, seeks) a discretionary fee enhancement or success

fee which is equivalent to a bonus.  It is very important, however, to distinguish those cases from

cases in which ordinary transaction fees are sought.  Transaction fees are part of the standard,

negotiated, base compensation for the investment banker, as confirmed in the New York cases I

cited.  They are not requests for bonuses above and beyond the approved compensation.  Cases

that address requests for extra compensation, beyond what is provided for in the retention

agreement, really deal with entirely different matters.

For example, the objectors have cited the decision by Judge Glenn in *In re Residential

Capital, LLC*, 504 B.R. 358 (Bankr. S.D.N.Y. 2014).  That case involved a request for

compensation by a court-approved chief restructuring officer.  The retention agreement for that

professional provided for compensation at an hourly rate.  However, the retention agreement said

that the professional could ask for an extra "success fee" at the end of the case, but only if the

debtor and the unsecured creditors' committee, in their sole discretion, thought it was warranted.

In *Residential Capital*, the proposed extra fee emphatically was not part of the negotiated

base compensation for the professional's work.  It was understood that it might never be paid and

that it effectively was a potential bonus that was entirely under the control of, and at the

discretion of, the debtor, the committee, and the court.

It is entirely appropriate, if a bonus is being sought, as in the *Residential Capital* case, to

look closely at the quality of the work done, the results achieved, and especially the role of the

professional in achieving those results, in order to see whether they are such as to warrant a bonus above and beyond the previously agreed compensation. It is utterly wrong, however, to cite the *Residential Capital* case as though it sets forth a standard that must be met when an investment banker applies for final approval of its transaction fee. The transaction fee is not a bonus, and there is no reason why allowance of the transaction fee should be subject to the same standards as a request for payment of a bonus.

The objectors have also cited to the decision by Judge Morris in *In re Northwest Airlines Corp.*, 400 B.R. 393 (Bankr. S.D.N.Y. 2009). However, that case also involved a request for extra compensation above and beyond the prior agreed terms and conditions of employment. In *Northwest Airlines*, Lazard sought a fee that it called a completion fee, but its retention agreement and order did not provide for the payment of such a fee. Instead, the retention agreement merely said that Lazard would receive monthly fees. The only reference to a completion fee was a statement that the committee and Lazard agreed to defer consideration of the possibility of such a fee until the end of the case. When Lazard sought such a fee, the United States Trustee objected that Lazard's request amounted to a request for a fee enhancement or bonus, and Judge Morris denied the request.

As with the *Residential Capital* case, I think it is wrong to treat the *Northwest Airlines* case as though it involves the same things as the transaction fees that ordinarily are sought by investment bankers. And it is wrong to suggest that an investment banker cannot receive its transaction fee unless it makes the same showing that a professional would have to make in order to receive a discretionary extra-contractual bonus. There is a big difference between a discretionary bonus and a percentage-based or flat fee that is the base compensation for the professional's work. Courts that consider applications for the payment of transaction fees should

8

not be confused by the labels that people apply and should instead look at exactly what compensation is sought and the terms under which it is being sought.

I should also note that this same misunderstanding appears in some cases in which courts have attempted to calculate an investment banker's compensation based on inferred hourly rates. These are cases that have also been cited to me by the objectors, and they represent an approach that the objectors have urged me to take here.  More particularly, some decisions have calculated an implied hourly rate for investment bankers, and they have done so so using only the monthly fees, which then are divided by the number of hours actually worked.  But that mathematical approach presumes that the monthly fees, standing by themselves, are expected to constitute full compensation for the underlying work and that the transaction fee, somehow, is just an extra bonus form of compensation.  For the reasons I have already said, I believe that is a false understanding of what the fees represent.  If one really wanted to know what an investment banker's implicit hourly rate or expected hourly rate was, one would need to calculate the total expected fee, *including* the transaction fee, and divide that by the expected time required to accomplish the transaction.  Looking only at the monthly fees results in a mathematically incorrect calculation.

In fact, if one were to calculate implicit "hourly" rates using only the monthly fees as a starting point (as the objectors urge me to do in this case), then by definition the calculation would always show that the monthly fees have already covered the reasonable hourly rates. They would do so because the calculation would have started with the false assumption that the monthly fees represent the full expected compensation for all of the work that was done.

Third, the parties in this case have referred to the so-called Blackstone Protocol, and some history and commentary on this is appropriate.

9

Effectively, the so-called Blackstone Protocol represents a negotiated truce between investment banks and the Office of the United States Trustee for the Southern District of New York. Historically, the United States Trustee has been a much larger opponent of Section 328(a) approvals than other parties have been. To some extent, this is based on a philosophical view that retentions and fees should always be reviewed after-the-fact. Other parties, including creditors' committees, sometimes object on similar grounds. But more often, they do not; and more often than not, those objections fade away. Sometimes committees object and then withdraw their objections when the committee reaches the point of hiring its own advisors who typically want Section 328(a) approval of their own fees.

The Blackstone Protocol was an arrangement that started in the Southern District of New York, I believe. It says, in effect, that parties are bound by the Section 328(a) standards, except for the United States Trustee, which has the right to object on Section 330 grounds. The United States Trustee confirmed during the hearing on December 8 that it has very rarely invoked this right.

A similar approach is now reflected in orders entered in Delaware, although historically there was more litigation over the issue in Delaware. Some bankers sought modified versions of the New York Blackstone Protocol when they were retained in Delaware. The primary focus of the limitation was an effort to obtain an agreement that the United States Trustee could object on Section 330 grounds, but that the reasonableness of fees would not be based on hourly rate criteria. As just one example of such an order, I cite to the order entered in *In re GWLS Holdings, Inc.*, case number 08-12430 (Bankr. D. Del. December 5, 2008), docket number 263. I will not provide a further detailed history of the Delaware developments, because I do not have time to reconstruct it, and because it is not really necessary here.

10

For a time, in Delaware, the issue was the source of heated negotiations between the United States Trustee and the bankers, that often were resolved and that less often produced actual litigation. But eventually the parties stopped fighting over the issue. I think one reason was that some bankers did not want to fight over it, and it was hard for bankers to ask for limitations on the United States Trustee's objection rights if other bankers in similar positions did not think those limits were needed. So eventually the same Southern District of New York language began to become common in the Delaware retention orders as well.

The language, as agreed, says that the United States Trustee may object on all grounds set forth in Section 330 of the Bankruptcy Code, but it typically bars other parties from doing so. In effect, the Blackstone Protocol creates a hybrid situation in which the court must apply or may apply the Section 330 standards to an objection made by the U.S. Trustee, but otherwise must apply Section 328(a).

Frankly, it is not at all clear that Congress contemplated this kind of hybrid approach when it enacted Section 328(a). *See, e.g., Riker, Danzig, Scherer, Hyland & Perretti v. Official Committee of Unsecured Creditors* (*In re Smart World Technologies, LLC*), 552 F.3d 228 (2d Cir. 2009). In *In re Smart World Technologies*, the court referred to Sections 328 and 330 as being "mutually exclusive," and held that a court may not conduct a Section 330 inquiry if there has been a Section 328(a) approval. *Id.* at 233.

The *Smart World* case did not involve an agreement of the kind we have here, so it did not rule on whether the hybrid approach reflected in the Blackstone Protocol is permitted under Sections 328 and 330. The best justification for the Blackstone Protocol that I have been able to theorize is that the hybrid standard of review to which the parties have agreed is, in effect, one of the approved terms of employment that is approved under Section 328(a), so that one of the

approved terms is that the United States Trustee may object on Section 330 grounds while no other party is permitted to do so.  The United States Trustee's objection rights, in other words, are made part of the agreed terms of retention that are protected by Section 328(a).

The fact that such rights are reserved for the United States Trustee does not mean that anyone else can assert objections under Section 330.  The whole idea of the approved terms and of the Protocol is that only the United States Trustee can assert Section 330 objections.  If, as described above, this limitation is one of the approved terms and conditions of employment under Section 328(a), then that approved term cannot be changed unless it is found to have been "improvident in light of developments not capable of being anticipated at the time."  11 U.S.C. § 328(a).  A court cannot after-the-fact change the standards that apply to objections filed by other parties, or change the terms on which other parties may object to fee applications, any more than the court could elect to apply a Section 330 standard in the *Smart World* case.

It would completely undermine Section 328(a) if all a court needed to do after approving a section 328(a) retention was to appoint a new party with standing to object and to give that new party the right to make objections on grounds other than Section 328(a).  Under *Smart World*, a court is forbidden from doing that.  Once the arrangement is approved and becomes part of the approved terms of employment, it is locked in.  If those approved terms of employment say that only the United States Trustee has a right to assert Section 330 objections, then that is also a term that is locked in.

Exactly what it means for the United States Trustee to reserve rights to object under Section 330 is, frankly, not clear.  There is some suggestion in the papers in this case, for example, that I should treat this reserved right as though it means that no pre-approval of the transaction fees had been given at all, and as though there had been no prior determination as to

the reasonableness of the fees or as to whether the fees were consistent with market standards. But I approved the fees under Section 328(a) as to every party other than the United States Trustee. I could not do that without finding that the fees were reasonable and consistent with market standards.

I suppose one possibility is that the reservation of rights in the Blackstone Protocol means that the United States Trustee is not collaterally estopped on the question of whether the fee is market-based and can raise that issue later. But I am not at all sure that that makes sense. Why should the United States Trustee retain a right to object after the fact on points that could have been raised and resolved at the outset? Fairness to all parties, it seems to me, means that issues that can be raised at the time of retention should be raised then, so the terms are resolved as far in advance as possible before the work is done.

The real aim of the arrangement, as I understand it, is not to postpone the litigation of issues that could and should be litigated at the outset, but instead to have greater flexibility after the fact than the literal terms of Section 328(a) would provide. In other words, it is an effort to have flexibility to deal with changed circumstances that the parties think may be relevant but that might not be capable of being considered under the literal terms of Section 328(a). Exactly what rights are conferred to the United Sates Trustee and what the proper scope of such rights should be is something I do not need to address further here for reasons I will explain.

Turning to the applications before me: as to PJT, the retention order (the "PJT Retention Order") is docket number 550 and was entered on September 21, 2015. Paragraphs 2 and 6 of the PJT Retention Order make clear that the retention is approved under Section 328(a) of the Bankruptcy Code. However, the PJT Retention Order also said that the United States Trustee retained all rights to respond or object to interim and final applications on all grounds, including

reasonableness pursuant to Section 330 of the Bankruptcy Code, and that the Court retained

jurisdiction to consider any such objections by the United States Trustee on Section 330 grounds.

The Houlihan retention order (the "Houlihan Retention Order") similarly provides for

retention under Section 328(a), and it has the same Blackstone Protocol language.  In that case,

however, the Section 330 rights were reserved not only for the United States Trustee, but also for

the Official Committee of Unsecured Creditors.

In these cases, the United States Trustee and the Official Committee of Unsecured

Creditors have not objected to the PJT or Houlihan applications.  The only objections filed were

by the fee examiner and by RSL and, in the case of Houlihan, by Relativity Fashion.  So, the first

question presented to the Court is, what arguments do the objectors have the right to assert?

In the case of RSL and Relativity Fashion, no suggestion has been made to me of any

reason why they, on their own behalf, should have rights to object pursuant to Section 330

standards as opposed to being confined to the standard of review under Section 328(a).

As to the fee examiner, the issue requires a little more discussion.  The idea of hiring a

fee examiner came up late in these cases.  It was presented to me in the form of a stipulation

among the debtors, the committee, and the United States Trustee.  Paragraph 1 of the stipulation,

found at docket number 1633 and entered on March 10, 2016, says that to the extent that the

United States Trustee retained the rights under a Section 328(a) retention order to object on

Section 330 grounds, "the fee examiner shall also be authorized (and shall have standing) to

object to the allowance of such fees and expenses, consistent with this stipulation and order."  *Id.*

at 3.

14

The fee examiner contends that I approved the stipulation and therefore that the fee examiner has the right to make objections under Section 330 and is not constrained by the standards set forth in Section 328(a) of the Bankruptcy Code.

I think this argument is incorrect for two reasons.

First, I did not approve the stipulation as it was presented, and I specifically did not approve the rights that paragraph 1 purported to grant to the fee examiner. I expressed some skepticism about the concept of having a fee examiner in general, and I asked the parties to the stipulation to discuss it at the next scheduled hearing before the Court. At that hearing I told the parties that I did not intend, through the appointment of a fee examiner, to change the standards that would govern the review and approval of any of the professionals' fees. Consistent with that direction, I did not "so order" the stipulation itself. I entered a separate order which appears at docket number 1742, entered on April 5, 2016. That Order says that the stipulation is approved "except as set forth herein." *Id.* at 1. I also added a paragraph to the proposed order, which is paragraph 4 of the Order as entered. Paragraph 4 of my Order says that "[n]othing in the Stipulation or in this Order shall effect any modification to the standard of review that is applicable to the consideration of a fee application or to the standards under which any professional was retained." *Id.* at 2.

In my mind, if a professional had been retained under Section 328(a), and if under my prior orders only the United States Trustee or the Committee could challenge those professionals' fees based on other standards, I was not altering that arrangement. I was not purporting to grant similar rights to additional parties, because in my mind, that would change the standard of review applicable to the engagements I had approved. I thought the language that I added in paragraph 4 was clear on that point.

15

Second, in addition to the fact that I did not give the fee examiner the rights that were sought under paragraph 1 of the stipulation, I believe that under Section 328(a) I could not have done so.

PJT and Houlihan were not parties to the stipulation. It was just a stipulation among the United States Trustee, the debtors, and the committee. The parties to the stipulation told me when we had our hearing that the retained professionals were not parties to it and had not reviewed or approved the terms of the stipulation. *See* Transcript of Hearing on March 31, 2016, Docket No. 1743, at 22.

The United States Trustee represented at the hearing that the idea for the fee examiner originated with Mr. Kavanaugh's counsel, that it was not a substitute for United States Trustee's review; that the United States Trustee might make suggestions to the fee examiner; but that the United States Trustee would continue its separate role and would make its own separate objections if it thought it appropriate to do so. *Id.* at 27.

As a result, I do not understand how this stipulation could be treated as though it, in effect, changed the terms after-the-fact of the prior retention orders entered for Houlihan and PJT. The original arrangement was that the retentions were under Section 328(a). The only reservation in the case of PJT was in favor of the United States Trustee, and the only reservations in the case of Houlihan were in favor of the United States Trustee and the Official Committee of Unsecured Creditors.

Under the terms of Section 328(a) and under the *Smart World* decision, I had no power to give anyone else the right to assert objections based on Section 330 standards. Doing so, in effect, would have changed the retention from a Section 328(a) standard to a Section 330 standard, which *Smart World* says I could not do.

I have been urged to find that PJT and Houlihan consented to this, because they did not object to the application for approval of the stipulation. I do not believe that silence and a failure to object in that regard is consent or should be interpreted as having accomplished a change to the prior retention orders. Notably, nobody served papers suggesting that the terms of the prior retention orders were being changed by the stipulation or calling to the attention of Houlihan or PJT that their rights were potentially being affected by the stipulation. It asks far too much to say that a party consents to relief when it is not even formally notified that relief is being sought against it.

Now, the fee examiner did have the authority to make recommendations. I suppose that leaves open the possibility that the fee examiner might have made suggestions to the United States Trustee about objections that the United States Trustee might wish to make under Section 330. But that is not what we have here. The United States Trustee said at the fee examiner hearing, as noted above, that it would object on its own behalf if it had objections. The United States Trustee has made no such objection here, and it confirmed that at the outset of this hearing. The fee examiner has filed this objection in his own name and on his own behalf. For the reasons I have stated, I do not believe the fee examiner has the right to do so, except pursuant to the standards of Section 328(a). I did not grant that right, and I could not have done so even if I had wanted to.

I should note that I also have a lot of doubts and questions about some of the arguments that were made about the standards that I should have applied in the event that I had agreed that the fee examiner and other objecting parties could make objections under Section 330, but I do not need to reach those points.

The parties have agreed that if the Section 328(a) standard applies, there is no issue as to the Houlihan application. In the case of PJT, if Section 328 applies, the only remaining issue is whether PJT is entitled to a transaction fee under the terms of its approved retention agreement.

The PJT retention agreement [Docket No. 284] defines a "Restructuring" on page 1 as collectively, "any restructuring, reorganization . . . and/or recapitalization of the Company substantially affecting existing or potential debt obligations or other claims, including, without limitation, senior debt . . . and/or any sale or other disposition of all or substantially all of the assets of or equity interests in the Company." *Id.* at 18. However, there is also a qualifier in the definition. A matter counts as a Restructuring under the agreement only if PJT "shall have provided material support and services with respect to such transaction." *Id.*

These cases began with an initial proposal to sell all of the assets, with the secured creditors acting as the stalking-horse bidder. An auction was scheduled and was conducted. There was no competing bid to buy all the assets, but there was a competing proposal that took a different form. More specifically, there was a suggestion that only some assets (while I will loosely refer to as the "Television Business") would be sold, and there would be a reorganization around the rest.

At the scheduled auction, at the offices of PJT on October 1 and 2, 2015, there were lengthy, intense negotiations that resulted in a tentative agreement on a new integrated proposal. Thereafter, the parties all collectively represented to me that a deal had been reached that provided that the Television Business would be sold and that one or more term sheets had been signed with regard to a restructuring of the rest of the obligations, and that the rest of the case would be focused on implementing, filling out, and effecting a reorganization along the lines that the parties had put into the term sheets. It was explicitly represented to me at the time and

characterized to me consistently throughout these cases that the sale of the Television Business and the term sheets were related to each other and were part of a single package deal.

The fee examiner and RLS contend that PJT did not provide material support or services for the restructuring that was achieved.  They contend that PJT worked only on the sale of the Television Business and did not work on the rest of the deal; that its work ended in October when Mr. Kavanaugh asked PJT to stop work; that many components of the restructuring were negotiated after October without any involvement from PJT; and that many other parties did things – such as negotiate terms, draft documents, or undertake other important restructuring-related activity – without PJT's presence.

The first and main problem with these contentions is that they imply that the sale was separate from the restructuring term sheets, and unrelated to the overall restructuring.  This is not the case.  The sale of the Television Business was not separate from the rest of the restructuring transaction.  It was an integral part of it.  It was always described that way to me.  The only witness at the hearing before me, Van Durrer, also described it that way during his testimony.  RSL, in fact, in its own papers, described the sale transaction as being integrally related and part of a single package with the rest of the restructuring.  Treating the sale of the Television Business as though it was separate and not part of the rest of what happened is not a reasonable way to view what happened in this particular case.

It is also clear that the restructuring term sheets were direct outgrowths of the auction process.  Furthermore, it is clear that those restructuring term sheets ultimately led directly to the plan that was confirmed.  Mr. Durrer described the October events as critical steps to the reorganization.  Of course, some things still had to be done, but the terms agreed to in October were the guiding terms that eventually found their way into the confirmed plan of reorganization.

Mr. Durrer also confirmed during his testimony that PJT provided material support and services in conjunction with the sale.  The objectors did not really dispute that.  In essence, their objection is that the sale part of the transaction should be viewed separately.  But the evidence and my own recollection do not support that contention.

The only evidence before me is that PJT did everything one would expect the investment banker to do through the time in October when Mr. Kavanaugh asked PJT to stop work, mostly as a result of a conflict that had developed between Mr. Kavanaugh and the person from FTI who had previously directed PJT's work.  The evidence is also that the October deals were a package and that PJT provided material support and services in producing that package.  Finally, the evidence is that this package led directly to the confirmed plan.

There was some hint in the objections and arguments made at the hearing that the contractual requirement of material support and services required, in effect, that PJT have an actual and ongoing central role in every aspect of the ultimate restructuring.  The contractual terms, and common sense, do not support that view.

First, that is not what the word "material" usually means.  My old edition of Ballantine's Law Dictionary defines the word "material" as meaning "important."  *See Ballantine's Law Dictionary* (3d ed. 1969).  It did not require that PJT's services infuse every corner of the deal, or that PJT be the sole or even the primary driving force in achieving what happened, or even that PJT's work be the most important factor in what happened.  It merely required that PJT's services be important.  Clearly, PJT was important and material to the auction and sale that produced the term sheets.  In that respect, its services were material to the restructuring that happened.  In fact, PJT's services were more than just important: they were an essential part of

the October agreements.  The restructuring in this case was built on the foundation established in October, and PJT played a material role in building that foundation.

As to the suggestions that other parties drafted documents and negotiated other terms: every reorganization, especially in companies with capital structures as complicated as the one these companies had, requires a host of negotiations and documents.  Lawyers typically do some negotiations.  Business people typically do some others.  Bankers typically do some.  Other terms often are hammered out by the stakeholders themselves without any direct involvement by the debtors or their professionals.  Of course other people played a part here in negotiating the terms that became part of the ultimate restructuring, as they do in all cases.  But that hardly means that PJT did not provide "material support and services."  If I were to interpret the requirement for the provision of material support and services as requiring that PJT had to be the dominant moving force in everything that happened, to the exclusion of the work done by other professionals, such an interpretation would be contrary to the way that everyone understands that a typical restructuring is conducted.  In fact, if I were to interpret it that way, it is hard to see how any fee could ever have been earned.

It is noteworthy that everyone who negotiated the retention agreement and who was a party to the case at the time of its approval supports PJT's application.  The witness who testified yesterday said that he, too, supports the application.  Moreover, finding that PJT is entitled to the compensation is consistent with my own understanding of what I was approving as well.  The evidence, therefore, clearly showed that PJT has satisfied the terms of its engagement letter, and that it is entitled to the fee that it negotiated, subject to the reduction to which it has already agreed.

There was a separate issue raised in the papers and discussed yesterday as to whether a sale occurred, as defined in the agreement.  A determination of that issue would have required consideration of whether the Television Business constituted a sale of all or substantially all of the assets or whether the October agreements provided for a disposition of all or substantially all of the assets or equity.  I would have needed a factual hearing before I could have decided such issues, but I do not need to reach them, and therefore I decline to do so.

For the foregoing reasons, the objections are denied and the parties are directed to submit orders that reflect allowance of the fees and expenses of PJT and Houlihan in accordance with their applications, subject to the modification of those amounts that were previously agreed to.

Dated:  New York, New York
         December 16, 2016

<u>s/Michael E. Wiles</u>
Hon. Michael E. Wiles
United States Bankruptcy Judge