**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **FOR PUBLICATION** |
| **RELATIVITY FASHION, LLC, et al.,** | **Chapter 11** |
| | **Case No. 15-11989 (MEW)** |
| **Reorganized Debtors.** | **(Jointly Administered)** |

**MEMORANDUM OPINION REGARDING MOTION FOR AWARDS**
**OF ATTORNEYS' FEES AND EXPENSES AGAINST NETFLIX, INC.**

**A P P E A R A N C E S :**

JONES DAY
*Attorneys for Debtors*
222 East 41st Street
New York, NY 10017
  By:  Richard L. Wynne, Esq.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
*Attorneys for Ryan Kavanaugh*
300 South Grand Avenue
Suite 3400
Los Angeles, CA 90071
  By:  Van C. Durrer II, Esq.

BARNES & THORNBURG LLP
*Attorneys for Netflix*
2029 Century Park East, Suite 300
Los Angeles, CA 90067
  By:  Stephen R. Mick, Esq.

**MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

        Relativity (defined below) and Mr. Ryan Kavanaugh have filed a motion seeking

reimbursement of attorneys' fees and expenses they incurred during litigation against Netflix,

Inc. [Docket No. 1963].  The litigation resulted in an Order and Injunction [Docket No. 1932]

that was issued for the reasons set forth in a written bench decision dated June 1, 2016.  [Docket

No. 1948].  The Court holds that Relativity is entitled to an award of attorneys' fees and

expenses as to Relativity's own counsel, but that Mr. Kavanaugh and Relativity are not entitled

to reimbursement of fees and expenses incurred by Mr. Kavanaugh's counsel.  The Court also

holds that the amount that Netflix is obligated to pay to Relativity is $818,547.48, consisting of

$795,732.50 in reasonable attorneys' fees and $22,814.98 in litigation expenses.  This award is

without prejudice to further applications to recover fees and expenses incurred in connection

with Netflix's appeals from this Court's Order and Injunction.

### Background

Relativity Media, LLC entered into a License Agreement with Netflix dated June 1, 2010.

The License Agreement described terms under which first run, theatrically released films would

later be made available for distribution by Netflix.  In exchange, Netflix agreed to pay license

fees that were tied to the theatrical box office receipts.  Amendments to the License Agreement

assigned the licensor's rights to RML Distribution Domestic, LLC ("RML") and granted certain

rights to affiliates of RML as to films in which they had interests.  Those affiliates include

Armored Car Productions, LLC and DR Productions, LLC, who own rights regarding the films

*Masterminds* and *The Disappointments Room*.  RML, Armored Car Productions, LLC and DR

Productions, LLC were debtors in these cases, and for ease of reference these three debtors will

be referred to here as "Relativity."[1]

Relativity and Netflix executed "Notices of Assignment" under which certain of

Relativity's rights regarding license fees for *Masterminds* and *The Disappointments Room* were

assigned to secured creditors.  In the Notices of Assignment, Netflix agreed that minimum

---

[1]    Papers were filed during the relevant litigation against Netflix, and in connection with the
fee motions, on behalf of the "Reorganized Debtors," as if all of the debtors in these cases
were parties to all of these matters.  In fact, the entities who are parties with respect to the
relevant matters are the three debtors identified above.  *See* Bench Decision at 3.

license payments would be made to the secured lenders by no later than a specified date, regardless of whether a theatrical release of the films had occurred by that date. After the plan of reorganization in these cases became effective Relativity asked Netflix to execute "Date Extension Amendments" to these Notices of Assignment. The amendments were based on the revised agreements with the secured creditors that had been incorporated in the confirmed plan, and they postponed the dates when Netflix was required to make payments to the secured creditors in light of the new planned theatrical release dates for the two films. However, Netflix refused to execute the proposed amendments. Netflix took the position that it had the contractual right to make payments to the secured lenders in June 2016 and then immediately to distribute *Masterminds* and *The Disappointments Room* through Netflix's own delivery services, without waiting for prior theatrical releases of the films.

After a trial, this Court held that Netflix's claimed contractual rights were inconsistent with positions that Netflix had taken during prior hearings and with findings the Court previously made. The Court therefore held that Netflix was barred by res judicata and by judicial estoppel from asserting that Netflix had the contractual rights to distribute the films before they had been theatrically released. The Court also held that Netflix's asserted contract rights were not consistent with the terms of the parties' written agreements and with the evidence at trial, which made clear that Netflix had no right to distribute licensed films without a prior theatrical release.

Paragraph 10.2 of the License Agreement provides that the "prevailing party" in any litigation "arising out of or relating to" the agreement is entitled to reimbursement of its reasonable costs and expenses, including reasonable outside attorneys' fees. Relativity contends that it was a "prevailing party" in the litigation against Netflix. Mr. Kavanaugh (Relativity's CEO and a plan proponent) contends that he, too, was a party to the litigation and that his own

attorneys' fees and expenses should be paid by Netflix.  Alternatively, Mr. Kavanaugh and

Relativity contend that Relativity was obligated to reimburse Mr. Kavanaugh for his fees and

expenses and that Mr. Kavanaugh's legal expenses therefore are "expenses" of Relativity that

Netflix is contractually obligated to pay.  Relativity seeks $795,732.50 in fees and $22,814.98 in

expense reimbursements for periods ending May 27, 2016.  Mr. Kavanaugh seeks $427,727.50 in

fees and $17,775.63 in expense reimbursements for the same period.  Relativity and Mr.

Kavanaugh also have reserved their rights to seek additional awards of fees and expenses

incurred after May 27, 2016 as a result of continuing litigation, including Netflix's appeals from

the Order and Injunction.  *See* Transcript, September 15, 2016 [Docket No. 2075] at 19.

Netflix contends that the underlying litigation was an effort to enforce the confirmed plan

of reorganization and was not an action "on a contract," and that Netflix has no obligation to pay

its opponents' fees and expenses.  Netflix further argues that Mr. Kavanaugh was not a moving

party or a prevailing party in the underlying litigation; that Mr. Kavanaugh is not a party to the

License Agreement and therefore has no rights to seek fees or expense reimbursements under

that agreement; and that Relativity's obligation to reimburse Mr. Kavanaugh for his expenses as

plan proponent does not entitle Relativity to seek those amounts from Netflix.  Netflix also

asserts that the fee requests are excessive, and that Relativity is barred from seeking litigation

"expenses" (other than taxable costs) through a post-trial motion.

## **The Submitted Record**

Rule 54 of the Federal Rules of Civil Procedure applies to the motion for awards of

attorneys' fees.  *See* Fed. R. Bankr. P. 7054, 9014; Fed. R. Civ. P. 54.  The parties have

submitted numerous exhibits, declarations and briefs, and for the most part they have agreed that

the Court should resolve the motions based on the submitted materials and the arguments of

4

counsel, without the need for oral testimony or cross-examination. *See* Transcript, August 18, 2016 [Docket No. 2045] at 12-13 (confirming parties' agreement as to the procedure); 10-54 *Moore's Federal Practice - Civil* § 54.157[3] (confirming that requests for attorneys' fees may be resolved by motion and based on briefs and evidentiary submissions and without the need for a trial). The exceptions are as to the requests to recover "expenses" other than taxable court costs. As noted above, Netflix contends that a request to recover nontaxable expenses is a contractual damage claim that cannot be made through a post-trial motion.

## Section 1717 of the California Civil Code

The License Agreement is governed by California Law. Section 1717 of the California Civil Code provides in relevant part:

> (a) In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs.

> *        *        *        *

> Reasonable attorney's fees shall be fixed by the court, and shall be an element of the costs of suit.

> *        *        *        *

> (b) (1) The court, upon notice and motion by a party, shall determine who is the party prevailing on the contract for purposes of this section, whether or not the suit proceeds to final judgment. Except as provided in paragraph (2), the party prevailing on the contract shall be the party who recovered a greater relief in the action on the contract. The court may also determine that there is no party prevailing on the contract for purposes of this section.

> (2) Where an action has been voluntarily dismissed or dismissed pursuant to a settlement of the case, there shall be no prevailing party for purposes of this section.

Cal. Civ. Code § 1717.

Section 1717 "was originally enacted to establish mutuality of remedy when a contract makes recovery of attorney fees available only for one party and to prevent the oppressive use of one-sided attorney fees provisions." *PCLM Group, Inc. v. Drexler*, 22 Cal.4th 1084, 1090-91 (Cal. 2000). Section 1717 entitled a contracting party to attorneys' fees in an action "on a contract" whenever the other contracting party would have had a contractual right to such fees if it had prevailed. "Unilateral" contractual rights to recover fees were automatically made mutual.

Section 1717 has engendered much litigation over the years, and two principles have emerged from the California court decisions that are relevant to the motion before this Court.

<u>First</u>, the California courts have ruled that section 1717 is applicable to all requests for awards of attorneys' fees that arise in actions "on a contract." Accordingly, for example, the rules in section 1717 regarding the identification of a "prevailing party" – including the rule that there is no prevailing party in an action that is voluntarily dismissed or that is settled – apply to all actions "on a contract" in which parties seek to recover attorneys' fees, no matter what the parties' contract says. *Santisas v. Goodin*, 17 Cal. 4th 599, 616-17 (Cal. 1998). In this regard section 1717 may expand some rights under a contract (by conferring a right to fees upon a party who otherwise does not have them) while restricting other contractual rights (by barring fee awards in cases that are settled).

<u>Second</u>, section 1717 applies only to actions that are "on a contract." Parties may agree, in a contract, to be liable for fees and expenses that are incurred in other kinds of actions. Accordingly, the California Supreme Court confirmed in *Santisas* that section 1717 does *not* limit in any way the enforcement of a contractual right to attorneys' fees in litigations that are not "actions on a contract." *Id*. at 615, 617. If a litigation is not an "action on a contract," then a party's contractual right to recover fees is determined solely by the contract itself. *Id*.

<u>Discussion</u>

I.      **Relativity May Recover its Own Reasonable Fees and Expenses**

Netflix contends that Relativity may not recover fees and expenses because the litigation

was not an action "on a contract" for purposes of section 1717, but instead was a request for

relief under section 1142 of the Bankruptcy Code.  Netflix similarly contends that Relativity did

not prevail on a contract claim, but instead prevailed only on a claim under section 1142.  In this

respect Netflix urges the Court to adopt a highly restrictive interpretation of what constitutes an

action "on a contract" for purposes of section 1717.  Netflix argues that it is not enough that

Netflix asserted contract rights and that the litigation involved contract issues; instead, in

Netflix's view, "[e]ven if there were ancillary *issues* relating to the contract, it is the

characterization of the moving parties' *action* that controls" in deciding whether 1717 is

applicable.  *See* Netflix Opposition [Docket No. 1997] at 21 (emphasis in original).  Netflix

believes that Relativity's invocation of section 1142 of the Bankruptcy Code as a basis for relief

requires this Court to conclude that the underlying dispute was not an action "on a contract."

Netflix's argument is a curious one in at least one respect.  By its terms, Civil Code

section 1717 only applies if the underlying action was an "action on a contract."  If Netflix were

right – if the invocation of section 1142 meant as a technical matter that the dispute before this

Court was not an action "on a contract" for purposes of section 1717 – that would just mean that

section 1717 does not apply at all.  In that case, Relativity would still have rights to recover fees

and expenses on its section 1142 motion so long as its contract with Netflix provided for such

fees and expenses.  *See Santisas v. Goodin*, *supra*, 17 Cal. 4th at 615, 617.  During argument,

Netflix's counsel acknowledged that section 1717 would not limit any contractual right to fees

that Relativity might have to the extent the parties' dispute was not a dispute "on a contract."

*See* Transcript, July 21, 2016 [Docket No. 2012] at 33.

7

Here, section 10.2 of the License Agreement provides that the prevailing party is entitled to recover fees and expenses "in any litigation or other proceeding arising out of or relating to" the License Agreement.  Netflix argues that the mere fact that a dispute is "related" to a contract, or "involves" contract issues, does not make it an "action on a contract" for purposes of section 1717.  But Netflix itself has consistently argued that the parties' disputes did "arise out of" and "relate to" the parties' License Agreement.  *See, e.g.,* Netflix Opposition [Docket No. 1868] at ¶¶ 10, 20-21, 34, 60-73; Netflix's Motion to Compel Arbitration [Docket No. 1892] at ¶¶ 1, 13, 18-19; and Netflix's Motion *In Limine* to Exclude Extrinsic Evidence [Docket No. 1906] at ¶ 1.  So even if Netflix were right in its restrictive interpretation of the words "on a contract," that would just mean that section 1717 is not relevant, and Netflix's own repeated admissions that the parties' disputes arose out of and related to the License Agreement would still entitle Relativity to recover its fees and expenses.

In any event, Netflix also is wrong in its contentions about what constitutes an action "on a contract" for purposes of section 1717, and as to whether Relativity was a "prevailing party."

### A.    The Dispute between Relativity and Netflix Was "On a Contract" for Purposes of Section 1717

The question of whether an action is "on a contract" is liberally construed by the California courts.  *Turner v. Schultz*, 175 Cal. App. 4th 974, 979 (Cal. Ct. App. 1st Dist. 2009). So long as a dispute "involves" a contract, or "arises out of, is based upon, or relates to an agreement by seeking to define or interpret its terms or to determine or enforce a party's rights or duties under the agreement," the dispute is an action "on a contract" for purposes of section 1717.  *Douglas E. Barnhart,* 211 Cal. App. 4th 230, 241-42 (Cal. Ct. App. 4th Dist. 2012); *see also Hjelm v. Prometheus Real Estate Group, Inc.*, 3 Cal. App. 5th 1155, 1169-70 (Cal. Ct. App. 1st Dist. 2016).

8

In addition, under section 1717 a party "prevails" on a contract claim if the party successfully resists an assertion of contract rights, even if the party does so by arguing "the inapplicability, invalidity, unenforceability, or nonexistence of the same contract." *Santisas v. Goodin, supra*, 17 Cal. 4th at 611 (quoting *N. Associates v. Bell,* 184 Cal.App.3d 860, 865 (Cal. Ct. App. 1st Dist. 1986)).   In other words, a party does not even have to acknowledge that a contract exists in order to be a prevailing party in an action "on a contract."   Prevailing in a dispute over the claimed application of a contract, where such contract contains a fee provision, is sufficient.   This is because the party who unsuccessfully asserted contract rights would have been entitled to fees if it had prevailed in establishing such rights, and under section 1717 that right must be mutual.   *Id.*; *see also Turner v. Schultz*, 175 Cal. App. 4th at 980; *Shadoan v. World Sav. & Loan Ass'n,* 219 Cal. App. 3d 97, 107 (Cal. Ct. App. 1st Dist. 1990); *IMO Dev. Corp. v. Dow Corning Corp.,* 135 Cal. App. 3d 451, 464 (Cal. Ct. App. 4th Dist. 1982).

Netflix nevertheless argues that the mere invocation of section 1142 is enough to take the parties' dispute outside the ambit of section 1717.   It contends that "courts applying California law have consistently held that a party has no right to contractual attorneys' fees in a proceeding seeking relief under the Bankruptcy Code, as opposed to relief on a contract."   *See* Netflix Opposition [Docket No. 1997] at 3, 19-22.   In other words, Netflix suggests that the Court should look only at the name of the motion and the statute or rule under which it was filed, and that the Court should ignore the nature of the defenses that Netflix raised and the source of the rights that Netflix claimed.   Netflix's argument is not consistent with the California authorities cited above. It is also a misstatement of what prior federal court decisions have held.

Federal courts in the Ninth Circuit have held that an action is not "on a contract" for purposes of section 1717 if the issue decided by a bankruptcy court did not involve litigation

over a contract's meaning or enforceability.  In *Bos v. Board of Trustees,* 818 F.3d 486 (9th Cir.

2016), for example, a chapter 7 creditor argued that a debtor should not be discharged from a

judgment because the debt allegedly had been incurred through "fraud or defalcation while

acting in a fiduciary capacity, embezzlement or larceny."  *Id*. at 488.  The debtor prevailed, and

then sought to recover attorneys' fees under the parties' contract.  The Court of Appeals held that

the dischargeability action was not itself an "action on a contract" because the proceeding "in no

way required the bankruptcy court to determine whether or to what extent the Trust Agreements

or the Note were enforceable against Bos, or whether Bos had violated their terms."  *Id*. at 190.

The Ninth Circuit Court of Appeals distinguished *Bos* from its decision just one year

earlier in *Penrod v. AmeriCredit Financial Services, Inc.*, 802 F.3d 1084 (9th Cir. 2015), while

affirming the continued validity of the *Penrod* decision.  In *Penrod*, a creditor argued that a

proposed chapter 13 plan was not consistent with the creditor's contractual rights and therefore

could not be confirmed.  The debtor ultimately prevailed, and then sought reimbursements of

attorneys' fees under the parties' contract.  The Court of Appeals held that the underlying

litigation was an "action on a contract" because the creditor had sought to enforce a claimed

contractual right when it objected to confirmation of the chapter 13 plan.  *Id.* at 1088.  Since

"[t]he only possible source of [AmeriCredit's] asserted right was the contract," and since the

only issue in the litigation was whether the relevant contract provision was in fact enforceable

under its own terms or was made partially inapplicable in bankruptcy, the debtor had prevailed

on a claim "on a contract" for the purposes of § 1717.  *Id.*  This was true even though the

bankruptcy court had not resolved any dispute over the interpretation of the contract.

The decision in *Penrod* makes clear that Relativity's dispute with Netflix qualifies as an

action "on a contract" for purposes of section 1717.  The License Agreement, and the Notices of

Assignment, were the sole source of Netflix's contentions: (1) that Netflix did not have to execute the Date Extension Amendments; (2) that Netflix could distribute *Masterminds* and *The Disappointments Room* on its own networks in June 2016; and (3) that Relativity was not entitled to relief. The parties' contracts were also the sole source of Netflix's contention that the dispute should be arbitrated. It is true that Relativity sought relief under section 1142 of the Bankruptcy Code, but Netflix did not challenge the application of section 1142 on any ground other than Netflix's claimed contractual rights. The Court held that Netflix was barred from asserting the contractual rights that it claimed, that arbitration was not required, and also that Netflix's contractual claims were wrong on the merits. Under California and Ninth Circuit precedents, that judgment resolved a dispute "on a contract" for purposes of section 1717.

### B.    Relativity Was the Prevailing Party

Netflix argues that Relativity only obtained relief under section 1142 of the Bankruptcy Code and not under the contract, and therefore Relativity was not a "prevailing party" for purposes of section 1717. Netflix's argument cannot be squared with the *Penrod* decision, which confirmed that a debtor who obtained confirmation of a chapter 13 plan nevertheless was the prevailing party in a dispute "on a contract" because contract issues were the only grounds for a creditor's objection to the proposed plan. Netflix's argument also cannot be squared with the *Santisas* decision, which confirmed that a party "prevails" in a dispute "on a contract" if the party successfully defeats the assertion of a claimed contractual right. *Santisas v. Goodin, supra*, 17 Cal. 4th at 611. *See also In re Branford Partners, LLC*, 2008 WL 8444795, at *8 (B.A.P. 9th Cir. 2008) (action was "on a contract" and fees were awarded after asserted equitable liens were dismissed based on their avoidability under the Bankruptcy Code); *In re Martin,* 491 B.R. 122, 127-30 (Bankr. E.D. Cal. 2013) (action was "on a contract" and fees were awarded after a deed

11

of trust was found to be unenforceable based on the operation of the Bankruptcy Code); *Weber v. Langholz*, 39 Cal. App. 4th 1578, 1585-86 (Cal. Ct. App. 2d Dist. 1995) (action was "on a contract" where defendant sought rescission of a loan under the Federal Truth in Lending Act).

In this case, Netflix never quarreled with the proposition that section 1142 of the Bankruptcy Code allows the Court to compel parties to execute instruments necessary to implement a confirmed plan of reorganization. Netflix's asserted contractual defenses were the sole ground on which it resisted the requested relief under section 1142. Relativity prevailed in the litigation over those claimed contractual defenses. More particularly, Relativity prevailed on the res judicata, judicial estoppel and substantive contract issues, as well as on Netflix's contention that the contract required arbitration of the dispute. The Court did not compel Netflix to execute the specific Date Extension Amendments that Relativity had proffered, because further proceedings in another court would be needed to determine the appropriate new "outside date" to be included in such amendments. In all important respects, however, the Court granted Relativity the relief that it sought. *See Merced Production Credit Ass'n v. Sparkman (In re Sparkman)*, 703 F.2d 1097, 1100 (9th Cir. 1983) ("the party who obtains a favorable judgment is deemed to be the prevailing party even though he did not successfully obtain all the relief which he sought in the action"); *see also Hsu v. Abbara*, 9 Cal.4th 863, 877 (Cal. 1995) (party can be the prevailing party even if some relief is denied, so long as the party has "achieved its main litigation objective").

## C.    No Apportionment of Fees and Expenses Is Proper or Necessary

Netflix argues that the request for relief under section 1142 was the equivalent of a "cause of action" that was separate from contract issues and that Relativity's attorneys' fees and expenses should be "apportioned" so as to eliminate those attributable to the section 1142 issues.

12

But in this case, as noted many times above, Netflix never opposed relief under section 1142 on any grounds other than contractual grounds. Netflix's contention that there was a "separate" litigation over the application of section 1142 is therefore unfounded. In addition, no apportionment would be proper even if the motion for relief under section 1142 were viewed as a separate or parallel cause of action. The California Supreme Court has made clear that attorneys' fees need not be apportioned when incurred in the litigation of an issue that is common to both a contractual cause of action and another cause of action. *Reynolds Metals Co. v. Alperson*, 25 Cal. 3d 124, 129-30 (Cal. 1979). The California courts similarly have held that apportionment is not required when claims are so intertwined that it would be impracticable, if not impossible, to separate the attorneys' time into compensable and noncompensable units. *Hjelm v. Prometheus Real Estate Group, Inc.*, 3 Cal. App. 5th at 1178. Since contractual defenses were the only issues raised in opposition to the requested relief under section 1142, there is no "apportionment" that is required or that would be practicable.

## II.    Mr. Kavanaugh Has No Right to Reimbursement Under Section 1717

Mr. Kavanaugh contends that under Civil Code Section 1717 the presence of an attorneys' fee provision in the License Agreement entitles him to attorneys' fees based on his participation in the litigation against Netflix, even though he is not a party to the License Agreement. The Court disagrees.

### A.    Mr. Kavanaugh Was a Moving Party

Netflix contends that Mr. Kavanaugh was not a "moving party" and thus could not have been a "prevailing party" in the litigation. The record on this point is far more muddled that it should have been. The name and address of Mr. Kavanaugh's counsel appear on the cover page and the signature page of the initial motion for relief under section 1142 of the Bankruptcy Code and on many other supporting papers. *See* Reorganized Debtors' Motion for Relief [Docket No.

1859]; Reorganized Debtors' Motion to Shorten Time [Docket No. 1860]; Reorganized Debtors'

Reply to Netflix Opposition [Docket No. 1877]; Reorganized Debtors' Prehearing Brief [Docket

No. 1904]. However, the text of each of those documents identifies the "Reorganized Debtors"

as the moving parties, and each document describes relief that the "Reorganized Debtors"

sought. The cover pages and signature pages, in which counsel are identified, are the only places

in which Mr. Kavanaugh's name even appears in these documents.

Netflix, in at least some of its opposition papers, treated the motion for relief as having

been filed by Relativity and also by Mr. Kavanaugh. *See* Netflix Opposition [Docket No. 1868]

at 1; *see also* Declaration of Scott McNutt Regarding Availability of Witnesses [Docket 1870] at

2; Netflix's Trial Brief [Docket No. 1910] at 1. In other filings, however, Netflix referred to the

pending motion as though it had been filed only by Relativity. *See* Netflix's Motion to Compel

Arbitration [Docket No. 1892] at 1; Netflix's Further Objection to Improper Forum and Demand

for Trial by Jury [Docket No. 1905] at 1; Netflix's Motion *In Limine* to Exclude Extrinsic

Evidence [Docket No. 1906] at 1-2.

The issue arose at trial on two occasions. At the opening of the trial, Netflix asked for

clarification as to who claimed contract rights as against Netflix. *See* Transcript, May 19, 2016

[Docket No. 1921] at 8-9. At that point the parties confirmed that the three entities defined in

this Memorandum Opinion as "Relativity" were the contracting parties, though Relativity's

counsel added that "we think that Relativity Media, the parent, also has an interest, because of

the plan issues." *Id*. On the next day, however – after Mr. Kavanaugh's counsel raised an issue

during the examination of a witness – Netflix's counsel objected that Mr. Kavanaugh's counsel

should not be heard because Mr. Kavanaugh was not a party to the contracts. Relativity's

counsel responded that Mr. Kavanaugh was "a party to the motion," and Mr. Kavanaugh's

14

counsel confirmed that "[w]e did join in the motion, Your Honor, and obviously we're a very key party-in-interest." *See* Transcript, May 20, 2016 [Docket No. 1938] at 18.

While the moving parties certainly should have been clearer, in context it was clear that Mr. Kavanaugh, in his capacity as a plan proponent, was a "moving party" with respect to the motion seeking relief under section 1142 of the Bankruptcy Code, though he did not contend that he personally was a party to any of the contracts with Netflix or that he had rights thereunder.

**B.    Mr. Kavanaugh Is Not Entitled To Reimbursement of Fees and Expenses**

A contractual right to attorneys' fees normally benefits only the parties to the contract, and this is true under section 1717 as well. *See Super 7 Motel Assoc. v. Wang*, 16 Cal. App. 4th 541, 544-45 (Cal. Ct. App. 4th Dist. 1993). The California courts have recognized exceptions to this rule where (1) the non-signatory stands in the shoes of a party to the contract, or (2) the non-signatory party is a third party beneficiary of the contract. *See generally Cargill, Inc. v. Souza*, 201 Cal. App. 4th 962, 966 (Cal. Ct. App. 5th Dist. 2011); *Exarhos v. Exarhos*, 159 Cal. App. 4th 898, 903-07 (Cal. Ct. App. 4th Dist. 2008) (non-signatory sued as successor in interest); *Wholesale Material Supply, Inc. v. Norm Wilson & Sons, Inc.*, 96 Cal. App. 4th 598, 601 (Cal. Ct. App. 2d Dist. 2002) (suit by assignee of contract rights). Neither of these exceptions applies here.

Mr. Kavanaugh had good reasons to want Relativity to succeed in the litigation before this Court, but he did not "stand in the shoes" of Relativity for that purpose. He was not an assignee of Relativity's rights, and he was not a successor, by operation of law, to any of those rights. Similarly, no party alleged that Mr. Kavanaugh was a "third party beneficiary" of the License Agreement. He is not mentioned in the License Agreement, and made no effort to show that he satisfied any of the tests that would need to be met in order to make him a third party

15

beneficiary. In fact, the License Agreement states clearly that there are no third party beneficiaries, actual or intended. Docket No. 1997, at 5 (citing Hearing Ex. 43-A, at § 10.13); *see also Sessions Payroll Management v. Noble Const. Co.,* 84 Cal. App. 4th. 671, 680-81 (Cal. Ct. App. 2d Dist. 2000) (disclaimer of creation of third party beneficiary rights precluded third party from recovering attorneys' fees under a contract).

The California courts have also applied section 1717 in cases where a non-party has defeated a contention that he or she is bound by a contract. They have done so on the theory that the other party would have been entitled to recover fees if it had succeeded in its claim that the party was bound by the contract, and that right must be mutual under section 1717. In *Reynolds Metals Co. v. Alperson*, 25 Cal.3d 124 (Cal. 1979), for example, a creditor alleged that the shareholders of a company should be held liable, on *alter ego* theories, for the promissory note obligations of the company they owned. Those promissory notes included attorneys' fees provisions. The defendants prevailed, and then were awarded fees. The court reasoned that since the defendant shareholders were sued as though they were liable under the notes as alter egos of the corporation, the defendants would have had to reimburse the plaintiff's fees and expenses if the plaintiff had succeeded. *Id.* at 129. "Since [defendants] would have been liable for attorney's fees pursuant to the fees provision had plaintiff prevailed, they may recover attorney's fees pursuant to section 1717 now that they have prevailed." *Id.*

Mr. Kavanaugh seeks to fit himself into the rule announced in *Reynolds.* He argues that if Netflix had prevailed in the litigation it would have sought fees from Mr. Kavanaugh, and so Mr. Kavanaugh should be allowed to do the same. *See* Motion [Docket No. 1963] at 18-19. However, the baldly stated premise of this argument – that Netflix could and would have claimed fees from Mr. Kavanaugh if Netflix had prevailed – is offered without any explanation or

16

support, and it is simply wrong.  Netflix never contended that Mr. Kavanaugh was a party to the

License Agreement, or that he had any rights under that contract, or that Netflix had any

contractual rights against Mr. Kavanaugh.  To the contrary: Netflix made clear that it believed

that only Relativity had contractual rights and obligations.  *See, e.g.,* Transcript, May 19, 2016

[Docket No. 1921] at 9; Transcript, May 20, 2016 [Docket No. 1938] at 18.

Mr. Kavanaugh never entered into a contract with Netflix.  He never claimed that he had

rights under the License Agreement, and he was never accused of owing obligations under that

contract.  Under the prevailing American rule Netflix would have had no right to collect fees

from him if Netflix had prevailed.  *Travelers Casualty & Surety Co. of America v. Pacific Gas &*

*Electric Co.*, 549 U.S. 443, 448 (2007).  Since Netflix would not have had a right to a fee award,

Mr. Kavanaugh cannot claim "mutual" rights under section 1717.  *See, e.g., Hsu,* 9 Cal.4th at

870-71 (section 1717 applies to a non-contracting party if "that party would have been liable

under the contract for attorney fees had the other party prevailed"); *Real Property Svcs. Corp. v.*

*City of Pasadena*, 25 Cal.App.4th 375, 377-78, 383-84 (Cal. Ct. App. 2d Dist. 1994) (same).

### III. Relativity's Obligation to Indemnify Mr. Kavanaugh Does Not Make His Fees A Recoverable Litigation Expense of Relativity Itself

Relativity also argues that it has indemnified Mr. Kavanaugh for his attorneys' fees and

expenses and that those items are litigation "expenses" of Relativity that Netflix must reimburse.

#### A. Netflix's Procedural Objection

Netflix argues that with the exception of fees and taxable court costs a party may not

recover "expenses" through a post-trial motion, but instead must seek recovery of such amounts

through a plenary proceeding.  *See, e.g., Hsu v. Semiconductor Systems, Inc.*, 126 Cal. App. 4th

1330, 1341 (Cal. Ct. App. 1st Dist. 2005) (holding that a party who sought to recover expert

witness fees needed to plead and prove its entitlement to such fees at trial rather than through a

17

post-trial motion). In *Hsu*, the court explained that although section 1717 permits attorneys' fees

and taxable "costs" to be awarded in a post-trial motion, a dispute over the right to recover

nontaxable "expenses" may raise issues of contract interpretation and must be submitted to a trier

of fact "pursuant to a prejudgment evidentiary proceeding, not a summary post-judgment

motion." 126 Cal. App. 4th at 1341-42 (citations omitted).

Most of the California appellate courts have adopted a rule similar to that followed in the

*Hsu* decision, and have held that in the California courts a request to recover "nontaxable"

expenses may not be made through a post-trial motion. *See, e.g., Steiner v. Thexton*, 2016 Cal.

App. Unpub. LEXIS 6039 (Cal. Ct. App. 3d Dist. 2016), at *41-42; *Harbison-Mahony-Higgins

Builders, Inc. v. Argonaut Constructors*, 2012 Cal. App. Unpub. LEXIS 741 (Cal. Ct. App. 1st

Dist. 2012); *Unzipped Apparel, LLC v. Apparel Distrib. Servs., LLC*, 2010 Cal. App. Unpub.

LEXIS 5121 (Cal. Ct. App. 2d Dist. 2010); *Jones v. Union Bank of Cal.*, 127 Cal. App. 4th 542,

551 (Cal. Ct. App. 2d Dist. 2005); *Carwash of America-PO LLC v. Windswept Ventures No. I,

LLC*, 97 Cal. App. 4th 540, 544 (Cal. Ct. App. 3d Dist. 2002); *First Nationwide Bank v.

Mountain Cascade, Inc.*, 77 Cal. App. 4th 871 (Cal. Ct. App. 1st Dist. 2000). However, one

California appellate court has held that a nontaxable "expense" may be sought in a post-trial

motion, at least where the contract explicitly authorizes the recovery of that expense. *Thrifty

Payless, Inc. v. Mariners Mile Gateway, LLC*, 185 Cal. App. 4th 1050 (2010) (holding that a

post-trial motion is sufficient for the recovery of expert witness fees in cases where the parties'

agreement authorized the recovery of such witness fees).

A separate question (which the parties have not addressed) is whether the rule set forth in

*Hsu* is a procedural rule that is not applicable here. Section 1717 of the California Civil Code

provides a post-trial procedure for the recovery of attorneys' fees and "costs," but as noted in the

*Hsu* decision section 1717 does not provide for the recovery of "nontaxable" expenses through a

post-trial motion.  By contrast, Rule 54(d) of the Federal Rules of Civil Procedure, which applies

in this Court, states that attorneys' fees as well as "nontaxable" expenses "must" be sought

through a post-trial motion.  The only exception is where "the substantive law requires those fees

to be proved at trial as an element of damages."  Fed. R. Civ. P. 54(d).

Five Circuit Courts of Appeal have held that a request to recover fees and expenses under

a "prevailing party" provision in a contract is not an "element of damages" for purposes of Rule

54(d) and that fees and expenses therefore are properly sought in a post-trial motion.  *See

Richardson v. Wells Fargo Bank, N.A.*, 740 F.3d 1035, 1039-40 (5th Cir. 2014); *Heavy

Petroleum Partners, LLC v. Atkins*, 457 Fed. Appx. 735, 748 (10th Cir. 2012); *Wiley v. Mitchell*,

106 Fed. Appx. 517, 522-23 (8th Cir. 2004); *Rissman v. Rissman*, 229 F.3d 586, 588 (7th Cir.

2000); *Capital Asset Research Corp. v. Finnegan*, 216 F.3d 1268, 1271 (11th Cir. 2000).  As the

Court explained in *Rissman*:

> What Rule 52(d)(2)(A) *[sic]* requires is that a party seeking legal fees among
> the items of damages – for example, fees that were incurred by the plaintiff
> before the litigation begins, as often happens in insurance, defamation, and
> malicious prosecution cases – must raise its claim in time for submission to
> the trier of fact, which means before the trial rather than after.  Fees for work
> done during the case should be sought after decision, when the prevailing
> party has been identified and it is possible to quantify the award.

229 F.3d at 588.  We have found no reported decisions on this question in the Second Circuit.

However, lower courts in other Circuits have followed the reasoning in *Rissman*.[2]

---

[2]    *See, e.g., E. Roofing Sys. v. Simon Prop. Grp.*, 2016 U.S. Dist. LEXIS 45910,  at *17 (M.D.
Pa. April 5, 2016); *Lehman Bros. Holdings, Inc. v. Gateway Funding Diversified Mtge.
Servs.*, 2015 U.S. Dist. LEXIS 143532,  at *7 (E.D. Pa. October 22, 2015); *Rockland Trust
Co. v. Computer Associated Int'l, Inc.*, 2008 U.S. Dist. LEXIS 61687,  at *16 (D. Mass.
August 1, 2008); *Telecom s. Am., Inc. v. Presto Telcoms, Inc.*, 2003 U.S. Dist. LEXIS
19650,   at *9-10 (E.D. Pa. October 28, 2003).

Does the decision in *Hsu* mean that the California courts disagree with the *Rissman* decision and with the reasoning of the federal Courts of Appeals in the cases cited above? Do the California courts believe that contractual "expense" claims inherently are "damage" claims, no matter what the procedural rules say? Or does *Hsu* merely stand for the proposition that section 1717 only allows a post-trial motion to recover attorneys' fees and taxable costs, so that procedurally the only way to seek nontaxable expenses in a California court is to do so through a plenary case? The *Hsu* decision could be read either way. If one traces back through the decisions cited in *Hsu* one will find decisions that predate the enactment of section 1717 and that held that requests to recover fees and expenses under a contract are items of "special damages" that must be proved at trial. *See, e.g., Cirimele v. Shinazy*, 124 Cal. App. 2d 46, 52 (Cal. Ct. App. 1st Dist. 1954). The more recent *Thrifty* decision, on the other hand, states quite emphatically that there is nothing about a contractual request to recover nontaxable expenses that makes it inherently a "damage" claim that can only be litigated at trial and that cannot be raised after trial. The court held, in *Thrifty*, that there is "no reason" why a contractual claim to recover nontaxable expenses must be presented "at trial" rather than through a post-trial motion, at least where the contract provides for the recovery of those expenses. 185 Cal. App. 4th at 1066-67.

Federal court decisions in the Ninth Circuit that have awarded fees and expenses under section 1717 do not help in resolving this issue. We have found numerous decisions by courts in the Ninth Circuit that have applied section 1717 and that have approved awards of nontaxable "expenses" that have been sought through post-trial motions. However, most of these decisions do not discuss the procedural issues, and many do not even mention the *Hsu* decision. *See, e.g., Dollar Leasing, Inc. v. Thornwood Lease Plan, Inc.*, 1992 U.S. App. LEXIS 3986, at *12-13 (9th Cir. 1992) (approving district court's allowance of photocopying, word processing, messenger

and clerical overtime costs pursuant to section 1717); *NuVasive, Inc. v. Madsen Med., Inc.*, 2016 U.S. Dist. LEXIS 86870, at *23 (S.D. Cal. July 1, 2016) (district court awarded some nontaxable items as expenses reasonably incurred in connection with the litigation, including travel expenses, and did so in ruling on a post-trial motion); *Genesis Merch. Partners, LP v. Nery's USA, Inc.*, 2013 U.S. Dist. LEXIS 190983, at *38 (S.D. Cal. Dec. 6, 2013) (district court awarded nontaxable costs through post-trial motion in a matter governed by section 1717).

At least one federal court in California has followed the rule in *Hsu* and has refused to consider a post-trial motion to recover nontaxable costs that had not been sought at trial. *See RD Legal Funding, LLC v. Erwin & Balingit, LLP*, 2011 U.S. Dist. LEXIS 2137, at *14 (S.D. Cal. January 10, 2011). However, at least one other federal court in California has declined to follow the holding in *Hsu*. *See Cataphora Inc. v. Parker*, 2012 U.S. Dist. LEXIS 6449 (N.D. Cal. Jan. 20, 2012). The court held, in *Cataphora*, that it would "waste judicial resources and inject confusion" to require each party to plead and prove its ongoing litigation expenses at trial, before a prevailing party had even been determined. *Id., at *8.

There is considerable merit to the reasoning of the decisions in *Rissman, Cataphora* and *Thrifty*. The contractual right to recover fees and expenses is triggered only when a party becomes a "prevailing party," and the "prevailing party" is not identified until after the trial is concluded. *See also Rockland Trust*, 2008 U.S. Dist. LEXIS 61687, at *16-17. If parties were required to prove their litigation expenses at trial, then in this case both Netflix and Relativity would have needed to do so in order to preserve their rights, which would have been inefficient and wasteful. Furthermore, the amounts of fees and expenses that are incurred during a trial change as the trial progresses. Forcing parties to quantify their fees or expenses as "damages" would create a litigation example of the Heisenberg uncertainty principle: the very effort to

21

quantify the damages would cause the damages to change. It therefore would be highly peculiar to require, notwithstanding the procedures authorized under Rule 54(d), that the fees or expenses incurred during a trial must be quantified during the trial itself.

The procedural issue discussed above may be more troublesome in cases where juries are impaneled. Here, the underlying dispute was tried to the court, and the request for an award of expenses is being presented to the same court. There is no risk of inconsistent decisions. Instead, there is only a timing issue. The same outcome (from a timing perspective) could just as easily have been accomplished by a bifurcation of the trial so that "expense" reimbursement issues would be determined only after the consideration of other issues and after a prevailing party had been identified. In fact, that is certainly the procedure the Court would have required if the parties had attempted to prove their respective fees and expenses during the prior trial.

In addition, although Rule 54(b) permits fees and expenses to be awarded without an evidentiary hearing, it does not prohibit the Court from holding such a hearing if the circumstances warrant one. In this case, the Court made clear to the parties that it would hold an evidentiary hearing and would take testimony and other evidence on any issues that the parties believed required such a hearing. *See* Transcript, July 21, 2016 [Docket No. 2012] at 35-37. The current procedure, then, has presented the issues to the Court in exactly the same order that the Court would have considered them if the expenses had been treated as "damage" claims and with the same procedural rights to an evidentiary hearing if one was needed.

Accordingly, in this case the Court believes that it is fully consistent with the federal procedures and the *Rissman, Thrifty* and *Cataphora* decisions, and does no violence to the substantive law of California, for this Court to consider the claim for "expense" reimbursements after the prior trial.

### B.    This Court Has Power to Decide the Motion Under *Stern v. Marshall*

Netflix argues that requests for reimbursement of nontaxable expenses raise contract issues that needed to be raised can only be decided in a separate litigation and that this Court lacks jurisdiction and power to decide them under *Stern v. Marshall*, 564 U.S. 462 (2011). The applicable federal rules make clear that Relativity's motion for an award of attorneys' fees and expenses incurred in the underlying litigation is a proceeding that is collateral to the underlying litigation, and is to be decided by the Court that entered the relevant judgment. *See* Fed. R. Civ. P. 54; Fed. R. Bankr. P. 7054, 9014. This Court has the Constitutional power to resolve the collateral issues regarding attorneys' fees for the same reasons that it had the Constitutional power to resolve the underlying litigation. *See* Bench Decision at 33-34.

### C.    The Merits of the Claim to Recover Indemnification Payments

Although the Court believes that Relativity is entitled to seek nontaxable "expenses" in a post-trial motion, the Court also believes that Relativity's request to recover its indemnification payments, on the theory that they are litigation expenses covered by the License Agreement, is unfounded. The License Agreement provides that in the event of litigation the prevailing party shall be entitled to recover "its" reasonable costs and expenses, including reasonable outside attorneys' fees. In context that language must be interpreted as referring to the prevailing party's own litigation expenses, not someone else's.

Relativity argues that the prevailing party provision in the License Agreement entitles Relativity to recover any "fees" for which Relativity is or becomes liable, including those for which it is liable by way of indemnity. In support Relativity cites the decision in *Trope v. Katz,* 11 Cal.4th 274 (Cal. 1995). However, *Trope* does not stand for the proposition for which it is cited. In *Trope*, the court held that an attorney litigating *in propria persona* was not entitled to

23

receive attorneys' fees under section 1717 because those costs were incurred in his

representation of himself.  In explaining its decision, the Supreme Court of California noted that

section 1717:

> . . . applies only to contracts specifically providing that attorney fees 'which
> are *incurred* to enforce that contract' shall be awarded to one of the parties or
> to the prevailing party . . . To 'incur' a fee, of course, is to 'become liable' for
> it, *i.e.*, to become obligated to *pay* it.

*Trope,* 11 Cal.4th at 280 (emphasis original, internal citations omitted).  *Trope* merely stands for

the proposition that there is no right to recover an attorney's fee if the client has no obligation to

pay an attorney, because in that context the client has not "incurred" a fee.  Relativity has taken

language out of context in urging that *Trope* stands for the proposition that a party may treat, as

its own attorneys' fees, any fee incurred by another party that is subject to an indemnification

provision.  No such issue was present in *Trope.*

Relativity has not offered any applicable precedent, or any evidence, in support of its

contention that an indemnity agreement between Relativity and Mr. Kavanaugh is sufficient to

make Netflix liable for Mr. Kavanaugh's fees and expenses.  If the reference to "expenses" in the

License Agreement were to be interpreted this broadly, it would have the effect of unilaterally

making Mr. Kavanaugh a third party beneficiary of the attorneys' fee provision in the License

Agreement, without any agreement by Netflix that Mr. Kavanaugh would have such rights.  It

would also reach many other parties whose fees Relativity is obligated to pay, including the

secured lenders and the Official Committee of Unsecured Creditors, who monitored the Netflix

dispute and submitted papers in connection with it.  It strains credulity to think that the parties

contemplated such a result when they agreed that litigation "expenses" would be reimbursed.

The general rule is that a party is not entitled to recover attorneys' fees from an adverse

party.  A contract may vary that rule, but under California law, as explained above, it does so

24

only as to the parties to the contract.  Non-parties may not recover fees except in specific

circumstances that are not applicable here.  Allowing Relativity to expand Netflix's obligations

through an indemnity agreement, without Netflix's consent or approval, would do violence to

this ordinary principle.  The attorneys' fee provision in the License agreement authorizes a

prevailing party to recover "its" own reasonable fees and litigation expenses, but that is all.  It

does not reach other parties whom Relativity has indemnified.

## IV.    Amount of Reasonable Fees to be Awarded

The parties have agreed that under California law, New York State law and federal law

courts used the same "lodestar" method to determine the reasonableness of fees.  *See* Transcript,

September 15, 2016 [Docket No. 2075] at 30-31, 37-38; *see also Nisselson v. Empyrean*

*Investment Fund, L.P.* (*In re MarketXT Holdings Corp.*), 2006 WL 2583644, at *4 (Bankr.

S.D.N.Y. 2006); *Gorman v. Tassajara Development Corp.,* 178 Cal. App. 4th 44, 63-64 (Cal. Ct.

App. 6th Dist. 2009).[3]  The lodestar method evaluates the reasonableness of an attorney fee by

---

[3]    Notwithstanding the parties' agreement on this point, along with numerous California
decisions that confirm the use of a "lodestar" approach, there are some California decisions
that hold that a lodestar analysis may not be required when calculating an award of
reasonable attorney's fees pursuant to a contractual fee-shifting provision, and that the trial
court instead has broad discretion to award what it believes is reasonable.  *See, e.g., Chan v.
Chase Aircraft Fin. Co.,* 1991 U.S. App. LEXIS 16199, at *16-17 (9th Cir. 1991)
("California courts awarding attorney's fees pursuant to section 1717 do not apply the
lodestar approach . . . Rather, California affords its trial courts broad discretion, in section
1717 cases, to consider a wide number of factors."); *Flannery v. Cal. Hwy. Patrol,* 61 Cal.
App. 4th 629, 641 n.5, 644, 647 (Cal. Ct. App. 1st Dist. 1998) (in a case awarding attorney
fees pursuant to statute, court acknowledges disagreement among California courts as to
whether the lodestar method must apply in cases which implicate Cal. Civ. Code § 1717);
*Yenidunya Invs. Ltd. v. Magnum Seeds, Inc.,* 2012 U.S. Dist. LEXIS 20421, at *17-18 (E.D.
Cal. 2012) (while courts begin their analysis of reasonable attorney's fees in section 1717
cases with the lodestar figure, courts are given "broad authority to determine the amount of a
reasonable fee" in such cases).  The factors considered in the lodestar analysis and discussed
in this Opinion are the same factors that this Court would consider if left to its own
discretion, so the use of a different standard would not change the outcome in this case.

considering "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *In re MarketXT Holdings*, 2006 WL 2583644, at *4; *see also Cruz v. Local Union No. 3 of Intern. Broth. Of Elec. Workers*, 34 F.3d 1148, 1159 (2d Cir. 1994). The reasonableness of an hourly rate, in turn, is established through comparison with prevailing rates in the legal community "for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Id.*; *see also Ingram v. Oroudjian*, 647 F.3d 925, 927-28 (9th Cir. 2011).

Netflix initially challenged the reasonableness of the claimed fees on many grounds, but in later submissions Netflix agreed to narrow its challenges to the following items.

## A.    Use of Premium Counsel

Netflix argues that Relativity was entitled to hire expensive counsel at Relativity's own expense if that is what Relativity wished, but that under the License Agreement Relativity should only be allowed to recover the fees that less expensive attorneys might have charged. As Netflix was fond of putting it, Relativity should not be allowed to recover the cost of a Cadillac (or a Ferrari) if a Honda Civic would have done the job. *See* Netflix Supplemental Opposition [Docket No. 2049] at ¶¶ 5, 7; Transcript, September 15, 2016 [Docket No. 2075] at 29, 48. The Court finds that Netflix's arguments about the reasonableness of Relativity's use of the Jones Day firm, and of the reasonableness of the fees that it incurred as a result, are without merit.

The License Agreement requires Netflix to reimburse Relativity for its "reasonable" attorneys' fees. The reasonableness of a party's choice of counsel, and the reasonableness of the attorneys' fees that are thereby incurred, depends on the complexity and importance of the matter being handled. A complicated, fast-paced, "bet the company" litigation requires counsel of

higher caliber (and expense) than a routine case that has little at stake. A party may not need a Ferrari to go to the corner grocery store, but winning a Grand Prix race is a different matter.

In this case, the issues that needed to be litigated were of the utmost importance to Relativity. Netflix itself made clear, at confirmation, that it understood that the planned revenues from the distributions of *Masterminds* and *The Disappointments Room*, and future payments under the Netflix License Agreement generally, were essential to Relativity's financial forecasts and the feasibility of its reorganization plan. Netflix's actions threatened to cut the legs out from under those financial forecasts and from the reorganization itself. The matter also had to be litigated at a fast pace and under great pressure. The litigation required sophisticated counsel who could devote a great amount of specialized resources to the task on short notice.

In addition, Relativity was represented by the Jones Day firm during the confirmation hearing. It would not have made sense for Relativity to hire different counsel to handle the post-confirmation dispute with Netflix. Familiarity with the prior confirmation proceedings was essential to the litigation of the post-confirmation dispute. Bringing in new counsel would only have hampered the litigation effort. In making a "reasonable" choice of counsel (and in reasonably incurring the associated attorneys' fees) Relativity surely was not obliged to hamper its own litigation efforts. In fact, it is dubious that any substantial savings would have been obtained even if Relativity had retained counsel with lower hourly rates, because such new counsel would have had to spend the additional time needed to become familiar with the entire prior record of the confirmation hearing and with all of the information, evidence and legal research relevant to the License Agreement that Jones Day had already developed.

Furthermore, this Court has previously found that Netflix did not make its post-confirmation contractual arguments in good faith. Bench Decision at 24. Instead, Netflix

completely reversed course in its interpretation of the parties' agreement, in the hopes that by

doing so Netflix could exert so much financial pressure on Relativity that it might coerce a

modification of the License Agreement.  Netflix is hardly in a position to criticize the

"reasonableness" of the litigation response that Netflix's own conduct made necessary.

Netflix is wrong when it suggests that the "lodestar" calculation requires the court to

ignore these factors and instead to compute the "average" fees that all attorneys in the

community charge for all kinds of cases.  *See, e.g.,* Netflix Supplemental Opposition [Docket

No. 2049] at ¶ 10.  Billing rates differ widely among firms, and differ widely for different types

of matters.  Clients regularly (and reasonably) retain large firms, at high billing rates, to handle

important and complex cases.  As the Supreme Court held in *Blum v. Stenson*, 465 U.S. 886, 895

n.11 (1984):

> Market prices of commodities and most services are determined by supply
> and demand.  In this traditional sense there is no such thing as a prevailing
> market rate for the service of lawyers in a particular community.  The type of
> services rendered by lawyers, as well as its experience, skill, and reputation,
> varies extensively -- even within a law firm.  Accordingly, the hourly rates of
> lawyers in private practice also vary widely.  The fees charged often are
> based on the product of hours devoted to the representation multiplied by the
> lawyer's customary rate.

A reasonable fee cannot be calculated except in reference to the importance of the issues raised

by the case and the fees normally charged by the firm that was retained and by firms of similar

caliber and size, and that is precisely what the "lodestar" calculation contemplates.  *See Farbotko

v. Clinton County*, 433 F.3d 204 (2d Cir. 2005) (reasonable hourly rate determination

"contemplates a case-specific inquiry into the prevailing market rates for counsel of similar

experience and skill to the applicant's counsel."); *Syers Properties III, Inc. v. Rankin*, 226 Cal.

App. 4th 691, 700 (Cal. Ct. App. 1st Dist. 2014) (in California, courts generally look to "equally

difficult or complex types of litigation to determine which market rates to apply").

Netflix is also wrong in suggesting that as a matter of law Relativity's own reasonable choice of high-priced counsel should be disregarded in computing a reasonable fee. A "reasonable" attorney's fee "means a fee that would have been deemed reasonable if billed to affluent plaintiffs by their own attorneys." *Missouri v. Jenkins*, 491 U.S. 274, 286 (1989) (quoting *City of Riverside v. Rivera*, 477 U.S. 561, 591 (1986) (Rehnquist, J., dissenting)); *see also In Time Products, Ltd. v. Toy Biz, Inc.,* 38 F.3d 660, 667 (2d Cir. 1994) ("A district court's award of attorneys' fees pursuant to a contractual fee-shifting provision must be reasonably related to the fee arrangement that the prevailing party would have made with counsel absent a fee-shifting agreement."). Many courts have held that the client's own willingness to pay an attorney at a particular rate is strong evidence of the reasonableness of the attorney's fees. *See, e.g., U.S. Bank N.A. v. Dexia Real Estate Capital Mkts.*, 2016 U.S. Dist. LEXIS 165268, at *26-27 (S.D.N.Y. Nov. 30, 2016) (approving hourly rates that ranges from $250 to $1055 per hour in part by noting that the client had agree to pay those rates); *Tomazzali v. Sheedy*, 804 F.2d 93, 98 (7th Cir. 1986) ("For private counsel with fee-paying clients, the best evidence is the hourly rate customarily charged by counsel or by her law firm.").

Netflix's contention – that "reasonable" attorneys' fees never cover "premium" counsel, and can never cover fees that outside of the middle of the spectrum – would effectively amount to a determination that as a matter of law it is never "reasonable" to retain large firms who charge high billing rates. Such a rule would be arbitrary, and contrary to market practice.

## B.    Billing Rates

It was appropriate for Relativity to retain the Jones Day firm to handle the dispute with Netflix, for each of the reasons stated above. The applicable case law plainly calls for the Court to determine the reasonable hourly rates for counsel of similar experience and quality to the

29

counsel that Relativity actually and reasonably employed in this case. *See Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 172 (2d. Cir. 1998) (rates used for lodestar calculation should be based on prevailing market rates "for comparable attorneys of comparable skill and standing in the pertinent legal community"); *see also Kerin v. USPS*, 218 F.3d 185, 190 (2d Cir. 2000) (same when suing under a statute which provides for attorney's fees for the prevailing party); *Gesualdi v. J.H. Reid*, 2016 U.S. Dist. LEXIS 87705, at *17-18 (E.D.N.Y. June 29, 2016) (same); *Savoie v. Merchants Bank*, 166 F.3d 456, 463 (2d Cir. 1999) (same when suit confers a benefit upon a class of people); *Popal v. Slovis,* 646 Fed. Appx. 35, 36-37 (2d Cir. 2016) (same when parties were unable to present a written legal services agreement, basing rate on what the attorney had previously charged clients in similar cases). California courts similarly look to the rates charged by comparable firms for similar types of work. *Cabral v. Martins*, 177 Cal. App. 4th 471, 491 (Cal. Ct. App. 1st Dist. 2009) (when awarding attorney's fees pursuant to a statutory fee-shifting provision, lodestar determination in California requires consideration of prevailing hourly rates "for similar work.").

Many courts have held that the best evidence of the reasonableness of the "market" value of a particular law firm's services (and therefore the reasonableness of its fees) are the fees that the law firm normally charges its clients in other matters. *Rozell v. Courtney Ross-Holst*, 576 F. Supp. 2d 527, 544 (S.D.N.Y. 2008) (rates that attorneys actually charge their clients is "obviously strong evidence of what the market will bear"); *In re Stock Exchanges Options Trading Antitrust Litigation*, 2006 U.S. Dist. LEXIS 87825, at *31 (S.D.N.Y. Dec. 4, 2006) ("the applicant attorney's customary billing rate for fee-paying clients is ordinarily the best evidence of the market rate"); *Anderson v. YARP Rest.*, 1997 U.S. Dist. LEXIS 1106, at *8 (S.D.N.Y. Feb. 4, 1997) (same). The Court is also entitled to rely on its own experience and knowledge of

30

prevailing rates, *In re MarketXT Holdings Corp.*, 2006 WL 2583644, at *5 (Bankr. S.D.N.Y.

July 21, 2006), and may take judicial notice of hourly rates approved in other cases involving

matters of similar complexity.  *Townsend v. Benjamin Enters.*, 679 F.3d 41, 59 (2d. Cir. 2012).

 Here, the hourly rates charged by Relativity's counsel were the rates that the Jones Day

firm normally charges, and Netflix has not contended otherwise.  In addition, this Court has

previously approved Relativity's retention of the Jones Day firm as counsel and has approved the

fee applications made by the Jones Day firm.  Sections 327 and 328 of the Bankruptcy Code only

permit a debtor to retain counsel on "reasonable" terms (including reasonable hourly rates), and

the approval of compensation under section 330 of the Bankruptcy Code requires the Court to

consider whether fees are reasonable in light of the "rates charged" and "the customary

compensation charged by comparably skilled practitioners in cases other than cases under this

title."  11 U.S.C. §§ 327, 328, 330(a)(3)(B) and (F).  The Court of Appeals has emphasized that

in making these "reasonableness" determinations a bankruptcy court is supposed to be guided by

prevailing market practices.  *In re Ames Dep't Stores, Inc.*, 76 F.3d 66, 71 (2d Cir. 1996)

(explaining that in section 330 Congress took "the position that 'compensation in bankruptcy

matters be commensurate with the fees awarded for comparable services in non-bankruptcy

cases'"); *see also In re United Artists Theatre Co.*, 315 F.3d 217, 229 (3d Cir. 2003).  There is no

substantive difference between the market-based determinations that this Court has made under

sections 327 through 330 of the Bankruptcy Code and the assessment of a market-based

"prevailing" rate for purposes of a lodestar calculation.  *See In re Northwest Airlines Corp.,* 382

B.R. 632, 645 (S.D.N.Y. 2008), *rev'd on other grounds sub nom. Lazard Freres & Co. LLC v.*

*Adams (In re Northwest Airlines Corp.),* 399 B.R. 124 (S.D.N.Y. 2008) ("Section 330 of the

Bankruptcy Code incorporates the lodestar analysis . . .").  The Court's prior approvals of the

Jones Day billing rates (both at the time of the firm's initial retention and in the approval of fee applications) were based on determinations that those rates were consistent with market rates.

This Court is also well aware of fees that have been approved for comparable counsel in other bankruptcy cases. Relativity offered examples of bankruptcy court approvals of hourly rates charged by other firms that are comparable with those charged by Jones Day. Countless similar examples can easily be found through a review the fees that the judges of this district have approved in other bankruptcy cases. *See, e.g., In re MF Global Holdings Ltd.,* Case No. 11-15059 (MG) (approving retention of Jones Day with partner billing rates ranging from $675 to $1,000 per hour); *In re Fairway Group Holdings Corp.,* Case No. 16-11241 (MEW) (approving retention of Weil, Gotshal & Manges LLP with partner billing rates ranging from $910 to $1,350 per hour); *In re SunEdison, Inc.,* Case No. 16-10992 (SMB) (approving retention of the Skadden firm with partner billing rates ranging from $935 to $1,425 per hour); *In re Sabine Oil & Gas Corp.,* Case No. 15-11835 (SCC) (approving retention of Kirkland & Ellis LLP with partner billing rates ranging from $665 to $1,375 per hour). As noted above, these billing rates could not have been approved except upon findings that they were consistent with prevailing rates, in the market, for firms of similar capacity and quality for similar matters.

The only material cited in support of Netflix's contrary contentions about "prevailing" rates are its citations to some prior decisions in intellectual property cases in which parties sought reimbursement for lower fees and such requests were approved. *See, e.g., TufAmerica Inc. v. Diamond*, 2016 WL 1029553, at *5 (S.D.N.Y. Mar. 9, 2016) (considering a statutory fee request in a copyright infringement suit and noting that New York district courts had approved "rates for experienced partners in the range of $500 to $800 per hour"); *River Light V, L.P. v. Lin & J Int'l, Inc.*, 2015 WL 3916271, at *12 (S.D.N.Y. June 25, 2015) (observing, in a Lanham Act

case, that courts in this District have observed that rates of $390 to $470 fall at the very top of

the spectrum of reasonable hourly rates for associates "in a trademark action").  But neither of

these decisions purported to rule on the "prevailing" rates charged by firms for bet-the-company

litigations of the kind involved here.  Netflix surely must know that the hourly rates involved in

*TufAmerica* and *River Light* are not the "peak" of the rates that clients ordinarily are willing to

pay in cases that threaten the clients' very survival, or that clients ordinarily are willing to pay

for the services of the Jones Day firm and firms of similar stature.

Netflix also contends that "based on Netflix's research" the highest partner billing rate

that has been approved in this District is $870 per hour.  *See* Netflix Supplemental Opposition

[Docket No. 2049] at 28.  More recently, however, the District Court has approved an award of

fees based on higher billing rates.  *See U.S. Bank N.A. v. Dexia Real Estate Capital Mkts.*, 2016

U.S. Dist. LEXIS 165268, at *26 (S.D.N.Y. Nov. 30, 2016) (approving hourly rates that ranged

from $250 to $1,055 per hour); *see also Themis Capital v. Democratic Republic of Congo*, 2014

U.S. Dist. LEXIS 124208, at *23 (S.D.N.Y. Sep. 4, 2014) (observing that partner billing rates "in

excess of $1,000 an hour" are "not uncommon in the context of complex commercial

litigation.").  Furthermore, Netflix's observation about the billing rates that have been approved

in other cases in this District can only be true if Netflix's researchers elected to limit themselves

to District Court decisions, and to ignore the legions of cases in which the bankruptcy courts in

this district have approved higher billing rates.

The Court in *TufAmerica* made clear that the determination of a "prevailing" rate must be

made with reference to "lawyers of comparable skill, experience, and reputation" and also varies

depending on the complexity and difficulty of the case, the resources needed to prosecute the

case effectively, and the timing demands of the case.  2016 WL 1029553, at *5 (quoting

33

*Miroglio S.P.A. v. Conway Stores, Inc.,* 629 F. Supp. 2d 307, 314 (S.D.N.Y. 2009)).  The Court

in *River Light* similarly held that a reasonable hourly rate is "what a reasonable, paying client

would be willing to pay, given that such a party wishes to spend the minimum necessary to

litigate the case effectively."  2015 WL 3916271, at *11 (quoting *Bergerson v. N.Y. State Office

of Mental Health, Cent. N.Y. Psychiatric Ctr.,* 652 F.3d 377, 389 (2d Cir. 2001)).  Here,

Relativity reasonably was willing to pay the hourly rates charged by Jones Day throughout the

bankruptcy case and in the critical post-confirmation battle with Netflix.

C.      **Time Spent and Assignments of Tasks to Senior Attorneys**

Netflix initially criticized the overall staffing of the litigation but ultimately reduced its

criticisms to those involving the tasks performed by specific attorneys.  Many of the criticisms

involved the work of lawyers from the Skadden firm who acted as counsel to Mr. Kavanaugh.  In

light of the Court's rulings above those issues are moot.  Netflix asserted only two criticisms as

to the time spent by the Jones Day attorneys and as to the assignments of tasks among those

attorneys.  First, Netflix argues that Ms. Lindberg (an associate) took notes and tracked exhibits,

and that "[t]hese tasks appear to be ones that would generally be proper for a paralegal, not an

associate billing at $450 per hour."  *See* Netflix Supplemental Opposition [Docket No. 2049] at

12.  Second, Netflix contends that Ms. Wiener (a Counsel with the firm) performed tasks that

"appear largely duplicative of those performed by Ms. Lindberg, and again appear more

appropriate for a paralegal than an attorney billing at $825 per hour."  *Id.*  Netflix also contends

that Ms. Lindberg and Ms. Wiener did not both "reasonably" need to attend the trial.  *Id.*

The evidence before the Court includes the daily time records of Ms. Lindberg and Ms.

Wiener, plus declarations that describe the work they did.  It is plain from those materials that

Netflix has understated the nature and importance of the work that these attorneys did.

34

Ms. Lindberg's work did not just include her attendance at trial. Prior to trial, she drafted witness declarations, helped to prepare witness outlines, and helped to identify documents that would be useful as exhibits during witness examinations. *See* Declaration of Christina Lindberg [Docket No. 2044] at 2-3. She attended the trial to provide continued assistance with the witness examinations and with the ongoing task of identifying exhibits – which, as anyone who has been a trial lawyer knows, can very much be a "moving target" as a witness testifies, particularly in a fast-moving dispute like this one that has not been preceded by extensive discovery or by any depositions. It is true that Ms. Lindberg took notes, but she did so for the purpose of assisting in cross-examinations and redirect examinations. Notes were essential because the trial was recorded on an audio system and daily transcripts were not available. The tasks that Ms. Lindberg performed required judgment and legal training and were not matters that should have been assigned to paralegals, as Netflix wrongly contends.

Ms. Wiener had previously been involved in the litigation (during confirmation proceedings) of issues relating to the Netflix License Agreement. It was only natural, and an efficient use of personnel, for her to be involved in the post-confirmation dispute. She researched and drafted the initial motion papers that Relativity filed; researched and assisted in drafting papers in opposition to Netflix's arbitration demands; and drafted other briefs and submissions on behalf of Relativity. She had principal responsibility for the preparation of Relativity's pre-hearing brief. She assisted in outlining the closing argument to be presented by Relativity's lead attorney, and supervised many other attorneys (not only Ms. Lindberg but also many attorneys from the Skadden firm) in the hectic work of gathering exhibits for use during witness examinations and ensuring that required materials were in evidence. It is unfair for Netflix to treat her participation as if she merely prepared a passive chronicle of the events that

were occurring.  It is obvious from the daily time entries, and her declaration, that Ms. Wiener did far more than that.

Trials can be a chaotic experience even under good circumstances.  Trials that occur on an accelerated schedule, with no discovery and with far less than the normal amount of time to get organized, are particularly challenging.  Handling multiple witnesses properly in such circumstances requires multiple attorneys to prepare examination outlines and to make a careful review and selection of potential exhibits.  Those are tasks that require judgment, experience and skill.  They are not merely clerical tasks.  Under the circumstances the Court finds nothing in the time entries of Ms. Lindberg and Ms. Wiener, or in the nature of the tasks that they were asked to perform, that requires a reduction to the fees sought by Relativity.

Furthermore, in considering the reasonableness of the time spent and the allocation of tasks in this case, the Court is mindful of Justice Kagan's advice that "trial courts need not, and indeed should not, become green-eyeshade accountants."  *Fox v. Vice*, 563 U.S. 826, 838 (2011).  Instead, "[t]he essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection.  So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time."  *Id.*  Netflix, in fact, has urged the Court to dispense with a meticulous ruling on individual time entries and instead to apply a general percentage reduction to the requested fees, based on the Court's sense of how the litigation was conducted.  *See* Netflix, Inc.'s Supplemental Opposition [Docket No. 2049] at ¶¶ 17-19.  But the Court does not believe that any such reduction is appropriate.  In fact, in considering the efficiency with which the proceedings were handled it should be remembered that a very large part of the work that the Jones Day firm would have been justified in doing was instead allocated to the Skadden firm.  This Court has determined that Mr. Kavanaugh is not

36

entitled to a fee award, and so the Skadden firm's time has already been excluded from the

computation of fees that Netflix must pay.  *See* Transcript, September 15, 2016 [Docket No.

2075] at 37 ("[i]f I were to not allow the Skadden time . . . that would be a little more than the

thirty percent [reduction] you've asked for").  Further reductions would not be called for, either

based on the Court's review of the time records or based on a consideration of the overall

efficiency of the trial effort.

## V.    Costs and Other Expenses

Finally, Relativity seeks reimbursement of the following expenses that it incurred in

connection with the Netflix litigation:

| | |
|---|---|
| Air Fare | $  6,147.40 |
| Court reporter fees | $     454.80 |
| Duplication charges | $  3,100.40 |
| Meals and beverages | $     669.58 |
| Hotel charges | $10,349.31 |
| Late work meals | $       97.64 |
| Late work taxi | $       24.83 |
| Mileage expenses | $       17.28 |
| Parking | $     233.00 |
| Taxis | $  1,457.74 |
| Car services | $     263.00 |
| **Total** | **$22,814.98** |

Most of the expenses are travel-related costs that were incurred due to the fact that the Jones Day

attorneys who represented Relativity in these cases were mostly based in Los Angeles, and the

trial was held in New York.  The backup information shows that meal expenses were capped at

$20 per person per meal, so that the above charges reflect a lower figure than the amounts

actually incurred.  Hotel expenses also were capped at $500 per night, which in some instances

means that the requested compensation is less than the amounts actually incurred.

Netflix has opposed the requests for an award of these expenses on the ground that they

exceed the items that would normally be taxable as costs.  However, the License Agreement is

not limited to the reimbursement of "taxable costs."  Instead, it covers "expenses" incurred, including reasonable attorneys' fees.

Netflix also contends that to the extent the requested "expenses" cover matters other than taxable costs, they needed to be pleaded and litigated at the trial on the merits, and not raised in a post-trial motion.  The Court has already addressed this argument in part III.A. above.

The question remains, however, whether a prevailing party fee provision in a contract covers travel costs that are incurred when out-of-state counsel are asked to handle a New York case.  The parties have paid little attention to this issue in their papers and have offered no citations to case law.

Here, as noted above, Netflix did not act in good faith when it adopted a new contract interpretation after confirmation of the plan, and Netflix had to expect that the Los Angeles attorneys who had handled the confirmation hearing would handle the post-confirmation litigation as well.  It is reasonable under these circumstances to provide compensation for the travel expenses.  *See Genesis Merch. Partners, LP v. Nery's USA, Inc.*, 2013 U.S. Dist. LEXIS 190983, at *38 (S.D. Cal. Dec. 6, 2013) (awarding compensation for lodging, travel and meal expenses for an attorney's attendance at trial "where reasonably necessary to conduct litigation" and citing other cases in which similar compensation had been allowed); *see also Northcross v. Board of Ed. Of Memphis City Schools*, 611 F.2d 624, 639 (6th Cir. 1979) (authority to award a reasonable attorneys' fee includes the authority to aware "those reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client," including photocopying and travel costs).  Similar expenses are regularly charged to (and paid by) clients, and in the underlying bankruptcy case the Court has regularly approved compensation for similar out-of-pocket expenses.  A party might quibble over some items (such as the mileage charge for

38

weekend work), but a great number of voluntary deductions have already been taken and on the

whole the requested expense reimbursements are reasonable.[4]

The Court will enter a separate Order that reflects the rulings in this Opinion.

Dated:  New York, New York
        March 22, 2017


                                         s/Michael E. Wiles
                                         The Honorable Michael E. Wiles
                                         United States Bankruptcy Judge

---

[4]   As noted above, the parties agreed that an evidentiary hearing was not necessary.  If Netflix
      contends that it decided to forego an evidentiary hearing on the expense issues only because
      it believed that the expense claims should have been barred in their entirety, and if Netflix
      believes it has evidence that the Court should consider as to whether the "expense"
      provision of the License Agreement covers the expenses discussed in this section, then the
      Court will permit Netflix, by motion made no later than fourteen days after the issuance of
      this decision and the accompanying Order, to seek to reopen the matter for the presentation
      of such evidence.