**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
In re                                                    :
                                                         :        **Chapter 11**
**RELATIVITY FASHION, LLC,** *et al.,*                   :
                                                         :        **Case No. 15-11989 (MEW)**
                                        **Debtors.**     :
-------------------------------------------------------------------x

**MEMORANDUM DECISION CONCERNING THE MOTION BY**
**RYAN C. KAVANAUGH TO ENFORCE THE RELEASE AND INJUNCTION**
**PROVISIONS OF THE CONFIRMED PLAN OF REORGANIZATION**

A P P E A R A N C E S :

FARRELL FRITZ P.C.
*Counsel to the Ryan Kavanaugh*
400 RXR Plaza
Uniondale, New York 11556
   By:   Patrick T. Collins, Esq.
           Kristina M. Wesch, Esq.

KASOWITZ BENSON TORRES LLP
*Counsel to Carey Metz*
1633 Broadway
New York, New York 10019
   By:   Matthew B. Stein, Esq.

**MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

     Ryan C. Kavanaugh contends that the release and injunction provisions of the Debtors'

confirmed plan of reorganization and this Court's confirmation order bar certain claims made

against him by Carey Metz in a post-confirmation lawsuit that was filed in California.   Metz

opposes the requested relief on various grounds.   For the reasons set forth below, Kavanaugh's

motion is granted as to certain of the claims asserted in the California litigation but denied as to

others.

### Facts

The Debtors' bankruptcy petitions were filed on July 30, 2015. The co-proponents of the Debtors' Fourth Amended Plan of Reorganization (the "**Plan**") were the Debtors, Ryan Kavanaugh and Joseph Nicholas. (Plan, Art. 1, sec. 114). On February 8, 2016, the Court entered an order confirming the Plan (the "**Confirmation Order**"), and the effective date of the Plan occurred on April 14, 2016.

Kavanaugh was the Chief Executive Officer of the Debtors and a member of the Board of Managers of Relativity Holdings, LLC on the day the bankruptcy petitions were filed; he also was the CEO and co-manager of Relativity Holdings as of the effective date of the Plan. Carey Metz was a shareholder of Relativity Holdings and a member of Relativity Holdings' Board of Managers on the day the bankruptcy petitions were filed, and he continued to serve on the Board of Managers through the effective date. Metz was one of three members on a "special committee" of the board that was responsible for oversight of the bankruptcy process.

Article X, Section F of the confirmed Plan provided for releases of certain claims against "Released Parties." More particularly, it stated:

> . . . EACH RELEASING PARTY SHALL BE DEEMED TO HAVE FOREVER RELEASED AND COVENANTED . . . TO FOREVER RELEASE, WAIVE AND DISCHARGE ALL LIABILITIES IN ANY WAY THAT SUCH ENTITY HAS, HAD OR MAY HAVE AGAINST ANY RELEASED PARTY . . . IN EACH CASE, RELATING TO A DEBTOR, THE ESTATES, THE CHAPTER 11 CASES, THE NEGOTIATION, CONSIDERATION, FORMULATION, PREPARATION, DISSEMINATION, IMPLEMENTATION, CONFIRMATION OR CONSUMMATION THIS PLAN, THE EXHIBITS, THE DISCLOSURE STATEMENT, ANY AMENDMENTS THERETO, THE DIP CREDIT AGREEMENT, THE INITIAL DIP ORDER, THE MODIFIED DIP ORDER, ANY OF THE NEW SECURITIES AND DOCUMENTS, THE RESTRUCTURING TRANSACTIONS OR ANY OTHER TRANSACTIONS IN CONNECTION WITH THE CHAPTER 11 CASES

2

OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER
AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO OR
ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN IN
CONNECTION THEREWITH OR IN CONNECTION WITH ANY OTHER
OBLIGATIONS ARISING UNDER THIS PLAN OR THE OBLIGATIONS
ASSUMED HEREUNDER.

The term "Released Parties" was defined in the Plan as including, among others, the Debtors and

"the Debtors' respective boards of managers and the members thereof each as of the Petition

Date." Art. I, sec. A.131. Both Mr. Kavanaugh and Mr. Metz were members of the Debtors'

boards of managers at the time of the bankruptcy filings.

The term "Releasing Parties" was defined in the Plan as including, among other persons,

any "Released Parties" and also any creditors who had voted in favor of the Plan or who had

checked a ballot box indicating their consent to such releases. Art. 1, sec. A.132. Earlier

versions of the proposed Plan had proposed broader releases by creditors, but at the Court's

direction the definition was modified so that voting creditors were included among the

"Releasing Parties" only if they had affirmatively manifested their consent to grant releases by

voting in favor of the Plan or by checking a box that manifested such consent. However, the

inclusion of "Released Parties" in the definition of "Releasing Parties" was not altered.

An injunction against the pursuit of released claims was set forth in Article X, Section C

of the Plan, which stated as follows:

AS OF THE EFFECTIVE DATE, EXCEPT WITH RESPECT TO THE
OBLIGATIONS OF THE REORGANIZED DEBTORS UNDER THIS
PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE
HELD, CURRENTLY HOLD OR MAY HOLD ANY CLAIMS OR
INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES,
DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION OR LIABILITIES
THAT ARE WAIVED, DISCHARGED OR RELEASED UNDER THIS
PLAN SHALL BE PERMANENTLY ENJOINED FROM TAKING ANY
OF THE FOLLOWING ENFORCEMENT ACTIONS AGAINST THE

3

> DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED
> PARTIES (TO THE EXTENT THE RELEASED PARTIES ARE
> RELEASED BY A RELEASING PARTY) OR ANY OF THEIR
> RESPECTIVE ASSETS OR PROPERTY ON ACCOUNT OF ANY SUCH
> WAIVED, DISCHARGED OR RELEASED CLAIMS, OBLIGATIONS,
> SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS,
> CAUSES OF ACTION OR LIABILITIES: (1) COMMENCING OR
> CONTINUING IN ANY MANNER ANY ACTION OR OTHER
> PROCEEDING . . . .

Neither Kavanaugh, nor Metz, filed any objection to the proposed releases or to the foregoing injunction.

Paragraph 21 of the Confirmation Order approved the releases and injunctions but clarified that no release was provided for claims based on gross negligence or willful misconduct (including fraud).   It provided:

> The injunction, exculpation and release provisions in Article X of the Plan
> shall be effective in accordance with their terms; provided, however, that
> such exculpations and releases shall have no effect on the liability of any
> Released Party or Exculpated Party that results from any act or omission that
> is determined in a Final Order to have constituted gross negligence or willful
> misconduct (including fraud).

Confirmation Order, ¶ 21.   In addition, paragraph 21 confirmed that voting creditors who were not themselves "Released Parties" would only be bound by the releases if they had affirmatively manifested their consent:

> In addition, and for the avoidance of doubt, creditors who are not themselves
> "Released Parties" shall not be bound by any releases of claims against non-
> Debtors except to the extent such creditors (i) voted in favor of the Plan, or
> (ii) voted to reject the Plan but checked a box indicating his, her or its
> willingness to grant such releases.   Creditors who are not Released Parties
> are not giving third party releases except to the extent they elected to do so by
> voting in favor of the Plan or providing a release even though they did not
> vote in favor of the Plan.

*Id.*

4

## The Metz Litigation and the Enforcement Motion

Sixteen months after the Plan became effective, Metz commenced an action in the California Superior Court, on August 17, 2017 (the "**State Court Action**").   Metz alleges that he made a $2 million loan to the Debtors, prior to the Debtors' bankruptcy filings, in reliance on inaccurate and fraudulent statements made by Kavanaugh about the Debtors' financial condition. Metz also alleged that Kavanaugh provided an oral guaranty of the purported loan.   The State Court Action includes the following causes of action: (1) fraudulent inducement by intentional misrepresentation; (2) breach of oral contract; (3) breach of the covenant of good faith and fair dealing; (4) false promise; (5) unjust enrichment; and (6) negligent misrepresentation.

Kavanaugh sought to dismiss the State Court Action, arguing that Metz's claims were barred by a release contained in a separate economic participation agreement, dated February 1, 2016, as well as by releases in the Plan and Confirmation Order.   Kavanaugh's contentions regarding the economic participation agreement required arbitration, and the State Court Action was stayed and the matter was referred to arbitration for that purpose.

On March 27, 2018, Kavanaugh filed a motion in this Court (the "**Enforcement Motion**"), arguing that some of Metz's claims against him fall within the release and injunction provisions of the Debtors' confirmed Plan and the Confirmation Order.   The parties do not dispute this Court's authority to interpret and to enforce its prior Confirmation Order, though they disagree as to the interpretation of that Order.   *See, e.g., In re Residential Capital, LLC*, 508 B.R. 838, 849-50 (Bankr. S.D.N.Y. 2014).

Kavanaugh seeks entry of an order enforcing the terms of the Plan and Confirmation Order and enjoining Metz from continuing any released claim.   He acknowledges that there is

5

an exception in the releases for claims based on a finding of gross negligence or fraud, but he

argues that if Metz pursues claims of gross negligence or fraud, and fails to obtain a court finding

in his favor, Metz should then be held in contempt of this Court's Confirmation Order.

Kavanaugh further moves, under 28 U.S.C. § 1927 and 11 U.S.C. § 105(a), for a reimbursement

of costs, expenses, and attorneys' fees.

Metz contends that the releases approved in the Confirmation Order only bind creditors

who consented to them, and that "[t]here is no evidence that Metz ever provided this consent."

Metz Objection (Dkt. no. 2305) at p. 2.   Alternatively, even if the release and injunction

provisions bind Metz, he argues that all of the causes of action in the State Court Action are

excepted from those provisions by their terms, which provide a carve-out for causes of action

based on actions of "gross negligence" or "willful misconduct," including fraud.   Metz

contends, essentially, that he should be permitted to pursue claims based on negligence (as well

as claims alleging fraud) so long as some portion of the complaint contends that the same

underlying course of conduct constituted "fraud."   Finally, Metz argues that he is not liable for

reimbursement of costs and expenses merely for pursuing actions which he maintains were

asserted in good faith.

A hearing on the Enforcement Motion was held on April 18, 2018 (the "**Hearing**").   At

the Hearing, the Court made certain rulings that are described below.   The Court separately

raised the question of whether the inclusion of members of the board of managers of Relativity in

the definition of "Released Parties" applied to such persons only in those capacities, or whether

the release terms applied generally to all claims that might be made by or against the individuals

who served in those capacities, without regard to whether the claims arose from their service in

those capacities.   The Court directed further briefing on this issue and it has reviewed and

considered the parties' submissions.

### Metz's Contention that He Is Exempted by His Alleged Lack of Consent

Metz initially argued that the releases proposed in the Plan would have covered him as a

"Releasing Party," but that the Court allegedly vitiated all of the proposed releases in the Plan

except for those given by creditors who voted in favor of the Plan or who checked a ballot box

indicating a consent to grant releases.   Metz cited to paragraph HH of the "Findings of Fact and

Conclusions of Law" section of the Confirmation Order, in which the Court cited, as one of the

factors that justified the approval of the releases, that the Third-Party Releases "are binding only

on Releasing Parties who have consented to those releases *and* on creditors who have consented

to the granting of such releases either by voting in favor of the Plan, or by voting to reject the

Plan but affirmatively electing to provide releases by checking the appropriate box on the ballot

form."   Confirmation Order, ¶ HH (emphasis added).   Metz contends that he did not submit a

ballot and therefore that he is exempt from the releases.

It certainly is true that the Court limited the releases given by holders of claims who were

entitled to vote.   However, Metz misinterprets both the Plan and the Confirmation Order by

contending that the Court also vitiated the proposed releases that were being given by the

"Released Parties" themselves.

It was always the Court's understanding that the Released Parties had consented to their

inclusion as "Releasing Parties" in the Plan in consideration of the releases they were being

given.   Accordingly, the Court approved releases given by Released Parties as releases to which

those parties had consented, as referenced in the portion of paragraph HH that states that the

7

releases are binding "on Releasing Parties who have consented to those releases."   Although the

Court separately limited the extent to which voting creditors would be considered to be

"Releasing Parties," the inclusion of "Released Parties" among the "Releasing Parties" was

never changed.   Paragraph 21 of the Confirmation Order, which is the operative paragraph,

makes this abundantly clear:

> In addition, and for the avoidance of doubt, creditors who are not themselves
> "Released Parties" shall not be bound by any releases of claims against non-
> Debtors except to the extent such creditors (i) voted in favor of the Plan, or
> (ii) voted to reject the Plan but checked a box indicating his, her or its
> willingness to grant such releases.   Creditors who are not Released Parties
> are not giving third party releases except to the extent they elected to do so by
> voting in favor of the Plan or providing a release even though they did not
> vote in favor of the Plan.

Confirmation Order, ¶ 21.   As stated in paragraph 21, the limitation of releases to creditors who

had voted in favor of the Plan, or who had voted against confirmation but had checked a box

indicating their willingness to give releases, applied only to the extent that those creditors were

not themselves "Released Parties."

Metz did not challenge the proposed releases at the confirmation hearing and did not

challenge his inclusion as a "Released Party" or as a "Releasing Party."   Metz also has made no

argument that he was unaware of the releases when the Plan was submitted.   Metz's counsel

acknowledged at the Hearing that Metz, as a manager of Relativity Holdings, had been asked to

approve the filing of the proposed Plan, and that he had done so.   Hr'g Tr., 9:17 – 11:4.

Counsel professed not to know for certain Metz was aware of the proposed release provisions

and of his inclusion as a "Released Party," *id*. at 14:1-7, but counsel acknowledged that it was

safe to presume that Metz had read the Plan before voting to approve it and to presume that Metz

was knowledgeable as to the release terms.   *Id*. at 9:24 – 10:15.

8

Metz argued that his vote to approve the Plan should not be considered as "evidence" of his own consent to the releases.   As the Court noted at the Hearing, however, many courts have treated a creditor's vote in favor of a Plan as a "consent" to the releases contained therein.   *See Chassix Holdings, Inc*, 533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015) (citing *Metromedia*, 416 F.3d at 142; *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1047 (7th Cir.1993); *In re MPM Silicones*, LLC, No. 14–22503, 2014 WL 4436335, at *32 (Bankr. S.D.N.Y. Sep. 9, 2014)); *see also Sun Edison, Inc.*, 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017).   If a creditor's vote in favor of a plan is fairly taken as a "consent" to the releases therein, then a manager's approval and authorization of the filing of a Plan (and his approval of his inclusion in the list of persons who would give releases and who would benefit from them) should similarly constitute evidence of the manager's "consent" to the proposed releases.

Metz further argued that he was subject to fiduciary duties in voting to approve the filing of the Plan, and that for this reason his vote should not be considered as a personal consent to the releases.   *See* Metz Opposition at 2, 6, 8, 12.   However, there was nothing in Metz's fiduciary duties to Relativity that barred Metz from objecting to his own inclusion as a "Released Party" and as a "Releasing Party" for purposes of the Plan.   Metz elected instead to support a Plan that included him among the Releasing Parties.

In any event, the Confirmation Order was entered with the understanding that the Released Parties had consented to the releases.   In light of "the findings that are in the confirmation order and the representations that were made at the time of confirmation that supported them," and the admitted fact that Metz voted in favor of the Plan, the Court ruled at the Hearing that if Metz wished to challenge the application of the releases to him (and to

9

challenge whether he had actually consented to them) he would need to file an appropriate application to the Court for relief from the terms of the Confirmation Order, and would need to provide an appropriate procedural and factual basis for such relief.   Hr'g Tr., 23:12-24.   In the absence of such an application Metz will continue to be treated as a "Released Party" and as a "Releasing Party" for purposes of the releases set forth in the Plan and approved in the Confirmation Order.   Hr'g Tr., 23:24-25:3.   Metz has not made such an application.

### <u>Whether the Releases Apply to Metz's Individual Claims</u>

The Court raised the issue of whether the reference in the Plan to released parties as including the Board of Managers meant "only claims they had in that capacity and whether it actually, by its terms under ordinary interpretation of releases, would bar the claims that Mr. Metz wants to assert."   Hr'g Tr., 24:5-8.   The parties have made additional submissions to address this point.

Courts construe the scope and meaning of a release by applying contract interpretation principles.   *Shugrue v. Pension Benefit Guar. Corp. (In re Ionosphere Clubs, Inc.)*, 147 B.R. 855, 861 (Bankr.S.D.N.Y.1992).   Article XII, Section J of the Plan provides that "the rights, duties, and obligations arising under [the] Plan" are to be construed in accordance with New York State law to the extent that the Bankruptcy Code or other federal law is inapplicable to an issue.   Pursuant to New York law, an unambiguous release is "enforced according to the plain meaning of its terms."   *Alvarez v. Amicucci*, 82 A.D.3d 687, 688, 918 N.Y.S.2d 144, 145 (App. Div. 2011).   New York law further provides that released parties need not be named or specifically identified in a release provision and may specified by use of a descriptive category of persons (such as attorneys, agents, officers).   *Wells v. Shearson Lehman/Am. Express, Inc*., 72

N.Y.2d 11, 18, 21 (1988).    Nor is a release provision that contains such general language

necessarily ambiguous requiring resort to extrinsic evidence.    *Id*. at 18.    As specificity is not

required, courts must determine the intent of the language by applying general contract

interpretation principals and resorting to extrinsic evidence only when the court concludes as a

matter of law that the contract is ambiguous.    *Id*. at 19.

There are instances in which a release is granted in favor of an "officer" or an

"employee" and in which the context makes clear that the releases is given only as to acts taken

in that listed capacity.    *See, e.g., In re Thomson McKinnon Secur., Inc.*, 132 B.R. 9 (Bankr.

S.D.N.Y. 1991).    In *TMSI*, the debtor filed an action to collect the unpaid balance of a loan it

had made, prior to bankruptcy, to an individual who at the time of the loan was a vice president

and director of the debtor.    The borrower left his position with TMSI and took a new job with an

affiliated asset management partnership.    During bankruptcy, TMSI sold its interests in the asset

management partnership, and in connection with that sale it released claims against three named

individuals, the partnership, and "all affiliates, successors, assigns, directors, officers, employees

and agents of the Released Parties and their respective subsidiaries and affiliates."    *Id*. at 10.

The borrower sought summary judgment in the loan action, and contended that TMSI's release

of claims against him as an "officer" of the asset partnership applied to TMSI's claim to recover

the unpaid balance of the loan, even though the loan predated his time as an officer of the

partnership and had nothing to do with his service in that capacity.

Judge Shwartzberg denied the borrower's request for summary judgment in *TMSI*.    He

noted that the release specifically named, as releasees, three individuals who were officers of the

asset management partnership, and observed that there would have been no reason to identify

11

those three individuals by name if the separate release of "officers" had been intended to release

claims "unrelated to their conduct as officers and employees." *Id.* at 11. He also noted that no

plausible explanation had been offered as to why TMSI would have elected to release the

borrower from the loan obligation in connection with the separate sale of the asset management

business. *Id.*

Similarly, in *Adams v. Judson*, 277 N.Y.S. 304, 307 (1st Dept. 1935), the court held that

further evidence was needed to determine whether a release of "officers" applied to unrelated

claims for the recovery of unremitted proceeds from a stock sale. In other cases, however,

courts have held that a general release of claims against "officers" conveys a release of all claims

against the relevant individuals, regardless of whether the claims arose from the individuals'

service in those capacities. *See, e.g., Pro Bono Invs., Inc. v. Gerry*, No. 03 Civ. 4347, 2008 WL

4755760 (S.D.N.Y. Oct. 29, 2008).

In *Pro Bono Invs.*, the Court held that the release of claims against officers of one party

barred the plaintiff from attempting to sue an individual officer for related acts that he allegedly

had performed in a different capacity. *Id.* at \*22-23. Judge Koeltl held that it would have

made no sense for the parties to have made the distinction the plaintiff sought, that the release

was clear on its face and that the effort to limit its scope was without merit. *Id.* at \*22. He

reviewed the *TMSI* decision and held that, in contrast to *TMSI*, there was no reason to think that

persons had to be named individually (and not named generally as "officers") in order to benefit

fully from the releases that were given. *Id.*

Based on the foregoing, it appears that there is no automatic rule regarding the effect of

naming "officers" or "managers" as released parties. Instead, the terms of the release agreement

12

must be examined as a whole to determine if the intent of the parties is clear and to determine whether there are any ambiguities that require further evidence and further proceedings. In this particular case, the Court concludes that Mr. Kavanaugh has the better argument and that the release provisions are not ambiguous.

First, there are other provisions in the Plan in which releases are made applicable to certain described entities only in their designated capacities as such. For example, the definition of "Released Parties" includes the "Representatives" of the various described entities. The definition of "Representatives" includes agents, attorneys, and others, but "solely in such capacity." Plan, Art. I, sec. A.141. No similar limitation applies to the references to the members of the boards of managers in the definition of "Released Parties." Similarly, the "Initial DIP Lenders" are included among the Released Parties, but the definition of "Initial DIP Lenders" includes the entities to who made certain loans "solely in such capacity." Plan, Art. 1, sec A.75. The inclusion of limiting "capacity" language as to some released parties, but the failure to include similar limitations as to the members of the boards of managers, supports the conclusion that the omission of such a limitation as to the managers was deliberate. *United States Fidelity & Guar. Co. v. Annunziata*, 67 N.Y.2d 229, 233 (1986).

Second, this case is far different from the circumstances that were before the court in *TMSI*. Here, one of the main purposes of the releases in favor of the members of the boards of managers was to limit lawsuits based on pre-bankruptcy fund-raising. There was no reason why the release granted in *TMSI* should have applied to an unrelated pre-existing loan, but there was every reason why the releases in this case were expected to apply to claims of the type that Metz has now made against Kavanaugh. The broad wording of the release – which applies by its

13

terms to "all liabilities in any way" that each Releasing Party has against "any Released Party" that relates to "a Debtor" – plainly conveys that it was to have a broad scope.

<u>Third</u>, it must be noted that the only argument that Metz made in opposition to the Enforcement Motion was that the Court allegedly had only approved releases by voting creditors and that Metz had not submitted a ballot.   He did not argue in his initial papers that the releases were limited to claims that he might own in his capacity as a member of the boards of managers of the Debtors, and apparently did not believe that the releases had such a limited scope.   The Court raised the question as to whether, as a matter of law, the reference to "managers" in the releases should necessarily be limited to claims by or against persons in those capacities, and the Court is satisfied based on the above case law that there is no such automatic limitation as to the scope of a release.   Given Metz's prior contentions, there is no credible argument that he ever had a contrary view as to the effect of the release, or that there is any legitimate ambiguity in the release provision or as to the parties' intent.

## Other Contentions of the Parties

The Confirmation Order provided that the releases would not relieve parties of liabilities for fraud or gross negligence.   *See* Confirmation Order, ¶¶ HH, 21.   There is no dispute over this.   Hr'g Tr., 7:10-13, April 18, 2018 (Debtor's counsel acknowledging that the fraudulent inducement and false promises claim fall within the carve-out).   At one point, Kavanaugh's counsel noted that the exclusion in paragraph 21 of the Confirmation Order only applies to a liability "that is determined in a Final Order to have constituted gross negligence or willful misconduct (including fraud)," and took the position that any "unsuccessful" pursuit of a claim alleging fraud or gross negligence should be treated retroactively as a violation of the Court's

injunction that would be subject automatically to contempt sanctions.   This is an absurd

interpretation of the relevant language.   The relevant language carved out liabilities for gross

negligence and willful misconduct from the releases; courts cannot rule on such alleged

liabilities without the pursuit of an underlying claim, and there is nothing in the good faith

pursuit of claims that allege fraud and gross negligence (whether they prove successful or not)

that would constitute grounds for a contempt finding.

Metz's counsel argued that although the Confirmation Order only excludes claims based

on "gross negligence" or "willful misconduct" from the releases, Metz should nevertheless be

able to pursue claims based on negligence and negligent misrepresentation so long as elsewhere

in his complaint he contends that the relevant underlying conduct also constitutes fraud.   Hr'g

Tr., 22:18-21.   This, too, is an absurd interpretation of the relevant terms of the Confirmation

Order.   The only claims excepted from the release provisions are those based on "gross

negligence or willful misconduct (including fraud)," and those are the only claims that Metz may

pursue.   He may not pursue claims that seek or permit recovery for conduct that is merely

negligent.   The only causes of action in the State Court Action that are permitted are the First

Cause of Action (alleging fraudulent inducement by intentional misrepresentation) and the

Fourth Cause of Action (false promise).   The remaining causes of action do not allege either

"gross negligence or willful misconduct (including fraud)" and, therefore, are barred by the

release and injunction provisions.

Finally, Metz argues in his most recent submission that the terms of the economic

participation agreement dated February 1, 2016 (the "**EPA**") allegedly preserve the "guarantee"

claim that Metz wishes to pursue against Kavanaugh.   Metz did not raise this issue in his initial

15

response to the Enforcement Motion, and instead raised it only after the Hearing, as an additional item in a submission that was supposed to be limited to the separate issue that the Court had raised regarding the effect of naming "managers" in a release.    Metz also has offered no excuse as to why the argument could not have been raised earlier.    The issue therefore is properly foreclosed.

In addition, Metz's argument plainly lacks merit.    He correctly notes that the releases in the Plan do not apply to liabilities of "any entity that would otherwise result from the failure to perform or pay any obligation or liability under this Plan or any contract, instrument, release or other agreement or document" entered into during the chapter 11 cases.    Plan, Art. X, Sec. F(A).  However, the claims in the State Court Action are not based on the terms of the EPA or the terms of any other contract entered into during the chapter 11 cases.    Instead, the claims are based on an alleged loan that predated the chapter 11 cases.    Metz cites to the release provisions in the EPA and contends that the release in the EPA itself does not apply to "preserved" claims, and that his guaranty claim against Kavanaugh was a "preserved" claim for this purpose.    However, that argument fails for two reasons.    First, there is nothing in the EPA that suggests that the guaranty claim was a "preserved" claim, or that identifies any "preserved" claim at all, other than claims to enforce the EPA itself.    Second, even if the guaranty claim was *excluded* from the releases granted in the EPA, and thereby "preserved" in the face of those releases, that would not be sufficient to turn the pre-petition alleged guaranty into a liability that results from "the failure to perform or pay" an obligation under the Plan or under an agreement made during the chapter 11 cases.

16

**<u>Reimbursement of Costs and Expenses</u>**

The Court declines to award costs, expenses or attorneys' fees in connection with the

Enforcement Motion.   It is plain that the main claims against Kavanaugh in the State Court

Action are based on allegations of willful misconduct.   Metz and his counsel were wrong in

adding claims for negligence, but given all the circumstances their actions are not so egregious as

to warrant sanctions.

A separate Order will be entered to reflect the foregoing rulings.

Dated: New York, New York
       June 7, 2018

                                           /s/ **Michael E. Wiles**
                                           UNITED STATES BANKRUPTCY JUDGE